STEVEN G. KALAR
Federal Public Defender
BRANDON M. LEBLANC
Assistant Federal Public Defender
19th Floor Federal Building
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700
Email: brandon_leblanc@fd.org

Counsel for Defendant Luke Brugnara

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | ) | CASE NO. CR 14-00306 WHA |
|---|---|---|
| | ) | CASE NO. CR 08-00222 WHA |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DEFENDANT'S MOTION TO REVOKE** |
| | ) | **MAGISTRATE COURT DETENTION** |
| LUKE BRUGNARA, | ) | **ORDERS** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**INTRODUCTION**

Defendant Luke Brugnara, by and through his counsel, Brandon LeBlanc and the Office of the Federal Public Defender, hereby moves this Court to revoke both detention orders issued by Magistrate Judges Corley and Cousins and to order Mr. Brugnara released on reasonable bail conditions. Specifically, Mr. Brugnara urges this Court to release him on a $500,000 bond, secured by $10,000 to be deposited with the Clerk of the Court, as well as the signatures of Kay Brugnara, his wife and would-be custodian, Vicki Brugnara, his mother, and Bishop Donald Pipkins, a dear and long-term friend. Mr. Brugnara further proposes that while on release (and as in the past), he would be subject to highly restrictive home detention with electronic monitoring and any other appropriate conditions the Court sees fit to impose upon him.

Importantly, this bail proposal is akin to the bail that Mr. Brugnara was released on *after* he had sentenced by this Court to a thirty month sentence on May 24, 2010 – and was then permit to self-surrender to FCI La Tuna in Anthony, Texas in the following month.  *See* CR 08-00222 WHA, Docket Entry Nos. 126, 135, 129.  Indeed, if ever there was evidence that Mr. Brugnara is bail-worthy under the Bail Reform Act, *see* 18 U.S.C. §§ 3141, *et seq.*, and will comply with any conditions of release, it is that– even after he was sentenced, released and permitted to self-surrender with the certainty that he was going to be imprisoned for thirty (30) months – he did not flee nor otherwise violate any condition of his post-sentencing release.  Instead, just as he was ordered to do, Mr. Brugnara drove, with his wife and custodian Katherine, from San Francisco to Texas so that Mr. Brugnara could timely surrender to the Bureau of Prisons to begin his two-and-a-half-year prison sentence.  This fact, in addition to many more set forth herein, illuminates why this Court ought to revoke both detention orders issued by the magistrate courts and order Mr. Brugnara immediately released on very restrictive bail conditions.

## PROCEDURAL BACKGROUND

Mr. Brugnara is very familiar to this Court, having first been indicted for filing false tax returns on April 3, 2008.  *See* CR 08-00222 WHA, Docket Entry No. 1.  Two weeks later, on April 17, 2008, Mr. Brugnara made his initial appearance on the indictment and was ordered released by the magistrate court on his own recognizance.[1]  *See* CR 08-00222 WHA, Docket Entry No. 2.  Mr. Brugnara then uneventfully remained on pre-trial release for the next twenty (20) months until January 2010, timely appearing at least twenty-four court appearances during that period.  *See* CR 08-00222 WHA, Docket Entry Nos. 3-73; *see also* CR 08-00236 MMC Nos. 1-53.

---

[1] On the same day, Mr. Brugnara made his initial appearance (and was also ordered released on his own recognizance) in CR 08-00236 MMC, wherein he was charged by indictment with violations of the Endangered Species Act and making False Statements.  *See* CR 08-00236 MMC, Docket Entry Nos. 1, 6.

On March 5, 2010, on the government's motion, Magistrate Judge Spero remanded Mr. Brugnara into custody, after finding that Mr. Brugnara had violated the terms of his pretrial release by visiting his residence at 224 Sea Cliff Avenue in the prior month – which he was prohibited from doing at the time. *See* CR 08-00236 MMC, Docket Entry Nos. 64, 67, 69. Mr. Brugnara then remained in custody until May 2010.

