# EXHIBIT C

1               UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3  Before The Honorable Jacqueline S. Corley, Magistrate Judge

4

5  UNITED STATES OF AMERICA,    )
                            )

6          Plaintiff,       )
                            )

7  vs.                   )   No. 14-MJ-70731-MAG-1
                            )

8  LUKE D. BRUGNARA,         )
                            )

9          Defendant.       )
                            )

10  _____)

                            San Francisco, California

11                            Wednesday, May 28, 2014

12  TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
                        RECORDING

13

14  APPEARANCES:

15  For Plaintiff:

16                       United States Attorney's
                         Office

17                       450 Golden Gate Avenue
                       San Francisco, California

18                       94102
               BY:  WILLIAM DOUGLAS SPRAGUE, ESQ.

19  For Defendant:

20                       Office of the Public
                         Defender's Office

21                       450 Golden Gate Avenue
                       19th Floor

22                       San Francisco, California
                       94102

23               BY:  ELIZABETH MEYER FALK, ESQ.

24  Transcribed by:          Echo Reporting, Inc.
                       Contracted Court Reporter/
                       Transcriber

25                       echoreporting@yahoo.com

2

Wednesday, May 28, 2014                              9:47 a.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK:  Calling Case Number 3:14-MJ-70731, USA versus Luke Brugnara.

MR. SPRAGUE:  Good morning, your Honor.  Doug Sprague for the United States.

THE COURT:  Good morning.

(Defendant confers with counsel.)

THE COURT:  All right.  So Mr. Brugnara, we're here this morning because you have been charged in a criminal complaint with mail fraud.

And Ms. Falk, do you have a copy of the complaint?

MS. FALK:  I do, your Honor.

THE COURT:  All right.  And Mr. Brugnara, have you seen a copy of the complaint?

THE DEFENDANT:  I saw it briefly in my house this morning.

THE COURT:  Okay.  In this proceeding this morning, we're going to advise you of the charge against you and your constitutional rights.  We'll set further hearings in the case and discuss your release status.

To begin with, could you please tell me your name and age for the record.

THE DEFENDANT:  Luke Brugnara, 50.

3

1          THE COURT:  And Mr. Brugnara, the first right I
2   remind you of is your right to remain silent.  You do not
3   have to make any statements about the charge in this case or
4   anything, for that matter.  If you've made a statement in
5   the past, you don't have to make any further statement.
6          If you start to make a statement, you may stop at any
7   time.  And you have the right to have your attorney with you
8   during any questioning.  But if you do make a statement, the
9   Government may use it against you to obtain a conviction.
10          You are also entitled to an attorney in this case.  You
11   have the -- from the beginning to the end.  You have the
12   right to hire your own attorney.  But if you can't afford to
13   do so, the Court will appoint one for you.  And I know you
14   haven't had a chance to speak to counsel this morning, and
15   you were just arrested this morning, so we can -- for the
16   purposes of this proceeding this morning, Ms. Falk is
17   representing you.  And then we'll figure out your counsel
18   situation at a later date.
19          As I said, you have been charged in a complaint.  Would
20   the Government please summarize the charge and maximum
21   penalties.
22          MR. SPRAGUE:  Yes, your Honor.  The Defendant has
23   been charged with one count of mail fraud, in violation of
24   Title 18, United States Code Section 1341.  The maximum
25   penalties for that offense are 20 years in prison, a term of

4

1 supervised release of three years, a $250,000 fine.

2        Restitution, which in this case would, according to the

3 Government, approximate $11 million and a mandatory special

4 assessment of $100.

5            THE COURT:  Now, you've been charged by a

6 complaint which is essentially charges that are supported by

7 an affidavit, a sworn affidavit of an agent.  If the grand

8 jury doesn't return an indictment -- that's -- the grand

9 jury is of 16 people.  They hear the evidence, the

10 Government's evidence, and if they find there's probable

11 cause to believe you've committed the crime charged, they

12 issue an indictment.

13        If the grand jury doesn't return an indictment within

14 14 days if you're in custody or 21 days if you're out of

15 custody, you have a right to what we call a probable cause

16 hearing.  That would be a hearing before a magistrate judge,

17 at which the Government would have the burden of

18 demonstrating that there's probable cause to believe you've

19 committed the crime charged.  But you also have the right to

20 waive that right to a hearing.

21            THE DEFENDANT:  Yes, your Honor.  I'd like to make

22 a statement that's very important for the Court to hear.

23 There is a judge in the Superior Court of California Pro

24 Tem, also a Professor at Hastings, Robert Kane, who has

25 actually been involved in this specific matter for two

5

1   months now.  It's a civil matter that a judge in the State

2   of California has been mitigating and addressing with their

3   counsel.

4       Moreover, the Federal Public Defender's Office, namely

5   Brandon LeBlanc, who is my attorney, has been fully apprised

6   of this specific circumstance not only from myself, but from

7   Judge Pro Tem Robert Kane, who is also very well respected

8   in the community, head of the Jewish Federation, et cetera,

9   and Professor at Hastings.

