MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

W. DOUGLAS SPRAGUE (CABN 202121)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7128
    FAX: (415) 436-7234
    doug.sprague@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>LUKE D. BRUGNARA,<br><br>    Defendant. | CASE NO. CR 08-0222 WHA<br>              CR 14-0306 WHA<br><br>UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO REVOKE DETENTION ORDERS<br><br>DATES:   June 27 and 30, 2014<br>TIME:    9:30 a.m. and 9:00 a.m., respectively<br><br>Magistrate Nathanael Cousins; Hon. William Alsup |

After hearings on May 28 and May 30, Magistrate Corley ordered defendant detained. (Dkt. 250; Ex. 1.) On June 11, Magistrate Cousins again ordered defendant detained. (Dkt. 261; Ex. 2.) After expressing concerns with defendant's prior criminal history and prior violations while under federal supervision (both pretrial and post-conviction), Pretrial Services also recommended that defendant be detained.

Defendant subsequently demanded and received a prompt hearing regarding his alleged violations of supervised release. The United States called three witnesses, and defendant testified in his own defense and, as he put it, so Judge Alsup could hear his side of the story and consider it when defendant moved to reconsider his detention.

1

On June 24, Judge Alsup ordered the defense to file its bail motion by June 25 at noon, and ordered the United States to respond by June 26 at 5:00 p.m., and set a hearing for June 30 at 9:00 a.m. before Judge Alsup.

On June 26, defendant changed course and filed a motion to have his bail conditions reconsidered by Magistrate Corley the following day, June 27. Magistrate Corley issued an order reminding defendant that any reconsideration should go before Magistrate Cousins, because Magistrate Cousins already had considered the sureties defendant proposes.

Defendant's motions should be denied on procedural and substantive grounds.

## I.   Defendant's Motion for Reconsideration Raises No Material New Information

A detention hearing may be reopened only "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2). The terms of release defendant proposes remain the same in all material respects: a $10,000 cash bond and the signatures of defendant's wife and mother. These are the precise conditions already rejected by Magistrate Corley, Magistrate Cousins, or both. The possible addition of another signature (with no financial or other security) by "a dear and long-term friend" adds nothing to the bail analysis. Motions for reconsideration of bail must be based on new, material information. This is not. It should be denied on that basis.

## II.   Defendant Should be Detained

Even if the Court considers defendant's motion on its merits, it should be denied.

Because defendant allegedly committed a crime while he was on supervised release, it is defendant's burden to establish by clear and convincing evidence that he will not flee and will not pose a danger to any other person or to the community. F.R.Cr.P. 32.1(a)(6). If defendant cannot meet his burden, the Court "shall order" that defendant be detained. *Id*.; 18 U.S.C. § 3143(a)(1). "Danger" includes economic danger. *See United States v. Reynolds*, 956 F.2d 192, 192-93 (9th Cir. 1992)("… danger may, at least in some cases, encompass pecuniary or economic harm.")(citation omitted.) Indeed, it is "beyond dispute that the criterion of 'danger to the community' … is not limited to the

potential for doing physical harm." *United States v. Miranda*, 442 F.Supp. 786, 792 (S.D.Fla. 1977)(citation omitted). As one Court has noted, the "case law, which spans several decades, as well as several circuits, makes clear that economic danger provides an adequate basis for detention under 18 U.S.C. § 3143(a)(1)." *United States v. Jinwright*, 2010 WL 2926084, at *3 (W.D.N.C. July 23, 2010). "Economic harm is certainly a danger from which this Court can protect the community …" *Id.* at *6.

**Defendant Cannot Establish Clearly and Convincingly that he is Neither a Danger Nor a Flight Risk**

Every factor the Court must consider in determining whether defendant can meet his burden to establish that he does not pose a danger to the community or a risk of flight weighs heavily in favor of detention.

A.  The History and Characteristics of Defendant

Defendant's history of crime, threats, and believing that the rules do not apply to him illustrate that he is not a suitable candidate for release.

