IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

  v.

LUKE D. BRUGNARA,

    Defendant.

No. CR 14-00306 WHA

**ORDER DENYING MOTION TO DISQUALIFY THE UNITED STATES ATTORNEY'S OFFICE OF THE NORTHERN DISTRICT OF CALIFORNIA**

In this criminal prosecution, our accused defendant was previously charged in this district with two sets of separate offenses, pled guilty, and served his time. One set of convictions was for false tax returns while the other was for Endangered Species Act violations and false statements to a government agent (*see* CR 08-00222; CR 08-00236). More recently and while on supervised release, he asked an art dealer in New York to send artwork worth many millions of dollars to him in San Francisco, upon the implicit representation that he would pay for them and had the means to do so — or so it is now alleged. Once, however, the artwork was locked in his garage in San Francisco, he told the art dealer the shipment had been a "gift" by her to him. The pending mail-and-wire fraud indictment now arises out of that transaction. In short, our defendant has pled guilty to two prior groups of felonies and is currently under indictment for a third.

The accused now contends that he is the victim of a vendetta and prosecutorial misconduct by three Assistant United States Attorneys spanning his various troubles with the law and that the entire United States Attorney's Office should now be disqualified from participating in the current prosecution.

The first few accusations are leveled against Maureen Bessette, an AUSA in this district. She handled one of the two prior felony prosecutions, namely, the prosecution for the Endangered Species Act violations and false statements to a government agent.

*First*, defendant declares that in 2008, his then-retained attorney Harris Taback told him that if he did not demolish his dam, that AUSA Bessette would indict him on two Fish and Game charges unrelated to the dam. (The dam was part of the *res gestae* of the conviction for the Endangered Species Act violations and false statements.) This order assumes for the sake of argument that AUSA Bessette said something along those lines, although there is no declaration from defendant's former attorney to show it. Nevertheless, it is perfectly permissible in the context of plea negotiations for a defense attorney to seek to fold into a plea bargain all potential charges, whether currently indicted or not. And, conversely, it is perfectly permissible for a government attorney to alert defense counsel that a superseding indictment or additional charges may be filed. In light of the fact that defendant himself pled guilty to improper operation of the dam, this first alleged incident would present, even if true, no improper conduct.

*Second*, defendant contends that in June 2010, AUSA Bessette provided false information to the Bureau of Prisons regarding defendant's custody designation, which led to him being placed in a low-security facility rather than a minimum-security facility, and in turn, this led to his being attacked "by three Nazi skinheads for playing chess with blacks," resulting in two fractures to his skull (Brugnara Decl. ¶ 3). He further claims that after this attack, he received no or minimal medical treatment.

The evidence, however, exonerates AUSA Bessette, and defendant's contention otherwise is simply based on wild surmise. As a beginning point, there is nothing wrong with an AUSA sharing accurate information to the Bureau for security classification purposes. Indeed, an AUSA likely has the most exhaustive data on an offender and should so share. For the same

2

reasons, an AUSA is free to tell the Bureau his or her opinion of the dangerousness of an offender. The only limit on such communications is avoidance of knowingly false information.

Having heard the testimony of a Bureau representative regarding records associated with defendant's custody designation, and having reviewed approximately a thousand pages that constitute the Bureau's files on defendant, the undersigned judge finds that AUSA Bessette sent no information to the Bureau in connection with defendant's custody designation, much less false information. At most, the Bureau's files indicate that defendant was classified for custody at a low-security facility — and not a minimum-security facility — based on his presentence investigation report, his prior crimes, his threats to five individuals (including the San Francisco District Attorney), and his voluntary surrender. In other words, there is no indication that any AUSA provided any information that influenced defendant's custody designation.

Moreover, the only references to AUSA Bessette within the Bureau's files are internal notes indicating that in early June 2010, AUSA Bessette contacted the Bureau solely for the purpose of seeking "immediate notification of designation, once [defendant was] assigned" to a facility (Dkt. No. 129 at 68:18–69:12; 109:1–114:10). There is no indication that AUSA Bessette or any other AUSA provided information to the Bureau, much less knowingly false information.

Defendant's claims of being attacked by Nazi skinheads and not receiving medical treatment thereafter are unsupported. To the contrary, the Bureau's files show that on September 22, 2010, defendant fought with another inmate after both admittedly "exchang[ed] words which lead to the physical altercation." Although defendant claimed to the Bureau then (as he does now) that he was assaulted by "five 'skin heads,'" the Bureau's investigation revealed only one other inmate who was involved in that fight. Furthermore, defendant *did* receive medical treatment afterward, as evidenced by the Bureau's medical reports and photographs documenting his injuries and treatment. In sum, the voluminous record utterly fails to support even a shred of defendant's accusation against AUSA Bessette.

*Third*, turning to the conviction for false tax returns and the government's efforts to recoup the unpaid taxes (after defendant was released from prison), defendant alleges that AUSA Charles Parker lied to the undersigned judge and Magistrate Judge Laurel Beeler to authorize a search of defendant's Sea Cliff house in San Francisco, all in aid of recovering restitution owed by defendant for his tax conviction. It turned out that defendant's Andy Warhol painting at the Sea Cliff house was a fake and not worth the $7.7 million originally thought.

