ERIK BABCOCK (Cal. 172517)
LAW OFFICES OF ERIK BABCOCK
717 Washington St., 2d Floor
Oakland, CA 94607
(510) 452-8400 Tel
(510) 452-8405 Fax

Attorney for Defendant
LUKE BRUGNARA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Nos.   CR 14-00306 WHA<br>           CR 08-00222 WHA |
| Plaintiff, | **MOTION FOR REVOCATION OF DETENTION ORDER** |
| v.. | |
| LUKE BRUGNARA, | Date: October 16, 2014<br>Time: 1:00 a.m. |
| Defendant                                / | Dept: WHA |

Defendant files this motion to revoke the order of September 24, 2014 by Magistrate Judge Cousins detaining defendant pending trial.

## BACKGROUND

The detention proceedings in this case have a long history with which the court is already familiar. Pertinent parts are summarized here, however. Defendant was convicted of tax fraud in case number CR 08-00222 WHA in 2008. After serving a 30 month sentence, he was placed on supervised release in 2012. On May 28, 2014 he was brought to court and arraigned in case

number CR 14-00306 WHA on a complaint alleging a charge of mail fraud. Dkt. #5.[1]
Magistrate Judge Corley ordered him detained on May 30, 2014. Dkt. 7.  Mr. Brugnara was represented by the Federal Defender's Office.   Without listing every court appearance, it is fair to say that bail issues were raised and addressed on numerous occasions, nearly every court appearance, over the next three months, first before Magistrate Judge Cousins, and then before this Court.

Eventually, this Court ordered defendant released on a $500,000 bond, secured by the property at 224 Sea Cliff, San Francisco.  The actual posting of the property, and setting of release conditions, was referred to Judge Cousins.   On August 25, 2014, Judge Cousins set the conditions recommended by Pretrial and ordered defendant released to the halfway house.  As pertinent here, the primary conditions were that defendant would reside at the halfway house, with a bracelet for electronic monitoring, that he was not allowed to use any cell phone or other devices with internet, and that, instead, he would be allowed to use the staff phone, but only to call his attorney of record in this case, with only 2 completed calls per day to his attorney. Dkt. 93..

On September 3, 2014, Judge Cousins modified the conditions to allow Mr. Brugnara to meet with counsel at the Federal Building because of concerns about the confidentiality of the attorney-client meetings at the halfway house: i.e., the staff would not allow the door to the room where Mr. Brugnara met with counsel to be entirely closed during meetings. Dkt 101. Mr. Brugnara insisted that he still wanted to retain private counsel but was unable to call or visit private counsel, so on September 9, 2014, this Court modified the release conditions again to

---

[1] Unless otherwise noted, all docket references are to Case No. CR 14-00306 WHA.

Mot. To Revoke Detention Order
United States v. Brugnara,
Nos. CR 08-00222 & 14-306 WHA                                    Page 2 of  12

allow defendant to call and meet with potential private attorneys. Dkt 105. On September 10, 2014, the court issued an order allowing defendant to secure a cell phone for his own use at the halfway house. Dkt. 109.

A violation memo was then filed, and a hearing was held on the alleged violation on September 12, 2014 before this Court. Dkt. 122. The evidence showed that Mr. Brugnara made several phone calls on September 11, 2014 that were not to his attorney of record, but were to private counsel, civil counsel, his doctor, and his wife. The court found he had violated the conditions of release and modified the release conditions to delete the condition that he be allowed his own cell phone. Dkt 118.

At multiple proceedings Mr. Brugnara insisted that he was not an economic danger, and that he could present witnesses to prove that point. His motion for an evidentiary hearing on that issue was denied, without prejudice, on September 11, 2014 because no declarations were submitted in support of the motion. Dkt. 113. On September 19, 2014 defendant submitted another motion to modify his release conditions with a request for an evidentiary hearing, this time with supporting declarations. Dkt. 134. The hearing was set for September 24, 2014.

On September 22, 2014, Pretrial Services filed a violation memorandum alleging that (1) on September 12th, after meeting with potential retained counsel James Lassart at the law firm Murphy Pearson, defendant stopped in the vicinity of the Westfield San Francisco Centre for approximately one-half hour before then returning to the halfway house; (2) that on September 18th, again after meeting Lassart, Mr. Brugnara again stopped for half an hour near the Westfield Centre, then rather than proceeding directly to the halfway house took a deviation on the way back; and (3) on September 19, 2014, defendant used the telephone when defense counsel was

Mot. To Revoke Detention Order
United States v. Brugnara,
Nos. CR 08-00222 & 14-00306 WHA                                         Page 3 of 12

not present and without prior approval from Pretrial.

