1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   J. DOUGLAS WILSON (DCBN 412811)
3  Chief, Criminal Division

4  W. DOUGLAS SPRAGUE (CABN 202121)
   BENJAMIN KINGSLEY (NYBN 4758389)
5  Assistant United States Attorneys

6       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
7       Telephone: (415) 436-7200
        Fax: (415) 436-7234
8       doug.sprague@usdoj.gov
        benjamin.kingsley@usdoj.gov
9
   Attorneys for the United States
10
                      UNITED STATES DISTRICT COURT
11
                     NORTHERN DISTRICT OF CALIFORNIA
12
                          SAN FRANCISCO DIVISION
13

14
   UNITED STATES OF AMERICA,          )  CASE NO. CR 14-0306 WHA
15                                    )           CR 08-0222 WHA
         Plaintiff,                   )
16                                    )  UNITED STATES' OPPOSITION TO
      v.                              )  DEFENDANT'S MOTION FOR REVOCATION OF
17                                    )  DETENTION ORDER
   LUKE D. BRUGNARA,                  )
18                                    )  Date:   October 16, 2014
         Defendant.                   )  Time:   1:00 p.m.
19 _____ )

20      Despite repeated violations of orders of this Court, Magistrate Cousins, and Pretrial Services,

21 defendant moves, yet again, to be released to the halfway house. In support of his motion, defendant

22 persists in his claim that he is not an economic danger, but he presents no new evidence to counter the

23 findings of Magistrate Corley, Magistrate Cousins, and this Court that he poses an economic danger to

24 the community. Defendant also claims this Court should disregard the most indisputable evidence of his

25 repeated violations of this Court's orders and trust. Magistrate Corley, Magistrate Cousins (more than

26 once), and this Court (several times) were correct; defendant's motion should be denied and he should

27 remain remanded pending trial.

28 //

U.S. Opp. To Def. Mot. for Revocation of Det. Order;
CR 14-0306 WHA and CR 08-0222 WHA

1

**BACKGROUND**

As the Court knows, this is not the first time the parties have argued, and this Court has considered, the conditions of defendant's pretrial detention and release.

**A.      Defendant's Initial Detention from May 28 through August 25**

Defendant was initially ordered detained by both Judge Cousins and Judge Corley based on their respective and independent findings that the defendant is an economic danger and was not amenable to supervision. This Court initially denied the defendant's requests to revoke those detention orders, making the same findings. In detaining defendant, this Court, Judge Cousins, and Judge Corley held at least eight hearings between May 28 and August 14—a period of two and a half months—relating to bail and detention. *See* Dkt. No. 5 (5/28/14 initial appearance on Complaint before Judge Corley); Dkt. No. 6 (5/30/14 detention hearing before Judge Corley); Dkt. No. 12 (6/11/14 arraignment on Indictment before this Judge Cousins); Dkt. No. 37 (6/27/14 reconsideration hearing before Judge Cousins); Dkt. No. 39 (6/30/14 hearing before this Court on motion to revoke detention orders); Dkt. No. 65 (7/29/14 hearing before this Court on defendant's further motion for pretrial release); Dkt. No. 69 (8/13/14 bond hearing before this Court); Dkt. No. 75 (8/14/14 further bond hearing before this Court). These do not include the various other hearings at which the parties appeared on other issues and the defendant raised pretrial detention.

During that same period, there were no fewer than four *written* detention orders finding that defendant is a danger to the community and not amenable to supervision. Dkt. No. 7 (5/30/14 Detention Order from Judge Corley finding that defendant is a danger to the community and not amenable to supervision); Dkt. No. 15 (6/13/14 Detention Order from Judge Cousins finding that Judge Corley's ruling was "correct," that defendant "is not amenable to supervision," and that "his conduct would not be deterred by a surety or in-home custodian"); Dkt. No. 38 (6/27/14 Preliminary Order from Judge Cousins denying defendant's motion to reconsider his detention); Dkt. No. 40 (6/30/14 Order from this Court denying motion to revoke detention orders and holding that "defendant would not honor any such conditions of release and that he would not be amenable to supervision" and finding "by clear and convincing evidence that defendant presents an economic danger to the community"). There were additional findings made orally on the record by each court on these same points. *See, e.g.*, Transcript

of 8/14/2014 Hearing at 85:2–5 (this Court noting that the defendant "is not amenable to supervision" and that "if I put the conditions on him, I believe that he will blow them off when it suits his convenience").

