Pages 1 - 47

                    UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

             BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
   vs.                             )   NO. CR 08-00222 WHA
                                   )   NO. CR 14-00306 WHA
LUKE D. BRUGNARA,                  )
                                   )   San Francisco, California
            Defendant.             )   Tuesday
                                   )   December 16, 2014
_____)   2:05 p.m.

                       TRANSCRIPT OF PROCEEDINGS

 APPEARANCES:

 For Plaintiff:            MELINDA HAAG
                           United States Attorney
                           450 Golden Gate Avenue
                           San Francisco, California  94102
                     BY:   WILLIAM DOUGLAS SPRAGUE
                           BENJAMIN KINGSLEY
                           Assistant United States Attorneys



 For Defendant:            LAW OFFICES OF ERIK BABCOCK
                           717 Washington Street
                           Second Floor
                           Oakland, California  94607
                     BY:   ERIK G. BABCOCK, ESQ.

 Also Present:             MARSHAL FRANK C. CONROY

 Reported by:              BELLE BALL, CSR #8785, RMR, CRR
                           Official Reporter, U.S. District Court

```
1    TUESDAY, DECEMBER 16, 2014                      2:05 P.M.

2                       P R O C E E D I N G S

3         THE CLERK:  Calling Case No. CR-08-222 and also

4    14-306.  Both are United States versus Luke D. Brugnara.  The

5    matter is on for appeal hearing.

6       Counsel, can you please state your appearances?

7         MR. SPRAGUE:  Good afternoon, Your Honor.  Doug

8    Sprague and Ben Kingsley for the United States.

9         MR. BABCOCK:  Good afternoon, Your Honor.  Erik

10   Babcock for Mr. Brugnara, who is in custody, and stepping out.

11      (Defendant present)

12        THE COURT:  All right.  Everyone is here.  This is on

13   for an appeal from the Magistrate Judge's refusal to grant

14   bail.  Again.  So, appellant may proceed.

15        MR. BABCOCK:  Your Honor, um, I made a -- I guess, a

16   sort of oral motion to continue last week, and cited -- one of

17   the reasons I cited, because I needed more time with my

18   client.  And, the difficulty I -- you know, difficult

19   logistics in doing that when he's in custody.  And, the Court

20   came up with this idea of hearing from the jail about what

21   exactly the rules are and the procedures and the like.

22      And we had the hearing on Friday, which was interesting

23   from my perspective, because I have been dealing with these

24   rules for 20 years, but it's all sort of informal and from

25   experience.
```

1          But, the testimony pretty much comported with my

2     experience.  For starters, I mean, there's certain kind of

3     things you can do through the glass.  I can have, you know,

4     relatively quick conversations with my clients through the

5     Plexiglas or the glass or whatever it is, but it's not -- it

6     is not an effective way, when documents -- and particularly

7     large documents -- are involved.

8          Yeah, I could review short police reports in state cases

9     pretty easily through the glass, but when you've got a lot of

10    stuff to look at it's just not an effective way to go.

11         And, the Court heard there's two rooms over at Glenn Dyer.

12    One of them has what I will call real chairs, you know, padded

13    like this.  But the other has round stools, metal round stools

14    (Indicating) that are set into the ground, can't be moved.

15    And honestly, after an hour or so, they're just really hard to

16    deal with.

17         So, you ask any member of the panel and they will tell

18    you -- ask which of the two contact visit rooms they prefer,

19    everybody prefers the one room, the one room with the real

20    chairs, because it's very hard to sit on those small metal

21    stools for hours at a time.  I have to get up constantly.  And

22    my client, as you know, has hemorrhoids, and has had

23    hemorrhoids, and sitting on those kinds of things just

24    exacerbates it.

25         There are certain hours during the day when you can have

1   contact visits.  There seem to be a little -- I don't --

2   honestly, I don't think the jail commander, Ms. Sanchez,

3   exactly knows all the rules, although she was the first one

4   the testify.  But, 9:00 to 11:30 and 12:00 to 2:30, maybe 3:00

5   and then again after business hours.  They are locked down

6   from 3:00 to 5:00 or 3:00 to 5:30, depending on who you ask.

7   And there are lawyers for 400 inmates, I guess, at the moment,

8   around 400 inmates at Glenn Dyer, that all use the same

9   contact visit rooms.

10      And this is my point, Your Honor:  In most cases, and, I

11  -- I totally -- I should have started this process with my

12  client a long time ago.  But, I'm having a set of discovery

13  made for my client.  But he has reviewed, to date, only a

14  small fraction of it.

15      He finally last Friday after we came back -- after he was

16  taken back from the hearing we had on Friday, he finally got

17  the documents the that I had left at the jail on Tuesday.  And

18  he started --

19          **THE COURT:**  How did he get it?

20          **MR. BABCOCK:**  I'm sorry?

21          **THE COURT:**  How did he get it?

22          **MR. BABCOCK:**  How did he get it?

23          **THE COURT:**  Yeah.

24          **MR. BABCOCK:**  I believe a --

25          **THE DEFENDANT:**  I put in a document request,

1   Your Honor, on Tuesday, as I testified.  And it took them four

2   and a half or four days to comply with the written request.

3          **MR. SPRAGUE:**  (Shakes head)

4          **THE DEFENDANT:**  I know Commander Sanchez said that

5   those written requests are complied in a matter of the same

6   day or the following morning, was her testimony from what I

7   remember, but it took them four days.

8      And then I put in a written request, Your Honor, to use

9   that -- what do you call it -- M-13 or whatever you guys refer

10  to the meeting room for the documents, if you remember the

11  Friday testimony.  And to date, going on to the fourth or

12  fifth day, I still have yet to be escorted to the room to read

13  my documents.

14     And I've read a total, now, of the manila folder that

15  Mr. Babcock left there, I've read 70 pages.  And I know

16  there's 14,000.

17     And just, the content of the 70 pages was very intense,

18  meaning they were FBI reports and sworn statements that could

19  not be scanned for one or two minutes.  It took me four or

20  five hours to go through those.  And then we met for an hour

21  and a half through glass yesterday.  So, 70 pages took about

22  six hours.  And we didn't even complete our discussions on it.

23     But the problem, you know, just screaming through that

24  glass -- Commander Sanchez explained it is two-inch Plexiglas

25  with no holes or anything.  You just can't do it.  You can't

1   be screaming for two hours.

2       But the point being is that -- the point I'm trying to

3   make is that it took them -- and this is by the commender of

4   the facility I guess who is equivalent to the chief of police,

5   she said I would get in that room, the M-13 room, the same

6   day.  If I wasn't mistaken, I heard also that the second man

7   that testified said the same thing.

8       I still haven't gotten in that M-13 room, and it's been

9   four and a half days.  And I still haven't gotten any other

10  documents from Mr. Babcock.

11      So, I mean, I just don't want to talk, you know, I know

12  you don't like to hear me talk, but I'm just beyond

13  frustrated.

14      Physically, I'm just dead.  I mean, physically, I --

15          **THE COURT:**  Please don't go off into a different

16  subject.

17      Okay.  Continue, Mr. Babcock.

18          **MR. BABCOCK:**  So we had a hearing Friday.  I went

19  over there Saturday, I guess, or was it Sunday?  I went in

20  over the weekend, I spoke with Deputy Perkins, who confirmed

21  that Mr. Brugnara had been given his documents Friday after he

22  got back, or some time that evening.

23      And that was -- you know, I don't know, I didn't count it,

24  but that was what I call a "redwell," an accordion file

25  stuffed with paper, probably five or six hundred pages, which

1    my client started to go through.

