1        Pages 1 - 4; 31 - 84

2            UNITED STATES DISTRICT COURT

3           NORTHERN DISTRICT OF CALIFORNIA

4          BEFORE THE HONORABLE WILLIAM H. ALSUP

5    UNITED STATES OF AMERICA,)
                             )
6         Plaintiff,         )    NO. CR 08-0222 WHA
                             )    NO. CR 14-0306 WHA
7      vs.                   )
                             )    San Francisco, California
8    LUKE D. BRUGNARA,       )    Tuesday
                             )    March 24, 2015
9         Defendant.         )    9:00 A.M.
     _____)

10

11           **EXCERPT OF TRANSCRIPT OF PROCEEDINGS**

12    **UNSEALED PORTION - PAGES 1 THROUGH 4 AND 31 THROUGH 84**

13   **APPEARANCES**:

14   **For Plaintiff:**    MELINDA HAAG
                           United States Attorney
15                         450 Golden Gate Ave.
                           San Francisco, California 94102
16              BY:        **BENJAMIN KINGSLEY, AUSA**
                           **KYLE WALDINGER, AUSA**

17

     **For Defendant:**    K & L GATES LLP
18                         Four Embarcadero Center
                           Suite 120
19                         San Francisco, CA 94111
                BY:        **JEFFREY L. BORNSTEIN, ESQ.**
20
                           LAW OFFICES OF ERIK BABCOCK
21                         717 Washington Street
                           Second Floor
22                         Oakland, CA 94607
                BY:        **JAMES STEVENS, ESQ.**
23

24   **ALSO PRESENT:**     **GEORGE BOISSEAU, ESQ.**

25   *Reported By:  Kelly Lee Polvi, CSR No. 6389, RMR, FCRR*

<u>P R O C E E D I N G S</u>

**MARCH 24, 2015**                                        **9:03 A.M.**

**THE CLERK:**  Calling criminal No. CR 08-0222 and CR 14-0306.  They're both United States versus Luke D. Brugnara, on for status and motion hearing.

Counsel, please state your appearances.

**MR. KINGSLEY:**  Good morning, Your Honor, Ben Kingsley for the United States.

**THE COURT:**  Welcome.

**MR. BORNSTEIN:**  Good morning, Your Honor, Jeff Bornstein. We're waiting for Mr. Brugnara to come in.

**THE COURT:**  Welcome.

**MR. STEVENS:**  Good morning, Your Honor, James Stevens, also representing Mr. Brugnara.

**THE COURT:**  And welcome to you.

**MR. BORNSTEIN:**  Your Honor, he's now walking in the courtroom; he's present, in custody, Your Honor.

**THE COURT:**  All right.  The record will show that Mr. Brugnara is present.  All right.

We're here on several things; first is the motion of Erik Babcock to withdraw.

Anything further to be said on that subject?

**THE DEFENDANT:**  Yes, Your Honor.

**THE COURT:**  All right.

Mr. Bornstein, is this something we have to clear the

1      courtroom to hear?

2          MR. BORNSTEIN:  I would think that if Mr. Brugnara wants

3      to talk, then I would ask you to do that.

4          THE COURT:  All right.

5          MR. KINGSLEY:  Your Honor?

6          THE COURT:  Yes, sir.

7          MR. KINGSLEY:  The Government, based on the public

8      record, Mr. Babcock has a conflict.  And every time we have an

9      ex parte hearing, Mr. Brugnara appears to raise things that

10     don't really need to be done ex parte and when the Government

11     comes back in the tenor of the hearing has changed

12     substantially.

13         I'm not sure -- obviously, I haven't been here for the ex

14     parte hearings, but I think Mr. Babcock has a conflict.

15     Mr. Babcock thinks he has a conflict.  It doesn't really have

16     anything to do with Mr. Brugnara's thoughts on it at this

17     point.

18         THE COURT:  Possibly that's true, but I would not want

19     somebody later on, in the Court of Appeals, to think that we

20     didn't hear Mr. Brugnara out on this.

21         So you would raise a fair point, and it is, in my

22     opinion, true that things that should not be raised ex parte

23     have been raised ex parte.  And I try to cut it off

24     immediately, but you understand the dynamic that we're dealing

25     with.

1        All right.

2        So we'll hear -- I'm going to hear Mr. Brugnara out in a

3    minute, but before we go there, let's go to Mr. Bornstein.

4        You have a motion to withdraw.

5        MR. BORNSTEIN:  That's correct, Your Honor.

6        THE COURT:  And is that still an active motion that you

7    wish to have heard?

8        MR. BORNSTEIN:  Yes, I do.

9        THE COURT:  All right.  Is there anything further that

10    Mr. Brugnara wishes to stay on that the subject?

11        THE DEFENDANT:  Yes, there is.

12        THE COURT:  All right.  Okay.  What we're going to do,

13    then, is to -- I'm going to ask everyone to step outside -- I

14    have to hear Mr. Brugnara in camera -- unless you are

15    affiliated with the Court, and then, in which case, you can

16    stay.

17    (Sealed portion begins)

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

1    **THE COURT:**  For the record, we'll start a new transcript.

2    The record will show that the Government and members of

3    the public are back in the room.

4    Both motions to withdraw have been granted on the

5    condition that they transition to the new lawyer and assist,

6    and I'm sure that they will.

7    All right.  So that now brings us to where we are now.

8    In anticipation that this could happen, the Court has

9    inquired of Mr. George Boisseau, who is on the front --

10   Mr. Boisseau, could you come up here for a moment?

11   **MR. BOISSEAU:**  Thank you, Your Honor.

12   **THE COURT:**  -- whether or not he would be willing to take

13   on this case.

14   And before you get appointed -- and he hasn't been

15   appointed yet -- Mr. Brugnara, this is George Boisseau.  All

16   right?  He is a member of the panel under the Criminal Justice

17   Act, one of the foremost trial lawyers in California.

18   He cannot try this case on April 27th.

19   But before you come into the case, let me ask you, have

20   you given some thought to when you could try this case?

21   **MR. BOISSEAU:**  Yes, Your Honor, I did.  And the date -- I

22   was thinking of July 13th; however, July 6th would work also.

23   **THE COURT:**  All right.

24   Mr. Kingsley, is July 6 still a date that will work for

25   the Government?

1      **MR. KINGSLEY:**  It still works for the Government, Your

2  Honor.

3      **THE DEFENDANT:**  Your Honor, I requested that this Court

4  have a *Faretta* hearing regarding my desire on that and I

5  understood that's why we were here today.

6      And I have already told the Court that I'm prepared to

7  proceed because I cannot give up my April trial date.  For

8  numerous reasons.

9      **THE COURT:**  Well, you see, the thing is you're putting it

10  in a position where that would not work under *Faretta*.  It will

11  not be a voluntary waiver of counsel.

12      What you're trying to say is -- to create a record that

13  says something like, "I wish I could get a lawyer, but since I

14  can't get a lawyer who can try the case on my schedule, I will

15  represent myself.  But I'm being forced into this."

16      That's not -- under *Faretta*, you can't do that.  So I'm

17  sorry, but I'm not going to go even down the *Faretta* route

18  until I hear you say "Whether I can get a lawyer or not."

19      And it can turn out this:  You could go by yourself and I

20  could change the date.  I could just change the date.  Because

21  there could be good reasons to change the date.  Maybe the

22  Government is not available.  And under the Speedy Trial Act, I

23  could do that.  Then you would be saying that I somehow cheated

24  you by holding out a date and you lost your lawyer and all of

25  that.

1        You can't --

2        THE DEFENDANT:  Your Honor --

3        THE COURT:  There's no such thing as a conditional, "I

4   want to go for my -- represent myself so I can keep that date."

5        I'm telling you now, if you fire your lawyer, you may not

6   get that -- you might not even get to trial on July 6th.

7        THE DEFENDANT:  Your Honor, I understand that it has to

8   be unequivocable and it would be unequivocable for this record.

9        This isn't some sort of gamemanship here.

10       I understand and I've read what Mr. Bornstein gave me

11  about the requirements to go pro se, and based on the fact that

12  you released Mr. Bornstein, it would be unequivocable because

13  Mr. Bornstein is now officially off the case.  So that

14  condition is no longer applicable.

15       THE COURT:  It's my duty to appoint a new lawyer for you

16  unless I hear a completely voluntary desire -- and unequivocal

17  -- to represent yourself, knowing all of the downsides and the

18  consequences and knowing good and well it may not happen on

19  April 27th either.

20       THE DEFENDANT:  I would like it to happen on April 15th.

21       THE COURT:  Well, see, that's the point.  I'm trying to

22  tell you, if you are trying to get rid of your lawyer so that

23  you can have a prompter trial date, that could be pie in the

24  sky.  I can't guarantee you that.  It could change.  And then I

25  know you well enough to know you would blame me and say, "Well,

1    I got screwed out of my lawyer because the judge changed the

2    trial date on me."

3         THE DEFENDANT:  Your Honor --

4         THE COURT:  I'm not going to go down that path until you

5    tell me something like "I'm willing to represent myself, even

6    if the trial -- if I stay in jail all the way until December,"

7    or whenever it is.

