Pages 1 - 72

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. CR. 14-00306 WHA** |
| | ) | |
| LUKE D. BRUGNARA, | ) | |
| | ) | San Francisco, California |
| Defendant. | ) | Tuesday, April 14, 2015 |
| | ) | 1:00 p.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:               Melinda Haag
                             United States Attorney
                             450 Golden Gate Avenue, 11th Floor
                             San Francisco, CA  94102
                    BY:  **BENJAMIN KINGSLEY**
                         **ROBIN L. HARRIS**

For Defendant:          **LUKE D. BRUGNARA, PRO SE**

                             Law Offices of Paul Wolf
                             717 Washington Street, Second Floor
                             Oakland, CA  94607
                    BY:  **JAMES R. STEVENS**

                             Law Offices of Tamor & Tamor
                             The Sierra Building
                             311 Oak Street, Suite 108
                             Oakland, CA  94607
                    BY:  **RICHARD ALAN TAMOR**

Reported By:  Lydia Zinn, CSR #9223, Official Reporter

 1          **THE CLERK:**  Calling Criminal Number CR. 14-306.  It's

 2  United States versus Luke D. Brugnara.  The matter's on for a

 3  motion hearing, status.

 4          **MS. HARRIS:**  Good afternoon, Your Honor.

 5  Robin Harris and Ben Kingsley, for the United States.

 6          **THE COURT:**  Welcome.

 7          **MR. STEVENS:**  Good afternoon.  James Stevens,

 8  appearing with Mr. Brugnara, who is present, in custody, I'm

 9  sure.

10          **THE COURT:**  Okay.  Welcome.  And?

11          **MR. TAMOR:**  Good afternoon, Your Honor.

12  Richard Tamor, appearing as advisory counsel to Mr. Brugnara.

13          **THE COURT:**  Welcome to you.  Mr. Brugnara's present,

14  representing himself.

15      All right.  We're here for a number of items.  And we have

16  one hour.  And I need to ask Mr. Brugnara to try to do as

17  lawyers do:  to make your point more succinctly, and not take

18  10 to 20 times as much time as a lawyer would take, because I

19  know you have a lot on your agenda you would like to get

20  through, but we have one hour.

21          **THE DEFENDANT:**  All right.  Well, I'll start.

22          **THE COURT:**  Wait.  No, no.  I get to run the show.

23  You don't get to run the show.  I'm going to ask you for your

24  views in a minute.

25      Here are some things that have come up.  My courtroom

1   clerk, Dawn Toland, has been subpoenaed by you.

2       And the Government has -- I sent out an Order asking the

3   parties to address this.  The Government has raised a

4   legitimate point; that the only reason you want my courtroom

5   deputy to testify is that voice mail that you left saying

6   that -- when you were on the lam, and saying that you didn't

7   want to appear for the trial.  That's hearsay.

8       So what do you have to say to that?

9           THE DEFENDANT:  Oh, I just want to have submitted

10  into evidence the voice-mail recording or the -- the message

11  that was left for you through your conduit.

12          THE COURT:  Yes, but the Government's point is that

13  is self-serving hearsay.

14          THE DEFENDANT:  Well, it's not self-serving hearsay,

15  because it shows a defense -- or at least my defense to my

16  intent and what my motives were; and they weren't to be on the

17  lam or to escape, or you would have never seen me again.  I can

18  assure of you that.

19          THE COURT:  All right.

20          THE DEFENDANT:  So that proves that, in fact, that

21  wasn't my intent.  My intent was to be here for the trial.

22          THE COURT:  Well, somebody could rob a bank, and call

23  up the police and say, "I'm in hiding, but, by the way, I'm

24  innocent."

25          THE DEFENDANT:  Who robbed a bank?

1      **THE COURT:**  And then whenever the trial -- they got

2   caught.  And the trial came.  And they say, "Well, let me play

3   that recording of where I said I was innocent."

4      **THE DEFENDANT:**  Your Honor, I phoned from a GPS phone

5   that -- it tracks you within two feet.  Please.  I mean, we

6   live in the 21st Century, and I'm well aware of triangulation

7   and tracking an iPhone from a GPS phone, knowing that they

8   would know exactly where I'm at.  So I mean that, itself,

9   proves --

10     **THE COURT:**  All right.  Anything more you want to

11  say?

12     **THE DEFENDANT:**  Well, I need that.  I need that voice

13  mail for my defense.  And obviously dawn Toland doesn't have to

14  testify, as long as it's just submitted into evidence.

15     **THE COURT:**  All right.  The Court rules as follows.

16  That is hearsay.  It's not going to be admissible, unless

17  somehow there is a switch in the way in which -- I can't say

18  "never," because there could be circumstances under which even

19  hearsay becomes admissible.  It's unlikely to occur.  But it is

20  hearsay, and you will not be allowed to admit it or even refer

21  to it before the jury without the Court's permission, which you

22  don't have right now.  And because it's highly unlikely that

23  will ever come before the jury -- and if it does, it would be

24  improper on your part -- then the subpoena is quashed to

25  Dawn Toland.  My deputy clerk will be able to attend to her

1   normal duties in trial.  So that's the end of that.

2        Your point is preserved for appeal.

3        Okay.  Now we go to -- just a moment.  All right.  I

4   received an *ex parte* communication from the defendant.  I read

5   enough of this to see that it was improper.  This should never

6   have been filed with me.  It's just like a private brief from

7   you to me, saying:  Ha, ha.  I'm right.  And I'm going to be

8   found innocent.  And this is something that should be -- most

9   of this is -- I don't know how much of this is admissible.

10  There's a lot here.  Some of it may be admissible, but that's

11  not the point.

12       The point is:  The Government should have been served with

13  this if you're going to be making these kind of *ex parte*

14  communications.  So after I decided this is something -- I

15  thought it had something to do with your CJA request.  It had

16  nothing to do with it.

17       So I am going to not read any further on this, unless you

18  want to supply it to the Government, in which case then both

19  sides could read it; or I'm going to just put it in a folder

20  and let it be put under seal for the Court of Appeals to look

21  at if and when there's ever an appeal in this case, but I'm not

22  going to read further on it.  And things like this should not

23  be sent to the Judge.  You're acting as a lawyer now.  You have

24  to -- there are times when *ex parte* is okay, but this was not

25  one of them.

1    Now, if you want me to let the Government see this, then

2  fine; but if you don't, fine, too.  I'll put it under seal.

3  But I'm not going to -- this will have no effect on me or any

4  of my rulings.

5    **THE DEFENDANT:**  I don't.  That -- I don't want them

6  to see it.

7    **THE COURT:**  Fine.  Then it will be placed under -- it

8  called *"Ex Parte* Communication from Luke Brugnara."  And it

9  says, "Dear Judge Alsup, Please find e-mails."  And then it

10  goes on at length.  So I -- it's many pages.  I'm going to give

11  this to the clerk right now.

12    Dawn, could you take this?  Please seal that, and have it

13  made available.  So it will be available for the Court of

14  Appeals in the event there is an appeal in the case.

15    All right.  Next I received a motions for 17(a) subpoenas

16  to a number of people.  And I have to bring this up, even

17  though normally I would treat this as *ex parte*.  We only treat

18  it as *ex parte* because of work product.  And you're not a

19  lawyer.  And this goes right back into the problem of many more

20  subpoenas are coming out.  So here is a request for now --

21  looks like -- four more subpoenas.  And I have to just bring it

22  up.  Let -- we're going to talk about it in open court because

23  you're putting so much -- so much pressure on our trial date --

24    **THE DEFENDANT:**  That's fine.  I understand.  I

25  understand.

1          THE COURT:  -- that every day that goes by --

2          THE DEFENDANT:  Yeah.

3          THE COURT:  -- the trial is coming up very soon.  And

4   we have -- you're still trying to subpoena people.

5       All right.  Maibaum.  We have yet another.

6          THE DEFENDANT:  I just want to qualify why I put

7   that.  Ms. Harris responded to one of our motions last week.  I

8   don't know which one.  She said, "If we choose to call the

9   victims" -- meaning Maibaum and Long, which was a surprise to

10  me, which gave the inclination to me:  She may not call them to

11  testify.

12      And you told me, probably three, four weeks ago, to be

13  abundantly cautious that, in fact, the U.S. Attorneys may not

14  call their witnesses.

15      Obviously, Maibaum and Long have to testify.  So if for a

16  strategic reason they decided not to put Maibaum or Long on the

17  witness stand, I need to make sure that they're subpoenaed so I

18  can call them; but I fully expect that the Government's going

19  to have them up there.  But again, Ms. Harris put in her motion

20  if we call the witness [sic] -- the victims as witnesses in

21  this case -- blah, blah, blah.

22      But I caught it.  You know, I caught what she wrote.

23          THE COURT:  All right.  Let's hear from the

24  Government.  What do you say to that?

25          MR. KINGSLEY:  I don't remember writing that.

1   Neither does Ms. Harris.  But we're going to be calling

2   Mr. Maibaum and Ms. Long as witnesses.

3            **THE COURT:**  Both for sure?

4            **MR. KINGSLEY:**  Yeah, for sure.

5            **THE COURT:**  We've already tried to serve Maibaum

6   twice, one of which I'm going to be informing you by -- under

7   seal later on.  One was served on his company successfully.

8       The one that -- the address you indicated to serve him

9   individually did not succeed.  And apparently it's only a place

10  to receive mail, so -- but that one defendant --

11           **THE DEFENDANT:**  Yeah.  He lives in South Jersey.  I

12  mean, I -- I -- I -- I --

13           **THE COURT:**  That's not what you put on the -- so I'm

14  sorry, but we have to go by the addresses you give us.

15      So in any event, we have -- now this will be the third;

16  but now in light of what I just heard from the Government, do

17  you want to withdraw this further subpoena from Maibaum and

18  Long?

19           **THE DEFENDANT:**  Yes.

20           **THE COURT:**  All right.  So those will be -- all

21  right.  The next one is someone named Jennifer Senhaji --

22           **THE DEFENDANT:**  Yes.

23           **THE COURT:**  -- Old Republic Title --

24           **THE DEFENDANT:**  Yes.

25           **THE COURT:**  -- will testify about a 1.1 million

1   cash-out, and so forth.

2       Is she -- where does she live?

3           THE DEFENDANT:  She's right in Oakland, on First, at

4   555 12th Street, right in the City Center high-rise on the 20th

5   Floor.  She's there every day, so she'll be easy to find.

6           THE COURT:  Harvey Schochet.

7           THE DEFENDANT:  That, again, is their attorney.  I

8   just want to make sure that he's going to be testifying.

9   That's the attorney for Long and Maibaum that was

10  communicating --

11          THE COURT:  All right.  Is he going to be testifying?

12          MS. HARRIS:  We anticipate he will, Your Honor.

13          MR. KINGSLEY:  He testified at the Form 12 hearing,

14  if you remember.

15          THE COURT:  I do remember him, but is he -- are you

16  going to call him in the case?

17          MS. HARRIS:  Yes.

18          THE COURT:  All right.  So we're not going to serve

19  that one.

20      All right.  So I'm going to allow you to -- and I'm going

21  to ask the Marshals to serve Jennifer Senhaji, without

22  prejudice to a motion to quash.

