```
                                        Volume 1

                                        Pages 1 - 270

                    UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

               BEFORE THE HONORABLE WILLIAM H. ALSUP

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
  vs.                              )  No. CR 08-0222 WHA
                                   )  No. CR 14-0306 WHA
LUKE D. BRUGNARA,                  )
                                   )  San Francisco, California
            Defendant.             )  Monday
                                   )  April 27, 2015
_____)  7:30 a.m.
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**          MELINDA HAAG
                            United States Attorney
                            450 Golden Gate Ave.
                            San Francisco, California  94102
                    **BY:  ROBIN HARRIS, AUSA**
                          **BENJAMIN KINGSLEY, AUSA**


**For Defendant:**          **LUKE D. BRUGNARA**
                            - pro se


**Advisory Counsel:**       LAW OFFICES OF PAUL WOLF
                            717 Washington Street
                            Second Floor
                            Oakland, California 94607
                    **BY:  JAMES R. STEVENS, ESQ.**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 Official Reporter - US District Court
                 Computerized Transcription By Eclipse

1 **APPEARANCES:  (CONTINUED)**

2

3 **Advisory Counsel:**          LAW OFFICES OF TAMOR & TAMOR
                                311 Oak Street
4                               Suite 108
                                Oakland, California 94607
5                       BY:  **RICHARD ALAN TAMOR, ESQ.**

6

7 **Also Present:**   FBI Special Agent Jeremy Desor

8                    FBI Special Agent Aleksandr Kobzanets

9                    Mary Mallory, U.S. Attorney's Office

10                          -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **P R O C E E D I N G S**

2    **APRIL 27, 2015**                                **7:38 a.m.**

3              **THE COURT:**  Good morning.  Come on forward, and we'll

4    wait for the defendant to appear.

5          (Defendant present, in custody.)

6              **THE COURT:**  All right.  Mr. Brugnara is present.

7    Everyone else is present.  Let's have our appearances, please.

8              **MS. HARRIS:**  Good morning, your Honor.  Robin Harris

9    and Ben Kingsley for the United States.

10             **MR. BRUGNARA:**  Luke Brugnara without shoes, your

11   Honor, pro se.

12             **THE CLERK:**  For the record, this is Criminal No. CR

13   14-306.  It's United States versus Luke D. Brugnara.  The

14   matter is on for jury trial this morning.

15             **MR. STEVENS:**  James Stevens with the defendant,

16   Mr. Brugnara.

17             **MR. TAMOR:**  Good morning, your Honor.  Richard Tamor

18   appearing as advisory counsel.

19             **THE COURT:**  All right.  We're here for trial.  The

20   jury venire is not yet in the room.

21         What's the story on the shoes issues?

22             **MR. BRUGNARA:**  I'd like to pick that up, because it's

23   been for two weeks insanity to get my clothes released from the

24   jail, which included my two pairs of dress shoes.

25         First, I signed a release two weeks ago and gave it to the

1    deputy to release to Mr. Stevens and/or Mr. Andrew Koltuniak,

2    the private investigator, my shoes and my clothes.  Nothing

3    happened for a week.  James Stevens got involved, spoke to

4    Ms. Lacey who came here and testified a week ago, who runs

5    Inmate Services, and said:  Why isn't Luke getting the shoes

6    released to us, so we can give it to his family to bring it

7    with the rest of his clothes down to the Federal Building?  And

8    he said:  Well, I'm going to get on it myself.  Fill out

9    another form.

10        So I filled out the form with James Stevens right there

11   and handed to it Ms. Lacey.  And she goes:  I'm going to make

12   sure this gets taken care of.  And James goes:  Can you release

13   it to me?  And she goes:  Well, no, we're going to have it in a

14   bag ready for the Marshals.

15        James Stevens then came, three days later on Friday.  I

16   said:  James, don't leave today, because these people are

17   totally incompetent, until you know that you have those clothes

18   that are sitting there for the Marshals or that the Marshals

19   take them today on Friday, because these people are 100 percent

20   incompetent.

21        He says:  Oh, no, they're not.  You'll be okay.  They'll

22   do what they say they do.

23        And I said:  Well, listen.  We've got the weekend.  And

24   then it's going to be Monday morning, and I don't trust them.

25        Because based on what I've observed being here for ten

1  months, they're completely incompetent; meaning, I live in a

2  world of competency and they're incompetent.  They can't even

3  handle getting my shoes and my clothes here after multiple

4  meetings, I mean at least six meetings; three involved James

5  Stevens.

6        I'm sitting here -- I'd like to take Mr. Kingsley's shows.

7  Are they size 13?

8            **THE COURT:**  Just, please, be quiet for a second.

9        What did you want to say, Mr. Stevens?

10           **MR. STEVENS:**  Your Honor, I have been dealing with

11 this issue for two weeks.  I've been calling Deputy Lacey --

12           **THE COURT:**  Just a second.

13       This is -- I'm talking to the Marshals.  This is

14 unacceptable.

15       Who is responsible today?  Raise your hand.  Come up here.

16       How come this man doesn't have his shoes for Christ's

17 sake?

18           **THE MARSHAL:**  The jail said they didn't have his

19 shoes ready.

20           **THE COURT:**  Well, it's your responsibility to get him

21 here properly dressed.  This is a trial.  He's going to go to

22 jail if he's convicted.  And you want him to show up

23 barefooted?  Come on.

24       How are you going to fix this problem?

25           **THE MARSHAL:**  The jail is currently looking for his

1    shoes, your Honor.  So we have a transport crew going to go to

2    the jail.  If they find the shoes, we'll hand them off to

3    our --

4            **THE COURT:**  Just a second.  This makes me so mad.

5        If he -- if they don't solve this problem, I'm going to

6    release him.  The Government has got to help me here.  We can't

7    let him go in front of the jury without shoes on for crying out

8    loud.

9            **MS. HARRIS:**  I understand that, your Honor.  We had

10   no idea that there was an issue until --

11           **THE COURT:**  Everybody says they have no idea, but,

12   you know, you have a responsibility.  My Marshal, everyone is

13   pointing their finger at somebody else.  This one is not his

14   fault.

15       I'm talking Mr. Brugnara is innocent on this.  He should

16   have had his shoes.

17       All right.  You're going to get his shoes, and you're

18   going to get them pronto.  I don't care if you have to go out

19   and buy them.  I'll pay for them, because I can't count on my

20   Marshals.  And I'm going to talk to Marshal O'Keefe today as

21   soon as this hearing is over, and I'm going to say:  Why in the

22   world did these two Marshals bring him in here barefooted?

23           **MR. STEVENS:**  It should be added that Deputy Lacey,

24   on Friday, assured me that everything was coming and would not

25   give it to me to bring it myself.

1          **MR. BRUGNARA:**  And I also want to make one more

2     statement --

3          **THE COURT:**  No.  You don't need to say anything more.

4     Please, just be quiet.

5          **MR. KINGSLEY:**  Your Honor, I have a spare pair of

6     size 13 shoes in any office that I'm happy to donate to the

7     defendant if it will get things moving.  We had no idea about

8     this.

9          **THE COURT:**  Go get them right now.

10         **MR. KINGSLEY:**  Thank you.

11         **THE COURT:**  What color are they?

12         **MR. KINGSLEY:**  They're black.  Is that okay?

13         **THE COURT:**  I don't know.  What have you got on?

14         **MR. BRUGNARA:**  Your Honor, I have no fashion sense,

15    so...

16         **THE COURT:**  We're going to go with what he can for

17    the time being.

18         (Mr. Kingsley exits the courtroom.)

19         **THE COURT:**  All right.  Let's go to the next item.  I

20    promise you this:  You're not going to go in front of the jury

21    without shoes on.

22         You raised a number of points that I don't think much of

23    in the process of this whole thing.  But this one you're right

24    on completely, so we're going to get to the bottom of it.

25         All right.

1        **MR. BRUGNARA:**  Well, I have a request, and this

2   involves miscommunication.  Not James Stevens' fault, but

3   probably collectively between the two of us.  I need to have

4   this stipulation stricken, because my understanding of the

5   stipulation that I signed, based upon, you know, trying to jam,

6   you know, ten hours of material into 45 minutes in the jail was

7   that if I signed a certain stipulation, that my felony status

8   won't be brought up at the trial.

9        Now I understand the U.S. Attorneys want to discuss it at

10  the trial.  So I don't agree to any stipulation.

11       **THE COURT:**  Look, the thing is, we'll just let the

12  whole form come in.  They're going to know that you were --

13  they are going to know you were in custody because of the

14  escape and the absconding charge.  They've got to know that.

15  There's no point in keeping from them that you were on pretrial

16  release.

17       Why do we need a stipulation?  I know I asked you about it

18  before.  I'll take most of the responsibility.  But on thinking

19  about it over the weekend, what's the point anymore?

20       **MR. BRUGNARA:**  And I agree to that.  That's fine.

21  Whatever you decide based on how the trial is proceeding, it's

22  your decision.  But I just want to make sure that that

23  stipulation that James had me sign -- because he can also tell

24  you I was chained.  I didn't have any glasses --

25       **THE COURT:**  Look.  Look.  I don't know if I buy any

1  of that.

2      But why do we even need the stipulation anymore

3  Ms. Harris?

4      **MS. HARRIS:**  Your Honor, the Court had asked the

5  Government to try and stipulate with Mr. Brugnara that the

6  financial affidavit that he submitted to Probation was a

7  document submitted under penalty of perjury to a Government

8  agency so that Mr. Brugnara's probation and felon status would

9  not come in.  And the Court said if we were not able to reach a

10  stipulation with Mr. Brugnara, that the felon status would come

11  in.

12      As I understand it, the defendant does not want to enter

13  into that stipulation, and the felon status will be admissible.

14      **THE COURT:**  But the jury is going to learn about

15  the -- that he was on supervised release at a minimum, right?

16      **MS. HARRIS:**  Correct, your Honor.

17      **THE COURT:**  All right.  So -- look.  He won't agree

18  to the stipulation.  But, in addition, almost all of that's

19  going to come into evidence as part of the res gestae of the

20  case.  So in proving up the -- does that document refer to the

21  felony status?  I've forgotten.

22      **MR. BRUGNARA:**  Your Honor, this is the thing.  Like I

23  said, Mr. Stevens handed to it me, and literally I was chained

24  like this, and I couldn't even go through the pages.  And my

25  understanding was if I signed this, then they would stipulate

1    to certain things, which they're not stipulating to.

2        So all I'm asking the Court to do, again, is not make any

3    ruling other than just to take that stipulation and rescind it,

4    because I don't agree to it.

5        **MS. HARRIS:**  No, your Honor.  The situation is this:

6    If we don't have the stipulation, we're going to call the

7    Probation Officer to --

8        (Mr. Kingsley enters the courtroom.)

9        **THE COURT:**  Just a moment.  Mr. Kingsley, you've got

10   to give those to the Marshal so they can check them first.  And

11   then, Mr. Kingsley, if the Marshals are okay with those shoes,

12   we're going to take a break so he can put those shoes on.

13       All right.  Finish your point.

14       **MS. HARRIS:**  Your Honor, the defendant entered into

15   the stipulation so that the Government would not need to call

16   the Probation Officer who was supervising him at the time he

17   signed the stipulation.  And we are now going to be permitted

18   to get into the background as to why that -- that financial

19   statement was submitted and the fact that the defendant was on

20   supervised release following a felony conviction.

21       It's my understanding that the defendant doesn't want to

22   stipulate to this.  And the Court's ruling is, then, the

23   Government gets into the background as to why the financial

24   statement was submitted.

25       If that's the situation, that's fine, but we need to have

1   an understanding as to what we can say in opening statement.

2          **THE COURT:**  All right.  May I see the document again?

3          **MR. BRUGNARA:**  Your Honor, that's not --

4          **THE COURT:**  Wait.  Wait.  Wait.  I want to see the

5   document.

6          **MR. KINGSLEY:**  The stipulation or the --

7          **THE COURT:**  Financial statement.

8          **MR. KINGSLEY:**  Do you want -- I have a copy of the

9   redacted one that I sent on to Mr. Stevens.

10          **THE COURT:**  I want to see the whole thing.

11          **MR. BRUGNARA:**  I just wanted to make a comment to

12   what she says.  That's not what your ruling was, your Honor, in

13   the limine rulings.  She's standing on --

14          **THE COURT:**  How did she misstate anything?

15          **MR. BRUGNARA:**  She misstated stating essentially that

16   she could get into the details of the felony conviction, if, in

17   fact, she has to call the probation officer, which is not, in

18   fact, what you ruled.

19          **THE COURT:**  Well, that's why I want to see the

20   document.  I want to see what's in the document.

21          **MR. BRUGNARA:**  Notwithstanding whatever you rule, I

22   don't agree to the stipulation.  It was not signed with full

23   understanding of what the message was as conveyed by

24   Mr. Stevens, who is not my attorney.

25     So if they wanted to convey to me a stipulation, it should

```
 1   have been conveyed to me either through a written
 2   correspondence, as I'm a pro se litigant, and not through
 3   someone who's not my attorney.  So it was not done properly
 4   anyway.
 5           MS. HARRIS:  Your Honor, we --
 6           THE COURT:  Wait.  Wait.
 7       Finish, Mr. Brugnara.
 8           MR. BRUGNARA:  And I don't agree to my understanding
 9   now of what -- I don't agree to the stipulation.  And if they
10   want to call probation, so be it, because I certainly have a
11   defense to this.
12           THE COURT:  All right.  Just hold that thought.
13       Please, let me see the document.
14           MR. KINGSLEY:  We don't have a copy of the full
15   document here.  Ms. Mallory went to go get it.  We thought we
16   had a signed stipulation, so we brought the redacted version.
17           MS. HARRIS:  Your Honor, the Government does not
18   intend -- Mr. Brugnara has misstated what the Government
19   intends to do.
20           THE COURT:  But the one point that -- is it necessary
21   to get into felony status in presenting that document to the
22   jury, as opposed to conviction status, and then leave for
23   further developments the word "felony"?  Do you understand what
24   I'm getting at?
25       There are many ways in which the word "felony" may become
```

1   completely admissible in this trial, but maybe this is not one

2   of them.

3         **MS. HARRIS:**  Well, the jury does need to understand

4   what "supervised release" is.  They don't necessarily need to

5   understand the nature of the conviction, only that he --

6   Mr. Brugnara had an obligation to the U.S. Probation Office,

7   and that obligation included satisfying a restitution award and

8   submitting regular financial statements to show whether he had

9   the present ability to do so.

10        **THE COURT:**  Well, all right.  But -- but for that

11  purpose, we can simply say there was a prior conviction and not

12  say that it was a felony yet.

13      Do you understand what I'm saying?

14        **MS. HARRIS:**  I do, your Honor, and that --

15        **THE COURT:**  So I think that that is the answer to

16  that problem.  And then there are many -- I want to make it

17  very clear:  In my judgment, it is very likely that the word

18  "felony" is going to be used in this trial because of the way

19  in which the defendant pitches the case to the jury.  But I

20  would feel better about it waiting until he opens that door,

21  and then the Government can put all the felonies in front of

22  the jury.

23      But for this one document, it's unnecessary, I think, to

24  do that unless the document, itself, refers to felonies.

25  That's why I want to see the thing.

```
1          You don't have it, so okay.
2              MR. BRUGNARA:  I have it, your Honor.
3              MS. HARRIS:  Your Honor, there's another issue --
4              THE COURT:  Wait a minute.
5          Mr. Brugnara, you have the whole document?
6              MR. BRUGNARA:  I do.
7              THE COURT:  All right.  Show it to the Government and
8     then let me see it.
9              MR. BRUGNARA:  And I have the -- I have the
10    stipulation that I don't -- that I don't agree to.
11             MS. HARRIS:  Your Honor --
12             THE COURT:  Just a minute.  Just a minute.
13         Mr. Brugnara, I want to say something:  You're going back
14    on your word.  In this courtroom, in most courtrooms, when
15    somebody gives their word, they're stuck with it.  They can't
16    come back later and say:  Well, my hands were tied.
17         Come on.  You know, you're -- I don't believe you for a
18    minute that you were coerced into something.  But maybe it's
19    not worth fighting over in this case.  And I just want you to
20    know, I'm not buying the argument that you got coerced into
21    something.
22         (Whereupon, document was tendered to the Court.)
23             MR. STEVENS:  I think that may be the redacted
24    version, your Honor.
25             THE COURT:  I'm handing it back.  I don't want the
```

1  redacted version.  I want the original version.

2       (Whereupon, document was returned to Mr. Brugnara.)

3       **MS. HARRIS:**  That is what I did want to raise with

4  the Court, your Honor.  We rely on a stipulation from my

5  adversary.  Mr. Brugnara is acting as an attorney right now,

6  and it is very unfair to the Government to have a stipulation

7  signed and then --

8       **THE COURT:**  Of course.  Of course, it is.

9       **MS. HARRIS:**  -- and then hear Mr. Brugnara say:  I

10 take it back.

11      **THE COURT:**  Mr. Brugnara's word has got to count for

12 something.  You can't give your word on day one and then say:

13 Oh, that was a joke, or:  Oh, that was a gift.

14      **MR. BRUGNARA:**  Your Honor, let me explain to you

15 keeping in the context of this.  Because regarding what she's

16 saying, a stipulation, I get a benefit in return.

17      I received what I understood as the benefit to be that

18 they weren't talking about the felon status as conveyed by

19 James Stevens.  Whether I misunderstood it or whether he didn't

20 say it properly, it was given to me, a one-page stipulation to

21 sign with my understanding that they wouldn't discuss any felon

22 status at all.

23      **THE COURT:**  I don't see anyone could have gotten the

24 idea that you would somehow -- by signing that one stipulation,

25 you would completely immunize the jury from the word "felony."

```
 1  There are so many ways that word is going to come up in this

 2  trial that all that stipulation was designed to do was to

 3  prevent it from coming up in the context of that one document.

 4          MR. BRUGNARA:  Okay.  Well, then, I completely

 5  misunderstood that to be the context, and I absolutely don't

 6  agree to the stipulation.

 7          THE COURT:  Look.  I'm going to let you out of it

 8  this time.

 9          MR. BRUGNARA:  All right.

10          THE COURT:  But you need to know, I don't believe you

11  for a second.  That's not -- your word has got to count for

12  something.

13          MR. BRUGNARA:  It does count, your Honor --

14          THE COURT:  No.  I can't count on you for anything.

15      All right.  But this time the Government is going to be --

16  you just put it in.  Put in the entire document.  Put in the

17  entire document.  If the entire document refers to "felony," it

18  comes in.  If it doesn't refer to "felony," then don't bring it

19  up until other doors are opened.

20          MS. HARRIS:  But we will be able to bring up the fact

21  that he sustained a conviction, that there was --

22          THE COURT:  Yes.  Yes.

23          MS. HARRIS:  Okay.  And we will call the Probation

24  Officer that we had already told did not need to show up.  We

25  will arrange for her to be here.
```

1          THE COURT:  All right.  So I need to -- I still want

2   the Marshals to get his shoes.  We've got substitute shoes for

3   now.

4       Where are those shoes right now?

5          MR. STEVENS:  Right here (indicating).

6          THE COURT:  All right.  We're going to take a short

7   break so Mr. Brugnara can put on the shoes.

8          MR. BRUGNARA:  Your Honor, I can do it in thirty

9   seconds so as not to disturb the Court.  I have no problems

10  doing it right now.

11         THE COURT:  Have a seat.  See if it works.  I want to

12  have the Marshals bring the shoes --

13         MR. BRUGNARA:  They fit.  I'm going to keep them.

14         THE COURT:  They're not a gift, Mr. Brugnara.

15         MR. BRUGNARA:  They're going to be a gift from

16  Mr. Kingsley.  An apology gift.

17         THE COURT:  That's a joke.

18         MR. BRUGNARA:  Thank you.

19         THE COURT:  Thank you for your cooperation,

20  Mr. Brugnara, and also Mr. Kingsley.

21         MR. BRUGNARA:  They're actually very comfortable.

22         THE COURT:  Those shoes will go into some kind of

23  Hall of Fame when this case is over.

24      All right.  Now, I have -- I want to go over with you the

25  jury selection.

```
 1        Oh, I want to say on the motion for reconsideration, I'm
 2   going to give you a couple of minutes.  It's a completely
 3   improper motion.  Not a new thing is put in there.  And it's
 4   just not -- it's not -- doesn't meet any of the criteria for a
 5   motion for reconsideration.  So --
 6              MR. BRUGNARA:  Okay.
 7              THE COURT:  -- most likely, I'm going to deny it, but
 8   I'm going to give you two minutes to say whatever you want to
 9   say on that, and then we're going to move on.
10        Go ahead.
11              MR. BRUGNARA:  Okay.  I'm only going to focus on one
12   item to make it simple on the reconsideration.  I'm going to
13   focus on the voice message to the Court.
14        And I got the benefit -- I received the benefit of case
15   precedent that should allow this into -- as an exception as the
16   hearsay rule under the following:  United States versus Zito
17   1972 basically states that:
18              "Out-of-court statement of witness introduced to
19         show witness state of mind, as long as the time falls
20         within the stated line exception to hearsay rule."
21        So essentially what they're saying is you can't do it
22   after, you can't do it after the period has lapsed where its
23   contrived and planned.  As long as it's essentially during the
24   moment, it's a state-of-mind statement.
25        The next is Prather versus Prather, P-R-A-T-H-E-R, 1981.
```

1    Again, it states that:

2            "Declarant's existing state of mind.

3        Declarant's state of mind must be a relevant issue in

4        the case.  State of mind is a relevant issue for the

5        jury to determine state of mind."

6        Next is *Brown versus Tard*, 1982.  Basically hearsay:

7            "Intentions for future plans which is directly

8        relative to my message are admissible under

9        state-of-mind exception under hearsay rule."

10       So that implies what my future plan would be and is

11   relevant under *Brown versus Tard*, T-A-R-D, 1982.

12       The next is *United States versus Mounts*, admission, and

13   this is 2014.

14           "Out-of-court statements, admission thereof is

15       not an abuse of discretion because the statements

16       fell within the hearsay exception for then existing

17       state of mind regarding physical condition," which is

18       relative to my case.

19       So, you know, I mean, there are several more.  But the

20   essence of these exceptions under 803 is that, and the way I

21   understood it, is that as long as the state-of-mind exception

22   is relating to the declarant's existing state of mind, even if

23   it relates to what his future actions are going to be, they

24   have to be allowed in under that hearsay exception.  And,

25   certainly, the message that I left was regarding what my

```
 1  intentions were and my existing state of mind and involved a
 2  physical condition that I was experiencing.
 3      And I'm going to be putting on evidence to my physical
 4  condition or, certainly, my state of mind of the physical
 5  condition.  And that message was left --
 6          THE COURT:  How are you going to put -- do that
 7  without testifying?
 8          MR. BRUGNARA:  I may testify, your Honor.
 9          THE COURT:  You said repeatedly that you weren't.
10          MR. BRUGNARA:  I -- I'm going to do it -- I'm going
11  to do it on -- as you said, you know, as the case proceeds,
12  whether or not I need to or not.  But the fact is, also, that
13  the -- the -- excuse me.
14      The FBI agent listened to the message and he can certainly
15  testify to the content of the message.  But, you know, the fact
16  of the matter is, all of these case precedents allow -- allowed
17  in as a hearsay exception, as long as it wasn't late in the
18  process of -- of the state of mind interpretation, and it
19  wasn't.
20      I mean, I have other also witnesses that are going to
21  corroborate this voicemail, specifically Stuart Gasner at John
22  Keker's office, and Jim Lassart of Pearson Murphy, because I
23  also left them messages, basically trying to get meetings
24  scheduled with them to come back in front of your Honor.
25          So, you know, I mean, it's all consistent with -- the plan
```

```
 1   wasn't to stay away from the Court.  The plan was to get
 2   counsel to come back in front of the Court and to proceed ahead
 3   with the trial.  Because I had already been given notice that
 4   Babcock was moving to get out.
 5        Okay.  So the fact is I made corroborating calls as well.
 6   The only calls --
 7             THE COURT:  Who were those lawyers again?
 8             MR. BRUGNARA:  Stuart Gasner, who is John Keker's
 9   senior partner, and Jim Lassart, who works with Tippy Mazzucco
10   at Pearson Murphy.
11             THE COURT:  And what will they supposedly say?
12             MR. BRUGNARA:  And they recall from this exact same
13   phone that I phoned from in, what they will say is that I left
14   a message saying that Luke wants to hire us immediately and
15   come to some sort of financial terms so they can proceed ahead
16   with the trial and get in front of you as soon as possible
17   and -- and move ahead to trial.
18             THE COURT:  I have no knowledge that anyone from
19   those offices ever contacted us.
20             MR. BRUGNARA:  Yet, your Honor, I filed a 17(c)
21   subpoena to subpoena their voicemail records and to subpoena
22   them to testify at trial that I left them those messages during
23   that same day that I phoned you.  And, also, there's other
24   subpoenas regarding my medical condition.
25        So, I mean, it's all going to --
```

```
 1          THE COURT:  I denied those subpoenas because there
 2   was no explanation.
 3          MR. BRUGNARA:  I understand.  They were done
 4   procedurally wrong.  And I apologize for that, your Honor.
 5          THE COURT:  You have to redo it in a way that lays
 6   out your explanation.  Maybe that would allow them to be served
 7   at that point.  But I didn't -- it was -- there was no
 8   explanation.  The Rule requires an explanation before the
 9   Government expends --
10          MR. BRUGNARA:  I understand.  Your Honor, I mean, the
11   problem that I'm having with this case also, and it's opening
12   my eyes to how the process works, is the United States
13   Attorneys are really -- they edit through who -- who they send
14   the FBI out to investigate, or if they edit who the FBI writes
15   the 302 reports on.
16       Because they get this phone -- you know, this phone that's
17   got, you know, 100 minutes of prepaid time and there is a call
18   to Judge Alsup, Stuart Gasner at Keker's office and Jim Lassart
19   and Tippy Mazzucco at Pearson Murphy, and they don't, you know,
20   notify the FBI to go out and talk to Gasner or -- or Mazzucco
21   and -- and -- and -- and Lassart, you know, because they don't
22   want that FBI agent to then have evidence that will harm their
23   case.
24       It's just really interesting, and it's imbalanced.
25          THE COURT:  These editorial comments don't help you
```

```
1    anyway.

2        Now, let me -- all right.  You made your point.

3        What does the Government say?

4        MS. HARRIS:  Your Honor, any time that the defendant

5    is going to seek to introduce a voice recording of him for the

6    truth of the matter, it's hearsay.  If he's trying to prove a

7    state of mind through these hearsay statements that -- false

8    exculpatory hearsay statements, that's the precise definition

9    of hearsay.

10       We can't cross-examine those statements.  He's seeking to

11   admit them for the truth of the matter.  And I'm glad that we

12   know that now he is trying to do an end run around the Court's

13   order regarding the voice message to Ms. Toland by trying to

14   get in voice messages to Mr. Gasner and Mr. Lassart.

15       The Court's ruling also applies to those.  Those are also

16   hearsay.  Any voicemail where the defendant is seeking to

17   introduce the content of the message, not the fact of the

18   message, but the content, is hearsay.  And we can't

19   cross-examine that false statement that he has made.

20       THE COURT:  Can I ask you this question?  In your

21   brief, Page 3, and I'll quote it.  You say that -- you quote

22   from some decision.  I guess it's Bailey, U.S. v Bailey.  You

23   say:

24           "In order to be entitled to an instruction on

25       duress or necessity as a defense to the crime
```

1         charged, an escapee must first offer evidence

2         justifying his continued absence from custody, as

3         well as his initial departure, and that an

4         indispensable element of such an offer is testimony

5         of a bona fide effort to surrender or return to

6         custody as soon as the claimed duress or necessity

7         has lost its coercive force."

8         So is there some way in which the voicemail message could

9    be construed as a bona fide effort to surrender or return to

10   custody?

11            **MS. HARRIS:**  No, your Honor.  That -- the voicemail

12   message is hearsay.

13       What would be construed as a bona fide effort to return to

14   custody is if he had self-surrendered.  He did not do that.

15       And I would ask the Court to at least wait until the proof

16   comes in on the escape, because what the Court is going to hear

17   is that when the car that his ex-girlfriend was driving with

18   him in it was stopped, when the Marshals stopped that car

19   alongside the road, he gave a false --

20            **MR. BRUGNARA:**  Your Honor, she --

21            **MS. HARRIS:**  -- name and he lied to the Marshals and

22   said he was on his way to the gym.  So we're going to prove

23   that he is not going to be entitled to that defense.

24       But with regard to the Court's question as to whether Mr.

25   Brugnara's self-serving hearsay can be used, it can't.  You

1  don't get to use hearsay to formulate a defense.  It's still

2  hearsay.  You have to testify and be subjected to

3  cross-examination so that the jury can evaluate the truth of

4  those statements.

5      He's seeking to get them in for the truth of the matter,

6  and --

7          **MR. BRUGNARA:**  That's not true, your Honor.  I'm --

8          **MS. HARRIS:**  -- they need to be subjected --

9          **THE COURT:**  Please, Mr. Brugnara.  I've got to...

10     Finish your point, please, Ms. Harris.  Finish your point.

11         **MS. HARRIS:**  I lost my train of thought because he

12 keeps interrupting.

13         **THE COURT:**  All right.

14         **MS. HARRIS:**  But he's seeking to get those statements

15 in for the truth of the matter; namely, that he was in dire

16 medical condition, et cetera, et cetera.  He needs to testify

17 so that the Government has the benefit of cross-examining him

18 and the jury has the benefit of being able to evaluate the

19 truthfulness of those statements.

20     It's just what like what the Court said.  Some defendant

21 can't, after a bank robbery, make some phone call and start

22 screaming at the top of their lungs:  I'm being abused.  I'm

23 being abused.  And say:  Your Honor, this is an excited

24 utterance.  It comes in for the truth of the matter.

25     That's not how the hearsay rule works.  He created false

1   exculpatory evidence that he is now seeking to get in back door

2   in violation of the hearsay rule.   And neither should be

3   messages -- the voicemail messages to Mr. Gasner or Mr. Lassart

4   be admissible.   It's the same thing.

5               **MR. BRUGNARA:**   Your Honor, I had no idea about *USA*

6   *versus Bailey*, obviously.   Please.   You know, I have had no

7   access to any case -- she -- she's implying that I had access

8   to a defense and that I contrived a defense; that I had

9   preconceived knowledge of *USA versus Bailey* and said:   Aha, I

10  know *USA versus Bailey*, blah, blah, blah.   This is my defense.

11  She -- she's nuts.

12      I mean, listen.   The fact is I made these calls absolutely

13  for state of mind at that moment, not for the truth of the

14  matter.   It's an exception under 803 for my state of mind.   I

15  just gave to you the case precedent that absolutely allows it

16  into evidence for a state-of-mind exception to the hearsay rule

17  under *Brown versus Tard*.   And that is -- and also, *Prather*

18  *versus Prather*.   And, you know, it's absolutely admissible with

19  the case precedent rulings, even for what the intended future

20  plan is to -- to the declarant.

21      And the fact of the matter is, that I made multiple

22  consistent calls that were very limited, that all had the same

23  directive to be back in front of your Honor to resolve this

24  matter because I -- as you know, I've always proclaimed my

25  innocence, as my medical distress had slowly mitigated to the

```
 1  point where I could come back.  And that's what I did.

 2       And the fact of the matter of is it's an exception to the

 3  hearsay rule because it was absolutely what the feeling and my

 4  sensations were at the moment that I left the message.  It's

 5  not for a statement of fact.

 6            THE COURT:  All right.  Here is the ruling.  The

 7  ruling stands.  To my mind it is hearsay.  It is -- the state

 8  of mind at the moment that you made the phone call is not yet

 9  relevant in the case.

10       Now, possibly as the case and the evidence unfolds I can

11  see some way in which that would be true.  In that case I will

12  allow it in.  But it is not -- we're not there yet, and I doubt

13  that we ever will be there, and I need to give you a direct

14  order not to make reference to this voicemail or to any other

15  voicemails prior to getting permission from the Court in the

16  presence of the jury.

17       So in other words, in the presence of the jury, this can't

18  be referenced until you get my okay to do so.  So that -- the

19  motion to reconsider is denied, period.

20       I need to turn to some things.  I want to make sure --

21            MR. BRUGNARA:  Can I -- can I make -- can I make one

22  other comment?  I want to --

23            THE COURT:  You can't make another comment, because

24  you're -- you know, this is -- we've already litigated this to

25  death and --
```

1          MR. BRUGNARA:  But it's important just for your

2   reconsideration down the road.  Like you said, based on what

3   happens at trial.

4          THE COURT:  Go ahead.  I'll give you one more minute.

5      Go ahead.

6          MR. BRUGNARA:  And it's this:  You cannot foreclose

7   under my due process rights my only defense to the indicted

8   charge.  And that's my Constitutional right --

9          THE COURT:  You made that point before.

10         MR. BRUGNARA:  No.  But Rules of Evidence are trumped

11  by my Constitutional right to present a defense.

12         THE COURT:  That's not true.

13         MR. BRUGNARA:  It is true.

14         THE COURT:  You have a right to present a defense

15  through the Rules of Evidence.  You don't have a right to

16  contort the Rules of Evidence and come up with your own Rules

17  of Evidence in order to contrive a defense.  That's just not

18  the way it works.

19         MR. BRUGNARA:  But it -- it's not a contrived defense

20  because I had no knowledge of the defense when the -- when the

21  statement was made.  It was made for state-of-mind

22  circumstance.  It wasn't based upon having legal research and

23  knowledge of:  Hey, this is a defense.  *USA versus Bailey*.  Let

24  me make this phone call.

25      No.  It was absolutely falls under the 803 hearsay

1  exception.  There are five case precedents that I just gave you

2  that affirms that.

3       **THE COURT:**  No.  Sometimes state of mind is in and of

4  itself relevant.  In this case it's not -- your state of mind

5  at the time of those voicemails has not yet been shown to be

6  relevant.  And that -- so you made your point.

7       **MR. BRUGNARA:**  Can I ask you a question then?  If

8  I -- if I -- if I testify on this specific voicemail, will that

9  open the door for them to open any question they want to me

10 about any subject matter, or could we have limited testimony

11 specifically -- specifically for me to my state of mind to

12 admit this evidence?

13      **THE COURT:**  Well, first of all, I won't allow you to

14 testify to the voicemail.  That's ruled out.  Even if you do

15 testify, you cannot get into it.  You could -- you can try to

16 explain that -- if it's true, that you escaped in order to go

17 see a doctor and get medical attention.  That much I will allow

18 you to say.  But you cannot -- you cannot use that hearsay

19 statement as a -- like somehow it cures everything.  No, that's

20 inadmissible.  You can't refer to inadmissible testimony.

21      Now, in some way the trial develops in a way that I don't

22 foresee that allows that voicemail to become relevant and to

23 your state of mind at the moment you left it to be relevant,

24 okay.  Then it will be fair to let it in.  But so far we're not

25 there.

1          MR. BRUGNARA:  What about the FBI agent's testimony?

2          THE COURT:  I don't know how that -- let me -- I have

3   to --

4          MR. BRUGNARA:  Because he listened to the voicemail.

5          THE COURT:  No.

6          MR. BRUGNARA:  He listened to the voice message,

7   so --

8          THE COURT:  Well, I think people review hearsay all

9   the time in getting ready for trial.

10         MR. BRUGNARA:  For the truth of the matter --

11         THE COURT:  That doesn't matter.

12         MR. BRUGNARA:  -- of him hearing of the voicemail,

13  it -- it would be relevant to my defense.

14         THE COURT:  No.  That is not the way the Rules of

15  Evidence work.  The lawyers, agents, they review all kinds of

16  hearsay getting ready for trial, but that doesn't mean that

17  everything they review somehow gets to be cross-examined about

18  at -- at the time of the trial.

19      All right.  I made my ruling.

20      I want to now -- Mr. Brugnara, we're going to trial in

21  front of the jury.  Many of the things we talked about in the

22  presence just of the Court and the counsel, but no jury being

23  present, we have had to hash out.  But there are some things

24  that I've ruled that are off limits and you should not be

25  making any reference to them in the presence of the jury

1   through testimony or through argument or through statements,

2   objections.  That cannot be -- we have to protect the jury and

3   the integrity of the process by keeping -- you can't do it.

4       Lawyers are never -- and you being your own lawyer, you're

5   not ever to violate one of these rules.  If I made a mistake,

6   then it will get fixed an appeal.  But if I haven't made a

7   mistake, I mean, no matter what, at the District Court level

8   you've got to abide by these rules.

9       So I am going to -- there are five things for sure that I

10  want to -- to reference here and order you directly not to make

11  reference to it in the presence of any venire, any potential

12  member of the jury, any -- any -- in the presence of the jury

13  once selected, at any time during the jury voir dire process,

14  during the trial, et cetera.

15      The first is the voicemail to Dawn, or for that matter, to

16  any of those lawyers that you just mentioned.  Until you get

17  permission of the court, which you don't yet have, that is off

18  limits and should not be mentioned.

19      Next.  I'm sorry, I've got the wrong list.

20      No mention of potential punishment.

21      Next.  No mention of what we call extrinsic evidence, but

22  I'll be more specific.  No specific bad acts by Maibaum or Rose

23  Long can come in.  The only possible exception to that is this.

24  You may ask both Maibaum and Rose Long about their dealings

25  with each other on the very items in question.  I said that you

1   could do that.  So you could ask Ms. Long about her dealings

2   with Maibaum on the specific art items in question that she

3   then tried to sell to you.  I'm going to let you go that far.

4        But what you can't do is get into Maibaum tried to defraud

5   somebody else in New York State and there was a lawsuit about

6   that.  Or Rose Long did the same thing maybe.  I don't know.

7   Or Rose Long got arrested and her arrest or alleged drug -- you

8   cannot get into her alleged arrest, drug use, medication she

9   takes, or any mental illnesses that she may have, or internet

10  posts about her.

11       And the same thing for Maibaum --

12           **MR. BRUGNARA:**  Can I ask a question on that?

13           **THE COURT:**  Wait.  No.  I'm not finished.

14       And -- and, now, in -- in the dealings between Maibaum and

15  Rose Long, they have a lawsuit going between the two of them.

16  And her lawyer has made accusations against Maibaum, dealing

17  with the very transaction between those two that led to the

18  transaction with you.  And since I have let the Government

19  treat your lawyer as stating on your behalf, I'm going to let

20  you treat her lawyer as making statements on her behalf, even

21  though she didn't sign those allegations in the complaint.  I

22  think that's -- that's a fair -- fair thing to do.

23       But it's about the pieces of art that -- only about the

24  specific pieces of art that went from Maibaum to her and then

25  to you.

```
 1            MR. BRUGNARA:  Understood.

 2            THE COURT:  That is what you may inquire about.

 3  But other bad acts by Maibaum and Rose Long are off limits, and

 4  you should not bring them up in the presence of the jury or

 5  during jury voir dire.

 6        Wait a minute.  I've got one more.

 7        Any time that -- you -- should never mention anything in

 8  the presence of the jury that -- for which there is not going

 9  to be a witness to back it up, or a document that is going to

10  be able to get into evidence to back it up.  It has -- there

11  has to be -- you have to have a good faith basis to lay

12  something before the jury.

13        So those are the things that I'm bringing up.

14        All right.  You wanted to ask a question.  Now you may ask

15  the question.

16            MR. BRUGNARA:  There was just one question, only one

17  question.  I understand all your rules, and I'm going to follow

18  them to the "T."

19        And it goes to the motion that I filed requesting --

20  hopefully James Stevens filed it, regarding requesting allowing

21  into evidence new information that was just received a couple

22  of days ago from the private investigator about Rose Long's not

23  arrest, but rather conviction.  The conviction --

24            THE COURT:  Was that a felony conviction?

25            MR. BRUGNARA:  I don't know.  It's a drunk driving,
```

1    so it's --

2            **THE COURT:**  Well, it's reckless driving, not drunk

3    driving.  It was reckless driving.

4            **MR. BRUGNARA:**  Okay.  I don't have --

5            **THE COURT:**  Is reckless driving a felony or not?

6    Does the Government know the answer?

7            **MS. HARRIS:**  The answer is it is not a felony

8    conviction, your Honor.  In fact, if you look at the -- the

9    clear printout, which Mr. Brugnara attached to his motion which

10   was provided by the Government, not the private investigator,

11   to Mr. Brugnara, show,s the reckless driving conviction, and

12   the maximum sentence being eight months.  So since it is not

13   punishable by more than a year, it was a misdemeanor.

14      I would also point out it was not a conviction for DUI,

15   and it is false and misleading for Mr. Brugnara to have filed a

16   motion saying that Ms. Long was convicted of DUI.  She was not.

17           **THE COURT:**  I -- I read the material --

18           **MR. BRUGNARA:**  It says -- it says here the initial

19   criminal offense, DUI.  So I'm not misstating to this Court the

20   fact that she was arrested for --

21           **THE COURT:**  She was arrested for DUI, potential DUI,

22   but not convicted of that.

23           **MR. BRUGNARA:**  Well, obviously, I mean, whatever --

24   however they settled it, she has an alcohol -- we're getting

25   the actual record of the case, as we speak, through the private

```
 1   investigator.  But she was arrested with an illegal alcohol
 2   level.  And it's relative to this case, the probative value,
 3   because as you know, I stated I was surprised by her utterance
 4   of the gift comment, and I said that she smelled of alcohol and
 5   probably had drugs also because she was acting real loopy.  And
 6   that's always been my consistent statement.
 7       So it's absolutely relative to this cause because this
 8   shows, you know, here is a woman being arrested multiple times
 9   as a -- she has been arrested four times, man, since she has
10   become a senior citizen.  I don't know anybody who has arrested
11   once as a senior citizen, let alone four times.  And so she has
12   a problem that is probative to this case because of the
13   statements she made about the gift.
14       And you can say:  Hey, Brugnara is nuts, man.  He said
15   it's a gift.  But it doesn't matter.  My actions showed that I
16   didn't believe that, and we worked on getting the stuff back.
17   But it doesn't excuse her from what came out of her mouth and
18   the fact that she has been arrested for all these drug and
19   alcohol-related crimes.
20       You know, one is still pending indictment.  You know,
21   she's got one year under the statute of limitations on this
22   assault on the peace officer and filling a false narcotics
23   prescriptions, which is a felony.  And now we have a DUI.  And,
24   quite frankly, the Court should be upset about this.
25       I mean, here is somebody -- your granddaughter or your
```

```
 1   children get killed by this woman because she's drunk or on
 2   drugs, that's on this Court then.  Because we're trying to
 3   bring to light here this woman has got a problem with alcohol
 4   and drugs.  You know, she leaves purportedly expensive art in a
 5   cluttered garage.  Then she comes and says:  Hey, this is a
 6   gift.  Then she says:  I didn't say that.
 7       Listen, there are a lot of reasons why it should come into
 8   evidence for probative value.  Mainly, my civil liberty is at
 9   stake.
10       MS. HARRIS:  Your Honor, this is not proper
11   impeachment evidence.  It's an arrest, not a conviction.  It's
12   a misdemeanor, not a felony.  And it does not go to her
13   character for truthfulness.  It's just an attempt to besmirch
14   the witness, and that is not permitted under the federal Rules
15   of Evidence.
16       THE COURT:  All right.  Under Rule -- right now I'm
17   limiting myself to Rule 609.
18       Here is the ruling.  To be admissible under 609 to impeach
19   a witness it has to either be a felony, and this does not
20   qualify as a felony, or it could be one that if -- if it proves
21   a dishonest act or a false statement.  Reckless driving is not
22   a dishonest act or false statement.
23       MR. BRUGNARA:  Your Honor, I am reading 609.2.  It
24   says.
25           "Any crime -- any crime -- regardless of the
```

1    punishment, the evidence must be admitted if the

2    Court can readily determine that establishing the

3    elements of the crime of a dishonest act."

4     **THE COURT:**  You left out the word "if."

5     "It must be admitted "if" the Court can readily

6    determine that establishing the elements of the crime

7    requiring proving or the witness admitting a

8    dishonest act or false statement."

9     **MR. BRUGNARA:**  And if you remember that, the ruling,

10 your Honor, on -- on the current pending charge is that an

11 assault on a peace officer rises to a crime of moral turpitude

12 and is considered an act of dishonesty, which is -- surprised

13 me.  Because the mere fact that you assault a peace officer

14 becomes a dishonest act under the -- under the jurisdiction of

15 the rule.

16   So what I'm saying is:  Listen, looking at it in totality,

17 if you just had one isolated incident at Walgreen's, you can

18 say:  Hey, listen.  Okay, man.  This is just one isolated

19 incident.

20   But when you put it into totality with multiple arrests,

21 DUIs, and it ties directly in to our case-in-chief, that:  Hey,

22 listen, this woman was drunk and/or on drugs.  I think it would

23 be unfair to foreclose that to the jury to make their own

24 informed determination based upon the facts.

25    **THE COURT:**  All right.  Mr. Brugnara, you interrupted

1   me.  I was making a ruling.

2            MR. BRUGNARA:  I'm sorry.

3            THE COURT:  You don't get to reargue it while I'm --

4   so just, please, stop.

5        And, once again, I want to cite this as an example for the

6   Court of Appeals that while I'm in mid-sentence, the defendant

7   interjects, argues with me, makes me lose my train of thought.

8   And I hope the Court of Appeals will be forgiving to me that my

9   answers on the record are not always as clear cut as they

10  should be because of his constant interruptions.

11           MR. BRUGNARA:  I apologize, your Honor.  I -- that's

12  not my intention.

13           THE COURT:  He's done it again.

14           MR. BRUGNARA:  I just want to get that apology in.

15           THE COURT:  All right.  Now, please be quiet.  I'm

16  going to try to start over.

17       Now, the -- what was the crime that we're dealing with?

18           MS. HARRIS:  Reckless driving, your Honor.

19           THE COURT:  Reckless driving.

20       Reckless driving does not rise to the level of dishonest

21  act or false statement, so it doesn't come in under Part 2, and

22  it doesn't come in under Part 1, because it's not a felony.  So

23  it's just inadmissible under 609.

24       Now, to jump forward to the assault on the police officer

25  alleged, that was a mere arrest.  It never got reduced to a

```
 1   conviction.

 2        Am I correct about that?

 3             MS. HARRIS:  That is correct, your Honor.

 4             THE COURT:  Right.  So that doesn't come in, period.

 5   Neither of those comes in.  And I'm ordering you to make no

 6   reference to that in the presence of the jury.

 7        Now, it is conceivable that in some way during her

 8   testimony or otherwise the Government will present the case in

 9   such a way as to open that door.

10        Ms. Harris.

11             MS. HARRIS:  What, your Honor?

12             THE COURT:  I'm saying to you that merely because

13   it's not admissible under 609, does not foreclose all other

14   possibilities that could come up remotely if you open the door.

15   And I don't know how you could do that, but I'll give you a

16   clearcut example.  This is never going to happen, but it's for

17   your own edification.

18        You may say on your direct examination of Ms. Long:

19   Ms. Long, have you ever been convicted of a crime?

20        And she says, No.

21        Of course, at that point, since you opened the door and

22   laid false testimony before the jury in my hypothetical, I

23   would, myself, probably ask the question.  And, certainly,

24   Mr. Brugnara, the door would be opened then.  But you're never

25   going to do such a thing.
```

1    So all I'm trying to say is, there are ways in which you

2  could try the case that conceivably could open the door.  And

3  if that happens, then we would allow it in.  But the defendant

4  would need my permission first, because I don't think that's

5  going to happen and I'm ruling that off limits.

6         **MR. BRUGNARA:**  I have a question, your Honor, if I

7  can ask it.

8         **THE COURT:**  You don't get to ask questions.  You just

9  want to reargue.

10        **MR. BRUGNARA:**  No, it's not arguing.  It's a question

11 of what I can ask so we don't have any disruption in the court.

12        **THE COURT:**  What is it?

13        **MR. BRUGNARA:**  My question, and it goes back to your

14 in limine ruling, because there are other ways to shoehorn

15 this in.  And I like that word "shoehorn" that I learned from

16 Mr. Kingsley, new word.

17    You said that people can opine as to their character.  So

18 if we have somebody that knows them and knows her to be a drunk

19 on a social or business, professional level, they can certainly

20 opine to that as that is their opinion subjectively of who this

21 woman is.

22        **THE COURT:**  Who would that witness be?

23        **MR. BRUGNARA:**  I have a lot of witnesses that know

24 this woman.

25        **THE COURT:**  Give me one example.

1      **MR. BRUGNARA:**  Joan Michaelman from New York, who I

2  bought a lot of art from, knows her.

3      **THE COURT:**  I would want to see -- how do we know she

4  will say that?

5      **MR. BRUGNARA:**  How do I know she'll say that?

6  Because I -- she warned me about her twelve years ago, let's

7  just put it that way, and I, unfortunately, didn't heed her

8  advice.

9      **MS. HARRIS:**  Your Honor, that would not be

10  admissible, even if he were to bring a witness out to say it.

11  He may attack a witness's character for truthfulness or

12  untruthfulness.  He may not have ad hominem attacks about other

13  aspects of a person.

14      **THE COURT:**  Well, possibly that's right.  But I have

15  already said to the defendant that his -- he may inquire and

16  try to show that Ms. Long was drunk on the morning in question.

17  That's what he said at the Form 12.  He said he smelled alcohol

18  on her breath.  I can see ways that that's relevant, and I'm

19  going to let him go down that path.

20      But that's not the same.  Somebody could be a complete

21  tee-totaler, and on a particular day they might have gotten

22  drunk.  And so they don't have a reputation for being a drunk,

23  but they got drunk on that day.

24      **MS. HARRIS:**  That's correct.  And if Ms. Long says

25  "no" in response to whether she had any alcoholic beverages

1  that morning, he's stuck with that answer and he doesn't get to

2  say:  Isn't it true that eight years ago you were arrested?

3          THE COURT:  Well, he can't -- yes, that --

4          MR. BRUGNARA:  It wasn't eight years ago.  It was

5  five years ago.

6          THE COURT:  Whatever it was, you can't get into it.

7  You can't -- you can't go into those past events.

8      But he's not exactly stuck with it.  He can say:  Well,

9  did you have a drink that morning?  Did you -- when is the last

10  time you had a drink before you came out?

11      He can ask her some follow-up questions that relate

12  directly to what happened that morning, because that's

13  cross-examination, and he's entitled to try to show that she

14  was inebriated on the morning in question.

15          MS. HARRIS:  That's correct.

16          THE COURT:  All right.

17          MR. BRUGNARA:  I have one more question --

18          THE COURT:  Yes?

19          MR. BRUGNARA:  -- along these same lines.  I just

20  need direction here, because I don't want to upset your Honor.

21      Mr. Bornstein had it in his subpoena request that you

22  granted that she has to disclose the prescription medication

23  that she takes.  And it's relevant, because we're talking about

24  legal prescription and its cited side effects which would then,

25  perhaps, warrant having us bring in a pharmacist or a physician

43

```
1    to say, you know:  Well, she takes prescription medicine X.

2    And prescription medicine X, if you take it on an empty

3    stomach -- she's already cited she hasn't eaten that morning --

4    if you take it on an empty stomach, it could cause, perhaps, a

5    deviant cognitive thinking process.

6        And this is going to get us into the next motion, because

7    we need to get this motion to compel moving, because we don't

8    have anything under the 17(c).  But I want to make sure that

9    once we get that discovery, that I'm certainly entitled to ask

10   those questions regarding the actual medication that she is

11   taking and have our relevant experts testify as to what the

12   possible side effects are of those.

13           MS. HARRIS:  I think the Court already ruled that he

14   is not permitted to get into that.

15           THE COURT:  I have ruled on that.  This is just a

16   fishing expedition.

17       There's absolutely no proof that on the day in question

18   she was in an incompetent state on account of her -- on account

19   of any drug use.  And the only evidence to back up alcohol is

20   the defendant's testimony, but I will credit that for purposes

21   of at least allowing him to ask about alcohol.

22       All right.  So the 17(c) motion is denied for the same

23   reason.

24       All right.  It's time now to start selecting our jury.

25           MR. BRUGNARA:  And, your Honor, we had the other
```

```
 1  motion in front of you about the motion to compel.  You put out
 2  an order when we were in front of you last time to DWT, to
 3  produce the discovery, specifically the bank records for the
 4  art in question in this case that you ordered, and then you
 5  admonished them and told them you better get that discovery
 6  now.
 7            THE COURT:  By the time he testifies, those documents
 8  will be produced.
 9            MR. BRUGNARA:  Your Honor, the bank records still
10  aren't here, nor has Rose Long --
11            THE COURT:  You wanted this trial.  You wanted this
12  trial on April 27.
13            MR. BRUGNARA:  I wanted it last July.
14            THE COURT:  Yes.  Well, the point is, I told you
15  whenever you wanted to represent yourself and go to trial on
16  April 27, it was going to be a tight squeeze trying to get in,
17  and many things would not get done.  I will deal -- we're going
18  to go ahead with the trial, unless you make a motion for a
19  continuance.
20            MR. BRUGNARA:  No.
21            THE COURT:  And you haven't done that.
22            MR. BRUGNARA:  No.  I want to move ahead, but I just
23  want you to force them to compel simple -- we've winnowed down
24  that Bornstein 17(c) to one simple request, man.  Just give us
25  your banking records to prove that you paid this.
```

1         THE COURT:  No, no.

2         MR. BRUGNARA:  One or two documents.  And they

3  received --

4         THE COURT:  I denied all that.  I denied that and I

5  told the man who was here before that there was one segment of

6  material he had to produce that he hadn't yet produced.

7         MR. BRUGNARA:  That's right.

8         THE COURT:  It was not banking records.

9         MR. BRUGNARA:  No, it was banking, your Honor.  It

10  was banking proof to prove that they paid what they claim they

11  paid for the art in question.

12         THE COURT:  I don't remember this.  What did I rule,

13  Ms. Harris?

14         MS. HARRIS:  That is not what you ruled, your Honor.

15  We can get the transcript.  We ordered the transcript.  But

16  this is part of the problem.

17      Mr. Brugnara does not get infinite bites at the apple here

18  in an attempt to confuse the record, misrepresent the Court's

19  prior rulings.  If he wants to bring a motion for

20  reconsideration, he needs the Court's permission to do so.

21         MR. BRUGNARA:  He's already ruled on this to the

22  gentleman from DWT.  He ordered him to compel the banking

23  records for the art in question in this case.  And Maibaum

24  can't, because it's all falsified.

25         THE COURT:  Look, I don't remember that.  My memory

1    of it is that I said that you were entitled to get the records

2    that went between Ms. Long and Maibaum on the very items in

3    question.  That's what I wanted to make sure you had.

4         Is that what I said or not?

5              **MS. HARRIS:**  That is what you ordered, your Honor.

6              **MR. BRUGNARA:**  Your Honor, Mr. Stevens just told me

7    he received an email an hour ago that they're going to send an

8    email that they've produced everything in direct violation of

9    this Court's order a couple of days ago to the gentleman that

10   stood in front of you when you ordered him.  So they're

11   refusing to comply with the order and --

12             **THE COURT:**  If they're saying in an email that they

13   complied, maybe they have.  I didn't say at the hearing that

14   they had not yet complied --

15             **MR. BRUGNARA:**  Right --

16             **THE COURT:**  Please.  I said at the hearing that the

17   lawyer said:  My understanding from talking to my client is...

18   And I interrupted hmm and said:  No, you -- when the lawyer

19   says that, it's 50/50 likely to be true.  And I ordered him to

20   go back and check.

21        Now, if he's gone back and checked and he says we did, in

22   fact, produce all of that, then God bless them.  They complied

23   with what I ordered them to do and I quashed everything else.

24   I did not say you get banking records.

25        Now, I say to the Government, I do think that there could

```
1   be potential importance in what I -- can you make sure that
2   Maibaum has produced that material, Mr. Kingsley?
3           MR. KINGSLEY:  I will be talking to him.  I'll ask
4   him if he has.  I mean, I think that that's -- he has attorneys
5   on that issue, and I don't want to be interfering with his
6   attorney privilege --
7           THE COURT:  I understand you don't want to do that.
8   But you tell him that I may hold a -- I'm not saying I will.
9   I'm saying maybe -- I may hold an evidentiary hearing out of
10  the presence of the jury.  And if Maibaum hasn't turned over, I
11  may just strike his testimony.  So it's to your advantage to
12  make sure he's complied with that subpoena.
13          MR. KINGSLEY:  And just to be clear, we're talking
14  about evidence regarding the George Luks painting that was --
15          THE COURT:  I think it was -- what I said, go back
16  and look.  It was everything that dealt between Rose Long and
17  Maibaum.  Those communications on the subject of the items that
18  are of art that came from Maibaum and went to Rose Long and
19  then went out to Mr. Brugnara.
20          MR. BRUGNARA:  You said proof of payment, your Honor.
21          THE COURT:  I don't think I -- I don't remember what
22  I said.
23          MR. BRUGNARA:  Your Honor, they've provided
24  everything except the proof of payment.  We don't need anything
25  else but the proof of payment.  That's all we need.
```

1    **THE COURT:**  Give me the transcript where I said that.

2  Give it to me right now --

3    **MR. BRUGNARA:**  From jail?  Let me out, please.  I'll

4  get it for you.

5    **THE COURT:**  All right.

6    **MR. BRUGNARA:**  I'm competent.

7    **THE COURT:**  Will the lawyers please get me that

8  transcript.

9    **MR. KINGSLEY:**  Yes, your Honor.

10    **THE COURT:**  I'm not going to make any further

11  rulings.  The motion is denied without prejudice to showing me

12  that I -- I've given you the ruling from my memory.  If it

13  turns out my memory is wrong and I said proof of payment in

14  there, then I stand corrected.  But I don't think I stand

15  corrected.

16    **MR. BRUGNARA:**  Can I ask you this, your Honor.  Here

17  is a man -- and I'm sure you read *Maibaum versus Long*.  I hope

18  you did.  It's not very long --

19    **THE COURT:**  I read enough of that lawsuit to see that

20  most of it is not going to be relevant.

21    **MR. BRUGNARA:**  On --

22    **THE COURT:**  There are some things in there that I

23  think are relevant.

24    **MR. BRUGNARA:**  Well, your Honor, the part that's

25  relevant where they say the documents are false that were

```
 1   advanced to me, and the value is not there, and that they
 2   didn't buy them for certain amounts, that's all relevant.
 3       So when we ask for a proof of payment and we don't get a
 4   banking receipt, it's just consistent with our position.  You
 5   know, it's all false information.  Of course, they can't
 6   produce a bank receipt because it's all falsified documents.
 7           THE COURT:  All right.  Is the George Luks the one
 8   that even Ms. Long now says is possibly forged or something?
 9   Something phony about it?
10           MS. HARRIS:  That's the one that's at issue in the
11   lawsuit, but that is not what she's going to say.
12           THE COURT:  Well, just a second.
13       In her lawsuit she says something about a George Luks
14   being in a counterclaim.  Says that it's not authentic or not
15   worth something, not worth what Maibaum says it was.
16           MS. HARRIS:  Right.  There was an issue about whether
17   it was actually a Gertrude Whitney, and it turns out of it was
18   a Gertrude Whitney --
19           MR. BRUGNARA:  Your Honor, how does she know what the
20   witness is going to testify to unless she's tampering with the
21   witness?  How does she know what Rose Long is going to testify
22   to?  She's --
23           THE COURT:  Mr. Brugnara, stop.
24           MR. BRUGNARA:  It's incredulous.
25           THE COURT:  Just a minute.  Here's what I'm going to
```

1  allow:  Whenever that witness is on the stand, Ms. Long, her

2  lawyer has made certain statements in that lawsuit that

3  denigrate Mr. Maibaum and the art in question.  I read it

4  myself.

5      She didn't say it directly, but her lawyer did.  And I'm

6  going to let Mr. Brugnara ask about that.  If she's got an

7  explanation, good for her.  But she's going to get asked about

8  it, Ms. Harris.  That's only fair.  I can't stop the defendant

9  from asking about that.

10          **MS. HARRIS:**  That's fine.

11          **THE COURT:**  So you're going to get -- you can use

12  relevant parts of that lawsuit as a playbook for your cross

13  examination of Ms. Long.

14          **MR. BRUGNARA:**  Yep.

15          **THE COURT:**  So, all right.

16          **MS. HARRIS:**  I understand that, your Honor.

17      Can we take a quick convenience break before we bring in

18  the venire?

19          **THE COURT:**  Yes.  It's time to get started with jury

20  selection.  We're going to bring the venire in.

21      Anything that we haven't covered yet by way of evidence,

22  we'll have to deal with later?

23      Mr. Brugnara, we're going to deal with any other evidence

24  points later.  It's time to get -- we've got to -- we've got 70

25  people waiting to come in.

1      All you members of the public, I'm going to ask you to sit

2   on my right-hand side so that the jury venire can be over

3   there.  And under no circumstances should any member of the

4   public have any communications with the venire.  And that goes

5   for counsel and Mr. Brugnara as well.

6           **MR. STEVENS:**  It's my understanding, your Honor, that

7   Mr. Brugnara will be able to stay out here and discuss with me

8   during this break.

9           **THE COURT:**  I think he should.  Why not?

10      Is that all right with the Marshals?

11          **THE MARSHAL:**  Yes.

12          **THE COURT:**  All right.  We'll take a 15-minute break.

13  And Dawn can ask them to bring -- have the venire ready to come

14  in the door.  All right?  I would like to be here.

15          **THE CLERK:**  Yeah.  I want to make sure Mr. Brugnara

16  doesn't need to use the restroom for anything.

17          **THE COURT:**  Mr. Brugnara, do you need to use the

18  restroom?

19          **MR. BRUGNARA:**  I want to talk to Mister -- James for

20  five minutes first.

21          **THE COURT:**  And then go to the restroom?

22          **MR. BRUGNARA:**  Yes.

23          **THE COURT:**  And then we won't bring the jury in until

24  you're back.

25          **MR. BRUGNARA:**  Okay.

```
 1          THE CLERK:  Got it.  All right.

 2      (Whereupon there was a recess in the proceedings

 3       from 8:40 a.m. until 8:53 a.m.)

 4          THE COURT:  Are we ready to go?  The defendant is

 5  here.

 6      (Venire enter the courtroom.)

 7      (Proceedings held at sidebar.)

 8          THE COURT:  Okay.  We're at sidebar.  The venire is

 9  present, but we're at the sidebar.  What's the problem?

10          MR. BRUGNARA:  No problem.  I just wanted to make

11  sure, I don't want any of the jurors to know that I have been

12  offered appointed counsel or any indigent references or

13  anything like that.  Obviously, you see "pro se" or whatever

14  you want to say, but I don't want any references to financial

15  condition or anything like that.

16          MS. HARRIS:  That's going to come into evidence

17  because Mr. Babcock is going to be testifying.

18          THE COURT:  Mister who?

19          MS. HARRIS:  Mr. Babcock is going to be testifying.

20  So there shouldn't be any adverse inference, but I'm not sure

21  what the problem is.  The Court is going to explain he's

22  representing himself.

23          MR. BRUGNARA:  And I don't want to say I was offered

24  a lawyer.  You can say I'm pro se, defense, and I just wanted

25  to leave it at that.  If you don't want to say I'm pro se, you
```

1   don't have to say I'm pro se.  But I don't want any inferences

2   that I need the Court to give me counsel, because I've always

3   said all along I don't.

4           **THE COURT:**  I wish you had brought this up sooner.

5   We have a room full of people waiting for jury selection.  I'm

6   going to -- I have your request in mind.  I'm not going to rule

7   on it.  As I go forward I'll see if it's necessary, and when it

8   becomes necessary to make the statement that you don't want to

9   be made.  Thank you.

10      Please have a seat.

11      (Proceedings held in open court.)

12                        **JURY VOIR DIRE**

13          **THE CLERK:**  To the prospective jurors, I like to take

14  role when you first come just to make sure everybody made it

15  down here from the jury office.  So I am going to just ask you

16  to please let me know you're present when you hear your name

17  called.

18      Okay.  Okay.  James, I think it's Brian Ropers or Ropers

19  Brian?

20          **PROSPECTIVE JUROR ROPER:**  Here.

21          **THE CLERK:**  Is that some Ropers instead of Brian or

22  -- I have some kind of penned-in change.

23          **PROSPECTIVE JUROR ROPER:**  Last name is Roper, first

24  name is Brian.

25          **THE CLERK:**  First name is Brian.  Got it.  Okay.

1      Okay.  David Arkin?

2              **PROSPECTIVE JUROR ARKIN:**  Here.

3              **THE CLERK:**  Okay.  Becca Barnett.

4              **PROSPECTIVE JUROR BARNETT:**  Here.

5              **THE CLERK:**  Angela Bass.

6              **PROSPECTIVE JUROR BASS:**  Yes.

7              **THE CLERK:**  Gabriel Baum.

8              **PROSPECTIVE JUROR BAUM:**  Present.

9              **THE CLERK:**  Amy Beaton or Beaton.  Ms. Beaton or

10     Beaton, B-E-A-T-O-N.

11             **PROSPECTIVE JUROR BEATON:**  Present.

12             **THE CLERK:**  Thank you.

13     Terrence Vezdek.

14             **PROSPECTIVE JUROR BEZDEK:**  Here.

15             **THE CLERK:**  John Bonetti?

16             **PROSPECTIVE JUROR BONETTI:**  Here.

17             **THE CLERK:**  April Bowles-Cuddihy?

18             **PROSPECTIVE JUROR BOWLES-CUDDIHY:**  Here.

19             **THE CLERK:**  Thank you.

20     Jason Bray.

21             **PROSPECTIVE JUROR BRAY:**  Here.

22             **THE CLERK:**  Peter Bretan?

23             **PROSPECTIVE JUROR BRETAN:**  Here.

24             **THE CLERK:**  Debra Bruce?

25             **PROSPECTIVE JUROR BRUCE:**  Here.

```
1            THE CLERK:  William Burke?

2            PROSPECTIVE JUROR BURKE:  Here.

3            THE CLERK:  Okay.  Thank you.

4       Robert Calabro?

5            PROSPECTIVE JUROR CALABRO:  Here.

6            THE CLERK:  Melissa Caldwell?

7            PROSPECTIVE JUROR CALDWELL:  Present.

8            THE CLERK:  Matthew Chan?

9            PROSPECTIVE JUROR CHAN:  Here.

10           THE CLERK:  Paul Christopulos?

11           PROSPECTIVE JUROR CHRISTOPULOS:   Christopulos.

12           THE CLERK:  Okay.  Thank you.

13       Karina Corbett?

14           PROSPECTIVE JUROR CORBETT:  Here.

15           THE CLERK:  Kaitlyn Crocker?

16           PROSPECTIVE JUROR CROCKER:  Here.

17           THE CLERK:  Cindy Demorest?

18           PROSPECTIVE JUROR DEMOREST:  Demorest.  Here.

19           THE CLERK:  Demorest.  Okay.

20       Valerie Durkee?

21           PROSPECTIVE JUROR DURKEE:  Here.

22           THE CLERK:  Rekhia Dutta.

23           PROSPECTIVE JUROR DUTTA:  Here.

24           THE CLERK:  Virginia Estrada?

25           PROSPECTIVE JUROR ESTRADA:  Here.
```

```
 1              THE CLERK:  Daniel Evenhouse?

 2              PROSPECTIVE JUROR EVENHOUSE:   Here.

 3              THE CLERK:  Robert Ferren?

 4              PROSPECTIVE JUROR FERREN:   Here.

 5              THE CLERK:  Erin Filoteo, Filoteo?

 6              PROSPECTIVE JUROR FILOTEO:   Here.

 7              THE CLERK:  Lawrence Forrest?

 8              PROSPECTIVE JUROR FORREST:   Here.

 9              THE CLERK:  Eric Garrett?

10              PROSPECTIVE JUROR GARRETT:   Here.

11              THE CLERK:  Lee Garsson?

12              PROSPECTIVE JUROR GARSSON:  Garsson.   Here.

13              THE CLERK:  All right.

14      Uday Gokarn?

15              PROSPECTIVE JUROR GOKARN:   Here.

16              THE CLERK:  Ryan Gonzales?

17              PROSPECTIVE JUROR GONZALES:   Here.

18              THE CLERK:  Frances Hackney?

19              PROSPECTIVE JUROR HACKNEY:   Here.

20              THE CLERK:  Pamela Haley?

21              PROSPECTIVE JUROR HALEY:   Here.

22              THE CLERK:  Jennifer Hamilton?

23              PROSPECTIVE JUROR HAMILTON:   Here.

24              THE CLERK:  Gregory Hansen?

25              PROSPECTIVE JUROR HANSEN:   Here.
```

```
1              THE CLERK:  David Hellman?

2         PROSPECTIVE JUROR HELLMAN:  Here.

3              THE CLERK:  Megan Hulme?

4         PROSPECTIVE JUROR HULME:  Here.

5              THE CLERK:  Craig Husfeld?

6         PROSPECTIVE JUROR HUSFELD:  Here.

7              THE CLERK:  Quang Huynh?

8         PROSPECTIVE JUROR HUYNH:  Here.

9              THE CLERK:  Ivan Jakic?

10        PROSPECTIVE JUROR JAKIC:  Yes.

11             THE CLERK:  Okay.  Brian Jones?

12        PROSPECTIVE JUROR JONES:  Here.

13             THE CLERK:  Jagdeep Kaur?

14        PROSPECTIVE JUROR KAUR:  Here.

15             THE CLERK:  Patricia Kimball?

16        PROSPECTIVE JUROR KIMBALL:  Here.

17             THE CLERK:  Sharon Kriegbaum?

18        PROSPECTIVE JUROR KRIEGBAUM:  Here.

19             THE CLERK:  Kenderry Luster?

20        PROSPECTIVE JUROR LUSTER:  Here.  Kenderry.

21             THE CLERK:  Thank you.  Sorry.

22    Adam Martin?

23        PROSPECTIVE JUROR MARTIN:  Yeah.

24             THE CLERK:  Michael Martinez?

25        PROSPECTIVE JUROR MICHAEL MARTINEZ:  Here.
```

```
 1            THE CLERK:  Monique Martinez?

 2            PROSPECTIVE JUROR MONIQUE MARTINEZ:  Here.

 3            THE CLERK:  Melanie Murphy?

 4            PROSPECTIVE JUROR MURPHY:  Here.

 5            THE CLERK:  Patricia Netsch?

 6            PROSPECTIVE JUROR NETSCH:  Here.

 7            THE CLERK:  Clare O'Brien?

 8            PROSPECTIVE JUROR O'BRIEN:  Here.

 9            THE CLERK:  Steve Ontiveros?

10            PROSPECTIVE JUROR ONTIVEROS:  Present.

11            THE CLERK:  Thank you.

12     Debra Opperud?

13            PROSPECTIVE JUROR OPPERUD:  Here.

14            THE CLERK:  Michael -- I'm sorry.  You're going to

15     have to help me.

16            PROSPECTIVE JUROR PANAGOPOULOUS:  Panagopoulous.

17            THE CLERK:  Okay.  Thank you.

18     Eric Patterson.

19            PROSPECTIVE JUROR PATTERSON:  Here.

20            THE CLERK:  Leif Perrson?

21            PROSPECTIVE JUROR PERSSON:  Yes.

22            THE CLERK:  George Pineda?

23            PROSPECTIVE JUROR PINEDA:  Here.

24            THE CLERK:  Ella Purington Wild?

25            PROSPECTIVE JUROR PURINGTON WILD:  Here.
```

```
 1            THE CLERK:  Sharon Romano?

 2            PROSPECTIVE JUROR ROMANO:  Here.

 3            THE CLERK:  Cesar Sanchez?

 4            PROSPECTIVE JUROR SANCHEZ:  Here.

 5            THE CLERK:  Barbara Sauceda?

 6            PROSPECTIVE JUROR SAUCEDA:  Here.

 7            THE CLERK:  Scott Schoenthal?

 8            PROSPECTIVE JUROR SCHOENTHAL:  Schoenthal.  Here.

 9            THE CLERK:  Thank you.

10       Jeffrey Searls?

11            PROSPECTIVE JUROR SEARLS:  Here.

12            THE CLERK:  William Shyvers?

13            PROSPECTIVE JUROR SHYVERS:  Here.

14            THE CLERK:  Patricia Spink?

15            PROSPECTIVE JUROR SPINK:  Here.

16            THE CLERK:  Jessica Streebel?

17            PROSPECTIVE JUROR STREEBEL:  Present.

18            THE CLERK:  Alida Stromberg?

19            PROSPECTIVE JUROR STROMBERG:  Yes.

20            THE CLERK:  Tuyet Tranfinley?

21            PROSPECTIVE JUROR TRANFINLEY:  Here.

22            THE CLERK:  Cheryl Vargas?

23            PROSPECTIVE JUROR VARGAS:  Here.

24            THE CLERK:  Erminia Velez?

25            PROSPECTIVE JUROR VELEZ:  Here.
```

```
1              THE CLERK:  Brian Venegas?

2              PROSPECTIVE JUROR VENEGAS:  Here.

3              THE CLERK:  Ricardo Villa?

4              PROSPECTIVE JUROR VILLA:  Here.

5              THE CLERK:  And David Weiss?

6              PROSPECTIVE JUROR WEISS:  Here.

7              THE CLERK:  Perfect.  Thank you.

8              THE COURT:  Is there anyone here whose name wasn't

9    called?

10        (No response.)

11             THE COURT:  Okay.  No one raises their hand.  I'm

12   sorry, Sheila?

13             JURY CLERK:  This gentleman has a hard time of

14   hearing.

15             THE COURT:  All right.

16             JURY CLERK:  This one I will move to the front.

17             THE COURT:  Please, go ahead.

18        But have we called his name?

19             JURY CLERK:  Yes, we have.

20             THE COURT:  Go ahead, Dawn.

21             THE CLERK:  Okay.  Thank you.

22        I do need to administer an oath to call of you as

23   prospective jurors.  I'm going to ask that you stand and raise

24   your right hand.

25             (Venire sworn.)
```

1      **THE CLERK:**  Thank you.

2      Please be seated.

3      **THE COURT:**  Welcome to the California Northern

4  District Court for the Northern District of California.  My

5  name is Judge, Alsup, A-L-S-U-P.  I'm the judge in this case.

6  And those of you who are be selected will be here for a few

7  weeks in deciding this case.

8      So, again, I welcome you and I thank you for your

9  willingness to serve as jurors.

10      Let me give you a short summary of what we're going to be

11  doing for the next few hours.  It's called jury selection.  We

12  will be asking you questions, and we will then be deciding

13  which ones of you each side wants to have on the jury, and then

14  we will -- there's a process that we go through.  And at the

15  end of the process we will have 14 of you sitting up here in

16  the jury box:  12 principle jurors and 2 alternate jurors.

17      So I'm going to give you have more details on how that

18  works in a minute, but that will occupy our time for most of

19  the day.

20      And then we will probably have a jury selected anywhere

21  between 1:30 and 4:30 in the afternoon.  So you should not be

22  making plans for the rest of the day.  You need to be here.

23  And most likely you will be here all day, so -- even though we

24  only need 14 of you at the end.

25      Now, to get it started right and official, we will ask the

```
1   clerk to call the case and then I will ask for appearances.

2            THE CLERK:  So the case is Criminal No. CR 14-306

3   WHA.  It's United States versus Luke D. Brugnara.

4            THE COURT:  All right.  Appearances, please.

5            MS. HARRIS:  Good morning, your Honor.  Robin Harris

6   and Ben Kingsley for the United States.

7            THE COURT:  All right.  Thank you.  And?

8            MR. BRUGNARA:  Luke Brugnara, defendant.

9            MR. STEVENS:  James Stevens with Mr. Brugnara.

10           MR. TAMOR:  Good morning, your Honor, Richard Tamor

11   appearing as advisory counsel.

12           THE COURT:  All right.  Okay.  Thank you.  Have a

13   seat.

14      Now, let me say that this is a criminal prosecution by the

15   United States against the defendant Luke Brugnara.

16   Mr. Brugnara introduced himself just a moment ago.  And he is

17   charged with various counts.

18      He is presumed innocent.  It is for the Government to

19   prove the case against him.  So he comes into this case with a

20   completely clean slate, and it is the job of the jury to decide

21   at the end to decide whether or not the Government has carried

22   its burden of proof.  I will get into more details on that in a

23   moment.

24      Now, you -- the defendant has a right to represent himself

25   if he chooses.  And in this case Mr. Brugnara has decided to
```

```
1   represent himself rather than to be represented by lawyers.  So
2   these two lawyers who are with him have been appointed by the
3   Court as advisory counsel to give him some advice on procedure
4   along the way.  But he has decided to represent himself and to
5   conduct the examination of witnesses and to make his opening
6   statement and to do all the things that a lawyer could do, but
7   doesn't need to be done.
8       Under the Constitution everyone has the right to a lawyer,
9   but they also have the right to not have a lawyer and to
10  represent themselves.  And Mr. Brugnara is entirely within his
11  rights to elect to represent himself, and it would be wrong for
12  any of you to hold that against him in any way, because he's
13  exercising a Constitutional right.
14      In our system, if someone cannot afford a lawyer, then the
15  Court will appoint one for that person.  If someone can afford
16  a lawyer, then they are entitled to hire their own lawyer.
17  Either way, we don't need to get into right now which category
18  Mr. Brugnara falls into, but either way somebody does have the
19  right to a lawyer, but in this case Mr. Brugnara has elected to
20  exercise his constitutional right to represent himself.
21      So there we are.
22      Now, we're going to get down to jury selection in just a
23  moment, but first I want to ask -- I do this at the outset of
24  all jury selections.
25      Is there anyone among you out there, the 70-plus of you
```

```
 1  who are coming here for jury selection, any one of you who are

 2  sick, who have a flu, bad bronchitis, who are going to be

 3  hacking and coughing and making the other jurors worry about

 4  whether you're spreading germs and getting them sick?  I want

 5  you to raise your hand and come down here and let me quiz you

 6  right now.  Anyone in that category?

 7      Okay.  I see not too many hands, but let's start on this

 8  side of the room.  Raise your hand high so I can see.  Just one

 9  over there.

10      Okay.  Sir, would you come down, please?  In the dark

11  shirt.  Yes, come down to the microphone.

12      (Prospective juror approaches podium.)

13          THE COURT:  Come down to this microphone right here

14  and state your name.

15          PROSPECTIVE JUROR SANCHEZ:  My name is Cesar Sanchez.

16          THE COURT:  Okay.  And you need to speak into the

17  microphone, please.

18          PROSPECTIVE JUROR SANCHEZ:  Oh, my name is Cesar.

19          THE COURT:  Cesar Sanchez.

20          PROSPECTIVE JUROR SANCHEZ:  Sanchez.

21          THE COURT:  And are you sick?

22          PROSPECTIVE JUROR SANCHEZ:  Well, I have a very

23  severe back pain.  It's been here for about four weeks now.

24          THE COURT:  I didn't ask about that.

25          PROSPECTIVE JUROR SANCHEZ:  Okay.
```

1       **THE COURT:**  You can bring that up later.  I'm asking

2  about hacking and coughing.

3       **PROSPECTIVE JUROR SANCHEZ:**  No.

4       **THE COURT:**  Okay.  Go have your seat.

5    I just want to know about hacking and coughing.  I've

6  learned the hard way that if you're sitting next to somebody

7  who is hacking and coughing, you're thinking:  Oh, my God.  I'm

8  going to get what that guy has got, you know.  I don't want you

9  to be thinking that.

10     All right.  Who ever over here raised their hand?

11     Okay.  You can -- all of you who raised your hand, come

12  down here, but don't tell me about your back pain yet.  You'll

13  get a chance to talk about back pain later.

14     (Prospective juror approaches podium.)

15       **THE COURT:**  Here comes a perfectly healthy looking

16  man.

17     (Laughter.)

18       **PROSPECTIVE JUROR BAUM:**  I ran a mile and a half

19  yesterday.

20       **THE COURT:**  You've got to talk into the mic.  What's

21  your name?

22       **PROSPECTIVE JUROR BAUM:**  My name is Gabriel Baum.

23  I've had a persistent cough.  I'm now into my fourth week.  I

24  have been prescribed various inhalers and medicine.  As you can

25  hear I'm hoarse, and I start the morning pretty clear.  I use

inhalers, but over time and just suddenly I get bouts, fits of
coughing.

THE COURT:   Okay.  Are you contagious?

PROSPECTIVE JUROR BAUM:   I don't know.  I believe
not.

THE COURT:   How long ago did you -- what did you have
four weeks ago?

PROSPECTIVE JUROR BAUM:   Do you mean medicine or
what --

THE COURT:   What kind of disease did you have four
weeks ago?

PROSPECTIVE JUROR BAUM:   The same disease I have now.
It -- it impairs my throat as I speak.  And I get bouts of
coughing.  It hasn't changed for the last two or three weeks.

THE COURT:   And -- and what started all this?  The
flu?  What was it that started this?

PROSPECTIVE JUROR BAUM:   I don't know.  It could well
be allergies.  I don't know.

THE COURT:   Right in an hour, how many times do you
think you're going to be getting into spasms of hacking and
coughing?

PROSPECTIVE JUROR BAUM:   I'm bad at predicting,
but -- in an hour did you say?

THE COURT:   One hour.

PROSPECTIVE JUROR BAUM:   If I could average, I would

1    say I get about three bouts of coughing in about two hours,

2    maybe three.  Worse after eating.  And as soon as the morning

3    medicine wears off.

4              THE COURT:  These cough drops I have up here.  If you

5    have a bout, I could give you have a cough drop.

6              PROSPECTIVE JUROR BAUM:  I really dislike sugar.

7              THE COURT:  These are sugarless.

8              PROSPECTIVE JUROR BAUM:  Hah, in that case I will

9    accept.

10             THE COURT:  Dawn, would you hand this to...

11        (Cough drop given to Juror Baum.)

12             THE COURT:  I think for the time being, I am going to

13   let you -- I can't -- you're not contagious.  Everyone now

14   knows you're not contagious.  So I'm going to let you be

15   subject to being selected.

16        All right.  Thank you.

17             PROSPECTIVE JUROR BAUM:  Thank you.

18             THE COURT:  All right.  Okay.  Anyone else raise

19   their hand?

20        (No answer.)

21             THE COURT:  I thought I saw several hands that went

22   up over there.  You've suddenly become healthy.

23        (Laughter.)

24             THE COURT:  Okay.  All right.  Let's do the

25   following.  And there is no one way to do this, but I think the

```
 1  best way is to just get started at it, and what we're going to
 2  do is call 32 of you forward.  I'm going to need all that bench
 3  over there.  I'm going to call 32 of you forward, and then
 4  you'll just all see how it goes.  And the clerk will call your
 5  name, and we'll tell you where to have a seat.
 6          So will the clerk start calling names?
 7              THE CLERK:  Okay, your Honor.
 8          David Hellman, H-E-L-L-M-A-N.
 9              THE COURT:  Okay.  Please take the seat in the jury
10  box closest to the court reporter.
11              THE CLERK:  Jeffrey Searls, S-E-A-R-L-S.
12              THE COURT:  All right.  Mr. Searls, before you --
13  come down here and let me ask you a question first.
14          If my information is correct, who do you work for?
15              PROSPECTIVE JUROR SEARLS:  I don't think you want me
16  to say.
17              THE COURT:  All right.  Do you work for law
18  enforcement?
19              PROSPECTIVE JUROR SEARLS:  Yes.
20              THE COURT:  And may I have the lawyers and
21  Mr. Brugnara please come to the sidebar for one moment.
22          (Proceedings held at sidebar.)
23              THE COURT:  Mr. Searls is a U.S. Marshal, Deputy
24  Marshal.  He's in the Oakland Division, we think, but he should
25  clearly be excused and I -- is that all right with you?
```

```
 1              MR. BRUGNARA:  Of course.

 2              THE COURT:  All right.  Is that all right with you?

 3              MS. HARRIS:  No objection.

 4              THE COURT:  All right.  He is going to be excused.

 5   Thank you.

 6         (Proceedings held in open court.)

 7              THE COURT:  Mr. Searls, you're excused.

 8              PROSPECTIVE JUROR SEARLS:  Thank you.

 9         (Prospective Juror Searls excused.)

10              THE COURT:  All right.  Next.

11              THE CLERK:  All right.  Rekhia Dutta, D-U-T-T-A.

12              THE COURT:  Welcome.  And please have that second

13   seat.

14              THE CLERK:  Michael Panagopoulous.  I am so sorry.  I

15   am badgering the name.  That is Panagopoulous,

16   P-A-N-A-G-O-P-O-U-L-O-U-S.  Panagopoulous, is that the way you

17   say it?

18              PROSPECTIVE JUROR PANAGOPOULOUS:  You got it.

19              THE COURT:  Panagopoulous, all right.

20              THE CLERK:  Thank you, your Honor.

21              THE COURT:  Okay.  Welcome.  Have the next seat,

22   please.

23         Next.

24              THE CLERK:  Robert Ferren, Ferren.

25              THE COURT:  Next seat, please.
```

```
 1            THE CLERK:  Brian Venegas, V-E-N-E-G-A-S.

 2       Scott Schoenthal, S-C-H-O-E-N-T-H-A-L.

 3       Quang Huynh, H-U-Y-N-H.

 4       Jennifer Hamilton, H-A-M-I-L-T-O-N.

 5            THE COURT:  Please take the first seat on the second

 6  row.

 7            THE CLERK:  Adam Martin, M-A-R-T-I-N.

 8       Becca Barnett, B-A-R-N-E-T-T.

 9       Brian Ropers, R-O-P-E-R-S.

10       I'm sorry, Judge.  He would like to get your attention.

11            PROSPECTIVE JUROR ROPER:  There is no "s" at the end,

12  just for the record.

13            THE CLERK:  Roper.  There is no "s"?

14            PROSPECTIVE JUROR ROPER:  Yes.

15            THE CLERK:  Okay.  I'll scratch it out.

16            THE COURT:  Got it.

17            THE CLERK:  Okay.  So John Bonetti.  B-O-N-E-T-T-I.

18       Ricardo Villa, V-I-L-L-A.

19       Paul Christopulos, C-H-R-I-S-T-O-P-U-L-O-S.

20            THE COURT:  All right.  Now we will start filling in

21  the first bench on the front row, and it will be a tight

22  squeeze.  So I need to get to get about 18 of you on that front

23  row and then 18 on the next row.  So it's going to be tight,

24  but temporary.  Yes.

25            THE CLERK:  Nine, nine on each.
```

1           THE COURT:  Did I say nine?  Nine on each; not 18,

2    nine.

3           THE CLERK:  All right, Judge.

4           THE COURT:  That would be tight.

5           THE CLERK:  Very.

6       David Arkin, A-R-K-I-N.

7           THE COURT:  Just go right up against the wall.  Thank

8    you.

9           THE CLERK:  Matthew Chan, C-H-A-N.

10      Daniel Evenhouse or Evenhouse, E-V-E-N-H-O-U-S-E.

11      Eric Patterson, P-A-T-T-E-R-S-O-N.

12      Shannon Romano, R-O-M-A-N-O.

13      Melissa Caldwell, C-A-L-D-W-E-L-L.

14      Valerie Durkee, D-U-R-K-E-E.

15      George Pineda, P-I-N-E-D-A.

16      Jacob Bray, B-R-A-Y.

17          THE COURT:  Mr. Bray, you get the last seat over

18   there.  And now we'll start a row.

19          PROSPECTIVE JUROR BRAY:  Your Honor, may I bring

20   something up?  I have a midterm at 12:00 o'clock today.  The

21   director in the other room told me that I should bring that up.

22   It's for my Spanish class.

23          THE COURT:  Are you a student someplace?

24          PROSPECTIVE JUROR BRAY:  Yeah.  I go to College of

25   San Mateo.

```
 1            THE COURT:  You're taking courses right now?

 2            PROSPECTIVE JUROR BRAY:  Yes.

 3            THE COURT:  You mean, during -- the rest of the week

 4   you've got courses?

 5            PROSPECTIVE JUROR BRAY:  Yes, I do.

 6            THE COURT:  Did you -- didn't you tell the -- write

 7   that on your form when you were --

 8            PROSPECTIVE JUROR BRAY:  I must have, yeah.  I don't

 9   know why I was selected to come in.

10            THE COURT:  All right.  Any objection to excusing

11   Mr. Bray?

12            MS. HARRIS:  No objection, your Honor.

13            MR. BRUGNARA:  No.

14            THE COURT:  All right.  The defendant says no

15   objection.  All right.  That's a legitimate excuse.

16        I'm going to excuse you, Mr. Bray.

17            PROSPECTIVE JUROR BRAY:  Thank you.

18            THE COURT:  Good luck on your test.

19            PROSPECTIVE JUROR BRAY:  Thank you very much.

20        (Prospective Juror Bray excused.)

21            PROSPECTIVE JUROR ROMANO:  Your Honor, may I bring

22   something up as well?

23            THE COURT:  What?

24            PROSPECTIVE JUROR ROMANO:  May I bring something up

25   as well?
```

```
 1          THE COURT:  What is it?

 2          PROSPECTIVE JUROR ROMANO:  I -- I talked to the

 3   check-in desk as well, and he said that I RSVP'd yes as

 4   available to come because I was unemployed at the time when I

 5   got the jury summons, but my schedule has changed and I also

 6   need to go to work at 10:00 o'clock, and it would cause me

 7   severe economic hardship if I wasn't able to get out.

 8          THE COURT:  I'm sorry.  That one I have to wait until

 9   it's your turn.  That one is not an automatic yes.

10          PROSPECTIVE JUROR ROMANO:  Yes.

11          THE COURT:  It may be a no.  I have to wait and hear

12   all the testimony about it.

13          PROSPECTIVE JUROR ROMANO:  Okay.

14          THE COURT:  And your name, please?

15          PROSPECTIVE JUROR ROMANO:  Sharon Romano.

16          THE COURT:  Thank you.

17          PROSPECTIVE JUROR MARTIN:  Your Honor, I have to

18   attend a funeral at 11:00 o'clock today in the Sunset District.

19          THE COURT:  I'm sorry.  Wait til your turn.

20          PROSPECTIVE JUROR MARTIN:  We can do that.

21          THE COURT:  We're going to give everybody a chance.

22   I want to fill up the rows first.

23          PROSPECTIVE JUROR MARTIN:  I just have a time

24   constraint for a funeral.

25          THE COURT:  I'm sorry.  Replace Mr. Bray.
```

```
 1              THE CLERK:  Okay, your Honor.  Amy Beaton,
 2   B-E-A-T-O-N.
 3              THE COURT:  Start the other row.
 4              THE CLERK:  Okay.  Cindy Demorest, D-E-M-O-R-E-S-T.
 5              THE COURT:  All right.  First seat right there,
 6   please.  In the front -- come through the double doors and sit
 7   in that first seat, please.  Thank you.
 8         Next.
 9              THE CLERK:  Okay.  Erin Filoteo -- Filoteo,
10   F-I-L-O-T-E-O.
11         (Telephonic interruption.)
12              THE COURT:  If you've got a cell phone on, please
13   turn it off.
14         Okay.  Please have that next seat.
15         Next.
16              THE CLERK:  Okay.  Eric Garrett, G-A-R-R-E-T-T.
17         Dave Gokarn, G-O-K-A-R-N.
18         Alida Stromberg, S-T-R-O-M-B-E-R-G.
19         Tuyet Tranfinley, T-R-A-N-F-I-N-L-E-Y.
20         Jagdeep Kaur, K-A-U-R.
21         Ryan Gonzales, G-O-N-Z-A-L-E-S.
22         Karina Corbett, C-O-R-B-E-T-T.
23         And, your Honor, that's 32.
24              THE COURT:  All right.  Okay.  Let's go to you.  You
25   had a -- what was your name, please?
```

```
 1              PROSPECTIVE JUROR MARTIN:  Adam Martin.

 2              THE COURT:  I need to give him the microphone.  I

 3    can't hear.

 4              PROSPECTIVE JUROR MARTIN:  Adam Martin.

 5              THE COURT:  All right.  And so which funeral do you

 6    need to go to?

 7              PROSPECTIVE JUROR MARTIN:  It's a friend of mine from

 8    high school.  I have the obituary on my phone, if you want to

 9    look at it.

10              THE COURT:  How close was this friend?

11              PROSPECTIVE JUROR MARTIN:  Very.

12              THE COURT:  Any objection to excusing Mister --

13    what's your last name?

14              PROSPECTIVE JUROR MARTIN:  Martin.

15              THE COURT:  Martin?  Any objection.

16         MS. HARRIS:  No objection, your Honor.

17              THE COURT:  Mr. Brugnara?  Any objection?

18         MR. BRUGNARA:  I'm sorry?

19              THE COURT:  Any objection to excusing him from the --

20    from jury service?

21         MR. BRUGNARA:  No.  He has a funeral.  Please.

22              THE COURT:  Thank you.  You're excused.

23        (Prospective Juror Martin excused.)

24              THE COURT:  Please let's replace Mr. Martin.

25        Please hand the microphone to the next gentleman right
```

1    there.

2        Let's call a name.

3            **THE CLERK:**  Okay.  Angela Bass, B-A-S-S.

4            **THE COURT:**  Ms. Bass, please take that empty seat.

5        All right.  Someone over there raised their hand.  Let's

6    get the microphone over there.  One of the lawyers take the

7    microphone down there.

8        Thank you, Ms. Harris.  Take the microphone down to Miss?

9            **PROSPECTIVE JUROR ROMANO:**  Romano.

10           **THE COURT:**  Ms. Romano, what's your situation?

11           **PROSPECTIVE JUROR ROMANO:**  I RSVP'd yes to be a juror

12   when I was unemployed or partially employed, so I thought I

13   would have a free schedule this week to be here, but as it

14   turned out my work schedule picked up.  So, and I feel like I

15   really need to go to work and they are counting on me, and I'm

16   pretty broke, too.  So it would cause me financial hardship if

17   I had to serve on this jury.

18           **THE COURT:**  Are you saying that you are now employed

19   by someone that you weren't employed by before?

20           **PROSPECTIVE JUROR ROMANO:**  I'm -- well, I'm a

21   contract worker for an off-site team building company as an

22   improve actor.  So we sort of work in ebb and flow, but it

23   picked up this week and I got booked.

24           **THE COURT:**  You get paid for jury service.

25           **PROSPECTIVE JUROR ROMANO:**  I know, but it's less than

1     what I get paid at my job.

2             **THE COURT:**  I'm sorry.  No.  Does your employer pay

3     you for jury service?

4             **PROSPECTIVE JUROR ROMANO:**  No.  No, they don't.

5             **THE COURT:**  Are you -- do you have someone else in

6     your family who works and earns an income?

7             **PROSPECTIVE JUROR ROMANO:**  No.  I'm single.

8             **THE COURT:**  Are you going to get unable to pay your

9     bills if you don't -- I need to understand what you mean by:

10    "financial hardship."

11            **PROSPECTIVE JUROR ROMANO:**  Yeah, it would be -- I

12    would be unable to support myself.  I mean...

13            **THE COURT:**  Is anyone else going to have this excuse?

14       Okay.  I got to -- I got to wait.  I'm not going to let

15    you go yet.  We will deal with it when we get to it.

16            **PROSPECTIVE JUROR ROMANO:**  Okay.

17            **THE COURT:**  It's going to take awhile.  Did you say

18    11:00 o'clock?

19            **PROSPECTIVE JUROR ROMANO:**  I need to leave at 10:00

20    o'clock.

21            **THE COURT:**  You're not going to make that.

22            **PROSPECTIVE JUROR ROMANO:**  Okay.  What should -- what

23    should I do?

24            **THE COURT:**  You should just not -- you're not going

25    to be able to make it until your turn comes.  And it just

1  sounds to me like your work picked up.  You were willing to do

2  it as long as you were going to get paid the $40 a day, but

3  when you got a better offer, you decided to take that.

4          **PROSPECTIVE JUROR ROMANO:**  Just because I would -- I

5  would have a financial issue if I didn't.  I'm just looking out

6  to just meet my expenses the best that I can.

7          **THE COURT:**  Have you ever served on a jury?

8          **PROSPECTIVE JUROR ROMANO:**  No.  Never.

9          **THE COURT:**  It's important to do that.

10          **PROSPECTIVE JUROR ROMANO:**  No, I completely agree and

11  I definitely I accept it as a specific responsibility.  It's

12  just -- I have had a lot of financial issues and I have some

13  debt.  And I have been very stressed by my finances recently.

14  So I'm just concerned about my situation, and my work is

15  counting on me to be there.

16          **THE COURT:**  Well, the fact that your work -- your

17  employer is counting on you does not count.  That's not --

18  never an excuse.

19          **PROSPECTIVE JUROR ROMANO:**  Okay.

20          **THE COURT:**  Your financial hardship might be.  It

21  depends on how severe it is.

22          **PROSPECTIVE JUROR ROMANO:**  It's very severe.

23          **THE COURT:**  Any objection to excusing Ms. Romano?

24          **MS. HARRIS:**  No objection from the United States.

25          **MR. BRUGNARA:**  No, your Honor.

1        **THE COURT:**  Ms. Romano, you're excused.  Thank you.

2        **PROSPECTIVE JUROR ROMANO:**  Thank you.  Who should I

3  give the mic to?

4      (Prospective Juror Romano exits the courtroom.)

5        **THE COURT:**  The lady beside you, please.

6      Let's replace Ms. Romero [sic].

7        **THE CLERK:**  Erminia Velez, V-E-L-E-Z.

8        **THE COURT:**  Wait a minute.

9        **THE CLERK:**  I'm sorry.

10       **THE COURT:**  Wasn't that -- what was your name over

11  there?

12       **PROSPECTIVE JUROR CORBETT:**  Karina Corbett.

13       **THE COURT:**  Karina Corbett.

14     So what happened to Angela Bass?

15       **PROSPECTIVE JUROR BASS:**  I'm right here.

16       **THE COURT:**  Okay.  All right.

17     So did you sit there?  You did.

18     All right.  What was her name again?  Velez?  All right.

19       **THE CLERK:**  Correct, your Honor.

20       **THE COURT:**  Okay.  Those of you who raised your hand,

21  do you have urgency to get out of here by 11:00 o'clock or some

22  time, or can you wait your turn before we quiz you about this?

23     (No response.)

24       **THE COURT:**  All right.  So what we're going to do now

25  is start asking you some questions.  It's important that you

```
 1  all listen to all the questions because when -- especially
 2  those of you -- everyone, because those of you out there when
 3  you get called forward, and I promise you several of you will
 4  be called forward, then I can ask:  Did you hear those
 5  questions?  Yes.  Would you have raised your hand?  And you say
 6  either "yes" or "no" as the case may be.  But if you -- if you
 7  don't listen, I have to then ask all the questions all over
 8  again and it takes longer.  So please pay attention.
 9      All right.  So we are here on a case that I will now
10  summarize, unless the lawyers gave me -- did you all give me a
11  summary?  If not, then I'm going to just summarize it myself.
12          MS. HARRIS:  It would be fine with the Government for
13  your Honor to do that.
14          THE COURT:  All right.  I need to explain to the jury
15  what the indictment says.  So I'm just going to do that.
16      So the --
17          MR. BRUGNARA:  Your Honor?
18          THE COURT:  Yes, sir.
19          MR. BRUGNARA:  You are going to make it clear that's
20  the Government's position and not the factual truth?
21          THE COURT:  I'm going to -- I'm going to -- I've
22  already made clear that the Government has got to prove what it
23  says.  These are mere accusations.  They are not proof of
24  anything.  I've got to make that real clear.  The indictment is
25  zero proof.  Z-E-R-O.  That's why we're here.
```

1          We have a trial to find out if the Government sitting at

2     that table can prove the case.   If the Government proves the

3     case, the jury is obligated to return a verdict of guilty.   If

4     the Government falls short in its case on any count, then the

5     obligation of the jury is to acquit.   That's the way it works.

6          But the jury needs to know what the charges are so that

7     you can help me understand whether or not you have some --

8     something that you may have thought this case that may cause

9     you to feel like you get heartburn or it's too emotional for

10    you or you had the same experience.   So we need to -- you all

11    need to tell me if there is something about this case that you

12    need to disclose.

13         Okay.   So this case involves alleged art fraud, A-R-T.

14    Like in paintings and sculptures.   Art fraud.   That's what's

15    alleged.   Okay.

16         And in summary, the first count -- actually, the first

17    four counts are for what is called wire fraud.   The first four

18    counts go to what is called wire fraud.   Using the wires like

19    telephone wires or internet wires.

20         The basic allegation there is that the -- the defendant,

21    Mr. Brugnara, allegedly agreed to purchase art totaling several

22    million dollars worth of art, and on the representation that he

23    intended to pay for the art.   Then when the art was delivered

24    to him, he did not pay for it and said that the -- it had been

25    a gift to him.

1     And also represented along the way that he was going to

2  place the art in a museum that he was building, and that what

3  Mr. Brugnara -- this is what's alleged, that he falsely -- I'll

4  just read from the indictment:

5         "Brugnara falsely stated he intended to and

6      would pay for the art.  Brugnara omitted that he had

7      almost no income, no assets, and no means to pay for

8      the art he had agreed to purchase, and he omitted

9      that he had a substantially negative net worth; that

10     Brugnara falsely stated that he would buy the art to

11     place in a museum he was building; and when the art

12     was delivered to his residence in the presence of

13     what is referred to as Victim 1," somebody you'll

14     learn about later, "Brugnara falsely told Victim 1

15     that he was not expecting Victim 1; that he was too

16     busy to inspect the art at that time and that he

17     would call Victim 1 later to arrange a time to

18     inspect the art."

19     And that after taking possession of the art and refusing

20  to pay for it, it's alleged that Brugnara falsely claimed

21  Victim 1 had given the art to Brugnara as a gift.

22     So that's the -- the essence of that count.  There are

23  four specific counts, each dealing with a specific email in

24  which the emails made various statements which the Government

25  contends were false.  And I will just summarize it in that

1  fashion, unless anybody wants me to go into more detail.

2          **MS. HARRIS:**  That's fine, your Honor.

3          **THE COURT:**  Mr. Brugnara, do you want me to go into

4  more detail or not?

5          **MR. BRUGNARA:**  No.  I just want to reiterated that's

6  the allegation from one individual person and not reality.

7          **THE COURT:**  All right.  Again, I -- I emphasize that

8  this is the allegation, not the -- the proof is for you to

9  determine, ladies and gentlemen, whether it satisfies the proof

10 or not.

11     All right.  So then we come to Count Five.  Those are the

12 first four counts.  Count Five is mail fraud, which is based on

13 the same course of events.

14     Count Six alleges -- alleges that the defendant made a

15 knowing, false, material declaration under oath in testimony

16 before the Court, and that the -- do you want me to read the

17 question and answer that's accused here?

18          **MS. HARRIS:**  Yes, your Honor.

19          **THE COURT:**  All right.  That's what we will do.

20     All right.  So this -- this is the passage of testimony in

21 a prior proceeding in this case.

22     Mr. Brugnara is alleged to have said --

23          **"QUESTION:**  Okay.  So after you wrote

24     Victim 1 this email, the discussion sort of

25     transitioned into when she was going to ship

```
 1          the art to the -- art pieces to Sea Cliff, is
 2          that correct?
 3              "ANSWER:  No.
 4              "QUESTION:  Okay.
 5              "ANSWER:  I took the emails that I got from
 6          her and I sent them to the head of Sotheby's in
 7          New York, who is also the head of Bonham Street
 8          in London.  And I asked, you know -- you know,
 9          what's the value or -- I don't have the
10          specific email in front of me, but the essence
11          of it was, quote, how much would you sell these
12          for and what are they worth?
13              "Just a simple valuation inquiry.  And I heard
14          back that the de Koonings are not authentic and that
15          they will not sell them as de Koonings.  And the
16          Degas, they would not sell the Degas because it was
17          not authentic."
18          And it's alleged that that testimony constituted a false
19   declaration before the Court in violation of 18 United States
20   Code Section 623.
21          Again, that's the allegation.  And we -- it's not proof.
22          All right.  So then we come to Count Seven, and it's based
23   on the same passage of testimony, and it is alleged to be a
24   violation of Section 1623.
25          Again, so what is the difference between Count Six and
```

```
 1   Count Seven?
 2         MS. HARRIS:   The italicized version in Count Seven
 3   that starts "So when" at the end of the answer, the last
 4   answer.
 5         "So when I have the information, I phoned Victim 1."
 6         THE COURT:   All right.  So what I read before is
 7   repeated.  And then there is an additional sentence that says:
 8              "So when I had that information I phoned
 9         Victim 1 and I told Victim 1 that, you know, these
10         de Kooning's are not authentic."
11         All right.  So that's the second, but that's Count Number
12   Six and Seven.
13         So we had four counts wire fraud, one count mail fraud.
14   And now six and seven go to false declaration before the Court.
15         All right.  We have two more allegations.  One is called
16   escape and one is called contempt of court.  And they involve
17   the -- the allegation is that:
18              "On February 5, 2015, in this district, the
19         defendant knowingly escaped from custody to which he
20         was confined under, and by virtue of process issued
21         under the laws of the USA by a court, judge, or
22         magistrate judge; by virtue of an arrest on a charge
23         of a felony, specifically mail fraud, wire fraud, and
24         false declaration charged in the first superseding
25         indictment, et cetera; and did so with consciousness
```

 1          of guilt with respect to those felony charges."

 2          Now, Counts One, Two, Three, Four -- sorry, One, Two,

 3     Three, Five, Six, Seven of the second superseding indictment.

 4          So that one is -- that charge is escape, which is a

 5     violation of 18 USC 751.  That's what's alleged.

 6          And then Count Nine is the same fact pattern, but alleged

 7     as contempt of court as opposed to escape.

 8          All right.  So that's what the -- that's what the jury is

 9     going to be deciding in this case, is guilt or not guilty on

10     those -- those -- those counts.

11          All right.  Now, I want you to be thinking about that

12     because if there is anything in this fact pattern that would

13     cause you special heartburn or emotional distress or something

14     about that that would cause you to have to disclose something

15     to us, then you should disclose whatever it is to us.

16          Okay.  So that's what the case is about.

17          Now, we are going to go to asking you some individual --

18     individual questions, and then later I'm going to tell you all

19     the -- the witnesses in the case -- maybe I should do that

20     first in case somebody knows one of the witnesses.

21          Do any of you think you know anybody involved in this

22     case?  If you do, raise your hand.  I'm talking to the 32 of

23     you.  If you think you know somebody in this case or a lawyer

24     or me or the clerk or -- raise your hand, please.

25          (No response.)

```
 1            THE CLERK:  Okay.  No one is raising their hand.
 2       I'm going to read off some names, if any of these ring a
 3  bell, these could be potential -- not every one I read is going
 4  to be testifying.  It's a long list.  But if you think you know
 5  any of them raise your hand.
 6       Jennifer Senhaji.  Am I saying that right?
 7       Harris Taback.
 8       Jameth Record.
 9       Brenda McCoy.
10       Patricia Failing.
11       Gary Tinnerow.
12       Mary Beecroft, Beecroft.
13       Mark Levinson.
14       Troy Carasco.
15       Jennifer Biederback.
16       Si Newhouse.
17       Jack Shaoul, S-H-A-O-U-L.
18       Joan Michelman.
19       Nick Barbato.
20       Doug Johnson.
21       Frank Sanders.
22       Tony Crossley.
23       Kathryn Solomon.
24       Okay.  I got some more names here.  I've got to get on the
25  right glasses.
```

```
 1       Abdus-Sabur, Hajarah.  Didn't I just go over that?  All
 2  right.  Abdus-Sabur, Hajarah.
 3       Tim Aoyagi, Aoyagi.
 4       Donna Aragon.
 5       Christopher Apostle.
 6       Erik Babcock.
 7       I'm not looking up each time now.  It's such a long list,
 8  so shout out if you want me to stop.
 9       Wayne Balolong, Balolong.
10       Nick Barbato.
11       Sean Benson.
12       Susan Bertelsen.
13       Lena Cortez Bezares.
14       Shawn Van Bockel.
15       Eddy Castillo.
16       Preston Davies.
17       Jeremy Desor.
18       Jeffrey Dorr.
19       Jessica Fox.
20       Caitlyn Frank.
21       Victor Guevara.
22       Suzanne Gyorgy.
23       Elizabeth Hadley.
24       Joshua Hartshorn.
25       Ian Hiebert.
```

```
1        Chris Hulse, or Hulse.

2        Jennifer James.

3        Robert Kane.

4        Mark Kock.

5        Aleksandr Kobzanets.

6        Dwayne Kurzrok.

7        Brandon LeBlanc.

8        Rose Long.

9        Walter Maibaum.

10       Let me make sure.  Rose Long, Walter Maibaum.

11       Anybody know that name, names?

12       (No response.)

13            THE COURT:  Gabriel Pedreros, Pedreros.

14       Greg Phillips.

15       Clarissa Post.

16       Andrew Purdy.

17       Harold Pritchett.

18       Kurt Raphael.

19       Abidja Record.

20       Alexander Rotter.

21       Harvey Schochet.

22       Natalia -- I need your help.

23            MS. HARRIS:  Shlyapina.

24            THE COURT:  Shlyapina.

25       Harriet Silver.
```

```
1         Gail Skelly.

2         Harris Taback.

3         DeJuan Tartt.

4         Warner Trejos.

5         Ludmilla Tuberman.

6         Caren Watson.

7         Brian Weber.

8              UNIDENTIFIED PROSPECTIVE JUROR:  Your Honor, did you

9    say Ludmilla Tuberman?

10             THE COURT:  Ludmilla Tuberman, T-U-B-E-R-M-A-N.  Is

11   that somebody you know?

12             UNIDENTIFIED PROSPECTIVE JUROR:  She goes by Lucy.

13             THE COURT:  What?

14             UNIDENTIFIED PROSPECTIVE JUROR:  She uses the same

15   Lucy usually.

16             THE COURT:  Well, okay.  Wait and see if you get

17   called forward.

18        Caren Watson.

19        Brian Weber.

20        Janie Zhuang.

21        Mike Ziller.

22        And then we'll have some custodians of records from

23   various companies.

24        All right.  Any of those names ring a bell?

25        Yes, sir.  We need to give you the microphone.  Your name,
```

1  please.

2          **PROSPECTIVE JUROR EVENHOUSE:**  Dan Evenhouse.

3          **THE COURT:**  Yes.

4          **PROSPECTIVE JUROR EVENHOUSE:**  The name that I

5  recognize was Eddy Castillo.

6          **THE COURT:**  Castillo.  All right.  Tell us about how

7  old the Eddy Castillo is that you know.

8          **PROSPECTIVE JUROR EVENHOUSE:**  I would regard him as

9  younger, probably forty-ish, maybe older.

10          **THE COURT:**  And where does he live?

11          **PROSPECTIVE JUROR EVENHOUSE:**  Eureka.

12          **THE COURT:**  Eureka?

13          **PROSPECTIVE JUROR EVENHOUSE:**  Yeah.  California.

14          **THE COURT:**  What does he do for a living?

15          **PROSPECTIVE JUROR EVENHOUSE:**  I believe he's

16  currently unemployed.

17          **THE COURT:**  Is that the same one?

18          **MS. HARRIS:**  No, your Honor.

19          **THE COURT:**  All right.  Different one.  Thank you,

20  though.  You did good by raising your hand.

21      Anybody else want to raise your hand, of the 32 of you?

22      Yes, you.  Yes.

23          **UNIDENTIFIED PROSPECTIVE JUROR:**  I just wanted to

24  clarify that you read out, was it Brian Weber or Ryan, for "R"

25  as in Roger?

```
 1          THE COURT:  Weber?

 2          UNIDENTIFIED PROSPECTIVE JUROR:  Weber.

 3          THE COURT:  Brian W-E-B-E-R.

 4          UNIDENTIFIED PROSPECTIVE JUROR:  I don't know him,

 5  your Honor.

 6          THE COURT:  Okay.  Thank you.

 7       Okay.  Now, the -- I'm going to introduce the lawyers and

 8  Mr. Brugnara again.  This is Mr. Luke Brugnara.  And then

 9  Mr. Stevens.  And you all please stand.

10       And you two lawyers, introduce yourselves again.

11          MR. STEVENS:  My names is James Stevens.  I'm serving

12  as advisory counsel for Mr. Brugnara.

13          MR. TAMOR:  And I'm Richard Tamor, advisory counsel

14  as well.

15          MR. BRUGNARA:  And I'm Mr. Brugnara.

16          THE COURT:  Okay.  Now, have any of you -- have ever

17  heard of or do you know any of these three gentlemen?  If so,

18  raise your hand.

19       (No response.)

20          THE COURT:  Okay.  No one is raising their hand.

21       All right.  Now, the Government, let's introduce the

22  people at the government table.

23          MS. HARRIS:  I'm Robin Harris.  I'm the assistant

24  United States attorney.

25          MR. KINGSLEY:  I'm Ben Kingsley.  I'm also an
```

1    assistant United States attorney.

2              **SPECIAL AGENT DESOR:**  Jeremy Desor, Special Agent

3    FBI.

4              **MS. MALLORY:**  Mary Mallory, paralegal.

5              **SPECIAL AGENT KOBZANETS:**  Aleksandr Kobzanets,

6    Special Agent for the FBI.

7              **THE COURT:**  Anybody know our -- please be seated.

8         Do any of the prospective jurors, on the first 32 of you I

9    mean, do you know of these or have you ever heard of these that

10   you just heard introduced?

11        (No response.)

12             **THE COURT:**  All right.  I guess not.  Thank you.

13        How about me or the court clerks here?  Any of you have

14   know any of the other personnel in the courtroom?  If so, raise

15   your hand.

16        (No response.)

17             **THE COURT:**  All right.  No one is raising their hand.

18   Great.

19        So what we're going to do now is start getting information

20   from you about yourself.  And who has got the microphone now?

21   Please bring it around to our first juror, Mr. Hellman.

22        What we're going to do is get biographical information

23   about you.  We will just start -- get started at it.

24        Okay.  Can you see that chart?

25             **PROSPECTIVE JUROR HELLMAN:**  Yes, your Honor.

1      **THE COURT:**  Please go down the chart and answer each

2   question.

3      **PROSPECTIVE JUROR HELLMAN:**  Name is David Hellman.  I

4   live in San Rafael.  I went to the University of California at

5   Berkeley with an undergraduate degree; went to Bolt Hall Law

6   School with a degree.  I'm self-employed as an attorney and

7   certified public accountant.  I'm an elected member of the

8   Marin County Board of Education.  I'm involved in the rotary

9   and, also, the Boy Scouts.

10      Hobbies, not a lot of time, but model trains.

11      I am divorced.  My partner is a legal secretary, works in

12   my office.  Have four children.  Oldest is 39 works as a

13   celebrity as an administrative assistant.  Also is a writer,

14   producer, actress.  Have another daughter that works at the

15   University of California at Berkeley in the research

16   administration department.  Have another daughter who is a real

17   estate agent.  And have a son who is in San Diego working, has

18   his own investments and started a green touch business.

19      I have never served on a jury before.  Never been in the

20   military or law enforcement.  I have been a party to litigation

21   and have been a witness in court, either on clients' cases and

22   sometimes as an expert witness.

23      **THE COURT:**  And how long ago was the most recent of

24   you being in court as a witness?

25      **PROSPECTIVE JUROR HELLMAN:**  I would say within the

1  last couple of years.  I've also done -- I've been an expert

2  witness in a case before an arbitrator, and that was within the

3  last year.

4          THE COURT:  Do you -- do you practice civil

5  litigation?

6          PROSPECTIVE JUROR HELLMAN:  Only in estate planning

7  trust, probate matters, and before the United States Tax Court.

8          THE COURT:  Do you do any kind of criminal cases?

9          PROSPECTIVE JUROR HELLMAN:  No.

10         THE COURT:  All right.  Now, if you get selected to

11  serve on the jury -- you know, lawyers serve all the time.

12  There's nothing wrong with a lawyer serving on the jury.  But

13  the extra word of caution is that it's the judge's duty to give

14  the jury the law and to tell -- explain the law to the jury.

15  And everybody on the jury has got to follow the law as I give

16  it to them, whether they think it's right or not.  If I get it

17  wrong, that's a point for appeal, but it's not a point for the

18  jury to try to say:  Oh, no, that can't be the law, so we'll do

19  this.

20      So you understand that?

21         PROSPECTIVE JUROR HELLMAN:  Yes, your Honor.

22         THE COURT:  So you would keep your own views of the

23  law to yourself and follow the law as I give it to you?

24         PROSPECTIVE JUROR HELLMAN:  Yes.

25         THE COURT:  All right.  Okay.  So while we're on that

1  subject, I will give all of you a -- many people come to court

2  and they don't know what a jury does.  They've never served on

3  a jury.  So let me explain what the jury does.

4      The jury decides the facts.  The law, the judge decides

5  and tells the jury what the law is.

6      So at the end of the case, I will give a complete

7  statement of the law that governs all of these counts to the

8  jury and tell the jury the elements of proof that the

9  Government must prove for each count.  So let's say there are

10 four elements of proof on a given count.  The Government has

11 got to prove those four elements each beyond a reasonable

12 doubt, because it's a criminal case.

13     And what the jury does is listen carefully to all the

14 evidence and decides whether or not it's been proven beyond a

15 reasonable doubt all four elements.  It's like a laboratory

16 experiment.  And you go into the jury room and you figure out,

17 Has the Government met that burden of proof?

18     Let's say that the Government proved three elements, fine,

19 but one element was not proven beyond a reasonable doubt.  Then

20 the jury has an obligation to acquit in that circumstance.

21     On the other hand, if all four elements are proven beyond

22 a reasonable doubt by the Government, then the duty of the jury

23 is to convict on that count.  So it's very important for the

24 jury to listen to the evidence as it comes in and keep track

25 and try to see what the Government has and hasn't proven.  And

```
1   then at the end of the case, the judge will tell you what the

2   elements of proof are.  And it's your duty to, then, lay the

3   evidence alongside those elements of proof that are required

4   and make that decision, either guilty or not guilty, depending

5   on whether the Government has proven the case.

6        Now, the defendant does not have to prove the case.  The

7   defendant does not have to prove anything.  It's always the

8   burden is on the Government.

9        So that's what the jury does.  And that's why I made a

10  special point of asking Mr. Hellman, because he's a lawyer, and

11  sometimes lawyers are tempted to inject additional elements or

12  modify something that the judge has told the jury.  And you

13  just can't do that.

14       All right?  You understand that?

15            PROSPECTIVE JUROR HELLMAN:  Yes, your Honor.

16            THE COURT:  All right.  Good.

17       And the rest you who get selected, if you were to serve,

18  you can't give him extra weight on the jury because he's a

19  lawyer.  No.  Everyone has the same vote and has the same

20  conscientious duty on the jury.

21       Okay.  We'll leave it at that for now, and we'll go to

22  your companion next to you.

23       Can you see the chart okay?

24            PROSPECTIVE JUROR DUTTA:  Yeah.

25            THE COURT:  Please go ahead.
```

```
1              PROSPECTIVE JUROR DUTTA:  All right.  My name is
2   Rekhia Dutta.  I live in Tiburon.  My education is from India.
3   I have an engineering degree from IIT and an MBA from IIM.
4              THE COURT:  What do those stand for?
5              PROSPECTIVE JUROR DUTTA:  Indian Institute of
6   Technology and Indian Institute of Management.  That's where I
7   got my MBA.
8              THE COURT:  Very good.  Go ahead.
9              PROSPECTIVE JUROR DUTTA:  I work for Cisco Systems as
10  a program manager.  I have been with them for ten years.
11             THE COURT:  What's the name of the company?
12             PROSPECTIVE JUROR DUTTA:  Cisco Systems.
13             THE COURT:  Oh, Cisco.  All right.
14             PROSPECTIVE JUROR DUTTA:  I'm not a member of any
15  organization, club, or union.  Hobbies, hiking.
16      I am married.  My husband is a businessman.  He's an
17  entrepreneur and a businessman.  No children.
18      No prior jury service.  No military, law enforcement
19  experience.  And I haven't been a party or a witness in court
20  before.
21             THE COURT:  All right.  Thank you.
22      Now we'll go to Mister...
23             PROSPECTIVE JUROR PANAGOPOULOUS:  Excuse me.  My name
24  is Phillip Michael Panagopoulous.  I live in San Francisco.  I
25  have a high school education.  I'm retired.  My most recent job
```

1  is with an electrical contractor, Rosen Electric in

2  San Francisco.  I do not belong to any organizations or clubs.

3  Now I don't.  I don't have any hobbies.

4      I'm married.  My wife is retired, also.  We have two

5  children, one by Laura's first marriage.  He's 47 and works as

6  a glazier in San Francisco.  My daughter, she's 31.  She lives

7  in San Jose, and she works as a massage therapist.

8      I am in the middle of raising my granddaughter, my

9  daughter's child.  She is nine years old, and Laura and I are

10 raising her.

11      I have been on two juries, both criminal, and we did reach

12 verdicts.

13      Never in the military or law enforcement, and never a

14 party or a witness in court.

15          **THE COURT:**  Thank you.

16      Next.

17          **PROSPECTIVE JUROR FERREN:**  My name is Robert Ferren.

18 I live in Monte Rio, California.  I have a psychiatric

19 technician degree from Santa Rosa Junior College.  And I

20 currently am employed as a quality assurance nurse at Crestwood

21 Behavioral Health in Napa Valley.  I don't belong to any

22 organizations.  I like gardening and skiing.

23      I have a domestic partner.  He works as an instructional

24 coach for Santa Rosa City Schools.  And I have a stepson from a

25 previous relationship.  He's 23, and he currently works for

 1    Round Table Pizza in Olympia, Washington.

 2         I haven't served on a juror and never been in the military

 3    or law enforcement.  And I've been in traffic court before.

 4              THE COURT:  All right.

 5         Next.

 6              PROSPECTIVE JUROR VENEGAS:  My name is Bryan Venegas.

 7    I live in Hayward.  Graduated high school and currently at

 8    Chabot College.  Job at PetCo part time.  Don't belong to

 9    anything.  Working on cars is my hobby.

10         Single.  No children.  Too young.  Never had -- never been

11    on jury duty or any of that.  No military or law enforcement.

12    And never been a witness in court or any of that.

13              THE COURT:  Next.

14              PROSPECTIVE JUROR SCHOENTHAL:  My name is Scott

15    Schoenthal.  I live in Dublin.  I have a bachelor's degree from

16    University of California Berkeley in computer science.  My most

17    recent full-time job is at Arkologic.  I was a technical

18    director, senior engineering director at Arkologic, which is a

19    startup in Fremont.  Currently, I'm semiretired.  I work part

20    time for Dublin School District as a soccer coach as well as

21    substitute teaching.

22         I belong to the National Soccer Coach Association.  My

23    hobbies are crossfit and rowing.

24         I'm currently married, my wife of thirty years.  She is a

25    part-time substitute teacher as well.

```
 1        I have three children.  The oldest one is 26 -- he'll be
 2   26 next month.  He's a sergeant in the Army stationed in
 3   Kentucky.  My middle child is graduating from Berkeley.  She's
 4   21 -- 22.  The youngest one is 18.  She is a student at the
 5   University of California San Diego.
 6        I've never served on a jury.  Never been in the military.
 7   Never been in court.
 8        THE COURT:  Thank you.
 9        Next.
10        PROSPECTIVE JUROR HUYNH:  My name Quang Huynh.  I
11   live in Newark.  I have a bachelor's degree in San Jose State
12   for corporate financial management.  I'm currently a premium
13   coordinator at Pensaurus (phonetic spelling).  No
14   organizations.  Biking is a hobby.
15        Single.  No spouse.  No children.
16        No prior jury service.  No military.  No witness in court.
17        THE COURT:  Just pass it back to Mr. Christopher
18   [sic].
19        PROSPECTIVE JUROR CHRISTOPULOS:  I'm Paul
20   Christopulos.
21        THE COURT:  Yes.
22        PROSPECTIVE JUROR CHRISTOPULOS:  I live in Sonoma.  I
23   have a B.A. in music from Sonoma State University.  I'm a
24   retired music instructor from Santa Rosa Junior College, but
25   I'm currently working as a private teacher and performer.
```

```
 1        I'm not a member of any organizations.  I hike, I guess
 2   you would say is my hobby.
 3        I'm married.  My wife is a geologist and a writer.  And I
 4   have a son who's 36, lives on the East Coast and is also a
 5   musician.  And a stepdaughter who's 25 and is a whitewater
 6   river guide.
 7        I've not been on a jury or in the military or in court.
 8            THE COURT:  Okay.
 9        Next.
10            PROSPECTIVE JUROR VILLA:  Carlo Villa.  I'm from the
11   City of Belmont.  Education, I have a Bachelor's and a Master's
12   from San Diego State University.  I work as an extra help with
13   the County in San Mateo.  I belong to the union at work.
14        Divorced.  No partner.  I have three children: 24 and 25.
15   San Diego.  They are manufacturing technicians.
16        No prior jury service.  I serve in the Navy Reserve.  I've
17   never been a party or a witness in court.
18            THE COURT:  What is your specific job?
19            PROSPECTIVE JUROR VILLA:  I'm a benefits analyst,
20   extra help.
21            THE COURT:  All right.  Thank you.
22        Next.
23            PROSPECTIVE JUROR BONETTI:  Name is John Bonetti.  I
24   live in Napa.  High school diploma.  I work, store manager for
25   Home Depot.  No organization or clubs.  Hobbies, camping and
```

1    gardening.

2        I am married.  Two kids, two and five.  I have a wife.

3    She does dispatching for a heat and air company.

4        Never been on a jury.  No military or law enforcement.

5    And just traffic court.

6            **THE COURT:**  All right.

7        Next.

8            **PROSPECTIVE JUROR ROPER:**  My name is Brian Roper.  I

9    lived in San Francisco up until two weeks ago, and now I live

10   in Alameda, California.

11       Education:  Bachelor's degree, University of California at

12   Davis in microbiology.  I work at Genentech in research.  I'm

13   no -- I'm not part of any organizations.  No hobbies.

14       I am single.  No children.  No prior jury service.  And no

15   military or law enforcement.  And I've never been a party or a

16   witness in court.

17           **THE COURT:**  Thank you.

18       Ms. Barnett.

19           **PROSPECTIVE JUROR BARNETT:**  My name is Becca Barnett.

20   I have a PhD in clinical psychology and am in the Episcopal

21   priesthood.

22       My most recent job is working as a psychotherapist and

23   doing academic editing and teaching academic writing to

24   psychology graduate school students.  I'm in ACBS, which is a

25   psychological organization.  And I belong to the church, St.

1    Gregory of Nyssa.

2         Hobbies, I guess, making jewelry.

3         And marital status, I'm divorced.  Been divorced since

4    '83.  Not remarried.  Don't have a spouse or partner.  I have

5    no children.

6         I did get called for jury service to the point where we

7    had to fill out some papers.  And then -- but there was a

8    question about whether you believed in the death penalty or

9    not.  And I -- and I don't, so I got excused from that.

10        And I haven't been in the military or law enforcement.

11   And I haven't been a party or a witness in court.

12        **THE COURT:**  You wanted to raise an issue about

13   hardship; so please go ahead and do that now.

14        **PROSPECTIVE JUROR BARNETT:**  Yeah.  At the beginning

15   of 2013 I got a very severe lung infection that lasted over

16   three months that they never diagnosed, and it changed the

17   whole metabolism, my body.  So I had to give up my practice and

18   give up everything.  And I had been living off my savings, but

19   I've depleted those.  And I've already borrowed from my family.

20        And now I'm beginning to get back on my feet and beginning

21   to build my practice, but I only have two people, you know, in

22   that.  And I -- I just have one or two editing clients.

23        So in my bank, I've only got about $1,500 and my $1,200

24   rent is coming up.  And I'm afraid if I work the next three

25   weeks [sic], I won't have accumulated the money to pay for my

```
 1  rent.  Because when I don't have the -- during this time when
 2  I'm trying to rebuild my practice and trying to rebuild my
 3  editing job, I drive for Lift.  And so that -- that's what gets
 4  me the money to be able to meet my rent.
 5          THE COURT:  You're the only breadwinner in your
 6  household?
 7          PROSPECTIVE JUROR BARNETT:  Yes.
 8          THE COURT:  Any objection to excusing Ms. Barnett?
 9          MS. HARRIS:  No objection, your Honor.
10          MR. BRUGNARA:  No.
11          THE COURT:  All right.  I'm going to accept your
12  reasons, and you're excused.
13          PROSPECTIVE JUROR BARNETT:  Thank you.
14      (Prospective Juror Barnett excused.)
15          THE COURT:  All right.  We're going to -- I'm going
16  to come back to you in a second.
17      We're going to call a name to replace Ms. Barnett.
18          THE CLERK:  Okay.  Melanie Murphy, M-U-R-P-H-Y.
19          THE COURT:  Let's go back to Mr. Villa.
20      You had raised your hand, too, didn't you?
21      Let's hear what your excuse is.  Can we send the
22  microphone back down there.
23          PROSPECTIVE JUROR VILLA:  I work as an extra help for
24  the county.  I'm single.  And I'm pretty much just making
25  enough to -- I cannot take that time off.
```

1          THE COURT:  You work for the County?

2          PROSPECTIVE JUROR VILLA:  As an extra help.

3          THE COURT:  Don't they pay for your jury service?

4          PROSPECTIVE JUROR VILLA:  No.

5          THE COURT:  Are you sure of that?

6          PROSPECTIVE JUROR VILLA:  Yes, I'm positive.  I'm not

7  a permanent employee.  It's just like an on-call basis.  There

8  is work, but -- like today, I'm not getting paid.

9          THE COURT:  Are you married?

10         PROSPECTIVE JUROR VILLA:  No.  Single.

11         THE COURT:  That's going to be -- is it going to be a

12 hardship on you to serve?

13         PROSPECTIVE JUROR VILLA:  Yes.

14         THE COURT:  Any objection to excusing Mr. Villa?

15         MS. HARRIS:  No objection, your Honor.

16         MR. BRUGNARA:  No.

17         THE COURT:  All right.  You're excused.  Thank you.

18      (Prospective Juror Villa excused.)

19         THE COURT:  Let's replace Mr. Villa.

20         THE CLERK:  Okay.  Francis Hackney, H-A-C-K-N-E-Y.

21         THE COURT:  Good morning.  Can you just please take

22 that seat right up there?

23      And let's pass the microphone back to Ms. Hackney, please,

24 and we'll start with her.

25      Ms. Hackney, welcome.  Do you have any hardship issue?

1          **PROSPECTIVE JUROR HACKNEY:**  No.

2          **THE COURT:**  All right.  Can you see the -- someone is

3   hacking and coughing.  Who would that be?

4      Would you like a cough drop?

5          **MS. MALLORY:**  Yes.

6          **THE COURT:**  You know, up here it's like being in a

7   thunderstorm.  When there is a static crash, I can't hear.  So

8   please be considerate to the poor old judge who is trying his

9   best to hear.

10     Did somebody back there want a cough drop?

11         **UNIDENTIFIED PROSPECTIVE JUROR:**  I have cough drops.

12         **THE COURT:**  Please take one of your cough drops so I

13  can hear.

14     Ms. Hackney, if you can see the board, please go ahead and

15  give us the info.

16         **PROSPECTIVE JUROR HACKNEY:**  My name is Francis

17  Hackney.  I live in Oakland.  High school.  Most recent

18  employer was Southwest.  I was a customer service agent.

19     Organizations I belong to, the National Association for

20  Federal Retired Employees.  Hobbies, I like to read and bowl.

21     I'm married.  My spouse was -- is a retired banker.  I

22  have one daughter, she's 39.  She's an IT person for Alameda

23  County Hospital.

24     Prior jury service, I have been on five juries.

25         **THE COURT:**  Did you say five?

```
 1              PROSPECTIVE JUROR HACKNEY:  Five.

 2              THE COURT:  Okay.  That's a lot.

 3              PROSPECTIVE JUROR HACKNEY:  Yeah.  I've been kind of

 4   busy over the years.

 5         We've always --

 6              THE COURT:  Did you reach a verdict in all five?

 7              PROSPECTIVE JUROR HACKNEY:  Yes.

 8              THE COURT:  Okay.

 9              PROSPECTIVE JUROR HACKNEY:  No military service.  And

10   I've never been a witness.

11              THE COURT:  All right.  Thank you.

12         Now we go back to Ms. Murphy.

13         Ms. Murphy, do you have any hardship issue?

14              PROSPECTIVE JUROR MURPHY:  I do not.

15              THE COURT:  Can you see the chart?

16              PROSPECTIVE JUROR MURPHY:  Yes.

17              THE COURT:  Please give us the info.

18              PROSPECTIVE JUROR MURPHY:  My name is Melanie Murphy.

19   I live in Alameda.  I went to some college.  I work for Eye For

20   Color in Oakland, California.

21         I'm a member of two cycling clubs.  I'm a musician and a

22   cyclist.

23         I'm not married.  I have no spouse or partner.  I have no

24   children.  No prior jury service.  No military or law

25   enforcement.  And I have never been in a court before today.
```

1           THE COURT:  Congratulations.

2           PROSPECTIVE JUROR MURPHY:  Thank you.

3           THE COURT:  Next.

4           PROSPECTIVE JUROR BASS:  Hi.  My name is Angela Bass.

5   I live in Richmond.  High school education.  I work for TPA.  I

6   am a worker's compensation litigation specialist.  I am a

7   volunteer for the German Shepherd Rescue of Northern

8   California.  I -- scuba diving, dirt biking.

9       I am married.  My husband is a project manager for Pacific

10  Gas and Electric.  No children.

11      No prior jury service.  No military.  I have made quite a

12  few appearances at the Worker's Compensation Appeals Board in

13  the past for claims.

14          THE COURT:  What is TPA?

15          PROSPECTIVE JUROR BASS:  I'm sorry?

16          THE COURT:  You said something about TPA.

17          PROSPECTIVE JUROR:  I work for a Third-Party

18  Administrator.

19          THE COURT:  Oh, Third Party Administrator.  Okay.

20          PROSPECTIVE JUROR BASS:  Yeah.

21          THE COURT:  Are you a lawyer?

22          PROSPECTIVE JUROR BASS:  No.  I just handle litigated

23  claims in my unit for worker's comp to defend my clients'

24  cases.

25          THE COURT:  Okay.  And who was it you appeared in

1    front of?

2              **PROSPECTIVE JUROR BASS:**  Worker's Compensation

3    Appeals Board.

4              **THE COURT:**  All right.  Go ahead and finish the -- on

5    or have you --

6              **PROSPECTIVE JUROR BASS:**  I'm done.

7              **THE COURT:**  You're done.  Thank you.

8        Next.

9              **PROSPECTIVE JUROR HAMILTON:**  I'm Jennifer Hamilton,

10   San Ramon.  My education is a B.S. from Oregon State and a

11   graduate master's worker at St. Mary's College where I got my

12   credentials.  I work for San Ramon Valley Unified as a special

13   education teacher.  And I also work as a contract worker for

14   Web Wise, which also does special education services.

15       I belong to CTA and Fellowship Christian Athletes,

16   organizations all within our church.

17       For hobbies I play volleyball, sports, and just trying to

18   keep up with my kids.

19       I am married.  My husband is also a special education

20   teacher.  We have three children:  Eight -- a daughter who's

21   eight, a daughter who turned seven today, and a little boy who

22   is three.  And they are second grade, first grade and

23   preschool.

24       I have never served on a jury.  I've been never been in

25   the military, but my husband did serve.  And I've never been a

1   party or a witness in court.

2          THE COURT:  All right.  Has your husband served on a

3   jury?

4          PROSPECTIVE JUROR HAMILTON:  I don't believe so.

5          THE COURT:  All right.  And what town did you live

6   in?

7          PROSPECTIVE JUROR HAMILTON:  San Ramon.

8          THE COURT:  San Ramon.  Okay.  Thank you.

9       Can you walk around to that row over there and hand them

10  the microphone?

11         PROSPECTIVE JUROR HAMILTON:  I can.

12      Can I just say, one of my only concerns, being a special

13  ed teacher we have IEP timelines that are legal documents, and

14  so we have several of those scheduled.  So that would be the

15  only thing I would have to reschedule those if I can, depending

16  on how many weeks --

17         THE COURT:  Why don't I tell you what the schedule is

18  in this case?

19         PROSPECTIVE JUROR HAMILTON:  Okay.

20         THE COURT:  This is for everybody.  The overall

21  timeline that I'm thinking is the case will probably over by

22  May 21, but it could go as long as June 5.  If it does go that

23  long, we will take off and no one will be around.  We'll all

24  take off May 22 to 25.  That's the Memorial Day weekend plus

25  the Friday preceding it.  So it would be a long four-day

```
 1   weekend there.  And then we would come back on the 26th and
 2   resume.
 3        It's hard for me to tell you how long this case will go.
 4   I wish I could give you a better estimate than that.  But I
 5   believe June 5 it will be over, I'll say 99 percent likely, and
 6   I will say better than an even chance that it will be over by
 7   May 21.  That's my guess.
 8        But we've got to assume the longest case, and that will
 9   take you all the way up to June 5.
10        We will be in session as follows:  Every morning the jury
11   gets here at 7:45 in the morning.  And except for today, we'll
12   go past 1:00 o'clock today.  I usually let you go at 1:00
13   o'clock.  So it's a -- this has worked great.  I've gotten a --
14   I got a box full of letters from jurors who love this schedule,
15   because it gives you, basically, half a day to continue on with
16   your lives starting at 1:00 o'clock.
17        We'll take two breaks each day, usually -- well, it just
18   depends on when we need them -- but two breaks.  And then you
19   get to go at 1:00.  And we don't give you lunch until you start
20   deliberating.  But at 1:00 o'clock, you get to go home or go
21   have lunch, whatever you want.  So we don't have a lunch break.
22   We just work right up to 1:00 o'clock.  So that's our schedule.
23        Now, there could be some days where I say:  Please stay a
24   little longer.  I'll try to give you a heads-up when those case
25   come.  And for sure, once the jury starts deliberating, the
```

1    juries almost always like to stay late each day.

2        Some days -- it depends on -- sometimes I've had them stop

3    at 1:00 o'clock.  But usually they like to push ahead to 4:00

4    o'clock.  But that's up to them.  That's up to the jury.

5    They're the boss at that point.

6        So that's our schedule.  To go back and repeat:  Today is

7    April 27; 27, 28, 29, and 30, and then we go to May 1.  And

8    then we're in the month of May.  And we could be done as early

9    as May 21.  Probably, we will be.  But I've got to -- I got to

10   hedge a little bit and say we might go as late as June 5.

11       All right.  Now, with that having been said -- I didn't

12   give you all that information before -- is there anyone over

13   there in the jury box for whom the schedule that I just laid

14   out is a shock or a surprise, and would you want to raise some

15   hardship issue that I didn't tell you?

16       Yes.  Okay.  Ms. Hamilton.

17           **PROSPECTIVE JUROR HAMILTON:**  Hamilton.

18           **THE COURT:**  You've got the microphone.  Go ahead.

19           **PROSPECTIVE JUROR HAMILTON:**  Our special needs

20   students have IEPs, which are legal documents that have to be

21   held within the timelines with the State.  And I'm numerous of

22   those scheduled throughout this week up until the end of the

23   school year.  So if I don't hold those, we're out of compliance

24   with our IEP as far as students.

25           **THE COURT:**  You're a school teacher?

```
 1              PROSPECTIVE JUROR HAMILTON:  Yeah.  Special ed
 2   teacher.
 3              THE COURT:  When you get sick, what does the school
 4   district do?
 5              PROSPECTIVE JUROR HAMILTON:  So if I don't have a
 6   meeting at that time -- because the meetings are scheduled in
 7   advance.  If I don't have that meeting, then we will try to
 8   reschedule it within the timeline from the year -- from the
 9   last annual IEP.  If that cannot happen, then we usually have a
10   parent agree to postpone the meeting, hold the meeting over the
11   phone if I can, and then we reschedule it.
12              THE COURT:  How many do you have do?
13              PROSPECTIVE JUROR HAMILTON:  I have six or seven.
14              THE COURT:  Can you do those in the afternoon after
15   court?
16              PROSPECTIVE JUROR HAMILTON:  They are during seven --
17   my work hours, which is 7:30 to 2:30.
18              THE COURT:  But I'm asking you, could you modify your
19   work hours so that you would do this after court?
20              PROSPECTIVE JUROR HAMILTON:  I have to hold them
21   within the school day, because I have a team that has to be
22   there, which includes teachers, administrator.  The IEP team is
23   made up of the parents, the administrator, the general ed
24   teacher, a special ed teacher, and our counselor.  So they are
25   hard to reschedule.
```

1              THE COURT:  What are these things called?

2              PROSPECTIVE JUROR HAMILTON:  An Individualized

3  Education Plan or IEPs.  Every special education student has

4  one.

5              THE COURT:  All right.  I'm not sure this is a --

6  this is legitimate, what you're saying.  But I'm not sure it's

7  a legal basis to be excused from jury service.  I've got to

8  think about that.

9          All right.  Who else raised their hand over there?

10         Ms. -- in the front row.  Ms. --

11             PROSPECTIVE JUROR DUTTA:  Rekhia Dutta.

12             THE COURT:  Yeah.

13             PROSPECTIVE JUROR DUTTA:  So I work as a project

14  manager, and I have to work -- most of my teammates are in

15  India or in Europe and UK.  So, and as a project manager, I do

16  coordination and facilitations.  And my meetings are mostly

17  scheduled during the early part of the day, 7:00 to

18  10:00 o'clock in the morning.  So taking a month off would be

19  very difficult.  I have -- I'm handling six projects at this

20  time, and...

21             THE COURT:  But you get paid for jury service by your

22  employer, right?

23             PROSPECTIVE JUROR DUTTA:  Yes, I would get paid.

24  That wouldn't be an issue.

25             THE COURT:  I've had this problem.  And I can tell

1  you that is not a legal excuse to be excused.  Somehow a big

2  company like -- Cisco, right?

3          **PROSPECTIVE JUROR DUTTA:**  Right.

4          **THE COURT:**  It's a big company.  They will find a way

5  to deal with your absence as important as you are.

6          **PROSPECTIVE JUROR DUTTA:**  Okay.

7          **THE COURT:**  So I cannot excuse you on that ground.

8          **PROSPECTIVE JUROR DUTTA:**  All right.

9          **THE COURT:**  Sorry.

10     Anyone else over there?

11     Yes, sir.  Let's go back to Mister -- repeat your name,

12  please.

13          **PROSPECTIVE JUROR BONETTI:**  John Bonetti.  It's not

14  really a hardship, but I have a vacation coming up in a couple

15  weeks.  We're going on vacation.

16          **THE COURT:**  Well, that could be.  Tell me the

17  details.

18          **PROSPECTIVE JUROR BONETTI:**  Just a trip.  We take our

19  family to Santa Cruz mountains for four days starting the 13th,

20  14th, 15th, 16th, 17th.

21          **THE COURT:**  Where do you go in the Santa Cruz

22  mountains?

23          **PROSPECTIVE JUROR BONETTI:**  It's a campground.  We go

24  there.

25          **THE COURT:**  And have you already invested money in

1  this vacation?

2          PROSPECTIVE JUROR BONETTI:  Yes.

3          THE COURT:  What have you invested?

4          PROSPECTIVE JUROR BONETTI:  $300.

5          THE COURT:  For what?

6          PROSPECTIVE JUROR BONETTI:  Just a deposit.

7          THE COURT:  For what, though?

8          PROSPECTIVE JUROR BONETTI:  For camping.  It's a camp

9  trip.

10          THE COURT:  $300 for a campground?

11          PROSPECTIVE JUROR BONETTI:  Yeah.  Because you have

12  to have two spaces.  It's a family kind of RV campground, KOA.

13          THE COURT:  Is it non-refundable?

14          PROSPECTIVE JUROR BONETTI:  It's refundable.

15          THE COURT:  Well, okay.  I don't know the answer to

16  this.  I'll tell you that the rule is that if you had already

17  paid for airplane tickets to go to, say, Florida, you get

18  automatically excused.  I shouldn't say that, because somebody

19  might tell me that's what's happened.

20      (Laughter.)

21          THE COURT:  But I don't think what you've told me --

22  I don't know.  I've got to write that down.

23          PROSPECTIVE JUROR BONETTI:  Okay.

24          THE COURT:  Maybe.  But here's the deal:  If you're

25  on the jury, you've got to be here every day, every minute.

1   It's not like high school where you say, Oh, give me your

2   notes.  No.

3       You've got to see it for yourself.  Hear the witnesses for

4   yourself.  You've got to be here on time.  So it's not like you

5   could, you know, sneak off to the Santa Cruz mountains for a

6   couple of days and then come back.  You've got to be here the

7   whole time.  People don't really understand that.

8       All right.  So you're Mr. Bodelli [sic]?

9           **PROSPECTIVE JUROR BONETTI:**  Bonetti.

10          **THE COURT:**  Yes.  Okay.  So, Santa Cruz.  And how

11  many kids are you taking up there?

12          **PROSPECTIVE JUROR BONETTI:**  I have two.  And my

13  brother-in-law, he also has two.

14          **THE COURT:**  All right.  Anyone else in the jury box?

15      All right.  Let's go back to Ms. Bass.

16          **PROSPECTIVE JUROR BASS:**  Hi.  The team that I work

17  on, we're already down three people.  I've got benefits and

18  settlements to pay.  And I do have a very major client meeting

19  next week where I have to present my cases.  And there is

20  nobody to take my place because they don't know my files.

21          **THE COURT:**  Who do you work for again?

22          **PROSPECTIVE JUROR BASS:**  I work for a company called

23  Sedgwick Claims Management Services.  We're a TPA that handle

24  worker's comp files.

25          **THE COURT:**  Yeah.  That's not a legal excuse.

```
 1                    PROSPECTIVE JUROR BASS:  Okay.

 2              THE COURT:  I can't let you out for that reason.

 3    They'll just have to adjust in some manner.  I'm sorry.

 4         Who else raised their hand?  Over there, Mr. Huynh.

 5              PROSPECTIVE JUROR HUYNH:  Quang Huynh.  I have a

 6    scheduled court appointment tomorrow.

 7              THE COURT:  What kind?

 8              PROSPECTIVE JUROR HUYNH:  It's for a traffic

 9    citation.

10              THE COURT:  Wait.  You're going to court tomorrow for

11    a traffic citation?

12              PROSPECTIVE JUROR HUYNH:  Yes.  I have it scheduled.

13              THE COURT:  What time is it?

14              PROSPECTIVE JUROR HUYNH:  They don't give a specific

15    time.  It opens, like, at 8:30.  They're going to take whoever

16    walks in.  I have an email if you want.

17              THE COURT:  Let me see that.

18              PROSPECTIVE JUROR HUYNH:  The email?

19              THE COURT:  Yeah.

20         Okay.  While you're looking for that, anyone else in the

21    jury box?

22         Okay.  Who's got the microphone?

23         You want to raise your hand?  Okay.  What's your name

24    again?

25              PROSPECTIVE JUROR ROPER:  Brian Roper.
```

1          THE COURT:  What's your issue now?

2          PROSPECTIVE JUROR ROPER:  I have a flight scheduled

3   for Barcelona on June 2nd.

4          THE COURT:  June 2nd?

5          PROSPECTIVE JUROR ROPER:  Yes.

6          THE COURT:  Have you paid for the ticket yet?

7          PROSPECTIVE JUROR ROPER:  Yes.

8          THE COURT:  You paid for it?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  You're sure?

11         PROSPECTIVE JUROR ROPER:  I was looking on my phone

12  just to confirm, and, yes, I paid for the ticket.

13         THE COURT:  Is it nonrefundable?

14         PROSPECTIVE JUROR ROPER:  Yes.

15         THE COURT:  Nonrefundable to Barcelona.

16     Well, if both sides were to guarantee me this case would

17  be over by then, it won't be a problem.  I'm not sure of that.

18     Ms. Harris?

19         MS. HARRIS:  I would like to be able to guarantee

20  that to the Court, but I just -- I just don't know how it's

21  going to work out.

22         THE COURT:  Mr. Brugnara?

23         MR. BRUGNARA:  Your Honor, I can't imagine this case

24  even taking a week let alone two weeks.  I'm thinking the

25  gentleman with the children should be able to make his camping

1   trip.

2        I mean, it's a very simple case, in my opinion, so I can't

3   imagine it dragging on, as far as my explanation, more than a

4   day.  It's a very simple case as far as I'm concerned.

5            THE COURT:  No speeches, please.  No speeches.

6        I believe that I'm going to let you go, because I think it

7   could go as late as June 5.

8            PROSPECTIVE JUROR ROPER:  Thank you, your Honor.

9            THE COURT:  All right.  So you're excused despite the

10   comments by both sides.

11        (Prospective Juror Roper excused.)

12            THE COURT:  We'll replace Mr. Roper, right?

13        Can we call a name?

14            THE CLERK:  Okay.  It's going to be Ella Purington

15   Wild, P-U-R-I-N-G-T-O-N, and W-I-L-D.

16            THE COURT:  So, Ms. Purington, just have a seat there

17   for a second.

18        How are you today?  Are you okay?

19            PROSPECTIVE JUROR PURINGTON WILD:  No.

20            THE COURT:  No?  Well, maybe I can fix that.  Okay.

21        You want to bring me that email?

22            PROSPECTIVE JUROR PURINGTON WILD:  Yes.

23        (Whereupon, a cell phone was tendered to the Court.)

24            THE COURT:  All right.  For the record, I'm looking

25   at very tiny print.

```
 1            PROSPECTIVE JUROR PURINGTON WILD:  It's a mini one.

 2            THE COURT:  That has your name on it from the traffic

 3   court.  Traffic -- calendar starts at 8:30.  Cases are called

 4   in the order in which they were reserved.

 5        Do you have a reserved time?

 6            PROSPECTIVE JUROR HUYNH:  That was it.  That's a

 7   confirmation for the -- they don't have reserved time.  It

 8   opens at 8:30, and whatever -- whoever walks -- to get priority

 9   whoever comes in first.

10            THE COURT:  "Due to the volume of the calendars,

11   please allow enough time for you to be in court approximately

12   two to three hours.  Shorts and tank tops are not allowed in

13   court."

14        (Laughter.)

15            THE COURT:  All right.  So this is you, huh?  All

16   right.  I'm going to excuse Mister -- say it again.

17            PROSPECTIVE JUROR HUYNH:  Huynh.

18            THE COURT:  -- Huynh, unless I hear an objection.

19   Any objection?

20            MS. HARRIS:  No objection.

21            MR. BRUGNARA:  No.

22            THE COURT:  Thank you, sir.  Good luck tomorrow.

23            PROSPECTIVE JUROR HUYNH:  Thank you.

24        (Prospective Juror Huynh.)

25            THE COURT:  All right.  Let's call another name.
```

```
 1              THE CLERK:  Okay.  Leif Persson, P-E-R-S-S-O-N.

 2              THE COURT:  All right.  Welcome to you.

 3       All right.  Let's go back to Ms. Purington.  Did you have

 4  any hardship issue you wished to raise?

 5              PROSPECTIVE JUROR PURINGTON WILD:  Yes.  I'm the HR

 6  manager for Local 1021, and I don't have a replacement for such

 7  a long term.

 8              THE COURT:  Well, you work for SEIU?  So you

 9  definitely get paid for jury service, right?  Yes?  Right?

10              PROSPECTIVE JUROR PURINGTON WILD:  Well, no -- yeah,

11  I probably do.

12              THE COURT:  You do, because the unions always get it.

13              PROSPECTIVE JUROR PURINGTON WILD:  But I'm an

14  at-will.  My position is at will.

15              THE COURT:  What does that mean?

16              PROSPECTIVE JUROR PURINGTON WILD:  I don't belong to

17  one of the staff unions.

18              THE COURT:  You what?

19              PROSPECTIVE JUROR PURINGTON WILD:  I don't belong to

20  one of the staff unions.

21              THE COURT:  So you're not in a union?

22              PROSPECTIVE JUROR PURINGTON WILD:  I work for the

23  union, but I'm not in a union.

24              THE COURT:  Don't they pay you for jury service?  You

25  don't know?
```

```
 1            PROSPECTIVE JUROR PURINGTON WILD:  My director once
 2   told me that they wouldn't pay for a long term.  I don't know.
 3            THE COURT:  You should have checked.  I can't let you
 4   off just on the gamble that you don't get paid.  That's --
 5   you're supposed to know the answer to that before you come to
 6   court.
 7      Here's the other thing:  If any -- this goes for
 8   everybody.  If any employer terminates you on account of jury
 9   service, that is a federal crime, and I will make sure they get
10   punished.  So don't even let them think about that.  I mean,
11   you shouldn't worry about that.
12            PROSPECTIVE JUROR PURINGTON WILD:  I'm not afraid of
13   termination.  I'm more afraid of having to go to court -- or
14   jury service and then having to work an additional eight hours
15   or nine hours afterwards.  And I'm going to be 67 next month,
16   and I don't have that energy.
17            THE COURT:  You don't have to do that -- you don't
18   have to -- when you're on jury service, you don't have to work
19   any after court.  You can go home and take a nap.  They can't
20   make you come back to work.  That's a voluntary act on your
21   part if you do that.  So they can't do that to you.
22            PROSPECTIVE JUROR PURINGTON WILD:  Well, I have
23   projects and deadlines and things going on, so I would have to
24   work.
25            THE COURT:  So does she.  So does she.  And that --
```

1   it's very important that -- we can't excuse people just because

2   they're important.  So that's not a good excuse.

3       Now, if you were to tell me you won't get paid and you

4   can't make your house payments, then I could excuse you or

5   would excuse you because that's legitimate.  But you don't know

6   the answer to that question, so I can't excuse you right now.

7       I believe SEIU, of all people, would be paying their

8   employees for jury service.  That's the number-one thing that

9   unions always get is a good deal on jury service.  I've got to

10  believe they're going to pay you.  But before you get selected,

11  if you come back with some proof that they won't pay you and it

12  would be a hardship, I'll hear you out on that.

13      So while you have the microphone, why don't you give us

14  that information.

15      Dawn, I can't see the chart anymore.  I want to make sure.

16  Can you see that chart?

17          **PROSPECTIVE JUROR PURINGTON WILD:**  Oh, yes.

18          **THE COURT:**  Okay.  Give us the information, please.

19          **PROSPECTIVE JUROR PURINGTON WILD:**  Okay.  My name

20  Ella Wild.  My city of residence is Albany.  I have a bachelor

21  of science in nursing.  I'm the HR manager for SEIU Local 1021.

22  My hobbies are hiking.

23      I'm divorced.  I have a partner who is semiretired.  I

24  have a son who is 29.  He has a PhD, and -- he just obtained

25  his PhD in geology and geophysics and works for Royal Dutch

 1   Shell in London.

 2        I haven't served on a jury before.  I have been in

 3   depositions and arbitrations.  I was never in the military.

 4   And I was never a witness in court.

 5             **THE COURT:**  Great.  Thank you.

 6        Pass the mic, please, to Mr. Garsson.

 7             **PROSPECTIVE JUROR GARSSON:**  Garsson.

 8             **THE COURT:**  How do you say your last name?

 9             **PROSPECTIVE JUROR GARSSON:**  Garsson, G-A-R-S-S-O-N.

10             **THE COURT:**  That's not who we --

11             **THE CLERK:**  It's supposed to be Leif Persson.

12             **THE COURT:**  Leif Persson.  Where is he?  Don't give

13   up hope.

14        (Laughter.)

15             **THE COURT:**  So, Mr. Leif Persson.

16        All right, Mr. Persson.  Do you have any hardship issue?

17             **PROSPECTIVE JUROR PERSSON:**  Probably not more than

18   anyone else around this room, so...

19             **THE COURT:**  No.  Is that it?

20        Tell me what you want to raise.  I'd like to hear it.

21             **PROSPECTIVE JUROR PERSSON:**  Personally I'm the only

22   one in my work, and I work for a company that's based out of

23   Houston.

24             **THE COURT:**  Are you going to get paid for jury

25   service?

1          **PROSPECTIVE JUROR PERSSON:**  Yes.

2          **THE COURT:**  Well, then, no.  The answer is almost

3   always no, unless there's national security or something.  So

4   the answers is no.

5          **PROSPECTIVE JUROR PERSSON:**  Okay.

6          **THE COURT:**  All right?

7          **PROSPECTIVE JUROR PERSSON:**  My name is Leif Persson.

8   I live in Livermore.  I'm a mechanical engineer.  I work for a

9   company out of Houston in the --

10          **THE COURT:**  What's the name of that company?

11          **PROSPECTIVE JUROR PERSSON:**  EWI, Incorporated.  We're

12   an outdoor power equipment distributor.

13          **THE COURT:**  Okay.

14          **PROSPECTIVE JUROR PERSSON:**  I don't belong to any

15   clubs.  I like to play soccer.  I mountain bike.  Skiing.

16      I'm married.  My wife, she works for a veterinarian.  I

17   have no children.

18      I have no prior jury service.  No military.

19          **THE COURT:**  Speak more into the mic.

20          **PROSPECTIVE JUROR PERSSON:**  I'm sorry?

21          **THE COURT:**  Speak more into the mic.

22          **PROSPECTIVE JUROR PERSSON:**  And I haven't been a

23   party or a witness in court.  No.

24          **THE COURT:**  You have or haven't?

25          **PROSPECTIVE JUROR PERSSON:**  I have not.

```
 1              THE COURT:  You keep wobbling around like -- you
 2   wouldn't stay focused on the mic.
 3         You have or have not been a party?
 4              PROSPECTIVE JUROR PERSSON:  I have not been a party.
 5              THE COURT:  All right.  Thank you.
 6         Let's pass the microphone over to the row over there,
 7   please.
 8         Your name again?  Remind us.
 9              PROSPECTIVE JUROR ARKIN:  David Arkin.
10              THE COURT:  Can you see the chart okay?
11              PROSPECTIVE JUROR ARKIN:  Yes.
12              THE COURT:  Do you have a hardship issue?
13              PROSPECTIVE JUROR ARKIN:  No more than anyone else
14   here, I'm sure.
15              THE COURT:  I'm going to take that as a no.
16         Please do the chart.
17              PROSPECTIVE JUROR ARKIN:  David Arkin, City of
18   Albany.  Bachelor of architecture from the University of
19   Minnesota.  Studies -- graduate studies in architecture and
20   planning at Cal.  Architect, self-employed.  Run a small
21   practice in the East Bay.
22         I currently serve as director of the California Straw
23   Building Association.  Served ten years on the Albany Planning
24   and Zoning Commission, and involved in several civic
25   organizations.  I enjoy long-distance cycling and snowboarding.
```

```
 1        Married.  My spouse is an architect.  She's a partner in
 2   our firm.  A son who is 20, currently traveling in Longmont,
 3   Colorado.  Daughter 21 at the University of British Columbia.
 4        Never served on a jury nor military or law enforcement.
 5   And I was president of a non-profit that was heard at the Ninth
 6   District Court of Appeals.
 7             THE COURT:  Say that again.
 8             PROSPECTIVE JUROR ARKIN:  I was president of a
 9   non-profit organization and our case made it as high as the
10   Ninth District Court of Appeal.
11             THE COURT:  You mean, the circuit court?
12             PROSPECTIVE JUROR ARKIN:  Yes.
13             THE COURT:  All the way up to the appellate court.
14   What was the name of that organization?
15             PROSPECTIVE JUROR ARKIN:  We were Citizens for
16   Responsible Government.
17             THE COURT:  We're all for that.
18        (Laughter.)
19             THE COURT:  Okay.
20             PROSPECTIVE JUROR ARKIN:  CEQA and election law.
21             THE COURT:  For what city were you contesting?
22             PROSPECTIVE JUROR ARKIN:  City of Albany.
23             THE COURT:  Albany.  Okay.  Is that it?
24             PROSPECTIVE JUROR ARKIN:  Yes.
25             THE COURT:  Good.  Have a seat.
```

1       Next.

2              PROSPECTIVE JUROR CHAN:  My name is Matthew Chan.

3  I'm from Berkeley, California.  I have a bachelor's, master's

4  and PhD in mechanical engineering from U.C. Berkeley.  My most

5  recent job and current job is R&D semiconductor process

6  engineer for Keysight technologies up in Santa Rosa.  I am a

7  volunteer aquarium diver for the California Academy of

8  Sciences.  My hobbies are scuba diving and rock climbing.

9       I am married.  My wife is an environmental consultant for

10 Department of Transportation.  No children.

11      No prior jury serves.  I have not been a member of the

12 military or law enforcement.  And I've only ever been in court

13 once when I was 16 for a speeding ticket, but I've learned my

14 lesson.

15             THE COURT:  But what?

16             PROSPECTIVE JUROR CHAN:  I was in traffic court at

17 the age of 16 for a speeding ticket once.

18             THE COURT:  Okay.  How old are you now?

19             PROSPECTIVE JUROR CHAN:  I am now 29.

20             THE COURT:  All right.  Thank you.

21      Next.

22      You don't have to stand.  I think -- unless you want to.

23 But you -- I mean, I can see you all now.

24             PROSPECTIVE JUROR CHAN:  Great.  My name is Dan

25 Evenhouse.  I live in Pacifica, California.  I have a master's

1  in social welfare from U.C. Berkeley.  I'm currently employed

2  by the San Francisco Veterans Affairs Healthcare System.  And I

3  am involved with -- I belong to the local Episcopal church.  I

4  have a number of veterans organizations that I've been involved

5  with.

6      I'm not, myself, a veteran.  I've never been in the

7  military, but I have been at the VA for about -- almost 20

8  years, so I'm involved with the Veterans Coalition of San Mateo

9  County, a couple of veteran's advisory councils.  I think

10  that's about it.

11      Hobbies, I don't have much time for hobbies, but

12  occasionally get some reading done.

13      I'm married.  I have two children, 11 and 13.  My spouse

14  is also -- actually, my occupation, I'm the director of

15  community-based services for a mental health program within the

16  VA.  So I'm a licensed clinical social worker.  And my spouse

17  also a licensed marriage and family therapist.

18      I served on a jury several years ago in Berkeley, and that

19  was a criminal case, and the jury found the person not guilty.

20          **THE COURT:**  All right.  You're just supposed to say

21  whether you reached a verdict or not.

22          **PROSPECTIVE JUROR CHAN:**  Okay.  Sorry.

23          **THE COURT:**  So -- that's fine.  Go ahead.

24          **PROSPECTIVE JUROR CHAN:**  And I've never been a party

25  or a witness in court aside from serving on a jury.

 1          THE COURT:  Thank you.

 2      Next.

 3          PROSPECTIVE JUROR PATTERSON:  My name is Eric

 4  Patterson, and I live in Novato, California.  I have a master's

 5  degree in journalism from the University of Kansas.  I'm

 6  currently vice president of strategy and development for a

 7  small technology firm called Bitcasa.  No organizations or

 8  clubs.

 9      I am a sailor.  I'm married.  My wife's current occupation

10  is chasing our two-year-old twins and six-year-old.

11      No prior jury service.  No military or law enforcement

12  background.  I was a witness in a criminal case about 15 years

13  ago.

14          THE COURT:  What kind of case was that?

15          PROSPECTIVE JUROR PATTERSON:  Theft involving

16  computer equipment from a company.

17          THE COURT:  All right.  Go ahead.  Is that it?

18          PROSPECTIVE JUROR PATTERSON:  Yes.

19          THE COURT:  Okay.  Before we continue, I want to say

20  something.  As you said, you worked for Bitcasa, so it just

21  triggered in my mind.  You know, these days most people want to

22  reach for their cell phone and Google something, like Google

23  the name of Luke Brugnara or Robin Harris or something about

24  this case.

25      No.  Do not do that.  Have any of you done that already?

1  Raise your hand if you've already done that.

2      (No response.)

3          **THE COURT:**  Okay.  No one is raising their hand.

4      Here's the thing:  This is very important.  When I said

5  earlier it's like a laboratory experiment, you decide the case

6  solely, solely, only, solely, exclusively on the evidence

7  presented here at trial.  It would be wrong to go on the

8  Internet and find information.  And then even if you think to

9  yourself you can ignore it.  No.  You can't do that.  You can

10  look it up all you want after the verdict.  But beforehand, no

11  way.

12      You have to decide the case based on what is presented

13  here in court as evidence.  And I'm going to repeat that many

14  times during the trial, because that's so important that we

15  hold the Government to its burden of proof, and you decide it

16  based on the evidence here at trial and not something that you

17  find on the Internet or that somebody tells you.

18      So one of the ground rules is no talking to anybody about

19  the case, including among yourselves, until it's time to

20  deliberate.  And no going on the Internet to look up

21  information.  If I find out you've done that, then we have to

22  suspend the whole thing, and I have an evidentiary hearing that

23  could take an entire day to find out why you did it, what you

24  learned, and what effect it has.  You just don't do that.  You

25  want to do it the right way.  I should have you that sooner,

1    but here we are.

2         Now, we're going to go to the next potential juror.

3         Please, go right ahead.

4         **PROSPECTIVE JUROR VELEZ:**  My name is Erminia Velez.

5    I'm from San Francisco.  I graduated from City College in

6    San Francisco.  I work for Pacific Gas and Electric Company as

7    an operating clerk.  I'm a member of the IBEW union.  No

8    hobbies.

9         I'm married.  My husband is a retired maintenance

10   engineer.  I have two sons:  One is 17, he's in high school;

11   19, he's in City College of San Francisco.

12        I've never served on a jury service.  No military or law

13   enforcement.  Never been a party or witness in court.  And I

14   have no problem going through June 5th, but on June 8th I'm

15   flying out of the country with my family on vacation.

16        **THE COURT:**  You say you do or you don't have a

17   problem?

18        **PROSPECTIVE JUROR VELEZ:**  I do not have a problem

19   through June 5th.

20        **THE COURT:**  Okay.  I think we can -- we'll make sure

21   you make your flight on June 8th.

22        **PROSPECTIVE JUROR VELEZ:**  Thank you.

23        **THE COURT:**  All right.  Who's next?

24        **PROSPECTIVE JUROR CALDWELL:**  Melissa Caldwell.  I

25   live in Albany.  I have a bachelor's degree in environmental

```
 1  engineering from Humboldt University.  I currently work as an
 2  engineer at a company called Arceus in Emeryville.  I do not
 3  belong to any clubs or organizations.  I enjoy almost anything
 4  outside.  Snowshoeing, cycling, hiking.
 5      My husband is a chef.  And no to the last four questions.
 6  Can I abbreviate like that?
 7          THE COURT:  Okay.  I'll allow you to do that.  What
 8  kind of engineer are you?
 9          PROSPECTIVE JUROR CALDWELL:  Environmental engineer
10  remediation.  I clean up groundwater and soil spill sites.
11          THE COURT:  Okay.
12      Next.
13          PROSPECTIVE JUROR DURKEE:  My name is Valerie Durkee.
14  I am a resident of Rohnert Park.  I retired in the year 2000.
15  I worked as -- in the business office of a Catholic high
16  school.  No clubs.  I like to travel.
17      I'm married.  My spouse is a retired courier officer in
18  the United States Coast Guard and currently has his own
19  computer consulting business.  I have two children:  One is 44,
20  he's a production manager for New Basis down south.  And my
21  older son is 46, and he is a quality manager for -- I forgot.
22      I have not served on a jury.  I'm a dependent of military
23  for most of my life.  And I am not a party or a witness in
24  court.
25          THE COURT:  Thank you.
```

1       Next.

2           **PROSPECTIVE JUROR PINEDA:**  Hello.  My name is George

3   Pineda.  I'm from San Francisco.  I have some college.  I work

4   for -- I'm a service writer for Hyundai in Burlingame.  A

5   member of a couple of organizations at my kids' school.  My

6   hobby is bass fishing and bowling.

7       I'm married.  My wife is an escrow officer for a title

8   company.  I have a 19-year-old daughter at U.C. Santa Barbara.

9   I have a junior at St. Ignatius, she's a junior.

10      No prior jury service.  I was in the Air Force, National

11  Guard.  And I was never a witness in court.

12          **THE COURT:**  Thank you.

13      Next, please.

14          **PROSPECTIVE JUROR BEATON:**  My name is Amy Beaton.  I

15  live in El Sobrante.  I have a bachelor's agree from Mount

16  Holyoke College.  I worked at the University of California for

17  over 25 years as a career technician.  I'm represented by a

18  union there.  I'm a union member.  I have hobbies, yes.  I like

19  to read and go outside.

20      My -- I'm married.  My husband is a schoolteacher in

21  Berkeley, a math and science teacher in sixth grade.

22      I have two children:  28, my son is a chemist.  He went to

23  Humboldt.  And I have a daughter who is at Humboldt now, and

24  she's 24.

25      I've never been picked for a jury.  No military or law

```
 1   enforcement.  I have been a party for, in CEQA lawsuits for the
 2   El Sobrante Valley Legal Defense Fund suing the City of
 3   Richmond Environmental Quality Act.
 4           THE COURT:  You've been the defendant or the
 5   plaintiff?
 6           PROSPECTIVE JUROR BEATON:  The plaintiff.
 7           THE COURT:  Okay.  Anything else?
 8       (No response.)
 9           THE COURT:  Let me ask you a -- you say you're a
10   technician at Cal, right?
11           PROSPECTIVE JUROR BEATON:  Yes.  I'm -- I work --
12   worked my entire life on fruit flies.  I'm an expert on fruit
13   flies.  I was on the genome project for over ten years and I'm
14   a developmental geneticist.
15           THE COURT:  Okay.
16       What was the name of that kind of fly that --
17           PROSPECTIVE JUROR BEATON:  Drosophila melanogaster.
18           THE COURT:  All right.
19       (Laughter.)
20           THE COURT:  Let's just pass the mic to the next --
21           MR. BRUGNARA:  Say it three times.
22           THE COURT:  -- to the next person.
23       Thank you.
24           PROSPECTIVE JUROR DEMOREST:  My name is Cindy
25   Demorest.  I live in San Bruno.  I'm a cashier at a grocery
```

138

1   store.  I'm divorced.  I have a 13-year-old son.

2       I've never been on a jury.  And I've never been in law

3   enforcement.

4             THE COURT:  So, wait.  Wait.  Are you going to get

5   paid for jury services?

6             PROSPECTIVE JUROR DEMOREST:  Sorry?

7             THE COURT:  Are you a member of the union?

8             PROSPECTIVE JUROR DEMOREST:  Yes, I am.

9             THE COURT:  All right.  So you get paid for jury

10  service, right?

11            PROSPECTIVE JUROR DEMOREST:  Yes, I do.

12            THE COURT:  Okay.  So you have a 13-year-old?

13            PROSPECTIVE JUROR DEMOREST:  Yes.

14            THE COURT:  Who is watching after your 13-year-old

15  during the -- when --

16            PROSPECTIVE JUROR DEMOREST:  He mostly lives with my

17  ex-husband.

18            THE COURT:  All right.  Okay.

19            PROSPECTIVE JUROR DEMOREST:  I really don't have any

20  hardships, so I have no problem serving.

21            THE COURT:  Okay.  Very good.  Thank you.

22      Next.

23            PROSPECTIVE JUROR FILOTEO:  My name is Erin Filoteo.

24  I live in Concord.  I have a bachelor of arts from U.C.

25  Santa Barbara.  I work -- I'm an administrative assistant part

```
 1   time with Putney Client Associates in Walnut Creek.  And I also
 2   help my husband.  I manage his business.  Really, no
 3   organizations or clubs.  Hobbies, baking.
 4       I am married.  My husband is an artist.  I have one
 5   daughter; she is 11.  I have never been picked for jury duty.
 6   No military, as well as never been a party or a witness in
 7   court.
 8           THE COURT:  What is your degree in?
 9           PROSPECTIVE JUROR FILOTEO:  I am women's studies and
10   sociology.
11           THE COURT:  And your husband, you say, is an artist?
12           PROSPECTIVE JUROR FILOTEO:  Yes.
13           THE COURT:  What kind of art does he do?
14           PROSPECTIVE JUROR FILOTEO:  He's an animation artist.
15           THE COURT:  A what?
16           PROSPECTIVE JUROR FILOTEO:  Animation.
17           THE COURT:  So like computer animation?
18           PROSPECTIVE JUROR FILOTEO:  A bit of both.  Free -- I
19   mean, drawing freehand as well as on the computer.
20           THE COURT:  All right.  Now, this case involves art,
21   a different kind.  It's not animation, but it's still art.  And
22   you know that you cannot talk to your husband about the case if
23   you get -- until after the case is over --
24           PROSPECTIVE JUROR FILOTEO:  Right.
25           THE COURT:  -- then you can.  You understand that?
```

1          PROSPECTIVE JUROR FILOTEO:  Yes.

2          THE COURT:  So he may be tempted to say something to

3   you if he knew something about these particular artists.  And

4   he would have to -- you'd have to say no.

5        Do you understand that?

6          PROSPECTIVE JUROR FILOTEO:  I do.

7          THE COURT:  Okay.  Great.

8        Let's go to the next person.

9          PROSPECTIVE JUROR GARRETT:  My name is Eric Garrett.

10  I live in Pleasanton.  I have a bachelor's in history from San

11  Diego State University.  I am currently a software engineer

12  for D&H.  Not part of any organizations or clubs.  Hobbies,

13  primarily hang with the family.

14       I'm married.  My wife is a homemaker.  I have three kids:

15  15, 9 and my little guy is 4.  No prior jury service.

16       No military law enforcement.  And I've never been a

17  witness in court.

18          THE COURT:  All right.  Next, please.

19          PROSPECTIVE JUROR GOKARN:  My name is Uday Gokarn.  I

20  live in Fremont.  I have a bachelor's of science degree from

21  Bangalore University and an M.B.A. from Cal State Hayward.  I

22  am product manager at Cisco systems.  I am --

23          THE COURT:  Wait, wait.  Do you two know each other.

24          PROSPECTIVE JUROR DUTTA:  No.

25          THE COURT:  Juror No. 2 over there.  Okay.  I just

```
1   need to check.  Okay.  Go ahead.

2           PROSPECTIVE JUROR GOKARN:  I'm a member of several of

3   the Indian community organizations and also a PTA member.

4   Hobbies, I play volleyball.

5       I'm married.  My spouse is a homemaker.  Children, two

6   children, six and eight, and they are in elementary school.

7       Never picked for prior jury service.  I've not served in

8   the military.  And I have been a party to court in a traffic

9   violation case.

10          THE COURT:  All right.  So let me just say that --

11  let me ask this question.

12      Do any of you 32 know any of the other 32?  If so, raise

13  your hand.  It's not a disqualifying thing, but I need to give

14  you a special instruction.  Does somebody in the back know

15  somebody?  Okay.  Just curious, who do you know?

16          UNIDENTIFIED PROSPECTIVE JUROR:   Mr. Christopulos.

17          THE COURT:  All right.  Well -- okay.  If you get

18  called forward, then it will be an issue, but I -- we're not

19  there yet.  Okay.

20      So next we continue on.

21          PROSPECTIVE JUROR STROMBERG:  Can I stand up?

22  Because I left my glasses at home.

23          THE COURT:  Of course.  Yeah.

24          PROSPECTIVE JUROR STROMBERG:  I can't read all this.

25          THE COURT:  Please.
```

1        **PROSPECTIVE JUROR STROMBERG:**  My name is Alida

2  Stromberg.

3        **THE COURT:**  Get as close as you need to.  Can you see

4  that?

5        **PROSPECTIVE JUROR STROMBERG:**  Well, that's why I am

6  standing a little closer, so I can lean forward.

7        **THE COURT:**  All right.

8        **PROSPECTIVE JUROR STROMBERG:**  My name is Alida

9  Stromberg.  I'm from Petaluma.  My education, I have got a B.A.

10  degree in legal studies at U.C. Berkeley.

11        **THE COURT:**  Is that the same thing as a law degree,

12  or is that different?

13        **PROSPECTIVE JUROR STROMBERG:**  No.  It's like a

14  paralegal.

15        **THE COURT:**  Okay.

16        **PROSPECTIVE JUROR STROMBERG:**  Okay.  And then I now

17  am actually a preschool teacher for Bright Horizons in San

18  Rafael.  I'm not a member of any organizations.  My hobbies, I

19  love sports and I love to travel.

20     I'm married.  I have two children.  One is 17 and 14, high

21  school and junior high.  And my husband works for -- he's in

22  sales for a construction company.  And I've never served on a

23  jury.  Never been in the military.  And I've never been a

24  witness in any court trials or anything.

25     I think I answered them all.

1          THE COURT:  Good.  Thank you.

2      All right.  Next, please.

3          PROSPECTIVE JUROR TRANFINLEY:  My name is Tuyet

4  Tranfinley.  I live in Marin City, Sausalito.  High school

5  education.  I work for Safeway grocery store.  No organization.

6  My hobby is travel.

7      I'm marriage.  My husband is retired.  No children.  No

8  jury service.  No jury service and never in the military, and

9  never party or never witness in court.

10          THE COURT:  What do you do for Safeway?

11          PROSPECTIVE JUROR TRANFINLEY:  I'm a retail clerk.

12          THE COURT:  A what?

13          PROSPECTIVE JUROR TRANFINLEY:  I'm a retail clerk.

14          THE COURT:  And do you -- are you a member of the

15  union?  Is there a union at Safeway?

16          PROSPECTIVE JUROR TRANFINLEY:  Yeah.

17          THE COURT:  Are you a member of the union?

18          PROSPECTIVE JUROR TRANFINLEY:  Yeah.

19          THE COURT:  All right.  So you get paid for jury

20  service?

21          PROSPECTIVE JUROR TRANFINLEY:  I think so.

22          THE COURT:  All right.  Well, I have to assume you do

23  unless you tell me differently.  So there we go.

24      Next.

25          PROSPECTIVE JUROR KAUR:  My name is Jagdeep Kaur.

1  City of Hayward.  Education, some college.  Most recent job,

2  I'm admin assistant for a hospital.  I don't belong to any

3  unions.  My hobbies are sports, watching sports, and walking.

4      I'm married.  My husband is a software engineer.  And I

5  have two children, twin boys, 17.  They are in high school.

6  And I've never been to jury.  No military.  Law enforcement.

7      I was a party for a bankruptcy case, Chapter 13.  And

8  that's it.

9          THE COURT:  Okay.  Thank you.

10     Next.

11         PROSPECTIVE JUROR GONZALES:  My name is Ryan.  I'm

12  from Fremont.  I'm currently an undergraduate student at San

13  Jose state.  I'm interning at Santa Clara Valley Medical

14  Center.  I'm a member of the Institute of Industrial Engineers.

15  My hobbies include computers, cars, robotics.

16     I'm single.  I have no children.  I was never in the jury

17  service.  Never in the military or law enforcement, and never

18  been a party or witness in court.

19         THE COURT:  Let me ask you this:  Are you a student

20  now?

21         PROSPECTIVE JUROR GONZALES:  Yeah.

22         THE COURT:  Well, how are you going to go to school

23  if --

24         PROSPECTIVE JUROR GONZALES:  My classes don't

25  conflict with this.  You said it's between 7:30 and 1:00?

1          **THE COURT:**  Correct.

2          **PROSPECTIVE JUROR GONZALES:**  Most of my classes are

3    in the late afternoon.  A conflict would be on May 8th, I have

4    to propose my senior project at 10:00 o'clock in the morning.

5          **THE COURT:**  What are we supposed to do at

6    10:00 o'clock?

7          **PROSPECTIVE JUROR GONZALES:**  Well, you can let me go.

8          **THE COURT:**  No, it doesn't work that way.  I mean, if

9    I get selected to serve, you've got to be here.  You would have

10   to cancel everything to be here 100 percent.  It's not like we

11   get -- we would then say:  Oh, that's the day Mr. Gonzales has

12   got to make his presentation.  I guess we won't have court that

13   day.

14       We can't do that.

15       So you're telling me on what day you have to make a

16   presentation?

17         **PROSPECTIVE JUROR GONZALES:**  May 8th.

18         **THE COURT:**  And that's to who?

19         **PROSPECTIVE JUROR GONZALES:**  My -- to the people that

20   I'm working for at the hospital and to my -- the Chair of the

21   Industrial Engineering Department.

22         **THE COURT:**  I'm going to let you go, excuse you,

23   unless I hear an objection.

24       Any objection?

25         **MR. BRUGNARA:**  No, your Honor.

1          MS. HARRIS:  No, your Honor.

2          THE COURT:  All right.  Look, you're a student.  That

3   comes first.  Go get your degree.  I can't let you jeopardize

4   that by serving on the jury.  I appreciate your willingness to

5   serve, but we -- you would have to be here and miss all of

6   that.  It would set your education back.  We can't do that.

7       All right.  Please go to the jury assembly room and tell

8   them what happened.  Good luck.

9       (Prospective Juror Gonzales.)

10          THE COURT:  Let's replace Mr. Gonzales.

11          THE CLERK:  Okay.  Robert Calabro, C-A-L-A-B-R-O.

12          THE COURT:  All right.  Welcome.  How are you today?

13          PROSPECTIVE JUROR CALABRO:  Doing fine.  Thank you.

14          THE COURT:  All right.  Do you have any hardship

15   issue?

16          PROSPECTIVE JUROR CALABRO:  No.

17          THE COURT:  Can you see the chart?

18          PROSPECTIVE JUROR CALABRO:  No.  I left might have

19   glasses in the car.

20       Name is Robert Calabro.  Live in San Rafael.  Got any

21   B.F.A. at Syracuse University.  I'm creative director at

22   Argonaut, advertising agency in the city.

23          THE COURT:  Wait.  You're a what?

24          PROSPECTIVE JUROR CALABRO:  Creative director.

25          THE COURT:  Of who?

```
 1              PROSPECTIVE JUROR CALABRO:  It's an advertising

 2   agency.

 3              THE COURT:  All right.  B.F.A. means Bachelor of Fine

 4   Arts.

 5              PROSPECTIVE JUROR CALABRO:  Fine arts, yes.

 6        No clubs.  My hobbies are art and music.

 7        I'm married.  My wife is also in advertising.  We have two

 8   kids, three and one.  No jury service.  No military, no law

 9   enforcement.  And never in court.

10              THE COURT:  All right.  I need to ask you some extra

11   questions.

12              PROSPECTIVE JUROR CALABRO:  Okay.

13              THE COURT:  I need for -- some help here.  I don't

14   remember all the artists in question here.  Just give me the

15   names of the artists in question and say one -- you go first,

16   Ms. Harris.  And then if Mr. Brugnara thinks it's not accurate,

17   he can correct it.

18              MS. HARRIS:  One Miro, Pablo Picasso, de Kooning and

19   Degas.

20              THE COURT:  And George Luks.

21              MS. HARRIS:  And George Luks.

22              MR. BRUGNARA:  Your Honor, those are all allegedly by

23   those artists.

24              MS. HARRIS:  Your Honor --

25              MR. BRUGNARA:  I'll come to the mic.
```

148

```
 1        I just want to correct that.  It's allegedly attributed to
 2   those artists, which is different than actually being by the
 3   artist, which will come into evidence.
 4        THE COURT:  All right.  Please, no speeches.
 5        Okay.  The names -- did you hear the names of those four
 6   artists?
 7        PROSPECTIVE JUROR CALABRO:  Yes.
 8        THE COURT:  Okay.  So the names of those four artists
 9   are going to be brought up several times, and some of their
10   works.  Now, do you have specialized knowledge about any of
11   those artists?
12        PROSPECTIVE JUROR CALABRO:  I mean, art history back
13   in college.  All but the last one ring a bell.
14        THE COURT:  All right.  But when is the last time you
15   read anything about -- or saw any of the works by those --
16   those artists?
17        PROSPECTIVE JUROR CALABRO:  I mean, some are pretty
18   famous, so -- or all of pretty famous.  So you see them in
19   passing, but nothing substantial.
20        THE COURT:  Okay.  Do you think you have specialized
21   knowledge about the -- beyond what you've told us about taking
22   a course, do you have specialized knowledge in any of those
23   artists?
24        PROSPECTIVE JUROR CALABRO:  No.
25        THE COURT:  All right.  Thank you.
```

1      So let's go to the last person.

2           **PROSPECTIVE JUROR CORBETT:**  So I'm first to admit my

3  negligence in not reporting that I'm a student and I should

4  have deferred.  So, I apologize.  But I'm at the end of my

5  semester.

6           **THE COURT:**  What was your name?

7           **PROSPECTIVE JUROR CORBETT:**  Karina Corbett.

8           **THE COURT:**  Where are you a student?

9           **PROSPECTIVE JUROR CORBETT:**  At Santa Rosa JC,

10  completing prerequisites for a doctorate program.

11          **THE COURT:**  Do you have course work in the next few

12  weeks?

13          **PROSPECTIVE JUROR CORBETT:**  Yes, I do.

14          **THE COURT:**  When does it meet?

15          **PROSPECTIVE JUROR CORBETT:**  Monday, I don't go in

16  until 3:00, so that would be fine.  But Tuesdays, I'm 8:00

17  until 4:00.  And then Thursdays, I'm 1:30 to 3:00.

18          **THE COURT:**  You should have said something sooner.

19      All right.  I'm going to excuse Ms. -- how do you say your

20  name?

21          **PROSPECTIVE JUROR CORBETT:**  Karina Corbett.

22          **THE COURT:**  -- unless I hear an objection.  Any

23  objection?

24          **MR. BRUGNARA:**  No, your Honor.

25          **MS. HARRIS:**  No, your Honor.

```
 1            THE COURT:  Thank you.  Good luck in your course
 2  work.
 3       (Prospective Juror Corbett excused.)
 4            THE COURT:  Let's replace Ms. Corbett.
 5            THE CLERK:  Terrence Bezdek, B-E-Z-D-E-K.
 6            THE COURT:  Okay.  Welcome.
 7            PROSPECTIVE JUROR BEZDEK:  Thank you.
 8            THE COURT:  Any hardship issue?
 9            PROSPECTIVE JUROR BEZDEK:  No, sir.
10            THE COURT:  Can you see the chart?
11            PROSPECTIVE JUROR BEZDEK:  Yeah.
12            THE COURT:  Please give us the info.
13            PROSPECTIVE JUROR BEZDEK:  My name is Terrence
14  Bezdek.  I live in Moraga.  I have an M.B.A. from Pepperdine.
15  My most recent job is as a technology auditor for Bank of
16  America, although, I'm currently retired.  I belong to no
17  organizations, clubs or unions.
18       My hobbies are reading.  Now and then I do model boats.
19  And recently we have been taking up golfing.
20            THE COURT:  Taking up what?  Golfing?
21            PROSPECTIVE JUROR BEZDEK:  Yeah.  Chase the little
22  white ball, yeah.
23       I'm married.  My wife is a successful -- my wife is
24  retired.  She was a successful furniture salesperson, office
25  furniture sales.
```

1      I have three kids.  My oldest is 49.  She works in Silicon

2   Valley as -- in marketing for some company.  I have no idea

3   where.  My middle child is a nurse, part-time nurse.  She's in

4   her mid-40s.  And my son is in his early 40s, and he's a -- he

5   takes care of a golf course up in Oregon.

6      No prior jury duty.  Not in the military.  Not in law

7   enforcement.  In court I have been to small claims court.  I

8   have been sued.  I was a witness in a civil matter sometime

9   back.

10         **THE COURT:**  What kind of civil case?

11         **PROSPECTIVE JUROR BEZDEK:**  I think it was -- I think

12   it was an employment issue.  It might have been a structural

13   harassment thing, but I think it was just an employment issue.

14         **THE COURT:**  All right.  Is that it?

15         **PROSPECTIVE JUROR BEZDEK:**  Yeah, that's it.

16         **THE COURT:**  Any special training in a part or

17   experience in the art world?

18         **PROSPECTIVE JUROR BEZDEK:**   Absolutely not.

19         **THE COURT:**  All right.  Have a seat.

20      Okay.  I want to stick with that point for a second.

21      And all of you have by now have figured out this case

22   involves an allegation that artwork by the named artists that

23   you just heard about were going to be sold to Mr. Brugnara, and

24   the -- one of the issues I need to know about is whether you

25   have any specialized knowledge about any of those artists.

```
1          Now, we've all heard of Pablo Picasso.  You don't -- that
2   doesn't disqualify you because you have heard of these artists,
3   but if you have specialized knowledge about their history or
4   their art works, maybe -- whatever, then I need to know that.
5   I'm not saying it would disqualify you, but I need to know what
6   that is.
7          So if you do have any specialized knowledge on those
8   subjects, and the artists were George Luks, Picasso, de Kooning
9   and Degas.  Okay?  Raise your hand if you think you have
10  specialized knowledge.
11         Not in the back yet.  Just the 32 of you.
12         (No response.)
13              THE COURT:  No one is raising their hand.  Okay.
14         So let me ask a question in that category.  Have any of
15  you ever been on the selling or receiving end, the buying end
16  or the selling end of expensive artwork?  If so, raise your
17  hand.
18              UNIDENTIFIED PROSPECTIVE JUROR:  What is expensive?
19              THE COURT:  Well, I'll just say, something that --
20  something that was a major investment for you.  So in that
21  category.
22         All right.  No one is raising their hand.  Okay.  I --
23  we're going to take a break in just a few moments.  We have
24  been going a long time.  I want to give you a facilities break.
25  But can you keep going a few more minutes?  Or is somebody
```

1   desperate to get out of here and go to the bathroom?

2       You are?

3           **PROSPECTIVE JUROR DUTTA:**  Yes.

4           **THE COURT:**  Okay.  Here is what we're going to do.

5   We're take a break now, and it will be sufficiently long for

6   you to go get your lunch on the second floor.  You have got to

7   be back here by noon.  It's now 11:15.  We will resume at noon.

8       And -- yes, Dawn, are you trying to tell me something?

9       (Brief pause.)

10          **THE COURT:**  I need to make sure that all of feel exit

11  and go away to take your lunch break or your facilities break

12  or wherever you want to go.  There is a lot of room to sit

13  around on the second floor.  And if you go early, like now, you

14  will be able to get through the lunch line downstairs very

15  quickly.

16      You need to remember where you're sitting and come back

17  whenever we're done and sit in the same spot, please.  But no

18  going on the internet.  No emailing somebody.  Nothing about --

19  don't do any of that stuff about this case.  Please.  Don't do

20  it.  It just leads to evidentiary hearings where I have to quiz

21  you, and it's just not an agreeable thing.  So let's not do it.

22      And then don't talk to your loved ones about the case.

23  Don't talk to your employer.  Don't call them up and say any of

24  those things.

25      Now, somebody didn't know about whether they were going to

```
1   get paid for jury service.  Who was that?  Or have they been

2   excused anyway?

3       If you want to call your employer and find out, if

4   you're -- and you come back and tell me absolutely for sure you

5   would not get paid for jury service and that would be a

6   hardship, then I would take that into account.  So this would

7   be a good opportunity to do that, or anyone else that thinks

8   there is some way you could get more information.  Okay.  Go

9   for it.  You can talk to somebody about that.

10      But you can't talk about the case and the merits of the

11  case to anyone.  And you can't talk with each over about the

12  case.  So there we are.  Anything else that somebody wants me

13  to admonish the jury on before we take a break?

14      (No response.)

15          THE COURT:  Hearing nothing then, okay, you all enjoy

16  your 45 minutes.  We'll see you back here.  When you come back

17  stay ought in the hallway until I call you in.

18      (Prospective jurors exit courtroom at 11:17 a.m.)

19          MRS. BRUGNARA:  Judge, I have the shoes for my son

20  that were supposed to be brought this morning.

21          THE COURT:  Wait, wait, wait.

22      Is there anyone here that is a prospective juror?

23      (No response.)

24          THE COURT:  Okay.  Are you the defendant's mom?

25          MRS. BRUGNARA:  I apologize.  I am Luke's mother, and
```

```
 1   his shoes were supposed to be brought this morning.
 2           THE COURT:  Please hand them to the Marshals.
 3           MRS. BRUGNARA:  Thank you.
 4           THE COURT:  The Marshals will take care of that.
 5           MRS. BRUGNARA:  Thank you very much.
 6           THE COURT:  All right.  Be seated, counsel.
 7       I need to raise with you some questions about two of the
 8   jurors.  I want to raise with you what to do with Ms. Hamilton,
 9   who has all those plans for her students.  And, also, with the
10   guy who's got the $300 worth of reservations to go camping in
11   Santa Cruz.  Those of the only two that I want to raise with
12   you, but if you have some you want to raise with me, I'll be
13   happy to let you do that.
14       So let's hear what -- I am inclined to excuse Ms. Hamilton
15   because -- probably legally it's not as good a reason as it
16   should be, but it's really going to -- she's going to be trying
17   to do those meetings, and it may interfere with her ability to
18   be a juror.  I just think we ought to excuse her.
19       What do you two say?
20           MS. HARRIS:  No objection, your Honor.
21           MR. BRUGNARA:  Your Honor -- do I need to stand, your
22   Honor?
23           THE COURT:  You should, but I don't -- I'm not --
24           MR. BRUGNARA:  My feeling on it is whoever isn't very
25   zealous about spending the time and if, in the first day, they
```

```
1   are already thinking of an excuse -- I mean, after two weeks or

2   ten days, you know, it could -- it could be troublesome for

3   them.

4           THE COURT:  So you're saying it's okay to excuse her?

5           MR. BRUGNARA:  Well, I think whoever wants to be

6   excused should be excused.

7           THE COURT:  Well --

8           MR. BRUGNARA:  I mean, that --

9           THE COURT:  So I'm going to take that as no

10  objection.  All right.

11      And then the guy who is going camping.  I think that

12  probably is a legitimate reason, but I haven't had -- I know

13  airplane tickets is, but I haven't had one that isn't airplane

14  tickets, but it's camping sites.  I'm willing to extend it to

15  let him do his a vacation.

16      What does the Government say?

17          MS. HARRIS:  We're not going to stand in the way of

18  that, your Honor, if the Court wants to excuse him.

19          THE COURT:  Mr. Brugnara?

20          MR. BRUGNARA:  I mean, my feeling on that is I

21  actually like that guy.  He was one of the -- one of the guys

22  that I particularly liked.  And I can't understand why the

23  Government needs so long to present their case in this matter

24  based on the evidence I've seen.  You know, I have had some

25  experience in civil trials, but, you know, I mean, like I said,
```

1  you know, this particular juror I liked and he seemed to be a

2  family man --

3        **THE COURT:**  You know, please.  I just need to know

4  whether you object to me excusing him.

5        **MR. BRUGNARA:**  I mean, if his only reasoning is that

6  this trial is not going to be over with, the 17th, he thought,

7  of May?  That's like three weeks, isn't it?

8        **THE COURT:**  I don't remember the date that he gave.

9        **MR. BRUGNARA:**  I believe he said the 16th or 17th.

10  That's three weeks.  I mean, I can't imagine this trial --

11        **THE COURT:**  I can easily imagine it going that long.

12  I hope it doesn't, and I hope you're right, but we can't -- we

13  have to err on the side of the worst-case scenarios.

14      So can I excuse him or not?

15        **MR. BRUGNARA:**  It's your discretion, your Honor.

16  It's your court.

17        **THE COURT:**  All right.  I'm going to excuse him.

18  Okay.

19      Now, those of the only ones on my list.  I'm happy to hear

20  any issues that you two have.

21      Let's start with you, Mr. Brugnara.  Are there any

22  follow-up issues that you want me to follow-up on with any of

23  the jurors, prospective jurors?

24        **MR. BRUGNARA:**  Your Honor, is this a -- this isn't

25  our picks?

```
 1              THE COURT:  No, it's not.  You're going to do that
 2   later.
 3              MR. BRUGNARA:  Oh, okay.
 4              THE COURT:  But this is the opportunity -- you know,
 5   you may -- let's say you heard something that is a red flag,
 6   and you want to know more about that issue.  And if you do,
 7   then I can ask some follow-up questions.
 8              MR. BRUGNARA:  Oh, okay.  Yeah, I just want to know
 9   what the attorney was an expert witness on.  He had indicated
10   he testified as an expert witness, and I'm just curious as to
11   what that was.
12              THE COURT:  All right.  I will ask him that question.
13       Any follow-up by the Government?
14              MS. HARRIS:  Yes, your Honor.  We would ask the Court
15   to follow-up with Juror No. 32 about what the lawsuit in small
16   claims court was about that he --
17              THE COURT:  That's Mr. Bezdek.
18              MS. HARRIS:  Yeah.  Said that he had been sued in
19   small claims court.
20       Then Juror No. 30, the party to the bankruptcy.  We're
21   just concerned given the issues in this case and -- that we
22   might recommend at sidebar.
23              THE COURT:  What is the issue there?
24              MS. HARRIS:  Well, just that Mr. Brugnara has talked
25   about that he's an expert in Chapter 11 bankruptcy, and I just
```

1  don't want there to be any special push toward that particular

2  juror by him.

3      Then we had a question --

4          **THE COURT:**  What do you mean "push toward him"?

5          **MS. HARRIS:**  If the Court doesn't want to follow-up

6  on it, that's fine.

7          **THE COURT:**  I don't see -- think is enough to

8  follow-up on it yet.

9          **MS. HARRIS:**  Okay.

10          **THE COURT:**  I mean, in every case there is something

11  that some juror says that may give one side or the other an

12  opportunity to say something in the evidence part that may

13  appeal or not appeal to that juror.  But I think the fact that

14  there has been bankruptcy is not enough to --

15          **MS. HARRIS:**  Okay.

16          **THE COURT:**  All right.  What else?

17          **MS. HARRIS:**  And then we had the same concern the

18  Court did about Juror No. 11, about whether there's a possible

19  excuse for cause depending on what her financial hardship is.

20  And I guess she'll come back and -- and try to clarify that.

21          **THE COURT:**  That was Ms. --

22          **MS. HARRIS:**  Ms. Wild.

23          **THE COURT:**  Yes.

24          **MS. HARRIS:**  And then, your Honor, there was

25  something we wanted to ask the Court.  The Court asked a very

```
 1   simple question about the name of the five artists involved in
 2   this case, and Mr. Brugnara made a speech and attempted to
 3   impart his view of the case to the jury.  That was improper.
 4   And we -- if that happens again, we're going to object
 5   publicly, but we would like you to admonish Mr. Brugnara --
 6           THE COURT:  That's true.
 7           MR. BRUGNARA:  I would like to comment before --
 8       Your Honor, I would -- she made a statement that's
 9   inaccurate, and I just want to have at least my side before you
10   rule, so I don't --
11           THE COURT:  Well, what was the inaccurate statement
12   she made?
13           MR. BRUGNARA:  You asked -- because I'm very good at
14   listening when it's all on line and you specifically said:
15   Tell me the names of the artists.  First, Ms. Harris and
16   Mr. Brugnara.  And she said:  Pablo Picasso, de Kooning.  And I
17   corrected her.
18       My position is it's not by them.  My position it's
19   attributed to or allegedly by them.  There is a big difference.
20   Okay?
21       So when we have our experts come in and say that's not by
22   de Kooning, it's a misrepresentation to the jury that it's by
23   de Kooning.
24           MS. HARRIS:  That wasn't what the Court's question
25   was.
```

1      **MR. BRUGNARA:**  That's exactly what the Court's

2  question was.

3      **MS. HARRIS:**  The question was:  What are the name of

4  the artists involved?

5      **THE COURT:**  I think that's what -- how I did phrase

6  it.  And you -- can't do -- make these speeches.  You will get

7  a chance to do an opening statement, which is supposed to be

8  directed just to evidence, to preview the evidence that the

9  jury will actually hear in your estimation.

10      It's not a chance for argument.  It's not a chance to make

11  speeches.  It's a preview of evidence.  Then we get to the

12  evidence part.  And then you get to make your closing argument.

13      But right now we're in something else.  It's called -- we

14  are trying to select the jury.  And you can't make these kind

15  of speeches.  So no more speeches like that.

16      **MR. BRUGNARA:**  I would like to make one other

17  comment, too, because I don't want to do anything to disrespect

18  the Court.  But Ms. Harris seems to constantly try to dictate

19  in the pretrial motions the direction of this Court, and she

20  has her style, which is much different than mine, but she

21  always seems to in her assertive articulate way direct you of

22  how you need to direct me.  And that's not her -- that's not

23  her position either to -- to be gatekeeper of this court.

24      **THE COURT:**  When she is right, I have to do what's

25  right.  I don't always do what Ms. Harris says, but this time

1   she's correct.  You should not have been making that speech.

2        All right.  Any other -- any other jurors you want me to

3   quiz about?

4           MS. HARRIS:  One moment.

5        (Discussion held off the record between government

6         counsel.)

7           MR. BRUGNARA:  Also the shoes that my mother brought,

8   your Honor, was not the shoes from the jail.  It was a backup

9   pair that don't fit me well.  And I need my shoes still, two

10  pairs, that the jail has that they said they were giving to the

11  Marshals on Friday and I signed all the release papers.

12          THE COURT:  Would the Marshals please get those --

13          THE MARSHAL:  There is a pair of black shoes in the

14  cell block along with his lunch.

15          MR. BRUGNARA:  There's two pairs.  There's a brown

16  pair and there's a black pair.

17          THE COURT:  Check the pair that he's got back there

18  during our lunch break and see if that satisfies you.

19       Are the ones that Mr. Kingsley -- do they work okay?

20          MR. BRUGNARA:  I will use these for now.

21          THE COURT:  Mr. Kingsley, thank you.

22       What else can I do for you --

23          MR. BRUGNARA:  I have one more request, your Honor.

24  I would like to stay up here.  I don't want to get locked up in

25  chains and handcuffs and go down to eat a piece of baloney.  I

```
1    want to stay here and talk to James Stevens about the jury

2    selection process.

3              THE COURT:  I'm going to allow that until you're done

4    with -- until you want your lunch.  Then when you have your

5    lunch, you've got to go back there and do it.

6              MR. BRUGNARA:  The other is, can I have Mr. Stevens

7    and Mr. Tamor get me a real lunch from the second floor and

8    bring it here?

9              THE COURT:  We're not going to do that.

10             MR. BRUGNARA:  Why not?

11             THE COURT:  You're asking too many things.

12             MR. BRUGNARA:  I will eat it right there in the --

13   right behind this door here.

14             THE COURT:  No, no.  You've got to talk with your

15   lawyers here in the courtroom because this is important.  I

16   want you to have that chance.  But when you're done with that,

17   then you go back to have your lunch.  If you want to skip

18   lunch, that's up to you.  But we're not going to ask the

19   Marshals to go get you a lunch or let them go get you a lunch.

20   No, we're not doing is that.

21             MS. HARRIS:  We have one more, your Honor.

22             THE COURT:  Yes.

23             MS. HARRIS:  Will you admonish the venire that when

24   we take breaks, if we run into them in the restroom, not to

25   speak with us.  They don't know that yet.
```

```
 1              THE COURT:  Remind me, I'll do that of course.
 2         Now, Dawn, let's just say to the Marshals.  When you bring
 3    the defendant out, I want you to be mindful sometimes the
 4    jurors are out there in the hallway looking through the glass
 5    doors, the little windows and the doors and I don't want them
 6    to see the defendant coming out in custody.  So be careful on
 7    that.  And if need be, Dawn will put a piece of paper over the
 8    glass if that's what the Marshals want.  Like we did in the
 9    MS-13 case.
10              THE MARSHAL:  Your Honor, there is no way we can
11    guarantee that the prospective jurors will look through the --
12              THE COURT:  Can't we get two CSOs to stand there when
13    we're bringing them through?
14              THE MARSHAL:  There's a possibility.  As soon as
15    we're opening this door, one could walk up and take look.
16              THE COURT:  If I've got a CSO standing there, you
17    can't see through the body.  If you need somebody else, one of
18    my law clerks is back there that has nothing better to do will
19    do it.
20         So let's -- I don't want to take a chance that some member
21    of the venire sees the defendant in custody.  Even though they
22    will probably figure that out, we don't need to exacerbate it.
23              Anything else?
24              (No response.)
25              THE COURT:  I want to make sure we all understand how
```

 1   this process works for selection.

 2        So, Mr. Brugnara, you particularly, because you haven't

 3   done it before.  I want you to -- let's go over how -- how this

 4   works.

 5        Our first goal is to get to the point where we pass 32 for

 6   cause.  We're not there yet.  I'll give you an example of

 7   cause.  Let's say somebody -- somebody stands up.  Some member

 8   of the venire stands up and says:  I couldn't be fair to

 9   Mr. Venire because -- I mean, to Mr. Brugnara because I always

10   trust the government.  It's happened in cases.  So then I would

11   excuse that person.  You wouldn't even have to make the motion.

12        Let's say there is somebody you wants to excuse.  We have

13   a hearing about it.  I excuse them.  Maybe I don't excuse them.

14   That depends on how goods the reason.  But eventually we will

15   get to the point where we have 32 for whom I have -- either

16   you've passed for cause or I have overruled the objection.  All

17   right.  So that's goal number one.  Get there.

18        At that point then we move to exercise of the peremptory

19   challenges, which is the second part of the process.  And

20   that's where we have that chart that I handed out the other

21   day.  And you pass it back and forth.

22        Where is that chart?

23        So hand that to me or give me my copy so that I can...

24        (Whereupon, document was tendered to the Court.)

25             THE COURT:  Let's go over how that part works.

1      All right.  So we're on the bottom half.  The Government

2   would go first.  The Government only gets six challenges, and

3   you get six.

4      Is that right?

5           MS. HARRIS:  We get six and he gets ten.  He gets

6   ten, your Honor.

7           THE COURT:  I'm sorry, ten.  Six and ten.  Yeah, all

8   right.  So that adds up to 16.

9      Okay.  So you get more.  And so if the Government writes

10  in the name of who they want to excuse, I would appreciate it

11  if you could put in the number, but sometimes it's hard to

12  figure out the number.  At least the name.  So then they pass

13  you the sheet and then you write in on number two there, the

14  one you want to excuse.  All right?  And it can be any of the

15  32.

16          MR. BRUGNARA:  Can I ask a question?

17          THE COURT:  Yeah.

18          MR. BRUGNARA:  Do they write all them in at once?

19          THE COURT:  No, no, no, no.  They just write in the

20  first one.  And then you write in the second one.

21          MR. BRUGNARA:  Oh, okay.

22          THE COURT:  And then it goes back to them to write in

23  the third one.  And then it comes to you to write in four and

24  five.

25          MR. BRUGNARA:  Kind of like picking for kickball or

1    softball in grade school, huh?

2            **THE COURT:**  That is a good analogy, yes.

3        Then it goes six.  Then it goes seven and eight.  All

4    right.  And if everyone exercises all their peremptories, we

5    will knock off 16 people.  Understand that math.

6            **MR. BRUGNARA:**  So this is for no reason?

7            **THE COURT:**  No, this is for a very good reason.  I'm

8    going to explain.

9        So let's say you exercise -- all 16 get exercised.  So

10   those people walk out of the room as soon as -- well, no, they

11   don't.  I'm sorry.  They don't -- they don't walk out quite

12   yet.  But as soon as you do the 16 and it's all hunky-dory,

13   then I look at it.  At that point before we get to the

14   alternates part and if everyone, you know, is in agreement as

15   to what has happened here, then those people get excused at

16   that point and the -- the 12 still seated -- this is very

17   important.  That will be your jury.  The 12 still seated by --

18   by their seat number, by their seat number, not the order in

19   which they were called forward, but by their seat number.

20   Those 12 will be the jury.

21       And Seat No. 1 is the closest to the court reporter.  And

22   it goes over to No. 7 in the jury box.  And No. 8 starts at the

23   second row and goes over to No. 14 in the back.  So that's 14.

24   But that could be half empty by the time we get to that point.

25       So then we go to the next row over there, over there by

1   the exit sign where I'm pointing and the first guy there in the

2   corner, he's next.  He's number -- he would be in Seat No. 15.

3   And then it goes all the way over to that end -- over there

4   underneath the clock.  All right.  So No. 32 is the one

5   underneath the clock.

6        So the -- there are 32.  So 16 would be -- minus 16, is 16

7   people would still be sitting there.  And those first, those 12

8   would be the jury.  And we would constitute them over there and

9   swear them in.

10       Then we have four left.  Those are the alternates, except

11  you each get a challenge.  So we do the same thing.  Government

12  goes first, and then you go, and then the two remaining will be

13  the alternates.

14       And they have priority in the -- in whoever -- like,

15  No. 32 has got the least priority and will be selected last if

16  there is a substitution.  So that's the way we select the jury

17  and the alternates.

18       And so what you need to be aware of, that -- and I want to

19  make sure you understand -- is that whoever is still standing

20  when the process is done, they will be the jury, the ones with

21  the lowest 12 seat numbers.

22       And in my -- it's almost impossible to tell how that's

23  going to go, because sometimes almost every one in the jury box

24  is knocked out and it winds up people over there.  Sometimes it

25  is the people -- I don't know.  It's just the way it goes.

```
 1        Now, there is a -- I want to make sure we understand the
 2   concept of passing.  So the Government probably is up to speed
 3   on this.  The Ninth Circuit about a year ago had a decision on,
 4   if you pass you do or you don't loss that position, that
 5   strike.
 6             MS. HARRIS:  You lose the strike.
 7             THE COURT:  I thought -- are you sure that's what
 8   they held?
 9             MS. HARRIS:  Is that the case in front of Judge
10   Illston?
11             THE COURT:  I don't remember.  No, I don't remember.
12   I thought they said you don't lose the strike.
13             MS. HARRIS:  No, the defendant would lose the strike
14   if the defense passes.
15        I'm not sure I understand the Court's question.  If --
16             THE COURT:  All right.
17             MR. KINGSLEY:  I think I know the case that you're
18   talking about.  I think if the defendant passes, is this the
19   case that says the defendant then doesn't lose the strike?  Is
20   that what you're thinking of?
21             THE COURT:  That's what I thought -- that's what I
22   thought it said, but I haven't gone back to check it.
23             MR. KINGSLEY:  I think that's what it said, but we'll
24   go back and check also.
25             THE COURT:  I think we should check it over lunch and
```

1  get my law clerk to look at it.  I am not going to make a

2  comment on passing yet.  But when we come back from lunch -- I

3  know this is definitely true, if there are two passes

4  consecutive.

5      So let's say that -- that you decide not to strike anyone

6  on your turn, Mr. Brugnara, and the Government then says:  We

7  don't either.  We're happy.  We don't strike anyone.  Two

8  consecutive passes means we're done.  There is no more.  That's

9  it.  And we take the lowest 12.

10         **MR. BRUGNARA:**  That makes sense.

11         **THE COURT:**  So, but as long as one side continues to

12  make a challenge, peremptory challenge, then it keeps it live.

13         **MR. BRUGNARA:**  That doesn't make logical sense

14  because if there -- if there -- if one side passes twice, the

15  other side you're saying gets to dislodge the entire jury with,

16  you know, potentially up to eight or nine picks?  That doesn't

17  make sense.

18         **THE COURT:**  Yeah -- no, no.  They get -- they get --

19  no.  Let's say that you never strike anybody.  Every time you

20  decide, you're happy.  You just give up your challenge.  But

21  the Government has still got it's right to use its six

22  peremptories.  So they get to continue on doing it.

23      And it just works the other way, too.  They could pass

24  every time.

25         **MR. BRUGNARA:**  You should be able to retroactively

```
 1  then go back and reengage your passes, depending on --

 2          THE COURT:  That's what we're going to find out.  I

 3  don't -- I need to look at how the law came out in that

 4  decision, and I will tell you after lunch because I'm going to

 5  go look at it.  But I want us to be -- this was something about

 6  that decision that surprised me and I can't now remember what

 7  it is.  We need to know exactly -- I want to obey the Ninth

 8  Circuit, of course.  So we need to figure that out.

 9          MR. BRUGNARA:  Judge Alsup, can you order Mr. Tamor

10  and Mr. Stevens to be back at a specific time so that we can

11  talk about the jurors before they reconvene?

12          THE COURT:  I think they are going to stay here.

13  They are welcome to stay here during the rest of this -- we've

14  got 20 more minutes before we reconvene.  They should stay

15  here.  They don't need to have lunch.  They are mere lawyers,

16  and you -- so they don't have any Sixth Amendments rights.

17      Mr. Stevens, what?

18          MR. STEVENS:  I was going to ask to be able to leave

19  to use the restroom, if that's all right.

20          THE COURT:  Yeah, you can do that.

21          MS. HARRIS:  Your Honor, we have one other matter to

22  take up with the Court.

23          THE COURT:  Ms. Harris is talking now, please.

24          MS. HARRIS:  The Court had ordered --

25          THE COURT:  Wait, wait.  Mr. Brugnara, Ms. Harris is
```

 1  speaking.  You need to listen to her.

 2          MS. HARRIS:  The Court had ordered the Government to

 3  make the art available for Mr. Brugnara to look at.

 4          THE COURT:  Yes.

 5          MS. HARRIS:  We were planning on doing that tomorrow

 6  morning.

 7          THE COURT:  I said you could do that on account of

 8  the logistics.  I told Dawn to tell you that.

 9          MS. HARRIS:  Okay.  But the jury selection, we're

10  going to have the art here.  That contemplated that we would be

11  done picking a jury today.

12          THE COURT:  We are going to be done today.

13          MS. HARRIS:  Okay.

14          MR. KINGSLEY:  We --

15          THE COURT:  I would be surprised if we're not.

16          MS. HARRIS:  Okay.

17          MR. KINGSLEY:  The other question that we have is the

18  art is in crates.

19          THE COURT:  We are going to go past 1:00 o'clock.

20          MS. HARRIS:  Okay.

21          THE COURT:  Yes.

22          MR. KINGSLEY:  The art is in the crates that we found

23  it in and it's wrapped.  We're going to unwrap, with art

24  handlers, certain pieces of it for the trial.  And we just want

25  clarification whether our art handlers need to be here

1  unwrapping whatever pieces Mr. Brugnara wants to look at in the

2  30 minutes tomorrow morning.

3        **THE COURT:**  I think so.  He is entitled to see what's

4  in those boxes before you show it to the jury the first time.

5        **MR. KINGSLEY:**  Unwrapping each piece, it might take

6  10, 15 minutes.  I don't know -- because it's very -- we can

7  take them out of the box, but that's different than actually

8  peeling off the layers of covering on it.  And I don't think

9  that can get done in half an hour.  And that's -- so we are

10 just --

11       **THE COURT:**  They should be here at 7:30 tomorrow and

12 we'll get as far as we can.  And it may be we don't finish it

13 all tomorrow morning, but we are going to get started on it.

14 And I want your handlers here to -- so Mr. Brugnara can see

15 what's here, and they can wrap it back up if they need to.

16       **MR. KINGSLEY:**  At 7:00?

17       **THE COURT:**  7:30.  What did I say?

18       **MR. KINGSLEY:**  You said 7:30.  I thought we were

19 talking about 7:00 so that there was enough time for --

20       **THE COURT:**  Can everyone be here at 7:00 tomorrow?

21       **MR. BRUGNARA:**  Well, this is the thing.  I was

22 waiting my turn, as you instructed me.

23       This is the thing, your Honor.  We just have the -- the

24 art experts that need to look at the art are being coordinated

25 with Mr. Stevens and Mr. Mr. Koltuniak, the private

1   investigator, to coordinate seeing the art tomorrow.

2              **THE COURT:**  Are they going to be here at 7:00 a.m.?

3              **MR. BRUGNARA:**  Well, they are waiting with Ms. Wise,

4   I believe is her name, with the CJA to coordinate making sure

5   that they are being compensated and what the logistics are of

6   that.  I understand that they are going to be coordinating with

7   Ms. Wise, Mr. Koltuniak and James Stevens.

8         But you have understand, I mean, the -- the art needs to

9   be made available for me and for them to see.  And it has to

10  be --

11             **THE COURT:**  7:00 a.m. tomorrow.  We're going to do it

12  right here in the courtroom.  7:00 a.m. tomorrow.

13        And I don't know about these experts.  I haven't approved

14  that yet.  I have to talk to Diana Wise.

15        Look, you've got 15 minutes, 16 minutes, and the jury is

16  going to get back.  You need to talk to your lawyers and you

17  need to get your lunch.  And we're going to resume sharply at

18  noon.  We'll take a break.

19        (Whereupon at 11:43 a.m.proceedings

20         were adjourned for noon recess.)

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2   April 27, 2015                              12:07 p.m.

 3        (Proceedings resumed afternoon recess.)

 4        (Defendant present, in custody.)

 5            THE COURT:  Please be seated.  Let's get back to

 6   work.  Thank you for being so punctual.

 7        Ms. Hellman, we're going to excuse you.  Please go back to

 8   -- unless you want to serve?

 9            PROSPECTIVE JUROR HAMILTON:  I would love to if it

10   were shorter.

11            THE COURT:  All right.  We've all agreed you have a

12   good excuse.

13        Mister -- who was it that was going to Santa Cruz?

14            THE CLERK:  Mr. Bonetti.

15            THE COURT:  Bonetti.  We're going to excuse you.

16        Did I do that, right?  Yes.  Yes.

17        (Prospective Juror Hamilton and Prospective Juror

18         Bonetti exit the courtroom.)

19            THE COURT:  Who was it that -- sitting back there.

20   Was that Ms. Hellman?

21            THE CLERK:  Hamilton.

22            THE COURT:  So I said the wrong name.

23        You're Mr. Hellman.  That's right.

24        So Ms. Hamilton is the one we excused.  Okay.  So now

25   we're right.  We will replace Ms. Hamilton first.
```

1      THE CLERK:  Clare O'Brien, O-B-R-I-E-N.

2      THE COURT:  Welcome.

3      PROSPECTIVE JUROR O'BRIEN:  Thank you.

4      THE COURT:  We'll replace Mr. Bonetti.

5      THE CLERK:  Ivan Jakic, J-A-K-I-C.

6      THE COURT:  All right.  So let's start with you,

7  Ms. O'Brien.

8         Where is our microphone?

9      THE CLERK:  I have it.

10      THE COURT:  Ms. O'Brien, do you have any hardship

11  issue?

12      PROSPECTIVE JUROR O'BRIEN:  Yes, sir.

13      THE COURT:  What's that?

14      PROSPECTIVE JUROR O'BRIEN:  I am a children's

15  librarian, and I have over the next several weeks -- I'm a sole

16  children's librarian in my town -- about 15 programs all

17  scheduled in the morning.  If I'm not there for a program,

18  they're canceled.  And I have many school children that I

19  contact with to promote our summer reading program.

20      THE COURT:  Personally, I think that's a very good

21  reason.  But under the law, that is not an acceptable reason,

22  so I cannot excuse you on that ground.

23      PROSPECTIVE JUROR O'BRIEN:  Thank you for

24  considering.

25      THE COURT:  Well, any other hardship issue?

```
 1              PROSPECTIVE JUROR O'BRIEN:  No, sir.

 2              THE COURT:  Okay.  Can you see the chart?

 3              PROSPECTIVE JUROR O'BRIEN:  Yes.

 4              THE COURT:  Please give us the info.

 5              PROSPECTIVE JUROR O'BRIEN:  My name is Clare O'Brien.

 6   I reside in Sonoma.  I have a master's of library science.  I

 7   am currently employed by the Sonoma County Library as a

 8   children's librarian.  I do not belong to any organizations,

 9   clubs, unions.  My hobbies are reading and hiking.

10       I am married to a retired California nursery professional.

11   I have no children.

12       I have served on two other juries:  One criminal, one

13   civil.  Both, a verdict were reached.  I am not in the

14   military.  Have never been involved with law enforcement.  And

15   I've never been a party or witness in court.

16              THE COURT:  Very good.  Thank you.

17       Now, we can go to Mr. Jakic.

18              PROSPECTIVE JUROR JAKIC:  Yeah.

19              THE COURT:  Here is the microphone.

20              PROSPECTIVE JUROR JAKIC:

21              THE COURT:  Wait.  Wait.  Use a mic.

22              PROSPECTIVE JUROR JAKIC:  My name is Ivan Jakic.  I

23   do live in San Francisco in the neighborhood.  My education is

24   in political science.  I am retired.  I do support some

25   organizations, like Amnesty International.
```

```
1        Hobbies:  Reading, writing, and walking.

2        I'm single.  Divorced.  Children, 27 and 32.

3        No jury services.  No military.  I was party to divorce.

4        Thank you very much.

5              THE COURT:  Okay.  All right.

6              PROSPECTIVE JUROR JAKIC:  I don't have any -- I can

7    be any time here.  I am free.

8              THE COURT:  Wonderful.  Let me ask you this:  Is your

9    English okay?  Can you --

10             PROSPECTIVE JUROR JAKIC:  Yeah.  Of course, my

11   English is okay.

12             THE COURT:  Have you understood everything that's

13   happened in court so far?

14             PROSPECTIVE JUROR JAKIC:  Yes, I did.  And I'm

15   multilingual.

16             THE COURT:  And you're what?

17             PROSPECTIVE JUROR JAKIC:  I'm multilingual.  I can

18   speak some other languages.

19             THE COURT:  Do you speak Russian?

20             PROSPECTIVE JUROR JAKIC:  Yes, sir.  And I speak

21   Spanish, too.

22             THE COURT:  Okay.  I may have to give you some

23   special instructions on Russian in a few minutes, but -- all

24   right.

25             PROSPECTIVE JUROR JAKIC:  I do speak Russian.  But I
```

```
 1  speak Croation.  I do speak Serbian.  I speak some other
 2  languages.
 3          THE COURT:  All right.  The reason I bring it up is
 4  some exhibits in this case are written in Cyrillic.
 5          PROSPECTIVE JUROR JAKIC:  Yes.
 6          THE COURT:  So I would have to give you some
 7  instructions on that.
 8      All right.  I need to -- okay.
 9      Mr. Hellman, I've got a question for you.  You are an
10  expert witness, you said, but I forgot to ask you what you're
11  an expert witness in.  You need the microphone.
12          PROSPECTIVE JUROR MR. HELLMAN:  I've been an expert
13  witness in taxation, 1031 exchanges, accounting, estate
14  planning, limited liability companies and business
15  organizations.
16          THE COURT:  All right.  Thank you.
17      And Ms. Wild, did you find out anything more about your --
18  whether you're going to get paid or not?
19          PROSPECTIVE JUROR WILD:  I'll get paid, because I'll
20  work after.
21          THE COURT:  Well, yes, but -- that's fine, but there
22  will be days when we may have to have you work past
23  1:00 o'clock, and you need to always need to get plenty of
24  sleep.  You can't come to court -- you can't go work til
25  midnight every night and then -- but it does usually work out
```

1   that jurors can do a fair amount of work after court.  But you

2   can't count on being able to get in a full eight hours every

3   day.  Okay?

4           **PROSPECTIVE JUROR WILD**:  Fine.

5           **THE COURT**:  All right.

6       Mr. Bezdek.

7       Can someone take the microphone all the way over there?

8   Ms. O'Brien?

9           **PROSPECTIVE JUROR BEZDEK**:  Yes.  It's Bezdek,

10  B-E-Z-D-E-K.

11          **THE COURT**:  Okay.  You said something about being in

12  a small claims court case, and I should have asked you for the

13  details.

14      What were those details?

15          **PROSPECTIVE JUROR BEZDEK**:  That was about 35 years

16  ago.  I sold a house.  People that bought it thought that the

17  oven didn't work and sued me for it.

18          **THE COURT**:  All right.

19          **PROSPECTIVE JUROR BEZDEK**:  We lost and then went to

20  Martinez to appeal and won the appeal.

21          **THE COURT**:  You won the appeal?

22          **PROSPECTIVE JUROR BEZDEK**:  That's correct.

23          **THE COURT**:  Okay.  Who was it that worked for an

24  escrow company?  Somebody, I think -- maybe they've been

25  excused.  But did somebody work for an escrow --

 1          PROSPECTIVE JUROR PINEDA:  My wife.

 2          THE COURT:  Your wife works for an escrow company?

 3          PROSPECTIVE JUROR PINEDA:  Yes.

 4          THE COURT:  What's the name of her company?

 5          PROSPECTIVE JUROR PINEDA:  Old Republic Title,

 6  residential and commercial.

 7          THE COURT:  All right.  Now, let me ask the parties:

 8  Is Old Republic Title in any way involved in any of our cases?

 9          MS. HARRIS:  Yes, your Honor.

10          MR. BRUGNARA:  Yes.

11          THE COURT:  All right.  Now, you -- do you work for

12  Old Republic Title?

13          PROSPECTIVE JUROR PINEDA:  I do not.

14          THE COURT:  Are we going to have any witnesses from

15  Old Republic Title?

16          MR. BRUGNARA:  Yes.

17          THE COURT:  All right.  Do you know anybody that

18  works at Old Republic Title other than your wife?

19          PROSPECTIVE JUROR PINEDA:  Yes.

20          THE COURT:  All right.  I don't know.  I mean, who

21  are those witnesses on the witness list?

22          MR. BRUGNARA:  Jennifer Senhaji.  She works at the

23  Special Projects Division.

24          THE COURT:  Do you know that person?

25          PROSPECTIVE JUROR PINEDA:  I do not.

1          **THE COURT:**  All right.  And if somebody shows up from

2     Old Republic Title, are you going to give them more weight,

3     less weight?  Is it going to make any difference in how you

4     evaluate their testimony?

5          **PROSPECTIVE JUROR PINEDA:**  No.

6          **THE COURT:**  All right.  You need to be -- I mean,

7     I've already said it, but you cannot talk to your wife about

8     this case.  She may know something about it.  I don't know.

9     Maybe she knows nothing.  Odds are she knows nothing.  But I

10    would hate for her to know something about this case and then

11    give you some pillow talk, and then that would mean we try the

12    case all over again.

13         Do you understand what I'm saying?

14         **PROSPECTIVE JUROR PINEDA:**  Yes, I do.

15         **THE COURT:**  So you can't talk to her.  Do I have your

16    word on that?

17         **PROSPECTIVE JUROR PINEDA:**  Yes, you do have my word.

18         **THE COURT:**  All right.  I should have gotten your

19    name.

20         **PROSPECTIVE JUROR PINEDA:**  My name is George Pineda.

21         **THE COURT:**  Thank you, Mr. Pineda.

22         All right.  Yes, sir.  Somebody raised their hand.

23         **PROSPECTIVE JUROR MR. PATTERSON:**  Sorry.  I didn't

24    put two and two together this morning, but whether it's

25    relevant or not I don't know.  I believe you're currently

1   presiding over a case, a pending case, involving the company I

2   work for Bitcasa.  So I just want to make sure that's ...

3          **THE COURT:**  Is that case still going on?

4          **PROSPECTIVE JUROR MR. PATTERSON:**  Yes, it is.  It's

5   pending.

6          **THE COURT:**  All right.  It won't make any difference

7   to me.  Does it make any difference to you?

8          **PROSPECTIVE JUROR MR. PATTERSON:**  No.  Want to make

9   sure it's...

10         **THE COURT:**  Well, yes.  I do remember the case, but

11  it won't have anything to do with your jury service.  It won't

12  come up.  You're right to bring it up.  Thank you for that.

13      Your name again?

14         **PROSPECTIVE JUROR MR. PATTERSON:**  Eric Patterson.

15         **THE COURT:**  Thank you.

16      Okay.  Anyone else want to bring up last-minute things?

17      Okay.  Over here, No. 2 in the back row.  Wait.  You need

18  the microphone.

19         **PROSPECTIVE JUROR MS. BASS:**  I don't need the

20  microphone.  I'm loud.

21      Angela Bass.  The company pays -- sounds like it might go

22  longer or not, but I just want to comment that my company only

23  pays for 20 days of jury duty.

24         **THE COURT:**  Well --

25         **PROSPECTIVE JUROR BASS:**  So I don't know if that

1    applies.

2             THE COURT:  Twenty days would be -- it might go a

3    little longer than 20 days.  Can you, for the good of the

4    order, bear with us in case you don't get paid for those extra

5    days?

6             PROSPECTIVE JUROR BASS:  Can I bear with you?

7             THE COURT:  Yeah.  Can you bear with the system?  In

8    other words, would that be a hardship on you?

9             PROSPECTIVE JUROR BASS:  A little bit, yes.

10            THE COURT:  A little bit is not enough.

11            PROSPECTIVE JUROR BASS:  Okay.

12            THE COURT:  It has to be something pretty -- you

13   know, serving on the jury is a hardship on everybody in one way

14   or another.  So if it's a small hardship, we all just accept

15   that.

16            PROSPECTIVE JUROR BASS:  Okay.

17            THE COURT:  If it's something that would mean you

18   couldn't send your kid to college or you get kicked out of your

19   house or they take your car away, then I would give you an

20   exemption.

21       Anyone else want to raise your hand or bring up something

22   new?

23       Yes, sir.  Mr. Arkin.

24            PROSPECTIVE JUROR ARKIN:  Yes.  I should have

25   mentioned earlier, my son who is 20 years old spent last

1    semester at the California College of the Arts.

2           **THE COURT:**  Okay.  Do you talk -- can you refrain

3    from talking to him during -- if you get selected -- until

4    after the case is over?

5           **PROSPECTIVE JUROR ARKIN:**  Absolutely.

6           **THE COURT:**  Okay.  That's what you have to do.

7        I'm going to -- oh, wait.  Somebody wants to raise their

8    hand over here.  Bring the microphone over to her.

9        Ms. -- give us your name, please.

10          **PROSPECTIVE JUROR TRANFINLEY:**  My name is Tuyet

11   Tranfinley.

12          **THE COURT:**  Yes?

13          **PROSPECTIVE JUROR TRANFINLEY:**  I'm sorry.  Is that

14   okay?  I'm on the medication right now, and I need to use the

15   bathroom a lot.  So is that okay if I can use the bathroom

16   during the trial?

17          **THE COURT:**  How often do you need to go?

18          **PROSPECTIVE JUROR TRANFINLEY:**  Because the medicine

19   make me have to go.

20          **THE COURT:**  Right now?

21          **PROSPECTIVE JUROR TRANFINLEY:**  No, not now.  But I

22   just say it because the medicine sometimes make you go to the

23   bathroom more often.

24          **THE COURT:**  Do you think it will be more often than

25   once every hour and a half?

```
 1              PROSPECTIVE JUROR TRANFINLEY:  Yeah, something like
 2   that.  Like every hour.
 3         THE COURT:  Look, if you get selected and you've got
 4   to go, you just raise your hand.  And I say:  Yes?  And you
 5   say:  I got to go to the bathroom.  And then we take a break
 6   and let you do that.
 7              PROSPECTIVE JUROR TRANFINLEY:  Yeah.  I just wanted
 8   to let you know.
 9         THE COURT:  You're right to bring it up.  Thank you.
10      Okay.  I'm going to go down some things about trials that
11   are important.  And I want you to raise your hand if there is
12   an issue.
13      First thing is something I've already said, which is this:
14   The indictment does not constitute proof of any kind.  It's
15   just the accusation.  And the reason we have a trial is because
16   the trial is to find out if the Government can prove the case.
17      Sometimes there are people who say, Well, they wouldn't
18   have been indicted if they didn't do something wrong, so they
19   must be guilty of something.
20      So if that's the way you feel, I need to know now.  Does
21   anybody out there feel that Mr. Brugnara must be guilty of
22   something otherwise he wouldn't have been indicted?  If so,
23   raise your hand.
24      (No response.)
25              THE COURT:  All right.  I don't see anyone raising
```

1   your hand.  Similarly, he is presumed innocent under the law.

2   And the Government has the burden of proof to prove that he's

3   guilty beyond a reasonable doubt, and Mr. Brugnara never has to

4   prove anything.

5       Do any of you have any problem with that proposition?  If

6   so, raise your hand.

7       (No response.)

8           **THE COURT:**  Okay.  No hands are going up.

9       Another thing is that he is representing himself.  And

10  many of you are used to watching TV and you see lawyers

11  representing people.  So you may say:  Well, that's not usual.

12  And you hold it against him because it's not usual.

13      I'm telling you, he has a constitutional right to do

14  exactly what he's doing, which is represent himself.  And do

15  any of you have a -- do -- are any of you going to hold it

16  against him in any way that he is representing himself?  If so,

17  raise your hand.

18      (No response.)

19          **THE COURT:**  Okay.  Nobody is raising their hand.

20      The defendant has a right not to testify.  He doesn't have

21  to decide that now.  He can decide that later.  He may decide

22  he does want to testify.  He may decide that he does not want

23  to testify.  It's his choice.  Under the Constitution, the --

24  everyone has the right to remain silent and not have to be

25  forced to testify.  It's a very important right, right there in

1  the Bill of Rights in our country.  So it would be wrong for

2  you to say:  Oh, he didn't get up there and deny it, so he must

3  be guilty.  That would be a flat out violation of the

4  Constitution for you to do that.

5        Now, I have had cases where somebody will raise their hand

6  in the jury and say, Look, if he was innocent, he would testify

7  and explain it all.

8        Do any of you believe that way?  If so, raise your hand.

9        (No response.)

10            THE COURT:  All right.  No one is raising their hand.

11        We're going to have a lot of law enforcement people

12  testify in this case, or at least some, maybe not a lot, law

13  enforcement.  And here is something that may surprise you:

14  Under the law, you cannot give any greater or lesser weight to

15  the testimony of any law enforcement officer than you would of

16  any civilian.  You can't give them extra weight just because

17  they wear a badge, and you can't give them less weight because

18  they wear a badge.

19        I've seen it go both ways.  And if you tell me right now,

20  I would hold it against a witness because they work for law

21  enforcement, and I wouldn't believe a word they said, or the

22  other way, I would believe everything they said.  Don't use it

23  just to get out of the jury service.  But that's a very

24  important one.

25        If any of you feel you would give extra or less weight to

1   somebody because they work for law enforcement, you should

2   raise your hand now.

3       (No response.)

4           **THE COURT:**  Who is that that hacked and coughed?

5           **UNIDENTIFIED PROSPECTIVE JUROR:**  Sorry.

6           **THE COURT:**  Would you like a cough drop?

7           **UNIDENTIFIED PROSPECTIVE JUROR:**  I'll take one if

8   you've got one.

9       (Brief pause.)

10          **THE COURT:**  You can tell that I don't like germs, but

11  it's for your own good.  And I also want everyone to hear what

12  happens, especially when the witnesses are on the stand.  I

13  don't like hacking and coughing, because the jury has got to

14  hear everything.

15      Anyway, raise your hand if you would give more or less

16  weight to a law enforcement witness.

17      (No response.)

18          **THE COURT:**  Okay.  Sometimes people don't like to sit

19  in judgment.  Once I had somebody say:  Under my religion I

20  can't sit in judgment on somebody and, anyway, I know when

21  they're guilty just by looking at them.

22      It's sort of inconsistent.  But just to stick with the

23  first part of that, if -- there are people who don't like to

24  sit in judgment.  And if you are in that category, you need to

25  raise your hand now, because that's important.  That's the

1  whole idea about being on the jury is you do sit in judgment.

2  And you have to decide sometimes who's telling the truth.  It's

3  not always easy.  It's a tough job.  That's why the

4  Constitution gives it to the jury.

5       So if you don't like to sit in judgment, raise your hand.

6       Okay.  We've got one hand going up -- not in the back yet.

7  Okay.  We've got two hands on that one.

8       All right.  Where is my microphone?  Let's give it to --

9  Mr. Garrett?

10               **PROSPECTIVE JUROR GARRETT:**  Correct.

11               **THE COURT:**  Okay.  Explain your situation.

12               **PROSPECTIVE JUROR GARRETT:**  To answer the question,

13  not about the situation, but the judgment part.  When

14  everything is laid out, it's kind of -- it's a responsibility,

15  of course.  But it's difficult for myself to judge others in a

16  manner that's going to be on either side of it.  I've kind of

17  always been the neutral guy kind of going with the flow.  But

18  it's understood if I'm in that situation, I would have to make

19  a decision based on what's provided.

20       But I'm not going to state I would be totally comfortable

21  with the decision internally, if that makes sense.

22               **THE COURT:**  Okay.  But you're not telling me your

23  religion --

24               **PROSPECTIVE JUROR GARRETT:**  No, it's not religion

25  based.  You said comfort.

1    **THE COURT:**  Do you have an ethical restriction,

2  internal ethical restriction, that keeps you from passing

3  judgment on somebody?

4    **PROSPECTIVE JUROR GARRETT:**  Put it that way, it's

5  very strong.  But you just posed a question as to would it

6  bother you or something difficult.  Difficult, but there's no

7  ethical line.

8    **THE COURT:**  All right.  That's not enough to

9  disqualify you.  You know, you're being -- you're voicing a

10  concern that everyone should have, which is serving on the jury

11  is an important responsibility, and it's not always easy to

12  decide what the right answer is.  And, of course, you should

13  feel hesitation in carrying that out.

14    But nonetheless, people who have that hesitation go into

15  the jury room day after day, and they consider the evidence

16  carefully, and they decide one way or the other, and they make

17  a decision.  So I don't think you're saying anything that would

18  cause you to be disqualified.

19    **PROSPECTIVE JUROR GARRETT:**  Okay.

20    **THE COURT:**  All right.  Good.  But you're right to

21  bring it up.

22    Ms. O'Brien, let's get you the microphone.  Mr. Garrett,

23  would you please bring that microphone over to Ms. O'Brien?

24    (Prospective Juror Garret complied.)

25    **THE COURT:**  And your situation, Ms. O'Brien, is?

1  What's your concern?

2          **PROSPECTIVE JUROR O'BRIEN:**  When you mentioned the --

3  the hesitation, I can understand that.  But as far as having a

4  religious imperative, that is not my situation.

5          **THE COURT:**  Do you have a personal ethic that would

6  prevent you from passing judgment on somebody?

7          **PROSPECTIVE JUROR O'BRIEN:**  I have a difficulty with

8  the phrase "passing judgment," but I believe I could help make

9  a good decision.

10          **THE COURT:**  All right.  So you're not saying that you

11  would be disabled from ever coming to a decision on what the

12  right outcome in the case is?

13          **PROSPECTIVE JUROR O'BRIEN:**  Correct.

14          **THE COURT:**  Okay.  Thank you.

15      Anyone else?

16      (No response.)

17          **THE COURT:**  All right.  No one is raising their hand

18  on that.

19      I want to go over with you what the role of the jury is.

20  I've already referred to it once.  And I -- I need to repeat

21  it, because this is the fundamental thing about a jury trial.

22      Right there in our Bill of Rights -- you all know what the

23  Bill of Rights is.  That's part of our Constitution.  It

24  guarantees the right to a jury trial in criminal cases.

25  Actually, in civil cases, too.

```
 1       But it's important, because the decision making is given
 2   straight from our Constitution to the jury.  It's like if the
 3   Bill of Rights was way up there, a bolt of lightning comes down
 4   and goes into the jury box.  It bypasses the judge and it goes
 5   straight to the jury box.  And you, under the Constitution, are
 6   the ones that decide the case, not the judge.
 7       And you have to do two things:  You take the instructions
 8   of the law, which you just take from me as correct -- and I'll
 9   tell you what the elements of proof that are required.  And you
10   lay the evidence alongside it and ask whether or not the
11   Government has met its burden of proof on each element.
12       And if the answer is yes, your duty is to vote to convict.
13   If the answer is no, then your duty is to vote to acquit.  And
14   that's what the jury does.
15       So you listen carefully to the evidence in whatever manner
16   is best for you.  Take notes if you wish.  You don't have to
17   take notes.  Pay close attention.  You've got to be here
18   100 percent of the time.  You can't excuse yourself.  And be
19   fair to both sides.  Don't talk about the case until it comes
20   to the end.  But then it's your duty to talk about the case in
21   deliberations and to as a group decide the case.  So that's
22   what the jury does.
23       You follow the judge's instructions on the law, but you
24   follow your own conscience as to what the -- the weight of the
25   evidence.
```

```
 1        Now, do any of you think you would have some problem doing
 2   what a jury is supposed to do?  If so, raise your hands.
 3        (No response.)
 4            THE COURT:  All right.  No one is raising their hand.
 5        Now, I -- I want to bring up a different thing, and that
 6   is your ability to keep things straight.  What is fact
 7   versus -- what is evidence versus what is not evidence?
 8        I say this in all trials.  It also applies in this case.
 9   In all trials both sides get to make opening statements.  They
10   get to make closing arguments.  That's going to be true here.
11   They get to examine the witnesses on cross examination and
12   direct examination.
13        So you will be hearing the two sides:  Mr. Brugnara on the
14   one side, and the Government on the other.  You'll be hearing
15   them way more than you hear me.  You've heard me a lot today.
16   But I kind of recede out of the picture, and you will be
17   hearing them a lot.
18        Not one word they ever say is evidence unless it's spoken
19   from the witness stand under oath.  So if the Government lawyer
20   were to say in a question, for example -- I'll just make this
21   up:  Isn't it true that the light was red, to a witness on the
22   stand -- this is not a traffic case -- but:  Isn't it true that
23   the light was red?  Let's say Ms. Harris asked that question.
24   And the witness said:  I don't know.
25        Does that prove in any way that the light was red?  No.
```

1    It is zero proof that the light was red.  Just because you

2    heard Ms. Harris say it, does not mean that the light was red

3    in any way.

4         If the witness said it was red, yes, that's true, it was,

5    then, of course, that would be evidence.  But you have to

6    distinguish between what the lawyer says versus what the

7    witness actually admits or says.  It's very important.

8         Similarly, if Mr. Brugnara asks a question, like:  Isn't

9    it true that the light was green?  And the witness says:  I

10   don't know.  That's not proof of anything either.

11        So you're going to be hearing both sides in this case a

12   lot.  They'll be making a lot of statements in opening

13   statement.  They'll be making statements in closing.  And

14   they'll be asking questions of the witnesses.  And you must

15   remember that not one word said in those circumstances -- zero,

16   Z-E-R-O -- not one word of that is evidence.

17        And at the end of the case, you must decide the case based

18   on the evidence versus the instructions of law and the elements

19   of proof, and not based upon things that were not evidence but

20   you just happened to hear the lawyers say them.  Okay?

21        Now, is there somebody out there who thinks they would get

22   so confused and unable to keep straight what is evidence and

23   not evidence?

24        I promise you, it can happen.  It's not -- it would be

25   okay for you to raise your land and say, I think I would have

1   trouble on that.

2       Okay.   There goes a hand around right there.   I need to

3   get you the microphone.

4           **PROSPECTIVE JUROR BEATON:**   My name is Amy Beaton.

5   It's a hypothetical question.

6           **THE COURT:**   Sure.

7           **PROSPECTIVE JUROR BEATON:**   Because I don't know what

8   evidence is.   So if the gentleman didn't cross examine a

9   witness and ask a question that I would have wanted to know,

10  and then I think that he made a mistake in not cross examining,

11  let's say, is that evidence about his behavior?   Is that

12  evidence, or can I form an opinion if he doesn't represent

13  himself and speak to you the way that the Government is

14  speaking to you, if I think he's not capably representing

15  himself?

16          **THE COURT:**   That's not evidence.

17          **PROSPECTIVE JUROR BEATON:**   Thank you.

18          **THE COURT:**   That would -- that should not be put into

19  the category of evidence, and you should not hold it against

20  him that he is representing himself.

21      Now, if he fails to bring out -- just like if the

22  Government failed to bring out a point on cross-examination

23  that you thought should have been brought out or at least

24  inquired about -- sometimes that happens on both sides -- and

25  what you may not know is they may have very good reasons,

1   strategic reasons, for leaving that alone and not going there.

2   But sometimes it is a mistake, possibly.  But you should not

3   hold it against somebody just because they made a mistake.  But

4   what you can do is consider the state of the actual evidence

5   and then size up what the actual evidence is at the end of the

6   case.  All right?

7       Okay.  Anyone else want to raise your hand on that topic?

8       (No response.)

9           THE COURT:  All right.  No one is raising their hand.

10      Now, I have a couple of questions here.  On the Russian

11  language part, raise your hand if you can speak Russian or read

12  it?

13          PROSPECTIVE JUROR JAKIC:  (Speaking in Russian.)

14          THE COURT:  What?

15          PROSPECTIVE JUROR JAKIC:  Okay.  I speak Russian.

16  (Speaking in Russian.)

17          THE COURT:  Wait.  Wait.  Wait.  The court reporter

18  can't take down Russian.

19      (Laughter.)

20          PROSPECTIVE JUROR JAKIC:  Okay.  I do speak Russian.

21          THE COURT:  Okay.  All right.  Now, here is the

22  thing:  This is -- our official language is English, and the

23  trial is going to be conducted in English.  And I can tell you

24  understand English, but you also understand some Russian.  And

25  you have to ignore what the Russian exhibit says, unless it's

interpreted officially for us, in which case you could then
consider the interpretation.  But you can't do your own
interpretation in the jury room.

Do you understand that?

PROSPECTIVE JUROR JAKIC:  Yes, I do, your Honor.

THE COURT:  Thank you.

All right.  And will you follow that, what I just said?
Will you do what I just said and not try to interpret it
yourself?

PROSPECTIVE JUROR JAKIC:  I will abide by your rules,
your Honor.

THE COURT:  All right.  See, I wouldn't want you to
get in the jury room and for one of the jurors to report out
that Mister -- Jakic?

PROSPECTIVE JUROR JAKIC:  Jakic, yes.

THE COURT:  -- is in there reading it to us in
Russian.  You know, they would tell me, I'm sure.  So you don't
want to do that.

Does anybody else speak Russian or read it?

(No response.)

THE COURT:  Okay.  No one.  No one does.

Have any of you ever -- or a member of your family or a
close friend, ever been a defendant in a criminal case or been
accused of criminal conduct?

And I want to say that if you feel that the answer is yes

1   and you want to talk about it privately, we will figure out a

2   way to do it more privately with just counsel and the defendant

3   present.  But if you're willing to talk about it publicly, that

4   would -- but we need to know.

5       Yes, over there in the back.  Mr. Christopulos.

6           PROSPECTIVE JUROR CHRISTOPULOS:  Christopulos.

7           THE COURT:  Please.  Microphone, though.

8           PROSPECTIVE JUROR CHRISTOPULOS:  Could I discuss it

9   in private?

10          THE COURT:  All right.  We'll come back to it

11  privately.

12      Okay.  Anyone else?

13      Mr. Hellman.  Please, the microphone.

14          PROSPECTIVE JUROR HELLMAN:  I have had a client that

15  was accused of a criminal matter, and I testified in that case.

16          THE COURT:  How long ago was that?

17          PROSPECTIVE JUROR HELLMAN:  It would be ten years.

18          THE COURT:  Is that in any way going to affect your

19  ability to be fair and impartial here?

20          PROSPECTIVE JUROR HELLMAN:  No.

21          THE COURT:  All right.

22      Anyone else?

23      Are you raising your hand?  You've got to really raise

24  your hand so I can see it.

25      Okay.  Mr. Hellman, will you take that microphone over

1    to -- is it Ms. Kaur?  How do you say your last name?

2              **PROSPECTIVE JUROR KAUR**:  Yeah.

3              **THE COURT**:  Yeah.  All right.

4              **PROSPECTIVE JUROR KAUR**:  I would like to discuss this

5    in private.

6              **THE COURT**:  Privately?

7              **PROSPECTIVE JUROR KAUR**:  Uh-huh.

8              **THE COURT**:  Okay.  We can do that.  But it's too

9    early for us to go there, so we -- we'll wait a bit on that.

10         Anyone else?

11         (No response.)

12             **THE COURT**:  Okay.  No one is raising their hand.

13        Has anyone ever testified in a criminal case as a witness

14   for either the prosecution or the defense beyond what you've

15   already disclosed?  If so, raise your hand.

16        (No response.)

17             **THE COURT**:  Okay.  No one is raising their hand.

18        Have any of you ever made a claim against the U.S.

19   Government, or a member of your family made a claim against the

20   U.S. Government?  If so, raise your land.

21        (No response.)

22             **THE COURT**:  No one is raising their hand.

23        Does anybody have any prejudices against the Government --

24   I'm going to ask the same thing about the defendant -- but

25   sometimes people just don't like the federal government, you

1    know?  And if you're one of those people who believe that the

2    federal government is, you know, something to be disliked, you

3    should raise your hand now.  If you're prejudiced against the

4    Government, raise your hand.

5         (No response.)

6         **THE COURT:**  No one is raising their hand.

7         Okay.  Same question for the defendant, Mr. Brugnara.

8    None of you know who he is, because all of you said you didn't

9    know him to begin with.  But if for some reason if you're

10   prejudiced against him, you need to raise your hand now.

11        (No response.)

12        **THE COURT:**  Okay.  Nobody is raising their hand.

13        Have any of you been the victim of a crime?  Raise your

14   hand.

15        Okay.  Several of you.  I'm going to just limit -- if it

16   was a small-time robbery, let that go.  But if it was something

17   like a crime of violence or an economic crime -- an economic

18   crime, let's say, like a fraud case, please raise your hand.

19        So let's see.  One hand.  Just one -- two hands.

20        Okay.  Where is my microphone?  Who's got the mic?  Here

21   it is.

22        Please give the microphone to Ms. -- is it Benton?

23        **PROSPECTIVE JUROR BEATON:**  Beaton.

24        **THE COURT:**  Beaton.  Yes.

25        **PROSPECTIVE JUROR BEATON:**  I was defrauded by an

1  electronic fund transfer from AT&T, which I didn't have an

2  account for.  They took money out of my bank account four

3  months in a row, and I got it all back, but I had to file a

4  complaint with the District Attorney before they called me up

5  and gave me my money back.

6          THE COURT:  Did they ever figure out who did it?

7          PROSPECTIVE JUROR BEATON:  No, and they wouldn't tell

8  me who did it.

9          THE COURT:  Who is "they"?

10          PROSPECTIVE JUROR BEATON:  Well, AT&T.  I mean,

11  somebody's bill was being paid with my money, and I didn't have

12  an account.  And when I would call them and ask them whose bill

13  was paid, they wouldn't tell me.

14          THE COURT:  Okay.  All right.  Now, do you think in

15  any way that personal experience will influence your

16  deliberations here as a juror?

17          PROSPECTIVE JUROR BEATON:  No.

18          THE COURT:  Okay.

19      All right.  Who else raised their hand?  Mister -- say it

20  again?  Who raised their hand?

21      Okay.  In the yellow shirt there -- sweater.  What is your

22  name?

23          PROSPECTIVE JUROR SCHOENTHAL:  Schoenthal.

24          THE COURT:  Yeah, that's what I got here.

25      All right.  What is your situation?

1           **PROSPECTIVE JUROR SCHOENTHAL:** So I was the victim of

2   identity theft several years ago.  And they did catch the

3   perpetrators.  They're actually going through the Federal Court

4   system in Chicago.  So I get emails from the Victim

5   Notification system regarding their processing through the

6   system.

7           **THE COURT:**  Now, you've heard what this case is

8   about, right?  Do you think this case has anything to do with

9   your case in Chicago?

10           **PROSPECTIVE JUROR SCHOENTHAL:**  No.

11           **THE COURT:**  Can you set aside the Chicago thing and

12   be fair and square to both sides here?

13           **PROSPECTIVE JUROR SCHOENTHAL:**  Yes.

14           **THE COURT:**  All right.  Thank you.

15      And who else raised their hand over here?  Mister--

16           **PROSPECTIVE JUROR FERREN:**  I was the victim of a

17   violent crime.

18           **THE COURT:**  What's your name again?

19           **PROSPECTIVE JUROR FERREN:**  Mr. Ferren, Robert.

20           **THE COURT:**  A violent crime?

21           **PROSPECTIVE JUROR FERREN:**  I was stabbed.

22           **THE COURT:**  Oh, my God.  Well, I don't think I need

23   to get into the details other than to ask you:  Is that going

24   to in any way influence what happens here with you as a juror?

25           **PROSPECTIVE JUROR FERREN:**  No.

1          THE COURT:  Okay.  Thank you.

2      Just curious.  How long ago was that?

3          PROSPECTIVE JUROR FERREN:  Ten years ago.

4          THE COURT:  All right.

5      Anyone else want to raise your hand on that question?

6      (No response.)

7          THE COURT:  Nobody.

8      Again, I want to come back to the question about art.

9  Have any of you ever had any dealings with Sotheby's or

10 Christie's concerning -- anything, really.  Sotheby's or

11 Christie's?  If so, raise your hand.

12     Mr. Hellman, what's your situation?

13         PROSPECTIVE JUROR HELLMAN:  On behalf of clients, I

14 have had those experiences.

15         THE COURT:  And describe more generally what it is

16 that you -- what kind of experiences?

17         PROSPECTIVE JUROR HELLMAN:  Appraising items, sale of

18 some items.

19         THE COURT:  Okay.  And did any of that involve

20 artwork?

21         PROSPECTIVE JUROR HELLMAN:  Yes.

22         THE COURT:  Do you remember any of the artists

23 involved?

24         PROSPECTIVE JUROR HELLMAN:  It was a client of mine

25 in particular that I'm thinking of.

```
 1            THE COURT:  You mean, the client was the artist?

 2            PROSPECTIVE JUROR HELLMAN:  Yes.

 3            THE COURT:  Okay.  Is it somebody we would have heard

 4   of?

 5            PROSPECTIVE JUROR HELLMAN:  Yes.

 6            THE COURT:  Can you tell us?

 7            PROSPECTIVE JUROR HELLMAN:  Jerry Garcia.

 8            THE COURT:  So you got one of those two to auction

 9   off some of his -- did he have artwork?

10            PROSPECTIVE JUROR HELLMAN:  He had artwork and -- it

11   was primarily for valuation.

12            THE COURT:  All right.  Was he the -- he wasn't the

13   artist, was he?

14            PROSPECTIVE JUROR HELLMAN:  Yes, he was.

15            THE COURT:  He was, okay.

16       Okay.  So -- all right.  Now, you may hear from some

17   witnesses in this case about Sotheby's or Christie's -- which

18   in your case was it, Sotheby's or Christie's?

19            PROSPECTIVE JUROR HELLMAN:  It was Christie's.

20            THE COURT:  All right.  So you might hear -- you're

21   going to hear from Christie's.  I think you're going to hear

22   from Sotheby's in this case, but I doubt you know the people

23   involved, because we read their names off earlier.

24       Isn't that right, counsel?

25            MS. HARRIS:  Yes, your Honor.
```

 1          THE COURT:  Did you know any of those names.

 2          PROSPECTIVE JUROR HELLMAN:  No, I didn't recognize

 3  them.

 4          THE COURT:  All right.  Now, will there be anything

 5  about your own prior experience involving Jerry Garcia that

 6  will somehow influence how you approach the evidence in this

 7  case?

 8          PROSPECTIVE JUROR HELLMAN:  No.

 9          THE COURT:  All right.  Anyone else.

10      (No response.)

11          THE COURT:  And the question is:  Have you ever had

12  any dealings with Sotheby's or Christie's?  If so, raise your

13  hand.

14      (No response.)

15          THE COURT:  Have you had any dealings with any other

16  auction house or art dealer?  If so, raise your hand.

17      Okay.  In the back row.  Ms. Murphy.

18          PROSPECTIVE JUROR MURPHY:  I have purchased a few

19  paintings from a local gallery here.

20          THE COURT:  Okay.  And roughly what is the price

21  range of what you purchased?

22          PROSPECTIVE JUROR MURPHY:  $5,000 each.

23          THE COURT:  $1,000?

24          PROSPECTIVE JUROR MURPHY:  5,000.

25          THE COURT:  5,000, all right.

1      And are there any artists' names that we might recognize?

2           **PROSPECTIVE JUROR MURPHY:**  No.  You would -- she's a

3    local artist, but hopefully she'll become someone.  Her name is

4    Lindsey Kustish (phonetic spelling).

5           **THE COURT:**  Okay.  So do you think you could set

6    aside that experience and evaluate this case on the evidence

7    that's presented here in court?

8           **PROSPECTIVE JUROR MURPHY:**  Yes.

9           **THE COURT:**  All right.

10      Anyone else want to raise your hand on that question?

11      (No response.)

12           **THE COURT:**  No one.  Okay.

13      I already asked if anybody owns any artwork.  I'm going to

14    say we'll use $5,000 as the -- anybody own any artwork that you

15    paid $5,000 or more for, other than Ms. Murphy?

16      Okay.  Over there.  Let's pass the microphone over there

17    to Mr. Patterson?

18           **PROSPECTIVE JUROR PATTERSON:**  Yes.

19           **THE COURT:**  Mr. Patterson.

20           **PROSPECTIVE JUROR PATTERSON:**  Two or three paintings

21    worth more than that.

22           **THE COURT:**  What's the approximate value, do you

23    think?

24           **PROSPECTIVE JUROR PATTERSON:**  5,000 to 10,000.

25           **THE COURT:**  Would we recognize the names of the

1  artists?

2        **PROSPECTIVE JUROR PATTERSON:**  No.

3        **THE COURT:**  And did you buy them through an auction

4  house?  How did you buy them?

5        **PROSPECTIVE JUROR PATTERSON:**  Gallery.

6        **THE COURT:**  Where?

7        **PROSPECTIVE JUROR PATTERSON:**  Up in Sonoma.

8        **THE COURT:**  All right.

9     Okay.  Anyone else?

10     Mr. Patterson, can you set aside your own experience with

11  buying expensive art and decide this case according to the

12  evidence presented here at trial?

13        **PROSPECTIVE JUROR PATTERSON:**  Yes.

14        **THE COURT:**  Okay.  Anyone else want to raise your

15  hand?

16     (No response.)

17        **THE COURT:**  Okay, nobody.

18     Does anyone have any special education, training or other

19  specialized knowledge in the area of either law or fine art?

20  If so, please raise your hand.  Beyond what you've already

21  testified to.

22     Mr. Evenhouse?

23        **PROSPECTIVE JUROR EVENHOUSE:**  Yeah.  I have -- as

24  part of my job, I supervisor creative art students.  So I have

25  several interns over the last few years who have knowledge

1  about art.  And we assist veterans in the sale of their artwork

2  at times, but it is definitely not in the expensive category.

3          **THE COURT:**  Okay.  Fair enough.  Will you be able to

4  set aside that experience and evaluate the case here just on

5  the evidence presented here in court?

6          **PROSPECTIVE JUROR EVENHOUSE:**  Yes.

7          **THE COURT:**  Anyone else want to raise your hand?

8      (No response.)

9          **THE COURT:**  Okay.  I don't see any other hands going

10 up.

11     So now we come to a question that is one where you get to

12 raise your hand if you wish and disclose something that you

13 think the lawyers or each side, Mr. Brugnara or the lawyers on

14 the other side, should know about in helping them decide the

15 case.

16     I'll give you some examples.  Let's say you are no good at

17 paying attention for more than 30 seconds, and -- because you

18 have been brainwashed by the media and you can't handle

19 anything that requires concentration.  I'm making that up.  I'm

20 sure none of you are in that category.

21     But if -- in this case you've got to pay attention as a

22 juror.  You've got to master the evidence as it's presented.

23 So you need to be able to pay attention.  So I would want you

24 to raise your hand and say:  I have an attention disorder.  I

25 can't concentrate for more than 30 seconds at a time.  Or if

1  you wanted to say:  My English is not very good and I might not

2  understand everything that is said.  I want you to raise your

3  hand.

4      So there are any number of things.  If fairness would

5  require you to disclose it, this is the time to do it.  Please,

6  don't be shy about it.

7      Okay.  We've got somebody to volunteer right off the bat.

8  Ms. Beaton.

9          **PROSPECTIVE JUROR BEATON:**  I forgot to mention, I'm a

10  member of -- Code Pink is one of my organizations.  And I have

11  been arrested at the Marine Recruiting Station in Berkeley for

12  blocking the entrance to a business, and that was dropped or

13  whatever.

14          **THE COURT:**  Code Pink?

15          **PROSPECTIVE JUROR BEATON:**  Code Pink.

16          **THE COURT:**  I may have heard that, but now I've

17  forgotten what it was.

18          **PROSPECTIVE JUROR BEATON:**  It's a women's grassroots

19  peace organization.  We're for no war.

20          **THE COURT:**  Okay.  So you went to someplace and

21  blocked the entrance?

22          **PROSPECTIVE JUROR BEATON:**  Yeah, for like two years.

23  But, you know, one day they showed up and arrested us.

24          **THE COURT:**  Well, who was the "they".

25          **PROSPECTIVE JUROR BEATON:**  The Berkeley Police.

```
 1              THE COURT:  What was the name of the business?  Just
 2   curious.
 3              PROSPECTIVE JUROR BEATON:  The Marine Recruiting
 4   Station.
 5              THE COURT:  Oh, okay.  So you blocked them for two
 6   years?
 7              PROSPECTIVE JUROR BEATON:  Well, I was sitting out
 8   front doing antiwar activity, counter recruiting.  And I had,
 9   you know -- every week on Wednesday we did that and -- for a
10   couple years there during the Afghanistan war.  And I had a lot
11   of experience with the police at that time.
12              THE COURT:  Okay.  So just -- I need to be -- did you
13   physically block anybody from getting in the doorway, or were
14   you there to protest and encourage people not to go in?
15              PROSPECTIVE JUROR BEATON:  Yeah.  We were there to
16   talk to people trying to get them not to go in.
17              THE COURT:  All right.  But if they said:  No, I want
18   to go in, you didn't try to tackle them or something?
19              PROSPECTIVE JUROR BEATON:  No.  The Marine guys were
20   pretty big standing next to them, and they opened the door.
21        I don't think it would affect me, however, to be on a
22   jury.
23              THE COURT:  You would be fair and impartial anyway?
24              PROSPECTIVE JUROR BEATON:  Yeah.  Be fair and
25   impartial.
```

 1           THE COURT:  That's exactly the kind of thing you

 2 should bring up, because here is the Government over here, and

 3 they may be worried --

 4           PROSPECTIVE JUROR BEATON:  They don't want me -- they

 5 may see the pink and say no.

 6           THE COURT:  They may say:  She's never going to vote

 7 for the Government.  She's against the Government.

 8           PROSPECTIVE JUROR BEATON:  Yeah.

 9           THE COURT:  But I think you would be fair and

10 impartial.

11       So you -- but you're right to bring it up.

12           PROSPECTIVE JUROR BEATON:  Thank you.

13           THE COURT:  That's a good thing.  All right.

14       Who else wants to volunteer?

15       Come on.  Somebody else?

16       Here we go.  We've got another volunteer.

17       And your name, please.

18           PROSPECTIVE JUROR PANAGOPOULOUS:  Michael

19 Panagopoulous.

20           THE COURT:  Yes.  Go ahead.

21           PROSPECTIVE JUROR PANAGOPOULOUS:  I'm willing to

22 serve on the jury.  But what I wanted -- I came here to see if

23 I could actually sit for a period of time, and it's not

24 working.  My back, all the way, it's very painful.  And so I

25 need to move.  It's hard.  It's been this way for --

```
 1              THE COURT:  Let's do this:  If you were selected, I
 2   could put you on the back row --
 3              PROSPECTIVE JUROR PANAGOPOULOUS:  And lay down.
 4              THE COURT:  -- and you could stand up every now and
 5   then.
 6              PROSPECTIVE JUROR PANAGOPOULOUS:  Could I do that?
 7   That's fine.
 8              THE COURT:  You can stand up as long as you're paying
 9   attention.  We'll put you in a position where it would not
10   interfere with the view of the other jurors.  And when your
11   back got to hurting and you needed to stand up, you could stand
12   up.
13              PROSPECTIVE JUROR PANAGOPOULOUS:  I could do that.
14   Okay.  Cool.
15              THE COURT:  That's another very good one to raise.
16        Okay.  Who else wants to tell us something that we should
17   know?
18        Okay.  Over here, we've got Ms. --
19              PROSPECTIVE JUROR FILOTEO:  Filoteo.
20              THE COURT:  Filoteo, yes.
21              PROSPECTIVE JUROR FILOTEO:  Your Honor, my husband is
22   an artist, and he has been an artist for -- been an artiest for
23   over 18 years now.  And I don't know if this would have any
24   bearing, but he has been cheated before.  I've heard stories of
25   other artists being cheated before.
```

```
 1        So I don't know if that would have any play.  I think -- I
 2   feel like I can be impartial, but I do want to let both sides
 3   know.
 4        THE COURT:  Well, how has he been cheated?
 5        PROSPECTIVE JUROR FILOTEO:  Cheated with doing work,
 6   not being paid.  Other artists not being compensated fairly.
 7   So...
 8        THE COURT:  All right.  So the alleged victims in our
 9   case -- I think -- if I'm broadly speaking, I think there are
10   two, is that correct?
11        MR. BRUGNARA:  One.
12        THE COURT:  One or two?
13        MR. BRUGNARA:  One.
14        THE COURT:  One.  All right.  Whatever.  They did not
15   do the artwork themselves.  They were brokers and dealers.  And
16   so the -- you know, like Picasso, he's gone on to a new
17   jurisdiction.  And others have -- I don't even know if they're
18   alive or not.  But they -- you don't have to worry that the --
19   those artists are not going to be appearing.
20        PROSPECTIVE JUROR FILOTEO:  Okay.  Understood.
21        THE COURT:  But it's the broker dealers.  So that's
22   who would be the alleged victims.
23        So now, does that affect your -- can you be fair to both
24   sides?
25        PROSPECTIVE JUROR FILOTEO:  I believe I can be, but I
```

215

1   just wanted to let...

2          **THE COURT:**  You're right to bring that up.  That's a

3   good point.

4          Okay.  Thank you.  Have a seat.

5          Anyone else?

6          (No response.)

7          **THE COURT:**  So here's the situation:  We're getting

8   close to the point where I'm going to start letting the lawyers

9   make their decisions.  I need to talk to a couple of you about

10  the things you wanted to talk about privately.  We're going to

11  do that in just a minute.

12         But I need to give you your last chance to bring up

13  anything you want.  Because once you're selected -- I'm going

14  to tell you a story:  I've had people, a room full of potential

15  jurors like this.  Somebody gets selected, and they get sworn

16  in immediately.  Just like the President takes an oath.  Just

17  like I take an oath.  You have to take an oath.  You take your

18  oath.

19         Then a few minutes later you say:  Judge, I didn't think I

20  would get selected.  Oh, I can't believe they selected me.  I

21  thought they heard about the Code Pink and they would never

22  have selected me.  Now I'm on the jury, and I have to tell you,

23  I've got to be at the X, Y, Z week.

24         Too bad.  You're selected.  It's like the Army.  They

25  draft you.  You're in for of the duration.  You can't get out

1   of it then.  So now is the time to bring it up.  If you've got

2   something you want to bring up, please -- Mr. Chan, is that

3   your name?

4           **PROSPECTIVE JUROR CHAN:**  Yes.

5           **THE COURT:**  Get the microphone please.

6           **PROSPECTIVE JUROR CHAN:**  Thank you, your Honor.

7       I don't think this would have any bearing on my ability to

8   make an impartial decision, but I wanted to disclose that my

9   mother has Parkinson's disease, and she's on hospice care.  It

10  could be six months; it could be a year.  I just want to

11  disclose that, that it's -- I mean, nobody knows when anybody

12  is going to pass away, but it is out there.

13          **THE COURT:**  I'm very sorry to hear that.  You tell

14  me, how long has she been in hospice care?

15          **PROSPECTIVE JUROR CHAN:**  Now, it has been a month and

16  a half.  I'm not the -- my father is the primary caregiver, and

17  I go visit when I can.

18          **THE COURT:**  Where is she?

19          **PROSPECTIVE JUROR CHAN:**  She's in Novato.

20          **THE COURT:**  Novato?

21          **PROSPECTIVE JUROR CHAN:**  Novato, California.

22          **THE COURT:**  Well, if you are selected to serve, will

23  you be able to pay attention and decide the case fair and

24  square?

25          **PROSPECTIVE JUROR CHAN:**  Yes.  It won't have any

1  bearing on my ability to make an impartial decision.

2          THE COURT:  All right.  Thank you for bringing that

3  up.  That's the kind of thing that we need to know about.

4          Yes, sir.  Name?

5          PROSPECTIVE JUROR EVENHOUSE:  Yeah, Evenhouse.

6      I just want to disclose -- this is not something that

7  prevents me from being on the jury.  It's not something that's

8  a hardship.  My employer pays for the time that I'm here.  But

9  I was supposed to present at a conference on May 8th, so that's

10  one thing.  And, obviously, if the trial goes longer than that,

11  then I wouldn't be able to present at the conference.

12          THE COURT:  I can promise you we're going to go later

13  than May 8th.  I'm almost certain.  So you're going to miss

14  that if you're selected, unless it could be done in the

15  afternoon after court.

16          PROSPECTIVE JUROR EVENHOUSE:  No.  Yeah, so I will

17  miss that.

18      The other thing is I'm working with veterans.  I'm in a

19  mental health capacity.  There are people that can fill in for

20  me while I'm not there, but that's just something I wanted to

21  disclose.  It does impact the general care that's available to

22  veterans, particularly at an outpatient mental health clinic

23  that is low -- low in terms of staffing anyway.

24          THE COURT:  Yes.  That's a very good point.  But

25  under the law, that's not a good enough reason.  So we all have

 1  to live with those kind of burdens on the system.

 2          **PROSPECTIVE JUROR EVENHOUSE:**  Right.  Right.  So I

 3  just wanted to disclose those things, your Honor.  Thank you.

 4          **THE COURT:**  Sure.

 5      Anyone else?

 6      Okay, Mr. Persson?

 7          **PROSPECTIVE JUROR PERSSON:**  Persson, yes.

 8      I just wanted to disclose I have the potential for a

 9  dental urgency.  Some people may call it an emergency.  But I

10  have a temporary bridge that is known to fall out, and it's

11  going to be replaced with a permanent one.  But just wanted to

12  disclose that.

13          **THE COURT:**  Do you have an appointment set up?

14          **PROSPECTIVE JUROR PERSSON:**  Yes, May 12th.

15          **THE COURT:**  When?

16          **PROSPECTIVE JUROR PERSSON:**  May 12th.

17          **THE COURT:**  What time of day?

18          **PROSPECTIVE JUROR PERSSON:**  8:00 o'clock in the

19  morning.

20          **THE COURT:**  I think you should move it to the

21  afternoon.

22          **PROSPECTIVE JUROR PERSSON:**  If my bridge comes loose,

23  the one I have, which it has happened several times, I have

24  to -- I have to go to the dentist, since he's right in

25  Livermore, and I have it taken care of.  I just wanted to

1  disclose it.

2         THE COURT:  All right.  We'll take our chances on the

3  emergency.  But you need to move that -- there's no such thing

4  as having that -- once you're in, it's the Army again.  You're

5  stuck.  You can't just call up and say I'm going to a doctor's

6  appointment at 8:00 o'clock.

7         PROSPECTIVE JUROR PERSSON:  Yes, your Honor.  I

8  realize that.  And that's not what I'm disclosing.  I'm just

9  disclosing that I have the potential for a dental urgency.

10 That's all.

11        THE COURT:  Thank you.  You're right to bring it up.

12    Next, right next to you, Mister --

13        PROSPECTIVE JUROR SCHOENTHAL:  Schoenthal.  So I

14 realize that my daughter's commencement at Berkeley is

15 May 19th.  She's graduating with a four-year degree.  So I

16 believe the commencement is at 1:00 o'clock.

17    When you take your break to talk to the people that you

18 have to talk to in private, I'll check that.

19        THE COURT:  May 19th?

20        PROSPECTIVE JUROR SCHOENTHAL:  Correct.

21        THE COURT:  1:00 o'clock?

22        PROSPECTIVE JUROR SCHOENTHAL:  I believe so.

23        THE COURT:  Well, I can't promise you, but we might

24 be able to adjourn slightly early that day so you could try to

25 get over there by 1:00 o'clock.  But I can't promise you that.

1    It's -- okay?  That's all I can say.  Maybe.

2        All right.  Anyone else?

3        (No response.)

4        **THE COURT:**  All right.  We had -- who were the two

5    who wanted to talk in private?  Raise your hands again.

6        I'm sorry.  Okay.  You two stay behind.  And I want to

7    give everyone else a 15-minute break.  I need to ask you to

8    step outside so we can do this in private, everyone else.  You

9    two stay behind.

10        Don't talk about the case.  No internet research.

11        (Prospective jurors exit courtroom at 1:08 p.m.)

12        **THE COURT:**  Ms. Kaur?

13        **PROSPECTIVE JUROR KAUR:**  Uh-huh.

14        **THE COURT:**  Could you bring your stuff.  I'm going to

15    ask you, Chris, to put her in the jury room for a moment.

16    We'll call you right back out.  I just need to -- do you know

17    if there's anything in the jury room that needs to be removed?

18        **THE CLERK:**  Some forms.

19        **THE COURT:**  Can you take a look?

20        (Brief pause.)

21        **THE COURT:**  All right.  Everyone be seated.

22        Mr. Christopulos?

23        **PROSPECTIVE JUROR CHRISTOPULOS:**  Yes.

24        **THE COURT:**  Why don't you come up here a minute and

25    just use the lectern.  Everyone is here, except you -- I'm

1   sorry.  Everyone that needs to be here is here but all the --

2   the room is otherwise private.  So tell us the answer to the

3   question.

4          **PROSPECTIVE JUROR CHRISTOPULOS:**  Okay.  The question,

5   I think, was had I -- had anyone ever been arrested?  And in

6   1970 or '71, I was arrested for breaking the Selective Service

7   Act.  And then it was -- it was -- the case was dismissed and

8   never went to court.

9          **THE COURT:**  Okay.  What was -- how did you allegedly

10  break the Selective Service act?

11         **PROSPECTIVE JUROR CHRISTOPULOS:**  I had been given a

12  conscientious objector status when I was in high school.  I

13  took a job as a psychiatric attendant.  Worked for a year.

14  Changed jobs and worked as a personal attendant for my second

15  year and didn't properly communicate.  It's my fault, really.

16  I didn't properly communicate with the Draft Board.  And I --

17  it was just a mistake.  And we talked.  That was the end of

18  that.

19         **THE COURT:**  All right.  Anybody want to ask any more

20  questions of the potential juror?

21         **MS. HARRIS:**  Not from the Government, your Honor.

22         **THE COURT:**  How about you, Mr. Brugnara?

23         **MR. BRUGNARA:**  No.  That's fine.  Thank you.

24         **THE COURT:**  Do you in any way hold that against the

25  Government or Mr. Brugnara in this case?

```
 1                PROSPECTIVE JUROR CHRISTOPULOS:  No.  I chalk it up
 2   to youthful folly on my part, really.
 3                THE COURT:  Okay.  Why don't you step outside and
 4   take your 15-minute break?  We'll see you in a bit.
 5           Let's bring in Ms. Kaur.
 6           (Prospective Juror Kaur enters the courtroom.)
 7                PROSPECTIVE JUROR:  Is it Car, C-A-R?
 8                PROSPECTIVE JUROR KAUR.  No.  Kaur, K-A-U-R.
 9                THE COURT:  I'm sorry to keep saying it wrong.  Come
10   stand at the lectern, please.
11           Tell us what your answers is to the question.
12                PROSPECTIVE JUROR KAUR:  I just wanted to disclose
13   regarding my brother.  He was convicted of drug-related
14   incident and --
15                THE COURT:  Your brother?
16                PROSPECTIVE JUROR KAUR:  Yes, my younger brother.  On
17   the border of Canada and U.S.  And he was deported back to our
18   country.
19                THE COURT:  He was what?
20                PROSPECTIVE JUROR KAUR:  He was deported back.
21                THE COURT:  So he's from Canada?
22                PROSPECTIVE JUROR KAUR:  He was U.S. citizen -- I
23   mean, not citizen.  He was in U.S. before.
24                THE COURT:  But he was deported to Canada after he
25   got caught here with drugs?
```

1            **PROSPECTIVE JUROR KAUR**: He was doing drugs in Canada

2   to U.S.

3            **THE COURT**:  All right.  And then he got convicted?

4            **PROSPECTIVE JUROR KAUR**:  Uh-huh.

5            **THE COURT**:  Yes?

6            **PROSPECTIVE JUROR KAUR**:  Yes.

7            **THE COURT**:  By the U.S. Government?

8            **PROSPECTIVE JUROR KAUR**:  Yes.

9            **THE COURT**:  All right.  And then -- now, do you

10  think -- where was the conviction?

11            **PROSPECTIVE JUROR KAUR**:  This was in Los Angeles

12  County.

13            **THE COURT**:  Los Angeles?

14            **PROSPECTIVE JUROR KAUR**:  Uh-huh.

15            **THE COURT**:  Was it state court or federal court?

16            **PROSPECTIVE JUROR KAUR**:  I believe it was federal.

17  I'm not sure.  Because he was deported.

18            **THE COURT**:  Do you think he was treated fairly or

19  not?

20            **PROSPECTIVE JUROR KAUR**:  He was.

21            **THE COURT**:  Do you in any way hold that against the

22  Government in this case?

23            **PROSPECTIVE JUROR KAUR**:  No.  No.  I just wanted to

24  disclose.

25            **THE COURT**:  Well, you're right to do that.  Would you

1   hold it against Mr. Brugnara in any way?

2           **PROSPECTIVE JUROR KAUR:**  No.

3           **THE COURT:**  Okay.  Any questions that either side

4   has?

5           **MS. HARRIS:**  No, your Honor.

6           **MR. BRUGNARA:**  (Nodding negatively.)

7           **THE COURT:**  Okay.  Mr. Brugnara says no.

8       Thank you.  Go -- you can have a break, too, for 15

9   minutes.

10      (Prospective Juror Kaur exits the courtroom.)

11          **THE COURT:**  Yes, Mr. Brugnara.

12          **MR. BRUGNARA:**  I'd like make a request of the Court,

13  because it involves -- should I take the microphone?

14          **THE COURT:**  Yes.  Come up here.

15          **MR. BRUGNARA:**  It involves -- we need to talk about

16  nourishment, because --

17          **THE COURT:**  What?

18          **MR. BRUGNARA:**  I need to get some form of nourishment

19  to make it through the next three weeks.  Specifically, I'm

20  hungry.  Okay?  And I can't -- I was just explaining to

21  Mr. Stevens when I was just sitting there.  I go:  Boy, man,

22  I'm feeling lightheaded right now.  Because you've got to

23  understand for the last, you know, ten months I've been sitting

24  in a cell, and it's basically sedentary and basically

25  complete -- almost like an isolation chamber, except for the

1  exterior noise.  But now that I'm here, active.  I'm exhausted.

2      The thing is, you know, I've lost all this weight.  And no

3  one really knows what the cause is right now.  But my idea is

4  that I need to eat more.

5      And the problem is this:  I cannot eat -- well, I do eat

6  it.  I get a piece of baloney in a bag, okay, for the last ten

7  months.  And in the morning at 3:00 o'clock in the morning, I

8  get a cup of gruel and an 8-ounce cup of milk.  Okay?  And then

9  they give me another bag of whatever at night, similar to what

10 you serve here.  It's not going to work.

11     I mean, I'm going to be passing out right in front of you

12 here, because the thing is, is that I need to be alert mentally

13 to present my defense.  And I need to have a certain amount of

14 calories to have my brain function and my body function.  And

15 I'm just not getting those calories.

16     So what I'm asking the Court is twofold:  A, that I be

17 allowed to eat at least a normal lunch during these court

18 proceedings.  You know, from second floor, just like we did

19 when I was with Babcock, where he got a sandwich.  Put in it a

20 container, brought it up.  I can eat it wherever you want me to

21 eat it here.  Then at least that will give me some food to eat.

22 Or I can eat it before the proceedings.  But I need to get some

23 food.

24          **THE COURT:**  All right.  Look, I'm going to make two

25 points:  One, is I've been hearing about you wasting away.  For

```
 1  the record, you look perfectly healthy to me.  You can talk
 2  longer and faster and more energetically than anybody I've ever
 3  met in my life, despite what you say.  So I don't know how much
 4  of this is exaggeration.
 5      But No. 2 -- where is my Marshal?  Can I do this?  Can I
 6  get Mr. Stevens to buy him a lunch downstairs?  Let you check
 7  it out and have him eat it back there.
 8              THE MARSHAL:  That's fine.
 9              THE COURT:  So you, Mr. Stevens, go down there
10  tomorrow, and you pick out what Mr. Brugnara would like for
11  lunch.  The Marshals will check it to make sure there are no
12  bombs in there.  And then you give it to Mr. Brugnara.
13              MR. STEVENS:  I will do that, your Honor.
14              THE COURT:  Thank you.
15      All right.  Now --
16              MR. BRUGNARA:  And then can I eat before you start
17  at -- the other thing I want to ask you is, you're going to
18  start at 7:30 sharp, right?
19              THE COURT:  Right.
20              MR. BRUGNARA:  Because you told -- I thought I heard
21  you say to the jury 7:45.
22              THE COURT:  The jury comes at 7:45, but you lawyers
23  will have -- I'm treating you as a lawyer.  You'll always have
24  something to bring up with me, so you've got to be here 15
25  minutes earlier.
```

```
 1              MR. BRUGNARA:  Can I just eat like, then, two candy
 2    bars before we start?  It doesn't have to be, obviously, out
 3    here.  Can I eat like, you know, at least one Hershey bar --
 4              THE COURT:  Can you guys get him a Hershey bar?
 5              MR. BRUGNARA:  Or James Stevens can get it and give
 6    it to them.  And I'll --
 7              THE COURT:  Either way.
 8              THE MARSHAL:  Your Honor, I can bring a couple extra
 9    lunches for him.
10              MR. BRUGNARA:  This -- this is what --
11              THE COURT:  Buy him a Hershey bar.  Let the Marshals
12    see it.  I don't want this to be an issue.  I don't want this
13    to be an issue on appeal.  So would you please do it?
14              MR. STEVENS:  Yes.
15              THE COURT:  And then work it out with the Marshals.
16        Now --
17              MR. BRUGNARA:  The shoes still aren't here.  The
18    shoes --
19              THE COURT:  Your mother brought the shoes.
20              MR. BRUGNARA:  No.  The shoes my mother brought are
21    not -- are backup shoes that are too small and don't fit me.
22    And my two good pair of shoes are at the jail in a bag that
23    were waiting for the Marshals, supposedly, last Thursday and
24    Friday.
25              THE COURT:  Look, the Marshals are going to get those
```

1  shoes, right?

2          **THE MARSHAL:**  Your Honor, we had the shoes at the

3  jail already delivered here.  One set is downstairs in the jail

4  cell and the other, I believe, is upstairs.  I can

5  double-check.

6          **THE COURT:**  I want you to find them.  But meanwhile,

7  you've got a pair of shoes that fit you.

8          **MR. BRUGNARA:**  I actually like these shoes, and I'm

9  going to keep these.

10          **THE COURT:**  Mr. Kingsley is going to let you have

11  them until you find your own shoes.

12          **MR. BRUGNARA:**  I'll make it work.

13      I just wanted, though -- because I just wanted to let the

14  Court know, just to make it on the record, that I was feeling

15  lightheaded there, you know.  And, obviously, I don't want to

16  feel that way once the process begins.  I --

17          **THE COURT:**  I was looking at you.  You did not look

18  lightheaded to me.  You looked perfectly normal to me.  And I

19  don't accept that.

20      All right.  We've got limited time.  This is a trial,

21  Mr. Brugnara.  We don't get to make these speeches.  It's time

22  now to move on with jury selection.

23      I believe that this -- does anyone have any challenges for

24  cause of any of the 32?

25          **MS. HARRIS:**  Government passes for cause, your Honor.

229

```
 1              THE COURT:  All right.  Mr. Brugnara, do you have any
 2   challenge to any of the 32 for cause?
 3              MR. BRUGNARA:  No, your Honor.
 4              THE COURT:  All right.  So here is where we are.
 5   It's up to peremptory challenge time.
 6         Now, have both sides -- or has the Government, at least,
 7   looked at the law on whether or not the challenge is waived?
 8   I'm looking at U.S. v Yepiz, Y-E-P-I-Z.  That, at least in the
 9   procedure that was used in that case, which is not the same
10   procedure I'm using here, but nonetheless they say the use it
11   or loss it was wrong and you get to keep your challenges.
12              MR. KINGSLEY:  I'm reading that case right now on my
13   phone, although I understand that the situation there was a
14   different setup, and it was involving challenges to a specific
15   panel of jurors as opposed to the group of 32 that we've set
16   up.
17              THE COURT:  Well, all right.  Let's have -- the
18   question is this:  I don't think that decision is on point,
19   because they had a different method for bringing forward the
20   jurors.  In this case, we passed all 32.  And everybody knows
21   who the 32 are and exactly what the sequence is.
22         So in my view, use it or lose it would still be okay, but
23   it applies both ways.  And I want to know if you both agree
24   with what I just said.
25         In other words, if you pass and the other side makes a
```

1   challenge, then you would lose that challenge.

2        MR. BRUGNARA:  I think retroactively there should be

3   a limit, probably, to the number of returns you can have.  But

4   that doesn't, from a mathematical sense, make any sense to me.

5   I think the way it would be fair would be a use it or lose it,

6   that you can only retroactively go back so many.  Because,

7   otherwise, they can go replace the entire jurors on the panel,

8   and then you'd never be able to recover, at least ones that you

9   want to get off.

10       THE COURT:  Could we all agree, Mr. Brugnara, that if

11  you pass, that counts as a challenge?  So you either challenge

12  then or there or you lose that opportunity for good.

13       Can everyone agree on that?

14       MS. HARRIS:  The Government agrees to that, your

15  Honor.

16       THE COURT:  Would you agree to that, Mr. Brugnara?

17       MR. BRUGNARA:  Mr. Stevens advises that we intend on

18  using them.  My position isn't the same as his.

19       But my concern is, I'm going to pass, and they're going to

20  keep winnowing down the jurors and putting on jurors that,

21  then, perhaps, I don't want that I'm out of challenges.  So I

22  mean, I think we should go 50/50 on it, where if I pass, then I

23  could recover 50 percent retroactively.

24       MS. HARRIS:  This isn't *Let's Make a Deal*, your

25  Honor.  This is what the case law is.

1        **THE COURT:**  Ms. Harris, I asked for the cases on

2    point.  You didn't even know about the case.

3        **MS. HARRIS:**  No.  Mr. Kingsley read it.

4        **MR. KINGSLEY:**  Your Honor, I pulled it up in the 20

5    minutes that we had while we were out, and I read it.  And I

6    agree with you that it doesn't apply to this situation.

7        **THE COURT:**  But they don't make an exception for our

8    type of procedure.  It could be read more broadly.

9        **MR. KINGSLEY:**  The problem is that if the situation

10   is such that the defendant gets to pass, then he would just

11   pass every single time and then use all of his peremptories at

12   the end of the Government's peremptories.  And that's not the

13   way this process has been set up by the Court.

14       I think this process is set up to be fair to the defendant

15   so he knows enough about everybody who could possibly be on the

16   jury --

17       **THE COURT:**  That's exactly right.  But the Court of

18   Appeals in its wisdom may see this precedent differently than

19   you and I see it.  And if you -- do you know of any authority

20   that supports what you just said?

21       **MR. KINGSLEY:**  I don't.  This is the only case I know

22   on point.  It also didn't reverse the judgment in that case

23   either.

24       **THE COURT:**  Do any of the advisory lawyers -- well,

25   maybe -- you're just advisory lawyers.  I don't want to ask you

1    any of that.

2              **MR. KINGSLEY:**  The specific facts of that case, your

3    Honor, involved somebody who had come into the panel after the

4    defendant had passed and who had specific information.  I think

5    it involved working in the DA's office.  And that was the

6    unfairness there, was the defendant didn't know anything about

7    that person before they stopped passing.  We don't have any of

8    that.

9              **MS. HARRIS:**  Both sides know who all 32 jurors are,

10   so a pass should be a pass.  You don't get to take it back.

11   That would be the same for the Government, if the Government

12   passes.

13             **MR. BRUGNARA:**  I would be willing to let them go back

14   retroactively as well 50 percent of their passes.  It would go

15   both ways.

16             **THE COURT:**  Has the Government found any other

17   decision by the Ninth Circuit on this point?

18             **MR. KINGSLEY:**  There was a case cited in that

19   decision, the *Turner* case, I think.  But I just looked at it

20   briefly, and it doesn't seem to shed light on this particular

21   situation.

22             **THE COURT:**  Here it is.  United States of America is

23   doing its legal research with a little cell phone.

24             **MR. KINGSLEY:**  That's correct, your Honor.  This came

25   up on the fly.

1          THE COURT:  All right.  I'm going to give you both

2   ten minutes.  I want to go back and do my own research, since

3   you don't have a good answer for me.  We'll take ten minutes at

4   this time.

5       You ought to be using this time -- Mr. Brugnara, you ought

6   to be talking to your lawyers about how you want to exercise

7   your peremptories.  All right?

8       (Whereupon there was a recess in the proceedings

9          from 1:25 p.m. until 1:34 p.m.)

10          THE COURT:  Does anyone have anything to add to the

11   use it or lose it thing?

12          MR. KINGSLEY:  No, your Honor.

13          THE COURT:  How about you, Mr. Brugnara?

14          MR. BRUGNARA:  Whatever you decide.

15          THE COURT:  Whatever I decide.

16          MR. BRUGNARA:  I mean, this is --

17          THE COURT:  All right.  So -- then here is my

18   decision:  The process that we're using, which has been a

19   longstanding process used in this District Court, I'm not -- I

20   didn't invent it -- and the form that we use is different than

21   the form that was in -- the process that was used in the *US v*

22   *Yepiz,* Y-E-P-I-Z case from 2012.

23       And the vice that happened there was that the jurors were

24   called forward -- potential jurors were called forward one at a

25   time and got into the box, and the defendant had passed the

```
1   panel twice and used eight challenges.  And then wound up a new
2   person came into the panel, and the defendant did not have an
3   opportunity to challenge because of the -- having used it up.
4   And they were caught by surprise, given the way in which the
5   venire was selected to come into the jury box.
6        Well, that is an acceptable method, but it's not the
7   method we use here.  The method we use here is different.  And
8   we have now passed for cause on 32.  Everyone knows who they
9   are.
10        That's one difference.  But there's a more fundamental
11   difference, and that is this:  Under our form -- and, Dawn, I'd
12   like for you to make an official part of the record the form.
13   I'm talking now to the Deputy clerk.  The defendant always gets
14   the last challenge, No. 16.  So there's no way that the problem
15   that arose in Yepiz, Y-E-P-I-Z, could arise here, because
16   Mr. Brugnara will always get the last challenge and not have to
17   worry about that problem.
18        So the Court is going to rule now that the Yepiz case does
19   not apply to this case.  And the vice that occurred there
20   cannot possibly happen here because Mr. Brugnara will always
21   get the last challenge as long as there are not two consecutive
22   passes.  So that's the ruling.
23        In other words, it is use it or lose it.  If you don't use
24   a challenge, it's gone forever.  Defendant gets ten; Government
25   gets six.  If you don't use it, its lost.  You can't go back
```

1    and reclaim it.

2         And the reason that's fair, again, is because under our

3    system, the defendant always gets the last challenge.

4         I need to reiterate, though, if there are two passes,

5    consecutive passes, then we're done.  Both sides have agreed to

6    the 12 with the lowest seat numbers.  Then we swear them in and

7    proceed to deal with the alternates.

8         So -- now, if the defendant has two challenges and only

9    uses one of them, that's not a complete pass.  It has to be a

10   complete pass followed by the Government passing.  All right?

11           **MR. KINGSLEY:**  Yes, your Honor.

12           **THE COURT:**  Okay.  Does everybody understand that, or

13   does somebody want to say anything more?

14           **MR. BRUGNARA:**  I -- not on that topic, your Honor.

15        I just wanted to ask you, before the jury comes in, three

16   things.

17           **THE COURT:**  Do they deal with jury selection?

18           **MR. BRUGNARA:**  They deal with jury instructions, or,

19   I guess, communication with the jury before the trial begins.

20           **THE COURT:**  Tell me what your first one is.

21           **MR. BRUGNARA:**  The first one is I just want to make

22   sure that -- and this goes to your prior in limine ruling --

23   that you give them instructions on what legally constitutes a

24   contract.  Because you already ruled in your in limine in

25   December that whether or not there's a contract is material to

1    this case --

2            THE COURT:   That will -- we have plenty of time to

3    deal with that in due course.  So pass that for the moment.

4            MR. BRUGNARA:   Okay.  The other one was there was a

5    17(c) subpoena sent out to MacWhinnie that the Marshals were

6    serving.

7            THE COURT:   Who?

8            MR. BRUGNARA:   To MacWhinnie on the East Coast.  I

9    wanted to get a status update on that.

10           THE COURT:   I don't have a clue what's going on

11   there.  So I -- you made your request --

12           MR. BRUGNARA:   The third one is they discussed the

13   crates of art, and they mentioned in the context of the opening

14   argument.  I just don't think that's appropriate to bring in

15   this voluminous amount of God knows what it is until, you know,

16   the evidence unfolds in this case.  And, you know, just lay

17   out, you know, this big grandstanding when we only have 40

18   minutes apiece to present our opening argument.  I just don't

19   think it's appropriate.

20           MR. KINGSLEY:   We're not going to bring the crates of

21   art in during opening.

22           MR. BRUGNARA:   The actual pieces is what I thought I

23   heard Ms. Harris say.

24           MR. KINGSLEY:   They're going to be -- we're going to

25   admit them through evidence through one of our first few

```
 1  witnesses.  I'm going to refer to the crates in opening, but

 2  not --

 3           MR. BRUGNARA:  Okay.  I misunderstood that, your

 4  Honor.  I just wanted to understand the procedure.

 5           THE COURT:  All right.  So we're now ready to -- here

 6  is what we're going to do:  We're going to bring everyone back

 7  in.  I'm going so explain to them what we're doing.  And,

 8  basically, it's going to be your passing it back -- the strike

 9  sheet back and forth.  If any of you see irregularities in the

10  strike sheet, then bring that to my attention.  But, basically,

11  this is just going to go with stony silence for about,

12  probably, 15 minutes while you pass it back and forth.

13           MR. BRUGNARA:  Is the jury sitting here or no?

14           THE COURT:  Usually, they sit here so you can consult

15  with your lawyer, so you can make sure you're striking the

16  right person.  If you want them all out of the room --

17  sometimes I've done that.  But I would recommend you keep them

18  here so that you make sure you don't make a mistake and strike

19  the wrong person.

20           MR. BRUGNARA:  All right.  Your Honor, I just wanted

21  to clarify, because all the civil trials that I've been in for

22  22 years, we've always relied on a bench judgment from the

23  esteemed judges to determine the fate of each action, which I'm

24  batting a thousand, not that it -- you're the one that

25  recommended a jury trial.
```

```
 1              THE COURT:  I'm not -- no.  No.  Don't blame it on
 2    me.  You have the right to a jury trial.
 3              MR. BRUGNARA:  Could we stipulate to a bench trial at
 4    this point?
 5              THE COURT:  No.  No.  No.
 6              MS. HARRIS:  Your Honor, we do --
 7              THE COURT:  Wait.  Look.  You're joking when you say
 8    that.  I don't want there to be some issue --
 9              MR. BRUGNARA:  I don't know if I am at this point,
10    your Honor --
11              THE COURT:  If you wanted to waive the jury and go
12    with that, we would have to brief that.  I don't know what the
13    answer to that is.
14              MS. HARRIS:  Your Honor, I can tell you the answer:
15    Both sides have to agree to that, and our office will not agree
16    to that.
17              THE COURT:  Okay.  So there we go.
18              MS. HARRIS:  But I did want to clarify with the
19    Court, after we're done with the first six for the Government
20    and ten for the defense, would the Court take a brief sidebar
21    to see if the either party has a motion before swearing the
22    jury in?
23              THE COURT:  Yes, I will.
24              MS. HARRIS:  Thank you.
25              THE COURT:  And if you see some kind of problem
```

239

```
1   developing in the way the strikes are done -- and this is for
2   both sides -- I want you to bring that to my attention before
3   we get all the way to the end.  And then I'll have to excuse
4   the jury and talk to you about it.  I don't think that's going
5   to happen in this case, but it could.
6        And, otherwise, I'm just sitting here doing nothing while
7   you two pass it back and forth.
8             MS. HARRIS:  That's why I asked for the sidebar, your
9   Honor.  Thank you.
10            THE COURT:  Okay.  Are you done?
11            MR. BRUGNARA:  I wasn't joking, though.  But it's
12  moot, because she said she opposed.
13            THE COURT:  Well, Mr. Brugnara, I -- you're just
14  bringing it up on the fly.  There's no way I can rule on
15  whether or not you can waive a jury.  The Government says they
16  have to agree.  I haven't researched --
17            MR. BRUGNARA:  Your Honor, think about it.  It would
18  have to be impromptu based upon what I visually see versus what
19  I have.  It's actually a logical decision.
20            THE COURT:  There we go.
21            MR. BRUGNARA:  All right.
22            THE COURT:  Jury trial.
23       Okay.  Can we bring -- let's bring back all the jury.
24       (Prospective jurors enter courtroom at 1:42 p.m.)
25            THE COURT:  All right.  Is everybody here?  I think
```

1    so, but is the door open there for a reason?  Somebody coming?

2    Here we go.

3        All right.  So let me tell you all where we are.  We made

4    progress to a milestone, and that is with very high likelihood

5    the 14 of you who will be selected are going to be from you 32.

6    I cannot let the rest of you go yet, because I don't know that

7    for certain, but very likely you will not be needed.  But bear

8    with us a little longer while this process works out.

9        And where we are now is that the 32 of you, we all agree,

10   would be excellent jurors.  So now the question is to go

11   through a process that winnows you down from 32, first to 12,

12   and then for two alternates.

13       So there's nothing more that you should say at this point,

14   unless something dramatic has occurred during the break.  I

15   guess you could raise your hand now before we get started.

16   But, otherwise, the lawyers are about to do their selections.

17       Anyone out there want to raise your hand?

18       (No response.)

19           **THE COURT:**  No hands going up.  All right.

20       So you just need to sit tight and see how the process

21   works.  And I've been doing this job 16 years.  I was a trial

22   lawyer for 25 years.  And I know I don't look that old, but...

23       (Laughter.)

24           **THE COURT:**  Just teasing.

25       This is one of the great things about the American way of

```
 1  justice, is that we're going to go through the jury selection
 2  process now.  And the way we do it here, it's all in silence.
 3      So the Government has a form there.
 4      Have you written down the information you need on your
 5  form?
 6      And then pass that over to the other table.  You need to
 7  pass the sheet back and forth.
 8      (Brief pause.)
 9          THE COURT:  So you all will know, each side gets a
10  certain number of peremptory challenges, and they write down
11  the challenges on the list.  So if your name goes on the list,
12  then you will not be serving in the case.  And the ones that
13  are left over, that's the jury.
14      It's a little bit more complicated than that, but that's
15  very close to the way it works.
16      (Brief pause.)
17          THE COURT:  All right.  So now the defendants get
18  to -- defendant gets to write in its information.
19      I'm going to be quiet now while this goes on.  It will be
20  about 15 minutes for this process to go on.
21      (Brief pause.)
22          THE COURT:  This is the one time you can take a nap,
23  if you wish.
24      (Laughter.)
25      (Brief pause.)
```

1          **MS. HARRIS:**  Your Honor, may we approach the bench?

2          **THE COURT:**  Yes.  Why don't you bring the strike

3    sheet?

4       (Proceedings held at sidebar.)

5          **THE COURT:**  What's the issue you had?

6          **MS. HARRIS:**  Mr. Brugnara's first challenge was to

7    the only African-American member of the venire and Mr. Kingsley

8    is going to make our *Batson* motion on that pint.

9          **MR. BRUGNARA:**  And I have a strong rebuttal --

10         **THE COURT:**  Wait.  Wait.  Let's hear the motion.

11         **MS. HARRIS:**  The motion is, she said almost nothing,

12   your Honor, nothing objectionable at all.  She's the only

13   African-American member of the jury.

14      On various jail calls Mr. Brugnara has repeatedly referred

15   to people by their race.  I have -- there is a prima facie case

16   that he struck her on the basis of race.

17         **MR. BRUGNARA:**  I have a strong response to that,

18   twofold:  A, I struck her because she's the only realtor on the

19   panel, and I don't want someone who is involved in real estate

20   on the panel.  That's been my profession for 35 years.

21      Secondly, they can't claim I'm a racist, because one of

22   their witnesses they claim I had a relationship with is

23   African-American.  That's absurd.  It's a diametric opposite.

24      So, you know, please.  These people are idiots.  That's

25   off the record.  I'm just saying, you know, they obviously

1   didn't do their background.  If I'm a racist, I wouldn't have a

2   romantic relationship.  They try to play the judge both ways.

3          **THE COURT:**  What do you say, Mr. Kingsley?

4          **MR. KINGSLEY:**  It is true that she's a realtor.  I'm

5   not sure how that's relevant to the case.  And if you hear what

6   he said about Ms. Record.

7          **MR. BRUGNARA:**  I said Ms. Record is African-American.

8          **THE COURT:**  The objection is overruled.  The strike

9   will stand.  Let's continue.

10      (Proceedings held in open court.)

11         **MS. HARRIS:**  Your Honor, may we approach?

12         **THE COURT:**  Is the form filled out?

13         **MS. HARRIS:**  The question is:  Do we fill this part

14  here (indicating)?

15         **THE COURT:**  All right.  So we'll do the alternates in

16  just a bit.

17      (Whereupon, document was tendered to the Court.)

18         **THE COURT:**  All right.  That's taken 45 minutes.

19  Longer than I thought, but this is important, so that's fine.

20      Now what I need to do is ask both sides to listen

21  carefully and make sure that I read this correctly, because the

22  last thing I want to do is excuse the wrong person.  All right?

23  So you all have in mind -- I'll go slowly, so if you all help

24  me out and just shout out if I goof up.  All right?

25      Let me explain to the 32 what we're about to do:  I'm

244

```
 1   going to read the ones who will not serve and who are being
 2   excused, then I'll tell you where we are.  And there are 16 of
 3   you who are going to be excused.  All right?
 4       So -- and, please, don't take it personally if you're
 5   excused.  I think every one of you would be a great juror.  And
 6   so just -- we got to get it down to a more manageable number.
 7   And please don't speculate as to who, which side excused you or
 8   somebody else.  I mean, those of you who remain, you shouldn't
 9   be trying to speculate as to who excused somebody, because you
10   can't tell from the way I'm going to do it.  This is a blind
11   system?
12       All right.  Okay.  Ella Wild.  Where are you?  Ella Wild.
13   All right.  You may stand up, and you're excused.  All right?
14   Go back to the jury assembly room and tell them what happened.
15       Now, I need to -- again, I stress to both sides, if I have
16   done it the wrong way, you've got to jump up immediately and
17   tell me that I misread the chart here.  Okay?
18       Next, Daniel Evenhouse, you're excused.
19       Melanie Murphy, excused.  Angela Bass.  Where is Angela
20   Bass?
21            PROSPECTIVE JUROR BASS:  Here.
22            THE COURT:  You're excused.
23       Clare O'Brien, excused.
24       Amy Beaton, excused.
25       Ms. Hackney, excused.
```

```
 1        Schoenthal.  Scott Schoenthal, where are you?  Excused.

 2        Now, let me pause and make sure.  Does anyone so far see

 3   any problem with the way I'm doing this?

 4        You're not saying anything, so good.

 5        Mr. Chan?  Matthew Chan, excused.

 6        I can't read this -- Valerie Durkee.  See, this is the one

 7   I can't make out.

 8        Wait.  Wait.  Wait.  Wait.  Wait.  What is your name?

 9             PROSPECTIVE JUROR DURKEE:  Valerie Durkee.

10             THE COURT:  That looks like Valerie Durkee.  Okay.

11   All right.  You're excused.

12        I can't read part of it.  Pineda.

13             PROSPECTIVE JUROR PINEDA:  Pineda, George?

14             THE COURT:  Yes.  George Pineda.

15             PROSPECTIVE JUROR PINEDA yeah.

16             THE COURT:  All right.  You're excused.

17        Lee Persson, excused.

18        Tranfinley.  Tranfinley?

19             PROSPECTIVE JUROR TRANFINLEY:  Tranfinley?

20             THE COURT:  I can't read the handwriting well enough

21   to tell you.  It looks like Tuyet, Tuyet Tranfinley.

22             PROSPECTIVE JUROR TRANFINLEY:  T-R-A-N-F-I-N-L-E-Y.

23             THE COURT:  Yes.  I think -- is this correct?  Both

24   sides agree that she's excused?

25        Yes, Mr. Brugnara?
```

 1              **MR. BRUGNARA:**  Yes.

 2              **THE COURT:**  Okay.

 3       Then it looks like G-O-K-E-A-R-N.  Is there someone with

 4   that as a last name?

 5              **PROSPECTIVE JUROR GOKARN:**  Gokarn?

 6              **THE COURT:**  What is your first name?

 7              **PROSPECTIVE JUROR GOKARN:**  Uday.

 8              **THE COURT:**  Do both sides agree that he was excused?

 9   Mr. Brugnara?

10              **MR. BRUGNARA:**  I think I saw him on that list.

11              **THE COURT:**  How about you, Ms. Harris?

12              **MS. HARRIS:**  Your Honor, I couldn't read the writing.

13              **THE COURT:**  Well, all right.  I think -- all right.

14       What is your first name?

15              **PROSPECTIVE JUROR GOKARN:**  Uday, U-D-A-Y.

16              **THE COURT:**  All right.  You're excused.  Thank you.

17       Next is F-I-L-O-E-T-O.

18              **PROSPECTIVE JUROR FILOTEO:**  Erin Filoteo.

19              **THE COURT:**  You're excused.  Good luck.

20       And then Venegas.  Mr. Venegas.  Okay.

21       Bryan, is that your first name?

22              **PROSPECTIVE JUROR VENEGAS:**  Yeah.

23              **THE COURT:**  You're excused.

24       (Excused prospective jurors exit the courtroom.)

25       All right.  Counsel, I think I've done it right.

1          MR. BRUGNARA:  Can I have a sidebar, please, so both

2   attorneys can concur?

3          THE COURT:  All right.  We'll have a sidebar.

4      (Proceedings held at side bar.)

5          THE COURT:  What's the issue?

6          MR. BRUGNARA:  The big issue, Ms. Harris.  Ms. Harris

7   just very strategically said when I asked the question, Is this

8   the writing?  And I said:  That's the name I saw on the list.

9   And Ms. Harris very strategically said:  I couldn't read the

10  writing.

11      So she just tipped off the jury -- it's important that --

12  excuse me.  There is another Indian that works in the same

13  company, and she just gave me a dirty look.  So guess what?  I

14  want her off the jury now.  I want her off the jury, his Indian

15  co-partner.  And you can blame Ms. Harris for that, because she

16  just tipped her off that I wanted that guy off.

17          THE COURT:  You don't even have to respond,

18  Ms. Harris.  That is a ridiculous objection.  And the fact is

19  that you have no right to have this even done in secret.  Most

20  judges would make you excuse people in public one at a time.  I

21  didn't do that just out of extra caution.

22          MR. BRUGNARA:  All right.  I learn everything --

23          THE COURT:  So you know --

24          MR. BRUGNARA:  Okay.

25          THE COURT:  I could have made you do it in public.

1        **MR. BRUGNARA:**  Okay.  I appreciate that.  All right.

2        **THE COURT:**  So that's a no.  And I don't believe she

3   gave you a dirty look.

4        **MR. BRUGNARA:**  I just wanted to make sure of that.

5        **THE COURT:**  The objection is overruled.  Thank you.

6        (Proceedings held in open court.)

7        **THE COURT:**  All right.  Now, I need to do some

8   traffic here.

9        You two on the back row, come down to the front row.

10       And then you four on -- over there.

11       And we're going to leave those last two chairs empty for

12   now.  Those are going to be for the alternates.

13       All right.  You four on that bench come down and fill in

14   in the rear in the same sequence that you're in.

15       And then the next two over there come and fill in the back

16   row.

17       **THE CLERK:**  Ms. Demorest and Mr. Garrett.

18   Ms. Demorest, come in first, please.

19       **THE COURT:**  Just go sit in the back row.

20       All right.  So here is what I want you to do just so the

21   record will be clear.  I want you to shout out your name, last

22   name only, so that there will be a record of who is on the

23   jury.  And we'll start with Mr. Hellman.

24       Mr. Hellman.

25       **PROSPECTIVE JUROR HELLMAN:**  Hellman.

```
 1              PROSPECTIVE JUROR DUTTA:  Dutta.

 2              THE COURT:  Louder.  Louder.  We can't hear you.

 3              PROSPECTIVE JUROR DUTTA:  Dutta.

 4              PROSPECTIVE JUROR PANAGOPOULOUS:  Panagopoulous.

 5              PROSPECTIVE JUROR FERREN:  Ferren.

 6              PROSPECTIVE JUROR JAKIC:  Jakic.

 7              PROSPECTIVE JUROR CHRISTOPULOS:  Christopulos.

 8              PROSPECTIVE JUROR ARKIN:  Arkin.

 9              PROSPECTIVE JUROR PATTERSON:  Patterson.

10              PROSPECTIVE JUROR VELEZ:  Velez.

11              PROSPECTIVE JUROR CALDWELL:  Caldwell.

12              PROSPECTIVE JUROR DEMOREST:  Demorest.

13              PROSPECTIVE JUROR GARRETT:  Garrett.

14              THE COURT:  All right.  Thank you.

15         Please stand now and take the oath as the primary jury in

16    this case.

17         (Jury panel sworn in.)

18              THE COURT:  All right.  Be seated.

19         Now, bear with me a little bit longer.  I'm going to hand

20    the sheet back.

21         The Government gets to make the first entry, and the

22    defendant makes the second entry.  And it's limited to the four

23    people that are left over there on Bench No. 2.  They will be

24    our alternates.

25         (Brief pause.)
```

```
 1              MR. BRUGNARA:  That's for a strike, your Honor?
 2   We're -- it's the same process?
 3              THE COURT:  But it's limited to these four over there
 4   on the bench.
 5              MR. BRUGNARA:  I understand.
 6              THE COURT:  Each side gets one strike.
 7         (Brief pause.)
 8         (Whereupon, document was tendered to the Court.)
 9              THE COURT:  All right.  We'll go through the same
10   drill here, but it will be much shorter.
11         Ms. Kaur, you're excused.
12         Mr. Bezdek, you're excused.
13         (Prospective Jurors Kaur and Bezdek exit the
14          courtroom.)
15              THE COURT:  Now, the two remaining will please come
16   over to the jury box.  And Ms. -- I'm sorry.  Is it
17   Ms. Stromberg?  Is that your name?
18              PROSPECTIVE JUROR STROMBERG:  Yes.
19              THE COURT:  Will, you please sit in the front row.
20         And Mr. Calabro -- is that your name?
21              PROSPECTIVE JUROR CALABRO:  Yeah.
22              THE COURT:  You're in the back row.
23         And, Dawn, would you -- you two please stand, the two of
24   you, and take the oath as alternate jurors.
25         (Alternate jurors sworn in.)
```

1       **THE COURT:**  Now, we have selected the jury and the

2   alternates.  I can now -- all you have out there who were --

3   you came as part of venire, I want to thank you for your

4   willingness to serve, but we cannot use you at this time, so

5   I'm going to excuse you.  You turn back into ordinary

6   civilians.  If you want to stay, you can.  If you want to go,

7   you can do that.  But you will only be members of the public if

8   you stayed, so make your own decision.

9       Bye-bye, and please be sure to go by the jury assembly

10  room to make sure that sign up for any travel or whatever

11  you're entitled to get.  I thank you again.

12      (Prospective jurors exit courtroom at 2:39 p.m.)

13      **THE CLERK:**  We need to make a logistic switch with

14  Mr. Panagopoulous to the back row.

15      **THE COURT:**  All right.  Mr. Panagopoulous, right?

16  You need to sit in the rear.

17      And what I would suggest, Dawn, if it's okay with you, is

18  that Juror No. 12 switch places so that -- is that going to

19  work for you?

20      **THE CLERK:**  Okay.  Mr. Garrett.  Okay.

21      Thank you.

22      **THE COURT:**  And the reason for that switch is on

23  account of his back, and he may have to stand up from time to

24  time.

25      I want to thank you all.  We'll be seeing a lot of each

1  other.  I can't tell you how much I appreciate the sacrifice

2  that you'll be making.  It's on behalf of your U.S. District

3  Court and the great trial system that we have in this country.

4  And my promise to you is to run as efficient a trial and as

5  fair a trial as I can, keeping in mind that we should not waste

6  your time, but I should do things that I can do out of your

7  presence before you even come in so that it doesn't take up

8  your time while you're here.

9       We're not going to hear any evidence today.  In fact, I'm

10  going to let you go in about five minutes to have a

11  conversation that's only about five minutes with Dawn in the

12  jury room.  I just want to give you a couple of admonitions.

13  These are like direct orders, but we use a nice term

14  "admonitions."

15       No going on the internet.  No homework.  No research.  No

16  looking up things, whether it's on the Internet or not.  You've

17  got to decide the case based on the evidence presented right

18  here in this courtroom and that only.

19       So it would be wrong for you to go and get evidence -- not

20  even evidence -- just some information from some other source

21  that no one knows you're doing it.  That would be wrong.  You

22  can't do that.  Just sit back.  Listen carefully and make

23  these -- both sides do their work, present their evidence, and

24  then you decide the case based on that.

25       So no homework, no internet, et cetera.

 1         Same thing for talking to other people.  Your loved ones
 2    are going to want to know about the case.  You can't talk to
 3    them about the case until the case is over.  And then if you
 4    want to have a press conference on the steps of the courthouse,
 5    God bless you.  You can do it then when the case is over.  But
 6    not now.  And you can't talk to your loved ones other than to
 7    say, of course, I have a trial.  I'm on a jury.  And what the
 8    schedule is and all that.  That's perfectly okay.  But talking
 9    about the merits of the case, no.  You can't do that for the
10    same reasons.
11         Now, when you -- every now and then you may run into
12    somebody involved in the trial right in the bathroom or the
13    hallway or the elevator.  And they are going to be
14    professional, and they are not going to engage you in small
15    talk.  No back slapping.  No, you know -- you know, the kind of
16    thing that you would, if you were going to a high school
17    reunion that you might be talking about.  No.
18         And why is that?  Why is it that they're going to maybe
19    even seem a little rude when they're really not rude at all?
20    And the reason is that they are respecting you.  They respect
21    you and the important job you have, and they want to keep their
22    distance.  They don't want to appear in any way as if they're
23    trying to ingratiate themselves with you as the jury.  They
24    want you to decide -- like I do and everyone does, the system
25    does -- everyone wants you to decide this case fair and square

```
 1    on the merits, and that's all.  It's very important.  Fair and
 2    square on the merits.
 3        So if you see them in the hallway, the most they're going
 4    to do is say good morning and keep walking.  They're not going
 5    to say anything more than that.  And, again, it's not because
 6    of rudeness.  It's because of the opposite.  It's for respect.
 7        All right.  Now, it would be wrong for any of you to go on
 8    your Facebook page and say:  My God.  I'm on the jury.
 9        I know you've thought about that, haven't you?  No, you
10    can't do that.  You know why?  Because somebody will start
11    asking you about it.  They will say:  Oh, what kind of jury is
12    that?  No Facebooks.  No Twitters.  A lot of those things that
13    I -- MySpace, LinkedIn, YouTube, text messages, Twitter,
14    BlackBerry, none of those things.
15        I've already emphasized that enough, I think.  I'm not
16    going to say it again.
17        You're not supposed to deliberate about the case until the
18    very end, or for that matter, to even try to make up your mind.
19    It's okay for you to think about the evidence.  We want you to
20    do that.  But we don't want you to make a premature judgment.
21        One of the things I learned in this job is sometimes the
22    most important thing you hear is the last thing you hear.  I've
23    seen that happen.  And you want to keep an open mind until the
24    very end.  And that's one of the reasons that we don't let you
25    talk about the case prematurely is because something could
```

1    happen in those last few moments of the trial that really

2    dramatically affect the -- what should affect the outcome.

3        I don't know if that's going to happen this case.  I've

4    seen it happen in other cases.  And that's why you need to

5    deliberate at the end and not beforehand.

6        So keep an open mind.  No talking about the case.  When

7    you go into the jury room, you can talk about how good the

8    coffee is that we're going to serve you every morning.  How

9    great the Federal doughnuts are compared to the doughnuts you

10   get elsewhere.  You know, sports.  You can talk about sports.

11   That's okay.

12       Probably not -- shouldn't talk about politics.  Then

13   you'll start getting mad at each other, so let's not do that.

14   Sports, you won't get mad at each other.

15       I think that's really the only admonitions I need.

16       Anything else that either side wants me to raise by way of

17   admonitions before I let the jury go to meet with Dawn and then

18   they'll go home for the day?

19            **MS. HARRIS:**  No, your Honor.

20            **MR. BRUGNARA:**  No, Judge Alsup.

21            **THE COURT:**  Thank you.

22       Now, you need to be here at 7:45 in the morning.

23   Sometimes -- I'll just tell you one quick story about this.  I

24   meet with the lawyers earlier than that -- but in this case

25   both sides -- starting at 7:30.  And I try to iron out any

```
 1  problems for the day in that period of time.  And I -- we
 2  always start by 8:00 o'clock.  Sometimes, though, when they run
 3  out of things to raise, which is often, we start right away.
 4      One time in a case, a criminal case, we started at 7:33 in
 5  the morning.  Every single -- all 14 were present in the jury
 6  box, and the lawyers had nothing to raise with me.  I said:
 7  See if all the jurors are there.  They were all there.  They
 8  came out, and we started at 7:33 in the morning.  While the
 9  rest of California was thinking about their first cup of
10  coffee, that jury was in the jury box doing their country's
11  work.
12      So you could be like that.  You probably will be like
13  that.  I just bring that story up to let you know that I'm
14  going to do this for your convenience.  No later than 8:00, but
15  sometimes even earlier than that, we will be ready to go so
16  that you can be hearing evidence or argument or whatever.
17      So 7:45 you've got to be here.  Dawn is going to get some
18  phone numbers.  Every now and then, once in a blue moon,
19  somebody calls in and says:  I'm stuck.  There was an accident
20  on the Bay Bridge.  I can't be there.
21      And you know what happens then?  We just wait.  Sometimes
22  we have to wait an hour, maybe.  And that's -- and we can't
23  proceed until everyone is there.  We need all 14 of you or we
24  cannot proceed.  It's not like -- you cannot go look at
25  somebody else's notes.  You have to be present to hear it for
```

 1   yourself, see the witnesses for yourself.

 2        So, and that's one of the reasons I admire the jury so

 3   much is that they do it day after day.  They get here on time

 4   and help make it run smoothly.

 5        So I'm going to let you go back and see your new home away

 6   from home.  Dawn is going to give you five minutes worth of

 7   orientation on some of the practical things like parking and

 8   jury badges and your notepads.  And then we'll see you here at

 9   7:45 in the morning.  We're going to have opening statements

10   first thing, and then we'll get right into the evidence.

11   You're going to be hearing a lot of evidence tomorrow.

12        We'll run up until 1:00 o'clock tomorrow.  7:45 to

13   1:00 o'clock with two breaks.

14        All right.  Please, welcome, again.  Dawn is going to take

15   you to the jury room.

16           **THE CLERK:**  Okay.  All rise.

17        (Jury exits courtroom at 2:49 p.m.)

18           **THE COURT:**  All right.  Everyone be seated.  And I

19   think we're done for the day, unless -- unless somebody has an

20   issue to raise with me for tomorrow.

21           **MS. HARRIS:**  Your Honor, Mr. Kingsley has something

22   to raise with the Court.

23           **THE COURT:**  All right.  Mr. Kingsley.

24           **MR. KINGSLEY:**  Your Honor, the defense raised the

25   idea that they'd be having experts examine the artwork

1   tomorrow.  And just in the interest of time, specifically since

2   you just said that we're going to be ready to go at 8:00.  I

3   want to make sure we understand exactly what's happening

4   tomorrow morning with the examination of the artwork.

5        If there's going to be defense experts there looking at

6   it, I don't know how long that's going to take, but I imagine

7   it will take more than whatever amount of time you've allotted

8   for it.

9            **THE COURT:**  What do you propose?

10           **MR. KINGSLEY:**  The Government objects to the defense

11  having an expert at this point at all.  We were never noticed

12  on anything, and the defense has had months and months to

13  examine the artwork and the idea that we would stop trial the

14  morning of trial to do it.  That doesn't make any sense.

15           **THE COURT:**  We're not going to stop the trial.  At

16  8:00 o'clock we will interrupt wherever we are and move on.

17  We're not going to delay things.  But we ought to have the

18  artwork here at 7:00.  You'll have the experts look at it.

19  They can look at it in the back of the room while we argue

20  about other things.

21       But -- and I am not ruling yet on the issue of whether or

22  not proper notice has been given.  That -- this is without

23  prejudice to that point.  That's a different issue for another

24  day.

25           **MR. KINGSLEY:**  Thank you, your Honor.

```
 1              THE COURT:  What else do you have to raise?

 2              MS. HARRIS:  That was it.

 3              THE COURT:  Mr. Brugnara, do you have anything to

 4    raise?

 5              MR. BRUGNARA:  Yes.  I have a couple of comments.

 6    One, is it's not going to happen before the opening arguments.

 7    So if it's going to happen tomorrow, it's going to be after the

 8    1:00 o'clock adjournment.

 9              THE COURT:  What is the "it"?

10              MR. BRUGNARA:  Looking at the artwork.

11              THE COURT:  What do you mean?  I thought you had

12    experts who wanted to come in here tomorrow morning at

13    7:00 a.m.?

14              MR. BRUGNARA:  Ms. Weiss of CJA is logistically

15    coordinating with whatever parties are going to be involved.

16    But, moreover, it's still --

17              THE COURT:  You can't put it on her now.  Please

18    don't blame the Court.  She's right there and can speak for

19    herself.

20              MR. BRUGNARA:  Your Honor, I'm sitting in a jail

21    cell, and I don't have access to a phone, as you know.  So --

22              THE COURT:  Well, Mr. Stevens has access.  He can do

23    it.

24              MR. BRUGNARA:  That's what they've been coordinating.

25        But what I'm trying to explain, I'm also going to look at
```

1   the art as part of this process.  And I'm not going to do it

2   before my opening argument.  I'm going to need to prepare for

3   the opening argument mentally at the bare minimum.  And I'm not

4   going to be looking at art and sidetracking my thought process.

5   So whatever I do would be after the 1:00 o'clock adjournment.

6            **THE COURT:**  Well, from 1:00 o'clock to 2:00 o'clock,

7   you could do it.  But at 2:00 o'clock, I have my normal

8   criminal calendar.  And I would have to stop it then.  And then

9   we're going to come back here at about 2:30 to telephone a

10  number of witnesses to see what they have to say.

11           **MR. BRUGNARA:**  That should be more than enough time.

12  The other thing is, I'd like to be able to stay in the room

13  here with counsels, associate counsels, to take down the

14  necessary notes on my pad there of the witnesses and, also, to

15  talk with them a little bit about the opening statement for

16  tomorrow.

17           **THE COURT:**  I want to give you a chance to do that.

18  Can the Marshals accommodate us on that?

19           **THE MARSHAL:**  Yes.

20           **THE COURT:**  How long do you think you need?

21           **MR. BRUGNARA:**  Well, as much time as you can give us.

22           **THE COURT:**  How about an hour?

23           **MR. BRUGNARA:**  That would be fine.

24           **THE COURT:**  All right.  An hour.

25       All right.  What do you have over there?

1            **MS. HARRIS:**  We arranged for the art handlers to be

2    here at 7:00 in the morning.

3            **THE COURT:**  Well, now they don't need to be here.

4            **MR. KINGSLEY:**  So I'm not sure if they're available

5    at 1:00.  We'll look into that and try to make it work.

6            **THE COURT:**  Thank you.  Please try to make it work.

7    This is not an easy trial to run.

8            **MR. KINGSLEY:**  I understand.  The defendant is

9    wearing my shoes.

10           **MR. BRUGNARA:**  Good luck shoes, I hope.

11           **THE COURT:**  Wait a minute.  I can't do it at

12   1:00 o'clock.  We've got four sentencings at 1:00 o'clock that

13   I didn't know about.

14       Can it be done at a different location?

15           **MR. KINGSLEY:**  It could be.  I don't think the Court

16   needs be there for it.  We were going to do it in the

17   courtroom, because it was going to be up here anyway for trial.

18           **THE COURT:**  Can the Marshals take -- where can we do

19   it?  Can we do it in the U.S. Attorney's Office?

20           **MR. KINGSLEY:**  I don't think with him in custody --

21           **THE COURT:**  Can the Marshal accompany him to the U.S.

22   Attorney's Office?

23           **THE MARSHAL:**  That's up to the U.S. Attorney.

24           **MR. KINGSLEY:**  I mean, the art isn't -- I think the

25   idea was to do it in here, because the artwork will be here.

1   Some of it will already be unwrapped here --

2          THE COURT:  That was the idea.  That was then; this

3   is now.

4          MR. KINGSLEY:  I understand.  But to move it from

5   here at 1:00 o'clock to somewhere else where he's going to

6   examine it --

7          THE COURT:  It doesn't even need to be here at

8   1:00 o'clock.  Why do you need it not here at 1:00 o'clock?

9          MR. KINGSLEY:  Because we're going to be using it

10  tomorrow with our first witness.

11         THE COURT:  Tomorrow is completely taken up with -- I

12  have a calendar starting at exactly when this trial ends at

13  1:00.

14     So what -- what does the United States suggest?

15         MS. HARRIS:  I suggest that we do it at 7:00 o'clock,

16  your Honor.  That was the time that was allotted for.  And just

17  because Mr. Brugnara comes in and says:  I'm not going to do

18  it, doesn't mean that we change what was agreed to.  This was

19  worked out with Mr. Stevens, the Court, and our experts, your

20  Honor.

21         MR. BRUGNARA:  I never agreed to that.  If you agree

22  with somebody --

23         MS. HARRIS:  I'm not finished.

24         THE COURT:  Wait a minute, please.  Let her finish.

25         MS. HARRIS:  So that's the way the situation is going

1    to go.

2        As the Court knows, we have had a lot of problems, most

3    recently with the stipulation, where we thought Mr. Brugnara

4    had agreed to something.  He comes in and tells the Court:  I

5    want to renege.

6        We now have the situation where the Government has been

7    doing backflips to get the appropriate handlers here so

8    Mr. Brugnara can look at the art that was all set up for 7:00

9    in the morning.  And that ought to be when it gets done.

10       **THE COURT:**  All right.  So that's got to be the

11   answer.

12       **MR. BRUGNARA:**  Your Honor, the problem with

13   Ms. Harris is, she states really sharply her point, but it's

14   just not factual.

15       The fact is, I don't have an attorney.  I am pro se.  She

16   has a duty to contact me and give me the accurate information.

17   She could do it in writing so there's no miscommunication and

18   send it over to the jail by physical courier if she wants to.

19       Mr. Stevens doesn't speak for me, and I have never agreed

20   to 7:00 a.m. the day of my opening argument, and I never would

21   have.

22       **THE COURT:**  I'm ordering it now.  7:00 a.m. tomorrow

23   morning.  And if it doesn't work tomorrow between 7:00 and

24   8:00 o'clock for some reason, then I will try to find another

25   time.  But it may be several days from now before we can do it

1   again.

2          **MR. BRUGNARA:**  I would rather you set it, then, for

3   several days so we can logistically coordinate it with

4   Ms. Weiss with the necessary --

5          **THE COURT:**  Can we do it 7:00 a.m. on Wednesday?

6          **MR. BRUGNARA:**  Your Honor, people don't wake up as

7   early as you.  The fact of the matter is 99 percent of the

8   businessmen and women are asleep at that time.

9          **THE COURT:**  No.  No.  I don't accept that.

10         **MR. KINGSLEY:**  Your Honor, we've arranged our art

11  handlers to be here tomorrow.  We haven't arranged for them to

12  be here any other day this week.

13         **MR. BRUGNARA:**  7:00 a.m. is not normal business hours

14  in the United States.  9:00 to 5:00, so that would be after the

15  court proceedings at 1:00 or 2:00 o'clock?

16         **THE COURT:**  Ms. Weiss, did you want to say something?

17         **MS. WISE:**  I did.

18     There is no one who is going to be available to be here

19  tomorrow morning at 7:00, so your handlers should not come and

20  go through that expense.

21     And why don't you give us til, you know, end of the day on

22  Wednesday to figure out an agreeable time that it can be done

23  when we can have someone here?

24         **MR. KINGSLEY:**  We didn't agree for the experts.  I

25  mean, the whole point was for the defendant to look at the art,

```
 1   which is why we were going to have it available when everyone
 2   was here.
 3            THE COURT:  Mr. Kingsley, do you want this to be an
 4   issue on appeal?
 5            MR. KINGSLEY:  No.  I just --
 6            THE COURT:  Okay.  Then why don't you help instead of
 7   being a hindrance?
 8            MR. KINGSLEY:  I think the defendant should be held
 9   to his word, your Honor.
10            THE COURT:  Do you think that's going to fly with
11   half the judges on the Court of Appeals, a pro se guy ought to
12   be held to his word when he gets a sentence at the end of the
13   case?
14            MR. BRUGNARA:  Your Honor, you're being presumptive.
15   I plan on being acquitted.
16            THE COURT:  I'm being presumptive, but you've already
17   served X months.
18            MR. BRUGNARA:  But that's at your decision.  I -- I'm
19   innocent, and I shouldn't have been in there 11 months.
20            THE COURT:  If you're innocent, all this is moot.
21   There won't be any appeal.
22       I'm talking about if you're convicted, then there will be
23   an appeal.  Then somebody on the Court of Appeals is going to
24   be electrocuting Mr. Kingsley, because he didn't allow you to
25   look at the art.
```

```
 1        Maybe -- I don't know.  Look, we're going to do what
 2   Ms. Weiss says.  Don't have your handlers here at 7:00 a.m.
 3   unless you want to look at it yourself.
 4        Do you want to look at it?
 5            MR. BRUGNARA:  I would like to look at it, but not at
 6   7:00 a.m. on the day of the opening argument.
 7            THE COURT:  All right.  Then we'll find a time when
 8   you and the experts can look at it later, but -- and then I'm
 9   going to order the Government to do it again.  But you don't
10   have to have your handlers here at 7:00 in the morning.  That's
11   not going to work.  It's not going to work.
12        I'm trying my best.  It's not going to work.
13            MR. BRUGNARA:  I'd also like to ask a procedural
14   question.
15        Is Mr. Kingsley or Ms. Harris doing the opening argument?
16            THE COURT:  Why do you need to know?
17            MR. BRUGNARA:  I'm interested.
18            THE COURT:  Well --
19            MR. BRUGNARA:  And, also, the other thing is are they
20   allowed to -- to -- to both do it?
21            MS. HARRIS:  Your Honor, on the point about the
22   art --
23            MR. BRUGNARA:  I would like to ask procedurally, does
24   this Court allow that?
25            THE COURT:  Just a minute.
```

1     **MS. HARRIS:**  On the point about the art, I just
2  wanted to make sure.  Our understanding had been that the
3  reason we're going through this exercise is that the defendant
4  was complaining he hadn't been allowed to view the art before
5  it was going to be introduced into evidence.  It's going to be
6  shown tomorrow during the trial, so Mr. Brugnara is now waiving
7  his right to view the art --
8     **THE COURT:**  That's correct.  Whenever you want to
9  present it to the jury in open court through a witness, he
10  cannot object on the ground that he has not looked at it.
11     **MS. HARRIS:**  Thank you, your Honor.
12     **THE COURT:**  That is not going to be entertained.  He
13  has had -- we made arrangements to allow for that.  He spurned
14  that opportunity.  And so it's not going to -- that objection
15  will be overruled.
16     I don't think you have the right to know who's going to
17  make the opening statements.  Who's going to make the opening
18  statement on your side?
19     **MR. BRUGNARA:**  I'm going to.
20     **THE COURT:**  All right.  So wait and see who gets --
21  you don't get to know that upfront.
22     **MR. BRUGNARA:**  I wish my civil liberty wasn't in the
23  balance, otherwise this would actually fun.  But,
24  unfortunately, my freedom is in the balance so --
25     **THE COURT:**  It is.

1         **MR. BRUGNARA:**  -- it's really no nonsense.

2         **THE COURT:**  It is, and I keep that in mind at every

3    one of these hearings how important this.  So you -- good luck

4    to both sides.

5       All right.  What more can I do for you today before we

6    adjourn?

7         **MS. HARRIS:**  Nothing, your Honor.

8         **MR. KINGSLEY:**  That's it, your Honor.  Thank you.

9         **THE COURT:**  Mr. Brugnara, are you done?

10        **MR. BRUGNARA:**  I'm done.

11        **THE COURT:**  Yes.

12        **MR. TAMOR:**  Your Honor, I just wanted to alert the

13   Court to some scheduling issues I have.

14      I can get most things covered.  However, I do have an oral

15   argument in front of the Ninth Circuit on May 13th.  I have

16   another oral argument in front of the Ninth Circuit the

17   following day on May 14th.  That's in the morning at 9:30.  And

18   then I -- I'm scheduled for a jury trial in front of Judge Chen

19   on June 1st.

20      I'm trying to -- I don't know if -- there's a severance

21   motion that's pending in that case and some other things that

22   might come up.  But I just wanted to alert you.

23        **THE COURT:**  I don't know.  You might need to make a

24   continuance motion on Judge Chen, because this is a trial

25   that's already underway and you have responsibilities here.

1        As for the appeal thing, I want you and Mr. Stevens and

2   Mr. Brugnara to confer as to whether or not we can dispense

3   with you for the short time needed for you to make that

4   appearance.

5        All right?  Okay.

6        All right.  So you get to stay here for one hour to meet

7   with the lawyers and decide what you want to do, and then the

8   Marshals will take you back.

9        See you both in the morning at 7:30 a.m.

10            **MR. KINGSLEY:**  Thank you, your Honor.

11       (Whereupon at 3:02 p.m. further proceedings were

12        adjourned until Tuesday, April 28, 2015 at 7:30

13        a.m.)

**I N D E X**

| | PAGE | VOL. |
|---|---|---|
| Jury Voir Dire | 53 | 1 |

_ _ _

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, April 27, 2015