Volume 2

Pages 271 - 561

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )
                                     )
  vs.                                )  No. CR 08-0222 WHA
                                     )  No. CR 14-0306 WHA
LUKE D. BRUGNARA,                    )
                                     )  San Francisco, California
            Defendant.               )  Tuesday
                                     )  April 28, 2015
_____ )  7:30 a.m.

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**          MELINDA HAAG
                            United States Attorney
                            450 Golden Gate Ave.
                            San Francisco, California  94102
                      **BY:  ROBIN HARRIS, AUSA**
                            **BENJAMIN KINGSLEY, AUSA**


**For Defendant:**          **LUKE D. BRUGNARA**
                            - pro se


**Advisory Counsel:**       LAW OFFICES OF PAUL WOLF
                            717 Washington Street
                            Second Floor
                            Oakland, California 94607
                      **BY:  JAMES R. STEVENS, ESQ.**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 Official Reporter - US District Court
                 Computerized Transcription By Eclipse

```
1   APPEARANCES:  (CONTINUED)

2

3   Advisory Counsel:         LAW OFFICES OF TAMOR & TAMOR
                              311 Oak Street
4                             Suite 108
                              Oakland, California 94607
5                       BY:  RICHARD ALAN TAMOR, ESQ.

6   Also Present:   FBI Special Agent Jeremy Desor

7                   FBI Special Agent Aleksandr Kobzanets

8                   Mary Mallory, U.S. Attorney's Office

9                           -  -  -

10              ALSO PRESENT AT 2:30 P.M. HEARING

11

12  For Deputy Haynes:        OFFICE OF THE COUNTY COUNSEL
                              County of Alameda
                              1221 Oak Street
13                            Suite 450
                              Oakland, California 94612
14                      BY:  L. DAVID NEFOUSE, ESQ.

15

16  For Irving Newhouse:      Sullivan and Cromwell, LLP
                              1870 Embarcadero Road
17                            Palo Alto, California 94303
                        BY:  NATHANIEL L. GREEN, ESQ.
18

19

20  For Gary Tinterow:        NIXON PEABODY, LLP
                              555 West Fifth Street
21                            46th Floor
                              Los Angeles, California 90013
22                      BY:  JASON GONZALEZ, ESQ.

23                          -  -  -

24

25
```

<u>**P R O C E E D I N G S**</u>

**APRIL 28, 2015**                                          **7:31 a.m.**

(Defendant present, in custody.)

**THE COURT:**  All right.  We're all present.  Let's get started.

Are there any issues to raise with the Judge at this time?

**MS. HARRIS:**  Good morning, your Honor.  Robin Harris and Ben Kingsley for the United States.

We brought a copy of the key trial exhibits for the Court.

**THE COURT:**  All right.  Please hand it to -- show it to Mr. Brugnara, and then hand it up to me, please.

**MS. HARRIS:**  These are just the 25 the Court asked for.

**THE COURT:**  All right.

(Whereupon, exhibit binder was tendered to the Court.)

**THE COURT:**  All right.  Mr. Brugnara.

(Brief pause.)

**THE COURT:**  I need to get moving here.  The time is up.

Mr. Brugnara, hand me the notebook.  I didn't ask you to read every document in there.  I just wanted you to see what the Government is providing me.

Anything else you all want to bring up with me now?

**MS. HARRIS:**  Just one thing, your Honor.  We received a copy this morning of the request for 17(a) and 17(c)

```
 1  subpoenas.  Mr. Brugnara is requesting for Jim Lassart and
 2  Stuart Gasner and the custodian of records.  We raised the same
 3  objection to that that we did --
 4           THE COURT:  I'm overruling the objection subject
 5  to -- I've already done an order on that.  And I'm going to
 6  allow the subpoena to be served, but I'm saying in the order it
 7  is highly unlikely it's ever going to come into evidence.  But
 8  whatever is there, I want it to be there for purposes of the
 9  appeal, if there is an appeal.  But it's unlikely that it will
10  come into evidence.  But until I see what's there, I can't make
11  a final decision on it.
12           So your objection is noted for the record.
13           As for the other four that were requested, there was
14  insufficient information provided, and those are going to be
15  denied by the same order.
16           All right?  I've already ruled on it.
17           MS. HARRIS:  All right.  Thank you, your Honor.
18           THE COURT:  Okay.  What's the next item?
19           MR. BRUGNARA:  I had a question on the motion to
20  compel for three items:
21           One was the subpoena, I believe, the Marshals served on
22  this guy, MacWhinnie, who purportedly stated that de Kooning
23  painted these little drawings on paper.  And he hasn't
24  compelled the evidence by the 25th, which was any proof
25  thereof.  And that's pretty important to this case.
```

1            THE COURT:  I have no idea what you're talking about.

2            MR. BRUGNARA:  It was a 17(c) subpoena issued to John

3    MacWhinnie by the U.S. Marshals to produce any -- and I don't

4    have the exact verbiage, but the short of it was any proof or

5    any documents proving up that, in fact, there is any connection

6    to de Kooning to these drawings.  Because, I mean, otherwise,

7    they're just drawings that, you know, a five-year-old could

8    have done.

9        So it was simply asking him to prove, because he -- he was

10   the link to de Kooning to Maibaum.  And Maibaum defers to

11   MacWhinnie's letter in all of his correspondence, saying:  I'm

12   not an expert on de Kooning, but, hey, I got this letter from

13   MacWhinnie.  And MacWhinnie says in the letter:  Hey, we got it

14   from de Kooning.

15       So you approved a 17(c) subpoena ordering MacWhinnie to

16   produce any proof that, in fact, de Kooning has any connection

17   to these little drawings.  And he didn't comply with your order

18   and the subpoena, so I'd like him to be forced to compel.

19           THE COURT:  All right.  Does the Government know

20   anything about this?

21           MS. HARRIS:  No, your Honor, we do not.

22           THE COURT:  Well, I know nothing about it myself.

23   And I'll -- I'll have to get the Marshals to -- are any of my

24   Marshals here able to respond to this?

25           THE MARSHAL:  I know nothing about it, your Honor.

```
 1            THE COURT:  All right.  Well, one of the problems
 2   with rushing this case to trial in the way that you insisted is
 3   that, I told you up front, that the Marshals would have
 4   difficulty getting these things served.  I don't even know if
 5   it's been served.  But if it hasn't been served -- I'm sorry.
 6   If it has been served, we're going to find out.
 7        Where is my law clerk?  We're going to find out at a break
 8   on what the story there is.
 9        Where is Mr. MacWhinnie located?
10            MR. BRUGNARA:  I think he's somewhere in the Hamptons
11   or somewhere in south of New York, Long Island, something like
12   that.
13            THE COURT:  All right.  Okay.
14        All right.  What's your next point?
15            MS. HARRIS:  Your Honor, we have something I forgot
16   to mention to the Court.  Today we're going to be showing the
17   original art.  And we just wanted to ask the Court's permission
18   not to put exhibit stickers on the original art; but after it's
19   wrapped up again, to put it on the plastic that covers the art?
20            THE COURT:  Fine.
21            MS. HARRIS:  Okay.
22            MR. BRUGNARA:  I think there's an issue with that
23   because of the non-compliance with that subpoena that's
24   directly related to, you know, these little drawings.
25        You know, there's a standing order for him to comply with
```

```
1   the 17(c) subpoena to give some shred of proof that they're
2   connected to de Kooning.  And they're just ignoring the Court's
3   order.  So I'm just confused.
4        So I can't -- I don't -- I think it would be confusing to
5   the jury.
6            THE COURT:  Let's say that they're not authentic but
7   they have a $1 value, $1.  It's still fraud.  Whether it's
8   10 million or $1, it's still fraud by you if the Government
9   proves its case.  It is not a defense to fraud that they were
10  trying to defraud you.
11           MR. BRUGNARA:  No, but it --
12           THE COURT:  You have to eliminate that idea from your
13  mind.
14           MR. BRUGNARA:  Your Honor, but it impeaches their
15  credibility on everything that comes --
16           THE COURT:  No --
17           MR. BRUGNARA:  Your Honor, please.
18       A lot of this case -- there's only a handful of emails.
19  The bulk of what purportedly transpired between me and Ms. Long
20  was telephonic, and it's what she says and it's what I say.
21           THE COURT:  Yes, but Maibaum didn't -- you never had
22  a conversation with Maibaum.
23           MR. BRUGNARA:  That's correct, but --
24           THE COURT:  So his credibility is zero.  It doesn't
25  mean anything in terms of what you and Ms. Long had a -- I
```

1  agree with you that you're entitled to try to show that your

2  version of what transpired between the two of you is truth, and

3  what she is saying is not true.  You have the right to try to

4  show that.  And, therefore, some of these things about the

5  value of the art and any attempt by her to defraud you bear on

6  the credibility for that purpose.

7      But it is -- but apart from that, it doesn't matter.  So

8  if Maibaum was a complete fraudster, you did not have any

9  conversations with him, and his -- his credibility, so far at

10 least to my mind, is not an issue to the case.

11         MR. BRUGNARA:  Your Honor, they are described as

12 partners.  In all the FBI 302s they're partners now.  So the

13 fact is they colluded together to deceive me by their own

14 district court filings.

15         THE COURT:  It's irrelevant.

16         MR. BRUGNARA:  It's absolutely relevant.  It goes to

17 the credibility of Rose Long and whether or not she can be

18 believed.

19         THE COURT:  There is a point at which we cannot track

20 down every rabbit hole in the United States and see what's down

21 there.  So I'm going to look into MacWhinnie -- you're not even

22 listening to me, Mr. Brugnara.

23         MR. BRUGNARA:  Your Honor, it goes to the reasonable

24 reliance upon my representations and if they reasonably

25 believed it was zero or close to zero --

1              MR. KINGSLEY:  Reliance is not an element of a

2    criminal case for fraud.

3              MR. BRUGNARA:  -- or close to zero, it would go to

4    their -- their state of mind regarding the transaction.

5         But nevertheless, you know, you issued the 17(c)

6    subpoena --

7              THE COURT:  Without prejudice to a lot of things.  I

8    didn't say you were entitled to get any of that into evidence.

9              MR. BRUGNARA:  They didn't file --

10             THE COURT:  That specifically --

11             MR. BRUGNARA:  Your Honor, they didn't file a motion

12   to quash that was due on the 21st.

13             THE COURT:  I don't even know if it's been served.

14   I'm going to look into it.  But the mere fact that the 17(c)

15   subpoena was issued means nothing in terms of whether or not

16   any of that would be admissible.  I said that many times.  I

17   think I said it in the order in question.

18        I'm going to look into it.  I'll try to see where it

19   stands.  But it is not a legitimate reason to deny the

20   Government the right to lay the art before the jury and start

21   proving its case that you haven't yet gotten something out of

22   MacWhinnie.

23        I'm overruling that.  Your point is preserved for appeal.

24   We're moving forward now.

25        What is the next point?

 1           MS. HARRIS:  We have nothing further, your Honor.

 2           THE COURT:  All right.  Do you have anything more to

 3  raise now?

 4           MR. BRUGNARA:  Well, there was the other

 5  subpoenas that --

 6           THE COURT:  All right.  We have a few minutes.  Tell

 7  me what -- what else do you have to raise?

 8           MR. BRUGNARA:  What we just received this morning

 9  from the attorney from DWT for Mr. Maibaum asking for the bank

10  proving up records of this little -- bronze Little Dancer, and

11  they said that they don't have -- not surprisingly, they don't

12  have the bank records.

13           THE COURT:  They don't have them they can't produce

14  what they don't have.  If that's what they said.  I haven't

15  received any of that.  I don't know what you're talking about.

16  But if they said they don't have records, people don't have to

17  produce what they don't have.

18      So it's just like if somebody subpoenaed you to produce X

19  and you don't have X, your answer would be:  I don't have X.  I

20  don't have to produce it, because I don't have to go make one

21  up just because somebody would like it.

22           MR. BRUGNARA:  Actually, it's okay.  I mean, it's

23  consistent with what our position is that such sale never

24  occurred.  So that's actually, you know, confirms our position.

25           THE COURT:  I don't know if it does or not.

```
 1        Do you have anything more to bring up?

 2             MS. HARRIS:  No, your Honor.

 3             THE COURT:  Mr. Brugnara, do you have anything more

 4   to bring up --

 5             MR. BRUGNARA:  No.

 6             THE COURT:  -- before we bring the jury in and get

 7   started?

 8             MS. HARRIS:  Is the Court going to pre-instruct the

 9   jury?

10             THE COURT:  Yes.

11             MS. HARRIS:  Okay.

12             THE COURT:  Not on the law.

13             MS. HARRIS:  Right.

14             THE COURT:  That will happen at the end.

15        I may -- I may give them instructions along the way when I

16   feel it's necessary as to elements of the law.  That, I do

17   sometimes.  But the main set of instructions on the law comes

18   at the end.

19        For example, I have a feeling that I will need to instruct

20   the jury at some point before the end of the case that even if

21   Ms. Long was a fraudster, that's not a defense.

22        That is the law, isn't it?

23             MS. HARRIS:  Yes, your Honor, it is.

24             MR. BRUGNARA:  I -- I -- I disagree with that.

25             THE COURT:  You can object.  Object all day long,
```

1    Mr. Brugnara, but that is the law.  And you can take that point

2    up on appeal.

3        It is not a defense to fraud that the victim was also

4    trying to defraud the other person.  You know, maybe both of

5    them go to jail.  But you can't blame the victim and put the

6    victim on trial and say:  They were trying to defraud me.

7            **MR. BRUGNARA:**  Your Honor -- your Honor, I'm the

8    victim, and this is a subjective statement.  Calling them a

9    victim, you've already made a predisposed ruling.

10           **THE COURT:**  This is the way the Government is

11   presenting the case.

12       You can argue to the jury.  I'm going to tell the jury

13   that if they were trying to defraud you, it is not a defense.

14   Period.

15           **MR. BRUGNARA:**  I think that's prejudicial --

16           **THE COURT:**  Of course, it's prejudicial.

17           **MR. BRUGNARA:**  Your Honor, you already made that on

18   the record yesterday.  So if you say that, you also have to say

19   that it would have to be proved beyond a reasonable doubt to a

20   moral certainty that I was trying -- I mean, I was --

21           **THE COURT:**  That's not the law.

22           **MR. BRUGNARA:**  What she's trying to do --

23           **THE COURT:**  Beyond a reasonable doubt is the law; not

24   to a moral certainty.

25           **MR. BRUGNARA:**  Actually, I have all sorts of stacks

1   in my cell saying moral certainty is the definition of beyond a

2   reasonable doubt.

3          **MS. HARRIS:**  No, your Honor, it is not.

4          **THE COURT:**  That's not the standard.  It's not the

5   standard.  I don't know where you got that.

6          **MR. BRUGNARA:**  Okay.  Well, I'll bring it in

7   tomorrow.

8          **THE COURT:**  Those stacks are not correct.  The law in

9   this Circuit is -- I think even the Supreme Court -- is that

10  beyond a reasonable doubt; not beyond all doubt, beyond all

11  reasonable doubt.

12         **MR. BRUGNARA:**  That's a subjective analysis.

13         **THE COURT:**  The point is preserved for appeal.

14     Look, I know the law on this point, and I'm not going to

15  let the drift of the evidence start misleading the jury into

16  thinking Rose Long is on trial.  Her credibility may be on

17  trial.  That's a fair point.  And so far as it bears on what

18  she said you to and your version and her version.  Okay, fair

19  point.

20     But you cannot defeat a fraud prosecution by saying:  Yes,

21  I was trying to defraud them, but they were trying to defraud

22  me, so it's a wash.

23         **MR. BRUGNARA:**  Your Honor, A, I wasn't trying to

24  defraud them; but B, I think it's prejudicial if you make any

25  additional comments, because you already gave instructions

1    yesterday in this case.

2            **THE COURT:**  It is prejudicial, but it is a fair

3    prejudice because it's the law.  And if you start misleading

4    the jury, or at the point where I think the evidence requires

5    me to straighten that out, I'm going to do it.

6            **MR. BRUGNARA:**  Hold on.  Hold on.

7            **THE COURT:**  And your point will be preserved for

8    appeal.

9            **MR. BRUGNARA:**  So you're saying when I prove that

10   she's a fraudster, which will happen today, then you're going

11   to protect --

12           **THE COURT:**  I'm not going to try to protect her.  I'm

13   going to try to make it clear to the jury what --

14           **MR. BRUGNARA:**  No, no, no, no.  No, no, no.  That's

15   totally inappropriate for a judge to opine that he just proved

16   that she engaged in fraud against Mr. Brugnara, but you still

17   can still find him guilty of fraud because that's not a

18   defense.  That's beyond prejudicial.  You've already set the

19   jury instructions.

20           **THE COURT:**  Mr. Brugnara, I'm sorry if you don't like

21   the way justice is being meted in this Court, but that's what's

22   going to happen, because it is the law, and you're not going to

23   be allowed to confuse the jury.

24           **MR. BRUGNARA:**  You are going to say:  But, oh, by the

25   way, then you can impeach everything that came out of her

1  mouth.  That's a he-said/she-said comment.

2       **THE COURT:**  I will make clear that you are

3  entitled -- I will explain how the issue of her committing

4  fraud on you, if they find that --

5       **MR. BRUGNARA:**  It doesn't infer --

6       **THE COURT:**  -- bears upon the issue of credibility.

7     All right.  It's now time to bring in -- the jury in and

8  get started.  So let's go -- let's go get the jury and bring

9  them in.

10     (Brief pause.)

11      **MR. BRUGNARA:**  Your Honor, we want to object to use

12  of certain -- use of certain evidence here if they plan on

13  using it in the opening, or should we wait until they try to

14  submit it as evidence?

15      **THE COURT:**  What are the items -- what items are you

16  going to use in the opening?

17      **MR. KINGSLEY:**  I'm going to use the financial

18  statement of Luke Brugnara that you've seen and we've talked

19  about.

20      **THE COURT:**  All right.  That's allowed.

21      **MR. KINGSLEY:**  I am going to use --

22      **MR. BRUGNARA:**  I need to comment before you make the

23  ruling --

24      **MR. KINGSLEY:**  -- four -- four emails --

25      **THE COURT:**  I've already ruled that it will come into

1    evidence.

2            MR. BRUGNARA:  But you don't know what I'm going to

3    say, though.

4            THE COURT:  I have a feeling -- well, go ahead.

5            MR. BRUGNARA:  Okay.  Let -- let me -- he said -- go

6    ahead.  Let me just give a comment.

7            THE COURT:  The jury is sitting -- standing out there

8    waiting to come in.

9            MR. BRUGNARA:  Okay.  And there is a bona fide

10   argument here that you need to hear.  This actually is hearsay

11   under the hearsay law for numerous reasons.

12           THE COURT:  Dawn, are they ready?

13           THE CLERK:  They are standing outside.

14           MR. BRUGNARA:  This is actually hearsay.

15           THE COURT:  It's not hearsay.  It's signed by you.

16           MR. BRUGNARA:  Can I describe why it's hearsay?

17           THE COURT:  No, because I know it's not hearsay.

18           MR. BRUGNARA:  Okay.  Well, let me state why.

19       For starters, it's not dated.  It's stamped with an

20   indiscernible date of zero.

21           MR. KINGSLEY:  Signed and dated at the back on the

22   last page, Mr. Brugnara.

23           MR. BRUGNARA:  Okay.  Your Honor, it's not certified.

24   It was not provided to anybody.  I believe it's testifying

25   today.  If it is, that needs to be proved up before it can be

1   shown into evidence with a chain of proof.

2          **MR. KINGSLEY:**  It will come into evidence through

3   Janie Zhaung.

4          **THE COURT:**  Stop.  The jury is waiting outside the

5   door.

6       All of these documents may be shown in the opening

7   statement subject to you getting them into evidence.  If you

8   don't get them into evidence at the right time, then you'll

9   have to tell the jury at the end that you didn't get that

10  document into evidence.  But you can show them to the -- to the

11  jury during your opening statement.  It's time to get started.

12      Let's bring in the jury.

13          **MR. KINGSLEY:**  Thank you, your Honor.

14          **MS. HARRIS:**  And we're going to be using the Elmo,

15  your Honor.

16          **THE COURT:**  Fine.  Use whatever you want.

17      (Jury enters courtroom at 7:51 a.m.)

18          **THE COURT:**  Thank you.  Be seated.  Welcome back.

19  Thank you for all being on time.

20      We're ready to get started, and all 14 of you are here.

21  That's most excellent.  Thank you for being punctual.  I'm

22  sorry that the coffee was lukewarm today.  We're going to fix

23  that.  Tomorrow it should be steaming hot.

24      Now, we're here for the trial, and I need you to -- we're

25  going to get started with the opening statements in just a

```
 1  moment, but I need to give you some pointers about the case and
 2  you will, please, pay attention to this.
 3      I told you earlier that you're the -- you're the judge of
 4  the facts.  And at the end of the case after you hear all the
 5  evidence, you need to -- you need to figure out the key
 6  question is:  Did the Government prove the elements relevant to
 7  convict beyond a reasonable doubt?
 8      So if somebody says the light was red and another witness
 9  says the light was green, you need to evaluate the evidence and
10  figure out which is the stronger view and whether it's clear
11  beyond a reasonable doubt and all that.  Now, we don't have a
12  red and light green.  I'm using that as an analogy.  It's not a
13  traffic case.  But I think you understand what I'm saying.
14      Now, when it comes to the law, what the elements of proof
15  are, you've got to take my word for it that I'm getting it
16  right.  If I get it wrong, then there will be an appeal.  But
17  if I get it right, you've got to presume that I get it right.
18  So your job -- you take it as a given when I tell you what the
19  law will be.
20      All right.  So I'm not going to invade your province of
21  the facts, and you don't invade my province of telling you what
22  the law is.
23      Now, I will be making rulings now and then on the
24  evidence, but I want you to know nothing that I ever say is
25  suggests -- in any way suggests what your verdict should be.
```

 1   Never.  That's always up to you.  So, please, don't -- don't --
 2   don't take from anything I say what the verdict ought to be.
 3        Now, evidence.  Evidence.  Let's talk about evidence for a
 4   minute.  What is evidence?  In a case where both sides are
 5   represented by a lawyer -- I say this in every case, I'm going
 6   to say it again -- nothing that a lawyer ever says, zero, is
 7   evidence.  Occasionally there will be a stipulation where both
 8   sides stipulate to something.  Rare, but it happens.  And I
 9   will tell you then that that is evidence you can consider.
10   That's a special case.
11        Normally nothing that a lawyer ever says in an opening, in
12   a closing, even when they are asking questions, it's not
13   evidence.  It's what the witness says under oath and subject to
14   cross-examination that is evidence.  That is the evidence part,
15   not what the lawyer says.
16        So in this case we have Mr. Brugnara, and he's acting as
17   his own lawyer so the same thing applies when he is acting as
18   his own lawyer.  Not one word that he says, not one word that
19   the Government prosecutor says is ever evidence.  All that is
20   evidence is what the witnesses say from the witness stand and
21   what the -- what the documents, pictures and things that come
22   into evidence.  Those are the evidence.
23        Same thing on objections.  Somebody can stand up and
24   object.  Okay.  That's a free country.  They can do that, I
25   guess.  But it's not evidence.  And it happens all the time

1  that somebody is mistaken, even when they stand up and say:

2  Well, that's not true.  They can't do that because of X, Y, Z.

3  And they honestly believe that.  But it's still -- it may be

4  mistaken.  It doesn't matter.  You just can't -- you ignore it

5  for purposes of evidence, an objection that's made.

6       Same thing with an opening statement.  You're going to

7  hear these opening statements in a few minutes, and these are

8  very important to let you know where the -- each side thinks

9  they are headed in the case.  So I -- I applaud opening

10  statements.  It's very useful.  But you must not get confused.

11  Not one word of it is yet evidence.

12       All right.  And from time to time I will tell you to

13  disregard things.  It happens in every trial.  You have to

14  disregard it.  It's not evidence if I tell you to disregard it.

15       Anything that happens in the jury room or out in the

16  hallway or anywhere outside this courtroom is not evidence.

17  It's got to come down right here in the courtroom.

18       Now, I'm going to repeat again:  No going to the internet.

19  No reading news.  There are going to be newspaper stories about

20  this case.  There already has been.  You should not read any of

21  those.  You can read them after the case is over.  Do not read

22  any of those.  Don't let anyone tell you what's in those

23  stories.

24       Don't go on the internet and look up anything about this

25  case.  And don't you talk on the internet or on FacePage [sic]

1  or -- all those things I mentioned yesterday.  You cannot do

2  that.  It would be wrong to do that.

3      All right.  So you're the one who gets to decide which

4  evidence to believe, which evidence is the strongest and so

5  forth.  I think I've made that clear.

6      Now, this is a criminal case.  There are three basic

7  things about a criminal case I want you to keep in mind.

8      First, I said yesterday and I'm going to repeat again:

9  Mr. Brugnara is presumed innocent until proven guilty.  The

10 indictment is only an accusation.  It is nothing more.  It is

11 not any proof itself.  It's not proof.  The defendant,

12 therefore, starts out with a clean slate.

13     Next.  The burden of proof is on the Government until the

14 very end of the case.  The defendant has no burden to prove

15 that he's innocent.  He doesn't have any burden to even present

16 evidence.  You could have a case where the defendant says

17 nothing, the lawyers for the defendant say nothing.  They just

18 stand mute all the way through to the very end.  And -- and

19 still your burden would be to ask the question:  Has the

20 Government proven the case beyond a reasonable doubt?  So

21 burden is always on the Government.

22     And the burden of proof is proof beyond a reasonable

23 doubt.  Proof beyond a reasonable doubt.  Now, I'll tell you

24 what that standard means as we go along.  Maybe for sure at the

25 end of the case, but it -- this is not like a civil case where

1    it's 51 percent proof, preponderance of the evidence.  It's a

2    higher standard of proof than that.  All reasonable doubt must

3    be eliminated on each element of the offense by the Government

4    in order to convict.

5         Now, I've already read to you yesterday and summarized, at

6    least, the charges in the indictment, and I'm not going to

7    repeat that.  I'm sure the lawyers will get into that this

8    morning.

9         You must decide this case based on what happens here in

10   the courtroom and no independent research.  Once I had a case

11   where somebody, you know, literally involved a traffic thing

12   and they -- they -- one of the jurors drove out to the scene of

13   the accident, did their own little investigation.  Big problem.

14   Evidentiary hearings had to be held.  Case got delayed.  You

15   can't do that.

16        The great thing about a trial is you sit back, pay close

17   attention and see what happens by way of proof right here.

18   This is where it matters, right here in the courtroom.  You

19   don't go out and do your own investigation.  You can't --

20   please don't discuss the case with anybody, even among your

21   fellow jurors until it goes to you at the end.  Then it will be

22   your duty to deliberate.  It will be your duty then.  But

23   please don't do it until then.

24        All right.  You don't have to take notes.  It's up to you.

25   Some people prefer not to.  They learn better by just paying

1   closer attention.  Other people like to take notes.  It's up to

2   you.  It's an individual thing.  These are your own personal

3   notes.  They are not for the entire group or anyone else.  They

4   are just your own personal notes.

5        We -- you'll leave your notes in the jury room each day,

6   but I promise you, we don't go in there and look and see what

7   you're writing.  We don't do that.  We won't invade your

8   privacy there.  At the end of the case, we will shred all the

9   notes.  And, again, without looking at them.

10       All right.  So, again, I want to say one other thing that

11  applies in this case is that Mr. Brugnara is representing

12  himself.  He has the right under our Constitution to do that.

13  Just as you have a right to a lawyer if you want one, you have

14  a right to refuse a lawyer and to represent yourself.  It's an

15  important right in the Constitution.  And you may not in any

16  way hold it against Mr. Brugnara that he has exercised that

17  right.  So please remember that.

18       All right.  So now we're going to turn to the opening

19  statements.  Each side has 40 minutes to present an opening

20  statement.  Nothing that you hear or see is going to be

21  evidence yet.  This is the -- each side has the opportunity to

22  present what they -- how they think the evidence in the overall

23  case is going to come in.

24       This is not the opportunity for closing argument and

25  impassioned speeches.  Some of that will be heard at the end.

1  But this is the time for you to get a presentation of what each

2  side thinks the evidence is going to wind up being.  So each

3  side has been allowed 40 minutes to do that.

4      Okay.  So with that, I'm going to -- who will be making

5  the opening statement for the United States?

6          **MR. KINGSLEY:**  I will, your Honor.

7          **THE COURT:**  Mr. Kingsley, are you prepared to

8  proceed?

9          **MR. KINGSLEY:**  I am prepared, yes.

10         **THE COURT:**  All right.  The floor is yours.

11         **MR. KINGSLEY:**  Thank you, your Honor.

12                          **OPENING STATEMENT**

13         **MR. KINGSLEY:**  This case is a story about the

14  defendant, Luke Brugnara, who hoodwinked a New York art dealer

15  named Rose Long into sending him five crates of artwork.  Five

16  crates containing artwork of some of the famous artists that

17  you heard the names of yesterday:  Pablo Picasso, Joan Mirò,

18  Willem de Kooning, George Luks, and Edgar Degas.

19      The evidence will show that Luke Brugnara never intended

20  to pay for this artwork.  It will show that he never had the

21  financial ability to do so.  And it will show that he told

22  Ms. Long that he was going to put this artwork in a museum, a

23  museum he did not have.

24      Now, you will see the emails between the defendant and

25  Rose Long which show that the defendant agreed to pay millions

1  of dollars for this artwork.  The evidence will show that when

2  the artwork was delivered to him in his garage in

3  San Francisco, he refused to pay for it and instead made the

4  incredible claim that Ms. Long had intended to give the artwork

5  to him as a gift, a gift worth millions of dollars from

6  Ms. Long to a man that she hardly knew.

7      We will prove to you that after the defendant got the

8  artwork, he engaged in a series of stall tactics through his

9  attorney in order to lull Ms. Long into believing that he was

10  going to return the artwork.  He never did return the artwork,

11  and eventually Ms. Long figured out that he wasn't going to do

12  so.  And when she figured that out, she turned to the FBI.

13      The FBI executed a search warrant and searched the

14  defendant's garage and residence, thoroughly searched it.  And

15  only four, four of the five crates of art that were delivered

16  to his garage were recovered.  The fifth crate, containing a

17  Little Dancer sculpture by Edgar Degas that Ms. Long considered

18  to be the most valuable piece in the transaction, was never

19  recovered.

20      The evidence will prove that that sculpture vanished while

21  under the defendant's control in his garage, and it will show

22  that the defendant, indeed, stole that sculpture.

23      You will also hear about the lies the defendant told to

24  cover up his fraud and attempt to explain the unexplainable.

25  He claimed, for example, that only four crates were delivered

1   to his garage.  Four crates and a small cardboard box.  The

2   evidence will show that five crates of artwork were delivered

3   to his garage.  And, indeed, you'll hear from a man who pushed

4   five crates of wooden -- five wooden crates of artwork into the

5   defendant's garage in the defendant's presence and with his

6   help.

7        The defendant also falsely testified that someone at the

8   art auction house, Sotheby's, called him in the days before the

9   art was delivered to his garage.  According to the defendant,

10  that person told him that the artwork was fake, and that's what

11  caused him to not pay for it.  You will hear from the only

12  people at Sotheby's who could have made such a phone call,

13  according to the defendant's own description of the story, and

14  they will tell you that that phone call never happened.

15       But there's more.

16       This trial was originally scheduled to begin on

17  February 26, 2015.  Not today, but a couple of months ago.

18  Three weeks before trial on February 5th, the defendant escaped

19  from custody in this very federal building and was a fugitive

20  from justice for nearly a week before being apprehended by

21  federal agents.  That's what the evidence will show.

22       Now, I'd like to reintroduce myself and the members of the

23  prosecution team who are sitting with me here.  I'm Assistant

24  United States Attorney Ben Kingsley.  This is my colleague,

25  Assistant United States Attorney Robin Harris.  We have FBI

```
 1   Special Agents Jeremy Desor and Alex Kobzanets.  And then we
 2   have paralegal Mary Mallory.  And we're going to be presenting
 3   this case to you over the next week, two weeks, however long it
 4   takes.
 5        Now, this case breaks down into three parts.  And it will
 6   be helpful for you to keep that in mind as we go through the
 7   evidence.  And they're related, but they're distinct sets of
 8   facts.
 9        The first part is the defendant's fraud in obtaining and
10   keeping the artwork and making this Degas sculpture vanish.
11        The second part are the stories that the defendant wove in
12   court to try to cover up his fraud, including false
13   declarations made under oath to a Court.
14        And the third part is the escape from custody and the
15   flight from justice that followed.
16        Now, what I'd like to do is walk you through the evidence
17   that we expect to show for each of these parts.  And I'm going
18   to start with the fraud.
19        The story of the fraud begins approximately ten or --
20             THE COURT:  I have to -- I'm sorry.  I must
21   interrupt.  You're not doing anything wrong.
22        I just received a note from Mr. Brugnara --
23             MR. BRUGNARA:  I don't want to interrupt him, your
24   Honor.  He can keep going.
25             THE COURT:  No, no.  We're not going to -- you have
```

```
 1  to be present at all times.

 2              MR. BRUGNARA:  Okay.

 3              THE COURT:  So do you need to use the facility?

 4              MR. BRUGNARA:  I do.

 5              THE COURT:  You do?  All right.  The jury will step

 6  out of the -- go back to the jury room.

 7              THE CLERK:  All rise.

 8        (Jury exits courtroom at 8:07 a.m.)

 9              THE COURT:  The jury is absent.  Please close the

10  door.

11        In 16 years on the bench, not a single time has one side

12  interrupted an opening statement in order to use the restroom.

13  It says here, "Mr. James Stevens says it's an emergency."

14        I believe this is a dirty trick.

15              MR. BRUGNARA:  It's not a dirty trick.  You can ask

16  your Marshal right here.  I said I don't want to interrupt Mr.

17  Kingsley.  I said I just need to use the bathroom.

18              THE COURT:  The Marshals will escort the defendant to

19  use the bathroom.

20        Mr. Kingsley, you're going to get a brand-new 40 minutes.

21  And this -- I'm going to give you the benefit of the doubt,

22  Mr. Brugnara.

23              MR. BRUGNARA:  You can ask the Marshal --

24              THE COURT:  I don't care what you said to them.

25  Self-serving once again.  Please.  Please, go and use the men's
```

1  room, and we'll --

2          MR. BRUGNARA:  I just don't need to hear his opening

3  argument, your Honor.  It's not interesting enough.

4          THE COURT:  Please go use the men's room.  Everyone

5  can be seated.

6      (Whereupon there was a pause in the proceedings

7        from 8:09 a.m. until 8:11 a.m.)

8          THE COURT:  All right.  The defendant is back.  Let's

9  bring back the jury.

10     (Jury enters courtroom at 8:12 a.m.)

11         THE COURT:  All right.  Welcome back, and please be

12  seated.

13     All right.  Mr. Kingsley, you may continue.  Please make

14  sure you're using the microphone so everyone can hear, all

15  right?

16         MR. KINGSLEY:  Thank you, your Honor.

17     So before I was interrupted, I was telling you that this

18  case broke down into three parts:  Defendant's fraud in getting

19  this artwork, keeping it in his garage for a period of time,

20  and then making that Degas sculpture vanish.  That's the part,

21  the fraud part of the case.

22     The second part, the stories that the defendant told in

23  Court, false declarations under oath before the Court,

24  testimony that was false and we will prove to you is false.

25     And the third is the escape from custody.  He was in

1   custody, and he escaped and fled from this federal building on

2   the eve of trial.

3       So I'm going to go back to where I was before, and we're

4   going to start with the fraud story at the beginning.

5       Approximately ten years ago, the defendant purchased a

6   Renoir painting from Rose Long for $500,000.  The transaction

7   went well.  There were no problems with it.  The defendant made

8   full payment.

9       Now, as of the time of the Renoir sale, the defendant had

10  enough money to pay a half million dollars for a painting.  But

11  between that sale in 2014, things had gone downhill for him

12  financially.  And as of April 2014, he was in a desperate

13  financial situation.

14      Now, you don't have to take our word for it.  I'm going to

15  show you now a piece of evidence that we expect to be in the

16  case that's going to prove that the defendant didn't have any

17  money at the time.

18      (Document displayed.)

19          **THE COURT:**  Does that show up in the jury box?

20      (Jury panel nodding affirmatively.)

21          **THE COURT:**  All right.

22          **MR. KINGSLEY:**  So this is financial statement of Luke

23  Brugnara received by the United States Probation Office of the

24  Northern District California.  You see his name on it here

25  (indicating).  224 Sea Cliff Avenue, that's his house.  This is

1  the first page.

2        I'm going to flip to the second page now.

3        Salary wages or commission.  Your gross salary before

4  deductions, zero.  Take home pay, zero.  Commission, if any,

5  zero.

6        And a few pages later under "Assets," he writes none for

7  "Non-wage income you or your spouse received."  He lists one

8  asset, real property, 224 Sea Cliff Avenue.  That's his house.

9  He says it's owned by his wife in the form of a corporation,

10  and he says that it's $3 million underwater at the time he

11  submits this form.

12        Now, I'm going to flip to the end and show you:

13             "With knowledge of the penalties for false

14        statements provided by 18 United States Code

15        Section 1001 and with knowledge that this financial

16        statement is submitted to me to effect action by the

17        United States Department of Justice, I certify that

18        this financial statement is true and that it is a

19        complete statement of all of my income and real and

20        personal assets, whether held in my name or by any

21        other person or entity."

22        And he signs it, "Luke Brugnara, April 7, 2014."

23        That date is important.  April 7, 2014, is the day that

24  the defendant got the artwork in question.

25        So into that desperate financial situation an opportunity

 1   falls into his lap.  And it comes through Rose Long, the person

 2   that he bought the Renoir painting from about ten years

 3   earlier.

 4        Over a series of emails, Ms. Long offered, and the

 5   defendant agreed to buy, artwork by the various artists that we

 6   mentioned.  There were paintings by Willem de Kooning, 16

 7   paintings; a drawing by Joan Mirò; etchings by Pablo Picasso; a

 8   painting by George Luks; and a Degas Little Dancer sculpture in

 9   bronze.  And that's the sculpture that I said was missing.

10        Now, Rose Long doesn't know about the defendant's

11   financial situation.  She just knows him as the guy who paid

12   half a million dollars for a painting ten years ago.  And so

13   she offers this artwork to him, and they engage in a series of

14   emails about it in which he agrees to pay for the artwork.

15        I'm going to talk about that in a second, but I want to

16   give you a preview about some background that we're going to

17   give you on this artwork.

18        Ms. Long sold this artwork to Mr. Brugnara, but a friend

19   of hers, another art dealer in New York named Walter Maibaum,

20   owned or controlled much of it.

21        Mr. Maibaum will tell you how it was valuable to him and

22   to Ms. Long and how he set prices for it.  Mr. Maibaum had the

23   de Kooning and the Mirò on consignment for other clients.  That

24   means he was selling them on behalf of other clients, and he

25   negotiated terms with them on the prices that he was going to

1    charge.   He previously owned the Mirò outright as well himself.

2        Ms. Long owned the Luks painting, which she bought from

3    Mr. Maibaum before.

4        And Mr. Maibaum owned the Picasso etchings and the Little

5    Dancer sculpture himself.

6        So he'll tell you about this artwork, where he got it, why

7    he thinks -- why he thought it was valuable.   And you'll hear

8    specifically about the Little Dancer sculpture, the one that

9    the evidence will show vanished from the defendant's garage.

10   You'll hear how it was cast with other identical sculptures in

11   bronze in the 1990's in a foundry in France.   And you'll hear

12   how the people under French law have the right to designate

13   which works by Degas should be considered authentic by

14   designating this sculpture to be authentic.

15       You'll hear how Mr. Maibaum organized exhibitions for

16   these sculptures in museums around the world, including one at

17   the Hermitage Museum in St. Petersburg, Russia.   And that's an

18   important point that I ask you to keep in mind, because I'm

19   going to come back to it shortly.

20       You'll also hear that there's a debate in the art world

21   about the histories of these sculptures, whether these

22   particular bronzes should be considered authentic.   But the

23   evidence will show that the defendant was well aware of this

24   debate.   He knew exactly what he was getting when he lied to

25   get this artwork and when he lied to buy time to make that

 1   Degas sculpture vanish.  So that's the artwork.

 2       And now I'll come back to the transaction and the

 3   defendant's con in getting this artwork.  You will hear from

 4   Rose Long about this transaction.

 5       But their course of conduct and the defendant's fraud in

 6   getting the artwork is established entirely by emails between

 7   the two of them.  So we'd ask you to focus on these emails as

 8   Ms. Long testifies.  You won't have to rely on her testimony to

 9   establish his lies, because he wrote them down and sent them in

10   emails to her.  And I'd like to give you a preview of a few of

11   those emails now.  There will be more of them, but these emails

12   will really establish in your minds what you should expect to

13   see from the course of dealings in these emails.

14       So Rose Long sent an email to the defendant quoting prices

15   for the various pieces of artwork.  And the defendant wrote

16   back from sftycoon1@aol.com.  And the evidence will show that

17   that's the defendant's email address -- to

18   roserameylong@gmail.com, and the evidence will show that that's

19   Rose Long's email address.  This is on Sunday, March 23rd.

20           "Rose, I will buy all of the paintings and put

21           them in my museum.  I will need a discounted price.

22           You will need to send the paintings to me at 224 Sea

23           Cliff Avenue, San Francisco, so I can inspect them."

24       224 Sea Cliff Avenue is the defendant's residence, which

25   you saw on that prior form.  He didn't tell Rose Long this at

1   the time of the transaction.  She figured it out eventually.

2   But that's an important part of the defendant's fraud.

3          **THE COURT:**  May I interrupt just -- excuse me -- to

4   say the Court has given permission to preview these exhibits,

5   but they are not yet in evidence.  You're just getting a

6   preview of what the Government expects that it can get into

7   evidence, but it's not in evidence yet.  And if it for some

8   reason it turns out that some of these emails don't make it

9   into evidence, then you have to disregard it later.

10         So it's not evidence yet.  That's a word of caution to

11  you.  This is just a preview.  The same thing is going to apply

12  when Mr. Brugnara has his turn.

13         Please go ahead.

14         **MR. KINGSLEY:**  Thank you, your Honor.

15         I just want to call attention to one more thing.  In this

16  email Mr. Brugnara says, "I will buy all of the paintings".

17  Paintings" is important.

18         Ms. Long writes back and asks whether that includes the

19  etchings and the Picasso bronze, because not everything in this

20  transaction is a painting.

21         And Mr. Brugnara responds -- and this is another email

22  that we expect will be in evidence in this case:

23             "Rose, I need all the art pieces, including the

24         etchings and the bronzes.  I need you to send

25         everything to me.  Luke."

1      The emails go back and forth.  And Ms. Long suggests him

2  making a deposit or some sort of down payment on the artwork.

3  But Mr. Brugnara doesn't want to do that.  He doesn't have any

4  money, and he can't afford to do that.  And we're going to

5  prove that to you.  So he writes back this email.

6      (Document displayed)

7          "Rose, I'm not going to pay for any shipping

8          costs or deposits.  You will need to incur those

9          costs as I have never paid for such costs.  I have

10          been a trusted client for over a decade.  Luke."

11      Their emails continue, and it seems like they've reached

12  some sort of agreement.

13      (Document displayed.)

14       Mr. Brugnara writes back, Tuesday, March 25:

15          "Thank you.  I look forward to putting them in my

16          museum."

17      The government intends to show that many of the points in

18  those emails were lies.  Most importantly, we will prove that

19  the defendant had no money, as that financial statement I

20  previewed for you shows, and had no intention of paying for the

21  artwork.  He also had no museum.

22      So with an arrangement in place, the artwork was packed in

23  New York City where it was being stored, and it was shipped to

24  San Francisco and delivered to the defendant's house in

25  San Francisco.  And you will hear from the people who packed

 1   it, shipped it, and delivered it.

 2        You're going to hear from somebody named Warner Trejos.

 3   This is a guy at the specialized art facility in New York,

 4   specialized storage facility for art in New York, who packed

 5   the artwork.  You will hear about the care that he and his

 6   staff took in packing the artwork.  This is a professional art

 7   storage facility, and Mr. Trejos has been doing this for years.

 8   You'll hear how he packed five crates, five wooden crates of

 9   artwork, and released them for shipment.  And you'll see a

10   picture.

11        And, again, this is another document that I expect will be

12   admitted into evidence, and Mr. Trejos will testify about it.

13        (Photograph displayed.)

14        This is a picture Mr. Trejos took of the Little Dancer

15   bronze in a wooden crate after he put it in the crate and right

16   before he sealed the crate and put it back into Mr. Maibaum's

17   storage unit just before he shipped to San Francisco.  This is

18   the Little Dancer sculpture that's missing and the crate that

19   was missing, the crate the defendant claimed he never got.

20        You will also hear from the people who shipped five crates

21   of artwork to San Francisco.  And then you'll hear from Eddy

22   Castillo.  He's the guy who delivered the artwork to

23   defendant's house.  Five crates to the defendant on April 7,

24   2014.

25        Now, Mr. Castillo is also a professional.  He's been doing

```
 1  this for years.  He'll tell you that he's certain that he had
 2  five crates of art.  He picked up five crates from
 3  San Francisco International Airport, and that he's certain that
 4  he delivered five crates to the defendant's house in Sea Cliff.
 5  He'll tell you how the defendant actually helped him push the
 6  five crates into the defendant's garage.  The defendant saw
 7  them with his very own eyes.  He never protested.  He never
 8  complained.  Never objected.  He accepted them all.
 9       So with the art in hand, the evidence will show that
10  Mr. Brugnara had Ms. Long and Mr. Maibaum exactly where he
11  wanted them.  The first part of this fraud, lying to get the
12  artwork, was complete.  And the second part, lying to keep the
13  artwork, began.
14       Rose Long traveled to San Francisco to be there when the
15  artwork arrived and the defendant, the unemployed man with no
16  assets, told her he was so busy that he had no time to inspect
17  the artwork.  He actually shooed her away.  And over of the
18  next few days as Rose Long desperately tried to get in touch
19  with the defendant, get him to inspect the artwork and pay for
20  it, he blew her off.  He wouldn't do it.
21       He never paid for of the art.  Never paid a single penny
22  for it before or after it got to his garage.  He never returned
23  it, and never allowed Ms. Long to inspect it with him.
24       Now, as part of his stalling, the defendant came up with
25  this story that Ms. Long gave the artwork to him as a gift.
```

```
 1   That a mere stranger, who the defendant actually never met in

 2   person until the day the artwork was delivered to his garage,

 3   had paid thousands of dollars to ship this artwork to the

 4   defendant.

 5       We will show you the text message where the defendant

 6   makes this claim to Rose Long.  You will see that text message,

 7   and we will prove to you that the text message, this gift

 8   story, was a lie.

 9       With the artwork sitting in the defendant's garage and him

10   not paying for it, Rose Long and Walter Maibaum seek legal

11   counsel.  And you'll hear from the lawyer they bring in,

12   somebody named Harvey Schochet.  He's brought in to help

13   resolve the transaction.  And the defendant has a lawyer,

14   somebody named Bob Kane, as well.

15       The lawyers go back and forth for over a week.  And this

16   is part of the defendant's fraud.  You will hear from

17   Mr. Schochet.  He'll tell you how the defendant's lawyer first

18   implied that the defendant would return the crates of art if he

19   got something in return.  Mr. Schochet believed that this was a

20   ransom.

21       When that went nowhere, the lawyers negotiated over the

22   terms in which the defendant would return the artwork, and the

23   paperwork that would need to be signed before that happened.

24   And during this whole time, the defendant never paid anything,

25   and the artwork was still sitting in his garage.
```

1    After well over a week of the defendant stalling through

2  his lawyer, for the first time, he makes the claim that only

3  four wooden crates of art were delivered to his garage.  Four

4  wooden crates and one small cardboard box.

5    That was a lie.  And that's the point at which these

6  negotiations break down, because Mr. Schochet, Mr. Maibaum, and

7  Ms. Long have the paperwork.  They know that five crates were

8  delivered to his garage.  All of the paperwork says five

9  crates.  And all the shippers who you're going to hear from,

10  including Eddy Castillo, the guy who pushed the crates into the

11  garage, says that there were five crates.

12    But there were other lies as well during this time.  And I

13  mentioned the Hermitage Museum.  And now we'll talk about it a

14  little bit more.

15    You'll hear about and see a book, a book of particular

16  importance in this transaction.  Rose Long will tell you, when

17  the art was delivered, she gave the defendant a book from an

18  exposition of the Degas sculptures at the Hermitage Museum.

19  This book is all about these particular -- this particular

20  edition of the Degas sculptures, including the Little Dancer

21  that was at issue in this transaction.  And you'll hear about

22  why this book is significant.

23    It's the Little Dancer that was in the missing fifth crate

24  that the defendant claimed he never received.  And you'll hear

25  evidence from a Russian woman with whom the defendant was

1    having a relationship and to whom he gave this very book.

2         Despite clearly having received the book and having given

3    it to his girlfriend, the defendant, through his attorney,

4    denied ever having received it.  And I'm going to show you an

5    email that we expect will come into evidence making that claim.

6         (Document displayed)

7         This email is dated April 15, 2014, eight days after the

8    artwork was delivered.  Robert Kane, rkane1089@aol, was the

9    defendant's attorney.  Harvey Schochet and Allison Davis are

10   attorneys for Mr. Maibaum and Ms. Long.

11            "Dear Harvey and Allison:  Mr. Brugnara was not

12         given a Hermitage book or any authentication

13         reference."

14        And then it goes on to discuss the paperwork that they

15   were negotiating with at that time.

16        So you will see that actual book and hear video testimony

17   from the Russian girlfriend establishing that he received the

18   book and that that email sent by the defendant's attorney was a

19   lie.

20        So at the point -- the point at which the defendant's

21   attorney claims that there were four crates of artwork,

22   Mr. Maibaum, Ms. Long, and Mr. Schochet decide that this is a

23   fraud.  They're done negotiating with him, and they decide to

24   report this to the FBI.

25        So near the end of May 2014, the FBI gets a search warrant

1  and thoroughly searches the defendant's house and garage in

2  Sea Cliff.  When they go in, they find four of the five crates

3  sitting in his garage, having been there for over six weeks

4  without the defendant returning them or paying for them.

5      Now, you will see those four crates that they recovered.

6  The four crates all have labels on them that indicate that they

7  are a part of a set of five, so they will say two out of five

8  or three out of five, making it obvious to anyone who looked at

9  them, including the defendant who had them in his garage for

10 weeks, that there were five crates.

11     The FBI searched the defendant's garage and his whole

12 house, and there was no fifth crate, nor was there a Degas

13 sculpture.

14     So during the six weeks that the defendant had these

15 crates under his control in his garage, the crate with the most

16 valuable piece of art in the transaction had vanished.  The

17 evidence, including the defendant's lies on the subject of the

18 number of crates, will show that the defendant stole the

19 sculpture that was in the fifth crate.

20     So that's the first part of the case.  It's the biggest

21 part of the case, it's the fraud.  But with the fraud complete,

22 the defendant did not stop lying.  And we will be presenting

23 you with some of the lies that he told to justify his fraud,

24 the stories that he made up.

25     He's charged with one set of those false statements in the

```
 1   indictment.  And the evidence will show that during a hearing

 2   in this very courtroom the defendant testified under oath to a

 3   false explanation for why he didn't pay for the artwork.  And

 4   I'm going to show you a snippet of that right now.

 5       (Document displayed)

 6       And the Court read this to you yesterday.  I want to

 7   highlight it again, because -- or part of it yesterday, because

 8   part of it is from the indictment.  So the answer parts of this

 9   are the defendant.

10          "QUESTION:  Okay.  So after you wrote Ms. Long

11       this email, the discussion sort of transitioned into

12       when she was going to ship the art pieces to Sea Cliff;

13       is that correct?"

14       The defendant:

15          "ANSWER:  No.

16          "QUESTION:  Okay.

17          "ANSWER:  I took the emails that I got from her,

18       and I sent them to the head of Sotheby's in New York,

19       who's also the head of Bond Street in London, and I

20       asked, what's the value or -- I don't have the specific

21       email in front of me, but the essence of it was:  How

22       much would you sell these for and what are they worth?

23       Just a simple valuation inquiry.  And I heard back that

24       the de Koonings are not authentic and they would not

25       sell them as de Koonings.  And the Degas, they would
```

1    not sell the Degas because it's not authentic.  It was

2    cast 10, 12 years ago, 14 years ago.  Whenever it was

3    cast, it was cast recently.  However, they do sell the

4    original Degases.  So when I had that information, I

5    phoned Rose Long and I told Rose Long that, you know,

6    these de Koonings are not authentic.

7         **"QUESTION:**  Was that before she made arrangements

8    for those to be shipped to Sea Cliff?

9         **"ANSWER:**  That was before."

10   The evidence will show that the defendant did send such an

11   email to somebody at Sotheby's.  That email was dated April 3,

12   2014, four days before the artwork was delivered.  We will

13   prove that nobody in Sotheby's responded to it.  Nobody called

14   him back or emailed him.  And how will we prove that?  You will

15   hear that Tobias Meyer, the person to whom the defendant sent

16   that email, who used to be in charge of the Contemporary Art

17   Department at Sotheby's, had left Sotheby's months earlier,

18   months before the email was sent in April of 2014.

19        Two people were given access to his email account.  And

20   you will hear from them, and they will say they never saw that

21   email, nor did they respond to it.  They didn't call him back.

22   They didn't write an email back to him.

23        At no time during the period when the defendant had the

24   artwork did he hear back from somebody at Sotheby's telling him

25   that this artwork wasn't real; nor did he phone Rose Long and

1   tell her that information, as he said at the end of that

2   testimony.

3       Now, you will hear the other lies that he told as well

4   after the artwork was recovered and the defendant began this

5   case.  These are not charged, but they're part of the case.

6       I've told you that we're going to prove that the defendant

7   did not have a museum.  And one way that we know that is

8   because the defendant testified about this museum.  He

9   testified that although he did not have one, he was building a

10  museum.  And he gave the name of the person with whom he was

11  building that museum, someone named Nick Barbato, a commercial

12  real estate mortgage broker in New York.  You'll hear from

13  Mr. Barbato, and he'll say that he was not financing a project

14  with Mr. Brugnara to build a museum.

15      The evidence will show that these lies and other lies were

16  part of the defendant's con game.  He conned the -- Mr. Maibaum

17  and Ms. Long to get the artwork, and now he was just making up

18  stories to try to get himself out of the situation he put

19  himself in.

20      Finally, we come to the third part of the case, the

21  escape.  The evidence will show that the defendant made a

22  last-ditch attempt to avoid being held accountable for his

23  prior lies.  He escaped from custody and fled from justice from

24  this very building that we're in today.

25      And I need to step back and explain to you what we're

1    going to show about that so you have some understanding of the

2    context.

3         As of February 2015, the defendant was ordered detained

4    without bail.  That meant he was in the custody of the United

5    States Marshal Service pending trial.  The Court granted a

6    limited furlough to him.  At the time the defendant was

7    represented by a lawyer, and the furlough allowed the defendant

8    to be released from the Marshal's custody to the custody of his

9    attorney for several hours at a time to prepare for trial in

10   this case, the trial that was coming up.

11        At the end of each session, he was ordered to return to

12   the Marshal's custody.  The furlough order is very specific.

13   You'll see that order and the conditions that were imposed upon

14   him.  He had to stay with his attorney on the 18th floor of

15   this building.  That's where the Attorneys' Lounge is, and

16   that's where they were supposed to meet.  And he had to go back

17   to the Marshal's custody on the 20th floor when he was done.

18   And that's where the Marshals released him to his attorney and

19   where he was supposed to come back.

20        We will show you that on February 5, 2015, the defendant

21   was three weeks away from trial in this case and was furloughed

22   that day to the custody of his attorney in the morning.  That

23   afternoon as his attorney was bringing him back to the Marshals

24   to go back to jail, they were on the 18th floor where they had

25   been meeting.  They walked to the elevators on the 18th floor.

1  The defendant walking ahead of his attorney, pressed one of the

2  elevators to go down.  They're supposed to be going upstairs to

3  the Marshals.  He presses the "Down" button.  The elevator

4  comes.  The defendant gets in, and after what appears to be a

5  brief discussion with his attorney, he goes down in the

6  elevator without his attorney.  Walks right out of the federal

7  building and took off on a sprint through the city of

8  San Francisco.

9      We're going to be able to show you videotapes from cameras

10 in and around this federal building showing the defendant's

11 movements as he took off on this flight from custody three

12 weeks before his trial was supposed to begin.  We're going to

13 show you videos of his sprint through San Francisco.

14     I want to show you a still photograph from one of those

15 videos now.  I expect the video will come into evidence later,

16 but I just wanted to give you a preview of that evidence.

17     (Photograph displayed.)

18     This video, the video from which this photo was derived,

19 was taken on the afternoon of February 5, 2015, on Willow

20 Street, a few blocks north of this courthouse.  And the image

21 appears to be of the defendant running through the Tenderloin

22 neighborhood of San Francisco after he walked out of the

23 federal building.

24     So the defendant made it all the way down to Los Gatos as

25 part of his escape before he was found six days later.  And

1  he's charged with escape and contempt of court in connection

2  with this.  And we're going to prove to you that that's exactly

3  what happened.

4      So three parts of the case:  Fraud, lies after the fraud,

5  and escape.

6      You may be wondering why this case is in Federal Court.

7  You may not be.  But I'm going to explain that now, and you're

8  going to hear evidence about that as well.

9      You'll hear that the emails that were sent by the

10  defendant and by his attorney traveled on interstate wires.

11  They all involved America Online, or AOL, with servers in

12  Virginia.  So they traveled from here to there and back again.

13  Those emails are the first four counts of the indictment of

14  wire fraud.

15      You'll hear that the artwork was shipped interstate from

16  New York to San Francisco by American Airlines, and that

17  shipment is Count Five of the indictment.  That's why the case

18  initially was in Federal Court.

19      So that's the -- that's the story that we expect to tell

20  you over the next week or so.

21      Now, a little while ago, I told you what this case is

22  about.  And now that you have some background, I want to tell

23  you what it's not about.  I've mentioned that the artwork that

24  the defendant said he was going to buy was created by famous

25  artists.  You may have heard of some of these artists, and you

1   may not have.  You'll hear testimony about that artwork, and

2   you will see some of it.

3       It's exciting, and it's more exciting than the defendant's

4   fraud involved getting some items that were not as interesting

5   as artwork, something substantially more mundane.

6       But as you hear the evidence, I would ask you not to be

7   distracted by the artwork itself.  The Government is not going

8   to prove that the artwork was worth millions of dollars.

9   Mr. Maibaum and Ms. Long will tell you that they believed it

10  was.

11      The evidence will show that the defendant made them think

12  he was going to pay millions of dollars for it.  But the

13  Government will not prove that the paintings were painted by

14  de Kooning, the sculpture was made from a wax or a plaster made

15  by Degas.  Those artists are dead and they're not going to be

16  testifying here.

17      This case is not about the artwork itself or about the

18  value of that artwork.  It's about what the defendant did and

19  the lies that he told.  The lies that he told to get the

20  artwork.  The lies that he told to keep the artwork.  The lies

21  regarding what happened with that fifth crate.  The lies he

22  told in court to cover his tracks.  And the escape he undertook

23  on the eve of trial.

24      So for that reason, I would ask you, as you hear the

25  evidence, to focus on those things that defendant did, the

```
1   things he said, the things he wrote in the email and his

2   escape.  And at the end of the case, we'll ask you to return

3   the only verdict supported by the evidence, and that's guilty

4   on all nine counts in the indictment.

5        Thank you.

6            THE COURT:  All right.  Mr. Brugnara, where would you

7   like to stand while you give your opening statement?

8            MR. BRUGNARA:  I want to stand in this general area

9   here (indicating).

10           THE COURT:  All right.  Keep your voice up so we can

11  all hear you and the court reporter can hear you.

12       Are you ready to proceed now?

13           MR. BRUGNARA:  I am, your Honor.

14           THE COURT:  You may proceed.

15                       OPENING STATEMENT

16           MR. BRUGNARA:  Ladies and gentlemen of the jury,

17  first I want to tell you -- first and foremost, I want to tell

18  you before we get into this, I really appreciate all of you

19  coming here today and committing your life for the next few

20  weeks.  I know how important every minute of every day is.  And

21  the commitment to drive here, you're coming over the bridge,

22  and it's a huge sacrifice.

23       And what you heard is not true, and I'm going to show you

24  evidence.  Trust me.  You're going to make sense of it real

25  quick.  We very carefully picked out all the jurors that are
```

```
 1  sitting here, because I personally believe in all of you, and I
 2  personally made sure all of you were sitting here, each and
 3  every one of you.  But I want to let you know, first and
 4  foremost -- and I don't want to underscore this -- I will
 5  appreciate this for the rest of my life you making this
 6  commitment and sacrifice, because I know you all have very
 7  important lives and commitments to children, grandchildren.
 8       And, but I want to get into -- start a little bit about
 9  myself.  I want to talk about why I'm going pro se.  I'll touch
10  on it real quick.  He mentioned it.  We had a top attorney
11  ready to go to trial in this case a few weeks ago.  And,
12  unfortunately, he's called as a witness in the superseding
13  charge of the abscond and escape, so he can't represent me.  So
14  I was put in a position where I either had to wait --
15            MR. KINGSLEY:  Objection, your Honor.
16            MR. BRUGNARA:  -- four to six months to have a trial
17  date or proceed pro se, so I chose to proceed pro se out of
18  necessity.
19       Also, I have a background -- I went to law school, and
20  I've been in civil courts for 22 years.  So I think, if you're
21  patient with me, I'll be able to perform my duties as per the
22  Court's instruction.
23       So I want to begin, first, with a little bit about myself.
24  You all had to share with us about your short bio.  And I'll
25  give you a short bio about myself so you can understand who I
```

1  am and where I got to where I'm at today.  And, quite frankly,

2  you know, I'm proud, most of all, of my family, my wife, my

3  daughter are there.  My daughter is in the maroon.  And my wife

4  came here.  I have four children.

5      I grew up in the Sunset District of San Francisco.  I'm a

6  fourth generation San Franciscan.  My family's ties are deep

7  here.  My uncle was chief of police for nine years.  My dad

8  worked at Juvenile Hall for 35 years with juveniles, counseling

9  them.  My mom taught fifth grade in the Sunset District.

10         **MR. KINGSLEY:**  Objection, relevance, your Honor.

11         **MR. BRUGNARA:**  This will all be proved by evidence,

12 ladies and gentlemen.  We'll have witnesses who will affirm who

13 I am, and --

14         **MR. KINGSLEY:**  Defendant's mom has nothing to do with

15 this.

16         **THE COURT:**  Wait, wait.  Mr. Kingsley.

17         **MR. BRUGNARA:**  So -- but fast forwarding, you know,

18 everyone's bio is important.  It makes up who they are.

19      And what you'll learn from my bio is my family instilled

20 in me strong values; whereas, contracts and all these things

21 are relevant in the business world.  And you're going to learn

22 I've done more business than anybody.  The evidence will prove

23 it -- by the way, everything that I tell you in this opening

24 argument, opening statement, whatever you want to call it, is

25 going to be proved up by my witnesses and by their witnesses.

```
 1  And I have been doing this for 22 years in civil court.  Okay.
 2  So I know what I'm doing.
 3      But the thing is this:  The foundation of who I am is my
 4  word.  It means everything to me.  And that's what my parents
 5  instilled in me.  I don't need a contract.  If I tell you I'm
 6  going to do something --
 7          THE COURT:  Mr. Brugnara, you're giving a closing
 8  argument.  This is supposed to be an opening statement, so
 9  you've got to stick to the evidence.
10          MR. BRUGNARA:  I understand, your Honor.  That is
11  part of the evidence.  So I --
12          THE COURT:  I question that.  Please stick to the
13  evidence that's going to be presented.
14          MR. BRUGNARA:  Okay.  So this is -- let's get -- so
15  the fact of the matter is, so what happened was, I grew up,
16  basically, in a middle class upbringing.  I went to school at
17  San Diego State.  Got degrees at San Francisco Law School.
18  After that, I graduated.  I started doing private mortgage
19  banking.  You're going to learn this from the witnesses who
20  will testify.  Whereas, it was in the early part of the 1990s
21  and the savings and loan crisis had just -- had happened.  And
22  the commercial real estate market, which is basically office
23  buildings, shopping centers, whatnot, took a big dive because
24  all the possible lenders for commercial real estate, pretty
25  much was winnowed down in half.  Because now you just have
```

1   banks to go to.  The savings and loans, most of them were

2   closed down by the federal government, because they weren't

3   regulated.  So it created huge opportunities to make money.

4        I was able to borrow money from the private investors that

5   were invested in these trusts for the mortgage banking firm

6   that I was working at.  And they lent me the money to begin

7   buying these office buildings.  So I was basically -- started

8   buying office buildings in 1993 in downtown San Francisco and

9   leveraged them with these loans.

10       But the market, to my good fortune, went up 400 percent

11  between 1993 and 2001.  And I had no partners.  I ended up

12  buying significant office buildings.  And this isn't ancient

13  history.  You're going to understand and hear that I'm doing

14  much bigger deals today, right now.  I'm not what they claim I

15  am.  I understand why -- and I'm glad we have an attorney here

16  that understands the law.

17       You don't structure them as individually owned.  You

18  structure them in -- as you know, limited liability companies,

19  corporate entities, a trust, things of that nature, to protect

20  the lenders, you know, in case I get hit by a bus or I have a

21  heart attack.  But these particular entities have hundreds of

22  millions of dollars of assets and credit.

23       So they're trying to deceive you.  It may just be

24  ignorance of the understanding of finance, because it's a very

25  complicated industry.  In fact, major law firms have just

```
1  separate divisions that handle trusts and corporate entities,
2  limited liability companies.  And you'll have -- defense
3  litigators won't know anything about it.  But --
4          MR. KINGSLEY:  Objection --
5          MR. BRUGNARA:  -- proceeding --
6          THE COURT:  What is the objection?
7          MR. BRUGNARA:  -- this is the foundation --
8          MR. KINGSLEY:  Stating facts that are not going to be
9  in evidence.
10          MR. BRUGNARA:  This will be in evidence.  So, your
11  Honor --
12          MR. KINGSLEY:  And relevance.
13          MR. BRUGNARA:  You can see, this is -- this is what
14  happens when -- I just had to go to the bathroom.  We are
15  probably going to do this for the next 40 minutes, and you're
16  going to be shocked by the story I tell you.  The true story is
17  actually a thousand times more shocking than his fictional
18  story he told you, because the fact of the matter is I borrowed
19  more, more than anybody on the west coast.  I borrowed over a
20  billion dollars, a billion three.  And anybody knows how hard
21  it is to get a $10,000 credit card, yet alone hundreds and
22  hundreds of millions of dollars when you didn't inherit the
23  pedigree banking connections.  You know, I've done it all on my
24  own because I honored my commitments for the last 22 years.
25          And what I mean by that is when someone gives you a loan
```

1   and it's memorialized in paper because you can torture them in

2   a reorganization for years and they lose their job.  I have

3   honored all my obligations to every lender.  I've paid back

4   every single penny on $1.3 billion.  The properties I've owned

5   in downtown San Francisco are significant, and you'll probably

6   know many of them:  939 Market Street at 5th and Market,

7   735 Market Street -- this is just --

8           **MR. KINGSLEY:**  Objection --

9           **MR. BRUGNARA:**  -- from my lenders --

10      (Unreportable cross talk.)

11          **THE COURT:**  I'm sorry.  What?

12          **MR. KINGSLEY:**  He's vouching for himself repeatedly.

13          **MR. BRUGNARA:**  No.  The evidence will prove this,

14  your Honor.

15      735 Market --

16          **THE COURT:**  His creditworthiness, you put it in issue

17  and he is entitled to respond on his creditworthiness, even

18  though it goes back to the 1990's.  You, yourself, mentioned

19  the art deal with Ms. Long back then.  So this is -- this is

20  okay.

21      Go ahead, Mr. Brugnara.

22          **MR. BRUGNARA:**  Well, it does go back to the 1990's,

23  and -- and I'm quite proud of that record.  And it also goes

24  all the way through 2015.  Actually 2014, before they threw me

25  and locked me in the dungeon in Oakland with murderers, which

1  will probably want to make you get sick by the time you hear

2  the end of my story.

3      But, so the short of it is that, yes, 735 Market Street,

4  where the Four Seasons Hotel is, I sold that to the Millennium

5  Partners.  814 Mission Street at the corner of 4th and Mission

6  to City College.  171 2nd Street, the Chevron building.

7  225 Bush.  351 California Street on the corner of California

8  and Sansome Street.  This is 100 percent ownership.  No -- no

9  partners, okay.

10      201 Sansome Street, Fred Furke building.  They have the

11  lion and unicorn there on the corner of Sansome and -- and --

12  and Pine Street.  140 Sansome Street, right down -- halfway

13  down the block.  The list goes on.

14      450 Pacific Avenue.  490 Post Street.  You know, a

15  20-story medical and dental building right there on Union

16  Square.  New apartments.  I owned all of them.  And I honored

17  all my obligations, sold these properties, paid back my

18  lenders, invested in art.

19      I've bought close to $100 million worth of art.  I know

20  more about art than anybody you're going to hear from in this

21  entire proceedings, and I'm one of the few preferred clients of

22  Sotheby's and Christie's in the world, as I've spent so much

23  money in there.

24      But the fact of the matter is all the art in this case is

25  completely fake.  It's stuff -- crap -- you reject off eBay.

1   You know what I mean?  This -- that -- and you're going to hear

2   that the two thieves that tried to defraud me are actually

3   suing themselves right now in Federal District Court in New

4   York, affirming everything that I'm going to tell you; that the

5   art is worth nothing; that it's fake; that one guy, Maibaum,

6   sold -- sold her the fake art and then she tried to dump it off

7   on me.

8       And thank God we got this -- we literally just got these

9   documents four days ago, and the U.S. Government has had

10  them -- access to them, at least through Pacer, for the last

11  four months.  So what they do is they lock you in a dungeon and

12  don't give you access to any communication.

13      And I'll tell you, you guys should be really concerned,

14  because if it can happen to me -- I borrowed a billion three,

15  but I have done $2 billion in transactions.  And it's going to

16  be confirmed -- I'm not trying to grandstand this because,

17  listen, at the end of the day my wife drives a 2000 Suburban.

18  I was driving a 15-year-old Cherokee.  You know, we go to

19  Disneyland.  The way I get my pleasure is walking in the park

20  and looking at some birds or some trees, maybe going to the

21  museum.  You know, we don't --

22          **THE COURT:**  This is not an opening statement.

23          **MR. BRUGNARA:**  -- live lavishly.

24          **THE COURT:**  Let's stick to the facts.

25          **MR. BRUGNARA:**  The fact of the matter of what this

```
 1   case is about, it's about who you're -- what the truth is.  And
 2   the truth is that these individuals are already fighting with
 3   each other over the art in this case.
 4        So what happened in this case, let's just go to the
 5   beginning.  This case what it's really about is cronyism.  It's
 6   about two fraudsters that were trying to defraud me.  And when
 7   their fraud backfired on them, they went and hired a crony of
 8   this little group here (indicating).  And what I mean by
 9   "crony" is somebody that worked in their office for 20 years.
10   20 years, okay?
11             MR. KINGSLEY:  Objection, your Honor.  That's --
12             MR. BRUGNARA:  And that will be proven --
13             MR. KINGSLEY:  -- neither irrelevant --
14             MR. BRUGNARA:  -- that will be proven by the
15   evidence --
16             MR. KINGSLEY:  -- nor --
17             MR. BRUGNARA:  -- and what also will be proven by the
18   evidence is 80 --
19             MR. KINGSLEY:  It is also a direct attack on the
20   prosecutors.
21             MR. BRUGNARA:  -- 82 -- 82 emails from my attorney,
22   who lives in Berkeley, who is a professor at U.C. Hastings.  He
23   has been my civil attorney 23 years, also a judge pro tem for
24   the Superior Court of California and a designated mediator for
25   the last 20 years for the Superior Court of California who
```

 1    negotiated to get this fake art out of my garage, out of my

 2    garage, desperately for a month.  Don't touch it.  Get it out.

 3        And they refused to pick it up.  They refused to pick it

 4    up to the point where this attorney, Schochet, who was actually

 5    working for Maibaum -- who you're going to learn intentionally

 6    tried to conceal his involvement, and this comes straight from

 7    their lawsuit in New York -- intentionally concealed his

 8    participation in this from me because his reputation is horrid.

 9    So he used her as a front to try to steal $11 million from me.

10    Okay?

11        And then when that backfired, she put down a $50,000

12    deposit.  She is in a pickle now because she puts up 50 grand

13    on this fraud, trying to dump the fake art on me.  Okay?  So

14    they don't pick it up.  So what do you do?

15        Their attorney, this guy Schochet, he's at a halfway

16    decent law firm, DWT.  Probably know them.  They've got several

17    offices.  His last email to Bob Kane, my attorney was:  Hey,

18    pick up the four crates.  Because there was an issue over the

19    fifth crate.  I testified at the preliminary hearing.  I don't

20    know how many crates were delivered.  She signed for the

21    delivery.  I didn't.  Okay?  But I said, pick up the four

22    cites.  We can litigate the fifth crate, if you want to

23    litigate the fifth crate.  I certainly didn't touch it.  It's

24    fake.

25        Here.  I'm going to show you an email right here.  Here is

```
 1   all you need to see.  This is from Sotheby's.  It says the
 2   Degas that they say is worth millions, it is worth nothing.
 3   You can get something on eBay for 100 bucks.  Okay.
 4        (Document displayed)
 5        Okay.  Here it is.  Read this here.  This is the head of
 6   the Impressionists at Sotheby's, and it's basically explaining
 7   that it's of decorative value only.
 8        You're going to hear from Sotheby's what "decorative value
 9   only" means.  It means, like, a couple hundred bucks.  So what
10   should enrage you right now -- I have no fear of these people,
11   as you can see.  That's part of the reason I'm also doing this
12   pro se, because this isn't a be in the media.  It's going to
13   be -- I have been on covers of more magazines than you want to
14   count.
15        Here is the *Las Vegas* magazine.
16        (Document displayed.)
17             MR. BRUGNARA:  I have been on the cover of --
18             MR. KINGSLEY:  Objection --
19             MR. BRUGNARA:  Well, they can show their pictures --
20             MR. KINGSLEY:  -- a magazine cover doesn't have to do
21   with anything.
22             MR. BRUGNARA:  A magazine cover has to do with who I
23   am.  I have been on the cover of *Forbes*.  I have been on the
24   cover of *Las Vegas* magazine, *San Francisco Weekly*.  This is all
25   going to come into evidence.  *Bay Guardian*, *San Francisco*
```

1  *Weekly.*

2      I mean, I don't even have a publicist.  I don't want the

3  publicity.  But the fact that I'm trying to tell you is that

4  they want -- they are very interested in this case.  *Forbes*.

5      It's like Judge Alsup told you.  That's what he told you

6  at the beginning.  You're probably going to have people phoning

7  you up:  Hey, what do you think about this?  You should be

8  angry at two people.  You should be angry at the people --

9          **THE COURT:**  This is a closing argument.  Please.

10  You've got to stick to facts.

11          **MR. BRUGNARA:**  You should be most angry that your tax

12  dollars are being used --

13          **THE COURT:**  Mr. Brugnara, if you don't turn to the

14  facts, I'm going to ask you to please have a seat.

15          **MR. BRUGNARA:**  I understand.

16      The facts of this case is that it's essentially helping

17  out a former colleague to pay his rent --

18          **MR. KINGSLEY:**  Objection, your Honor.

19          **MR. BRUGNARA:**  -- and pay his mortgage.

20          **MR. KINGSLEY:**  This is closing.  It's not coming into

21  evidence.

22          **MR. BRUGNARA:**  That's what it is about --

23          **THE COURT:**  This is a closing argument.

24          **MR. BRUGNARA:**  It is inexplicable that -- the fact of

25  the matter is, ladies and gentlemen, you can understand, you'll

```
 1  hear from my attorneys.  They have never heard of a fraud case

 2  that involves one claimant --

 3          MR. KINGSLEY:  Objection.

 4          THE COURT:  Wait, wait, wait, Mr. Brugnara.

 5          MR. BRUGNARA:  It involves thousands -- thousands of

 6  potential victims.  Or if there is one claimant, it's a bank or

 7  savings and loan, like Wells Fargo or Bank of America.  You

 8  never say:  Well, this gentleman here defrauded me.  That's

 9  what they have civil courts for.

10      They have invested your money, chasing me on a witch hunt,

11  okay, to help their friend who has to pay his mortgage, who

12  worked with them for 20 years.  That should make you very

13  upset.  And that's the truth of the matter.  And the way you

14  pick somebody like me -- and the other thing is --

15          THE COURT:  All right.  Mr. Brugnara, I have to ask

16  you, you're opening statement is now over.  Please have a seat.

17          MR. BRUGNARA:  Excuse me.  Your Honor, I'm

18  finishing --

19          THE COURT:  You have veered off into improper things

20  and a closing argument.

21          MR. BRUGNARA:  Okay.  Well, let me continue --

22          THE COURT:  I will let you finish --

23          MR. BRUGNARA:  Okay.

24          THE COURT:  I will give you two more minutes to stick

25  to some facts.
```

1          **MR. BRUGNARA:**   Okay.   The facts -- further facts of

2    the case, as they talked about, no museum.   I have had a museum

3    at 351 California Street for 12 years.   And we'll have all the

4    photographs and all the people that have been through it.

5          And I was building -- they said I wasn't building a museum

6    and didn't have assets.   Listen, here is the top mortgage

7    banking firm in Manhattan.   Nick Barbato is going to testify.

8    He has been there for 40 years.

9          And this is -- I'm buying the Riviera and the gentleman

10   there that's doing the meeting, the $10 billion hedge fund

11   that's putting up the equity on the transaction, Barbato is the

12   vice-president at Cooper Horowitz.

13         Here is the next one that actually cites the museum.   As

14   you can see, it's circled there.

15         (Document displayed)

16         And look at the date.   This is May 14.   I was arrested

17   May 28th.   So this was actually two weeks before I was

18   arrested.   Okay.   The museum is going on the back parcel in Las

19   Vegas.   And I developed that parcel, and that's why I also

20   showed you the magazine.

21         I don't know if any of you have been down to Las Vegas,

22   but I developed that entire corner between Sid Wynn's resort

23   and the Riviera.   And that's the shopping plaza.   I -- I

24   developed it from dirt.   You know, Ross Dress, Denny's,

25   7-Eleven, Walgreen's, and all right.   And, you know, here is

1   more, you know, proof of assets.  This will all be brought into

2   evidence.  You know, here is water rights that the Brugnara

3   entities own.

4       (Document displayed)

5       And these are all going to be proved up.  You know, they

6   are in the range of over $100 million.

7       You know, the house that they talk about in Sea Cliff is

8   underwater.  We are -- there is already testimony in the Grand

9   Jury in this case that the agent, the top agent, Mark Levinson,

10  who is going to be one of the prime witnesses says it's worth

11  at least 21 million.  A shack a few doors over sold for 3,100 a

12  foot.  This house is 7,700 feet.  So you apply the math and

13  it's $25 million.  We owe 7 million on it.  So just on the

14  house alone, there's 18 million of equity.

15      The fact of the matter is they are just basically

16  advancing -- this is the thing.  They are advancing to you a

17  fictional lie perpetuated by two individuals that were engaging

18  in fraud against me.  When their fraud backfired, they

19  didn't -- they didn't know what to do.  So they went out,

20  scrambled to hire someone with a little bit of juice, and I end

21  up getting arrested.

22      But the thing is this.  The evidence is going to prove

23  everything I just told you.  There's 82 emails advising them to

24  come pick up the boxes.  And what the fact is, anybody would

25  pick up the boxes and then litigate if there's any issue to

```
 1  litigate, whatever the residual litigation point is.  But they
 2  didn't because they knew all the art was fake and they wanted
 3  me to retain possession of it and then advance this into a
 4  criminal action so they could somehow turn it into a
 5  restitution with then punitive damages in a civil matter.
 6       And it's really a horrid -- the situation gets even worse,
 7  because what they end up doing is I end up getting put in jail
 8  from this.  They actually came and arrested me and put me in
 9  jail.  I have literally been sitting in jail since May 28th,
10  and this goes to the abscond.
11       There is a reason for the alleged abscond.  I weighed
12  200 -- I was bigger than this gentleman (indicating).  You take
13  care of your granddaughter.  I was 270 and pretty muscular.
14  I'm down to 170.  I've been tortured, man.  I don't know if I'm
15  dying of cancer or what, but this goes to my defense on the
16  abscond.
17       I was literally -- and my witnesses will testify.  My
18  physical body was literally shaking, literally shaking in this
19  building, uncontrollably, from the -- from the physical
20  torture, including physical assaults that are documented.
21  Three in a week.
22       So we need -- we were coming up on the trial date, and I
23  hadn't had any physical assaults or any issues that happened to
24  me in this jail for whatever, nine months.  And then, boom.
25  Right when they are trying to choke me out into a plea, I get
```

 1  assaulted three times in seven days.  And two of the assaults

 2  were by the deputies.  And one was by one of the inmates, that

 3  they breached the rules to let him out to attack me.  So I was

 4  assaulted three times in one week.

 5      So I had to get -- and when I got out, I -- I -- I -- I --

 6  I basically was -- and you're going to hear that I was

 7  convalescing in the care of a medical professional just to

 8  regain my physical health.

 9      And I would do it again.  I'm telling you right now.

10  There is nothing -- this is the irony of this entire case.

11  There is nothing standing here today that I could have or would

12  have done differently, except just not accepting the delivery

13  from this crazy woman and her silent partner.  There is nothing

14  I could have or would have done differently.

15      So short of accepting the delivery, there is nothing I

16  could have or would have done differently sitting here today.

17  I engaged counsel.  The top mediator in the whole area.  And he

18  worked in good faith to come up with a resolution to indemnify

19  both parties with a first-tier offering.  She refuses to sign

20  the settlement to pick up the boxes, because it's a scam.

21  And -- and -- and then it balloons into this.  You know, it's

22  just -- it's really crazy.

23      So I have -- so then what happened, then to get to the

24  pro se status.  So what happens when this abscond charge comes,

25  my attorney has to be a witness so he has to be excluded.

1              **MR. KINGSLEY:**  Objection.  His pro se status is not

2    relevant to the evidence in this case.

3              **MR. BRUGNARA:**  Well, it's relevant to the fact that I

4    want them to understand that I could have had another counsel,

5    but then I have to wait another four or six months.

6         So if I'm -- if I'm not in custody -- absolutely.  I mean,

7    I want you guys to know, I'm not some -- I have done $2 billion

8    in deals.  Obviously, the first question I am sure all of you

9    has is:  Why is this guy representing himself?  There is an

10   answer.

11        I can't -- I couldn't stay there another four -- four or

12   six months.  I physically won't make it.  I already lost

13   100 pounds, man.  I -- I probably have cancer.  They don't give

14   you any medical treatment.

15             **MR. KINGSLEY:**  Objection.  This is argument, and it's

16   also not believable --

17             **MR. BRUGNARA:**  No, it will come --

18             **MR. KINGSLEY:**  And, also, coming into evidence --

19             **MR. BRUGNARA:**  -- into evidence.  It's going to be

20   subpoenaed --

21             **MR. KINGSLEY:**  And it's also repetitive.

22             **MR. BRUGNARA:**  -- the doctors.

23             **MR. KINGSLEY:**  Also, there are --

24        (Unreportable cross talk.)

25             **THE COURT:**  All right.  Please.  I think you --

1   you're done now.

2          MR. BRUGNARA:  You know, and this is everything that

3   I have been subjected to for the last -- ladies and gentlemen,

4   for the last 11 months.  Muffling.  This is the United States

5   of America.

6       It's in your hands now.  Because the United States of

7   America is not the people in this court that are sitting here

8   trying to force their hand on your free will or my free will.

9   It's you.

10      You're the ones who decide who gets president, that

11  appoints the judges, that then effectively puts in these people

12  sitting here.  And it's not by coincidence that the person that

13  threw me in jail without bail, after we offered $2 million -- I

14  have no history of violence at all, just to let you know.

15          MR. KINGSLEY:  Objection.  His --

16          MR. BRUGNARA:  It's absolutely relevant.

17      (Unreportable cross talk.)

18          MR. KINGSLEY:  -- are not relevant.

19          MR. BRUGNARA:  I offered $2 million.

20          MR. KINGSLEY:  It's also argumentative.

21          MR. BRUGNARA:  Who do you suppose worked in their

22  office for ten years?  Magistrate Cousins.  Denied bail.  Why?

23  They don't want me to get bail.  Why not?  Well, it doesn't

24  serve anyone's purposes.

25          THE COURT:  This is completely irrelevant.

 1            **MR. BRUGNARA:**  But it's the truth.

 2            **THE COURT:**  The jury will disregard all of this.

 3            **MR. BRUGNARA:**  It's the truth.  And the fact of the

 4    matter of is it is shocking.

 5        But, listen.  I have a few more emails here to show you

 6    regarding Rose Long actually gave me one year in writing to

 7    decide whether or not I want --

 8            **THE COURT:**  If you're going to show that, please show

 9    that --

10            **MR. BRUGNARA:**  And these are -- listen.  I just -- I

11    didn't want to make this about evidence because you're going to

12    be bored to death for the next week with evidence, but there

13    are a couple of key ones that will probably verify what I'm

14    telling you here, so you don't have to take my word for it.

15        (Document displayed)

16        Here is one where I actually tell her the day she's

17    shipping the art:  Rose, you ShipArt.

18        You're going to hear ShipArt is a third-party escrow

19    company that handles fine art for everybody.  Every museum,

20    everyone who has any significant art in the Bay Area only uses

21    ShipArt.  So you send ShipArt the art -- and we used it on the

22    Renoir transaction ten years earlier.

23        Ship the art there, and then you go look at it.  You

24    decide whether you like it or you don't like it; and if you

25    like it, you pay and they release you the art.  And if you

1  don't like it, well, then, the art goes back to the person that

2  shipped it.  I mean, that's common sense.  I mean, people

3  aren't sending million dollar pieces of art.  This is not eBay,

4  but it is eBay.  You see?

5      And, you know, that's -- I mean, the simplest answer is

6  the one that makes the most sense.  Okay?  You're going to see

7  evidence from the Form 12 transcript, which is the pretrial

8  transcripts, where -- where my attorney asks Ms. Long:  Well,

9  Ms. Long, how many sales have you done in the last, you know,

10  20 years of art?

11     She says:  Oh, 300.

12     And he goes:  Well, have you had a contract on all of

13  those?  You know, a written contract?

14     I mean, my God, you have a written contract on anything,

15  right?

16     She said:  I had a written contract on all of them, except

17  this one.

18     Oh, surprise, right?  You know, I have had a written

19  contract on all 300 except the biggest deal I've ever done in

20  my life, you know, for $11 million, but the little ones for

21  $10,000 I have had 300 written contracts.

22     This is just -- we never had a deal.  A contract is a

23  meeting of the minds.  And it's relative to this case.  There

24  was never a meeting of the minds.  And when you hear this woman

25  testify, you're going to understand she's living in a different

```
 1  reality than the rest of us.  Okay?  She is living in a
 2  different reality than the rest of us.  And you will make your
 3  own determination about that.
 4      Just from a factual aspect, there was never a contract.
 5  There was never a meeting of the minds.  He shows you things.
 6  Well, he said he was going to buy the Degas for 4 million.  You
 7  know, like I said, part of me is still in shock.  I know there
 8  has been some victims in this case from physical -- I'm also a
 9  physical victim of violence -- of violence right now.  And I'm
10  on a daily recovery right now, as I know the gentleman here
11  (indicating).  It's hard, you know.
12          MR. KINGSLEY:  Objection.  He's speaking to
13  individual members of the jury.
14          MR. BRUGNARA:  I -- I am in a position now where --
15          THE COURT:  Mr. Brugnara, you're off topic.
16          MR. BRUGNARA:  I understand, your Honor.
17      The other email I want to show you is that -- this one
18  here -- is that also is relative to this case where she says
19  you have the year, what I just told you.
20      (Document displayed.)
21      And it is right here.  It says:  I will be happy to give
22  you a year after we arrange any or full price to check
23  yourself.
24      Now, this is the thing.  There are a handful of emails for
25  this case.  And there's about probably 10 or 12 phone calls.
```

```
 1   And those phone calls all basically impeached the value of the
 2   art.  And this is before I got the lawsuit between Maibaum and
 3   Long where they are suing each other now for, you know, ripping
 4   off each other.  I mean, that's -- that's the shocking thing.
 5        I thought the case was going to be dismissed four days
 6   ago.  This is in a U.S. district court, just like this is a
 7   U.S. District Court, where basically they affirm -- she
 8   affirms, at least, the art has no value.  He ripped me off on
 9   his George Luks.  He sold it for 350 to me, and it's not worth
10   anything.  And I went to the auction houses and they told me
11   it's not worth anything.  It's damaged.  And, yeah, we've
12   already rejected it.
13        Yet, she sends to me what Mr. Kingsley conveniently omits
14   from his five emails is the email to me on the George Luks.
15   Oh, I love it.  Don't tell the auction houses about it.  You're
16   going to love this.
17        Complete fraud.  I mean, complete deception.  Complete
18   mail fraud trying to unwind her bad situation and dumping it on
19   me.  And then she has the gall to add an extra hundred thousand
20   dollars.  She got ripped off by Maibaum for 350.  This is how
21   rotten of a person she is.  She adds an extra hundred grand to
22   stick it to me.  You know what I mean?  This should sicken
23   everybody here.
24        And the crazy thing, it's in U.S. District Court, man.
25   Like, literally right now where she says this guy ripped me off
```

```
1   on this George Luks for 350 grand.  Oh, but by the way, it's
2   okay that I tried to rip off Luke on this for 450 because, you
3   know, I've got these guys over here protecting me (indicating).
4   Shocking.  And you should be appalled.
5        And, yeah, you should speak to the media when this is
6   over --
7              THE COURT:  All right.  Mr. Brugnara --
8              MR. BRUGNARA:  -- because there is a no-brainer.
9   This is a no-brainer case.
10             THE COURT:  Mr. Brugnara, I'm going to send the jury
11  out.  If you don't stop talking, I'm going to send the jury
12  out.  So your closing -- opening statement is now done.
13             MR. BRUGNARA:  So I --
14             THE COURT:  It turned into too many times a closing
15  argument statement.
16             MR. BRUGNARA:  I don't think I had my 40 minutes yet.
17             THE COURT:  That's too bad.  I'm terminating your
18  time --
19             MR. BRUGNARA:  All right, your Honor.
20             THE COURT:  -- because you're not using it in the
21  proper manner.
22        Please have a seat.
23             MR. BRUGNARA:  Using my defense, your Honor.
24             THE COURT:  All right.  I need to say some things to
25  the jury after you have your seat.
```

```
 1        Now, again, you cannot hold it against the defendant
 2   because he's representing himself.  He has the right to do so.
 3   And as you see, sometimes he gets carried away, and I don't
 4   think you should hold that against him either.  I think you've
 5   got to evaluate the case based on the evidence that's presented
 6   and the burden of proof is still on the Government.  And keep
 7   that in mind.
 8        There are a couple things that came up there that are very
 9   important that I want to straighten out now.  The essence of
10   the -- I'm going to give you the specific details later, but
11   the essence of the wire fraud and the mail fraud is the
12   accusation that the defendant made -- lied to Ms. Long in order
13   to get her to part with something of value.  That's the essence
14   of the wire fraud case and the mail fraud case.  It is not a
15   defense, not a defense, not a defense if it turned out that
16   Ms. Long was trying to defraud him at the same time.
17        If the Government proves all of the elements required to
18   prove wire fraud or mail fraud, it does not matter that the
19   alleged victim was also trying to defraud the defendant.  That
20   is the law.
21        Now, you're going to hear in this case some evidence along
22   the lines of what the -- how Ms. Long came into possession and
23   what the value of those artworks were and so forth.  I'm going
24   to let some of that come into evidence because there is a
25   controversy between the defendant and the Government over what
```

1   was said between Ms. Long and the defendant.

2         And you may have to decide who is telling the truth.   And

3   the defendant is entitled to -- to try to show that she was not

4   truthful, if that is the case, with respect to some of the

5   statements that were made to him because it would bear on her

6   own credibility.   And so it's a credibility issue.

7         But I need to repeat:   It does -- it is not a defense to a

8   fraud charge, wire fraud charge or mail fraud charge, that the

9   alleged victim was also trying to defraud the defendant.

10  Period.   All right.

11        The other thing I want to say is, just as I said for the

12  Government, not one word that the defendant just said is

13  evidence.   Zero.   Z-E-R-O.   Not one word of it.   It is not

14  evidence.   You have to wait and see what comes in as evidence,

15  just as you do with what the Government presented to you.

16        All right.   I have -- I'm just going to leave it there.

17        Now, are we ready with the first witness?

18            **MS. HARRIS:**   We are, your Honor.

19            **THE COURT:**   All right.   Let me ask the jury:   Are

20  you -- do you need a facilities break of any type?   Anybody

21  over there need a facilities break?   You good to go for a

22  while?

23        (Jury panel nodding affirmatively.)

24            **THE COURT:**   All right.   The Government may now call

25  its first witness.

1          **MR. KINGSLEY:**  Your Honor, the Government calls

2    Walter Maibaum.

3          **THE COURT:**  Fine.

4                    **WALTER MAIBAUM**,

5    called as a witness for the Government herein, having been

6    first duly sworn, was examined and testified as follows:

7          **THE WITNESS:**  I do.

8          **THE CLERK:**  Please be seated.

9                    **DIRECT EXAMINATION**

10   BY MR. KINGSLEY

11   **Q**    Good morning, Mr. Maibaum.  Will you will you please

12   introduce yourself to the jury and tell us what you do?

13   **A**    Yes.  My name is Walter Maibaum, and I'm an art curator

14   and art dealer.

15   **Q**    And for how long have you been an art dealer?

16   **A**    Since 1986 -- sorry.  1968, about 50 years.

17   **Q**    And as a dealer, do you work for someone, or do you run

18   your own business?

19   **A**    No.  We run our own business.

20   **Q**    Can you tell me about the -- tell me a little bit about

21   your business.

22   **A**    We buy and sell art.  I organize museum exhibitions.  And

23   we travel around.  And I do a lot of research and write books.

24   **Q**    And what are the names of the businesses that you -- under

25   which you buy and sell artwork?

1  A    We have two primary businesses:  Modernism Fine Art, Inc.,

2  which buys and sells art from the first half of the 20th

3  Century, and we also run the Degas Sculpture Project, in which

4  we do research and write and organize museum exhibitions and

5  buy and sell Degas bronzes.

6  Q    So you testified that you've been an art dealer since

7  1968.  Over that time, how much in dollars in artwork have you

8  sold over the years, would you say?

9  A    Well over 100 million.

10  Q    All right.  Now, can you tell me a little bit about your

11  practices in buying and selling artwork?  What are the ways in

12  which you acquire artwork?

13  A    Well, we acquire art from other dealers, collectors, and

14  occasionally auction houses.  And if you -- before we buy

15  something, of course, we examine it carefully.  We do our own

16  research.  We go to the books in our library, for example, and

17  I can look up documentation on the particular works of art that

18  we purchase.  And that's what we make decisions on.

19      Of course, we also go by comparable sales of art.  In

20  other words, if a piece of art was comparable to something

21  we're looking to buy sold for, let's say, $50,000, then we know

22  what we should pay for that work of art, approximately.

23  Q    I want to get to a couple of things you said there.

24      First of all, you said "we" a couple times.  Who is "we"

25  that you're talking about?

1    **A**     My wife and I.  Her name is Carol Conn.

2    **Q**     And you run the business together with her?

3    **A**     We do.  We're a mom-and-pop operation.

4    **Q**     Okay.  And could you tell me a little bit -- you talked

5    about how you get artwork.  Could you tell me how you sell it?

6    Who do you sell it to?  How do you find the buyers?

7    **A**     Well, the buyers find us, actually, because we specialize

8    so -- our focus is such that people look to us, and we do some

9    advertising as well.

10   **Q**     Do you buy or sell pieces at auction?

11   **A**     Rarely.  Excuse me.  Let me rephrase that.

12         We occasionally buy at auction, but we rarely, if ever,

13   sell at auction.

14   **Q**     Why do you not sell pieces at auction?

15   **A**     Because historically about a third of the works don't sell

16   at auction.  I'm talking about Sotheby's, Christie's, Bonhams

17   and so on.  And those works are then burned.  It's like having,

18   like a house that doesn't sell, for example, can sit on the

19   market.  People know.  They see it's been sitting on the market

20   for some time or ask why it didn't sell.

21         People just philosophically believe there might be

22   something wrong if the work doesn't sell, so it's risky to sell

23   at an auction.

24   **Q**     All right.  So you talked a little bit about the research

25   you do in determining whether you should buy a piece of

 1   artwork, so I'd like to ask you a few questions about that.

 2        What are some of the things you look at in determining

 3   whether a piece of art is something you want to buy?

 4   A    Well, first we look at the provenance.  The provenance is

 5   the ownership history.  In other words, who owned the work of

 6   art beforehand?  Can it be traced back to an artist, for

 7   example?

 8        Did Picasso paint this painting?  Can we look in the

 9   archives and see if Picasso did, in fact, paint the painting.

10   Or we go to certain books which are called catalogue raisonne,

11   which shows the definitive work of an artist.

12        For example, we can go to Picasso catalogue raisonne from

13   1967 and I can find all the paintings and drawings that Picasso

14   did in 1967.  So I can say: Hey, wait a minute.  This piece

15   isn't in the catalogue raisonne.  There's something wrong.

16        So either I shy away from it or I have to do some more

17   research to find out why it's not in the book.

18   Q    You mentioned "provenance" a little bit.  Could you

19   explain just a little bit more what that means.  What makes for

20   the provenance of a piece of art?

21   A    Well, the provenance, basically, again is the ownership

22   history.  Who had it before the person selling to it me owned

23   it.  In other words, it goes back step by step by step.  The

24   painting was done in 1950.  Who owned in it 1950?  Where did it

25   go from there?  Did it go to a second collector, third

1  collector, fourth collector?

2      So if one has a trace, we'll call it, back to the period

3  in which the painting was done, one can determine that the

4  provenance is accurate.

5  **Q**   All right.

6  **A**   And acceptable.

7  **Q**   Do you also examine the artwork physically as part of this

8  determination of whether you're interested in it?

9  **A**   Yes.  One must examine each work of art that one purchases

10  physically to determine if it's a fake or a copy, for example.

11  And there are certain other parameters one goes by.

12      For example, on paintings you can measure the painting,

13  and if it conforms to the documentation, for example -- again,

14  using Picasso as an example.  If you have a Picasso painting

15  that is supposed to be 50-by-40 inches and it's cataloged as

16  50-by-40 inches and you measure the painting and it's only

17  36-by-20 inches, you know there's a problem.

18      So these are the things we can use to determine.

19  Everything is pretty documented in books as to what dimension

20  should be, for example, with Picasso at least.  And so we

21  can -- there's many factors that go into it.

22      Of course, also, when you look at the work of art, you can

23  see are the brush strokes, for example, in the painting as they

24  should be?  Or in a sculpture, do the dimensions match as they

25  should?  And so on and so forth.  But looking at a painting is

1   critical, or a sculpture.

2   **Q**    All right.  You mentioned researching history, and I think

3   you may have said this, but I just want to clarify.

4        Where do you -- which books do you look at, and where do

5   you have these books to research this history?

6   **A**    Well, we have a number of books in our library.  Actually,

7   we have more than 8,000 books in our personal library.  And we

8   use these, obviously, as a reference.  And so we don't have to

9   go to the public library, for example, to find out what the

10  painting or sculpture should be.

11       And, quite frankly, we have books and catalogs that most

12  libraries don't have.  And that's a valuable asset.  Our

13  library, in fact, is more personally valuable to me than most

14  of the art that we have, because it's the one way we can

15  determine authenticity for certain.

16            **MR. BRUGNARA:**  I object, your Honor.

17            **THE COURT:**  What's the objection?

18            **MR. BRUGNARA:**  The objection is it's not relevant.

19            **MR. KINGSLEY:**  This goes to Mr. Maibaum's state of

20  mind and the background for this particular transaction.

21            **THE COURT:**  Based on the way the opening statements

22  were presented, it is relevant, so the objection is overruled.

23       Please continue.

24  **BY MR. KINGSLEY:**

25  **Q**    All right.  I want to move on to prices.

1      What determines the prices at which you buy and sell

2  artwork?

3  **A**    Well, we use comparables such as you would in real estate.

4  For example, if a two-bedroom home in the Richmond District

5  sold for this price and it was the same size.

6      We can also go to auction records.  There's a database

7  called Artnet and it -- it catalogs and documents every work of

8  art that's sold at auction since, I believe, 1985.

9      So, for example --

10         **MR. BRUGNARA:**  I object, your Honor.  That's hearsay,

11  and it's not substantiated.

12         **THE COURT:**  Sustained.  Well, where you're headed is

13  sustained.  It's not hearsay yet.  But if you're going to

14  purport to draw valuations off of some internet site, we may

15  have an issue about hearsay.

16         **MR. KINGSLEY:**  Well, your Honor, Mister --

17         **THE COURT:**  Otherwise, it's going to work both ways.

18         **MR. KINGSLEY:**  I'm trying to get out with Mr. Maibaum

19  how he priced the artwork that Mr. Brugnara just spent time --

20         **THE COURT:**  Why don't you just ask that question, and

21  then we'll see where that leads.  But if you start getting into

22  hearsay sources, then the other side gets the same flexibility.

23  Keep that in mind.

24         **MR. KINGSLEY:**  Okay.

25

1  BY MR. KINGSLEY:

2  Q    So you mentioned you try to determine comparable auction

3  prices?

4  A    Correct.

5  Q    So how confident do you need to feel about the

6  authenticity of a piece of artwork before you sell it?

7  A    100 percent.

8  Q    And have you ever made mistakes in that regard?

9  A    Yes.

10 Q    And what do you do when you find out that you've made a

11 mistake regarding authenticity?

12 A    You refund the money.

13         THE COURT:  Now, can I ask you:  You know, we've had

14 some motions in limine about specific prior deals.  Are you're

15 just now opening the door to that, Mr. Kingsley?

16         MR. KINGSLEY:  No.

17         THE COURT:  I believe you may be.  You better be

18 careful.  You -- you just -- I'm telling you, we had a lot of

19 practice on specific prior deals.  So you need to ask yourself,

20 are you opening the door to all of that?

21         MR. KINGSLEY:  I'll move on, your Honor.

22 BY MR. KINGSLEY:

23 Q    So you mentioned that you do business with various people,

24 I think.

25      Is Rose Long one of the people you've done business with?

1   A      Yes.

2   Q      For how long have you known Ms. Long?

3   A      Twenty years.

4   Q      What's the nature of your relationship with her?

5   A      She was a friend.  We bought and sold art to her.

6   Q      And approximately how many transactions would you say

7   you've conducted with Ms. Long before 2014?

8   A      Fifteen to 20, perhaps.

9   Q      And how much money do you think was involved in those

10  transactions?

11  A      Before this transaction, about two and a half million.

12  Q      So do you own a collection of artwork?

13  A      Yes.

14  Q      And where do you keep that?

15  A      Mostly at Cirkers Warehouse, a security warehouse.

16  Q      Tell me a little bit about that.  What is Cirkers, and why

17  do you keep your art there?

18           THE COURT:  Spell that word, please, Cirkers.  None

19  of us, except you who studied this, know what in the world

20  you're talking about.  How do you spell that word?

21           THE WITNESS:  C-I-R-K-E-R-S.

22           THE COURT:  Thank you.

23  BY MR. KINGSLEY:

24  Q      So what is Cirkers, and why do you store your art there?

25  A      Cirkers is a security warehouse in mid-town Manhattan,

1   which is a high-security warehouse where you have to be keyed

2   up to each floor.  You have to sign in.  You have to go through

3   security devices.  And you have to register.

4        And you have private rooms at Cirkers, which we -- we have

5   two private rooms at Cirkers in which we store the art.

6   **Q**   Why do you store your art at Cirkers and not at, say, your

7   house or apartment?

8   **A**   There are a number reasons:  We don't have room in our

9   apartment.  We have a New York apartment.  And -- but mostly

10  it's for security.

11       Cirkers also has showrooms where we can bring a client to,

12  and they can -- we can show the art there.  Plus, Cirkers also

13  crates and ships art for us.

14  **Q**   Does Cirkers do this for free, or do you pay them?

15  **A**   No.  We pay them a lot of money.

16  **Q**   All right.  About how much money do you pay Cirkers for

17  your storage rooms?

18  **A**   Also, we probably pay over 30,000 a year between storage

19  and shipping and handling.

20  **Q**   All right.

21  **A**   And crating.

22            **MR. BRUGNARA:**  Your Honor, that's not responsive.  He

23  asked how much for the storage, and he just added shipping,

24  crating.  Those are all distinctly different categories of

25  costs.

```
 1              THE COURT:  Well, can you answer just as to storage?
 2              THE WITNESS:  Your Honor, I think it would be -- most
 3   of that -- most of the 30,000 would be storage.  It's on
 4   occasion the crating and shipping, perhaps, would be another
 5   4,000 or 5,000.
 6              THE COURT:  All right.
 7              THE WITNESS:  I can't say specifically.  I'm sorry.
 8              THE COURT:  All right.  That's the best we can do,
 9   then.
10         Next question.
11   BY MR. KINGSLEY:
12   Q    Now I'd like to direct your attention to a particular
13   transaction with Ms. Long in March of 2014 -- March and
14   April of 2014.
15         Do you know what I'm talking about?
16   A    I do.
17   Q    Do you remember this transaction?
18   A    I do.
19   Q    What artwork was involved in this transaction?
20   A    The artwork we sold -- we sold the art to Rose Long.  And
21   the artwork involved was 16 de Kooning paintings on paper, a
22   Mirò drawing, a group of Picasso etchings -- we have those
23   three -- and the -- forgive me a moment, and the Degas bronze,
24   the Little Dancer.
25   Q    Was there also -- were you aware there was a painting by
```

```
 1   George Luks that was also involved in this transaction?

 2   A    Yes.

 3   Q    Did you own that piece?

 4   A    We did not.

 5   Q    Had you sold it previously to Ms. Long?

 6   A    Yes.  We sold it in March of 2013.

 7   Q    All right.

 8   A    To Ms. Long.

 9   Q    Okay.  Did you own the artwork that you sold to

10   Ms. Long -- well, let me just ask you this:  Did you own the

11   artwork that you just described that was involved in this

12   transaction?

13   A    Some.

14   Q    Which pieces did you own?

15   A    We owned the Degas, and we owned the Picasso etchings.

16   Q    And what about the other pieces?  What was your

17   relationship with them?

18   A    The other pieces were on consignment to Modernism Fine

19   Arts.

20   Q    And had you owned the Miró painting -- or the Miró drawing

21   before?

22   A    Yes, we had.  We had owned it before.

23   Q    I want to ask you about that George Luks painting.  For

24   how much did you sell that painting to Ms. Long?

25   A    Sold for $350,000.
```

1   Q    Now, had Rose Long raised any complaints with you about

2   that painting after the transaction?

3   A    Yes.

4   Q    What did she say about it?

5   A    She said that somebody said it was not a portrait of, as

6   it was supposed to be, Gloria Vanderbilt Whitney -- Gertrude

7   Vanderbilt Whitney.  Excuse me.

8   Q    And how did you respond when she raised that issue with

9   you?

10  A    I said it's always been known by that name.  I can't

11  imagine it would be known by any other name.  Plus, there was a

12  book with a cover, a portrait of Gertrude Vanderbilt Whitney,

13  which is identical to the painting subject.

14  Q    So you looked into her -- the issue that she raised?

15  A    Exactly.

16  Q    Okay.  So the artwork that you just described, where was

17  all of that artwork stored?

18  A    The artwork that we shipped to -- well, that we turned

19  over to Rose Long, and Rose Long also had a room at Cirkers.

20  It was all stored at Cirkers.

21  Q    So the artwork that you owned or controlled, the pieces on

22  consignment or that you owned, was stored in your rooms at

23  Cirkers?

24  A    That is correct.

25  Q    Okay.

1              THE COURT:  And if I understand your testimony, that

2    would be all of the items except the George Luks?

3              THE WITNESS:  That is correct, your Honor.

4              THE COURT:  All right.  Thank you.

5    BY MR. KINGSLEY:

6    Q    So what was your arrangement with the people that owned

7    the de Koonings and then the Mirò in terms of who got paid when

8    you sold it, and how did that work?

9    A    In each case, we were to pay the consignors within five

10   business banking days of the date upon which we received it.

11   Q    And how did you determine --

12             MR. BRUGNARA:  Your Honor, there should be an

13   objection on that for hearsay and for relevance to the

14   transaction.

15             THE COURT:  Overruled.  The witness would know what

16   his own arrangement was with other people, so that's overruled.

17   BY MR. KINGSLEY:

18   Q    And how was it determined how much money under your

19   arrangement with the consignors went to the consignors versus

20   how much you got to keep?

21   A    I would have to look at the documents to see.

22   Q    But there was an arrangement in advance?

23   A    There was an arrangement in advance, exactly.

24   Q    All right.  So let's talk about the de Koonings.

25        In 2014, were you trying to find a buyer for these

 1  de Koonings?

 2  **A**    Yes.

 3  **Q**    And what did you do to try to find a buyer for them?

 4  **A**    Well --

 5         **THE COURT:**  Can I -- it might help us all, including

 6  people like me who don't have a fine arts degree, to explain to

 7  the jury who de Kooning was and all these other people that

 8  we're talking about here.  Just one sentence would be of

 9  value --

10         **MR. KINGSLEY:**  Certainly.

11         **THE COURT:**  -- to us that don't know anything about

12  it.

13  **BY MR. KINGSLEY:**

14  **Q**    So give us a little background on Willem de Kooning.  Who

15  was he, as you understand it?

16  **A**    Willem de Kooning was a Dutch artist who moved to America.

17  And he was one of the founders of what's called the Abstract

18  Expressionist Movement.  In the 1950s and '60s and '70s, he was

19  one of the most -- in fact, today, still continued to be one of

20  the most important American artists.

21      He developed the movement and -- I don't want to get into

22  details too much, your Honor, but he was a founder of a very

23  important movement in art history in America.

24         **THE COURT:**  All right.  That's -- short answer.  Do

25  the same on the other artists.

1  **BY MR. KINGSLEY:**

2  **Q**     Who was Joan Mirò?

3  **A**     Okay.  Joan Mirò was an artist in Spain, Catalan artist,

4  who was a very important surrealist artist, most especially in

5  the 1930s and '40s.  And he went on to do lithographs and

6  etchings.  And they're distributed worldwide.  His work is in

7  many, many museums around the world.

8  **Q**     All right.  And the piece at issue in this transaction by

9  Mirò was a drawing by him?

10  **A**     This was an original drawing.  That is correct.

11  **Q**     And just to back up, the de Koonings were paintings?

12  **A**     Paintings on paper.

13  **Q**     Okay.

14         **THE COURT:**  When you say "on paper," is that like --

15  what's the significance of "on paper"?

16         **THE WITNESS:**  Well, usually, your Honor, paintings on

17  canvas would be worth more, frankly, and they're usually a

18  larger scale.  But on paper, people tend to think that they

19  have less value, frankly, than they would if they were on

20  canvas.

21         Artists sometimes, like de Kooning was an example, was

22  more deliberate when he painted on canvas.  But when he painted

23  on paper, it was more spontaneous.  He might pick up a piece of

24  paper, for example, when he was having breakfast and do a

25  painting on it.  Whereas, he would go to a studio and paint

1  something, let's say, more significant on canvas.

2           **THE COURT:**  All right.  So continue on.

3  **BY MR. KINGSLEY:**

4  **Q**    So that's de Kooning, Mirò.

5       What about George Luks?  Who is he?

6  **A**    George Luks, I'm not an expert on.  In fact, Rose Long is

7  an expert on Luks.

8       But he was an American artist, primarily known for his

9  paintings in the '30s and '40s.  He did a lot of portraits.

10 And he was known as a founder of the Ashcan school.  That was

11 from the Depression, the Great Depression, when he became

12 famous.

13      Why they called it the Ashcan school, I don't know, but

14 that's what it was called.

15 **Q**    All right.  And Picasso, I assume some of us have heard of

16 Picasso, but who was he?

17 **A**    Picasso was, in my opinion anyway, the greatest artist of

18 the 20th Century, the most creative artist.  And he came up

19 with many new ideas when it came to painting.

20      In fact, if I may, your Honor, just give something, a

21 little history.  People laugh when they first see some

22 Picassos, because the ear is on top of the head or the nose is

23 underneath the chin.  But what Picasso is, for example --

24           **MR. BRUGNARA:**  Your Honor, objection.  It's not

25 relevant to this case.

364

```
 1            THE COURT:  Overruled.  Please continue.
 2            THE WITNESS:  What Picasso did, for example, in 1907,
 3    1908, he would show three dimensions on a two-dimensional
 4    canvas.
 5        For example, when you see all these --
 6            MR. BRUGNARA:  Your Honor, this is a question from
 7    the 1930s.  He's talking about a 1907 Cubist works.  And that's
 8    absolutely not relevant to the art in this case.
 9            THE COURT:  He's explaining who Pablo Picasso was.
10        Bring it to a close, please.
11            THE WITNESS:  Yes, sir.
12    A    Anyway, it's as if you were taking a globe and making it
13    into a map.  All maps are two dimensional.  But he did that --
14    for example, you could see on a painting you were looking
15    around the women's head and that's why it was distorted.
16            THE COURT:  Next question.
17    BY MR. KINGSLEY:
18    Q    All right.  And just to clarify -- and I didn't did you
19    this with the Luks -- but what -- what was the type of art by
20    Picasso that was involved in this transaction?
21    A    These were original etchings from the 1930s, 1937.
22    Q    And what's an etching?
23    A    An etching?  An artist such as Picasso takes a copper
24    plate and he engraves into the copper plate.  And then you ink
25    the copper plate, and you press it into an etching -- into a
```

1   piece of paper in an etching press.  And the image is

2   transferred from the copper plate onto a piece of paper.

3       And you can do that once or ten times or a hundred times.

4   But each time, you have to ink the copper plate, and each one

5   is considered an original etching.

6   **Q**   And the George Luks painting, I know that you said you're

7   not an expert, but you owned it.  Could you just describe

8   generally what it is?  Is it a painting on paper?  On canvas?

9   **A**   It's a large painting on canvas, and it's a portrait of

10  Gertrude Vanderbilt Whitney.

11  **Q**   Okay.  Now, the last artist was on your Degas.  Can you

12  just give me a little bit of background on who that is?

13  **A**   Edgar Degas was a founder of the French Impressionism

14  Movement.  He was born in 1843, died in 1917.  He was known for

15  his ballet dancers, primarily.

16          **THE COURT:**  And spell Degas, please?

17          **THE WITNESS:**  First name is Edgar, E-D-G-A-R.  Last

18  name is D-E-G-A-S.

19          **THE COURT:**  Please continue.

20  **BY MR. KINGSLEY:**

21  **Q**   So that's the artwork.  I want to go back to this

22  particular transaction.

23      You testified that you had the de Koonings on consignment,

24  and you were trying to find a buyer for them?

25  **A**   Right.

1  Q    What did you do to try to find a buyer for these

2  paintings?

3  A    Well, I knew Ms. Long always asked me for de Koonings if

4  we ever get any.  So she was the first I called, in fact.

5  Q    And what happened after you called her?

6  A    Ms. Long got very excited about the prospect of the

7  de Koonings, and she went to Cirkers where they were being

8  stored --

9           MR. BRUGNARA:  Objection, your Honor, hearsay.

10          THE COURT:  That's true.  It is hearsay, so you can't

11 testify as to what she did.  You can testify as to what you

12 did.

13      Sustained.

14 BY MR. KINGSLEY:

15 Q    Were you there with Ms. Long when she went to Cirkers?

16 A    I was with her when she examined the de Koonings.

17          THE COURT:  All right.  He can testify as to what he

18 observed.

19 BY MR. KINGSLEY:

20 Q    So just tell me what happened when you were there with

21 Ms. Long when she examined the de Koonings.

22 A    She was very excited.  She liked them very much.  And she

23 told me she had a client for them.

24 Q    Okay.

25          MR. BRUGNARA:  That's hearsay, your Honor.

1          **MR. KINGSLEY:**  It's not for the truth of the matter,

2    your Honor.

3          **THE COURT:**  It's proving up the transaction between

4    the two of them.  For that limited purpose and that limited

5    purpose only, the witness's comment about what she said is

6    admissible, and the jury will keep that limitation in mind.

7          Go ahead.

8    **BY MR. KINGSLEY:**

9    **Q**    Did you know who the client was who she said she was

10   interested in selling these to?

11   **A**    I did not.

12   **Q**    Now, is that something that's normal in your business?

13   **A**    Yes.

14   **Q**    And so why is that normal?  Is there a reason behind why

15   art dealers would do that?

16   **A**    Because dealers guard their clients jealously, because

17   they don't want to expose their clients to another dealer for

18   concern that, perhaps, the other dealer then might try to

19   solicit that client for business.

20   **Q**    Did you end up selling the de Kooning paintings to that

21   particular client of Rose Long's, whoever it was?

22   **A**    No, we did not sell the de Koonings to Rose Long.

23   **Q**    Do you know why not?

24   **A**    Yes.

25         (Brief pause.)

1  Q    All right.  So this transaction, the first transaction

2  with the de Koonings doesn't happen.

3       How is the next, the March/April transaction that you

4  discussed, how was that initiated?

5  A    My wife and I were in Paris at the time, and we got a

6  phone call from Ms. Long who excitedly said, "I sold the

7  de Koonings."

8  Q    Okay.

9            MR. BRUGNARA:  Objection, your Honor, hearsay.

10            THE COURT:  It's received for the same limited

11  purpose as before, not for the truth of the comment.

12       Go ahead.

13  BY MR. KINGSLEY:

14  Q    Do you remember when -- when this came up?

15  A    It would been in early March of 2014.

16  Q    All right.  And did you have communications with Ms. Long

17  about this transaction in March of 2014?

18  A    Yes.

19  Q    All right.  And did you know initially who the buyer that

20  she had was?

21  A    No.

22  Q    And, again, that's part of your experience as an art

23  dealer?

24  A    I wouldn't even ask.

25  Q    All right.  Now, did Ms. Long tell you anything about the

1   buyer?

2   **A**     She said that the buyer was building a museum in

3   San Francisco.

4   **Q**     And did she say what he planned to do with that artwork?

5   **A**     Put it into the museum.

6   **Q**     And did that make you wonder who the buyer was?

7   **A**     Yes.

8   **Q**     Okay.  Did it make a difference to you that she was --

9   that she told you that the buyer was going to be putting the

10  artwork in a museum?

11  **A**     Yes, it did.

12  **Q**     Can you tell me a little bit why?

13  **A**     Because if the work was going to a museum, we would be

14  more inclined to give a more favorable price.  And, plus, it

15  would be of -- all the art would be available to the general

16  public, which, to my mind, is very important.

17  **Q**     Are there specific pieces of art for which it was

18  particularly important to you that this artwork was going to a

19  museum?

20  **A**     Yes.  The Picassos and the Degas sculpture.

21  **Q**     And why did it make a difference with respect to the

22  Picassos?

23  **A**     The Picassos were very historically significant.  They

24  were linked to one of Picasso's most important painting

25  Guernica, which was an antiwar group of paintings.

```
1        In fact, he did etchings against Senor Franco, General
2   Franco in the Spanish Civil War, who had bombed this small
3   village in Spain, Guernica.  And, again, a very famous
4   painting.  And this group of etchings relates to this painting.
5   Q    What about the Little Dancer?  Did it make a difference to
6   you that that was supposed to be going to a museum?
7   A    Yes.  That was very significant to us personally, because
8   when a bronze or a work of art is in a museum, it establishes
9   more credibility for that work of art and it gives us what's
10  known as an imprimatur.  More value, at least historically, and
11  in every other respect as we will.
12  Q    Okay.  So you said that Rose Long initially described the
13  transaction involved in the de Koonings.  And then how did it
14  get to -- how did the transaction come to include these other
15  pieces of art?
16  A    Well, basically, it began with the de Koonings.  And then
17  Ms. Long said words to the effect, I don't remember exactly,
18  but:  This gentleman is building a museum, so he's looking for
19  other works of art.  What else can we -- what else do you have?
20  What else can we sell him, essentially.
21  Q    Okay.
22           MR. BRUGNARA:  Your Honor, that's hearsay.
23           THE COURT:  It be received for the limited purpose of
24  explaining the transaction between --
25           MR. BRUGNARA:  Explaining what my state of mind was?
```

1    If that's not hearsay, I don't know what is.

2              MR. KINGSLEY:  He's explaining why what the defendant

3    said was material to him.

4              THE COURT:  Correct.  For that reason --

5              MR. BRUGNARA:  What I said to her?

6              THE COURT:  Overruled.

7         Please continue.

8              MR. KINGSLEY:  All right.

9    BY MR. KINGSLEY:

10   Q    So based on your understanding, at some point did Ms. Long

11   inform you that she'd reached some kind of agreement on this

12   artwork?

13   A    Yes.

14   Q    And so did you reach an agreement with Ms. Long regarding

15   the artwork?

16   A    Yes.

17   Q    And what was your agreement with Ms. Long?

18   A    We sold the works of art to Ms. Long, that being the

19   Picasso, the Mirò, the Degas, and the de Koonings.

20   Q    And why did you -- why did you do it that way instead of

21   consigning it to her, giving her a commission or something like

22   that?

23   A    Well, because if we were to give her a commission, then we

24   would have known who the client was, number one.

25        But, more importantly, we wanted to confirm it was a sale.

1   And, also, we had to go back to the consignors of the de

2   Koonings and the Miró to get their approval to ship the art to

3   San Francisco, otherwise, they might not have allowed to ship

4   the art.  It had to be a firm sale, in essence.

5           **MR. KINGSLEY:**  May I approach the witness, your

6   Honor?

7           **THE COURT:**  Yes.

8       (Whereupon document was tendered to the witness.)

9   **BY MR. KINGSLEY:**

10  **Q**   I'm showing you what's been previously marked by the

11  Government as Exhibit 34.

12      Could you just take a moment and look at it and let me

13  know whether you recognize this document?

14  **A**   Yes, I recognize the document.

15  **Q**   And what is it?

16  **A**   This is our invoice to Rose Long for the Degas sculpture.

17  **Q**   Is this exhibit the type of document made in the ordinary

18  course of business of the Degas Sculpture Project?

19  **A**   Yes.

20  **Q**   And is it the type of document made by someone with

21  knowledge of the events it reflects?

22  **A**   Yes.

23  **Q**   And is it made at or near the time of the events that it

24  reflects?

25  **A**   Yes.

1   Q     And is it maintained in the regular course of business?

2   A     Yes.

3           MR. KINGSLEY:  The Government would move to admit

4   Exhibit 34 and publish it to the jury.

5           THE COURT:  Any objection?

6           MR. BRUGNARA:  No, your Honor.

7           THE COURT:  Received in evidence.

8       (Trial Exhibit34 received in evidence.)

9           THE COURT:  Please show it to the jury.

10      Do we have that on the screen?  Can we put it on the

11   screen?

12          MR. KINGSLEY:  Switch it to the laptop.

13          THE CLERK:  It's switched on mine.

14      (Discussion held off the record.).

15          THE COURT:  Here is what I suggest:  Take the

16   exhibit.  Use the Elmo for now.  And during the next break,

17   let's get the wiring fixed so that the system works.  It

18   doesn't work now, so use the Elmo for now.

19      (Document displayed)

20   BY MR. KINGSLEY:

21   Q     All right.  Mr. Maibaum, can you see on your screen --

22   A     Vaguely.  It's very fuzzy.

23      (Brief pause.)

24   Q     So you testified that this was an invoice that you gave to

25   Ms. Long for the Degas sculpture.  And I want to focus your

```
 1  attention on the middle of the page with the -- the sentence

 2  that begins -- or the paragraph that begins, "The bronze is

 3  from 1997 Valsuani Foundry."

 4      Can you read that paragraph for me?

 5  A   Yes.

 6          "The bronze is from the 1997 Valsuani Foundry

 7          edition of 12.  There is also a 1998 Valsuani edition

 8          consisting of 34 bronzes.  Both editions total 46

 9          bronzes were cast in a plaster believed to date from

10          1903 or before."

11  Q   So did you write that?

12  A   I did.

13  Q   And I would like to ask you some questions about what that

14  means, and this goes back to a little bit about what you were

15  saying about the background of the artists.  What is a bronze?

16  A   A bronze is a cast process.  The bronze is a cast made

17  from the artist's original.

18  Q   And how is it made from the artist's original?  What

19  medium is the artist working in?

20  A   In this particular case Degas sculpted his works in wax,

21  because wax is malleable and it remains something he can rework

22  over time.

23  Q   And then how does it get from the wax to being a bronze

24  sculpture?

25  A   From the wax -- let's presume this is a wax.
```

1          THE WITNESS:  If we may, your Honor?  Is it okay?

2          MR. BRUGNARA:  Your Honor, I object to relevance to

3    the art in question in this transaction and how it relates to

4    Rose Long trying to tell me the fake art.

5          MR. KINGSLEY:  Mr. Brugnara, he just explained why

6    it's relevant.  He just said it's --

7          THE COURT:  All right.  You can use that water bottle

8    instead.

9          THE WITNESS:  Okay.

10         THE COURT:  And go ahead and do your illustration.

11         THE WITNESS:  Okay.  I mean, very simply.  If Degas

12   made that sculpture in wax, after the wax -- after he finished

13   the wax or after the wax was finished, then it would be brought

14   to the foundry and then they would surround the wax with the

15   mold material.  In this case gelatin --

16         MR. BRUGNARA:  Your Honor, hearsay.

17         THE COURT:  Overruled.

18         MR. BRUGNARA:  He wasn't there.

19         THE COURT:  But he has the qualifications --

20         MR. BRUGNARA:  Actually, he doesn't.

21         THE COURT:  Well, you can cross examine then on this

22   point.

23       Overruled.

24         MR. KINGSLEY:  Your Honor, the Government is also

25   introducing this for Mr. Maibaum's state of mind and for

```
 1  Ms. Long's state of mind to the extent that he informed her of

 2  these things, too.

 3          THE COURT:  Well, I don't know about that part, but

 4  he's qualified to give the answer.

 5      Go ahead, please --

 6          MR. KINGSLEY:  Thank you, your Honor.

 7          MR. BRUGNARA:  Your Honor, he's not qualified.

 8          THE COURT:  Well, I get to decide that.  Your point

 9  is preserved.

10      Please continue with your answer.

11  A   So Degas' wax is this.  The foundry then surrounds it with

12  the mold material.  They cut the mold material in half, open up

13  the mold, and inside that mold usually they would make a

14  plaster.  From the plaster they would take more molds, and from

15  those molds they would make other waxes to make bronzes.  Those

16  waxes would be lost in the lost wax process.  It's a little

17  more complicated than that.  But that's a simple explanation of

18  how bronzes are cast.

19      And I should mention one other thing.  Casting bronze is a

20  collaborative process.  It takes about 20 people to make a

21  bronze.  An artist doesn't make a bronze.  An artist can paint

22  a painting because he can do it himself or herself.  But a

23  foundry has to make a casting of a bronze.  It's not something

24  an artist can make.

25          THE COURT:  Can I -- but one thing that's not clear
```

377

1    about your answer.

2        Are you saying that the original work that Degas did was

3    just a wax thing and then that was it?  He did -- his original

4    was just one item and it was made out of wax?

5            **THE WITNESS:**  That is correct, your Honor.

6            **THE COURT:**  So he -- so Degas himself never arranged

7    for a bronze?

8            **THE WITNESS:**  That is correct.

9            **THE COURT:**  All right.  Thank you.  Continue on.

10   **BY MR. KINGSLEY:**

11   **Q**    And I want to follow up on that point.  When to Degas die?

12   **A**    Degas died in 1917.

13   **Q**    And this particular bronze, according to the paragraph you

14   read, was made in 1997, right?

15   **A**    That is correct.

16   **Q**    So 80 years after he died?

17   **A**    That is correct.

18   **Q**    Is it your understanding that -- let me step back for a

19   second.

20       So this is a particular edition.  It says the "1997

21   Valsuani edition of 12."  What is the "Valsuani edition"?  What

22   does that mean?

23   **A**    Valsuani edition is made at the Valsuani Foundry in

24   France, which casts the bronzes.

25   **Q**    And is there another edition of Degas bronzes that exists?

1   A    Yes.  There was an earlier edition of Degas bronzes, but

2   also cast after he died.  Those bronzes began casting in 1920

3   and they ended being casted in about 1965.

4       They were cast by the Hebrard Foundry, H-E-B-R-A-R-D.  And

5   so those --

            **THE COURT:**  Spell that again, please.

7           **THE WITNESS:**  I'm sorry.  Those bronzes are known as

8   the Hebrard bronzes, H-E-B-R-A-R-D.

9           **THE COURT:**  Valsuani, spell that, too.

10          **THE WITNESS:**  V-A-L-S-U-A-N-I.

11          **THE COURT:**  All right.  Please continue.

12  A    So anyway, Hebrard cast bronzes from Degas waxes,

13  beginning in roughly 1920 and continued to cast under the

14  Hebrard name until 1965.

15  **BY MR. KINGSLEY:**

16  Q    So the Little Dancer that was at issue in this transaction

17  was a Valsuani edition, not a Hebrard edition?

18  A    That is correct.

19  Q    Okay.  Did Degas create sculptures other than just the

20  Little Dancer?

21  A    Yes.  He created 73 others.

22  Q    Okay.  And I think this goes to the judge's question:

23  There was only one Little Dancer wax as far as you are aware?

24  A    That is correct.

25  Q    But there were waxes of other sculptures?

1   **A**    Other sculptures, correct.

2         **THE COURT:**  May I ask where the original wax version

3 that he created is on display or who owns it?  Do you know?

4         **THE WITNESS:**  Yes.  The -- the great majority of

5 them, about 65, are in the National Gallery in Washington D.C.

6 And the others are scattered around different museums around

7 the world.

8         **THE COURT:**  All right.  Next question.

9 **BY MR. KINGSLEY:**

10   **Q**    Which sculpture created by Degas would you consider to be

11 the most valuable, market value?

12   **A**    The Little Dancer.

13   **Q**    And that was what was at issue in this transaction?

14   **A**    Yes.

15   **Q**    About how many bronzes were cast in each edition, Hebrard

16 and Valsuani, of the Little Dancer?

17   **A**    Hebrard, I believe -- in my research I found 38 Hebrard

18 Little Dancer bronzes, and in total Valsuani there were 46.

19   **Q**    Okay.  Now, are the Hebrard Little Dancer bronzes

20 universally accepted as authentic?

21   **A**    Yes.

22   **Q**    And what does that -- what does that mean?

23   **A**    Well, they -- the first bronze -- the first Little Dancer

24 bronze was cast around 1920.  A famous collector then purchased

25 one and donated it to the Metropolitan Museum of Art in New

 1  York, and that kind of established the authenticity and, also,

 2  established, in fact, the marketability of those bronzes.

 3          MR. BRUGNARA:  I object, your Honor.  This is

 4  hearsay.  Speculating.  It's not accurate.

 5          THE COURT:  Overruled.  He has the background and

 6  qualifications.  It is -- it is not --

 7          MR. BRUGNARA:  Your Honor, he -- he hasn't qualified

 8  himself on anything.  Qualified based on what?

 9          THE COURT:  Overruled.

10  BY MR. KINGSLEY:

11  Q    I guess my question is:  The fact that the Hebrard Little

12  Dancers are considered authentic, in your experience as an art

13  dealer, what does that mean for the price that they get in the

14  marketplace?

15  A    Well, authenticity determines value.  If something is

16  authentic, it has one value.  If it's not authentic, obviously

17  it would have no value or hardly any value.

18  Q    Okay.  Are the Valsuani Little Dancer bronzes as accepted

19  by the marketplace as the Hebrard Little Dancers?

20  A    Not at this point in time.

21  Q    And what effect does that have on the comparative prices?

22  A    The Valsuani bronzes are worthless.

23  Q    How much less would you say?

24  A    Depends on the bronze.

25  Q    What about the -- depends on the Little Dancer bronze or

1  the --

2  **A**    In general, it depends on the bronze.  But in the case of

3  Little Dancer, it's probably worth, in the marketplace,

4  10 percent, perhaps, of the Hebrard bronzes.

5  **Q**   Now, has it been -- is there a debate --

6             **MR. BRUGNARA:**  Your Honor.  Your Honor, I object.

7             **MR. KINGSLEY:**  I haven't even asked a question.

8             **MR. BRUGNARA:**  Not to your question.  To the last

9  question and -- and -- and his answer.

10        **THE COURT:**  Well, you can cross examine when it's

11 your turn, but he's qualified to state an opinion.  He possibly

12 is wrong and on cross examination you can bring that out.  So

13 overruled.

14      Please, next question.

15      We're going to take a break soon.  And I think the jury

16 would like to probably see a picture of one of these Little

17 Dancers because so far you haven't shown them one.

18             **MR. KINGSLEY:**  It's coming up, your Honor.

19        **THE COURT:**  And then we're going to take a break

20 after that.  So let's move on.

21             **MR. KINGSLEY:**  We can go to the picture right now.

22      I'm going to turn to the next page of this document --

23 actually, not the next page, the third page of this document.

24      (Photograph displayed.)

25

1   **BY MR. KINGSLEY:**

2   **Q**   What is this a picture of?

3   **A**   This is a photograph of a Valsuani Little Dancer bronze.

4   **Q**   And is this the exact bronze that was at issue in this

5   transaction, or is it a different one?

6   **A**   No.  It's a different -- different cast.

7   **Q**   Umm --

8   **A**   But they are all identical.

9   **Q**   They are all identical?

10  **A**   All the bronzes in the edition are identical.

11  **Q**   And how do you know that this is a picture of the Valsuani

12  Little Dancer bronze?

13  **A**   Because I can tell from the posture and the thickness of

14  the dancer's legs.

15  **Q**   Have you also -- have you seen Valsuani Little Dancer

16  bronzes in person?

17  **A**   Yes, I have.

18  **Q**   Okay.

19          **THE COURT:**  Is this a good time to take a break?

20          **MR. KINGSLEY:**  This would probably be a good time.

21          **THE COURT:**  All right.  I need to admonish you now in

22  the jury box.

23      No talking about the case in the jury room or the evidence

24  or whatever.  Talk about sports, coffee, those kinds of things,

25  but not about the evidence in the case.

383

```
 1        We'll see you back here in 15 minutes.  Thank you.

 2             THE CLERK:  All rise.

 3        (Jury exits courtroom at 9:57 a.m.)

 4             THE COURT:  All right.  Please, may the witness be

 5   excused?

 6             MR. KINGSLEY:  Yes, your Honor.

 7             THE COURT:  All right.  Not excused, but you can go

 8   and take your 15-minute break, too.  We'll see you back here in

 9   15 minutes.

10             THE WITNESS:  Thank you, your Honor.

11        (Witness steps down.)

12             THE COURT:  Okay.  Everyone else be seated.

13        Is there anything the lawyers need the judge for?

14             MS. HARRIS:  Just very briefly, your Honor, a couple.

15        The first is procedural.  The Court has referred to making

16   a record in the Ninth Circuit.  And we were not permitted to

17   have our objections ruled on during the defendant's opening

18   statement, and we would ask the Court to admonish the defendant

19   that he is not to talk over the Court when the Court is trying

20   to make a ruling.  We need to have a clear record for the

21   Government, just like the Court needs a clear record, should

22   this case ever go to appeal.  And we want to make sure our

23   objections are ruled on and preserved for any future court to

24   look at.  And he cannot speak loudly and bully this Court into

25   not listening or making proper rulings on our objections.
```

```
 1        The second point I'd like to bring to the Court's

 2   attention is that we would ask the Court to explain that

 3   hearsay is an out-of-court statement, not an out-of-court

 4   observation.  So when a witness testifies to what they

 5   observed, it's not hearsay.  And most of the hearsay

 6   objections -- and I understand he's pro se.  But -- but hearsay

 7   is only an out-of-court statement being admitted for the truth

 8   of the matter.

 9             THE COURT:  Well, there -- some of those were

10   out-of-court statements.

11             MR. BRUGNARA:  Your Honor, can I comment --

12             THE COURT:  Just a minute.

13        Are you done?

14             MS. HARRIS:  I am, your Honor.

15             THE COURT:  All right.  What's your response?

16             MR. BRUGNARA:  Yeah, my response is, you know, she

17   talks -- there are two types of bullies.  There's -- there's --

18   there's -- there's the quiet bully, like Ms. Harris, and then

19   there is the more obvious.  The fact of the matter is I --

20             THE COURT:  Like you.

21             MR. BRUGNARA:  Yeah, like me.  I mean, let's just --

22   call it what it is, right?

23        But the fact is, she has her style.  I have my style.

24   They are distinctly different.  And if she doesn't like it, too

25   bad.  But as long as I follow the Court's orders, obviously.
```

1    And I did sit down when you cut my opening argument short.
2  I want that made on the record, too.  I believe I got cut short
3  by 15 minutes.

4    So I -- whatever penalty I incurred from that, I accepted
5  it with -- with objection on appeal if that ever happens.

6    But, your Honor, her other comments about hearsay, I'm not
7  shooting from the hip.  My pro se status is hearsay.  I'm
8  concurring with the two appointed experts, gurus they were
9  called, especially Mr. Tamor who has got 21 years' experience.
10 And according to CJA, he's the guru of -- of -- of evidence,
11 and he concurs with my objections before I make them.

12    So I just want to make this Court aware that I'm not doing
13 anything frivolous to upset your Honor or try to disrupt the
14 proceedings, unless I concur with the experts.

15         **THE COURT:**  Now, to go to the opening statement.  If
16 a lawyer had given that opening statement, they would be held
17 in contempt for violating so many fundamental rules.

18    And I'm very disappointed in the advisory lawyers that
19 they didn't tell you how to perform.  If they did tell you how
20 to perform in an opening statement, then I'm very disappointed
21 in you, Mr. Brugnara.  You told me you were going to behave
22 yourself and that was -- that was way beyond anything that
23 should have ever been said to the jury.

24         **MR. BRUGNARA:**  Well, your Honor, you -- you gave me
25 about four or five directives what I must -- actually, there

```
 1    were four.  I have them written down.  You gave them to me
 2    yesterday.  And I followed all four of your written directives
 3    to the T and I didn't violate any of them.
 4         And, no, we didn't discuss the procedure or protocol.
 5    And, in fact, I'm relying on 22 years' experience in -- in --
 6    in civil court of what is allowed in an opening argument.  And
 7    I don't see what I did over there that constituted some -- some
 8    distress.  I didn't touch on any of the subjects that you --
 9    that you ordered me not to.  I followed to the letter what your
10    four directives were.
11              THE COURT:  I also told you to stick to things where
12    there was going to be evidence in the case to support it.
13              MR. BRUGNARA:  There will, your Honor.
14              THE COURT:  You get into how Magistrate Nat Cousins
15    is a co-conspirator with the prosecutors here.  Is that going
16    to come into evidence?
17              MR. BRUGNARA:  Your Honor, Erik Babcock is going to
18    be a witness in this case.  And Erik Babcock has filed numerous
19    motions with his name on it that -- that -- that will affirm
20    that my distress, my state of mind when the alleged abscond
21    happened, whether you believe it was real because you think I
22    look great or whether it is real and I will be dead in six
23    months from cancer since cancer runs in my family and I've lost
24    100 pounds eating every scrap of food they stuck through my
25    door like a zoo animal.  I may be dead in six months and you
```

1    will be going home.

2        But you know what?  My state of mind goes to the fact that

3    I have been pretrial confined.  And that's what caused the

4    alleged abscond.

5        And if -- if -- if counsel that's advising me advises we

6    need to include that when I cross examine Mr. Babcock, I will

7    do so.  If they advise that I don't and I concur, well, then, I

8    probably won't.  But I might.  And it's --

9        **THE COURT:**  You're not even answering.  I asked you

10   how in the world it's ever going to come into evidence that Nat

11   Cousins is a co-conspirator with Mr. Kingsley.

12       **MR. BRUGNARA:**  Well, I --

13       **THE COURT:**  What --

14       **MR. BRUGNARA:**  -- I wouldn't use the word

15   "co-conspirator."  I would use the word that I used every time:

16   He's a puppet of the U.S. attorneys, and I -- and that's the

17   word I use --

18       **THE COURT:**  That's never going to come into evidence.

19   You know it's not going to come into evidence.

20       **MR. BRUGNARA:**  I will never use that word in this

21   court, out of respect for this Court.

22       But the fact of the matter is I sat in his courtroom and

23   saw somebody who exploited teenage girls my daughter's age on

24   Craigslist, just completely violate -- where he had a standing

25   bench warrant, because he didn't go to the Court.  He walked

```
1  in, when I'm sitting there in chains, and he walked out five

2  minutes later with a $500,000 bail to go back and exploit young

3  girls on the internet.  And I'm sitting here in jail for 11

4  months.  Where is --

5          THE COURT:  Well, I learned I can't trust a word you

6  say on things like that.

7          MR. BRUGNARA:  Okay.  Well --

8          THE COURT:  So I -- I have learned the hard way that

9  there is more to the -- always more to the story.

10         MR. BRUGNARA:  There is not more to the story because

11 I put it on the record, on the transcribed record in front of

12 Judge Cousins.  And everything I say to you I called to

13 Judge Cousins' face first, and he had no explanation for it.

14         THE COURT:  Now, the Government raised a good point

15 and that is when they make an objection, you have to stop and

16 you have to let me rule on it.

17         Instead, you just continued right on talking and bullying

18 your way through.  I couldn't get a word in edgewise.  No one

19 could get a word in edgewise.  And -- and it's just -- the

20 thing is this, okay?  So you've got to stop next time and let

21 me make a ruling.  The Government is right about that.

22         And I want to say for the record, because it won't always

23 come out clear, that Mr. Brugnara has, despite his claims that

24 he has cancer, despite his claims that he's wasting away, can

25 speak for ten minutes without taking a breath.  And he speaks
```

```
 1   so fast that no one can get a word in edgewise.  He is a
 2   whirling dervish in the courtroom.  And you just have to be
 3   here to see it and marvel at it.  And you can't -- it won't
 4   come through on the cold record.
 5        So, please, the Court of Appeals cannot possibly blame the
 6   prosecutors for their inability to get a word in edgewise.  And
 7   when they do, for me not being able to get a word in edgewise.
 8        You abuse the process greatly, Mr. Brugnara.  There were
 9   so many things wrong with that opening statement that I'm not
10   even going to try to count them up now.
11        You're not diagnosed with cancer.  Telling the jury you
12   got cancer --
13             MR. BRUGNARA:  I didn't say -- I didn't tell them I
14   had cancer.  I said I might have cancer.  Because when I spoke
15   to the doctor this morning, at 4:30 in the morning as she was
16   trying to talk her way out of the 17(a) subpoena, she said:
17   Well, could be cancer.  It could be an autoimmune disorder.
18   She is going to run blood tests --
19             THE COURT:  I don't believe a word of it.
20             MR. BRUGNARA:  Her name is --
21             THE COURT:  You don't have cancer.  Come on.  And you
22   shouldn't have said that to the jury.
23             MR. BRUGNARA:  Your Honor, my -- my brother, who I
24   can bring in here as a witness, is a year older than me and he
25   has had cancer twice.
```

```
 1              THE COURT:  All right.
 2              MR. BRUGNARA:  And he is only one -- and my mother
 3    just had her colon removed from cancer.  And I have three
 4    uncles that died from cancer.  And you know --
 5              THE COURT:  I'm sorry --
 6              MR. KINGSLEY:  Your Honor, I --
 7         (Unreportable cross talk.)
 8              MS. HARRIS:  One other thing, your Honor, while we
 9    are on the topic of objections.  They should be confined.
10    Mr. Brugnara is acting as a lawyer on his own behalf.  He
11    should not be making ad hominem attacks on the witness.  He
12    should only be raising legitimate objections.  He should not
13    being interjecting "fake art" or any other ad hominem attacks.
14              THE COURT:  I understand.  And you're right about
15    that.
16         I admonish you to just say "hearsay."  Sometimes you did
17    it right.  Say, "Hearsay."  "Not qualified."  Those are
18    legitimate objections.  I didn't sustain some of them, but
19    that's okay.  But to make a speech at the same time, no, you
20    can't do that.
21         We're going to take our break.  And I want the -- I want
22    the advisory counsel to know you should talk with Mr. Brugnara
23    about whether or not the way his behaving in court is helping
24    his case with the jury.  It's up to him.
25         If he wants to misbehave, and maybe the -- in my
```

1   experience some juries would hold it against him if he

2   misbehaves.  Not because he's pro se, but because he

3   misbehaves.  And you need to talk with him and give him some

4   advice.  That's what you're here for.

5       Now, if he disregards your advice and he wants to

6   misbehave in front of the jury, I'm doing my best to --

7   admonish the jury to be as fair as possible to him and not hold

8   it against him because he gets carried away.  But you talk to

9   him about it.

10          MR. BRUGNARA:  Your Honor, that's a subjective

11  comment, because the fact is I followed your four written

12  directives that you gave me that I wrote down yesterday --

13          THE COURT:  No, you didn't.  No, you didn't.  I told

14  you not to get into things where there would be no evidence,

15  and there is not going to be evidence about cancer.  There is

16  not going to be evidence about --

17          MR. BRUGNARA:  Yes, there is.

18          THE COURT:  -- Nat Cousins.

19          MR. BRUGNARA:  Yes, there is.

20          THE COURT:  There is not going to be any of that

21  evidence.

22          MR. BRUGNARA:  Your Honor, we have three doctors --

23  two registered nurses and a doctor that is going to come in and

24  stay exactly what I said.

25      So for you, again, to be essentially, you know, at the

```
 1  beck and call of Ms. Harris whenever she looks at you, "Hey."
 2  That -- that -- this is not right.  They got their full 50
 3  minutes.  I got cut short at 30 minutes, and I needed the full
 4  40.
 5          THE COURT:  All right.  Well, you wasted -- you
 6  wasted 90 percent of the time that you -- you were up there.
 7      All right.  We're taking a 12 or 15-minute break ourselves
 8  and then we will resume.
 9          MR. KINGSLEY:  Can I raise an evidentiary when we
10  come back?
11          THE COURT:  Yes.
12          MR. KINGSLEY:  Thank you.
13      (Whereupon there was a recess in the proceedings
14       from 10:09 a.m. until 10:20 a.m.)
15          THE COURT:  I need to say something to the lawyers.
16  It has been reported to me that in the men's room,
17  Mr. Kingsley, you said something that if -- to the effect:
18  Come on, advisory counsel.
19      Now, no harm probably done.  But you need to know that the
20  jurors sometimes go to those bathrooms.
21          MR. KINGSLEY:  I apologize, your Honor.
22          THE COURT:  They have their own back here, but --
23  there is one for each gender, so they have to use the other
24  facilities and we don't want to take a chance.
25      So when you lawyers are out there in the hallway or in the
```

 1    facilities, elevators, don't -- just mum is the word.   Excess

 2    caution is the way to do it.

 3          **MR. BRUGNARA:**   Well, your Honor, I want to make a

 4    comment on that, because my liberty is at stake here and I --

 5    and I thought -- and my attorneys thought, just to let you

 6    know, who have collectively 20-something years' experience,

 7    that I did a good job on the opening statement, and I got

 8    across the human point that I'm innocent, which is the essence

 9    of this trial.   I'm innocent.   And the fact is I followed the

10    directives that you gave me specifically the day before.   And

11    to admonish me, to cut me off is prejudicial.   Ms. Harris is

12    trying to orchestrate a circumstance where she directs you and

13    then you admonish me.

14          **THE COURT:**   I believe the record will be clear on

15    appeal, so enough is said.   Your point is preserved for the

16    record.

17          All right.   It's time to now bring the jury in and move

18    on.

19          **MR. KINGSLEY:**   Can I -- your Honor, before I go on,

20    there is a piece of evidence I want to introduce.   It's a

21    certificate that Mr. Maibaum got involving the particular

22    Little Dancer in this case from the foundation in France that

23    authenticates these things.   I recognize that the certificate

24    itself is probably hearsay, but Mr. Brugnara has been attacking

25    the credibility of the witnesses and the authenticity of this,

1   and I think it goes to Mr. Maibaum's state of mind.  And I

2   wanted to flag that before I brought it up.

3          THE COURT:  Just a moment.  Are you going to make an

4   objection on hearsay?

5          MR. BRUGNARA:  I am, your Honor, because --

6          THE COURT:  The objection is sustained for now.

7   However, there is a very good chance on the cross examination

8   that Mr. Brugnara will place that in issue, and it will become

9   admissible later.  But for now it's not admissible.

10          MR. KINGSLEY:  Okay.  We'll will hold off.

11          THE COURT:  What else do you have?

12          MR. KINGSLEY:  Can I -- can I ask him whether he

13   believed it was authentic or would you -- I mean, I can leave

14   all that out until -- we know he's going to go into it at

15   cross.

16          THE COURT:  I think -- yes, but it hasn't happened

17   yet.

18          MR. KINGSLEY:  Okay.

19          THE COURT:  I think it will happen, but wait and see.

20   But the --

21          MR. KINGSLEY:  I have leave that until redirect,

22   depending on the process.

23          MR. BRUGNARA:  Can you show the certificate you're

24   talking about?

25          (Document tendered to Brugnara.)

```
 1            MR. BRUGNARA:  You know, your Honor, I want to make
 2    one other comment.  And, you know, I think for somebody who's
 3    put in the situation I am and actually going through this
 4    trial, or experienced trial lawyers don't even have to deal
 5    with the sort of pressure, let alone being locked in a cell for
 6    11 months with murderers, not sleeping for 11 months.
 7            THE COURT:  What's your point?
 8            MR. BRUGNARA:  I think I am doing pretty good --
 9    well, I think I'm doing pretty darned good.  I'm just kind of
10    giving myself a little pat on the back since you refuse to.
11            THE COURT:  Well, I -- so far, you don't get a pat on
12    back.  But you can still redeem yourself by behaving better.
13        (Brief pause.)
14            MR. BRUGNARA:  We have never -- I have never seen
15    this before.
16            MR. KINGSLEY:  It was produced to you a long time
17    ago.
18            THE COURT:  It doesn't matter.  You're not going to
19    use it now.  So let's bring in the jury and let's get started.
20        (Jury enters courtroom at 10:27 a.m.)
21            THE COURT:  Be seated, please.
22        Mr. Maibaum, can you get the microphone so it will catch
23    your voice?
24            THE WITNESS:  Yes, sir.
25            THE COURT:  Mr. Kingsley, you may go ahead.
```

396

| | |
|---|---|
| 1 | **BY MR. KINGSLEY:** |
| 2 | **Q**    I think we have the laptop working now, so I'm going to |
| 3 | give him the original copy of the exhibit. |
| 4 |         **THE COURT:**  Fine.  Let's put something on the screen |
| 5 | so we know it's working. |
| 6 |         **MR. KINGSLEY:**  Can you publish Exhibit 34, the third |
| 7 | page? |
| 8 |      (Photograph displayed.) |
| 9 |         **THE COURT:**  Did a picture come up on your screen in |
| 10 | the jury box? |
| 11 |      (Jury panel nodding affirmatively.) |
| 12 |         **THE COURT:**  Thank you. |
| 13 |      All right.  Next question. |
| 14 | **BY MR. KINGSLEY:** |
| 15 | **Q**    So we were talking about the Valsuani Little Dancer |
| 16 | **A**    Yes. |
| 17 | **Q**    The Valsuani Little Dancer bronze that's depicted in this |
| 18 | image. |
| 19 |      Do you know if the major art auction houses would accept a |
| 20 | Valsuani Little Dancer for auction at this time? |
| 21 | **A**    Not at this point in time. |
| 22 | **Q**    And which auction houses would those be? |
| 23 | **A**    Christie's and Sotheby's. |
| 24 | **Q**    And can you tell me just a little bit about what |
| 25 | Christie's and Sotheby's do generally? |

```
 1  A     Well, they auction works of art that are consigned to the
 2  auction house.
 3  Q     And so they wouldn't sell this particular Little Dancer
 4  that you sold to Ms. Long in this transaction?
 5  A     Not at this point in time.
 6  Q     Do you believe that will change?
 7  A     Absolutely.
 8  Q     And why --
 9           MR. BRUGNARA:  Speculative, your Honor, hearsay.
10  Trying to explain what Sotheby's and Christie's may do in the
11  future?
12           THE COURT:  Sustained.
13  BY MR. KINGSLEY:
14  Q     Have the Valsuani Little Dancer bronzes been exhibited in
15  museums in the United States?
16  A     Not at this point.
17  Q     What about elsewhere?
18  A     Yes.
19  Q     Which museums?
20  A     Well, among others, the Telaviv Museum of Art and the --
21  most recently the Hermitage Museum in St. Petersburg, Russia.
22  Q     Any others?
23  A     Yes, many others.  The Herakleidon Museum of Modern Art in
24  Athens.  Ivan in Spain, the biggest sculpture museum in Western
25  Europe and other's.  The National Museum in Sofia, and a number
```

1   of others.

2   **Q**    So you mentioned the Hermitage Museum specifically.

3   What's that?  And I'm asking based on your experience in the

4   art world.

5   **A**    The Hermitage Museum is considered by most among the top

6   three museums in the world.  The other two being the Louvre and

7   the Metropolitan Museum in New York.

8   **Q**    And the Little Dancer that was at issue in this

9   transaction -- not the exact bronze, but the Valsuani edition

10  of the Little Dancer, was exhibited at the Hermitage Museum?

11  **A**    That is correct.

12  **Q**    And were you involved in the exposition in which it was

13  exhibited?

14  **A**    I was.

15  **Q**    Okay.  You mentioned before that it was important to you

16  that Ms. Long's buyer was going to put this artwork in a

17  museum.

18       Can you tell me a little more about that now that we've

19  heard more about these bronzes and about the exhibitions of

20  these bronzes in other places?

21  **A**    Well, the more bronzes that are exhibited -- the more

22  Little Dancer bronzes that are exhibited in museums, the more

23  credibility it gives the edition of Valsuani, and that's the

24  purpose of having the exhibitions.

25       And, of course, it also is very important for scholars to

```
 1  research so they can see the bronzes, the Valsuani bronzes, for
 2  example, side by side the Hebrard, to see which might be more
 3  important, which might be more significant and so on.
 4  Q    And is that important to you personally?
 5  A    Yes, it's very important to me personally.
 6  Q    And why is it important to you personally?
 7            MR. BRUGNARA:  Judge.  Your Honor.  Your Honor, how
 8  is this relevant to the art transaction --
 9            MS. HARRIS:  It goes to materiality.
10            MR. BRUGNARA:  -- Rose Long and Brugnara properties?
11            THE COURT:  Overruled.  It's -- overruled.
12            THE WITNESS:  I'm sorry.  What was the question?
13  BY MR. KINGSLEY:
14  Q    Why is it important to you personally?  I think you
15  described the general reason as to why it matters that it's in
16  a museum.  But, specifically, what about these Little Dancers
17  being in a museum makes a difference for you?
18  A    Well, personally, plaster was not known to exist by
19  scholars and experts until, frankly, my wife and I examined the
20  plaster.  We found it at the Valsuani foundry in France, in
21  fact.  We had no idea, frankly, what it was at the time.  They
22  thought, perhaps, it was a rejected plaster that was made by
23  Hebrard.  But during the past 15 years in research, we have
24  found that it's quite something else.
25  Q    And so exhibiting these in museums helps validate your own
```

1  personal views about this sculpture?

2  **A**    That is correct.  Let's -- putting in it in a different

3  way:  Obviously, no museum, especially a great museum like the

4  Hermitage, would ever display a bronze or exhibit a bronze that

5  they did not believe 100 percent was authentic.

6          **MR. BRUGNARA:**  Your Honor, that's hearsay and

7  speculation --

8          **THE COURT:**  Sustained.

9          **MR. BRUGNARA:**  -- and it's clearly an act of --

10          **THE COURT:**  Sustained.

11     Well, I don't know -- I don't think the witness is able to

12  read the mind of the Russian museum.  He may have opinions on

13  it, but that -- this is too far afield from his area of

14  expertise, so we're not going to allow that answer.

15  **BY MR. KINGSLEY:**

16  **Q**    Let's just stick to what is in your mind for now, then.

17     Do you have a personal financial stake in whether these

18  Little Dancers, the Valsuani Little Dancers are accepted as

19  legitimate by the marketplace?

20  **A**    Yes.

21  **Q**    Do you own multiple Valsuani Little Dancer bronzes?

22  **A**    Yes.

23  **Q**    So the fact that a Little Dancer bronze is going to go to

24  a museum makes a difference to you personally?

25  **A**    That is correct.

1  Q     Okay.

2         MR. KINGSLEY:   Now, Ms. Mallory, can we turn back to

3  the first page of this exhibit?

4     (Document displayed)

5         MR. KINGSLEY:   I don't know if the jury can read it,

6  because it's -- can we zoom in on the top on this part,

7  Ms. Mallory, below the artist's name and then there's a bunch

8  of writing.

9     (Document enlarged.)

10        MR. KINGSLEY:   Thank you.

11 BY MR. KINGSLEY:

12 Q     All right.  So here it says, "Cast letter EF D."  And then

13 something in French.  And then it's stamped "EF D," the year

14 1997.  What does that mean?

15 A     Well, the year 1997 is the year the bronze was cast.  And

16 EF D is a French abbreviation for approved de founderie,

17 meaning foundry proof, and the letter D.  And the letter D is

18 fourth one cast in the edition.

19    The first bronze cast in the edition would be EF A, second

20 EF B, third EF C, and this one is EF D.  So it was the fourth

21 foundry proof cast in 1997 of the sculpture.

22 Q     What's the purpose of that -- those stamps?

23 A     Well, each individual bronze has an individual stamp, so

24 we can distinguish which bronze we're speaking of and which

25 bronze could be documented in a certain way, if that's what

402

```
 1  your question refers to.
 2  Q    That's correct.  That was what I was trying to get at.
 3       We didn't get into this before, but in this transaction,
 4  was there originally supposed to be a different Valsuani Little
 5  Dancer bronze that was sold, as you understand it?
 6  A    No.  At one point, Rose Long, who purchased a Little
 7  Dancer previously back in 2001, I believe, she thought about
 8  selling hers.  But then she asked us if we would be interested
 9  in selling one of ours, since it's going to a museum.  Because
10  if she sold hers, it would be involved -- her ex-husband, I
11  believe, she said, "I would have to involve you-know-who,"
12  meaning her ex-husband, who she did not have a cordial
13  relationship with.
14  Q    So let me just ask you a question based on this stamp on
15  it.  If one Little Dancer is stamped EF E and another one is
16  stamped EF D, but they come from the same edition, are they
17  identical?
18  A    They are -- they are identical in nature, yes.
19  Q    And would you consider the price for -- strike that.
20       Does the price of different Little Dancers from the same
21  edition vary, or are they --
22  A    No.
23  Q    -- are they all the same?
24  A    They should be approximately the same.
25  Q    All right.  It also says on here.
```

1          "The word reproduction as required by French law,

2      the Degas heir's sculpture Inventory No. 73 and the

3      mark of the Valsuani foundry."

4      What does the word "reproduction" mean?

5   **A**   Reproduction, in French -- this is a literal translation

6   from French.

7      In English, obviously, "reproduction" could mean a copy;

8   but in France it means a multiple.  So when there's more than

9   12 examples, as there are here -- here, there are 46 bronzes.

10  Since there are more than --

11          **MR. BRUGNARA:**  Your Honor, that's hearsay and it's

12  speculation and his perception of the word "reproduction."

13  There is no proof or any substance to the 12 is the benchmark

14  to set the standard of reproduction.

15          **THE COURT:**  Do you know the answer to the question?

16          **THE WITNESS:**  I do.

17          **THE COURT:**  From your experience and special

18  learning?

19          **THE WITNESS:**  I do, your Honor.

20          **THE COURT:**  All right.  The objection is overruled.

21      Please continue with your answer.

22          **MR. BRUGNARA:**  At least the legal law, your Honor.

23  He cited a law, and I'd just like to have that law.  He says

24  it's a French law that says anything over 12 has to be stamped

25  reproduction, and I want to know what that law is.

1          **THE COURT:**  Please, continue with your answer and

2     save your objection for cross examination.

3          Go ahead, Mr. Maibaum.

4          **THE WITNESS:**  Thank you, your Honor.

5          Under French law, an edition of bronzes or an edition of

6     anything -- lithographs, etchings -- has to be stamped with the

7     word "reproduction."  If more than 12 examples exist, they're

8     considered multiples as opposed to originals.

9          So when you have more than 12, by law in France, the

10    bronzes cast in France, the word "reproduction" has to be

11    stamped on those bronzes.

12    **Q**    Thank you.

13         **MR. KINGSLEY:**  Ms. Mallory, can we zoom back out

14    again, please?

15    **BY MR. KINGSLEY:**

16    **Q**    So in the middle of the page, it looks like it says "Net

17    price, $2 million."

18         What is that?

19    **A**    That's the price that the invoicee, meaning Rose Long, has

20    to pay for the sculpture.

21    **Q**    Okay.  And then --

22         **MR. KINGSLEY:**  Ms. Mallory, can we zoom in on the

23    paragraph that begins "terms," please?

24         (Document enlarged.)

25

1   **BY MR. KINGSLEY:**

2   **Q**     Could you read those terms to me, please.

3   **A**     Sure.

4           "The bronze shall be shipped, as soon as

5         possible, to a California location to be determined

6         by Rose Long Fine Art," indicating RLFA.  "RLFA shall

7         cover the costs of crating the bronze to the

8         location.  RFLA agrees to pay for the bronze in full

9         by bank wire transfer to the account of the Degas

10        Sculpture Project."

11           **MR. BRUGNARA:**  Your Honor, I need to object.  This

12   is a contract between him and Ms. Long.  It has nothing to do with

13   an alleged contract between myself and Ms. Long.

14           **THE COURT:**  What is your answer to that?

15           **MR. KINGSLEY:**  This goes to Mr. Maibaum's

16   expectations and Ms. Long's expectation in this transaction.

17   This is an invoice that was sent to Ms. Long.  And Mr. Brugnara

18   claims that he had -- this was a gift, that he had time to pay

19   for it.

20           **THE COURT:**  I think Mr. Brugnara has a good point,

21   and I'll deal with it in the following way:  Mr. Brugnara

22   cannot be convicted based on what was in the mind only of

23   Ms. Long and this witness.  You have to look at the evidence

24   between Mr. Brugnara and the people he dealt with, which was

25   only Ms. Long, as I understand it, not Mr. Maibaum.

1    So Ms. Long is going to come in and testify, right?

2         MR. KINGSLEY:  That's correct, your Honor.

3         THE COURT:  In a way, this is background, what we're

4    hearing now.  But I do think that there's enough relevance to

5    what -- the way the case has been presented that we're hearing

6    relevant testimony.

7         But it is important for you to realize that this

8    document -- was this document ever shown -- are you going to

9    try to prove this document as having shown to the defendant?

10        MR. KINGSLEY:  Not this particular document.

11        THE COURT:  All right.  So this document never went

12   to the defendant.  So it may shed light on other people's

13   intentions, but it cannot shed light on what was in the mind of

14   the defendant.  You might hear other things that might bear on

15   that, but we're not there yet.

16        All right.  So the objection is overruled, but you must

17   keep in mind the qualification that I just gave you.

18        Go ahead.

19        MR. KINGSLEY:  Thank you, your Honor.

20   BY MR. KINGSLEY:

21   Q    I'm not sure.  Where were we reading?

22   A    I was about to read the second sentence, I believe.

23   Q    All right.  Can you please pick up there.

24   A    Sure.

25        "Rose Long, RLFA, agrees to pay for the bronze in

```
 1          full by bank wire transfer to the account of the

 2          Degas Sculpture Project, DSP, on or before April 15,

 3          2014.  Free and clear title to the bronze shall

 4          automatically pass to RLFA, Rose Long, upon DSP's

 5          receipt of payment in full."

 6   Q   Thank you.

 7          So is it fair to say that your expectation as part of this

 8   was that you were going to be paid on or before April 15,

 9   52014?

10   A   Correct.

11   Q   Was that a relevant expectation for you in determining

12   whether you were selling this bronze to Ms. Long?

13   A   Without a doubt.

14   Q   Okay.

15          MR. KINGSLEY:  Ms. Mallory, can you pull out of this

16   and go back to the full document, please.

17          Thank you.

18          (Document displayed)

19   BY MR. KINGSLEY:

20   Q   You testified that you were selling it to Ms. Long for

21   $2 million.

22          What was your arrangement with Ms. Long with respect to

23   what price she could charge to whoever her buyer was?

24   A   She could charge whatever she wants.

25   Q   So was she free to mark up the price?
```

1   **A**     Yes.

2   **Q**     Now, how did you come up with the price of $2 million?

3   **A**     In my opinion, that was the current value.

4   **Q**     And what did you base that opinion on?

5   **A**     There was one auction --

6           **MR. BRUGNARA:**  Your Honor, hearsay.  You already

7   ruled on the hearsay.  This alleged transaction doesn't exist.

8           **THE COURT:**  Well, are you -- I don't know what you're

9   talking about there.  But are you, yourself, going to cross

10  examine him about the value of these -- of this artwork?

11          **MR. BRUGNARA:**  No, your Honor.  He's just about to

12  talk about the hearsay off the internet.  And you just, I

13  believe, admonished Mister --

14          **MR. KINGSLEY:**  Mr. Kingsley.

15          **MR. BRUGNARA:**  -- Kingsley several times.

16      He's free to open that door.  Let him open it.  But once

17  he opens it, he can't cry about it.

18          **THE COURT:**  That is a fair point.

19          **MR. KINGSLEY:**  He said in his opening that this Degas

20  sculpture was worth, I think, a hundred dollars or something

21  like that.  Mr. Maibaum is not only an expert on this subject,

22  but he was making that comment in relation to Mr. Maibaum and

23  Ms. Long's credibility.

24          **MR. BRUGNARA:**  Your Honor, I need to comment on that.

25  I actually proved up a document from a witness who's going to

1   testify in this trial from Sotheby's.  And they're talking

2   about hearsay, rank hearsay, as you were quoted, I believe, on

3   the bench, off the internet.

4       So if he wants to talk about rank hearsay, that's fine.  I

5   just want to make sure that the door is open for both sides.

6       **THE COURT:**  All right.  Now I'm going to sustain the

7   objection.  And we're not going to get into the specifics of

8   what he based the 2 million on.

9       **MR. KINGSLEY:**  Thank you, your Honor.

10  BY MR. KINGSLEY:

11  Q   All right.  I'm going to move on from this exhibit.

12      **MR. KINGSLEY:**  May I approach the witness.

13      (Whereupon document was tendered to the witness.)

14  BY MR. KINGSLEY:

15  Q   I'm showing you what's been previously marked as

16  Government's Exhibit 35.

17      Do you recognize this document?

18  A   I do.

19  Q   What is it?

20  A   This is our invoice to Rose Long Fine Arts for the 16

21  Willem de Kooning paintings on paper.

22  Q   And is this the type of document that was made in the

23  ordinary course of business of Modernism Fine Arts?

24  A   He.

25  Q   And is it the type made by someone with knowledge of the

1  events that it reflects?

2  **A**     Yes.

3  **Q**     And is it the type made at or near the time of the event?

4  **A**     Yes.

5  **Q**     And was it maintained by Modernism Fine Arts in the

6  ordinary course of business?

7  **A**     Yes.

8          **MR. KINGSLEY:**  The Government moves to admit

9  Exhibit 35 and publish it to the jury.

10          **MR. BRUGNARA:**  Your Honor, I object to that on the

11  same grounds as the last objection that it's a contract,

12  purportedly, we don't know yet, between him and Ms. Long, which

13  has nothing to do with his purported art transaction.

14          **THE COURT:**  I'm going to allow it in with the same

15  caveat that I made earlier; that is, that the jury needs to

16  keep straight what were the communications with the defendant.

17  That's more important than what we're looking at now, but this

18  has some relevance, and it will be allowed.

19      Go ahead.

20      (Trial Exhibit 35 received in evidence)

21          **MR. KINGSLEY:**  Thank you, your Honor.

22      Can we publish this to the jury?

23          **THE COURT:**  Sure.  Go ahead.

24      (Document displayed)

25

```
 1          MR. KINGSLEY:  So looking at the middle of the page,

 2   Ms. Mallory, can we zoom in under "Net Price to Rose Long Fine

 3   Arts," please.  Down to "Total Price."

 4        Thank you.

 5   BY MR. KINGSLEY:

 6   Q    So how many de Kooning paintings were involved in this

 7   transaction?

 8   A    Sixteen.

 9   Q    And those are the 16 listed there?

10   A    Correct.

11   Q    Are these the prices for each individual painting?

12   A    Yes.

13   Q    What was the total price that you were selling these to

14   Rose Long for?

15   A    $5,692,000.

16   Q    Okay.

17          MR. KINGSLEY:  Can we zoom out, please?  And can we

18   zoom in on the very bottom paragraph?

19        (Document enlarged.)

20   BY MR. KINGSLEY:

21   Q    So this looks like a similar provision to what you had in

22   the Degas invoice.  It says:

23          "Rose Long Fine Arts agrees to pay in full on or

24          before April 15, 2014."

25        Is that right?
```

1  **A**     Correct.

2  **Q**     And what was your expectation with regard to that

3  provision?

4  **A**     That we would be paid in full by April 14, 2015.

5  **Q**     Okay.  You testified that these were on consignment.  What

6  was your arrangement with respect to the owners of it in terms

7  of when they should have expected payment?

8  **A**     Once we received the money, we were to pay them within

9  five business banking days thereafter.

10 **Q**     Okay.

11            **MR. KINGSLEY:**  Ms. Mallory, can you zoom out?

12 **BY MR. KINGSLEY:**

13 **Q**     We discussed provenance a bit before.

14            **MR. KINGSLEY:**  Can we zoom in on the provenance

15 paragraph here?

16     (Document enlarged.)

17 **BY MR. KINGSLEY:**

18 **Q**     So could you tell me what this means, the paragraph after

19 provenance?

20 **A**     Yes.  This is the ownership history of these de Koonings.

21 For the record, Inez MacWhinnie is the first person listed from

22 South Hampton, New York, was a close friend of Bill and Elaine

23 de Kooning --

24            **MR. BRUGNARA:**  Your Honor, that's hearsay and

25 unproven and actually in violation of the order that you issued

```
 1   in the 17(c) subpoena for him to prove up any proof.  And he

 2   didn't prove up any proof, and now he's hearsaying as fact.

 3            THE COURT:  What's your answer to the objection?

 4            MR. KINGSLEY:  It's the same for all of these, which

 5   is this is the provenance that Mr. Maibaum and Ms. Long relied

 6   on in selling them.  It's background.  We can get into it

 7   later.  But I don't think we should have to recall Mr. Maibaum

 8   down the road.

 9            THE COURT:  Do you have -- do you know MacWhinnie?

10   Do you know that person?

11            THE WITNESS:  I do not.  Inez MacWhinnie, you're

12   referring to?

13            THE COURT:  So you weren't around when MacWhinnie got

14   the artwork to begin with?

15            THE WITNESS:  No.  But we have documentation provided

16   by the consignors we have documentation provided by the

17   consignors of the artwork.

18            THE COURT:  Have you produced that documentation to

19   us?

20            THE WITNESS:  We have.

21            THE COURT:  In this case?

22            THE WITNESS:  Yes.

23            THE COURT:  All right.  The objection is overruled.

24   But the jury will remember that this is not based on firsthand,

25   he saw with his own eyes.  He never met MacWhinnie in his life.
```

414

1  And he's going off of documents and other things that would

2  normally be hearsay.

3      But on account of him being an expert in the field, this

4  is allowed.  So you must keep in mind the nature of the proof.

5  It's an opinion that he's giving.  An opinion, not fact.

6      So in that vein, I'm going to allow the testimony to

7  continue.

8          THE WITNESS:  We were provided documents from the

9  consignors of the de Koonings, testifying basically that this

10  is the correct provenance, if that answers the question.

11  BY MR. KINGSLEY:

12  Q    Yeah.

13      So this is your -- this is your understanding of where

14  these came from?

15  A    Yes.  And this is what we relied upon.

16  Q    Okay.  Thank you.  That's it.

17          MR. KINGSLEY:  Ms. Mallory, can we turn now to page 3

18  of this exhibit?

19      (Document displayed)

20  BY MR. KINGSLEY:

21  Q    So what are these images on Page 3 of Exhibit 35?

22  A    Page 3 and 4 are images of each of the individual

23  de Koonings, along with the dimensions and if they are framed

24  or matted.

25  Q    So when you say "framed or matted," can you just elaborate

1  on that a little more?

2  **A**    Yes.  If the work is framed -- the works are either framed

3  or they are put in mats, window mats -- I guess we'll see in a

4  moment -- as how they are preserved.

5  **Q**    So some of the paintings at issue in this case were

6  framed?

7  **A**    That is correct.  And others were just simply matted.

8          **MR. KINGSLEY:**  Ms. Mallory, could you turn to the

9  next page as well so the jury can see what the witness is

10  referring to?

11         (Document displayed)

12  **BY MR. KINGSLEY:**

13  **Q**    And these of the rest of the de Koonings that were

14  involved --

15  **A**    That is correct.

16         **MR. KINGSLEY:**  All right.  I'm finished with this

17  exhibit.

18         May I approach, your Honor?

19          (Whereupon document was tendered to the witness.)

20  **BY MR. KINGSLEY:**

21  **Q**    I'm showing you what's been previously marked as

22  Government's Exhibit 36.  Could you just take a moment and let

23  me know if you recollect it?

24  **A**    I do.

25  **Q**    And what is it?

1   A    It's our invoice to Rose Long Fine Arts, Rose Long, dated

2   March 31st, 2014, for the Joan Miro crayon drawing.

3   Q    And I'm going to ask you the same questions I asked you

4   with prior documents.

5        Is this the type of document made in the ordinary course

6   of business of Modernism Fine Arts?

7   A    Yes.

8   Q    Is it the type made by someone with knowledge of the

9   events that it reflects?

10  A    Yes.

11  Q    Is it the type made at or near the time of the events that

12  it depicts?

13  A    Yes.

14  Q    Is it maintained in the regular course of business of

15  Modernism Fine Arts?

16       **MR. BRUGNARA:**  Your Honor, I object to the same as

17  the other two.

18       **MR. KINGSLEY:**  The Government moves to admit

19  Exhibit 36.

20       **THE COURT:**  The jury will keep in mind the admonition

21  I gave earlier about the difference between documents that went

22  between the defendant and Ms. Long versus documents that went

23  between Ms. Long and this witness.

24       And with that caveat, the objection is overruled, and the

25  exhibit is received.

417

```
 1            MR. KINGSLEY:  Thank you, your Honor.
 2        (Trial Exhibit 36 received in evidence)
 3            MR. KINGSLEY:  Can we publish to the jury?
 4        (Document displayed)
 5            MR. KINGSLEY:  Ms. Mallory, can we zoom in on the
 6   first big paragraph that starts with "Joan Miro"?
 7   BY MR. KINGSLEY:
 8   Q    So what is the name of the drawing that the sale involved?
 9   A    It's untitled, but "personnage" in French just means
10   person.  A figure, a person.
11   Q    And so when it's untitled but has this parenthetical, does
12   the artist give the name in the parenthetical, or how does it
13   work?
14   A    Sometimes the artist does, or, perhaps, it was done as an
15   identification by the artist dealer.  I don't know.
16   Q    Okay.  And then just working through it the way we did
17   with the other ones.  It says provenance.  What is your
18   understanding of what that means?
19   A    Well, these are dealers of Miro's works, all of whom
20   handled the drawing.
21   Q    And do you recognize the galleries or dealers that are
22   described on there?
23   A    I do.
24   Q    What do you know about those galleries?
25   A    They're all very well recognized as dealers in important
```

```
1   works of art.  They're premium galleries.  Also, Gallery Barbiè
2   in Barcelona.
3   Q    Where it says, "Joan Mirò, catalogue raisonne of
4   drawings," can you tell us what that means?
5   A    Yes.  As I mentioned earlier, there are catalogue raisonne
6   books basically documenting each work by an artist that's
7   authentic.  And this drawing is listed and shown in that book
8   of the Mirò catalogue raisonne.
9            MR. KINGSLEY:  Ms. Mallory, can you turn to Page 4 of
10  Exhibit 36, please?
11       (Document displayed)
12  BY MR. KINGSLEY:
13  Q    What is this a picture of?
14  A    It's a pictures of the image.  The art is not drawn on
15  chart paper as this appears to be.  That must have been a
16  computer glitch or something.  But, anyway, it does show the
17  drawing, the line of drawing.
18  Q    Okay.  And how do you know that this is the image, this is
19  an image of that picture?
20  A    Because I recognize it.
21  Q    Okay.
22            MR. KINGSLEY:  All right.  I'm finished with that
23  one, and I have one last similar exhibit to give you
24       May I approach?
25
```

```
 1  BY MR. KINGSLEY:

 2  Q    I'm showing you what's been previously marked as

 3  Exhibit 37.

 4       (Whereupon document was tendered to the witness.)

 5  BY MR. KINGSLEY:

 6  Q    Do you recognize this document?

 7  A    I do.

 8  Q    And what is it?

 9  A    This is our invoice to Rose Long, dated March 31st, 2014,

10  for the Picasso etchings.

11  Q    Okay.  And I'm going to ask you the same questions again.

12  Is this the type of document made in the ordinary course of

13  business in Modernism Fine Arts?

14  A    Yes.

15  Q    And is it the type made by someone with the knowledge of

16  the events it reflects?

17  A    Yes.

18  Q    Is it the type made at or near the time of the event in

19  question?

20  A    Yes.

21  Q    Is it maintained in the regular course of business?

22  A    Yes.

23       MR. KINGSLEY:  Your Honor, the Government moves to

24  admit Exhibit 37.

25       MR. BRUGNARA:  Your Honor, same objection on hearsay.
```

420

1          THE COURT:  Well --

2          MR. BRUGNARA:  Relevance to the transaction.

3          THE COURT:  Relevance is overruled.

4      There are hearsay statements within the hearsay.  The

5  business record rule doesn't overcome the

6  hearsay-within-hearsay.  But those -- could I see the document,

7  please?

8          (Whereupon document was tendered to the Court.)

9          THE COURT:  You indicate an invoice.  There's a lot

10  more in here than that.  That part is easy to get into

11  evidence.  But the part that has the provenance is -- couldn't

12  possibly be based on first-hand knowledge.  It has to be based

13  on out-of-court or things from libraries and other sources.

14  And so there has to be an independent basis for getting that

15  into evidence.  And I will allow it into evidence.

16      But, again, I need to explain to the jury that this

17  provenance is just opinion.  It's not fact, like I saw the

18  light and it was red.  It's somebody checking out things on the

19  internet or looking at books, and they're skilled at doing

20  that, and they can draw judgments that ordinary mortals like

21  you and me can't draw because they're experts.  But it's just

22  an opinion, so you've got to keep that in mind.

23      So to call this a business record is not quite right.  I'm

24  going to allow -- I'm going to allow it in because it is -- it

25  is the invoice part, but these descriptions and the history and

1   all of that is opinion.

2       I'm going to allow it in, but the jury has got to keep in

3   mind that distinction.  I know you will.

4       All right.  So there you go.  Here is your document back.

5   It's received in evidence.

6       (Trial Exhibit 37 received in evidence.)

7           **MR. KINGSLEY:**  Thank you, your Honor.

8           **THE WITNESS:**  Your Honor, may I speak to that for a

9   moment?

10          **THE COURT:**  No.

11          **THE WITNESS:**  Okay.

12          **THE COURT:**  Not until there's a question.

13          **THE WITNESS:**  Okay.

14       (Whereupon document was tendered to the witness.)

15          **MR. KINGSLEY:**  Ms. Mallory, could you zoom in from

16  the first Pablo Picasso to the total price, please?

17       (Document displayed.)

18  **BY MR. KINGSLEY:**

19  **Q**   What were the names of the etchings involved in this sale?

20  **A**   The English translation, the first group would be the

21  Dreams and Lies of Franco.

22  **Q**   What about the second one?

23  **A**   The second one would be the tavern -- In The Tavern.

24  **Q**   And it says total price for the Picasso is $100,000.  What

25  was that?

1   **A**     Actually, I don't understand your question.

2   **Q**     Was that -- was that the price that Rose Long was supposed

3   to pay you for these Picassos?

4   **A**     Yes.  This was for all of these etchings, correct.

5   **Q**     All of them as a group.

6          Now, there doesn't appear to be a description of the

7   provenance as obviously on this document as there were on the

8   others.

9          Can you just tell me why that would be the case for the

10  Picasso etchings?

11  **A**     Well, with etchings, unlike paintings or drawings or a

12  sculpture for that matter, it's very, very difficult to fake a

13  copy.  And it's not necessary generally because, again, there

14  are catalogue raisonne books where I can get very precise

15  measurements and accurate dimensions of each etching.

16         For example, if one of these etchings, say In The Tavern,

17  was supposed to be in millimeters, which is a very definitive

18  measurement, let's say 46-by-58, and this dimension is 48-by-58

19  and it matches precisely, one can easily determine if it is

20  authentic.

21         Plus there's a surface feel, surface texture, to the

22  etching that people who have experience can feel the etching --

23  which, frankly, I can do -- and say if it's authentic or not.

24         It doesn't pay, frankly, for people to fake etchings,

25  generally speaking.  If a forger were inclined to do so or

1  forger were inclined to make a fake, it's much easier to make a

2  drawing, because some drawings are not documented.  It's

3  very -- almost impossible --

4          MR. BRUGNARA:  Your Honor, that's hearsay unless he

5  has first-hand knowledge of making forgeries.

6          THE COURT:  All right.  We're going to stop the

7  answer there -- I'm not going to strike the answer, but I think

8  it's time for a new question.

9          MR. KINGSLEY:  Thank you, your Honor.

10     Ms. Mallory, can we turn to Page 3 of Exhibit 37?

11     (Document displayed)

12  BY MR. KINGSLEY:

13  Q    What are these images depicted on this page?

14  A    Okay.  On each -- on the top and the bottom are images of

15  a sheet of paper upon which, on each sheet, nine etchings were

16  printed.  So you have nine individual small etchings on one

17  sheet, on the top one.  Same on the bottom one.

18  Q    And which of the set of etchings is depicted in these two

19  sets of images?

20  A    Can you rephrase that question?

21  Q    What's the name of the work of art?

22  A    These are the Dreams and Lies of Franco.

23  Q    Okay.

24  A    It's like an allegorical statement.

25  Q    And so each piece of paper -- does each image reflect one

```
 1  piece of paper or --

 2  A    Yes.  The top -- the top sheet, which has nine small

 3  images, that's one sheet of paper.  Same on the bottom.

 4  Q    Okay.  Thank you.

 5       MR. KINGSLEY:  Ms. Mallory, can we turn now to Page 4

 6  of this Exhibit?  Sorry, page 5.

 7       (Document displayed.)

 8  BY MR. KINGSLEY:

 9  Q    What are the images at the top of this page?

10  A    These are close-ups of the individual etchings, which are

11  on the larger sheets, individual images.

12  Q    Now, this particular set of etchings, was it all big

13  sheets with little pictures on it or were there some cutouts?

14  A    No.  In this particular set, which is very rare, Picasso

15  himself cut out the nine images on each sheet of paper and he

16  kept them in a box.  And we have one of those boxes.

17  Q    So part of the work that you were selling to Rose Long as

18  part of this transaction included these cutouts that are

19  depicted?

20  A    That is correct.  Very, very rare.

21  Q    And it also included the full pages that we looked at just

22  a moment ago?

23  A    Yes.

24  Q    All right.

25       MR. KINGSLEY:  Can we look at Page 6 now, please,
```

```
 1   Ms. Mallory?

 2        (Document displayed)

 3   BY MR. KINGSLEY:

 4   Q    What is this a picture of?

 5   A    This is an image of the other etching, which is not part

 6   of the other group.  This is called In the Tavern.  It's an

 7   individual work of art that Picasso created as an etching.

 8   Q    Okay.

 9            MR. KINGSLEY:  Can we turn to the last page of

10   Exhibit 37?

11            THE WITNESS:  I think this is the last page.

12        (Document displayed.)

13   BY MR. KINGSLEY:

14   Q    I guess you're right.  That's all I wanted.

15        Just by way of background, you talked about all of these

16   images here and you described them as these pieces of art.

17        How do you know that each of these images is the piece of

18   art that is depicted?  What's your basis for knowing that this

19   is In La Taberna, for example?

20   A    Well, I can look in the catalogs and the books to

21   determine that.

22   Q    Well, I mean -- I'm asking you:  Have you seen this

23   particular piece of art before?

24   A    Oh, yes.  I'm sorry.  Yes, I have seen this before.

25   Q    And the same would be true for the other etchings?
```

426

1    **A**    That is correct.

2    **Q**    Okay.   Thank you.

3        So now that we've talked about all of the pieces, which

4    single work in the transaction did you consider the most

5    valuable?

6    **A**    The Degas bronze, the Degas sculpture, Little Dancer

7    **Q**    Okay.   Thank you.

8        So I'd like to show you some of the art now.   And so we're

9    going to bring some artwork into the courtroom.

10        With the permission of the Court, we'll begin with that.

11            **THE COURT:**   Fine.

12            **MR. BRUGNARA:**   Your Honor, I'll object.   We haven't

13    seen it yet.

14            **THE COURT:**   Overruled.   We'll see it now.

15            **MR. BRUGNARA:**   Your Honor, is this the art that was

16    supposedly sent to Sea Cliff?

17            **THE COURT:**   How am I supposed to know?   The witness

18    will tell us what he knows about it.

19            **MR. BRUGNARA:**   Your Honor, I think he already said he

20    wasn't involved in shipping of the art.   That would be a

21    question for Rose Long, not Mr. Maibaum.

22            **THE COURT:**   The objection is overruled.

23        The Government can only proceed one witness at a time.   I

24    presume that when Ms. Long is here, she will also testify about

25    these items of art, and maybe others, too.   But we have to take

```
 1   it one question at a time, one document at a time.  And so the
 2   objection is overruled.
 3        If the Government doesn't prove up its whole case by the
 4   end, well, the Government will be in trouble.
 5        (Brief pause.)
 6             THE COURT:  Has this been marked as an exhibit?
 7             MR. KINGSLEY:  This has been marked -- this is
 8   Exhibit 4A.
 9             THE COURT:  All right.
10             MR. BRUGNARA:  Your Honor, should I -- is this --
11             THE COURT:  You're fine where you are for now.
12             MR. KINGSLEY:  Can you show it to the defendant,
13   please?
14        (Artwork shown to Mr. Brugnara.)
15             THE COURT:  Mr. Kingsley, who is this gentleman
16   wearing a T-shirt and who is holding up the artwork?
17             MR. KINGSLEY:  This is somebody who works at ShipArt.
18   He's an art handler who is here to handle this art.
19             THE COURT:  All right.  So, fine.  If you need
20   assistance, that's okay.  I can see it's kind of heavy.
21        But, go ahead.  Ask your first question.
22             MR. KINGSLEY:  All right.
23        Can you show it to Mr. Maibaum, please?
24        (Artwork displayed.)
25             THE COURT:  For the record, there is a -- something
```

```
 1   that looks like about 2-feet-by-3-feet all wrapped up with a

 2   frame around it.  And it's kind of hard to see exactly what's

 3   in there, but the witness is being asked.

 4         Can you see that?

 5               THE WITNESS:  I can.  Thank you, your Honor.

 6         The blue stripe is not part of the image.  It's part of

 7   the packaging.

 8               THE COURT:  Do you know what's there?

 9               THE WITNESS:  I do know what's there.

10               THE COURT:  What is there?

11               THE WITNESS:  Underneath the packing material is the

12   Mirò drawing.

13               THE COURT:  Okay.  So what's your next question?

14   BY MR. KINGSLEY:

15   Q    How do you know that it's the Mirò drawing?

16   A    Because I recognize the drawing.  I recognize the frame.

17   I recognize everything about it.

18   Q    And did you own this Mirò drawing before?

19   A    I did.

20   Q    And this is the one that you were selling on consignment

21   to Rose Long?

22   A    Correct.

23   Q    In this transaction?

24   A    Yes.

25   Q    Okay.
```

429

```
 1        THE COURT:  Now, go ahead.  What's your -- you're
 2   moving it into evidence?
 3        MR. KINGSLEY:  I was going to move to admit
 4   Exhibit 4.
 5        THE COURT:  All right.  Any objection?
 6        MR. BRUGNARA:  Your Honor, I would like to get a
 7   clarification, because I'm very confused.  He said before in
 8   his testimony that he sold it to Rose Long, and now he's saying
 9   he sold it on consignment.  I don't understand what the
10   difference is.
11        THE COURT:  You can deal with that on cross
12   examination.
13        Now, this has no relevance, unless this is the one that
14   was shipped to Mr. Brugnara.  So that hasn't been proven get.
15        Do you represent to me you're going to be able to prove
16   that?
17        MR. KINGSLEY:  We're going to be able to prove that.
18        THE COURT:  Okay.  I will allow this to be shown to
19   the jury subject to your connecting that up.  You must close
20   the loop.  But we can only proceed one step at a time, so I'm
21   going to allow the jury to see this item.  If it turns out that
22   it can't be proven, we'll strike it --
23        MR. BRUGNARA:  I think at that point, it's
24   prejudicial to the defense.  I think they would need to prove
25   the chain of title before they'd even be allowed to show it to
```

1   the jury.  Because the chain of title, you said, is the most

2   important point to cover first.  I think you talked about that

3   for months.

4           THE COURT:  All right.  That's overruled.  It's

5   impossible to prove everything at once.  It has to proceed one

6   step at a time.

7       So the Government has represented they will be able to

8   prove that that was shipped to Mr. Brugnara.  And if that proof

9   doesn't come in, the Government will be in trouble with the

10  Court.

11      All right.  For now, it can be shown to the jury.  And it

12  will be received in evidence subject to you connecting it up.

13      (Trial Exhibit 4A received in evidence)

14          THE COURT:  Are you going to open it up, or are you

15  going to just leave in it that package?

16          MR. KINGSLEY:  We're not going to open it up now.

17  That would be a bit of a process.

18          THE COURT:  That blue stripe -- let's be clear, then.

19  That big blue stripe coming down the middle, is that the

20  artwork?

21          THE WITNESS:  No, it is not.

22          THE COURT:  Which part of what we're looking at is

23  the artwork?

24          THE WITNESS:  Well, the artwork is on the plain piece

25  of white paper.  So that's part of the packing material.

```
 1            THE COURT:  I want to say something to these art
 2   handlers.
 3        Can -- that tripod is too flimsy.  I don't like the
 4   idea -- just hold it up in your hands.  Don't put it on that
 5   flimsy tripod.  It will fall down and then somebody will be
 6   suing me.  So I want you to just hold it in your hands.  That
 7   tripod is no good.
 8            (Artwork displayed.)
 9            THE COURT:  Can everybody on the jury see that?
10        (Jury panel nodding affirmatively.)
11            THE COURT:  Okay.  You can take that one away now.
12        (Brief pause.)
13            THE COURT:  Next.
14            MR. KINGSLEY:  I think they're coming, your Honor.
15        We're showing what will be marked as Exhibit 3.  I did not
16   put a sticker on this one yet, because it's currently
17   unwrapped.
18        (Artwork displayed.)
19   BY MR. KINGSLEY
20   Q    Now, Mr. Maibaum, do you recognize this piece of artwork?
21   A    Yes, I do.
22   Q    What is it?
23   A    It's a George Luks painting, a portrait of Gertrude
24   Vanderbilt Whitney.
25   Q    How do you know that?
```

1   **A**    I've seen it before.

2   **Q**    And did you previously own this particular painting?

3   **A**    I did.

4   **Q**    And this was the painting that you were intending to sell

5   to Rose Long as part of this transaction?

6   **A**    Yes -- no.  Excuse me.

7          **THE COURT:**  That's one he already owned.

8   **BY MR. KINGSLEY:**

9   **Q**    Oh, correction.  Sorry.

10  **A**    I was just about to correct you.

11         It's a painting we sold to Rose Long in 2013, the year

12  before the transaction, approximately.

13         **MR. KINGSLEY:**  Thank you, your Honor.

14         The Government moves to admit Exhibit 3A.

15         **THE COURT:**  Do you make the same representation?

16         **MR. KINGSLEY:**  Yes.

17         **THE COURT:**  All right.  Subject to you proving that

18  that's the one that was actually shipped to Mr. Brugnara, No. 3

19  is received in evidence.

20         (Trial Exhibit 3 received in evidence.)

21         **THE COURT:**  All right.

22         **MR. KINGSLEY:**  All right.  The next one.

23         **THE COURT:**  The art people need to keep these

24  somewhere handy in case on cross examination we need to see

25  them again.

```
 1              MR. KINGSLEY:  They will.

 2              THE COURT:  All right.

 3              MR. KINGSLEY:  They don't want to leave the unwrapped

 4    paintings just sitting out in the courtroom.

 5              THE COURT:  Fine.  Next item.

 6         (Brief pause.)

 7              MR. BRUGNARA:  Your Honor, I think there are like

 8    20-something pieces in total.  I'd be willing to stipulate that

 9    all of them went to the possession of Rose Long, and at least

10    cover the chain of title to Rose Long, to save the Court time

11    and save the jury the grief of having to go through

12    20-something pieces.

13              MR. KINGSLEY:  We don't intend to show 20-something

14    pieces.  Just this one and one more.

15              THE COURT:  All right.  Well, thank you for that.

16    That's very good that you made that proposal.

17         If the Government can take advantage of that, I think we

18    would all appreciate it.  But you -- you prove the case the way

19    you want to prove it.

20         Go ahead.  Next question.

21         (Artwork displayed.)

22    BY MR. KINGSLEY:

23    Q    Mr. Maibaum, do you recognize -- I'm showing you what's

24    been previously marked as Exhibit 2A, or which I'm marking

25    right now as Exhibit 2A.
```

434

```
 1        (Trial Exhibit 2A marked for identification)
 2   BY MR. KINGSLEY:
 3   Q    Do you recognize this?
 4   A    I'd like to see it a little closer, please?
 5            MR. KINGSLEY:  Would you guys bring it up to him?
 6            THE WITNESS:  Yes.  I recognize this as one of the
 7   de Koonings.
 8   BY MR. KINGSLEY:
 9   Q    Is it one of the framed or matted de Koonings?
10   A    This is one of the matted de Koonings.
11   Q    And this was one of the de Koonings that was involved in
12   the transaction with Rose Long?
13   A    Correct.
14   Q    And how do you know that this is one of those de Koonings?
15   A    I've seen it before, and I can testify to that.
16            MR. KINGSLEY:  Okay.  The Government moves to admit
17   Exhibit 2A into evidence.
18            THE COURT:  Received with the same caveat.
19        (Trial Exhibit 2A received in evidence.)
20            MR. KINGSLEY:  Thank you, your Honor.
21        Can you publish it to the jury?  Show it to them, and then
22   we'll get to the next piece.
23        (Artwork displayed.)
24        (Brief pause.)
25            MR. KINGSLEY:  Can you bring it up here and show it
```

435

```
 1   to the witness?
 2              THE COURT:  What's this marked as?
 3              MR. KINGSLEY:  I'm showing what will be marked as
 4   Exhibit 1A.  This also is not currently wrapped, and I'll put a
 5   sticker on the wrapping afterwards.
 6         (Trial Exhibit 1A marked for identification.)
 7   BY MR. KINGSLEY:
 8   Q    Mr. Maibaum, do you recognize this work of art?
 9   A    I do.
10   Q    What is it?
11   A    It's one of the de Koonings that we sold to Rose Long.
12   Q    Is it one of the framed or the matted de Koonings?
13   A    It's a framed one.
14   Q    And how do you know that it's one of them?
15   A    I've seen it before.
16   Q    All right.  The Government moves to admit Exhibit 1A.
17              THE COURT:  All right.  Same -- admitted with the
18   same caveat.
19         (Trial Exhibit 1A received in evidence.)
20              MR. KINGSLEY:  Can we publish to the jury, please?
21              THE COURT:  Sure.
22         (Artwork displayed.)
23              MR. KINGSLEY:  Thank you.
24   BY MR. KINGSLEY:
25   Q    So was there other artwork involved in this transaction
```

```
 1  than the four pieces that we just looked at?
 2  A    Yes.
 3  Q    Did you give this artwork to Ms. Long as a gift?
 4  A    No.
 5  Q    Did you give it to her buyer as a gift?
 6  A    No.
 7  Q    Or did your consignors give some of it to her buyer or to
 8  Ms. Long as a gift?
 9  A    No.
10  Q    So at some point, did you help arrange for the packing and
11  shipping of the artwork that was involved in this transaction?
12  A    Yes.
13  Q    And where did Ms. Long tell you to send the artwork to?
14  A    She didn't.  She didn't tell me to send the artwork.  What
15  she did, she said her buyer was in San Francisco, and she asked
16  us to cover the insurance and she would cover the shipping to
17  the buyer.
18  Q    Okay.
19  A    And the crate.
20  Q    Well, let me ask this differently then.  When you said you
21  arranged the packing and shipping of the artwork to
22  San Francisco, what did you do to arrange it?
23  A    Again, I didn't arrange it.  I gave instructions to
24  Cirkers on how to pack the art.
25  Q    Okay.
```

1   **A**    How to crate the art.

2   **Q**    Can you tell me a little bit about the instructions that

3   you gave to Cirkers?

4   **A**    Yes.  About the instructions, I -- I emailed the person in

5   charge of shipping and crating --

6           **MR. BRUGNARA:**  Hearsay, your Honor.

7           **THE COURT:**  Well, this is proving up a transaction.

8   This is part that he knows of his own firsthand knowledge what

9   instructions he gave.  This part is not hearsay.

10      Please continue.

11          **THE WITNESS:**  Thank you, your Honor.

12      Basically, I told -- I instructed Cirkers on how it would

13  be best to pack and ship and crate the art.  And then Rose Long

14  was to ship the art to the buyer.  At that point, I did not

15  know who the buyer was, in fact.

16  **BY MR. KINGSLEY:**

17  **Q**    Okay.  So I want to clarify again:  This artwork is all

18  stored at Cirkers in New York, right?

19  **A**    That is correct.

20  **Q**    I'd like to show you what's previously been marked as

21  Government's Exhibit 38.

22      (Whereupon, document was shown to Mr. Brugnara.)

23          **MR. KINGSLEY:**  May I approach, your Honor?

24      (Whereupon document was tendered to the witness.)

25

**BY MR. KINGSLEY:**

1

2 **Q**    Can you please take a look at that exhibit for a minute

3 and let me know if you recognize it.

4 **A**    I do.

5 **Q**    And do you recognize the attachments to that document?

6     (Brief pause.)

7 **A**    Yes, I do.

8 **Q**    What is the email?

9 **A**    The email is the -- well, this is a copy, obviously a

10 printout, of an email that I sent to Hajarah at Cirkers giving

11 her specific instructions about how to pack the works of art in

12 the transaction.

13         **MR. KINGSLEY:**  The Government moves to admit

14 Exhibit 38 into evidence, your Honor.

15         **THE COURT:**  Any objection?

16         **MR. BRUGNARA:**  Excuse me, your Honor?

17         **THE COURT:**  Any objection to 38?

18         **MR. BRUGNARA:**  Your Honor, it's the same objection as

19 the other -- I'm sorry.  This is the letter to -- no objection

20 to that.

21         **THE COURT:**  This is -- 38 is the email to Cirkers.

22 Packing instructions.

23         **MR. BRUGNARA:**  That's fine, your Honor.

24         **THE COURT:**  Thank you.

25     Received in evidence.

```
 1          (Trial Exhibit 38 received in evidence.)
 2              MR. KINGSLEY:  Ms. Mallory, can we show -- pull
 3   Exhibit 38 up?
 4          And, Ms. Toland, can we publish it to the jury, please?
 5          Ms. Mallory, can you zoom in on the top half of the
 6   document?  Let's split this into two parts.
 7          Actually, let's get the subject and to and from there as
 8   well.
 9          Thank you.
10          (Document displayed)
11   BY MR. KINGSLEY:
12   Q    All right.  So in the "From" line, it says
13   "Modernism@nyc.rr.com."  Whose email address is that?
14   A    You said whose?
15   Q    Whose email address is that?
16   A    That's the email for our company, Modernism Fine Arts,
17   Inc.
18   Q    Okay.  And hajarah@cirkerhayes.com, who did you understand
19   you were sending this email to?
20   A    She is -- she's no longer there, but she was the
21   responsible party to oversee the crating and shipping of works
22   of art.
23   Q    And roserameylong@gmail.com, whose email was that?
24   A    That was Ms. Long's.
25   Q    Okay.  So in the second -- under the second bullet, it
```

440

```
 1   says:
 2           "Warner, it's the sculpture we unpacked a few
 3       weeks ago.  It has a sheet of paper on the wood base
 4       that says EF D."
 5       Who is Warner?
 6   A   Excuse me.  I don't know where you're referring to.
 7   Q   I'm on the -- I'm sorry.  You can't see where I'm drawing.
 8       I'm in the second paragraph on the --
 9   A   Oh, I see.  Okay.  Now I see.  Okay.
10       Warner is the person in the warehouse at Cirkers who is
11   completely responsible for shipping and packing.  In other
12   words, Hajarah is the person in the office who oversees the
13   packing and shipping; Warner is the person who physically does
14   it.
15   Q   And had you worked with Warner before?
16   A   Yes, for many, many years.
17   Q   And had you shown him this artwork in particular before?
18   A   Yes.
19   Q   When did you do that?
20   A   Prior to this transaction, often.
21   Q   Okay.  Who is responsible -- let me back up.
22       Does Cirkers do the shipping and packing that you're
23   asking Cirkers to do in this transaction, do they do it for
24   free?
25   A   No.
```

441

1  Q    Who was responsible for paying Cirkers for this?

2  A    Cirkers was -- excuse me.  Ms. Long was responsible for

3  paying for the packing and shipping.

4  Q    Okay.  And I don't think we need to show it to the jury

5  again, but the rest of the pages of this document, the images

6  on them, what do those images depict?

7  A    Those are the Picasso etchings.

8  Q    Okay.  And this email has a lot of information on it.

9       Why did you send such a detailed email to Cirkers?

10 A    Because I'm very precise.  And they -- and each work of

11 art is so valuable that I want to make sure it's precisely

12 packed and correctly crated.

13 Q    Okay.  Thank you.

14      I'm finished with this exhibit.  And I'd like to show you

15 a couple more that are the same, very briefly.

16      Did you send other emails after you sent this particular

17 one?

18 A    To whom?

19 Q    To Cirkers.

20 A    Perhaps.  I don't recall offhand.

21 Q    All right.  Well, let me show you --

22          MR. KINGSLEY:  May I approach, your Honor?

23      (Whereupon document was tendered to the witness.)

24 BY MR. KINGSLEY:

25 Q    -- what's been marked as Government's Exhibit 39.

1        Do you recognize this exhibit?

2   **A**    Yes, I do now.

3   **Q**    And what is it?

4   **A**    Obviously, it's the image and information on the Mirò that

5   I sent as a follow-up to the first email that you just had

6   showed me.

7            **MR. KINGSLEY:**  Okay.  The Government moves to admit

8   Exhibit 39.

9            **THE COURT:**  Any objection, 39?

10           **MR. BRUGNARA:**  Your Honor, the same as before.  The

11  provenance, hearsay on the provenance and --

12           **THE COURT:**  May I see the document?

13           **MR. KINGSLEY:**  The purpose of this is to show

14  that Mister --

15           **THE WITNESS:**  Excuse me, your Honor.

16      (Whereupon, document was tendered to the Court.)

17           **MR. KINGSLEY:**  -- Mr. Maibaum showed the images of

18  the artwork to the people who were packing it.

19           **THE COURT:**  Objection overruled.

20           **THE WITNESS:**  Thank you, your Honor.

21           **THE COURT:**  39 is in.

22      (Trial Exhibit 39 received in evidence.)

23           **THE COURT:**  Next question.

24           **MR. KINGSLEY:**  Can we -- Ms. Mallory, can he pull up

25  Exhibit 39, just the first page?

443

```
 1         And, Dawn, can we please publish to the jury?
 2         (Document displayed)
 3   BY MR. KINGSLEY:
 4   Q   Again, this says, "From Walter Maibaum, Email 2 of 2."
 5         Does this mean this was the second email to the one that
 6   you just testified about?
 7   A   Yes, apparently so.
 8   Q   And you were sending it to the same people?
 9   A   Correct.
10   Q   Okay.  And looking at the next page of the document or the
11   follow-up pages, what are of the images contained in there?
12   A   It's the Mirò drawing.
13   Q   Okay.  Thank you.
14         MR. KINGSLEY:  May I approach, your Honor?
15         (Whereupon document was tendered to the witness.)
16   BY MR. KINGSLEY:
17   Q   I'm showing you what's been marked as Government's
18   Exhibit 40.
19         Do you recognize this email and the attachments?
20   A   I do.
21   Q   And what is it?
22   A   It's an email sent about the -- with an image attached of
23   the George Luks painting.
24   Q   And who did you send this email to?
25   A   Hajarah, the same people.
```

1   Q    And it was a follow-up to your prior message?

2   A    And cc to Rose Long and other people at Cirkers.

3        MR. KINGSLEY:  The Government moves to admit

4   Exhibit 40.

5        THE COURT:  Any objection?

6        MR. BRUGNARA:  Again, your Honor, just regarding the

7   provenance.

8        THE COURT:  That objection has been overruled

9   earlier.

10       For the same reasons allowed now, 40 is received.

11       MR. BRUGNARA:  Your Honor, one other objection.

12       The painting that was shown here in court wasn't framed.

13  There appears to be a frame on this, on this picture, and the

14  one that was brought in by the two ShipArt workers was

15  unframed.

16       THE COURT:  All right.  What do you say to that,

17  Mr. Maibaum?

18       MR. KINGSLEY:  Is that a basis for cross examination?

19       THE COURT:  Well, I'm just curious.

20       THE WITNESS:  Your Honor, I have no knowledge of why

21  the frame is not on the painting.

22       THE COURT:  All right.  So it will be received in

23  evidence, but the jury will take note that the one we saw had

24  no frame.  The one on the picture there does have a frame, so

25  there is that discrepancy.  But it's up to the jury to decide

1   how much weight to give it.

2           So that objection is overruled.

3           **MR. KINGSLEY:**  Thank you, your Honor.  So is this

4   exhibit, Exhibit 40, admitted into evidence?

5           **THE COURT:**  Yes, it is.

6       (Trial Exhibit 40 received in evidence.)

7           **MR. KINGSLEY:**  I don't think we need to publish it to

8   the jury.

9   **BY MR. KINGSLEY:**

10  **Q**   I'm going to show you the last email now as well, if it's

11  all right.

12      (Whereupon document was tendered to the witness.)

13  **Q**   I'm showing you what's been marked as Government's

14  Exhibit 41.

15      Do you recognize this document?

16  **A**   I do.

17  **Q**   What is it?

18  **A**   It's an email about the de Koonings and speaking as to

19  which ones are matted and which ones are framed.  Again, to

20  Hajarah at Cirkers.

21  **Q**   And is it the fourth of the prior -- sequence of the three

22  emails that we've seen before --

23  **A**   Correct.  It says on top, "Email 4 of 4."

24          **MR. KINGSLEY:**  The Government moves to admit

25  Exhibit 41 into evidence.

```
 1              THE COURT:  Mr. Brugnara, any objection?

 2              MR. BRUGNARA:  That's fine, your Honor.

 3              THE COURT:  Thank you.  Received into evidence.

 4         (Trial Exhibit 41 received in evidence.)

 5              MR. KINGSLEY:  I don't think I need to publish it to

 6    the jury.

 7    BY MR. KINGSLEY:

 8    Q    So you sent those emails to Cirkers instructing them on

 9    how to pack the artwork.  Did you instruct them on how to ship

10    the artwork?

11    A    No.

12    Q    Did you discuss with them possible ways of shipping the

13    artwork?

14    A    Yes.  Originally, Cirkers and I discussed the possibility

15    of shipping everything by truck to San Francisco.  But then it

16    was found that -- Cirkers found that it was much less expensive

17    and more accommodating to do it by airfreight.

18    Q    Okay.  So at some point, were you informed that the

19    artwork had been shipped to San Francisco?

20    A    Yes.

21    Q    And were you also informed that there was a problem with

22    the transaction?

23    A    Yes, after it arrived in San Francisco.

24    Q    What did you do when you found out that there was a

25    problem?
```

1  **A**    I retained an attorney here in San Francisco.

2  **Q**    Who was that attorney?

3  **A**    Harvey Schochet, S-C-H-O-C-H-E-T.

4  **Q**    And what was his responsibility with respect to this

5  transaction?

6  **A**    His responsibility was trying to get the art back.  It was

7  clear to me at that point that the sale would not go through,

8  that Mr. Brugnara would not pay Rose Long, and Rose Long in any

9  case probably could not pay us.  So we said, fine -- excuse me.

10  **Q**    You don't need to get into the details --

11          **MR. BRUGNARA:**  I just want to object, your Honor.

12  That's hearsay.  He wasn't involved in any communications

13  between Rose Long and myself.  And it's hearsay whatever Rose

14  Long may have conveyed to him.

15          **MR. KINGSLEY:**  I'm not eliciting that information.  I

16  just wanted to know if he hired the attorney and what the

17  attorney did.

18          **THE COURT:**  All right.  The jury will disregarded

19  evidence about whether or not Mr. Brugnara could pay, and so

20  that part of the answer will be stricken, but the rest it will

21  stand.

22          All right.  Go ahead.

23  **BY MR. KINGSLEY:**

24  **Q**    So do you have the artwork that was at issue in this

25  transaction right now?  Is it in your possession?

```
 1   A     No.

 2   Q     How do you know that?

 3   A     Because I don't have it.

 4   Q     Have you been to your rooms in Cirkers where it was

 5   stored?

 6   A     Yes, we have.

 7   Q     And is the artwork that we've discussed that had been in

 8   those rooms before, is it there anymore?

 9   A     That is correct.

10         THE COURT:  What?  You didn't answer the question.

11   He said, "Is it there anymore?"  And you said, "That is

12   correct."  That isn't responsive to the question that he asked.

13         THE WITNESS:  I'm sorry, your Honor.  The answer is

14   it is not in our rooms at Cirkers.

15         THE COURT:  All right.

16   BY MR. KINGSLEY:

17   Q     Okay.  So after the transaction, you were informed that

18   there was a problem with the transaction.

19         Did you instruct Ms. Long to keep your name out of any

20   negotiations she was undertaking?

21   A     You mean with whom?

22   Q     With her buyer, whoever --

23   A     Yes, I did ask that.

24   Q     And why did you do that?

25   A     Frankly, I didn't want to be associated with any bad
```

```
 1  publicity that might be linked to the defendant.
 2          MR. BRUGNARA:  Your Honor, I object.  That's hearsay.
 3  He said he has never spoken to me, and he said he's never met
 4  me.
 5          THE COURT:  Well, he's explaining why he gave the
 6  instruction.
 7       Why is that relevant in this case?
 8          MR. KINGSLEY:  Mr. Brugnara, in his opening, said
 9  that -- discussed how the silent partner to Rose Long was --
10  name was not in the transaction, was hidden from him.  And
11  Mr. Maibaum is explaining why, in part, that was the case.
12          THE COURT:  All right.  The objection is overruled.
13       Next question.
14  BY MR. KINGSLEY:
15  Q    And just generally, without getting into any specifics
16  about the defendant or anyone else, why were you worried about
17  bad publicity?
18  A    Well, everyone in business worries about bad publicity.
19  Q    You were worried it could hurt your business?
20  A    Perhaps it could.  Sure.
21  Q    Okay.  Was this artwork covered by any kind of insurance
22  policy?
23  A    Yes.
24  Q    Can you explain to me what kind of insurance policy you
25  had for the artwork involved in this transaction?
```

450

1  **A**    We have a policy with Lloyd's of London.

2  **Q**    And what type of insurance policy was it?

3  **A**    It's called schedule insurance.  Every item we have in our

4  inventory is scheduled for a certain amount as to its value.

5  So we -- for example, the Picassos were insured for a certain

6  amount.  The Degas was insured for a certain amount.  And so...

7  **Q**    Do you have a sense of how much you were paying around

8  that time on a monthly basis -- or annual, whatever the term

9  was -- to insure all of the artwork that was involved in this

10 transaction that you owned or controlled?

11 **A**    It was a little more than $10,000.

12 **Q**    $10,000 --

13 **A**    Annually.  Annually.

14 **Q**    Annually.  Okay.

15      Now, you sued Rose Long as part of this transaction,

16 right?

17 **A**    That is correct.

18 **Q**    And what claims have you made against Rose Long?

19 **A**    Well, we sued Rose Long because she didn't pay for the

20 art, nor was it returned.  And on top of that, the Little

21 Dancer bronze is missing.  The Degas Little Dancer bronze is

22 missing.

23 **Q**    Did you allege fraud on her part as you understand your

24 lawsuit?

25 **A**    Did we claim fraud on her part?  No.

1  Q    Okay.  And if you had gotten all the artwork back from the

2  buyer, would you have sued Rose Long?

3  A    No, absolutely not.

4  Q    Has she made counterclaims against you as part of this

5  lawsuit?

6  A    Yes, she has.

7  Q    And did one of those claims involve claims about a Luks

8  painting?

9  A    Yes.

10 Q    Was it the Luks painting at issue in this transaction, or

11 was it a different painting?

12 A    Well, there are two claims for a Luks painting.  One claim

13 was that the subject of the Luks painting that we saw in the

14 courtroom a few moments ago was not actually a portrait of

15 Gertrude Vanderbilt Whitney, but of another subject.  But,

16 frankly, that's ludicrous, because we have photos of the

17 subject, Gertrude Vanderbilt Whitney, and that is clearly her

18 portrait.

19      Now, the other --

20          MR. BRUGNARA:  Your Honor, that's hearsay, I believe.

21          THE COURT:  He's qualified to make the comparison.

22 Overruled.  Next.

23 BY MR. KINGSLEY:

24 Q    Did you look at pictures of Gertrude Vanderbilt Whitney --

25 A    Yes, we did.

452

```
1  Q     -- when you made the comparison?

2        And you looked at the artwork in question, too?

3  A     Yes, we did.

4  Q     And you compared the two pictures?

5  A     That is correct.

6  Q     All right.

7  A     And the other claim was -- which was, frankly --

8        (Discussion held off the record between Government

9         counsel.)

10        MR. KINGSLEY:  That's all.  That's fine.

11 BY MR. KINGSLEY:

12 Q     All right.  Was there a book involved in this transaction?

13 A     You mean about the Luks or in general?

14 Q     No.  Let's -- was there a book about the Degas that was

15 involved in this transaction?

16 A     Yes, there is.

17 Q     All right.  And what book was that?

18 A     It was a book published by the Hermitage Museum in Russia.

19 The book is in English, by the way.  And it shows all of the

20 Degas bronzes cast by Valsuani, one which is the Little Dancer

21 Q     And why did you include that book as part of this

22 transaction?

23 A     Well, I -- I gave it to Ms. Long so she could give it to

24 the buyer, because it substantiates -- substantiates the bronze

25 was exhibited at the Hermitage Museum, and it gives it the
```

1  credibility and imprimatur, the stamp of approval as it were,

2  of the Hermitage Museum.

3  **Q**    Okay.

4           **MR. KINGSLEY:**  All right.  May I approach the

5  witness, your Honor?

6           **THE COURT:**  Yes.

7       (Whereupon a book was tendered to the witness.)

8  **BY MR. KINGSLEY:**

9  **Q**    I'm showing you what's been marked as Government's

10  Exhibit 5.  Would you take a look at this book and tell me if

11  you recognize it?

12  **A**    Yes, I recognize the book.

13  **Q**    And what is it?

14  **A**    It's a book of the Degas exhibition at the Hermitage

15  Museum, and it shows all of the bronzes cast by Valsuani that

16  were included in the exhibition, one of which is the Little

17  Dancer bronze.

18  **Q**    Is it -- without saying whether it was the precise book

19  that you gave to Rose Long, is it a copy of the book that you

20  gave to Rose Long as part of this transaction?

21  **A**    Yes, it is.

22  **Q**    Okay.  And how do you know that?

23  **A**    Because I know the book very well, and I was involved in

24  the book.

25  **Q**    Okay.

1            **MR. KINGSLEY:**  Thank you, your Honor.  We're not

2   moving to admit that exhibit just yet.

3            **THE COURT:**  Can I see it for a moment?

4            **MR. KINGSLEY:**  Sure.

5            **THE WITNESS:**  Why don't you hand it to him?  I can't

6   stretch that far.

7        (Whereupon, book was tendered to the Court.)

8            **THE COURT:**  Now, I have just a question.  Maybe parts

9   of this is in English, but -- I do see parts are in English,

10  but I also see parts of it that look like they're in Russian.

11           **THE WITNESS:**  Yes.  It was multilingual, your Honor.

12           **THE COURT:**  So when you said it was in English, was

13  that in error?

14           **THE WITNESS:**  No.  I should have rephrased it

15  properly.  I apologize.  It was both in English and Russian.

16           **THE COURT:**  All right.  Is this moved in evidence or

17  not?

18           **MR. KINGSLEY:**  No.  We're not going to move it into

19  evidence just yet.  I can take it back down and hold onto it

20  for later.

21           **THE COURT:**  If it ever does come into evidence, I

22  need to say to the jury, the Russian parts, even though we have

23  somebody on the jury who can read Russian, you can't read it.

24  It has to -- we're going on the English language in this case.

25  And unless there is a translation that is offered in evidence,

```
 1  the Russian parts must be just looked at as if it were
 2  scribbles, but you can't try to translate it.  All right?
 3      It's not in evidence yet, though.  Go ahead.
 4          MR. KINGSLEY:  Your Honor, I have no further
 5  questions for Mr. Maibaum at this time.
 6          THE COURT:  All right.
 7      Are you ready?
 8          MR. BRUGNARA:  I would request a five-minute restroom
 9  break.
10          THE COURT:  All right.  We will take our next break
11  at this time.
12      Please remember my admonition about talking about the --
13  or not talking about the case.  And we'll see you back here in
14  15 minutes.
15          THE CLERK:  All rise.
16      (Jury exits courtroom at 11:39 a.m.)
17          THE COURT:  All right.  Everyone be seated.  I'm
18  going to take my break, too, unless somebody needs me right
19  now.
20          MR. KINGSLEY:  No, your Honor.
21          THE COURT:  Mr. Brugnara is going to take his
22  restroom break.  The witness can take 15 minutes, too.
23          THE WITNESS:  Thank you, your Honor.
24      (Whereupon there was a recess in the proceedings
25       from 11:39 a.m. until 11:54 a.m.)
```

```
 1              THE COURT:  Everyone is here but the jury.  The
 2    witness can sit down.
 3         Was there an issue to raise with me?
 4              MR. KINGSLEY:  Yes, your Honor.
 5              THE COURT:  What's that?
 6              MR. STEVENS:  I don't know whether Mr. Maibaum should
 7    be here.
 8              THE COURT:  Then, please go out in the hallway,
 9    Mr. Maibaum.
10         (Witness steps out.)
11              THE COURT:  All right.  The witness is outside.
12    What's the issue?
13              MR. KINGSLEY:  So Mr. Brugnara has referred to these
14    problems or problem with the George Luks painting, and I asked
15    Mr. Maibaum about the George Luks painting at issue in this
16    transaction.
17         There are also allegations in the lawsuit between
18    Mr. Maibaum and Ms. Long about a different George Luks painting
19    that Mr. Maibaum also sold Ms. Long.  I didn't ask about that.
20    And our understanding is that's not a piece of art that was
21    involved in this transaction.  It's not something that the
22    defendant gets into.  But I wanted to seek clarification on
23    that before cross examination.
24              MR. BRUGNARA:  I understand the difference, your
25    Honor.  And I know the difference between the two.
```

457

```
1       One is a -- actually, I think there's three.  One is of a
2  chicken, one is of a young woman, and then you've got the
3  Vanderbilt.  So there are three.  I think there's three.
4  Definitely two.  I have no interest in talking about the other
5  two, just the art in this case, like you ruled.
6          THE COURT:  While the witness is coming back, one of
7  the jurors -- please listen to me.  One of the jurors said to
8  Dawn while she was taking them into the jury room that to
9  please ask you all to use the mics because they're having
10 trouble hearing you.  So some of your pearls of wisdom were
11 lost on at least one juror.
12      And I also say, especially you, Mr. Kingsley, you have a
13 habit of swallowing the last half of your questions in rapid
14 form, as if we're going to understand what you're saying.  And
15 I listen carefully.  I happen to get it all, but you need to be
16 aware that you have that habit.
17      Mr. Brugnara, you should probably use a microphone too,
18 but your voice is louder.  I just give you that, what one of
19 the jurors said.
20          MR. BRUGNARA:  Your Honor, when I speak very quickly,
21 it's precise, and you can understand what I'm saying, though,
22 correct?
23          THE COURT:  Well, not always.  Sometimes you get --
24 get going so fast, I can't tell what you're saying.  So it's
25 the same problem.
```

```
 1        You're representing yourself.  Good for you.  But if you
 2   talk a mile a minute, a lot of people, like where I'm from,
 3   can't even understand what you're saying.  It's too fast.
 4   That's what's known as a fast talker.
 5        So you need to slow down.  Both of you could improve.
 6   But, listen, you're the lawyers.  I'm just the judge.  I'm
 7   passing on what the juror said.  That's all I'm going to say.
 8   It's up to you.
 9             MR. BRUGNARA:  All right.
10             THE COURT:  Where is my witness?
11             MR. KINGSLEY:  Thank you, your Honor.  He's out in
12   the hall.
13        (Witness resumes the stand.)
14             THE COURT:  Let's bring back the jury.
15        (Jury enters courtroom at 11:57 a.m.)
16             THE COURT:  Welcome.  Be seated.
17        All right.  So I notice that some of you have coats on
18   over there.  Is it too cold for you?
19             JUROR STROMBERG:  I'm always cold.  It is a little
20   chilly, but that's okay.
21             THE COURT:  Well, it's better to be chilly than to be
22   warm.  So unless I hear a real complaint, I'm going to leave
23   the temperature where it is.
24        Mr. Brugnara, are you now prepared to proceed?
25             MR. BRUGNARA:  Yes, I am.
```

```
 1            THE COURT:  Why don't you use that mic over there?

 2            MR. BRUGNARA:  You know, I prefer using this one,

 3   because I like looking to my left.

 4            THE COURT:  All right.  Then adjust it so that the

 5   microphone reaches your voice.

 6                         CROSS EXAMINATION

 7   BY MR. BRUGNARA:

 8   Q    Good afternoon, Mr. Maibaum.

 9   A    Good afternoon.

10   Q    So I'm going to cross examine you on a few of the

11   questions that I have.  And I know that you and I haven't met,

12   and, you know, I've had several surprises over the course of my

13   dealings --

14            THE COURT:  Uh, uh.  Now, now, wait.  That's a

15   speech.  You just get to ask questions.

16            MR. BRUGNARA:  I'm just trying to be cordial, your

17   Honor.

18            THE COURT:  That's not -- it doesn't work.

19            MR. BRUGNARA:  Okay, your Honor.

20            THE COURT:  You've got to ask questions, not give

21   speeches.

22            MR. BRUGNARA:  All right.

23            THE COURT:  If anybody on the jury does not hear

24   Mr. Brugnara because he's not using the microphone, raise your

25   hand.  I want you to make sure you hear everything.  So, all
```

1   right.

2        So, please, first question.

3   **BY MR. BRUGNARA:**

4   **Q**    Okay.  Mr. Maibaum, you represented that you're an expert

5   in the art field on your testimony.  And specifically, you said

6   you were an art expert on the art in question in this case;

7   isn't that true?

8   **A**    No.

9   **Q**    Okay.  You -- I believe the record shows that you

10  forwarded certain documents to Rose Long regarding this art and

11  provided certain invoices with certain representations that you

12  were an expert -- or, rather, that the art was authentic --

13  **A**    That's quite different.

14  **Q**    Okay.  Let me ask you this:  You said you were the

15  owner -- or one of the owners of the Degas Sculpture Project?

16  **A**    Yes, that's correct.

17  **Q**    Okay.  Do you think that an unknowing person that doesn't

18  know anything about Degas would assume that you're an expert if

19  you're the owner of that entity?

20  **A**    Not necessarily.

21  **Q**    Okay.  Well, based upon the fact that you are the owner

22  and that you are attempting to benefit, as you stated in your

23  testimony, with pecuniary profits from selling these Degas

24  sculptures, don't you think you have an ethical responsibility

25  to the people that you're selling them to to have some

1  knowledge before you enrich yourself?

2  **A**    I do have knowledge of the Degas.  That is correct.

3  **Q**    Okay.  Now, you were interviewed by the FBI at least four

4  times throughout the course of the last six or seven months.

5       Do you remember those interviews?

6  **A**    I don't believe it was four times.

7  **Q**    Okay.  Well, I see four interviews.  One --

8            **THE COURT:**  Ahh, now you're testifying.

9            **MR. BRUGNARA:**  Okay.  You're right.

10           **THE COURT:**  You can't do that.

11           **MR. BRUGNARA:**  Okay.

12  **BY MR. BRUGNARA:**

13  **Q**    Do you remember interviewing with the FBI on August 5th,

14  2014?

15  **A**    I don't recall the exact date, but, yes, I was interviewed

16  by the FBI in New York on one occasion.

17  **Q**    Okay.  So the testimony or the statements that you made

18  with the FBI agents were accurate statements?

19  **A**    To the best of my knowledge.

20  **Q**    Okay.  So when you said that you're not an expert for the

21  artist de Kooning, was that a false statement to the FBI?

22  **A**    No, that was a true statement.

23  **Q**    Okay.  So you're not an expert on de Kooning?

24  **A**    I do not consider myself on expert on de Kooning.

25  **Q**    Okay.  What would constitute an expert on de Kooning?

1  **A**     Someone who's handled or works on exhibitions on

2  de Kooning or was a de Kooning dealer.

3  **Q**     Okay.  Well, you are selling these pieces as authentic

4  de Koonings under the name of your company that you own solely

5  with your wife.  You're saying that that's normal practice in

6  the art community to sell multimillion dollar pieces, works of

7  art, when you're not an expert --

8  **A**     Absolutely.  Many multimillion dollar works of art are

9  sold by people who are not experts.

10 **Q**     Oh, I understand that.  But on those particular

11 instances -- you know what provenance is?

12 **A**     Yes, I do.

13 **Q**     Okay.  You made a statement to the FBI that -- I want to

14 give the exact quote here.

15         **THE COURT:**  Well, the proper way to do what you're

16 trying to do, Mr. Brugnara, since you're just reading from

17 somebody's write-up, is to first ask him did he say to the FBI

18 A, B, C.

19         **MR. BRUGNARA:**  Well, I believe he already --

20         **THE COURT:**  Unless it's written -- unless the

21 document is written by this witness, it's probably written by

22 an agent.  So you need to do the preliminary step of saying:

23 Did you tell the agent A, B, C?  And then the witness will

24 either say "yes" or "no" or what he remembers on that subject.

25 But to just read from that document is not permitted.

463

```
 1              MR. BRUGNARA:  Okay, your Honor.
 2   BY MR. BRUGNARA:
 3   Q    Mr. Maibaum, do you remember telling the FBI that there is
 4   no question regarding the authenticity of the Degas sculpture?
 5   A    Yes.  No question in my mind, that is.
 6   Q    No question in your mind.
 7        So your authenticity of the Degas sculpture, in your
 8   mind -- in your mind, that determination was based upon you not
 9   being an expert?
10   A    No.  I never said that.
11   Q    Well, actually, we just -- it says right here.  It says,
12   "Maibaum stated he's not an expert" --
13              MR. KINGSLEY:  Objection.  He's making a hearsay
14   statement.
15              MR. BRUGNARA:  This is from the FBI report that he
16   received --
17              THE COURT:  The proper way to do it is to say:  Did
18   you tell the FBI...  And then say what -- and then you can --
19   read it, but --
20              MR. BRUGNARA:  I understand.  Okay.
21   BY MR. BRUGNARA:
22   Q    Mr. Maibaum, is the FBI lying and producing false
23   documentation --
24              MR. KINGSLEY:  Objection.
25
```

1   BY MR. BRUGNARA:

2   Q    -- when they state --

3           THE COURT:  Sustained.  How would he know?

4   BY MR. BRUGNARA:

5   Q    Mr. Maibaum, did you -- did you tell the FBI that you're

6   not an expert for de Kooning, Degas, Picasso, and Mirò?

7   A    No.  I probably told the FBI -- I'm not certain exactly

8   what I said, but I told the FBI I'm not an expert on de Kooning

9   and I'm not an expert on Luks.

10  Q    Okay.

11  A    I am an expert on Degas.

12  Q    Okay.  Well, listen, I'm not here to judge you, sir.

13          MR. KINGSLEY:  Objection.  He's arguing and...

14          THE COURT:  Don't make a speech, Mr. Brugnara.

15          MR. BRUGNARA:  I'm not making a speech.

16          THE COURT:  Just ask questions.

17  BY MR. BRUGNARA:

18  Q    Okay.  Well, would it surprise you if you found out that

19  this FBI -- it's called an FBI 302 -- report states that --

20          MR. KINGSLEY:  Objection.  He's getting into the 302

21  again.

22  BY MR. BRUGNARA:

23  Q    -- that you're not an expert for Degas?  Degas?

24          THE COURT:  Okay.  Did you say anything to the FBI

25  that would have led them to believe that you're not an expert

1 on Degas?

2          THE WITNESS:  No, I did not.

3          THE COURT:  All right.  So that's it.

4          MR. BRUGNARA:  Okay.

5 BY MR. BRUGNARA:

6 Q    Now, let's get to something that you're not an expert on

7 that at least you agree.

8      So the FBI, based upon your testimony, produced a false

9 report?

10          MR. KINGSLEY:  Objection.

11          THE COURT:  Sustained.

12          MR. BRUGNARA:  Okay.

13          THE COURT:  What you need to do -- and I want the

14 jury to listen to this, too, because we want to follow the

15 Rules of Evidence -- that if you believe that it's something

16 that needs to be proven up, the proper way to do this is after

17 this witness is gone and when it's your turn to present

18 evidence, you may call that -- whoever prepared that exhibit,

19 report.  And if it -- you may then ask whether or not

20 Mr. Maibaum told them that he was not an expert in Degas.  And

21 we have to, then, wait and see what that witness says.  And

22 that would be the proper way to do this.

23          MR. BRUGNARA:  All right.

24          THE COURT:  So there we are.  But you don't get to

25 just read out loud from the hearsay document.

```
 1              MR. BRUGNARA:  That's not what I'm doing, your Honor.
 2   I'm just getting organized here.
 3   BY MR. BRUGNARA:
 4   Q    So, Mr. Maibaum, you stated to the FBI in that same
 5   report -- excuse me.
 6        Did you state, Mr. Maibaum, to the FBI on August 5th that
 7   you're not an expert on de Kooning?
 8   A    Yes.
 9   Q    Okay.  Did you also state to the FBI in that report that
10   you relied on the provenance when making a determination of the
11   authenticity of the de Kooning?
12   A    Rely on the provenance and, also, on a document from the
13   person who provided the provenance.
14   Q    All right.  So you're saying you're relying on the
15   provenance through the person who provided the document on the
16   provenance, meaning the subsequent owner?
17   A    The consignors.  The consignors provided a document
18   confirming the provenance.
19   Q    So that would be one of the successive owners in the
20   provenance chain, correct?
21   A    That is correct.  One of the successive owners who
22   consigned the works to Modernism Fine Arts.
23   Q    Is it your practice to -- to delete or edit the provenance
24   chain of the art pieces that you sell?
25   A    Delete or edit?
```

1  Q    Delete or edit.  So if you have, say, five chains in the

2  provenance title, is it your practice to remove the prior

3  owners that don't benefit your sale?

4  A    Not normally, no.

5  Q    You have been accused of that, though, several times,

6  haven't you?

7  A    Never.  Not that I'm aware of.

8  Q    You're not aware of the case with Mr. Newhouse where --

9          **MR. KINGSLEY:**  Objection.  This was excluded.

10          **THE COURT:**  Sustained.

11          **MR. BRUGNARA:**  I thought he opened it, your Honor.

12          **THE COURT:**  No.  No.  The jury will disregard all of

13  that comment about that case.

14  **BY MR. BRUGNARA:**

15  Q    Okay.  Mr. Maibaum, so you -- you do rely on the

16  provenance, and that's good.  And here's where I'm confused.

17  Because in this particular matter with these de Kooning pieces,

18  the provenance comes from a person by the name of John

19  MacWhinnie.

20      And if you bear with me one second here.

21      (Brief pause)

22  **BY MR. BRUGNARA:**

23  Q    You stated -- Mr. Maibaum, you had an interview with the

24  FBI also on July 7, 2014?

25  A    I don't recall the date, but if you say so, perhaps.

```
 1   Q    All right.  You -- do you remember stating to the FBI that
 2   the provenance for the de Koonings is, quote, very strong?
 3   A    Yes.
 4   Q    And that's based upon your subjective determination?
 5   A    It's based upon what I was provided with and was told by
 6   the consignors to Modernism Fine Arts.
 7   Q    Okay.  So if I were to come to you, to Modernism Fine
 8   Arts -- is that the name of your company?
 9   A    Yes.
10   Q    And I brought to you a painting that I felt was by
11   de Kooning, and I brought it to you on a piece of paper like
12   this, and I said:  Mr. Maibaum, I would like you to sell this
13   to me for $10 million.  I'm Luke Brugnara.  I'm the greatest
14   guy in the world.  I've done $2 billion in deals.  I've got a
15   strong reputation --
16        MR. KINGSLEY:  Objection.  He's testifying through
17   his question about himself.
18        MR. BRUGNARA:  It's a question based upon person
19   presenting the alleged provenance, okay, because that's what's
20   going on here.
21   BY MR. BRUGNARA:
22   Q    Would you, then, say:  Okay, I got the provenance from
23   Luke Brugnara.  Hey, this guy has done a lot of deals.  I'm
24   sure he's not a liar.
25        Would you then go and advance that because I'm going to
```

```
1  quit what I'm doing, and I'm going to start making up these
2  little de Koonings and have you sell them for me?
3           THE COURT:  Mr. Brugnara, you were okay for a
4  while --
5           MR. BRUGNARA:  Your Honor, part of it is a joke,
6  because the reality is Mr. MacWhinnie -- let me ask you --
7           THE COURT:  No, no, no.  No speeches.
8           MR. BRUGNARA:  Mr. Maibaum has done a good job with
9  the Degas.
10           THE COURT:  We don't care whether you like him or
11  hate him.  It's not part of this case.
12  BY MR. BRUGNARA:
13  Q    The problem here is MacWhinnie is not a well-known figure
14  in the art community; isn't that true?
15  A    No, that's not true.  His mother was a very well-known
16  figure in the art community who knew de Koonings, who knew the
17  de Kooning family.
18  Q    So would it surprise you to learn that the various other
19  reputable art dealers in Manhattan are not interested in
20  selling these de Koonings as authentic de Koonings based upon
21  what John MacWhinnie says?
22           MR. KINGSLEY:  Objection.  I'm not sure what the
23  basis of his question is.  We don't have any documentation
24  from --
25           THE COURT:  Well, nevertheless, it is a question, so
```

470

1    please answer the question.

2          **THE WITNESS:**  I cannot speak to what other art

3    dealers would or would not do.

4    **BY MR. BRUGNARA:**

5    **Q**    Okay.  Would it surprise you that neither of the major

6    auction houses in the United States will sell these de Koonings

7    as authentic de Koonings?

8    **A**    I can't speak to that.

9    **Q**    Okay.  Well, you can, because when you go to the invoice

10   that's in exhibit right now regarding de Kooning, you put on

11   the second page of the de Kooning that you were -- is it you're

12   selling to Ms. Long or consigning?  I can't follow whether it's

13   a consignment -- is it a consignment or a sale?

14   **A**    It's a sale.

15   **Q**    There's a distinct legal difference, as you know.

16   **A**    Of course I know.  It's a sale.

17   **Q**    So you sold Rose Long these pieces?

18   **A**    That is correct.

19   **Q**    And whatever she did from that point moving forward,

20   whether she made a bonfire or donated it to a museum, that

21   really is none of your concern, correct?

22   **A**    In theory, that's correct.

23   **Q**    Okay.  So why did she refer to you as her partner?

24   **A**    I don't know that she did refer to me -- I mean, I have no

25   knowledge of why she would refer to me as her partner.

471

1  Q    Are you -- are you familiar the with the lawsuit Maibaum

2  versus Long right now?

3  A    Sure.

4  Q    Okay.  When you submitted to the federal district judge in

5  New York your complaint and your cross-complaint and your

6  answers to the cross-complaint, were you aware that that was

7  for the truth of the matter?

8  A    I don't understand your question.

9  Q    Meaning, when you submit a complaint and an answer to a

10  complaint to a federal judge, you're responsible for those

11  standards --

12         MR. KINGSLEY:  Objection.  He's testifying to what

13  was in the lawsuit through his question.

14         MR. BRUGNARA:  No.  He asked me to clarify my

15  question.

16         THE COURT:  Well, you, yourself, asked about the

17  lawsuit.

18         MR. KINGSLEY:  I did.  I think it's fine for him to

19  ask about the lawsuit.  He's just --

20  BY MR. BRUGNARA:

21  Q    Mr. Maibaum, I'll just get more direct with my question --

22         THE COURT:  I'm going to sustain the objection on the

23  ground that the question is too hard to follow and you need to

24  ask a more clearcut question.

25

BY MR. BRUGNARA:

Q    Okay.  Mr. Maibaum --

        MR. BRUGNARA:  Now, I'm -- I can't remember what the
question is, your Honor.  I'll start --

        THE COURT:  What point are you trying to get at?

        MR. BRUGNARA:  The point I'm trying to make, your
Honor, is -- let's just go straight to the lawsuit.

BY MR. BRUGNARA:

Q    You're aware that Rose Long stated that she was
essentially your front for the sale of this art to Luke
Brugnara and/or Brugnara Properties?

A    I'm not aware of that at all.

Q    Okay.  Well, I'm going to read it to you, and maybe it
will refresh your memory, or I'll phrase in it a way where you
can answer.

        THE COURT:  What are you about to do?  You're going
to read from some out-of-court document?

        MR. BRUGNARA:  No.  This is an in-court document
filed on PACER with a federal judge like yourself, your Honor.

        MR. KINGSLEY:  Objection.  It's not this court.

        THE COURT:  That's not this court.  And also it would
be just somebody's allegation.

    Now, it's the allegation by this witness, okay.  I'll
allow you to do that if you read it exactly.  But if it's by
somebody else, that's not...

```
 1              MR. BRUGNARA:  Okay.

 2   BY MR. BRUGNARA:

 3   Q    Well, are you aware, Mr. Maibaum, that she alleges in this

 4   countersuit against you that, in fact, you not only were not at

 5   arm's length; that you were fully involved in the sale of the

 6   art, the failed sale between Rose Long and myself?

 7   A    No, I'm not aware of that.  I think I need to see what the

 8   document says that you're referring to.

 9   Q    Okay.  So you have not seen the cross-complaint and the

10   complaint from Maibaum versus Long?

11   A    I have seen the cross-complaint, but I don't know the

12   specific text that you're referring to, so it's hard for me to

13   answer the question unless I can read it myself.

14              THE COURT:  Well, if you want to try to refresh his

15   memory, assuming there is such a thing --

16              THE WITNESS:  What specifically does it say?

17              THE COURT:  -- you can just take it up there, show it

18   to him, if you have a passage along those lines, and let him

19   read it.  And maybe that would refresh his memory about what

20   allegation is being made.

21              MR. BRUGNARA:  I'll read it first --

22              MR. KINGSLEY:  Can you -- can he just -- I have -- I

23   just want him to direct us to what part of the document he's

24   going to be asking about.

25              MR. BRUGNARA:  It's -- it's -- it's Page 20 of 28,
```

```
 1  and it states as follows --
 2              THE COURT:  Wait, wait, wait.  You're not supposed to
 3  just lay hearsay documents before the jury.  Wait a minute.
 4  Which paragraph?
 5              MR. BRUGNARA:  Paragraph 28, Page 20.
 6              THE COURT:  All right.
 7  BY MR. BRUGNARA
 8  Q    It says:  "The claim is" --
 9              THE COURT:  Which --
10  A    This is my client or her counter?
11  BY MR. BRUGNARA:
12  Q    Her counter.
13              THE COURT:  Wait a minute.  I have it here, too.  I
14  want to read it for myself.
15  BY MR. BRUGNARA:
16  Q    It says:  "The counterclaim defendants" --
17              MR. KINGSLEY:  Your Honor, he's reading the hearsay
18  document.
19              THE COURT:  Wait, wait, wait.
20      All right.  The way you should do this is not just read it
21  out loud, but -- because it's a hearsay document that's not yet
22  in evidence.  It may never come into evidence.  But it is to
23  say, is it true --
24              MR. BRUGNARA:  Is --
25              THE COURT:  Wait.  Is it true that you started
```

475

```
 1  structuring a deal with the inherent intention --
 2              MR. BRUGNARA:  Yes.  Sure.
 3              THE COURT:  -- and then -- and ask if it's true or
 4  not.
 5              MR. BRUGNARA:  Yeah, yeah.
 6  BY MR. BRUGNARA:
 7  Q    Mr. Maibaum, is it true that you said about structuring a
 8  deal with Ms. Long whereas it was the intent of you and your
 9  companies to conceal your involvement from the inception?
10  A    Not my intent.  It was Rose Long's intent.
11  Q    Okay.  Is it true that you communicated with
12  Ms. Littlejohn -- I guess that's her alias or pseudonym.
13              MR. KINGSLEY:  Objection.
14  BY MR. BRUGNARA:
15  Q    -- via email in a number of instances instructing
16  specifically to Ms. Littlejohn what to say to Brugnara?
17  A    No.  It was -- excuse me.  I'm sorry.  Is there an
18  objection?
19  Q    No.  Mr. Maibaum, please.
20              THE COURT:  He answered your question.  He said no.
21              MR. BRUGNARA:  No.  Then he was going to elaborate.
22              THE COURT:  Well, do you have something more to say?
23              THE WITNESS:  I would like to hear the statement
24  again.
25
```

476

1   BY MR. BRUGNARA:

2   **Q**   It says:  She alleges that in a -- quote, in a number of

3   instances that you instructed -- "they" meaning actually not

4   just you, but you and your wife -- instructed Rose Long on what

5   to say to me.

6           **THE COURT:**  Is Ms. Littlejohn the same thing as --

7           **MR. BRUGNARA:**  Yeah, that's who --

8           **THE COURT:**  -- Rose Long?

9           **MR. BRUGNARA:**  That's her alias.

10          **THE WITNESS:**  That was after the --

11          **MR. KINGSLEY:**  Objection.

12          **THE COURT:**  All right.

13          **MR. KINGSLEY:**  He can't testify to what Ms. Long's

14  alias is when he's asking the questions.

15          **THE COURT:**  Wait, wait, wait.

16  BY MR. BRUGNARA:

17  **Q**   Mr. Maibaum -- this is fine, because I have this here.  We

18  can address this.

19      Mr. Maibaum -- this is something that he referenced.  You

20  stated that Ms. Long -- is that her name Ms. Long?

21  **A**   That's how I knew her as.

22  **Q**   That's what she is using now?  Okay.  Or she was when you

23  knew her.

24      Okay, Ms. Long.  You relied upon what she represented to

25  you about her expertise; is that fair?  Is that a fair --

```
 1   A     In terms of the Luks and the de Koonings, that is correct.

 2   Q     Correct.  So you didn't do a -- a cursory investigative

 3   search on her representations to you about what qualifies her

 4   to be an expert, correct?

 5   A     Not yet, that's correct.

 6   Q     So would it surprise you to learn that she has no formal

 7   education or training whatsoever in de Koonings or any art and

 8   her representations to yourself about having master's degrees

 9   is, in fact, a lie?

10   A     I'm not aware that.

11   Q     Would that surprise you?

12   A     It would surprise me.

13   Q     Okay.  Well -- well, that is a fact.

14             THE COURT:  Wait, wait, wait.

15             MR. KINGSLEY:  Objection.

16             MR. BRUGNARA:  I would like to -- your Honor, can I

17   approach Mr. Maibaum --

18             THE COURT:  No.  No.  You're going to stay there.

19        That was -- first of all, when he says "would it surprise

20   you," it's like if somebody said:  Would it surprise you that

21   the earth has spun out of its orbit and going to land in the

22   sun.  That is not a fact.  That's just asking if it would

23   surprise you.

24        And even when a lawyer does it or Mr. Brugnara does it

25   and -- and gives off the aura that it is a fact and that they
```

478

1    truly believe it, it is not evidence.  It is not evidence.  It

2    is not evidence.

3         And then when Mr. Brugnara then asserts that it's a fact,

4    that is not evidence.  That is -- is it under oath?  Is

5    Mr. Brugnara subject to cross examination on that?  No.  That

6    is not evidence.

7    **BY MR. BRUGNARA:**

8    **Q**    Okay.  Mr. Maibaum --

9              **THE COURT:**  No, no.  This has been happening all

10   morning, and it should not be happening.  And it is not

11   evidence.  What is evidence is what comes out of the mouth of

12   this witness, period.

13        Mr. Brugnara, you must -- you must abide by the Rules of

14   Evidence --

15             **MR. BRUGNARA:**  I understand.

16             **THE COURT:**  -- and proper courtroom decorum and

17   everything else, instead of making speeches so --

18   **BY MR. BRUGNARA:**

19   **Q**    Okay.  Mr. Maibaum --

20             **THE COURT:**  Go ahead.

21   **BY MR. BRUGNARA:**

22   **Q**    -- did Rose Long represent to you that she had a master's

23   degree from Tisch School at New York University?

24   **A**    Not that I recall.

25   **Q**    Okay.  Would it surprise you if she represented that to

479

```
 1   many other people?
 2   A    I can't speak to that.
 3   Q    Okay.  That's fine.
 4        So when you deferred to Ms. Long being an expert on
 5   de Koonings in your FBI interview, what were you basing that
 6   on?
 7   A    Her representations to me.
 8   Q    So what did Ms. Long represent to you regarding her
 9   expertise on de Kooning?
10   A    That she knew works by the artist.  She had experience
11   with works by the artist.
12   Q    Did you do due diligence since you were putting your good
13   name associated with this sale to find out what expertise or
14   sales she has been engaged in?
15   A    I did not rely on Rose Long's representations to offer the
16   de Koonings to clients, be it her or to anybody else.
17        What I relied on was the provenance provided by the
18   consignors to Modernism Fine Arts.  That's what I relied on.
19   Not on Rose Long.
20   Q    Okay.  So you're telling me if anybody brings to you a
21   provenance that links them to Willem de Kooning, you will sell
22   that as a de Kooning?
23   A    I didn't say that.
24   Q    Have -- have you ever gone on eBay Mr. Maibaum?
25   A    Have I gone on eBay?
```

480

1  Q    Yes.

2  A    Yes, perhaps a few occasion.

3  Q    Okay.  Have you ever seen any Willem de Koonings sell on

4  eBay before?

5  A    I never Googled it or looked at eBay for Willem

6  de Kooning.

7  Q    Would it surprise you if I told you if you went on eBay

8  and looked up Willem de Kooning, exact pieces like this, they

9  trade from anywhere from $90 to $100 or best offer?  Would that

10  surprise you?

11  A    Nothing would surprise me on eBay.  Because eBay is

12  knowing for offering, selling works of art that are not

13  authentic.

14  Q    That's correct.  And -- and are you aware that Sotheby's

15  and Christie's has -- has a very thorough vetting out -- do you

16  know what "vetting out" means?  "Vetting"?  Do you understand

17  that legal term?

18  A    Yes, I do.

19  Q    They have a very thorough vetting out of the art that they

20  sell at auction, because they take their reputation very

21  seriously and they also are liable if the information is not

22  accurate.  Are you aware of that?

23  A    Yes.

24  Q    Okay.  Would you say that the standard of -- the standard

25  bearer of -- of excellence, or at least the standard bearer of

```
 1  protocol for selling fine art should be, at least, the standard
 2  that Sotheby's and Christie's instates:
 3          "Whereas, there is a thorough vetting out of the
 4      provenance before representations are made to
 5      unknowing buyers"?
 6  A   Sotheby's and Christie's, although they hold themselves
 7  out to be the greatest experts in the world, in fact, they rely
 8  on outside experts to vet for them.  Let's make that clear.
 9      Sotheby's and Christie's, in fact, the people that work
10  for Sotheby's and Christie's don't call themselves experts.
11  They call themselves specialists.
12  Q   I -- I understand.  Are you aware that I'm a preferred
13  client of Sotheby's, Mr. Maibaum?
14          MR. KINGSLEY:  Objection.
15          THE COURT:  Sustained.
16      The jury will disregard.
17  BY MR. BRUGNARA:
18  Q   Mister --
19          THE COURT:  There is no evidence that Mr. Brugnara is
20  such a thing.  If he eventually testifies to that, it's his
21  choice whether to testify, then there will be evidence to that
22  effect, or maybe it will come in in some other way.
23      But just this say-so and this, "Are you aware that
24  I'm..."  No. That's not evidence.
25          MR. BRUGNARA:  Well, that's why we're having
```

482

```
 1   Sotheby's --
 2           THE COURT:  You can't ask that kind of question.
 3           MR. BRUGNARA:  Your Honor, Sotheby's is going to
 4   testify.  I don't -- I -- that's how it's going to come into
 5   evidence.  I asked him if I would surprise him.  I'm allowed to
 6   ask him that question.
 7           THE COURT:  What is the possible relevance --
 8   BY MR. BRUGNARA:
 9   Q    Mr. Maibaum, let's cut to the chase here.  There is a
10   standard that Sotheby's and Christie's uses when they are going
11   to sell a piece of art to an unknowing buyer who maybe wants to
12   invest some money that they get from an inheritance or from a
13   windfall from a stock option and they want to go to a dealer or
14   an auction house to buy some art.
15        There has to -- do you agree in your professional opinion
16   that there has to be a standard of due diligence for the
17   ethical consideration of the buyer?
18   A    Can you rephrase that question, please?
19   Q    I'm rephrasing it.
20        Don't you think you have an ethical duty as a businessman
21   who has several decades' experience to do proper due diligence
22   on par with Sotheby's and Christie's experts that they defer to
23   to give them their guidance in their auctions?
24        Don't you think you owe your clients --
25           MR. KINGSLEY:  Objection.  This is two questions.
```

```
 1              MR. BRUGNARA:  It's not two questions.
 2   BY MR. BRUGNARA:
 3   Q    Don't you think you owe the people that are parting with
 4   their hard-earned money, or inherited or whatever, the duty to
 5   do the same due diligence that Sotheby's and Christie's does
 6   with their experts?
 7              THE COURT:  Sustained.  Objection sustained.  Too
 8   argumentative.  Too --
 9              MR. BRUGNARA:  It's not too argumentative.
10              THE COURT:  Too long.  You need to break that you
11   up --
12   BY MR. BRUGNARA:
13   Q    You -- have you ever relied upon Rose Long as your
14   expert -- since you are not an expert on de Kooning, have you
15   ever relied on Rose Long as your expert on other sales of
16   de Kooning?
17   A    No.
18   Q    Who have you relied on as your expert in de Kooning in
19   past sales?
20   A    Excuse me.  I have never had any other de Koonings or
21   sale.
22   Q    So you've never had a de Kooning for sale.  So what made
23   you believe that Rose Long was qualified to be an expert on
24   de Kooning?
25              MR. KINGSLEY:  Objection.  Misstates the testimony of
```

1   the witness.

2          **THE COURT:**   All right.   Use your own words and try to

3   explain whatever you can about that subject.

4      Go ahead.

5   **A**   The answer is I did not rely on Rose Long.   You're

6   misconstruing the fact.   The facts were that I relied on the

7   provenance and the written document that was provided by the

8   consignors of the de Koonings to me.   It had nothing to do with

9   Rose Long's experience or expertise.

10  **BY MR. BRUGNARA:**

11  **Q**   Okay.   So correct me if I'm wrong, I'll put it in a

12  question here to you.

13         So what you're trying to tell us here is that if Mr. John

14  MacWhinnie continued to provide to you, which is the source of

15  this bona fide source of provenance, additional de Koonings on

16  paper, he essentially has a money printing machine here, as

17  long as you advance those sales?

18  **A**   The answer is I never met John MacWhinnie.   He never

19  provided anything to me.   He provided -- he provided the

20  documents to the current owners who consigned the works to me.

21  The current owners gave me a guarantee as to authenticity,

22  which I then passed on to Rose Long.

23  **Q**   Okay.   Mr. Maibaum.   Mr. Maibaum, the two consignors to

24  you were Mr. Stone and Mr. Carlson; is that correct?

25  **A**   That is correct.

1  Q    Did you do any due diligence on Mr. Stone and Mr. Carlson,

2  Mr. Maibaum?

3  A    No.

4  Q    Why did you --

5  A    Excuse me.  What do you call "due diligence"?

6  Q    I do due diligence -- you just said that you relied upon

7  the consignor to you to verify the provenance of the validity

8  of these $7 million pieces -- I mean, Mr. Maibaum, you said to

9  the FBI --

10       THE COURT:  Ask him if he said to the FBI.

11 BY MR. BRUGNARA:

12 Q    Mr. Maibaum, did you say to the FBI -- and I can pull out

13 the exact:

14       "The short of it is de Koonings are very loose,

15       very easy to fake so I have to rely on provenance."

16       Do you say that?

17 A    I don't recall, but perhaps I did.

18 Q    Okay.  That was the gist of it.

19       And when you are saying --

20       THE COURT:  Wait, wait, wait.  Are you saying that's

21 the gist of it?

22       MR. BRUGNARA:  Okay.  Well, let's --

23       THE COURT:  The witness has to say that.

24       MR. BRUGNARA:  -- let's read it word for word then.

25       THE COURT:  Well --

1          **MR. KINGSLEY:**  Objection.  Hearsay in what he's about

2    to read.

3          **THE COURT:**  You can -- you can do the following.  You

4    can say:  Did you tell the FBI, and then you can read it

5    exactly.  And then the witness can say whether he did or he did

6    not.  And it's not a verbatim recording.  It's just a summary.

7          **MR. BRUGNARA:**  Your Honor --

8          **THE COURT:**  So you can do that much.

9          **MR. BRUGNARA:**  Your Honor --

10          **THE COURT:**  But you can't just start making a speech.

11          **MR. BRUGNARA:**  I under- -- and it's not a speech.

12   **BY MR. BRUGNARA:**

13   **Q**    The FBI wrote in their 302 that, in fact, you said:

14          **"**The de Koonings were easy to fake because they

15        are loose."

16        Those were your exact words, "loose," isn't that correct?

17          **MR. KINGSLEY:**  Object.

18   **BY MR. BRUGNARA:**

19   **Q**    Isn't that correct?

20          **THE COURT:**  Well, wait a minute.

21   **BY MR. BRUGNARA:**

22   **Q**    Isn't that correct, Mr. Maibaum?

23          **THE COURT:**  You're asking him if it was the exact

24   words.  Show him the document.

25

**BY MR. BRUGNARA:**

**Q**    Is the correct word, gist that they are easy to fake because they are loose?  Is that what you said?

**A**    I don't recall, but perhaps I did.

**Q**    Okay.  And don't you think they are easy to fake, Mr. Maibaum, because they are loose?

**A**    I'm not a faker, so I don't know.

**Q**    But you gave a seminar on fakes, didn't you, in Ireland?

**A**    I did.

**Q**    So how can you not be an expert on fakes and then you stand in front of a roomful of people and give a speech about fakes?  So you either are an expert on fakes or you are not. Which one are you?

**A**    I'm not an expert on fakes.  I'm an expert on what constitutes an original work of art, an authentic work of art.

**Q**    Okay.  But that's --

**A**    That's different.

**Q**    The title of the speech, Mr. Maibaum, was Fakes --

**A**    It was not.  It was --

**Q**    Okay.  Fakes was in the title.  It was --

           **MR. KINGSLEY:**  Objection.  He's testifying, giving speeches and interrupting the witness as the witness starts to answer his question.

           **THE COURT:**  Sustained.

       Do you remember the title of the speech?

1  A     It was asking like "Fakes, Forgeries and Lewded Art."  I

2  don't recall exactly.

3  **BY MR. BRUGNARA:**

4  Q     But it's not about authentication of art.  It's about

5  fakes and forgeries, which is two distinctly different areas.

6  A     Well, it's not because they -- they -- they flow together.

7  If something is not authentic, it's a fake or forgery.

8  Q     Mr. Maibaum, in the current District Court action in

9  Federal Court in New York, Rose Long alleges that you --

10        **THE COURT:**  Go ahead and tell us the paragraph

11  number.

12  **BY MR. BRUGNARA:**

13  Q     Page 24, Paragraph 45.

14        And I'm going to give you the exact words, Mr. Maibaum.

15  A     Please do.

16  Q     It says -- and I'm going to interject "counterclaim

17  defendants" with "Long" and "you" with "counterclaim

18  plaintiffs" for easier understanding here.  I will use Long and

19  Maibaum interchangeably for these two.

20        So it will be:

21            **"**Maibaum conspired to defraud Long into

22        purchasing American Masters that were inauthentic or

23        worth far less in value" --

24        **MR. KINGSLEY:**  Objection.  This isn't related to the

25  artwork involved --

1                  **MR. BRUGNARA:**  It is, your Honor.

2                  **MR. KINGSLEY:**  Your Honor ruled on that.

3                  **MR. BRUGNARA:**  No.  It is, your Honor.  It

4   involves -- it involves the -- one piece of art, the George

5   Luks.

6                  **THE COURT:**  Well, but you said earlier that that was

7   not the same item.

8                  **MR. BRUGNARA:**  It was one of the three.  They are one

9   of the three American Masters that she purchased.

10                  **MR. KINGSLEY:**  He should ask questions about the one

11  that is at issue in this transaction then.

12                  **THE COURT:**  All right.  I will -- I'm going to ask a

13  question, preliminary question.

14        Mr. Maibaum, first, I need to say to the jury that

15  allegations in another lawsuit are not facts proven in this

16  case.  So just because somebody makes an allegation in some

17  lawsuit somewhere else does not mean that it's true or not

18  true.  It's not -- it's not evidence.

19        But since the Government brought up the lawsuit, I'm going

20  to ask you this preliminary question:  Are you being sued by

21  Ms. Long in that case?

22                  **THE WITNESS:**  We sued Ms. Long.

23                  **THE COURT:**  And she sued you back?

24                  **THE WITNESS:**  And then -- and she sued back, correct.

25                  **THE COURT:**  All right.  And in her countersuit is she

1  saying that you conspired to defraud her?

2          **THE WITNESS:**  I don't recall the words because I

3  don't have it in front of me, but if you're reading it, I will

4  accept that.

5          **THE COURT:**  All right.  I will just read it out loud.

6  I'll tell the jury it's not evidence, but I'm trying to get

7  through this:

8          "The counterclaim defendants conspired" -- this

9      is what she alleges.

10          "The counterclaim defendants," that would be

11      you're side, "conspired to defraud the counterclaim

12      plaintiffs," that would be her side, "into purchasing

13      American Masters that were inauthentic or worth far

14      less than the values they represented to the

15      counterclaim plaintiffs."

16      Now, are you familiar with that allegations?

17          **THE WITNESS:**  I am.

18          **THE COURT:**  All right.  I'm asking because I have no

19  way of knowing.  Are the American Masters that are referred to

20  there involved in our -- any of them involved in our case?

21          **THE WITNESS:**  There is one, and it's the George Luks

22  painting that was shown earlier.  And the question was about

23  that, she claimed fraud because the painting's subject was not

24  Gertrude Vanderbilt Whitney.  Whereas, in my opinion it is.

25          **MR. BRUGNARA:**  Okay.  And I accept --

```
 1          THE COURT:  All right.  So that's the only part of
 2  this we're going to inquire into.
 3          MR. BRUGNARA:  No.  No, that's not -- that's now what
 4  the lawsuit states.  Because if you go to Page 17, No. 17, it
 5  states not just that she was concerned about the subject matter
 6  of the painting.  There was a much bigger issue regarding the
 7  fact that you had represented to her that -- and provided to
 8  her with an auction estimate for Sotheby's that the piece was
 9  worth double what she paid for it.  And then --
10          MR. KINGSLEY:  Objection.  He's misrepresenting the
11  facts.
12          MR. BRUGNARA:  She went to -- I will gave the quote.
13          MR. KINGSLEY:  Objection.  He is not --
14          MR. BRUGNARA:  Okay.  Your Honor, go up to
15  Paragraph 15, two above 17.  Let's read it word for word so
16  there is no --
17          THE COURT:  Let me do this.
18          MR. BRUGNARA:  15, your Honor.
19          THE COURT:  Just a minute.  I'm going to read this
20  out loud as a way to get through this so that we won't have so
21  many interruptions.
22      And I need to say to the jury, not one word of what I'm
23  about to read is evidence.  This is some out-of-court thing
24  that we're using as a basis to ask the question of the witness,
25  and what the witness then says is the evidence.  But these
```

```
 1  allegations in some other case about misdoings, is that

 2  evidence in this case?  Zero.

 3           MR. BRUGNARA:  Well, your Honor, it's --

 4           THE COURT:  Zero.  Zero.  Zero.

 5           MR. BRUGNARA:  -- it's the exact painting that was

 6  just in front of them right there--

 7           THE COURT:  Mr. Brugnara.  Mr. Brugnara.

 8           MR. BRUGNARA:  How do you want --

 9           THE COURT:  And what is evidence is what the witness

10  says about it under oath.

11       Now, some day we are going to have Ms. Long come in here

12  and we can go through it again.  Maybe she will then

13  regurgitate these allegations under oath.  That might be --

14  that might be evidence, but we haven't gotten there yet.

15       This is what this says.  I'm going to start with

16  Paragraph 15 where you wanted me to.

17           "On or about March 13 and 14, 2013, Mr. Maibaum

18       and Ms. Conn," C-O-N-N," emailed Ms. Littlejohn and

19       offered her another Luks painting named Portrait of

20       Gertrude Vanderbilt Whitney for $350,000.  They

21       described the painting as highly important and

22       claimed that a well-known auction house had estimated

23       its value up to twice the price they were offering to

24       Ms. Littlejohn.  Ms. Littlejohn agreed to purchase

25       this painting, received it and made full payment."
```

1        Let me just stop there and say:  To what extent is that

2   true?

3            **THE WITNESS:**  I haven't seen the email, but I believe

4   it is true.  But what was left out of that is that we did

5   provide a letter from Sotheby's.  I believe it was from

6   Sotheby's, giving a much higher estimate than the 350.

7            **THE COURT:**  All right.  So I'm now going to read the

8   next paragraph --

9            **THE WITNESS:**  Or -- excuse me.  Or a document.  I am

10  not sure what -- what happened Sotheby's had taken in the

11  painting for an estimate.  And I don't recall the amount, but

12  it was much greater than the $350,000.

13      Plus, I also provided the Sotheby's printout of a painting

14  of a similar subject, of was comparable, that I sold for double

15  as I recall.

16           **THE COURT:**  All right.  Now I'm going to read the

17  next paragraph.

18      You're going to be able to come back to this,

19  Mr. Brugnara.  I just want to cover it all once and then you

20  can ask follow-up questions.

21           "On or about May 1, 2013, Ms. Littlejohn emailed

22           a representative of a well-known museum to see

23           whether the museum might be interested in purchasing

24           the Luks portrait of Gertrude Vanderbilt Whitney.

25           The representative responded that the museum was not

1    interested and that questions had been raised about

2    whether the woman depicted in the portrait was

3    actually Gertrude Vanderbilt Whitney.  Ms. Littlejohn

4    forwarded the representative's email to Mr. Maibaum

5    and Ms. Conn, who responded that the painting has

6    always been known as a Portrait of GVW."

7    To what extent can you tell us if that's true or not?

8        **THE WITNESS:**  That is correct.

9        **THE COURT:**  All right.  No. 17:

10    "During the summer of 2013 Ms. Littlejohn offered

11    to Prenderghast a the Luks' portrait of Gertrude

12    Vanderbilt Whitney to a number of houses for possible

13    sale at auction.  She learned from the auction houses

14    that both paintings had previously been offered to the

15    auction houses.  The mere fact that a work of art is

16    offered to numerous potential buyers or auction houses

17    can decrease increase the market value for the work of

18    art.  The auction houses had also concluded that the

19    paintings had been damaged and heavily restored and

20    were rejected, both for inclusion in any auctions."

21        **MR. KINGSLEY:**  Your Honor, the next sentence relates

22    to a painting that's definitely not at issue in this.

23        **THE COURT:**  All right.  All right.  Just a second.

24    "In addition, Ms. Littlejohn had a restorer examine

25    the Luks Feeding the Chickens and he informed

```
 1        Ms. Littlejohn that it is not authentic."
 2        Now, I know that there is -- your -- my basic question is:
 3   To what extent is that paragraph true, remembering that it may
 4   be referring to multiple paintings?  But the first sentence did
 5   start out referring to a portrait of Gertrude Vanderbilt
 6   Whitney.
 7        Do you have all that in mind?
 8             THE WITNESS:  That we have already discussed.  As far
 9   as I know in history, the painting has always been known by
10   that subject.  Why the museum says it is a different subject, I
11   don't know.  But that's certainly not fraud, because everybody
12   knows that's what the painting has been called for generations.
13        Number two, restore, as you're referring to, says a
14   painting is not authentic.  A restorer's job is to restore
15   paintings.  You know, fix them up if they need cleaning or
16   something like that or they polish bronzes.  But they are not
17   art authenticators.  For a restorer to say that a painting is
18   not authentic, frankly, is ludicrous.
19             THE COURT:  Well, was the -- was the restoring part
20   dealing with Gertrude Vanderbilt --
21             THE WITNESS:  No.  It was a different painting
22   entirely.
23             THE COURT:  All right.  All right.  Now, that's all
24   that we're going to read from this document.
25        If you have some follow-up questions, if you don't think
```

```
 1  they have been adequately answered, you may do so,

 2  Mr. Brugnara.

 3           MR. BRUGNARA:  Okay.  Yeah, I want to.

 4  BY MR. BRUGNARA

 5  Q    Where my name is specifically mentioned in this lawsuit

 6  relative to the artwork in this case that's in this -- in this

 7  litigation, it specifically -- Ms. Long states that you

 8  instructed her to -- her exact word is "conceal their

 9  involvement in their sale to Brugnara at all costs."

10        Also, she inferred that you gave material

11  misrepresentations and omissions, that you acted in wanton

12  dishonesty and malice and --

13           THE COURT:  Well, where are you reading from now?

14           MR. BRUGNARA:  Page --

15           THE COURT:  About the concealed part.

16           MR. BRUGNARA:  Oh, about the concealed?  That's --

17  excuse me.  That's on Page 26, No. 53.

18  BY MR. BRUGNARA

19  Q    And on Page 27 they claim unjust enrichment, unjustifiable

20  conduct, unconscionable conduct, fraudulent and negligent

21  activity.

22        So she's alleging fraud against you and your companies and

23  your wife regarding the sale, not only of the Luks, but this

24  entire lawsuit is for the totality of the artwork that's

25  also -- was being --
```

```
 1            THE COURT:  That's a speech.  This is a speech.  This
 2   is an improper question and it's not true.  So --
 3   BY MR. BRUGNARA:
 4   Q    Okay.  Well, Mr. Maibaum.  Mr. Maibaum --
 5            MR. KINGSLEY:  Your Honor --
 6   BY MR. BRUGNARA:
 7   Q    -- were you the partner of Ms. Long?  Were you the hidden
 8   partner, the clandestine partner, the Wizard of Oz behind of
 9   curtain in this sale from Ms. Long to Luke Brugnara?  That's
10   the question.
11   A    Absolutely not.
12   Q    Okay.  And that's -- that's -- that's -- that's a solid
13   answer.
14        I mean, Ms. Long -- all right.  Would it surprise you that
15   Ms. Long has put out to the world that, in fact, you were the
16   puppeteer and she was the puppet in this transaction?
17            MR. KINGSLEY:  Objection.  That's --
18   BY MR. BRUGNARA:
19   Q    Would that surprise you?
20            MR. KINGSLEY:  -- not in evidence.  It's not what
21   she --
22            THE COURT:  Sustained.  Sustained.  Sustained.
23   BY MR. BRUGNARA:
24   Q    Would it surprise you that Ms. Long --
25            THE COURT:  You can't ask those kind of questions.
```

```
 1   BY MR. BRUGNARA:

 2   Q    Does --

 3              THE COURT:   Those are argumentative questions.

 4   BY MR. BRUGNARA:

 5   Q    Mr. Maibaum, did it surprise you when you read this

 6   lawsuit --

 7              THE COURT:   Sustained.

 8        Ignore the question.   Don't -- don't ask any more

 9   questions that start, "Would it surprise you?"

10              MR. BRUGNARA:   Okay.

11              THE COURT:   They are inherently argumentative.

12   BY MR. BRUGNARA:

13   Q    I would like to just put here for the --

14              THE COURT:   What is that you are about to -- what is

15   that?   What is that?   Is that document in evidence?

16              MR. BRUGNARA:   This is -- this is the loose statement

17   from the FBI report.

18              THE COURT:   No.   You can't show that to the jury.

19   That's hearsay.

20   BY MR. BRUGNARA:

21   Q    Okay.   Well, I will just slide to this.   I just want to

22   give you the exact verbiage because you said you --

23              MR. KINGSLEY:   Objection.   He can't read it either.

24   BY MR. BRUGNARA:

25   Q    Mr. Maibaum, do you remember --
```

1          **MR. KINGSLEY:**  Objection.

2  **BY MR. BRUGNARA:**

3  **Q**    -- this statement to the FBI --

4          **THE COURT:**  Wait, wait.  You may do the following,

5  "Did you tell the FBI..."  Then you can read it exactly.

6  **BY MR. BRUGNARA:**

7  **Q**    Mr. Maibaum, did you tell the FBI, quote, de Koonings are

8  easy to fake because are the images are loose?

9  **A**    I don't recall, but perhaps I did.

10          **THE COURT:**  Just a minute.  This is a good

11  opportunity.  Is that evidence that such a statement was made?

12      See, the only way to get that into evidence, if the

13  witness had said:  Yes, I made that statement, that would be

14  evidence.  But the -- what the witness said is, "I can't

15  remember.  It's possible."  That's the extent of what the

16  evidence is.

17  **BY MR. BRUGNARA**

18  **Q**    Is the FBI a reliable source in the art world to rely on

19  their expert --

20          **THE COURT:**  Sustained, sustained.

21  **BY MR. BRUGNARA**

22  **Q**    -- statements?  Is that -- is that a reliable source --

23          **MR. KINGSLEY:**  Objection.

24          **THE COURT:**  The cleanest way to get at this is to

25  just ask the witness without regard to these statements.

```
 1   Just -- just say is it -- is it easy to fake a de Kooning?

 2              MR. BRUGNARA:  Okay okay.

 3              THE COURT:  Why don't you just ask that question?

 4   BY MR. BRUGNARA

 5   Q    Mr. Maibaum, is it easy to fake a de Kooning?

 6   A    Not one that would pass close scrutiny.

 7   Q    Mr. Maibaum, would you tell the FBI it's easy to fake a

 8   de Kooning if it's not easy to fake a de Kooning?

 9              THE COURT:  That assumes a fact not in evidence.  He

10   has not testified that he so told the FBI.

11   BY MR. BRUGNARA

12   Q    Okay.  So, Mr. Maibaum, assuming the FBI are not lying in

13   their report --

14              MR. KINGSLEY:  Objection.

15              THE COURT:  Sustained.  We got to bring this to an

16   end.

17              MR. KINGSLEY:  Your Honor --

18   BY MR. BRUGNARA

19   Q    Mr. Maibaum.  Mr. Maibaum, you relied upon the

20   representations of Mr. Stone and Mr. Carlson regarding their

21   relationship, or their alleged relationship, with

22   Mr. MacWhinnie in advancing the sale of these de Kooning oil

23   and papers, is that correct?

24   A    That is correct.

25   Q    Okay.  I'm going to keep it real tight now, okay?  Would
```

501

```
 1  it surprise you if I told you that you --
 2           THE COURT:  Sustained.
 3  BY MR. BRUGNARA
 4  Q    -- that Mr. Stone and Mister --
 5           THE COURT:  Sustained.  I told you not to ask
 6  questions with "would it surprise you."
 7  BY MR. BRUGNARA
 8  Q    Mr. Maibaum, do you know that Mr. Stone and Mr. Carlson
 9  were also interviewed by the FBI?
10           MR. KINGSLEY:  Objection.
11           THE COURT:  How would he possibly know?  Sustained.
12           MR. BRUGNARA:  I'm asking if he knows.
13           THE COURT:  Speculation.  It's not going anywhere.
14  Sustained.
15  BY MR. BRUGNARA
16  Q    Okay.  Mr. Maibaum, do you hold Mr. Stone to be an art
17  expert?
18  A    No.
19  Q    Mr. Maibaum, do you hold Mr. Carlson to be an art expert?
20  A    No.
21  Q    Okay.  Mr. Maibaum, you are considered an expert, or at
22  least very well experienced, in the art world, correct?
23  A    In the general art world, yes.
24  Q    And I will agree to that.
25       So why, Mr. Maibaum, would an experienced
```

502

```
1   internationally-known art dealer rely upon representations of
2   two individuals that are trying to advance a multi-million
3   dollar sale when they have no expertise in art based upon your
4   testimony --
5           MR. KINGSLEY:  Objection.  He didn't say they had no
6   expertise in art.  He said they were not experts.
7           THE COURT:  Sustained.
8   BY MR. BRUGNARA
9   Q    Mr. Maibaum, would it -- Mr. Maibaum, are you aware that
10  Mr. Stone has only been involved in art for less than a year
11  and a half and that he is, in fact, interested in geology and
12  collecting rocks?  Are you aware of that?
13  A    I'm not aware of his history, no.
14  Q    Are you aware that Mr. Carlson is also interested in rocks
15  and geology?  They are not art experts.
16          MR. KINGSLEY:  Objection.  Relevance with respect to
17  the rocks.
18  BY MR. BRUGNARA
19  Q    Mr. Maibaum --
20          THE COURT:  Well, but these "are you aware"
21  questions, I need --
22  BY MR. BRUGNARA
23  Q    Mr. Maibaum --
24          THE COURT:  -- I need to say to the jury that's not
25  evidence.
```

503

1  BY MR. BRUGNARA

2  Q    Mr. Maibaum.  Mr. Maibaum --

3          THE COURT:  No matter how many times you say it,

4  unless the witness agrees to it, it's not evidence.

5  BY MR. BRUGNARA

6  Q    Mr. Maibaum --

7  A    I never met Mr. Stone.

8  Q    Mr. Maibaum, where did you meet Mr. Stone's partner,

9  Mr. Carlson?

10 A    I don't recall exactly, but Mr. Carlson came to us

11 offering some works of art some years ago, three or four years

12 ago.

13 Q    Mr. Maibaum, Mr. Carlson is not, let's say, a million

14 dollars or a well-heeled financial art buyer and trader in

15 Manhattan, is he?

16 A    Not in Manhattan.

17 Q    Mr. Carlson gave the FBI certain pieces of information

18 that these piecer were bought for $50,000.  Is that what he

19 represented to you?

20         MR. KINGSLEY:  Objection.

21         THE COURT:  To say that, that he represented that to

22 the FBI --

23         MR. BRUGNARA:  I said, did he stay that to you.

24         THE COURT:  You can't lay information like that.  If

25 that guy comes and testifies, you can then ask them that

1    question.

2    **BY MR. BRUGNARA**

3    **Q**    Mr. Maibaum, did Mr. Carlson tell you what he paid

4    Mr. MacWhinnie for the de Koonings?

5    **A**    No.  It's none of my business.

6    **Q**    So, Mr. Maibaum, you already stated that Mr. Carlson is

7    not an art expert or known expert in the art world?

8    **A**    That is correct.

9    **Q**    And you stated that the you're an esteemed professional

10    and that you hold your position of high value, your reputation.

11    Isn't that what you testified?

12            **MR. KINGSLEY:**  Objection.  I don't think he testified

13    to that.

14    **BY MR. BRUGNARA**

15    **Q**    Mr. Maibaum, is your reputation important to you?

16    **A**    Of course.

17    **Q**    Mr. Maibaum, do you think it's unusual or odd that someone

18    in your position would rely upon the recommendations of someone

19    such as Mr. Carlson to stake your reputation on the line

20    regarding a $6 million sale?

21    **A**    It has nothing to do with the person's reputation who is

22    offering the work of art to me.  It has to do with the

23    provenance and other issues.

24    **Q**    Mr. Maibaum, is Mr. Carlson an art dealer?

25    **A**    No.

```
 1              THE COURT:  May have I ask a question?  That may be
 2   unclear.
 3       What does Mr. Carlson have to do with our transaction?
 4              THE WITNESS:  Mr. Carlson was one of the consignors
 5   of ten of the de Koonings to Modernism Fine Arts.
 6              THE COURT:  All right.  Thank you.
 7   BY MR. BRUGNARA
 8   Q    So, Mr. Maibaum, we're going back to the due diligence.
 9   Do you know what "due diligence" is, Mr. Maibaum?
10   A    Of course.
11   Q    What is the usual due diligence, Mr. Maibaum, that you do
12   when a consignor comes to you and asks you to put your
13   reputation on the line to sell certain pieces of artwork on
14   consignment?
15              MR. KINGSLEY:  Objection.  I don't think Mr. Maibaum
16   has testified he puts his reputation on the line when he sells
17   a piece of artwork, and Mr. Brugnara assumes that in the
18   question.
19   BY MR. BRUGNARA
20   Q    Mr. Maibaum, would you say that the reputation of an art
21   dealer is based upon what he recovers for sale to the general
22   public or to collectors?
23   A    Partially.
24   Q    So you, obviously, must hold Mr. Carlson in high -- do you
25   hold Mr. Carlson in some sort of esteemed position, other than
```

506

```
1   an art expert, that would make you put these pieces up for sale
2   under the name of your company for $6- or $7 million when you
3   previously stated they are easy to make and they are loose?
4   A    First of all, I never said they are fake or they are
5   loose.
6   Q    Mr. Maibaum, isn't it true that you said to the FBI of
7   that, in fact, regarding the sale to Luke Brugnara, you relied
8   upon Ms. Long's expertise of de Kooning regarding these pieces
9   and, in fact, you had her look at them?
10  A    No, that is not correct.  What I relied on was the
11  provenance documents that were provided to Modernism Fine Arts
12  and then Rose Long's acceptance of the works by de Kooning as
13  someone who is knowledgeable on the artist.
14  Q    Okay.  Mr. Maibaum, what you're telling me, the consignor,
15  Mr. Carlson, is not an art dealer.  He is not a known buyer or
16  trader of art, and that he came to you, and you don't remember
17  where you met him or how you met him; but he came to you and he
18  said that he would like you to con sign these pieces for sale,
19  is that correct?
20  A    Carlson, although he's not an art dealer, he trades in
21  art.  He's an investor.  Sometimes he buys art and trades in
22  art.  He's not a professional art dealer, number one.
23       What is the second part of your question?
24  Q    The second question is, why?  Why would you believe what
25  Mr. Carlson says about these drawings on a piece of paper?  Why
```

1  would you believe what Mr. Carlson told you?

2  **A**    It's not what Mr. Carlson told me.  I will repeat what I

3  said before.  I relied on the provenance and I relied on Ms.

4  Long's eye and expertise on de Kooning.

5      I relied on the provenance to establish the history of the

6  works, where they came from.  I know MacWhinnie, John

7  MacWhinnie.  He was a friend, artist, and wife.  They were very

8  close friends, neighbors, and they would socialize with each

9  other.

10 **Q**    I understand that.  But you --

11 **A**    So I did not rely on Mr. Carlson's representations.

12 **Q**    I understand?

13 **A**    I relied on the facts.

14 **Q**    I understand.  But you just testified, Mr. Maibaum, isn't

15 it true, about a half hour ago that you never met

16 Mr. MacWhinnie, nor his mother, who is deceased.

17      So how can you verify as an art expert the provenance when

18 the person who purports to receive these items, the person is

19 dead?

20 **A**    First, Mr. MacWhinnie is not dead.  He's quite alive.

21      Two, Mr. Carlson is a very reliable person of good

22 character, so I relied on his representation.  Plus, he

23 provided a document from Mr. John MacWhinnie testifying that

24 the works of works of art were authentic.

25 **Q**    I understand that, and I believe that's in evidence in

1    this case.

2         But, Mr. Maibaum, if anybody who is not an expert in the

3    art community came to you with a letter from Mr. John

4    MacWhinnie and a drawing that they claim came from

5    Mr. MacWhinnie that he received from his mother, would you then

6    go in and advance that for sale for $2 or $3 million?

7    **A**    Depends on the person who presented it.  If someone

8    credible presented it, yes.

9    **Q**    So --

10   **A**    And -- and if someone like Rose Long, who has experience

11   with de Kooning, said, "These are fine, look fine to me,"

12   that's good enough.

13   **Q**    But I'm confused now.

14   **A**    I'm not surprised.

15   **Q**    Because you actually sold the pieces to Rose Long as

16   authentic de Koonings, so how could she be authenticating the

17   de Koonings to be de Koonings?

18   **A**    I don't understand your question.

19   **Q**    Mr. Maibaum.  Mr. Maibaum, you had these de Koonings for

20   sale before you ever presented them to Ms. Rose Long, isn't it

21   true?

22   **A**    Yes.  But the minute I got them, she is one of two people

23   I called immediately.

24   **Q**    Okay.  But you had just stated that you relied -- two

25   prong.

```
 1        You relied on Ms. Long to authenticate the pieces and you
 2   relied upon -- I don't know if it's moral or ethical good
 3   standing of Mr. Carlson.  You already said he's not an art
 4   expert.  So I guess Ms. Long's --
 5               MR. KINGSLEY:  Objection.
 6               THE COURT:  It's an argumentative question.
 7               MR. BRUGNARA:  It's not argumentative.
 8               THE COURT:  So, so argumentative.  Please, ask a fact
 9   question.
10   BY MR. BRUGNARA
11   Q    Okay.  Mr. Maibaum, so you don't have a standard procedure
12   after all these years in the art -- in the art world to sell
13   works of art whereas you're not an expert on the art, is that
14   true?
15   A    Let me just say something.  I don't know how many art
16   dealers there are in this country, probably thousands, okay?
17   Ninety percent of the art they sell they are not experts in.
18   Period.
19   Q    Okay.
20   A    Okay.
21   Q    Okay.  Mr. Long --
22               THE COURT:  Maibaum.
23   A    Maibaum.
24   BY MR. BRUGNARA
25   Q    That actually would be a real problem there.
```

1   **A**     Serious.

2   **Q**     And here is something that involves me, and you.

3         Mr. Maibaum, were you involved in the sale of the Renoir

4   to Luke Brugnara 12 years ago?

5   **A**     No.

6   **Q**     You were not?

7   **A**     I was involved in what sale to Rose Long of a Renoir.

8   **Q**     Oh, okay.  Do you know a Mr. Steve Banks?

9   **A**     I do.

10  **Q**     What is your relationship with Mr. Steve Banks?

11  **A**     He died, unfortunately.

12  **Q**     Oh, okay.  Hopefully...

13        Well, are you aware that a Renoir was sold to Luke

14  Brugnara approximately 12 years ago for around a half a million

15  dollars?

16  **A**     I wasn't aware until the problems here developed.

17  **Q**     Okay.  So are you aware that Ms. Long represented that she

18  owned the piece and that she received it from a museum?

19  **A**     I have no knowledge of that.

20  **Q**     Okay.  Are you aware that Ms. Rose Long falsified the

21  provenance when she was selling the pieces whereas your name

22  was associated as a broker?

23              **MR. KINGSLEY:**  Objection.

24              **THE COURT:**  Sustained.  The jury will disregard that

25  allegation until it's otherwise proven up with -- just to

1  assert "are you aware that" and fill in the blank with -- no,

2  that's not evidence.

3  **BY MR. BRUGNARA**

4  **Q**    How much money did you make on that sale to me on the

5  Renoir?

6  **A**    Well, first of all, I didn't sell it to you.

7       Number two, I have no recollection of the amounts involved

8  or anything else.  It was a number of years ago.

9  **Q**    Okay.  Let's go on to the Degas?

10       **THE COURT:**  It's time to -- it's 1:00 o'clock and

11  it's time to take our break.  Is this a good point to stop?

12       **MR. BRUGNARA:**  I think we should keep going.

13       **THE COURT:**  Well, no.  We're going to continue

14  tomorrow, but we're going to take our break now.

15       Mr. Maibaum, you have to come back and be here at 7:30

16  a.m. in the morning.  Our jury is excused for the day.  We'll

17  see you back here at the normal time tomorrow.

18       Thank you very much for your close attention.  No talking

19  about the case, no going on the internet to look up Degas or

20  any of those other people.  You've got to get all the evidence

21  you need to decide the case right here in the courtroom.

22       Thank you.  See you tomorrow.

23       **THE CLERK:**  All rise.

24       (Jury exits courtroom at 1:34 p.m.)

25       **THE COURT:**  Mr. Maibaum, you may step down.

```
 1              THE WITNESS:  Thank you, your Honor.

 2              THE COURT:  See you in the morning at 7:30.

 3         (Witness steps down.)

 4              THE COURT:  Everyone else be seated.

 5         I have a sentencing I've got to do in four defendants in

 6    two minutes.  So I can take up something quick right now, but

 7    otherwise I need to -- I need to move on to the next calendar.

 8              MR. KINGSLEY:  The Government just wants to clarify

 9    whether Mr. Brugnara intends to use --

10              THE COURT:  Use what?

11              MR. KINGSLEY:  Use the art that we showed for his

12    cross examination of Mr. Maibaum tomorrow.

13              THE COURT:  Why does it matter to you?

14              MR. KINGSLEY:  Because we need to tell our art

15    handlers whether they need to be here and pay them for it.

16              THE COURT:  Mr. Brugnara, do you plan to have -- use

17    the -- tomorrow, to use that art?

18         Are you going to have Ms. Long here, too?

19              MR. KINGSLEY:  She's going to be here too.

20              THE COURT:  Are you going to use the art on cross

21    examination tomorrow?  If you are, then the Government has got

22    to pay the handlers.

23              MR. BRUGNARA:  I -- I need to confer with the --

24              THE COURT:  What?

25              MR. BRUGNARA:  I need to confer with the associates.
```

 1          **THE COURT:**  Why don't you do that?  But I can't let

 2   you stay in the courtroom today, because I've got a sentencing

 3   right now, and I -- so everyone is going to have to vacate.

 4        So you all let -- Mr. Stevens, let the Government know the

 5   answer by say an hour or so from now.

 6          **MR. STEVENS:**  Yes, your Honor.

 7          **THE COURT:**  All right.  That's all we've got for

 8   today.  We'll see you at 7:30 in the morning.

 9          **MR. KINGSLEY:**  Thank you, your Honor.

10        (Whereupon there was a recess in the proceedings

11          from 1:34 p.m. until 2:50 p.m.)

12        (Proceedings held in open court, outside

13          the presence and hearing of the jury.)

14          **THE COURT:**  All right.  Everyone is present.

15   Mr. Brugnara is present.

16        First item of business is -- Mr. Stevens, I need for you

17   to come up here.

18        A question was raised about a subpoena that was supposedly

19   served on -- I can't tell -- in Brooklyn on somebody --

20   MacWhinnie.  The Marshal -- we inquired.  The Marshal says:

21          "The subpoena was not served because the date

22          April 18 had passed."

23        I don't know why April 18 was on there.  That's your

24   problem.

25          "Can you have a new subpoena reissued, no new

```
 1        order, with a new date and/or immediately upon

 2        service or something like that and the date.  We will

 3        scan it for Brooklyn and serve and so forth."

 4     So this was your fault for not having the proper date on

 5  there.  I'm giving it back to you, and you can deal with it.

 6  If you really want to try to serve that guy, you've got to give

 7  a new subpoena.  All right?

 8            MR. STEVENS:  All right.

 9            THE COURT:  So you and Mr. Brugnara have now been

10  advised of where that subpoena stands, so the burden is on you

11  to get me a new subpoena.

12     I'm not giving you any guarantees it will get served in

13  time.  The trial could be over, and we could have a verdict by

14  the time somebody shows up, so you need to get cracking if you

15  want that done.

16     Okay.  We have several people who want to move to quash

17  various other subpoenas that you have served and we have

18  succeeded in serving.  And the purpose now is to let them have

19  an opportunity to quash.  And I'm going to -- I don't know what

20  order to call them in.  I need some assistance from the lawyers

21  on what order do you want to call these people in?

22     Do I have anyone here that's in person?  Everybody here

23  needed to be in here in person?

24            THE CLERK:  There's three in person.

25            MR. BRUGNARA:  Your Honor, could we hand this up to
```

1  the Court?

2         **THE COURT:**  What is it?

3         **MR. BRUGNARA:**  It's the motion on the subpoenas that

4  were asked to be rewritten.

5         **THE COURT:**  I don't know what -- does this deal with

6  something we're going to hear right now?

7         **MR. BRUGNARA:**  Yeah, because it's just over at the

8  jail, so the Marshals are -- the private investigator could

9  jump on it right away.

10         **THE COURT:**  I don't know whether they will or not.

11      The record will show that Mr. Brugnara has just handed up

12  to me seven or eight sheets of paper, and I don't know whether

13  this is sufficient or what, so I am going to look at it after

14  the hearing.  I'll give it to my law clerk to look at.

15      Come over here and pick this up.

16      Whether or not this is sufficient or not, I can't tell you

17  right now.

18      All right.  Who is here from Glenn Dyer?

19         **MR. NEFOUSE:**  Your Honor, David Nefouse, Office of

20  the County Counsel Alameda County.

21         **THE CLERK:**  Come forward.

22         **THE COURT:**  Come up here, please -- the rest of you

23  can have a seat.

24      So what is this -- do you have a copy of the subpoena in

25  question?

 1          **MR. NEFOUSE:**  Yes, I do, your Honor.

 2          **THE COURT:**  All right.  Hand it up so I can look at

 3   the subpoena in question.

 4          **MR. NEFOUSE:**  There's actually two subpoenas, your

 5   Honor.

 6          **THE COURT:**  We're looking at a -- who is it that's

 7   the respondent?  Deputy Haynes?

 8          **MR. NEFOUSE:**  Deputy Douglas Haynes.  Yes, your

 9   Honor.

10          **THE COURT:**  All right.  What's the problem?

11          **MR. NEFOUSE:**  Your Honor, we received no reason why

12   Mr. Brugnara wanted the testimony.

13          **THE COURT:**  Is he required to give you the reason?

14          **MR. NEFOUSE:**  It would be helpful.

15       In addition to that, your Honor, we suspect it's so that

16   he could testify as to statements that Mr. Brugnara made to

17   him, and we feel those statements are inadmissible.

18          **MR. BRUGNARA:**  That's not the case, and I actually

19   provided to the clerk --

20          **THE COURT:**  Mr. Brugnara, why did you -- why did you

21   subpoena Deputy Haynes?

22          **MR. BRUGNARA:**  Well, first is, we corrected the scan

23   based upon your order that you just handed to Mr. Stevens.  And

24   Mr. Haynes was actually the floor deputy between June and

25   February in my pod four or five times a week.  And he would

1  testify regarding my health and my eating, because he was the

2  one that served the food to me.  And he also picked up the

3  trays for the two main meals, the morning meal and the evening

4  meal.

5      So he would be testifying just, basically, that he was, in

6  fact, feeding me pursuant to proper protocol, and I was eating

7  the food that was given to me.

8          **THE COURT:**  What is that going to prove?

9          **MR. BRUGNARA:**  Well, also, he's been there for, I

10  believe, something like 20 or 25 years.  And he did say to me

11  several times that he was concerned about my weight loss, and

12  he had never seen anybody in 25 years eat the food and lose

13  such a massive -- massive amount of weight.

14      And the main thing I want to get into evidence, though, is

15  the fact that I was eating the food, because, you know, the

16  rebuttal that someone losing weight, obviously, is he's not

17  eating.  So I am eating.

18          **THE COURT:**  Is the Government going to argue that --

19  Ms. Harris, is the Government going to argue that Mr. Brugnara

20  lost weight because he didn't eat?

21          **MS. HARRIS:**  Your Honor, I don't think Mr. Brugnara's

22  weight is in any way related to whether or not he defrauded

23  Ms. Long and Mr. Maibaum.  His weight, I don't see how --

24          **MR. BRUGNARA:**  It goes to the abscond charge.

25          **MS. HARRIS:**  -- it has anything to do with any charge

 1   in this case.  His weight --

 2          THE COURT:  Will you promise me under no

 3   circumstance -- because he may -- he's going to be, probably,

 4   allowed to explain if he testifies why he lost -- why he

 5   absconded or if there's some substitute evidence.

 6      I don't know what it's going to be.  We've heard in court

 7   several times that he claims, even though he looks perfectly

 8   healthy to me, that he was losing weight and had to go get

 9   medical attention.  So that could come into evidence.

10      So you're dodging my question.

11          MS. HARRIS:  I'm not going to argue anything about

12   what he was eating.  I don't know what he was eating or what he

13   wasn't eating.  I am going to take issue with the idea that

14   it's a defense to absconding.

15          THE COURT:  I can instruct the jury about that.

16          MS. HARRIS:  Okay.  Okay.  I'm not going to --

17          THE COURT:  Okay.  Here is the answer:  I'm going to

18   wait and see how the case develops.

19      Mr. Haynes does not have to show up until further order of

20   the Court.  But if it turns out that the weight loss becomes an

21   issue in the case, I'm going to make him show up to testify to

22   what counsel just told me -- not counsel, but Mr. Brugnara just

23   said; that he was eating his food.  I don't know about the

24   other thing, about him --

25          MR. BRUGNARA:  He was the one that did the strip

1  searches daily, you know, where it's a full nudity search.  So

2  he would have a full ability to determine what the weight loss

3  is based upon his --

4        **THE COURT:**  Look, if weight loss becomes an issue as

5  the trial goes on, possibly he's going to have to show up.

6      Now, Mr. Haynes, can I -- counsel, he can't go on

7  vacation.  He's got to be available on short notice.  So he

8  can't be -- he can't be going on trips.

9        **MR. NEFOUSE:**  How long is this trial going to be

10  going on, your Honor?

11        **THE COURT:**  Until June 5.

12        **MR. NEFOUSE:**  And, your Honor, I will say that he

13  does work the night shift right now at Glenn Dyer, I believe.

14  So when he gets off, he probably going straight to bed.

15        **THE COURT:**  He would have to get up and come here.

16  If we need him -- if we need him, we'll get ahold of you and

17  we'll get him here in a couple of days.

18      I think there's a good chance he won't be needed.  I think

19  there's a chance he might be needed.  And I don't want to have

20  to decide it right now, so I'm not going to quash this yet.

21  But I'm provisionally going to quash it subject to weight loss

22  becoming an issue in the case more than it is now.

23      All right.  So that's Mr. Haynes.

24      Who else do you want to move on behalf of?

25        **MR. NEFOUSE:**  Your Honor, this morning we received a

 1  subpoena requesting records for all telephone calls, including

 2  recordings for a phone number, area code (415)505-8869, as

 3  written on the opening statement to the subpoena submitted by

 4  Mr. Brugnara.

 5      This morning it seemed he wanted to request these records

 6  to address his state of mind.  In our subpoena, our motion to

 7  quash we filed this morning, we argued that if Mr. Brugnara

 8  wants to address his state of mind, he may do so by testifying

 9  and being subject to cross-examination.

10      We believe the Court has already addressed similar issues

11  in regards to a voice message that Mr. Brugnara left with

12  Ms. Toland.  And we find that any types of records going to his

13  state of mind would be self-serving and duplicative.

14          **THE COURT:**  Possibly.  Explain why you would need

15  those records, Mr. Brugnara.

16          **MR. BRUGNARA:**  I asked to have the custodian of

17  records authenticate them.  And, again --

18          **THE COURT:**  What relevance are they?

19          **MR. BRUGNARA:**  Well, because there's several phone

20  calls with my wife and with my mother where I'm in absolute

21  distress over my weight loss and my horrible health.  And -- I

22  mean, you'd have to be an Academy Award winner to say that

23  they're not truthful.

24      And state of mind -- present state of mind, which is an

25  exception under the 403(3), is it?  403 -- excuse me, 803(3) to

1  present state of mind and absolutely part of the defense.

2          THE COURT:   What is the time period for those --

3  whose phone number is that?

4      MR. BRUGNARA:   I just have my wife's phone number.

5  And we actually have the number of calls winnowed down to, I

6  think, seven.

7      Mr. Stevens did get that MP3 player over to me.  And I --

8  there's 418 calls, which is basically 600 hours.  And I

9  listened to them until I couldn't listen anymore.  I winnowed

10  it down to only, like, six or seven messages.  So it's only

11  about six or seven that are pertinent, and not even the entire

12  ten or fifteen minutes.  Maybe a one-minute segment.  So

13  probably four or five minutes of calls.

14          THE COURT:   On the -- what is the time period?

15      MR. NEFOUSE:   It says June 1, I believe, or around

16  June 2014 to the present, your Honor.

17      MR. BRUGNARA:   I just wanted them authenticated, and

18  I gave James Stevens, I believe, the numbers that we needed to

19  have them winnowed down and then presented back to the Court in

20  the final form.

21          THE COURT:   All right.  This one is quashed on

22  account of being overbroad.  Going from June of last year all

23  the way forward is way too many, and --

24      MR. BRUGNARA:   We already reissued it, your Honor.

25  Your clerk should have it right now.

```
 1              THE COURT:  What?

 2              MR. BRUGNARA:  That's what we just handed to you,

 3   your Honor.

 4              THE COURT:  I've got to go with what -- so this is

 5   not a rolling poker game where everything changes --

 6              MR. BRUGNARA:  No.  That was given to you before you

 7   took the stand.  We handed it to you --

 8              THE COURT:  I didn't take any stand.  You handed

 9   something up to me about 20 minutes ago, but that -- what is

10   that?  Is that supposed to be considered on this motion?

11              MR. BRUGNARA:  Well, it's the same motion.  It's --

12   it's for the -- a fresh 17(c) subpoena request for the

13   winnowed-down version of the overly broad version.

14              MR. NEFOUSE:  We have not seen that subpoena, your

15   Honor.

16              THE COURT:  It's hearsay.  Self-serving hearsay.

17   Inadmissible for any purpose.  It's just self-serving hearsay.

18              MR. BRUGNARA:  Well, it's not --

19              THE COURT:  Even for his state of mind, it's

20   self-serving hearsay.

21        Mr. Brugnara, you can say anything in the world on those

22   phone calls --

23              MR. BRUGNARA:  No.  The self-serving hearsay is --

24   there's an exception for present state of mind.  I mean, if

25   somebody is on the phone crying to his wife or his mother that
```

1   he's dying, that's not self-serving hearsay.

2          THE COURT:  Have you ever heard of the phrase "drama

3   queen"?

4          MR. BRUGNARA:  I wish it was true.

5          THE COURT:  Sometimes, I think you're a very good

6   one.  And you have -- you, yourself, say persistence overcomes

7   resistance.

8          MR. BRUGNARA:  If you're right.  If you're wrong, I

9   don't think --

10          THE COURT:  You have a modus operandi that precedes

11   you.  And I don't buy for a minute that we can trust those --

12   that is self-serving hearsay.

13          MR. BRUGNARA:  Your Honor --

14          THE COURT:  Your point is preserved for appeal.  That

15   point is quashed.

16      I've got many hearings here.  We've got to move on.

17          MR. BRUGNARA:  I know.  I'm entitled to have a

18   defense to the abscond charge.  And I -- first, you have say I

19   can't use the call that was made to the Court.  Now you're

20   trying to say that a call that I made to my mother and my wife

21   can't -- I can call them as a witness.  And --

22          THE COURT:  That may be.  I don't know.  If all

23   they're going to do is regurgitate your dramatic moments over

24   the telephone, what good is that?

25          MR. BRUGNARA:  It's just state of mind.

524

1   Present-tense state of mind.  And it's absolutely an exception

2   under 803.

3           THE COURT:  All right.  Your point is preserved for

4   appeal, but I disagree.

5           MR. BRUGNARA:  So you're -- so you're foreclosing any

6   opportunity I have to defend the abscond --

7           THE COURT:  I'm not.

8           MR. BRUGNARA:  -- that's clearly what the Court --

9           THE COURT:  I'm not doing that.  If you come up with

10  a decent defense that is allowable under the law.  But I just

11  can't let you admit some phony -- not phony, some defense

12  that's not allowable under the law --

13          MR. BRUGNARA:  Why don't we listen to the messages

14  first before you make a predisposed determination that they're

15  phony or not present-tense state of mind when the call is made?

16  I think that would be --

17          THE COURT:  I'm not going to listen to them.  I'm not

18  going to listen to those tapes --

19          MR. BRUGNARA:  You're not going to listen to five

20  minutes of tapes, and my freedom in the balance?

21          THE COURT:  No.  It's June.  June -- I'm quashing the

22  subpoena as written, and I'm not going to go back and rewrite

23  it for you.  It's quashed.  Overbroad.  Self-serving.  End of

24  story.

25          All right.  So on the first point of your things, you

```
 1   don't win.  And I'm going to rule on that later.
 2        On the second one, I'm quashing it.  All right?  End of
 3   that story.
 4        So we're now going to the next subpoena.  So you can go --
 5   you're excused.
 6              MR. NEFOUSE:  Thank you, your Honor.
 7              THE COURT:  All right.
 8        Now, who are these other lawyers here?
 9        (Brief pause.)
10              THE COURT:  Mr. Brugnara, you don't get to talk to
11   the lawyers here.
12        Who is next?
13              MR. GREEN:  I'm Nathaniel Green from Sullivan and
14   Cromwell --
15              THE COURT:  Come up here.  I didn't hear a word you
16   said.  State it again.
17              MR. GREEN:  Sorry, your Honor.  Nathaniel Green from
18   Sullivan and Cromwell on behalf of third-party Samuel Irving
19   Newhouse, Jr., another subpoena recipient.
20              THE COURT:  And what's his problem?
21              MR. GREEN:  I think we have two bases for a motion to
22   quash.  Mr. Newhouse was served with the subpoena on
23   April 21st.  Mr. Brugnara is, apparently, seeking testimony
24   regarding a transaction with Christie's in 2002, where
25   Mr. Newhouse purchased a Picasso statue that was originally
```

1   owned by Mr. Maibaum.

2         Some questions after the purchase arose as to its

3   authenticity, and Christie's ended up filing suit in 2006.

4   Mr. Newhouse was not a party to that action.  It was later

5   settled out of court.  It was essentially a breach of contract

6   case.  There were no allegations of fraud.

7         Mr. Brugnara apparently seeks to use Mr. Newhouse to

8   testify and somehow impugn Mr. Maibaum's credibility as a

9   witness, or to suggest that he behaved dishonestly in

10   connection with that Christie's transaction; therefore, he has

11   character for dishonesty and, you know, must have conducted

12   himself dishonestly in the transaction that gave rise to these

13   current proceedings.

14         So we move to quash the subpoena on the basis that it's

15   inadmissible.  I think the Court has really already ruled on

16   the admissibility of that kind of evidence in its April 23rd

17   omnibus order on the Government's motions in limine,

18   specifically motion in limine No. 6, when it ruled that

19   extrinsic character evidence relating to Mr. Maibaum's supposed

20   prior bad acts was not admissible.  It's not admissible under

21   608(b), because it's extrinsic impeachment evidence.  He can't

22   have Mr. Newhouse come up here and testify about Mr. Maibaum's

23   prior bad acts to suggest that Mr. Maibaum is not credible as a

24   witness.

25         And 404 -- Federal Rules of Evidence 404 and 405 also

1  don't allow specific instances of the kind Mr. Brugnara seeks

2  to introduce here relating to the Christie's transaction to

3  suggest that a victim has a character for dishonesty, as the

4  Court has already ruled.

5          **THE COURT:**  All right.  Any response, Mr. Brugnara?

6          **MR. BRUGNARA:**  No.

7          **THE COURT:**  All right.  That motion is granted.  That

8  subpoena is quashed in it's entirety, and for the reasons

9  you -- you have just stated.

10         **MR. GREEN:**  Thank you, your Honor.

11         **THE COURT:**  All right.  Who is the next lawyer?

12         **MR. GONZALES:**  Good afternoon, your Honor.  Jason

13 Gonzales from Nixon Peabody here for witness Gary Tinterow.

14         **THE COURT:**  All right.  Summarize your motion.

15         **MR. GONZALES:**  Mr. Tinterow was subpoenaed on

16 April 21st.  There is a -- and I have a copy of the subpoena,

17 if the Court would like to see it, but there's a handwritten

18 description of what Mr. Brugnara apparently would want

19 Mr. Tinterow to testify about.

20     And Mr. Tinterow, just for background, is the Director of

21 the Houston Museum of Modern Art.  And he has been asked, or

22 indicated on the subpoena at least, that Mr. Brugnara wants him

23 to testify about the Valsuani Little Dancer Degas sculpture and

24 that it was created or not created from a plaster cast.

25     So our position is -- in regards to that subpoena is,

```
 1  first, there was insufficient notice.  It was served
 2  April 21st.  And it's -- Mr. Tinterow, as you might expect, is
 3  a very busy person with a lot of scheduling issues --
 4          THE COURT:  Don't give me that.  We're all busy.  And
 5  Mr. Brugnara is facing -- he's correct, that he's facing going
 6  to jail.  So I'm sorry that he's a busy man.  We're busy, too.
 7          MR. GONZALES:  Absolutely.  I meant no disrespect.
 8          THE COURT:  So just move to your better points.
 9          MR. GONZALES:  Sure.  The better point, I guess,
10  under that discussion is that he has no personal knowledge of
11  anything to do with the case --
12          THE COURT:  What can he say on Valsuani?
13          MR. GONZALES:  He -- basically, he is knowledgeable
14  about all sorts of art issues, including Degas and other
15  sculptures.  With respect to this particular sculpture, he has
16  not seen it.  He does have an opinion about its worth or its
17  provenance.  It's apparently very complicated.
18          THE COURT:  But what would he say about Valsuani in
19  general?
20          MR. GONZALEZ:  That Valsuani is one of a series of
21  casts that was done of Degas sculptures.  And that's basically
22  what the factual situation is.  It's not clear exactly what the
23  thrust of the expected testimony.
24          THE COURT:  Let me ask the defendant, Mr. Brugnara.
25      What do you say is -- we've already heard from Mr.
```

1  Maibaum.  He gave some testimony on the history of the Valsuani

2  deal and how it differed from the -- the Hebrard casts and so

3  forth.  So what is it that Tinterow could give in this case by

4  way of testimony that would be better than what you've already

5  gotten from Maibaum?

6          MR. BRUGNARA:  Well, all right.  Tinterow has come

7  out -- he's the only one who's come out publicly.  And it's

8  when he was the -- I guess before the Houston Museum, he was

9  the impressionist and modern director at the Metropolitan

10  Museum, and he formed a committee with various museums.  I

11  think it included the Boston Museum and the Smithsonian, all

12  that had the original Hebrard Degas Little Dancer from 100

13  years ago.  And they formed a committee basically to

14  blackball -- that's probably a crude term, but that's the

15  essence of it, to blackball basically the Valsuanis from all

16  the American museums.  You heard Mr. Maibaum testify that they

17  are in no -- they have been shown or seen in any American

18  museum.

19      But the thing that separates Mr. Tinterow from the rest of

20  the experts on the Valsuani and Hebrard Little Dancers is that

21  he's the only one who is actually made public statements that,

22  in fact, the Valsuani is not by Degas and it was his -- his

23  opinion that it was a copy made -- a plaster copy made after

24  his death.  Meaning that it wasn't a plaster that was conceived

25  from a wax, but, rather, it was a plaster that was conceived,

1    you know, by, you know, molding plaster and, thus, is not an

2    original Degas.

3         So there is more than one -- one statement he has made

4    publicly.

5         Plus, the committee is well known that he headed to

6    basically shut down -- and he effectively has done a good job

7    of it.  Effectively Sotheby's and Christie's will have nothing

8    to do with the -- and I think we've already shown the Court,

9    will have nothing to do with the Valsuanis.  The museums -- you

10   know, my sister runs the Legion of Honor and the de Young here,

11   head of exhibit.  They will have nothing to do with it.

12        So all -- none of the museums in the United States will

13   have anything to do with the -- the Valsuanis that were cast

14   10, 15 years ago.

15        But Mr. Tinterow is the only one comes out publicly

16   several times and was the head of the committee.  So I think it

17   would be meaningful to have his testimony.

18        **THE COURT:**  Well, here -- here is a question I've got

19   for you.  I'm learning some details today from Mr. Maibaum, and

20   he seemed somewhat candid in saying that there -- that it's the

21   new kid on the block, the Valsuanis, and they have not been

22   shown in any museums in the USA, but they had been shown in the

23   Hermitage and two others.  And that the -- the fact that they

24   had been shown at the Hermitage gave value, some value.

25        So you, being as you say, the expert that you are and all

1  the art that you have purchased over the years, you would be,

2  to my mind, expected to know what a Valsuani is.  It was -- it

3  was told to you that it was a Valsuani.

4        **MR. BRUGNARA:**  This is -- this is --

5        **THE COURT:**  So what is the point that was concealed

6  from you that -- I don't see anything that was concealed from

7  you because they admitted to you it was a Valsuani.

8        **MR. BRUGNARA:**  This is -- this is the thing.  The

9  first thing is, let's talk about the Hermitage because I'm very

10 transparent.  And I'm -- I'm -- I'm -- I'm going to put an

11 analogy out there.

12       The Legion of Honor and the de Young in San Francisco, Dee

13 Wilsey, runs both of those museums.  She's the head.  She's the

14 chair.  She raised all the money to build the de Young,

15 $400 million.  And her son, Trevor Traina, the unknown

16 photographer, which I know you're a photographer as we will,

17 had a full showing on par with Monet showing, because that's

18 his mother.  It's called nepotism.

19       Same thing applied with the Hermitage and this Degas

20 showing.  It was a -- Benatoff, again, is Maibaum's partner is

21 a benefactor of the Hermitage and he wanted it shown.  And when

22 a benefactor puts forth a demand to the museum which they are

23 giving free money, such demands are usually complied with.

24       The Hermitage is a massive museum.  Almost as big as the

25 Louvre with so many wings you'll get lost, and it will take two

 1  days to find your way out.  And, yes, they did show the Degas

 2  in an isolated distant wing to help out Mr. Benatoff, who is

 3  Maibaum's Russian partner who lives in Russia.

 4      But, you know, that wasn't a -- listen, the fact of the

 5  matter is all these museums independently are funded and come

 6  to their own decisions with their board of trustees --

 7      **THE COURT:**  But you have -- you must have known all

 8  that all along.  In other words, you -- you would -- they

 9  didn't conceal from you the fact that it hadn't been shown in

10  the U.S.  They didn't conceal from you anything about what --

11  they told you it was a Valsuani.  I saw the document myself.

12      **MR. BRUGNARA:**  This is the problem.  This is -- goes

13  to state of mind and -- and the fact -- listen, if I didn't see

14  the lawsuit between Rose Long and Maibaum, they basically were

15  defrauding each other, then advanced their fraud onto me.  Rose

16  Long states in the Maibaum-Long lawsuit that the Degas has no

17  value.  Okay?

18      So, you know, that's a -- that's a problem.  You know,

19  she's saying the Degas has no value.

20      **THE COURT:**  I don't think she said that.

21      **MR. BRUGNARA:**  Christie's -- Christie's and Sotheby's

22  is saying the Degas has no value.  And Maibaum says it has

23  value, but then he can't produce bank records.

24      So, I mean, it's pretty easy to connect the dots here.

25  There is a man who is saying it's valuable, and he has the only

533

1  one that has any benefit to gain here.  And everyone else says

2  it's not valuable.

3      The reason why Mr. Tinterow is worthwhile is because he's

4  a scholar, a museum director, someone who doesn't have any

5  interests.  Sotheby's and Christie's are businesses of

6  commerce.  They may have to protect relationships --

7          **THE COURT:**  But you're not answering the question.

8      Let's say that Mr. Maibaum thinks it's worth 2 million on

9  account of it being shown at the Hermitage.  And then you,

10 knowing that it was a Valsuani and knowing since you're as

11 smart as you are and so knowledgeable and bought and sold more

12 art than I could ever dream of, you, as the expert, would know:

13 Hey, this is a Valsuani.  Hey, this is not even shown in the

14 U.S.  It's not worth the two million.  It's worth something

15 else.

16          **MR. BRUGNARA:**  Yes, your Honor.

17          **THE COURT:**  So where is the fraud?

18          **MR. BRUGNARA:**  And we -- and that's the beauty of

19 this.

20          **THE COURT:**  Because they are charging 2 million for

21 something you think is worth $10?

22          **MR. BRUGNARA:**  No.  There --

23          **THE COURT:**  That's not fraud.

24          **MR. BRUGNARA:**  Your Honor, we were -- no, it goes --

25 there was fraud because Rose Long -- for starters, there were

```
 1  numerous conversations between this handful of emails that the
 2  Government relies upon in error.  Because, you know, just the
 3  mere fact she said $4 million, and it goes into a black hole
 4  and all of a sudden it purportedly invoices for $3 million.
 5  You've got to remember, your Honor, the FBI twisted that house
 6  into a pretzel with about 20 or 30 agents looking for any
 7  purported invoices.  There were no invoices.
 8      But the fact of the matter is in the conversations of
 9  course I had discussions with her.  These aren't real Degas.
10  These aren't Hebrards.  The Hebrards are selling for 24- to
11  $28 million.  There's only like 12 of them in museums
12  worldwide.  And she advanced her position.  Well, I still want
13  you to look at it.
14      That's what I said.  I'm not paying for any shipping,
15  any -- you want to send it to me?  Fine.  Send to it me and
16  I'll look at it.  I will look at it.  Okay?  And this is before
17  she came in her whatever, drunk and -- but this -- on the basis
18  of the position, that's where it stood.
19      You want to look at -- and the same thing applied with the
20  de Koonings.  Send them to me.  I'll look at them.
21      But the fact of the matter is, it goes to Mr. Maibaum
22  didn't even send -- your Honor, he didn't even send Rose Long's
23  Degas -- Rose Long didn't even send her Degas.
24          THE COURT:  But those are little things --
25          MR. BRUGNARA:  It does.
```

535

1          THE COURT:  -- that has nothing to do with Tinterow.

2          MR. BRUGNARA:  Well, it has --

3          THE COURT:  Tinterow can't -- can't decide which

4    Degas got sent or whether it was Rose Long's one intended for

5    the daughter or was it one from New York at the -- at the

6    Maibaum place.  He can't help us in any way on that.

7          The most it sounds like he could say is what we've already

8    heard from Maibaum, is they are not shown in the USA; the

9    Valsuanis, no one likes them; and the art world is against them

10   in the USA.  And here is Maibaum trying to create this market.

11         There is nothing illegal or deceptive about that.

12         MR. BRUGNARA:  Well --

13         THE COURT:  And Mr. Maibaum -- that's the way

14   people -- that's the way artists get started.  They -- they

15   create the market.

16         MR. BRUGNARA:  Yes, that -- that's true.

17         THE COURT:  So they go out and get some museum to

18   show their work.

19         MR. BRUGNARA:  Your Honor, if it's done -- this is

20   the thing.  If it's done above board with museums like the

21   Houston Museum, like the Metropolitan Museum, like the

22   Smithsonian or Boston Museum that are legitimate museums.  Not

23   obscure museums in Greece or Israel that no none has ever heard

24   of.

25         THE COURT:  Or like Leningrad maybe.

1          **MR. BRUGNARA:**  Or -- or the Hermitage.  You heard

2    Benatoff just happens to be a benefactor --

3          **THE COURT:**  Wouldn't the Hermitage be like one of the

4    top ones in the whole world?

5          **MR. BRUGNARA:**  Your Honor, this is the thing.  And

6    you heard Mr. Maibaum testify, okay?  I mean, he's the only

7    person here to benefit.

8          And the problem is it's a moving target because I don't

9    know what to believe on the -- the reports I get from Ms.

10   Harris and the FBI anymore, because one day it was Long paying

11   225 for it.  And then next day she's buying into an LP that has

12   nothing to do with Little Dancer.

13         So I don't know what to rely upon.  So the more

14   information I can gather from the experts, the better we will

15   have that information.

16         **THE COURT:**  Well, here is -- here is the ruling.  I'm

17   going to make a ruling now.  Are you ready?

18         I am going to ask Mr. Tinterow to stay on standby.  There

19   is a high likelihood that he is not going to be needed because

20   in my judgment right now, as I understand the case, the -- the

21   point that Mr. Brugnara wants to make through him about how the

22   art world regards these Valsuanis, is already known to the jury

23   and it -- and it was never misrepresented to -- to him.  And

24   so --

25         **MR. BRUGNARA:**  Your Honor --

```
 1              THE COURT:  No, no.  You don't get to argue anymore.
 2              MR. BRUGNARA:  You know, he --
 3              THE COURT:  Stop.
 4              MR. BRUGNARA:  Out of respect to just let him go
 5    then, because I don't want this guy to have his summer jammed
 6    up on my account.
 7              THE COURT:  Okay.  Thank you for being so generous.
 8    The subpoena is quashed.
 9              MR. GONZALEZ:  Thank you, your Honor.  Thank you.
10              THE COURT:  All right.
11       Now we go to -- is there another lawyer here?
12              THE CLERK:  No more lawyers.  Everyone else is phone
13    standby.
14              THE COURT:  All right.  So I need to -- who's got the
15    latest -- who are the people back east that may be later in
16    time?  I think we should try to --
17              MR. BRUGNARA:  I think Joan Michelman is important
18    because I purchased several million dollars from her worth of
19    art, and she's a top dealer in -- in Manhattan.
20              THE COURT:  Well, what has she done?  How can she
21    help you?
22              MR. BRUGNARA:  She is going to testify that I
23    purchased this art without any issues, without any problems
24    regarding payment, without any issues whatsoever.
25              THE COURT:  Well, that was back then.  Back in the
```

```
 1   '90s.

 2            MR. BRUGNARA:  No, it wasn't back in the '90s.

 3            THE COURT:  When was the last purchase?

 4            MR. BRUGNARA:  I don't know.  Probably 2006 maybe.

 5            THE COURT:  Well, when were all the bankruptcies?

 6            MR. BRUGNARA:  I don't have any bankruptcies.  I had

 7   a reorganization in 2008 -- 2009.  I have had 30 LPs, and two

 8   went into reorganization and the lender was paid in full.

 9       And the only reason it went into reorganization, because

10   Danny Pang, someone you may know, is the head of a hedge fund

11   and a receiver took over that was federally appointed, and he

12   would not honor a simple, you know, nine-month extension to

13   consummate a sale.  So the property, out of necessity, was put

14   into a reorganization just to buy the time to consummate the

15   sale and then the lender was paid off in full.

16            THE COURT:  All right.  Let's get Ms. Michelman on

17   the phone for a minute.  See if we can track her down.

18            MR. BRUGNARA:  I have never filed a bankruptcy, your

19   Honor, personally.

20            THE COURT:  Will she be able to hear me?

21            THE CLERK:  She should.

22       (Phone ringing.)

23            MS. MICHELMAN:  Hello?

24            THE CLERK:  Hi, Ms. Michelman.  It's Dawn, clerk for

25   Judge Alsup.  I have you on speakerphone in the judge's
```

```
 1   courtroom with --
 2           MS. MICHELMAN:  Oh, my, I forgot all about that.  Oh
 3   my goodness, but I'm here.  I forgot all about this, but I'm
 4   here.  Go ahead.
 5           THE CLERK:  Okay.  The judge will come on the line
 6   now.
 7           THE COURT:  Okay.  Ms. Michelman, I'm the judge.
 8   I'm -- my name is Judge Alsup.
 9           MS. MICHELMAN:  How do you do?
10           THE COURT:  And we're here in a big courtroom with
11   several people present.  We have a court reporter taking down
12   everything just as if you were right here in the courtroom.  We
13   have here Mr. Brugnara, who is on trial in a criminal case.
14   And he has issued a subpoena for you and then you said you
15   didn't want to appear.  And so we're having -- I can't just let
16   you off because you don't want to appear.  I have to -- I have
17   to figure out how relevant and how much testimony you can give.
18       Mr. Brugnara is representing himself, although he does
19   have some advisory counsel here with him.
20       In addition, the Government is represented by a prosecutor
21   here named Robin Harris, and there -- just so you know, there
22   are a small number of people in the back of the courtroom who
23   are observing.
24       So that's our situation.  So do you have a mental image of
25   where -- what's going on here?
```

```
1              MS. MICHELMAN:  I -- I sort of do.  But the only

2    thing that worries me is my memory.  Because I -- you know, I

3    just didn't look up my any of my records.  But anyway, fire

4    away.  This was so long ago.

5              THE COURT:  All right.  I want to put you under oath

6    so the record will be under oath.

7              MS. MICHELMAN:  Sure.

8              THE COURT:  So raise your right hand and the clerk

9    will swear you in.

10             MS. MICHELMAN:  Okay.  I'm raising my right hand.

11        (Ms. Michelman placed under oath.)

12             THE COURT:  Okay.  I'm going to ask the questions at

13   least to begin with.

14             THE WITNESS:  Okay.

15             THE COURT:  But everyone is listening, and then maybe

16   the others will get a chance to ask questions, too.

17             THE WITNESS:  Sure.

18             THE COURT:  Okay.  So do you know Mr. Luke Brugnara?

19             THE WITNESS:  Yes, I do.

20             THE COURT:  How do you know him?

21             THE WITNESS:  Well, I'm a private art dealer.  And

22   many years ago, but I can't -- as I said, I can't be precise

23   because I didn't look up my records, Mr. Brugnara approached me

24   about buying art.

25             THE COURT:  All right.  Do you -- can you give us a
```

1  rough ballpark idea of how many years ago that was?

2         THE WITNESS:  You know, I really -- I know how much

3  this all means to you and, you know, the folders for

4  Mr. Brugnara are not even in this present location where I'm

5  at.  I don't even have them anymore.  You know, so I would say

6  it's at least 20 years ago.  I -- I may be wrong, but that's

7  what I think.

8         THE COURT:  Do you -- where are you located?

9         THE WITNESS:  I'm in Manhattan, at 23 East 74th

10 Street.

11        THE COURT:  Were you then located in Manhattan?

12        THE WITNESS:  Yes.

13        THE COURT:  All right.  So tell us what you remember

14 about approximately 20 years ago, about that, the art dealings

15 that you had with Mr. Brugnara.

16        THE WITNESS:  Oh, my memory is just -- you know, as

17 you get older.

18     He approached me.  He said he was a real estate developer

19 who lived in San Francisco and he bought a couple of things,

20 but I just don't remember.  I mean, I would have to ask my

21 assistant to try to go back.

22     Did we have computers then?  I don't even remember, you

23 know.  So maybe perhaps you could tell me what Mr. Brugnara

24 says he bought.  And I could say "yes" or "no."

25        THE COURT:  All right.  Here is what I would like to

```
 1   do.  I'm going to give him a chance to ask you questions, kind
 2   of like if it was on trial.  But we don't have a jury present
 3   right now.  This is -- the jury has gone home for the day, and
 4   I'm trying to deal with issues like your subpoena.  So I'm
 5   going to let him ask you a few questions.
 6        Now, Mr. Brugnara, you've got to get right to the point
 7   and not -- not go off on tangents.  All right.  Go ahead.
 8             MR. BRUGNARA:  Hello, Joan.
 9             THE WITNESS:  Hi.
10             MR. BRUGNARA:  This happened, based upon my records
11   and recollection, between 2002 and 2006 --
12             THE WITNESS:  Okay.
13             MR. BRUGNARA:  -- but the paintings that I
14   remember -- will, I bought the Monet, View from the Cliffs.  Do
15   you remember that painting?
16             THE WITNESS:  I think I do, yes.
17             MR. BRUGNARA:  And I believe that was about a million
18   and a half dollars.
19        I also bought the Titian Penitent Magdalen.
20             THE WITNESS:  That I remember, yes.
21             MR. BRUGNARA:  And that was in the same million,
22   million and a half dollar range; million four, million five,
23   million four fifty, I think, right?
24             THE WITNESS:  Uh-huh.
25             THE COURT:  Hold on.  Now, I need to hear -- the
```

543

```
 1  witness, when you say "uh-huh," I don't know whether you're

 2  saying yes, you remember that and agree --

 3          THE WITNESS:  Yes, I do, I agree.  The Titian, I

 4  remember that.

 5          THE COURT:  To the dollar amounts as well?

 6          THE WITNESS:  Well, I can't be precise, but I think

 7  that's correct, without looking at the invoices, which I don't

 8  have in front of me.

 9          THE COURT:  All right.  Thank you.

10      All right.  Go ahead.

11          MR. BRUGNARA:  And then we had the -- we had that

12  Baburen, Christ and the Doctors.  Remember the big Baburen

13  Christ and the Doctors from -- Slatkis (phonetic spelling)

14  looked at?

15          THE WITNESS:  Yes.

16          MR. BRUGNARA:  And that was, I think, like $500,000?

17          THE WITNESS:  Yes.

18          MR. BRUGNARA:  And then we have the two Pompeo

19  Batonis, Christ Salvador Mondè and the Holy Family, the larger

20  Holy Families, the two Batonis.  And those were about a half

21  million dollars each.

22          THE WITNESS:  Yes.

23          MR. BRUGNARA:  And then we had the -- let's see what

24  else I bought from you.

25      I bought -- oh, the Christ Carrying the Cross.  That was,
```

```
 1  you know, somewhere between 300,000, 400,000, 500,000.  It was

 2  in the hundreds of thousands.

 3       We looked -- we -- also -- oh, the Bougereaus.  Remember

 4  that big Bougereau with the two babies kissing under the tree

 5  and the lady kind of halfway in the shade?

 6            THE WITNESS:  Yes.

 7            MR. BRUGNARA:  And that was $800,000.

 8            THE WITNESS:  Uh-huh.  Yes.

 9            MR. BRUGNARA:  And then -- oh, there was -- remember

10  the Bougereau, the girl with the lamb, too.

11            THE WITNESS:  Yes.

12            MR. BRUGNARA:  And that was, I think, 500,000 or

13  $600,000.

14            THE WITNESS:  Yes.

15            MR. BRUGNARA:  And then there was --

16            THE COURT:  When you say "yes," do you remember these

17  things?

18            THE WITNESS:  Yes, I do.  But, I mean -- because I am

19  so neurotically accurate as to the price --

20            MR. BRUGNARA:  Yeah, she is.  Yeah.

21            THE WITNESS:  -- the best thing for me tomorrow, when

22  the business day begins, is probably to look all this up and

23  see if I can find Luke's folder, you know, and just email them

24  to you.

25            MR. BRUGNARA:  Yeah.  You know what, Joan -- Joan,
```

```
 1   that's -- we're just getting -- the whole point of why I just
 2   wanted you to testify, I was hoping that you didn't have to be
 3   inconvenienced.
 4        But, you know, we have -- I also wanted you to opine
 5   regarding Ms. Rose Long, and I know that when we -- I had a
 6   transaction with her -- by -- remember that Renoir, the
 7   Gabrielle with the rose in her hair?
 8             THE WITNESS:  Uh-huh.
 9             MR. BRUGNARA:  That was about 12 years ago.  And then
10   you told me:  Oh, my God.  You know, I could have gotten that
11   for you much cheaper.  And don't deal with her, or something
12   along those lines.  Or, you know, make sure you just go through
13   me.
14        I just wanted you to opine on her reputation --
15             THE WITNESS:  What is her name, please?
16             MR. BRUGNARA:  Rose Long.  She also goes by a couple
17   of aliases.  Rose Littlejohn and --
18             THE WITNESS:  I've never heard of this person.
19             MR. BRUGNARA:  Well, Rose Long.  You had -- you had
20   heard of her 12 years ago.
21        And this guy named Walter Maibaum, who is kind of her
22   silent partner.
23             THE WITNESS:  I've heard of Walter Maibaum.
24             MR. BRUGNARA:  Right.  So what happened was basically
25   they tried to sell me this fake art, and --
```

```
 1           THE COURT:  Now you're getting into a speech.

 2           MR. BRUGNARA:  Okay.

 3           THE COURT:  You're getting into a speech.

 4           MR. BRUGNARA:  Well, listen, basically, Joan, what I

 5   wanted you to confirm, and maybe Judge Alsup will let you do it

 6   telephonically because you're so far away and I know that

 7   you -- you have health issues.  But just that on those multi --

 8   many -- I mean, we reeled off there about $10 million worth of

 9   art, all that I paid on time, in full, as agreed.  There were

10   no issues, correct?

11           THE WITNESS:  Correct.

12           MR. BRUGNARA:  Okay.  And, also, I was very happy

13   with your service.  And we always used ShipArt, correct?

14           THE WITNESS:  Correct.

15           MR. BRUGNARA:  That's right.  Okay.  And because they

16   are the only secured art handlers in the Bay Area.  I know you

17   have Daley Mayers (phonetic spelling) and there's a few others

18   in Manhattan, but there's only have ShipArt here, correct?

19           THE WITNESS:  Right.  Correct.

20           MR. BRUGNARA:  Okay.  And I also -- so, I mean, I

21   just -- you know, Joan, as you know, I've bought a lot of art

22   from Sotheby's and Christie's and I'm their preferred client

23   and you were my main art dealer when I was actively buying.

24   You know, I -- I take my reputation very seriously and to have

25   them besmirch my reputation, I just needed to call on somebody
```

547

```
 1   to put it in perspective of the reality that -- you know, we

 2   have Sotheby's, also, who is going to be testifying.  You know,

 3   I purchased from Sotheby's --

 4            THE COURT:  You're making a speech.  No, you can't do

 5   that.  Mr. Brugnara, this is -- you started out okay.  But now

 6   you're off into --

 7            THE WITNESS:  Can you opine --

 8            THE COURT:  You're trying to brainwash the witness.

 9            MR. BRUGNARA:  Okay.  Okay.  Joan, can you opine --

10   this is the thing.  You know, Walter Maibaum and Rose Long, you

11   know, are -- are suing each other in -- in New York District

12   Court for fraud --

13            THE COURT:  No, no, no, no.

14            MR. BRUGNARA:  Okay.  Okay.  Joan, they -- they --

15   they brought this --

16            MS. HARRIS:  Your Honor --

17            MR. BRUGNARA:  -- action against me alleging that I

18   didn't pay them for art, that they didn't come pick back up,

19   and I need you to opine on their character.  Not on any

20   transactions.  Not on any specific instances -- instances, but,

21   but rather just you, as probably the top art dealer in

22   Manhattan, or one of the top art dealers in Manhattan,

23   certainly the top two or three, your opinion of Walter Maibaum

24   and your opinion of Rose Long.

25            THE COURT:  All right.
```

```
 1              THE WITNESS:  I never heard of Rose Long --

 2              THE COURT:  Okay.  Just -- that's it.

 3              THE WITNESS:  Okay.

 4              THE COURT:  I'm going to take over the questioning.

 5    This is the judge again.

 6              THE WITNESS:  Okay.  Thank you.

 7              THE COURT:  All right.  So I want to start with the

 8    first proposition, and that is it sounds to me like whenever

 9    time it was you had some dealings and sold Mr. Brugnara several

10    items of expensive art, and he paid on time and you had a good

11    relationship with him back, whenever that was.

12        Am I getting that right?

13              THE WITNESS:  You're getting that right.

14              THE COURT:  All right.  So you --

15              THE WITNESS:  Again, I would like -- I would love to

16    go through his folder, but it's not in front of me.  I would

17    have remembered if it was --

18              THE COURT:  Okay.  So you would -- you would need to

19    do that.

20        All right.  So then the second question is, you never

21    heard of Rose Long or --

22              THE WITNESS:  No.

23              THE COURT:  -- what's the other name?

24              THE WITNESS:  Walter Maibaum, I've heard of.

25              THE COURT:  Okay.  What's the other name.  Rose Long?
```

```
1              MR. BRUGNARA:  Littlejohn.

2              THE COURT:  Littlejohn.  Have you ever heard of

3  Mrs. Littlejohn?

4              THE WITNESS:  No.

5              THE COURT:  All right.  So, all right.  Walter

6  Maibaum.

7        Now, I'm not saying whatever -- whatever you say is going

8  to going to be of -- admissible or not.  That's a separate

9  question.  But do you have an -- an opinion for his reputation

10 for -- for honesty?

11             THE WITNESS:  I really don't, because I've never done

12 any business with him, you see.  I just have never dealt with

13 him.  I know of him, but I have not really dealt with him --

14             THE COURT:  All right.

15             THE WITNESS:  -- in any significant way.

16             THE COURT:  All right.  Okay.  I am going to leave it

17 there.

18       Here is what I -- Ms. Michelman, have I got that name,

19 right?  Michelman?

20             THE WITNESS:  Yes.

21             THE COURT:  I -- I think I'm going to have to ask you

22 to come out here and testify.

23             THE WITNESS:  But I cannot do that.  I can get a note

24 from my doctors.  I can't fly.

25             THE COURT:  Well, tell me about -- tell me about
```

1   your -- why can't you?

2           **THE WITNESS:**  I just have, you know -- I'm -- I'm

3   seeing a psychiatrist and have seen a psychiatrist for many

4   years, and I just have phobias since I was a child.  And I'm

5   under a doctor's care.  And I have not flown since Reagan got

6   shot.  That was the last time I flew.

7           **THE COURT:**  Well --

8           **THE WITNESS:**  I have not been on a plane.  I can't.

9           **THE COURT:**  How about a train?  You can come on a

10  train.

11          **THE WITNESS:**  I cannot do that.  I just can't.  I

12  have a -- I'm running a business here.  I am a family.  I have

13  a sick husband who had a stroke.  I can't do it.  My husband

14  cannot be without me.  I just can't.

15          **MR. BRUGNARA:**  Your Honor, I don't want to -- can we

16  do it telephonically?  I mean, she -- she's of age, advancing

17  age, more than yours.  And -- and, you know, her husband is the

18  top rabbi for New York on an international level.  She's a good

19  woman.

20      Can we do it telephonically like we did with the

21  appraiser?

22          **THE COURT:**  I don't know.  I don't -- I don't like

23  to --

24          **MR. BRUGNARA:**  Or video.  Your Honor, video?

25          **THE COURT:**  I don't know.  We would have to -- we

1  would have to consider that.

2      Ms. Michelman, are you able to -- you can go to others

3  places in Manhattan I assume, couldn't you?

4          **THE WITNESS:**  Oh, of course.  Yeah, there's no

5  problem with that.  Of course.  Yeah.

6          **THE COURT:**  All right.  Any questions by the

7  Government?

8          **MS. HARRIS:**  I have no questions.

9      I do want to address the issue of the relevance of her

10 testimony before we make a decision that she's going to need to

11 come here or be brought to New York to testify.  Because I

12 don't see how any transactions the defendant did from 2002 to

13 2006 have any bearing on the fraud committed in 2014, or as a

14 defense to the fraud committed in 2014.

15         **THE COURT:**  Well, that's a separate point.  We will

16 argue it out of the presence of the witness.

17     Ms. Michelman, would you go and get your records and send

18 an email -- how did we find out that you were objecting?  Did

19 you send an email to the Court?

20         **THE WITNESS:**  I did.  And I also spoke to my own

21 attorney, to Eric Feinstein, and -- because when I got the

22 subpoena -- I had never gotten a subpoena in my life, you know.

23 So I asked him, you know, what to do.  And they gave me advice.

24 And actually they gave me the name of an attorney in

25 San Francisco.  I don't have his name in front of me.  I hope

1  that I won't have to do all of this.

2          THE COURT:  Listen, just do this.  Find out when the

3  transactions were that your records show.

4          THE WITNESS:  That's fine.  I will do that gladly.

5          THE COURT:  What time period they covered and -- and

6  some description of it, and then email that to the Court.

7          THE WITNESS:  Okay.

8          THE COURT:  And I'm going to put on hold whether or

9  not you have to appear in some manner.  Maybe by video

10  conferencing.  I don't know.

11          THE WITNESS:  We'll figure it out.

12      But is there a possibility -- do I have -- how do I have

13  the Court's email and all of that?  Do I have all of that?

14          THE COURT:  I don't know how you contacted us to

15  begin with.

16          THE WITNESS:  On the subpoena there was a name of

17  Dawn somebody.

18          THE COURT:  Yeah, that's the one.

19          THE WITNESS:  I was told she was a clerk, I think.

20  And she told me to send a letter to the judge, which I did.

21          THE COURT:  Okay.

22          THE WITNESS:  So I don't know if I have the email.

23  But can I give you my email, or is that allowed?

24          THE COURT:  It's an open courtroom here.  And I -- if

25  you don't mind doing it publicly.

```
 1              THE CLERK:  She gave it to me already.

 2              THE COURT:  No.  We -- we got -- no, no.  We've got

 3   your email.

 4              THE WITNESS:  Okay.

 5              THE COURT:  You don't need to do this.  Here is

 6   what's going to happen.

 7              THE WITNESS:  Okay.

 8              THE COURT:  Dawn is going to email you.  She's my

 9   clerk.

10              THE WITNESS:  Right.

11              THE COURT:  And then you're going to email her back

12   with the information, and that will help me decide how

13   relevant -- how dated and stale the information is, which is

14   a -- not the only factor, but a factor.

15         And then, remember, you're still under oath.  But you're

16   telling me that you're under doctor's care and cannot travel.

17              THE WITNESS:  Oh, yes.  I -- I -- my -- I can give

18   you the name of my doctor.  He can write a letter.  I can't do

19   jury duty or anything.

20              THE COURT:  May I have ask what your age is?

21              THE WITNESS:  I'm 72.

22              THE COURT:  All right.  Well, good.  Okay.  I'm going

23   to let you hang up right now and I will --

24              MR. BRUGNARA:  Thank you, Joan.

25              THE COURT:  I cannot tell you that we won't need you,
```

554

```
 1   at least by some video conferencing way.  But I'm not saying
 2   that we will either.  And I need to give it more thought.
 3           MR. BRUGNARA:  Joan --
 4           THE WITNESS:  I understand.
 5           MR. BRUGNARA:  Joan, there is a -- I remember, too,
 6   there is a Warhol, too, just so we know your records check that
 7   out, too.
 8           THE WITNESS:  Thank you.  I will do that.
 9           THE COURT:  All right.  Okay.  Thank you very much,
10   Ms. Michelman.  Have a good day and thanks for coming on the
11   line.
12           THE WITNESS:  Thanks.  Bye bye.
13      (Telephone call disconnected.)
14           THE COURT:  All right.  Okay.  I don't see why the
15   Government just doesn't want to love that evidence.  It shows
16   that Mr. Brugnara is a sophisticated man.  He buys and sells
17   art all the time.  He would know good and well what a Valsuani
18   is.  And there is no way to get a -- no way to get anything
19   past him.  I don't know why you're resisting it.
20           MR. BRUGNARA:  There has never been an argument that
21   I didn't know what a Valsuani is.
22           THE COURT:  What?
23           MR. BRUGNARA:  I did know what a Valsuani is, and I
24   argued that I -- I -- I'm not paying that.
25           THE COURT:  Well, look, I'm not going to rule on this
```

```
 1   right now.  I understand the argument, that it's so stale and
 2   it's so far back in the ancient history --
 3            MR. BRUGNARA:  It's not ancient.
 4            THE COURT:  -- that it has nothing to do with
 5   anything.
 6       But at the same time I don't see the harm in letting the
 7   jury hear that.
 8            MS. HARRIS:  Well, I guess the question I have, your
 9   Honor, is it's sort of reverse propensity evidence.  It's --
10   he's trying to get it in to show that he has done another deals
11   in the past that went well, so, you know, this isn't -- he's
12   not criminally responsible for what happened here.  We wouldn't
13   be able to get into all the times he scammed people, lied to
14   people --
15            MR. BRUGNARA:  I never scammed anybody in my life.
16            MS. HARRIS:  -- and other acts, bad acts from, you
17   know, 2002 through 2006 to show that he acted in conformity
18   with that here.
19            THE COURT:  Here is another thing I'm just curious
20   about because I know a lot about the case.  When those
21   probation people went out there and all that artwork was
22   hanging on your wall and they thought it was genuine, but it
23   turned out every single one was a fake.
24            MR. BRUGNARA:  Really?
25            THE COURT:  So you -- you --
```

```
 1              MS. HARRIS:  That's what you said.

 2              THE COURT:  So that is what you were telling them all

 3   along.

 4              MR. BRUGNARA:  All right.

 5              THE COURT:  So, I mean, aren't you an expert in

 6   fakes?  I --

 7              MR. BRUGNARA:  You know, your Honor, the fact of the

 8   matter is, I'm the only person in this room that can go into

 9   Sotheby's, and I have a credit where they will hand me a paddle

10   and put their entire auction at stake, and I can buy whatever I

11   want up to any price, 100 million, 50 million, 60 million.

12       I have my card sitting at the U.S. Marshals right now and

13   I can give you, Judge Alsup --

14              THE COURT:  I can promise you that they will not give

15   me that paddle.

16              MR. BRUGNARA:  Your Honor --

17              THE COURT:  And I wouldn't want it.

18              MR. BRUGNARA:  No, no, not the paddle.  I'm talking

19   about I have a card.  It's a credit card.

20       Your Honor, I have a credit card in my wallet that they

21   just brought over from the jail with my Olympic card.  I told

22   the Marshal he can use it for golfing.

23       No, but the card is a preferred card.  No, it's going to

24   be evidence.  I need it.  But with that card -- and it's got

25   the Monet Water Lilies impression on it.  It's the preferred
```

```
 1   card.  And I can take that card, get into any museum.  And I
 2   can go to any auction worldwide, hand them that card.  I get my
 3   paddle, unlimited limit.  Because I paid for every auction I
 4   have been to, and the Sotheby's is going to testify, tens of
 5   millions of dollars.
 6        Joan Michelman, you just heard her, $10 million.  And
 7   that's just 10 million that I remember.
 8        I made -- you remember Tom Newman in the tax case?  He
 9   said I made $103 million in 2001.
10          THE COURT:  Wait, wait, wait.  We're way off track.
11          MR. BRUGNARA:  Your Honor, and I get shown respect.
12   I get shown respect --
13          THE COURT:  I have two more witnesses to call.
14          MR. BRUGNARA:  No one ever said there was any
15   criminal -- it was all buying and selling real estate.
16          THE COURT:  Marshals got to help me here.  I got
17   to -- you have got to be quiet.  I'm not going to rule on her
18   yet.  And I don't want to hear any more argument.  I got two
19   more people to deal with.
20        One is Jack Shaoul.  What's the story on with him?
21          MR. BRUGNARA:  Well, he's the guy that was involved
22   in the Christie's lawsuit, whereas, he would testify that he's
23   the one that sold Maibaum that fake Picasso for a couple
24   thousand dollars that he turned around and sold for $6 million.
25          THE COURT:  To who?
```

```
 1              MR. BRUGNARA:  Well, Christie's was brokering it on

 2   behalf of --

 3              THE COURT:  This is -- this is definitely extrinsic

 4   evidence --

 5              MR. BRUGNARA:  Right.

 6              THE COURT:  -- on some other fraud and I've already

 7   ruled that out.

 8              MR. BRUGNARA:  Correct.

 9              THE COURT:  So I'm going to grant that motion to

10   quash.  So we need to inform him that he doesn't -- he's not --

11   that's quashed.

12         Will the Government please do that?  That's one -- someone

13   named Shaoul.  Or, Dawn, you can do that, too.

14         Okay.  The last one is someone named Patricia Failing.

15              MR. BRUGNARA:  Well, she was --

16              THE COURT:  Why do you want her?

17              MR. BRUGNARA:  Well, we -- we don't need her because

18   we have I think all we need.

19         Brandon LeBlanc had contacted her.  She was on the

20   committee with Tinterow.  But not as a museum director, but as

21   one of the scholars from the university that was a purported

22   expert on these plasters.  And she had published two papers,

23   scholarly papers that concurred with Tinterow that they were

24   plaster reproductions made sometime in the '30s, '40s, '50s,

25   whatever.  But, you know, well after Degas' death based upon a
```

```
 1   copious doing a plaster copy of the Maibaum -- I mean, you
 2   know, the Hebrard.
 3        THE COURT:  All right.  So you're withdrawing that
 4   subpoena?
 5        MR. BRUGNARA:  Yes.
 6        THE COURT:  All right.  So that one will be quashed
 7   and the clerk will inform Ms. Failing that she does not need to
 8   appear.
 9      All right.  I've now gone through all of the ones that we
10   were going to hear today, and I think it's time to stop for the
11   day.
12        MS. HARRIS:  Thank you, your Honor.
13        THE COURT:  We will see you at 7:30 in the morning.
14      (Whereupon at 3:45 p.m. further proceedings were
15       adjourned until Wednesday, April 29, 2015 at 7:30
16       a.m.)
17
18
19
20
21
22
23
24
25
```

<u>**I  N  D  E  X**</u>

|                                           | <u>PAGE</u> | <u>VOL.</u> |
|-------------------------------------------|-------------|-------------|
| Opening Statement by Mr. Kingsley         | 294         | 2           |
| Opening Statement by Mr. Brugnara         | 320         | 2           |

- - -

| <u>**PLAINTIFF'S WITNESSES**</u>          | <u>PAGE</u> | <u>VOL.</u> |
|-------------------------------------------|-------------|-------------|
| **MAIBAUM, WALTER**                       |             |             |
| (SWORN)                                   | 347         | 2           |
| Direct Examination by Mr. Kingsley        | 347         | 2           |
| Cross Examination by Mr. Brugnara         | 459         | 2           |

- - -

<u>**E X H I B I T S**</u>

| <u>TRIAL EXHIBITS</u> | <u>IDEN</u> | <u>VOL.</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|---|
| 34 | | | 373 | 2 |
| 35 | | | 410 | 2 |
| 36 | | | 417 | 2 |
| 37 | | | 421 | 2 |
| 4A | | | 430 | 2 |
| 3 | | | 432 | 2 |
| 2A | | | 434 | 2 |
| 1A | 435 | 2 | 435 | 2 |
| 38 | | | 439 | 2 |
| 39 | | | 442 | 2 |
| 40 | | | 445 | 2 |
| 41 | | | 446 | 2 |
| 2A | 434 | 2 | | |

_ _ _

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, April 28, 2015