Volume 3

Pages 562 – 844

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CR 08-0222 WHA |
| | ) | No. CR 14-0306 WHA |
| LUKE D. BRUGNARA, | ) | |
| | ) | San Francisco, California |
| Defendant. | ) | Wednesday |
| | ) | April 29, 2015 |
| _____ | ) | 7:30 a.m. |

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**           MELINDA HAAG
                            United States Attorney
                            450 Golden Gate Ave.
                            San Francisco, California  94102
                    **BY:  ROBIN HARRIS, AUSA**
                          **BENJAMIN KINGSLEY, AUSA**


**For Defendant:**          **LUKE D. BRUGNARA**
                            - pro se


**Advisory Counsel:**       LAW OFFICES OF PAUL WOLF
                            717 Washington Street
                            Second Floor
                            Oakland, California 94607
                    **BY:  JAMES R. STEVENS, ESQ.**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                  Official Reporter - US District Court
                  Computerized Transcription By Eclipse

*Debra L. Pas, CSR, CRR and Belle Ball, CSR, CRR*
*Official Reporters -  U.S. District Court - San Francisco, California*
*(415) 431-1477*

**APPEARANCES:   (CONTINUED)**

Advisory Counsel:                LAW OFFICES OF TAMOR & TAMOR
                                 311 Oak Street
                                 Suite 108
                                 Oakland, California 94607
                          BY:  **RICHARD ALAN TAMOR, ESQ.**


Also Present:   FBI Special Agent Jeremy Desor

                FBI Special Agent Aleksandr Kobzanets

                Mary Mallory, U.S. Attorney's Office

                              -   -   -

**P R O C E E D I N G S**

**APRIL 29, 2015**                                        **7:31 a.m.**

1     (Defendant present, in custody.)

2     (The following proceedings were held outside of the

3      presence of the jury)

4          **THE COURT:**  All right, Mr. Brugnara.  Are you ready?

5          **MR. BRUGNARA:**  Can I have a minute, your Honor?

6          **THE COURT:**  Are you ready on the Government's side?

7          **MS. HARRIS:**  We are, Your Honor.

8     Very briefly, the Court's quashed a subpoena to

9 Mr. Shaoul.  I don't know who that is or have contact

10 information for Mr. Shaoul.  The Court asked the Government to

11 notify him.  We don't know who -- the contact information.

12         **THE CLERK:**  I spoke with him yesterday, after the

13 hearing.

14         **THE COURT:**  Any other issues to take up?

15    (No response)

16    (The following proceedings were held in open court,

17     in the presence of the jury:)

18         **THE CLERK:**  All rise.

19         **THE COURT:**  Good morning.  All right, welcome again.

20 Please have a seat.

21    Somebody asked Dawn over there in the jury box, who those

22 people were in the back of the room.  And, it's a public

23 proceeding.  Our -- one of the great things about our court

1  system is that it's all public.  So, sometimes people come and

2  watch.  That's the answer.

3      All right.  Where's our witness?

4          **MR. KINGSLEY:**  He's outside.

5          **THE COURT:**  All right.  Let's bring in the witness.

6      While we are waiting, thank you all, you are here early,

7  earlier than you were required to be here.  It's now 7:45 and

8  you are here, well before you were required to be and we're all

9  ready to go, and sitting in the courtroom.  Thank you for that.

10      You will remember -- Mr. Maibaum, please come forward,

11  welcome back.  Have a seat.  I have got to remind you, you are

12  still under oath, of course.

13      If anyone over there needs a cough drop -- do you need a

14  cough drop?

15          **MS. MALLORY:**  I brought them.

16          **THE COURT:**  All right.  Please use them, because we

17  don't want to have static crashes during the testimony.

18                          **WALTER MAIBAUM,**

19  called as a witness for the Government herein, having been

20  previously sworn, resumed the stand and testified further as

21  follows:

22          **THE COURT:**  All right.  You want to get yourself some

23  water -- do you have water there?

24          **THE WITNESS:**  Let's hope.

25          **THE COURT:**  All right.  You remember we got through

1    the direct examination of our witness on the stand, and we had

2    started the cross examination, but had not finished it.  So,

3    it's -- we will resume where we left off yesterday.

4        Mr. Brugnara, the floor is yours.

5            MR. BRUGNARA:  Thank you, your Honor.

6        Good morning.

7                    **CROSS EXAMINATION RESUMED**

8    BY MR. BRUGNARA:

9    Q    Good morning, Mr. Maibaum.

10   A    Good morning.

11   Q    So Mr. Maibaum I just want to revisit a few material

12   issues from yesterday regarding the art in question that you

13   sold to Rose Long.  And I just want to set a few issues,

14   clarify a few issues for me, at least, regarding your sale with

15   her just so the record's clear.

16       Okay.  So, what you said yesterday, is it true that you

17   said yesterday that the transaction between you and Rose Long

18   was an arms-length transaction whereas you are not partner of

19   hers, correct?

20   A    That is correct.

21   Q    Okay.  And your company has no affiliation, she's not an

22   officer of your corporation or a shareholder of any of your

23   subcorporations and companies.  Correct?

24   A    Correct.

25   Q    Okay.  So, your relationship to this transaction between

1    Rose Long and Brugnara or Brugnara Properties has nothing to do

2    with you and your transaction between you and Rose Long.

3    Correct?

4    A    I'm sorry; would you say that again?

5    Q    The transaction between Rose Long or the failed

6    transaction between Rose Long and Brugnara -- let's call

7    Brugnara, you know, be Brugnara -- has nothing to do with the

8    transaction between you and your companies and Rose Long and

9    her companies, to the extent of the contractual sale between

10   your companies and Rose Long's companies.

11   A    In terms of the contractual arrangements, that is correct.

12   Q    Okay.  All right.  Because, as we discussed yesterday, in

13   the cross, you are aware that Rose Long has alleged and Judge

14   Alsup clarified it is her allegation that in fact you were a

15   silent partner, or you were advising her --

16            MR. KINGSLEY:  Objection.

17            THE COURT:  Sustained.  This is argument.

18            MR. BRUGNARA:  Okay.

19            THE COURT:  Whatever I read yesterday from that

20   pleading, the jury has in mind.  But you are now just going

21   into argument.

22            MR. BRUGNARA:  No, Your Honor, I'm not going to argue

23   with him.  I just want to set the record clear.

24   BY MR. BRUGNARA:

25   Q    Your position is that those are false statements and --

```
 1              MR. KINGSLEY:  Objection.

 2              THE COURT:  Sustained.

 3   BY MR. BRUGNARA:

 4   Q    You are not partner of Rose Long.  She is not a partner of

 5   yours, is that correct?

 6   A    That is correct.

 7   Q    All right.  We'll leave that alone.  I just wanted to make

 8   that clear.

 9        So moving ahead, I want to talk about the shipment of art

10   and your experiences with that, as it relates to this

11   transaction in particular and the emails that were sent.

12        You had indicated to the FBI that the proper procedure --

13              THE COURT:  That is not a proper question.

14              MR. BRUGNARA:  Okay.

15   BY MR. BRUGNARA:

16   Q    Isn't it true, Mr. Maibaum, that you stated that proper

17   protocol would be to use a company such as ShipArt or Manhattan

18   -- Cirkers or Day & Myer where you would ship valuable art --

19   not you in particular, but "you" meaning anybody, anyone who's

20   shipping valuable art, a prudent sale would include shipping

21   valuable art to a third-party secure storage facility, and then

22   it would be a sort of escrow arrangement.

23        Isn't that correct?

24              MR. KINGSLEY:  Objection.  I don't understand the

25   question.
```

1          MR. BRUGNARA:  Okay.  Let me rephrase it.

2          THE COURT:  It's also a very compound question.

3          MR. BRUGNARA:  Okay.

4    BY MR. BRUGNARA:

5    Q    Mr. Maibaum, isn't proper protocol for the purchase of

6    valuable fine art using a -- an established reputable art

7    shipment and facility to complete the transaction?

8    A    It depends on the circumstances, but in this particular

9    case I did ask Rose Long to ship it to ShipArt in South

10   San Francisco.

11   Q    Okay.  And that's what the report says.

12        And isn't it true --

13          MR. KINGSLEY:  Objection.

14          THE COURT:  Sustained.  The jury will disregard what

15   Mr. Brugnara just said about what the report said.  That is not

16   evidence, that is not evidence, not evidence.

17        You cannot do that.

18          MR. BRUGNARA:  Okay.  Well, it wasn't done

19   intentionally, your Honor.

20          THE COURT:  Well, I don't know whether it was

21   intentional or not, but the jury might get confused and think

22   that is evidence.

23          MR. BRUGNARA:  Okay.

24          THE COURT:  You just get to ask questions.  You don't

25   get to make statements.

1          **MR. BRUGNARA:**  Okay.  Mr. Maibaum confirmed what is

2  stated.  Okay --

3          **THE COURT:**  Again, that is not evidence.  The jury

4  will disregard that last comment.

5      Please, just ask questions.

6  **BY MR. BRUGNARA:**

7  **Q**    Mr. Maibaum, isn't it true that you communicated with

8  Harvey Schochet, the attorney, nearly the identical

9  information, specifically in an email stating that your

10  company, Modernism, would have insisted that the art be shipped

11  to a company such as ShipArt in South San Francisco, similar to

12  Cirkers, and the art would have remained there under control

13  until such time payment in full was received, and then in

14  parentheses, "an escrow type arrangement"?

15      Isn't it correct that you sent that email to Mr. Schochet?

16  **A**    Well, I don't have the email in front of me, but if you

17  have it --

18          **MR. BRUGNARA:**  May I approach Mr. Maibaum

19  (Indicating)?

20          **THE COURT:**  Yes, you may.

21      (Witness examines document)

22          **THE WITNESS:**  Thank you.  May I read what the

23  underlying statement says?

24          **MR. KINGSLEY:**  Objection.  This is a hearsay email.

25          **THE COURT:**  Sustained.

```
 1            MR. BRUGNARA:  Okay.  I guess I'll rephrase it.
 2            THE COURT:  Why is this different from the point you
 3   were making a moment ago?
 4            MR. BRUGNARA:  Well, you know, it's all going to tie
 5   together, your Honor, because --
 6            THE COURT:  Well, he said that he had asked Ms. Long
 7   to ship it by -- what was it again?
 8            THE WITNESS:  To a company called ShipArt in South
 9   San Francisco.
10            MR. BRUGNARA:  It's all going to tie --
11            THE COURT:  Is this just gilding the lily?
12            MR. BRUGNARA:  Just, your Honor, on a sidebar here, I
13   like talking, you know, at a normal conversation flow, not
14   riddles.  But, you know, the Rules of Evidence require me to
15   fashion a question in such a manner --
16            THE COURT:  You have to be quiet and ask questions.
17   No speeches to the jury.
18            MR. BRUGNARA:  Okay.
19   BY MR. BRUGNARA:
20   Q    Okay, Mr. Maibaum, now we're going to tie it all together.
21        Isn't it true that Ms. Long told you that Luke Brugnara
22   didn't want to use ShipArt?
23            MR. KINGSLEY:  Objection, hearsay.
24            THE COURT:  No, this goes to establishing what the
25   transaction and communications were between -- this is okay.
```

1       Did she say that to you?

2            MR. KINGSLEY:  He is asking to get in -- (Inaudible)

3       (Reporter interruption)

4            MR. KINGSLEY:  Objection, hearsay.  He's asking the

5   witness to testify to Mr. Brugnara's statement to Rose Long.

6            THE COURT:  Well, if it was admitted for the truth,

7   that would be true.  But to prove up the transaction of what

8   was communicated at the time in question, assuming it was, it

9   would be limited to that purpose.

10      So, did she tell you that he made that statement?

11           THE WITNESS:  As I recall, what Rose Long told me was

12  that Mr. Brugnara insisted that the art be -- actually, she

13  didn't say "Mr. Brugnara."  At that point I didn't know who the

14  client was.

15           THE COURT:  All right.

16           THE WITNESS:  As I recall, she said that the art must

17  be shipped to "the facility," indicating the museum, rather

18  than to ShipArt.  That's what the insistence was.

19  BY MR. BRUGNARA:

20  Q    Okay.  Mr. Maibaum, would you be interested and surprised

21  to know and realize that I, in fact, told Ms. Long to ship the

22  art to ShipArt?

23           MR. KINGSLEY:  Objection --

24           THE COURT:  Sustained.  It's improper.

25

1  **BY MR. BRUGNARA:**

2  **Q**    Mr. Maibaum, do you know, do you know, do you know that I

3  told Ms. Long --

4          **MR. KINGSLEY:**  Objection.

5          **THE COURT:**  Sustained.

6  **BY MR. BRUGNARA:**

7  **Q**    -- to ShipArt?

8          **THE COURT:**  Sustained.  You asked him a question, and

9  he gave you an answer.  And, and now you are arguing with him.

10         **MR. BRUGNARA:**  I'm not arguing.

11         **THE COURT:**  Over the accuracy of the answer.  No, you

12  can't do that.

13         **MR. BRUGNARA:**  I didn't hear his answer.

14         **THE COURT:**  You are trying to testify in the guise of

15  questions before the jury.

16         **MR. BRUGNARA:**  Okay.

17         **THE COURT:**  You can't do that.

18  **BY MR. BRUGNARA:**

19  **Q**    Mr. Maibaum --

20         **THE COURT:**  You can't do that.

21  **BY MR. BRUGNARA:**

22  **Q**    Were you aware that I told her to use ShipArt?

23         **MR. KINGSLEY:**  Objection.

24         **THE COURT:**  Sustained.

25

MAIBAUM - CROSS EXAMINATION / BRUGNARA

1   BY MR. BRUGNARA:

2   Q    Mr. Maibaum, did your attorney, Harvey Schochet, tell you

3   that I told her to use ShipArt?

4            MS. HARRIS:  Objection.  Hearsay again.

5            THE COURT:  Sustained.

6   BY MR. BRUGNARA:

7   Q    Mr. Maibaum, did your attorney or did Ms. Long tell you

8   that I told her --

9            MR. KINGSLEY:  Objection, hearsay.

10            MR. BRUGNARA:  -- send to ShipArt --

11            THE COURT:  Sustained.  We're going to deal with it

12   this way.

13        Mr. Maibaum, tell us in your own words everything that

14   anybody told you at the time on the subject of how the

15   purchaser wanted the art to be shipped.  Now, you've already

16   answered that in part, but if there's anything more to add on

17   that subject, please do so now.

18            THE WITNESS:  The correct answer is, as I recall,

19   Ms. Long said that the purchaser whose name I did not know at

20   that point insisted that the art be shipped to his facility.

21   And he guaranteed -- or she validated and said to me words to

22   the effect that she will stand behind the shipment and that she

23   will guarantee the shipment directly to the buyer.

24            MR. BRUGNARA:  Your Honor, can I approach Mr. Maibaum

25   to show him --

```
 1              THE COURT:  If you are going to show him something

 2    that is a communication to him, then okay.  You can do that.

 3              MR. KINGSLEY:  I'm not --

 4              THE COURT:  If it's some communication between you

 5    and Rose Long, no.  That's not going to be proper.  You haven't

 6    laid the foundation to do that.

 7              MR. KINGSLEY:  Mr. Brugnara, can I see it before you

 8    show it to him?

 9         (Request complied with by Mr. Brugnara.)

10    BY MR. BRUGNARA:

11    Q    Mr. Maibaum, have you seen this email that was sent by --

12    and confirmed through the authorities?

13         (Witness examines document)

14              THE COURT:  Just, have you seen what he showed you?

15              THE WITNESS:  I don't know this email.  I have never

16    seen this email before.

17    BY MR. BRUGNARA:

18    Q    Okay.  Thank you.

19              MR. BRUGNARA:  Your Honor, can I put this email into

20    an exhibit?

21              THE COURT:  There's no foundation.  This witness has

22    never seen it.

23              MR. BRUGNARA:  Okay.

24    BY MR. BRUGNARA:

25    Q    Mr. Maibaum, this email confirms --
```

1      **MR. KINGSLEY:**  Objection.  This is hearsay,

2  your Honor.  Mr. Brugnara --

3      **THE COURT:**  Mister -- you can't read from something

4  that is not in evidence.

5  **BY MR. BRUGNARA:**

6  **Q**   Okay.  Mr. Maibaum, doesn't the document you just read --

7      **MR. KINGSLEY:**  Objection.

8      **THE COURT:**  Sustained.  You cannot do that.  You

9  cannot read from the document and argue with the witness over

10 some document that the witness hasn't seen.  Maybe you can do

11 that with Ms. Long when she comes.

12     (Off-the-Record discussion between Mr. Brugnara and

13      Counsel)

14 **BY MR. BRUGNARA:**

15 **Q**   All right, Mr. Maibaum, I have a couple of questions for

16 you about the art that we saw yesterday.  I just want to make

17 the record clear, based on your testimony.

18     The first piece that we saw, the Miro, we sent out certain

19 subpoenas that responded to --

20     **MR. KINGSLEY:**  Objection.

21 **BY MR. BRUGNARA:**

22 **Q**   Mr. Maibaum, did you respond to certain subpoenas for

23 information through -- by and through your counsel?

24 **A**   As far as I recall, yes.

25 **Q**   And wasn't one of those documents certain evidence of

1  certain purchases of the art in this case?

2  **A**    I would have to know the document you're referring to.

3  **Q**    Okay.  Mr. Maibaum, did you look at and review the

4  documents that were provided to this Court by and through your

5  attorneys pursuant to a subpoena?

6  **A**    I presume so.

7  **Q**    Okay.  So regarding the Miro, isn't it true, then, that

8  that came from an established reputable source and -- it was

9  France -- on a trade for approximately $40,000?

10 **A**    No, that's not correct.  It came from Spain.  It came from

11 Manuel Barbié Gallery.  And I believe the cost was

12 approximately 60,000.  55- to 60,000.

13 **Q**    And then, regarding the Franco Picassos that came from

14 another reputable gallery, from Germany, it was 20 or 30,

15 $25,000, isn't that correct?

16 **A**    No, that is not correct.  That's only a pair of the

17 Picassos, but there were many more.  And they came from other

18 sources as well.

19 **Q**    But those invoices that were provided by your counsel are

20 accurate and true representations of what you paid for --

21 **A**    To be clear, you mentioned 25,000 --

22 **Q**    I believe it was 25,000.  I can pull up the document.

23         **MR. KINGSLEY:**  Objection, arguing with the witness.

24         **THE WITNESS:**  To be clear, to be clear, it was much

25 more than 28,000 for the group of Picasso etchings.  In fact,

1   we paid approximately 100,000 for the entire group.

2   **BY MR. BRUGNARA:**

3   **Q**   Okay.  Let me ask you this, Mr. Maibaum.  Why didn't you

4   provide the requested items under the subpoena request for the

5   information that you're discussing right now?

6   **A**   I did provide the requested items.  To the best of my

7   ability, to the best of my knowledge.

8   **Q**   Do you normally keep records of what you purchase and what

9   you sell --

10  **A**   Of course.

11  **Q**   -- in your normal course of business?

12  **A**   Yes.

13  **Q**   How long do you keep those records for?

14  **A**   As long as necessary.

15  **Q**   In your practice, what is as long as necessary?

16  **A**   Ten years, perhaps.

17  **Q**   So, ten years.  So these --

18  **A**   This is an approximation.

19  **Q**   So these purchases were made, though, in the last ten

20  years, according to the documents provided to the Court.

21  **A**   That's correct.

22  **Q**   So is there a reason why, that you didn't provide a

23  complete set of sales receipts --

24         **MR. KINGSLEY:**  Objection.  There's no evidence that

25  Mr. Maibaum didn't provide a complete set.

1        THE COURT:  That's true.  Sustained.

2   BY MR. BRUGNARA:

3   Q    Mr. Maibaum, are you aware that -- let's talk about the

4   Picassos.  Are you aware that there were two receipts provided

5   on the Picasso, one for $12,000 and one for $28,000?

6        MR. KINGSLEY:  Objection.  He's testifying about

7   documents that are not in evidence.

8        THE COURT:  Sustained.  And -- just, sustained.

9   BY MR. BRUGNARA:

10  Q    Mr. Maibaum, there were no banking records produced

11  pursuant to that 17(c) subpoena by this Court.  Are you aware

12  of that?

13       MR. KINGSLEY:  Objection.  He just stated a fact, and

14  then asked if he was aware of it.

15       THE COURT:  Well, do you know the answer to what was

16  in that stack of materials that was provided in response to the

17  subpoena?

18       THE WITNESS:  Your Honor, I do not.  As far as I

19  recall, there were no requests for banking records in this

20  subpoena.  It was documentation requested about our purchase.

21  And about the works of art, themselves.

22  BY MR. BRUGNARA:

23  Q    Okay.  Mr. Maibaum, are you aware there was a hearing two

24  days ago on that subpoena, request to quash it?

25       MR. KINGSLEY:  Objection.  He wasn't at that hearing.

MAIBAUM - CROSS EXAMINATION / BRUGNARA                    580

```
 1              MR. BRUGNARA:  I asked if he was aware of that.

 2              THE COURT:  Well --

 3              MR. KINGSLEY:  It --

 4              THE COURT:  The witness was not present at that

 5   hearing.  Most of the subpoena was quashed.

 6              MR. BRUGNARA:  Okay, Mr. Maibaum --

 7              THE COURT:  And part of it was allowed, and a large

 8   number of documents were produced.  I saw it, myself.

 9        Now, how is this witness --

10              MR. BRUGNARA:  I have a question that ties in.

11   BY MR. BRUGNARA:

12   Q    Are you aware that there was a declaration provided with

13   that motion --

14              MR. KINGSLEY:  Objection.

15   BY MR. BRUGNARA:

16   Q    -- that was signed by you?

17              MR. KINGSLEY:  Relevance.

18   BY MR. BRUGNARA:

19   Q    Did you --

20              THE COURT:  Well, did you sign the declaration?

21              THE WITNESS:  I did sign a declaration, yes.

22              THE COURT:  All right.  Well, you can inquire about

23   the declaration.

24   BY MR. BRUGNARA:

25   Q    Mr. Maibaum, isn't it true that the declaration stated
```

1   that you don't have the banking records, and that you've

2   provided all of the records to the United States Attorney?

3   **A**    No.  What the declaration said, in truth, was that there

4   were no banking records, because we never got paid on the works

5   of art in the transaction.  That's what the declaration said.

6   So, there's no banking records.

7   **Q**    Mr. Maibaum, are you aware that the Court ordered your

8   attorney to produce banking records regarding the purchase and

9   the sale of the artwork in question?

10          **MR. KINGSLEY:**  Objection.

11          **THE COURT:**  What's the objection?

12          **MR. KINGSLEY:**  The subpoena was quashed.  He's

13   testifying --

14          **MR. BRUGNARA:**  No.

15          **MR. KINGSLEY:**  (Inaudible) court order.

16          **MR. BRUGNARA:**  The subpoena pursuant to those matters

17   weren't quashed.  That's why declarations were provided to the

18   Court subsequent --

19          **THE COURT:**  I did require that the company,

20   Mr. Maibaum's company, produce the records as between him and

21   Rose Long on the items of art that involved you.  I did not

22   require that banking records and so forth be produced.  I said

23   that the rest of the subpoena would be quashed.  That's my

24   memory of it.

25      Now, if you have a transcript that says something

1    different, I'll be happy to be corrected on this.  But I think

2    that's what happened.

3    **BY MR. BRUGNARA:**

4    **Q**    Mr. Maibaum, would you leave art of any value in a

5    cluttered garage, that you were trying to sell?

6    **A**    Would I?  Absolutely not.

7    **Q**    Okay.

8            **MR. BRUGNARA:**  I would like to approach the witness

9    and show him a photograph.

10           **THE COURT:**  Of what?

11           **MR. BRUGNARA:**  Of something that might interest

12   everybody.

13           **THE COURT:**  All right.  Go ahead.

14   **BY MR. BRUGNARA:**

15   **Q**    Mr. Maibaum, do you recognize those crates?

16        (Witness examines photograph)

17   **A**    Actually, I had never seen the crates.

18   **Q**    Okay.  Well, those are the crates.  Does that --

19           **MR. KINGSLEY:**  Objection.

20           **MS. HARRIS:**  Objection.

21   **BY MR. BRUGNARA:**

22   **Q**    Mr. Maibaum, does that garage look cluttered to you?

23           **THE COURT:**  That's a hypothetical question.  He

24   wasn't there.  He never saw the garage, he never saw the

25   crates.  This is just an argument.  There will be other

1   witnesses that you can explore this with.

2          MR. BRUGNARA:  Your Honor, can I put this on the

3   video screen?

4          THE COURT:  No, you can't.  You wait until Rose Long

5   or whoever it is that can deal with this on a

6   firsthand-knowledge basis shows up.  But this is premature.

7          (Off-the-Record discussion between Mr. Brugnara and

8           Counsel)

9   BY MR. BRUGNARA:

10  Q     Okay, Mr. Maibaum, isn't it true that in your lawsuit

11  against Ms. Long that we discussed yesterday, you're suing her

12  for negligence amongst other claims for leaving art in a

13  cluttered garage?

14  A     I believe so.  I would have to look at the document again.

15  Q     So, in your experience, it's prudent and normal business

16  practices to send valuable art or somewhat valuable art to a

17  reputable storage facility such as ShipArt rather than a

18  cluttered garage.

19      Is that correct?

20          MR. KINGSLEY:  Objection.  Compound question, and

21  facts not in evidence.

22  BY MR. BRUGNARA:

23  Q     Okay.  Mr. Maibaum --

24          THE COURT:  We have covered the ground where --

25          MR. BRUGNARA:  Okay --

 1          THE COURT:  He's already told everybody he didn't use

 2  ShipArt.

 3  BY MR. BRUGNARA:

 4  Q    Are you an expert in art?

 5  A    In some art.

 6  Q    Are you an expert in the art industry?

 7  A    In the art business?

 8  Q    In the art business, in the art industry?

 9  A    I have a long-term experience in the art world, yes.  In

10  the art business.

11  Q    What is your opinion regarding somebody who would leave

12  art in a cluttered garage?  What is your opinion?

13  A    In what context?  I don't understand --

14  Q    In the context:  Do you think that is a proper way to

15  conduct business?

16  A    Again, it depends on the circumstance, but normally it

17  wouldn't be prudent.

18  Q    Why wouldn't it be prudent?

19          THE COURT:  I think he said it would not be prudent.

20          MR. BRUGNARA:  No, I said "Why wouldn't it be

21  prudent," I said.

22          THE WITNESS:  Damage could occur, perhaps.  It

23  depends on the circumstance.  Theft could occur, perhaps.

24  BY MR. BRUGNARA:

25  Q    Would it surprise you, Mr. Maibaum, after looking at that

 1  picture, to have anybody tell you that that garage is empty?

 2           MR. KINGSLEY:  Objection.

 3           THE COURT:  Sustained.

 4           MR. BRUGNARA:  Okay.

 5  BY MR. BRUGNARA:

 6  Q    All right.  Mr. Maibaum, I want to you ask you a couple

 7  other questions since you're an expert in art.

 8  A    In some art.

 9  Q    Some art.  Mr. Maibaum, in order to remove art from these

10  heavy crates, what's been your experience regarding the proper

11  procedure and protocol?

12           MR. KINGSLEY:  Objection, foundation.  This witness

13  has not testified about moving art from anyplace.

14           THE COURT:  Well, but he may -- maybe he knows about

15  this.

16       Do you know about the procedure for uncrating works of

17  art?

18           THE WITNESS:  Yes, Your Honor, I do.

19           THE COURT:  All right, then you may testify about

20  this.  Do you want him to tell us the procedure?

21           MR. BRUGNARA:  No, I would like to ask him a couple

22  of direct questions.

23           THE COURT:  Please ask him your questions.

24  BY MR. BRUGNARA:

25  Q    Mr. Maibaum, isn't it true that on these crates of heavy

1   art, they usually entail screws that are about three to five

2   inches?

3   **A**   Depends on the crate.  Depends on the --

4   **Q**   Okay.  Mr. Maibaum, on a crate that weighs 200-plus pounds

5   and is perhaps five feet by three feet, don't they usually

6   engage screws that are heavy-duty commercial screws, perhaps

7   between three to five inches, to secure the crates closed

8   during transport?

9   **A**   The screws would be long enough to support the weight of

10   the crate, if packed properly by a security warehouse like

11   Cirkers.

12   **Q**   Thank you.  Mr. Maibaum, wouldn't you say it would be

13   impossible to manually -- even if you were extremely muscular,

14   to manually dislodge to 50 or 60 screws that are in these

15   crates, or in one crate, to secure it shut?  Could it be done

16   physically by hand?

17   **A**   I don't know --

18         **MR. KINGSLEY:**  Objection.  We don't know how many

19   screws.

20         **THE COURT:**  Sustained.

21   **BY MR. BRUGNARA:**

22   **Q**   Mr. Maibaum, how many screws on a crate that's 50 --

23   you've been doing this 40 years.

24   **A**   Fifty years.

25   **Q**   Fifty years, okay.  On a crate that's five feet by two

1  feet and weighs 200 pounds and has to support the weight on

2  these screws, how many screws, in your experience, would seal

3  such a crate shut?

4  **A**    It depends on the nature of the crate, and it depends on

5  the nature of the art inside.  But certainly more than a dozen,

6  I would say.

7  **Q**    Okay.  Have you ever tried or have you ever seen anyone

8  try to do it manually?

9  **A**    Yes.

10 **Q**    Is the proper protocol manually?  Or with a

11 commercial-grade screwdriver?

12 **A**    I have done it myself with a home screw gun.

13 **Q**    So you have actually seen someone dislodge a five-inch

14 screw from solid pine on a 200-pound crate by hand?

15 **A**    Yes.  I have done it, myself.

16 **Q**    You're a lot stronger than you look --

17        **MR. KINGSLEY:**  Objection.

18        **THE COURT:**  No commentary.

19 **BY MR. BRUGNARA:**

20 **Q**    Mr. Maibaum, could a six-inch pair of pliers open a

21 200-pound crate that's five feet by three feet, that has 20

22 screws in it?

23 **A**    It wouldn't be logical.

24 **Q**    Okay.

25        **THE COURT:**  Are you saying pliers?  Pliers?  Or a

1  screwdriver?

2            MR. BRUGNARA:  Okay.

3  BY MR. BRUGNARA:

4  Q    Mr. Maibaum, have you ever seen a pair of pliers that

5  have, almost like a Swiss Army knife, a retractable

6  Phillips-head screwdriver on it, that you may see at Home Depot

7  --

8            THE COURT:  Talking about a Leatherman?  A tool

9  called a Leatherman where they have, like, a Swiss Army knife

10 that pops out?  I have one of those; I understand that.

11       Is that what you are referring to?

12 BY MR. BRUGNARA:

13 Q    Mr. Maibaum, could somebody open a 200-pound crate with

14 the Leatherman?

15 A    I have never seen a Leatherman.  I don't know what you're

16 referring to.

17 Q    Okay.  Mr. Maibaum, are you aware that Ms. Rose Long --

18            MR. KINGSLEY:  Objection.

19 BY MR. BRUGNARA:

20 Q    Mr. Maibaum, are you aware that --

21            THE COURT:  I can tell already this is not going to

22 be admissible.

23            MR. BRUGNARA:  Okay.  I'll wait on that one.  Let's

24 go on to the next.

25            MR. KINGSLEY:  Your Honor, could the Defendant be

 1  instructed not to show pictures that are not in evidence to the

 2  jury?

 3          THE COURT:  You should not be showing things to the

 4  jury that are not in evidence.

 5      Did you raise your hand over there?  I thought I saw

 6  somebody raise their hand in the jury box.

 7          JUROR:  (Shakes head)

 8          THE COURT:  All right.  Mr. Brugnara, continue,

 9  please.

10  BY MR. BRUGNARA:

11  Q   All right.  Mr. Maibaum, I just want to clarify a couple

12  of things, going back to the art in question.

13      Is your email address modernism@nyc.44.com?

14  A   Yes.  For Modernism Fine Arts.

15  Q   Okay.  Did you receive an email from

16  roserameylong@gmail.com, April 9th, that stated --

17          MR. KINGSLEY:  Objection.

18          THE COURT:  Just, show the exhibit to the witness and

19  he can say whether he received it or not.

20      Is that marked as evidence yet?  Do we have an exhibit

21  number for that?

22          MR. KINGSLEY:  We haven't marked it.  I don't even

23  know what he's showing the witness.

24          THE COURT:  All right.  Do you know that document,

25  Mr. Maibaum?

```
 1        (Witness examines document)
 2             THE WITNESS:  I vaguely recall the document.  It was
 3   a year ago.
 4             THE COURT:  All right.  Did you receive that exhibit?
 5             THE WITNESS:  If I can take a quick -- another look,
 6   I'll see to whom it is addressed.
 7             MR. KINGSLEY:  This is -- objection.  This is going
 8   to be hearsay.
 9             THE COURT:  Well --
10             MR. BRUGNARA:  Can I put it on the screen,
11   your Honor?
12             THE COURT:  Can I see it first?
13        (Document handed up to the Court)
14             THE COURT:  All right.  I agree with the Government.
15   This is going to be hearsay, and is not admissible.
16        (Document handed down)
17   BY MR. BRUGNARA:
18   Q    Mr. Maibaum, did Rose Long tell you that -- did Rose Long
19   tell you that I wasn't expecting her when she arrived --
20             MR. KINGSLEY:  Objection.
21   BY MR. BRUGNARA:
22   Q    -- on April 7th?
23             THE COURT:  Sustained.  Hearsay.
24        (Off-the-Record discussion between Mr. Brugnara and
25         Counsel)
```

MAIBAUM - CROSS EXAMINATION / BRUGNARA

1  BY MR. BRUGNARA:

2  Q    Mr. Maibaum, do you have any knowledge of what Ms. Long's

3  expectations were regarding whether or not she was going to be

4  present at the delivery of the art in question?

5  A    Yes.

6  Q    And what were those expectations?

7  A    Those expectations were that she was going to fly out to

8  San Francisco, I believe on a Saturday preceding the shipment's

9  arrival and that she would be present when the shipment arrived

10 at your facility.  At your home.

11 Q    So does it surprise you to now learn that in fact, she

12 wasn't expected --

13           MR. KINGSLEY:  Objection.

14           THE COURT:  Sustained.

15     (Off-the-Record discussion between Mr. Brugnara and

16      Counsel)

17 BY MR. BRUGNARA:

18 Q    So Mr. Maibaum, the email that you read earlier is not

19 your accurate recollection of what your understanding was then,

20 on April 1st?

21           MR. KINGSLEY:  Objection.

22           THE COURT:  Sustained.  Sustained.  You're referring

23 to something that's not in evidence, this is not going to get

24 in evidence with this witness, and maybe not ever, because it

25 sure is hearsay.

```
 1              MR. BRUGNARA:  Okay.

 2              THE COURT:  And you just can't go there.  I think you

 3    should move to something else.

 4              MR. BRUGNARA:  Okay.  Let's move ahead, then.

 5    BY MR. BRUGNARA:

 6    Q    Mr. Maibaum, why, why were you so interested in this

 7    transaction, since it was an arms-length sale to Rose Long, and

 8    for all purposes it was completed once you two completed your

 9    sale?

10         Why were you interested thereafter?

11              MR. KINGSLEY:  Objection.  He didn't testify he was

12    interested.

13    BY MR. BRUGNARA:

14    Q    Mr. Maibaum, were you interested in the sale of the art in

15    question here between Rose Long and Brugnara?

16    A    I was interested in the sale to Rose Long.

17    Q    Were you interested in the sale between Rose Long and

18    Brugnara?

19    A    I don't know what you mean by "interested."  Can you

20    clarify?

21    Q    Well, were you in communications with attorneys, regarding

22    the transaction between Long and Brugnara?

23              MR. KINGSLEY:  Objection, privileged.

24    BY MR. BRUGNARA:

25    Q    Were you in --
```

1           THE COURT:  No, it is not privileged.  The content

2    would be privileged, but whether or not lawyers were involved

3    is not privileged, itself.

4           Are you talking about before the deal was done?  Or after

5    the deal was done?

6    BY MR. BRUGNARA:

7    Q    After you sold the art to Ms. Long, did you engage counsel

8    regarding anything that has to do with a possible sale between

9    Long and Brugnara?

10   A    Well, let's be clear.  Before the art was shipped, we had

11   a transaction --

12   Q    That is a yes-or-no question.

13          THE COURT:  No --

14          MR. BRUGNARA:  I'll rephrase it.

15   BY MR. BRUGNARA:

16   Q    Did you engage counsel --

17          THE COURT:  He is going to get --

18   BY MR. BRUGNARA:

19   Q    -- after you completed your sale between Maibaum and Long,

20   regarding the possible sale between Long and Brugnara?  Did you

21   engage counsel or not?

22          THE COURT:  You may answer that question any way that

23   you think is fair and complete.  Take as much time as you need.

24          And Mr. Brugnara, do not interrupt the witness while he's

25   answering.

1      Go ahead.

2           **THE WITNESS:**  Thank you, Your Honor.

3      To be clear, the transaction was between Modernism and

4  Degas Sculpture Project and Rose Long.  We made the sale to

5  her.  I was not interested, had no knowledge of the sale to

6  Long to you.

7      I did not retain counsel until two or three days after the

8  art arrived on your premises.  And until that time, everything

9  as far as I knew was -- was happening in the transaction as it

10  should, and Rose Long was going to pay us.

11      When I realized that Rose Long had told me that perhaps

12  she would not pay, at that point I retained counsel.  So that

13  was three or four days after the art arrived on your premises.

14  **BY MR. BRUGNARA:**

15  **Q**    I understand.  Mr. Maibaum, were you told or are you aware

16  that in fact, Brugnara was given 365 days --

17           **MR. KINGSLEY:**  Objection.

18  **BY MR. BRUGNARA:**

19  **Q**    -- to conduct due diligence?

20           **MR. KINGSLEY:**  He is testifying.

21           **THE COURT:**  I'm sorry?

22           **MR. KINGSLEY:**  He's testifying through his question.

23           **THE COURT:**  Sustained.

24  **BY MR. BRUGNARA:**

25  **Q**    Do you have any knowledge from any of the parties

1  regarding your interest in the Long and Brugnara transaction,

2  that I was given 365 -- Brugnara was given --

3          MR. KINGSLEY:  Same objection.

4          THE COURT:  No, there would be a proper way to --

5  I'll tell you how -- I will ask the question in a way that I

6  think would be proper, although it may not fully suit

7  Mr. Brugnara's purposes.

8      But here, prior to the deal and prior to the art being

9  shipped, was there a point where Ms. Long described to you what

10 her deal was with the buyer?

11         THE WITNESS:  Thank your Honor.

12     No, there was absolutely no knowledge on my part that

13 Ms. Long had given you 365 days.  Nor, frankly, would I have

14 approved the shipment of the art or the sale of the art, had

15 that been told to me.

16         MR. BRUGNARA:  All right.

17 BY MR. BRUGNARA:

18 Q   Mr. Maibaum, isn't it true that in your experience,

19 reputable dealers have contracts of sale that involve deposits

20 or detailed terms such as the exhibit that was presented in

21 court yesterday by the attorneys that you provided to Ms. Long

22 with several terms and conditions of a sale of any -- anything

23 of pecuniary value?

24         MR. KINGSLEY:  Objection.  Confusing.

25         THE COURT:  It is confusing; sustained.

1  BY MR. BRUGNARA:

2  Q    Mr. Maibaum, I'll try to simplify this.

3       Mr. Maibaum, is it your experience in the -- as a

4  businessman, to have a detailed meeting of the minds

5  memorialized in a written document regarding the sale of

6  anything of value?

7  A    That is certainly my practice.

8  Q    Don't you think, Mr. Maibaum, in your experiences

9  worldwide, that's the practice of any prudent businessman or

10 businesswoman?

11 A    It should be.

12 Q    Are you aware, Mr. Maibaum, there's absolutely no written

13 contract between Long and Brugnara?

14         MR. KINGSLEY:  Objection.

15 BY MR. BRUGNARA:

16 Q    Based upon the statement you said of your understanding of

17 the transaction?

18         MR. KINGSLEY:  Objection.

19         THE COURT:  Sustained.

20     (Off-the-Record discussion between Mr. Brugnara and

21      Counsel)

22 BY MR. BRUGNARA:

23 Q    Mr. Maibaum, in your experiences buying and selling fine

24 art, have you ever sold a piece of art that had a possible

25 value of the tens of thousands of dollars or hundreds of

1  thousands of dollars, without some form of written meeting of

2  the minds, memorializing a contract or some other written

3  instrument outlining the terms of the transaction?

4  **A**    Not to my recollection.

5  **Q**    Mr. Maibaum, are you familiar with the basic terms of what

6  a legally-binding contract is?

7            **MR. KINGSLEY:**  Objection.  This will call for a legal

8  conclusion.

9            **MR. BRUGNARA:**  Your Honor, you already stated in

10  limine, said a contract is -- is material to this case.

11            **THE COURT:**  I need to say, since that comment was

12  made to the jury, the government does not need to prove in this

13  case that there was or was not a contract.

14       What the Government needs to prove for wire fraud or mail

15  fraud are elements that I will tell you at the end of the case.

16       It is possible that in some ways, the existence or

17  non-existence of a contract could have relevance to some of the

18  facts and circumstances of the case, so that's why you can

19  inquire about it.  But, it is not necessary for the Government

20  to prove there was a contract in this case.  That's not -- that

21  is not an element of proof.  So --

22  **BY MR. BRUGNARA:**

23  **Q**    Mr. Maibaum, are you aware that Rose Long solicited

24  Brugnara in this transaction?

25            **MR. KINGSLEY:**  Objection.  He's testifying.  Hearsay.

 1              THE COURT:  So --

 2              MR. KINGSLEY:  These are all proper questions for

 3  Rose Long.

 4              MR. BRUGNARA:  Your Honor, he's telling me what I can

 5  ask.  I can ask him, I can ask her.  I asked him:  Are you

 6  aware simply --

 7              THE COURT:  But unless he was sitting there with her

 8  at the time she composed the email or the phone call, how would

 9  he even know?

10              MR. BRUGNARA:  Well, Your Honor, if you read the

11  District Court filing that Ms. Long claims, she claimed --

12              MR. KINGSLEY:  Objection, he's talking --

13              THE COURT:  That's hearsay.

14              MR. KINGSLEY:  Not in evidence.

15              MR. BRUGNARA:  That's why I'm asking the question.

16  I'm asking the question --

17              THE COURT:  You were just eliciting hearsay.  I'm

18  going to sustain that.  I think you need to take a couple more

19  minutes and wind up your examination.

20              MR. BRUGNARA:  Okay.

21  BY MR. BRUGNARA:

22  Q    Mr. Maibaum, isn't it true that in one of your FBI

23  interviews you stated that the bronze that was purportedly

24  shipped through -- to -- to Long -- let me backtrack that.

25       Mr. Maibaum, when you sold the bronze Valsuani --

1  **A**    The Degas.

2  **Q**    -- attributed-to-Degas bronze Valsuani to Ms. Long, did

3  she take possession of it?

4  **A**    Two points.  Number one, it's not attributed.  It is an

5  authentic bronze by Degas.  And number two, I do not know she

6  took possession of it.  The bronze was transferred I believe to

7  her at Cirkers.  Whether she actually physically took

8  possession, I don't know.

9  **Q**    So you're saying you didn't give instructions to Cirkers

10 to take it out of your possession and forward it to the Sea

11 Cliff house?

12 **A**    No.  I gave Cirkers instructions to release it from my

13 room at Cirkers, and put it in her room at Cirkers.  From that

14 point on, I do not know the disposition.

15 **Q**    Oh, okay.

16 **A**    Or, I cannot attest to the disposition.

17 **Q**    Regarding the attributed-to-Degas --

18 **A**    Excuse me; it's not attributed.

19 **Q**    Okay.  Mr. Maibaum, does that come from the succession's

20 committee's determination?

21 **A**    It does, and from the validation from ten museums,

22 including the Hermitage.

23 **Q**    Okay.  Mr. Maibaum, the succession committee of Degas, was

24 that the Degas heirs?  Or, excuse me, the descendants of Degas?

25 **A**    Yes, the Succession Degas are the heirs of the artist.

1  That is correct.

2  **Q**    Isn't it true, Mr. Maibaum, that Degas had no children?

3  **A**    That is correct.

4  **Q**    Isn't it true, Mr. Maibaum, that his only living relative

5  was either a first or second cousin who was a nun in a convent?

6  **A**    That's not exactly correct.

7  **Q**    Isn't it true, Mr. Maibaum, that the succession committee

8  that validates the authenticity of these bronzes a hundred

9  years after his death are in fact the descendants of the

10 benefactor of the nun's will and testament, whereas it was a

11 friend, but not, in fact, a blood relative, obviously, of the

12 nun?

13          **MR. KINGSLEY:**  Objection.  Compound question.

14          **THE COURT:**  In your own words, please try to explain

15 what Mr. Brugnara is getting at to the jury.

16          **THE WITNESS:**  I would be happy to.

17          **THE COURT:**  Please.

18          **THE WITNESS:**  Under French law, the heirs of the

19 artist or those who inherit the heirs -- the heirs of the

20 artist's estate are the ones who have the right to

21 authenticate.  And they bring in outside experts to look at the

22 works of art, and do whatever due diligence they need to be

23 done, in order to interpret and qualify the authenticity of

24 particular works of art.  And in this case, the Succession

25 Degas did just that.

1  BY MR. BRUGNARA:

2  Q    Okay.  But you said they were in fact the heirs, so I

3  guess from a legal standpoint that may be true.  But would you

4  say from a layperson's standpoint who reads a Succession Degas

5  Committee comprised of the living heirs of an individual would

6  make a reasonable determination that in fact there would be

7  some bloodline succession, and not, you know, third person

8  removed from a deceased nun, based on her -- her signing?

9            MR. KINGSLEY:  Objection.  Unintelligible.

10           MR. BRUGNARA:  If you follow the bouncing ball, it's

11  a funny story, and it has a funny question.

12           THE COURT:  I don't think this is going to lead

13  anywhere.  Sustained.  This is irrelevant.

14           MR. BRUGNARA:  Okay.  Well, I think it is relevant.

15           THE COURT:  Well, I'm the Judge.  I get to decide.

16  BY MR. BRUGNARA:

17  Q    Okay, let's talk about something that is relevant.

18       What was sent, are you aware that Ms. Long purportedly

19  sent a bronze sculpture that she had owned for several years to

20  Brugnara?

21  A    No.  That's not correct.

22  Q    That is not your understanding.  So are you aware that

23  Ms. Long told me she was sending me a bronze that she's had in

24  her possession for many years?

25           MR. KINGSLEY:  Objection, hearsay.

1           THE COURT:  Sustained.

2  BY MR. BRUGNARA:

3  Q    Okay.  Mr. Maibaum, the bronze that was packed from

4  Cirkers and sent to Sea Cliff that you said was first forwarded

5  to Ms. Long, is it true that it was EF D --

6  A    To the best of my knowledge, yes.

7  Q    Okay.  So, it could have been something other than EF D?

8  A    Perhaps, but I have -- I can't imagine why it would have

9  been.

10 Q    How could it have possibly been another one, other than EF

11 D?

12 A    I don't understand your question.

13 Q    Well, you said it possibly could have been a bronze other

14 than EF D.  And I said, how possibly could it have been another

15 bronze than EF D?

16 A    Well, because Rose Long also owned a bronze from the same

17 edition.

18 Q    Okay.  Were you there when the bronze was packed at

19 Cirkers?

20 A    No, I was not.

21 Q    So you weren't there.  You don't know what was packed in

22 the box.

23 A    That is correct.

24 Q    Okay.

25           THE COURT:  All right.  Are we done?

 1            **MR. BRUGNARA:**  No.

 2    **BY MR. BRUGNARA:**

 3    **Q**    Mr. Maibaum, isn't it true that EF D has an attorney's

 4    lien, or an attorney has an equity position on that particular

 5    bronze?

 6    **A**    That is not correct.

 7    **Q**    Isn't it true, Mr. Maibaum, that you told the FBI that --

 8    in an interview, that the attorney that you had previous, a

 9    legal matter with, had an equity interest in the EF D bronze?

10    **A**    He did, but that was transferred to another bronze that we

11    had.  So it was not -- so it was -- at the point of the

12    transfer to Rose Long, he did no longer have an equity interest

13    in the bronze.

14    **Q**    Okay.  Well, I'm glad that's cleared up.  All right.

15    **A**    And it wasn't a lien.  It was an equity interest.  It's

16    quite different.

17    **Q**    I agree.  Regarding -- I have a question.  You talks about

18    the French law in court yesterday and then again today, and

19    then I believe it was covered in the FBI interview.

20        Can you clarify or explain what you mean by the stamp

21    "Reproduction"?  How it doesn't apply to the first 12, and then

22    the subsequent 12?

23        Is that what you testified to?

24    **A**    No, that is incorrect.  The first 12 are also stamped

25    "Reproduction."

1        In other words, if the total edition is more than 12, each

2   bronze in the edition, the first 12 included, have to be

3   stamped with the word "Reproduction."

4   **Q**    Isn't it true, Mr. Maibaum, that you recently settled a

5   claim on the missing crate with your insurance carrier for

6   approximately $50,000?

7   **A**    No.

8   **Q**    Well, can you tell the Court, Mr. Maibaum, how much you

9   settled the claim for?

10  **A**    I cannot because under -- under the agreement we signed

11  with the insurance company, we're not allowed to divulge the

12  information.

13          **THE COURT:**   The information has no relevance.  I'm

14  not going to require him to get into that.

15  **BY MR. BRUGNARA:**

16  **Q**    Isn't it true, Mr. Maibaum, that you sold Ms. Long one of

17  the Valsuani Degases for approximately $200,000?

18  **A**    In 2001, yes, 14 years ago.

19  **Q**    And isn't it true, Mr. Maibaum, in --

20  **A**    Excuse me.  I don't know if it was 200,000.  I don't

21  recall the exact amount.

22  **Q**    Approximately.

23  **A**    I think it was closer to 300,000.  But I don't recall the

24  exact amount.

25  **Q**    Are you aware, Mr. Maibaum, that Ms. Long gave an

1    interview with the FBI stating that --

2             MR. KINGSLEY:  Objection.

3             THE COURT:  Sustained.

4             MR. BRUGNARA:  Okay.

5    BY MR. BRUGNARA:

6    Q    Mr. Maibaum, did you sell her -- did you sell to Ms. Long

7    during that same period an equity position or a limited

8    partnership position, in the Degas Sculpture Project?

9    A    Never.

10   Q    Would it surprise you to learn that --

11            THE COURT:  Sustained.

12            MR. BRUGNARA:  Okay.

13   BY MR. BRUGNARA:

14   Q    So Ms. Long has no equity or other -- otherwise interest

15   in the Degas Sculpture Project?

16   A    That is correct.

17   Q    All right.

18            MR. BRUGNARA:  I have no further questions,

19   your Honor.

20            THE COURT:  All right.  You're done.  Thank you.

21       I need to say to the jury that many times, statements were

22   made by Mr. Brugnara.  Those are not evidence.  The only thing

23   that is evidence is what the witness admitted to or stated on

24   his own.  Things that were read from were not evidence unless

25   they were admitted in evidence as a marked exhibit.

```
1        So please be mindful to keep that straight.

2        The same rule goes for the Government.  It works both ways

3   for both sides.

4        All right.  Any redirect examination?

5             MR. KINGSLEY:  Yes, Your Honor.

6                      REDIRECT EXAMINATION

7   BY MR. KINGSLEY:

8   Q    I would like to start by going back to some of the

9   questions Mr. Brugnara was asking you about the Succession

10  Degas.  And I'm going to show you what's been previously marked

11  as Government Exhibit 29.

12            MR. KINGSLEY:  May I approach, your Honor?

13            THE COURT:  You may.

14       (Witness examines document)

15  BY MR. KINGSLEY:

16  Q    Can you take a moment to look at that document, and let me

17  know if you recognize it.

18  A    I do.

19  Q    And can you tell me what it is?

20  A    This is the certificate of authenticity for "Little

21  Dancer" bronze, EF D.  Stamped "EF D."

22  Q    In what language is the first page of that document?

23  A    It is in French.

24  Q    Do you understand written French?

25  A    Yes.
```

1  Q    Can you turn to the second page of the exhibit as well,

2  and let me know what that is.

3       (Witness examines document)

4  A    This is a -- excuse me.  This is an English translation of

5  the French language.

6  Q    And is the translation consistent with your understanding

7  of French?

8            THE COURT:  Well, that's not quite the right

9  question.

10           MR. BRUGNARA:  Can I see that, Ben?

11           MR. KINGSLEY:  Sure.

12      (Document tendered to Mr. Brugnara.)

13           THE COURT:  Mr. Brugnara's entitled to see it.  But

14  while I'm interrupting, the proper question is not whether it's

15  consistent with.  It's whether or not it's accurate.  That's

16  the question you have to ask.

17           MR. KINGSLEY:  I think the relevance of this document

18  mostly goes to what Mr. Maibaum believed about the sculpture.

19  But I can show the Court the document and --

20           THE COURT:  Let's move it along, please.

21      (Witness examines document)

22  BY MR. KINGSLEY:

23  Q    Is the English translation accurate, an accurate

24  translation of the French?

25      (Witness examines document)

1   **A**   Yes.

2   **Q**   Okay.  So, you said this is from the Succession Degas.

3   And Mr. Brugnara asked you some questions about this, but can

4   you tell me what the Succession Degas is?

5   **A**   Yes.  The Succession Degas is comprised of the living

6   legal heirs -- legal heirs -- of the artist.

7   **Q**   Okay.  And did you have this document at the time that you

8   sold the Degas sculpture to Ms. Long that was involved in this

9   transaction?

10  **A**   Yes.

11  **Q**   And can you tell me which Degas "Little Dancer" sculpture

12  had this document refers to?

13  **A**   This document refers to the "Little Dancer" bronze that we

14  sold to Rose Long.

15  **Q**   And how do you know that?

16  **A**   Because it matches the stamp on the bronze to the

17  certificate which details that this is the bronze EF D, which

18  conforms to the stamp on the bronze.

19        **MR. KINGSLEY:**  Your Honor, the Government moves

20  Exhibit 29 into evidence.

21        **THE COURT:**  Any objection?

22        **MR. BRUGNARA:**  No, Your Honor.

23        **THE COURT:**  All right.  29 is received.

24      (Trial Exhibit 29 received in evidence)

25      (Document displayed)

1          THE COURT:  Can I ask for a clarification of your

2    last answer?

3          THE WITNESS:  Sure.

4          THE COURT:  You said the one sold to Rose Long, but

5    my memory of your testimony that is there were two.

6       So are you talking about the earlier one or are you

7    talking about the one that was destined for San Francisco?

8          THE WITNESS:  Thank you for the clarification, your

9    Honor.  The answer is this refers to the bronze that was sold

10   to Rose Long.  The earlier bronze, as I recall, was stamped

11   with the letter "B" like "Boy," whereas this bronze was stamped

12   "EF D" which conforms to this certificate.

13         THE COURT:  And is that the one that you thought was

14   destined for California?

15         THE WITNESS:  Well, destined for Rose Long, yes.

16         THE COURT:  All right.  Thank you.

17      Go ahead.

18         MR. KINGSLEY:  Can we publish Exhibit 29 to the jury,

19   please.

20         THE CLERK:  It should be.

21   BY MR. KINGSLEY:

22   Q   Mr. Maibaum, can you turn to Page 2 of the English

23   translation, please.

24   A   Sure.

25      (Document displayed)

1     **MR. KINGSLEY:**  And can you zoom in on the middle

2   paragraph, Ms. Mallory, through the original letter, "We hereby

3   confirm..."

4        (Document displayed)

5   **BY MR. KINGSLEY:**

6   **Q**   Mr. Maibaum, can you read this part of the letter and just

7   let me know what it means, please.

8        (Witness examines document)

9   **A**   Do you want me to read the quote?

10  **Q**   Could you read it out loud?

11  **A**   Sure (As read):

12  "Through this original letter, we hereby confirm..."

13       That's the Succession Degas.

14  ""...that the Degas bronze sculpture from the 1997 edition

15  which bears the casting reference 'EF D'..."

16       That's the stamp on the bronze.

17  ""...is one of the cast bronzes of *La Petite Danseuse de*

18  *Quatorze Ans*, Little Dancer, Age 14, recognized as authentic by

19  the Estate."

20  **Q**   And what does that mean to you, given your expertise?

21  **A**   This means under French law and by worldwide recognition,

22  this bronze is authentic.

23  **Q**   And could you tell me a little bit about the French law

24  that gives the Succession Degas the authority to say something

25  like this?

1  **A**    Well, as stated earlier, basically, under French law for

2  French artists, the living legal heirs of an artist have the

3  sole right to authenticate works of art by that particular

4  artist.

5  **Q**    So under French law, this is considered -- the EF D

6  sculpture is accepted to be an authentic Degas sculpture?

7  **A**    Without question.

8  **Q**    Now, you testified about a different sculpture that you

9  sold to Rose Long in 2001.  Correct?

10  **A**    Correct.

11  **Q**    And you said that that was EF B?

12  **A**    No, just the letter "B" like "Boy."

13  **Q**    Okay.  And is there any distinction physically between

14  that sculpture and the EF D sculpture?

15  **A**    No.

16  **Q**    Do you -- is there any reason you would think there would

17  be a difference between the value of that sculpture and the EF

18  D sculpture?

19  **A**    No, each bronze in this edition which has a certificate of

20  authenticity as it should, would have the same value.  More or

21  less the same value.

22  **Q**    Okay.  Mr. Brugnara asked you some questions about where

23  you believe this art was going.  And you testified that you

24  thought it was going to a museum, correct?

25  **A**    Correct.

```
 1   Q    What is the practice in the art industry with regards to
 2   shipping art to a museum?  Does that happen?
 3   A    Yes, of course.
 4   Q    And would you consider that to be common practice?
 5   A    Yes.
 6   Q    So if you believed it was going to a museum, would there
 7   be anything unusual about a transaction where the art was going
 8   directly there?
 9   A    No.  That would be a normal transaction.
10   Q    Okay.  I want to go back to the lawsuit between you and
11   Rose Long very briefly.  Would you have brought that lawsuit if
12   you had gotten all the artwork back, in question?
13   A    No.  No.
14   Q    Okay.
15        (Off-the-Record discussion between counsel)
16             MR. KINGSLEY:  No further questions, your Honor.
17             THE COURT:  All right.  Anything within the scope of
18   what we just heard, Mr. Brugnara?
19             MR. BRUGNARA:  Yes.  A few questions.
20                     RECROSS EXAMINATION
21   BY MR. BRUGNARA:
22   Q    Mr. Maibaum, regarding the EF D and its similarity to the
23   M that was sold to Rose Long --
24   A    B, not M.
25   Q    Excuse me?
```

1  **A**    Letter B, not M.

2  **Q**    Okay, letter B.  Mr. Maibaum, there's actually two

3  committees that you have authenticate the Degas.  One is the --

4  correct me, or I'm asking you this:  One is, as you just said,

5  the Succession Degas Committee?

6  **A**    Succession Degas, correct.

7  **Q**    Which is the heirs.  And then there's the second

8  committee, the Committee Edgar Degas?

9  **A**    Comité Edgar Degas, correct.

10 **Q**    I don't speak French, excuse me.

11 **A**    That's okay.

12 **Q**    But those are the two certificates that you issue when you

13 or your company that oversees the sale of these, the Valsuani

14 Degas Project -- or what's the name of the firm?

15 **A**    The Degas -- the Degas Sculpture Project for the Valsuani

16 bronzes.

17 **Q**    They issue the two certificates from the two committees,

18 correct?

19 **A**    Not exactly.  Normally what happens is we provide the

20 Succession Degas certificate first.  And when the sculpture is

21 paid for, then we provide the Comité Degas certificate.

22 **Q**    I see.  And who has the Comité certificates?

23 **A**    The Comité Degas holds the certificates.

24 **Q**    And where are they located?

25 **A**    In Paris.

MAIBAUM - RECROSS EXAMINATION / BRUGNARA                614

1    Q    Okay.  So, on this particular transaction, do you remember

2    having an interview with the FBI on or about October 9, 2014?

3    A    Probably.

4    Q    Do you remember telling the FBI interviewer that you,

5    Maibaum, did not have a certificate from the Comité Degas for

6    the "Little Dancer" EF D that was being sent to Sea Cliff?

7    A    No.  What I said was words to the effect that we will

8    provide the certificate upon payment.  I did not say we didn't

9    have the certificate.

10   Q    Okay.  So are you telling me that the FBI report that

11   states "Maibaum did not have a certificate..."

12        MR. KINGSLEY:  Objection.

13        THE COURT:  Sustained.  Sustained.

14   BY MR. BRUGNARA:

15   Q    So that's--

16   A    If I may be allowed to clarify, I didn't physically have

17   the certificate.  It was being held in France.  And upon

18   payment, it would be sent to me and returned to the buyer, Rose

19   Long.

20   Q    And what would happen if a buyer didn't get that

21   certificate from the committee in France?

22   A    Well, if the buyer purchased the bronze and paid for it,

23   they would have the certificate.  So that's an illogical kind

24   of question, in my opinion.

25   Q    So you are saying that -- that the French committee that's

1  in -- where are they located?  In Paris?

2  **A**    In Paris, correct.

3  **Q**    So you are saying they would be flying out to Sea Cliff?

4  **A**    No, I didn't say that.  What I said was that once the

5  bronze was paid for, the Comité would provide the certificate

6  to me, and I would in turn provide it to Rose Long.

7  **Q**    What if the Comité didn't provide the certificate?  Then

8  what would happen?

9  **A**    Well, they would.

10 **Q**    But what if they didn't?

11           **MR. KINGSLEY:**  Objection.

12           **MR. BRUGNARA:**  It's not an argumentative question.

13           **THE COURT:**  We have exhausted this topic.  We are

14 going to go to something else.

15 **BY MR. BRUGNARA:**

16 **Q**    So you're saying that that certificate validates the

17 authenticity of a Valsuani Degas bronze.  Correct?

18 **A**    It, among others, validates, plus other -- plus other

19 things that validate the authenticity.

20 **Q**    There's two certificates.  This is a very confusing, even

21 for experienced art --

22           **MR. KINGSLEY:**  Objection, arguing.

23 **BY MR. BRUGNARA:**

24 **Q**    Let's clarify this so we have a jury that understands.

25      There's two certificates that are issued to validate the

1  sale of a Valsuani Degas "Little Dancer" as part of this

2  transaction.  One from the Comité Degas, and one from the Degas

3  Succession Committee.  Is that correct?

4  **A**    They don't validate the sale.  They validate the

5  authenticity of the sculpture.

6  **Q**    Okay, they validate the authenticity.  And is it isn't it

7  true that when somebody purchases a Valsuani, they would expect

8  it to be authenticated when they're making that payment and

9  making that purchase?

10  **A**    That is correct.

11  **Q**    Okay.  So you're telling me the procedure, is it true that

12  you pay first, and then if you get the certificate, good for

13  you, and if you don't, well, hey, sorry, out of luck?

14  **A**    No, that is not at all what I'm saying.  What I'm saying

15  is if you pay for the sculpture, you would have the

16  certificate.

17  **Q**    So you are saying that you control the Comité Degas?

18  **A**    I don't control the Comité Degas.

19  **Q**    How can you represent to anybody here what they will do?

20  **A**    Because this is the standard procedure.

21  **Q**    Okay.  And I'm asking you -- because what normally

22  happens, as you know, in a purchase, you get the benefit of

23  what you're paying for upon the completion of the transaction.

24  And now you are telling me that you don't get the benefit until

25  a Comité in France whose outside the jurisdiction of this

```
 1   country decides whether or not they want to issue the

 2   certificate.

 3   A     The Comité Degas is holding the certificate.

 4   Q     Mr. Maibaum, isn't it true that on Rose Long's -- a bronze

 5   that she didn't send, that you sold her 12 years ago, you

 6   issued to her a Comité Edgar Degas certificate?

 7   A     Yeah, that's correct, because she paid for it.

 8   Q     Okay, okay, that's correct.  So there's a difference

 9   between Rose Long's Comité-Degas-certified bronze and the

10   bronze that was sent to Sea Cliff that didn't have the Comité

11   Degas certificate, that they would have to wait and hope and

12   cross their fingers that it might be sent from Paris, France,

13   without any jurisdiction to litigate that if they did not?

14   A     So you're confirming the bronze was sent to Sea Cliff.

15   Q     No, I'm saying based upon this case.

16   A     I'm saying, based on this case, you're --

17   Q     Well, it may have, it may have been sent to Sea Cliff.

18   I've always stated it may have been sent to Sea Cliff; it may

19   not have been sent to Sea Cliff.  I don't know.

20   A     So --

21             THE COURT:  Let's just ask a question.

22             MR. BRUGNARA:  Okay, your Honor.  The point that I'm

23   trying to say is:  This particular bronze that was assumed sent

24   to Sea Cliff, assumed delivered to Sea Cliff, it did not have

25   the Comité Degas certificate.
```

```
 1              MR. KINGSLEY:  Objection (Inaudible)

 2              THE WITNESS:  It did have a certificate.  It happened

 3    to be located in France.

 4    BY MR. BRUGNARA:

 5    Q    Okay, it had the Comité Degas certificate in France.  But

 6    wouldn't the Comité Degas have to physically see that bronze

 7    before they would issue the certificate?

 8    A    They saw it before it left France.

 9    Q    Yeah, but how do they know the one in Sea Cliff was the

10    one that was in France, unless they would have to come out and

11    relook at it?

12    A    Because they're taking my word and credentials.

13    Q    So you do control -- I asked you if you controlled them,

14    and you said no.  Now you are admitting that you control the

15    Comité Degas.  And that it's a shell committee.

16              MR. KINGSLEY:  Objection, argument.

17              THE COURT:  This is argument.

18              MR. BRUGNARA:  Your Honor, I don't have any further

19    questions.  Thank you.

20              THE COURT:  Thank you, thank you.  All right.  Are

21    you done?

22              MR. KINGSLEY:  Can I clarify just one question?

23              THE COURT:  Just going to open it up again.  Go

24    ahead.

25              MR. KINGSLEY:  Never mind.
```

1    **THE COURT:**  All right.  May the witness step down?

2    **MR. KINGSLEY:**  Yes, Your Honor.

3    **THE WITNESS:**  Thank you, Your Honor.

4    **THE COURT:**  Mr. Brugnara, may the witness be excused

5   and discharged from the subpoena?

6    **MR. BRUGNARA:**  Yes, Your Honor.

7    **THE COURT:**  So you are free to leave.

8    (Off-the-Record discussion between Mr. Brugnara and

9      Counsel)

10    **MR. BRUGNARA:**  Oh, your Honor subject to recall,

11   Counsel suggested.

12    **THE COURT:**  All right.  I -- you may be subject to

13   recall.  I cannot excuse you from the subpoena yet.  But you

14   are -- you are free to go for now.  We will let you know if

15   you're needed again.

16    I -- let's just leave it at that for now.  All right?

17    **THE WITNESS:**  Your Honor, I'm scheduled to fly back

18   to New York where I live, and it would be -- whatever might

19   come up, can I testify to it now so I don't have to fly back to

20   San Francisco?

21    **THE COURT:**  Well, we will -- I -- we don't know

22   what's going to come up.  And, you are the first witness.

23   There could be other legitimate reasons to recall you, in light

24   of testimony given by somebody else.

25    But you should go ahead and fly back to New York, and we

```
 1   will give you at least 48 hours' notice before you have to come

 2   back.  If you do have to come back.  I'm not saying you will.

 3        But, under the law, I cannot excuse you if one of the

 4   sides wants to hold you for potential recall.  So, I have to do

 5   it that way.  So you should get on an airplane and go back

 6   about your business for now.

 7             THE WITNESS:  Thank you.

 8             THE COURT:  Leave the documents here.  The lawyers

 9   will take care of them.

10        (Witness excused)

11             THE COURT:  All right.  Who is our next witness?

12             MS. HARRIS:  Your Honor, the United States calls Rose

13   Long.

14             THE COURT:  All right.  Let me ask the jury, can you

15   -- can we continue for a bit before we take our break, or do

16   you -- does anyone over there need a break?

17        All right.  We are going to go about 30 minutes and then

18   we will take a break.  So let's bring in the next witness.

19        Raise your right hand.  The clerk will swear you in.

20             ROSE RAMEY LONG, PLAINTIFF'S WITNESS, SWORN

21             THE CLERK:  Thank you.

22             THE COURT:  All right.  Welcome.  Please have a seat.

23             THE WITNESS:  Thank you.

24             THE COURT:  Now, you see how the microphone will move

25   all around?  Yours does, too.  You need to speak into it so
```

```
 1   everybody can hear you.

 2       Why don't you say your name.

 3           THE WITNESS:  Rose Ramey Long.

 4           THE COURT:  Pull it up a little higher so it'll catch

 5   your voice.

 6           THE WITNESS:  Rose Ramey Long.

 7           THE COURT:  Can everybody hear it?

 8       Looks like everyone can hear.

 9       All right.  Go ahead, Ms. Harris.

10                       DIRECT EXAMINATION

11   BY MS. HARRIS:

12   Q   Good morning, Ms. Long.  Can you spell your middle name

13   for the record?

14   A   Yes.  R-A-M-E-Y.

15   Q   Other than the name Rose Long, do you use any other

16   surname?

17   A   Yes, I do.

18   Q   What is that?

19   A   Littlejohn is my -- go ahead.

20   Q   What, is Littlejohn your maiden name?

21   A   Yes, it is.

22   Q   Are you currently married?

23   A   No.

24   Q   Was Long your married name?

25   A   Yes, it was.
```

1   Q    And, what name do you currently use as your surname?

2   A    Littlejohn.

3   Q    Thank you.  Where are you currently employed?

4   A    I'm self-employed.

5   Q    What is the name of your business?

6   A    It's Rose Long -- Rose Ramey -- I have to get used to it.

7   Rose Ramey Littlejohn Fine Arts.

8   Q    Prior to it being known as Rose Ramey Littlejohn Fine

9   Arts, was it known as Rose Long Fine Arts when your married

10  name was Rose Long?

11  A    Yes, it was.

12  Q    Where is your company located?

13  A    In New York.

14  Q    What type of business is Rose Long Fine Arts?

15  A    It's the purchasing of art that I appreciate, and then

16  eventually sell.

17  Q    Approximately when did you start your business?

18  A    Which one?

19  Q    Rose Long Fine Arts.

20  A    Oh, Rose Long Fine Arts was in '79, when I married.

21          THE COURT:  I didn't hear.

22          THE WITNESS:  In '79, 1979.

23          THE COURT:  '79, all right.

24  BY MS. HARRIS:

25  Q    How long have you been an art dealer, approximately?

1  **A**    Thirty- -- I guess -- -two years, about now.

2  **Q**    Did you have any other art business before you started

3  Rose Long Fine Arts?

4  **A**    Yes, I did.

5  **Q**    Where is most of your fine artwork stored?

6  **A**    It's at Cirkers.

7  **Q**    Where is Cirkers located?

8  **A**    It's 444 55th, West 55th Street.

9  **Q**    In New York?

10  **A**    In New York.

11  **Q**    What type of business is Cirkers?

12  **A**    Cirkers is a storage and also will exhibit your works of

13  art individually, and also in longistics (Phonetic).

14  **Q**    Do you also live in New York?

15  **A**    Yes, I do.

16  **Q**    Do you reside anywhere else besides New York during part

17  of the year?

18  **A**    Yes.

19  **Q**    Where is that?

20  **A**    Memphis, Tennessee.

21  **Q**    Have you gone to school to study art conservation and

22  restoration?

23  **A**    Yes, I have.

24  **Q**    Can you describe for us your formal education in art?

25  **A**    I attended NYU, strictly in the restoration and

```
 1   conservation department.  And after approximately two years, I
 2   also was attending Beaux Arts in France at the same time.
 3   Q    Did you receive any degree from NYU?
 4   A    No.
 5   Q    And you mentioned you also attended the Academy of Beaux
 6   Arts.  What did you study there?
 7   A    The same thing.  Conservation, restoration.
 8   Q    Have you worked under mentors that are recognized as
 9   experts in the field of art restoration?
10   A    Yes, I have.
11   Q    And can you describe those mentors or experts for us?
12   A    Gustaf Berger is a wonderful mentor, and also Irving Yamet
13   was another --
14   Q    Can you pull the microphone a little closer to you?
15   A    Okay.
16   Q    Thank you.  Have you taught at any museums during your
17   career in the art conservation?
18   A    Yes.  I've lectured and taught my -- restoration works to
19   the -- their conservation departments.
20   Q    Which museums have you taught and lectured at?
21   A    At the Met, and also the Louvre and -- well, the Brooks
22   Museum in Memphis.  It's been several, so I don't remember them
23   all.
24   Q    Have you met any well-known artists throughout your
25   career?
```

 1  **A**     Yes, I have.

 2  **Q**     Can you give us some of the names of the artists you have

 3  been acquainted with?

 4  **A**     Because of one of my mentors, Irving Yamet, I was able to

 5  meet Picasso, and Dalí, and Chagall.  And then I met on my own

 6  while attending Beaux Arts, because they were neighbors, I met

 7  David Hockney and Jean DuBuffet.

 8  **Q**     What is an art authenticator?

 9  **A**     It's someone that knows how to determine whether something

10  is original or not.

11  **Q**     Do you have experiences as an art authenticator?

12  **A**     Yes, I do.

13  **Q**     Can you briefly describe your experience to us as an art

14  authenticator?

15  **A**     Well, while studying conservation, that part of it, you

16  have to be able to determine -- and sometimes it's through

17  science, sometimes it's just through knowledge, automatically

18  from, you know, just your experiences.

19         But, you have to be able to take a piece of -- a chip of a

20  painting from behind or under the frame or something, and be

21  able to authenticate it as being the right period and the right

22  type of paint that particular artist would have used.

23  **Q**     Do you know someone named Luke Brugnara?

24  **A**     Yes, I do.

25  **Q**     Do you also know someone named Catherine Dickson?

1   **A**    Yes, I do.

2   **Q**    Who is Catherine Dickson?

3   **A**    Catherine Dickson is a friend of mine in Florida.

4   **Q**    How did you -- when did you first come into contact with

5   Luke Brugnara?

6   **A**    Catherine Dickson called me and said that --

7   **Q**    Don't tell us what she said, please.

8   **A**    Okay.  Catherine Dickson is the one that told me about

9   Luke Brugnara.

10  **Q**    And can you tell us when you first came into contact with

11  Mr. Brugnara?

12  **A**    Approximately ten to eleven years ago.  I'm not certain

13  exactly.

14  **Q**    And was it Ms. Dickson that connected you with

15  Mr. Brugnara?

16  **A**    Yes, it was.

17  **Q**    Did you sell Luke Brugnara any artwork approximately ten

18  or eleven years ago, after Ms. Dickson connected you and

19  Mr. Brugnara?

20  **A**    Yes, I did.

21  **Q**    Can you describe for us your first business transaction

22  that you had with Mr. Brugnara?

23  **A**    Luke Brugnara purchased a beautiful Renoir called *Gabriela*

24  *del la Rose*.

25  **Q**    Did you personally own the Renoir at the time that you

 1  sold it to Mr. Brugnara?

 2  **A**    Yes, I did.

 3  **Q**    Who did you buy it from?

 4  **A**    From Walter Maibaum.

 5  **Q**    Who is Mr. Maibaum?

 6  **A**    Mr. Maibaum is another art dealer in New York.

 7  **Q**    Are you familiar with the term "earnest money"?

 8  **A**    Yes, I am.

 9  **Q**    What is earnest money?

10  **A**    Earnest money is what you determine together that will be

11  sent in advance for the purpose of being able to view the work

12  of art that you send to a storage facility.

13  **Q**    Is earnest money akin to a deposit?

14  **A**    Yes.

15  **Q**    Drawing your attention to the purchase for the Renoir

16  "*Gabriela la Rosa*" -- am I pronouncing that correctly, it is?

17  **A**    It's "*Gabriela de la Rose*," that's all right.

18  **Q**    The Renoir?

19  **A**    Yes.

20  **Q**    What were the terms of that transaction, the Renoir?

21  **A**    Well, after the discussion and sending him, you know,

22  photos and authentication, he was to -- the earnest money was

23  put into an escrow account.

24  **Q**    Let me ask you this:  Did Mr. Brugnara pay you earnest

25  money or a deposit for the Renoir?

1   **A**    Yes, he did.

2   **Q**    Was that before it was shipped?

3   **A**    Yes, it was.

4   **Q**    How much did Mr. Brugnara pay you as a deposit for the

5   Renoir before it was shipped?

6   **A**    $25,000.

7   **Q**    Approximately how much did you charge the Defendant for

8   the Renoir?

9   **A**    500,000.

10  **Q**    After Mr. Brugnara paid you the $25,000 deposit, what was

11  the next step in the transaction?

12  **A**    I -- I was prepared to ship to ShipArt.

13  **Q**    What is ShipArt?

14  **A**    ShipArt is the same as like Cirkers, it is also a storage

15  facility.  And, also they are -- it's in security until the

16  person that is supposed to be seeing had a particular piece has

17  a code to see it.

18  **Q**    Does ShipArt actually physically ship works of fine art?

19  **A**    Yes, they do.

20  **Q**    Did Luke Brugnara make full payment to you for the Renoir

21  after it was shipped to him?

22  **A**    Yes, he did.

23  **Q**    After you sold Mr. Brugnara the Renoir some ten or eleven

24  years ago, did you sell any other works of art to Luke Brugnara

25  after the Renoir?

1    **A**    Yes.

2    **Q**    What was the next piece of art you sold Mr. Brugnara?

3    **A**    The next -- the next was a Picasso drawing, six-color

4    drawing.

5    **Q**    Okay.  Approximately when did that sale occur?

6    **A**    Approximately a year after the Renoir.

7    **Q**    Did you own the Picasso drawing that you sold to Luke

8    Brugnara?

9    **A**    Yes, I did.

10   **Q**    Did Luke Brugnara make full payment for the Picasso?

11   **A**    Yes, he did.

12   **Q**    After you sold Luke Brugnara the Renoir and the Picasso,

13   did you have any further contact with him until February of

14   2014?

15   **A**    No.

16   **Q**    I'm now drawing your attention to the time period of

17   approximately late February, 2014.  Did you have any contact

18   with Luke Brugnara some time in early 2014?

19   **A**    Yes.

20   **Q**    What, if anything, prompted you to contact Mr. Brugnara in

21   early 2014?

22   **A**    Well, I was ready to sell a few pieces of my art.

23   **Q**    And how was it that Mr. Brugnara came to your radar

24   screen?

25   **A**    Well, Mr. Brugnara had been telling me since the time he

```
 1   bought the Renoir that he was building a museum.  And so, I

 2   thought it was a great idea, that it would be in his museum.

 3   Q    Did you actually contact Mr. Brugnara in early 2014?

 4   A    Yes, I did.

 5   Q    How did you contact him?

 6   A    By phone.

 7   Q    What did you and Mr. Brugnara discuss during this first

 8   conversation in early 2014?

 9   A    I offered him my Picasso -- no, excuse me.  A Degas.

10   Q    Did Mr. Brugnara express interest in this first telephone

11   conversation?

12   A    Yes, he did.

13   Q    After you telephoned Mr. Brugnara in early 2014, did you

14   follow up with him by email?

15   A    I'm sure I did.

16        MS. HARRIS:  Your Honor, may I approach the witness?

17        THE COURT:  Yes.

18   BY MS. HARRIS:

19   Q    I am going to hand you what has been marked as Government

20   Exhibit 54 for identification.

21        Do you recognize Government Exhibit 54?

22        (Witness examines document)

23   A    Yes, I do.

24   Q    What is Exhibit 54?

25   A    It is an email from me to sftycoon1.
```

1  Q    Was it your understanding that "sftycoon1" was the email

2  address for Luke Brugnara?

3  A    Yes, I did.

4  Q    Exhibit 54 is dated March 22, 2014, at 7:26 a.m.  Is that

5  the approximate date and time on which you sent Exhibit 54 to

6  Mr. Brugnara?

7  A    Yes, it is.

8         MS. HARRIS:  I offer Government Exhibit 54 into

9  evidence.

10        THE COURT:  Any objection?

11        MR. BRUGNARA:  No, Your Honor.

12        THE COURT:  Received in evidence.

13     (Trial Exhibit 54 received in evidence)

14        MS. HARRIS:  Your Honor, may we publish Exhibit 54?

15        THE COURT:  Yes, you may.

16     (Document displayed)

17  BY MS. HARRIS:

18  Q    Ms. Long, there are a series of attachments to Government

19  Exhibit 54.

20     Did those attachments accompany the email that we're

21  looking at right now, that you sent on March 22, 2014?

22  A    Yes, it is.

23  Q    And in your email, you say to Mr. Brugnara (As read):

24  "I don't know if you got my first letter, but it is a pleasure

25  getting back in touch."

```
1        And then you enclose the PDFs of the artwork.  Were the
2   PDFs that were enclosed in Government Exhibit 54 the artwork
3   you discussed selling to Mr. Brugnara in the telephone call you
4   had with him?
5   A    Yes, it is.
6            MS. HARRIS:  Your Honor, may I approach the witness?
7            THE COURT:  You may.
8   BY MS. HARRIS:
9   Q    Handing you what's been marked as Government Exhibit 55
10  for identification, can you please take a look at Exhibit 55?
11  A    Yes.
12  Q    Do you recognize Government Exhibit 55?
13  A    Yes, I do.
14  Q    What is Government Exhibit 55?
15  A    It's an email from Luke to me.
16  Q    Exhibit 55 is dated March 22, 2014, at 8:45 p.m.  Is that
17  the approximate date and time on which you received Exhibit 55?
18  A    Yes, it is.
19           MS. HARRIS:  Your Honor, offer Government Exhibit 55
20  into evidence.
21           THE COURT:  Any objection?
22           MR. BRUGNARA:  No, Your Honor.
23           THE COURT:  Received.  Thank you.
24      (Trial Exhibit 55 received in evidence)
25           MS. HARRIS:  May we publish it to the jury?
```

1           **THE COURT:**  You may.

2       (Document displayed)

3           **MS. HARRIS:**  Ms. Mallory, if you could highlight the

4   first sentence of Government Exhibit 55 for the jury.

5       (Document displayed)

6   **BY MS. HARRIS:**

7   **Q**    What did Mr. Brugnara say to you in the email that is

8   Government Exhibit 55, the first sentence of the email?

9       Can you read it for us?

10  **A**    Yes.  It's an email from Luke to me, and it says:

11  "Rose, how much for the art pieces?"

12  **Q**    Let me stop you right there.

13      When Mr. Brugnara said to you "How much for the art

14  pieces," was it your understanding that that referred to an

15  exchange of money?

16  **A**    Yes, I did.

17  **Q**    Let's look at the next sentence of Exhibit 55.

18  Mr. Brugnara asks you another question.  Can you read to us

19  what Mr. Brugnara asked you?

20  **A**    "Who else have you offered them to?  Luke."

21  **Q**    Getting to the "Luke," how did Mr. Brugnara sign the email

22  to you that is Exhibit 55?

23  **A**    "Luke."

24  **Q**    Did you send Mr. Brugnara an email in response to

25  Government Exhibit 55?

1   A    Yes, I did.

2        MS. HARRIS:  Your Honor, may I approach the witness?

3        THE COURT:  Yes.

4   BY MS. HARRIS:

5   Q    Showing you what has been marked Government Exhibit 56 for

6   identification, can you please take a look at Exhibit 56 and

7   tell us if you recognize it?

8   A    Yes, I recognize it.

9   Q    What is Government Exhibit 56?

10  A    It is an email from me to Luke.

11  Q    Exhibit 56 is dated March 23, 2014, at 7:20 a.m.  Is that

12  the approximate date and time which you sent Exhibit 56 by

13  email to Mr. Brugnara?

14  A    Yes, it is.

15       MS. HARRIS:  Your Honor, I offer Government Exhibit

16  56 into evidence.

17       THE COURT:  Any objection?

18       MR. BRUGNARA:  No, Your Honor.

19       THE COURT:  Received in evidence.  You may publish

20  it.

21       (Trial Exhibit 56 received in evidence)

22       MS. HARRIS:  Thank you.

23       (Document displayed)

24       MS. HARRIS:  Can you, Ms. Mallory, highlight the

25  email address for Luke Brugnara?

```
 1              THE WITNESS:  Could you ask me that again?
 2   BY MS. HARRIS:
 3   Q    Is the email address you used "sftycoon1"?
 4   A    Yes, it is.
 5   Q    Then in Exhibit 56, you say to Mr. Brugnara:
 6   "I have not offered them to anyone."
 7        Was that in response to Mr. Brugnara's prior email to you?
 8   A    Yes, it was.
 9   Q    And then you say:
10   "I only offer them to one client at a time."
11        Is that correct?
12   A    Yes, that's correct.
13   Q    Then you quote a series of prices.  And I would like to go
14   through the prices with you.
15   A    All right.
16   Q    First, drawing your attention to the first paragraph, and
17   if we can highlight the sentence that begins "The price as a
18   group..."?
19   A    Yes.
20   Q    Okay.  What price were you quoting Mr. Brugnara for all 16
21   de Koonings that you intended to offer him to buy?
22   A    The amount that was -- it's 7,360,000.
23   Q    And was that for the de Koonings?
24   A    Yes, it was.
25   Q    At the time, March 23, 2014, did you personally own the
```

 1   de Koonings that you were offering Mr. Brugnara?

 2   **A**    No, I did not.

 3   **Q**    Who had control over those paintings?

 4   **A**    Walter Maibaum.

 5   **Q**    Do you know if Mr. Maibaum personally owned them, or had

 6   them on consignment for another client?

 7   **A**    He had them on consignment.

 8   **Q**    Now, if we could move down in Exhibit 56 to the sentence

 9   that begins "The Picassos," and if we can highlight that, what

10   price did you quote Mr. Brugnara for purchase of the Picassos?

11   **A**    145,000.

12   **Q**    Okay.  You also offered Mr. Brugnara in Exhibit 56 a

13   portrait by the artist George Luks.  Is that correct?

14   **A**    Yes, that's right.

15   **Q**    What was that portrait of?

16   **A**    Gertrude Vanderbilt Whitney.

17   **Q**    Did you personally own the George Luks portrait of

18   Gertrude Vanderbilt Whitney as of March 23, 2014?

19   **A**    Yes, I did.

20   **Q**    What price did you quote Mr. Brugnara for the purchase of

21   the George Luks painting?

22   **A**    450,000.

23   **Q**    And in the next sentence, did you advise Mr. Brugnara that

24   you and your husband were no longer involved with each other?

25   **A**    Yes.

1  Q    And you identified your husband by his surname, is that

2  correct?

3  A    Yes.

4          MS. HARRIS:  Your Honor, may I approach the witness

5  again?

6          THE COURT:  Yes, you may.

7  BY MS. HARRIS:

8  Q    Showing you what's been marked as Government Exhibit 57

9  for identification.  Do you recognize Exhibit 57?

10 A    Yes, I do.

11 Q    What is Exhibit 57?

12 A    It's an email from sftycoon1 to me.

13 Q    And Exhibit 57 is dated March 23, 2014 at 4:04 p.m.  Is

14 that the approximate date and time on which you received

15 Exhibit 57?

16 A    Yes, it is.

17         MS. HARRIS:  I offer Government Exhibit 57 into

18 evidence.

19         THE COURT:  Any objection?

20         MR. BRUGNARA:  No, Your Honor.

21         THE COURT:  Received in evidence.

22     (Trial Exhibit 57 received in evidence)

23         THE COURT:  Please publish it.

24     (Document displayed)

25

1  **BY MS. HARRIS:**

2  **Q**    Mr. Brugnara in Government Exhibit 57 asks you a question.

3  He says:

4  "Rose, has Sotheby's seen the de Koonings"?

5       Do you see that question?

6  **A**    Yes, I do.

7  **Q**    And do you respond to Mr. Brugnara by email regarding that

8  question?

9  **A**    Yes.

10  **Q**    And then Mr. Brugnara asks you a question about the George

11  Luks.  He says:

12  "I see the Luks was put up for auction by Sotheby's.  It did

13  not sell?"

14       Do you see that?

15  **A**    Yes, I see that.

16  **Q**    Did you also respond by email later to Mr. Brugnara

17  concerning that inquiry?

18  **A**    Yes, I did.

19  **Q**    Then the last sentence, could you read for us what

20  Mr. Brugnara asked in the last sentence of Government

21  Exhibit 57?

22  **A**    Says:

23  "What other pieces do you have in your collection?"

24  **Q**    How did Mr. Brugnara sign the email that's Government

25  Exhibit 57?

1  A    "Luke."

2         MS. HARRIS:   Then Ms. Mallory, if you could highlight

3  the section right under, thank you.

4  BY MS. HARRIS:

5  Q    Does Exhibit 57 indicate how the email Mr. Brugnara sent

6  you, what the telephone was?  Drawing your attention to where

7  it says "Sent via..." can you read that?

8  A    Oh, yes.  That's his cell phone number, it's a --

9  Q    But can you describe what it says?  It says "Sent via..."

10 A    Yes, "LTE smartphone."

11 Q    Does it say "Samsung Galaxy"?

12 A    "Samsung Galaxy," yes.  Glasses.

13 Q    Did you respond by email to Mr. Brugnara's questions that

14 he asked you in Exhibit 57?

15 A    Yes, I did.

16        MS. HARRIS:   Your Honor, may I approach the witness?

17 BY MS. HARRIS:

18 Q    Showing you what's been marked as Government Exhibit 58

19 for identification.  Do you recognize Government Exhibit 58?

20 A    Yes, I do.

21 Q    What is Government Exhibit 58?

22 A    It's an email from me to Luke.

23 Q    Government Exhibit 58 is dated March 23, 2014, at 6:04

24 p.m.  Is that the approximate date and time that you sent

25 Exhibit 58 to the Defendant?

1   **A**    Yes, it is.

2           **MS. HARRIS:**  Your Honor, I offer Government

3   Exhibit 58 into evidence.

4           **THE COURT:**  Any objection?

5           **MR. BRUGNARA:**  No, Your Honor.

6           **THE COURT:**  Received.

7       (Trial Exhibit 58 received in evidence)

8           **THE COURT:**  Go ahead and publish it.

9       (Document displayed)

10  **BY MS. HARRIS:**

11  **Q**    Drawing your attention to THE first line of Government

12  Exhibit 58, you told Mr. Brugnara (As read):

13  "The Luks was never put up for auction, that was just an

14  estimate..."

15       Were you referring to the provenance that you had sent

16  Mr. Brugnara in Government Exhibit 54?

17  **A**    Yes.  Exactly.

18  **Q**    Then you also answered Mr. Brugnara about the de Kooning

19  paintings, and you said you didn't want Sotheby's or Christie's

20  to know about the de Koonings.  Is that correct?

21       It starts, the sentence says "Second."

22  **A**    No, I didn't say that.

23  **Q**    What did you say?

24  **A**    I said:

25  "I don't want to have Sotheby's or Christie's know about the

```
 1  de Koonings..."

 2  Q    Okay.  And then drawing your attention to the paragraph

 3  which is the second paragraph, it says (As read):

 4  "My Luks is one of the big eight American artists also known as

 5  the Ashcan School."

 6       What is the Ashcan School?

 7  A    Well, those are the most important American masters, while

 8  Impressionism was going on in Europe.

 9  Q    And is the George Luks one of the American masters?

10  A    Yes.

11  Q    And then in the last paragraph, I would like to draw your

12  attention to the -- the paragraph that begins "Thank you for

13  your concerns."

14       And you say (As read):

15  "If you wish, since I want the collection of de Koonings to

16  stay together, I'll be happy to give you a year after we

17  arrange any or full price...yourself or return your money."

18       What did you mean when you said "Any or full price to

19  check yourself, or return your money"?

20       Was Mr. Brugnara to pay you?

21  A    Yes.  Within five days of receiving them.

22  Q    Was it your anticipation that if Mr. Brugnara purchased

23  the de Koonings, he would pay you money for those de Koonings?

24  A    Yes.  Absolutely.

25  Q    Okay.  You also say:
```

1    "I have a partner whom will arrange the same thing as I

2    request."

3         Who were you referring to?

4    A    Walter Maibaum.

5    Q    Were you and Mr. Maibaum partners in any legal sense?

6    A    No.

7    Q    What did you mean when you said "partner" in Exhibit 58?

8    A    Well, since Walter started actually sending me many, many

9    more pieces that he wanted to go to the museum of Luke

10   Brugnara, and so it belonged to him, so he is actually giving

11   not only the pricing, but also the answers.

12   Q    But, what did you mean when you said "partner"?

13   A    Well, I meant that he owned the majority of the art.  And

14   I was concerned, you know, that --

15   Q    Did you receive a response by email from Mr. Brugnara?

16   A    Yes, I did.

17        MS. HARRIS:  Your Honor, may I approach the witness?

18        THE COURT:  Yes.

19   BY MS. HARRIS:

20   Q    Showing you what's been marked as Government Exhibit 59

21   for identification.

22   A    Yes.

23   Q    Do you recognize Government Exhibit 59?

24   A    Yes, I do.

25   Q    What is Exhibit 59?

1  **A**    It's an email from sftycoon1 to me.

2  **Q**    Exhibit 59 is Sunday, March 23, 2014 at 6:51 p.m.  Is that

3  the approximate date and time on which you received Exhibit 59?

4  **A**    Yes, it is.

5        **MS. HARRIS:**  Your Honor, I offer Government

6  Exhibit 59 into evidence.

7        **THE COURT:**  Any objection?

8        **MR. BRUGNARA:**  No, Your Honor.

9        **THE COURT:**  Received in evidence.

10     (Trial Exhibit 59 received in evidence)

11        **THE COURT:**  You may publish it.

12     (Document displayed)

13  **BY MS. HARRIS:**

14  **Q**    What state were you physically located in when you

15  received Government Exhibit 59?

16  **A**    New York.

17  **Q**    Drawing your attention to the re: line --

18        **MS. HARRIS:**  If we could blow it up, the line that

19  starts "de Kooning," Can you highlight that?

20  **BY MS. HARRIS:**

21  **Q**    The re: line says:

22  "De Kooning, Picasso, Degas & George Luks."

23     Were those the works of art that you were offering to

24  Mr. Brugnara to buy?

25  **A**    Yes, it is.

1  Q    Let's look at the first line of the email that is

2  Government Exhibit 59.  Mr. Brugnara writes to you:

3  "Rose, I will buy all of the paintings and put them in my

4  museum."

5       What did you understand the word "buy" to mean?

6  A    To purchase pieces.

7  Q    Okay.  And it says "...put them in my museum."  What was

8  your understanding of Mr. Brugnara's museum?

9  A    Well, I was glad his museum was finally finished and these

10  beautiful works of art, so valuable, would be, you know,

11  displayed for the whole world to see.

12  Q    Then Mr. Brugnara says:

13  "I will need a discounted price."

14       Did you understand "discounted price" to be referring to

15  money?

16  A    Yes, I did.

17  Q    Mr. Brugnara says (As read):

18  "You will need to send the paintings to me at 224 Sea Cliff

19  Avenue, San Francisco, California, so I can inspect them."

20       Was that the first time you had seen that address in any

21  of your correspondence?

22  A    Yes, it is.

23  Q    What, if anything, did you think that was the address of?

24  A    I thought it was his museum.

25  Q    Okay.  How did Mr. Brugnara sign Government Exhibit 59?

1    A    "Luke."

2    Q    And again, under the signature that says "Luke," does it

3    show what type of device Exhibit 59 was sent on?

4    A    Yes.  Says, "Samsung Galaxy, 4G LTE smartphone."

5         MS. HARRIS:  Your Honor, may I approach the witness?

6         THE COURT:  Yes.

7    BY MS. HARRIS:

8    Q    Showing you what's been marked as Government Exhibit 60

9    for identification.  Do you recognize Government Exhibit 60?

10   A    Yes, I do.

11   Q    What is Government Exhibit 60?

12   A    It's gmail from me replying to Luke.

13   Q    Exhibit 60 is dated March 24, 2014, at 7:55 a.m.  Is that

14   the approximate date and time on which you sent Exhibit 60 to

15   Mr. Brugnara?

16   A    Yes, it is.

17        MS. HARRIS:  I offer Government Exhibit 60 into

18   evidence.

19        THE COURT:  Any objection?

20        MR. BRUGNARA:  No, Your Honor.

21        THE COURT:  Received in evidence.

22        (Trial Exhibit 60 received in evidence)

23        MS. HARRIS:  May we publish it?

24        THE COURT:  Yes.

25        (Document displayed)

1  **BY MS. HARRIS:**

2  **Q**    Let's look at the first line:

3  "I know you will be happy with this collection.  I love the

4  de Koonings."

5       Had you seen the de Koonings when you wrote Exhibit 60?

6  **A**    Yes, I had.

7  **Q**    Okay.  And you say:

8  "I wish I could afford them."

9       Had they been offered to you for sale?

10  **A**    Yes.  Yes, they were offered to me.

11  **Q**    Did you buy them?

12  **A**    No.

13  **Q**    And then you say:

14  "But I feel great knowing they will be in your Museum."

15       As of March 24, 2014, was it your expectation that the

16  de Koonings Mr. Brugnara was buying would be placed in a

17  museum?

18  **A**    Yes.

19  **Q**    Why did you say that would make you feel great?

20  **A**    Well, because beautiful works of art that are unique and

21  original need to be in a museum.

22  **Q**    Then going further down in your email, you say:

23  "Do you only want the oils or did you mean any drawings or

24  etchings also?"

25       What were you referring to?

```
1    A    I was clarifying the way he worded the email before this.

2    Q    So if we could take a look again at Government Exhibit 59,

3    Mr. Brugnara said to you in Exhibit 59:

4    "You will need to send the paintings to me."

5         Is that correct?

6    A    Yes, he did.

7    Q    So, in Government Exhibit 60, was that your effort to

8    clarify what Mr. Brugnara meant by "paintings"?

9    A    Yes.

10   Q    And then you ask:

11   "What kind of discount did you wish, I will have to OK the

12   amount with my partner."

13        Who were you referred to?

14   A    I was referring to Walter Maibaum.

15   Q    Why were you referring to Mr. Maibaum?

16   A    Because the de Koonings and -- everything was Walter

17   Maibaum's works of art.

18   Q    Was the George Luks Walter --

19   A    Yes.  I owned the George Luks.

20   Q    And you say:

21   "As you can see, I already discounted the George Luks."

22        What were you referring to?

23   A    I was referring to the price being very close to my cost.

24   Q    How much did you actually pay for the George Luks when you

25   bought it?
```

1   **A**    350,000.

2   **Q**    And how much did you offer it to Mr. Brugnara for?

3   **A**    450,000.

4            **MS. HARRIS:**  Your Honor, may I approach the witness?

5            **THE COURT:**  Yes.  One or two more exhibits at most,

6   and then find a good resting point.

7            **MS. HARRIS:**  This will probably be --

8            **THE COURT:**  After this one?

9            **MS. HARRIS:**  Uh-huh.

10           **THE COURT:**  All right.

11       (Witness examines document)

12  **BY MS. HARRIS:**

13  **Q**    Showing you what's been marked as Government Exhibit 61

14  for identification, do you recognize Government Exhibit 61?

15  **A**    Yes, I do.

16  **Q**    What is Government Exhibit 61?

17  **A**    It's an email that Luke sent to me.

18  **Q**    Exhibit 61 is dated Monday, March 24, 2014 at 9:37 a.m.

19  Is that the approximate date and time on which you received

20  Exhibit 61?

21  **A**    Yes, it is.

22  **Q**    Okay.  And Exhibit 61, the email address, what is the

23  email address that Luke Brugnara used?

24  **A**    Sanfranciscotycoon1.

25  **Q**    "sftycoon1"?

1   **A**   Yes.

2           **MS. HARRIS:**  Your Honor, I offer Government

3   Exhibit 61 into evidence.

4           **THE COURT:**  Any objection?

5           **MR. BRUGNARA:**  No.

6           **THE COURT:**  Received.

7       (Trial Exhibit 61 received in evidence)

8           **THE COURT:**  Please publish.

9       (Document displayed)

10  **BY MS. HARRIS:**

11  **Q**   What state were you physically located in when you

12  received Government Exhibit 61?

13  **A**   In New York.

14  **Q**   Mr. Brugnara writes to you on March 24, 2014 (As read):

15  "Rose, I mean all the art pieces...including the etchings and

16  the bronzes..."

17      What did you interpret that to mean?

18  **A**   That he was defining all the pieces that he wished to

19  purchase.

20  **Q**   And it says:

21  "I need you to send everything to me."

22      Is that correct?

23  **A**   That's correct.

24  **Q**   What did you interpret "I need you to send everything to

25  me" to mean?

1  **A**    That he was wishing to purchase all of the pieces that I

2  had offered him.

3  **Q**    How did Mr. Brugnara sign the email?

4  **A**    "Luke."

5          **THE COURT:**  All right.  We are going take a 15-minute

6  break.

7      While I'm thinking about it, you've seen reference several

8  times to an address in Sea Cliff.  You cannot go driving by

9  there to see what it looks like.  That would be your own

10  investigation.  You cannot do that.

11      You have to -- whatever you are going to learn about that

12  address, you're going to have to learn about here right in

13  court.  And I suspect there is going to be some testimony about

14  it, but you can't go do your own investigation.  No driving by

15  there.  So, remember that.

16      And also, while I'm at it, remember, no going on the

17  internet, no emailing about the case, no talking with anyone

18  about the case.  Including among yourselves.  It will be your

19  duty to talk about the case later on during deliberations.

20      Okay.  We will take a 15-minute break.

21          **THE CLERK:**  All rise.

22  (Jury excused)

23  (The following proceedings were held outside of the

24   presence of the jury)

25          **THE COURT:**  All right, be seated.  Ms. -- Long is

 1  your name?  Which one do you want us to call you?

 2          THE WITNESS:  I prefer Littlejohn, please.

 3          THE COURT:  Ms. Littlejohn, you can have a 15-minute

 4  break too.

 5      Does the lawyers or Mr. Brugnara need me to rule on

 6  anything now?  I see nothing, so we'll take our break too.

 7          THE WITNESS:  Okay.

 8      (Recess taken from 9:31 to 9:48 a.m.)

 9          THE COURT:  Welcome back.  Please be seated.

10      Okay.  Looks like all the steno pads are open and ready to

11  go.

12      Ms. Harris, you may continue.

13  BY MS. HARRIS:

14  Q   Good morning again, Ms. Long.  When we broke, we were just

15  discussing Exhibit 61.  So let's bring that up again,

16  Exhibit 61.

17      (Brief pause.)

18          MS. HARRIS:  We're waiting for the computer to bring

19  up Exhibit 61.

20          THE COURT:  Is it up on the screen?

21          THE WITNESS:  I see it.

22          MS. HARRIS:  I don't see anything.

23          THE CLERK:  It blew me out for some reason.  I'm

24  logging back in.  Until I log in, I can't display anything.

25          THE COURT:  What are we doing?

```
 1              THE CLERK:  I had to reboot.  For some reason my

 2    computer was logged off.  It booted it off for some reason.

 3              THE COURT:  How long is this going to take?

 4              THE CLERK:  Two seconds here.

 5         (Brief pause.)

 6              THE CLERK:  I'm sorry.  You want to display

 7    exhibit...

 8              MS. HARRIS:  Exhibit 61.

 9              THE CLERK:  Okay.

10         (Document displayed)

11    BY MS. HARRIS:

12    Q    Before we took our break, we were discussing Exhibit 61.

13    So if you could take a look at Exhibit 61, this is the email

14    from Mr. Brugnara to you where he says:

15              "Rose, I mean all the part pieces, including the

16         etchings and bronzes.  I need you to send everything

17         to me."

18         Did you respond by email to Mr. Brugnara?

19    A    Yes, I did.

20              MS. HARRIS:  Your Honor, may I approach?

21              THE COURT:  Yes.

22    BY MS. HARRIS:

23    Q    Showing you what's been marked as Government's Exhibit 62

24    for identification.

25         (Whereupon document was tendered to the witness.)
```

1  Q    Do you recognize Government's Exhibit 62?

2  A    Yes, I do.

3  Q    What's Government's Exhibit 62?

4  A    It's an email from me to Luke.

5  Q    Exhibit 62 is dated Monday, March 24, 2014, at 11:16 am.

6       Is that the approximate date and time on which you sent

7  Exhibit 62 to the defendant?

8  A    Yes, it is.

9       **MS. HARRIS:**  Your Honor, I offer Government's

10 Exhibit 62 into evidence.

11      **THE COURT:**  Any objection?

12      **MR. BRUGNARA:**  No.

13      **THE COURT:**  Received in evidence.

14      (Trial Exhibit 62 received in evidence.)

15 **BY MS. HARRIS:**

16 Q    In the first line you say to Mr. Brugnara:

17      "Thank you for your confirmation that you will

18      purchase the 16 de Kooning oil paintings on paper."

19      What did you mean when you used the word "purchase"?

20 A    That he was offering to buy them.

21 Q    And when you say "buy," did you contemplate an exchange of

22 money from Mr. Brugnara to you?

23 A    Yes, I did.

24 Q    Okay.  And then the second line you say:

25      "I am really pleased they will be in your museum

1      so that the public will be able to enjoy these

2      wonderful works of art."

3      Why did you think the artwork would be placed in a museum

4  that you were selling Mr. Brugnara?

5  **A**   Because that's all he's referred to so far, is his museum.

6  **Q**   Okay.  And then the next line says:

7          **"**I spoke with my partner about the price for the

8      group.  He agreed to a 10 percent discount since the

9      paintings will go to a museum."

10     Who were you referring to when you used the word

11  "partner"?

12 **A**   Walter Maibaum.

13 **Q**   At any time during any of your correspondence with

14 Mr. Brugnara did he ever ask you who the person you were

15 referring to as your "partner" was?

16 **A**   No, he didn't.

17 **Q**   Did you ever refuse to tell Mr. Brugnara who you were

18 referring to when you used the word "partner"?

19 **A**   No, I did not.

20 **Q**   And in this second paragraph of Government's Exhibit 62,

21 you say:

22          **"**He agreed to a 10 percent discount."

23     Who are you referring to when you use the word "he"?

24 **A**   Walter Maibaum.

25 **Q**   And you said, "since the paintings will go to a museum."

1          Was a discount to Mr. Brugnara in the amount of money

2     Mr. Brugnara would have to pay being offered in reliance on the

3     fact that the paintings were going to a museum?

4     **A**    Most definitely.

5     **Q**    Okay.  Then you say in the next line:

6              "He asked for a down payment of 500,000 since

7          the paintings will be crated and shipped."

8          Who were you referring to when you said "he"?

9     **A**    Walter Maibaum.

10    **Q**    Okay.  And then you gave some bank and wire instructions

11    below.  And you say:

12             "The balance will be due when you receive the

13         paintings and have them inspected."

14         Were you contemplating that Mr. Brugnara would pay

15    $500,000 as a deposit on the paintings, the de Kooning

16    paintings, that you were selling to him?

17    **A**    Yes, I do.

18    **Q**    And you say:

19             "Mirò ink drawing I reduced to $160,000."

20         Was that the cost you intended to charge Mr. Brugnara for

21    the Mirò ink drawing?

22    **A**    Yes, it is.

23    **Q**    And you said you reduced it to 160,000.  Why did you

24    reduce the price?

25    **A**    Because he asked for a discount, so I was, you know,

1    trying to discount them as best I could.

2    **Q**    Okay.  And then you say:

3              "Assuming this is acceptable, as we did before,

4         I will prepare the invoice accordingly."

5         When you say "as we did before," what are you referring

6    to?

7    **A**    When he bought the Renoir and the Picasso and we had an

8    understanding for earnest money.

9    **Q**    Okay.  And then you say:

10             "Please let me know and again confirm."

11        And then you give him your bank instructions for the

12   deposit; is that correct?

13   **A**    That's correct.

14   **Q**    And then you say:

15             "I will write you separately on the Degas and

16        maybe the Zadkine.  I have owned them alone for many

17        years."

18        When you say you had owned them alone, what did you mean?

19   **A**    Well, Degas was mine, and the Zadkine I had owned.

20   **Q**    As of March 24, 2014, did you personally own your own

21   Degas Little Dancer statue?

22   **A**    Yes, I did.

23   **Q**    As far as you, know did Mr. Maibaum also own the same

24   Degas Little Dancer statute?

25   **A**    Yes, he did.

1          **MS. HARRIS:**  Your Honor, may I approach the witness?

2    **BY MS. HARRIS:**

3    **Q**    Showing you what's been marked as Government's Exhibit 63

4    for identification.

5          (Whereupon document was tendered to the witness.)

6    **Q**    Do you recognize Exhibit 63?

7    **A**    Yes, I do.

8    **Q**    What is Government's Exhibit 63?

9    **A**    It is an email from Luke to me.

10   **Q**    Exhibit 63 is dated Monday, March 24, 2014, at 11:21 a.m.

11         Is that the approximate date and time on which you

12   received Government's Exhibit 63?

13   **A**    Yes, it is.

14         **MS. HARRIS:**  Your Honor, I offer Government's

15   Exhibit 63 into evidence.

16         **THE COURT:**  Any objection?

17         **MR. BRUGNARA:**  No, your Honor.

18         **THE COURT:**  Thank you.  Received.

19      (Trial Exhibit 63 received in evidence.)

20         **THE COURT:**  Please publish.

21      (Document displayed)

22         **MS. HARRIS:**  If we could highlight everything that

23   comes after the word "Rose."

24      (Document highlighted.)

25

1    BY MS. HARRIS:

2    Q    Mr. Brugnara says to you:

3              "I am not going to pay any shipping costs or

4         deposit.  You will need to incur those costs as I

5         have never paid for such costs."

6         Was that true?

7    A    No, that's not true.

8    Q    Did Mr. Brugnara previously pay a deposit for works of art

9    that you sold him?

10   A    Yes, he did.

11   Q    Okay.  Then Mr. Brugnara says:

12             "I have been a trusted client for over a

13        decade."

14        How does Mr. Brugnara sign the email that's Government's

15   Exhibit 63?

16   A    "Luke."

17            MS. HARRIS:  Your Honor, may I approach the witness?

18            THE COURT:  Yes.

19        (Whereupon document was tendered to the witness.)

20   BY MS. HARRIS:

21   Q    Showing you what's been marked as Government's Exhibit 64

22   for identification.

23        (Whereupon document was tendered to the witness.)

24   Q    Do you recognize Government's Exhibit 64?

25   A    Yes, I do.

1  Q    What is Government's Exhibit 64?

2  A    It's an email from me, again, to Luke.

3  Q    And what email address did you use for Mr. Brugnara?

4  A    Sftycoon1.

5  Q    Exhibit 64 is dated Monday March 24, 2014, at 12:40 p.m.

6  is that the approximate date and time on which you sent

7  Exhibit 64 to Mr. Brugnara?

8  A    Yes, it is.

9          MS. HARRIS:  I offer Government's Exhibit 64 into

10  evidence.

11          THE COURT:  Any objection?

12          MR. BRUGNARA:  No.

13          THE COURT:  Thank you.  Received in evidence.

14      (Trial Exhibit 64 received in evidence.)

15  BY MS. HARRIS:

16  Q    Okay.  Let's highlight the first sentence in Government's

17  Exhibit 64.

18      (Document displayed and highlighted.)

19  Q    In the first sentence you tell Mr. Brugnara -- are you

20  responding, by the way, to Mr. Brugnara's email where he says

21  he's not going to pay any deposit or shipping costs?

22  A    Yes, I am.

23  Q    And you say:

24          "I understand your reasoning, but the investment

25      my partner has involved causes a fear of sending the

```
 1        de Koonings without any earnest payment."
 2        Who are you referring to as your partner?
 3   A    Walter Maibaum.
 4   Q    At the time that you sent Government's Exhibit 54, who
 5   actually had control over the de Koonings?
 6   A    Walter Maibaum.
 7   Q    Did Mr. Brugnara ever ask you who the partner was?
 8   A    Never.  No.
 9   Q    And you refer to earnest money.  Again, is that a
10   reference to the deposit that you had expected?
11   A    Yes, it is.
12   Q    Then you say:
13            "So I thought to appease him, since I'm not in a
14        position to pay him because I have so much invested
15        in my art collection."
16        Who is the "him" you're referring to?
17   A    Walter Maibaum.
18   Q    Okay.  You said:
19            "I trust you to send my Degas, 14 Year Old
20        Little Dancer bronze and for you only, don't please
21        tell anyone, $4 million to you."
22        And are -- are you quoting a price for your Degas statute?
23   A    Yes, I am.
24   Q    As of March 24, 2014 did you intend to sell your own Degas
25   to Mr. Brugnara?
```

1   **A**    Yes, I certainly did.

2   **Q**    At some point during the negotiations with Mr. Brugnara

3   did that change, where you -- it was not your Degas that got

4   sold but somebody else's?

5   **A**    Yes.

6   **Q**    Okay.  Okay.  And then you say in the second-to-the-last

7   line:

8           "I trust you that I could pay the earnest money

9       to my partner."

10      What were you conveying in that sentence?

11  **A**    I was going to send my Degas, and if he -- as he received

12  it, pay for the Degas and then I could, in turn, give the

13  earnest money to Walter Maibaum.

14  **Q**    So let me see if I understand this.  Your proposal would

15  be that you would sell the Degas to Mr. Brugnara --

16  **A**    Yes.

17  **Q**    -- correct?

18      Upon payment for the Degas by Mr. Brugnara to you, you

19  would then give a portion of the money to Mr. Maibaum as

20  earnest money for the de Koonings?

21  **A**    Yes.

22  **Q**    Okay.

23          **MS. HARRIS:**  Your Honor, may I approach the witness?

24          **THE COURT:**  Yes.

25

1  BY MS. HARRIS:

2  Q    Showing you what's been marked as Government's Exhibit 65

3  for identification.

4        (Whereupon document was tendered to the witness.)

5  Q    Do you recognize Government's Exhibit 65?

6  A    Yes, I do.

7  Q    What is Government's Exhibit 65?

8  A    It's a Gmail from sftycoon1 to me.

9  Q    And did you receive Exhibit 65 on Monday, March 24, 2014

10 at approximately 1:53 p.m.?

11 A    Yes, I did.

12 Q    Okay.

13        MS. HARRIS:  Your Honor, I offer Government's

14 Exhibit 65 into evidence.

15        THE COURT:  Any objection?

16        MR. BRUGNARA:  No.

17        THE COURT:  Thank you.  Received.  You may publish

18 it.

19     (Trial Exhibit 65 received in evidence)

20     (Document displayed)

21 BY MS. HARRIS:

22 Q    Exhibit 65, the email from Mr. Brugnara to you, he says:

23        "Rose, perhaps you can send at least a few of

24     the de Koonings.  Regarding the Degas, please email

25     to me now the pictures and provenance."

```
 1        Do you see that?
 2   A    Yes, I do.
 3   Q    Okay.  How did Mr. Brugnara sign the email?
 4   A    "Luke."
 5   Q    Did you respond by email to Mr. Brugnara?
 6   A    Yes, I did.
 7   Q    By the way all the emails that we discussed, what state
 8   were you physically located in when you sent and received these
 9   emails?
10   A    In New York.
11        MS. HARRIS:  Your Honor, may I approach?
12        THE COURT:  Yes.
13   BY MS. HARRIS:
14   Q    Showing you what's been marked as Government's Exhibit 66
15   for identification.
16        (Whereupon document was tendered to the witness.)
17   Q    Do you recognize Government's Exhibit 66?
18   A    Yes, I do.
19   Q    What is Government's Exhibit 66?
20   A    It's an email from me to Luke.
21   Q    Exhibit 66 is dated Monday, March 24, 2014 at 3:16 --
22   3:17 p.m.  Is that the approximate date and time that you sent
23   Government's Exhibit 66?
24   A    Yes, it is.
25        MS. HARRIS:  Your Honor, I offer Government's
```

1   Exhibit 66 into evidence.

2           **THE COURT:**  Any objection?

3           **MR. BRUGNARA:**  No, your Honor.

4           **THE COURT:**  Thank you.  Received.

5       (Trial Exhibit 66 received in evidence.)

6           **THE COURT:**  You may publish it.

7       (Document displayed)

8           **MS. HARRIS:**  If we can get to the first line, which

9   is, "I will be glad to answer all your interests."

10      And then can you highlight the part of the sentence that

11  starts with, "How to arrange."

12      (Document highlighted)

13  **Q**   Okay.  And then you say:

14          **"Have to arrange traveling insurance for such**

15          **large important works of art."**

16      What did you mean when you referred to "such large

17  important works of art"?

18  **A**   Well, to send my Degas would be quite expensive to freight

19  and crate and, also, to, you know, have it delivered in to

20  San Francisco.

21  **Q**   What does "such large important works of art" mean?

22  **A**   Well, he was asking for a few of the de Koonings, which

23  was not going to be possible, but I -- I could send my Degas.

24  **Q**   And did you consider that to be a large important work of

25  art?

1    A    Most certainly.

2              MS. HARRIS:  Your Honor, may I approach?

3              THE COURT:  Yes.

4    BY MS. HARRIS:

5    Q    Showing you what's been marked as Government's Exhibit 67

6    for identification.

7         (Whereupon document was tendered to the witness.)

8    Q    Do you recognize Government's Exhibit 67?

9    A    Yes, I do.

10   Q    What's Government's Exhibit 67?

11   A    It's an email from me to sftycoon1.

12   Q    Did you send the email that's Government's Exhibit 67 on

13   Tuesday, March 25th, 2014 at approximately 7:42 am?

14   A    Yes, I did.

15   Q    And did you have two attachments to Government's

16   Exhibit 67 at the time that you sent Exhibit 67?

17   A    Yes, I did.

18             MS. HARRIS:  Your Honor, I offer Government's

19   Exhibit 67 into evidence.

20             THE COURT:  Any objection?

21             MR. BRUGNARA:  No.

22             THE COURT:  Received in evidence.

23        (Trial Exhibit 67 received in evidence.)

24             THE COURT:  You may publish.

25        (Document displayed)

1  BY MS. HARRIS:

2  Q    In Exhibit 67 you tell Mr. Brugnara:

3         "Please find enclosed my Little 14 Year Old

4    Dancer.  Most refer to her as the Little Dancer."

5    Is that a sculpture by Degas?

6  A    Yes, it is.

7  Q    And you say.

8         "Also a small authentication is closed.  The

9    original is approximately 28 pages long and is locked

10   in my bank in Memphis."

11   Can you now turn to the next page of Government's

12 Exhibit 67, which appears to be a photograph?

13   (Photograph displayed.)

14 Q    What is this a photograph of?

15 A    This is a photograph of the 14 Year Old Little Dancer.

16 Q    And for the record, we're referring to Page 2 of

17 Exhibit 67.

18   And it says -- underneath the photograph it says:  "Bronze

19 sculpture cast by Valsuani Foundry;" is that correct?

20 A    That's right.

21 Q    And is this the exhibit -- the attachment that was sent to

22 Mr. Brugnara on Tuesday, March 25th, 2014?

23 A    Yes, it is.

24 Q    And was your Little Dancer a sculpture cast by the

25 Valsuani Foundry?

```
 1   A    Yes, it was.

 2   Q    Was Mr. Maibaum's Little Dancer also a sculpture cast by

 3   the Valsuani Foundry?

 4   A    Yes, it was.

 5   Q    Now, if you could turn to Page 4 of Government's

 6   Exhibit 67, and there we have a written page.

 7        (Document displayed.)

 8   Q    Was Page 4 of Government's Exhibit 67 also sent to

 9   Mr. Brugnara on March 25th, 2014?

10   A    Yes, it was.

11   Q    And I would like to draw your attention to the

12   second-to-the-last paragraph.  And specifically if we could

13   highlight the sentence that begins:

14           "Thus, the Valsuani bronzes reflect Degas' wax

15        as it appears circa 1903."

16        And then you have a comparison, and it says:

17           "Whereas, the Hebrard bronzes reflect Degas' wax

18        as it appeared upon the artist's death after the

19        modifications had been made."

20        Do you see that?

21   A    Yes, I do.

22   Q    Was this statement on Edgar Degas' works attached to

23   Government's Exhibit 67, was that sent to Mr. Brugnara on

24   March 25th --

25   A    Yes, it was.
```

1  Q    Okay.  And the next paragraph, the last paragraph also

2  says, in the first sentence -- we're about halfway through the

3  first sentence:

4         "And those cast by Valsuani from the lifetime

5         plaster with the authority of the Succession Degas."

6  And you say:

7         "Certificates of authenticity for the bronzes

8         have been issued by the Succession Degas.  The Comitè

9         Degas has certified the bronzes as well."

10 Was this information transmitted to Mr. Brugnara on

11 Tuesday, March 25th, 2014?

12 A    Yes, it was.

13        MR. BRUGNARA:  Your Honor, I don't have the document

14 that she's referring to.  Can I see it, please?

15        MS. HARRIS:  All of the exhibits had been provided to

16 Mr. Brugnara, including the attachments, your Honor.  He has

17 paper copies of everything at counsel table.

18        THE COURT:  Mr. Stevens, don't you have that exhibit?

19        MR. BRUGNARA:  I have the three pages here.  I think

20 she's on the fifth or sixth page, and there are only three

21 here.

22        THE COURT:  Well, Mr. Stevens, do you not have the --

23        MR. STEVENS:  Your Honor, we have all the exhibits.

24 I believe maybe we didn't hear what exhibit --

25        MS. HARRIS:  Government's Exhibit 67.

 1          THE COURT:  We are on 67.

 2          MR. BRUGNARA:  Yeah.  I thought it was a comitè Degas

 3   certificate.  It was just a narrative regarding that.

 4          THE COURT:  Well, can you -- do you now have what we

 5   are referring to?  Do you have the right document now?

 6      I think we're set now.  Go ahead.

 7          MS. HARRIS:  May I approach the witness, your Honor?

 8          THE COURT:  Yes.

 9   BY MS. HARRIS:

10   Q    Handing you what's been marked as Government's Exhibit 68

11   for identification.

12      (Whereupon document was tendered to the witness.)

13   Q    Do you recognize Government's Exhibit 68?

14   A    Yes, I do.

15   Q    What is Government's Exhibit 68?

16   A    It's an email from me to Luke.

17   Q    Okay.  Exhibit 68 is dated March 25th, 2014 at 11:57 a.m.

18   Is that the approximate date and time that you sent Exhibit 68

19   to Mr. Brugnara?

20   A    Yes, it is.

21          MS. HARRIS:  Your Honor, I offer Government's

22   Exhibit 68 into evidence.

23          THE COURT:  Any objection?

24          MR. BRUGNARA:  No, your Honor.

25          THE COURT:  Thank you.  Received.

1          (Trial Exhibit 68 received in evidence.)

2    **BY MS. HARRIS:**

3    **Q**    If we could take a look at the first sentence of

4    Government's Exhibit 68, the email you sent to Mr. Brugnara you

5    say:

6              "I took out another floater insurance policy and

7         will send you the de Koonings."

8         Had you actually taken out a floater insurance policy?

9    **A**    I was in the process and when I found out how much it was

10   going to cost, then Walter and I changed the situation.

11   **Q**    Did Mr. Maibaum take out insurance?

12   **A**    Yes.

13   **Q**    And then you say:

14             "After I had time to have the Degas Little

15        Dancer crated, I will send it next."

16        And you explained how the de Koonings are framed and

17   matted.

18        And then you have a sentence that says:

19             "I hope you are sincere because everything

20        involved is extremely expensive to me right now."

21        What did you mean by that?

22   **A**    Well, in order to crate and remove from your storage and

23   then bring it to the crating room, everything has to be

24   measured because the crates are actually made to fit the works

25   of art.

1        And then from that point when they are all completely

2    crated, then they have to be freighted to the airport.

3    Q    Was that something that was going to be an expense borne

4    by you?

5    A    Very much, yes.

6    Q    You also say:

7             "I am including a part of the Degas letter of

8         authentication that didn't entirely email."

9        Are those the two attachments that we see on Government's

10   Exhibit 68?

11   A    Yes, it is.

12   Q    If I could draw your attention to Page 1 of Government's

13   Exhibit -- Page 2, actually, of Government's Exhibit 68.  The

14   first attempt.

15       (Photograph displayed.)

16   Q    What is Page 2?

17   A    The first one is the photo of the 14 Year Old Little

18   Dancer.

19   Q    And does the -- underneath the photograph does it say:

20   "Bronze sculpture cast by Valsuani Foundry"?

21   A    Yes, it does.

22   Q    And was Page 2 sent to Mr. Brugnara along with your email

23   that is Exhibit 68?

24   A    Yes, it was.

25   Q    Okay.  Now, if we could look at Page 4 of the email -- not

 1  Page 3, but Page 4 -- which has a little history of Edgar

 2  Degas.

 3       (Document displayed)

 4  Q    Was Page 4 also sent to Mr. Brugnara?

 5  A    Yes, it was.

 6  Q    And then the last paragraph of Page 4 of Exhibit 68, if we

 7  could just blow that up?

 8       (Document enlarged)

 9        It says:

10            "Therefore, there are two bronze versions of the

11        same sculpture.  The Hebrard edition cast from the

12        posthumous plaster and those cast by Valsuani from

13        the lifetime plaster with the authority Succession

14        Degas."

15       Was that information transmitted to Mr. Brugnara exactly

16  as we see it in court today?

17  A    Yes, exactly.

18            MS. HARRIS:  Your Honor, may I approach the witness?

19            THE COURT:  Yes.

20  BY MS. HARRIS:

21  Q    Showing you what's been marked as Government's Exhibit 69

22  for identification.

23       (Whereupon document was tendered to the witness.)

24  Q    Do you recognize Government's Exhibit 69?

25  A    Yes, I do.

1  Q    What is Government's Exhibit 69?

2  A    It's an email that Luke sent to me.

3  Q    Exhibit 69 is dated Tuesday, March 25th, 2014 at 1:16 p.m.

4  Is that the approximate date and time that you received

5  Exhibit 69?

6  A    Yes, it is.

7          MS. HARRIS:  Your Honor, I offer Government's

8  Exhibit 69 into evidence.

9          THE COURT:  Any objection?

10          MR. BRUGNARA:  No, your Honor.

11          THE COURT:  Thank you.  Received.  You may publish.

12      (Document displayed)

13  BY MS. HARRIS:

14  Q    In Government's Exhibit 69, if we could highlight the

15  entire text.

16      (Document displayed)

17  Q    Mr. Brugnara says:

18          "Thank you.  I look forward to putting them in

19      my museum."

20      Is that correct?

21  A    That's correct.

22  Q    What did you understand "I look forward to putting them in

23  my museum" to mean?

24  A    Exactly what it says, that they would be, you know,

25  displayed in his museum.

1  Q    And when you say "they would be displayed" --

2  A    All the art that he would be receiving, or he was

3  purchasing would go into his museum.

4  Q    Was that important to you?

5  A    It was extremely important.

6  Q    Why?

7  A    Because these types of work only belong in a museum.

8  Q    Where were you physically located, what state, when you

9  received Exhibit 69?

10  A    I was in New York.

11        MS. HARRIS:  Your Honor, may I approach the witness?

12        THE COURT:  Yes.

13  BY MS. HARRIS:

14  Q    Showing you what's been marked as Government's Exhibit 70

15  for identification.

16      (Whereupon document was tendered to the witness.)

17  Q    Do you recognize Government's Exhibit 70?

18  A    Yes, I do.

19  Q    What is Government's Exhibit 70?

20  A    It's an email Luke sent to me.

21  Q    And Exhibit 70 is dated Wednesday, March 26, 2014 at

22  10:41 p.m.  Is that the approximate date and time that you

23  received Government's Exhibit 70?

24  A    Yes, it is.

25        MS. HARRIS:  Your Honor, I offer Government's

1   Exhibit 70 into evidence.

2              THE COURT:  Any objection?

3              MR. BRUGNARA:  No, your Honor.

4              THE COURT:  Thank you.  Received.

5         (Trial Exhibit 69 received in evidence.)

6              THE COURT:  You may publish it.

7         (Document displayed)

8   BY MS. HARRIS:

9   Q    Mr. Brugnara says to you:

10             "Dear Rose:  Please let me know the estimated

11        date of arrival of the paintings and bronze."

12        What did you understand the "paintings and bronze" to

13   refer to?

14  A    The de Koonings and the Picassos and the --

15  Q    What was the bronze?

16  A    Well, of course, the Degas bronze especially.

17  Q    And then how did Mr. Brugnara sign the email that is

18  Government's Exhibit 70?

19  A    He says, "Very truly, Luke."

20             MS. HARRIS:  Okay.  Your Honor, may I approach the

21  witness?

22             THE COURT:  Yes.

23  BY MS. HARRIS:

24  Q    I'm handing you what's been marked as Government's

25  Exhibit 71 for identification.

1        (Whereupon document was tendered to the witness.)

2   **Q**    Do you recognize Government's Exhibit 71?

3   **A**    Yes, I do.

4   **Q**    What is Exhibit 71?

5   **A**    It's an email from me to Luke.

6   **Q**    Exhibit 71 is dated Thursday, March 27, 2014 at 8:57 am.

7   Is that the approximate date and time you sent Exhibit 71 to

8   Mr. Brugnara?

9   **A**    Yes, it is.

10          **MS. HARRIS:**  Your Honor, I offer Government's

11  Exhibit 71 into evidence.

12          **THE COURT:**  Any objection?

13          **MR. BRUGNARA:**  No.

14          **THE COURT:**  Received.

15      (Trial Exhibit 71 received in evidence.)

16          **THE COURT:**  You may publish.

17      (Document displayed)

18  **BY MS. HARRIS:**

19  **Q**    The first line you say:

20          "My packers at Cirkers are busy crating and

21      collecting all the pieces of art I mentioned to you."

22      And then you say -- you go on to say:

23          "Then I have a dedicated art truck just handling

24      your pieces."

25      Then I would like to highlight the sentence that comes

```
 1   after the semicolon.

 2          "Anything" --

 3      You say:

 4          "Anything of this value must not only have

 5      strictly art handlers, but also the best art

 6      protectors in transportation."

 7      What did you mean when you said "anything of this value"?

 8   A   Well, the extreme amount of value and extremely important

 9   works of art.

10   Q   Okay.  And then you say:

11          "You will probably receive them by April 7."

12      Was it your anticipation that you -- the art would be sent

13   somewhere?

14   A   Yes.

15   Q   In San Francisco?

16   A   Yes.

17   Q   What -- where did you think physically the art was going

18   to be sent to?

19   A   To his museum.

20   Q   Okay.  And then you say:

21          "I thought I might fly down and help you or even

22      show you how the best arrangement for the de Koonings

23      and show you the movement and flow of correct

24      balance."

25      What were you offering to do?
```

1   **A**    I was actually wanting to make sure that they were

2   prepared in the proper direction and, as I say, the flow and

3   the movement, because pieces -- when you have 16 in one

4   collection, you make sure that each one is hung by the --

5   correctly by the next one.

6   **Q**    Were you offering to arrange them at the defendant's

7   museum?

8   **A**    Yes.

9   **Q**    And then the last line of your email you ask:

10          "Which hotel is closest to your museum site?"

11          Why did you ask that?

12  **A**    So that I would be near when it was time to meet the

13  freight that was arriving at his museum.

14  **Q**    Did you say "freight"?

15  **A**    Yes.

16  **Q**    Okay.  So it was -- was it your expectation that you would

17  be staying in a hotel near the museum for delivery of the art?

18  **A**    Yes.

19  **Q**    Did Mr. Brugnara ever respond to your inquiry concerning

20  which hotel is closest to his museum?

21  **A**    No, he did not.

22          **MS. HARRIS:**  Your Honor, may I approach the witness?

23          **THE COURT:**  Yes.

24  **BY MS. HARRIS:**

25  **Q**    Showing you what's been marked as Government's Exhibit 72

 1  for identification.

 2       (Whereupon document was tendered to the witness.)

 3  Q    Do you recognize Government's Exhibit 72?

 4  A    Yes, I do.

 5  Q    What is Government's Exhibit 72?

 6  A    It's an email from me to San Francisco -- sftycoon1.

 7  Q    And Exhibit 72 is dated March 28, 2014 at 7:11 a.m.  Is

 8  that the approximate date and time you sent Exhibit 72 to

 9  Mr. Brugnara?

10  A    Yes, it is.

11            MS. HARRIS:  Your Honor, I offer Government's

12  Exhibit 72 into evidence.

13            THE COURT:  Any objection?

14            MR. BRUGNARA:  No, your Honor.

15            THE COURT:  Thank you.  Received.

16       (Trial Exhibit 72 received in evidence.)

17            THE COURT:  You may publish.

18       (Document displayed)

19  BY MS. HARRIS:

20  Q    Okay.  And the first sentence of Government's Exhibit 72

21  you tell Mr. Brugnara:

22            "The crating will be finished and on the

23       dedicated art handler truck on the 2nd."

24       Were you referring to April 2?

25  A    Yes, I was.

1  Q   And you said:

2          "In order for a safe journey to you by the 7th."

3      Was it your expectation that the art would be delivered to

4  the museum by April 7th?

5  A   Yes.

6  Q   And then you ask Mr. Brugnara a question in the next

7  paragraph.

8      If we could highlight that?

9      (Document highlighted.)

10         "Please give me the exact museum address and its

11      hours of operation, especially any specifics on time

12      limits and the driver's entrance."

13      Why were you asking for the exact museum address and its

14  hours of operation?

15  A   For many reasons.  First of all, I needed to tell the

16  truckers they would be picking them up via ShipArt at the

17  airport.

18      And I have had many things delivered to museums, and there

19  is a process, and the -- the men that are supposed to be

20  watching the freight come in are supposed to be employees of

21  the museum.

22  Q   Have you had other experience with works of art being

23  delivered to a museum?

24  A   Yes, I have.

25  Q   Were these questions consistent with your experience as to

1   how art should be delivered to a museum?

2   **A**    Yes, exactly.

3   **Q**    You referred to something called ShipArt in a previous

4   answer.  What is ShipArt?

5   **A**    ShipArt is the connection that Cirkers made to send the

6   truckers to what I thought was the museum.

7   **Q**    Was ShipArt involved in this particular transaction?

8   **A**    No -- yes, they were.  That's who sent out the truck.  It

9   was called -- well, you'll tell me later.

10  **Q**    Was ShipArt in any way being used as an escrow agent for

11  the art in this transaction?

12  **A**    Yes.

13  **Q**    Are you sure?

14  **A**    Well, they were --

15  **Q**    They were --

16  **A**    They were contacted to.

17  **Q**    Transport --

18  **A**    Yes.

19  **Q**    Okay.  But they were not going to have any --

20          **MR. BRUGNARA:**  Objection, your Honor.  She's --

21  **BY MS. HARRIS:**

22  **Q**   But they --

23          **MR. BRUGNARA:**  Your Honor, she's interrupting the

24  answer she doesn't want to hear, and then --

25          **MS. HARRIS:**  Your Honor, this is a speaking

 1   objection.

 2           **MR. BRUGNARA:**  -- asking the answer she wants to

 3   hear.

 4       She asked her:  Was ShipArt an escrow holder in this

 5   transaction?

 6       She said:  No.

 7       No, no. She wasn't.  She's telling her -- correcting her

 8   answer.

 9           **THE COURT:**  All right.

10           **MR. BRUGNARA:**  That's just --

11           **THE COURT:**  Well, let me -- tell us what the role was

12   of ShipArt in this transaction.  Start all over again and tell

13   us.

14           **THE WITNESS:**  All right.

15   **A**    When one company that is also a shipper is contacting

16   the -- where it is being delivered, they contact that

17   shipper --

18           **THE COURT:**  Tell the jury, not me.

19   **A**    -- they tell the shipper which -- you know, which freight

20   they are going to use and then that's the freight that is sent

21   out to the airport, the freight truck.

22           **THE COURT:**  So ShipArt in this case, what --

23           **THE WITNESS:**  They contacted --

24           **THE COURT:**  -- what were they supposed to do in this

25   case?

```
 1              THE WITNESS:  They just are the ones that chose the

 2   freight company to pick up the art.

 3              THE COURT:  All right.  Next question.

 4              MS. HARRIS:  Your Honor, may I approach the witness?

 5              THE COURT:  Yes, you may.

 6   BY MS. HARRIS:

 7   Q    Showing you what's been marked as Government's Exhibit 73

 8   for identification.

 9        (Whereupon document was tendered to the witness.)

10   Q    Do you recognize Government's Exhibit 73?

11   A    Yes, I do.

12   Q    What is Government's Exhibit 73?

13   A    It's an email from Luke to me.

14   Q    Exhibit 73 is dated March 28, 2014 at 8:40 a.m.  Is that

15   the approximate date and time on which you received Exhibit 73?

16   A    Yes, it is.

17              MS. HARRIS:  Your Honor, I offer Government's

18   Exhibit 73 into evidence.

19              THE COURT:  Any objection?

20              MR. BRUGNARA:  No, your Honor.

21              THE COURT:  Received in evidence.

22        (Trial Exhibit 73 received in evidence.)

23   BY MS. HARRIS:

24   Q    Exhibit 73, Mr. Brugnara says to you:

25              "Dear Rose:  As I stated to you previously, send
```

```
 1        the pieces to Brugnara Properties."
 2        Had you ever heard of Brugnara Properties before Friday,
 3   March 28, 2014?
 4   A    No, I had not.
 5   Q    In any of the correspondence you had with Mr. Brugnara
 6   concerning his purchase of the pieces of art, had he ever
 7   referred to Brugnara Properties as the buyer?
 8   A    No, he has not.
 9   Q    And there is an address, 224 Sea Cliff Avenue,
10   San Francisco, California.  Did you understand that -- had you
11   seen that address before?
12   A    No.  That's the first time.
13   Q    Had Mr. Brugnara ever referred to the Sea Cliff address to
14   you?
15   A    No, he had not.
16   Q    If you could take a look at one of the exhibits that's
17   already in evidence, if you could take a look at Government's
18   Exhibit 59.
19        (Brief pause.)
20   Q    I would ask you if reviewing Exhibit 59 refreshes your
21   memory?  Can you find Government's Exhibit 59?
22   A    It has to be down in here.  This is the one I'm using.
23        THE COURT:  Would you help her find Government's
24   Exhibit 59, please?
25        (Brief pause.)
```

```
 1            MS. HARRIS:  Actually, why don't we just publish
 2   Exhibit 59?
 3            THE COURT:  All right.  We'll use the screen.
 4       Can you see the screen?
 5       (Document displayed)
 6            THE WITNESS:  Yes, I can.
 7            THE COURT:  All right.  That looks like -- I can't
 8   tell the exhibit number from this, but is that 59?
 9            MS. HARRIS:  It's Exhibit 59, your Honor.
10       Can you blow up the address in Exhibit 59?
11       (Document enlarged.)
12   BY MS. HARRIS:
13   Q    Does reviewing Exhibit 59 refresh your memory about --
14   A    Yes, it does.
15   Q    Okay.  Have you heard of 224 Sea Cliff Avenue before?
16   A    Yes.
17   Q    Okay.  What was it your understanding 224 Sea Cliff Avenue
18   was the address for?
19   A    His museum.
20   Q    Okay.  Mr. Brugnara, in Government's Exhibit 73 now --
21   we're talking about Exhibit 73, that's also on the screen.
22       (Document displayed)
23   Q    It says:
24            "The shippers can coordinate delivery by calling
25       me."
```

1       And then he gives a phone number.  What was the phone

2   number Mr. Brugnara gave you?

3   A    (415)871-8011.

4   Q    Okay.  Is that the phone number that you had for

5   Mr. Brugnara at this time?

6   A    Yes, it -- yes, it is.

7   Q    And it says:

8           "And there will be someone from Brugnara

9           Properties present to assist them."

10      And he says:

11          "This is a fairly wide straight street so there

12          should be no restriction on truck deliveries."

13      Do you see that?

14  A    Yes, I do.

15  Q    How does Mr. Brugnara sign Exhibit 73?

16  A    "Very truly, Luke Brugnara, Brugnara Properties."

17  Q    Had Mr. Brugnara ever signed any of the correspondence

18  with you before Exhibit 73 as "Luke Brugnara, Brugnara

19  Properties"?

20  A    No.

21          MS. HARRIS:  Your Honor, may I approach the witness?

22          THE COURT:  Yes, you may.

23  BY MS. HARRIS:

24  Q    Showing you what's been marked as Government's Exhibit 74

25  for identification.

1      **THE COURT:**  While you're up there, please take back

2  all those other folders so that she can have some room.  And

3  then if we need them, we can come back to them.

4      **MS. HARRIS:**  You want me to take these?

5      **THE COURT:**  Yes.  It's getting too crowded on the

6  witness bench.

7      **THE WITNESS:**  They are not in order now.  Sorry.

8      **THE COURT:**  Well, that doesn't matter.  We'll get

9  them in order.  Just focus on the document in front of you.

10     **THE WITNESS:**  All right.

11     **THE COURT:**  What's your next question?

12 **BY MS. HARRIS:**

13 **Q**    Do you recognize Government's Exhibit 74?

14 **A**    Yes, I do.

15 **Q**    What is Exhibit 74?

16 **A**    It's an email from me to sftycoon1.

17 **Q**    Okay.  And Exhibit 74 is dated Tuesday, April 1, 2014 at

18 9:09 a.m.  Is that the approximate date and time that you sent

19 Exhibit 74 to Mr. Brugnara?

20 **A**    Yes, it is.

21     **MS. HARRIS:**  Okay.  Your Honor, I offer Government's

22 Exhibit 74 into evidence.

23     **THE COURT:**  Any objection?

24     **MR. BRUGNARA:**  No, your Honor.

25     **THE COURT:**  Received in evidence.

```
 1          (Trial Exhibit 74 received in evidence.)

 2               THE COURT:  Please publish.

 3          (Document displayed)

 4   BY MS. HARRIS:

 5   Q    Let's look at the second sentence.  You say:

 6               "I needed help to facilitate the shipment

 7          arrangements with you, since the works of art will be

 8          leaving today."

 9          Did you mean that the art that you were shipping to the

10   museum in San Francisco would be leaving New York on April 1?

11   A    Yes.

12   Q    Okay.  And you said:

13               "All the de Koonings, Degas, Picassos, Mirò and

14          Luks will arrive on the 7th of April."

15          What did you mean by that?

16   A    That the trucker had all been arranged and the freight

17   would arrive at his museum.

18   Q    And then you also say:

19               "It will be very important for you or your

20          assistant to notify your insurance carrier that the

21          art must be covered under your policy the moment it

22          arrives at your location.  This was a stipulation on

23          my insurance and has always been once it is out of my

24          hands."

25          What were you conveying when you wrote that?
```

1   A    I was letting him know that once the insurance -- when all

2   the artworks are out of my hands, as I said, I no longer have

3   them, they are going into his museum, they -- his insurance

4   needs to cover them.

5   Q    Let's look at the next sentence in the last paragraph, the

6   first sentence.

7        If we could blow up the first sentence?  That's perfect.

8   Okay.

9        (Document enlarged.)

10  BY MS. HARRIS:

11  Q    You say to Mr. Brugnara:

12           "I will be in San Francisco ten minutes away

13        from your location."

14       What were you conveying to Mr. Brugnara there?

15  A    That I would be there to assist with the checking the

16  freight and seeing that nothing could happen in the traveling.

17  Q    When I said "I will be there," what city were you

18  referring to?

19  A    San Francisco.

20  Q    And then you said -- let's look at the last sentence

21  before you sign Exhibit 74.  It begins, "While I."  The last

22  sentence.

23           "While I am in San Francisco, you may always

24        reach me at..."

25       And then what is the phone number you gave for yourself?

```
 1   A    My cell, which is (901)270-6632.

 2   Q    Is that the telephone number that you had Mr. Brugnara use

 3   for you at all times during this transaction?

 4   A    No.

 5   Q    Okay.  Did you have another number?

 6   A    Yes.

 7   Q    What was that?

 8   A    The -- my home number in New York, (212)628-2189.

 9   Q    Did you give him your cell number to use while you were in

10   San Francisco?

11   A    Yes, I did.

12   Q    Okay.

13        MS. HARRIS:  Your Honor, may I approach the witness?

14        THE COURT:  Yes.

15   BY MS. HARRIS:

16   Q    I'm handing you what's been marked as Government's

17   Exhibit 75 for identification.

18        (Whereupon document was tendered to the witness.)

19   Q    Do you recognize Government's Exhibit 75?

20   A    Yes, I do.

21   Q    What is Government's Exhibit 75?

22   A    It's an email from --

23        MR. BRUGNARA:  Your Honor?

24        THE COURT:  Yes.

25        MR. BRUGNARA:  Can I ask your Honor to take a look at
```

1  what's in that folder, because counsel advises generally the

2  exhibits are produced in paper form, just for notes or any

3  other references.

4        (Whereupon, document was tendered to the Court.)

5              THE COURT:  There is nothing, but the exhibit.

6              MR. BRUGNARA:  That's fine, your Honor.  Just wanted

7  to be sure.

8  BY MS. HARRIS:

9  Q    Ms. Long, can you take a look at what's been marked as

10 Government's Exhibit 75.  And I'm going to ask you if you

11 recognize Government's Exhibit 75.

12 A    Yes, I do.

13 Q    What is Exhibit 75?

14 A    It's an email from --

15             THE COURT:  You need to speak into the microphone.

16             THE WITNESS:  Oh, sorry.

17 A    It's an email from sftycoon1 to me.

18 BY MS. HARRIS:

19 Q    Okay.  And did you receive the email that's Government's

20 Exhibit 75 on April 1, 2014 at approximately 11:08 a.m.?

21 A    Yes, I did.

22             MS. HARRIS:  Your Honor, I offer Government's

23 Exhibit 75 into evidence.

24             THE COURT:  Any objection?

25             MR. BRUGNARA:  No, your Honor.

1              **THE COURT:**  Received in evidence.

2         (Trial Exhibit 75 received in evidence)

3              **THE COURT:**  You may publish it.

4         (Document displayed)

5    BY MS. HARRIS:

6    Q    Ms. Long, other than the exhibit tab, is Exhibit 75

7    identical in all respects to when you received it?

8    A    Yes, it is.

9    Q    Let's look at what Mr. Brugnara wrote to you on April 1,

10   2014:

11             "Dear Rose:  You can arrange unloading/moving

12        with ShipArt International."

13        Do you see that?

14   A    Yes, I do.

15   Q    Does it say anything about ShipArt International as an

16   escrow agent?

17   A    No, it doesn't.

18   Q    And then Mr. Brugnara says:

19             "I do not have the staff to unload these

20        pieces."

21        Do you see that?

22   A    Yes, I do.

23   Q    How did Mr. Brugnara sign Government's Exhibit 75?

24   A    "Luke."

25   Q    Okay.  Underneath the signature it says "Sent via," and

 1  there is something referred to.  What does it say?

 2  **A**    "Samsung Galaxy AT&T 4G LTE Smartphone."

 3  **Q**    Thank you.

 4         **MS. HARRIS:**  Your Honor, may I approach the witness?

 5         **THE COURT:**  Yes.

 6  **BY MS. HARRIS:**

 7  **Q**    I'm handing you what's been marked as Government's

 8  Exhibit 76 for identification.

 9         (Whereupon document was tendered to the witness.)

10  **Q**    Do you recognize Government's Exhibits 76?

11  **A**    Yes, I do.

12  **Q**    What is Government's Exhibit 76?

13  **A**    It's an email from me to sftycoon1.

14  **Q**    Exhibit 76 is dated April 2, 2014 at 1:30 p.m.  Is that

15  the approximate date and time that you sent Exhibit 76 to

16  Mr. Brugnara?

17  **A**    Yes, it is.

18         **MS. HARRIS:**  Your Honor, I offer Government's

19  Exhibit 76 into evidence.

20         **THE COURT:**  Any objection?

21         **MR. BRUGNARA:**  No, your Honor.

22         **THE COURT:**  All right.  It's received.

23     (Trial Exhibit 76 received in evidence.)

24         **THE COURT:**  And you may publish it.

25     (Document displayed)

1  BY MS. HARRIS:

2  Q    Let look at the first sentence of Government's Exhibit 76.

3  You write to Mr. Brugnara:

4        "Dear Luke:  My truckers will remove the crates

5        in the protected area that you wish at 224 Sea Cliff

6        Avenue."

7        What did you think -- as of April 2, 2014, what did you

8  think 224 Sea Cliff Avenue was?

9  A    I thought it was a museum.

10 Q    Okay.  And then let's take a look at the last paragraph of

11 Government's Exhibit 76.  You say:

12        "This arrangement will have all the art works in

13        your possession."

14        What were you intending to convey to Mr. Brugnara when you

15 wrote that?

16 A    To remind him that his -- he needed to have his insurance

17 prepared to take over.

18 Q    Did you actually travel to San Francisco to be present

19 when the art was delivered to the museum?

20 A    Yes, I did.

21 Q    Did you arrive shortly before April 7th, 2014?

22 A    Yes, I did.

23 Q    Where did you stay when you arrived in San Francisco?

24 A    Oh, it was one of the hotels down by the Fisherman's

25 Wharf.  I'm not certain which one, since I have been back so

1  many times.

2  **Q**    Did you bring your cell phone with you?

3  **A**    Yes, I did.

4  **Q**    At any point prior to when you arrived physically in

5  San Francisco, did Mr. Brugnara give you the name of any hotel

6  you should stay at?

7  **A**    No, he didn't.

8  **Q**    Drawing your attention now to the morning of April 7th,

9  2014.  What did you do after you woke up?

10 **A**    As always, I ordered a pot of coffee.

11 **Q**    Did you eat any breakfast?

12 **A**    No.

13 **Q**    Other than coffee, did you have anything else to drink

14 that morning?

15 **A**    No.

16 **Q**    After you had coffee, did you leave the hotel?

17 **A**    Yes.

18 **Q**    Where did you go?

19 **A**    I went to meet the -- be waiting for the truckers, the

20 freighters.

21 **Q**    Okay.  What address did you go to?

22 **A**    I got directions to the 226 -- well, I actually asked

23 Walter where this was and got directions.

24 **Q**    Directions to what address?

25 **A**    To the 220- -- look at it.

LONG - DIRECT EXAMINATION / HARRIS

1   Q    To the Sea Cliff address?

2   A    Yes, 224.

3   Q    How did you get there on the morning of April 7th?

4   A    I had rented a car from the airport, so I drove.

5   Q    Approximately, what time did you arrive at that address on

6   Sea Cliff Avenue?

7   A    I can't say certainly, because I don't remember.  But I

8   know it was in the morning and it was approximately 9:00

9   something, I think, because the freight people were to call me

10  as soon as they were on their way to that house, which they

11  did.

12  Q    Did you receive a call from the freight people?

13  A    Yes, I did.

14  Q    Okay.  And after you received that call, what did you do?

15  A    Then I went straight to that address.

16  Q    And by "that address," what are you referring to?

17  A    224 Sea Cliff Avenue.

18  Q    Can you describe for us what you saw when you arrived at

19  224 Sea Cliff Avenue?

20  A    Yes.

21  Q    Go ahead.

22  A    I saw a normal looking home with a garage in the front.

23  Q    Was it a museum?

24  A    No, not at all.

25  Q    Did you bring anything along with you when you went to

1    what you thought was going to be the museum?

2    **A**    Yes, I did.

3    **Q**    What did you bring?

4    **A**    I brought my tools.  And as you see, I carry large purses

5    so I can carry my tools.  I carry the Hermitage Degas book,

6    where the exhibition had been in Russia, and the invoices.

7    **Q**    Okay.  When you got to Sea Cliff Avenue, did you see the

8    delivery truck?

9    **A**    In a few minutes.  15 minutes or so, yes.

10   **Q**    When you first arrived there, did you see Mr. Brugnara?

11   **A**    No.

12   **Q**    At some point that morning did you actually see

13   Mr. Brugnara?

14   **A**    Yes.

15   **Q**    Can you describe how that occurred?

16   **A**    After the truck was -- had arrived, he opened the garage

17   door and came, I guess, through his home through the garage.

18   **Q**    Was the first time that you saw Mr. Brugnara on April 7th,

19   2014 when he emerged through the garage?

20   **A**    Yes.

21   **Q**    Was this the first time you had ever met Mr. Brugnara in

22   person?

23   **A**    Yes, it is.

24   **Q**    Did you introduce yourself to him?

25   **A**    Yes, I did.

1    Q    Did Mr. Brugnara introduce himself to you?

2    A    Yes, he did.

3    Q    Was there any other conversation at that time?

4    A    No.  It was mainly paying attention to the art works.

5    Q    Okay.  Do you see the person that you met on April 7th,

6    2014 as Luke Brugnara sitting in this courtroom?

7    A    Yes, I do.

8    Q    Can you point to him and identify him by what he's

9    wearing?

10   A    Yes.  He's the first gentleman sitting at the table right

11   over there with the white shirt and navy blue jacket and gray

12   pants.

13           MS. HARRIS:  Your Honor, may the record reflect that

14   Ms. Long has identified the defendant.

15           THE COURT:  Yes, that's what happened.

16   BY MS. HARRIS:

17   Q    Were the crates of art that you had sold to Mr. Brugnara

18   unloaded at 224 Sea Cliff Avenue?

19   A    Yes, they were.

20   Q    How many crates were unloaded?

21   A    Five.

22   Q    Did you personally see all five crates?

23   A    Yes, I did.

24   Q    Who unloaded the crates from the truck?

25   A    The two gentlemen that were sent to remove them.

1  Q    Where were the crates put when they were taken off the

2  truck?

3  A    First they were put down on the ground because I had to

4  check each one.

5  Q    What were you checking for?

6  A    Checking to see if there was any damage, you know, or it

7  looked like it had been -- you know, somebody had tampered with

8  it or anything.  You always have to check that.

9  Q    When you say "check," were you looking inside the crates?

10 A    No, no.  No.  I just made sure they had not been opened

11 and they had not been touched so that we could proceed.

12 Q    Did you confirm that they had not been touched?

13 A    Had not been touched, no.

14 Q    Did you confirm that there were five crates?

15 A    Yes, I did.

16 Q    After you confirmed that there were five crates and they

17 had not been touched, what's the next thing that happened?

18 A    Oh, he directed the gentlemen to put them in his garage.

19 Q    Who is "he"?

20 A    Luke.

21 Q    Were the crates put in the garage?

22 A    Yes.

23 Q    Okay.  At any point on April 7, 2014 while you were

24 physically present were the crates opened?

25 A    No.

1  Q    Why didn't you open them with Mr. Brugnara?

2  A    Because he said he was a very busy man and he had someone

3  coming any minute to show some property he was buying, and that

4  he didn't have time.

5          MS. HARRIS:  Your Honor, may I approach the witness?

6          THE COURT:  Yes.

7  BY MS. HARRIS:

8  Q    Showing you what's been marked as Government's Exhibit 77

9  for identification.

10     (Whereupon document was tendered to the witness.)

11 Q    Do you recognize Government's Exhibit 77?

12 A    Yes, I do.

13 Q    What is Exhibit 77?

14 A    It's -- it's the Tigers billing label.

15 Q    Is that your signature in the lower right-hand corner of

16 Exhibit 77?

17 A    Yes, it is.

18 Q    And Exhibit 77 is dated April 7th, 2014.  Is that the date

19 on which you signed Exhibit 77?

20 A    Yes, it is.

21         MS. HARRIS:  Your Honor, I offer Exhibit 77 into

22 evidence.

23         THE COURT:  Any objection?

24         MR. BRUGNARA:  No, your Honor.

25         THE COURT:  Received in evidence.  Thank you.

LONG - DIRECT EXAMINATION / HARRIS

```
1        (Trial Exhibit 77 received in evidence.)

2            THE COURT:  You may publish.

3        (Document displayed)

4   BY MS. HARRIS:

5   Q    I want to ask you some questions about Exhibit 77.  Other

6   than the signature and the date, is any of the handwriting on

7   Exhibit 77 your handwriting?

8   A    You said other than the signature?

9   Q    Yes.

10  A    No.

11  Q    Drawing your attention to the right of your signature,

12  there is a little box that says "Pieces."  Do you see that?

13       If we could highlight that?

14       (Document highlighted.)

15       How many pieces does the waybill refer to?

16  A    Five.

17  Q    Were there five pieces delivered to 224 Sea Cliff Avenue?

18  A    Yes.  Definitely.

19  Q    And was the indication that there were five pieces

20  delivered to Sea Cliff Avenue on Exhibit 77 when you signed it?

21  A    Yes, there is.

22  Q    When I asked you if you had brought anything with you to

23  Sea Cliff Avenue, you referred to a book.  What book was that?

24  A    It was the exhibition from the Hermitage of the -- the

25  exhibition for the Degas, the entire.  And the main -- when you
```

1   open it, then you -- sorry.

2   **Q**   Don't tell me anything about it yet.

3   **A**   Sorry.

4           **MS. HARRIS:**  Your Honor, may I approach the witness?

5           **THE COURT:**  Yes.

6   **BY MS. HARRIS:**

7   **Q**   Handing you what's been marked as Government's Exhibit 5

8   for identification.

9           (Whereupon a book was tendered to the witness.)

10          **MR. BRUGNARA:**  Your Honor, can I have an sidebar

11  please for one second?

12          **THE COURT:**  All right.  Let's have a sidebar.

13          (Proceedings held at sidebar.)

14          **THE COURT:**  All right.  What's the issue?

15          **MR. BRUGNARA:**  I have an issue that just happened

16  right now.  I think it's clear, but Ms. Long says -- there has

17  been some instruction to the witness as to how to respond to

18  the book.

19          She said -- and you see how she has responded to every

20  message -- excuse me, every question, to the specific question.

21          Have you seen this Hermitage book?  She said yes.  And

22  then if you open a few pages, you know, to get to the Hermitage

23  stamp that we discussed ad nauseam that day.  Remember, you

24  said -- remember, here it is on the third page.

25          The fact is that she was instructed clearly to describe

1  where the name Hermitage is on there written in English by the

2  way she responded to that question, which means Ms. Harris

3  and/or someone in that office tampered with this, tampered with

4  this --

5        **THE COURT:**  Well, you can on cross examination -- if

6  you think you can prove that she has been brainwashed, you can

7  bring that on cross-examination.  But the record doesn't show

8  that now.

9        **MR. BRUGNARA:**  I think that's going to be such a

10 minor issue, I just want to make a record of it; that I think

11 based upon her testimony so far, it's a struggle for her and

12 that she gets to:  Have you seen the book?  So, yeah.  But if

13 you go to the fifth page, there's the stamp.  That's what's

14 coming up now.

15       **THE COURT:**  Thank you.  Objection is overruled.

16 Overruled.

17       **MR. BRUGNARA:**  I understand.

18     (Proceedings held in open court.)

19 **BY MS. HARRIS:**

20 **Q**   Ms. Long, before we took the sidebar, I had brought

21 Exhibit 5 to you.

22     Do you recognize Exhibit 5?

23 **A**   Yes, I do.

24 **Q**   What is Exhibit 5?

25 **A**   It's the Degas book from the Hermitage that I gave to Luke

1    Brugnara.

2    **Q**    When did you give Exhibit 5 to Mr. Brugnara?

3    **A**    When we were sitting inside of his home because I was --

4    brought it for the purpose of -- because he was purchasing the

5    Degas, which is the main work of art by Degas.

6          **MS. HARRIS:**  Your Honor, I offer Government's

7    Exhibit 5 into evidence.

8          **THE COURT:**  Any objection?

9        (Pause)

10         **MR. BRUGNARA:**  We object, your Honor.

11         **THE COURT:**  And the basis of the objection?  Just the

12   legal objection?

13       (Discussion held off the record between Mr. Brugnara

14        and his advisory counsel.)

15         **MR. BRUGNARA:**  Your Honor, here is the objection.

16   Based on content, it shouldn't be coming into evidence.

17         **THE COURT:**  All right.  The book will be received.

18   Exhibit 5 is received.

19       But the contents of the book are not offered for the truth

20   of any statements and you may not consider them for the truth

21   of any statements, but you may consider the book is offered for

22   part of what allegedly transpired between this witness and

23   Mr. Brugnara.

24       Is that acceptable to everyone?

25         **MS. HARRIS:**  Well, your Honor --

1          THE COURT:  Is there some part of that you're

2     offering for the truth?

3          MS. HARRIS:  Only that the photograph of the -- of

4     the statute is in the book.

5          THE COURT:  Well, that would still just be a -- it

6     cannot be offered for the truth.  It can only -- because that

7     still would be hearsay.

8          But you can show that the photograph is in there and that

9     that was part of what was the witness says was provided to the

10    defendant.

11         MS. HARRIS:  That's what we intend to do, your Honor.

12         THE COURT:  It can be used for that purpose.

13         MS. HARRIS:  Thank you.

14    (Trial Exhibit 5 received in evidence)

15 BY MS. HARRIS:

16 Q    Drawing your attention now to Exhibit 5.

17         Why did you give the book, this Exhibit 5, to the

18    defendant on April 7th, 2014?

19 A    Because being exhibited at the Hermitage is one of the

20    most important museums to be in in the world, and it has the

21    Degas that he was purchasing from me --

22         MR. BRUGNARA:  I object, your Honor.

23 A    -- in the book.

24         THE COURT:  I'm sorry.  What?

25         MR. BRUGNARA:  I object, your Honor.

1          **THE COURT:**  What's the objection?

2          **MR. BRUGNARA:**  Foundation of:  Has she been to the

3    Hermitage?  She's making statements about the Hermitage as an

4    expert.

5          **THE COURT:**  But she's qualified to make that

6    statement.

7          **MR. BRUGNARA:**  To places she's never been, your

8    Honor?

9          **THE COURT:**  That's what experts do.

10         **MR. BRUGNARA:**  Really?

11         **THE COURT:**  Yes.  People can be experts on places

12   they have never been.

13        So that objection is overruled.

14   **BY MS. HARRIS:**

15   **Q**    Ms. Long, have you ever been to the Hermitage Museum?

16   **A**    Yes, I have.  Several times.

17   **Q**    Is it one of the most important museums in the world?

18   **A**    Yes, it is.

19   **Q**    Okay.  Now, drawing your attending to the book that you

20   brought Mr. Brugnara, did you explain to Mr. Brugnara that this

21   book reflected an exhibit at the Hermitage?

22   **A**    Yes, I did.

23   **Q**    Did you actually show Mr. Brugnara where the book referred

24   to the Hermitage?

25   **A**    Yes, of course.

 1          **MS. HARRIS:**  Okay.  May Ms. Long demonstrate for the

 2  jury what she showed Mr. Brugnara?

 3          **THE COURT:**  Yes.  Yes, she may.

 4  **BY MS. HARRIS:**

 5  **Q**    Can you show the jury on Exhibit 5 what you --

 6          **MR. BRUGNARA:**  Objection, your Honor.

 7  **Q**    -- specifically pointed out to --

 8          **MR. BRUGNARA:**  Objection, your Honor.

 9          **MS. HARRIS:**  May I finish the question before --

10          **THE COURT:**  Just a moment.  You both --

11          **MR. BRUGNARA:**  This is hearsay.

12          **THE COURT:**  That's not a valid objection to the

13  question that is being requested, so the objection is

14  overruled.

15      The witness will now hold up the page that is responsive

16  to the question just asked by counsel.

17          **MR. BRUGNARA:**  And, your Honor, can you make a note

18  she's going through every page in the book starting about the

19  middle and working her way backwards, so she clearly doesn't

20  have knowledge of where that page is?

21          **MS. HARRIS:**  Your Honor, can Mr. Brugnara just state

22  a legal basis for his objection?

23          **THE COURT:**  That is not a proper objection.  That is

24  overruled.

25          **THE WITNESS:**  That's my fault.  I just --

1          **THE COURT:**  Do you have in mind the question anymore?

2          **THE WITNESS:**  No.

3          **THE COURT:**  Do you know what you're supposed to be

4    doing?

5          **THE WITNESS:**  Yes.  Yes.

6          **THE COURT:**  Find the page that counsel just referred

7    to.

8          **MR. BRUGNARA:**  Your Honor, she's going through every

9    page in the book.  If she knew where it was, your Honor, she

10   would know the general vicinity of what page it's on, wouldn't

11   she?

12         **THE COURT:**  Have you -- can you find it, please?

13         **THE WITNESS:**  I have.

14         **THE COURT:**  Have you found it?

15         **THE WITNESS:**  I'm sorry.  I was looking at other -- I

16   just love it.  Love Degas.

17         **THE COURT:**  Do you -- do you have it in front of you

18   now?

19         **THE WITNESS:**  Yes, I do.

20         **THE COURT:**  Okay.  Look down and make sure that you

21   are on the page that you are -- all right.  And then hold that

22   up so the jury can see it.

23      (Book displayed)

24   BY MS. HARRIS:

25   **Q**    And for the record, Ms. Long, can you describe for the

1  jury the photograph you're showing in Government's Exhibit 5?

2          THE COURT:  Here is what, counsel, you should do.

3          MS. HARRIS:  Okay.

4          THE COURT:  Take the book and walk up slowly back and

5  forth in front of the jury box so the jury can see it.

6          MS. HARRIS:  May I pass it to the jury?

7          MR. BRUGNARA:  Your Honor, that wasn't the objection.

8  The objection was, she asked her what Hermitage notation was,

9  and now she's trying to cover the question by saying:  Okay,

10  here is the picture.

11      Go back in the transcript.  The question Was:  Where is

12  the Hermitage notation?

13          THE COURT:  Just let the jury see what the witness

14  turned to.

15      (Whereupon said book was published to the jury.)

16          THE COURT:  Now, since the objection was made, and

17  while the book is being passed around, Ms. Harris, is that

18  the -- is that the page that you were referring to?

19          MS. HARRIS:  Yes, it is, your Honor.

20          THE COURT:  All right.

21      (Brief pause.)

22          THE COURT:  All right.  So, Ms. Harris, can you

23  retrieve the book from the jury box and give it back to the

24  witness and continue on with your next question.

25      (Said book returned to the witness.)

1   **BY MS. HARRIS:**

2   **Q**    Ms. Long, did you identify Exhibit 5 to Mr. Brugnara as a

3   book from the Hermitage Museum exhibits?

4   **A**    Yes, I most definitely did.

5   **Q**    Did you go through other pictures besides the Little

6   Dancer with Mr. Brugnara when you showed it to him on

7   April 7th?

8   **A**    Yes, I did.

9   **Q**    Okay.

10  **A**    That's why I was looking through to.

11  **Q**    Were there other pictures besides the Little Dancer that

12  you and Mr. Brugnara looked at on April 7th?

13  **A**    Most definitely.

14  **Q**    Can you explain that to the jury?

15  **A**    Yes.  When he saw this and also knew that he had the crate

16  right there and we were discussing this, then he took the book

17  and was flipping all through it and asked me if I had any

18  others.

19       So that's why I was doing it that way, because this, of

20  course, would be the first one.  Anybody knows that.

21  **Q**    Was the first picture that you showed Mr. Brugnara on

22  April 7th the picture of the Little Dancer that you showed the

23  jury?

24  **A**    Yes, it is.

25  **Q**    And then did you and Mr. Brugnara look at other pictures

1  in Exhibit 5?

2  **A**   Yes, we did.

3  **Q**   Did Mr. Brugnara ask you anything about the other

4  pictures?

5  **A**   Yes.  He asked me if I owned any of the other ones.

6  **Q**   What did you respond?

7  **A**   And I said, yes, I do.

8  **Q**   Were there other works of Degas that Mr. Brugnara

9  indicated he was interested in purchasing after he looked at

10  the book?

11  **A**   Yes.

12  **Q**   Did you leave 224 Sea Cliff Avenue on April 7th without

13  opening the art?

14  **A**   Yes.

15  **Q**   Why was that?

16  **A**   Because he was only interested in talking about his home,

17  and how important it was, and then talking about what else did

18  I have.  And he would not talk --

19         **MR. BRUGNARA:**  Objection, your Honor.  She's citing

20  what I'm thinking, what I'm saying.  That's not what I was

21  thinking or saying.  But, certainly, she can't go to my state

22  of mind.

23         **THE COURT:**  Well, all right.  You can say -- you

24  can -- that's a fair point.  You cannot read his mind.  You can

25  only tell us what he said.

```
 1              THE WITNESS:  All right.
 2              THE COURT:  So you tell us what was actually said and
 3    what actually happened that you saw and heard.  You can do
 4    that.
 5              THE WITNESS:  Yes.  Thank you.
 6    BY MS. HARRIS:
 7    Q    What did Mr. Brugnara say to you that caused you to leave
 8    without opening the art on April 7th?
 9    A    He said he had a real estate appointment, and that he
10    didn't even know I was coming, and that he was very, very busy.
11    Q    When Mr. Brugnara said to you that he didn't know that you
12    were coming, had you ever, in email correspondence, explained
13    that you would be in San Francisco for the delivery of the art?
14    A    Definitely.  Several times.
15    Q    You mentioned that you went inside Mr. Brugnara's house.
16    Where specifically were you taken in the house?
17    A    We were sitting in his bay, and we were sitting on two
18    chairs.  And he proceeded to flip through these pieces.  And
19    after talking about his home as he was flipping through this,
20    then we discussed his question about did I own any of the
21    others.
22    Q    Can you describe what the room looked like that you sat
23    in?
24    A    It didn't have hardly anything in it whatsoever.
25    Q    Was there any furniture in it?
```

1    A     Just what I was sitting on, and a table, and a chair he

2    was sitting on.

3    Q     What did the chair look like that you were sitting on?

4    A     I don't remember because it wasn't like a memorable piece

5    of fine furniture.

6    Q     After you leaved -- left 224 Sea Cliff Avenue on

7    April 7th, 2014, did you attempt to get in touch with the

8    defendant about opening the crates, the five crates of art that

9    had been left behind?

10   A     Most definitely.  I did before I left.

11   Q     And then after you left, tell us what you did.

12   A     Then I called him a few hours later.

13   Q     What happened when you called Mr. Brugnara a few hours

14   later?

15   A     He kept saying he can't do it at this time, he's a very

16   busy man, and to call -- call him later.

17   Q     At any time after you called Mr. Brugnara, did you receive

18   any text messages from him?

19   A     Yes, eventually, yes.

20         MS. HARRIS:  Your Honor, may I approach the witness?

21         THE COURT:  Yes.

22         While you're doing that.  In case -- I don't remember if I

23   don't say so, but Exhibit 5, the book, is received in evidence.

24   I think I said that, but my notes are unclear.

25         All right.

1   BY MS. HARRIS:

2   Q    Showing you what's been marked as Government's Exhibit 79

3   for identification.

4           MR. BRUGNARA:  I object, your Honor.

5           THE COURT:  What's the objection?

6           MS. HARRIS:  She hasn't even looked at it, your

7   Honor.

8           MR. BRUGNARA:  Objection is hearsay.  Lacks

9   foundation.

10      We can do a sidebar if you want, but this is a text

11  message without any foundation.  It's hearsay.  It's basically

12  the same reasons that the voicemails can't come in.

13          THE COURT:  Let me see it.

14      (Whereupon, document was tendered to the Court.)

15          MS. HARRIS:  Your Honor, this is a text message from

16  Mr. Brugnara.  It's an admission.

17          THE COURT:  Well, just a minute.

18          MR. BRUGNARA:  Your Honor, can we have a sidebar?

19          THE COURT:  No.

20      (Brief pause.)

21          THE COURT:  Let's hear the foundation and then

22  we'll -- I'll hear any objections after I hear the foundation.

23      Go ahead.

24  BY MS. HARRIS:

25  Q    Ms. Long, I'm drawing your attention to Page 1 of

1  Government's Exhibit 79.  There's the date Wednesday, April 9

2  at 9:38 a.m.

3       Is that the approximate date and time on which you

4  received the text message that's Government's Exhibit 79?

5  **A**    Yes, it is.

6  **Q**    And then above that there is a phone number.  What is that

7  phone number?

8  **A**    It's a return call-back from Luke Brugnara.

9  **Q**    I just asked you what the phone number is.  Can you read

10 it for us?

11 **A**    Yes.  (415)871-8011.

12 **Q**    Is that the phone number that you --

13        **MR. BRUGNARA:**  Your Honor, objection.

14 **Q**    -- asked for --

15        **MR. BRUGNARA:**  It's a statement -- a presumption of

16 Luke Brugnara's phone number.

17        **THE COURT:**  Just a minute.

18        **MR. BRUGNARA:**  There is no foundation that that is,

19 in fact --

20        **THE COURT:**  We're going to find out if there is

21 foundation.  And if it doesn't get into evidence, it doesn't

22 get into evidence.

23       But ask your next question.

24 **BY MS. HARRIS:**

25 **Q**    Is that the phone number you understood was Mr. Brugnara's

 1  phone number?

 2  **A**    Yes.

 3          **THE COURT:**  Based on what?

 4          **THE WITNESS:**  I'm --

 5          **MS. HARRIS:**  I'm going to show the witness an

 6  exhibit.

 7          **THE COURT:**  All right.  All right.  Go ahead.

 8  **BY MS. HARRIS::**

 9  **Q**    Okay.  Drawing your attention to Government's Exhibit 73,

10  which is in evidence.

11  **A**    Yes.

12          **MS. HARRIS:**  If we could pull up Exhibit 73 on the

13  screen?

14      (Document displayed)

15  **BY MS. HARRIS:**

16  **Q**    I would ask you to look at the first line of Government's

17  Exhibit 73, which is in evidence.  The email from Mr. Brugnara:

18          "The shippers can coordinate delivery by calling

19      me at (415)871-8011."

20      Did Mr. Brugnara write that to you on March 28, 2014 as

21  his phone number?

22  **A**    Yes, he did.

23  **Q**    Is that the same phone number that we see on Government's

24  Exhibit 79?

25  **A**    Yes, it is.

1          **MS. HARRIS:**  Your Honor, I offer Government's

2     Exhibit 79 into evidence.

3          **MR. BRUGNARA:**  Objection.

4          **THE COURT:**  What is the objection?

5          **MR. BRUGNARA:**  My objection is she made a comment

6     that's presumptive, without foundation, that it's my phone

7     number; that I sent it.

8          I'm not saying that it isn't or it isn't, but the rules

9     have to be the same for both sites.

10         **THE COURT:**  Well --

11         **MR. BRUGNARA:**  If I'm not allowed to get in

12    telephonic voice messages and texts, they shouldn't be allowed

13    to either.  But if they are, then I'm happy to put in mine.

14         But you're precluding me and you are allowing them under

15    the same standard, but we need to be on the same -- same rules.

16         **THE COURT:**  All right.  Let me say two things.

17         One, the foundation has been laid for this to come into

18    evidence, so Exhibit 79 is received.

19         (Trial Exhibit 79 received in evidence)

20         **THE COURT:**  There is sufficient evidence from which

21    the jury could conclude that the messages were sent by

22    Mr. Brugnara.

23         And with respect to the second point that has just been

24    laid in front of the jury, I will explain to the jury and to

25    the defendant:  Any statement made by the defendant is an

1   admission, which the Government has the right to put into

2   evidence, but the defendant himself does not necessarily have

3   the right to put in.  It's -- there is a good reason behind

4   that rule, but I don't need to get into it.  But the rule works

5   that the -- the Government may -- as the adverse party, may put

6   into evidence anything relevant that has been said by the

7   defendant.

8        On the other hand, the defendant does not have the right

9   to put in anything he said in the past.  There is an exception,

10  and that is whenever it needs to be put in for the sake of

11  completeness on something that was put in by the Government in

12  order to make sure that what the Government has put in is not

13  misleading, then, of course, we would allow it under the rule

14  of completeness.

15       But that's the rule, and Mr. Brugnara did not properly

16  state the rule a moment ago, and his objection is overruled.

17            All right.  Continue.  Continue on.

18       **MR. BRUGNARA:**  Your Honor, I object under rule of

19  completeness because there is preceding emails in the chain --

20  excuse me, preceding text messages in the chain --

21       **MS. HARRIS:**  Your Honor --

22       **MR. BRUGNARA:**  -- that need to be in the chain.

23       **MS. HARRIS:**  -- Mr. Brugnara is testifying now.

24       **THE COURT:**  Well, and possibly there are.  And I will

25  consider them under the rule of completeness, if you bring them

1    to my attention.  But the Government is not required to put in

2    every single thing that has ever been uttered in this case by

3    the defendant.

4        All right.  Go ahead.  Next question.

5            MS. HARRIS:  May we bring up Exhibit 79 and publish

6    it to the jury?

7            THE COURT:  Yes, you may.

8        (Document displayed)

9    BY MS. HARRIS:

10   Q    Drawing your attention to the text message you received

11   from Mr. Brugnara on April 9 at 9:38 in the morning.  Did you

12   receive this text message in response to your trying to get in

13   touch by phone with Mr. Brugnara?

14   A    Yes, I did.

15   Q    Okay.  And what did Mr. Brugnara tell you on April 9, two

16   days after the art had been delivered?

17   A    He wrote "Sorry.  I'm busy.  Call back later."

18   Q    Did you respond to Mr. Brugnara in Exhibit 79?

19           MR. BRUGNARA:  I object, your Honor, to that

20   statement.  That's a pre -- pre-registered AT&T message that's

21   a telephonic button to push.  She said I wrote it.  I didn't

22   write it.

23           THE COURT:  Well there is no evidence before the

24   jury.  What -- what counsel -- what Mr. Brugnara just said is

25   not evidence.  It is not evidence.  It is not evidence.  The

1    jury will disregard it.

2        All right.  Now, number two.  I do need to say, is that

3    green part what you responded?

4             THE WITNESS:  Yes, it is.

5             THE COURT:  All right.  The green part may not be

6    considered for the truth of anything.  Because it can only be

7    considered for what she -- how she responded and to explain

8    what the transaction, the back-and-forth, was.

9        But the green part is hearsay, isn't it?  It is.

10            MS. HARRIS:  Yes.

11            THE COURT:  All right.  So it can only be considered

12   for purposes of the give-and-take that went on in these text

13   messages between the -- whoever said "Sorry, I'm busy.  Call

14   back later" and the green part.

15       So, but the parts that if the jury concludes were sent by

16   the defendant, those can be considered for any purpose without

17   limitation.

18       All right.  Go ahead.

19   BY MS. HARRIS:

20   Q    All right.  Ms. Long, let's start at the beginning.  What

21   telephone number did you receive the text from that says,

22   "Sorry, I'm busy.  Call back later" in the upper --

23   A    Yes.  It is (415)871-8011.

24   Q    Was that a number known to you as Mr. Brugnara's phone

25   number?

1   **A**     Yes.

2   **Q**     Did you respond when Mr. Brugnara texted you -- the person

3   using the phone number 871-8011 texted you "Sorry.  I'm busy.

4   Call back later."  Did you respond to him?

5   **A**     Yes, I did.

6   **Q**     By the way, the content of the text "Sorry, I'm busy.

7   Call back later," did Mr. Brugnara also say that to you in

8   telephone calls you had made prior to this text?

9   **A**     Yes, he did.

10  **Q**     Did he use words almost identical to the text?

11  **A**     Yes, he did.

12  **Q**     All right.  Let's now look at what you responded to

13  Mr. Brugnara.  You sent a very lengthy text that's Government's

14  Exhibit -- attached to Government's Exhibit 79.  You say:

15         "I'm not leaving.  I'm very sorry we did not get

16         to sit down and answer your concerns and your answer

17         completely because I did not know we wouldn't be

18         opening the crates together along with your

19         authenticator."

20      What did you mean when you said you didn't know you

21  wouldn't be opening the crates along with Mr. Brugnara's

22  authenticator?

23  **A**     When they arrive, that is the customed thing you always

24  do, is authenticate them immediately.  And he told me he would

25  have his authenticator there also.

```
 1   Q    Now, if we could look at Page 2 of Government's Exhibit
 2   79, the continuation of your text.  And if we could
 3   specifically highlight the sentence that begins "I know you are
 4   a very busy man."
 5        (Document highlighted.)
 6            "I know you are a very busy man, but I never
 7            dreamed you would assume I wouldn't be a nervous
 8            wreck leaving them in a garage."
 9        What did you mean?
10   A    Exactly that.  I just -- the fact that he was avoiding,
11   first of all, letting me authenticate them.  And, second, to
12   think that they were in a garage.  I needed to know where they
13   were going.
14   Q    Had you ever in your entire career left crates of valuable
15   art in someone's garage?
16   A    Absolutely not.
17   Q    Did you know that that's where the crates of art were
18   going to be left when you arranged to have them shipped to
19   Mr. Brugnara?
20   A    No, not at all.
21   Q    And then you say, continuing on in the text:
22            "No matter your significance and wealth, I was
23            horrified and am still concerned."
24        What did you mean by you were "horrified"?
25   A    Well, I'm still horrified, the fact that they were in a
```

 1  garage.  And I didn't know where they may possibly be moved, or

 2  if he didn't want me to know about his museum, or if the museum

 3  was in another state.  I didn't know.

 4  **Q**    And then you say:

 5        "How quickly your expert will arrive to evaluate

 6        my works of art.  Please send me his name."

 7        At any point did Mr. Brugnara during this transaction ever

 8  send you the name of an art authenticator?

 9  **A**    No, he did not.

10  **Q**    And then you ask for:

11        "During our ten minutes with interruptions for

12        your real estate acquisitions..."

13        Were you -- what were you referring to there?

14  **A**    He had a gentleman arrive and acted as if they had a real

15  estate appointment.

16  **Q**    Let's take a look at the next page of Government's

17  Exhibit 79.  This is Page 3 for the record.

18        **MR. BRUGNARA:**  Your Honor, I am going to object to

19  that presumption "acted."  She's making statements of state of

20  mind in top real estate executives in the whole Bay Area.  She

21  said "he acted as if he had a transaction."

22        **THE COURT:**  Overruled.  It was -- it was -- she

23  testified as if -- as it appeared to her, and that's something

24  she could have observed.  So that is -- objection is overruled.

25        **THE WITNESS:**  I was even introduced to him.

```
 1              THE COURT:  What?

 2              THE WITNESS:  I was introduced to him also.

 3              THE COURT:  All right.  Next question.

 4   BY MS. HARRIS:

 5   Q    If we could look now at Page 3 of Government's Exhibit 79,

 6   and specifically the portion of your text message that says:

 7              "I cannot leave S.F. without your acknowledgment

 8         in writing of having them in your possession.  Next,

 9         by your not letting me inspect the works of art, you

10         are causing me a breach of contract on any claim.

11         God forbid.  That was the purpose of five days needed

12         to complete our transaction."

13         What were you referring to?

14   A    Just everything that had been going on.  I -- he was not

15   allowing me to, you know, meet with him, see him, do anything

16   that was the proper way to handle this situation.

17   Q    Okay.  Now, let's take a look at Page 4 of Government's

18   Exhibit 79, the continuation of the text message.  And

19   specifically let's look at the sentence that begins:

20              "You have my and a client's works of arts, and I

21         will not leave them in a turmoil, due to the fact

22         that you are causing us to wait."

23         Do you see that?

24   A    Yes, I do.

25   Q    What were you intending to convey with this portion of
```

1    your text?

2    A    That I had no intentions of leaving until this matter was

3    settled.

4    Q    Okay.  And then you say:

5             "This is not correct business behavior for

6         anyone, knowing what a dangerous position for me

7         financially."

8         What did you mean?

9    A    Well, with someone trying to avoid you and not, you know,

10   allow you to correct any of the problems --

11            **MR. BRUGNARA:**  Objection, your Honor.  Foundation.

12            **THE WITNESS:**  Your avoidance.

13            **THE COURT:**  She's explaining what she meant at the

14   time.  That's something she would understand and have

15   foundation to do.

16        Overruled.  Please, continue with your answer.

17   **BY MS. HARRIS:**

18   Q    Can you explain to us what you were intending to convey?

19   A    Yes.  Every single time I contacted him, he had one reason

20   or another or would, you know, even scream at me how busy he

21   was and I kept interrupting him.

22   Q    Now, let's look at the last page of Government's

23   Exhibit 5 -- 79, and specifically the portion of your text

24   where you say:

25            "Hope you will work with and not be belligerent.

```
 1          Just give me the time and date."
 2          What did you mean when you said, "Hope you will work with
 3   and not be belligerent"?
 4   A    Because he had become very, very belligerent and rude, and
 5   not even using the best of language.
 6              MR. BRUGNARA:  Objection, your Honor.  Presumptive
 7   regarding state of mind, someone other than herself.
 8              THE COURT:  Lay opinion.  Overruled.
 9          Please continue.
10   BY MS. HARRIS:
11   Q    Can you describe what you meant, and if you had any
12   specific examples of what you were referring to when you said
13   that Mr. Brugnara had become belligerent with you?
14   A    Well, the -- the one that really upset me is he said:
15   "Why don't you just run on back to the south and play with your
16   Pom?"
17              MR. BRUGNARA:  Objection, your Honor.
18              THE COURT:  What's the objection?
19              MR. BRUGNARA:  The objection is there is no
20   foundation.  She said I'm too busy to talk with her, but I know
21   she has a dog.  It's absurd.
22              THE COURT:  The witness is -- any witness has
23   foundation to testify as to what somebody else said to them.
24          That objection is overruled.
25
```

1   BY MS. HARRIS:

2   Q    Okay.  Ms. Long, so that we have a clear record, can you

3   explain what Mr. Brugnara said to you about going back to the

4   South?

5   A    Yes.  He specifically told me that he is too -- he's too

6   busy to be answering phones for me and that I have pulled him

7   away from too many busy meetings, and why don't I run home to

8   the South and play with my Pom.

9   Q    At any point had you told Mr. Brugnara when you were there

10  on April 7 that you had a dog?

11  A    Yes.

12  Q    And did you mention the breed of the dog?

13  A    Yes.

14  Q    What was the breed?

15  A    Pomeranian.

16  Q    Did you tell that to Mr. Brugnara?

17  A    Oh, yes.

18       MS. HARRIS:  Your Honor, may I approach the witness?

19       THE COURT:  Yes.

20  BY MS. HARRIS:

21  Q    I'm handing you what's been marked as Government's

22  Exhibit 80 for identification.

23       (Whereupon document was tendered to the witness.)

24  Q    Do you recognize Government's Exhibit 80?

25  A    Yes, I do.

1   **Q**    What is Government's Exhibit 80?

2   **A**    They are emails.

3   **Q**    Is there a telephone number at the top of the page of

4   Government's Exhibit 80?

5   **A**    Yes.  (415)871-8011.

6   **Q**    Do you know the difference between a text message and an

7   email?

8   **A**    Yes, I do.

9   **Q**    What is Government's Exhibit 80?

10  **A**    These are -- these are texts.

11         **MS. HARRIS:**  Your Honor, I offer Government's

12  Exhibit 80 into evidence.

13         **THE COURT:**  Any objection?

14         **MR. BRUGNARA:**  Same objection, your Honor, as before.

15         **THE COURT:**  All right.  Overruled.  Please --

16  received in evidence.

17     (Trial Exhibit 80 received in evidence.)

18         **THE COURT:**  You may publish it.

19     Same admonition to the jury.

20     (Document displayed)

21  **BY MS. HARRIS:**

22  **Q**    Ms. Long, before asking you any questions about

23  Government's Exhibit 80, during this period of time that you

24  were trying to communicate with Mr. Brugnara, the period of

25  time we're talking about, did you extend your stay in

1   San Francisco?

2   **A**    Yes, I did.

3   **Q**    And did you take additional nights at a hotel?

4   **A**    Oh, yes.

5   **Q**    How many approximately?

6   **A**    It was weeks.

7   **Q**    Did you pay for that yourself?

8   **A**    Yes, I did.

9   **Q**    Now, let's take a look at the text message that's

10  Government's Exhibit 80.

11       (Document displayed)

12  **Q**    Was this the text message that you received from the phone

13  number (415)871-8011?

14  **A**    Yes, it is.

15  **Q**    Okay.  Let's take a look at the first line:

16       "Rose, you freely gave these items April 7th

17       because you said you were downsizing and wanted me to

18       have them."

19       Was this the first time that Mr. Brugnara ever suggested

20  that the items of art that were delivered on April 7th were a

21  gift from you?

22  **A**    Absolutely.  I mean, first of all, I did not even

23  understand what he was saying.

24  **Q**    And then he says:

25       "You know I lost 300,000 on the Renoir you sold

```
 1        me years ago.  It was worth 300 less than the 500k

 2        you sold it to me when I sold it at Sotheby's."

 3        Did Mr. Brugnara ever say anything to you about the Renoir

 4   at any point before you received this text message?

 5   A    Never.

 6   Q    Now let's look at Page 2 of Government's Exhibit 80.

 7        (Document displayed)

 8   Q    And Mr. Brugnara says:

 9            "I'm confused by your text, as your attorney has

10        been in contact with my attorney for several days to

11        resolve this matter."

12        At this point had you consulted with an attorney

13   concerning Mr. Brugnara's refusal to pay or return the artwork?

14   A    I -- I was -- yes, I consulted one.  He was not my

15   attorney.

16   Q    What was of the name of the attorney you consulted with?

17   A    Harvey Schochet.

18   Q    Okay.  Now, looking at the text messages, another one

19   comes in after the one we just read, and it says:

20            "Rose, I also need to inform you that your

21        attorney forwarded to my attorney invoices which were

22        never given to me from you."

23        Did you give Mr. Brugnara invoices on April 7, 2014?

24   A    Yes.

25   Q    And did you give him the invoices when you were at the 224
```

1   Sea Cliff Avenue residence to inspect the art with

2   Mr. Brugnara?

3   **A**    Yes, I did.

4   **Q**    Okay.  Then it says:

5            "These invoices sent to my attorney were not

6        billed to any recipient, as you gave me these items

7        as a gift."

8        Was this the first time that Mr. Brugnara maintained that

9   you were giving him the five crates of art as a gift?

10  **A**    Well, yes.

11  **Q**    What -- what did you -- what was your reaction when you

12  received this text?

13  **A**    As I still am, I'm just shocked.

14  **Q**    Now, if we could look at the next part of the text, which

15  is on Page 3 of Government's Exhibit 80.

16       The text from the phone number (415)871-8011 says:

17           "There was no sale or written or verbal sales

18       agreement.  Moreover, your values on those invoices,

19       documents sent to my attorney, are not accurate

20       regarding values."

21       At any point before you received the text that's

22  Government's Exhibit 80, had Mr. Brugnara raised any issue with

23  you concerning the value of the five crates of art?

24  **A**    No, he had not.

25  **Q**    Let's look at the next line, and if we can highlight it,

1    the line that starts "Notwithstanding."

2         (Document highlighted.)

3         The next line of the text that you received from

4    Mr. Brugnara says:

5              "Notwithstanding you giving the items to me as a

6         gift."

7         Had you ever given the items that were delivered to

8    Mr. Brugnara as a gift?

9    A    Absolutely not.

10   Q    Had you ever made had an $11 million gift to anyone in

11   your life?

12   A    No, I have not.

13   Q    And then he goes on about:

14             "For example, the de Kooning Foundation, which

15        oversees and controls de Kooning artwork, does not

16        recognize or accept the pieces as authentic."

17        Did Mr. Brugnara in your presence ever open the crates of

18   art of the de Koonings?

19   A    No, he did not.

20   Q    Okay.  Now, if we could look at the next page of

21   Government's Exhibit 50 --

22             MR. BRUGNARA:  Your Honor, I object to that -- that

23   question.  It was leading, and evidence has already been put in

24   that all of the paintings of the -- the de Koonings were

25   provided by high resolution email transmissions.  You know,

1    it's trying to mislead -- mislead the Court.

2            **THE COURT:**  All right.  The jury will disregard the

3    comments just made by Mr. Brugnara about what the record does

4    or does not show.  That's for you to decide.

5        Objection is overruled.  Next question.

6    **BY MS. HARRIS:**

7    **Q**    If we could go now -- we're going to look at the continued

8    text here, and then I'll ask you to clarify some information

9    about the de Koonings.

10        But let's look at what Mr. Brugnara says about the Degas,

11   and we'll read the text now.  If we could highlight it?

12        (Document highlighted.)

13            "The Degas that was shown on your email is a

14        Russian production from 15 years ago of Degas" --

15            **THE COURT:**  You misspoke.  You said "production" --

16            **MS. HARRIS:**  Oh, sorry.

17            **THE COURT:**  -- and I think you meant "reproduction."

18            **MR. BRUGNARA:**  She did it --

19            **THE COURT:**  Please start over.

20            **MS. HARRIS:**  I'm sorry about that, your Honor.

21   **BY MS. HARRIS:**

22   **Q**    (As read)

23            "The Degas that was shown on your email is a

24        Russian reproduction from 15 years ago of Degas

25        original sculptures from 100 years ago.  These

1          reproductions of the Little Dancer were sold by the

2          Russian Foundry at $65,000 each in 2000 through

3          2004."

4          Do you have any idea what Mr. Brugnara is talking about?

5   **A**    No.  This is just total -- you know what, can I say?  He

6   hadn't even opened the crate.  So you can't determine all these

7   ideas just from looking at a crate.

8              **MR. BRUGNARA:**  Your Honor, objection.

9              **MS. HARRIS:**  Okay.

10             **MR. BRUGNARA:**  Your Honor, objection.  She's making a

11  state-of-mind statement regarding my state of mind based upon

12  the evidence presented, the high resolution photos.  And then

13  she's making a determinative of my state of mind based upon

14  what I was thinking and what I relied upon.

15             **MS. HARRIS:**  Your Honor, I'm going to move to strike

16  Mr. Brugnara's remarks.

17             **THE COURT:**  Well, that motion is granted.

18      I'm trying to remember what the witness said.  You -- but

19  you don't know whether he opened the crates after you left, so

20  that --

21             **THE WITNESS:**  I do.

22             **THE COURT:**  How do you know that?

23             **THE WITNESS:**  Because when the FBI obtained them,

24  confiscated them, I was brought in to authenticate them and

25  they had never been opened.

1              THE COURT:  Which ones?

2              THE WITNESS:  All four that he had.  And he kept the

3  Degas and he won't tell us where it is.

4              MR. BRUGNARA:  I object, your Honor.

5              THE COURT:  Well, I think that objection is -- is

6  overruled.

7       Well, all right.  The testimony will stand.

8              MR. BRUGNARA:  Your Honor.

9              MS. HARRIS:  Okay.  Can I --

10             MR. BRUGNARA:  Your Honor.

11             MS. HARRIS:  -- reask --

12             MR. BRUGNARA:  Your Honor.

13             MS. HARRIS:  -- the question --

14             MR. BRUGNARA:  Your Honor.

15             MS. HARRIS:  -- your Honor?

16             MR. BRUGNARA:  Her answer just affirmed your

17 question.

18             THE COURT:  Which was?

19             MR. BRUGNARA:  Well, it was under the presumption if

20 this was delivered and I opened it, I certainly would have seen

21 it.  I mean, you know, this is ridiculous.

22             THE COURT:  The jury -- the jury will understand the

23 purport of the testimony and the basis for her comment that he

24 had not opened the crates.  So that's now been clarified.

25       Next question.

1  **BY MS. HARRIS:**

2  **Q**    Okay.  Getting back to the text message that we were

3  discussing.

4  **A**    Yes.

5  **Q**    Okay.  There is some verbiage about the Degas.  Do you see

6  what Mr. Brugnara -- Brugnara is writing:

7         "The Degas that was shown on your email is a

8         Russian reproduction from 15 years ago of Degas

9         original sculptures from 100 years ago."

10         Do you see that?

11 **A**    Yes, I do.

12 **Q**    Of all the pieces that were shipped to Mr. Brugnara, based

13 on your experience, what was the most valuable single piece of

14 art?

15 **A**    The Degas.

16 **Q**    The Little Dancer?

17 **A**    The Little Dancer.

18 **Q**    Now, Mr. Brugnara in Exhibit 80 talks about the George

19 Luks.

20         "The Luks portrait, if authentic, is worth 30k

21         to 50k, according to Sotheby's, New York City."

22         Do you have any idea what that is referring to?

23 **A**    Well, since Sotheby's hasn't seen it, except to give a

24 value many, many years ago, and it certainly was nothing like

25 that.

1  Q    How much did you pay for the George Luks in 2013?

2  A    350,000.

3  Q    Which you paid $350,000 for the George Luks, is that what

4  you thought it was worth?

5  A    Yes.

6  Q    Okay.  Now let's look at the last line of this page where

7  it starts:

8           "In short, the actual commercial value of the

9       gift received."

10      Do you see that?

11 A    Yes.

12 Q    If we could blow that up?

13      (Document enlarged.)

14 Q    See where Mr. Brugnara says:

15           "In short, the actual commercial value of the

16       gift received, if they are what you state in your..."

17      And then it continues on.

18           "... in your email to my attorney..."

19      And it goes to the next page.

20           "... is approximately 100,000 to $120,000."

21      What was the approximate value of the art that you sold to

22 Mr. Brugnara as indicated by the prices you quoted him, the

23 total value?

24           **MR. BRUGNARA:**  Your Honor, that's hearsay.

25 A    $11 million.

1          **THE COURT:**  What?

2          **MR. BRUGNARA:**  She can ask her what her opinion of

3    the value is, but she said what is the value of that.  That's

4    hearsay.

5          **THE COURT:**  Well, the jury will understand that

6    the -- the basis for her testimony.

7          The objection is overruled.  Please answer.

8    **A**    $11 million.

9    **BY MS. HARRIS:**

10   **Q**    And then Mr. Brugnara continues to maintain this is a

11   gift.

12          "The commercial value of the gift received, if

13        they are what you state in your email to my attorney,

14        is approximately 100,000 to $120,000 total.  This is

15        the gift valuation I will use for my records."

16        Again, did you ever make a gift of any of the art that was

17   shipped to Mr. Brugnara on April 7, 2014?

18   **A**    Absolutely not.

19   **Q**    Was the first time that Mr. Brugnara made the claim that

20   the artwork that was delivered on April 7, 2014 was a gift in

21   this text message?  Was that the first time you ever heard

22   that?

23   **A**    Yes.

24   **Q**    Now, Mr. Brugnara in his text message that we looked at,

25   Government's Exhibit 80, maintained that the gift valuation

1   that he was going to use was 100,000 to $120,000 for the art

2   that he kept.

3         Did he ever pay you that amount?

4   A    No.

5   Q    Did he ever pay you any amount?

6   A    No.

7   Q    As you sit here testifying today did Mr. Brugnara ever pay

8   you a single penny for the art that was shipped on April 7,

9   2014?

10  A    Not one penny.

11  Q    Did Mr. Brugnara ever return any of the art that was

12  delivered on April 7, 2014?

13  A    No, he didn't.

14  Q    You mentioned that you were actually personally present

15  when some of the crates of art were opened that the FBI had

16  seized.  Do you remember that testimony?

17  A    Yes, that is true.

18  Q    And you gave that in response to the Court's questions; do

19  you remember that?

20  A    Yes.

21  Q    Okay.  Was all of the art recovered that had been

22  delivered to Mr. Brugnara?

23  A    No.  Every -- all -- the four crates were there and had

24  never been opened.  And the one crate with the Degas Little

25  Dancer, 14 Year Old Dancer, was missing.

1  **Q**    Has the Little Dancer that was shipped to Luke Brugnara

2  ever been recovered?

3  **A**    Not to this moment.  He refuses to...

4          **MS. HARRIS:**  Your Honor, I have no further questions.

5          **THE COURT:**  All right.  Well, it's 11:30.  We're

6  going to take a 15-minute break and then we'll come back for

7  cross-examination.  Thank you.

8          **THE CLERK:**  All rise.

9      (Jury exits the courtroom at 11:30 a.m.)

10         **THE COURT:**  Please be seated.

11     Ms. Littlejohn, you may take a 15-minute break.  Just be

12 back.

13     Do you have something to take up with the judge?

14         **MR. BRUGNARA:**  I would like -- if Ms. Rose would like

15 to hear, also.  I just want to make sure that she doesn't speak

16 to anybody from the U.S. Attorney's Office and that the

17 Marshals, to preserve the integrity of the testimony on the

18 cross --

19         **THE COURT:**  Once the cross examination starts, that's

20 the rule, so.  But it hasn't started yet.

21         **MR. BRUGNARA:**  That's not my understanding.  They

22 can't -- they can't speak to her and -- and -- speak to a

23 witness.  That's witness tampering.

24         **MS. HARRIS:**  Your Honor --

25         **THE COURT:**  I --

1           **MS. HARRIS:**  -- I understand what the elements of

2  proof are for criminal witness tampering.  I will not talk to

3  Ms. Littlejohn at all.

4       But I have some things I would like to address with the

5  Court before cross examination starts, and I would like that to

6  be done outside the presence of the witness.

7           **THE COURT:**  All right.  You may step down and go out

8  into the hallway.

9       (Witness steps down.)

10          **MR. BRUGNARA:**  Your Honor, the Marshals are going

11  to -- are going to make sure of that, correct?

12          **THE COURT:**  Make sure of what?

13          **MR. BRUGNARA:**  Well, that the integrity of the court

14  is preserved.

15          **THE COURT:**  The rule in my courtroom is that once the

16  cross examination starts, the lawyers are not supposed to talk

17  to the witness.

18          **MR. BRUGNARA:**  Okay.

19          **THE COURT:**  But it hasn't started yet.  You haven't

20  asked the first question on cross.

21          **MR. BRUGNARA:**  All right.  But my understanding --

22          **THE COURT:**  That's your understanding.  I'm the one

23  that makes the rules, and that is the rule.

24          **MR. BRUGNARA:**  So you're saying that witnesses can --

25  can be prepared before testimony and that's not witness

 1  tampering?

 2          THE COURT:  Witnesses can be interviewed.

 3          MR. BRUGNARA:  Interviewed for information, that's

 4  correct.

 5          THE COURT:  And they can be interviewed.  And the

 6  Government, in my view, is free to do that now.  But once you

 7  start with your cross --

 8          MR. BRUGNARA:  Well, hold.  Hold.  Hold.

 9          THE COURT:  -- then there is a problem.

10          MR. BRUGNARA:  They can be interviewed for

11  information?  She's -- they've already -- they've already

12  questioned her.  What -- what -- what purpose would an

13  interview serve?

14          THE COURT:  You don't get to ask those questions.

15  Your point is preserved for appeal.

16      All right.  When do you want to bring up?

17          MS. HARRIS:  Your Honor, based on the way that

18  Mr. Brugnara attempted to cross examine Mr. Maibaum, I want to

19  make sure that we have certain understandings, because he was

20  testifying, getting in absolute rank hearsay.  And the Court

21  was continually forced, unfortunately, to instruct the jury to

22  disregard the -- the question or to strike certain aspects of

23  the testimony.

24      And my concern is that Mr. Brugnara, as he told his mother

25  he was going to do, is going to do the exact same thing with

```
 1   Ms. Long.  His view is once it's out, the jury has heard it.
 2   We know that's his view.  We provided you the telephone call,
 3   and he's demonstrated --
 4              MR. BRUGNARA:  Your Honor.  Your Honor --
 5              MS. HARRIS:  I am not finished.  I am not finished.
 6        (Continuing) -- and that is the concern the Government
 7   has.  It would be absolutely improper, and it's very confusing
 8   for the jury.
 9        They are presumed to follow the Court's instructions, but
10   Mr. Brugnara is trying to do what it is that he said he was
11   going to do when he talked to his mother.
12        And I want to make sure that he understands what hearsay
13   is and what his statements are that are not admissible.  They
14   are not admissions coming from him.
15              MR. BRUGNARA:  Okay.  My response to that is I wrote
16   down your four directives from two days ago, and I memorized
17   them, your Honor, and I followed them.  And I'm not an
18   attorney, and I'll do my best to present the evidence, to make
19   sure it's presented, because that's the only way it's going to
20   benefit me, if the evidence comes into evidence.
21        So if I have a question, I'll go back and ask Mr. Tamor
22   and Mr. Stevens.
23              THE COURT:  I think the Government is right.  But I
24   don't know what more I can say than I have already said.  And
25   I'm trying, struggling the best I can to give a fair trial to
```

1 somebody who refused a lawyer.

2          **MR. BRUGNARA:**  Your Honor --

3          **THE COURT:**  I don't know.  Mr. Brugnara, if you get

4 out -- you've gotten out of line so many times in this trial

5 that -- but I'm ordering you to comply with the Rules of

6 Evidence.  There.

7     Now, the --

8          **MR. BRUGNARA:**  Can I use the bathroom?

9          **THE COURT:**  But there is one thing -- let's not --

10 there is one thing that you said, Ms. Harris, that's not right,

11 which is that the give-and-take on this transaction -- all of

12 these emails, it's not true that you can just put in your side

13 and he can't put...

14     Anything that deals with the back-and-forth between Ms.

15 Long and Mr. Brugnara should be laid before the jury, because

16 that's part of the transaction.  So that if you just put in the

17 part that helps you, he's entitled to put in the part of those

18 emails and telephone calls that help him.

19          **MS. HARRIS:**  I understand that, your Honor.  My point

20 is that when Mr. Maibaum was on cross examination, that is not

21 what Mr. Brugnara did.

22          **MR. BRUGNARA:**  Your Honor.

23          **MS. HARRIS:**  He put --

24          **MR. BRUGNARA:**  Your Honor.

25     (Unreportable cross talk.)

```
 1              THE COURT:  Stop.  Wait.

 2              MR. BRUGNARA:  She's trying to disrupt my cross --

 3              MS. HARRIS:  He put --

 4              MR. BRUGNARA:  Your Honor.  Your Honor.  I need to

 5   prepare for any cross examination -- and I -- and she's trying

 6   to disrupt my cross examination.

 7              THE COURT:  Stop.  Stop.

 8              MR. BRUGNARA:  Your Honor, please.

 9              MS. HARRIS:  I'm not finished.

10              MR. BRUGNARA:  I need to go to the bathroom, please.

11              THE COURT:  All right, look.  We're going to leave it

12   there.  If you get out of control, Mr. Brugnara, I have to

13   overrule your objections.  I have to tell the jury to disregard

14   it.  And, you know, you're -- you're trying your own case.

15         I will say this.  I don't think you're helping yourself.

16              MR. BRUGNARA:  Well, your Honor --

17              THE COURT:  I think the way you're going about this

18   is -- is that you're digging the hole deeper --

19              MR. BRUGNARA:  What?

20              THE COURT:  -- is my professional opinion.  But

21   you're in charge of your case --

22              MR. BRUGNARA:  Well --

23              THE COURT:  -- and you're the lawyer.

24              MR. BRUGNARA:  I have been sitting in a dungeon for

25   11 months, and this is not my preference.  And I can't wait
```

1   four months for a competent attorney to present my case.  I was

2   put in this position, not by my choice.

3          **THE COURT:**  Well, take that up with the Court of

4   Appeals.

5       We're going to take a few minutes break and come back.

6   Please be ready to go.

7       (Whereupon there was a recess in the proceedings

8          from 11:36 a.m. until 11:49 a.m.)

9          **MS. HARRIS:**  Your Honor, I understood the Court's

10  position, and I agree with it, that the course of dealings

11  between the two come in.  But Mr. Brugnara cannot testify to

12  his own hearsay statements.  He can only ask Ms. Long what he

13  said to her.  He can't say:  I told you X, Y, and Z, didn't I?

14  He can say:  What did I tell you.

15         **THE COURT:**  Why can't he use a leading question?

16         **MS. HARRIS:**  He can lead, but he can't testify as to

17  what he said.  That's hearsay from him.

18         **THE COURT:**  But he could say:  Didn't I tell you the

19  light was red?  Why can't he do that?  If a lawyer in good

20  faith does that -- I mean, if a lawyer in good faith said:

21  Didn't so-and-so tell you the light was red?

22         **MS. HARRIS:**  Our concern is the second part of the

23  question.

24         **THE COURT:**  I understand that it can be very easily

25  abused.

```
 1              MS. HARRIS:  Okay.
 2              THE COURT:  But I -- it is a proper form of question.
 3   I can't rule it out completely.
 4              MS. HARRIS:  Okay.
 5              THE COURT:  Come on up here, Ms. Long.
 6       Welcome back.  Please have a seat.
 7       (Brief pause.)
 8              THE COURT:  Everyone over there in the jury box got
 9   your notepads ready and ready to go?  All right.  Good.
10       Madam Witness, are you ready?
11              THE WITNESS:  Yes.
12              THE COURT:  Mr. Brugnara, the floor is yours.
13              MR. BRUGNARA:  Thank you, your Honor.
14                         CROSS EXAMINATION
15   BY MR. BRUGNARA::
16   Q    Hello, Ms. Long.
17   A    Hello.
18   Q    So, Ms. Long, I listened to your testimony and --
19              THE COURT:  No speeches.  Just ask questions.
20   BY MR. BRUGNARA:
21   Q    Ms. Long, are you familiar with a lawsuit in the Southern
22   District of New York Federal Court ongoing right now, Maibaum
23   versus Long?
24   A    Yes.
25   Q    Maibaum versus Littlejohn?
```

1   A      Yes.

2   Q      Are you Long/Littlejohn --

3   A      Yes.

4   Q      -- in that lawsuit?

5          Ms. Long, is the painting that you were trying to sell --

6   and I'm going to qualify the Brugnara Properties/Luke Brugnara,

7   we'll just say "me" or "Brugnara," okay, for the --

8              MS. HARRIS:   Your Honor, I'm going to object to that.

9              THE COURT:   Sustained.

10  BY MR. BRUGNARA:

11  Q      Was the painting that you were selling to -- I'm going to

12  call it "Brugnara" -- Brugnara, was one of them a Luks called

13  Portrait of Gertrude Vanderbilt Whitney?

14  A      Yes.

15  Q      Okay.  And do you -- do you affirm that that's one of the

16  paintings whereas you're suing Mr. Maibaum on a counterclaim in

17  the Maibaum versus Long/Maibaum versus Littlejohn lawsuit

18  whereas you're filing a counterclaim against Mr. Maibaum?

19  A      No, that's not it at all.

20  Q      That's not?

21  A      No.

22  Q      Do you -- are you aware that the Federal District Court of

23  New York has a counterclaim whereas you're making a

24  counterclaim against Mr. Long [sic] under the penalty of

25  perjury and have filed documents with the Federal Court of New

```
 1  York --
 2          MS. HARRIS:  Objection, your Honor.
 3  BY MR. BRUGNARA:
 4  Q    -- regarding the Portrait of Gertrude Vanderbilt Whitney
 5  by George Luks?
 6          MS. HARRIS:  Objection, your Honor.  That assumes
 7  facts not in evidence.
 8          THE COURT:  Sustained.
 9  BY MR. BRUGNARA:
10  Q    Ms. Long, do you remember writing a reply to the complaint
11  from Mr. Maibaum that during the summer of 2013 --
12          MS. HARRIS:  Objection, your Honor.
13  BY MR. BRUGNARA:
14  Q    Ms. Littlejohn --
15          THE COURT:  Wait, wait.  I'm sorry.
16          MS. HARRIS:  Objection, your Honor.
17          THE COURT:  What's the objection?
18          MS. HARRIS:  Hearsay.
19          MR. BRUGNARA:  You Honor, you already said this --
20  this lawsuit is admitted on the in limine motions.  We talked
21  about it for a half hour.
22          THE COURT:  No.  I said things that were otherwise
23  admissible could come in about this.
24          MR. BRUGNARA:  And the art in this case you said, not
25  the art not in this case.
```

 1          **THE COURT:**  The art in this case.  So what -- so what
 2    is the point you're trying to get at?
 3          **MR. BRUGNARA:**  The point is --
 4          **THE COURT:**  What paragraph are you looking at in the
 5    counterclaim?
 6          **MR. BRUGNARA:**  I am looking at the exact one we
 7    looked at in the in limine, 17.  Page 17, No. 17.
 8          **THE COURT:**  17, No. 17.
 9          **MR. BRUGNARA:**  It says, "During the" --
10          **THE COURT:**  Wait, wait, wait, wait.  Let me read it
11    again to myself.  Did I read this out loud the other day?
12          **MR. BRUGNARA:**  Yes.
13          **THE COURT:**  Just a minute.
14       (Brief pause.)
15          **THE COURT:**  So here is what I -- I'm going to try
16    to -- to make this go smoothly, Ms. Long.
17       I have before me the counterclaim.  I don't think this is
18    under penalty of perjury.
19          **MS. HARRIS:**  It is not.
20          **THE COURT:**  I don't know where you got that idea.
21          **MR. BRUGNARA:**  Your Honor, this is filed --
22          **THE COURT:**  This is not --
23          **MR. BRUGNARA:**  This is Rule -- Federal Rule -- this
24    is civil court that I'm familiar with.  It's Federal Rule 106,
25    and it -- and whoever --

1          THE COURT:  Show it to me right now where it's under

2     oath.

3          MR. BRUGNARA:  Civil, Civil Rule --

4          THE COURT:  Show me where it's under oath.

5          MR. BRUGNARA:  106.

6          THE COURT:  It's not.

7          MR. BRUGNARA:  Okay.  Your Honor --

8          THE COURT:  The jury will disregard the comments that

9     Mr. Brugnara made about things under penalty of perjury.  I've

10    got the counterclaim right here.  It's signed by the lawyer,

11    and it's not signed by her and it's not under oath.

12         MR. BRUGNARA:  Okay.  Your Honor, Federal Rule 106 is

13    where an attorney will be disbarred if they file a frivolous

14    lawsuit with a federal court in the jurisdiction of the federal

15    district courts and civil courts.

16      So, I guess, assuming this attorney is prepared to be

17    disbarred, lying on behalf of Mrs. Long -- or Ms. Long.

18         MS. HARRIS:  Your Honor --

19         THE COURT:  Everything that Mr. Brugnara said is

20    incorrect.  It is not the law.  He doesn't know what he's

21    talking about.  Disregard it.

22      Now, I'm going to let you refer to Paragraph 17 --

23         MR. BRUGNARA:  Okay.

24         THE COURT:  -- but --

25

**BY MR. BRUGNARA:**

**Q**    So Paragraph --

        **THE COURT:**  Just a minute.  I'm going to -- I'm going
to assist here.  I'm going to read what your lawyer said in the
case in New York, all right, in what's called a counterclaim.
And it does mention Portrait of Gertrude Vanderbilt Whitney, so
pay attention.

        Paragraph 17:

        "During the summer of 2013, Ms. Littlejohn

        offered the Prenderghast and Luks Portrait of

        Gertrude Vanderbilt Whitney to a number of auction

        houses for possible sale at auction.  She learned

        from the auction houses that both paintings had

        previously been offered to the auction houses.  The

        mere fact that a work of art is offered to numerous

        potential buyers or auction houses can decrease the

        market value for the work of art.  The auction houses

        had also concluded that the paintings had been

        damaged and heavily restored and rejected both for

        inclusion in any auctions.

        "In addition, Ms. Littlejohn had a restorer

        examine the Luks --

        **MS. HARRIS:**  Your Honor --

        **THE COURT:**  (Reading)

        "-- Feeding the Chickens" -- just a minute --

```
 1          "and he informed Ms. Littlejohn that it is not

 2          authentic."

 3       All right.  What is your objection, Ms. Harris?

 4              MS. HARRIS:  That is not in the case --

 5              THE COURT:  I understand that.  But I'm trying to

 6    move this along.  There was a reference to Vanderbilt.

 7       All right.  Did you hear the reference to Vanderbilt?

 8              THE WITNESS:  Yeah, but I had never read that.

 9              THE COURT:  So you haven't read this document?

10              THE WITNESS:  No.

11              THE COURT:  All right.

12              MR. BRUGNARA:  Your Honor.

13    BY MR. BRUGNARA:

14    Q   So, Ms. Littlejohn, you testified earlier today that, in

15    fact, the Luks -- you testified today, Ms. Littlejohn, that the

16    Luks -- I want to use the exact quote from your email, which

17    you've already affirmed is in evidence right now.  It's

18    entitled "de Kooning, Picasso, Luks" is the heading.

19       It says:

20          "No auctions or dealers have tried to obtain

21          it" -- excuse me.

22          "No one but auctions or dealers have tried to

23          obtain it.  Just to try by the auction house to

24          obtain it."

25       And you sent that email to me regarding the George Luks'
```

1   Portrait of Gertrude Vanderbilt Whitney.  Again, I'll repeat

2   that:

3              "Just to try by the auction house to obtain it."

4         **THE COURT:**  Show Ms. Harris what you're referring to.

5         **MS. HARRIS:**  What exhibit number is this?

6      (Whereupon, document was shown to counsel.)

7   **BY MR. BRUGNARA:**

8   **Q**    And --

9         **THE COURT:**  And the exhibit number is what?  So we

10  can keep straight what the exhibit number is you're reading

11  from.

12        **MR. BRUGNARA:**  Your Honor, can I put this on the

13  screen for the jury to see?

14        **THE COURT:**  No, you can't.  I want to know the

15  exhibit number first.

16        **MR. KINGSLEY:**  It's on the bottom right of the page.

17  Exhibit 58.

18        **THE COURT:**  58.

19  **BY MR. BRUGNARA:**

20  **Q**    On Exhibit No. 58 --

21        **THE COURT:**  It is in evidence.  All right.  You may

22  use -- you can put it on the screen, if it's in evidence.

23        **MR. BRUGNARA:**  Okay.

24      (Document displayed)

25        **MS. HARRIS:**  Your Honor --

```
1            MR. KINGSLEY:  He's got his notes all over it.
2            THE COURT:  You can't put your -- your propaganda on
3    there.  That's not right.
4            MR. BRUGNARA:  That -- that's an unfair prejudicial
5    comment, "propaganda."  There is no propaganda.
6            THE COURT:  Well, your -- your comments to yourself
7    that you're trying to get -- lay before the jury through the
8    Elmo are not proper.
9            MR. BRUGNARA:  Okay.
10           THE COURT:  So you -- you can use the official
11   exhibit.
12           MR. BRUGNARA:  Can I have a copy of the official
13   exhibit?
14           THE COURT:  The jury will disregard my "propaganda"
15   comment.  Please don't hold that against Mr. Brugnara.
16       Can we get a clean copy?  Will the Government help me
17   here?
18           MS. HARRIS:  Yes.  This is the original Exhibit 58.
19       (Document tendered to the defendant.)
20           THE COURT:  All right.  That's the one we ought to be
21   using.
22       (Document displayed)
23           MR. BRUGNARA:  Can you -- can we highlight --
24           THE COURT:  No.  You can't highlight on an Elmo.
25           MR. BRUGNARA:  All right.
```

1   BY MR. BRUGNARA:

2   Q    It's pretty self-explanatory.  Doesn't need a lot of

3   explanation here.

4        You -- Ms. Long, isn't it true, were trying to advance to

5   me a painting that you testified that you invested $350,000

6   into and then tried in vain to get the auction houses to sell

7   it to recover your losses after you found out that it was

8   damaged and heavily restored, and, in fact, tried to sell it to

9   me for $450,000 and told me that, in fact, the auction houses

10  not only didn't reject it, but they actually wanted it?

11       Is that -- is that the truth, Ms. Long?  Is that the

12  truth, that the auction houses wanted it?

13           MS. HARRIS:  Your Honor, I'm going to object --

14  A    The way that --

15           THE COURT:  Wait, wait, wait, wait.  One moment.

16  What's the objection?

17           MS. HARRIS:  Compound.  Vague.

18           THE COURT:  Sustained on grounds of compound.

19  BY MR. BRUGNARA:

20  Q    Ms. Long, did the auction houses want the George Luks

21  painting in their auction?

22  A    Yes.

23  Q    Really?  Well, I guess your attorney --

24           MS. HARRIS:  Your Honor --

25  Q    -- will be disbarred in -- in New York.

```
 1              THE COURT:  All right.  So the --

 2              MS. HARRIS:  Your Honor, objection.  I move to

 3   strike.

 4              THE COURT:  The comments will be stricken.  The jury

 5   will disregard about disbarring somebody in New York.

 6              MR. BRUGNARA:  Okay.

 7   BY MR. BRUGNARA:

 8   Q    So Ms. Long --

 9              THE COURT:  Disregard the comment "Really?"

10   BY MR. BRUGNARA::

11   Q    Ms. Long, you're saying that what your attorney filed in

12   Federal Court --

13              THE COURT:  She said she did not read the document.

14   BY MR. BRUGNARA::

15   Q    -- last month --

16              THE COURT:  She said she did not read the document.

17   It's not an adopted -- she has not adopted it.  You may not

18   refer to it.

19              MR. BRUGNARA:  You -- you're inferring adoption from

20   reading it?

21              THE COURT:  She said --

22              MR. BRUGNARA:  Your Honor, you are --

23              THE COURT:  -- she did not read the document.

24              MR. BRUGNARA:  Your Honor, you are protecting the

25   witness, and this is prejudicial to me.
```

1          MS. HARRIS:  For failing to --

2          MR. BRUGNARA:  First it's "propaganda."  Now

3  you're -- now you're not even allowing me to cross-examine her.

4          THE COURT:  No.  She said she had not read the

5  document.  Is that true?  I don't know.

6          MR. BRUGNARA:  Okay.  Well, your Honor -- your Honor,

7  I would like to do a 17(a) subpoena right now for her attorney

8  and bring them in here on an express flight from New York.  And

9  I bet you everything I have in the planet when we sit that

10 attorney down, he will impeach what she said.

11         THE COURT:  You know what --

12         MR. BRUGNARA:  And that pretty much is the case in a

13 nutshell.  She's a liar.

14         THE COURT:  No.

15         MR. BRUGNARA:  And I have got -- I have 100 other

16 here.  Shall we start -- let's forget about that.  I --

17         THE COURT:  I have -- I have a proposal for you.

18         MR. BRUGNARA:  I have a good one.  I have a good one.

19 I have a good one here.  Let's start with another good one.

20         THE COURT:  No.

21 BY MR. BRUGNARA:

22 Q    Okay.  Ms. Long --

23         THE COURT:  Just a minute.

24         MS. HARRIS:  Your Honor --

25         THE COURT:  Mr. Brugnara, please.  We have already

 1  read to the jury.  I read myself the paragraphs you wanted read

 2  yesterday, and -- before I realized today that she had never

 3  seen the document, you've already gotten the benefit of it.

 4      I will let you continue to make whatever point because I

 5  read it to the jury myself.  The jury now understands that she

 6  didn't read the document herself and that her lawyer made these

 7  statements on her behalf from New York.

 8  **BY MR. BRUGNARA:**

 9  **Q**    Okay.  Ms. Long --

10       **THE COURT:**  That's good enough.  That's the best you

11  could ever possibly get out of this situation.

12  **BY MR. BRUGNARA:**

13  **Q**    Ms. Littlejohn --

14       **MR. BRUGNARA:**  No, it's not, because I would like her

15  to answer these questions.

16  **BY MR. BRUGNARA:**

17  **Q**    Ms. Littlejohn, are you saying in this courtroom today

18  under the penalty of perjury that your attorney, Mister -- who

19  is your attorney, Ms. Long, in this -- in this cross-complaint?

20  Who is your attorney, Ms. Long?

21  **A**    Phil Patterson.

22  **Q**    So are you telling me that Mr. Phil Patterson, Esq.

23  misrepresented your statements to a federal district sitting

24  judge in the state of New York?

25       **MS. HARRIS:**  Your Honor, I'm going to object to this.

 1            **THE COURT:**  I'm going to sustain the objection.  It's

 2  argumentative.

 3            **MR. BRUGNARA:**  It's not argumentative.  Because --

 4            **THE COURT:**  Yes.

 5            **MR. BRUGNARA:**  -- it goes to truthfulness of the

 6  witness, and that's what this entire case is about.

 7            **MS. HARRIS:**  Your Honor --

 8            **THE COURT:**  No.

 9            **MR. BRUGNARA:**  If you believe her truthfulness or

10  not.  And you've already put that on the record for 11 months.

11  It goes to truthfulness.

12            **MS. HARRIS:**  Your Honor --

13            **MR. BRUGNARA:**  And -- and -- and --

14            **THE COURT:**  There are other ways to get at --

15            **MR. BRUGNARA:**  -- and -- and --

16            **THE COURT:**  -- credibility of the witness other than

17  she has said that she did not read the document.

18            **MR. BRUGNARA:**  Credibility of the witness,

19  truthfulness and character.  Credibility of the witness.

20            **THE COURT:**  That's -- that's worthwhile pursuing, but

21  not the way you're doing it.

22            **MR. BRUGNARA:**  Okay.

23  **BY MR. BRUGNARA:**

24  **Q**   Ms. Littlejohn, how did your attorney, Mr. Patterson,

25  contrive these lies in this district court filing if you didn't

1  give him the information to write the document?

2          **MS. HARRIS:**  Your Honor, I will object.  It's

3  argumentative.

4          **THE COURT:**  It is.  It is.

5  **BY MR. BRUGNARA:**

6  **Q**   Okay.  Ms. Littlejohn --

7          **THE COURT:**  Why don't you -- can I --

8  **BY MR. BRUGNARA:**

9  **Q**   Is the painting by George Luks heavily damaged and heavily

10  restored?

11  **A**   It has some restoration in the black area, not in the

12  figure of --

13  **Q**   Ms. Long --

14  **A**   -- Gertrude Vanderbilt Whitney.

15  **Q**   -- why didn't you disclose that to Luke Brugnara?

16  **A**   Because we never got anywhere to discuss anything, the way

17  it was.

18  **Q**   Why --

19  **A**   You avoided anything.

20  **Q**   So you agree there was no contract?

21          **MS. HARRIS:**  Your Honor, I'm going to object.  That

22  calls for a legal conclusion.

23  **BY MR. BRUGNARA:**

24  **Q**   Ms. Littlejohn, do you --

25          **MR. BRUGNARA:**  Are you trying to say there was no

```
 1  contract, your Honor?
 2            MS. HARRIS:  Your Honor --
 3            THE COURT:  Just a second.
 4            MR. BRUGNARA:  She just said we got nowhere.  I am --
 5  BY MR. BRUGNARA:
 6  Q    Can you clarify what "we got nowhere means" --
 7            MS. HARRIS:  Your Honor --
 8  BY MR. BRUGNARA:
 9  Q    -- Ms. Littlejohn?
10            MS. HARRIS:  -- there is no question pending.
11            THE COURT:  Just a minute.
12  BY MR. BRUGNARA:
13  Q    Can you clarify what you mean by "we didn't get anywhere"?
14            MS. HARRIS:  Your Honor --
15  BY MR. BRUGNARA:
16  Q    I mean, we're not talking about traveling.  You're talking
17  about a metaphor --
18            THE COURT:  Mr. Brugnara --
19  BY MR. BRUGNARA:
20  Q    -- for no transaction, correct?
21            MS. HARRIS:  Your Honor --
22            THE COURT:  The jury will disregard this argument.  I
23  told you a moment ago, a few hours ago, the Government does not
24  have to prove there is any contract.  That's not part of a wire
25  fraud case.
```

1           **MR. BRUGNARA:**  Your Honor, you've already ruled on

2   the motion to a limine in this court that whether or not there

3   is a contract is material to this case.  It goes to state of

4   mind of both the defendant and -- excuse me, the accused and --

5   and -- and the defendant in this case, and you already ruled --

6           **THE COURT:**  I ask you, please, when I am admonishing

7   the jury, please don't interrupt me.  I lost my train of

8   thought.

9           **MR. BRUGNARA:**  Okay.  I just want to get --

10          **THE COURT:**  Wait a minute.  Wait a minute.  I'm going

11  to explain something to the jury, and this is also the ruling

12  on this evidentiary point.

13          The term -- the give-and-take that happened between these

14  two people is important because that's part of the essence of

15  what the Government is trying to prove or not prove and what

16  Mr. Brugnara is trying to prove or not prove.  That's all fair

17  game.  I understand that.

18          But in a wire fraud case, in a mail fraud case, nobody has

19  to prove that there was or was not a contract.  This is not a

20  breach of contract case.  This is an allegation by the

21  Government that Mr. Brugnara made false statements or omissions

22  in order to get Ms. Long and, I guess, her partner to part with

23  valuable property.

24          **MR. BRUGNARA:**  Your Honor, you're putting a defense.

25  And the fact of the matter is, your Honor, the defense goes to

```
 1  state of mind, because there cannot be fraud unless I intended
 2  to defraud Ms. Long.  The key sole element of fraud is my
 3  intent to steal from that woman.
 4          THE COURT:  All right.
 5          MR. BRUGNARA:  So --
 6          THE COURT:  This -- you don't get to admonish the
 7  jury.  I get to.  So you have to wait --
 8          MR. BRUGNARA:  Okay.  Can I finish --
 9          THE COURT:  -- for your closing argument --
10          MR. BRUGNARA:  Can I finish?
11          THE COURT:  -- and then you can make your closing
12  argument.
13          MR. BRUGNARA:  Okay.  Your Honor, I would like to
14  finish my questions, too, about the --
15          THE COURT:  Just a moment.  But you injected such
16  erroneous things in the presence of the jury --
17          MR. BRUGNARA:  That's not erroneous.  Are you saying
18  that -- that -- that fraud, the element of fraud is not my
19  intent?
20          THE COURT:  Please, Mr. Brugnara.  I'm explaining to
21  the jury.
22      So contract or not is not a requirement.  But the terms
23  and conditions of what was discussed between the two of them,
24  of course, that's relevant.
25      And it does -- and Mr. Brugnara is correct.  His state of
```

1    mind is a very important issue in this case, and the jury

2    instructions will make that very clear.

3         All right.  So if you don't have any more questions,

4    Mr. Brugnara, I'm going to bring it to a close.

5              MR. BRUGNARA:  I do, your Honor.

6              THE COURT:  All right.  So if you have more

7    questions, let's -- let's go to them.  But I --

8              MR. BRUGNARA:  I just -- I just want -- I just want

9    your Honor to admonish the FBI agent for laughing and

10   disrespecting the Court and the integrity of the Court.

11   Mr. Desor, not surprisingly.

12             THE COURT:  All right.  I'm not going to do that

13   right now.

14             MR. BRUGNARA:  Okay.  So --

15             THE COURT:  Let's go -- let's move on.

16             MR. BRUGNARA:  I'll -- I'll repeat the question.

17   BY MR. BRUGNARA:

18   Q    Is the George Luks painting that you tried to sell to

19   Brugnara heavily damaged and heavily restored?

20   A    No.

21   Q    As to --

22   A    It had -- some -- someone put their foot through one side

23   of the very dark part, and it was restored.

24   Q    Ms. Long, that's a "yes" or "no" question, and you just

25   said "no" --

1  **A**   I just told you.

2  **Q**   -- and then you said "yes."

3       Ms. Long --

4  **A**   You don't --

5  **Q**   -- did you disclose to --

6  **A**   You said "heavily."

7           **MS. HARRIS:**  Your Honor, please.

8  **BY MR. BRUGNARA:**

9  **Q**   -- Mr. Brugnara that the painting --

10      (Unreportable cross talk.)

11          **MR. BRUGNARA:**  Your Honor, it's a "yes" or "no"

12 question.

13          **THE COURT:**  No, it wasn't.  She answered it properly.

14          **MR. BRUGNARA:**  Okay.  So -- so --

15          **THE COURT:**  Go to your next question.

16 **BY MR. BRUGNARA:**

17 **Q**   So in your expertise as an art dealer, if somebody puts

18 their foot through a painting, is that not a heavily restored

19 painting?

20 **A**   Nobody jumped on it.

21 **Q**   How do you know that, Ms. Long?  You said someone put

22 their foot through it.  So how do you know if somebody put

23 their foot through it unless you actually saw them put their

24 foot through it?

25 **A**   They were hanging the picture and it fell --

1    **Q**     Okay.  That's not --

2    **A**     -- while they were hanging it.

3    **Q**     That's not someone putting their foot through it.

4              **MS. HARRIS:**  Your Honor, I'm going to ask

5    Mr. Brugnara --

6              **MR. BRUGNARA:**  I'm trying to have her qualify what

7    she's saying.  I'm impeaching her testimony.

8              **THE COURT:**  Mr. Brugnara, it is unfair to the witness

9    to not let her finish her answer --

10             **MR. BRUGNARA:**  It's unfair for me to be in jail when

11   I'm innocent, and I have had my liberty seized.

12       No one has accused me of any criminal misconduct for 50

13   years of my life, except this lady (indicating), I have a right

14   to impeach her, and I'm going to.

15             **MS. HARRIS:**  Your Honor --

16             **MR. BRUGNARA:**  Or you can let me out on bail and I

17   will have an attorney do it the right way --

18             **THE COURT:**  Mr. Brugnara --

19             **MR. BRUGNARA:**  -- because I don't prefer doing it

20   this way.

21             **THE COURT:**  Mr. Brugnara, are you too upset to

22   continue?

23             **MR. BRUGNARA:**  No, sir.  No, I'm not.

24             **THE COURT:**  Then I ask you to behave and -- and to --

25             **MR. BRUGNARA:**  You're protecting the witness, your

 1  Honor.

 2             **THE COURT:**  I am --

 3             **MR. BRUGNARA:**  I'm in jail --

 4             **THE COURT:**  I'm allowing --

 5             **MR. BRUGNARA:**  -- because of this witness's claims --

 6             **THE COURT:**  -- the allowing the witness to answer the

 7  question.

 8             **MR. BRUGNARA:**  -- that are false.

 9             **THE COURT:**  So have you finished your answer?

10             **THE WITNESS:**  Yes, I did.

11             **THE COURT:**  All right.  Next question.

12  **BY MR. BRUGNARA:**

13  **Q**    Okay.  So did you see the person put their foot through

14  the painting?

15  **A**    No.

16  **Q**    Okay.  Why did you say in your testimony under sworn

17  statement that someone put their foot through the painting?

18  **A**    Because the person I purchased it from told me what

19  happened.

20  **Q**    Why didn't you tell that to Mr. Brugnara?

21  **A**    Because it was restored.

22  **Q**    Okay.  Ms. Long, restored paintings are worth less than

23  paintings that aren't restored, isn't that correct?

24  **A**    Not if it's not in the image.  It was not in the image.

25  **Q**    So, okay.  I'm not even going to proceed further on that.

1  **A**     Well, you need to understand what you're asking.

2  **Q**     I don't need to understand.  There is no question pending,

3  Ms. Long.

4          **MR. BRUGNARA:**  I call your Honor to Page 20,

5  Paragraph 28 in the lawsuit.

6          **THE COURT:**  Say that again.  Page what?

7          **MR. BRUGNARA:**  20, No. 28 in the counterclaim.

8  **BY MR. BRUGNARA:**

9  **Q**     Now, you talk about Mr. Maibaum setting that -- quote,

10 setting about structuring the deal with the --

11         **MS. HARRIS:**  Your Honor, I'm going to object to this.

12 **BY MR. BRUGNARA:**

13 **Q**     -- with the intentional concealment of their

14 involvement --

15         **THE COURT:**  Mr. Brugnara, you cannot use this

16 document because -- unless you show that she approved of this

17 particular paragraph.  And she has already said she didn't read

18 the document.

19         **MR. BRUGNARA:**  Okay.  Well, I'd like -- I'd like to

20 get an emergency subpoena issued for Mr. Patterson.  Absolutely

21 critical at this point to have him confirm that she -- that

22 she --

23         **THE COURT:**  We'll deal with that later on.

24         **MR. BRUGNARA:**  -- affirmed --

25         **THE COURT:**  But now we have a witness on the stand.

1          **MR. BRUGNARA:**  -- that she affirmed this -- that she

2   affirmed this document.

3      I -- I don't believe that one of the top attorneys in New

4   York did not get her affirmation before he filed this and put

5   his reputation and his law -- his law degree -- or excuse me,

6   his -- his --

7          **THE COURT:**  Please.  Just ask the questions you have.

8          **MR. BRUGNARA:**  Your Honor, you already said this

9   was --

10         **THE COURT:**  -- and find out what her answers are.

11         **MR. BRUGNARA:**  Okay.

12  **BY MR. BRUGNARA:**

13  **Q**    It says, for instance --

14         **THE COURT:**  No.  Don't say what it says.  Just ask --

15         **MR. BRUGNARA:**  It says --

16         **THE COURT:**  -- a question.

17         **MR. BRUGNARA:**  Those are the exact words.

18  **BY MR. BRUGNARA:**

19  **Q**    Ms. Long, it says that Mister --

20         **MS. HARRIS:**  Your Honor, I want to object to this.

21  **BY MR. BRUGNARA:**

22  **Q**    -- Mr. Maibaum instructed you --

23         **MS. HARRIS:**  Your Honor --

24  **BY MR. BRUGNARA:**

25  **Q**    -- specifically what to say to me in this transaction to

 1  conceal --

 2          **MS. HARRIS:**  Your Honor --

 3  **BY MR. BRUGNARA:**

 4  **Q**     -- intentionally their involvement.  Is that true?

 5          **MS. HARRIS:**  Your Honor, you have already made a

 6  ruling on this.  Mr. Brugnara cannot scream at the top of his

 7  lungs.

 8          **THE COURT:**  Please don't answer the question.

 9          **MR. BRUGNARA:**  She's interrupting me, your Honor.

10  She is trying to play judge.  Ms. Harris hasn't been appointed

11  to be a judge.  Apparently, they don't think she is qualified

12  to be a judge and she has been passed over for God knows how

13  many years.  Maybe she should sit down and let the judge be the

14  judge and she can be the prosecutor.

15          **THE COURT:**  The jury will please disregard all of the

16  comments just made.  And let's try to stick to the merits.

17      Here is the problem.  I want to -- if this witness had

18  adopted this document, then she can be cross-examined on it.

19  But she has not, according to her testimony.

20      And now the general subject matter is something you could

21  ask about, as long as you don't add -- tie it in to what is

22  said in this document.

23          **MR. BRUGNARA:**  What I'm going to do, your Honor --

24          **THE COURT:**  So you -- you can get at this another

25  way, but --

1          **MR. BRUGNARA:**  No.

2          **THE COURT:**  -- you just don't -- you just aren't able

3    to use this document.

4          **MR. BRUGNARA:**  What I will do, your Honor, is -- is

5    we will put this particular document on hold until we have

6    Mr. Patterson testify that Ms. Long is lying to the Court under

7    penalty of perjury, and then maybe you'll put her in jail.

8    Because -- then I'll get back to this document after

9    Mr. Patterson testifies.

10         **MS. HARRIS:**  Your Honor --

11         **MR. BRUGNARA:**  Because she said --

12         **THE COURT:**  Mr. Brugnara, please.

13         **MR. BRUGNARA:**  She said that he's lying, and she --

14   and she didn't authenticate or adopt this.  And I would love to

15   see what Mr. Patterson says about that.

16         **MS. HARRIS:**  Your Honor, I want to ask the Court to

17   take a five-minute recess so we can cool things down.

18         **THE COURT:**  I think we should.  I think -- I'm sorry,

19   ladies and gentlemen.

20         **MR. BRUGNARA:**  No, your Honor.  I'm -- I'm involved

21   in cross examination.

22         **THE COURT:**  You're --  you are --

23         **MR. BRUGNARA:**  And she -- Ms. Harris doesn't control

24   this courtroom.

25         **THE COURT:**  I'm going to --

```
 1              MR. BRUGNARA:  I'm not using any profanity, your
 2  Honor.
 3              THE COURT:  I'm going to give the jury a five-minute
 4  break.
 5              MR. BRUGNARA:  I'm not doing anything to disrupt the
 6  Court.
 7              THE COURT:  Oh, yes, you are.
 8         Please, everyone, take five minutes in the jury room.
 9              THE CLERK:  All rise.
10         (Jury exits courtroom at 12:15 p.m.)
11              THE COURT:  All right.  I'm going to ask the witness
12  to step out in the hallway, too, please.
13              THE WITNESS:  Is it all right if I leave it here?
14              THE COURT:  I will watch it for you.
15              THE WITNESS:  There is nothing in it but my books.
16  Thanks.
17         (Witness steps out).
18              THE COURT:  Everyone be seated.
19         All right.  What is the -- what do you need, Ms. Harris?
20              MS. HARRIS:  Your Honor, this entire proceeding since
21  Mr. Brugnara has stood up has been highly inappropriate, and
22  the Court -- I'm asking the Court to admonish Mr. Brugnara and
23  to cut off his cross examination.
24         He has made ad hominem attacks --
25              MR. BRUGNARA:  Your Honor.  Your Honor.  Your Honor.
```

1      **MS. HARRIS:**  -- he has interrupted the Government

2  when the Government is --

3      **MR. BRUGNARA:**  Your Honor.

4      **THE COURT:**  Mr. Brugnara.

5      **MS. HARRIS:**  -- trying to make a valid objection.  He

6  has impugned the integrity of the witness by calling her a liar

7  without having questions in front of her.

8      He has --

9      **MR. BRUGNARA:**  That's not true.  She said

10  Mr. Patterson didn't adopt that document.

11      **THE COURT:**  Stop.

12      **MR. BRUGNARA:**  Ms. Harris --

13      **MS. HARRIS:**  Your Honor --

14      **MR. BRUGNARA:**  -- thinks she can control this Court,

15  and she's not going to in my case.

16      **MS. HARRIS:**  Your Honor, all of the behavior that we

17  just witnessed here was so inappropriate, and that it happened

18  in front of a jury.  This is becoming an outrageous situation

19  that this jury should be subjected to the screaming, bullying

20  and inappropriate behavior.

21      It does not matter that he's acting pro se.  He's still

22  subject to the rules of this court, the Rules of Evidence and

23  the rules of basic decorum.

24      **THE COURT:**  Okay.  What do you have to say --

25      **MR. BRUGNARA:**  She's not the gatekeeper of

1  Judge Alsup's court, and she -- ever since she has come into

2  this court, she has been your gatekeeper.  And in her very

3  passive-aggressive way, she's told you what to do.

4      And now she's stepping it up because she realizes her

5  claimant, her sole claimant in this absurd case, is, in fact, a

6  liar.

7      She just sat there under penalty of perjury and said an

8  esteemed member of the New York Bar working on Central Park

9  in -- in -- in Upper -- the Upper East Side Manhattan is a liar

10  and that he is basically authenticating and adopting her

11  statements to him as fact and truth to a sitting federal judge

12  in -- in a federal court in New York.

13      And Ms. Long thinks she can lie at will and bat her

14  eyelashes at the judge and think it's going to fly.

15      Not with me sitting in Oakland Jail for 11 months.  No

16  way.  I have had my liberty seized because of this woman's

17  false claims.  And now she's being proven for the world to see

18  that she is a liar.

19      And this is just the tip of the iceberg, man.  I've got

20  500 lies.  This is one of 500.

21          THE COURT:  Well, good.

22          MR. BRUGNARA:  And you said it yourself.  You may

23  blow her up the water so far, were your exact words, she may

24  have fins.

25      This is one of 500, man.  I received --

1          THE COURT:  I'm glad you got some more because this

2   one is at an end.

3          MR. BRUGNARA:  It is, because --

4          THE COURT:  No, no.

5          MR. BRUGNARA:  Your Honor --

6          THE COURT:  We're not going to pursue this anymore.

7   I'm going to make a ruling now.

8          MR. BRUGNARA:  Fine.

9          THE COURT:  All right.  I want to say something.

10      It is true that earlier in the case -- I want to start

11   with a fundamental proposition.  The fact that if -- if it were

12   true that she was trying to defraud you, it's not a defense to

13   you trying to defraud her.  Her fraud has -- is not a defense

14   to your fraud, if it's proven by the --

15         MR. BRUGNARA:  Your Honor, it's a subjective --

16         THE COURT:  Wait.

17         MR. BRUGNARA:  But fraud is subjective based upon the

18   intent --

19         THE COURT:  Mr. Brugnara.

20         MR. BRUGNARA:  -- in this case.

21      And you said it goes to the credibility of her versus the

22   credibility of --

23         THE COURT:  If you -- if you don't stop, I'm going to

24   rule that your cross examination is at an end.  Now, I don't

25   want to do that, but you are making this impossible.

```
 1        Here is the -- I'm going to get -- here is my ruling.
 2   Fraud is not a defense to fraud, number one.
 3        Number two, I had earlier said that you could use that
 4   lawsuit insofar as it dealt with this, the very pieces of art
 5   in question because it might -- not because it would show fraud
 6   as a defense, but because it might shed light on the
 7   credibility of the actual words that were used between the two
 8   of you and her credibility on the things that do count in this
 9   lawsuit.
10        MR. BRUGNARA:  That's correct.  That's correct
11   exactly what --
12        THE COURT:  I'm not changing that ruling.
13        MR. BRUGNARA:  Thank you.  Thank you, God.
14        THE COURT:  Here is the ruling.  You are not going to
15   be allowed to say one more word to her about that lawsuit.
16        MR. BRUGNARA:  Until Mr. Patterson impeaches her.
17        THE COURT:  No, no.  That's all out now because of
18   your gross misbehavior in the courtroom, your abuse under
19   Rule 403.  It is so clear to me that you are abusing the
20   privilege of being able to examine her on this lawsuit that
21   it's out now.
22        MR. BRUGNARA:  Your Honor, she lied on -- on the
23   first statement that she said --
24        THE COURT:  It's out.
25        MR. BRUGNARA:  -- that I didn't adopt those
```

1    statements.  I never said that to my attorney.

2        And you said, your exact words:  This is your playbook for

3    the trial, Mr. Brugnara.  You said that two days ago.

4            **THE COURT:**  No, I didn't.  I -- I don't remember what

5    I said.

6            **MR. BRUGNARA:**  And I --

7            **THE COURT:**  But if I said it, I'm taking it back.

8            **MR. BRUGNARA:**  But -- but --

9            **THE COURT:**  I'm taking it back.

10           **MR. BRUGNARA:**  Well, we all know --

11           **THE COURT:**  You've got 499 other lies.  You'll have

12   to go to one of them.

13           **MR. BRUGNARA:**  But, your Honor, no, because in that

14   particular lawsuit she states exactly what you said.  The exact

15   pieces in this case are worth nothing --

16           **THE COURT:**  No, she didn't.

17           **MR. BRUGNARA:**  -- and it --

18           **THE COURT:**  I've read it.

19           **MR. BRUGNARA:**  They're --

20           **THE COURT:**  I've read it.  I've read it.

21           **MR. BRUGNARA:**  The attorney --

22           **THE COURT:**  If everything she said was true, it would

23   not be a defense for your case.

24           **MR. BRUGNARA:**  It would be a defense to the extent

25   that it shows that the subjective viewpoints of what she says

1    of -- of conversations that occurred between her and I are --

2          **THE COURT:**  I can't imagine a single conversation

3    that she had that would get you off of this hook.  The evidence

4    is overwhelming that you committed fraud against this woman.

5          **MR. BRUGNARA:**  Okay.  You know, you -- there should

6    be a mistrial.  You -- you're making statements that are

7    completely prejudicial.

8          **THE COURT:**  Well, what is it?

9          **MR. BRUGNARA:**  You haven't even heard --

10         **THE COURT:**  What is it?

11         **MR. BRUGNARA:**  -- my defense yet.

12         **THE COURT:**  I have heard --

13         **MR. BRUGNARA:**  Oh, my God, you just --

14         **THE COURT:**  I have heard it.

15         **MR. BRUGNARA:**  You just convicted me.  I can't

16   believe this.

17         **THE COURT:**  I have heard it in the Form 12 hearing.

18         **MR. BRUGNARA:**  In the Form 12 we haven't presented

19   any witnesses.

20         **THE COURT:**  All right.  You testified.

21      All right.  I'm going to rule -- I'm sticking by my

22   ruling.  You're not going to be allowed to mention this lawsuit

23   one more time.  Period.

24         **MR. BRUGNARA:**  Until we have Mr. Patterson --

25         **THE COURT:**  No.  He's not coming either.  It's out of

1  the case.  It's gone.  It's gone on account of 403 and Luke

2  Brugnara and the way he misbehaves when he gets --

3          **MR. BRUGNARA:**  You can't -- you can't foreclose my

4  defense --

5          **THE COURT:**  Then take it to the Ninth Circuit.

6          **MR. BRUGNARA:**  You can't foreclose my defense --

7          **THE COURT:**  I --

8          **MR. BRUGNARA:**  -- if you feel I'm in contempt.  They

9  are two different issues.

10      You say:  Oh, you're contemptuous.

11          **THE COURT:**  No, no.

12          **MR. BRUGNARA:**  That's different than me having my

13  defense foreclosed on.

14          **THE COURT:**  Read Rule 403.  Read Rule 403.

15          **MR. BRUGNARA:**  You said -- I know what 403 is.

16          **THE COURT:**  All right.

17          **MR. BRUGNARA:**  I did a good job on --

18          **THE COURT:**  The balance -- the balance on prejudice

19  and the misuse is so heavily in favor of excluding this now --

20          **MR. BRUGNARA:**  On the art in question, where she

21  says --

22          **THE COURT:**  Correct.

23          **MR. BRUGNARA:**  -- that it was trampled on by

24  somebody's foot?

25          **THE COURT:**  Correct.  Correct.  Correct.  Correct.

1          MR. BRUGNARA:  And in other --

2          THE COURT:  Because you could have opened up the

3   crate and looked at it and said:  What's that -- what's that

4   patch right there?

5          MR. BRUGNARA:  I didn't look -- I didn't touch

6   anything.

7          THE COURT:  But that was part of the deal.  You just

8   glommed onto it.

9      Look, it's --

10         MR. BRUGNARA:  I know -- see, so now you're judging

11  this case.

12         THE COURT:  Your point is preserved for appeal.  Your

13  point is preserved for appeal.

14     You're not going to mention this lawsuit again.

15         MR. BRUGNARA:  Okay.  What about --

16         THE COURT:  If you --

17         MR. BRUGNARA:  -- the fact that it says they engaged

18  in fraudulent conduct against me by concealing -- intentionally

19  concealing their -- the involvement of Maibaum and Long.

20  That's an absolute defense to this.

21         THE COURT:  No, it's not.

22         MR. BRUGNARA:  They engaged in an intentional --

23         THE COURT:  It won't help you at all.

24         MR. BRUGNARA:  -- fraudulent activity --

25         THE COURT:  It -- it --

1          **MR. BRUGNARA:**  -- to conceal the facts of the art in

2   this case against me.

3          **THE COURT:**  Whatever value there is there is so slim

4   that compared to the abuse that you would make out of it here

5   in the courtroom and the confusion that you would throw into it

6   and the -- the false statements that you would lay before the

7   jury, no.

8          **MR. BRUGNARA:**  You're making --

9          **THE COURT:**  Not going to --

10         **MR. BRUGNARA:**  -- presumptive comments.  What false

11  statements have I made?

12         **THE COURT:**  Many.  Many.  Many.

13         **MR. BRUGNARA:**  Name one right now.

14         **THE COURT:**  Like -- like the one said that she has

15  sworn to it under oath.  That's not true.

16         **MR. BRUGNARA:**  She has sworn to that under oath?

17         **THE COURT:**  You had said she had sworn to the

18  counterclaim under oath.  Not true.

19         **MR. BRUGNARA:**  Well, it was advanced to a federal

20  sitting judge --

21         **THE COURT:**  That's different.

22         **MR. BRUGNARA:**  -- in a U.S. District Court.

23         **THE COURT:**  That's much different.

24     See.  See, you just lie to that jury over there.  You told

25  them that she -- that's not a possible good faith basis that

 1  you could have had for making that statement.  You just -- no.

 2     This -- this lawsuit is -- I'm not saying you can't --

 3  whatever -- I've already let it in evidence a little bit

 4  earlier.  I read from parts of it.  That part, you can make

 5  your arguments in the closing argument.  But we're not going to

 6  bring it up again, the rest of the -- the rest of the evidence.

 7  It's out of the case.

 8        **MS. HARRIS:**  Your Honor, I would like the record to

 9  reflect that Mr. Brugnara has been screaming.  He has been

10  interrupting people.  He has been bullying the Government, the

11  Court and the witnesses.

12        **MR. BRUGNARA:**  And I --

13        **MS. HARRIS:**  And I would --

14        **MR. BRUGNARA:**  -- would like the record to reflect

15  that Ms. Harris in her own way is doing the exact same thing.

16        **THE COURT:**  You're doing it again.

17        **MR. BRUGNARA:**  She's interrupting me constantly, from

18  the opening all the way to where we're at today.

19        **THE COURT:**  Mr. Brugnara --

20        **MR. BRUGNARA:**  She's, by her own style, bullying the

21  Court in her passive-aggressive style.

22     And, in fact, she's prohibiting me from putting on my

23  defense, which I'm legally entitled to do under the

24  Constitution of the United States as an innocent defendant, to

25  extract myself from this horrible situation.  I'm entitled to

1    have a defense.  This is not China or North Korea.

2              **THE COURT:**  Your point is preserved for appeal.  If

3    they think you haven't been provided with every possibility for

4    a defense, then you'll be -- you'll be vindicated.

5         All right.  Here is -- I think you have been given way too

6    much latitude.

7         All right.  Here is the thing.  At 1:00 o'clock -- it's

8    now 12:25.  At 1:00 o'clock your examination is going to be

9    over.  So you've got 25 -- 35 --

10             **MR. BRUGNARA:**  I can't being foreclosed from cross

11   examining --

12             **THE COURT:**  Yes, you can.

13             **MR. BRUGNARA:**  -- 500 impeachment pieces.

14             **THE COURT:**  Yes, you can.

15             **MR. BRUGNARA:**  She had six, seven hours.  You can't

16   foreclose my --

17             **THE COURT:**  Yes, I can.

18             **MR. BRUGNARA:**  -- cross examination.

19             **THE COURT:**  Here -- here -- I'm going to listen to

20   what you do in the next 35 minutes.  If you make good use of

21   the time in a way that's not abusive, then you're going to get

22   more time tomorrow.  But if you abuse the next 35 minutes, it's

23   going to be over.  So you make your choice.

24        You know how to behave.  I've seen you behave some.  You

25   can do it.  If you misbehave, then you're going to -- it's

1  going to just be over at 1:00 o'clock.  That's the way it's

2  going to being from now on.

3          **MR. BRUGNARA:**  I disagree --

4          **THE COURT:**  And if I get reversed on account of this,

5  then God bless the Court of Appeals.

6          **MR. BRUGNARA:**  I -- there is no doubt.  You took my

7  liberty from me when you shouldn't have 11 months.  I should

8  have been on bail and we would have an attorney doing it the

9  right way right now.  You have orchestrated this venue, and now

10 you're crying about it.  The fact is, I didn't want this venue.

11 You wanted it.

12         **THE COURT:**  All right.

13     I'm sorry.  Let's bring back the jury.  Bring back the

14 witness.  1:00 o'clock.

15     No more references to that lawsuit.

16         **MR. BRUGNARA:**  I won't discuss it.  I keep my word.

17 People believe in what's coming out of my mouth.  That's why

18 they lent me a billion dollars.  I'm a man of my word.

19     I don't know why you're protecting her, though.  It's

20 inexplicable to me.

21     I guess if she bats her eyelashes at you a few times, you

22 know, that's what works.  Because I can't -- I can't think of

23 any other explanation.

24         **THE COURT:**  Thank you for being supportive.

25     All right.  Where is my witness?  Come on back up here.

1        (Brief pause.)

2        Ms. Long, are you feeling all right?  Are you ill or

3   anything?

4              **THE WITNESS:**  No.  I damaged my knee badly.

5              **THE CLERK:**  All rise.

6        (Jury enters courtroom at 12:26 p.m.)

7              **THE COURT:**  Okay.  Welcome back, and everyone be

8   seated.

9        Remember I told you at the outset of the case about the

10  difference between what the lawyers say and the parties say

11  versus evidence.  It is very important that you keep that in

12  mind and remember that what is evidence in the case is what is

13  said under oath from the witness stand and the exhibits that

14  get into evidence and that's it.  And the things that I say to

15  you are not evidence.  The things that the lawyers say or

16  Mr. Brugnara says is not evidence.  And so there we are.

17        And we're going to continue on until 1:00 o'clock and see

18  how it goes.

19  **BY MR. BRUGNARA:**

20  **Q**    Okay.  Ms. Long, do you -- do you remember testifying in

21  this Court -- in this courtroom in June of 2014?

22  **A**    I know I was here.  That's all.

23  **Q**    Do you remember testifying sitting in that exact seat

24  testifying under oath under penalty of perjury in this case in

25  June 2014?

```
 1   A    Yes, I remember being here.

 2   Q    Are you -- are you -- are you on any medication today that

 3   would prevent you from having a cognitive difficulty thinking?

 4   A    Your rudeness is not helping.

 5   Q    I'm asking you a simple question.  Are you on any

 6   medication that would prohibit you from thinking clearly today

 7   or any time in the past?

 8   A    I'm not --

 9        MS. HARRIS:  Your Honor --

10   A    And I --

11   BY MR. BRUGNARA:

12   Q    Okay.  That's fine.

13   A    There is no way to answer any of  --

14   Q    Let's proceed ahead.

15        Okay.  On that --

16        THE COURT:  Please let her finish your answer.  Did

17   you finish -- what was your answer?  I didn't hear it.

18   A    It's impossible to answer your questions.

19   BY MR. BRUGNARA:

20   Q    Okay.  Well, that's -- that's a subjective statement.

21        Do you remember saying on that date in June an answer when

22   you were asked --

23        THE COURT:  Please read the question exactly and the

24   answer exactly.  It must be exact.

25
```

BY MR. BRUGNARA:

Q    (As read)

         "QUESTION: Are you in the business of

    selling high value art?"

    Your answer was:

         "ANSWER: Yes."

    Do you remember saying that?

A    Yes, I do.

Q    Okay.  Ms. Long, you've probably sold 300 pieces of art.

    Do you remember saying that?

A    Yes.

         MS. HARRIS:  Your Honor, could the Court ask

Mr. Brugnara to refer to the page numbers?

         MR. BRUGNARA:  Page 84 of the Form 12 hearing.

BY MR. BRUGNARA:

Q    And Mr. LeBlanc, he's the gentleman looked like a movie

star, he asked you:

         "QUESTION: In connection with those sales,

    how many times have you had a sales contract?"

    And your answer was:

         "ANSWER: Every time."

    Do you remember that?

A    No, I really don't.

Q    Okay.  Well...

    I'm going to read to you from Page 84, Line 14 --

```
 1              THE COURT:  Wait.  Let's make sure that the
 2   Government is -- are you at the right spot?
 3              MS. HARRIS:  What page?
 4              MR. BRUGNARA:  "Okay."  It says, "Okay."
 5              MS. HARRIS:  Wait.  What page and line number?
 6              MR. BRUGNARA:  Page 84.  I'm on a time limit here, I
 7   guess, until 1:00.  I'm going to -- I'm going to need several
 8   hours on this.
 9              THE COURT:  You've got until 1:00 o'clock.
10              MR. BRUGNARA:  Well, today you mean?
11              THE COURT:  Maybe.  Maybe this will be it.
12         All right.  Ms. Harris, are you there?
13         All right.  Go ahead and read it exactly, the question and
14   then the answer.
15   BY MR. BRUGNARA:
16   Q    Okay.  After the "yes" of the high value of art, it says:
17              "QUESTION: Okay.  And it sounds like you
18         said you probably sold over 300 pieces of art.
19         In connection with those sales, how many times
20         have you had a sales contract?"
21         Your answer:
22              "ANSWER: Quite often.  Every time, I mean."
23              "QUESTION: Every time," was the question to
24         you.
25              "ANSWER: Yes."
```

 1          That's Page 84, Line 14 to 19.

 2              MS. HARRIS:  Actually, he didn't finish her answer,

 3     your Honor.

 4              THE COURT:  You must read the entire answer.  You

 5     can't stop short.  Please read the entire answer.

 6              MR. BRUGNARA:  That is the entire answer.  "Yes,"

 7     period.  The rest of the answer is not relative.  This is my --

 8              THE COURT:  Ms. Harris --

 9     BY MR. BRUGNARA:

10     Q    The next question is --

11              THE COURT:  Wait, wait, wait.  If it's in the answer,

12     Ms. Harris is entitled to have that answer.

13              MR. BRUGNARA:  Okay.

14              "ANSWER: Yes.  Ordinarily it's really

15          invoices.  It's not contracts under a

16          particular situation."

17              MS. HARRIS:  No.  "Unless it's under a particular

18     situation."

19     BY MR. BRUGNARA:

20     Q    Okay.  Next -- next question --

21              THE COURT:  I would -- I think it should be -- now,

22     hand it -- one of you hand it to me, because it's now been

23     butchered up so much I want to read it out loud.

24          (Whereupon, document was tendered to the Court.)

25              MR. BRUGNARA:  Okay.  I'm going to go on to the next

1  question --

2          THE COURT:  Wait.  Wait.  Here we go.

3          "QUESTION: Every time?

4          "ANSWER: Yes.  Ordinarily it's really

5      invoices.  It's not contracts unless it's under

6      a peculiar situation."

7      All right.

8  BY MR. BRUGNARA:

9  Q   Next question.  It says:

10         "QUESTION: What date did the art arrive to

11     his home?"

12     This is on Page 92, Line 16.

13     And you said:

14         "ANSWER: The 7th of July."

15     Did the art arrive the 7th of July?

16  A   No.  I was --

17  Q   Okay.  That's fine.

18     And then your next answer was:

19         "ANSWER: I can't even remember how long

20     it's been."

21  A   Yes.

22  Q   Okay.  Below that you said:

23         "ANSWER: Okay" --

24         THE COURT:  Well, wait, wait, wait.  This is not the

25  proper way to proceed.

```
 1            THE WITNESS:  Let me -- this is --

 2            THE COURT:  What you have to do is ask --

 3            MR. BRUGNARA:  Okay.

 4            THE COURT:  -- ask the question like:  What day did

 5   the art arrive?

 6   BY MR. BRUGNARA:

 7   Q    And the --

 8            THE COURT:  Wait a minute.  I'm going to explain to

 9   you how you do this so we'll save time in the long run.

10        You just -- without regard to the transcript, you say --

11   you say, "What day did the art arrive?"

12        She then says, "April 7."

13        And you say, "Well, didn't you testify" -- "I'm going to

14   read what you said before."

15            MR. BRUGNARA:  Okay.

16            THE COURT:  And then it comes out it was July 7th,

17   and then --

18            MR. BRUGNARA:  Okay.

19            THE COURT:  -- you made your point.

20            MR. BRUGNARA:  I understand.  And your Honor actually

21   stepped in and made the next comment, protecting Ms. Long.  You

22   said in the Form 12 hearing --

23            THE COURT:  What did I say?

24            MR. BRUGNARA:  Oh, are you referring to that thing

25   earlier?  You said April 7th.
```

1      So you took the position to correct her and --

2              **THE COURT:**  Okay.  And what --

3              **MR. BRUGNARA:**  -- from impeaching --

4              **THE COURT:**  What did she say they were?

5              **MR. BRUGNARA:**  Well, I don't think that was

6   appropriate, the Court protecting conflicting testimony under

7   sworn statements to my detriment.  If it's over money or my

8   liberties, I don't really care --

9              **THE COURT:**  Well, Mr. Brugnara --

10             **MR. BRUGNARA:**  -- but when I'm sitting in jail, I

11  really do care.

12             **THE COURT:**  -- while you're educating us, tell --

13  tell us all what she said.

14             **MR. BRUGNARA:**  I just want to make a record of what's

15  going on in this court, because I'll probably be dead in a few

16  months from cancer.

17  **BY MR. BRUGNARA:**

18  **Q**    Okay.  And your answer was:

19             **"ANSWER:** She says" --

20             **THE COURT:**  I want the jury to know there is no

21  evidence whatever that Mr. Brugnara has cancer or that he's

22  about to die in a few months.  That is -- should not have been

23  said to you and there is no evidence whatever to support that.

24             **MR. BRUGNARA:**  Not yet, ladies and gentlemen of the

25  jury.  We're going to have about six medical professionals come

1   through here.

2           **THE COURT:**  They are not going to come through here.

3   They're -- they're -- that's a surprise to me.

4           **MR. BRUGNARA:**  Well, they are.

5           **THE COURT:**  I will -- I will promise you this.  If

6   some doctor is willing to come in here and say he's going to

7   die in a few months, I will certainly let that be told to you.

8           **MR. BRUGNARA:**  Okay.  So --

9           **THE COURT:**  But, now, what did the witness then say?

10  **BY MR. BRUGNARA:**

11  **Q**    The witness then said:

12          "ANSWER: Oh, yes, April 7.  Thank you."

13          Thanking you, your Honor --

14          **THE COURT:**  All right.

15  **BY MR. BRUGNARA:**

16  **Q**    -- for helping her out.

17  **A**    That's not what he --

18  **Q**    And then she sent to say:

19          "ANSWER: Well --

20  **A**    That's not the whole sentence.

21  **Q**    I'm talking, Ms. Long.

22          "ANSWER: Well, I have been there so many

23          times, I didn't even know what day it is."

24          "QUESTION: Ms. Long, didn't you testify

25          approximately two hours ago that you had never

```
 1        been to the house?"

 2             MS. HARRIS:  Your Honor, I'm going to object --

 3   BY MR. BRUGNARA:

 4   Q    (Continuing)

 5             "QUESTION: -- at 224 Sea Cliff Avenue?"

 6             THE COURT:  Just a minute.  What's the objection?

 7             MS. HARRIS:  I'm going to object.  It misstates her

 8   prior testimony.  And I don't know what he's doing with this

 9   transcript.  He's not asking questions.  He's just reading --

10             THE COURT:  You can't just read from a transcript and

11   then -- you first have to do the foundational question.

12             MR. BRUGNARA:  We have the foundation.

13             THE COURT:  It's not -- you don't --

14   BY MR. BRUGNARA:

15   Q    Okay.  Ms. Long, Ms. Long, isn't it true that you

16   testified two hours ago that you've never been to 224 Sea Cliff

17   before --

18             THE COURT:  April 7th.

19   BY MR. BRUGNARA:

20   Q    -- April 7th?

21   A    Yes.

22   Q    Okay.  Ms. Long, why did you testify under sworn testimony

23   in front of Judge Alsup in this court in June a few weeks

24   later:

25             "I've been there so many times, I don't even
```

1      know what day it is"?

2  **A**    It's -- it's not referring to your address.

3  **Q**    Well, what -- what are we talking about?  "I have been

4  there."  What does that mean?

5  **A**    I mean, your process of the way that you've handled --

6  **Q**    Okay.

7  **A**    -- people and trying to make --

8  **Q**    Let's continue on.  Next page.

9          **THE COURT:**  No.  She -- she gets to answer the

10  question.

11         **THE WITNESS:**  I get to answer.

12         **THE COURT:**  Please finish the answer, Ms. Long.

13         **THE WITNESS:**  This is what I dealt with the entire

14  time I've known this man.

15         **MR. BRUGNARA:**  Okay.

16         **THE WITNESS:**  So it's a very -- you could forget

17  where you were.

18         **MR. BRUGNARA:**  Your Honor, I need that stricken from

19  the record.  It's nonresponsive and I need to continue with the

20  questioning on the limited time that you've given today.

21         **THE COURT:**  The answer will stand.

22      What's your next question?

23  **BY MR. BRUGNARA:**

24  **Q**    You -- you were asked a question from the time -- and this

25  is sworn --

```
 1          THE COURT:  This is not a proper way to do it.
 2  BY MR. BRUGNARA::
 3  Q    You were -- is it true that you answered, when you --
 4          MS. HARRIS:  Your Honor, this is --
 5  BY MR. BRUGNARA:
 6  Q    -- when you were asked:
 7          "QUESTION: When to Mr. Brugnara over the
 8      phone, was it in February or March in 2014?"
 9      And your answer was --
10          MS. HARRIS:  Your Honor.  Your Honor.
11  BY MR. BRUGNARA:
12  Q    (As read)
13          "ANSWER: I have no idea."
14          MS. HARRIS:  Objection.
15  BY MR. BRUGNARA:
16  Q    (Continuing)
17          "ANSWER: You know, I don't even think in
18      those terms"?
19          MS. HARRIS:  Your Honor, he cannot just be waving a
20  transcript around.  He needs to lay a foundation and then use
21  the transcript.
22      Could we have him instructed --
23          THE COURT:  You can't --
24          MS. HARRIS:  -- on how to impeach?
25          THE COURT:  You can't refer to the transcript,
```

```
 1   period, until after you ask the witness -- I will use this as

 2   an example.

 3        You could ask that very same question without referring to

 4   the transcript and say:

 5             "When did you have your first telephone call" --

 6   BY MR. BRUGNARA:

 7   Q    Ms. Long, Ms. Long, how is your cognitive thought

 8   process --

 9   A    Are you finished?

10   BY MR. BRUGNARA:

11   Q    Ms. Long, how is your cognitive --

12             THE COURT:  I -- I can't even finish --

13   BY MR. BRUGNARA:

14   Q    Ms. Long, Ms. Long --

15             THE COURT:  -- my comments without being interrupted.

16             THE WITNESS:  That's what I mean.

17   BY MR. BRUGNARA:

18   Q    Ms. Long, Ms. Long, I have been sitting in jail based upon

19   your false claim.

20             MS. HARRIS:  Your Honor, I'm going to object.

21   A    Because you've stolen something --

22   BY MR. BRUGNARA:

23   Q    Really?

24   A    -- and will not return it.

25   Q    So if they find it in some contractor's garage that was
```

```
 1  working on a site two doors over, then what are you going to

 2  do?

 3          MS. HARRIS:  Your Honor --

 4  BY MR. BRUGNARA:

 5  Q    -- and what is the judge --

 6          MS. HARRIS:  Your Honor, your Honor, your Honor.

 7          THE COURT:  Mr. Brugnara --

 8          MR. BRUGNARA:  Okay.

 9          THE COURT:  -- you've got to ask proper questions --

10          MR. BRUGNARA:  Okay.

11          THE COURT:  -- or I'm going to bring it to an end.

12  BY MR. BRUGNARA:

13  Q    Okay.  The next is, when you said:

14          "I have no idea, I don't think in those terms,"

15      what do you mean by that?

16  A    Because I have an artistic side of the brain.  What do you

17  think?

18  Q    So you have a -- so by having an artistic side of the

19  brain --

20  A    Yes.

21  Q    -- that means that you don't think mathematically?

22  A    You know my -- I mean, I have many clients, many places.

23  You think I'm thinking of you?  Only in horror.

24  Q    No.  I'm talking about the question that you've sworn

25  under oath and you answered.  They asked you what -- this is a
```

```
 1  case about specific dates and specific times and specificity --
 2  A    You made that clear.
 3  Q    -- and you said you don't think in those terms.  You have
 4  an artistic mind.
 5       I asked you:  So your cognitive thought process is, in
 6  fact, impaired.  Isn't that true?
 7  A    Oh...
 8  Q    Okay.  Ms. Long, you said in testimony two hours ago that
 9  a crew of delivery men delivered the crates to 224 Sea Cliff
10  Avenue.  Is that true?
11  A    I don't know what is the question.  224 Sea Cliff Avenue?
12  Q    The house in Sea Cliff, you said a crew of delivery men
13  delivered the crates to --
14  A    I did not say "crew."
15  Q    -- to 224 Sea Cliff Avenue on April 7.  Did you not say
16  that?
17  A    No.
18  Q    What did you say?
19  A    I said two men --
20  Q    Okay.  Okay.
21  A    -- put the --
22  Q    Assuming that's what you said --
23  A    -- five crates in your garage.
24       (Unreportable cross talk.)
25  Q    You said two men --
```

LONG - CROSS EXAMINATION / BRUGNARA

 1          **MS. HARRIS:**  Your Honor, may the witness finish?

 2          **THE COURT:**  I remember her testimony, and that is

 3   what she said.

 4   **BY MR. BRUGNARA:**

 5   **Q**    Okay.  Ms. Long, is your cognitive thought process

 6   impaired?

 7   **A**    If you insult me one more time, I will just stop.

 8   **Q**    Okay.  Ms. Long, you need to answer the questions,

 9   Ms. Long.

10          **THE COURT:**  You've asked that question.

11          **MR. BRUGNARA:**  Okay.

12          **THE COURT:**  She's answered --

13          **MR. BRUGNARA:**  I'm giving her one more chance to

14   correct herself.

15          **THE COURT:**  No.  I'm not going to let you do that.

16   **BY MR. BRUGNARA:**

17   **Q**    Okay.  Ms. Long, are you aware that one man brought in the

18   crates, not two men?  Are you aware of that?

19   **A**    That is wrong.

20   **Q**    Okay.  Well, that's your state of mind.

21   **A**    You really think one man can pick up about an eighty, you

22   know, five --

23   **Q**    Okay.  Ms. Long, Ms. Long, will it surprise you --

24          **MS. HARRIS:**  Your Honor --

25

1  **BY MR. BRUGNARA:**

2  **Q**    -- to learn --

3          **MS. HARRIS:**  Your Honor, your Honor, your Honor.

4  **BY MR. BRUGNARA:**

5  **Q**    -- will it surprise you to learn, Ms. Long, that the next

6  witness after you is the one man that brought the crates.

7      Ms. Long, you weren't thinking or seeing things properly

8  on the date of April 7th were you, Ms. Long?

9  **A**    Is that a question?

10 **Q**    What -- were you thinking straight, Ms. Long?

11          **MS. HARRIS:**  Your Honor, I object to this.  This is

12 argumentative.  This is harassing and badgering this witness,

13 and it is not --

14          **MR. BRUGNARA:**  I'm not badgering --

15          **MS. HARRIS:**  -- and it is --

16          **MR. BRUGNARA:**  -- the witness, your Honor.

17      Excuse me.  Can you not interrupt me?  I didn't interrupt

18 you.

19          **MS. HARRIS:**  I've got to get my objections on the

20 record.

21          **THE COURT:**  All right.  You don't need to.

22      I'm going to sustain the objection because this has been

23 asked and answered.

24          **MR. BRUGNARA:**  Okay.

25          **THE COURT:**  You've asked her several times was she

```
 1   thinking straight, was her --

 2            MR. BRUGNARA:  Okay.

 3            THE COURT:  -- cognitive abilities --

 4            MR. BRUGNARA:  So she said one man delivered the

 5   crates and she gave an explanation --

 6            THE COURT:  Okay.  She said two men delivered it.

 7            MR. BRUGNARA:  Okay.

 8            THE COURT:  And then you can -- if you feel it's

 9   going to help, you can bring out later that one man brought it,

10   if that's, in fact, true.  I don't know that.

11   BY MR. BRUGNARA:

12   Q    Ms. Long --

13            THE COURT:  We'll find out from other witnesses, but

14   we've made that point.  Let's move on.

15   BY MR. BRUGNARA:

16   Q    Let's move on, Ms. Long.

17   A    I would like to finish that question --

18   Q    Ms. Long, testified --

19   A    -- what it was --

20            THE COURT:  Wait, wait, wait.

21   BY MR. BRUGNARA:

22   Q    Excuse me.  Ms. Long, you gave a statement to the FBI, and

23   you also testified in your Form 12 hearing under oath in this

24   Court --

25            THE WITNESS:  I'm not going to answer --
```

1    BY MR. BRUGNARA:

2    Q     -- in June 2014 --

3              THE WITNESS:  -- insults in between his questions.

4    BY MR. BRUGNARA:

5    Q     -- that --

6              THE COURT:  I'm sorry?

7              THE WITNESS:  He's insulting me before -- while he's

8    asking me a question, so I can't even understand what he means.

9              THE COURT:  Well, all right.  Ask a fresh question.

10   And please, please don't try to upset the witness.

11             MR. BRUGNARA:  I'm upset, your Honor.  I'm sitting in

12   jail --

13             THE COURT:  I know you are.

14             MR. BRUGNARA:  -- based upon what this woman has

15   perpetuated against me.  So I don't have any sympathy for her

16   at all.

17             THE COURT:  But --

18             MR. BRUGNARA:  I -- I --

19             THE COURT:  -- when you act --

20             MR. BRUGNARA:  Okay.

21             THE COURT:  -- as your own attorney, you have to --

22   you have to behave somewhat like an attorney would and be

23   polite to the witnesses and -- and make your factual points.

24   And let's -- let's do it in the professional way.

25             MR. BRUGNARA:  Okay.

1  BY MR. BRUGNARA:

2  Q    Ms. Long, aware that you told the FBI and you also told

3  this Court in June 2014 that when the art was delivered that

4  the garage was totally empty?

5           MS. HARRIS:  Your Honor, that's not a proper

6  question.

7           THE COURT:  It's not.  But you can ask this question.

8  You can say, when the --

9           MR. BRUGNARA:  I -- I know how to ask a question.

10 BY MR. BRUGNARA:

11 Q    Was the garage empty, Ms. Long, on April 7th?

12 A    Your car was in it and the rest of it was empty.

13 Q    Okay.  That's not what said to the -- in your testimony

14 on -- are you correcting the testimony now of --

15 A    No.  I'm just --

16 Q    -- of -- of your Form 12 --

17 A    I'm just explaining --

18 Q    -- on June 2014?

19 A    The whole thing seemed strange --

20 Q    Okay.

21 A    -- so I thought you were going to --

22 Q    Ms. Long --

23 A    We were going to continue to move it elsewhere.

24 Q    Ms. Long, is your recollection better today in -- in -- in

25 April 2015, or is your recollection better in June 2014 as to

```
 1   what transpired a month earlier?  When is your recollection

 2   better?

 3   A     When -- you said now or when?

 4   Q     Is your recollection of the events that occurred in your

 5   life and in my life --

 6   A     Yes.

 7   Q     -- sharper, more accurate, better today or a year ago?

 8   A     It's been the same.

 9   Q     It's been the same?

10   A     Uh-huh.

11   Q     Okay.  So --

12   A     Except I know a lot more.

13   Q     So -- so how should this Court reconcile the differences

14   between your testimony --

15           MS. HARRIS:  Your Honor, objection.

16   BY MR. BRUGNARA:

17   Q     -- if it's the same?

18           THE COURT:  There is no proof yet that it was

19   different.

20   BY MR. BRUGNARA:

21   Q     Okay.  Well, Ms. Long, in your Form 12 testimony you

22   stated, in fact, that the garage was, in fact --

23           THE COURT:  Just read it.  Just read it.  You may be

24   right.  But I would like for the jury to have the benefit of

25   the actual question and answer.
```

```
 1              MR. BRUGNARA:  All right.

 2              MS. HARRIS:  What page?

 3              MR. BRUGNARA:  It's not a problem.

 4         (Brief pause.)

 5              MR. BRUGNARA:  Okay.  Page 141, Line 20.

 6              THE COURT:  Okay.  Are you there, Ms. Harris?

 7         You don't get to put it on the Elmo.  Just read it

 8    exactly.

 9    BY MR. BRUGNARA:

10    Q    It says:

11              "QUESTION: Did you see them put it in the

12         garage?"

13         Line 23.  Your answer was:

14              "ANSWER: Yes."

15         The next question:

16              "QUESTION: Did you see -- was the garage

17         empty at that point?"

18         You said:

19              "ANSWER: Yes."

20         The question was:

21              "QUESTION: Was it completely empty?"

22         You said:

23              "ANSWER: Yes."

24         The question was:

25              "QUESTION: Was there nothing in the
```

```
 1        garage?"

 2        You said:

 3            "ANSWER: No."

 4            "QUESTION: So when all the five crates were

 5        delivered, was the only thing in the garage the

 6        five crates?"

 7        And you said:

 8            "ANSWER: Yes.  That's all that was in it."

 9            MS. HARRIS:  Actually, your Honor, the rest of the

10   answer needs to be --

11   BY MR. BRUGNARA:

12   Q   (As read)

13            "ANSWER: Yes, that was all that was in it."

14            MS. HARRIS:  "But..."

15   BY MR. BRUGNARA:

16   Q   (As read)

17            "ANSWER: ...but I was concerned discussing

18        where we were taking it from there."

19            THE COURT:  I'm sorry.  Can I -- can I see -- I would

20   like to see what it is you're trying to get in.

21            MR. BRUGNARA:  Well, she's discussing her state of

22   mind of being worried, but I -- the point I'm trying to make

23   isn't about her state of mind of her concern, but the fact that

24   the garage was empty.

25            THE COURT:  Well, just a moment.
```

809

```
 1          (Whereupon, document was tendered to the Court.)

 2               THE COURT:  It says:

 3               "QUESTION: Okay.  So when all five crates

 4          were delivered, was the only thing in the

 5          garage the five crates?

 6               "ANSWER: Yes."

 7               MR. BRUGNARA:  Okay.  That's --

 8               THE COURT:  Wait.  No, no.

 9               MR. BRUGNARA:  That's -- we're not looking for any of

10     the other information.

11               THE COURT:  Well, I'm sorry, but --

12               MR. BRUGNARA:  We're concerned --

13               THE COURT:  -- the entire answer gets to be read.

14               MR. BRUGNARA:  Okay.  I understand.

15               THE COURT:  (As read)

16               "ANSWER: Yes, that's all I saw in it, but I

17          was still concerned in discussing where we were

18          taking it from there, from the men, and -- and

19          wanted them inside of the house.  So I was -- I

20          mean, I was really worried from that point on."

21          All right.

22               MR. BRUGNARA:  Okay.

23               THE COURT:  So that's the full answer.

24               MR. BRUGNARA:  Okay.  That's the full answer.

25               THE COURT:  All right.
```

1  BY MR. BRUGNARA:

2  Q    Okay.  Ms. Long, I want you to look at this picture.

3       (Photo tendered to the witness.)

4            THE COURT:  Is that in evidence?

5            MS. HARRIS:  No, it is not.

6            THE WITNESS:  No.  It's not real.

7            THE COURT:  Okay.  If you would --

8            MR. BRUGNARA:  I would like to mark this in

9  evidence --

10           THE COURT:  If you can possibly get it into evidence

11 through her, but I know what picture that is --

12 BY MR. BRUGNARA:

13 Q    Ms. Long --

14           THE COURT:  -- and I don't think she can put it in

15 evidence.

16 BY MR. BRUGNARA:

17 Q    Ms. Long, are these the crates that were opened by the FBI

18 that you saw?

19           MS. HARRIS:  Your Honor, that's not a proper

20 question.

21 A    That's absurd.

22           MS. HARRIS:  He has laid no foundation for asking her

23 anything --

24 BY MR. BRUGNARA:

25 Q    Ms. Long --

```
 1              THE COURT:  Wait, wait.  Ask --

 2         Ms. Long, do you know -- do you know what is -- from

 3    personal knowledge, what is in that picture?

 4              THE WITNESS:  Yes.  It's a setup on purpose to -- for

 5    me just to see a little bit of a corner of one box, and then a

 6    bunch of stuff all thrown in there deliberately to look like I

 7    don't know what I'm talking about.

 8              MR. BRUGNARA:  All right.

 9              THE WITNESS:  But it doesn't show five crates.

10              MR. BRUGNARA:  Okay.

11              THE COURT:  All right.

12    BY MR. BRUGNARA:

13    Q    Ms. Long, are these not the five, but are those two of the

14    five crates?

15    A    I actually can only tell about one.

16    Q    Okay.  Is that one of the five crates, Ms. Long?

17    A    Yes.

18    Q    Okay.  That's one of the five crates that were delivered.

19              MR. BRUGNARA:  I'd like to put this into evidence,

20    your Honor.

21              MS. HARRIS:  I object, your Honor.  It's not --

22              THE COURT:  It's not -- there is no foundation as to

23    the date of the photograph or --

24              MR. BRUGNARA:  Your Honor, this was taken by the FBI.

25              MS. HARRIS:  Your Honor, Mr. Brugnara is testifying.
```

 1                **THE WITNESS:**  No, it wasn't.

 2                **THE COURT:**  You'll have to put that in in some other

 3  way.

 4                **MR. BRUGNARA:**  Okay.  Okay.  We'll put it in through

 5  the FBI then.

 6                **THE COURT:**  No.  You -- you can call -- but she

 7  testified about April 7th.  That picture could have been some

 8  other day.

 9                **MS. HARRIS:**  Your Honor, can you ask Mr. Brugnara to

10  turn the picture over so that it's not shown to the jury before

11  it's received into evidence?

12                **THE COURT:**  Of course.

13        Are you just laying it there so the jury can see --

14                **MR. BRUGNARA:**  I'm not laying anything.  And I don't

15  believe the jury has X-ray vision to see --

16                **THE COURT:**  Well, turn it upside down so the jury

17  does not get tempted to look at it.

18  **BY MR. BRUGNARA:**

19  **Q**    Okay.  So you talked about the delivery team and -- and

20  the Form 12, and you discussed the two delivery men.  This is

21  important:  How many delivery men were there that you saw?

22                **THE COURT:**  She's already covered this.

23  **BY MR. BRUGNARA:**

24  **Q**    Two?

25                **MS. HARRIS:**  Objection, your Honor.  Asked and

 1   answered.

 2           **THE COURT:**  Sustained.

 3       (Brief pause.)

 4   **BY MR. BRUGNARA:**

 5   **Q**   Okay.  Ms. Long --

 6           **MR. BRUGNARA:**  I call the Court to Page 123 of the

 7   Form 12, Line 21.

 8           **THE COURT:**  Ask a fresh question that doesn't tie

 9   into the document per se, and then if she contradicts herself,

10   you can -- you can then read the testimony.

11   **BY MR. BRUGNARA:**

12   **Q**   Okay.  Ms. Long, you stated regarding the alleged invoices

13   that you brought to the Sea Cliff house when they were brought

14   into evidence in the Form 12 hearing, you said, quote, No,

15   these are not --

16           **MS. HARRIS:**  Your Honor, this is not a proper

17   question.

18           **THE COURT:**  It's not proper.  You have to --

19   **BY MR. BRUGNARA:**

20   **Q**   Ms. Long --

21           **THE COURT:**  It's not proper.

22   **BY MR. BRUGNARA:**

23   **Q**   Do you remember testifying about the invoices that you

24   allegedly brought to the -- to 224 Sea Cliff Avenue?

25           **THE COURT:**  Earlier today?

1              MR. BRUGNARA:  During the Form 12 hearing and earlier

2    today.

3              MS. HARRIS:  Your Honor, there was no testimony about

4    what Mr. Brugnara is trying to ask about.

5              MR. BRUGNARA:  That's not true.

6              THE COURT:  I'm sorry?

7              MS. HARRIS:  There was not -- this is beyond the

8    scope of the direct.

9              THE COURT:  But it is cross examination.

10        Why don't you just ask a fresh question about invoices and

11   not tie it into the Form 12 yet.

12             MR. BRUGNARA:  Okay.

13             THE COURT:  And then if she gives a different answer,

14   you can then try to --

15   BY MR. BRUGNARA:

16   Q    Ms. Long, do you remember testifying during the Form 12

17   hearing that we had several conversations and -- just to

18   refresh your memory, so you can answer it truthfully --

19             MS. HARRIS:  Your Honor, objection --

20             THE COURT:  Sustained.  It's improper.  I know you

21   understand what I asked you to do.

22   BY MR. BRUGNARA:

23   Q    Ms. Long, Ms. Long, do you remember discussing the many

24   phone calls in and between you and I changing opinions and

25   minds regarding this transaction?

```
 1            MS. HARRIS:  Your Honor, I'm going to object to that.
 2   It's unintelligible.
 3            MR. BRUGNARA:  Well, it goes to her state of mind,
 4   because she's the one that said it.  I'd like her to explain
 5   it.
 6            THE COURT:  Just ask --
 7            THE WITNESS:  I don't know what you asked.
 8            THE COURT:  She doesn't understand the question,
 9   so --
10   BY MR. BRUGNARA:
11   Q    Ms. Long, it is hard to follow the bouncing ball here, but
12   this is what you said at the Form 12 hearing --
13            THE COURT:  You don't get to do it that way.
14   BY MR. BRUGNARA:
15   Q    Ms. Long, do you remember having many phone calls by and
16   between Brugnara and yourself whereas there were changed
17   opinions and changed minds regarding this transaction?
18            THE COURT:  All right.  That's -- do you understand
19   that?  That's a proper question.
20   A    There were not many.  There were a few.
21   BY MR. BRUGNARA:
22   Q    Okay.  Why did you testify under sworn statement in this
23   court --
24            THE COURT:  Just read it.  If she testified
25   differently, read the actual testimony.
```

1   BY MR. BRUGNARA:

2   Q    Ms. Long, Ms. Long, you testified there are many, many

3   phone calls --

4               MS. HARRIS:  Where is it?

5               THE COURT:  What page number, please?

6   BY MR. BRUGNARA:

7   Q    -- in between that there were changed opinions or minds.

8               MS. HARRIS:  Where is it?

9               THE COURT:  Could you please give counsel --

10              MR. BRUGNARA:  That is Page 123, Line 22 and 23.

11              THE COURT:  All right.  So let's read the exact

12  question and the exact answer that was given before so the jury

13  can assess if there's a contradiction.

14      All right.  So let's just -- just go ahead and read it.

15  BY MR. BRUGNARA:

16  Q    You were discussing, here, the invoices:

17          "QUESTION: Are these not the same invoices

18      then?

19          "ANSWER: No.  These are my original

20      invoices when I was writing up.  But the

21      headline, it's a long story.  There are many

22      phone calls in between, and there are many

23      changed opinions or minds."

24              MS. HARRIS:  He cut off the answer that --

25

1   **BY MR. BRUGNARA:**

2   **Q**     "I had to prepare it again for me to bring personally to

3   hand it to him," which is consistent with that.

4         So is it my understanding of this that there were many

5   changed opinions and changes of minds in your perception of the

6   communications between us regarding this art?

7   **A**     No.  When I say "many," there were conversations between

8   Walter Maibaum and you and myself as far as what the prices

9   would be, what the discounts you asked for.

10        You asked all kinds of questions, and I would have to get

11  to him.  So there were other, you know, phone calls.  So, yes,

12  several times we had to have other discussions.

13  **Q**     And would --

14  **A**     You never did anything --

15  **Q**     And where -- where --

16  **A**     -- but want them in your museum.

17  **Q**     Yet, you didn't memorialize any of these discussions in

18  any emails or any written correspondence between Brugnara and

19  yourself --

20  **A**     Yes.

21  **Q**     -- or Brugnara and Maibaum?

22  **A**     Yes.  That's not phone calls.

23  **Q**     And -- and where is that memorialized, Ms. Long?

24              **THE COURT:**  Where what is?

25  **A**     Emails.  We've already been through this.

1    BY MR. BRUGNARA:

2    Q    No.   Ms. Long, this question was regarding --

3             MS. HARRIS:   Your Honor, he --

4    BY MR. BRUGNARA:

5    Q    -- subsequent to the invoicing, or the alleged invoicing

6    of de Koonings where there were changed opinions and changed

7    minds.

8         Ms. Long --

9             THE COURT:   You're asking her now to tell you what

10   she was referring to a year ago there?

11   BY MR. BRUGNARA:

12   Q    Ms. Long, Ms. Long --

13            THE COURT:   Can you do that?

14   BY MR. BRUGNARA:

15   Q    Ms. Long, you stated to the Court last June that Walter

16   Maibaum did not want his name divulged, so everything was done

17   in your name, and you had to answer as if it were you.

18   A    Yes.

19   Q    Did you ever tell and -- I know -- I didn't appreciate it

20   either.  Did you ever divulge or disclose to me that, in fact,

21   Walter Maibaum was directing this deal?

22   A    No, I had never talked to you about Walter Maibaum.

23   Q    Okay.  Are you aware that you're required to do that, to

24   have transparent, open -- on a sale, at least in California,

25   that you cannot deceive or withhold material information

```
 1   regarding a sale of property?

 2             MS. HARRIS:  Your Honor --

 3             THE COURT:  What Mr. Brugnara just said is not the

 4   law.

 5             MR. BRUGNARA:  Certainly is.

 6             THE COURT:  It's an incorrect statement.

 7             MR. BRUGNARA:  Certainly is.

 8             THE COURT:  The jury will disregard it.  That

 9   question is stricken.

10             MR. BRUGNARA:  There are books on nondisclosure law,

11   and they all require transparency and material disclosures.  So

12   I don't know what law you're -- I've been in civil court for 22

13   years --

14             THE COURT:  Well --

15             MR. BRUGNARA:  -- on $2 billion of deals, and you

16   have to disclose everything to all the parties so they can make

17   an informed decision that's not prejudiced --

18             THE COURT:  Ladies and gentlemen of the jury, this

19   that's totally improper.  What Mr. Brugnara is doing right now

20   must be disregard by you.

21       I tell you that is not the law that applies in this case.

22   N-O-T, not the law.  It is not the law.

23       And you're not supposed to be arguing the law with the

24   witness anyway.

25             MR. BRUGNARA:  I understand, your Honor.
```

1          THE COURT:  So it's now -- you've got four minutes to

2    go.

3    BY MR. BRUGNARA:

4    Q    We'll bring in a legal expert to explain what your

5    responsibilities are --

6          THE COURT:  It's my duty to tell the jury what the

7    law is.  You're stuck with it, whether you like it or not.

8    Move on.

9    BY MR. BRUGNARA:

10   Q    Ms. Long, you stated under sworn testimony last June that

11   you took out another floater insurance policy to send the

12   de Koonings.  Is that true?

13   A    No.  And I --

14   Q    That's fine, Ms. Long.

15   A    No.  You can't --

16   Q    That's a yes-or-no answer.  I don't need -- I don't need a

17   "dog ate my homework" excuse.

18          MS. HARRIS:  Your Honor, objection --

19          THE COURT:  Would you like to explain your answer?

20       Mr. Brugnara, please remain silent.

21       Finish your answer.

22          THE WITNESS:  Yes.  I took one out.  But when they

23   came back and told me that it would be $60,000 for the

24   insurance, I had a discussion with Walter, and he carried the

25   insurance, though it wasn't that much because he already was

1     using Lloyd's of London.

2          And so I handled the freight and the crating and he did

3     the insurance.

4               THE COURT:  Thank you.

5          Next question.

6     BY MR. BRUGNARA:

7     Q    Are you -- are you aware, or do you have knowledge,

8     Ms. Long, personal knowledge, that Sotheby's and Christie's say

9     that the art that you tried to tell me is not worth anything?

10              MS. HARRIS:  Your Honor, I'm going to object.  There

11    is no foundation.

12              THE COURT:  There's no foundation for that question.

13    And it's a --

14              MR. BRUGNARA:  I asked her if she had personal

15    knowledge, your Honor.

16              THE COURT:  How is she going to know what --

17              MR. BRUGNARA:  How is she going to know --

18              THE COURT:  -- what Sotheby's told you?

19              MR. BRUGNARA:  Because she said that --

20              THE COURT:  That is an improper question.  There's no

21    foundation for it.

22         The jury will not infer from anything Mr. Brugnara just

23    said that there has been any such communication.  Disregard it.

24         Next question.  You've got two minutes.

25              MR. BRUGNARA:  Your Honor, that's -- two minutes?

LONG - CROSS EXAMINATION / BRUGNARA

```
 1            THE COURT:   Two minutes until 1:00 o'clock.

 2            MR. BRUGNARA:   Okay.

 3            THE COURT:   Then we'll decide where we are.

 4  BY MR. BRUGNARA:

 5  Q    Ms. Long -- and, again, this is going back, all the way

 6  back to last year.

 7       You were stating, quote, That he told me he would be

 8  afraid if anything happened, that, you know, it would be all

 9  over the news.  It would be in the newspapers, in Artnet news,

10  everything.  It would ruin our reputations.

11       Ms. Long, Walter Maibaum was using you as a front to sell

12  me fake art for millions of dollars that all the auction houses

13  had rejected and was worth nothing; isn't it true?

14  A    Why are you making -- then if it's worth nothing, why

15  don't you give the Degas back?

16  Q    Ms. Long, I don't have the Degas.

17       Ms. Long --

18            MS. HARRIS:   Your Honor, I'm going to object --

19  BY MR. BRUGNARA:

20  Q    Ms. Long --

21            MS. HARRIS:   -- to Mr. Brugnara is testifying.

22            THE COURT:   We're not going to --

23            MR. BRUGNARA:   You have to admonish the -- I believe

24  the witness --

25            THE COURT:   First of all, the question was totally
```

1   improper.  It's very argumentative.  And it should -- so the --

2   disregard the question, the answer, and the comment made by

3   Mr. Brugnara.

4        One minute.

5   **BY MR. BRUGNARA:**

6   **Q**   Ms. Long, on Page 105, Line 14, regarding the Picasso

7   etching, or alleged attributed Picasso etching, you state:

8              "Another I would love to keep, but I can't, is a

9          pencil 1934 etching signed In the Tavern."

10       You were asked:

11             "Do you know the Pablo Picasso etching?"

12       And you said:

13             "No."

14       Why do you imply that you own these when -- to me, when

15   you, in fact, didn't own them?

16  **A**   I'm not saying I own them.  I'm just giving you the prices

17  for it.

18  **Q**   Okay.  Ms. Long, let's go back to your email to me where

19  you specifically state that you own all these pieces.

20       This is --

21             **THE COURT:**  What exhibit number do you want?

22             **MR. BRUGNARA:**  This is the third email.  Exhibit

23  No. 56.

24  **BY MR. BRUGNARA:**

25  **Q**   You state here:

1          **"**Another I would love to keep, but I can't,

2      is" -- again, this is the -- from the testimony --

3      "In the Tavern."

4          Why did you tell me on Sunday, March 23rd, that you owned

5  Picasso when, in fact, you didn't own it?

6          **MS. HARRIS:**  Your Honor --

7  **A**   I did not say I owned it.  I said I wish I could own it.

8  **BY MR. BRUGNARA:**

9  **Q**   No.  You say here specifically:  "I would love to keep,

10 but I can't."

11 **A**   Okay.  Yes.  Because now they are in my possession,

12 because they're going -- being crated.

13         **MS. HARRIS:**  Your Honor.  Your Honor.

14 **BY MR. BRUGNARA:**

15 **Q**   This is March 23rd.  You've already testified that they

16 weren't crated until the first week of April.

17 **A**   I didn't --

18 **Q**   This is a week and a half prior to that.  This first day

19 we were having email communications together --

20 **A**   You were just having conversations any old way you want.

21 Just blowing -- that's not exactly what I said.

22         It took a long time it started being able to get prepared

23 to be freighted.  But it takes weeks and weeks to get it to

24 that point, because every crate has to fit the work, the image

25 of the art, the size and everything.

1  Q    Ms. Long --

2           THE COURT:  Wait.  Wait.  She's not finished her

3  answer.

4       Have you finished your answer?

5           THE WITNESS:  Yes.

6  BY MR. BRUGNARA:

7  Q    Ms. Long, our first communication was on March 22nd.  And

8  the art was shipped, I believe, on the 2nd or the 3rd.  That's

9  a week.

10 A    Yes.

11          MR. BRUGNARA:  She just stated on the record that it

12 takes three weeks to make a box --

13          THE WITNESS:  I didn't say three weeks.  I said

14 weeks.

15          THE COURT:  The jury will understand what she said or

16 did not say.

17      It's now 1:00 o'clock.  Ladies and gentlemen, I thank you

18 for your careful attention.  We will see you here tomorrow at

19 the normal time.  We may even start earlier if you all are

20 here.  So thank you very much.

21      Dawn, can you escort the jury out?

22          THE CLERK:  All rise.

23      (Jury exits courtroom at 1:01 p.m.)

24          THE COURT:  All right.  Ms. Long, don't forget your

25 purse.  But I'm going to -- I want you to be available tomorrow

```
 1   morning at 7:30.  I'm not sure how much longer you'll be on the

 2   stand, if at all.  So please be available at 7:30 a.m. here.

 3   All right?

 4        Thank you.

 5        (witness steps down)

 6             THE COURT:  Everyone be seated.

 7        Ms. Harris?

 8             MS. HARRIS:  Your Honor, we would request that the

 9   Court end the cross examination today.  That was completely

10   abusive.

11             MR. BRUGNARA:  Your Honor, she --

12             MS. HARRIS:  Mr. Brugnara -- I am not finished.

13             THE COURT:  Mr. Brugnara --

14             MS. HARRIS:  I am not finished.

15             THE COURT:  Stop.

16             MS. HARRIS:  I am not finished.

17             MR. BRUGNARA:  She should move to North Korea, your

18   Honor.  I think, you know, she's dressed for it --

19             THE COURT:  Stop.

20        Finish your comment.

21             MS. HARRIS:  Mr. Brugnara has made personal

22   ad hominem attacks to the jury about this witness.  It was

23   completely improper.

24        I know the Court is trying its hardest to give

25   Mr. Brugnara a fair trial.  The Government is also entitled to
```

```
1  a fair trial, and this does not resemble a fair trial, what

2  Mr. Brugnara is being allowed to do in front of the jury.  He

3  has abused the Court's goodwill, the Court's patience, and he

4  has completely turned the --

5          MR. BRUGNARA:  Your Honor, she can't determine

6  what --

7      (Unreportable cross talk.)

8          MR. BRUGNARA:  She's telling the Court --

9          THE COURT:  Stop, stop, stop.

10         MR. BRUGNARA:  She's making subjective changes.

11         THE COURT:  Stop.

12         MS. HARRIS:  Your Honor, I must be permitted to

13 finish.

14         THE COURT:  You are correct.  Please continue.

15         MS. HARRIS:  He has disparaged me publicly and in

16 front of this jury.  That is completely improper.  If any

17 attorney in this courtroom did what Mr. Brugnara did, they

18 would be in jail.  He is already in jail, but I'm also asking

19 you to find him in contempt.  He committed that contempt in

20 front of you, and I would ask you to add whatever sentence, if

21 you make that finding, onto any sentence that he will serve.

22         THE COURT:  Am I entitled to do it right now?

23         MS. HARRIS:  I think you can find him in summary

24 contempt, your Honor.

25         MR. BRUGNARA:  Your Honor --
```

```
 1              THE COURT:  What do you say to that?

 2              MS. HARRIS:  As long as --

 3              MR. BRUGNARA:  I think that -- I think that --

 4              MS. HARRIS:  I'm not done.

 5              MR. BRUGNARA:  -- she has been trying to -- to --

 6      to -- to direct this Court -- can we have just a sidebar --

 7              THE COURT:  Stop.

 8              MR. BRUGNARA:  We --

 9              THE COURT:  I want to hear the rest of what she has

10      to say.

11              MR. BRUGNARA:  Your Honor -- your Honor, I would like

12      to clear the courtroom to have this discussion.

13              THE COURT:  No, you are not.  This is a public

14      proceeding.

15              MR. BRUGNARA:  Okay.

16              THE COURT:  Go ahead.

17              MS. HARRIS:  Your Honor, this has been completely

18      abusive to the Government, the Court, the jury, the witnesses

19      and all of the Court personnel, including the United States

20      Marshals.

21          Mr. Brugnara is entitled to a fair trial.  He's entitled

22      to represent himself.  He is not entitled to turn the Federal

23      Rules of Evidence on its head, to use this as a forum for his

24      personal attacks on people's clothing --

25              MR. BRUGNARA:  Your Honor, you know what --
```

PROCEEDINGS                                    829

```
 1              THE COURT:  Stop.  Stop.

 2              MS. HARRIS:  -- on witnesses, and to otherwise turn

 3   this courtroom into a charade.  And he should be held

 4   accountable for his behavior.

 5       This Court has repeatedly given him infinite patience and

 6   goodwill and he has abused it all.  And enough is enough.

 7              THE COURT:  Right.

 8              MS. HARRIS:  And he has abused this witness.

 9              THE COURT:  All right.  What do you say?  Now --

10              MR. BRUGNARA:  My response is she's completely out of

11   line.  She is -- ever since she has stepped into this case, she

12   has tried to direct this Court in her own style of the

13   direction she wants this case to go, which is essentially

14   muffle me, oppress me and not allow me to have a defense to the

15   charges that have no merit whatsoever.  And I have been having

16   my defenses foreclosed based upon this Court protecting

17   Ms. Long, and that's totally inappropriate.

18       This judge -- this Court has already ruled that open

19   issues in the in limine rulings, specifically that the U.S.

20   District filing Maibaum versus Long was of probative value as

21   long as it was limited to the art in question in this case.

22       And I did not abuse that Court's ruling.  And when I began

23   to get -- every time I began to get traction on impeaching the

24   witness, Ms. Harris strategically jumped up and made a

25   technical -- a technical argument to -- to disrupt the
```

1    proceedings, and she constantly tries to play judge in this

2    courtroom.

3        Moreover, Ms. Long made a very, very serious accusation

4    against an esteemed member of the Manhattan Bar; that he, in

5    fact, falsified her statements and -- and adopted them as fact

6    and truth and then proffered them as truth to a sitting federal

7    judge in the state of New York.  And this Court can't give her

8    a pass on that.

9        She has to be held accountable when she swears to God in

10   this court of Judge Alsup that she's telling the truth.  And

11   if, in fact, she's telling the truth, and Judge -- and this

12   Mr. Patterson lied to a sitting federal judge, he should lose

13   his license.

14       But if she lied to this Court while I'm having my liberty

15   seized from me on a daily basis, keeping me from my beautiful

16   four children and my wife, and she thinks she can lie with

17   impunity in this Court and besmirch a sitting -- besmirch the

18   judicial process in New York, which is a federal court as well,

19   and lie with impunity, that's absurd.  She needs to be held

20   accountable.

21       She is in the process of proving my entire case.  Whatever

22   comes out of her mouth can't be believed, unless it suits her

23   needs.  And she tries to use confusion and her

24   misunderstanding.  The fact of the matter is, she was trying to

25   steal from me millions of dollars, selling me fake or very less

1   valuable art pieces.

2        And the fact is, it does go to the essence of the charge

3   against me, because in order for me to be convicted of fraud, I

4   have to have intent to defraud her.  And it is all going to

5   come -- there is only, what, ten emails.  It's going to come

6   down to the conversations, which she just testified on the

7   witness stand were many.  She testified at the Form 12 there

8   were many telephonic conversations, and she just affirmed there

9   were many telephonic conversations.

10              **THE COURT:**  She said that was with Maibaum --

11              **MR. BRUGNARA:**  No.  She said --

12              **THE COURT:**  -- and you.

13              **MR. BRUGNARA:**  Well, the Form 12 says were with me.

14              **THE COURT:**  No.

15              **MR. BRUGNARA:**  And that was also sworn under oath

16   when her memory was fresher than it was today.  That was a year

17   ago.

18        So in those conversations, whether it be few or many, my

19   perception of what happened in those conversations and her

20   perception of what happened in those conversations is clearly

21   diametrically opposite.

22        I absolutely believed there was no contract.  I absolutely

23   believe we had no meeting of the minds, other than I had a year

24   to evaluate and have due diligence of whether or not -- whether

25   or not I wanted to buy these pieces.  And that needs to come

1    into evidence, the fact that she lies constantly.

2         Now, they may still believe her.  They may say:  Hey,

3    listen, she has lied 500 times.  Half of them under oath in

4    this court.  And -- but you know what?  I still believe her.

5         I doubt that's going to happen.  I think this jury, when

6    they hear each specific lie -- I can't be rushed anymore.  Your

7    Honor, you have to understand, I'm sitting in a cell half the

8    size of your podium with 60,000 pages now.  And I have proof,

9    because I have 12 banker boxes, and each banker box holds 5,000

10   pages.  So 5,000 times 12 is 60,000 pages.  I have 60,000 pages

11   in a, what, 9-foot by 10-foot cell, with screaming murderers in

12   my pod in an echo chamber.  And I have to somehow, without

13   staples or a paper clip or even a Redweld, to separate the

14   evidence, somehow coordinate my evidence to present in a

15   meaningful fashion in front of this Court and the jury.

16        Man, this is an impossible task that you have orchestrated

17   here for Luke Brugnara.  Because it would be nearly impossible

18   if I was sitting in Sea Cliff, up all night, with all of it

19   spread out on my dining room table then being able to come in

20   here and present it in -- in -- in -- in a fashion that's

21   coherent.

22        This is not the way that I conduct business, nor the way I

23   conduct my life.  I am extremely a perfectionist and detail

24   oriented, and what's why I have been highly successful.  And

25   for me to come in here disorganized with papers strewn about,

1   no staples, no paper clips, no Redwelds, everything that anyone

2   would just need, bare minimum, I don't have.  And then the

3   Court look at me with a raised eyebrow and go:  Hey, what's --

4   this isn't professional.

5        Man, I have had to learn the Rules of Evidence on my heels

6   with no sleep for a year, losing 100 pounds with a bunch of

7   murderers screaming in my pod, you know, with earplugs in my

8   ear.  Them kicking their doors.  And I think I've done a pretty

9   good job in the in limine hearings, advancing my arguments on

10  803 and 404(2)(b), holding my own against Ms. Harris on a few

11  of them.  I thought that I might get a pat on the back or two.

12       I didn't tread at all on the -- on the subject matters

13  that you have absolutely prohibited, and I honored this Court's

14  request of me.  I think I've done an admirable job in this

15  Court.

16       Your Honor, this entire case is a single-claimant case.

17  This is not Wells Fargo Bank or Citibank, which is the basis of

18  most single-claimant fraud cases.  This is a single individual.

19       My attorney, Babcock, wrote in this Court, it's on the --

20  it's in the -- it's in the record of the -- of -- of this

21  docket, that he has never seen in 30 years -- and he's very

22  active in this Court -- a single-claimant fraud case, from a

23  single claimant.  Those go to civil court.

24       So this is highly unusual on itself that you have a

25  single -- other than a bank or a savings and loan, sitting

1  there making an accusation against me that hasn't even been

2  substantiated with -- with this missing Degas in a closet or

3  stashed away, you know, buried in the ground.  I mean, hey,

4  then you could almost say this thing has got some teeth.

5      Man, this Degas sculpture, your Honor -- and you're a very

6  reasonable man, very reasonable -- could have easily been

7  grabbed by anybody going back and forth, or the delivery driver

8  who hasn't even testified may -- who, by the way, has impeached

9  himself, if you've got a keen eye and you read all the FBI

10 reports, which I don't know whether the U.S. Attorneys have it

11 or not.  He has already impeached himself several times.  He

12 may have it in his living room.

13     Why am I being castigated and being disrespected after I

14 have built up a good reputation in this community as a

15 businessman?  No one has ever accused me of any criminal

16 misconduct in my entire life, business life, in my business

17 activities.  On a lot of business, whether it be a billion or

18 2 billion.  It's somewhere in there.  That's a lot of business

19 and no one has ever said:  Hey, man.  You are a thief.  You are

20 a liar.

21     Except her, this crazy, crazy woman.  Because, you know

22 what?  If she is not on medication, she should be.  The woman

23 doesn't think straight, like she said.  She qualifies it as,

24 "I have an artistic mind."

25     No.  She has a mind that is scatterbrained.  And the fact

1    of the matter is I have sat in jail for 11 months because in

2    her mind she believes she had something that she never had, and

3    it's not memorialized in writing.   It's not memorialized in a

4    deposit.   She already testified with Brandon LeBlanc, out of

5    300 sales, this is the only sale she's never had a contract,

6    written contract.

7         And I sat in jail for 11 months based upon what -- my life

8    is on the line.   I haven't seen my daughter, who sat out in

9    that audience there, in eight months, man.

10        I could be dead in a few -- you say I don't have cancer.

11   I saw the doctor yesterday at 4:00 o'clock in the morning, and

12   she is going to sit there and testify.   And she said I might

13   have cancer.

14        So what happens when I'm dead and I get cut off from my

15   children for the last six or eight months of my life because

16   you kept me in jail and I haven't done a damn -- I told the U.S

17   Attorneys, I said, give me a lie detector test.

18        I said it to Sprague.   I said it to Ms. Harris.   And the

19   FBI was sitting right there.   I go, I know it's not admissible,

20   but let's do it, so you can get off my case.   And they won't do

21   it because they don't want to hear the truth.

22        I just want to get -- I have not used profanity with this

23   woman.   I've tried to show respect.   But the fact of the matter

24   is she is disparaging my entire life.   She is the only person

25   that has pointed a finger at me and said:   You are a thief.

1    You are a liar.  You are a crook.  No one has said it.

2        And we're going to have witnesses sit up there that are

3    the top banking executives in Manhattan.  They are going to

4    say:  Hey -- that are older than you.  They are going to say:

5    Hey, I lent this guy $500 million and he has paid back every

6    penny on time in full.  Did he do a reorganization?  Well,

7    yeah.  Did he torture the lenders?  No.  He still paid back

8    every one.

9        I know how to torture a lender for four years if I wanted

10   to, and I didn't.  I have integrity.  Even when I can get away

11   with stealing $20 million legally from a lender, I didn't do.

12       I don't want their stupid Degas.

13            THE COURT:  All right.

14        MR. BRUGNARA:  Your Honor, he even said 200 grand,

15   100 grand, 50 grand.  That's a joke.  That's a joke in my life.

16       You heard Ms. Michelman on the phone.  Man, I -- I buy

17   $10 million of paintings.  I bought -- my house -- the house

18   next door just sold for 3,100 a foot.  A shack.  The house is

19   worth -- this is a joke having this conversation.  Because I'm

20   sitting in jail being kept from my family?

21       This is what I propose, your Honor.  This is what I

22   propose as a solution --

23            THE MARSHAL:  It's over.

24        MR. BRUGNARA:  Okay.  Your Honor, let me go free on

25   bail to Sea Cliff.  Let's redo this the -- your Honor, let's

1   redo this the right way.  I will hire an attorney.

2           **THE COURT:**  The trial --

3           **MR. BRUGNARA:**  I will hire --

4           **THE COURT:**  The trial has started.

5           **MR. BRUGNARA:**  I will hire an attorney --

6           **THE COURT:**  The trial has started.  We're going to

7   the end.

8           **MR. BRUGNARA:**  Okay.  Then I need to be allowed to --

9           **THE COURT:**  And you're not helping yourself.  So, all

10  right.  You've said enough.

11          **MS. HARRIS:**  Okay.  Your Honor --

12          **THE COURT:**  So you don't get to say anything more.

13  I'm going to make a ruling.

14      All right.  Number one, with respect to the witness on the

15  stand, I have never seen such an abusive performance by anyone,

16  even Mr. Brugnara, as happened with -- with Rose Long.  So the

17  ruling is that the cross examination is over, subject to one

18  thing.

19      In the morning at 7:30 you can come in and make a specific

20  offer of proof of specific items that you want to bring up.

21  Just limit it to your top two or three.  If those are good

22  enough, I'll consider letting you continue with the cross

23  examination.  But if it's just going to be more of the

24  ad hominem attacks on the Government, on the judge, on the

25  witness, on the system, and -- and not following the -- the

 1   Rules of Evidence -- and I know you by now.  You know what

 2   you're doing wrong.  You just continue to do it.  So we're not

 3   going to do that.

 4        It's going to have to be very persuasive that you need

 5   more time with this witness because you've wasted -- you

 6   squandered the time that you had with her today and abused this

 7   witness.

 8        I want to say one other thing.  I think she's probably got

 9   post-traumatic stress syndrome now, and the Government is

10   totally free to talk to her all you want, including the FBI,

11   because I'm afraid that she has been done mental damage by the

12   way in which she has been treated by Mr. Brugnara today.

13        So there is no restriction on you, even though she's

14   technically on cross examination.

15             **MR. BRUGNARA:**  Okay.  Can I make --

16             **THE COURT:**  No.  No.

17             **MR. BRUGNARA:**  Can I have the attorneys confer with

18   me --

19             **THE COURT:**  No.  I'm making a ruling now.

20             **MR. BRUGNARA:**  Okay.

21             **THE COURT:**  That's number one.

22        Number two is, I am holding you in summary contempt, and

23   whatever sentence you get in this case, 21 days is going to be

24   added to it for you violating the rules.  And the rules are --

25   you have violated -- you're supposed to follow the Rules of

```
 1   Evidence.  And even cutting you slack for being pro se, you

 2   know better than -- you have done the same violations over and

 3   over again, and you know by now that you're -- you're violating

 4   that direct order to follow the rules in court.  So it's going

 5   to be 21 days added.

 6        Now, the next time I hold you in summary contempt, it's

 7   going to be 60 days added.  And then after that, it will be 90

 8   days.  So you need to start behaving yourself, Mr. Brugnara.

 9        I know you think this is some kind of kangaroo court.  I

10   don't think so.  This is the United States of America and the

11   U.S. District Court, and you will have some day the right to go

12   to the Court of Appeals and appeal if you're convicted.  Okay.

13   You can do that.  But -- and if I get -- if I get reversed, so

14   be it.  I think I've done the right thing.

15        Now, that's all.  We're not going to argue any more today

16   on it.  I got -- I'm five minutes late on the next criminal

17   case, and I'm going to see you all at 7:30 in morning --

18             MR. BRUGNARA:  I need an order to -- to the associate

19   advisory counsel, or whatever you --

20             THE COURT:  No, you have it.  I've already done --

21   I've already done it.

22             MR. BRUGNARA:  I need them to -- to meet with me

23   today.  I guess, while they are here would probably be the best

24   time for at least --

25             THE COURT:  The 20th floor.  Let the Marshals -- you
```

1    all go meet with him.

2          And now I want to say something --

3              MR. BRUGNARA:  I want for a minimum time, too,

4    because they will come up for five, ten.  I need an hour

5    minimum and I --

6              THE COURT:  Take an hour.  I -- I want you -- you

7    lawyers are -- if you're giving him advice to do what he has

8    been doing, then I'm very disappointed in you.

9              MR. TAMOR:  Well, hold on.

10             THE COURT:  All right.  Wait a minute.  You don't

11   have to reveal, but I know you're both better than that.

12         Mr. Stevens -- and here is the other thing.  I don't want

13   there to be any doubt about this.  If Mr. Brugnara is going to

14   testify in his defense, somebody has got to ask the questions.

15   Either I get to ask them or one of you two get to ask him.  So

16   you -- I would prefer that one of you two ask the questions.

17   You can at least do that much.

18         So start thinking about who is going to ask because I have

19   a feeling he's going to -- he's going to testify,

20   notwithstanding his claims that he's not.

21         So all right.  What did you want to say?

22             MR. TAMOR:  A couple of things, your Honor.  First, I

23   have to be in front of Judge Chen at 2:30.

24             THE COURT:  All right.  Go.  You're excused then.

25   You didn't have to be here.  Mr. Stevens will answer the

 1  questions.  Fine.  You don't have to go up there now.

 2      You weren't in here for the 100 percent duration.  You're

 3  supposed to be here as much as you can be, but I will let you

 4  -- I know you have that hearing.  So, go ahead.

 5      **MR. TAMOR:**  And the other thing I wanted to raise,

 6  your Honor.  I don't represent Mr. Brugnara, but if I was, I

 7  certainly would probably file a motion to determine his

 8  competency, either to understand the proceedings against him

 9  and/or to aid in his defense.

10      **THE COURT:**  You know what?  I thought about that.

11  There is no doubt that he's competent.  There is -- we have

12  been through this.  You're new to the -- you're the new kid on

13  the block.

14      Mr. Brugnara knows good and well what he's doing.  This is

15  part of his thing.  And he is a bully.  He likes to bull his

16  way through life.  He is smart-as-a-whip guy, and he is not

17  incompetent.  He has been down this path, and he's admitted

18  that he's competent.

19      So, good for you.  That is the first possible reaction

20  when someone sees what goes on with Mr. Brugnara, but it is not

21  correct.  And I've given that a lot of thought.  So don't worry

22  yourself over that.  And that's not your job here.  Your job is

23  to give him advice on how to try this case.

24      We're not going to dismiss this case.  This jury, who has

25  heard all of this misconduct by Mr. Brugnara, is going to

PROCEEDINGS

1   decide his guilt or innocence.  And if he's convicted, he is

2   going to go up on appeal.

3            **MR. BRUGNARA:**  Your Honor, I disagree --

4            **THE COURT:**  We're not starting over.

5            **MR. BRUGNARA:**  I disagree about misconduct.  I'm not

6   asking as to start over, but this Court --

7            **THE COURT:**  I don't care whether you disagree.  I've

8   made the ruling.  The Marshals are going to take Mr. Brugnara

9   out of here, and we're going to go to the next case.

10       (Whereupon at 1:21 p.m. further proceedings were

11        adjourned until Thursday, April 30, 2015 at 7:30

12        a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          **I   N   D   E   X**

3

**PLAINTIFF'S WITNESSES**                      **PAGE**     **VOL.**

4

**MAIBAUM, WALTERN**
5    (PREVIOUSLY SWORN)                           565        3
     Cross Examination Resumed by Mr. Brugnara    566        3
6    Redirect Examination by Mr. Kingsley         606        3
     Recross Examination by Mr. Brugnara          612        3
7

8    **LONG, ROSE RAMEY**
     (SWORN)                                      620        3
9    Direct Examination by Ms. Harris             621        3
     Cross Examination by Mr. Brugnara            747        3
10

11                          – – –

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Debra L. Pas, CSR, CRR and Belle Ball, CSR, CRR*
*Official Reporters - U.S. District Court - San Francisco, California*
*(415) 431-1477*

844

**E X H I B I T S**

| TRIAL EXHIBITS | EVID | VOL. |
|---|---|---|
| 29 | 609 | 3 |
| 54 | 631 | 3 |
| 55 | 633 | 3 |
| 56 | 634 | 3 |
| 57 | 637 | 3 |
| 58 | 640 | 3 |
| 59 | 643 | 3 |
| 60 | 645 | 3 |
| 61 | 649 | 3 |
| 62 | 653 | 3 |
| 63 | 657 | 3 |
| 64 | 659 | 3 |
| 65 | 662 | 3 |
| 66 | 664 | 3 |
| 67 | 666 | 3 |
| 68 | 670 | 3 |
| 69 | 675 | 3 |
| 71 | 676 | 3 |
| 72 | 679 | 3 |
| 73 | 684 | 3 |
| 74 | 688 | 3 |
| 75 | 692 | 3 |
| 76 | 694 | 3 |
| 77 | 701 | 3 |
| 5 | 705 | 3 |
| 79 | 717 | 3 |
| 80 | 728 | 3 |

— — —

*Debra L. Pas, CSR, CRR and Belle Ball, CSR, CRR*
*Official Reporters - U.S. District Court - San Francisco, California*
*(415) 431-1477*

## CERTIFICATE OF REPORTER

We certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_____

Belle Ball, CSR 8785, CRR, RMR, RPR

Wednesday, April 29, 2015