On May 26, 2010 – two days *after* he was sentenced by this Court in CR 08-00222 WHA and on the same day that he was sentenced in CR 08-00236 MMC – Magistrate Judge Joseph Spero ordered Mr. Brugnara released on a $1,000,000 bond secured by his home at 224 Sea Cliff Avenue and with his wife Katherine Brugnara to serve as his surety and custodian. *See* CR 08-00222 WHA, Docket Entry Nos. 128, 130, 135; CR 08-00236 MMC, Docket Entry No. 102. Mr. Brugnara was also to be subject to electronic monitoring upon release and was ordered by Magistrate Judge Spero to self-surrender to his designated Bureau of Prisons ("BOP") facility by no later than June 18, 2012. Consistent with that order, Mr. Brugnara drove with his wife over 1,150 miles from California to Texas and timely self-surrendered to FCI La Tuna on June 18, 2010. *See* CR 08-00222-WHA, Docket Entry No. 139.

In 2012, Mr. Brugnara was released from the BOP in Texas and traveled – by himself – back to California, where he was ordered to report to a halfway house in San Francisco to continue serving out a portion of his BOP sentence. Mr. Brugnara timely reported to the halfway house and resided there without issue before, in time, transitioning to home detention with electronic monitoring to serve out the final months of his BOP sentence at his home at 224 Sea Cliff Avenue in San Francisco.[2]

On August 17, 2012, Mr. Brugnara began his one-year term of supervised release. *See* CR 08-00222 WHA, Docket Entry No. 189. On June 4, 2013, nine months into his supervision

---

[2] Mr. Brugnara completed the entirety of his BOP sentence, including the time in-custody, in the halfway house and on home detention with electronic monitoring, without issue.

DEF.'S MOT. TO REVOKE DET. ORDERS, *U.S. v. Brugnara*, CR 14-00306 WHA & CR 08-00222 WHA       3

term, the United States Probation Office ("U.S.P.O.") filed a Form 12 petition alleging that Mr. Brugnara had violated the terms of his supervised release. *Id.* Months later, on October 22, 2013, Mr. Brugnara admitted to violating his supervised release by failing to truthfully answer inquiries from his probation officer. *See* CR 08-00222 WHA, Docket Entry Nos. 230, 231. This Court then imposed a revocation sentence of one day in custody with 364 days of additional supervised release to follow.[3] *See* CR 08-00222 WHA, Docket Entry No. 231.

On May 28, 2014, after being supervised by the U.S.P.O. for approximately twenty-one months, Mr. Brugnara was arrested by the F.B.I. for a criminal complaint charging him with mail fraud, in violation of 18 U.S.C. § 1341. *See* CR 14-306 WHA, Docket Entry No. 11. That same day, he appeared before Magistrate Judge Corley for his initial appearance. *See* CR 14-00306 WHA, Docket Entry No. 5. During that appearance, Mr. Brugnara, as is his tendency, addressed the magistrate court at length and urged the court to immediately release him. *See* Exhibit C: *Transcript of May 28, 2014 Proceedings*. Judge Corley, on the government's motion that Mr. Brugnara be detained on the grounds of "flight, but primarily danger[,]" ordered him remanded to United States Marshal custody pending a detention hearing scheduled two days later for May 30, 2014. *See* Exhibit C: *Transcript of May 28, 2014 Proceedings*, at 6.

On the following day, May 29, 2014, the U.S.P.O. filed a Form 12 petition seeking to revoke Mr. Brugnara's supervised released based on the new mail fraud charge. *See* CR 08-00222 WHA, Docket Entry No. 247.

Magistrate Judge Corley then conducted a detention hearing on May 30, 2014 and at the conclusion of the proceeding, ordered Mr. Brugnara detained. *See* CR 08-00222 WHA, Docket Entry No. 248. In her written order of detention, Judge Corley indicated that Mr. Brugnara bore

---

[3] After the Form 12 was filed in June 2013 and continuing until his arrest on May 28, 2014, Mr. Brugnara had roughly a dozen court appearances before the magistrate court(s) and this Court. As he had between 2008 and 2010, Mr. Brugnara timely made all of his appearances. *See* CR 08-00222 WHA, Docket Entry Nos. 194-245.