10      The bottom line that I'm trying to convey is that it's

11  very important to understand there is not an indictment

12  here.  And if there was proper investigation done by the

13  field office of the FBI, they certainly would have spoke to

14  Mr. LeBlanc and certainly Judge Robert Kane, and they would

15  have learned that, in fact, it's a civil matter that Robert

16  Kane had daily involvement in for two months.

17      I've committed no crime.  Moreover, I haven't even

18  communicated with these people.  I turned it over to Bob

19  Kane day one and told Brandon LeBlanc about it day one, and

20  him and Bob Kane have been interfacing on this matter

21  several times.

22      So it's a complete shock.  I'm a family man, married

23  with 25 years with four minor children, a well respected

24  businessman in the community.  And quite frankly, I just

25  simply want to get bail today and let the matter go through

6

1  due process.

2      I'm sure once Bob Kane is interviewed and Brandon

3  LeBlanc is interviewed, I would suspect this matter would be

4  dropped.  But in the meantime, I have children that need me

5  daily.  I have a moral and a legal duty to my four minor

6  children.  And also, I have to support them.  And I'm

7  innocent.

8      So I'm no threat or danger to the community.  I've

9  actually had a forensic psychologist say that and has

10  interviewed me for the last few months because I was coming

11  off -- a tax matter, and she said I'm no threat or danger to

12  the community at all.  She's already conveyed that to this

13  attorney's office.  I'm certainly no flight risk.  That's

14  already been determined by Judge Spero.

15      And I have four minor children, and I'm innocent.  So I

16  mean, there's really no reason not to be granted bail, I

17  mean, based upon my understanding of the law.  But that's

18  where I stand today.

19          THE COURT:  All right.  Thank you.

20      And what is the Government's position?

21          MR. SPRAGUE:  Your Honor, the Government moves for

22  detention.  And the grounds for that are both flight, but

23  primarily danger.

24      Briefly as to flight, but then I'd like to focus my

25  comments on danger.  Mr. Brugnara was arrested this morning

7

1   at 224 Seacliff, which public records state is a 5500-

2   square-foot residence.   The assessed value is approximately

3   $8 million.   The property taxes the last three years have

4   averaged $96,000 per year.

5       In August of 2012, he applied for a $9 million loan.

6   In that loan application, he represented that he had

7   $300,000 in cash, $150 million in real estate, $100,000

8   worth of automobiles, $2 million in casino equipment and a

9   $500 million art collection.   He claimed his net worth was

10  $650 million in researching this $9 million -- seeking this

11  $9 million loan.

12      In contrast to that, after his two Federal Court cases

13  concluded, he was ordered to pay $1.9 million in

14  restitution.   And he has paid in the neighborhood of a

15  couple hundred dollars to that -- toward that restitution.

16  He has filled out financial affidavits with the court

17  process, just pretty much putting a circle with a line

18  through it for zero for all assets, except for a few hundred

19  dollars here and there, and has claimed that he's living on

20  borrowed funds, while he's living in this house that's worth

21  somewhere in the neighborhood of 6 to $10 million.

22      He's also prepaid rent for his wife and kids up in

23  Corte Madera that is in the neighborhood of 5500 to $6,000 a

24  month.   And that's been prepaid through the next couple of

25  months.   So there's real financial questions here.

8

1        There's also -- turning to the facts of this case
2   briefly, Mr. Brugnara received five crates of art.  The
3   total value of the crates of art were approximately $11
4   million.  This morning when he was arrested and the
5   residence was searched, four of those crates, but not five,
6   were recovered.  Mr. Brugnara I know has claimed that he
7   only received four, but the people who shipped it to him and
8   the lay bills and the shipping know that it's five.
9        Now, turning to some of the information about Mr.
10  Brugnara's danger.  When the two cases were set to begin, he
11  eventually ended up pleading guilty to three counts of
12  filing false tax returns, two false statement accounts under
13  18 USC Section 1001 and four violations of the Endangered
14  Species Act.  He pled guilty back in January of 2010.
15       The week before the trial was set to begin, he was
16  arrested for threatening to kill two witnesses in the trial.
17  He was then remanded.  He then decided to plead guilty.  And
18  he also threatened to kill his wife.
19            THE DEFENDANT:  That's absolutely false, your
20  Honor.  In fact, she testified in front of Judge --
21            MR. SPRAGUE:  Judge Chesney or Judge Alsup.
22            THE DEFENDANT:  I'm sorry.  She actually testified
23  in open court in front of Judge Chesney that there was no
24  threat against her life ever.  Moreover, your Honor, that
25  charge came three days before the commencement of the trial,

9

1  after I had been on OR for two years in a tax case where I

2  was indicted for $45 million, and the forensic accounting

3  came back $300,000.

4      So, okay --

5          THE COURT:  No, no, no.  But I'm going to let the

6  Government finish, and then you'll have a full opportunity

7  to respond.