1.  Defendant's Criminal History

Defendant's criminal history spans decades. In 1989, he was convicted of carrying a loaded firearm in a public place. (Def. Mot. to Revoke, Ex. E, ¶ 53.) After failing to appear in court to address that charge, a warrant was issued and he was arrested. *Id.*

In 2001, he was arrested on charges of assault, threats, and battery. (Def. Mot. to Revoke, Ex. E, ¶ 55.) According to the victim of defendant's rage, the defendant pulled up next to her car, got out of his car, began yelling and screaming at her about a pending paternity suit, and began striking his cell phone on her car window. *Id.* The victim was so scared that she locked her doors and drove away, but defendant followed her, swerved around other cars to catch her, and again approached her car while she was stuck at a red light. *Id.* After defendant's brother later tried to intercede, defendant's brother told police that defendant screamed at his own brother "I'll fucking kill you," grabbed a metal bar, brandished it at his brother, and warned his own brother to "Stay out of my fucking life or I'm going to kill you. This isn't over, you are going to pay." *Id.* Defendant was convicted of violating a court order to prevent domestic violence. *Id.*

In April 2008, defendant was indicted on three counts of filing false tax returns. *Id.*, ¶ 1. He

3

1 eventually pleaded guilty to those charges and was sentenced to 30 months in federal prison. While that
2 case was pending, defendant was arrested and detained for threatening to kill two witnesses. Those
3 charges were dismissed as part of a plea bargain. Defendant was released to the third party custody of
4 defendant's mother, ordered to reside at her home only, and placed on electronic monitoring with leave
5 from his mother's home allowed only for limited purposes and with advance approval. *Id.*, ¶ 8. Within
6 days of agreeing to these terms and being released, defendant claimed to his Pretrial Services Officer
7 that he needed to visit his attorney to fire him. Defendant and his mother were explicitly instructed that
8 they were only authorized to travel to the attorney's office. *Id.* Instead, defendant and his mother went
9 straight to defendant's residence at 224 Sea Cliff Avenue, immediately violating his conditions of
10 release. *Id.*

11 Defendant also pleaded guilty to two counts of making false statements, as well as four counts of
12 violating the Endangered Species Act. CR 08-0236 MMC. Judge Chesney sentenced him to 15 months
13 in federal prison for those crimes, a sentence that ran concurrently to the 30-month sentence imposed by
14 this Court.

15 After serving his prison term, defendant began his term of supervised release. Within merely a
16 few months of his release from prison, probable cause existed to believe he was engaged in new criminal
17 activity, and a search warrant was issued for his residence. Among other things, agents found a firearm
18 and ammunition. Defendant subsequently admitted to two charges of lying to the United States
19 Probation Office. In addition, in response to assertions that he did not file his monthly reports,
20 defendant claimed that he did, but that the Probation Office must have lost them. (He made the same
21 claim regarding his tax returns, claiming he timely filed them but the IRS must have lost them. *See* Def.
22 Mot. to Revoke, Ex. E, ¶ 12-13.)

23 "[T]hat a person has been found, beyond a reasonable doubt, to have committed a criminal act
24 certainly indicates dangerousness." *Jones v. United States*, 463 U.S. 354, 364 (1983).

25     2.    <u>Defendant's Past Conduct – Threats and Violent Behavior</u>

26 Defendant's past conduct also demonstrates his dangerousness, a consistent pattern of
27 threatening behavior, and a fervent belief that rules and laws simply do not apply to him.
28 //

4

### a. Defendant Threatens His Girlfriend and Her Husband

Defendant's former girlfriend, K.R., reported that defendant physically and verbally abused her during their relationship, and that one of defendant's employees told her that defendant asked to have her killed, even expressing that defendant had found a place to bury her body. (Decl. of IRS SA Martins at ¶ C, attached hereto as Exhibit 3.) Defendant told K.R. that "if you fuck with me, I'll kill you." *Id.* K.R.'s former husband stated that defendant said that if the husband told defendant's wife about his relationship with K.R., "The police won't help you … you'll be on the bottom of the Bay." *Id.* Defendant subsequently violated the restraining order K.R. had obtained against him by sending an employee of his to contact K.R. *Id.* These are just a few of the many threats defendant directed at his former mistress and those associated with her. *Id.*

### b. Defendant Threatens His Own Brother, Violates Yet Another Court Order

After defendant asked his brother to intercede in the paternity issues involving K.R. and their infant child, defendant's brother became friends with K.R. Defendant ordered his brother to stop seeing K.R., but his brother refused. Defendant's own brother had to get a restraining order against defendant, which defendant violated almost immediately by threatening physical violence against his brother (and his other brother after that brother, too, tried to make peace). Defendant was soon arrested for violating the restraining order.