Probation and the United States Attorney's Office, however, can hardly be blamed for thinking that what appeared to be a Warhol hanging on the walls of a home in one of the more exclusive neighborhoods in California might be valuable and thus might be used to pay the restitution. Defendant himself has blown hot and cold on the authenticity and value of his artwork. Just this year, defendant indicated in a financial document that he owns an art collection worth five hundred million dollars. (At the same time, he has represented that he is too cash-poor to hire a lawyer and therefore deserves CJA counsel.) AUSA Parker thought it might be a real Warhol and he acted reasonably in trying to seize it until its authenticity could be determined. No AUSA misled the Court.

*Fourth*, turning now to the prosecution at hand, defendant levels an allegation against the prosecutor in the instant proceeding, namely, AUSA William Douglas Sprague. After a plethora of evidentiary hearings, the undersigned judge found the accused to be a danger to the community by reason of a propensity to perpetrate economic crimes and fraud schemes. AUSA Sprague is now accused of withholding information on whether defendant is a danger to the community.

More specifically, the government supplied to the Court a psychiatric report dated January 21, 2014, from Dr. Cathy Barrette (who treated defendant this year). So far, so good. The prosecutor, however, is now accused of failing to supply an alleged supplemental psychiatric report by Dr. Barrette, who reportedly went so far as to say therein that defendant was not, in her opinion, a danger to the community. AUSA Sprague responds that he is unaware of any such more recent, supplemental report. As far as the Court can determine, there was no such further report and none has been supplied by the movant. At most, there was a declaration

4

on a prior motion herein, a declaration procured by defense counsel from Dr. Barrette making the point alleged, but, of course, that declaration *was* supplied to all, including the Court, and nothing was withheld. This order finds that AUSA Sprague withheld nothing.

*Fifth*, defendant next accuses AUSA Sprague of misleading the Court as to the equity available in a Sea Cliff house owned by Brugnara Property VI to secure defendant's bond. For purposes of obtaining pretrial release, the accused asserted that there was sufficient equity in the Sea Cliff house. The government argued the opposite. It appears true that AUSA Sprague represented to the Court that a CMR Mortgage loan still encumbered the property (when in fact, that loan had been paid off). But the government promptly corrected this error concerning the CMR Mortgage loan *the day after* defendant disputed that loan. There was nothing sinister in this one-day misunderstanding. Defendant has frequently used the Sea Cliff house as security in a variety of business deals and personal loans, and it is understandable, in the light of so many deals involving the property, that the title reports might have garbled the true state of equity in the house by listing as active an encumbrance that had been removed. No improper conduct has been shown.

*Sixth*, defendant asserts that his wife told him about an August 2014 visit by two FBI agents, who reportedly broke through the front gate of the Sea Cliff property so that they could intimidate her into refusing to sign as a surety for defendant by, among other things, telling her about his girlfriend. Both FBI agents testified at the evidentiary hearing on this motion, as did the wife and defendant.

Here is what really happened. In August 2014, the agents went to visit the spouse to try to learn the possible whereabouts of one crate of artwork that was not found when agents raided the house in May of this year and which is a subject of the pending indictment. They had legitimate intentions unrelated to whether or not she would sign as a surety. As for the break-in, they arrived at the front gate on the public sidewalk. There was no buzzer and the wife did not answer her cell-phone calls. The agents needed to go through the gate and then the front yard to get to the house and its front door to ring the buzzer or knock. The gate was merely propped closed by a one-by-four on the interior side. By simply putting a hand through a broken slat in

5

1  the gate, the agents were able to remove the prop and let the gate swing open.  Although at one
2  point there had been (long ago) a dead bolt with a padlock, this order finds that the dead bolt and
3  lock were no longer operable at the time the agents arrived in August, so that the entry was
4  available simply by removing the one-by-four prop.

There was a "No Trespassing" sign but the agents had no intent to trespass.  They were merely attempting to get to the front door to ring the doorbell or knock.  In this connection, there were *two* FBI visits, one in July and one in August.  The same means of entry (simply removing the one-by-four prop) was used both times.  In the July visit, the wife arrived just after they had entered the front gate and graciously let in the agents and then had a discussion.  At no time did the wife accuse the agents of trespassing.  In the August visit, the agents came to the house and reasonably assumed it was acceptable to enter the way in which they did.

At no time did the agents try to dissuade her from signing as a surety (and she did, in fact, so sign).  Defendant specifically claims that the FBI agents tried to intimidate the wife by telling her details about defendant's girlfriend.  At the evidentiary hearing, the wife and the agents all testified that the wife, not the agents, brought up this subject.  *She* asked *them* questions about the girlfriend.  The accusation against the FBI agents is untrue.

Finally, it deserves to be said that, in all events, AUSA Sprague had nothing to do with the means of entry and defendant's accusation to the contrary is wrong.

\*          \*          \*

The standard for disqualifying even a single prosecutor is "clear and convincing evidence [that] a conflict is presented."  *United States v. Kahre*, 737 F.3d 554, 583 (9th Cir. 2013) (internal citations omitted).  On this record, by any standard, there is no basis for disqualifying any AUSA, much less the entire United States Attorney's Office in this district.  The motion to disqualify is thus **DENIED**.

Because the Court took seriously its duty to inquire into contentions of prosecutorial misconduct, it held an evidentiary hearing and heard four witnesses, including defendant himself.  The Court also reviewed all of the Bureau's files on defendant, including approximately a thousand pages documenting defendant's custody designation as well as his

1 reported incidents and medical treatment during custody.  After considering all of the record, the
2 Court is firmly of the view — and so finds — that this motion was utterly without merit and was
3 anchored in falsehoods and wild surmise.

**IT IS SO ORDERED.**

Dated:  October 3, 2014.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

7