On September 23, 2014, the government filed a motion to revoke the release order. Dkt. 140. In support of its motion it provided phone records for the phone in one of the conference rooms at the attorney lounge.

At the hearing on September 24, 2014, the court first received testimony from two witnesses proffered in support of defendant's argument that he was not an economic danger. Tony Crossley testified that he has known Mr. Brugnara for approximately 20 years. Exhibit A (Transcript of September 24, 2014, at p 17). Crossley is a commercial real estate broker with Colliers International. Over the years, Crossley helped defendant purchase, sell, and lease office space at many office buildings throughout San Francisco. The deals were for millions of dollars. Other people at his firm also helped Mr. Brugnara with respect to properties in Las Vegas. During all his dealings with defendant over the years, Mr. Crosseley said that there were never any suggestions of fraud in any of the transactions. TX at p. 25.

Defendant then called Frank Sanders to the stand. TX at p. 31. Mr. Sanders is a former Vice President of the Commercial Bank of San Francisco, and the U.S. Thrift and Loan. He has known Mr. Brugnara for approximately 20 years. He has also brokered deals in which other people lent Mr. Brugnara money. The last deal he was involved in with Mr. Brugnara was for a loan of approximately $38 million. TX at p. 33. He has lent money or brokered deals in which other people lent Mr. Brugnara money 12 to 13 times. TX at p. 34. All the loans made by Mr. Sanders to Mr. Brugnara were paid off, on time, in full. TX at p. 37.

Allen Lew then testified. TX p. 64. He said that Mr. Brugnara had been authorized to meet with counsel until 5:00 p.m., and directed to report back to Pretrial after meeting with counsel, on September 19, 2014. At about 5:00 p.m. that day, Mr. Lew said he realized that Mr.

Brugnara had not yet reported back to Pretrial. He knew that defendant had been meeting counsel at the Attorney Lounge, so he went to the Attorney Lounge. TX at p. 65, 67.  The lounge was empty but he could hear what sounded like Mr. Brugnara's voice through one of the closed conference room doors, though he could not hear what was being said. TX p,. 66, 67.  Mr. Lew knocked, and defendant quickly answered the door.  Mr. Lew observed that defendant was not holding the phone, which was on the other side of the room, but the receiver of the phone was off the hook.  TX at p. 68.  Lew said it appeared defendant had been using the phone.  TX 66.  Defendant did not deny using the phone.  TX 69.  He said he had unsuccessfully tried to contact Bob Kane.  TX at p. 66.  Defendant also mentioned that this court had authorized him to use the phone without supervision.  TX at p. 66.  Mr. Lew picked up the receiver but there was no dial tone.  He then hit the redial button to see what number had been called but it did not work.  TX at pp. 69-70.

     Mr. Brugnara then testified in his own behalf.  TX p. 76.  He did not deny stopping on the way back from Mr. Lassart's office on September 12th and 18th.  He said that the first time he went to into the bathroom at Lassart's office and it only had one stall and there was someone on it.  TX p. 80.  He said that he could have waited, but that he has bleeding hemorrhoids and did not want to make a mess in Lassart's common office toilet.  TX 81-82, 84.  He testified that he had to stop and use a bathroom on the way back to the halfway house on both occasions.  TX at p. 79.  He said that on the second trip back from Lassart's office, there was a group of people screaming on Market so he took a detour to avoid the conflict.  TX at p. 81.  He said that he got back to the haflway house early on both occasions.  Id.  On cross he testified that he stopped at the Flood Building to use the bathroom, which is where Bob Kane's office is located.  TX 87.  He said he did not see Bob Kane or use a phone one the way back on either occasion.

Mr. Brugnara testified that when Mr. Lew came to the conference room on September 19, 2014, he was getting ready to call Bob Kane. TX 90.   He testified that defense counsel was with him before that but did not know exactly what time he left because he did not have a watch and there was no clock in the conference room. TX 90-92. Mr. Brugnara said that it was his understanding that he was allowed to call Bob Kane because he was allowed to call his attorneys. TX 92.

In support of detention, the government argued that the phone records for the conference room phone showed that defendant had violated the conditions of release. It argued that defense counsel was not present when the conference room phone was used because phone calls to defense counsel's cell phone were made from the conference room phone at 4:16 and 4:17 p.m. on September 19th.  Those calls were then followed by a telephone call to a witness, Natalia Shlyapina, that lasted for 51 and one-half minutes. TX 57-64.   The government argued that defendant then lied to Pretrial Services Officer Lew about his use of the phone.   The government also noted that there were calls made to Kay Brugnara, Bob Kane, and the San Francisco Chronicle, among others, on earlier occasions from the conference room.