**B.    Defendant's Release to Halfway House on August 25**

On August 22, this Court approved the defendant's release to a halfway house, with conditions, after a lengthy series of bond hearings. Dkt. No. 92. Those hearings were designed to ensure that there was enough value in the defendant's family home to secure a bond, so that a secured bond would hopefully "have some sobering value to Mr. Brugnara that if he were to violate his conditions, it would come back to haunt his wife, and more importantly, his children." Transcript of 8/22/2014 Hearing, Dkt. No. 99 at 49:17–24. There was good reason for this Court to attempt to impose a bond and conditions of release that would have some deterrent effect on defendant. As this Court found, in explaining why defendant's case was different from other white-collar cases with respect to pretrial detention, the "evidence indicates that Mr. Brugnara maybe just can't help himself. He gets on the phone, he starts talking, and pretty soon he's cheated somebody out of money. So I think he does present a risk, substantial risk, of further crimes to the community, and it bothers me. That's why these conditions are so strict." *Id.* at 50:25–51:6.

This Court did not rest its justification for these strict conditions only on the economic danger posed by defendant. It also relied on the overwhelming evidence and repeated findings that the defendant was simply unable to follow anyone's directions and thus was not amenable to supervision. As this Court explained, "he has demonstrated that he is not amenable to supervision. He interrupts the Court. He tries to fire his lawyer. He won't abide by his own lawyers instructions, and despite many admonitions by the poor judge in the case trying to get him to keep quiet because it's not doing him any good." *Id.* at 51:8–13. Finally, as defendant stands accused of fraudulently obtaining and retaining a valuable Degas sculpture, the Court noted that "there is substantial evidence, that that missing piece of piece of artwork was delivered to him" and thus the Court was concerned "that if he was out free, he could conceal the evidence in some manner." *Id.* at 52:13–16.

As a result of these concerns, this Court applied restrictive conditions on the defendant, "designed to protect the community from further crimes, white-collar crimes." *Id.* at 52:6–8. On

August 25, based on this Court's direction, Judge Cousins held a bond hearing and released the defendant on the conditions previously approved by this Court. Dkt. No. 94 (8/25/14 bond and surety hearing before Judge Cousins). These conditions required that he reside at the GEO Care halfway house and wear a GPS monitor. They restricted his use of the telephone, stating that "the defendant may only use a Geo halfway house telephone . . . in the presence of a member of the Geo staff and only for the purpose of communication with his attorney of record, currently Mr. Erik G. Babcock, for cases 3:14-CR-0306 or 3:08-CR-0222. He may not use any other telephones for any other purpose." The conditions prohibited him from possessing or using any cellular phones, smartphones, computers, tablets, or any other device that could connect to the internet, make phone calls, and send or receive text messages. They prohibited him from asking any other person, beyond his attorney of record, to send or receive emails or text messages, or contact any other individuals, on his behalf, and they prohibited him from engaging in or attempting to engage in any financial transactions, directly or indirectly.

**C.    Defendant's Violations of Pretrial Release from August 25 through September 12**

Less than 10 days after he was released to the halfway house, Pretrial Services filed a notice of defendant's violations of the terms of his release. Specifically, defendant had failed (repeatedly and despite being told several times) to charge his GPS device, resulting in hours' worth of gaps in his known whereabouts. In addition, defendant attempted to contact a witness. Even after being told by the witness' attorney that he could not talk to the witness, defendant pursued the communication and said "I love you" to witness Natalia Shlyapina minutes before her Rule 15 deposition.

On September 3, Judge Cousins admonished defendant for this conduct, but, at defendant's request, expanded his conditions of release to permit defendant to meet with his counsel of record, Erik Babcock, here in the federal building to prepare for trial—a privilege, as set forth below, that defendant proceeded to abuse with impunity. Dkt. No. 101 (9/3/14 bail review hearing before Judge Cousins).

The following week, on September 9, when the parties were before this Court on defendant's motion to continue the trial, defendant persisted in complaining about the halfway house conditions. Defense counsel raised concerns about the conference room door at the halfway house closing and the defendant's ability to hire a new lawyer. Transcript of 9/9/2014 Hearing at 18–21. This Court allowed defendant to make calls to possible new criminal defense attorneys, and suggested that the halfway

house should close the door when the defendant was meeting with his attorney there. *Id.* The next day, September 10, this Court issued an order permitting the defendant to possess a cell phone only to talk to his attorney of record, and to work with Pretrial Services to use it on a restricted, monitored basis. Dkt. No. 109.