2        I'm still trying to understand if this discovery room is

3    real.  I know that the commanding officer said there was a

4    discovery room, and I remember it from the MS-13 case.  I've

5    never had anyone else had access to it or been told it was

6    there.

7        I did actually, again, with Deputy Perkins who I saw over

8    the weekend, he said, if I understood him right, that yeah,

9    there's a room, but it just -- it hasn't been really used

10   since the MS-13 case.  So, it's not really operating, as best

11   I understand.

12       But as we speak, I'm having a set of discovery copied for

13   my client.  And, he's going to need time to go through it.

14           **THE COURT:**  I thought he already had at least some of

15   it.

16       **MR. BABCOCK:**  I --

17           **THE COURT:**  I thought he had three boxes' worth.

18       **MR. BABCOCK:**  No, he's got a redwell.  What, 500

19   pages?  600 pages?  I don't know.

20           **THE COURT:**  The marshals told me he has three boxes.

21       **MR. BABCOCK:**  No.  He doesn't have three boxes of

22   anything.  He's got the redwell that I left, and it took three

23   days to get to him last week.  I'm having a set at Colour

24   Drop, made for him.  It's going to be 14-some thousand pages.

25       I don't know how many boxes that will be.  Probably four

1    or five boxes.  I'm estimating; I don't know.  A fair amount

2    of discovery.

3               **THE COURT:**  Well, does he at least have the redwell?

4               **MR. BABCOCK:**  Yeah, he finally -- he got the redwell.

5               **THE COURT:**  That's in his cell with him.

6               **MR. BABCOCK:**  Friday after court when he got back.  I

7    assume it's in his cell.

8               **THE DEFENDANT:**  Well, I just want to make one very

9    brief comment, Your Honor.

10       The one -- few pages that I did read, and I was very

11   troubled to -- when I met with Mr. Babcock he hadn't even read

12   through them yet.

13       But, the FBI report from October, which was a supplemental

14   FBI report, they basically affirm that there is not a human

15   being on the planet other than the claimant that affirm that

16   these are DeKoonings.

17       And that, alone -- if this information was known by my

18   attorney, say, three months ago when it was available to him,

19   we could have had this matter resolved --

20               **THE COURT:**  One witness is enough to convict anybody.

21   So, I don't know where that point goes.

22       But, Mr. Babcock, please continue.

23               **THE DEFENDANT:**  One witness?  No, the claimant, I

24   said, Your Honor.  The claimant in this case who made the

25   claim against me -- there is one claimant in this case, not a

1    multiple-claimant case.  One claimant in this case --

2         **THE COURT:**  That's enough.  That's enough.  You don't

3    have to have many.  You have one witness.

4         So please, continue on, Mr. Babcock.

5         **MR. BABCOCK:**  Anyway.  So, there -- the Court heard

6    the evidence Friday.  And the Court's read both mine and

7    Mr. Sprague's briefs on what we thought it showed.

8         It's really coincidental that the Court ordered that

9    hearing and we had it Friday, because that was one of the

10   issues we raised in front of Judge Cousins just before

11   Thanksgiving.

12        But it was just by way of declaration and -- and our

13   understanding of what the rules were.  The Court actually

14   heard the evidence.  So, I thought it appropriate, and

15   certainly the Court can consider it.

16        The Court has -- it's a *de novo* review here, and the Court

17   can consider any of the issues addressed in any of the bail

18   hearings, to date.  So, I think the Court should consider the

19   evidence we heard Friday.  And it just goes to the practical

20   issues, Your Honor.

21        Is it impossible to review discovery in the jail?  No,

22   it's not impossible, but it's not practical in big-document

23   cases.

24        **THE COURT:**  Well, wait a minute.  He said that the --

25   the testimony was that at any time he could have two full

1  boxes full of -- in his cell.  Right?

2          **MR. SPRAGUE:**  (Nods head)

3          **THE DEFENDANT:**  You can't read in your cell.  None of

4  you have been in the cell, but me.  It's loud 24-7,

5  Your Honor.  I haven't slept in seven months.  That's why I

6  lost so much weight.  I eat the food they put in my hole

7  there.  Okay.  I lost this much weight because I don't sleep,

8  only because it's so loud.

9      The jail is not meant to hold people long-term.  And it's

10  certainly not meant to hold innocent white-collar -- I'm the

11  only white-collar person pretrial in the whole jail.  And I

12  was the only white-collar guy in the entire halfway house.

13      So, this is an aberration.  This is not normal, you

14  keeping me there or at the halfway house, because every other

15  white-collar guy goes to his house and prepares.

16      I just want to be treated the same as everyone else.  I

17  don't want any preferential treatment.  And I'm not being

18  treated the same.

19          **THE COURT:**  We did let you go to the halfway house,

20  and you stabbed the poor judge in the back.

21          **THE DEFENDANT:**  I didn't stab -- Your Honor --

22          **THE COURT:**  All right, Mr. Brugnara --

23          **THE DEFENDANT:**  If you call -- if phoning my wife on

24  a family emergency is stabbing you in the back, then I guess

25  you could say that.  Because I'll say: when my children's

1    health is at risk, I have to respond.

2            **THE COURT:**  That's not true.

3            **THE DEFENDANT:**  Can you please tell --

4            **THE COURT:**  Not true.

5            **THE DEFENDANT:**  -- what you told --

6            **THE COURT:**  Not true.  We had a hearing.  I'm not

7    going to relitigate it.

8        Mr. Babcock, my memory of the testimony is that he could

9    have two boxes in his cell at any time.

10           **MR. BABCOCK:**  That is what --

11           **THE COURT:**  Now, you may not have brought him the two

12   boxes.  Maybe that's on you, and not on the system.

13           **MR. BABCOCK:**  It is on me.  Absolutely.

14           **THE COURT:**  All right.  So --

15           **MR. BABCOCK:**  I --

16           **THE COURT:**  So, now, if he can't -- maybe you can

17   bring him some ear plugs.  He can read those two boxes in his

18   cell.

19       All right.  Continue.

20           **MR. BABCOCK:**  It goes to the practical.  That is on

21   me, Your Honor.  And I take full responsibility.

22       I -- when I made my statements last week, Your Honor, the

23   ones that prompted this hearing, I really wasn't trying to

24   blame the jail.  I was trying to point out some logistical and

25   practical issues, but --

```
 1          (Off-the-Record discussion between Defendant and Counsel)

 2          MR. BABCOCK:  There are issues, as the Court knows.

 3    We had our pretrial last Wednesday.  I went to the jail the

 4    very next day.  I had a contact two-hour visit scheduled with

 5    my client, and they told me he wasn't there because the

 6    marshals had picked him up.

 7       Turns out the marshals hadn't picked him up.  He was still

 8    sitting there the whole time.  But they still showed him as on

 9    the pickup list for the court.  It's not --

10          THE COURT:  Well, that's a one-time glitch.

11          THE DEFENDANT:  I've had one meeting in seven months

12    with this man.  So that's a -- one meeting, that's 100 percent

13    of the total meetings I had with him.

14       I'm just not -- I'm not getting any opportunity to defend

15    myself in this case.

16          THE COURT:  Mr. Brugnara, you have to be quiet.  You

17    see how you are not amenable to supervision?

18          THE DEFENDANT:  Actually, I am, though.  I've never

19    had a -- I've never --

20          THE COURT:  You are not quiet.  You are so

21    disruptive, and every time you -- no.

22          THE DEFENDANT:  I'm frustrated, Your Honor.

23          THE COURT:  You will not follow directions.

24          THE DEFENDANT:  I'm frustrated because my attorney

25    said, himself, he's not effective.  So when I -- not effective
```

1    counsel, it's frustrating.  I'm not disruptive.