8         THE DEFENDANT:  That's not my interpretation of what

9    Mr. Bornstein gave me.  My interpretation of what Mr. Bornstein

10   gave me is that the Court has to honor my rights to a speedy

11   trial and honor the conditions that are currently in front of

12   this Court regarding the trial dates and the pending motions

13   for the trial date.

14        And this Court has already stated, in the hearing last

15   week, that, in fact, if I wanted to go pro se, it would honor

16   the April 27th date.

17        THE COURT:  I would try to.  I would try to.

18        THE DEFENDANT:  You said that on the record.

19        THE COURT:  Let's make it clear now.  I would try to.

20   "Try" is not a guarantee.  I will not guarantee that date for

21   you.  The Government could come in and make a motion and say,

22   "We can't be ready," or, "Our witness is in the hospital," or

23   something like that.  Then you would be complaining that you

24   didn't get your April 27th trial date.

25        I'm sorry.  I can't.  All I can do is say "I would try my

1    best."

2       THE DEFENDANT:  But the availability of 34 witnesses is a

3    logistical hell.

4       THE COURT:  Mr. Brugnara, see, you're arguing with me.

5       THE DEFENDANT:  I'm sitting in jail.  I've lost a hundred

6    pounds.  I'm dying.

7       THE COURT:  Your case would have been over if you hadn't

8    absconded.  The verdict would have been in.  You would either

9    be innocent or you would have been guilty.  The case -- you

10   absconded and put yourself in this position.

11      THE DEFENDANT:  I didn't abscond.

12      THE COURT:  Yes, you did.

13      THE DEFENDANT:  I would have been out in July or June if

14   you didn't remove Mr. Kalar.

15      THE COURT:  Now we're going in circles.  I'm going to

16   order you to be quiet.

17         Here's what we're going to do.

18      THE DEFENDANT:  Okay.  I'd like to speak with

19   Mr. Boisseau --

20      THE COURT:  I'm going to give you that opportunity.

21      THE DEFENDANT:  -- for a few minutes before I make a

22   decision.  Could I speak to him for 15 minutes?

23      THE COURT:  I was going to suggest that very thing.

24         Here's what I would like to do.  It's now 9:45.  Can we

25   come back at, say, 11:30 or noon and give Mr. Boisseau a chance

1    to meet with his client in the lockup?

2         And would that -- and then you can go over things like

3    *Faretta*, or you can go over the trial schedule.

4         But in my judgment, you could not try this case -- no

5    competent lawyer could be ready to try this case on April 27th.

6    I think you could do it on July 6th, but I don't think you

7    could do it on April 27th.

8         Now.  But can we all come back at, say, 11:30 or noon?

9         MR. BOISSEAU:  Yes.

10        MR. KINGSLEY:  Yes, Your Honor.

11        MR. BORNSTEIN:  Yes, if you still want me to come back.

12        THE COURT:  I may not need you if Mr. Boisseau says he

13   doesn't need you here, but I don't have anyone representing

14   Mr. -- well, I've got Mr. Stevens, but I'd like you to stay on

15   board.

16        Mr. Boisseau, you haven't actually been appointed yet

17   so -- my intention is to appoint you, if you think you can get

18   along with the defendant and if the defendant thinks he can get

19   along with you and after you have your conversation.

20        MR. BOISSEAU:  I will start with the conversation.

21        THE COURT:  All right.  We're going to -- let's -- can we

22   make it noon?  Would that be all right?  Or 11:30?

23        Which one works best for the -- either one is okay with

24   me.

25        MR. STEVENS:  11:30 would work best for me.

1       THE COURT:  11:30 it is.  We'll see you back here then.

2  Thank you.

3           (A recess was taken from 9:48 A.M. to 11:36 A.M.)

4       THE COURT:  Let's go back to work.  Please be seated.

5       THE CLERK:  Okay.  For the record, recalling criminal

6  No. CR 08-222 and related case CR 14-306.  Both are

7  United States versus Luke D. Brugnara.  The matter's on for

8  status conference.

9           Counsel, please state your appearances.

10      MR. KINGSLEY:  Good morning again, Your Honor, Ben

11 Kingsley for the United States.

12      MR. BORNSTEIN:  Good morning, Your Honor, I am Jeff

13 Bornstein.  I think I am no longer representing Mr. Brugnara,

14 but Mr. Brugnara is present, in custody.

15      THE COURT:  Thank you.

16      MR. BOISSEAU:  And George Boisseau, making a special

17 appearance at this point.

18      THE COURT:  Thank you.

19          So to catch everyone up, we were here earlier this

20 morning, the motion to withdraw by the two prior counsel was

21 granted, and now the Court has gone to a lot of trouble to ask

22 Mr. Boisseau to step in so that if -- but we gave the defendant

23 an opportunity to meet for about 90 minutes with Mr. Boisseau

24 in the lockup.

25          And let me ask, first, was that enough time or do you

1    need more time to meet?

2        THE DEFENDANT:  For me, Judge, I'll accept that was

3    sufficient time.  And I want to thank the Court for making the

4    effort to bring in Mr. Gasteau [as spoken].  However -- and I

5    like him personally.  He's very nice man, very smart man, good

6    attorney.

7        But, you know, despite our meeting, I'm prepared to

8    unequivocably waive the right to the appointed counsel to

9    proceed pro se, and that's what I'd like to do.

10       THE COURT:  All right.  Now, before we go down that path,

11   let me ask Mr. Boisseau, since you've been good enough to come

12   a long way for today's hearing, what do you have to say?  Or

13   you don't have to say anything.  I'm just giving you the

14   opportunity.

15       MR. BOISSEAU:  No, I spoke -- spoke to him, and I'll

16   defer.

17       THE COURT:  All right.  So in the 90 minutes, I spent

18   part of that trying to figure out what the Government's

19   conflicts were, and the Government says that it has conflicts

20   that would prevent it from going to trial on April 27th.

21       Now, I want to make sure I understand that right.

22       Mr. Kingsley; is that correct?

23       MR. KINGSLEY:  That's correct.  Since the last filing we

24   did on this the case that I had that was supposed to go to

25   trial, the Davis case, Mr. Davis pleaded open last Thursday, so

1    that case has resolved.  Otherwise, the stated conflicts in

2    there that Ms. Harris has still exist.  The United States

3    versus Murray case is still going to trial.

4        **THE COURT:**  Well, which one of you is the lead counsel?

5        **MR. KINGSLEY:**  Well, I'm not sure either of us is lead

6    counsel.  Ms. Harris is certainly the more senior counsel on

7    the case.  But I've been involved in the case for quite some

8    time, as you know.

9        **THE COURT:**  Well, are you prepared to try the case on

10    behalf of the Government even without Ms. Harris?

11        **MR. KINGSLEY:**  The Government will be prepared to go to

12    trial on April 27th, if that's what the Court feels is

13    appropriate.

14        **THE COURT:**  Well, that's a new fact that I didn't know.

15        So you're -- looking at your prior statement, indicated

16    to me that you could not go to trial on April 27th, but now

17    you're telling me you can.

18        **MR. KINGSLEY:**  The Government's position before, I think,

19    was that there were conflicts for both Government counsel that

20    would have required the Government to lose some amount of

21    continuity of Government counsel or possibly the entirety of

22    continuity of Government counsel.

23        In addition, the Government was concerned that it would

24    rearrange the schedules of its witnesses, of its attorneys, and

25    reassign this case or other cases to set a trial date that,

1    based on Mr. Bornstein's representations, appeared not likely

2    at all to happen.

3         Since those filings, my conflict no longer exists and so

4    I would be able to continue on this case; Ms. Harris wouldn't.

5         So I think that the continuity issue has been partially

6    resolved but not entirely.  The Government still has concerns

7    about, again, reassigning matters either way because Ms. Harris

8    will have a conflict.

9         THE COURT:  Who would take the case if Ms. Harris drops

10   out?

11        MR. KINGSLEY:  I believe Mr. Waldinger, who is here.

12        THE COURT:  Right there.

13        MR. KINGSLEY:  He snuck up on me.

14        THE COURT:  So Mr. Waldinger, come forward, please.

15        Is that true, that if we went to trial on April 27th you

16   would step in and be able to try the case?

17        MR. WALDINGER:  I believe so, Your Honor.  I've been

18   trying to rearrange my schedule.  We would find somebody.

19   Whether it would be me or somebody else, we would find

20   somebody.

21        THE COURT:  All right.  I have an issue that I would

22   raise, but it's a small one because it may not matter.  But at

23   the end of the month of May -- let's see, April 27 would be

24   one, two -- so, like, at the end of the fourth week of this

25   case, if we did start on April 27th, if we had not reached a

1    verdict I would have to adjourn the trial for almost a week for

2    personal reasons.

3         That would be an unfortunate time to do it because we

4    might be in jury deliberations or something.  But I can't help

5    it; it's a command performance on my -- that I have to attend

6    to.

7         So let me get the Government's estimate, trial estimate,

8    of time.

9         MR. KINGSLEY:  What we've said since the escape is that

10   we estimate two to two and a half weeks for our case in chief.