23      And now you said at one of these documents somewhere that

24  I had approved all of your subpoenas, and the relevance of

25  their testimony.  I have not done that.  I have not done that.

1     What I have done is say:  We'll let you get to first base

2   without prejudice to somebody bringing a motion for a

3   protective order, because it could turn out they have no

4   admissible testimony to give on a relevant topic.  But I don't

5   want to prejudge that.  That's a difference for another day.

6       But on Jennifer Senhaji we're going to allow that.

7       All right.  Now we have one where you want to bring in

8   Harris Taback.

9           **THE DEFENDANT:**  Yes.  And that needs to be served.

10          **THE COURT:**  Didn't I already do one on Harris Taback?

11          **THE DEFENDANT:**  I think the Government said they were

12  going to subpoena Harris Taback, but if they're not, he needs

13  to be here.

14          **THE COURT:**  I don't remember.  Did I do that?

15          **THE DEFENDANT:**  No.  What you asked Harris Taback for

16  were the e-mails that he received from me.  And he said he

17  didn't receive any through the Special Master.

18          **THE COURT:**  When did I say that?

19          **MR. KINGSLEY:**  I think Mr. Brugnara might be

20  referring to the when we moved to waive privilege for

21  communications between Mr. Taback, Mr. LeBlanc, and Mr. Kane.

22  And then we appointed Ed Swanson as Special Master.  And we

23  served subpoenas on those three, for documents that went to

24  Mr. Swanson.  And we've subpoenaed those three for trial.  But

25  under your ruling, we have to wait.  We can't call them unless

1  Mr. Brugnara waives privilege during the trial.

2      I'm not sure what he's seeking from Mr. Taback now,

3  because I think we already went through this process back in

4  September, and he produced what he had to Mr. Swanson.

5          THE DEFENDANT:  Well, that's what he says.

6          THE COURT:  All right.  Look.  I don't know enough

7  about what he has to -- I'm going to let this one go forward

8  again, with the same caveat.  We're going to subpoena

9  Mr. Taback.  And we'll --

10     But I'm not saying that what he has is going to be

11  admissible, but that's for another day.

12     All right.  Now we come to the -- where we were last time.

13  And we were discussing the motion to set aside the indictment.

14  And we -- Mr. Brugnara, you had taken about 20 minutes.

15         THE DEFENDANT:  Okay.  Well, listen.

16         THE COURT:  I'm going to let you have another five

17  minutes on this one, and then I'm going to hear from the

18  Government.

19         THE DEFENDANT:  Well, before we do that, did you want

20  to do the other three emergency mop-up issues that we had on

21  emergency motions?  That was supposed to be last Monday.  It

22  was regarding the return of the items, the expend --

23         THE COURT:  All right.  I got emergency *ex parte*

24  motion for order to Glenn Dyer Jail regarding *pro se* use of

25  phone by Luke Brugnara.

1          **THE DEFENDANT:**  Yeah, because I'm not getting to use

2    the phone.  They're going from the time they put me in the

3    booth until the time I'm getting to two calls.  That's not even

4    enough time to -- and it's not on connected calls.  It's just

5    to go in the booth.

6        I need at least eight, ten hours in a seven-day period --

7    that's an hour and 15 minutes a day -- just to talk to the

8    private investigator, or try to reach James Stevens.  And they

9    need to get an Order for me, in order for me to have that.

10       And then I need the items that were taken from Sea Cliff

11   that were promised to Erik Babcock four months ago by Sprague.

12         **THE COURT:**  Wait.  Let's just talk about the phone

13   first.  Do the -- the lawyers need to help me on this.  Does

14   the four-page thing from Glenn Dyer say that the Judge can

15   increase the number of hours?

16         **THE DEFENDANT:**  Yes.

17         **THE COURT:**  All right.  Hang on a minute.  I don't

18   see it.

19         **THE DEFENDANT:**  It says two hours, or as otherwise

20   directed by the Court.  There are many people that have more

21   than two hours.

22         **THE COURT:**  My law clerk come up here and --

23       **MR. KINGSLEY:**  I don't see the "otherwise directed by

24   the Court," Your Honor.

25         **THE DEFENDANT:**  If you hand me it to me, I'll find

1  it.

2          THE COURT:  There is a place where something in there

3  says, "unless otherwise directed by the Court."

4          THE DEFENDANT:  Yeah.  We went over this last week.

5  I'm just feeling rushed.  And I just don't think this is fair.

6  You know, I've waited now weeks to go over the -- they set

7  aside the indictment, which is going to take some time.

8          THE COURT:  All right.  It's Number E.  "Inmate may

9  use telephone for a total of two hours in a seven-day period,

10  unless the Court orders otherwise."

11      And I don't know what the limits -- limitations over there

12  are.

13          THE DEFENDANT:  The limits are -- are at their

14  discretion if they're not busy.  If they're not busy, enough

15  time where I can squeeze in more hours; but they won't let me

16  take more hours after I basically made two calls.

17          THE COURT:  All right.  I'm going to increase the

18  hours to four hours per seven-day period.

19          THE DEFENDANT:  Okay.  Then the next thing is --

20          THE COURT:  Do I need to do a written Order on that?

21          THE DEFENDANT:  It has to be in writing, or they

22  won't --

23          THE COURT:  All right.  My law clerk's going to do

24  that.  Four hours in a seven-day period.

25          THE DEFENDANT:  That expand the duties of --

1      Well, let me go to the next one.  That's easier.  The four

2   items that were taken from the house that were already promised

3   to be returned to Babcock four months ago:  My phone, my

4   computer, my tax and business documents, which is a very small

5   stack that was in -- probably, you know, a one-inch stack that

6   was in the dining room, and the mountain lion.  All of these

7   were promised, again, four months ago, and still have yet to be

8   returned.  So they need -- there needs to be, I guess --

9           **THE COURT:**  Returned where?

10          **THE DEFENDANT:**  Back to where they were taken from:

11   Sea Cliff.

12          **THE COURT:**  What good?  Why do you care right now?

13          **THE DEFENDANT:**  Why do I care?  Because --

14          **THE COURT:**  You're not there.

15          **THE DEFENDANT:**  No, no.  There's no accountability in

16   this office.

17          **THE COURT:**  This is not helping us prepare for trial.

18   You will get all of that stuff back if you're entitled to it in

19   due course, but this is a post-trial-type thing.

20          **THE DEFENDANT:**  Well, I disagree.  The mountain lion

21   was 2013.  Okay?  And that's coming on two years.  And they

22   need to return it.  Brandon LeBlanc had already dealt with the

23   mountain lion; said it was going to be returned.  He dealt with

24   Doug Sprague, and passed the baton off to Babcock.  Babcock

25   decided they were going to return it, and they still haven't

1  returned it.

2          MR. KINGSLEY:  If you want to go into it --

3          THE COURT:  All right.  What is it?

4          MR. KINGSLEY:  -- the phone is evidence.  And we plan

5  on using it at trial, so we're not going to give it back to

6  him.

7      I think we could probably give -- I don't know who we --

8  we were actually talking to Mr. Babcock about returning the

9  computer and some of these documents that he's referring to

10 before Mr. Brugnara absconded or allegedly absconded.  And then

11 he -- that never happened.  But we could give that to

12 Mr. Brugnara's wife, if he feels really urgent about it.

13     The mountain lion was destroyed.  And we actually have a

14 letter that we found at his residence --

15          THE DEFENDANT:  Ho, ho, ho.

16          MR. KINGSLEY:  -- that I'm handing to Mr. Brugnara

17 right now --

18          THE DEFENDANT:  You can't destroy that.

19          THE COURT:  -- from the City and County of

20 San Francisco.

21          THE DEFENDANT:  I don't believe they destroyed it.  I

22 think they're lying.

23          THE COURT:  Wait.  Wait a minute.  Let me hear the

24 Government.

25          MR. KINGSLEY:  It's this letter which I believe we

1    found at Mr. Brugnara's residence as part of the search

2    warrant.   It says that "Although the statute of limitations for

3    prosecuting these matters has now passed, it is nonetheless

4    illegal for you to possess either the mountain lion or the hawk

5    that were seized.   Consequently, the Department may not return

6    these items to you, and will dispose of these items."   And this

7    is from the Office of the District Attorney for the City and

8    County of San Francisco.

9         **THE DEFENDANT:**   And -- and -- and my rebuttal to that

10   was that the law is -- and I have it right in here -- is that

11   the ownership predates the June 1990 California law prohibiting

12   ownership.   It has grandfathered status accordingly.   So I have

13   grandfathered --

14        **THE COURT:**   Maybe you're right; but who seized it,

15   and who has it now?

16        **MR. KINGSLEY:**   I think it was seized when the

17   Marshals searched his property in 2013.   It was turned over to

18   the City, because they were the ones investigating the game

19   violations or the endangered -- whatever the violations were,

20   which were under state law.   And then, as I understand it, they

21   destroyed it.

22        **THE DEFENDANT:**   They didn't destroy it.   They didn't

23   destroy it.

24        **THE COURT:**   Look.   Okay.   No more on this.

25        **THE DEFENDANT:**   They didn't.

1          **THE COURT:**  Here's the answer.  I don't know who's

2     telling the truth, but it doesn't matter, because this is not a

3     trial item.  This is not going to help us get ready for trial.

4          **THE DEFENDANT:**  Okay, but he didn't -- the letter

5     doesn't say it was destroyed.  It said it was disposed of.

6     Means they could be keeping it in their living room.

7          **THE COURT:**  Maybe they've got it in somebody's living

8     room.

9          **THE DEFENDANT:**  It's my mountain lion.  And it's

10    legally -- I have legal ownership.  So for this Court --

11         **THE COURT:**  Maybe you do.  Maybe you don't.  I don't

12    know, but --

13         **THE DEFENDANT:**  You signed the writ of execution.  So

14    the only person that can have it returned is you telling them

15    on your Order to return it, because if it wasn't for your

16    signature on the writ, it would never have been pulled out of

17    my house illegally.

18         **THE COURT:**  I don't remember signing any writ.  Did I

19    sign some writ?

20         **THE DEFENDANT:**  Yes, you did, based on a proffered

21    lie from Charles Parker in their office when he said, "Hey,

22    there's a bunch of valuable items in there."  You signed the

23    writ.  He went and took them all.  He put them all back, except

24    for the mountain lion.

25         **THE COURT:**  Well --

1          **THE DEFENDANT:**  Everything's been put back, except

2    the mountain lion.  And then Brandon LeBlanc jumped on it.  And

3    they said, "Well, I think it might be a violation of state

4    law."

5          And they said, "Well, no, it's not a violation of the

6    state law because its grandfathered status pre June 1990."

7          **THE COURT:**  Well, then you'll have possibly a lawsuit

8    against the City for --

9          **THE DEFENDANT:**  It's not a lawsuit.  They have it.

10   They just need an Order from you to give it back to me.

11         **THE COURT:**  I'm not going to.  I'm not going to deal

12   with that when we have a trial coming up very shortly.  This is

13   something that we can deal with after the fact.

14         **THE DEFENDANT:**  Okay.  All right.  Well --

15         **MR. KINGSLEY:**  On the computer and the other

16   documents --

17         **THE COURT:**  But do this much, at least.  I want the

18   Government do this much.  Call whoever it is over there, and

19   tell them not to destroy it; to preserve it until we can deal

20   with it later.  I would hate for it to turn out that they

21   destroyed it after today's hearing.