1 the burden of establishing by clear and convincing evidence that he was neither a flight risk nor a
2 danger to the community, because he was on supervised release when charged with the new mail
3 fraud offense. *See* CR 08-00222 WHA, Docket Entry No. 250, at 2. On the issue of flight (or
4 non-appearance), Judge Corley found that Mr. Brugnara does not pose a risk of non-appearance
5 because of his long-standing ties to the community and his history of consistently making his
6 court appearances. *Id.* However, in Judge Corley's view, Mr. Brugnara had not demonstrated
7 that he would be amenable to supervision (specifically at the halfway house) because of his (1)
8 in-court behavior and (2) that he had previously admitted to violating the terms of his supervised
9 release before this Court in October 2013.[4] *Id.* On the issue of danger, Judge Corley – relying in
10 large part on this Court's March 2011 observation that Mr. Brugnara "has a history of doling out
11 threats of violence, and several individuals have obtained restraining orders against him" as well
12 as Mr. Brugnara's obstreperous in-court behavior – concluded that he posed a danger to the
13 community and was not amenable to supervision.[5] *Id.*

14 On June 5, 2014, Mr. Brugnara was indicted for mail fraud. *See* CR 14-00306 WHA,
15 Docket Entry No. 9. On or about the same day, Mr. Brugnara asked the magistrate court to
16 reopen the detention hearing because two sureties had since come forward – his wife and mother
17 – following the May 30, 2014, detention hearing before Judge Corley. A bail-review hearing was
18 scheduled for June 11, 2014 before Magistrate Judge Nathanael Cousins. *See* CR 14-00306
19 WHA, Docket Entry No. 10.

20 On June 11, 2014, after hearing from the parties, Judge Cousins denied Mr. Brugnara's
21 request for bail and declined to modify Judge Corley's prior detention order. *See* CR 14-00306

---

[4] Because Mr. Brugnara successfully completed his time a in San Francisco halfway house after his release from a BOP facility in 2012, it follows that, if released here, he would again be amenable to supervision at the halfway house and would comply with any other court-ordered conditions.

[5] The subject restraining orders are exceedingly stale and trace back to 2002 and before. *See* CR 08-236 MMC, Docket Entry No. 64.

1  WHA, Docket Entry No. 15. Specifically, Judge Cousins likewise concluded that Mr. Brugnara
2  had failed to establish by clear and convincing evidence that he was not a flight risk nor a danger
3  to the community, emphasizing especially Mr. Brugnara's courtroom demeanor and airing
4  concerns that Mr. Brugnara poses an economic danger to the community. *Id.*
5      Thereafter, on June 17 and June 18, 2014, Mr. Brugnara took the stand and testified
6  during his supervised release revocation proceedings. *See* CR 08-00222 WHA, Docket Entry
7  Nos. 279, 280. Prior to taking the stand, Mr. Brugnara explained to the Court that he desperately
8  wanted to testify, in part to vindicate himself, but also so that this Court could "hear [his] side of
9  the story so [the Court] can make an informed decision when we do come at a later time on a bail
10 request, so at least you hear both sides of the story." CR 08-00222 WHA, Docket Entry No. 283,
11 at 22. Mr. Brugnara explained further:

12 > The bottom line, though, is for me the opportunity to get reasonable bail.
> Once you hear my side of the story, I think it would be compelling for you to
13 > consider it, and I don't even think I can make it 40 days there.
> Okay. So the fact is I need to have that opportunity of getting reasonable
14 > bail, even if it means previewing my case, but at the end of the day, I don't think
> there's a problem in previewing my position because it's the truth, and I don't
15 > have anything to hide. It's transparent. It's going to be my accurate depiction of
> what happened as I understood it, and that's all I want to tell the Court today, and
16 > I – and I have to.

17 CR 08-00222 WHA, Docket Entry No. 283, at 23.
18     Mr. Brugnara now appeals to this Court, urging this Court to revoke both detention orders
19 and release him on highly stringent bail conditions.

20                                    **ARGUMENT**

21     Under the Bail Reform Act, "[o]nly in rare circumstances should release be denied, and
22 doubts regarding the propriety of release should be resolved in the defendant's favor." *U.S. v.*
23 *Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) (citing *U.S. v. Motamedi*, 767 F.2d 1403, 1405 (9th
24 Cir. 1985)). With this unequivocal guiding principle in mind, this Court, based on its
25 independent review of the record, should grant Mr. Brugnara's instant motion, revoke the
26 magistrates' detention orders, and order Mr. Brugnara released subject to home detention with

electronic monitoring as he has consistently proven that he poses no flight risk and is not dangerous. *See* Fed. R. Crim. P. 32.1(a)(6); 18 U.S.C. §§ 3142(g) and 3145(b).