8          THE DEFENDANT:  Thank you.

9          THE COURT:  All right.  Mr. Sprague.

10         MR. SPRAGUE:  Your Honor, the allegations which

11 were supported by declaration in that case were that Mr.

12 Brugnara said to his wife in front of his then 14-year-old

13 child that these two witnesses, Joe McAvoy (phonetic) and

14 David Chandler, I know bad people, I have a lot of money,

15 and I'm going to have them killed.  I'm going to put a

16 bullet through their head.

17     His wife then said, I may get called at this

18 evidentiary hearing which is coming up in connection with

19 this trial that was about to start, and if they put me on

20 the stand, I'm going to have to tell the truth and I'm going

21 to have to say that.   And then he said, well, if that

22 happens, I'll have to put a bullet through your eyes.

23         THE DEFENDANT:  This is --

24         THE COURT:  You'll have an opportunity to respond.

25         THE DEFENDANT:  -- to the testimony in court, your

10

1 Honor.

2          THE COURT:  Okay.

3          MS. FALK:  That's not how it works.

4          MR. SPRAGUE:  His wife then relayed that to

5 someone who relayed it to the witnesses in law enforcement,

6 and he was remanded at the time.  He then pled guilty.

7          He was then released on strict conditions after that.

8 And part of the strict conditions were he was to be in the

9 third-party custody of his mother at her home 24/7 and on

10 electronic monitoring.  He could only leave with

11 preauthorization for limited purposes.

12          The first day he got approval to leave on

13 preauthorization to go visit a couple of attorneys, he went

14 somewhere else.  He went back to 224 Seacliff.  There are

15 pictures of him taken there.  And a few weeks later, he was

16 remanded for violating the terms of his pretrial release.

17          He eventually -- when he pled guilty, he moved to

18 withdraw his pleas.  The case went through the court system

19 for a while.  He eventually pled guilty.  He then appealed.

20 He filed a motion for bail pending appeal before Judge

21 Alsup.

22          Judge Alsup found -- denying that motion for bail

23 pending appeal, Judge Alsup found that Defendant, quote,

24 "has a history of doling out threats of violence, and

25 several individuals have obtained restraining orders against

11

1  him," end quote.  That was March 30th, 2011.

2       Some of those threats that were documented in the two

3  prior Federal Court cases include in the 1999, 2000 time

4  frame, he threatened a Deputy City Attorney in charge of

5  regulatory cases against the Defendant where the Defendant

6  had been charged with violating various building

7  regulations.

8       Defendant said he was, quote, "going to get," end

9  quote, the attorney.  He also allegedly grabbed and

10 threatened the City's main witness, who was a San Francisco

11 fire inspector, telling him, quote, "I'll take you on any

12 time," end quote, and, quote, "I will get you," end quote.

13 He said he was worth $200 million, and he would get both of

14 them.

15      He was eventually served with a contempt motion.  He

16 made a throat-slitting gesture to the Deputy City Attorney

17 and told him, quote, "you're dead," end quote.

18           THE COURT:  What are you reading from?

19           MR. SPRAGUE:  I'm reading from notes I've taken

20 from several inches of pleadings in his prior federal cases

21 which attach declarations alleging what I'm --

22           THE DEFENDANT:  Declarations.

23           MR. SPRAGUE:  He then importantly -- granted, the

24 Defendant denied these things.  However, the City obtained a

25 restraining order against him ordering him not to assault,

12

1  batter, stalk or follow that particular Deputy City Attorney

2  and not to come within 100 yards of his work or residence.

3       In the same time period, he allegedly threatened a

4  Court-appointed receiver who was charged with collecting

5  rents from Defendant's properties to pay debts.  And this

6  purported receiver also put in a declaration in this matter.

7       The Defendant then even wrote and signed a memo to all

8  of his tenants, instructing them not to pay the Court-

9  appointed receiver, despite orders of the San Francisco

10 judge, calling the Court-appointed receiver a trespasser and

11 stating that the court documents were not valid.

12      He also allegedly threatened his mistress, who was

13 pregnant with his child.

14           THE DEFENDANT:  Not true.  And I'm offended by

15 that comment, your Honor.  The pregnancy problem has already

16 been adjudicated in Family Court by Judge Gilibock

17 (phonetic), and it was (indiscernible), your Honor.

18           MR. SPRAGUE:  And he also threatened his

19 mistress's former husband.  The mistress reported threats to

20 the police.  She obtained a restraining order against him.

21 And then there were -- the Defendant had his brother -- and

22 that's correct, this is in the 2000, 2001, 2002 time frame.

23      The Defendant had his brother try to work out a

24 settlement with the mistress, and the brother ended up

25 befriending the mistress.  Defendant ordered his own brother

13

1  not to have any contact with the mistress.  He refused.  And

2  then the Defendant threatened his own brother, and his own

3  brother had to get a restraining order against Mr. Brugnara,

4  which the Defendant violated and was arrested by SFPD for

5  that.