### c. Defendant Threatens a Deputy City Attorney

In 1999-2000, defendant was involved in regulatory proceedings with the City of San Francisco. During those proceedings, defendant told the assigned Deputy City Attorney that defendant was "going to get" him, that he never forgot anyone or anything, and that he "would eventually get" the Deputy City Attorney. (Ex. 3, Decl. of IRS SA Martins, p. 2.) Defendant later told the principal witness against him, a San Francisco Fire Inspector, that defendant would "take you on any time" and "I will get you." Defendant physically grabbed this witness at this time. After being served with an Order to Show Cause re: Contempt, defendant made a throat-slitting gesture directed at the Deputy City Attorney and told him "You're dead." The Deputy City Attorney perceived defendant's threats as real and serious, and the City of San Francisco obtained a restraining order against defendant.

//

d. <u>Defendant Threatens a *Court-Appointed* Receiver</u>

In connection with the same case, defendant threatened a *court-appointed* receiver and yelled at him "Do you know what it's like to get your ass kicked![?]" Defendant also attempted to obstruct court orders in that matter by telling tenants that the court-appointed receiver was a trespasser and directing tenants not to follow the court order of paying rent to the receiver, threatening tenants with consequences if they obeyed a court order instead of defendant.

e. <u>Defendant Ignores Yet Another Court Order</u>

In June 2000, defendant was found guilty of contempt for willfully failing to comply with an injunction requiring him to abide by medical waste and fire regulations at a property he owned. Among other violations, defendant was found to have intentionally made false statements affecting the health and safety of the public.

f. <u>Defendant Traumatizes Fourth Graders</u>

Defendant claims in his Motion that the restraining orders against him are "exceedingly stale and trace back to 2002 and before." (Def. Mot. to Revoke, p. 5, n.5.) Not so.

In October 2008, defendant's threatening and violent behavior forced the stoppage of a soccer game being played by *fourth grade boys*. This incident is detailed in Exhibit 4. In short, defendant's then 9-year old son was on a 4th grade soccer team at his school, St. Vincent de Paul Parish in San Francisco. After defendant's initial efforts of yelling at and berating the coach for not playing defendant's son in the game did not satisfy defendant, defendant again yelled at the coach, calling him a "fucking liar, fuck you!" for not putting defendant's son in a 4th grade soccer game. Moments later, defendant walked across the field during the game, again yelling at the coach that he was "a fucking liar, this fucking sucks, this school fucking sucks, fuck this, [defendant's son] get fucking over here, we're fucking leaving … get fucking over here now." (Ex. 4, police report.) The coach had to stop the game and get the other kids away from defendant. Defendant then pulled his 9-year old son's jersey off of his son, ripped it in half, and yelled "fuck this school, this school fucking sucks, fuck all of you." He then left with his son. (*Id.*)

The coach sought and obtained a restraining order against defendant. (Declaration of Reverend John Ring, attached hereto as part of Exhibit 4.) In light of defendant's threats against Reverend Ring

6

and other members of that parish, the parish also sought a restraining order against defendant. After he received a letter condemning his conduct, defendant responded to the school by email. In that email, he called the letter "a joke" and declared "I own a billion dollar company and answer to no one. I make my own decisions without regret. I do not regret how I handled [redacted] last weekend, as he deserved what he got and a lot worse." (*Id.*, 10/15/08 email from defendant re: SVDP Soccer Incident.)

During his first bail hearing in this matter, defendant defended his actions in this soccer game incident by claiming that a school priest was stealing money "like most of these priests that are dirt bags ... the guy is just a piece of garbage like most of these priests are." (Transcript of May 28, 2014, proceedings before Magistrate Corley, at pp. 16-17.) It is unclear what defendant's comments have to do with his undisputed terrorizing of fourth grade boys and their families.

e. Defendant Threatens to Kill Witnesses Against Him

In January 2010, on the eve of his scheduled trial, defendant threatened to kill two witnesses against him, one of whom is defendant's brother-in-law. Defendant's wife stated that defendant told his wife that he was going to have "someone put a bullet" in the heads of two witnesses, including his brother-in-law. Defendant said he knew bad people and had enough money to pay them to do this. Defendant told his wife he would have her killed, too, if she testified about this threat. This witness took this threat seriously. (Decl. of J. McAvoy, attached hereto as Exhibit 5.)

As this Court correctly noted when denying a prior bail request, "[d]efendant has a history of doling out threats of violence, and several individuals have obtained restraining orders against him." (March 28, 2011, Order Denying Defendant's Motion for Release/Bail Pending Appeal, attached hereto as Exhibit 6.) Defendant attempts to brush off this conduct by characterizing it as "would-be hollow threats and bluster." (Def. Mot. to Revoke, p. 10.) That is most certainly not how defendant's intended victims of these threats understood them.