The court found that defendant had violated the terms of his release by using a phone, and by contacting a witness outside the presence of defense counsel. TX 106.   The court concluded it was unlikely that there was any combination of release conditions that Mr. Brugnara would abide that would reasonably assure the safety of the community and remanded the defendant into custody. TX 109.

///

///

///

## LAW AND ARGUMENT

**I.   DETENTION IS UNWARRANTED BECAUSE THERE ARE CONDITIONS THAT WILL REASONABLY ASSURE THE SAFETY OF THE COMMUNITY**

The detention of Mr. Brugnara pending trial is improper because there are conditions that will reasonably assure the safety of the community.

### A.   Applicable Law

Mr. Brugnara is on supervised release with an alleged violation pending.  Accordingly, his detention or release is governed by Rule 32.1(a)(6) of the Federal Rules of Criminal Procedure.  That rule provides, in turn, that the release of a defendant pending revocation of his supervised release is governed by 18 U.S.C. § 3143(a)(1), and that the defendant bears the burden of proof to a clear and convincing evidence standard.   Section 3145(b) provides that this court may review a detention order by a magistrate judge.    This court's review of a detention order is de novo.  *United States v. Koenig*, 912 F.2d 1190 (9th Cir. 1990).   This court must determine on its own whether or not detention is proper.

### B.   There Are Conditions That Will Assure Mr. Brugnara Is Not An Economic Danger To the Community

Even if Mr. Brugnara used the telephone in the attorney's lounge without counsel present that does not show that he is dangerous to the community. Mr.Brugnara is certainly not so economically dangerous that his continued residency at the halfway house would not "reasonably assure" the economic safety of the community. *See United States v. Hir*, 517 F.3d 1081, 1091-92 (9th Cir. 2008) ("Even where a defendant poses a danger, he must still be released if there is a 'condition or combination of conditions [that] will reasonably assure . . . the safety of any other person and the community.'" (quoting 18 U.S.C. § 3142(e))).

Economic danger is and should be the rarest form of detention.  Even Bernard Madoff,
Mot. To Revoke Detention Order
United States v. Brugnara,
Nos. CR 08-00222 & 14-00306 WHA                                                                Page 7 of  12

who was convicted of running the largest Ponzi scheme in history and defrauding investors of billions of dollars, was released on conditions pending trial. There may be another such case, but the undersigned cannot think of another white collar case in this district where a defendant was denied bail pending trial.

Although the Ninth Circuit has held that economic danger can be the basis for detention after conviction in *United States v. Reynolds*, 956 F.2d 192 (9th Cir. 1992), the *Reynolds* case is distinguishable. In that case, the defendant was convicted at trial of 13 counts of fraud, and two counts of witness tampering, and then sentenced to 14 years imprisonment. His application for bail pending appeal was denied in the district court, and the Ninth Circuit affirmed that denial. The court stated that danger to the community "may, at least in some cases, encompass pecuniary or economic harm." *Id.*

Mr. Brugnara pled guilty to tax evasion several years ago, but he has not been convicted of any of the charges against him in the new case. Not only was Mr. Brugnara released on bail for 20 months while his 2008 case was pending, he was then also released on bail after sentencing and allowed to self surrender to the prison in Texas for service of his 30 month sentence. He was then on supervised release in this court, with no economic restrictions whatsoever, for over two years after his release from prison before Rose Long alleged he defrauded her of a piece of art. Mr. Brugnara presents a far stronger case for release than did the defendant in Reynolds.

Moreover, through his witnesses at the September 24th hearing, Mr. Brugnara has proven that he is not an economic danger. His witnesses testified, as Mr. Brugnara has always asserted, that over the last 20 years he borrowed millions and millions of dollars in the course of buying, leasing and selling dozens of commercial properties. His witnesses proved that he also has, over

the last 20 years, repaid those millions and millions of dollars. There was never any allegation of fraud in any of those transactions. Magistrate Judge Cousins apparently found this evidence not probative because none of the transactions occurred within the last few years.[2]

While residing at the halfway house, Mr. Brugnara was only allowed to use the staff phone. As the court knows, he did not have free or unlimited access to that phone, but had to get the permission of staff to be able to access the conference room where the phone was located. The staff was able to monitor what telephone numbers were called when Mr. Brugnara was allowed access to the phone to ensure that he only made authorized calls.