At approximately the same time, however, the United States learned that defendant had made unauthorized calls from the halfway house. Accordingly, on September 11, the United States moved to revoke defendant's pretrial release. Dkt. No. 117. At a hearing on that motion on September 12, defendant initially claimed an employee of the halfway house told defendant that he could make the calls at issue. When pressed for a name, defendant said the employee who permitted those calls was Ms. Daniels. Transcript of 9/12/2014 Hearing at 5:18–25 (when asked by the Court for "the name of the person who allegedly told your client that he could violate the order," Mr. Babcock answered "Ms. Daniels" and the defendant answered "Melody Daniels"). Ms. Daniels testified, however, that she did not give any such permission. *Id.* at 60:5–60:21. Defendant then changed his story. He stated that he had spoken to Ms. Washington about receiving a cell phone, and that no one had directly told him that he could make the calls in question. *Id.* at 106:23–109:24. Ms. Washington then came to court and testified that she neither told the defendant that he could have a cell phone nor that he could make the calls in question. *Id.* at 134:11–19. After violating his conditions of release and then lying about it, this Court found that defendant violated his conditions of release but decided not to remand defendant "yet." *Id.* at 157:23–24. Specifically, this Court stated as follows:

> Now, with respect to these calls that were made yesterday, they were in violation of the order. They were in violation of the conditions. The Court rejects the idea that anybody at the halfway house told him he could make those calls. And, you know, if you followed what happened today, the story changed at every turn. First it was X that told him he could do it. He next testified, "No, that's not true," then "Oh, well, maybe it was Y. No." Then Y testified, "No, I didn't tell him that, either." So it just was -- it just got -- it's a story that gets made up as he goes along, made up as he went along, and whatever -- whatever seemed convenient at the moment is what Mr. Brugnara says, and I don't believe his version of it. I believe the GEO Care's version of it. And so I believe he did violate the order, but I'm not going to revoke him on that count yet. I'm just going to take judicial notice of those violations and tuck it away for future reference in case we need to revoke in the future.

This Court did, however, rescind its prior order regarding defendant being allowed to use a cell phone on a limited basis, finding that defendant's complaints about the conditions at the halfway house had been untrue. *Id.* at 158:2–3. Notably, one of the unauthorized phone numbers defendant had dialed

U.S. Opp. To Def. Mot. for Revocation of Det. Order;
CR 14-0306 WHA and CR 08-0222 WHA
5

was to his civil attorney, Robert Kane. This Court again made clear that the defendant, though authorized to contact criminal attorneys who might represent him in this case, was not authorized to call Robert Kane. *Id. at* 163:11–164:17 ("I'm not including Mr. Kane in that. Mr. Kane is not included in that.").

**D.      Defendant's Violations in Detouring from Trips to Visit Law Firms**

*The very same day* as that September 12 hearing before this Court, defendant again disregarded orders of this Court and Judge Cousins. That afternoon he left the law offices of potential new counsel just after 5:36 p.m. 9/22/14 Violation Memorandum by Pretrial Services. According to GPS data, defendant was in the vicinity of the Westfield Mall by 5:54 p.m. *Id*. He remained there for approximately 33 minutes. *Id*. One week later, when Pretrial Services confronted him with this information, defendant claimed he stopped to use the bathroom (apparently for 33 minutes). When Pretrial Services asked why he did not use the bathroom at the law offices before he left, defendant claimed the law office bathroom was "very small" and that an alleged medical condition contributed to the decision.

Defendant repeated the same implausible story when confronted with another inexplicable detour on his way from those law offices to the halfway house. This time, GPS data showed that on September 18 defendant left the same law offices at approximately 3:49 p.m. He then remained in the vicinity of the Westfield Mall for approximately 35 minutes. Compounding this violation, defendant spent another 22 minutes of unauthorized travel walking northbound on Powell Street to O'Farrell, down Cyril Magnin, and lingering outside. When asked about this, defendant repeated the same implausible bathroom story.

These instances show plain violations of court orders and Pretrial Services' instructions. They also show he committed another violation, lying to Pretrial Services. Claiming that he did not want to use a law firm bathroom because it is "small" shows that defendant knew he needed to use a bathroom before he left. Instead of doing so, however, he left. Then, instead of walking straight to the halfway house to use the bathroom—approximately a 10 to 12 minute walk—defendant claims he walked to The Flood Building at 870 Market Street to use a bathroom there. Robert Kane's office is in The Flood Building at 870 Market Street.