2           **MR. BABCOCK:**  When my client was out on bail for that

3    brief period in this case, he was not disruptive at all.

4    Okay?  He let me do the talking.

5           **THE COURT:**  No, that was one hearing.  The rest of

6    the time he did the talking.

7           **MR. BABCOCK:**  When he's been in jail.

8           **THE COURT:**  No.  Even, even when he was out.  He was

9    -- you had one hearing where he behaved.  And that was it.  My

10   memory of it.  After that, he always managed to start talking,

11   even though he wasn't supposed to.  Even when he was out.

12          **MR. BABCOCK:**  I don't believe that is true.  We had a

13   couple of hearings in front of Judge Cousins when he was out,

14   and it wasn't an issue, is my recollection.  I'm not looking

15   at the transcripts.

16      But, even -- even the day of the government's motion to

17   have his, I guess, pretrial motion --

18          **THE COURT:**  All right.  Look, your point is --

19          **MR. BABCOCK:**  In any event.

20          **THE COURT:**  Your point is that the system sucks, --

21          **MR. BABCOCK:**  No.

22          **THE COURT:**  -- it's no good, and you can't get in

23   there to see your client.

24          **MR. BABCOCK:**  That's not what I said, Your Honor.

25          **THE COURT:**  What is it that you say?

1    **MR. BABCOCK:**  Please don't overstate what I'm saying,

2    okay?  Because that's --

3         **THE COURT:**  Well, tell me in a nutshell --

4         **MR. BABCOCK:**  I'm telling you --

5         **THE COURT:**  -- what it is you're trying to say.

6         **MR. BABCOCK:**  -- in this kind of case -- in this

7    case, with a white-collar defendant, okay, where there's a

8    real question, real -- the Court has had doubts and it's said

9    on the Record, right, it had real concerns about putting him

10   in because it's a white-collar case.

11      And in this kind of case, where I know the Court feels

12   betrayed or stabbed in the back or whatever you call it,

13   because he made a couple of phone -- made some phone calls

14   when he was out, I -- I have a problem with that, because I

15   never understood the Court's order that he not be allowed to

16   call his wife.

17      I mean, what kind of rule is that?  What kind of condition

18   is that?  That he not call his wife?  And then he gets

19   remanded for violating it?

20         **THE COURT:**  Don't you remember?  He called the

21   girlfriend.

22         **THE DEFENDANT:**  Not a girlfriend.  Somebody who made

23   a claim -- she wasn't even here.

24         **MR. BABCOCK:**  The girlfriend -- she had already

25   testified in deposition.  Her testimony is over.

1        **THE COURT:**  Well, he called her -- she was a -- she

2  is a witness.  We don't know -- it doesn't matter.  He was

3  ordered not to do it.

4    You don't get to rearrange the terms and conditions --

5        **MR. BABCOCK:**  I understand.

6        **THE COURT:**  -- just because you think there is no

7  longer a reason for it.  You don't get to decide what the

8  conditions are.  The Judge does that.

9        **MR. BABCOCK:**  It just goes to the -- to what the

10  appropriate sanction is, your Honor.  If he was out

11  threatening a witness, that would -- would that be -- should

12  he be remanded for that?  Absolutely.

13    Right?  If he was out bribing a witness, if he was

14  threatening them, if he was doing something like that.  But,

15  calling his wife?  And calling a girlfriend?

16        **THE COURT:**  A witness girlfriend.

17        **MR. BABCOCK:**  A former witness.  She testified.  Her

18  testimony's done, Your Honor.  We have a video.  They're going

19  to play a video.  She's not going to be here.  She's in

20  Russia.  What's the harm?

21        **THE COURT:**  She was still in the U.S. at the time the

22  call was made.

23        **MR. BABCOCK:**  What's the harm, though?

24        **THE COURT:**  She could still have given further

25  testimony.

1          MR. BABCOCK:  I just --

2          THE COURT:  And he was ordered not to do it, and he

3     did it.

4          MR. BABCOCK:  I know that, Your Honor.  I know that.

5          THE COURT:  And then lied about it.  Said he didn't

6     do it.  He did do it.  The records show that.  So --

7          MR. SPRAGUE:  And the Ninth Circuit has affirmed,

8     Your Honor, affirmed the Magistrate's finding on that.

9          MR. BABCOCK:  Well, this Court has new evidence, and

10    we're in new circumstances.  Including my own -- my own -- not

11    my client's fault, but my own fault.

12       I'm sorry I got us in this position, Your Honor, but it's

13    my fault.  I'm not blaming the jail; I'm not blaming the

14    government; I'm not blaming my client.  And I'm -- you know,

15    I'm sorry.  I had this trial in state court; it ended up

16    taking two months.

17       I'm doing the best I can, but it was long -- when I got

18    into this case, when I accepted this appointment, I was told

19    there was 300 pages of discovery.  Three hundred pages.

20          THE COURT:  Who told you that?

21          MR. BABCOCK:  That's what I got from Brandon LeBlanc,

22    the federal defender's office.  "It's a PDF file of about 300

23    pages."  Okay?

24       And we had a trial date in August, about a month and a

25    half later.  So, it seemed very doable at the time.

1          **THE COURT:**  At the time of the continuance motion,

2     when your side said that you would be ready on January 5th, --

3          **MR. BABCOCK:**  I'm sorry.

4          **THE COURT:**  -- you knew that there was more than 300

5     documents.

6          **MR. BABCOCK:**  Absolutely.  But -- and I certainly

7     hadn't looked at it all.  And I'm sorry, Your Honor.  I made a

8     mistake.  I shouldn't -- I shouldn't have let my associate say

9     that.  Okay?  But he did, and I did.

10        I'm sorry.  What else can I say?  I make mistakes.  I'm

11     not perfect.  I'm doing the best I can here.  This is not a

12     simple case to prepare or to defend.  And, and it's only going

13     to be that much harder if my client's in custody.

14        And that's just because of logistics.  It's not because

15     anyone at the jail is bad; they're not.  I see those people

16     weekly, and I've seen -- some of those people have been there

17     20 years.  They're doing the best they can.

18        But, the logistics of my client reviewing 14,000 pages of

19     discovery and me being able to go over it with him, it's --

20     it's just going to be really hard, Your Honor.

21        And, I -- I've scheduled a bunch of meetings with him this

22     week and next.  But I guarantee you, we're only going to get

23     through -- I don't know how much, but some fraction of the

24     14-plus-thousand pages.

25          **THE COURT:**  Well, all right.  Now let's hear from the

1   government.

2          **MR. SPRAGUE:**   Thank you, Your Honor.

3      Mr. Babcock's argument sort of is morphing into, I think,

4   a continuance.  But, Your Honor -- his continuance motion that

5   he says is forthcoming.

6      But, Your Honor had this hearing on Friday.  The Court,

7   after that, asked for supplemental briefing from the

8   government which -- due today, which the government is going

9   to file today.

10      I think, as Mr. Babcock points out, some words I wrote

11   down here:  "As we speak," he's having discovery copied for

12   his client.  It's on him, absolutely.  He says it's his fault.

13   The discovery could have gone over there before.

14      But beyond that, I don't want to relitigate whether he

15   violated terms, which he clearly did, or how many documents

16   there were six months ago, all that.  At this time, he can

17   have, as the Court has pointed out, two boxes, at any given

18   point, in his cell.  He can have more than that, boxes, in the

19   property room that he can rotate out when he's done.