11   I think that four weeks will be plenty of time for the entire

12   trial, though I don't know what Mr. Brugnara would intend to do

13   if he's representing himself.

14        THE COURT:  Well, I don't know either, and -- I think he

15   would put on some witnesses and we have closing arguments and

16   things like that.  Charging conference.

17        THE DEFENDANT:  Your Honor --

18        THE COURT:  No, please.  Wait.  Wait.

19        What I want to -- I want to circle back to what I said

20   earlier today, which is that you should not be going pro se on

21   the theory that you have a guarantee of April 27th.  You could

22   only go forward with the idea that the Court would try to make

23   that work.

24        But things can get in the way, witness problems could

25   come up, any number of things could come up that would require

1    a continuance.

2          And it may even -- if you think the continuance should be

3    short, it might -- for other reasons, might wind up being

4    longer.

5          So I just want that to be very clear.  That if you did it

6    in order to get an earlier trial date, well, good, God bless

7    you, it might work.  But there's no guarantee.

8          Do you understand that?

9          **THE DEFENDANT:**  Yes.

10         **THE COURT:**  All right.  Okay.  I -- here's what I propose

11   to do, then.  I would like to go through as many things as I

12   can think of to admonish the defendant about with respect to

13   *Faretta*, and -- meaning going pro se, as the defendant puts it,

14   and to see where we are.

15         We got to get through the whole thing and -- before I can

16   decide that I would let you -- you do have the right to

17   represent yourself.  But once you do it, it's over.  You don't

18   get a chance to change your mind.  So you have to make sure you

19   really want to do this and I want to make sure you understand

20   that -- as much about the consequences as I can.

21         But there's no way I can foresee everything, and there'll

22   just be many situations where you say, "Well, you didn't tell

23   me that, Judge," and I have to say to you, "I can't foresee

24   everything."

25         So let me make sure I understand this.  Is it your

1    desire, Mr. Brugnara, to dispense with counsel completely and

2    represent yourself?

3         THE DEFENDANT:   Counsel's already withdrawn, Your Honor,

4    so I'm requesting to proceed representing myself.

5         THE COURT:   No, no, I can appoint Mr. Boisseau as your

6    counsel and I'm prepared to do that right now, so don't play

7    games with me.

8         Do you want a lawyer?  Do you want Mr. Boisseau to come

9    in and represent you, one of the best trial lawyers in

10   California, or do you want to represent yourself?

11        THE DEFENDANT:   Your Honor, I want to represent myself.

12   I read what Mr. Bornstein gave me and yes, he went over it with

13   me about the *Faretta* conditions and we spent probably 20, 30

14   minutes talking about it and I understand it's unequivocable --

15   unequivocal and I agree to that.

16        THE COURT:   Well, then I need to go through a lot of

17   things with you now to make sure that you -- it's called a

18   *Faretta* hearing.  I'm required to do this.  And I want to see

19   what your answers are.  And if your answers are equivocal, then

20   that's a problem.

21        All right.  So first, I need to put you under oath and

22   you need to take an oath to tell the truth.

23        Please raise your right hand.

24        THE DEFENDANT:   Before we start that, I'd like to ask the

25   Court one question, though -- because I was impressed by

1    counsel -- is my understanding of -- my interpretation of what

2    I read that Mr. Bornstein gave me, as well as the case

3    precedent, which was actually in this court, Steven Kalar was

4    an associate defender, is that, in fact, there are, under

5    *Faretta*, still due process rights and guarantees that the

6    defendant has that have to be honored, such as, for instance,

7    let's say, the right to have subpoenaes issued, for instance,

8    the right to have communication to effectively prepare for

9    trial for the minimum standards set forth by *Faretta*.

10           So I want to make it clear to the Court that I've --

11           **THE COURT:**  See, you're being equivocal already.  You're

12    making a speech about your rights and then you want to -- so

13    you want to have it both ways.

14           **THE DEFENDANT:**  Well, no, I just want to -- is your

15    interpretation -- because I believe --

16           **THE COURT:**  You don't have a right to anybody to come

17    help you with subpoenaes.  You got to do it yourself.  If the

18    Court winds up appointing somebody to do that for you, it's a

19    matter of grace, it's a matter of discretion by the Court.  And

20    you have no right to it.  If you -- you have to prepare the

21    subpoenaes on your own, submit them to the Court.  We'll try to

22    help you get them served, but you do not have a right to an

23    assistant to -- no.  That's what the lawyer is for in the first

24    place.

25           **THE DEFENDANT:**  I understand that, Your Honor.  I think

1   you misunderstood my -- the angle -- what I was trying to

2   inquire, is that, for instance -- this is more about the

3   conditions of confinement rather than -- I know anything that

4   would be done by any counsel, standby or otherwise, is at the

5   discretion of the Court.  I'm talking about nondiscretionary

6   rights that I have.  Nondiscretionary rights meaning if I'm in

7   confinement and I don't have a pencil and I ask -- I need a

8   pencil to write a subpoena and I need it mailed to Judge Alsup

9   and they don't follow through with that request and violate my

10  rights to due process -- because it's happened numerous times

11  already in this case where you didn't get the mail for three

12  weeks.  And we already had an evidentiary hearing on that.

13       And, you know, that's the situation where I need to

14  understand that there's going to be some sort of due process

15  rights that I have where, as the jail isn't following the

16  procedure --

17       THE COURT:  Do one of my marshals know the answer to if

18  Mr. Brugnara wants to serve a subpoena for trial on some

19  witness the extent to which the jail or the marshals will give

20  him assistance in supplying him with the form, having it

21  served, and that sort of thing?

22       THE MARSHAL:  I need to research it with the jail staff.

23       THE COURT:  We don't know the answer to that.

24       Does the U.S. Attorney know?

25       MR. KINGSLEY:  I don't know the answer with respect to

1    Alameda County Jail's procedures.

2         **THE COURT:**  How about you, Mr. Boisseau?

3         **MR. BOISSEAU:**  Well, generally-speaking, I don't check

4    into that.  But I'm sure -- the jail will have to give him some

5    privileges, and I believe they do.

6         And the question is whether they'll do it in this case,

7    and I'm sure Mr. Brugnara will come to the Court if they don't.

8         **THE COURT:**  Well, the only answer I can give you is this:

9    I don't know the jail's policy; I don't run the jail.  And I

10   haven't had this problem with the -- which county are you in?

11   Alameda?  So I don't know the answer.  But whatever the jail

12   will give you, that's fine with me.  But -- and if you have

13   some problem with it, you could come and ask me and I might be

14   able to give you more help with it or not.

15        But the thing is, I can't guarantee that.  So right off

16   the bat you're asking me to guarantee you due process.  Well,

17   of course I'll give you due process for somebody who's locked

18   up in jail in pretrial the best I can.  But, you know, I don't

19   know the answer to that question.  I -- whatever the jail

20   policy is and the marshal policy is for somebody representing

21   themselves, that's what you'll get.  And --

22        **THE DEFENDANT:**  Your Honor, you had the commander,

23   Ms. Sanchez, Commander Sanchez, sit on that and testify at the

24   evidentiary hearing, for instance, that there was a document

25   discovery room.  They qualified it, I believe, as the M-13

1    room.  But, in fact, there never was one.

2        And it finally came to light that there is none and they

3    brought me the boxes to my cell.

4        So the fact is the commander didn't even know exactly

5    what's going on in the jail.

6        And the problem is, is that I have no way of

7    communicating with you.  Meaning, I can't call you.  I get out

8    of my cell for a couple of hours a week.  I got out this week

9    for three hours, in total, at 10:00 o'clock at night and at

10   11:30 at night.

11       So from a due process standpoint, under my Sixth

12   Amendment right to due -- I don't know, is it 14? -- right to

13   due process, I just want to make sure that I'm just not locked

14   in a dungeon and say, "Okay, well, the trial date is this day,"

15   whether it be April or -- whatever it is, and say, "Okay."

16       Because I have had experiences now for 10 months, 9 and a

17   half months, where I've had all my rights violated.

18       **THE COURT:**  Here's what we'll do.  Are you free,

19   Mr. Boisseau, to come back tomorrow?

20       **MR. BOISSEAU:**  Actually, I'm not.  I have a sentencing I

21   can't avoid --

22       **THE COURT:**  Thursday?

23       **MR. BOISSEAU:**  -- in state court.

24       **THE COURT:**  Could you come Thursday?

25       **MR. BOISSEAU:**  I could have someone else --

1    **THE COURT:**  No, I want you here.  I know you're not even

2    appointed yet, but I'd like for some lawyer to be here.

3        **MR. BOISSEAU:**  What time would the Court want me --

4        **THE COURT:**  What time can I do it?

5        **THE CLERK:**  You could do it at -- you could come back at

6    10:00 A.M. or you could come back at noon.  We have one CMC at

7    11:00.

8        **THE COURT:**  All right.  Noon.