22         **THE DEFENDANT:**  And I already provided declarations

23   to this Court through Brandon LeBlanc regarding the

24   grandfathered status.

25         **THE COURT:**  What do you have stuffed in that thing?

1  What is so -- why are you so fixated on it?

2          THE DEFENDANT:  Something.  No.  It's like -- it's --

3  it's -- it's the biggest one on the West Coast.  It's like a

4  280-pound mountain lion.  It's a very --

5          THE COURT:  Well, all right.

6          THE DEFENDANT:  -- important piece.

7          THE COURT:  Maybe, but it not going to help us on

8  trial preparation.

9      All right.  What's your next emergency?

10         THE DEFENDANT:  Was regarding -- I guess this is one

11 step below the mountain lion.  It's about James Stevens getting

12 his role expanded.

13         THE COURT:  No.  No.

14         THE DEFENDANT:  Okay.

15         THE COURT:  You wanted to represent yourself.

16    There is one thing I'm going to let him do, though.  And

17 I'm not -- no way he's going to do legal research for you.

18 That's what you undertook to do.

19         THE DEFENDANT:  Well, but there's a problem with

20 legal research.  And I found this out just recently -- is that

21 I have -- as a *pro se* defendant, I have a constitutional right

22 to have access to a law library and legal research.

23         THE COURT:  They have a computer over there.  That's

24 the law library.

25         THE DEFENDANT:  No, no, they don't.  They got rid of

1   it in 2004.

2            **THE COURT:**  No.  I've been over there since then, and

3   they showed me a computer.

4            **THE DEFENDANT:**  Well, there's no computer.

5            **THE COURT:**  All right.  Let me ask.  Does the

6   Government know the answer to this question?

7            **MR. KINGSLEY:**  I don't know.

8            **THE COURT:**  Marshals know the answer for sure?

9            **U.S. MARSHAL:**  No.

10            **THE COURT:**  All right.  Well, my memory is that they

11   had a --

12            **MR. KINGSLEY:**  It's --

13            **THE COURT:**  -- visiting area that the inmates can go

14   to, and they can look up things on the computer.  And I saw it

15   with my own eyes.

16            **THE DEFENDANT:**  Doesn't exist anymore.

17            **MR. KINGSLEY:**  Going back to the *pro per*

18   orientation -- and I think we talked about this when he was

19   going through the *Faretta* hearing.  Legal Research Associates

20   is a law firm contracted to assist you with legal research.

21   There is a white form available in the housing unit for you to

22   use in submitting any questions.  There is no browsing law

23   library.

24            **THE COURT:**  All right.  What's that I'm remembering.

25            **THE DEFENDANT:**  There's a problem with that, because

the turnaround time is ten days.  And when you put out an Order

that we need to respond within five days, that -- that -- that

denies me my -- my due-process rights as a *pro se* litigant to

have access to legal research to respond effectively to their,

uh, motions or their responses.  So I'm being denied that

constitutional right to have access to legal research.

So if we have James Stevens conduct the legal research,

he's a block away.  He can get it to me within a day.  And I

can respond timely to your motions.

**THE COURT:**  Where is the part in here about -- on --

the four-page thing about the legal research?

**THE DEFENDANT:**  And I have the, uh -- excuse me.  I

have the, uh -- I have the law on that, too.  It's *Bounds*

*versus Smith*.  It's on this *ex parte* motion for funding for

James Stevens and the private investigator that was filed with

this Court on April 10th, filed under seal.  And it was

essentially asking for, uh, an expedited hearing from yesterday

to talk about the set-aside.  Talking about cited here the

constitutional right for *pro se* litigants with no jail or law

libraries Bound versus Smith, 430 US. 81752 L.  Then it goes

on.  It's from 1977.  It says inmates that are *pro se* have a

constitutional right of access to the courts, and adequate law

libraries.  Okay?

So I don't have either one.

So I also put in there -- you need to have toll-free phone

1    use to, at the minimum, call this Court, because I have a

2    constitutional right to call the Court.  And they're not

3    allowing me the right to call the Court right now.

4           THE COURT:  Yes, we are.  You can call Dawn Toland.

5    That's one of your list of three.

6           THE DEFENDANT:  They're not allowing me, unless you

7    put in the Order, that it be toll free.  Those calls still

8    required a collect call to be placed, which is a $5 collect

9    call for the minute.  And Dawn Toland doesn't accept collect

10   calls, or it hits the answering machine.  So that needs also to

11   be in the Order.

12          MR. KINGSLEY:  Your Honor, I have an answer to that

13   question, because this thing about the ten days -- Mr. Brugnara

14   has only raised that for the first time right now.  And with

15   him, we have to look into everything to verify whether anything

16   he says is true.  On the calls -- I asked Deputy Dickson

17   (phonetic) about this when Mr. Brugnara filed his motion.  And

18   what he said is that they are only free for jail-rated indigent

19   inmates.  And those are inmates that receive no paid calls,

20   online commissary, or inmate-ordered commissary.

21      Brugnara's family needs to put money on his debit phone

22   account.  If he stops receiving money and purchases from the

23   outside, he would be indigent, and two hours of free access to

24   make calls to the predesignated Court-ordered numbers would be

25   allowed.

1        THE DEFENDANT:  Okay.  That's an illogical basis.

2  They're saying indigency for the basis of a federal ruling is

3  based upon their own internal guidelines for what they

4  determine is an indigent.  And it's a disconnect.

5        THE COURT:  Look.  I've ordered them.  You get three

6  calls to the lawyers -- I mean, to Dawn --

7        THE DEFENDANT:  Yeah.

8        THE COURT:  -- the lawyer, and who else?

9        THE DEFENDANT:  They have to be toll free.  What I'm

10  saying is I can't make the call, because if it's a collect

11  call --

12        THE COURT:  Mr. Kingsley, I'm just going to order it.

13  Can I order it, to make it free?

14     Why don't we order it?

15        MR. KINGSLEY:  I think you might as well try.  I

16  don't know the answer to that.

17        THE COURT:  I want my law clerk to put in the Order

18  you're going to get those three for free.

19        THE DEFENDANT:  Okay.

20        THE COURT:  But I'm not going to -- you wanted

21  $40,000 for --

22        THE DEFENDANT:  I don't want anything.  They want

23  that.

24        MR. KINGSLEY:  Your Honor, can I --

25        THE DEFENDANT:  Listen.  I need to get into the

1  indictment, Your Honor, because we only have -- what? -- 30

2  minutes.

3       **THE COURT:**  Mr. Brugnara, I want to finish up on --

4       See?  No.  I'm going to finish up on this emergency thing.

5       Mr. Stevens, I'm going to -- do you feel competent to

6  prepare for the Defense a proposed set of Jury Instructions for

7  this case?

8       **MR. STEVENS:**  I do, Your Honor.  Yes.

9       **THE COURT:**  All right.  I'm going to authorize you to

10 do that.  That would be a big help to your client, as well as

11 to the Court.

12      However, I'm not authorizing you to do anything more on

13 the --

14      And I am asking, however, the Government to look into and

15 report to me:  Does it take ten -- is there a ten-day

16 turnaround; and if there is, what can the Judge do about it?

17      **MR. KINGSLEY:**  We'll look into that.

18      Can I just add one other thing?

19      Now that Mr. Brugnara has an investigator, we've heard him

20 mention in jail calls the possibility of him using that

21 investigator to make the three-way calls that he wanted to make

22 with Mr. Stevens before.

23      And I just want clarification from the Court.  My

24 understanding is that wouldn't be permitted.  And I don't know

25 if the --

1      THE COURT:  Would, or would not?

2      THE DEFENDANT:  No.  You actually said it would be

3  permitted in the last hearing.  You said that I could be on the

4  phone call with the investigator, but not James Stevens, if I

5  wanted to speak to the witnesses.

6      THE COURT:  I don't remember saying that.

7      THE DEFENDANT:  Well, I remember you saying it.

8      THE COURT:  Well, I'm not going to let you do that.

9  The investigator can go out there and talk to the people, and

10  then report to you what they've said.  So unless there's some

11  law that says that I have to allow you to be on the phone -- I

12  don't think that there is any such law.  Okay.

13      MR. KINGSLEY:  Thank you, Your Honor.

14      THE COURT:  So all right.  We're now going to get off

15  of the emergency motions, and go back to the one that you

16  wanted to discuss.  I'm going to give you five more minutes.

17      THE DEFENDANT:  Well, I need more than five minutes.

18  This is going over the three indictments, but I'll start.  I

19  filed a motion to set aside the indictment.  The indictment --

20  uh -- uh -- is based upon numerous false statements, lies,

21  whatever term you want to use, made to the Grand Jury by FBI

22  Agent Desor, and advanced, and proffered as truth to the Grand

23  Jury knowingly by U.S. Attorney Doug Sprague, and then

24  subsequently by Mr. Kingsley.

25      The Courts have upheld -- the District Courts and the

1  Appellate Courts -- that a defendant must make two distinct

2  showings in order to have his indictment dismissed.  One, that

3  an error occurred in the Grand Jury; and two, that this error

4  resulted in actual prejudice.

5      And in determining whether or not there was prejudice, you

6  look to the violation; whether it influenced the Grand Jury's

7  decision to indict, or if there's doubt that the decision to

8  indict was free from the influence of the violation.

9      So essentially there's two broad issues on these

10  indictments.  And one is somewhat subjective of intentional

11  omissions.  And then the second one is actual, flat-out false

12  statements.

13      And regarding the intentional omissions, which I think is

14  critical in this Grand Jury, uh, transcripts and testimony is

15  that even though Ms. Harris put, you know, omissions aren't

16  enough to, uh, show misconduct.  And, in fact, uh, there's a

17  ruling that, uh -- from *United States versus Navarro*,

18  Ninth Circuit, that substantial exculpatory evidence -- uh,

19  uh -- they have no obligation to disclose that.

20      But this is different, though.  Intentional omission of --

21  uh -- of relevant facts, and perhaps in a chain of e-mails is

22  much different than -- uh, uh -- benefiting the Defense with

23  substantial exculpatory evidence which would be independent

24  from a chain of e-mails.  So if you have a chain of e-mails --

25  say of 20 -- and you cherry-pick out five, you don't have a

1  picture, which is different than substantial exculpatory

2  evidence.

3      So the spirit of that ruling wasn't to say, hey, you can

4  go and take communications, and then mislead the jury by

5  editing it -- uh -- in such a fashion where they don't get the

6  correct -- uh -- picture as to really what's going on here.

7      And that's what happened during all three Grand Jury

8  proceedings.

9      And I -- and that's subjective; up to the Court to

10  determine.

11      What's not subjective -- and it goes to the spirit of the

12  complaint and argument here -- is there, in fact, were

13  proffered lies.  And I counted 50 of them.  And they go from

14  little white lies that really don't have much merit, to very

15  substantial misstatement of fact.  And I'm just going to jump

16  right into it, because of the time problems here.

17      And the fact that the second superseding indictment

18  replaced the first two still doesn't discount the fact that the

19  first two need to be reviewed, because they referred to the

20  first two indictments in the second superseding indictment.