I.  **Standard of Review**

Mr. Brugnara may challenge the magistrates' detention orders before this Court. *See* 18 U.S.C. § 3145(b). The magistrates' findings should be treated "with no deference," and this Court "should review the evidence before the magistrate[s] and make its own independent determination whether the magistrate[s'] findings are correct." *See United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990). Differently stated, this Court has a duty "to make its own 'de novo' determination of facts." *See id.* Because Mr. Brugnara is on supervised release, he bears the burden of showing by clear and convincing evidence that he will not flee or pose a danger to any other person or to the community. *See* Fed. R. Crim. P. 32.1(a)(6); 18 U.S.C. § 3143(a)(1).

II.  **Mr. Brugnara Has Consistently Demonstrated For Years That He Is Not a Flight Risk Nor A Risk of Non-Appearance**

Mr. Brugnara has a long, unbroken history of making *all* of his scheduled court appearances – without fail. In CR 08-00222 WHA (and CR 08-00236 MMC), between April 2008 and early 2010, Mr. Brugnara dutifully attended at least 24 hearings while on pre-trial release, despite facing a potentially significant prison term along the way. *See* CR 08-222 WHA, Docket Entry Nos. 3-73; *see also* CR 08-00236 MMC, Docket Entry Nos. 1-53.

Then, after he was remanded in March 2010 and sentenced by this Court to thirty (30) months in prison for multiple felony convictions in May 2010, Mr. Brugnara was again ordered released from custody (under identical conditions as being proposed here) so that he could self-surrender at a federal correctional institution weeks later. As directed, Mr. Brugnara and his wife Katherine, who is ready and willing to serve as a surety and custodian for her husband should he be released by this Court, drove over 1,150 miles to Anthony, Texas so that he could self-

//

//

DEF.'S MOT. TO REVOKE DET. ORDERS, *U.S. v. Brugnara*, CR 14-00306 WHA & CR 08-00222 WHA     7

surrender.[6] Mr. Brugnara timely self-surrendered to the BOP at FCI La Tuna on June 18, 2010.

Moreover, in addition to having an unblemished history of appearing as directed while on pre-trial *and* post-conviction release, Mr. Brugnara's long and deep ties to the community are legion. As this Court is aware, Mr. Brugnara is a fourth generation San Franciscan who has lived in the Bay Area for almost the entirety of his life. His entire family is here, including his siblings, his mother (who is unfortunately ill and battling colon cancer) and his wife of twenty-years and his four minor children who need their father. *See* Exhibit D: *Letter to the Court*.

In short, Mr. Brugnara is clearly rooted here, has no incentive to flee and has already demonstrated over the years that he will not flee and will timely appear at Court as directed if he is released from custody. *See* 18 U.S.C. § 3142(g)(3)(A) (listing family ties, length of residence in the community, and community ties as relevant factors to consider when determining whether to release defendant). And as he shared with the Court in recently proceedings, he strongly wishes to be released so that he can be reunited with his ailing mother, as well as his wife and children, and fully recognizes that failing to appear for court would both imperil his ability to with his family and also place them in financial ruin.

### A. Nor Does Mr. Brugnara Pose a Risk of Flight Because He Has Been Charged with Mail Fraud, Which Carries a Twenty (20) Year Maximum Sentence

Mr. Brugnara faces a maximum penalty of twenty years in prison should be convicted of mail fraud. *See* 18 U.S.C. § 1341. However, this increased maximum exposure does not portend that he suddenly poses an increased risk of flight. As already explained, Mr. Brugnara has already stared down a certain lengthy prison sentence before – a thirty month sentence imposed by this Court – and he did not flee when he *clearly* had an opportunity to do so when he was

---

[6] FCI La Tuna is located approximately twenty-five (25) miles from the United States-Mexico International Border. *See* FCI La Tuna, http://www.bop.gov/locations/institutions/lat/ (last visited June 24, 2014).

permitted to self-surrender to BOP.  Instead, rather than flee, he timely self-surrendered to FCI La Tuna to begin his first (and only) prison sentence.