6           THE DEFENDANT:  That's not accurate.

7           MR. SPRAGUE:  In 2008, after having been warned

8  for similar conduct, Mr. Brugnara -- the pastor at his

9  children's school, St. Vincent de Paul Parish in San

10 Francisco, directed Defendant not to come to the parish

11 anymore and to move his children to another school.

12     After the Defendant threatened the parish, the parish

13 had to file for a restraining order against the Defendant.

14 And the Defendant's response, when told, you can't come to

15 the school and your kids need to leave the school was, I own

16 a billion-dollar company and answer to no one, which his

17 actions prove, your Honor, is that he seems to answer --

18 think he doesn't have to answer to anyone.

19     He got out of -- when he got out of prison in August of

20 2012, approximately in August of 2012 for his federal cases,

21 previous federal cases, within six months, there was

22 probable cause to search his house.  They did a search

23 warrant, and among other items, they found a firearm and

24 ammunition in his home, which was clearly illegal.  He also

25 had a carry-and-conceal firearm conviction back from many

14

1  years ago, 1989.  And then as a result of the federal cases,

2  he obviously wasn't allowed to have these things.

3       The probation officers who are supervising him on

4  supervised release had filed Forms 12 alleging him of lying

5  to probation officer about not possessing art, lying to

6  probation officer about bank account access and information,

7  lying by omission, failing to pay restitution, not

8  submitting monthly reports.

9       And his answer to that was he insisted that the

10 probation officer had lost them.  Lying about loans he had

11 received as recently as July 2013 through which he prepaid

12 some of the -- on the Seacliff residence as well as the rent

13 on the Corte Madera residence where his wife and kids live

14 and received substantial cash and did not tell Probation

15 about it.

16          THE COURT:  So he's currently on supervised

17 release?

18          MR. SPRAGUE:  He's currently on supervised

19 release, your Honor, which brings me to 3142(d), which my

20 reading is that if he is on supervised release or execution

21 of sentence or probation and parole and then he may flee or

22 pose a danger to the community, the judicial officer shall

23 order the detention of such person for a period of not more

24 than 10 days, excluding Saturday, Sundays and holidays, so

25 two weeks.

15

1       So the Government can, in essence, inform Probation

2  about this, which we've tried to do already.  I understand

3  Probation is at training today.  Many of them are, and I

4  couldn't get the agent.  I think it's Jennifer James,

5  although he's been through several.  I suspect they will

6  file a Form 12, and then we're back before the judge.  I'll

7  be arguing that it's then his burden on both prongs, and

8  I'll be arguing he cannot meet them in light of the history

9  that I've outlined, your Honor.

10       THE DEFENDANT:  Okay.  Your Honor, I want to

11  address this from memory because I didn't have the benefit

12  of writing this.  If I miss any of his claims, I'd

13  appreciate it if you'd question me on it so I can address

14  those.

15       I'm absolutely transparent.  I have nothing to hide.  I

16  haven't done $2 billion in deals.  You as a judge know, as a

17  federal judge, it's impossible to get $5 million, let alone

18  2 billion, unless you're a person of character, man or

19  woman.  Because people that make the loans on Wall Street,

20  they lose their livelihood, their jobs, their children's

21  college tuitions and mortgages if they make a mistake and

22  lend someone like me 5, 10, $15 million (indiscernible)

23  billion dollars.

24       So I'm going to educate this gentleman here on the

25  facts now.  For starters, let's start chronologically.

*Echo Reporting, Inc.*

16

1  Let's go back 15 years.  Fifteen years to 1999.  I was
2  shaken down by a young woman after I -- had been in
3  magazines.  She claimed I fathered a child when, in fact, I
4  fathered no child.  Paul Cave (phonetic), the gentleman who
5  is my civil attorney, brought a civil case in the court
6  of -- the State of California court.  It was adjudicated in
7  my favor in Judge Gilibock's court.
8      She the refused to take a blood test that Judge
9  Gilibock ordered.  So I mean, that tells it all right there.
10 She had absolutely no credibility.  That comes to I
11 threatened him.
12     Let's talk about more serious issues.  The tax cases,
13 which is recent history in the last -- we can talk about
14 this priest in 2008.  Yeah, I went up to Father Green
15 (phonetic).  He was stealing $350,000 from St. Vincent de
16 Paul, like most of these priests that are dirt bags.  And
17 I've been in that church.  And I went up to him, I said,
18 hey, listen, I have Matthew Hewey (phonetic), who is the
19 contractor in all of our office buildings and on the San
20 Francisco Airport, and Genie (phonetic).  He's a major
21 contractor, an Asian gentleman who is very well respected in
22 the public community.
23     And I said, he can paint the church for $38,000 and
24 will guarantee it at 40,000.  Father Green, of course, was
25 going out to the parishioners saying he needed $420,000.  So