3. Defendant's Past Conduct – Guns and Mental Health Issues

Defendant's unbroken pattern of threatening physical violence and aggressive behavior is even more troubling when seen in conjunction with his mental health history and prior—and recent—possession of firearms and ammunition.

//

### a. Mental Health

As reflected in the Presentence Investigation Report attached to Defendant's Motion to Revoke, defendant refused to answer any questions regarding his mental health posed by the Pretrial Services Officer. (Def. Mot. to Revoke, Ex. E, ¶ 90.) Defendant's mother, however, reported that defendant had hallucinated in the past, including one instance in which he reported seeing "little purple men flying around." (*Id.* at ¶ 91.) In light of this and other information, the Court ordered defendant to participate in mental health counseling, "but [defendant] did not follow through on this directive by the United States Pretrial Services Officer." *Id.*

Defendant cites to psychological evaluations from 2010 that allegedly concluded that "he poses no danger to the community." (Def. Mot. to Revoke, p. 11.) There are several problems with this assertion. First, the citations for that assertion are Docket Nos. 102 and 103 from CR 08-0222 WHA. Reviewing those docket entries reveals no such thing. One is a brief about predicted comments, the other is a minute order. Second, these reports are from four years ago. Upon information and belief, other psychiatrists saw defendant earlier *this year*, yet defendant has not proffered that report or its contents. Third, one of the doctors who examined defendant found that "delusions of persecution may be present" that he may be "experiencing grandiosity of delusional proportions" and that he "appeared paranoid" and the "provisional diagnostic formulation" of Bipolar I Disorder, Acute Stress Disorder" was proposed. (Def. Mot. to Revoke, Ex. E, ¶ 94.) While he did not exhibit signs of "imminent dangerousness" at the time of these meetings, "it is important to note that further assessment of dangerousness would be necessary in order to provide an opinion about the level of his current risk" and "a psychiatric medication evaluation is clearly warranted … Ideally, use of psychiatric medication would occur in conjunction with regularly [sic] psychotherapy or counseling." *Id.*

### b. Firearms and Ammunition

Although it was many years ago, defendant was convicted of carrying a loaded firearm in a public place. (PSR, ¶ 53.) And just last year, while on supervised release, agents found a firearm and ammunition in defendant's home, in plain violation of not only his terms of supervised release, but in violation of federal law.

It is difficult to imagine a more dangerous combination than a documented history of threatening

8

and aggressive behavior combined with a history of firearm and ammunition possession and mental health issues.

### 4. Defendant's Past Conduct – Fraudulent and Inconsistent Financial Dealings

In addition to threats of violence and aggressive behavior, defendant's past is full of attempted and actual fraudulent financial episodes. Some of these are set forth in the PSR, attached as Exhibit E to Defendant's Motion to Revoke.

Defendant does not have a job. It is not clear when he last had a job. Yet he resides in a home worth many millions of dollars and was able to pre-pay almost one year of rent for a home in Corte Madera that cost more than $5,000 per month. In a loan application found during the search of his home in April 2013, defendant had claimed a net worth of more than $650 million. When asked about this document, he claimed he was not even sure the handwriting was his and tried to refuse to answer questions about it. But then just days later, he filed a declaration admitting the document was found at his home but claiming it was never submitted to a lender. (Def. Mot. to Revoke, Ex. A.) As he admits, in another application he claimed to have no assets and no income. The vast financial inconsistencies support that defendant is a severe economic danger to the community and a risk of flight.

And after claiming he was indigent, there can be no question defendant told the victim in this case that he "will buy" millions of dollars worth of art. Even crediting his (wholly implausible) testimony that he later learned the art was not authentic, the fact remains that he initially stated he would pay millions for it. But he plainly could not afford to do so, even by his own admissions, including as recently as his declaration filed yesterday.

Despite being broke, defendant admitted that he was trying to purchase a $3 million home in Tiburon as recently as the past few months. When asked how someone with no assets and no income could purchase a $3 million home, defendant claimed he could get loans to do so with no problem. (Yet apparently he cannot get loans to satisfy his debts to the United States.) This statement is troubling. Either it is true or it is false. If it is true, defendant has access to cash, underscoring his flight risk and his intent not to pay restitution (he has only come up with a few hundred dollars in the many months he has been released). If it is false, it is another example of defendant lying, and doing so under oath right in front of this Court.