Finally, the alleged phone call violation at issue in the revocation proceeding should not have resulted in detention. As the court may recall, the person with whom he apparently had a long telephone conversation, Natalya Shlyapina, is a woman with whom Mr. Brugnara had an ongoing personal relationship and whom gave birth to his youngest biological son just a couple of months ago. She was a witness in the case in only a very tangential way, and her Rule 15 deposition was taken to secure that testimony more than a month ago. She has since returned to Russia, the country where she resides and is from. She is no longer a witness in this case. She is still, however, and will always be, the mother of Mr. Brugnara's young son. Although the phone call may have been a violation (if the phone records are allowed to be considered, which defendant argues against below), it was not a violation that should result in detention. As argued

---

[2] The only specific fraudulent transaction of which counsel is aware, apart from Rose Long's unsubstantiated allegations, is case of Ebnetter v. Brugnara, San Francisco Superior Court No. CGC-08-502436. In that case, the plaintiff gave up a loan secured by property in Gilroy in exchange for making a larger loan to defendant, in the amount $900,000, with a deed of trust to 351 California Street. The deed of trust was not executed by the owner of 351 California Street. However, it should be significant that the court found that the plaintiff had not suffered any monetary loss because of defendant's conduct. Indeed, it noted that defendant offered to give the plaintiff the Gilroy property but the plaintiff declined the offer.

Mot. To Revoke Detention Order
United States v. Brugnara,
Nos. CR 08-00222 & 14-00306 WHA

above, a change in release conditions would have addressed the concerns raised by the activity.

Finally, the restriction disallowing Mr. Brugnara from calling anyone but counsel was not narrowly tailored to the harm it sought to prevent: i.e., economic danger. Moreover, it unreasonably impinged upon his rights of free speech or association. *See Overton v. Bazzetta,* 539 U.S. 126, 131, 123 S. Ct. 2162, 156 L. Ed. 2d 162 (2003).

The evidence shows to a clear and convincing standard that Mr. Brugnara would not pose a danger to the community if he is returned to the halfway house on the conditions previously imposed; that is, without being able to come to the Federal Building to meet with counsel, or to go to meet potential counsel at their offices.

### C. The Court Should Disregard The Phone Records

Here, the government's motion to revoke Mr. Brugnara's release was premised upon phone records it obtained for the phone from the conference room where the government knew that defendant was having attorney-client meetings. This kind of investigation is wholly improper and prejudicial to the defendant. Because of concerns about the confidentiality of the attorney-client meetings at the halfway house, defendant was allowed to meet with counsel at the federal building. Pretrial Services knew that Mr. Brugnara was meeting counsel in the Attorney Lounge. When Pretrial informed the government that Mr. Brugnara had made a call in the room where he had been meeting counsel, the government subpoenaed all the records for the phone in that room.

Since the government knew that this was the room where defendant was meeting counsel, this was improper. During bail proceedings, defense counsel had requested that defendant be allowed to come to his office for meetings, but that request was denied. CJA counsel do not have offices in the Federal Building. However, if Mr. Brugnara was still represented by the Federal

Defender's Office, it would be unthinkable for the government to subpoena the phone records for the Federal Defender's Office when defendants were meeting counsel.

"'[A] claim of outrageous government conduct premised upon deliberate intrusion into the attorney-client relationship will be cognizable where the defendant can point to actual and substantial prejudice.'" *United States v. Haynes*, 216 F.3d 789, 797 (9th Cir. 2000) (quoting *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996)). A claim of government interference with the attorney-client relationship has three elements: (1) the government was objectively aware of an ongoing, personal attorney-client relationship; (2) the government deliberately intruded into that relationship; and (3), as a result, the defendant suffered actual and substantial prejudice. *Voigt*, 89 F.3d at 1067.

Defendant made a prima facie case of outrageous government conduct here. The government was aware of the location where Mr. Brugnara was meeting privately with counsel, it deliberately subpoenaed the phone records for the room where the meetings took place (a deliberate intrusion), and Mr. Brugnara suffered substantial prejudice as a result. The appropriate remedy is for this court to disregard the phone records obtained by the government.

Absent those records, there was no evidence presented that defendant was doing anything other than what he told Mr. Lew.

///

///

///

///

///

///

**CONCLUSION**

Mr. Brugnara should be released back to the halfway house on the conditions previously imposed, except that the condition that previously allowed him to have attorney-client meetings at the Federal Building, and to go meet with potential retained counsel, should be deleted. These restrictions would reasonably assure the safety of the community.

DATED: October 9, 2014

                                     Respectfully submitted,

                         By:   /S/Erik Babcock
                              ERIK BABCOCK
                              Attorney for Defendant
                              LUKE BRUGNARA