Defendant initially used the same false excuse to explain his September 18 detour. Not only is this excuse implausible on its face for the same reasons, but the implausibility is compounded by the coincidence—defendant happened to have to use the bathroom again upon leaving the law offices; he did not wish to use a law firm bathroom; instead of going to the same place this time—The Flood Building— he crossed the street and went into a mall. And then he wandered off-track for 22 minutes before returning to the halfway house. In all, it took him more than an hour to cover the 10 to 12 minute walk from the law offices to the halfway house. (Even with the alleged bathroom stop on September 12, that day he made the trip from the law office to the halfway house in approximately 40 minutes.) Instead of making up a story about his wanderings, defendant "denied having *stopped* anywhere else that afternoon." *Id*. (emphasis added)

**E.    Defendant's Violations in Making Further Unauthorized Phone Calls from Attorney's Lounge**

Yet defendant's brazen disregard for court orders and Pretrial Services' instructions did not even pause. The *very same day* Pretrial Services confronted him with his unauthorized detours, defendant violated the restrictions by remaining in the "Attorney Lounge unaccompanied by defense counsel and without prior approval from U.S. Pretrial Services." *Id*. At 5:11 p.m. on Friday, September 19, Pretrial Services Officer Allen Lew went to the Attorney's Lounge and heard defendant's voice behind a closed conference room door. Defendant was alone in the room. He claimed he was trying to reach civil attorney Robert Kane; even if true (and as demonstrated at the September 24 hearing before Judge Cousins as discussed below, it was false), that is a clear violation of the terms of his release.

After being informed of the defendant's unauthorized use of the phone in the Attorney's Lounge, the United States requested and received phone records pertaining to the conference room telephone where Pretrial Service Officer Allen Lew caught defendant using the phone, outside the presence of counsel. Those phone records show additional repeated violations of court orders.

Those records show that when Pretrial Services Officer Allen Lew walked in to find defendant on the phone, outside the presence of counsel, at approximately 5:11 p.m. on September 19, *defendant was talking to witness Natalia Shlyapina and had been talking to her for 51 minutes.* The phone records reflect that at 23:17 UTC time (which is 4:17 p.m. PST) a call was placed from that conference room

U.S. Opp. To Def. Mot. for Revocation of Det. Order;
CR 14-0306 WHA and CR 08-0222 WHA

phone to phone number 415-860-9931. That is witness Natalia Shlyapina's cell phone number. The phone records reflect the duration of that call was 51 minutes and 33 seconds; in other words, the call was from 4:17 p.m. to approximately 5:09 p.m. Pretrial Services Officer Lew heard defendant talking in the room (defendant was alone in the room) and entered the room at approximately 5:11 p.m. Just prior to that call, defendant had called attorney Babcock and defendant's wife. The next call after the call with Ms. Shylapina is an incoming call (of zero duration) at 5:32 p.m. and an outgoing call (of zero duration) at 5:33 p.m. By those times, defendant had left the building. It is plain, therefore, that Pretrial Services Officer Lew interrupted an unauthorized call with a witness in this case, and that defendant simply lied to Officer Lew when asked about it (and, to reiterate, even if the lie were true, it would have been an unauthorized call).

It was apparent that this unauthorized call is just one of many. The phone records demonstrate a pattern of the defendant making calls to defense counsel's cell phone—showing defense counsel is not present—preceded and followed by numerous calls. There are 13 pages of phone records, which were submitted at the evidentiary hearing on September 24 and are attached hereto as Exhibit 1. The last call on page 12, call number 456, is a call from the Attorney's Lounge conference room to defense counsel's cell phone. That call was placed at 4:01 p.m. PST, and it lasted for 11 minutes and one second. It is followed immediately by a call with many digits, then two calls to defendant's wife's cell phone, two calls to defense counsel's cell phone, and then the 51 minute call with witness Natalia Shlyapina eventually interrupted by Mr. Lew. All of these calls were outside the presence of counsel.

By the time he was making these calls, the defendant had been admonished by this Court for contacting witness Shlyapina. He simply ignored the admonishment. He was admonished for making unauthorized calls, including specifically to Robert Kane, and this Court found defendant had violated the conditions of release by doing so. Yet he continued to do so.