20      Certainly, Counsel is going to narrow down the most

21   important documents, if he hasn't done so already, to point

22   those out for his client, to go through them when they meet.

23      On top of all that, there -- there are a lot of

24   white-collar defendants who have been held in custody before

25   trial.  One that comes to mind that I had with Your Honor, he

1  ended up pleading guilty.  But, he was in custody.  Michael

2  Steven Banuelos is his name.

3      At some point the defense argued that this just didn't

4  happen, and so I surveyed colleagues.  I can provide a lengthy

5  list to the Court in our supplemental -- I don't know about

6  our supplemental briefing due today, but I can provide it by

7  tomorrow -- of all the white-collar defendants who were held

8  in cases far more complicated than this, with comparable or

9  more discovery than this.

10     So, it happens.  This argument this never happens and

11  lawyers aren't equipped for it, it's not fair.  It just --

12  just falls flat.

13     (Off-the-Record discussion between Defendant and Counsel)

14         **MR. SPRAGUE:**  In addition to -- getting back to the

15  documents, in addition to the two boxes that he can have in at

16  any given point, he's already got the redwell, he can have two

17  boxes in the cell.  He can have many more than that in the

18  property room.  At his request, they would be brought in, in

19  one business day, I think was the testimony.

20     But as part of the supplemental briefing, the government

21  is going to attach declarations from Alameda County employees,

22  one of which is from Lieutenant Sanchez, who testified, who

23  says that they are willing to make this discovery room,

24  discovery cell -- it does exist; it has existed for years.

25  They are willing to make it available to the Defendant four

 1  days a week, six hours a day.  Put all the documents in that

 2  room.

 3      The defense has to do some work here, and get them to the

 4  Defendant.  But he says that they're doing that now.  And

 5  presumably, Colour Drop, with this relatively small amount of

 6  discovery, this is a job that takes very little time for

 7  Colour Drop to turn around.  So presumably that will be over

 8  there in the next couple days.

 9      So, the jail is going --

10          **THE COURT:**  Can you -- that's good to hear.  Now, can

11  you -- what you do you say about the noise problem?  Alleged

12  noise problem?

13          **MR. SPRAGUE:**  Your Honor, I can't take anything the

14  Defendant says at face value.  He makes all kind of claims

15  that turn out to be not true.  I don't know what the noise

16  issue is.

17          **THE COURT:**  But this cell that they're going to use,

18  it's just an ordinary cell.  Right?  It's an empty cell.

19          **MR. SPRAGUE:**  It's an empty cell on the fifth floor

20  of the jail.  I can ask for followup about who is around

21  there, what the noise issues are.  I don't know them, as I

22  stand here.

23          **THE COURT:**  Can they give him ear plugs or ear muffs

24  that would get rid of the noise?  Or at least, like,

25  noise-cancelling headphones?

```
 1              MR. SPRAGUE:  I will ask those questions, Your Honor.
 2     I -- many defendants, as I think the defense concedes, it
 3     concedes, have used this in the past.  I don't know if the
 4     Court had this MS-13 case or this piece of it they're
 5     referring to and whether there were complaints, that even
 6     though he set up --
 7              THE COURT:  No, there were no complaints about noise
 8     in that case.  I did not hear that complaint.
 9        So, is this the same room or a different room?
10              MR. SPRAGUE:  I don't know.  I thought the testimony
11     was that the prior one might have been on the second floor.
12     This one that she's referring to is on the fifth floor, but I
13     don't remember whether this is the same or different.
14              THE COURT:  And which floor is Mr. Brugnara on?
15              MR. BABCOCK:  Two.
16              THE COURT:  Two.  All right, so he would have to go
17     up, and he could be there six hours a day?
18              MR. SPRAGUE:  They would make it available for him up
19     to six hours a day, four days a week, if the Court requests
20     it.
21              THE COURT:  Well, I am going to request it.  But, but
22     he would have to ask for it too, right?
23              MR. SPRAGUE:  Correct.
24              THE DEFENDANT:  I asked for it, Your Honor.  I asked
25     for it four days ago.
```

```
 1              THE COURT:  Okay.

 2              THE DEFENDANT:  One hand doesn't know what the other

 3    hand is doing in this jail, as you well know by the testimony.

 4    But --

 5              THE COURT:  Mr. Brugnara, the government has the

 6    floor.

 7         So, you consider it done.  I'm making that request.

 8              MR. SPRAGUE:  Okay.

 9              THE COURT:  All right.  So, what more do you have to

10    say?

11              MR. SPRAGUE:  He also complained about which room he

12    has access to.  He can follow up.  He says that one of them

13    has metal stools.  The other one apparently is preferable.

14         I'm happy --

15              THE COURT:  I mean, do you believe what he's saying?

16    I can't believe Mr. Babcock would make that up.  One has

17    comfortable chairs, the other one has --

18              MR. BABCOCK:  Ask anybody on the panel.

19              THE COURT:  -- metal stools embedded in concrete.

20              MR. SPRAGUE:  I'm not challenging what he said.  What

21    I'm doing is to further show that we are willing to

22    accommodate him, two points about this:  Number one, I will

23    ask if he can have priority for the more comfortable room.

24    These are things that -- that's one.

25         Number two, these are things that I could do.  If the
```

1  defense did exactly what I've said, several months ago, when

2  they raised an issue -- although they didn't complain at the

3  time, because as we pointed out in our brief, Mr. Stevens

4  said, "I have been able to see him when I wanted."

5       Right above that in the transcript, I said I invite them

6  to ask me if --

7           **THE COURT:**  I remember you saying that.

8           **MR. SPRAGUE:**  -- if there are any issues.

9           **THE COURT:**  I remember it.  Okay.

10          **MR. SPRAGUE:**  And I never got word -- not one of them

11 complained to me about anything.  But these are the things

12 that we can do, if I'm asked.  I can follow up.

13      I will now follow up about ear plugs, ear muffs, and

14 whether they can have priority for the more comfortable of the

15 two contact visits rooms.  And I will follow up generally

16 about noise issues on the fifth floor near where this

17 discovery cell is.

18          **THE COURT:**  So, just pause.

19      Mr. Babcock, when are you going to send the documents over

20 that you want to send over?  You said --

21          **MR. BABCOCK:**  I was told that they will -- I believe

22 they'll be delivered to me tomorrow.  I talked to Colour Drop

23 about noon or so.

24          **THE COURT:**  Now, is there going to be some problem

25 about paper clips and staples?  Are you going to get rid of

1   all the paper clips and staples?

2         **MR. BABCOCK:**  There's not supposed to be any.  It

3   should be just a fresh set of copies.

4         **THE DEFENDANT:**  How do I know what's -- this whole --

5   this is ridiculous.

6      Your Honor, there's murderers that are walking out on

7   bail, and armed robbers, since I've been there.  I can't --

8         **THE COURT:**  Not amenable to supervision.  Not

9   amenable to supervision.  You won't be quiet.

10        **THE DEFENDANT:**  But for two and a half years, I was.

11        **THE COURT:**  No, you weren't.

12        **THE DEFENDANT:**  When I had a competent attorney.

13  That was the caveat.

14     He (Indicating) admits he is not effective.  He admits

15  he's not competent.  He didn't even file a rebuttal on this

16  hearing day, and he promised to do it yesterday.

17     I asked him first thing:  "Did you file the rebuttal?"

18     He said, "No."

19     "Why?"

20     "I'm too busy."