9        **THE DEFENDANT:**  Your Honor, I want to make the motion

10   today to not lose any time.  And I'm not -- I'm just trying to

11   make it clear to the Court --

12       **THE COURT:**  But, see, you're being equivocal.  You're

13   saying things like --

14       **THE DEFENDANT:**  I just made an inquiry of information.

15       **THE COURT:**  I'm giving you the best answer I can.

16       **THE DEFENDANT:**  Okay.  Well, based upon that answer I'm

17   prepared to move forward with the hearing to not waste any

18   court time.

19       **MR. KINGSLEY:**  Your Honor.

20       **THE COURT:**  Yes.

21       **MR. KINGSLEY:**  Regardless of how the *Faretta* hearing

22   went, the Government would probably request, whether

23   Mr. Brugnara wanted it or not, the court-appointed standby

24   counsel, for various reasons.

25       And Mr. Stevens has been in this case for a long time,

1    would seem to be one person who would be well-suited for that.

2         And presumably standby counsel could aid in some of the

3    technical things that Mr. Brugnara wants to do.  That's part of

4    the reason for having standby counsel.

5         And I don't offer that because I understand that he's

6    being equivocal; I just think it's a path that we might want to

7    consider either way.

8         THE COURT:  Once -- that's the cart before the horse.  I

9    will consider, later, whether, in my discretion, to appoint

10   either advisory or standby counsel.  But the waiver has got to

11   be clear-cut and with the understanding that there is no right

12   to that and no guarantee of that and he should not be waiving

13   his right to counsel on the theory that he's going to have

14   Mr. Stevens in the background helping him.

15        So thank you for bringing that up, but Mr. Brugnara

16   should exclude that from his consideration.  Because I'm not

17   going to guarantee that.  That would just be one more thing

18   that he claims on appeal that I stabbed him in the back on.

19        THE DEFENDANT:  Your Honor, just to further that, it says

20   here -- of what Mr. Bornstein gave me -- it says, "It's

21   generally advisable for the Court to appoint standby counsel to

22   assist defendant as needed."

23        THE COURT:  Yes, yes, I'm aware of that, and I have that

24   in mind as a possibility.  But you have been so abusive of the

25   lawyers in this case that I am not prepared to give you any

1    kind of a guarantee that that's going to happen.

2         THE DEFENDANT:  Your Honor, no attorney, other than

3    Mr. Bornstein, claimed abuse.  Steven Kalar, Brandon LaBlanc,

4    James Stevens and Babcock, none of them have ever claimed any

5    abuse or anything along those lines.

6         THE COURT:  I've heard things that they may not have

7    claimed it, but -- in order to protect you, but the marshals

8    have told me things that have happened.  And I know for a

9    certainty that you abused Mr. Babcock.

10        THE DEFENDANT:  Mr. Babcock didn't meet with me for seven

11   months and I lost seven months of my life because of his

12   ineffectiveness, so --

13        THE COURT:  Here we go again.  All right, look.  I'm

14   going to -- we'll have to do this under oath.  We've wasted all

15   this time.  Raise your right hand, take an oath to tell the

16   truth.

17        THE CLERK:  Do you solemnly swear that the answers to the

18   questions that you are about to give will be the truth, the

19   whole truth, and nothing but the truth, so help you God?

20        THE DEFENDANT:  I do.

21        THE COURT:  All right.

22   What is your name?

23        THE DEFENDANT:  My name is Luke Brugnara.

24        THE COURT:  How old are you?

25        THE DEFENDANT:  Fifty-one.

1      THE COURT:  How far did you go in school?

2      THE DEFENDANT:  A couple of years -- I have degrees and a

3   couple of years' of law school.

4      THE COURT:  Did you finish high school?

5      THE DEFENDANT:  Yes.

6      THE COURT:  Did you finish college?

7      THE DEFENDANT:  Yes.

8      THE COURT:  All right.  Are you thinking clearly today?

9      THE DEFENDANT:  Yes, I am.

10      THE COURT:  Are you under the influence of anything?

11      THE DEFENDANT:  No, I'm not.

12      THE COURT:  Any medicine you should have taken but forgot

13   to take?

14      THE DEFENDANT:  No.

15      THE COURT:  Are you mentally ill?

16      THE DEFENDANT:  No.

17      THE COURT:  Are you under -- being treated for mental

18   illness?

19      THE DEFENDANT:  No.

20      THE COURT:  All right.

21      I'd like for the Government to please summarize the

22   nature of the charges, the maximum penalties, and the sentences

23   that can run concurrently or consecutively and so forth, and I

24   want -- Mr. Brugnara, the reason for this is so you'll know

25   what you're facing as possibilities here.

1          Mr. Kingsley.

2          **MR. KINGSLEY:**  Your Honor, Mr. Brugnara is currently

3     charged in a 9-count indictment.  Counts 1 through 4 charge him

4     with wire fraud, in violation of 18 United States Code

5     Section 1343.  Count 5 charges him with mail fraud in violation

6     of 18 United States Code Section 1341.

7          The maximum penalties for Counts 1 through 5 are all the

8     same, and that's a term of 20 years' imprisonment, a $250,000

9     fine or twice the value of the property involved in the

10    offense, whichever is greater, a 3-year term of supervised

11    release, a $100 mandatory special assessment per count, and

12    restitution to be determined by the Court.

13         Count 6 and 7 charge defendant with making false

14    declarations before a Court, in violation of 18 United States

15    Code Section 1623.  The maximum penalties for each of those

16    counts are 5 years' imprisonment, a $250,000 fine, supervised

17    release term of 3 years, $100 mandatory special assessment per

18    count, and, again, restitution, to the extent it's applicable.

19         Count 8 charges defendant with escape, in violation of 18

20    United States Code Section 751(a).  The maximum penalty for

21    that is five years of imprisonment, $250,000 fine, 3 years' of

22    supervised release, and $100 mandatory special assessment.

23         Count 9 charges defendant with contempt of court, in

24    violation of 18 United States Code Section 4013.  The penalties

25    of imprisonment and a fine are at the discretion of the Court

1    under the statute, and there is another $100 mandatory special

2    assessment that applies to the contempt charge.

3         THE COURT:  How many of those are possibly consecutive,

4    meaning that they can be added together?

5         MR. KINGSLEY:  They could all be consecutive.

6         THE COURT:  And if they were maximums and all added

7    together, what is the total prison time that the defendant is

8    looking at?

9         MR. KINGSLEY:  Well, it would be 115 years for Counts 1

10   through 8, and then, in addition, the discretionary sentence

11   imposed for contempt under Count 9.

12        THE COURT:  You understand all that, Mr. Brugnara?

13        THE DEFENDANT:  Yeah, I went over with counsels, multiple

14   counsels, what the guidelines are and what the maximums and

15   minimums.  I understand the minimum's zero on all of those as

16   well.

17        THE COURT:  Well, but I need to make sure you understand

18   the maximums.

19        Did you understand what Government counsel just said?

20   You don't have to agree that that should be done; I'm just

21   saying do you understand that that is what the Government

22   contends are the maximum possibilities.

23        THE DEFENDANT:  I understand the purpose of what they're

24   trying to do, and I understand what the terms are, yes, as they

25   stated, the maximum, and I also note what the minimums are and

1    what the guidelines are.

2        THE COURT:  Did you hear and understand what Mr. Kingsley

3    said?

4        THE DEFENDANT:  I did, Your Honor.

5        THE COURT:  Thank you.

6        Now I want to talk about timing, first, since I know this

7    is much on your mind.  While the Court would try to have a

8    trial on April 27th, you need to be aware that if you go pro se

9    or with a lawyer, whatever, that is not a guarantee and it

10   could change.  There could be circumstances that -- for

11   example, the unavailability of a witness.  Many things could

12   cause that date to change, despite the best intentions of

13   everyone concerned.

14       So do you understand that the April 27th date is not a

15   guarantee?

16       THE DEFENDANT:  Yes.

17       THE COURT:  All right.

18       Now I want to go over with you the -- your entitlement to

19   a lawyer, at no expense to you, all the way through trial, and,

20   for that matter, sentencing.  This is based upon your

21   representations to the Court as to your financial conditions,

22   which we have taken at face value.  And I want to explain to

23   you what your rights to a lawyer are.

24       You've already had several in this case.  We have here

25   now Mr. Boisseau, George Boisseau, who is one of the esteemed

1    members of the bar of this court, tries cases all the time.  It

2    would be very hard to find a better lawyer than

3    George Boisseau.

4         And so not only can I say to you that you would get a

5    qualified lawyer from the panel of lawyers who practice in this

6    district, but you would get Mr. Boisseau, who is excellent, and

7    at no expense to you, all the way through sentencing.

8         Do you understand that?

9         **THE DEFENDANT:**  Yes.

10        **THE COURT:**  All right.  This lawyer would help conduct

11   the investigation, review discovery, follow up on leads, and

12   make motions on your behalf.

13        Do you understand that?

14        **THE DEFENDANT:**  Yes.

15        **THE COURT:**  All right.  This lawyer would try to poke

16   holes in the Government's case and cross-examine the witnesses,

17   and he's skilled at doing that, from many prior trials, up

18   against these very -- this very office of the United States

19   Attorney.

20        Do you understand that that's another thing that he would

21   do?