21  And it prejudiced the entire flavor, because they said, well,

22  he's already been indicted by the Grand Jury on this time -- in

23  this time on this fraud charge.

24      So on the first -- the first of June 5th -- and I

25  summarize it here, so I didn't have to go through the

transcript.  On page 6, line 19 starts off with some little
white lies.

She operates her business out of New York.

That's not true.  She operates her business out of
Tennessee.  She doesn't operate her business out of New York.
You know, not that big of a deal, but still a misstatement of
truth.

**MR. KINGSLEY:**  Your Honor --

**THE DEFENDANT:**  The second --

**MR. KINGSLEY:**  -- can we make the defendant -- put
this under oath, since this is basically --

**THE DEFENDANT:**  Your Honor, I'm going to give you the
page number and the line number.  Page 6, line 19.

**MR. KINGSLEY:**  It's not the citations, but what he's
saying.  He's saying that the agent testified falsely.  And
then he's proferring to the Court, which was the same problem
last time they made this motion.

**THE COURT:**  That's true.

And, by the way, one of your subpoenas for Rose Long did
have a New York address.

**THE DEFENDANT:**  I -- I -- I --

**THE COURT:**  How do you explain that?

**THE DEFENDANT:**  I'm sitting a jail cell.  So whoever
you appointed to -- to -- to get the addresses is ineffective,
then, would be my answer, because I'm sitting in a jail cell 24

1  hours a day.  So whoever you appointed, who -- I can't hire my

2  own people -- is ineffective.  And you should fire them,

3  probably, and hire somebody's who's effective.  Okay?

4      So, well, two is page 7.  They, quote, "conducted two

5  transactions."

6      That's not true.  There was only one transaction in the

7  past.

8      And then they talk about two transactions again on page 8,

9  line 12.

10      There's only one transaction.  That was the Renoir from 12

11  years ago.  Again, these are --

12  (Reporter requests clarification.)

13          **THE DEFENDANT:**  I'm sorry.  The Renoir from 12 years

14  ago.

15      And then we started getting into more substantial

16  problems.  On page 10 and 11 -- line 24 on 10, line 1 to 3 on

17  11 -- it says, quote, "They settle on a specific price.  Did

18  they settle on a specific price on the art pieces?"

19      "Answer:  Yes."

20  (As read.)

21          **THE DEFENDANT:**  Absolutely false.  There was no price

22  set on the art pieces.  That came out at the Form 12.

23      I mean, if you remember even the e-mails, she said in one

24  it's 4 million.  And then there was nothing to show:  How did

25  it get down to 3 million?  Well, it never got down to

1  3 million.  That was -- in her own mind it was 3 million.

2  There were certainly no e-mails it was at 3 million.

3      I thought I had a year to decide whether I wanted them, or

4  not.

5      And remember there were three different versions of the

6  price on the Form 12 hearing where she -- you know,

7  Brandon LeBlanc questioned her.  The fact is there was no

8  meeting of the minds on price.

9      The problem is Desor proffered a definitive answer -- yes

10 -- to the Grand Jury as proof:  Yes, there was a meeting of

11 minds on price.

12     Did they settle on a specific price for the art pieces?

13     Yes.

14     That's a lie.  We didn't settle on a specific price.

15     Next big lie.  Brugnara.  Was Brugnara building or had he

16 built a museum in San Francisco or Las Vegas?

17     And he said he has not.

18     Another lie.  I mean, everyone knows.  The U.S. Attorneys

19 went down into my museum on 351 California Street in WHA -0222.

20 It's five times bigger than this room.  It had a hundred --

21 hundred paintings in it -- okay? -- at 351 California Street on

22 the mezzanine.  It's 12,500 feet.  They knew I had a museum in

23 San Francisco.  They knew that.  If they didn't have actual

24 knowledge, they should have, because Tom Newman knew it and

25 U.S. Attorney knew it, who was his boss.

1        And then the second one is they had an FBI 302 from the

2   Russian girl who said, "Yeah, Luke's building a museum in

3   Las Vegas either at the Riviera or somewhere else, and women

4   and children will go free."  So they --

5            THE COURT:  The museum that you say you have in

6   San Francisco -- what building was that?

7            THE DEFENDANT:  351 California Street.  And I have

8   photos of a museum.

9            THE COURT:  I thought that got foreclosed on.

10            THE DEFENDANT:  It didn't -- I've never had any

11   property in my life --

12            THE COURT:  You're saying Brugnara Company still owns

13   351?

14            THE DEFENDANT:  No, it doesn't own it.  We sold the

15   property.

16            THE COURT:  When did you sell it?

17            THE DEFENDANT:  We sold it in 2010.

18            THE COURT:  So how could you say that it, whenever

19   this all came down in 2014 --

20            THE DEFENDANT:  No.  I said had -- had --

21            THE COURT:  -- that was your museum?

22            THE DEFENDANT:  Had he had a museum?  It says the

23   word "had."  "Had built a museum in San Francisco or

24   Las Vegas."

25        I did have a museum.

1          THE COURT:  You mean four years earlier you had a

2     museum that got sold?

3          THE DEFENDANT:  Well, it was there for several -- but

4     I was build -- I was in the process of developing a museum in

5     Las Vegas.

6          THE COURT:  Well, that's in dispute.

7          THE DEFENDANT:  That's in dispute, but he gave a

8     definitive answer:  He has not.  So --

9          THE COURT:  I think his answer was correct.  Four

10    years earlier, maybe you had a museum.

11         THE DEFENDANT:  Well, okay.  It's up --

12         THE COURT:  You didn't have one in Las Vegas yet.

13    And it wasn't even being built in Las Vegas.

14         THE DEFENDANT:  Okay.  Okay.  I'm going to keep going

15    down the list here.

16         THE COURT:  All right.  I don't think that one is

17    very persuasive.  What's your next one?

18         THE DEFENDANT:  How many crates were delivered to

19    Mr. Brugnara's residence?

20         He says, as a fact, five.

21         He doesn't know whether five were delivered.  Five may

22    have been delivered.  Four may have been delivered.  We don't

23    know how many were delivered, because he wasn't there.

24         Goes on.

25         She handed the delivery receipt to Mr. Brugnara, and he

1    appeared to sign the document, and he did.

2        I did not.  In fact, his own 302 says that the little

3    delivery guy handed me the document.  I said "I'm not going to

4    sign this."

5        So he lied on that.

6        He also lied and said she had the tools necessary to open

7    the crates.  Yes.

8        No, she didn't have the tools necessary in order to open

9    those crates.  The screws are six inches long.  The crates

10   weigh 200-and- some-odd pounds each.  And she had one pair of

11   pliers.  She didn't have the tools necessary to open the

12   crates; but Desor misled the jury to believe she had all of the

13   tools necessary to open these crates.

14           **THE COURT:**  I remember her testifying at the Form 12

15   that she wanted you to open the up the crates, then and there,

16   and that she did have the tool to do it.  There was some kind

17   of special tool.

18           **THE DEFENDANT:**  Ha, ha, ha.  Your Honor, she had a --

19   and it's in the --

20           **THE COURT:**  That's what she said now.

21           **THE DEFENDANT:**  She also said the garage -- she also

22   said the garage was empty, Your Honor, and --

23           **THE COURT:**  But this is why we have juries.  They're

24   going to --

25       For you to just say we throw out the indictment because

1  you've got one side of the story and they've got theirs -- they

2  get to tell their side of the story to the Grand Jury.

3         **THE DEFENDANT:**  Your Honor --

4      Can you hand that to Judge Alsup, please?

5  (Whereupon a document was tendered to the Court.)

6         **THE DEFENDANT:**  And -- yeah.  And this is the same

7  lady that said that's an empty garage there.  And I think you

8  said when you saw the picture, "Boy, you guys are going to have

9  a problem with credibility here."

10      I think so.  Yes.

11      Does that look empty to you?

12         **THE COURT:**  Well, in this picture -- I agree with you

13  this picture --

14         **THE DEFENDANT:**  That's from the FBI.

15         **THE COURT:**  To this limited extent I agree:  It looks

16  like a pretty junked-up garage to me.

17         **THE DEFENDANT:**  Yeah.  And that goes all the way to

18  the ceiling.

19         **THE COURT:**  But that doesn't prove that that's the

20  way it looked whenever she said it --

21         **THE DEFENDANT:**  You know what?  We have the police,

22  and Mark Levinson, and a Lieutenant or Sergeant.

23         **THE COURT:**  You'll have a great time cross-examining

24  her then.

25         **THE DEFENDANT:**  If I wasn't in jail, and my family

wasn't suffering, this actually would be very fun; but because
there's so much suffering going on, it's just going to be --
it's going to be down to business.

      **THE COURT:**  But I'm telling you that --

      **THE DEFENDANT:**  I wish this was about money.

      **THE COURT:**  There's evidence to support five.

      **THE DEFENDANT:**  There's not evidence to support five.

    She handled -- okay.  She he had the tools.  Okay.
Listen.  Brugnara said each time that she phoned, he was in an
important meeting.

    That's not -- that's a lie.  I phoned her back at least
two or three times, and that's on the phone records.

    The overall transaction price was 11 million.

    Desor says, "Right."

    The overall transaction price was never 11 million.

      **THE COURT:**  There was evidence to that effect.  I
remember seeing it.

    And then you said, "Okay.  I want an extra 10 percent off,
on account of my museum."

      **THE DEFENDANT:**  That's when the supposed Degas was
$4 million; before I did a little bit of due diligence and
realized this stuff wasn't worth anything.

    And then how did it go from 4 million all of a sudden down
to 3 million, without any e-mails or paper trails or anything
like that?

1      Because what the deal was:  I'll tell you what.  You want

2   to send it to me?  Send it to me.  And I've got a year to

3   decide whether I want it or not, or --

4          THE COURT:  Well, that's your version of what

5   happened.

6      But their version -- and there's support in the record for

7   it -- is that there was a deal for about $11 million.

8          THE DEFENDANT:  No.  No.  The deal would have been

9   for $12 million.  And if you add 4 million --

10          THE COURT:  Then minus whatever the 10 percent was.

11          THE DEFENDANT:  No.  And then it would still be more

12   than the minus 10 percent, because then you would get 4 million

13   on the Degas.  No.

14      There's a disconnect between this purported meeting of the

15   minds, and when the stuff was shipped.  Okay?

16      And when the stuff was shipped, there was no meeting of

17   the minds on the price.  And the proof is in the e-mails.

18          THE COURT:  That's your version of what happened.

19          THE DEFENDANT:  That's not my version.

20          THE COURT:  That's not what her version of what

21   happened was.

22          THE DEFENDANT:  When she was on the Form 12 witness

23   stand, she gave four different versions of the contract.

24          THE COURT:  I don't think so.

25          THE DEFENDANT:  Really?

1      **THE COURT:**  Yeah.  I don't think so.  We can't just

2   accept your version of the facts.

3      **THE DEFENDANT:**  Listen.  The facts are going to come

4   out.  The fact of the matter is it was a contingent sale,

5   contingent upon my due diligence.  And I decided that I wasn't

6   going to buy them or I wasn't going to accept the gift, or

7   whatever the issue was.  And I tried to get them out and back

8   in their possession.  I can't force them to come pick them up.