On this same point, when Mr. Brugnara previously appeared before this Court in CR 08-00222 WHA, he faced a total maximum sentence of twelve (12) years, based on the four counts each carrying a maximum term of three years.  *See* CR 08-00222 WHA, Docket Entry No. 68; 26 U.S.C. §§ 7206(a), 7212.  Likewise, in the previous matter before District Judge Chesney, Mr. Brugnara also faced a maximum sentence of twelve (12) based, based on two counts of false statements, which each carried a possible maximum term of five years, and four Endangered Species Act counts, which each carried possible maximum term of six months.  *See* CR 08-00236 MMC, Docket Entry No. 1; 18 U.S.C. § 1001; 16 U.S.C. §§ 1538(a)(1)(G), 1540(b)(1).  In other words, even though Mr. Brugnara faced very lengthy potential prison terms in both of these cases, Mr. Brugnara unfailingly attended *every* hearing before this Court and District Judge Chesney alike, and he later self-reported to a prison more than eleven hundred miles away, right on the U.S.-Mexico International Border, fully away that he was self-surrendering on a lengthy prison term.  The increased maximum penalty in this case therefore should not materially influence this Court's analysis about whether he poses an increased risk of flight.

**B.  The Whereabouts of the Allegedly Missing Art Is Not Relevant to Whether Mr. Brugnara Poses a Flight Risk**

Then there is allegedly missing piece of art: a Valsuani Foundry Degas Little Dancer sculpture.  This too is not relevant to whether Mr. Brugnara poses a flight risk.  As an initial matter, Mr. Brugnara flatly disputes that the alleged piece of art was ever delivered to his home and testified that he has no knowledge of its existence or whereabouts.  But, beyond that, its whereabouts – even if was delivered and is an authentic, high-value art piece that has gone missing – still (1) has little bearing on whether Mr. Brugnara will appear for his court dates and comply with supervision if he was released on strict home detention with electronic monitoring and (2) is not a basis to conclude that Mr. Brugnara would not appear.

Much more relevant is Mr. Brugnara's long history of making all of his court appearances, a fact which Judge Corley emphasized in her finding that Mr. Brugnara did not pose a flight risk. *See* CR 08-00222 WHA, Docket Entry No. 250. Further, consideration of the allegedly missing art goes to the weight of the evidence against Mr. Brugnara, which the Ninth Circuit has repeatedly emphasized is the least important factor to consider when determining whether to release Mr. Brugnara. *See Motamedi*, 767 F.2d at1408 ("[T]he weight of the evidence is the least important of the various factors.").

### III. Mr. Brugnara Does Not Pose a Physical Danger to the Safety of the Community

Mr. Brugnara is presently charged with a non-violent offense (mail fraud) and his history shows that he does not pose any physical danger to the safety of any other person or to the community. The proof: at fifty years-old, he has never been convicted of a violent crime. *See* Exhibit E: Presentence Report, CR 08-00222 WHA. As the Court is aware, his recent criminal history consists exclusively of white-collar offenses and an obscure violation of the Endangered Species Act. *Id.* Mr. Brugnara is precisely the type of non-violent defendant, whom the Bail Reform Act envisioned should be released.

The government's heavy emphasis on stale restraining orders and alleged past threats, which were entered against Mr. Brugnara in 2001 and before, is misplaced and is hardly relevant, if at all, to evaluating whether Mr. Brugnara presently poses a danger to the community. But, more than that, even the stale restraining orders and past alleged threats relied upon the government (and which this Court referenced in March 2011) do not include or reference any actual physically violent conduct by Mr. Brugnara. In other words, while the allegations contained within restraining orders from 2002 and before would obviously be concerning to this Court, it is important that the Court understand that allegations, even if true (which Mr. Brugnara refutes) did not include any actual physical violence whatsoever – just considerable amount of would-be hollow threats and bluster.

//

As this Court is acutely aware, having had him in this Court since 2008, Mr. Brugnara is prone to blustering. In court, for instance, he is often animated, obstreperous and overly talkative, over the advice of his counsel. In light of such conduct, it is perhaps unsurprising that both magistrate court based danger analsyses, in part, on Mr. Brugnara's in-court demeanor.

However, Mr. Brugnara's in-court demeanor, while disruptive at times, is not accompanied by any actual physical violence in his background – other than allegations of threats that were not acted upon. Therefore, his in-court behavior, while concerning, does not support the conclusion that he presently poses a danger community, given that, at fifty, he has never been convicted of any violent offense. *See* Exhibit E: Presentence Report, CR 08-00222 WHA. This fact, far more than Mr. Brugnara's contentious in-court behavior, demonstrates that he is not a danger to the community nor himself.