17

1 I confronted the man and told him what I thought of him.
2 And he knew there would be backlash, so that he kicked my
3 four children -- four children from kindergarten through
4 sixth grade out of school because the guy is just a piece of
5 garbage like most of these priests are.
6          THE COURT:  So I'm going to stop you.
7          THE DEFENDANT:  (Indiscernible).
8          THE COURT:  I want to -- I actually want to focus
9 on just post-August 2012.  So you can -- I'll accept that
10 you --
11          THE DEFENDANT:  Yes.
12          THE COURT:  -- deny everything that the
13 Government --
14          THE DEFENDANT:  I deny --
15          THE COURT:  -- preAugust 2012.  So what I want
16 to -- and one reason I'm doing this is, Ms. Falk did advise
17 you not to speak.  And I don't -- so I don't want you to say
18 things that aren't going to make any difference --
19          THE DEFENDANT:  I understand.
20          THE COURT:  -- that may then come down the line
21 and hurt you, because there's no point to that.  So that's
22 why I'm stopping you.
23     So I'll tell you what the thing is, is that you do have
24 two prior convictions recent in this court.  And following
25 those, your release, you have violated the terms of your

*Echo Reporting, Inc.*

18

1 supervised release or had Form 12s filed.  So there's a

2 history there, and then there's the allegations of this

3 complaint, which I'm familiar with because I signed the

4 complaint and I've read the affidavit.

5     So all of that, I believe -- at least the Government

6 has met their burden to at least hold you to have a hearing.

7 You're entitled to a hearing, but to remand you in the

8 meantime.  So I'm just telling you that so that you can then

9 focus on really since your supervised release.

10          THE DEFENDANT:  Yes.  I'll address that now, your

11 Honor.  And it's important to understand that -- let's start

12 with from the federal case.  Judge Spero, in fact, released

13 me.

14          THE COURT:  But I'm just going to stop you for a

15 second.  What I'm saying is, they have enough to hold you,

16 and you're entitled to a hearing.

17          THE DEFENDANT:  I understand.  What I'm trying to

18 plead for, your Honor --

19          THE COURT:  Well, Ms. Falk wants to say something.

20          MS. FALK:  I don't actually think the Government

21 is correct about this 10-day rule.  I do think they're

22 correct that he has the burden to establish that he's on

23 supervised release in a pending --

24          THE COURT:  I'm not saying the 10 days.

25          MS. FALK:  Okay.

19

1          THE COURT:  I'm just saying today, you come in --
2    it's not a presumption case, right?  I'm just saying they
3    come in, the Government has made a proffer that satisfies
4    the Court.  Not that he's a risk of nonappearance, that he's
5    a danger.  That has been satisfied.  Although there is also
6    a risk of nonappearance because of all the inconsistencies
7    with respect to the financial resources.
8          THE DEFENDANT:  I need to respond to that.
9          THE COURT:  Okay.  Just a minute.  Let me --
10          THE DEFENDANT:  Can I respond after you finish?
11          THE COURT:  You can.  I just want to let --
12    because you do have an attorney here.  You have -- you have
13    the right to speak, but I want to let the attorney first
14    respond and give you advice, and then you can.
15          MS. FALK:  She's made up her mind.
16          THE DEFENDANT:  I understand.  But not until I
17    explain --
18          THE COURT:  All right.  So Ms. Falk, I just want
19    to make sure I'm applying the law correctly.
20          MS. FALK:  Okay.
21          THE COURT:  So my -- I'm not saying that they're
22    entitled to hold him for 10 days at all based on that.
23          MS. FALK:  That's fine.  That's --
24          THE COURT:  What I'm just saying is, you're a
25    normal, everyday, common felony charge, nonviolent.

20

1          MS. FALK:  Nonsupervised released.

2          THE COURT:  Nonsupervised release.  They've made a

3    proffer which I think is sufficient to detain him pending --

4    entitled to a hearing.

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  So now go ahead.

7          THE DEFENDANT:  And I would like to oppose that

8    because he's proffering to the Court false information.  And

9    this is critical because the first thing is -- let's talk

10   about the serious issues of this threat on life, which is

11   absurd on the face of it from four years ago.

12        Your Honor, that went in front of a grand jury.  And I

13   spoke to my attorney, Brandon LeBlanc and my civil attorney,

14   Robert Kane, the Judge.  He goes, I've never heard of

15   anybody losing a grand jury indictment.  The grand jury

16   rejected that, your Honor, because it was false.  It was a

17   false thing.

18        I won.  They continued and proceeded with that charge

19   at the grand jury, and they lost at the grand jury.  And the

20   reason why they did it, your Honor, is very simple.  Because

21   there's a reason and motive for everything.  These gentlemen

22   are civil servants.  They have no ax to grind with Luke

23   Brugnara one way or another.  They do.  Because what they

24   did in the beginning is they indicted me for $45 million.

25        And what happened, your Honor, was it was accounted

*Echo Reporting, Inc.*

1 down to $300,000 of $103 million, which ended up being one-

2 third of 1-percent.  So if you made $100,000 in a year --

3 and they did a forensic accounting for 2010, so it went all

4 the way back to 2001.  They filed the action at the end of

5 the seven-year statute of limitations literally with one

6 week to go.