9

Also when claiming to have no assets, defendant was contacting Sotheby's to both *sell* art he claimed he owned and to *buy* millions of dollars worth of art. As demonstrated during his testimony at the supervised release proceedings, defendant emailed Sotheby's about Chinese ink paintings he wanted to have Sotheby's sell at auction, and he contacted Sotheby's about his desire to buy almost $10 million worth of art to return it to his "collection." (Govt. Exs. 16 and 17 at supervised release proceedings, attached hereto as Exhibits 7 and 8.) Defendant made these representations just a few weeks before he certified to the United States Probation Office that he had no money, no assets, and no art. (Ex. 9.)

### 5. Defendant Was on Supervised Release When Arrested for this Offense

The Bail Reform Act also requires the Court to consider "whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending … completion of sentence for an offense …" 18 U.S.C. § 3142(g)(2)(B). As noted, defendant was indeed on supervised release when he was arrested for this offense. Furthermore, it was not the first violation of his supervised release, again illustrating his lack of respect for the law and orders of the Court.

### 6. Defendant's Testimony

Another factor illustrating his lack of respect for the law and weighing heavily in favor of detention—on both grounds---is the implausible story defendant told throughout his testimony regarding the art and the multiple lies he was caught in during that testimony. Simply put, he lied with impunity for hours on end. Many lies were exposed while he was testifying. More are being investigated, and one lie at the heart of defendant's purported defense required little investigation to prove false. Defendant claimed that he emailed a Sotheby's employee to ask about some of the art he was going to buy from the victim in this case. Defendant claimed that in response to his email, a different Sotheby's employee called him and told him the art was not authentic. Curiously, defendant could not recall any details of this call, except that the art was fake.

Contrary to defendant's sworn testimony, the email he sent was to an employee who had left Sotheby's months earlier. The email merely sat on Sotheby's server, unread.

Relatedly, as each judge who has witnessed it has noted, defendant's demeanor in court is concerning. Magistrate Corley and Magistrate Cousins each noted it. Based on defendant's increasingly aggressive and belligerent behavior in court, the United States Marshal's Service has been forced to

restrain defendant during court appearances and to physically remove him from at least one of them. Judge Alsup noted for the record that at one point the defendant was screaming at the top of his lungs and banging the witness stand while shouting invectives at undersigned government counsel. Based on his disregard for the truth, rules, laws, and his aggressive behavior in federal courts of law, there is no reason to believe he can be trusted if released to the community, and every reason to believe he poses a significant danger to the community if released.

### B. The Weight of the Evidence and Nature and Circumstances of the Offense

The weight of the evidence against defendant weighs heavily in favor of detention. As this Court has witnessed, defendant agreed to buy millions of dollars worth of art, took delivery of it, then claimed it was a gift from someone he had not communicated with in years. Shipping and delivery records confirm 5 crates were delivered, yet defendant claims he "did not count them" when they arrived and then there were only 4 when he did count them. In court on the day he was arrested, however, he admitted there were five. (Transcript of May 28 proceedings at p. 26.) The fifth box, and the expensive Degas sculpture contained in it, remain missing.

The charges in this case are another example of the financial danger defendant poses if released. He will lie to anyone—lenders, buyers, sellers, Pretrial Services, Probation, the Court—about anything if it suits his purpose. And these charges carry vastly more severe consequences than any charges he has faced to date.[1] The Sentencing Guidelines range of imprisonment likely will be approximately 9-11 years. In addition, defendant faces up to another year in custody on his supervised release violation. This exposure is several times more severe than he faced in the cases leading to his other federal criminal convictions.

## III. Conclusion

Defendant has been convicted of multiple crimes, including involving crimes of dishonesty and violating court orders. He has a lengthy history of threatening and aggressive behavior that has

---

[1] A cornerstone of defendant's argument to be released is that he has never missed a court appearance. This too is false. . Attached as Exhibit 10 are Criminal Pretrial Minutes from a change of plea hearing "NOT HELD" because defendant was "not present" for a scheduled appearance before this Court in 2009.

continued up through these court proceedings. He has twice been found with firearms and ammunition, both times possessing them unlawfully. He has a history of mental health issues which remain unaddressed. Defendant has not met his burden to establish by clear and convincing evidence that he is neither a danger to the community nor a flight risk. The conditions he proposes--$10,000 cash and the signatures of his mother, wife, and friend—fall far short of meeting his burden, and, in fact, have at least in large part already been rejected. The decisions of Magistrate Corley and Magistrate Cousins were correct, and defendant should be detained pending trial.

//

DATED: June 26, 2014

Respectfully submitted,

MELINDA HAAG
United States Attorney

_____/s/_____
W. DOUGLAS SPRAGUE
Assistant United States Attorney