Indeed, the phone records establish that defendant simply used the Charles R. Breyer Attorney Lounge as his personal office. Those records reflect that from September 9, 2014, through September 19, 2014, defendant made approximately ***ninety*** calls to defense attorney Babcock. There would be no reason, of course, to call attorney Babcock if attorney Babcock were in the room meeting with defendant. The calls to attorney Babcock frequently were preceded and/or followed by calls to

unauthorized persons, including dozens of calls to defendant's wife (number ending in 8869), dozens of calls to defendant's girlfriend (number ending in 9931), numerous calls to the San Francisco Chronicle (number ending in 1111), calls to the entity holding the second mortgage on defendant's home, and more. The records from September 17, 2014, are illustrative. The ***more than 120 phone calls*** just that day begin with two connected calls to attorney Babcock's cell phone number (ending in 9151). Approximately 40 more calls are made to that number throughout the day, some of which do not connect, some of which appear to connect, but all suggesting attorney Babcock is not present with defendant. Interspersed between the calls to attorney Babcock's cell phone are calls to Bob Kane (numbers ending in 1510 and 7597), a 12+ minute call with Saxe Mortgage (the entity holding the second mortgage on defendant's home), a call with defendant's mother (number ending in 7228), several calls with defendant's wife (number ending in 8869), and five calls—including more than 45 minutes of connected time—with defendant's girlfriend (number ending in 9931).

This is not trial preparation, and this is not trial preparation with attorney Babcock. This is a violation of release terms.

**F.     Defendant's Motion to "Refute" the Finding of Economic Danger**

Even while he was violating the terms of his release, defendant was continuing to contest the repeated designations of this Court and the magistrate courts that he is an economic danger to the community. On September 10, defendant filed a motion requesting a hearing to refute that he was an economic danger. Dkt. No. 110. On September 11, 2014, this Court issued an order denying the request for an evidentiary hearing regarding economic danger. Dkt. No. 113. In so doing, this Court held that the "defendant poses an economic danger to the community" based on evidence from the Form 12 hearing. *Id.* This was the fifth written order by a court stating that the defendant is an economic danger or that he is not amenable to supervision.

On September 19, the defendant filed a motion for modification of the conditions of relief, asking for a further detention hearing and asking Judge Cousins to declare that the defendant is not an economic danger to the community. Dkt. No. 134. He based his request for a further detention hearing on two bare-bones declarations, consisting of a total of nine substantive sentences, from Tony Crossley and Frank Sanders. Dkt No. 134 Attachments A and B.

1   Both men testified at the hearing on September 24 before Judge Cousins. Mr. Crossley testified
2   that he is a commercial real estate broker who had known the defendant for approximately 20 to 25
3   years, and had served as the defendant's broker in buying, selling, and leasing commercial real estate.
4   Transcript of 9/24/2014 Hearing at 16:23–18:20. Mr. Crossley testified that the last transaction he did
5   with the defendant was "eight or ten years ago" and that these deals were "ancient stuff." *Id.* at 25:23–
6   26:5. Mr. Crossley also testified that the declaration that he signed attesting to his prior business
7   dealings with the defendant had been modified; defense counsel had provided a draft declaration with an
8   inflated dollar figure that he felt necessary to correct. *Id.* at 26:10–27:6, 29:19–29:21.

9   Mr. Sanders testified that he is a private commercial real estate lender who had known the
10  defendant for twenty years, and he had loaned money or brokered loans for the defendant. *Id.* at 31:22–
11  32:18. He testified that he had been involved in about 12 or 13 loans to defendant, *id.* at 32:6–18. and
12  that the last transaction with defendant was a loan he had brokered before defendant had been indicted
13  for tax evasion, *id.* at 39:16–17. He testified that, for the most recent loan, he was not aware of whether
14  the lender was paid back or not. *Id.* at 34:17–19. He did testify that, for the loans for which he or his
15  employer was the lender, he had been paid back. *Id.* at 37:2–5. It was apparent, however, that most of
16  these transactions occurred in the 1990s. Mr. Sanders testified that the first draft of the declaration
17  regarding his transactions with defendant had stated that Mr. Sanders had made $200 million in loans to
18  defendant. *Id.* at 42:12–14. Mr. Sanders, like Mr. Crossley, insisted on revising the figure lower, to
19  "several million dollars," to ensure it was accurate. *Id.* at 42:15–43:5. He further testified that
20  defendant had once attempted to obtain a loan from or through Mr. Sanders using artwork as collateral.
21  *Id.* at 43:6–44:4.

22  Judge Cousins then denied the motion, finding that "the probative value of the information
23  presented in court today to be very small because of the timing of the information presented." *Id.* at
24  55:24–56:1. Specifically, Judge Cousins noted that the transactions involved were, at best, 5 years or
25  more old, and that the information was not new, as it was "not disputed that Mr. Brugnara engaged in
26  multimillion dollar commercial transactions with many millions of dollars." *Id.* at 56:2–19.