21     Ineffective, incompetent.  I have to talk, and then I look

22  crazy.  When I had Hallinan and Wine, when I had Brian Getz, I

23  never said a word.  Go back and check that.  For two and a

24  half years.  Silent as a churchmouse.

25     This is totally unfair.  You appointed him, not I.  I

1   begged to you let me hire private counsel, give me reasonable

2   bail.  Crucify me.  You've already done it, for phoning my

3   wife and this girl who made a claim about the child.

4       That doesn't warrant me going back with murderers and

5   armed robbers for another 90 days.  You're beating a dead

6   horse.  Whatever you wanted to teach me, I learned it in the

7   first 48 hours.  Okay?

8           **THE COURT:**  I'm not trying to teach you anything.

9   What I'm trying -- I have got a system to run here.  And I

10  tried to let you out.  You didn't follow the rules.

11          **THE DEFENDANT:**  But, again, it fell on Babcock,

12  because I told Babcock there's no way I can have bail

13  conditions where I can't speak to my wife.  Because we have

14  four minor children, some who have medical problems.

15      So that, itself, makes no logical sense.  I can never

16  speak to my wife, but I can speak to her if I'm in jail?

17  Think about the logic of that.  It's completely illogical.

18      The fact of the matter is:  That's the only call, was a --

19  personal of nature, and it was one call.  If I wanted to

20  violate your terms -- there are hundreds of cell phones, and I

21  waited, if you remember, by the testimony, for hours to use --

22  it may have been an hour and a half, may have been three

23  hours.  I waited over an hour.

24          **THE COURT:**  The government has the floor here.  Would

25  you please be quiet.

1          Continue on, please.

2              **MR. SPRAGUE:**  Your Honor, I think I was done with

3      those issues.  You had asked Mr. Babcock when he was going to

4      get the documents over to the jail.

5              **THE COURT:**  All right.  What more do you want to say

6      on anything that's been raised today?

7              **MR. SPRAGUE:**  Nothing here, today, Your Honor.  We

8      will be filing that supplemental briefing that you requested

9      later today, which does touch on these issues.

10             **THE COURT:**  Thank you.  All right.  I have a couple

11     of things here to say.

12         From Frank C. Conroy, Supervisory Deputy U.S. Marshal, he

13     looked into some things involving this case, and says that

14     Lieutenant Sanchez at Glenn Dyer said Mr. Babcock can have up

15     to three hours, provided he states that when making his

16     schedule over the coming weeks.

17         Mr. Conroy, you are here.  Where are you?

18         Did I read that right?

19             **MARSHAL CONROY:**  Yes, sir.

20             **THE COURT:**  And so, and so, that's okay.  You've

21     already told that to Mr. Babcock, correct?

22             **MARSHAL CONROY:**  Up to the three hours, not

23     (Inaudible) three hours.

24             **THE COURT:**  Well, okay.  I don't want to say

25     something to him that's wrong.  So, is it correct that he can

1    have up to three hours at a time, if he says that when making

2    his schedule, his request over the coming weeks?

3            **MARSHAL CONROY:**  Yes, sir.

4        **THE COURT:**  Okay, so that's --

5        **MR. BABCOCK:**  What's the last part of that?

6        **THE COURT:**  That -- that you've got to tell them in

7    advance --

8            **MR. BABCOCK:**  Oh, yeah, yeah, yeah.

9        **THE COURT:**  That you want it for three hours so they

10   can reserve it for him, for three hours.

11       (Off-the-Record discussion between Defendant and Counsel)

12       **THE COURT:**  All right.  Now, I can't do anything

13   about the concrete, steel uncomfortable interview room versus

14   the other one, though I may -- but, Mr. Sprague said maybe he

15   can help you on that end, so I'm going to ask him to try to

16   find a way to get you into the more comfy one, instead of the

17   hard one.

18       In addition, Mr. Conroy has told me the following: That

19   the marshals are willing to move Mr. Brugnara to San Francisco

20   County Jail.  They have six contact visit rooms there, and

21   will allow a 24-hour visitation schedule.

22       So if you want to move to San Francisco, where there's

23   longer visiting hours, --

24       **THE DEFENDANT:**  They don't have --

25       **THE COURT:**  -- Mr. Conroy's willing to do that.

1      Right?

2          **MARSHAL CONROY:**  Yes, sir.

3          **THE COURT:**  So, if Mr. Babcock makes that request, it

4 will be done.

5          **THE DEFENDANT:**  Yeah, but they don't have the

6 security clearance there for me at San Francisco.  We already

7 went over that three months ago, if Your Honor remembers.

8 They don't have maximum separation, it's 12 to a cell, so you

9 have to fist-fight to use the phone.

10      And you all like to live in fantasyland of how you think

11 it is; I know the reality.  I've been there for seven months,

12 and three months before.

13      And the fact of the matter is I can tell you for hours how

14 BOP is, how people get murdered there.  They call it a

15 fistfight because if they called it a murder, they'd be shut

16 down.  And they'd be on 20/20 and Prime Time.

17      There's never anybody who's ever been killed in the BOP in

18 a fistfight.  You know why?  Because they get -- everything's

19 about hiding the truth.  The fact of the matter is --

20          **THE COURT:**  (Inaudible)

21          **THE DEFENDANT:**  -- it's a horrible, a horrible

22 situation.  I'm in the best of the horrible situations where

23 I'm at right now.

24      And from a practical standpoint, because I'm just a

25 straight shooter, I'm transparent:  This will never go to

1    trial for two years, because I'm not going to trial until I

2    see every page of discovery.  And I've only seen 70 pages.

3    And I'm not trying slow it down, but this man still hasn't

4    gotten me any discovery, and he hasn't read any discovery.

5        Ask Mr. Babcock how many pages he's read, out of 14,000.

6    The man you appointed, against my request.  And he'll tell you

7    none, except the few that we went over.

8        So I've lost seven months of my right to a speedy trial

9    because of his ineffectiveness.  And I'm not sitting in jail

10   any -- we can circle into 20/20, Prime Time, and the Supreme

11   Court, because I'm not sitting in jail -- today's my 25th

12   wedding anniversary.  And, I know you don't care about me and

13   my wife and my family.  That's abundantly clear to me.

14       I'm -- I'm really surprised at you.  I really am.

15   Because, you know what?  I'm not violent.  We have two

16   independent psychiatrists that the United States Attorney

17   appointed, Dr. Kessler who appeared in front of Judge Spero,

18   and in this case, Dr. Barrett.  Two independent psychiatrists

19   said I'm no threat or danger to myself or others.  They all

20   said I'm not a flight risk.

21       So here you've got a guy who's not a threat; he's not a

22   flight risk.  Okay, let's call him an economic danger.

23       We had one hour of testimony, that I paid back over a

24   billion dollars, or hundreds of millions.  What's the

25   difference?  Is it 800 million?  Is it a billion?  I've

1    borrowed more money than anybody on the West Coast of the

2    United States, and paid back every penny.  Well, where's the

3    money?  The great recession hit.

4         How did Merrill Lynch, how did Lehman Brothers go out of

5    business?  They'd been in business for 200 years.  You know,

6    my properties were leveraged around 65, 70 percent.  And as

7    you know, the commercial mortgage-backed securitized

8    marketplace can call a note due, even if it's not in technical

9    default, once the threshold of loan to value is breached.

10   Because of the recession, the loan to value got breached; all

11   the loans were called that were outstanding.