22        **THE DEFENDANT:**  Yes.

23        **THE COURT:**  And the lawyer would, in my opinion, be

24   excellent, and that you would be foolish to turn down the

25   services of such an excellent lawyer.

1          Do you understand that?

2          That's my advice to you, is that you should not represent

3     yourself but you should go with Mr. Boisseau.

4          Do you understand that?

5          **THE DEFENDANT:**  I understand that's your opinion.

6          **THE COURT:**  All right.  Now, the types of motions that

7     Mr. Boisseau could make on your behalf -- not that -- there are

8     many types.  Motions to suppress evidence.  I have a feeling

9     you have not a clue where to begin to bring a motion to

10    suppress evidence that would have any merit.  He would know

11    where to find the ones that might have merit.

12         Motions to compel information from the Government.  You

13    wouldn't have the experience that he has in figuring out how to

14    make those kind of motions.

15         Another type of motion is a motion in limine, meaning a

16    motion that might exclude evidence.  Or the Government will

17    bring motions in limine against you and you won't know the

18    proper way in which to respond to those, but Mr. Boisseau would

19    know how to respond to those.

20         Motions to recuse the judge.  You brought that up several

21    times in the past.  You then say "No, I don't want to do that,"

22    but you never know; you might want to do it.  He would know how

23    to prepare such a motion.

24         A motion to exclude experts.  I understand there's going

25    to be some experts in this case, at least from having heard the

1    defense side.  And maybe the Government will have an expert.

2           And then certainly we got all these problems with the

3    waiver of the attorney-client privilege.  And the lawyer will

4    know how to deal with those problems, but you don't have that

5    experience.  Even though you have some law school, you're not a

6    lawyer, you didn't make your living in that way, and you will

7    not be able to do as good a job as Mr. Boisseau.

8           Do you understand that?

9           THE DEFENDANT:  I understand that's your position.

10          THE COURT:  All right.  But do you understand what I've

11   said?  You don't have to agree with it, I can't force you to

12   agree with it, but I do have to make sure you understand.

13          THE DEFENDANT:  I understand what you said.

14          THE COURT:  All right.  There may be times that you might

15   want to make a motion to put something under seal, make a

16   motion for a bill of particulars.  Anyway, the lawyer would

17   know how to do it.  You, as a non-lawyer, would not have that

18   experience to even understand which motions are likely to

19   succeed.

20          Another -- so let me just make sure you understand that

21   basic point on motion practice --

22          THE DEFENDANT:  Your Honor, just so you understand it's

23   unequivocal, I understand what all those motions are that you

24   just described.  I've also been involved in civil courtrooms

25   and trials for over 20 years.  And many of the -- many of those

1   rules and motions apply in civil cases, as you know as well.

2        So I'm very adept in trials.  I've never lost a civil

3   trial in over 20 years.  And I'm confident that my innocence

4   will be shown in this case and I'll be fully vindicated in a

5   few weeks.

6        **THE COURT**:  All right.  Now I want to say how a trial

7   works.  And I say this in every trial.  I say to the jury --

8   this is in a normal trial, where there are lawyers.  I say that

9   the lawyers are very important, but nothing that a lawyer ever

10  says is evidence in the case because it's not under oath, it's

11  just asking questions and making points in the courtroom.

12       That's the nature of argument, but it is not evidence.

13       And I make sure the jury understands that what somebody

14  says in their role as an advocate is not evidence.  All that is

15  evidence is what is said under oath from the witness stand and

16  the documents and the physical exhibits that come into

17  evidence.

18       So let me make sure I stop there.

19       Do you understand what I've just said?

20       **THE DEFENDANT**:  Yes, I understand the rules of evidence,

21  Your Honor.

22       **THE COURT**:  All right.  So when you are representing

23  yourself in court, I know from experience with you in this case

24  that you will try to argue your point to the jury.  Maybe not

25  based on anything that anyone has said, but just start talking

1    in front of the jury about, "Oh, she -- she was drunk that day"

2    or whatever.  And I will have to say to the jury -- unless it's

3    something you say under oath from the stand -- that's

4    different -- but if it's just you talking out loud in the

5    courtroom, I have to say to the jury, "Ladies and gentlemen of

6    the jury, what Mr. Brugnara just said is not evidence and you

7    may not treat it as evidence."

8        If you want to lay before the jury something like, "Oh,

9    she was drunk that day; I can smell alcohol on her breath,"

10   which you have said in the case before, then it has to be under

11   oath from the witness stand and subject to the penalties of

12   perjury.

13       Do you understand that?

14       **THE DEFENDANT:**  Unless she admits to it when she's being

15   cross-examined.

16       **THE COURT:**  Well, she might.  That's a good point.  She

17   could admit it.  But I think, from what I know about the case,

18   is she's probably not going to say that.  And then you are

19   going to want to say that out loud, but you may not want to say

20   that under oath.  I don't know.

21       What I have to say to the jury is, "If it's not under

22   oath, it's not evidence."  And if you start making outbursts in

23   front of the jury, I have to tell them to disregard that and

24   it's not evidence.  They can treat it as argument, but they

25   cannot treat it as evidence.

1          And you can't make outbursts to begin with; you have to

2     comply with the normal rules of examination.

3          So let me stop.  Do you understand what I'm saying?

4          **THE DEFENDANT:**  Yes.

5          **THE COURT:**  All right.  Now let's talk about normal rules

6     of examination of witnesses.

7          When you are -- you would be asking the questions.

8          What was that woman's name?  Ms. Long.  Wasn't that her

9     name?  Long?

10         **THE DEFENDANT:**  Yes.

11         **THE COURT:**  Rosemary Long?

12         Let's take her, for example.  She's on the stand.  It's

13    your turn to cross-examine her.

14         So it would be okay to say to her, "Ms. Long, were you

15    drunk that day?"  That would be okay.  But what if you were to

16    just turn to the jury and start saying, "I remember you being

17    drunk that day, Ms. Long.  I just remember you being drunk.

18    What do you say to that?"

19         That's a totally improper question because you're

20    purporting to testify in front of the jury.

21         **THE DEFENDANT:**  I agree.

22         **THE COURT:**  You have to just to ask a question, you

23    cannot make a speech, and it cannot be an argumentative

24    question.  You couldn't say, for example, "Ms. Long --

25         I don't know.  I don't want to give you --

1          You just have to know what an argumentative question is,

2     you need to know what the rules of evidence are for leading

3     questions, for ones that call for speculation, one that has no

4     foundation.

5          All right.  So let's say that you want to try to show

6     that she has been arrested for -- been convicted of something

7     in Arkansas.  I think that's one of your -- no.  Tennessee, I

8     think it was.  And she denies it.  Are you going to be allowed

9     to put something from the Internet into evidence?  No.  Of

10    course not.  You can't use the Internet as evidence.  You would

11    have to have an official -- something official that would

12    satisfy the rules of evidence.

13         It can't be a newspaper article, the rankest of all

14    hearsay.  It can't be something off the Internet.  Just as

15    rank.  It has to be in compliance with the rules of evidence.

16         And so then if you were to blurt out to the jury, "Oh,

17    well, I saw it on the Internet; she's guilty," I would have to

18    say to the jury, "Disregard that.  It's not evidence.

19    Mr. Brugnara should not have said that."

20         Do you understand that you have to comply with the rules

21    of evidence?

22         **THE DEFENDANT:**  Yes, I do.

23         **THE COURT:**  Experts.  I don't know how you're going to

24    get an expert from jail.  That's your problem.  If you want to

25    do this from jail, maybe you can do it.  I don't know.  But you

1   will be greatly hampered in your ability to investigate this

2   case and to contact witnesses.  You will be greatly hampered

3   because you're in jail and the Government is not in jail.  But

4   if you had a lawyer who was out of jail, he could be doing all

5   of those things for you.

6       Do you understand that?

7       THE DEFENDANT:  Mr. Babcock didn't do anything for eight

8   months.

9       THE COURT:  We're not talking about Mr. Babcock any more;

10  we're talking about Mr. Boisseau.

11      THE DEFENDANT:  I'm not going down that road any more.

12  It's been, what, three -- three false starts.

13      THE COURT:  So you're being equivocal.  I want you to

14  understand that Mr. Boisseau, he would be using his

15  professional discretion, he would be in a position to do the

16  kind of things that I just mentioned that you would find

17  extremely difficult to do from the jailhouse.

18      Do you understand that?

19      THE DEFENDANT:  Your Honor -- and again, this goes to the

20  marshals, again, too.  I was told that I have access to a phone

21  in the pro se room.  There's actually a pro se room at the

22  jail.  Obviously --

23      THE COURT:  I don't know if that -- I have a plan on how

24  to deal with that.

25      THE DEFENDANT:  I was told, Your Honor, by the lieutenant

1    or the sergeant there what their current protocol is.  Their

2    current protocol is whereas you would issue an order that I am

3    pro se I have access to the phone and then I would give you a

4    list of the people that I'm going to call, or to the marshal,

5    and then you can verbally tell them.  That way there's no loss

6    of time.