9   All I can tell them is to come get them.  Sign a release.  I

10  can't do anything else.

11     **THE COURT:**  Well, that one's not persuasive.

12     What's your next one?

13     **THE DEFENDANT:**  Here's a good one.  Here's a real

14  good one.  You know, I really have a problem, you being an

15  advocate for the FBI, because I'll tell you something.  My

16  family's been in law enforcement my whole life.  My uncle was

17  the Chief of Police for nine years.  My dad was a supervisor at

18  Juvenile Hall.  My brother works in this building for 25 years

19  as an NSA agent; worked with the Department of Treasury; still

20  works there.  They hold the highest level of integrity in their

21  jobs.  And they take it really seriously.  My brother -- man, I

22  tell you that guy would never lie about anything.  And he's

23  super well respected.  FBI even said, 'Man, your brother's

24  really well respected."  He would never make these sort of

25  lies.

1      And this guy comes in from Chicago, where anything goes in

2  Chicago, the home of Al Capone, Hoffa.  Anything goes.

3      That's not the way it flies in San Francisco.  San

4  Francisco is not Chicago.  You do that in Chicago, it's

5  business as usual.  You do that in San Francisco, you lose your

6  job.  You get fired.  Look what goes on in the San Francisco

7  Police Department.  Law enforcement is held to the same high

8  standard of excellence; even a higher standard.

9      And he got a pass on what he did at my house in Sea Cliff

10 when he broke and entered through the front gate without a

11 warrant.  And I'll tell you.  We looked up -- Bob Kane did; the

12 civil attorney -- looked up what the law was in the state of

13 California, where he's a Superior Court Judge.  And the law in

14 California:  When there is a "Do Not Trespassing" [sic] sign,

15 the gate doesn't even have to be locked.  The gate could be

16 unlocked.  You cannot breach that door if it says, "Do Not

17 Trespass."

18     And there's another thing.  It says, "Beware of Dog."  We

19 had a little chihuahua -- half chihuahua, half miniature

20 pinscher -- that my children love.  It gets them through the

21 hard times.  And that dog is out in that yard a lot.  What

22 would have happened if that dog ran out and started biting --

23     He's over there, smiling.  He thinks it's funny.

24     What would happen if he started biting at his ankles?

25         MR. KINGSLEY:  Mr. Brugnara is referring to the house

1  where said before that he left the garage door open.

2         THE DEFENDANT:  If he's biting -- if that dog started

3  biting Mr. Desor's ankles and feet, would he have kicked it?

4  Would he have shot it?

5         THE COURT:  You're way off topic.

6         THE DEFENDANT:  The point is -- no, no.  This is

7  all -- proves my point that he does whatever he wants.  He'll

8  lie to the Grand Jury.  It all ties in to setting aside the

9  indictment.  He breaks through a gate.  What if my two little

10 dog --

11        THE COURT:  We had a whole evidentiary hearing on

12 what happened.  And your version was he broke through a gate.

13 I listened to all of the witnesses.  It wasn't that --

14        THE DEFENDANT:  You're missing the point -- what I

15 just said.  You were wrong, because even if he didn't break the

16 gate, the mere fact that it was posted with a "Do Not

17 Trespassing" [sic] sign is a trespass.  And he violated the

18 laws of the State of California.

19        THE COURT:  That's what you -- I never heard that

20 point until right now, and I'm not sure it's even true.  When

21 the FBI, which has the benefit of the supremacy clause of the

22 United States, comes knocking on somebody's door, they may not

23 be bound by a local law.

24        THE DEFENDANT:  Yes, they are.  Yes, they are.  The

25 FBI can't do whatever they want just because they're the FBI.

1  They cannot.  He could have gotten arrested.  Worse could have

2  happened to him.  Worse could have happened.  What would have

3  happened if my two daughters were taking a little -- a bath,

4  like they do in a little, blow-up swimming pool, and they're

5  naked, and Desor comes in and walks in on them?

6          **THE COURT:**  That didn't happen.

7          **THE DEFENDANT:**  It didn't happen, but what if -- what

8  if the dog.

9          **THE COURT:**  There's no dog that bit anybody.

10         **THE DEFENDANT:**  You're missing the point here.  I

11  think your prejudice -- you're trying to insulate the agents to

12  my prejudice.

13         **THE COURT:**  No, I'm not.  I'm just waiting for you to

14  make a good point, and you're way off on tangents.

15         **THE DEFENDANT:**  No, because it's -- it's protocol for

16  him, is the point I'm saying, because he said it now in three

17  Grand Jury testimonies.

18      So let's wrap up.  So he says --

19         **THE COURT:**  Give me -- you said you had some good

20  points.

21         **THE DEFENDANT:**  Here's -- the fifth missing crate

22  contained a painting worth $400,000.  That's right.  Correct.

23      That's a lie.

24      The fifth missing crate didn't contain a --

25      Well, hey, maybe it did actually.  I take that back,

1  Your Honor.  Maybe we dot got this case all wrong, and there's

2  a missing painting.

3        **THE COURT:**  I thought it was supposed to be the

4  Degas.

5        **THE DEFENDANT:**  I don't know.  I mean, you just said

6  he doesn't lie.

7        **THE COURT:**  All right.  So maybe he misspoke on that

8  one.

9        **MR. KINGSLEY:**  I think this is the precise point that

10  Mr. Brugnara should testify under oath on, if he wants to be

11  impeaching the credibility of an agent who testified under

12  oath.  If he wants to testify that there was a Degas in that

13  crate --

14        **THE COURT:**  Well, I thought five crates went in.  One

15  of them was a Degas.  When --

16        **THE DEFENDANT:**  That's not what --

17        **THE COURT:**  -- the FBI seized them, there were only

18  four --

19        **THE DEFENDANT:**  It says the fifth --

20        **COURT REPORTER:**  I cannot -- I can't figure out who's

21  talking.  Who am I supposed to take down?

22        **THE COURT:**  No.  Wait.  Stop.  It's my fault.

23        **THE DEFENDANT:**  The fifth missing crate contained a

24  painting worth $400,000.

25        That's a lie.

```
1        Or maybe it did.  Like I said, I don't know what the truth
2   is in this case.  All I know is I'm being stuck in jail when I
3   didn't do anything wrong.  Maybe the painting.  Maybe there is
4   no fifth crate.  Maybe the fifth crate was taken.  Maybe the
5   crate had a fake Degas.  Maybe the crate had a real Degas.
6   Maybe the crate had a $400,000 painting.  I don't know.  Maybe.
7        But the fact is Mr. Desor knows what we don't know,
8   because he proffered that as truth to the Grand Jury, as an
9   esteemed --
10            THE COURT:  All right.  Can I ask the --
11            THE DEFENDANT:  -- officer of the federal government.
12            THE COURT:  All right.  Here's one that I would like
13  the Government to respond to.  Why did he say to the Grand Jury
14  that it was a painting, when I thought your theory was that it
15  was a Degas?
16            MR. KINGSLEY:  Your Honor, Mr. Brugnara is bringing
17  this up on the fly for the first time, reading from a
18  transcript that I don't have in front of me because --
19            THE DEFENDANT:  Here it is.
20            MR. KINGSLEY:  -- it's completely irrelevant to --
21            THE COURT:  You mean this is not in a written
22  document somewhere?  You mean this is coming out of left field?
23            MR. KINGSLEY:  Yes.
24            THE COURT:  Oh.  I didn't know that.
25            THE DEFENDANT:  It's not coming out of left field.
```

1          **MR. KINGSLEY:**  Your Honor, this was my point before.

2   They filed a motion to dismiss the indictment, and didn't

3   support it with an affidavit.  You denied that motion.

4          Mr. Brugnara filed another motion attacking prior Grand

5   Jury testimony that has nothing to do with the current

6   superseding indictment; and also, again, not attaching an

7   affidavit with the facts supporting anything he's saying right

8   now.

9          **THE COURT:**  All right.  So it's coming out --

10         **MR. KINGSLEY:**  Yeah.

11         **THE COURT:**  So nonetheless, off the top of your

12  head --

13         **THE DEFENDANT:**  Here it is.

14         **THE COURT:**  -- do you know the answer to the question

15  I asked?

16         **THE DEFENDANT:**  Top of page 22 and the bottom of 21.

17  The last line on 21, and the top of 22.

18  (Whereupon a document was tendered to the Court.)

19         **THE COURT:**  We have 14 minutes.

20         **THE DEFENDANT:**  Well, I think this is enough to set

21  aside the indictment right here.  We don't even need the 14

22  minutes.

23         **THE COURT:**  Well, let me ask you something.  Let's

24  assume that that is a misstatement, but that there was a fifth

25  crate, and it contained some artwork that was worth -- he says

1   here -- $400,000.  What difference would that make in the case?

2          **THE DEFENDANT:**  That's not a standard.  According to

3   the Court, the defendant must make two distinct showings to

4   have the indictment dismissed:  That an error occurred in the

5   Grand Jury, and that this error resulted in prejudice.

6       Well, obviously, the error occurred.  And the prejudice

7   actually is obvious.

8          **THE COURT:**  What is it?  I mean, if the Government's

9   theory all along has been there were five crates, and you still

10  have the fifth one somewhere --

11         **THE DEFENDANT:**  This is different.

12         **THE COURT:**  -- and it was had valuable artwork in it,

13  okay, so if they goofed up and said it was a painting in there

14  instead of a statue --

15         **THE DEFENDANT:**  No, no, because -- because if you --

16         **THE COURT:**  -- what's the prejudice?

17         **THE DEFENDANT:**  No, because they have to is say our

18  theory is that there was a painting in there, or we were told

19  there was a painting in there, or Ms. Long told us there was a

20  painting in there.

21      They had to prequalify their statement to the jury as a

22  factual statement.  They can't take a supposition or

23  conjecture, and proffer it as truth under a oath or a presumed

24  oath since -- I believe it was under oath -- as a factual truth

25  to the Grand Jury, when my liberty's at stake.

1          THE COURT:  All right.  I'm handing this back to you.

2      I don't see that as -- as a substantial prejudice to you,

3   because I can't say how it would have misled the jury -- Grand

4   Jury on whether or not you should be indicted.  The Government

5   was still making the point that there were five crates with

6   valuable artwork.  And they -- at most, they goofed up on what

7   was in one of them.

8          THE DEFENDANT:  Okay.  So what happens when the

9   experts come in, and you're convinced, and everyone's convinced

10  that this art is worth nothing?  Okay?  You can go on

11  Craigslist or eBay and get the same stuff for a couple of

12  thousand dollars.  This is a material misstatement.

13         THE COURT:  $1,000 is not nothing.

14         THE DEFENDANT:  Okay.  It's not four -- and it's not

15  $400,000, either.  Okay?

16         THE COURT:  Well, well, there -- I have read enough

17  of your materials to know --

18         THE DEFENDANT:  Okay.  How about the next one?

19         THE COURT:  -- that there's a dispute in the art

20  world over whether or not that Degas was worth several million

21  dollars --

22         THE DEFENDANT:  Okay.  Listen.  Okay.  Listen.

23         THE COURT:  -- or whether it was worth nothing.

24         THE DEFENDANT:  Your Honor, you don't even have to go

25  far.  You can go right to another lie, right on the same page.