This conclusion is also supported by two court-ordered forensic psychological examinations that occurred since 2010 (and the second of which was completed merely months ago). Both psychological evaluations concluded that, while Mr. Brugnara may be grandiose and defiant at times, he poses no danger to the community. *See* CR 08-00222 WHA, Docket Entry Nos. 102-03.

### IV.     Mr. Brugnara Does Not Pose an Economic Danger to the Community

Nor Mr. Brugnara does pose any economic danger to the community. *See United States v. Reynolds*, 956 F.2d 192-93 (9th Cir. 1992) (danger to the community under § 3143 "may, at least in some cases, encompass pecuniary or economic harm"). The primary evidence proffered by the government that Mr. Brugnara poses any economic danger to the community relates to the unproven allegations underlying the new mail fraud charge. But because Mr. Brugnara is presumed innocent of the charge against him, this Court should afford less weight to those allegations in determining whether Mr. Brugnara poses an economic danger to the community. *See United States v. Madoff*, 586 F. Supp. 2d 240, 252-53 (S.D.N.Y. 2009) ("[A] presumption of innocence may be a factor in determining the weight of an alleged economic harm and whether it

would rise to the level of danger to the community."). And, as noted above, the weight of the evidence against Mr. Brugnara is the least important factor to consider. *See Motamedi*, 767 F.2d at 1408.

Moreover, even if this Court considers the underlying allegations, the scope of the alleged fraudulent conduct is quite limited, involving only a single art dealer; all but one of the pieces of art at issue have been returned; and the location and provenance of the remaining piece is still a matter of dispute. *See* Exhibit F: *Articles*. Thus, the scope of the alleged economic danger based on the charged conduct is not vast, has already been abated and was not faced by the community at large. Further, the alleged economic danger posed by Mr. Brugnara pales in comparison to numerous white-collar defendants who have faced much more serious fraud charges, and who have been released on appropriate conditions pending trial. *See, e.g., Madoff*, 586 F. Supp. 2d at 255 (denying government's motion to detain Bernard Madoff based on economic danger he posed to community); *see also United States v. Madoff*, 826 F. Supp. 2d 699, 700 (S.D.N.Y. 2011) (noting that Madoff's fraud scheme cost his clients billions of dollars); *United States v. Giordano*, 370 F. Supp. 2d 1256, 1264 (S.D. Fla. 2005) (denying government's detention motion even when defendant was charged with 35 counts of various fraud offenses and explaining that "In economic fraud cases, it is particularly important that the government proffer more than the fact of a serious economic crime that general great sums of ill-gotten gains . . . evidence of strong foreign family or business ties is necessary to detain a defendant even in the face of a high monetary bond").

### A.     Mr. Brugnara Does Not Have a Propensity to Commit Fraud

While this Court may validly consider Mr. Brugnara's propensity to commit crime generally in determining whether he poses an economic danger, Mr. Brugnara has not shown any such propensity. *See United States v. Provenzano*, 605 F.2d 85, 95 (3d Cir. 1979) ("[A] defendant's propensity to commit crime generally, even if the resulting harm would be not solely physical, may constitute a sufficient risk of danger to come within the contemplation of the [Bail

Reform] Act."). Mr. Brugnara's criminal history is limited and does not include any prior fraud convictions. Nor has ever previously been criminally charged with fraud. Obviously, his prior tax convictions before this Court, as with the instant offense, involve elements of dishonesty or misrepresentation; but this does not demonstrate that he has is prone to committing fraud; particularly in that all of the prior allegations of fraudulent conduct and/or filing false tax returns are distinct in kind.

Under the government's reasoning, however, virtually all white-collar defendants with no history of assertive violence would be subject to detention on the grounds that they posed an economic danger, simply because their alleged fraudulent conduct involved large sums of money. But such reasoning runs contrary to the Bail Reform Act, which demands that "[o]nly in rare circumstances should release be denied, and doubts regarding the propriety of release should be resolved in the defendant's favor[,]" *see Gebro*, 948 F.2d at 1121, and further "mandates [the] release of a person facing trial under the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person as required." *See Motamedi*, 767 F.2d at 1405 ("The Fifth and Eighth Amendments' prohibitions of deprivation of liberty without due process and of excessive bail require careful review of pretrial detention orders to ensure that the statutory mandate has been respected.").