7       So what happened was, they needed to really cover their

8 A-S-S because they probably would have lost their jobs.

9 They spend millions of dollars believing I owed tens of

10 millions of dollars, and it was only $300,000.

11      So they padded it with the Fish case, which was

12 completely nonsense.  Still going to trial.  So they threw

13 up the hail Mary pass.  It's just like in a football game.

14 Last second hail Mary passes.  Grab the guy, throw him in a

15 dangerous prison cell and hope that he pleads -- asks for an

16 evidentiary hearing, put it out three weeks.

17      This all happened the night before the trial, your

18 Honor.  So -- in front of Judge Chesney.  So the fact of the

19 matter, that's the way they operate.  Okay.  Because they

20 knew they were going to lose the case.

21      Also, I won the civil tax case, which was 48 hours

22 before the indictment.  The same U.S. Attorney, Thomas

23 Newland (phonetic), was a civil tax attorney out of

24 Washington when they sued me for $11 million in front of

25 Judge Haynes (phonetic) in U.S. civil Tax Court.  They lost

22

1  that case.

2       During that case, Newland was appointed to the U.S.

3  Attorney's Office to their tax division, so he had an ax to

4  grind with me.  People got in a lot of trouble.  A lot of

5  people got fired in the IRS over in the San Rafael office

6  from that case because they spent so much money chasing

7  their tail on me.

8       So there's a lot of bad blood between myself and the

9  U.S. Attorney's Office.  They tried to set me up, your

10  Honor, while I was on probation, spent tens of thousands of

11  dollars, if not $100,000 perpetuating a sting where they had

12  a guy that I knew who owned a pizza parlor try to solicit me

13  to sell artwork.  And that had blown up in their faces.  In

14  fact, the art was just copies.  It was represented as such.

15  It went absolutely nowhere.

16       So they continue -- I'm on probation.  I'm supposed to

17  be on probation two weeks ago, but I'm going to be off in a

18  few months.  And they're trying to prolong my agony because

19  they're owed the restitution.

20       Now, this has been in front of Judge Alsup for about a

21  year.  The fact of the matter is, all of the properties were

22  owned by limited liability companies that were formed by

23  Orrick, Herrington 12, 15 years ago.  This wasn't in any way

24  to try to deceive the Government or hide assets or anything

25  like that.  These entities were formed 15 years ago.  And

23

1   they were structured by the biggest law firm in the country.

2        So there is no hidden agenda.  Judge Alsup, who is one

3   of the partners at LOFO (phonetic) was trying to explain to

4   the U.S. Probation at the last hearing, because they're

5   saying, well, we don't understand this.  How can he

6   negotiate his debt down, what was a forbearance and a

7   complicated restructuring of debt.  I mean, they have

8   divisions in major law firms that are just focusing on that

9   where the litigators and transactional attorneys don't even

10  get involved in that because it's so sophisticated.

11       So what's going on here is you have a situation where

12  there's a disconnect of the U.S. Attorneys and -- especially

13  the U.S. Probation Office, an understanding and concept of

14  what's going on.  So in their mind, they say, oh, my God,

15  this guy is doing something illegal.  This can't be right.

16  How can he live in this house, and how can this happen and

17  how can that happen.  He must be a criminal.

18       In reality, I'm not.  My attorney for 21 years has been

19  Bob Kane and Brandon and everyone stands behind me.  We were

20  in front of Judge Cousins, who has already ruled on my

21  financial condition.  To the point, Brandon LeBlanc.

22       So this -- he's just, you know, putting in front of you

23  conjecture and just false information, capricious and

24  arbitrary statements based upon supposed witnesses that

25  signed affidavits that are then impeached by grand juries

24

1 and in open court by testimony, for instance, of my wife.

2 She testified in front of Judge Chesney I never threatened

3 her.

4       And moreover, she was a witness in the grand jury

5 testimony where I never threatened anyone else.  Because the

6 threat supposedly on her brother, whatever, on this Fish

7 case went through her.  She said it never, in fact,

8 happened, and she had a witness that said also that that

9 never happened.

10       So again, this is conjecture.  This is arbitrary,

11 capricious statements from parties that basically are trying

12 to cover their behinds.

13       Now, I'm not a threat or danger to the community.  I

14 even went, at the advice of Brandon LeBlanc, to talk to a

15 top forensic psychiatrist who is a forensic psychiatrist for

16 this court, Cathy Barrett.  And that was put forth by the

17 U.S. Attorneys and U.S. Probation, Jennifer James.  And I

18 voluntarily went and spoke to her for a few months.

19       And she already told Brandon and everyone, there's no

20 threat or danger to anyone.  She even recommended that

21 Probation terminate early.  And this is who the Court

22 depends on for professional advice.

23       So he can play psychologist over there all he wants

24 based upon hearsay and half-cooked arguments, but the

25 reality is, the Court has to rely upon (indiscernible) who

25

1  is a professional that studies and gets her Master's degree

2  and is a professional on that side.