27  Judge Cousins was plainly correct in denying the defendant's motion for modification of his
28  release conditions. A detention hearing may be reopened "if the judicial officer finds that information

U.S. Opp. To Def. Mot. for Revocation of Det. Order;
CR 14-0306 WHA and CR 08-0222 WHA

10

1  exists that was not known to the movant at the time of the hearing and that has a material bearing on the
2  issue whether there are conditions of release that will reasonably assure the appearance of such person as
3  required and the safety of any other person and the community." 18 U.S.C. § 3142(f). The defendant
4  did not come close to meeting this standard, and Judge Cousins correctly refused to reverse his holding
5  that the defendant is an economic danger to the community, for several reasons.

6  First, the declarations and testimony of Mr. Crossley and Mr. Sanders contained no new
7  information. Instead, the witnesses stated what defendant has already repeatedly stated himself: that
8  defendant has previously engaged in successful commercial business transactions. Dkt. No. 135 at 2;
9  Dkt. No. 44 at 35:9-12 ("Nobody has ever, your Honor, in $2 billion of transactions spanning 22 years
10 of two million square feet of commercial space has ever stated that I've engaged in fraud."). Second,
11 and relatedly, the content of the witness's testimony is information that defendant knew at the time of
12 the many prior detention hearings. The defendant plainly knew from the outset of this case that he had
13 conducted business transactions with Tony Crossley and Frank Sanders. Third, a snapshot of the
14 defendant's history of business transactions is simply not material to the detention decision. The
15 government has never contested that defendant has engaged in various real estate transactions, nor has
16 the government contended that everyone with whom defendant had previously done business was
17 defrauded by defendant. The various rulings and orders by the courts of this district on defendant's
18 pretrial release conditions never turned on these facts.

19 Instead, the findings of economic danger are based on much more recent conduct than his old
20 business dealings—his fraud in connection with this case, his prior convictions for tax evasion and for
21 making false statements to law enforcement agents, his prior supervised release violations, and
22 defendant's obvious inability to comply with the terms of any restrictions on his conduct. As this Court
23 explained in its most recent order on this issue, the "Form 12 proceeding demonstrated by clear and
24 convincing evidence that defendant poses an economic danger to the community, based on (among other
25 things) his false representations concerning his financial ability to pay and his intentions and treatment
26 of the artwork, as illustrated by his claims that the multi-million dollar artwork was a 'gift' by Ms. Rose
27 Long." Dkt. No. 113 at 1. As this Court explained on June 30, "defendant would not honor any such
28 conditions of release and that he would not be amenable to supervision," Dkt. No. 40 at 1, and as Judge

1  Cousins found that defendant "is not amenable to supervision," and that "his conduct would not be
2  deterred by a surety or in-home custodian," Dkt. No. 15 at 2.
3        In fact, the circumstances surrounding the declarations the defendant attempted to obtain from
4  these witnesses only support the finding that defendant is a danger and cannot be supervised. That
5  defendant submitted draft declarations with exaggerated figures to both witnesses unsurprising, and is
6  consistent with defendant's history of lying about his financial status to get what he wants. Moreover,
7  the defendant has repeatedly stated that he has done "over $2 billion worth of deals." Dkt. No. 44 at
8  35:9-12. That he can only find two individuals representing a small fraction of that amount certainly
9  does not represent new, material information to reopen bail proceedings or to reverse prior findings.

**G.     Defendant's Wikipedia Page**

      To the contrary, any "new" information supports remand.

      Defendant was released to the halfway house on or about August 25, 2014. Defendant claimed then, as he claims now, that he needed to be released so he could focus on preparing for trial. In addition to the phone activity discussed above, other records recently received by the government show what defendant's priority was upon arriving at the halfway house. *On his first full day at the halfway house,* defendant made sure to update his autobiographical summary on Wikipedia: http://en.wikipedia.org/wiki/Luke_Brugnara. Specifically, records reflect that on August 26, 2014, at approximately 2:57 and 2:58 p.m. PST, defendant's Wikipedia page was edited. Attached hereto as Exhibit 2 is a copy of the "Revision history" for defendant's Wikipedia page. Defendant again updated his Wikipedia page on or about August 27, August 28, August 29, September 1, September 6, September 9, and September 23. Attached as Exhibit 3 is one example of one such edit, namely, the first one made after defendant's release to the halfway house. On that day, defendant deleted a description of his legal problems and inserted his own summary of his current case, including accusing Rose Long of having "a history of art fraud," claiming that he "determined that the art was not authentic," that Ms. Long gave defendant "365 days to authenticate the art," and that defendant had been "released on bail as the case works its way through the courts." Attached as Exhibit 4 is a response from Comcast establishing that these changes were made on a computer *at the halfway house to which defendant had been released the prior day.* Defendant, of course, had been ordered not to use a

computer or any other device that can access the internet. (Release Condition #3.)[1]

This is not trial preparation. This is a violation of release terms.