12        I sold the properties and paid back my lenders.  That's

13   why I still have a great reputation in the community, in the

14   lending community, because I paid back everybody.  I didn't

15   make their lives miserable.  But unfortunately, I'm in a

16   situation now, okay, I don't have a lot of assets, but I have

17   great reputation with my lenders.

18        I'm in a situation now where Your Honor knows for six

19   years, from 2008, 2009, 2010, 2011, '12, '13, all the way to

20   '14, you've always never had any restrictions on me.  Tom

21   Newman, who is a U.S. Attorney, even allowed me to go back and

22   forth to Las Vegas for two years when I had Hallinan and Wine

23   as my attorneys, working on deals, pretrial, in that case.

24        And then even post-conviction with Mr. Sarlatte, who's

25   Allen Lew's associate, there was minimal restrictions before I

```
 1   self-surrendered to La Tuna.  Kay, my wife, my surety, drove
 2   me on a 24-hour notice to Texas.  Fully compliant.
 3       Then when I got out, there were no issues at the halfway
 4   house.  There were no issues with any restrictions on
 5   probation for me conducting economic, you know, business.
 6       Then this woman -- and even Your Honor, in May of this
 7   last -- this year, made -- May 7 was our hearing date.  We
 8   spoke for 45 minutes about the Las Vegas deal, how I'm going
 9   to pay Tom Newman the million, nine that's owed.  I told you I
10   could give you a list of the tenants.
11       That meeting concluded where I was going to give a
12   thorough understanding of the deal.  And, I'm still happy to
13   do it.  Everyone was in good spirits.  They were going to get
14   their million, nine, everything's looking good.
15       And then, boom.  Rose Long makes this claim two weeks
16   later, and I've been in jail for the last seven -- seven
17   months.
18       The thing that I found incredibly shocking in the last two
19   days is when I got this little redwell, when I read the FBI
20   report, they affirmed that the DeKoonings that make up 90
21   percent of this, you know, monetary claim, they're the only
22   two people on the planet that say they're DeKoonings.
23       It would be like someone saying that your photograph
24   upstairs is an Ansel Adams.  One person says it, and tries to
25   sell it for 300 grand.  They go: No, that's Alsup.
```

1         No, that's Ansel Adams.

2         Only one crazy woman who's arrested on film -- on film,

3    according to Mr. Babcock, for attacking the officer and filing

4    a false prescription -- which is a felony -- for narcotics.

5    So she actually should be in federal jail for that.  It's on

6    film.

7         She makes this absurd claim with her partner who's

8    personally bankrupt, and who has a background of selling fake

9    bronzes to S.I. Newhouse and Christie's, they say that I

10   somehow defrauded them, and that lands me in jail for seven

11   months?

12        Well, I'm in jail for seven months because I have

13   ineffective assistance of counsel.  And I think he's a good

14   guy, and I think if he was probably getting paid 200 grand,

15   you'd have a different show going on here.

16        But when someone's not -- doing it for a cut-rate fee, you

17   get a cut-rate performance.  And that's really what I got

18   going on here.  So, I'm frustrated.

19        So I'm, like, begging to get information so I can feed it

20   to my attorney, through my wife, on $10 phone calls every 15

21   minutes, when I get out for an hour a day.  And I'm

22   bits-and-pieces reading.  And every piece of information that

23   I get is just more and more -- just incredulous.

24        You know, we found out who this -- I found out who this

25   Canadian -- there's a Canadian called Yates (Phonetic), a

1    billionaire, or worth several hundred million.  He sued

2    Maibaum about this exact Degas as being a fake surmoulage.  He

3    was selling it to Yates, 73 of them, for $65,000 apiece.

4         If you read the FBI report, this $4 million Degas

5    (Indicating quotation marks), this guy Maibaum bought it in

6    '07 for around 300 grand, he claims.

7         The interesting thing, of course, is that the artwork was

8    at a peak in '07, fell off the cliff with the recession, still

9    hasn't rebounded back to '07 levels.  And this is common

10   knowledge.  So if you pay 300 grand for the $4 million Degas

11   in '07, it's probably worth 200 grand today.

12        So we're talking about fake DeKoonings, and maybe a Degas

13   that might be worth -- a surmoulage that might be worth 200

14   grand that they were trying to sell to me for 11 million

15   bucks.  They were trying to defraud me.

16        Okay, they were trying to -- and the craziest thing is if

17   you continue to read the FBI report, I don't have all -- I

18   asked Doug, "Can I have all the FBI..."

19        "Well, I don't know; I haven't found them yet."

20        If you read the FBI reports that I received, they don't --

21             MR. SPRAGUE:  Your Honor, the court reporter can't

22   keep up.

23             THE DEFENDANT:  They don't even have the chain of

24   title -- excuse me; can I finish, please?

25             THE COURT:  The court reporter cannot follow, you're

1  talking so fast.

2          **THE DEFENDANT:**  I'm sorry, I --

3          **THE COURT:**  And we're going to bring the hearing to

4  an end --

5          **THE DEFENDANT:**  I'm sorry, Your Honor.

6          **THE COURT:**  -- because you're out of control.

7          **THE DEFENDANT:**  I'm not.

8          **THE COURT:**  You're out of control, Mr. Brugnara.

9  This is not helping you.

10          **THE DEFENDANT:**  Okay.  I just --

11          **THE COURT:**  The fact is the artwork came out, you

12  made them put it in your -- your --

13          **THE DEFENDANT:**  I didn't make anyone do any --

14          **THE COURT:**  -- garage, and then you wouldn't let them

15  go up there, and you claimed it was a gift.

16          **THE DEFENDANT:**  Your Honor, two things that are true

17  about that statement: A, she said it was a gift when she was

18  drunk and high on drugs, in my house.

19      The more important issue --

20          **THE COURT:**  That is not believable, Mr. Brugnara.

21          **THE DEFENDANT:**  But she's believable, attacking the

22  Walgreen's pharmacist and the police officer.  She's filling

23  her false prescription.

24          **THE COURT:**  Put all that before the jury; let the

25  jury decide.

```
 1          THE DEFENDANT:  Your Honor, Your Honor, Your Honor,

 2   let me just -- the fact of the matter is Bob Kane, if you

 3   looked at the emails that are submitted to the Form 12 that

 4   are already of record, was in contact with the attorney.

 5          Even if you take their position of the five-day

 6   due-diligence period, within 48 hours he picked up the boxes.

 7   You can't pick up the boxes until you have a signed release.

 8   They weigh 400 pounds each.  Okay, so we contacted them, and

 9   waived contingency on the second day.  "Pick up the boxes."

10          So whether you say it's a five-day conditional period or a

11   365-day conditional period, we told them to pick up the boxes,

12   through counsel.

13          And this guy is a judge for the State of California, too.

14   So he's an esteemed attorney, not just some guy working down

15   on Mission Street.

16          The fact of the matter is we told them within 48 hours,

17   through counsel, "Pick up the boxes."  And they negotiated a

18   release thereafter for a month and a half.

19          So, the fact of the matter is whether the stuff is worth

20   20 million or nothing --

21          THE COURT:  All right -- Mr. Brugnara, I'm ordering

22   you to be quiet.

23          THE DEFENDANT:  All right.

24          THE COURT:  You must stop.  This is a very good

25   example of how you are not amenable to supervision.  You do
```

```
 1   what you want to do, you think you're always right, the world
 2   is against you, you're right, you can do anything you want to
 3   do because God is on your side.  I don't know.
 4           THE DEFENDANT:  I just want another attorney,
 5   Your Honor.  I don't -- I don't have an attorney.
 6           THE COURT:  Be quiet.
 7           THE DEFENDANT:  I don't have an attorney.
 8           THE COURT:  Then -- just a moment.
 9      Here's what we're going to do.  I had asked you,
10   Mr. Babcock, to meet with your client.  And if he wants to
11   bring a motion to fire you and get another lawyer, I'll
12   consider that.
13      I haven't seen any such motion yet.  But, I'm ordering you
14   to make -- I want it to come through you, and not one of these
15   handwritten deals from the jail.  I want it to be a real
16   motion.  All right?  If we are going to have it.
17      If he wants to fire you, you should bring the motion.
18           THE DEFENDANT:  We can have the motion right now.
19           THE COURT:  No, we're not going to have it right now.
20   It's going to be brought through Mr. Babcock.  If we're going
21   to have it at all.
22      We've heard enough on this bail thing.  Mr. Brugnara has
23   burned up all the time that I had available for it.  And, I'm
24   not going to hear anything more.  I'm just taking it under
25   submission.
```

1    As soon as I get the government's -- did I give

2  Mr. Babcock an opportunity to file a reply, or not?  I don't

3  remember.