7        THE COURT:  You want me to take your word for what the

8    sergeant over there -- who I don't even know who it is.

9        All right.  Here's what we're going to do on this piece

10   of it.  We're going to come back here Thursday at noon, and I

11   want the marshals to bring with them somebody from the jail who

12   can answer these questions and I can count on it.  And it's

13   going to be things like what privileges are available to people

14   who are representing themselves in criminal cases, what help

15   does he get on subpoenaes --

16       (Addressing the marshal.)  You want to make a note?

17   Write this down.

18       What help does he get on subpoenaes, access to the

19   telephone, writing materials, access to -- for legal research.

20   This is for somebody who is pro se.

21       And it's got to be somebody who knows how it really works

22   and I can count on and that the witness -- the defendant can

23   count on.

24       So I want that to be explained on the record for the

25   benefit of the defendant so he'll know what the limitations are

1    as well as what his privileges are if he goes pro se.  All

2    right?

3         Please make sure it's somebody who knows what they're

4    talking about.

5         Okay?  Thank you.

6         All right.  Nonetheless, Mr. Brugnara, even if they give

7    you some additional privileges over there on account of you

8    being pro se, there is absolutely no doubt that you will be

9    greatly hampered in your preparing the defense compared to what

10   Mr. Boisseau can do for you on account of you being in jail.

11        Do you understand that?

12        THE DEFENDANT:  I disagree.

13        THE COURT:  Well, then how can you disagree with that?

14   Explain to me why it is that -- what you mean by that.

15        THE DEFENDANT:  I think that I know this case better than

16   anybody.  Mr. Bornstein, Babcock, they all said -- I've done

17   nothing for the past five months but read through every piece

18   of discovery about a thousand times.  I know this case on the

19   tip of my tongue, I know this case stamped into the back of my

20   hand and my brain, and I understand every facet of this case.

21   And I know exactly the questions I need to ask the witnesses.

22        I only have a handful of witnesses that I'm going to

23   call.  It will probably take a couple of days at the most.  And

24   this, in my opinion, and all the counts that I've had thus far,

25   is a relatively simple, straightforward case regarding the

1    fraud aspect.

2          And I don't -- I don't see why how it could even drag on

3    two weeks, but so be it.

4          Our witnesses certainly won't take more than a few days,

5    and I don't think Mr. Gasteau [as spoken], even if he had six

6    months, would be as prepared as I am.  Because, again, I've had

7    a lot of experience in court.  Even though I'm not an attorney,

8    I've assisted my attorney, my civil attorney, in every single

9    case for the last 20 years.

10         And quite frankly -- and Babcock on this case, I wrote

11   half the motions.  Okay?  So I know what all the motions are.

12         And the only motions I plan on filing prior to trial are

13   ones that have already -- apparently Mr. Bornstein has done

14   one, is the -- there's two.  One is the motion to set aside the

15   indictment, which Mr. Bornstein said he was doing, and the

16   other is the motion to elimine.

17         THE COURT:  Well, he's not going do that anymore.  Once

18   he's out of the case, he's not going to file a motion.

19         THE DEFENDANT:  Am I allowed to get the work product that

20   he's completed?

21         THE COURT:  It's up to him, if he wants to give it to

22   you.  I'm not going to order that.

23         THE DEFENDANT:  If he doesn't, I can certainly write it

24   myself.  Those are the only two motions, and I will send out a

25   handful of subpoenas, and I'm ready to go.  I can do this trial

1  date sooner than the 27th because my witnesses are going to

2  show.  I'm ready to go any time in April, if the U.S. Attorneys

3  are ready to go any time in April.

4      THE COURT:  All right.  Let me continue with some other

5  things.

6      Another thing a lawyer can do for you that you cannot do

7  for yourself is negotiate a plea agreement.  Let's say that the

8  lawyer thinks he can negotiate a deal with you.  I know you say

9  you're innocent.  I don't want you to tell me, get into that.

10  But oftentimes people do negotiate deals, and it's very

11  awkward.  It's possible for you to do one on your own behalf,

12  but it's very difficult and it's very awkward.

13      Do you understand that?

14      THE DEFENDANT:  I spoke to Mr. Babcock about pro se and

15  he told me that you can always negotiate any resolution at any

16  point in time, so, I mean --

17      THE COURT:  It's not true.

18      THE DEFENDANT:  What's awkward --

19      If both sides are willing to do such a thing.  Obviously,

20  it's got to be two willing parties.

21      But what's awkward is me being in the condition I'm in.

22  That's -- nothing is awkward, once you've been tortured like

23  this.

24      THE COURT:  The Government is under no obligation to

25  offer you a deal.  They're under no obligation to negotiate

1    with you for a deal.  You could be begging them to come see you

2    to negotiate a plea deal and they are completely within their

3    rights to say, "Forget it.  We're going to trial.  We'll find

4    out if you're innocent or not."

5         You have no right, at any time, to negotiate a deal.

6    It's only if both sides want to do it and then they present a

7    deal which is acceptable to the Court.  The Court has got to

8    decide whether or not it's acceptable, if it's one that sets a

9    certain penalty.

10        Do you understand what I just said?

11        **THE DEFENDANT:**  Yes, Your Honor.

12        And that applies to the attorneys, too; correct?

13        **THE COURT:**  Even if you did have an attorney -- you're

14   right about that.  If Mr. Boisseau was your lawyer, the

15   Government could still stonewall him and say, "We don't want a

16   deal.  No deal in this case."

17        But experience has shown that good lawyers like

18   Mr. Boisseau have a way of working out a deal that the client

19   themselves could never have done.  That's where you will be

20   disadvantaged.

21        Do you understand that?  Do you at least understand what

22   I'm saying?  You don't have to agree with it, but you have to

23   at least acknowledge that what I have said, you understand the

24   point I'm making.

25        **THE DEFENDANT:**  I do.

1      **THE COURT:**  All right.  Someone like Mr. Boisseau has

2      done a lot of trials in this courthouse against these very --

3      this very U.S. Attorney's Office, and he would be good at

4      giving you advice on what the best strategy is.  The best

5      strategy for picking a jury.  The best strategy for how to --

6      which points to concede and which points not to concede.  Any

7      number of points in a trial that I think -- even in a simple

8      trial there are a dozen things that a lawyer and a client have

9      got to decide.  And in a more complicated case like this, there

10     are probably a hundred things.

11         And you won't have the benefit of Mr. Boisseau's advice,

12     or anyone; you'd just be on your own.

13         Do you understand that?

14     **THE DEFENDANT:**  Yes.

15     **THE COURT:**  There'll be issues like what is a permissible

16     opening statement.  That's limited to what the facts are going

17     to show in the case.  You can't be laying stuff in front of

18     jury that you have no way to prove.

19         You have to -- in fact, if you did that and got away with

20     that much and then later couldn't prove it, it would work to

21     your detriment because the jury would remember you'd promised

22     that information but didn't deliver on it.

23         Do you understand that?

24     **THE DEFENDANT:**  Yes, sir.

25     **THE COURT:**  And it wouldn't be -- it couldn't cut any

1    figure with me for you to say, "Judge, I've already told the

2    jury X, Y, Z and now you're not letting me prove that."  And

3    when I say to you "That's because X, Y, Z, you can't prove it

4    through the way you want to do it and be consistent with the

5    rules of evidence, you got to do it the right way and you don't

6    have a right way to do it," I have to say no to you, and it

7    won't cut any figure that you've already told the jury

8    something you can't prove.

9         Do you understand that?

10        THE DEFENDANT:  I understand.

11        THE COURT:  During the trial itself there are many times

12   the lawyer will make a motion, trial-type motion.  You will not

13   know when to do that.  You might have some vague idea from

14   those civil cases; this is a criminal case.

15        I don't think you've ever represented yourself in a

16   criminal case before, have you?

17        THE DEFENDANT:  Never been in a criminal case other than

18   the tax case, Your Honor, which didn't go anywhere.

19        THE COURT:  Well, the endangered species case.  Two, that

20   I know of.

21        THE DEFENDANT:  Well, yeah, that was the -- that was the

22   case I'm referring to.

23        THE COURT:  All right.  So you had two cases.  Neither of

24   those went to trial.  But my point was you don't have any trial

25   experience in criminal.  You may have been in a civil

1    courtroom.  Okay.  Fair enough.  That's good.  But it's not the

2    same as being in a criminal case.

3         Do you understand that?

4         THE DEFENDANT:  I do.

5         THE COURT:  All right.  Mr. Boisseau could follow up on

6    leads, he could dig up evidence, he could talk to witnesses, he

7    could consult with experts -- whether they testify or not, he

8    could go out and find impeachment evidence against the

9    Government's witnesses, he could go get an investigator and

10   have that investigator go out and ask questions, and you will

11   be greatly limited in all of those things.

12        Do you understand that?

13        THE DEFENDANT:  Yeah.  But in all fairness, Your Honor,

14   Mr. Babcock, was, what, seven, eight days away from a trial, so

15   all that preparation work has already been done by prior

16   counsel, with the exception of the subpoenaes.  And, like I

17   said, we got this case nailed down.