1  Did I submit my financial statement in an official proceeding?

2  That's the financial statement I gave to Janie Zhuang.  Yes.

3  Of course.  That was -- I didn't submit that in an official

4  proceeding.  I dropped it off to Janie Zhuang, a floor down.

5  Another lie.  I did not submit the April 7th financial

6  statement in an official proceeding.  That's another lie.  It's

7  a prejudicial lie that's prejudicing me.

8       We've got to keep going on, because it gets worse for

9  them.  Believe me.

10          **THE COURT:**  I'm surprised to hear that.  I thought

11  that this motion had been supported by a brief of some sort.

12  And here we're finding out that you're just --

13          **THE DEFENDANT:**  Hey, Your Honor.  I see the --

14          **THE COURT:**  -- letting the Government know for the

15  very first time.

16          **THE DEFENDANT:**  Your Honor.  I learned.  I learn

17  something every time you give me at least a little bit of air

18  to breathe for the drowning man, he can find something to help

19  you out.  And you have what's called Federal Rules of Criminal

20  Procedure, Rule 2.  You can make any ruling in the interests of

21  justice.  You're the king.  You're the god.  Like I said in

22  this room.  So under Rule 2, you can make any ruling you want.

23  And you can interpret any of these rules any way you wanted to

24  rule, too.

25       So in the interests of justice, knowing that I'm sitting

1   in a cell 24/7, and I don't even have a pencil -- that's why

2   you can barely read some of this:  I don't even have a

3   pencil -- obviously, for me to have the access to put a

4   complete motion together is impossible, but in the interests of

5   justice, I'm trying to get this out to be --

6         I just a want to keep going on with the lies, so we make a

7   record of this.  How about the next one?

8              **THE COURT:**  All right.  I'm going to let you use the

9   ten minutes any way you want, but let me --

10             **THE DEFENDANT:**  Okay.  Well, I'm going to take

11  advantage of that.  Okay.  Here we go.

12             **THE COURT:**  -- first ask:  Do you have any --

13             **THE DEFENDANT:**  How about the next one?  Here's a

14  great one.  Here's a great one.  Straight-up lie.

15        Have you reviewed the testimony from Mr. Brugnara about

16  how many crates there were delivered?

17        I have.

18        And does he claim there were only four?

19        He has.

20        Lie.  Lie.  I was asked on the Form 12 by Sprague:

21  Mr. Brugnara, so how many crates were delivered?

22        I said I don't know.

23        He goes:  Oh, you don't know?  You didn't count them?

24        I said, no, I didn't count them.

25        Were there were four or five?

1      There could have been four.  Could have been five.

2      That was my Form 12 testimony.

3      And this guy lies to the Grand Jury, and says I say there

4  were only four delivered.

5      I've never said there were just four.

6          **THE COURT:**  I thought you'd said that in e-mails.

7  Somebody for you said there were four.

8          **THE DEFENDANT:**  No.  We said Bob Kane, when he went

9  out there, said there were four there.

10     I never said how many were delivered.

11     And I testified in open court that I -- it could have been

12  four; could have been five.

13     Oh, how about this?

14     He says Sotheby's doesn't authenticate works of art.

15     Of course, yes, Sotheby's authenticates works of art.

16     I believe you have to have knowledge --

17         **THE COURT:**  Wait a minute.  But you're --

18     Read to us the question and the answer, so that we can

19  have it exactly.

20         **THE DEFENDANT:**  The exact quote was -- I don't have

21  the exact question, but I can pull it up if you give me a

22  minute here.  I want to make use of these 10 minutes.  It was

23  along the lines of, you know:  Does Sotheby's authenticate art?

24     Desor says Sotheby's doesn't authenticate works of art.

25  Authentication of art is a dangerous area.  If you say yes,

1   that work is done by a particular artist -- blah, blah, blah.

2       The fact is they do authenticate art.  He lied to the

3   Grand Jury.  I've had Sotheby's authenticate dozens of pieces

4   of art, including the piece of art that's going to be in this

5   trial.  Okay?  So another lie.

6       Brugnara.  Oh, okay.  Brugnara didn't question the

7   authenticity until the text message; you know, the one of April

8   10th.

9       Absolutely false.  Ha!

10      All the e-mails and all of the -- all of the proffers said

11  Luke had $X$ number of days or $X$ number of years -- whatever --

12  to authenticate the art.  Obviously, I'm authenticating the art

13  during the due-diligence period.  So I obviously did not just

14  state that I'm going to authenticate the art on April 10th,

15  which is four days -- three days after the delivery.  So that's

16  another lie.

17      Next lie:  Was 224 Sea Cliff in foreclosure May 2014?

18      Yes.  It's past due.

19      Not past due.

20      All of the debt service -- if you remember under that loan

21  I got was prepaid in full through August of 2014.  So the loan

22  wasn't in foreclosure.  The house wasn't in foreclosure.  And

23  all of the interest was paid in advance, all the way -- three,

24  four months past this day.

25      Another lie to try the give the misconception:  Oh, hey,

1   this guy's financially struggling.  His house is in

2   foreclosure.  The guy's got no money.

3        This goes all to intentionally withholding the chain of

4   e-mails, too, because if they gave him the entire course of

5   e-mails, they would see, hey, you know, come pick up the

6   crates.

7        Listen to the next one.  You know.  Did he try to give the

8   art back?

9        No.

10       Of course I did.  There are 82 e-mails from Bob Kane.

11  Come get the art.  Sign the release.  And an e-mail from

12  Harvey Schochet to Bob Kane that was put in evidence saying,

13  hey, I told her to sign the release, but she won't sign it.

14       And then FBI asked her in a 302; why didn't you pick up

15  the crates when Schochet told you to?

16       Because I looked through the garage-door window, and he

17  moved the crates.

18       Oh.  Surprise.  There's no window in the garage.  That

19  will be fun next week.  She can't pull out of that one, either,

20  because it's in your FBI report, unless you guys want to indict

21  her for lying to an FBI agent.  Isn't that a felony,

22  Your Honor?

23            **MR. KINGSLEY:**  We do have a couple of things we'd

24  like a ruling on.  I don't know --

25            **THE DEFENDANT:**  Well, no.  The lies continue to roll

1    here.  The lies continue to roll.

2              **THE COURT:**  All right.

3              **THE DEFENDANT:**  After you testified --

4         You said I have ten minutes.

5         After you testified again before the Grand Jury, it

6    says -- again, he says -- and this is now Mr. Kingsley's -- uh,

7    uh -- second superseding indictment, where he really tightens

8    up the -- tightens up the reins here on Desor and, you know,

9    got it down from 50 lies down to just 13.

10        He says:  Were five crates of artwork delivered to

11   224 Sea Cliff?

12        He says, yes, there were.

13        We don't know that.  We don't know that.  Okay?

14        He thinks that -- the correct answer was we believe based

15   on our investigation that there were five, or we were told

16   there were five.

17        He doesn't know there were five.  Nobody knows whether

18   five were delivered there.

19        Was what was in the crate of artwork that was missing?

20        He says a Degas sculpture.

21        Well, that's funny, because in a previous one, he said

22   it's a $400,000 painting.  Okay?

23        How about the next one?

24        As of today, March 12th, says Mr. Kingsley, is that Degas

25   sculpture still missing?

1    He goes:  Yes.

2       This is my favorite one.  And you know why it's my

3  favorite one?  Because my question is:  Which one?  Because

4  you've got to remember this is the rotating Degas statue.  You

5  know, under which -- you know, under which cup is -- which

6  Degas are we talking about?  Because you've got to remember she

7  was supposedly sending me her Degas that she was saving for her

8  daughter.  And then she sent all of the paperwork that it was

9  her Degas, you know it was stamped "M."

10      But then it wasn't hers that was purportedly sent.  It was

11 Maibaum's that's stamped "E."  Okay?

12      But there's a big difference between hers and Maibaum's,

13 if you remember.  And if you read the FBI reports, Maibaum's

14 doesn't have a certificate.

15      And God bless Tippy Mazzucco and Lassart.  It's the first

16 thing they said.  Are you aware of that?

17          **COURT REPORTER:**  I didn't understand that.

18          **THE DEFENDANT:**  I said, "No.  Really.  What?  What's

19 the difference?"

20      He said his has no certificate.  Hers had a certificate.

21      Wow.  Okay.  So what --

22      They asked this question.  As of today, March 12th, 2014,

23 is that Degas sculpture stills missing?

24      He says yes.

25      Well, according to the exhibits that they put on to the

1 Grand Jury, they got her Degas as the one that's purportedly

2 missing.

3      And it ain't missing.  It's sitting back in Tennessee in

4 her house.  Okay?  That, alone, gets this indictment set aside,

5 because her Degas isn't missing; the one that she supposedly

6 sent me.

7      But they did send it to me.  She's got it sitting back at

8 her house.  So that Degas isn't missing.

9      They're just a bunch of liars, man.  You think that you

10 have it bad.  See, I've been around chiefs of police, and my

11 brother, who's an esteemed agent his whole life.  And I know

12 how they're supposed to act.  And they don't act like him.

13 He's a liar.  And he doesn't care about my family and my

14 liberty.  And he doesn't deserve to wear that badge.  Okay?

15 And that's what I say, because I'm -- I've been sitting in jail

16 for ten months because he lied to a Grand Jury.

17      Let them go and have Master Swanson sit in on a real Grand

18 Jury proceeding to make sure they don't lie, and see if I get

19 indicted.  And show the entire e-mail chain, and tell the

20 truth.  I guarantee you there's not a Grand Jury around that

21 there indict me on any of these charges.

22           **THE COURT:**  All right.

23           **THE DEFENDANT:**  Okay.  And it keeps going on.

24           **THE COURT:**  No.  The ten minutes is up.

25           **THE DEFENDANT:**  Well, we've got like another 15 lines

1   here.  You don't want to hear them?

2         THE COURT:  We've run out of time.

3     I'm going to ask the Government to respond by Friday at

4   noon to what has been said on the record so far.  And you'll

5   just have to get a copy of the transcript, but I somehow lost

6   track of the fact that none of -- this has been very unfair to

7   you.  You have you've been blindsided.  None of this has been

8   presented to you in the past, and you're hearing it for the

9   first time.  But I do think you'll want to make sure you

10  respond.

11        MR. KINGSLEY:  Can we also -- the Government would

12  ask the Court to rule that all of the things that he talked

13  about from prior Grand Jury appearances aren't relevant,

14  because we returned the second superseding indictment.

15        THE COURT:  Well, is that the law?

16        THE DEFENDANT:  It's not the law.  It's not the law,

17  because they refer to the second superseding and the second

18  superseding indictment to the first two a Grand Juries, uh,

19  indicting me for fraud.

20        MR. KINGSLEY:  He's --

21        THE DEFENDANT:  So they both are relevant.  They're

22  both relevant, and they're --

23        THE COURT:  All right.  Both sides -- by Friday, both

24  sides can give me authorities on that.

25     Now, if the Government believes that you're correct on

1  that, then you only need to respond --

2          **MR. KINGSLEY:**  Can I --

3          **THE COURT:**  -- to the last superseding indictment.