**B. Government Exhibit 23 Does Not Show That Mr. Brugnara Poses an Economic Danger to the Community**

During this Court's evidentiary hearing on June 17 and 18, 2014, the government presented Mr. Brugnara with Government Exhibit 23, a document which purports to be a loan application that was seized by government agents during an April 5, 2013 search of Mr. Brugnara's home. *See* Exhibit A: *Declaration of Luke Brugnara*; Exhibit B: *Government Exhibit 23*. Mr. Brugnara maintains that Government Exhibit 23 was merely document that he may written in August 2012, around the time that he began his supervised release term, but was never submitted to any lender. *Id.* The government has proffered no evidence that Mr. Brugnara

actually submitted the document, or that he received (or attempted to receive) any loan in relation to the exhibit. Additionally, the $500 million estimated value of an art collection listed on the draft application represented only Mr. Brugnara's subjective valuation of the art collection. Odd or not, Mr. Brugnara's then-perhaps-wishful evaluation of the value of his art collection in a private draft document does not indicate that he (1) had engaged in any fraudulent activity or (2) that he poses such an economic danger to the community that he could not be released on sensible conditions.

Of course, even if this Court does find that Mr. Brugnara poses an economic danger to the community, in part due to Government Exhibit 23, this finding alone would not warrant detention because "[e]ven where a defendant poses a danger, he must still be released if there is a 'condition or combination of conditions [that] will reasonably assure . . . the safety of any other person and the community.'" *United States v. Hir*, 517 F.3d 1081, 1091-92 (9th Cir. 2008) (quoting 18 U.S.C. § 3142(e)). Moreover, reasonable assurance of the safety of the community does not mean that this Court must guarantee community safety. *See id.* at 1092 n.9 ("We note that the Bail Reform Act contemplates only that a court be able to 'reasonably assure,' rather than guarantee, the safety of the community."). For the following reasons, Mr. Brugnara is clearly bailable under conditions that will reasonably assure the community's safety, as he has been in the past.

      **C.**      **Mr. Brugnara Has Demonstrated That He Is Amenable to Supervision and Can Be Successfully Released Under Conditions that Reasonably Assure Community Safety**

For over 20 months, Mr. Brugnara was successfully on pre-trial release, making all of his required court appearances. After this Court sentenced Mr. Brugnara in the tax case, he was ordered released and complied perfectly with the in-home detention and later reporting requirements when he traveled to a distant prison in Texas. After being released from prison, Mr. Brugnara successfully resided in a halfway house here in San Francisco for several and successfully served the final portion of his custodial sentence at home, on home detention with

1  electronic monitoring, the precise condition of supervision that Mr. Brugnara now seeks.

2        Both magistrates placed heavy reliance on their observations of Mr. Brugnara's
3  courtroom demeanor in concluding that he was not a suitable candidate for pre-trial release.  Mr.
4  Brugnara's choice to speak in his own defense at preliminary hearings, however, is not a valid
5  basis for denying his request for pretrial release.  Mr. Brugnara is certainly a talkative and
6  boisterous person, but the magistrate's strong emphasis on their personal impressions of his
7  courtroom demeanor is simply not a relevant consideration that has any bearing on whether he
8  poses a flight risk or a danger to the community.  *See* 18 U.S.C. § 3142(g) (outlining proper
9  factors).  As then-Judge Kennedy emphasized in *Motamedi*, the relevant statutory factors "may
10 be considered only in terms of the likelihood that the person will fail to appear or will pose a
11 danger to any person or to the community." 767 F.3d at 1408.  Simply put, Mr. Brugnara's in-
12 court behavior does not have any bearing on whether he will appear in court or pose a risk to the
13 community.  And his choice to testify last week and vindicate himself through his testimony and
14 to share his testimony with this Court demonstrates that he is prepared and ready to deal with this
15 case head-on and if released, will comply with any and all appropriate conditions this Court sees
16 fit to imposes – just as he has time and time again in the past.

17 **CONCLUSION**

18     For the foregoing reasons, Mr. Brugnara respectfully urges that this Court revoke the
19 prior detention orders, and order Mr. Brugnara released on condition of home detention with
20 electronic monitoring as set forth herein.

21 Dated: June 25, 2014

22             Respectfully submitted,

23             STEVEN G. KALAR
              Federal Public Defender
24
            /S/
25
            BRANDON M. LEBLANC
26             Assistant Federal Public Defender