3       So from a threat or danger standpoint, as of last

4  Wednesday, I'm no threat or danger to anybody.  And from a

5  practical standpoint, I'm not.  I've been married 25 years.

6  I have four children.  I have no record of ever laying a

7  hand on anybody.  There's no proof that anybody has been

8  threatened because I haven't threatened anybody.

9       So again, it's just arbitrary statements that he's

10 trying to proffer as proof when, in fact, they've already

11 been caught lying to Judge Beeler, your Honor, just to let

12 you know, on that setup with the artwork with the Warhol.

13 And one of the U.S. Attorneys got pulled off the case and

14 was reprimanded by Judge Beeler for lying to her on a false

15 proffer.  Charles -- what's his last name?  Charles --

16            MS. FALK:  I don't --

17            THE DEFENDANT:  It was -- but Judge Beeler has

18 already reprimanded --

19            THE COURT:  All right.  So --

20            THE DEFENDANT:  Okay.  So I'm -- this is the

21 thing.  I can't be remanded because the complexity of my

22 business -- if you were remanded -- I mean, every day is

23 critical for my ability to support and provide for my family

24 and to be productive.  Because if you pull one of the cogs

25 out of this wheel, it's going to collapse because that's my

26

1 business, finance.  It's not like I'm a carpenter.  Okay.
2 Well, let you go here for -- it'll just collapse everything.
3      So the consequences of even being remanded for one day
4 would be -- I could recover from, and then it would be a
5 travesty on my rights to due process because they haven't
6 even fulfilled their burden of proof regarding the danger
7 because it's contradicted by the psychiatrist.
8      And also, the fact of the matter is that the judge has
9 already -- as of just last Wednesday, Judge Alsup has
10 already ruled that I'm free in the community.
11      I think the most troubling point that I have with this
12 entire agenda here is that the federal office of --
13 Defender's Office has been well aware of these five boxes.
14 Okay.  And these five boxes, if you check the woman who sent
15 them, she's all over the internet for art fraud, this Rose
16 Long.
17      So you just plug in her name, Rose Long, art fraud,
18 there's 10 articles that pop up saying that she tries to --
19 and she's been accused of selling to young married couples
20 Picassos and different art pieces and then telling them
21 basically whatever.
22      So this is someone that's got very unclean hands.  I
23 immediately contacted --
24           MS. FALK:  You need to be careful what you -- this
25 is --

27

1          THE DEFENDANT:  It's a fact --

2          THE COURT:  I'm going to -- I'm going to stop you

3    as well.

4          THE DEFENDANT:  I appreciate that.

5          MS. FALK:  Now you're really --

6          THE COURT:  I'm going to stop you for a second.  I

7    hear what you're saying about all that, but the Government

8    has made a proffer, and this is the way it works.  That it's

9    sufficient for me to order you remanded.  You're entitled to

10   a hearing on the detention in which you can bring the report

11   that you have from the psychiatrist and all those kinds of

12   things.

13      But I'm ordering you remanded now.  I think the

14   Government has made --

15          THE DEFENDANT:  (Indiscernible) you reconsider.

16          THE COURT:  I understand, but I've made my order,

17   and that's going to stand.

18          THE DEFENDANT:  What is it based on, your Honor?

19          THE COURT:  It's based on the -- it's based in

20   large part on the fact that you are -- you are currently on

21   supervised release, that while on supervised release, there

22   have been several Form 12s already filed that you haven't

23   even complied with that.

24      So I find that you are not -- that you are not amenable

25   to supervision of being released.  You are well known to

28

1   this court.

2          THE DEFENDANT:  I know.  Just --

3          THE COURT:  And I also --

4          THE DEFENDANT:  Judge Alsup -- last Wednesday

5   Judge Alsup ruled, in fact, told the U.S. Attorneys -- when

6   they came forth with these arbitrary comments, he said to

7   them, he said, if you have a Form 12 violation, bring it in

8   front of me.

9          The only Form 12 violation that they brought was last

10  October -- got heard last October 9th.  And the fact of the

11  matter is, everything was resolved with Probation and the

12  U.S. Attorneys on that, and Alsup said, okay, I'm going to

13  let you off probation on April 21st.  And the hearing got

14  heard last week where I said, there's nothing fresh.  I'll

15  let you off probation.

16         Well, they came and said, well, we still haven't

17  figured out this refinance from last January.  Brandon

18  LeBlanc said, hey, listen, this is untimely.  Moreover,

19  Brandon met with Jennifer James and Probation for five hours

20  with me, and Marlena Peters, and they signed off on it

21  before Jennifer went down to San Jose.

22         And it's just the new probation officers didn't

23  understand the complexity of the financial transaction.  But

24  it had nothing to do with me.  It was a limited liability

25  company set up 15 years ago.  And Judge Alsup understood

29

1 that because he understands complex business transactions.