**H. Defendant's Arguments to Revoke Magistrate Cousins' Latest Detention Order**

Finally, in the face of indisputable evidence of violations (indeed, defendant appears to concede he violated the terms of release), defendant advances two arguments that he should be given yet another chance in the halfway house.

First, almost in passing, defendant claims he would pose no danger if he were in the halfway house "without being able to come to the Federal Building to meet with counsel, or to go to meet potential counsel at their offices." (Def. Mot. at 10.) This is not persuasive. As this Court already has found, defendant violated the terms of his release while at the halfway house. Especially in light of the violations set forth here, there is no reason to believe he will change his behavior. There is every reason to believe he will again use (or cause the use of) the internet despite orders not to do so, as illustrated by his Wikipedia edits. There is every reason to believe he will use the conference room phone or another resident's phone or computer to contact unauthorized persons.

In fact, defendant admits this is precisely why he is seeking release: in the Supplemental Declaration of Luke Brugnara (Dkt. 411), defendant reasserts his desire to "do a $150 million project, without partners, with zero down, and create tens of millions dollars [sic] of equity at close of escrow." (Dkt. 411, p. 1.) But as demonstrated in a prior hearing, defendant has illustrated how he intends to get a loan for a real estate deal: by collateralizing fake art and falsely inflating his net worth. Attached hereto as Exhibit 5 is an email dated March 26, 2014, in which defendant is trying to use the fake Warhol as collateral for a loan, claiming it is worth "$4M-$5M." Attached as Exhibit 6 is an email dated May 27, 2014, the day before defendant's arrest, in which defendant claims his net worth is $879 million, including an art collection worth more than $500 million. Defendant also asserts his "need to negotiate with the existing first and second [trust deed] note holders on [224] Sea Cliff to avoid foreclosure filings." Dkt. 411, p. 1. This, again, would be a violation of the terms of release defendant

---

[1] The false and unsubstantiated assertions regarding the purchase price of 224 Sea Cliff, the seller of that residence, defendant's charitable contributions, defendant's ownership of water rights, and defendant's $100 million art collection remain on his Wikipedia page.

1 purported to agree to before he was released to the halfway house the first time.

2 As every Court to consider the issue has found, defendant is and remains an economic danger to
3 the community. As defendant has established through his conduct, he cannot be trusted to follow any of
4 the restrictions placed upon him to mitigate that risk.

5 Defendant's second argument—that the Court should ignore indisputable evidence of repeated
6 violations shown in the phone records—fares no better for two main reasons.

7 First, there was no intrusion into the attorney-client relationship here. The attorney-client
8 privilege "does not extend beyond the *substance* of *confidential* attorney-client communications."
9 *United States v. Carrillo*, 16 F.3d 1046, 1050 (9th Cir. 1994) (emphasis added) (citing *In re Fischel*, 557
10 F.2d 209, 211 (9th Cir. 1977). A party asserting the attorney-client privilege has the burden of
11 establishing the existence of an attorney-client relationship *and* the privileged nature of the
12 communication. *United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010). Because it impedes full and
13 free discovery of the truth, the attorney-client privilege is strictly construed. *Id.* The party asserting the
14 privilege bears the burden of proving each of the essential elements to be covered by an attorney-client
15 relationship, including: (1) legal advice is sought, (2) from a professional legal adviser in his capacity as
16 such, (3) the communications relate to that purpose, (4) the communications are made in confidence, (5)
17 by the client. *Id.* The attorney-client privilege protects the confidentiality of communications within the
18 attorney-client relationship, not the "external trappings" of that relationship; courts have found the
19 following examples not covered by the privilege: the existence of the relationship, dates and general
20 subjects of meetings, the identity of persons at those meetings, telephone records revealing a call made
21 to an attorney, fees paid to an attorney, and the existence (as opposed to the substance) of
22 communications between attorney and client. *See, e.g., Thompson v. Cincinnati Ins. Co.*, 2010 WL
23 4667100, *3 (N.D.Fla. 2010) (collecting cases).[2] There is no reason to "disregard the phone records" as
24 defendant requests.