4         **MR. SPRAGUE:**  You did, Your Honor.  His optional

5  reply is due tomorrow, I think at noon.  I know tomorrow; I'm

6  not positive about noon.

7         **THE DEFENDANT:**  Could you order him to reply,

8  Your Honor, please?  Because he won't reply unless you order

9  him to.  He only does the bare minimum.  Please order him to

10 reply.

11        **THE COURT:**  I'm not going to -- no; that's up to

12 Mr. Babcock and his professional judgment.

13    All right.  So, I'm not going to say anything else.  The

14 one item that was on schedule -- oh, on any motion for

15 continuance, you've got to bring a real motion, if you're

16 going to bring it.

17    I'm not going to take these -- these --

18    (Off-the-Record discussion between Defendant and Counsel)

19        **THE COURT:**  You've got to be meeting with your

20 client, and try your best to meet the date you told me you

21 could meet.

22    And, and I'm not going to grant any motion for continuance

23 yet.  I might.  I'm not saying no yet, ultimately, but I'm

24 saying no right now.

25    We've got a trial.  It is too early to panic.  I think

```
 1   this case can be ready for trial on January 5.  It may wreck
 2   your holiday; I'm sorry.
 3         THE DEFENDANT:  Going to wreck mine.  How can anybody
 4   read 14,000 pages?
 5         MR. BABCOCK:  That's not --
 6         THE DEFENDANT:  I'm not going anywhere until I read
 7   every page, so --
 8         MR. BABCOCK:  That's not the issue, Your Honor.  It's
 9   not -- it's not because of the holidays.
10         THE DEFENDANT:  Has nothing do the with the holidays.
11         MR. BABCOCK:  There are things that need doing that I
12   have not done yet.
13         THE COURT:  You know, you brought this crazy motion
14   to knock the government out of the case.  You had time to do
15   that.  You had time to bring that motion.
16         THE DEFENDANT:  That was his idea, it wasn't --
17         THE COURT:  But you don't have time to get ready for
18   trial.  I don't know; I didn't think that motion had any merit
19   after I got -- we had an evidentiary hearing on it, because
20   the allegations you made bothered me.
21      But when we got into it, and I saw what was really there,
22   it was nothing there.  It was just made up.
23         MR. BABCOCK:  Wasn't nothing, at all.
24         THE DEFENDANT:  Nothing, Your Honor --
25         MR. BABCOCK:  The FBI agent admitted --
```

```
 1          THE DEFENDANT:  Nothing was made up.

 2          MR. BABCOCK:  -- to going either through or over that

 3   gate, without a warrant.

 4          THE DEFENDANT:  I think we should put this in front

 5   of Judge Chesney if this --

 6          THE COURT:  That's not what the -- I wrote it all

 7   out, I spent the time to do it.

 8       But if we've got time to consider a motion like that, and

 9   work on it, we've got time to take this case to trial on the

10   schedule you gave me.

11          MR. BABCOCK:  I don't think I'm required to choose

12   between making a motion or getting ready for trial.  It's not

13   supposed to be in the conjunctive.

14          THE COURT:  That's true; I agree with that.  But

15   frivolous motions --

16          MR. BABCOCK:  That wasn't a frivolous motion.  My

17   client had legitimate grounds to complain about how he had

18   been treated, I thought.

19          THE COURT:  I don't agree, now that I've heard the

20   evidence --

21          MR. BABCOCK:  I know the Court disagrees --

22          THE COURT:  You're wrong about that.  That motion

23   should never have been made.

24          THE DEFENDANT:  You should have appealed it.  And

25   you're too busy doing --
```

1        **THE COURT:**  Go ahead and appeal it.

2        **THE DEFENDANT:**  He doesn't do anything.

3        **THE COURT:**  All right.  We're done for today.  I will

4  get an order out.

5        **MR. BABCOCK:**  Your Honor, I would like -- I think we

6  should calendar some time.

7        **THE DEFENDANT:**  (Inaudible)

8        **THE COURT:**  Be my guest.  What day do you want?

9        **MR. BABCOCK:**  Mr. Sprague and I had talked about

10  Thursday, if the Court has some time for us Thursday.

11        **THE COURT:**  This week?

12        **MR. BABCOCK:**  Yeah.

13        **MR. SPRAGUE:**  If he files a motion tonight, I think

14  we --

15     (Off-the-Record discussion between Defendant and Counsel)

16        **MR. SPRAGUE:**  He's talking about filing a motion for

17  a continuance, Your Honor.  The government's happy to come

18  back on Thursday to talk about that.  If he files a motion

19  tonight, we will --

20        **THE COURT:**  Look:  If you're going to do that motion,

21  I would prefer if you're going to bring a motion, to withdraw

22  as counsel.  And I would not blame you.  If I was in your

23  position, I would not blame you for wanting to get out of this

24  case.

25     But you, being a good professional --

1      **THE DEFENDANT:**  Oh, so I'm the villain?  I'm the

2  villain --

3      **THE COURT:**  You may feel that you need -- a good

4  lawyer's got to take even this case.  So, it's up to you and

5  Mr. Brugnara.  But if he wants you to withdraw, --

6      **MR. BABCOCK:**  I hear you.

7      **THE COURT:**  -- then it's your duty to bring the

8  motion.

9      Now, I don't know who -- I'm not saying that you will get

10  somebody else.  I don't know who you would get.  But, whoever

11  that would be, would be the last CJA lawyer.  Meaning, the

12  last --

13      **THE DEFENDANT:**  I don't want a CJA lawyer.  I want to

14  hire my own independent attorney, but you're denying me the

15  right to hire --

16      **THE COURT:**  Well, hire --

17      **THE DEFENDANT:**  -- my own attorney of my choosing,

18  because you refuse to give me bail that's reasonable, and

19  guaranteed under the Bail Reform Act.  You just thumb your

20  nose at the Congressional Bail Reform Act as if though it

21  doesn't exist.

22      I'm entitled to reasonable bail conditions.

23      **THE COURT:**  Please, Mr. Brugnara, the Court feels

24  this is --

25      **THE DEFENDANT:**  Oh, Goodwin shouldn't have been on

1   the panel.  And I told them that, because he had already heard

2   the other one.  But the attorney, again, had a first-year law

3   student write it.  He didn't write it (Indicating).  He had a

4   first-year law student write the appeal; didn't show me the

5   draft.  That, itself, needs to be completely turned around and

6   reheard.