18        THE COURT:  Well, you may get the benefit of what

19   Mr. Babcock has done before, that's a fair point, but there's

20   still more to be done.  And when it comes to doing it, you will

21   be much prejudiced because you're in custody.

22        Do you understand that?

23        THE DEFENDANT:  Excuse me?

24        THE COURT:  You will be much prejudiced, disadvantaged,

25   on account of being in jail when it comes to doing the

1    follow-up things of the type, if they were to be required

2    during the course of the trial.

3         **THE DEFENDANT:**   I agree, Your Honor.   That's why I'd like

4    to hear a bail motion at the conclusion of this *Faretta* motion.

5         **THE COURT:**   All right.   Now, if you -- first, I've

6    referred all bail motions to the magistrate judge.   I think it

7    is highly unlikely that you're going to get out of jail while

8    you're in pretrial on account of your absconding and on account

9    of what happened when you were at the halfway house and

10    violated the conditions for which we had an evidentiary hearing

11    and it was all proven.

12         So if you are making this motion to dispense with counsel

13    on the theory that this is going to lead to a pretrial release,

14    I need to tell you that that is unlikely to happen.

15         Do you at least understand what I'm saying?

16         **THE DEFENDANT:**   I understand what you're saying.

17         **THE COURT:**   All right.   Now, under the constitution you

18    do have the right to represent yourself.   You have a right to a

19    lawyer.   That's a very important right.   And, in my judgment,

20    you should exercise that right and take Mr. Boisseau.   However,

21    you also have the right under our constitution to represent

22    yourself.   So we -- me as the judge, and us as the system, we

23    have to honor that right.   I want you to know that I will honor

24    that right if I believe that you understand the consequences of

25    what I -- at least what I've tried to explain to you and you

1    voluntarily waive that right and that it is clear-cut, no ifs

2    and buts about it.

3         But if you were to do that, you don't get special

4    treatment for your mistakes.  If you make a mistake on the

5    rules of evidence or the rules of court, I can't just say, "Oh,

6    we'll give him another shot at it a different way," or, "Okay,

7    we'll give you special treatment that a lawyer would not get

8    just because you're pro se."

9         Do you understand that?

10   **THE DEFENDANT:**  Yes.  And I'd like to make one other

11   comment.  I'm also entitled -- my understanding of the

12   constitution that you referred to is that I'm entitled to hire

13   counsel of my choosing, effective counsel of my choosing not

14   appointed by this Court, which puts us in the conundrum where

15   we're in today where that really hasn't happened.

16        So I want to make sure that's one of my constitutional

17   rights as well.

18   **THE COURT:**  Well, all right.  Look.  That's not answering

19   the point.  Look, in the past, yes, you do have the right to

20   hire your own counsel.  You've told us that you're broke and

21   can't afford counsel.  That's why we're appointing counsel for

22   you.  And so far you didn't bring in counsel and I did give you

23   a few days -- until you violated conditions at the halfway

24   house -- to go get counsel.

25   **THE DEFENDANT:**  But, Your Honor, you also know, just to

1    clarify the financial condition, the first question I asked

2    probation and they asked me when I was on probation filling out

3    these monthly statements, I said, "If I had the access to

4    borrow money --

5         And this was asked to Ms. Jennifer James.  I already

6    attested to this in open court.  Untranscribed.  I said, "If I

7    can borrow millions of dollars, do I need to cite that on my

8    report here?"

9         She said, "No.  It's just income."

10        Mr. Sprague asked me the same question.

11        "So, Mr. Brugnara.  So you can borrow millions of

12   dollars?"

13        I said, "Yes, I can."

14        "All right.  So why don't you pay the million-nine?"

15        I said, "Because I don't have to.  That has to come from

16   income."

17        So if I have the ability to borrow the money and my right

18   to hiring independent counsel of my choosing -- effective

19   counsel of my choosing -- is foreclosed because this Court

20   doesn't give me reasonable bail conditions to access those

21   lenders -- because when I had bail, the only person I could

22   contact was Mr. Erik Babcock under the rule that you set on the

23   restrictions.

24        And you allowed me to go meet with John Keker and Lassart

25   and Mazzucco, but not to call them.  The only person who could

1    call them was Mr. Alan Lew [phonetic].

2         Well, both of those attorneys that are also very esteemed

3    attorneys wanted to represent me.  In fact, Mr. Keker said he

4    would take the case -- to my wife.  Wanted $500,000.

5         Lassart and Mazzucco, Tippy Mazzucco, wanted -- we didn't

6    finalize a number, but it was in the hundreds of thousands of

7    dollars.

8         So I told Mr. Babcock, "Well, I need to talk to my

9    lenders to borrow those funds to pay those men."

10        I was taken into custody, not coincidentally, that

11   afternoon.  That afternoon.  After I spent 40 -- or 20 hours

12   with Mazzucco and Lassart.  They invested 20 hours preparing to

13   take on the case.  A piece.

14        **THE COURT:**  You were taken into custody for violating the

15   terms of the release and it had nothing to do with where you

16   were in the process of retaining counsel.  And I'm sorry that

17   it didn't work out for you.

18        **THE DEFENDANT:**  I disagree.  I think it was done on

19   purpose by the U.S. Attorneys in concert with the pretrial

20   services, that it was done on the afternoon I was set to hire

21   these private counsels, and it was too coincidental.

22        And the fact of the matter is their motion to revoke the

23   bail was also coincidentally filed the day I was having the

24   bail conditions expanded to include me going back to Seacliff,

25   and they filed their motion as a retaliation on the

1    hyper-technical default of speaking on a personal phone call,

2    which has no bearing whatsoever on any consequences or

3    dangerousness.

4         You know, the fact of the matter --

5         THE COURT:  Wait.  Wait.  We're off the subject.

6         THE DEFENDANT:  No, it's not.  Because you said I have a

7    right to counsel --

8         THE COURT:  You have a right to counsel.

9         THE DEFENDANT:  -- and I wanted to make sure that I have

10   a right to a counsel of my choosing.

11        THE COURT:  If you could get a lawyer to come in and

12   represent you, either a paid lawyer like John Keker, or if he

13   wanted to come in and represent you for free, this is still

14   America and you have that right.  But you have not done it so

15   far.  And the fact that you're in jail is your fault and it is

16   not anyone else's fault.

17        And so there.  You've made your point; I've made my

18   point.

19        THE DEFENDANT:  But, Your Honor, I want this Court to

20   hear, like I said, the fact is you could put forth reasonable

21   conditions that foreclose any concerns that you have and still

22   guarantee a fair trial, without these sort of impediments, by

23   structuring reasonable bail conditions under the Bail Reform

24   Act, which mandates and requires you to put reasonable -- not

25   guaranteed -- conditions.  If a million dollar secured bond is

1    posted for any breach of the conditions, that would be a

2    huge -- a huge deterrent for breaching any condition.

3         The fact is that the trial's forthcoming in a few weeks.

4    Just to get sleep in my own bed and have a few normal meals.  I

5    haven't slept in 10 months.

6         And here's an example at the jail.  Mr. Joe, the marshal,

7    can go say, "Well, the jail rules and regulations" -- and I

8    read it last night, I'll bring it on Tuesday -- says "the TVs

9    have to be off at 11:00 P.M."  I can even show you video.  TV's

10   off at 11:00 P.M.

11        The only person who can turn the TV off at 11:00 is the

12   guard.  The deputy.

13        Not one TV is turned off at 10:00 P.M. out of 32 pods in

14   that building.

15        They don't follow the rules.

16        Okay, now.  You'll say, "Well, let's go to

17   San Francisco."

18        San Francisco is even worse.  You sit under a light

19   that's brighter than that.  I say, "Does somebody turn off the

20   light?"

21        **THE COURT:**  Mr. Brugnara.

22        **THE DEFENDANT:**  Your Honor, their TV's on 24 hours a day.

23        **THE COURT:**  I'm sure that being in jail is not good.

24        **THE DEFENDANT:**  It's horrible.

25        **THE COURT:**  Let's say it's horrible.  Can I tell you

1    something?

2        THE DEFENDANT:  (Indiscernible - simultaneous speaking)

3    seven fights in my pod, which is the size of your podium up

4    there.  Maybe a little bit --

5        Seven fights in the first 24 hours.  Here I am, in with

6    murderers, bank robbers, and drug dealers.  I'm looking at this

7    saying, "This is surreal.  This is beyond --

8        I mean, it's insanity.

9        THE COURT:  Can I tell you?  Whatever the conditions are

10   there, you're going to be stuck with it while you're preparing

11   for trial.

12       THE DEFENDANT:  And I think that's stubborn.  Because if

13   you listen to what the Bail Reform Act says, you have to give

14   me bail --

15       THE COURT:  You've already done that, made that argument

16   to the Court of Appeals, and they turned you down.

17       MR. BOISSEAU:  The Court of Appeals was silent on the

18   issue of dangerousness; they only said if there was a breach of

19   the conditions.

20       THE COURT:  Here's another great thing you can do when

21   you're in jail.  You can make another writ.  You can write it

22   out by hand and send it over there and see if they agree with

23   you.