4          **MR. KINGSLEY:**  I also -- I would again ask that

5  Mr. Brugnara be forced to put his things under oath, because

6  he -- almost everything he just said is false.  And he hasn't

7  been forced to put it under oath in order to challenge an

8  indictment returned by sworn testimony.  And that was our

9  response to the first time he filed this motion, and that's my

10 response again.

11         **THE COURT:**  You can put that in your brief, but

12 please do your best to help the Court.

13         **MR. KINGSLEY:**  I understand.

14         **THE COURT:**  If you want to identify things that you

15 think are lies, you can do that.

16         **THE DEFENDANT:**  Your Honor, I quoted it verbatim.

17 And I just handed you the transcript to prove up what I was

18 saying.  Everything that I say is proved up, as long as I'm not

19 chained and locked in a dungeon, starved out a hundred pounds.

20 As long as I have access to my attorneys, to a computer, I can

21 prove up everything.  My entire life has been about proofing up

22 what I say.  I've inherited no banking connections.

23 Your Honor, excuse me.  Can I finish, please?

24         **MS. HARRIS:**  Can we get to one of the Government's

25 motions?

1          THE DEFENDANT:  I've been waiting two weeks.

2          THE COURT:  Mr. Brugnara, you've monopolized this

3    hour.  I'll give you 30 more seconds, and then I'm going to --

4          THE DEFENDANT:  Okay.  Well, tell you what.  I got a

5    little surprise from Ms. Harris, you know; the pillar of their

6    office here.  Ms. Harris is a liar, too.  Ms. Harris --

7          THE COURT:  All right.  That's enough.

8          THE DEFENDANT:  -- told this Court -- Ms. Harris told

9    this Court -- I have the transcript here.  You said to her --

10   after I complained I still don't have all of the discovery, you

11   said, Ms. Harris, does Mr. Brugnara still have all of the

12   discovery?

13        And she goes --

14        I have it here, if you give me a second.

15        She goes, yes, he does, Your Honor.

16        And guess what.  I don't have all of the discovery.  I

17   still don't have that book.  And Mr. Bornstein asked for the

18   book.  And Babcock has asked for the book.

19        And so she lied to you.  And she knew I didn't have the

20   book.  So Ms. Harris also is a liar.  Okay?  And you can't

21   refute that, because you asked her:  Does he have all of the

22   discovery?  And there's a written trail from Bornstein and

23   Babcock saying we need the book.

24        And she knew they hadn't give in up the book yet.  And the

25   trial's in a week.  So the fact of the matter is she lies.

1           **THE COURT:**  Now that's enough.

2      Let me ask you about the book.  Have you turned that over?

3           **MS. HARRIS:**  Your Honor, the book is a piece of

4   physical evidence in the same --

5           **THE COURT:**  How about pictures of it?

6           **THE DEFENDANT:**  Bornstein asked for a photocopy, Your

7   Honor, and so did Babcock.

8           **MS. HARRIS:**  Your Honor, can I just finish?  We are

9   not going to make a photocopy.  It's a coffee-table-sized art

10  book.

11          **THE DEFENDANT:**  Ha, ha, ha, ha.  It's okay.  It's

12  going to be excluded from evidence.

13          **MS. HARRIS:**  Your Honor, please ask Mr. Brugnara --

14          **THE COURT:**  Mr. Brugnara, please.  Say Mr. Brugnara's

15  in jail.  How can he come to your office?

16          **MS. HARRIS:**  It was offered --

17          **THE COURT:**  He's acting as his own lawyer now.

18          **MS. HARRIS:**  Well, that's correct, but it was offered

19  to Mr. Brugnara before he was incarcerated.

20      He also saw that piece of physical evidence at the

21  deposition of the Russian mistress.

22          **THE DEFENDANT:**  That's -- A, she's not my mistress.

23  She's making gratuitous comments.  Completely false.

24      Secondly, Mr. Bornstein, knowing they probably concocted

25  some sort of lie, said, "I'd like a photocopy of it."  And she

didn't send a photocopy to KL Gates.  And he asked for that,
Your Honor, 70 days ago.  So guess what.  It's excluded under
16-1 because they didn't produce it within 14 days.

     **THE COURT:**  Is there one page or two pages that are
more important?

     **MS. HARRIS:**  Not in my opinion.  It's the fact of the
book and the lie that was told about the book that's important.
We have it here.

     **THE COURT:**  Why is this book so important?

     **MS. HARRIS:**  Well, it shows that Ms. Long did what
she said she did, which was give Mr. Brugnara a book about the
provenance of the Degas, and the Hermitage Museum.

     And then it also bolsters the testimony of the Russian
witness, because Mr. Brugnara gave it to the Russian witness
because large portions of the book are in Russian.

     But Bob Kane sent an e-mail during the course of the
meltdown after the art was delivered but not paid for, saying
that Mr. Brugnara never received the book.  And we can prove
that up.  That's Count Four in our Indictment.  So that's why
the book is significant.

     We also have it here today.  And if we can make
arrangements with the Marshals, Mr. Brugnara can take a look at
it; but we're not going to photocopy it.  It's not a
photocopy-able article.

     **THE COURT:**  Can I see?

1      **MS. HARRIS:**  Yeah.

2      **THE DEFENDANT:**  Can you hand that to Judge Alsup,

3  please?

4  (Whereupon a document was tendered to the Court.)

5      **THE DEFENDANT:**  Just so you see, Your Honor, I'm not

6  fabricating anything.  This is what you asked Ms. Harris; if

7  they've turned over all of the evidence.

8      And she says yes.

9      **THE COURT:**  May I see the book?

10  (Whereupon a book was tendered to the Court.)

11      **THE COURT:**  All right.  This book looks like a high

12  school yearbook; about that thick.  It's called Edgar Degas:

13  Figures in Motion, and it's got some Russian things.  It's got

14  a lot of Russian pictures in Russian, a lot of text in Russian.

15      What page is the one that's the most important?

16      **THE DEFENDANT:**  Your Honor, could I see that for a

17  second?  Because I want to tell something that you're going to

18  find interesting.  If it's --

19      **THE COURT:**  No.  I'm looking at it right now.  I

20  don't see anything in here that's English.  How do we -- is

21  there any part of this that is English?  Here's a little bit.

22      **MR. KINGSLEY:**  The introduction is in English.

23      **MS. HARRIS:**  The --

24      **MR. KINGSLEY:**  The substance of the book is

25  irrelevant to the Government's case.

1    It's the fact that Mr. Brugnara's lawyer said he'd never

2 received the book --

3         **THE DEFENDANT:**  That's not true.

4         **MR. KINGSLEY:**  -- and the book is about the Degas --

5         **THE DEFENDANT:**  That's not what --

6         **COURT REPORTER:**  I'm sorry.  You're going to have to

7 let this gentleman speak.

8         **THE DEFENDANT:**  I'm sorry, clerk.

9         **MR. KINGSLEY:**  -- and that he then gave it to

10 Ms. Shlyapina.  That's basically the three pieces of evidence

11 about the book that are most relevant.

12         **THE COURT:**  Which page would be the page that has our

13 statue in it?

14         **MR. KINGSLEY:**  I'm not sure which page has our statue

15 in it.

16         **THE COURT:**  Well, then wait.  It's called the

17 *Little Dancer*.  Right?  Something like that?

18         **MR. KINGSLEY:**  Yeah.

19         **MS. HARRIS:**  Yes.

20         **THE COURT:**  Surely it's in here somewhere.

21         **MS. HARRIS:**  But it accompanied the shipment.

22 Ms. Long gave it to Mr. Brugnara, which he then denied; but our

23 proof is that Mr. Brugnara gave it to the Russian woman.

24         **THE COURT:**  All right.  Here's what we're going done

25 on this one.  The Government has a decent point, plus they did

1   offer to let this be examined earlier.

2       After today's hearing, and while the defendant is still on

3   the 20th floor and the lawyers are present and the Marshals are

4   present, I want Mr. Brugnara to be able to look through this,

5   and designate up to ten pages that you would then photocopy for

6   him, including the cover if you wish.

7       But I don't see much in here that is going to be of use to

8   have the entire thing photocopied.

9           **MR. BRUGNARA:**  Your Honor, could I just ask --

10          **MS. HARRIS:**  In light of the hearing today --

11          **THE DEFENDANT:**  I waited my turn, Your Honor.  It's

12  my turn.

13          **THE COURT:**  Ms. Harris has been dying to say

14  something.

15          **MS. HARRIS:**  Can we put a time limit on this, so the

16  Marshals aren't here all night?  Can we just have Mr. Brugnara

17  look at this --

18          **THE DEFENDANT:**  Absolutely not.

19          **THE COURT:**  -- with Mr. Stevens, and designate his

20  ten?

21          **THE DEFENDANT:**  Your Honor, there is a pending motion

22  to have this evidence excluded under Federal Rules of Evidence

23  16-1 because they've withheld it.

24      And it would need to also be translated.

25      But could I just see the cover, Your Honor, just for a

1  second?  Because I can't see that good.  Could you just --

2  could Mr. --

3          THE COURT:  I'm sorry.

4          THE DEFENDANT:  Okay.  Okay.  Okay.  But this just

5  puts it all in perspective.  Everyone can see it.  There's --

6          THE COURT:  Why are you holding it?

7          THE DEFENDANT:  Because everyone likes the show here.

8  The reality is the Hermitage book -- the Hermitage book is what

9  Bob Kane said he doesn't have.

10      Does that say "the Hermitage book"?  I don't see

11  "Hermitage" on there, Your Honor.  No one ever said "the Degas

12  book."  They said "The Hermitage book." I don't see "Hermitage"

13  on there, unless it says "Hermitage" in Russian, but I don't

14  speak Russian.

15          THE COURT:  Here's the place where I see the word

16  "Hermitage."  It says right here.  It says "The State Hermitage

17  Museum."

18          THE DEFENDANT:  I guess if you opened up a book --

19          THE COURT:  And I only found that in 30 seconds.

20          THE DEFENDANT:  You know what, Your Honor.  That

21  would be if you were looking for it.

22          THE COURT:  I wasn't looking for it.  I found it.

23          THE DEFENDANT:  Your Honor, anyone who looks at the

24  front page sees that it's written in Russian.  And they don't

25  even go to the second page, because they already know the

 1  book's in Russian.  Okay?  That's the way it works in the real

 2  world.

 3          THE COURT:  That is not a good argument.

 4          THE DEFENDANT:  Oh, really?  Your Honor, to you --

 5      This is such an unlevel playing field.  Let's stick this

 6  guy in jail for a year until he gets starved to death.  Let's

 7  lock him up like an idiot.  Let's give everyone the benefit of

 8  the doubt.  Thank God you don't control these 12 jurors,

 9  because the reality is it would be a miracle to have any one of

10  them even have any remote idea that I had anything to do with

11  taking a box.  Okay?

12          THE COURT:  Wait.  Look.  We're going to do the

13  following.  After today's hearing, I want the Marshals to do

14  the following.  All of you -- Stevens?  You, too -- are going

15  to take the book up there.  And the Marshals will guard this

16  book and make sure that nothing gets destroyed.  And you get 15

17  minutes to look through it.

18          THE DEFENDANT:  I don't accept that.

19          THE COURT:  Then we don't do it at all.

20          THE DEFENDANT:  No.  Because I need it translated.  I

21  don't read Russian.