2 He said, listen, I'm not going to let him off supervised

3 release, but if you have an issue with Mr. Brugnara, file a

4 proper Form 12 and do it not willy-nilly, were his exact

5 words.  And I want to see what your claim is, not, oh, he's

6 living in a house at Seacliff or he's eating, you know, two

7 double cheeseburgers instead of macaroni.  He basically

8 said, enough of this already.

9      So I can't afford to have my liberty seized from me

10 based upon this continued harassment, basically.  Because

11 there is nothing -- I mean, just like coming today.  Well,

12 we don't have an indictment and we don't have anything

13 substantive.  But hey, by the way, throw him in jail.

14 That's not fair.  I mean, you've got to treat me the same

15 way you would want to be treated.  It's not fair.

16           THE COURT:  I hear what you're saying.  I am

17 treating you the same as we treat everyone.  I understand

18 you disagree.  I'm ordering you remanded.

19      When would you like to return, Ms. Falk?

20           THE DEFENDANT:  Immediately.

21           MS. FALK:  If I can get -- I'll have to pull his

22 file.

23      (Defendant confers with counsel.)

24           MS. FALK:  I can set it for tomorrow.

25           THE COURT:  I don't know that you're going to have

30

1  anything more to offer.

2          MS. FALK:  I understand.

3      Is it in Brandon's file?

4          MR. SPRAGUE:  Your Honor, I'd ask for at least

5  three days.  We need to notify -- the Government needs to

6  notify Probation.  Probation, I suspect, but I'm not sure,

7  would file a Form 12.  And that's going to have an immediate

8  bearing on the burden in the matter on the detention issue.

9  So I'd ask for at least until Friday, if not the full three

10 days, which would be Monday, your Honor.

11         MS. FALK:  One thing I could do by tomorrow is get

12 some sureties.  And I could come up with a set of proposed

13 conditions that may not be perfect to either side, but at

14 least I'd have some -- and somebody would be on the hook

15 tomorrow if he were to go ahead and violate whatever the

16 Court were to set.  I probably could get my hands on the

17 forensic report.

18     In fact, did you give it to --

19         THE DEFENDANT:  You can phone Cathy Barrett.

20 She's in the Forensic Institute.  And she said she'd be

21 willing to update that at any time.  I know she did it for

22 Brandon last Wednesday.

23     The thing is, your Honor, I can have either my mother

24 or my wife sign a surety bond.  I'm no threat or danger.

25 They're willing to sign and have in the past.  Judge Spero

31

1  deemed -- excuse me.  I self-surrendered when we came to the

2  conclusion in the last case to the location, the facility.

3  Spero allowed me to drive across the country, Texas.  And

4  Judge Spero, your Honor -- to drive across the country.  I'm

5  no flight risk.  I'm no danger.

6      I just can't -- I can't be tied up this way.  There's

7  no reason not just to let me appear back on my own

8  recognizance.  And I can assure this Court I'll bring a

9  surety, a guarantor, my wife and my mother.

10         THE COURT:  Okay.  I'm not releasing you today.

11  I'm remanding you to the custody of the U.S. Marshals.

12  We'll return on Friday.  We'll return on Friday.  That gives

13  them the opportunity to have Probation.  I want to see all

14  the -- you know, the Form 12s and review that.

15         MS. FALK:  I can do that.

16         MR. SPRAGUE:  Thank you, your Honor.

17         MS. FALK:  I absolutely can do that.

18         MR. SPRAGUE:  Oh, and your Honor, the Government

19  moves to unseal the criminal complaint and arrest warrant.

20         THE COURT:  Yeah, everything is unsealed.  All

21  right.  So --

22         MR. SPRAGUE:  Also, the search warrant.  Did I

23  miss anything?  The application for -- anything that's been

24  filed to date.  The file to date.

25      (Defendant confers with counsel.)

32

1          THE DEFENDANT:  This is a civil matter, your

2  Honor.

3          THE COURT:  I understand that argument.  I

4  understand that argument.  All right.

5          MS. FALK:  So this will give me some -- this will

6  allow me to do a full presentation.  I can check off a lot

7  more boxes.

8      (Defendant confers with counsel.)

9          THE COURT:  Ms. Falk, maybe you can go upstairs

10  and visit.

11          MS. FALK:  Yeah.

12          THE COURT:  She'll come up and see you after

13  court.

14          MS. FALK:  They took him so fast -- sometimes they

15  take them --

16          THE COURT:  Well, they're going to be here for a

17  little while.  I'd like Ms. Falk to be able to see him.

18  Okay.

19      So Ms. Falk will come see you after court.

20          MS. FALK:  I'll come up and see you because it's a

21  lot better.  Okay.

22          THE COURT:  All right.  Thank you.

23          MR. SPRAGUE:  Thank you, your Honor.

24          THE CLERK:  So we're coming back tomorrow?

25          THE COURT:  No.  Friday.

33

1          THE CLERK:   Friday?

2      (Proceedings concluded at 10:26 a.m.)

34

1                  CERTIFICATE OF TRANSCRIBER

2

3       I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9       I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16          Echo Reporting, Inc., Transcriber

17             Thursday, June 5, 2014

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*