25 Second, defendant's claim that "[a]bsent the phone records, there was no evidence presented that

---

[2] The case defendant cites, *United States v. Haynes*, 216 F.3d 789 (9th Cir. 2000), has no bearing here. In that case, the government learned the *content* of *privileged* information from a defense private investigator who, while serving as a government informant, told the government of the substance of communications involving the defendant and his defense attorney.

U.S. Opp. To Def. Mot. for Revocation of Det. Order;
CR 14-0306 WHA and CR 08-0222 WHA

defendant was doing anything other than what he told Mr. Lew" is not true. Mr. Lew testified that he heard defendant talking in the conference room. (9/24/14 Transcript, pp. 65-66.) Defendant was the only person in the room. At that time, defendant falsely claimed to Mr. Lew that he had called Bob Kane and had "left a message," and he falsely claimed that this Court had "permitted him to use a phone without any direct supervision or permission." *Id*. at 66. At the hearing a few days later, however, defendant changed his story, now claiming that instead of having just left a message for Bob Kane, defendant had taken the phone off the hook with the intent to call Bob Kane, had not dialed any numbers, and then was interrupted in that effort by Mr. Lew's knock at the door as defendant was "about to" phone Bob Kane and was "preparing" to call him. (*Id*. at 77-78; 82-83.) Defendant's own statements prove he lied either to Mr. Lew or to Magistrate Cousins (or to both). Of course, considering the phone records only provides additional evidence of the lie, because they establish Mr. Lew interrupted a call with witness Natalia Shlyapina. But those records are not needed to show that defendant lied to the Court, whether to Mr. Lew or Magistrate Cousins or to both.

Furthermore, this Court had repeatedly instructed defendant that he was not permitted to call Bob Kane. In addition to the plain terms and conditions of release drafted by Mr. Lew, some examples of this Court driving home this point are set forth here:

> THE COURT: … he was not supposed to be making those calls [including to Bob Kane], and Ms. Daniels said she didn't give him permission to do that, contrary to what you [defense] told me a while ago." (9/12/14 Transcript, pp. 78-79);

> THE COURT: And what made you think that you would be permitted to talk to Bob Kane in that fashion?"
> THE WITNESS: Well, Bob Kane visited me three – two or three times.
> THE COURT: That's different. Personal visits were okay. Telephone calls were not okay.
> THE WITNESS: Yeah, but I don't know if Bob Kane made that phone call or not, is what I'm trying to explain to you. Bob Kane may have made that phone call. I'm not certain as I sit here, and I'm under oath. So I don't want to make any statement that could be misconstrued or twisted in any way. (*Id*. at 115—116.);

> THE COURT: … the most important thing is talking to the criminal defense lawyers, not Mr. Kane, no his wife. Now, if they had nothing to do at the halfway house except deal with your client, maybe we would let him make a call a week or two calls a week to his wife, but then that adds additional burden on the halfway house, administrative burden, when the top priority is his defense in the criminal case. So it's a priority problem and a burden problem on the halfway house. How much can we ask them to do for Mr. Brugnara when they've got 200 other people? (*Id*. at 150-151.)

Despite these repeated instructions, defendant, yet again, simply ignored them and continued to

call Bob Kane as defendant saw fit; defendant's own testimony established that, and the phone records show many, many calls to Bob Kane.

### CONCLUSION

As the Court has recognized, the Court and Pretrial Services have "bent over backwards to accommodate" defendant's request to be released to the halfway house (and, later, to meet at the Federal Building) so defendant can prepare for trial. (9/12/14 Transcript at 148-149.) But defendant simply believes no rules apply to him and court orders are, at most, inconveniences to be maneuvered around. Furthermore, the evidence establishes that defendant's true motives are far different than the purported motive of wanting to focus on trial preparation. Instead of preparing for trial, defendant has abused the Court's repeated efforts on defendant's behalf to conduct the following activities: making false entries on his Wikipedia page, making scores of unauthorized phone calls, taking detours on the way back from meeting with allegedly prospective counsel, and lying to this Court, Magistrate Cousins, and Pretrial Services. Defendant should remain remanded pending trial.

DATED: October 15, 2014

/s/
W. DOUGLAS SPRAGUE
BENJAMIN KINGSLEY
Assistant United States Attorneys