7       Listen:  You're just locking me up, throwing away the key,

8   and thinking:  Oh, this guy eventually is just going to be

9   muffled.

10      I'm not going to be muffled, because I'm innocent.  I

11  haven't done anything wrong.  That's why I'm fighting so hard

12  here.  I've done nothing wrong.

13          **THE COURT:**  In your motion, if you do bring it,

14  consider with your client the possibility that he would go

15  pro se.

16          **THE DEFENDANT:**  I don't know -- that's what you want.

17  The crazy guy going pro se.

18          **THE COURT:**  That's what he does, anyway.

19          **THE DEFENDANT:**  No, I want to hire -- I have

20  attorneys that are willing to be hired.  Let's talk about it.

21      Your friend, Kecker.

22          **THE COURT:**  No, you don't.

23          **THE DEFENDANT:**  Tippy Mazzucco.  James Lassart.  The

24  only --

25          **THE COURT:**  They would have come in here long ago.  I

1    know those lawyers.

2              **THE DEFENDANT:**  They want the money.

3              **THE COURT:**  No, they -- yes.  Yeah.  You don't have

4    the money.

5              **THE DEFENDANT:**  I have access to the money.  And I've

6    already had it -- proof at the evidentiary hearing that you

7    refused to hear.  Let's have an evidentiary hearing if I can

8    get the money tomorrow.  Let's --

9              **THE COURT:**  I let you out -- I let you out to go work

10   on all of that, to have meetings with your client.

11             **THE DEFENDANT:**  And we did meet.  We met --

12             **THE COURT:**  Yes.  And it went nowhere.

13             **THE DEFENDANT:**  We met five times.  And we had a

14   meeting scheduled -- you can ask Mr. Lew -- the same day --

15             **THE COURT:**  Went nowhere; none of those lawyers --

16             **THE DEFENDANT:**  Not true.  Ask Mr. Lew.  There was a

17   meeting scheduled the day I got remanded, with Tippy Mazzucco

18   and James Lassart at Murphy Pearson -- Pearson Murphy.  And I

19   got kept from that meeting.  And that was the meeting where we

20   were going to discuss financial terms.  They were going to

21   take a deed of trust, pending me paying them.

22        And I am happy to bring in Mazzucco and Lassart and Allen

23   Lew to testify tomorrow at an evidentiary hearing.

24        You kept me from hiring counsel of my choosing that I had

25   the means and the ability to hire, because this is a setup

1    here.

2            THE COURT:  All right.  Just a moment.

3            THE DEFENDANT:  I'd like to hire them.  That's my

4    position.  I want to hire Mazzucco, and I want to hire

5    Lassart.  And I want to do it immediately.

6        And I want the ability to meet and confer with them, come

7    to financial terms, and have them take over this case.

8            THE COURT:  All right.  I'm now looking, looking

9    above the crowd, in the distance, to the Court of Appeals.

10       And I want the Court of Appeals to know that you must take

11   these statements made by Mr. Brugnara with a grain of salt,

12   and look at the entire record of the lengths to which the

13   Court has gone to give Mr. Brugnara the opportunity to meet

14   with private counsel and to make those kind of deals.  And, it

15   did not happen.  And they --

16           THE DEFENDANT:  And Mr. Lew is here, Your Honor.

17           THE COURT:  No.

18           THE DEFENDANT:  He can testify right now.  I had the

19   appointment set up that afternoon, the day I was remanded.

20       And I'd like to call Mr. Lew to rebut what you just said,

21   because the meeting was canceled due to me being remanded.

22   And that was the meeting where I was going to hire them, off

23   the financial terms.

24       We met for over 20 hours, Lassart, Tippy Mazzucco and

25   myself.  They're not going to meet with me 20 hours.  And

1    that's over and above the 25 hours of meetings that I had with

2    Mr. Babcock.  They've said the case is a joke.

3        And these were people that were U.S. Attorneys

4    collectively in this district for over 30 years.  They were

5    shocked.  And they said:  This is going to go away.

6        That's why I use the term:  Make this case go away by

7    hiring competent attorneys (Indicating quotation marks).  It

8    wasn't an arbitrary and capricious statement.  It was a

9    verbatim statement that they said.  Okay?

10       This case is a joke.  The woman is a single claimant who

11   is a drunk and a drug addict, who was arrested for assaulting

12   a police officer in Walgreen's.

13       And I have no doubt that that case will be -- we'll go

14   straight to the Attorney General of Tennessee to make sure she

15   gets indicted, because I have no doubt that the U.S. Attorney

16   interfered with her getting her indictment.  Because that

17   breaches their case.

18       Mr. Babcock, whether it be him or the next attorney, first

19   call is going to be to the Attorney General:  Why isn't this

20   woman, on film, who was filling a false prescription, a

21   felony, and who attacked a police officer on camera, why did

22   you drop the charges?

23           **THE COURT:**  All right.

24           **THE DEFENDANT:**  The only logical explanation is

25   interference from this U.S. Attorney.

```
 1            THE COURT:  Will the marshal please put the Defendant
 2   back in handcuffs, and escort him out of the room.
 3       And, this is just one more example of how he is not
 4   subject to or amenable --
 5            THE DEFENDANT:  No.  I just need counsel, Your Honor.
 6   Your Honor, I just need private counsel, please.
 7            THE COURT:  It is just impossible to --
 8            THE DEFENDANT:  I just need private counsel.  I can't
 9   have Mr. Babcock as my attorney anymore.  I need to hire
10   counsel of my choosing.  I am amenable.  It's been proved for
11   six years in this court.  Just private counsel.
12       (Defendant escorted from the courtroom)
13            THE COURT:  All right.  The Record will show that the
14   Defendant has been taken back into the holding cell.
15       All we're going to do now is set the time on Thursday that
16   you want.
17       What time can we make available, Dawn?
18            THE CLERK:  Well, you could do Thursday afternoon.
19   You could start around 12:00, at the point after your
20   law-and-motion calendar is over.
21            THE COURT:  All right.  12:00 noon.  How's that?
22            MR. BABCOCK:  That's fine, Your Honor.
23            MR. SPRAGUE:  Fine with the government, Your Honor.
24            THE COURT:  All right, 12:00 noon.  We'll see you
25   back then.
```

1    **MR. SPRAGUE:**  Your Honor, I know the Defendant is not

2    here, but you had talked about Mr. Babcock having up to three

3    hours of time, and he's obviously rejected the offer to move

4    to San Francisco County.

5        Was there anything else from the Court that you want the

6    government to look into on that list?

7        **MR. BABCOCK:**  I'm going to talk to him more about the

8    San Francisco thing, to make sure he understands.

9        **THE COURT:**  You should talk to him, because I'm not

10   sure I trust what Mr. Brugnara said about how bad it was.  So,

11   look into it.

12       And, and please -- Mr. Conroy has tried very hard, and

13   I've asked to him try very hard to work with you and the

14   lawyers to find a way to make Mr. Brugnara happier.

15       And so, Mr. Conroy, if you feel there's any merit to those

16   things about murders going on, and 20/20 and Sixty Minutes

17   that we heard, you can -- Mr. Conroy will help you find out

18   how many people have been murdered down there, the Hall of

19   Justice.

20       All right.  This case is off calendar now.  I'll see you

21   on Thursday.

22       **MR. SPRAGUE:**  Thank Your Honor.

23       **MR. BABCOCK:**  Thanks, Your Honor.

24       (Proceedings concluded)

25

## CERTIFICATE OF REPORTERS

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball_____

Wednesday, December 24, 2014

Belle Ball, CSR 8785, CRR, RDR