24       THE DEFENDANT:  Judge Goodwin, who was also in the tax

25   appeal -- Bob King filed two-feet-thick on the tax case.

1   Goodwin's response was two sentences long, okay.  "No,"

2   basically.  That's it.

3       I asked Bob King, "Well, isn't there going to be a

4   multi-page response on why?  He said no, they don't have to

5   give a --

6       THE COURT:  So Mr. Brugnara, if you want to waste your

7   time --

8       THE DEFENDANT:  I would never waste my time ever on an

9   appeal again.

10      THE COURT:  Then what I'll tell you is this.  As far as

11  I'm concerned, you're going to be in jail until the trial is

12  over.  It would take a miracle to convince me otherwise, in

13  light of your absconding.  And I'm trying to make the point to

14  you, if you think that you can go pro se and somehow work that

15  into pretrial release, forget it.  You are going to have all of

16  those adverse conditions.

17      That's exactly why you are making a mistake to reject

18  Mr. Boisseau.  You should not be trying to represent yourself.

19  You're going to be stuck with that.

20      Now you may not agree with it, but do you understand what

21  I am saying?  That you will be stuck with being in jail and

22  preparing for trial?

23      THE DEFENDANT:  Notwithstanding, I still would like this

24  Court to hear the bail motion after this.

25      THE COURT:  It will be heard by the magistrate judge with

1    appeals to me.

2         THE DEFENDANT:  Magistrate Cousins doesn't work in this

3    building anymore; he's in San Jose.

4         THE COURT:  He'll come back.  He's promised me he'll come

5    back for the hearing.

6         THE DEFENDANT:  And he does exactly what the

7    U.S. Attorneys tell him.

8         THE COURT:  See.  There you go again.

9         THE DEFENDANT:  Your Honor, she was in the same office

10   when I -- this WHA 222 tax case was in that office.

11        THE COURT:  It doesn't matter.  That's a bogus point.

12   That does not matter.

13        THE DEFENDANT:  So if he has a desk next to Mr. Sprague

14   and Mr. Sprague's prosecuting this case and Mr. Newman was

15   working on the tax case, you don't think that there's a

16   conflict there?

17        THE COURT:  They don't have -- this is not like some

18   clerical office where they each have offices next to each

19   other.  See, that's just bogus.

20        (Indiscernible - simultaneous speaking.)

21        THE REPORTER:  I'm sorry, Judge, I can only --

22        THE COURT:  Mr. Brugnara, the Court of Appeals makes me

23   explain this to you and all you're doing is arguing with me.

24        I can't let you represent yourself --

25        THE DEFENDANT:  (Indiscernible - simultaneous speaking.)

1      THE COURT:  -- unless you tell me --

2      Look.  You can bring a motion in front of the magistrate

3  judge with an appeal to me and we will decide it on the merits.

4  But because I know that -- how I feel, that you absconded and

5  that you violated those conditions -- we even had an

6  evidentiary hearing on it, I've already -- I've already

7  basically made up my mind that -- you got an uphill battle with

8  me.  I am not going to release you, as far as I'm concerned.

9  You should be thinking "If I'm going to go represent myself,

10  I'm going to be in jail while I do it."

11      Now, do you understand what I'm saying?  You don't have

12  to say that I'm right; just tell me that you understand.

13      THE DEFENDANT:  Well, I don't think that's fair for you

14  to pre-judge before you hear a motion or an appeal from the

15  magistrate.  And I would ask, at least, that Judge Spero can

16  hear the motion because he was the original magistrate in the

17  tax case and he's familiar with this case.

18      THE COURT:  You understand that I'm telling you that you

19  can't count on any of that and that probably you're going to --

20  very likely, highly likely, you're going to be in jail for the

21  entire duration?

22      THE DEFENDANT:  I believe it's highly likely but I also

23  believe in justice and I believe that I'm entitled to bail.

24      I've seen murderers and bank robbers getting bail over

25  the last 10 months.  And if you think that they're entitled to

1  bail, blowing people's brains out and robbing banks and little

2  old ladies and dealing drugs and I'm not entitled to bail, then

3  there's a disconnect with the justice system.

4      THE COURT:  I didn't do that.  I don't know what judge

5  did that, but it wasn't me.

6      So do you understand that I am saying to you that if --

7  you will be in custody while you are preparing for trial and

8  during the trial itself and you can say, "I think it's unfair,

9  I don't like it, but I understand what you're saying"?

10     THE DEFENDANT:  I think it's -- it will help level the

11  playing field because I'm innocent of these ridiculous

12  charges --

13     THE COURT:  Do you understand what I'm telling you?

14     THE DEFENDANT:  -- and I understand that the Court needs

15  to balance out the playing field by not allowing me to sleep

16  and restricting me.  But I'm still going to be found innocent

17  because I didn't do anything and I'm going to be vindicated.

18     But, you know, you can tie both arms behind by back,

19  deprive me of sleep, shine the light in my eyes for another few

20  weeks, or another month.  The outcome is going to be the same

21  because the facts are what they are.  There's no fraud.

22     THE COURT:  All right.  Mr. Brugnara, I know you disagree

23  with my view about whether you should be in pretrial detention,

24  but do you at least understand what I have said to you?

25     THE DEFENDANT:  I think it's a sin.  I think it's beyond

1    sad.  I think it's a sin what you're doing to me and my family,

2    keeping me in pretrial detention.

3         If I lost a trial -- you can do what you want, but

4    pretrial, I think this is -- it's not right.  And I think you

5    know it's not right.  That's why you tried to bend over

6    backwards to placate everyone with those bail conditions and

7    furlough conditions.

8         But you got to remember I never even complained when I

9    didn't see my children at Christmas, when you made it clear you

10   wanted me to see my children at Christmas on the holiday visit.

11   And these U.S. Attorneys over here, while he wants to visit

12   his -- have his, you know, see his new child being born and

13   visit his family, I didn't even get to see my children for one

14   hour after this Court required because they wouldn't sign the

15   stipulation because they were missing in action.

16        THE COURT:  All right.  We're going to bring this to an

17   end because you're not giving an answer to my question.

18        THE DEFENDANT:  I understand, Your Honor.  I understand.

19        THE COURT:  You understand what I said?  That you would

20   be in pretrial detention, in all likelihood, and -- even if you

21   think it's unfair and a sin.  Do you understand that?

22        THE DEFENDANT:  Pending what happens with the magistrate

23   and you on an appeal, if that comes to that, I suppose so.

24        THE COURT:  All right.  I think I've reached a point

25   where I need to have the jail personnel here to explain what

1    the privileges are that a pro se defendant has, and I'd like to

2    get -- where's my marshal?  I'd like to -- are you going -- are

3    you now in charge?  All right.

4        You will have somebody here who can explain if there are

5    any special privileges the marshals will allow a pro se

6    defendant to have while they're in trial or preparing for

7    trial, and we will resume this hearing at noon on Thursday.

8        Right, Dawn?

9        **THE CLERK:**  Yes.  Correct, Your Honor.

10       **THE COURT:**  I want the Government to evaluate the

11   adequacy of the colloquy so far.  I'm going to do the same, but

12   I may see how it goes.  I want to make sure that I have done my

13   very best to do what the constitution requires, the Ninth

14   Circuit, by way of colloquy.

15       Mr. Boisseau, you can be back.  There's no need for

16   Mr. Bornstein to be back.  Mr. Stevens, you should come back

17   next time because you haven't been relieved yet.

18       But where this is headed, I want to make clear you're not

19   even entitled to Mr. Stevens.  When you're pro se, you're pro

20   se.  You understand that?

21       **THE DEFENDANT:**  Oh, I understand.

22       **THE COURT:**  All right.  So we will resume right here on

23   Thursday on the *Faretta* thing.  And my plan is to hear from the

24   marshal, the jail, do whatever follow-up we need to do, and

25   then make a decision then.

1        And my further plan is -- this is no guarantee, but since

2    the Government is promising, their very best, to be ready on

3    April 27th, that's what I would like to do.  I would like to

4    try this case on April 27th.  Start trying it on April 27th.

5        So unless I hear more right now, Mr. Boisseau, I'm going

6    to let you specially appear today and specially appear next

7    week.

8        MR. BOISSEAU:  This Thursday?

9        THE COURT:  I'm sorry.  Thursday.  Yes.

10        MR. BOISSEAU:  I'll be here.  Thank you.

11        THE COURT:  All right.

12        MR. WALDINGER:  Your Honor, I'll be here as well.  I do

13    have an appearance in front of Judge Orrick at 1:30 that I need

14    to go to.  It's a sentencing that I need to cover.  But

15    Mr. Kingsley will be here for the duration on Thursday.

16        THE COURT:  Thank you.  See you then.

17        (Proceedings adjourned at 12:42 P.M.)

18

19

20

21

22

23

24

25

<u>CERTIFICATE OF CONTRACT REPORTER</u>

I, Kelly Lee Polvi, certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 24th day of March, 2015.


Kelly Lee Polvi
CA CSR No. 6389
Registered Merit Reporter
Federal Certified Realtime Reporter