22          THE COURT:  No.  The word "Hermitage" is in English.

23          THE DEFENDANT:  Okay.  Your Honor, I already filed a

24  motion to have this excluded as evidence, because it's already

25  been asked for.

1        THE COURT:  Motion denied.  Motion is denied.

2        THE DEFENDANT:  No.  They're entitled to get that

3   under Rules of Evidence.  And Bornstein asked for it in a

4   photocopied form so he could also have it translated.  And it

5   was denied to Bornstein.  And it was denied to Babcock for the

6   last seven months.  I'm not going to then have it thrown into

7   my lap for 15 minutes, five, six business days before the

8   trial's going to start.

9        THE COURT:  Here's the -- but look.  You know, this

10  is the thing.  I remember the testimony.  Ms. Long said she

11  went out to your house, sat around in your nice living room,

12  and she gave you a book that seems like it was -- looks like

13  this book.

14        THE DEFENDANT:  That's not what she said.

15        THE COURT:  Yes, she did.  The Russian lady then

16  said --

17        THE DEFENDANT:  Yeah.

18        THE COURT:  -- that you gave her this book.

19        THE DEFENDANT:  Yeah.

20        THE COURT:  All right.  So one plus one equals two.

21  You said she didn't give the book.  So that's not one plus

22  one equals two.  That's something else.

23  So there's testimony that indicates that you're not

24  telling the truth.

25        THE DEFENDANT:  Okay.  Okay.

1       **THE COURT:**  And the Government wants to show that.

2       **THE DEFENDANT:**  No one said "a Hermitage book."  If

3   someone said "a Degas book," that's different than "a Hermitage

4   book."

5       **THE COURT:**  "Hermitage" is right here.  I never saw

6   this book before, and I found it immediately right here

7   (indicating).

8       **THE DEFENDANT:**  Yeah, but if you don't have --

9       **THE COURT:**  "The State Hermitage Museum."  That's

10  written in English.

11      **THE DEFENDANT:**  You're missing the point.  If you

12  don't have possession of the book, you can't fellowship through

13  the pages to get to that page.  You would only know what you

14  saw on the cover.

15      **THE COURT:**  I'm going to give you 30 minutes to look

16  through this; designate up to ten pages you want to have

17  photocopied.

18      **THE DEFENDANT:**  You're missing the point of what I'm

19  saying.  If somebody says to Bob Kane -- this is a simple

20  argument.  Do you have the Hermitage book?

21      No, we don't have the Hermitage book.

22      Okay.  That's it.

23      How would I know it's a Hermitage.

24      Hermitage is a museum.  It's not about an artist.  A

25  Hermitage --

1        You say:  Do you have the book on the Louvre?  Do you have

2    the book on the British Museum, or on the Tate, or on the

3    Metropolitan Museum?

4        That's much different than saying:  Do you have the book

5    on Picasso?

6        Please stop defending them.

7            THE COURT:  All right.  Do you want the 30-minute

8    opportunity, or not?

9            THE DEFENDANT:  What I need, Your Honor, is to have a

10   hearing on setting aside this, because they didn't follow the

11   Rules of Evidence.  And it's not fair that they get to sit on

12   it for ten months, and then I get ten minutes.

13           THE COURT:  Do you want the 30-minute opportunity

14   today, or not?

15           THE DEFENDANT:  I'd like as much time as I can get.

16           THE COURT:  Thirty minutes.

17           THE DEFENDANT:  I'm not waiving my right to have it

18   excluded.  And I'm not saying that that is sufficient for me

19   to --

20           THE COURT:  I'm not ruling on exclusion.  I'll even

21   give you 20 pages.  You can have 20 pages of this copied.  It's

22   too big to copy everything.  Most of this is not going to be

23   relevant.

24           THE DEFENDANT:  It goes to what the content is, as

25   well, though I need to know what that says, which means it

would need to be translated into English.

THE COURT:  Twenty pages.  You can have them translated if you want.  I don't see why translation makes any difference.  You don't speak Russian.  Mr. Kane doesn't speak Russian.

The only body that speaks Russian is the woman who's now in -- who received this from you, according to her testimony --

THE DEFENDANT:  And we have --

THE COURT:  -- that Russian doesn't make any difference.

THE DEFENDANT:  And we have a pending -- uh -- uh -- *in limine* to have her testimony excluded for the all these reasons and more, because they withheld the FBI notes; they withheld all of the information that Babcock needed to have a meaningful Form 15 testimony deposition.

And moreover, the biggest red herring of that mess, if you give them the benefit of the doubt, was that then when waited three months to produce the report, knowing that Babcock could have reconvened the Form 15 within a 30-day scope if he wasn't happy with, then, some subsequent notes that he got from the FBI.

So what happens the FBI holds back their notes for three months before they do the 302.  And it's not protocol.  Look at all of their other 302s.  They're whipped out in a week.

So they hold back this 302 that has all this conflicting

1 information from Babcock, this poor guy who's already

2 overworked.  Right?  And then they give him the 302 three

3 months later, after she already split and went back to Russia,

4 knowing that Babcock can't reconvene the Form 12.

5       THE COURT:  Well, but this is a --

6       THE DEFENDANT:  So that book may be completely moot,

7 anyway.

8       THE COURT:  Well, but this is a -- do you want that

9 opportunity for 30 minutes, and to designate up to 20 pages

10 that the Government would then copy and give to you?

11       THE DEFENDANT:  I would like whatever I can get.

12       THE COURT:  Without prejudice to you complaining

13 later that that wasn't enough.

14       THE DEFENDANT:  Well, I'm hoping that you're going to

15 rule on the indictment to at least let me go free right now,

16 and let me --

17       THE COURT:  No.  I haven't heard a thing yet that

18 persuades me that the jury got misled in any way that

19 prejudices you.

20       THE DEFENDANT:  Really?  Wow.

21       THE COURT:  No, none of that.  And honestly, what you

22 have said are small nitpicks.  And it's just your side of the

23 story; not the Government's side of the story.

24       THE DEFENDANT:  Wow.  So that's a benchmark, now?

25 That's the benchmark now in this building?  I wish my brother

was sitting in here, and my uncle, who dedicated their life to
following the rules and public service as agents of the federal
government --

        **THE COURT:**  The Judge --

        **THE DEFENDANT:**  -- because that's not the way they
follow --

        **THE COURT:**  Well, I'm sorry.  I --

        **THE DEFENDANT:**  -- to the letter, but I guess it's
anything goes in this court.  Then also --

        **THE COURT:**  All right.  Mr. Brugnara, please.

    I want to say this for the benefit of the Court of
Appeals.  Sometimes I was in the middle of making a ruling, and
then Mr. Brugnara leaps on the end of the statement and he
interrupts me, and I forget where I am.  And I hope the Court
of Appeals will forgive me whenever they review this record and
say, "Well, why didn't the Judge say *X*?  Why didn't the Judge
say *Y*?"

    And the reason is Mr. Brugnara has interrupted me at least
a hundred times over the course of the last few months, and
it's not easy for me to keep my train of thought.

    I'm not going to say anything more.

    Your motion to dismiss the indictment is denied.

    Your rights to appeal at the end of the case are intact.

    I don't want to hear anything more about your motion,
because you were so disrespectful to the Court.  And you

disrespect proper process.  And too bad if you don't like it,
because that's we're not going to hear anything more on your
improperly presented motion.  It's denied.  Denied.

     So we haven't gotten to the one about the Russian woman
yet.  That will have to be for another day.  We've now gone an
hour and 15 minutes.

     I want to make sure the Marshals will guard this book and
make sure nothing gets defaced or torn out of it.

     **THE DEFENDANT:**  Okay.  Now I'm being disrespected,
because I've never torn or defaced anything in my life.  I
actually create value from nothing.  Okay?  So I --

     **THE COURT:**  You told me you wouldn't run out of
building, either, whenever I let you go on that furlough.  I
have to be careful with the evidence.  I'm letting you touch
original evidence.  But you're going to get that opportunity:
30 minutes, 20 pages.

     **THE DEFENDANT:**  Let me ask you this regarding the
motion to set aside the indictment.  You're saying now that
they're not respond to respond the U.S. Attorneys?

     **THE COURT:**  They don't have to respond.  I'm denying
it, because of your disrespect for the Court, and because you
have failed to file it in a proper manner, with no supporting
declarations.  I'm sorry.  It's just denied.

     **THE DEFENDANT:**  So that's without prejudice?

     **THE COURT:**  I don't know what that means.  If you

1  file a proper motion, I'll consider it.

2      **THE DEFENDANT:**  Okay.  So I need to refile it with

3  all of the attachments and a declaration, and then we'll have a

4  another hearing on this?

5      **THE COURT:**  And then the Government would respond.

6  And by that point, we'll probably be in trial already.

7       So I've already heard this motion once.

8      **THE DEFENDANT:**  I know, but I'm a person that

9  believes that people have to follow the rules, because I have

10  to follow the rules.  So I will do it just for a matter -- to

11  make a point that everyone's got to follow the same rules,

12  including Mr. Desor.

13      **THE COURT:**  All right.  Now, did you have anything

14  else to bring up Ms. Harris?

15      **MS. HARRIS:**  Your Honor, we were wondering if the

16  Court could just, given we're pressed for time, rule on the

17  papers.  You can --

18      **THE COURT:**  On what papers?

19      **MS. HARRIS:**  On the waiver of the attorney-client

20  privilege, so that we can interview Mr. Babcock about the

21  escape.  We filed a motion regarding the waiver.

22      **THE COURT:**  I need more time.  I need to give both

23  sides time to --

24      **MS. HARRIS:**  Okay.  We'll deal with that.

25      **THE COURT:**  We're going to have to do that at the

1    next hearing.

2            **MS. HARRIS:**  The pretrial.

3            **THE COURT:**  The final pretrial conference.

4            **MS. HARRIS:**  And then we had a pending motion on

5    courtroom demeanor.

6            **THE COURT:**  On what?

7            **MS. HARRIS:**  On Mr. Brugnara and courtroom demeanor.

8    I think we filed a motion.

9            **THE COURT:**  We're going to -- I'm going to do my best

10   to ask Mr. Brugnara and to order him to behave.  I'm hoping for

11   the best.

12           **MS. HARRIS:**  Okay.  We are, too.

13           **THE COURT:**  All right.  The marshals will help me out

14   on the book.  The book will stay in the hands of the U.S.

15   Attorneys until we all get up there.

16           **THE DEFENDANT:**  Thank you.

17           **THE COURT:**  And then I want the lawyers to be there.

18   Mr. Stevens, I want you to be there.  I want you two to be

19   there.  And I don't want there to be any question about the

20   integrity of the book during the process.

21       All right.  I'm sorry for the 2:00 o'clock calendar.  I'm

22   running late, but I'll give you three minutes to sign in, and

23   then I'll come right back out.

24           **MR. KINGSLEY:**  Thank you, Your Honor.

25   (At 2:21 p.m. the proceedings were adjourned.)

1    I certify that the foregoing is a correct transcript from the

2    record of proceedings in the above-entitled matter.

3

4

5    _____   April 15, 2015
     Signature of Court Reporter/Transcriber   Date
6    Lydia Zinn

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25