```
                                         Volume 7

                                         Pages 1755  -  1944

                     UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

                BEFORE THE HONORABLE WILLIAM H. ALSUP

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
  vs.                              )  No. CR 08-0222 WHA
                                   )  No. CR 14-0306 WHA
LUKE D. BRUGNARA,                  )
                                   )  San Francisco, California
            Defendant.             )  Tuesday
                                   )  May 5, 2015
_____)  7:30 a.m.
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

```
For Plaintiff:          MELINDA HAAG
                        United States Attorney
                        450 Golden Gate Ave.
                        San Francisco, California  94102
                  BY:  ROBIN HARRIS, AUSA
                       BENJAMIN KINGSLEY, AUSA


For Defendant:          LUKE D. BRUGNARA
                        - pro se


Advisory Counsel:       LAW OFFICES OF PAUL WOLF
                        717 Washington Street
                        Second Floor
                        Oakland, California 94607
                  BY:  JAMES R. STEVENS, ESQ.
```

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

*Reported By:   Debra L. Pas, CSR 11916, CRR, RMR, RPR*
Official Reporter - US District Court
Computerized Transcription By Eclipse

1756

1    **APPEARANCES:   (CONTINUED)**

2

3    **Advisory Counsel:**          LAW OFFICES OF TAMOR & TAMOR
                                    311 Oak Street
4                                   Suite 108
                                    Oakland, California 94607
5                          BY:   **RICHARD ALAN TAMOR, ESQ.**

6

7    **Also Present:**    FBI Special Agent Jeremy Desor

8                         FBI Special Agent Aleksandr Kobzanets

9                         Mary Mallory, U.S. Attorney's Office

10                                    -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2   MAY 5, 2015                                          7:34 a.m.

3        (Defendant present, in custody.)

4        (The following proceedings were held outside of the

5        presence of the jury.)

6            THE COURT:  All right.  Both sides are now ready.

7            MR. STEVENS:  Your Honor, it seems like we're going

8   to have some difficulty bringing in Ms. Record, who is under

9   subpoena.  She has told our private investigator that she's not

10  going to listen to him about coming in today at 11:00, which is

11  what we had asked her to do yesterday.

12           THE COURT:  I can't hear you.  Speak up.

13           MR. STEVENS:  We asked her to come in at 11:00

14  yesterday and she's refusing to do so, and so I want to bring

15  that to the Court's attention and see if the Court could assist

16  us in making sure that she's here.

17           MR. BRUGNARA:  Who is that?

18           MR. STEVENS:  Ms. Record.

19           THE COURT:  All right.  Does the Government know

20  anything about this?

21           MS. HARRIS:  No, your Honor.

22           THE COURT:  Have you served her with a subpoena?

23           MR. STEVENS:  It is my understanding that Andrew

24  served her with a subpoena and then -- the private

25  investigator, and then also returned the proof of service to

PROCEEDINGS

```
 1   this Court.

 2           THE COURT:  Is that true, Dawn?  Do we have proof of

 3   service on her?

 4           THE CLERK:  I don't know, Judge.  I'm not sure what

 5   the Marshals have filed along that line of proof of service or

 6   anything on the subpoenas.  I don't have any record that I have

 7   independently kept.

 8           THE COURT:  Don't you know the answer?  You should

 9   know whether or not the proof of service has been returned and

10   on the record.

11           MR. STEVENS:  I understand, your Honor.  I was

12   completely not in the loop when --

13           THE COURT:  If it turns out that she hasn't been

14   served, then this is just a fool's errand.  If she has been

15   served, then I'm going to get the Marshals to go arrest her.

16           MR. STEVENS:  I understand.

17           THE COURT:  So you've got to help me on this and not

18   just come throwing yourself -- come on.

19       What is the answer, Dawn?  Do we have a proof of service?

20           THE CLERK:  I'm just scanning the docket right now.

21   I don't see proofs of service --

22           THE COURT:  All right.  I'm not going to do a thing

23   until you show me proof that she was served.

24           MR. STEVENS:  I'll do that.

25           THE COURT:  Get your guy in here with a proof of
```

PROCEEDINGS

```
 1  service.  As soon as that's done, I will issue a bench warrant
 2  for her arrest.  She will go into custody until she testifies.
 3      Now -- all right.  Now, I need to come up with another
 4  witness problem.  The witness in New York, what's her name?
 5          MR. STEVENS:  Joan Michelman.
 6          MR. BRUGNARA:  Joan Michelman.
 7          THE COURT:  As soon as our -- I understand that you
 8  want to have her testify tomorrow at 10:30 New York time, 7:30
 9  our time.  That's fine with me, if the Government has finished
10  its case -- will you have finished by then?
11          MS. HARRIS:  Your Honor, we anticipate resting this
12  morning.
13      And before Ms. Michelman is called as a witness, the
14  Government wanted to be heard on its relevance objection.  I
15  think your Honor reserved judgment on that when we were
16  discussing her subpoena.
17      You'll recall that Mr. Brugnara wants to call her for art
18  transactions that happened in excess of a decade ago and the
19  Government has raised a reverse 404(b).  It appears that the --
20  there is no probative value to any defense in this case and
21  that he's using it to try and show, you know, character and
22  conformity today with what he did 10 or 12 years ago with an
23  unrelated art dealer.  We don't see any relevance to her
24  testimony at all and any reason why she should be brought
25  before this Court.  It's not relevant to a single defense that
```

1  the defendant can articulate.

2          **THE COURT:**  I don't want to -- it has marginal

3  relevance.  It's not overwhelming.  It is ancient history.

4      But it has some relevance and I'm going to allow it if the

5  defense can get her there.  If they can't get her there, then

6  under 403 it's out.

7      Now, have you talked to her, Mr. Stevens?

8          **MR. STEVENS:**  I have spoken with her.  She is

9  prepared to go down to --

10         **THE COURT:**  Why is 7:30 tomorrow morning so critical?

11         **MR. STEVENS:**  Oh, it was going to be 7:45, is what

12 I --

13         **THE COURT:**  Look.  That's putting a lot of pressure

14 on our staff here.

15         **MR. BRUGNARA:**  Your Honor, I know this woman.  She

16 can go at any time.  I mean, she --

17         **MR. STEVENS:**  That's not what she told me.  She told

18 me that because of what's going on in the art world this week,

19 she -- I was trying to accommodate her schedule.

20         **THE COURT:**  Here is what's going to happen.  You get

21 with a guy named Stefan -- what's his last name?

22         **THE CLERK:**  Curl.

23         **THE COURT:**  C-U-R-L, who will show up in court

24 sometime this morning and you two work out the logistics of

25 how -- with the person in New York at the District Court of how

 1  you're going to get this done in court.

 2       Dawn, will try to help you some, but this is on you to

 3  coordinate.  I will give you the resources, but you've got to

 4  make it happen.  I don't have the time to make it happen.  All

 5  I'm trying to do -- I'm giving you the resources here and then

 6  if I -- if you can't get it pulled together in time, you need

 7  to pull me in more.

 8       But I have a feeling there is no way on this short notice

 9  that my staff here is going to be able to set up the equipment

10  for tomorrow morning.  Maybe it could be done.  Maybe it could

11  be done the next day.  I don't know.

12       So, but the burden is on you, Mr. Stevens.

13       All right.  So that's all I'm going to say on that for

14  right now.

15       All right.  Now --

16            **MR. BRUGNARA:**  I have an update, if you --

17            **THE COURT:**  Wait.  Just a minute.

18       Did you have anything more to say?

19            **MS. HARRIS:**  We had a couple of items we wanted to

20  bring to the Court's attention, your Honor.

21            **THE COURT:**  What are those?

22            **MS. HARRIS:**  As I mentioned, we do anticipate resting

23  this morning, and we have received no Rule 16 discovery for the

24  defendant.  We would ask for any documents that he intends to

25  use in his case-in-chief be provided to the Government before

PROCEEDINGS

1    the case begins, and that would include any reports of

2    interviews that his private investigator has done.

3        We have provided all of the FBI 302s to the defense.  We

4    want all interviews that the private investigator has done of

5    any witnesses.

6        And then we would ask the Court -- the Court had before

7    said that if Mr. Brugnara was going to testify, the Court did

8    not want to ask the questions.  Mr. Stevens should.  We

9    understand that.

10       We think it's appropriate, but we would ask the Court to

11   review the questions; not provide them to the Government, but

12   review them to make sure that Mr. Stevens isn't in the awkward

13   position of asking completely improper questions as drafted by

14   the defendant.

15       My understanding is Mr. Stevens' role is not to -- that

16   the defendant is not listening to his legal advice --

17            **MR. BRUGNARA:**  Your Honor.  I object, your Honor.

18            **MS. HARRIS:**  -- and clearly --

19            **THE COURT:**  Stop.  You're interrupting again.

20            **MS. HARRIS:**  Clearly --

21            **MR. BRUGNARA:**  She is --

22            **MS. HARRIS:**  Clearly --

23            **MR. BRUGNARA:**  That is a presumptive comment.  This

24   is --

25            **THE COURT:**  Stop.

1          **MS. HARRIS:**  There could be clearly improper

2    questions in there that the Court could just deal with upfront

3    without involving the Government.

4          **THE COURT:**  I'm going to tell Mr. Stevens now.  You

5    know -- you're experienced enough to know what is improper

6    under the rules laid down here, so you can't ask those kind of

7    improper questions.

8          **MS. HARRIS:**  And then -- oh, okay.  So Mr. Stevens

9    will be permitted to vet the questions?

10         **THE COURT:**  Yes.

11         **MS. HARRIS:**   Okay.

12         **THE COURT:**  Yes.  He's not going to be allowed to

13   just ask any question that Mr. Brugnara writes down.  It's got

14   to be a proper question.  He ought to know by now what a proper

15   question is.

16         **MS. HARRIS:**  Then we would ask for an offer of proof.

17   We received several witnesses last night that the defense

18   intends to call, and we would ask for an offer of proof on some

19   of them --

20         **THE COURT:**  Okay.  Wait, wait, wait.  Let's go back.

21      Show me -- I think you're correct, but let's do this

22   right.

23      Under Rule 16 where does he have to turn over his

24   investigative reports?

25         **MR. BRUGNARA:**  Your Honor, we don't have any, so you

PROCEEDINGS

1  don't even have to worry about it.  I haven't received one

2  piece of paper from the private investigator.  Not one slice of

3  paper.  So there is nothing, nothing to hand over.

4          **THE COURT:**  Is that true, Mr. Stevens?

5          **MR. STEVENS:**  I am -- he has emailed me about a

6  couple of the witnesses, but, no, there is nothing I would call

7  an investigative report.

8          **THE COURT:**  Email would --

9          **MR. BRUGNARA:**  I haven't seen the emails.

10          **THE COURT:**  Mr. Stevens has seen it.

11          **MR. BRUGNARA:**  But I haven't.

12          **THE COURT:**  That's too bad.  Mr. Stevens has talked

13  to you about it.  So that's got to be turned over.

14      Where does it require it in the -- in the reciprocal

15  discovery?  Let's point that out.

16          **MS. HARRIS:**  Under Rule 16(b).

17          **THE COURT:**  Which one?

18          **MS. HARRIS:**  Rule 16(b)(1)(A).

19      And then as far as reports of examinations and tests, that

20  would be Rule 16(1)(B), items the defendant intends to use in

21  his case-in-chief.

22      And then we also have an issue under Rule 16(1)(C), but

23  I'll raise that with the Court after we deal with the --

24  16(1)(A)is the documents.  So any documents that the defendant

25  intends to use in his case-in-chief, should have -- they should

PROCEEDINGS

```
 1   have been provided.
 2          THE COURT:  But an email -- I mean, a document he
 3   intends to use in the case-in-chief does not include hearsay
 4   investigative reports.  Even though you've turned over 302s,
 5   that is -- really, you're not required to under Rule 16.  You
 6   just do that as a matter of grace and goodness of your heart.
 7   But investigative reports are not required under case-in-chief
 8   materials.
 9          MS. HARRIS:  If they contain statements of the
10   witness that were adopted, they would be Jencks, your Honor.
11          THE COURT:  Yes, that would be true, if they do.  But
12   if they are 302s, never do.
13          MS. HARRIS:  That's correct.  But we don't know what
14   these contain and we don't know whether there is Giglio
15   material in them.
16          THE COURT:  Mr. Stevens, I'm just going to say to you
17   this:  You have reciprocal disclosure duties.  You know what
18   has been generated by this expert -- not expert, this
19   investigator.  If it falls under 16(B), you've got to do your
20   duty and turn it over.
21       So do you, Mr. Brugnara.
22       And so there.  That's what I -- that's all I can say on
23   that.
24          MR. BRUGNARA:  All right.  So --
25          THE COURT:  Now -- just a second.
```

PROCEEDINGS                                    1766

```
 1        Now, what are the witnesses that you want to bring up that
 2   you feel we need an offer of proof on?
 3            MS. HARRIS:  Mark Levinson, your Honor, appears to be
 4   a noticed expert witness.
 5        And then we need offers of proof as to the -- what are the
 6   lenders' names?
 7            THE COURT:  Now, can I say something?
 8            MS. HARRIS:  Yes.
 9            THE COURT:  Did you notice Maibaum as an expert?
10            MR. KINGSLEY:  Yes, we did, your Honor.  And if you
11   recall, the defense moved to exclude Mr. Maibaum and Ms. Long
12   back in December on the basis that they were unnoticed and this
13   Court held that they were noticed.
14            THE COURT:  All right.  So are you going to be
15   eliciting any opinion testimony and expert testimony from
16   Levinson?
17            MR. BRUGNARA:  Regarding the art?
18            THE COURT:  Regarding, like, let's say, the value of
19   your home.
20            MR. BRUGNARA:  Yeah, yeah, yeah.
21            THE COURT:  Well, then, that won't be permitted
22   because that's expert testimony.
23            MR. BRUGNARA:  Well, I'll get his opinion not as an
24   expert then.
25            THE COURT:  Well --
```

```
1              MR. BRUGNARA:  I'm entitled to that.

2              MS. HARRIS:  Your Honor, then there would be no

3    purpose of calling him.

4              MR. BRUGNARA:  She doesn't know what -- he was there

5    both times that Rose Long was at my house.  So you know what,

6    your Honor, can --

7              THE COURT:  I'll let him testify -- I'll let him

8    testify as to what --

9              MR. BRUGNARA:  Can I not be interrupted --

10             THE COURT:  I'll let him testify to what real offers

11   were made, those kind of facts things, but just his mere

12   professional opinion on what the house is worth --

13             MR. BRUGNARA:  Your Honor, he --

14             THE COURT:  -- that's expert.

15             MR. BRUGNARA:  He just sold a house two doors over

16   this week.  So the fact of the matter is, he is an expert as

17   far as value --

18             THE COURT:  He could testify to what some other house

19   sold for.  That would be a fact, not an opinion.  But what he

20   cannot do is say:  In my opinion --

21             MR. BRUGNARA:  Okay.  Well, then --

22             THE COURT:  -- 224 Sea Cliff Avenue is worth

23   $22 million.

24             MR. BRUGNARA:  Okay.  Well, then, so what do I need

25   to do to have him testify to that?  So I'll --
```

1           THE COURT:  You should have given a notice a long

2   time ago.

3           MR. BRUGNARA:  Okay.  Well, I'll give the notice now

4   and then we can wait until -- listen.  I want to tell you, I

5   just got dragged out of my cell again at 10:00 p.m. last night

6   with -- oh, yeah, so they came in right when I was finally

7   saying, okay, I think I'm going to get a few hours of

8   sleep after --

9           THE COURT:  No.  You're changing the subject.  You're

10  changing the subject.

11          MR. BRUGNARA:  No, but I'm just letting you know --

12          THE COURT:  I'm telling you that no opinion

13  testimony, expert opinion testimony --

14          MR. BRUGNARA:  What do you need me to file?  I'll

15  file it --

16          THE COURT:  Nothing.  It's too late.

17          MR. BRUGNARA:  It's not too late.  Why is it too

18  late?  I just --

19          THE COURT:  Go read Rule 16.  That's what Rule 16

20  says.

21          MR. BRUGNARA:  And you have under Rule 2 the right to

22  use discretionary power to adopt what's fair and interpret each

23  rule as you see fit.

24          THE COURT:  Somebody back there is sneezing.  Can

25  somebody give them a -- do you need a --

1           **UNIDENTIFIEDI SPEAKER:**  Thank you very much.  I'm

2    okay.

3           **THE COURT:**  Do you need a Kleenex?

4           **UNIDENTIFIED SPEAKER:**  I think I'm done.

5           **THE COURT:**  All right.  Thank you.

6           **MR. BRUGNARA:**  I'm allowed to have -- Mark Levinson

7    has already testified under the Grand Jury, under the same

8    capacity when Sprague was interviewing him.  And he's already

9    testified in this Court during the bail hearing.  And he has a

10   right to opine on the value --

11          **THE COURT:**  He doesn't have a right to do anything.

12   This is not his courtroom.

13          **MR. BRUGNARA:**  You know what?  I will file whatever I

14   need to file to have him.  And I'll continue to draw witnesses

15   in and I'll -- and -- until we get to the point where it's

16   allowed.

17      I mean, this -- I have been foreclosed from cross

18   examining plaintiff's witnesses and every witness.  I'm being

19   foreclosed out of having meaningful cross examination.  Each

20   one I have been cut short.  And you know what?  I'm not going

21   to be foreclosed, certainly, from my defense.

22          **THE COURT:**  Very little that you've done by way of

23   examining these witnesses has been meaningful.

24          **MR. BRUGNARA:**  Well, let me tell you --

25          **THE COURT:**  You have wasted and squandered your

1    opportunities.

2           MR. BRUGNARA:  You're saying when I got 13 minutes

3    with the FBI agent, that's sufficient, when they examined her

4    for, questioned her for two hours --

5           THE COURT:  You had about 30 seconds of useful

6    questions out of your time.

7           MR. BRUGNARA:  Well, you know what?  My idea of

8    what's useful will tie together in the closing argument, and I

9    get information based upon my questions, and I have a lot of

10   other subject matters --

11          THE COURT:  You didn't get any information.  You just

12   made speeches.

13          MR. BRUGNARA:  I did not make speeches.  I have a

14   bunch of questions that I already passed through my associate

15   counsel that has 20 years experience, that agree that they are

16   meaningful and necessary for the closing argument --

17          THE COURT:  I don't believe it.

18          MR. BRUGNARA:  -- and I need a fair amount of time to

19   cross examine their witnesses, otherwise --

20          THE COURT:  All right.  Now we're going back to --

21          MR. BRUGNARA:  I want to tell you what happened last

22   night.

23          THE COURT:  No.  You don't get a chance to say that

24   yet.

25       Ms. Harris, did you have more other witnesses you want to

PROCEEDINGS

1   bring up?

2        MS. HARRIS:  Your Honor, we would like an offer of

3   proof as to what the defendant intends Ms. Record to say, if

4   she's going to testify today, an offer of proof as to what

5   meaningful defense she is going to testify to.

6        THE COURT:  I'm not going to go there.  We know what

7   she's -- we know what Mr. Brugnara wants.  He wants to say that

8   she gave him medical attention.  I assume that's what it is

9   and -- what is that smell?

10        THE CLERK:  It's a marker, and it's extremely strong.

11        THE COURT:  I'm not going to require that.

12        MS. HARRIS:  Okay.  And then the next issue is the

13   defendant noticed Bob Kane, the attorney, and we would then ask

14   for a ruling that if Mr. Kane testifies, the attorney-client

15   privilege is going to be waived.

16        THE COURT:  It's possible, but not necessarily.

17   There are things that Kane could -- Mr. Kane could testify to

18   that would not waive the attorney-client privilege, and there

19   are certainly things that would waive the privilege.  I have to

20   wait and see how it develops.

21        MS. HARRIS:  But he would not be permitted to get in

22   the hearsay statements that the defendant was trying to get in

23   through Mr. Kane's emails yesterday and the Court excluded.

24   Just calling Mr. Kane as a witness doesn't the cure the hearsay

25   problem.

```
 1            THE COURT:  That part is correct.  But, nevertheless,

 2   there are things that he could testify to.  For example, his

 3   conversations with Mister -- is it Schochet?

 4            MS. HARRIS:  Schochet, that's correct.

 5            THE COURT:  Schochet.  Those would not be privileged.

 6   And so there are things that he could testify to.

 7       Apparently, he went out and did measurements --

 8            MR. BRUGNARA:  Four hours out there.

 9            THE COURT:  -- maybe he took pictures --

10            MR. BRUGNARA:  He did.

11            THE COURT:  Please.

12       So he -- there are things he could testify to that would

13   not waive the privilege.

14       But you should be very careful, Mr. Brugnara, because I've

15   seen it many times.  Questions can be asked where he waives the

16   privilege and then it's an open door.  So you need to be -- and

17   another thing that is an open door is if through the manner of

18   questioning you leave the impression that he somehow blessed

19   your course of conduct, that's a waiver.

20            MR. BRUGNARA:  That's subjective.

21            THE COURT:  That's what I'm going to be listening

22   carefully for.  So be very careful not to leave the

23   impression --

24            MR. BRUGNARA:  Okay.  I have a question.

25            THE COURT:  -- that this lawyer blessed your course
```

PROCEEDINGS

1   of conduct.

2         **MR. BRUGNARA:**  I have a question on this subject

3   matter.  And I want to make one preceding comment.

4       You know, Ms. Harris, her preference would be for me to

5   not be able to put on any defense at all.  She likes the fact

6   that you're foreclosing all my rights to cross examine her

7   witnesses, and I object to all that.

8        I'm just -- I am going to just call back whoever I want

9   in my case-in-chief, whoever I was foreclosed out from cross

10  examining, which I have a right to do in my case-in-chief.

11        **THE COURT:**  Maybe.  We'll see.

12        **MR. BRUGNARA:**  But, regarding Bob Kane.  If you feel

13  there is a question, I ask this Court to notify me, because I'm

14  a pro se defendant, at the inception of the question.

15      And, moreover, it would have to be answered by Bob Kane,

16  because Bob Kane is as experienced as you are, and I'm sure he

17  won't answer any questions that he feels broaches on the

18  attorney-client privilege.

19        **THE COURT:**  I'm not going to do that, because I can't

20  promise to do that, because that would be impossible given the

21  way that you proceed in the courtroom.  It is impossible to get

22  a word in edgewise.

23      You could ask a question, lay some information before the

24  jury even.  If the witness doesn't answer it, then you've

25  infected the jury with the idea that the witness has blessed

PROCEEDINGS

1  your course of conduct.  So you are on your own on this one.

2  I'm sorry.  I cannot promise you I will be able to save you

3  from that disaster.

4         **MR. BRUGNARA:**  Regarding Mark Levinson again.  I just

5  want to make, then, an oral -- I guess, whatever the motion is,

6  or do you need it in writing?  Because the fact of the matter

7  is I'm going to have --

8         **THE COURT:**  Go read Rule 16 and comply.

9         **MR. BRUGNARA:**  I know Rule 16.

10      I know Rule 2 is you have the authority to pretty much

11  usurp every code in that book based upon judicial fairness.  So

12  under Rule 2 you have control of doing what -- reinterpreting

13  any rule in that book.  You can reinterpret anything to the

14  directives of this Court.

15      So I'm asking you under Rule 2 to say that that statutory

16  period can be waived so we -- you know, for the sake of time.

17  Because I'm going to have him -- I am going to go have him

18  testify about the value of the house.

19      I have that right because they brought in -- they brought

20  it into question, your Honor, when they brought it up yesterday

21  saying it was in foreclosure and it was underwater and there

22  was no equity.  They are the one that opened the door to it,

23  not me.

24         **MS. HARRIS:**  Those were Mr. Brugnara's statements

25  about the condition of the house, your Honor, and Mr.

1  Brugnara's admissions, not expert testimony.  He has been told

2  many times what he needs to do to notice an expert --

3          **MR. BRUGNARA:**  Your Honor.  Your Honor --

4          **MS. HARRIS:**  He's interrupting again, your Honor.

5          **MR. BRUGNARA:**  She said --

6          **THE COURT:**  Stop it, Mr. Brugnara.

7          **MR. BRUGNARA:**  And that's why -- because she will

8  interrupt every time I speak.  This is the thing.  They brought

9  in --

10          **THE COURT:**  She didn't interrupt you.

11          **MR. BRUGNARA:**  They brought in photographs of the

12  house yesterday and put them out to the public out there of

13  probably 600 square feet of an 8,000-foot house making it look

14  like, just like you said, Paris burning.  Okay?

15      The reality is that is not the reality.  The reality is

16  that's a small piece of the house.  Ms. Hadley even commented,

17  you know, that's just a small fraction of the pictures.

18      And I'm going to have Mark Levinson testify as to what

19  that house is worth.  The gallery is --

20          **THE COURT:**  No, you're not, unless I give you

21  permission to do so.

22      Rule 16 requires a written summary of any expert testimony

23  that you intend to use under Rule 702, 703 or 705.  And you

24  haven't given any written summary to the Government.  So you're

25  not going to be able to do that until -- if you did it, I might

 1  allow you to do it late, but I -- I can interpret the rules

 2  under Rule 2, but I cannot -- I cannot ignore the rules under

 3  Rule 2.

 4          **MR. BRUGNARA:**  Well, I just wanted to let you know in

 5  that vein of what we're talking about.  Last night -- and just

 6  to let you know what --

 7          **THE COURT:**  Go ahead.  Tell us what happened last

 8  night.

 9          **MR. BRUGNARA:**  You know, I want a, you know,

10  metaphoric pat on the back.  I am a champ in this case, for the

11  benefit of the U.S. Attorneys also, man, because I could have

12  delayed this out a week after what happened to me on Friday and

13  I didn't.  And I was tired yesterday, okay?  Really tired.

14      Last night I was finally getting ready to go to bed.  It

15  was, I don't know, whatever, 9:30, 9:00 o'clock.  And they're

16  like:  Okay, Brugnara, time to move.  I go:  What?  I thought

17  it was a joke.  They go:  No.  You're going back, I guess, to

18  Glenn Dyer.  I said:  Okay.  Well, I'll need at least --

19          **THE COURT:**  That's what you wanted.

20          **MR. BRUGNARA:**  Yeah, but at least -- but not at, you

21  know, 10:00, 11:00 o'clock at night.

22      Okay.  So he said -- so boxed up everything.  Threw it in

23  a bunch of boxes.

24      I mean, I'm glad that it happened, but it would have been

25  nice to happen at, you know, 1:00 in the afternoon or 2:00.

PROCEEDINGS

```
 1        So by the time I got situated all the way back to Glenn
 2   Dyer, about the middle -- it was about 1:00 o'clock in the
 3   morning.  And, you know, these guys come get me 5:00 or, you
 4   know, 6:00.  They wake me up at 4:00 o'clock in order to eat
 5   breakfast.  I got another two hours sleep.
 6        Listen, man.  From last Friday -- actually, from Thursday
 7   night to today, I've had three hours of sleep.
 8        Now, I'm not making excuses.  I'm just letting you know
 9   the sacrifices --
10        THE COURT:  Are you asking for a continuance?
11        MR. BRUGNARA:  No.  This is the thing.  This is a
12   fight.  You can't back down now.
13        The reality -- I just want the Court to be aware -- and
14   this is all documented through Alameda and the Marshals.  You
15   can confirm it.
16        What I'm saying is, I want a little bit of leniency here
17   as far as --
18        THE COURT:  I'm not going to let you.
19        MR. BRUGNARA:  The fact that --
20        THE COURT:  -- violate the rules --
21        MR. BRUGNARA:  I'm not -- listen, I'm not going to
22   violate any rules.  But I am doing a great service to the Court
23   and even the U.S. Attorneys not asking for delays that I'm
24   entitled to at that point because of what's happened to me.
25        And I'm willing to plod ahead here, but, you know, this is
```

PROCEEDINGS

 1  getting ridiculous, man.

 2          **THE COURT:**  I cannot -- I can consider a motion for

 3  continuance.  You're not making that.  But what I can't do is

 4  say:  Okay, since you don't want the continuance, I'll let

 5  you -- I give you a blank check to violate rules.  I'm not

 6  going to do that.

 7          **MR. BRUGNARA:**  I understand.  That's not what I'm

 8  asking you to do.

 9      I'm just asking you to understand, be understanding and

10  compassionate to the circumstances.

11          **THE COURT:**  I am sympathetic to that circumstance of

12  what happened to you over the weekend.  I've made that very

13  clear.  But that does not cut a figure when it comes to a

14  proper procedure in the courtroom.

15      All right.  I have something --

16          **MR. BRUGNARA:**  There is one other question you

17  asked --

18          **THE COURT:**  Yes, go ahead.

19          **MR. BRUGNARA:**  -- you said:  When you come in the

20  morning, ask me what questions you're going to ask Ms. Hadley.

21          **THE COURT:**  Who?

22          **MR. BRUGNARA:**  Ms. Hadley, the FBI girl.

23          **THE COURT:**  No.

24          **MR. BRUGNARA:**  Okay?

25          **THE COURT:**  Agent.  Not girl.  Agent.

PROCEEDINGS                                                  1779

```
 1            MR. BRUGNARA:  The FBI agent.

 2            THE COURT:  She's a grown woman.  Come on.

 3            MR. BRUGNARA:  The FBI agent.

 4       She -- and, again, my preference would have been to

 5   question Mr. Desor, because I prefer not questioning her, but

 6   they don't want to put him on the witness stand.  But I do have

 7   questions for her.  And one of them is about the Natalia, the

 8   Russian girl's -- the Russian woman's --

 9            THE COURT:  I think you should do this.  Write these

10   out.  I will consider -- give it to the Government, write it

11   out, and then maybe you get to call her back because she's off

12   on some surgery today --

13            MR. BRUGNARA:  And I -- I -- listen --

14            THE COURT:  -- we're not going to call her back

15   today.

16            MR. BRUGNARA:  I'm sympathetic, empathetic to that.

17   I'm not looking to disrupt her, but I just have a few questions

18   to ask her.  Just --

19            THE COURT:  You need to write them out and see if I

20   think that they are relevant enough to require her to come

21   back.

22            MS. HARRIS:  And those would be provided to the

23   Government?

24            THE COURT:  Of course they would be, yes.

25            MR. BRUGNARA:  And you want -- we have -- the final
```

PROCEEDINGS

1   question I have is, you want -- and I just want to get a

2   confirmation on this because you said last week when I do the

3   case-in-chief, I do the completeness of the record for the Form

4   12 for me, my testimony, correct?  Or do you want me to do it

5   now?

6           **THE COURT:**  You need to write it out so that I can

7   see what you propose to put in, so we -- we don't do it on the

8   fly, which particular passages you think are necessary for the

9   sake of completeness.  That ought not to be so hard for you to

10  do.

11          **MR. BRUGNARA:**  I have it right here.

12          **THE COURT:**  Show it to the Government and then show

13  it to me.

14      (Document was shown to the counsel.)

15          **MR. BRUGNARA:**  You want me to mark it?

16          **THE COURT:**  I think it should be marked so there will

17  be a record on appeal.

18          **MR. BRUGNARA:**  Let me get a pen and mark it.

19          **THE COURT:**  I have something I want to raise with all

20  of you, if I may, but I want the defendant to be...

21      All right.  Yesterday the Government moved for summary

22  contempt.  I granted that.  I said that the defendant was

23  guilty of summary contempt and that I would decide later what

24  the number of days of additional imprisonment should be, and

25  the answer is 21.  So 21 days will be added to the days

PROCEEDINGS

1  already.

2      **MR. BRUGNARA:**  Your Honor, I --

3      **THE COURT:**  No, no.  You don't get to argue any more.

4  We had the argument yesterday.

5      And I want to remind the defendant that I have told you

6  many times, there are some things you should not be doing.

7  There were four we started out with.  Plus, to comply with the

8  Rules of Evidence.  And then as time has gone on, I've added to

9  that list.  I'm going to give you some of those -- some of

10 those do not do's.  I'm going to remind you of those.

11     No speeches wherein you lay facts before the jury that are

12 not in evidence allegedly in the form of a question.  I've seen

13 you do that the at least 200 times.

14     No interrupting the judge when he is speaking or making a

15 ruling.

16     No interrupting the Government when they are speaking.

17     And no more questions that begin with, "Would it surprise

18 you."  A totally improper question.

19     No arguing with witnesses.

20     No talking over the government's objections.

21     Now, there are some other things like now that Maibaum and

22 Long have already testified, no more mention of the Maibaum

23 versus Long lawsuit with other witnesses.  In the closing you

24 can make your arguments, but those other witnesses have nothing

25 to do with that lawsuit.

PROCEEDINGS                                    1782

1      So there were quite a number of other things.  I haven't

2  given you an exhaustive list.  You have just thumbed your nose

3  at the Court.  And even though you're pro se, you're doing

4  exactly what you told your mother you were going to do --

5          MR. BRUGNARA:  No, I didn't --

6          THE COURT:  Just a second.

7          MR. BRUGNARA:  You keep saying that.

8          THE COURT:  The Government is -- here is the other

9  thing.  If this continues, the Government has the blessings of

10  the Court to put in evidence that statement you made to your

11  mother on the telephone.  So the jury will see exactly what's

12  been going on here.

13          MR. BRUGNARA:  Okay.  Well, then we're definitely

14  going to have completeness of the record.  Actually, I would --

15  I would stipulate to that because it's a 15-minute call and I

16  talk about all sorts of things --

17          THE COURT:  No.  It would just be the part that

18  the --

19          MR. BRUGNARA:  No, no.  That would be prejudicial

20  then.  This is --

21          THE COURT:  No.  That's the whole point, to show the

22  jury what you have been up to.  It was a concocted plan from

23  the get-go.

24          MR. BRUGNARA:  I want to correct the record here

25  about what you just said.

1          You said Maibaum versus Long didn't include Mr. Schochet.

2     Is that his name?  Schochet?  Mr. Schochet's name is in that

3     lawsuit at least ten times.  So the fact is it did include him.

4          THE COURT:  No, that doesn't matter.  The only people

5     who made admissions in that lawsuit are Maibaum and Long.  They

6     are the only way that that case could have been brought in by

7     way of impeachment or contradictions.

8          But Schochet is not one of the witnesses -- I'm sorry.  He

9     may be a witness in that case, but he's not a party who has

10    made any admissions unless he's testified or given declarations

11    in that case.  If he did that, then he could be impeached with

12    his own declaration.  That would be okay.  But I'm pretty sure

13    that hasn't happened.

14         MS. HARRIS:  Your Honor?

15         THE COURT:  Yes.

16         MS. HARRIS:  On that list that you just read to the

17    defendant of prohibited conduct, could you add that he is not

18    to call any of the witnesses liars in front of the jury.  He

19    has done that on several occasions.

20         THE COURT:  That's improper, too.  You can't do that

21    until closing argument.  Then you're free to call anybody you

22    want a liar, at least a witness a liar.  But you cannot -- you

23    cannot be doing that and making these arguments as you go

24    along --

25         MR. BRUGNARA:  Okay.  Can you --

PROCEEDINGS

1    **THE COURT:**  -- with the witnesses.

2    **MR. BRUGNARA:**  And can you admonish her and tell her

3  not to interrupt me?  When she makes an objection, not to stand

4  up and approach the stand?  My understanding is she should be

5  seated down when she makes an objection until you hear --

6  unless you call her forward.

7    So I don't want her bullying me while I'm doing my cross

8  examination or I'm doing my case-in-chief because she --

9    **THE COURT:**  There is nothing wrong with a lawyer

10  standing up and approaching the lectern to make an objection.

11  That's okay.

12    **MR. BRUGNARA:**  Well --

13    **THE COURT:**  She's not doing anything wrong.

14    Whenever you're doing something improper, she's entitled

15  to stand up and make an objection --

16    **MR. BRUGNARA:**  Okay.

17    **THE COURT:**  -- and freeze things until I can sort it

18  out.

19    **MR. BRUGNARA:**  And, also, I want her, also, to be

20  admonished for directing this Court how to conduct its protocol

21  rather than putting it in the form of a request or a proffer.

22    She constantly makes statements to this Court:  You need

23  to do this.  He's doing that, and you need to do this.  Telling

24  the Court, as if the Court is a puppet and she's the puppeteer,

25  of how you must act in her courtroom.  She's not the judge in

PROCEEDINGS

1    this case.  She's the plaintiff.  She's the prosecutor.

2        The fact is you're the judge and she constantly -- and I

3    have been in courtrooms.  You don't say to the judge:  Oh, well

4    you have to do this.  You know, the law is this and you need to

5    do this.

6        She has done that 99 percent of the time when she presents

7    her complaints to you, instead of saying:  Your Honor, we

8    object to Mr. Brugnara doing this and this is the Code and we

9    request -- we request that the Court do this.  She never

10   requests it.  She always tells you what to do.  And then you

11   go:  Well, that's true.  You know, you're blah, blah, blah, and

12   then you need to do this.  She never asks you in a proper form

13   and it's disrespectful to me.

14       **THE COURT:**  Well, I believe the record is to the

15   contrary and Ms. Harris has behaved admirably in the

16   circumstances.  So that request is denied.

17       All right.  Are we ready to go on with the trial?

18       **MS. HARRIS:**  Yes, we are, your Honor.

19       And I did want to alert the Court that we're going to be

20   reading some exhibits into evidence, some certified copies,

21   this morning.

22       **THE COURT:**  All right.  You can do that.  Assuming

23   that -- is there any controversial one?

24       **MS. HARRIS:**  Well, I'll tell the Court what they are.

25   I can't imagine there would be controversy, but my imagination

PROCEEDINGS

1    is not that broad.

2         We're going to be reading the indictment as it existed

3    before the defendant absconded.  We're not going to read the

4    indictment in, but place it in, the certified copy of the

5    indictment as it existed to show that there were charges from

6    which he was fleeing.

7         We are going to read the -- have the furlough order, a

8    certified copy of the "Order Re Furlough Procedures."

9         We are then going to have the acknowledgment of the "Order

10   Re Furloughs" which has Mr. Brugnara, Mr. Stevens and

11   Mr. Babcock's signatures.

12        Then we are going to have the certified copy of the order

13   regarding the activation of the furlough procedures.

14        And then we're going to have the "Order Re the Trial Date"

15   read in so that the jury is aware that there was an imminent

16   trial date from which he fled.

17             **THE COURT:**  All right.  All those sound fine to me.

18             **MR. BRUGNARA:**  Well, except the last comment.  I

19   didn't hear all of them.

20        The last one, "imminent trial date from which he fled."  I

21   didn't flee from an imminent trial date.  I fled because of my

22   medical circumstances.

23             **THE COURT:**  That's what you say, but they are

24   entitled to show there was an imminent trial date and then they

25   will argue to the jury:  Why do you think he fled five days

PROCEEDINGS

1  before the trial, or whatever it was.

2          **MR. BRUGNARA:**  That's a closing argument, though.

3  They can't -- just like I can't make that argument on cross

4  examination --

5          **THE COURT:**  You're not going to make that argument

6  when you present it.

7          **MS. HARRIS:**  No.

8          **THE COURT:**  You will just present the evidence, of

9  course, and then make that argument at closing.

10          **MR. BRUGNARA:**  So I'm allowed to object, then, if she

11  makes that -- if she tries to make that argument not at

12  closing?

13          **THE COURT:**  Well, if she were to try to say:  Now

14  we're going to explain to you why he fled, and then start

15  reading that document, I would sustain your objection and say:

16  Save that for the argument.

17      But she's entitled to put the evidence in --

18          **MR. BRUGNARA:**  Of course.

19          **THE COURT:**  -- that that was a lie.

20          **MR. BRUGNARA:**  Of course.  Of course, she is.

21          **THE COURT:**  But she's not going to do that.

22          **MR. BRUGNARA:**  I just want to make sure --

23          **THE COURT:**  She's a good lawyer --

24          **MR. BRUGNARA:**  Really?  I just want to --

25          **THE COURT:**  -- she's not going to do that.

```
 1              MR. BRUGNARA:  I disagree.

 2              THE COURT:  Well, I have had experience with --

 3              MR. BRUGNARA:  So have I.

 4              THE COURT:  -- a lot of the lawyers in this

 5   courtroom --

 6              MR. BRUGNARA:  So have I.

 7              THE COURT:  -- and I'm telling you, she has behaved

 8   better than you have.

 9              MR. BRUGNARA:  I agree with that, but I disagree with

10   the first comment.

11              THE COURT:  All right.  Let's -- can we bring -- just

12   a second.  There was something else I wanted to bring up.

13         Are you ready to go with your first witness today?

14              MR. STEVENS:  Yes.

15              THE COURT:  What?

16              MR. STEVENS:  Yes.

17         (Discussion held off the record between the defendant

18          and his advisory counsel.)

19              THE COURT:  Now, we cannot be in a position where we

20   have a lot of time left on the clock.  If it's a few minutes,

21   I'll let you have that.  But we can't be in a position where we

22   waste part of the jury's day, a large part of it.

23         So you need to be ready with your first witness, unless

24   you're going to -- if we get up to, like, 12:30, I'll let it go

25   though.  But if you're going to rest a lot sooner than that,
```

1   then we need to have a witness ready to go.

2            MS. HARRIS:  We do anticipate that, and we would ask

3   just for a very short recess so that we can make we all our

4   exhibits in evidence and then we will rest in front of the

5   jury, if that is okay.

6            THE COURT:  All right.  Let's get started here.

7            MR. STEVENS:  So, Judge Alsup?

8            THE COURT:  Wait.  What?  Yes.

9            MR. STEVENS:  I'm not sure if this is the right forum

10  to have this discussion, but Mr. Brugnara is now arguing --

11           MR. BRUGNARA:  It's not the right forum.  It's not

12  the right forum.  And it's not the right forum.

13       The first --

14           MR. STEVENS:  If we could have an in camera to

15  discuss what's going on with the witnesses so I can inform the

16  Court of what I've done and where we're at, I would appreciate

17  it.

18           THE COURT:  I need to hear from Mr. Brugnara.  You

19  need to have your witnesses here.  You're in charge.

20           MR. BRUGNARA:  My understanding was that it would be

21  Tony Crossley and Frank Sanders, and then --

22           THE COURT:  Are you going to have them here?

23           MR. BRUGNARA:  James -- listen.  I don't access to a

24  phone, okay?  So, obviously, if you give me a phone, I'll phone

25  them right now.

PROCEEDINGS

1       But the third one isn't going to be going until tomorrow

2   because I don't have any of the information.  It's in boxes and

3   in plastic bags that I need to sort through, probably tonight

4   sometime.

5       But I'm prepared --

6           **THE COURT:**  We will have a -- if need be, an in

7   camera thing later in the morning.  Right now we're going to

8   get started with the government's case.

9       Go ahead.  Bring in the jury.

10      (Jury enters courtroom at 8:04 a.m.)

11          **THE COURT:**  Okay.  Thank you.  Welcome back and be

12  seated.  We are ready to go to the government's next witness.

13          **MR. KINGSLEY:**  Your Honor, the Government moves to

14  admit portions of Exhibit 6, the videotaped deposition of

15  Natalia Shlyapina and publish it and play it to the jury now.

16          **THE COURT:**  All right.  Any objection?

17          **MR. BRUGNARA:**  Completeness of the record, your

18  Honor.

19          **THE COURT:**  Well, the Government will put in the

20  portions it wishes.  If it turns out that something needs to be

21  put in for the sake of completeness, then we'll show it to the

22  jury separately.

23          **MR. BRUGNARA:**  Your Honor, under the *Brady*, we also

24  make that objection.

25          **THE COURT:**  All right.  Those objections are

1  overruled.

2       Please proceed.  What is that exhibit number, 6?

3            **MR. KINGSLEY:**  It's Exhibit 6, your Honor.

4            **THE COURT:**  All right.  And the court reporter will

5  not try to record it.  You need to put in for the record an

6  exact duplicate of the portions actually shown to the jury.

7       Are you able to do that?

8            **MR. KINGSLEY:**  We are able to do that.  And we can

9  provide a transcript to the court reporter as well.

10           **THE COURT:**  Let me explain to the jury what's going

11 on.  This is new.  You know, I've told you many times that it's

12 the testimony from the stand under oath that counts.  You're

13 about to hear testimony from a witness who is not going to be

14 testifying live in the courtroom, but gave testimony in this

15 case by way of what's called deposition a few months ago.  And

16 this witness's name is who?  Give me the name again and spell

17 it.

18           **MR. KINGSLEY:**  Natalia, N-A-T-A-L-I-A.  Shlyapina,

19 S-H-L-Y-A-P-I-N-A.

20           **THE COURT:**  All right.  And she is no longer in the

21 United States and so is not available to testify.  So the rules

22 permit both sides to show up and appear at the deposition and

23 take the testimony down and then play it back to the jury

24 later.  So that's the way it works.

25      So this is evidence in the case.  It counts just as much

PROCEEDINGS                                    1792

1   as testimony from the stand, and I believe -- correct me if I'm

2   wrong, but both sides at that time were represented by counsel,

3   is that correct?

4           MR. KINGSLEY:  That's correct, your Honor.

5           THE COURT:  And the name of the lawyer who was then

6   represented -- whose name may appear -- who was representing

7   the defendant then is who?

8           MR. KINGSLEY:  That was Erik Babcock.

9           THE COURT:  And was the defendant present at the

10  proceeding?

11          MR. KINGSLEY:  The defendant was present.

12          THE COURT:  All right.  So you will now -- but the

13  judge was not present, but the judge does not need to be

14  present.

15      So this is not to be given any special weight.  It's just

16  to be treated just like any other testimony in the case.  It's

17  up to you to decide how much weight to give testimony or any

18  other evidence in the case.

19      All right.  So at this time it's going to be played to

20  you.  Is it all set up to go got jury box?

21          THE CLERK:  As soon as they start, yes.

22          THE COURT:  And give us just a heads up.  How long it

23  will last, roughly?

24          MR. KINGSLEY:  I think around 10 to 15 minutes, your

25  Honor.

1    **THE COURT:**  All right.  So it helps the jury to

2   understand how long it's going to be.

3    All right.  So we will all go silent now and we will hear

4   the videotaped deposition of that witness.

5    <u>**NATALIA SHLYAPINA**</u>,

6   called as a witness for the Government herein, testified via

7   videotaped deposition played in open court in the presence and

8   hearing of the jury.

9    (Time noted:  8:07 a.m.)

10    **MR. KINGSLEY:**  Can you make sure the jury can hear

11  it?

12    **THE COURT:**  Can you hear okay?

13    (Jurors responding negatively.)

14    **THE COURT:**  We've turned it up as loud as it will go

15  here.  Can you turn it up louder on your end?

16    (Brief pause.)

17    (Videotaped deposition resumed.)

18    **THE COURT:**  All right.  Can you hold?  One second.  I

19  need to give a special admonition.

20    Is this in Russian and it's interpreted?

21    **MR. KINGSLEY:**  Yes.

22    **THE COURT:**  All right.  This happens when you have a

23  foreign language witness.  What counts for your purposes is the

24  English that you hear.

25    At least one of you on the jury understands Russian.  You

PROCEEDINGS                                          1794

 1  must disregard anything you hear in Russian.  What counts is

 2  the English.  The English translation is all that counts.

 3      And so don't be over there trying to do your own

 4  interpretations.  You listen to the English part.  That's what

 5  counts as testimony in the case.

 6      So you will hear the question in English.  There will be a

 7  translation.  And then an answer in Russian.  And then it gets

 8  translated.  It's a little cumbersome.  You'll get used to it.

 9  It works pretty well.

10      I'm sorry for the interruption.  Please go ahead.

11      (Videotaped deposition resumed.)

12      **MR. KINGSLEY:**  Your Honor, that's the entirety of the

13  deposition that the Government moves to admit at this time.

14      (Time noted: 8:35 a.m.)

15      **THE COURT:**  All right.  So that -- what the jury has

16  now seen is evidence in the case.

17      So we go as to the next witness.

18      **MR. BRUGNARA:**  Well, I want to get -- I have an

19  objection on completeness of the record.  I think the jury

20  should see the complete video, if they are going to see any of

21  it.

22      **THE COURT:**  Well, you -- if you wish to submit

23  portions that you would like to show the jury, we will show

24  those, if it's required, under the rule of completeness.

25      Or, if you independently wish to present any of it, you

1  can present that to me out of the presence of the jury and

2  we'll go over it and -- but for right now we don't need to do

3  that.

4      So the Government can present its next witness.

5          MS. HARRIS:  Your Honor, at this point the Government

6  would move to admit certain certified records and after they

7  are admitted, to read portions to the jury.

8          THE COURT:  All right.  Go ahead.

9          MS. HARRIS:  First, we would move to admit as

10 Government's Exhibit 135, which is a certified copy of the

11 indictment returned against defendant Luke Brugnara on

12 July 22nd, 2014 -- July 17th.  I'm sorry, your Honor.

13 July 17th, 2014.

14         THE COURT:  All right.

15         MS. HARRIS:  That's Government's Exhibit 135.

16         THE COURT:  That's received in evidence.

17     (Trial Exhibit 135 received in evidence.)

18         THE COURT:  Just to clarify something for the jury.

19 We are here at trial on -- is it the second superseding

20 indictment?

21         MS. HARRIS:  Correct, your Honor.

22         THE COURT:  All right.  We're here on a later

23 indictment, but the prior indictment that the Government just

24 referred to is being admitted as potentially relevant from your

25 deliberations for an issue which we don't need to get into now,

```
 1  but I don't want you to be confused about what indictment we're
 2  here on.  We're here at trial on a later indictment.
 3       And, again, I remind you that no indictment is evidence of
 4  guilt in the case.
 5       All right.  Go ahead.  Next.
 6            MS. HARRIS:  The next exhibit is Exhibit 136, which
 7  is a certified copy of document No. 257, the December 23rd,
 8  2014 "Order Re" --
 9            MR. BRUGNARA:  Your Honor.  Your Honor, I have an
10  objection on prior, that I just spoke with counsel.  I want the
11  jury to also be aware we have a pending appeal to set aside the
12  indictment with the Ninth Circuit.
13            THE COURT:  All right.  That's irrelevant.  If the
14  Court of Appeals, of course, were to say to the judge:  You
15  goofed up in some way and -- that's their prerogative.  They
16  have -- they are way up there and I'm down here.
17       But we're down here right now and I -- any pending appeal
18  is of no moment.
19       So, go ahead.
20            MS. HARRIS:  Thank you, your Honor.
21       So the next exhibit we would seek to introduce is
22  Government's Exhibit 136, which was the December 23rd, 2014
23  certified copy of the "Order Re Furlough Procedures" for
24  defendant Luke Brugnara.
25            THE COURT:  All right.  That's admitted into
```

1   evidence.  136 is received.

2       (Trial Exhibit 136 received in evidence.)

3       **MS. HARRIS:**  Now, we would like to publish that for

4   the jury and read certain portions.

5       **THE COURT:**  All right.

6   (Document displayed)

7       **MS. HARRIS:**  Starting at Page 1, if you could just,

8   Denise, blow up the second -- the first paragraph that begins,

9   "The United States Marshal's office..."

10      And I'll read this into the record.

11          "The United States Marshals office will

12      facilitate the following furlough procedure for

13      Defendant Brugnara, a current pretrial detainee at

14      Glenn Dyer jail.  When defendant's lead lawyer Erik

15      Babcock makes an appointment by 4:00 p.m. the

16      previous day, the Marshal Service" --

17      **THE COURT:**  Previous business day.

18      **MS. HARRIS:**  Excuse me, your Honor.

19          "... previous business day, the Marshals Service

20      shall bring defendant to the marshals lock-up

21      facility in either Oakland" -- and there is a phone

22      number -- "or San Francisco as requested.  The

23      Marshals shall then release defendant, wearing

24      clothing to be provided by the defendant's family, to

25      the temporary custody of defendant's lead lawyer,

1798

PROCEEDINGS

```
 1          Erik Babcock, for the sole purpose of meeting with
 2          his counsel in the Attorneys' Lounge in the same
 3          building.  Attorney Babcock must physically escort
 4          defendant from the lock-up facility directly to the
 5          Attorneys' Lounge when he accepts custody."
 6      And then if we could skip to the sentence about, "During
 7  furlough sessions in the San Francisco facility" and highlight
 8  that?
 9      (Document highlighted.)
10          MR. BRUGNARA:  Your Honor?  Your Honor?
11          THE COURT:  What?
12          MR. BRUGNARA:  Can we have a sidebar?  I concurred
13  with counsel.  It's relevant.
14          THE COURT:  No.  This is already in evidence.  We're
15  not going to have a sidebar while it's being published.
16          MS. HARRIS:  Now if we could turn to:
17          "During furlough sessions in the San Francisco
18          facility, the accused must remain within sight" --
19          THE COURT:  "Must also remain."
20          MS. HARRIS:  (As read)
21          "... must also remain in site of Attorney
22          Babcock, except when the accused is left with Allen
23          Lew in Pretrial Services for the sole purpose of
24          allowing counsel to pick up lunch."
25      Then if we could turn to the next page, and the second
```

1   full paragraph that starts "Defendant."

2          "Defendant may not leave the federal building and

3       may only go from the lock-up facility to the

4       Attorneys' Lounge and back, plus rest facilities."

5       And then let's go to the sentence that says, "In

6   San Francisco."  And if we could highlight that?

7       (Document highlighted.)

8          "In San Francisco defendant may only be in the

9       lock-up facility, the Attorneys' Lounge on the 18th

10      floor, and the elevator in between.  During furlough

11      sessions, defendant may only meet with and speak to

12      Attorney Babcock, Attorney James Stevens, a paralegal

13      or investigator working at Mr. Babcock and

14      Mr. Stevens' direction, a representative of the

15      Marshal and a representative of Pretrial Services."

16      Then if we could highlight the next sentence?

17      (Document highlighted.)

18         "On furlough, defendant may not possess or use

19      any cellular phones, smartphones, computers, laptops,

20      or computer tablets.  Defendant may not use or

21      possess any device that can access the internet,

22      send/receive telephone calls, and/or send/receive

23      text messages.  Defendant shall not engage in or

24      attempt to engage in any financial transactions

25      either directly or indirectly through third parties

PROCEEDINGS                          1800

```
 1            (including but not limited to his wife, other family

 2        members or civil or criminal attorneys)."

 3            MR. BRUGNARA:  Your Honor --

 4            MS. HARRIS:  And then let's --

 5            MR. BRUGNARA:  Your Honor --

 6        THE COURT:  Yes.

 7            MR. BRUGNARA:  Before we get to Page 3, I need -- I

 8   need to approach.

 9        THE COURT:  All right.  We'll have a short bar.

10        (Proceedings held at sidebar.)

11            THE COURT:  What's the issue?

12            MR. BRUGNARA:  Yes, your Honor.  I just want to have

13   these -- she's talking about tantrums and shouting, and

14   tantrums and shouting, outbursts and tantrums.

15            THE COURT:  Are you going to read the tantrum thing?

16            MS. HARRIS:  I'm not going to read it.

17            MR. BRUGNARA:  They are reading it on their screens.

18            MS. HARRIS:  It's a certified record.  That is the

19   order he violated.

20            MR. BRUGNARA:  That's prejudicial.  And it's -- it's

21   subjective and gratuitous.

22            THE COURT:  Here is what I want you to do.  I want

23   you to redact from the version that goes to the jury room the

24   sentence about the tantrums.

25            MR. BRUGNARA:  And, also, off the computer because
```

```
1   she's publishing it to the jury.
2            THE COURT:  Just a minute.
3        And if you can show it on the screen without showing --
4   without showing the "tantrum" part, then do so.  But if you
5   can't do it without -- if it would show up on the screen, then
6   just read it out loud.  Don't show the jury the "tantrum" part.
7            MR. BRUGNARA:  It's in two places.
8            THE COURT:  All right.  That's fine.  I will make
9   that accommodation to Mr. Brugnara.
10           MR. BRUGNARA:  All right.
11           THE COURT:  All right?  You -- can you live with
12  that?  I think you can do that.
13           MS. HARRIS:  Yes.
14           THE COURT:  All right.  Thank you.
15       (Proceedings held in open court.)
16           MS. HARRIS:  I'm now reading from Page 3 of the
17  furlough order.
18           "When one lawyer uses the restroom, the accused
19       must remain in the conference room with the other
20       lawyer, or both the accused and counsel must use the
21       facility at the same time.
22           "When defendant is present, no phone may be used.
23       Defense counsel shall remain from having any cell
24       phones within reach of the defendant."
25       Then skipping to the next paragraph:
```

1       "When the meeting is over, Attorney Babcock shall

2       escort defendant back to the Marshals lock-up

3       facility no later than 3:00 p.m., where defendant

4       will be immediately remanded back into the custody of

5       the United States Marshal, searched, returned to jail

6       clothing and transported back to the Glenn Dyer

7       jail."

8       Then the next paragraph reading:

9       "The period of furlough can be from 9:00 a.m. to

10      3:00 p.m. on any business day by reservation the

11      previous business day.  If defendant violates any of

12      these rules or attempts to leave the courthouse, his

13      lawyer, as an officer of the court, shall notify the

14      Marshals immediately.  Defendant's lawyer shall

15      promptly report any potential violation of these

16      conditions, whether material or not, to the Marshals

17      office."

18      And then reading the last paragraph:

19      "Before defendant can take advantage of this

20      procedure, he and his counsel must sign and date a

21      copy of this order stating that they have read it,

22      understood it -- understand it and will obey it.

23      Then the Court will, after approving the signed

24      subscriptions, issue an order activating this

25      furlough procedure.  It is so ordered December 23rd,

```
1     2014."

2         Your Honor, the United States moves now to admit

3   Government's Exhibit 137, which is a certified copy of Docket

4   262, the signed acknowledgment of "Order Re Furloughs."

5              THE COURT:  All right.  What's the exhibit number?

6              MS. HARRIS:  137.

7              THE COURT:  All right.  Received in evidence.

8         (Trial Exhibit 137 received in evidence.)

9              MS. HARRIS:  I would ask that we publish it?

10             THE COURT:  All right.  Publish it, and then I need

11  to give an admonition to the jury.

12        Go ahead.  Publish that.

13             MR. BRUGNARA:  Your Honor, that's pursuant to what

14  you stated on a previous exhibit, right, at the sidebar?

15             THE COURT:  We will -- yes, that still continues.

16        All right.

17        (Document displayed)

18             THE COURT:  So is that now -- can you read that in

19  the jury box?

20        (Jury panel nodding affirmatively.)

21             THE COURT:  All right.  The -- only one signature

22  showing up on the screen.

23        (Document displayed.)

24             THE COURT:  All right.  I need to say this to the

25  jury.  As you have gathered, probably from prior proceedings in
```

1    this case, and as this now makes very clear, the defendant was

2    remanded prior to trial to the custody of the Marshals for

3    reasons that we don't need to get into and about which you

4    should not in any way speculate.

5        Those -- the fact -- the fact that the defendant was

6    remanded for pretrial custody is not evidence that you may use

7    against him in determining whether or not he is guilty of the

8    charges.

9        Now, the fact that he was in custody is relevant to only

10   one issue in the case, which is, the count that deals with the

11   alleged escape from the building and the violation of the Court

12   order.

13       So that's the only way in which you can consider the fact

14   of detention.  It would be unfair for anyone to hold against

15   Mr. Brugnara on the other counts the fact that he was in

16   custody.  So please keep that in mind.

17       All right.  Next.  Please, continue.

18       **MS. HARRIS:**  Your Honor, the Government now moves to

19   admit Government's Exhibit 138, which is a certified copy of

20   the Court's "Order Re Activation of Furlough Procedures."

21       **THE COURT:**  All right.

22       **MS. HARRIS:**  And Mr. Kingsley is going to read the

23   relevant portions from 138.

24       **THE COURT:**  Received in evidence.

25

PROCEEDINGS                                     1805

1          (Trial Exhibit 138 received in evidence.)

2              THE COURT:  Go ahead.  Read the part that you think

3    is relevant.

4              MR. KINGSLEY:  (As read)

5              "The Court has received signed copies of the

6         Court's furlough procedures from attorneys Erik

7         Babcock, James Stevens and defendant Luke Brugnara.

8         This order now activates the furlough procedures set

9         forth in the Court's order dated December 23rd, 2014,

10        Docket No. 257.  The Marshals are hereby authorized

11        to furlough Mr. Brugnara on the terms of the Court's

12        December 23rd order."

13             MS. HARRIS:  Your Honor, the Government now moves to

14   admit Government's Exhibit 139, which is Docket No. 303, and

15   it's the Court's "Order Re Trial Date."

16             THE COURT:  All right.  Just hold it up and let me

17   see.

18        (Document was shown to the Court.)

19             THE COURT:  Correct.  I remember.

20        Thank you.  Received in evidence.

21        (Trial Exhibit 139 received in evidence.)

22             MS. HARRIS:  May we publish it to the jury --

23             THE COURT:  Yes, yes.

24             MS. HARRIS:  -- and read portions?

25        (Document displayed)

1           **MS. HARRIS:**  The order is dated January 13, 2015, and

2    the relevant portion is:

3           "The start of trial is hereby moved to 7:30 a.m.

4        on February 26, 2015 and will continue on Friday,

5        February 27th and thereafter, except that trial will

6        not be held on Friday March 6th, 2015."

7        And that is ordered on January 13th, 2015.

8           **THE COURT:**  All right.  Next.  Next exhibit.

9        (Brief pause.)

10          **MS. HARRIS:**  Your Honor, the United States calls Mark

11   Kokc.

12          **THE COURT:**  All right.  Deputy, please raise your

13   right hand.

14                        **MARK KOLC**,

15   called as a witness for the Government herein, having been

16   first duly sworn, was examined and testified as follows:

17          **THE WITNESS:**  Do.

18          **THE COURT:**  Please have a seat, and adjust the

19   microphone so that it catches your voice.  It will move

20   backwards, the whole thing -- no, no.  The mic will move

21   backwards, not you.

22       There.  Speak into it and say your name.

23          **THE WITNESS:**  Mark Kolc.

24          **THE COURT:**  Everybody hear okay?

25       (Jury panel nodding affirmatively.)

1          **THE COURT:**  Go ahead.

2                  **DIRECT EXAMINATION**

3  BY THE COURT

4  Q    Can you spell your last name for the record?

5  A    Yes.  It's spelled K-O-L-C.

6  Q    Good morning, Agent Kolc.  Where do you work?

7  A    I work for the United States Marshal Service in Northern

8  California.

9  Q    Which location?

10  A    At 450 Golden Gate in San Francisco.

11  Q    Is that also known as the San Francisco Federal Building?

12  A    That's correct.

13  Q    What do you do at the San Francisco Federal Building?

14  A    I'm the judicial security inspector for the Marshal

15  Service in this District.  My duties encompass courthouse

16  security.

17  Q    How long have you worked for the United States Marshal

18  Service?

19  A    I have been employed by them for ten years.

20  Q    Does the Federal Building at 450 Golden Gate Avenue have a

21  video surveillance system?

22  A    Yes, it does.

23  Q    Do your responsibilities include overseeing portions of

24  that system?

25  A    Yes, they do.

KOLC - DIRECT EXAMINATION / HARRIS

1   Q    What floors of the building are you responsible for

2   overseeing the video system?

3   A    I'm responsible for overseeing the Court floors, which

4   encompass Floors 15 through 20.

5   Q    What is the purpose of the video surveillance system?

6   A    The purpose of the video surveillance system is to provide

7   accountability and security monitoring for the court.

8   Q    How does that system work?

9   A    The system employs a number of cameras which record to a

10  number of DVRs, which are located in our control room on the

11  20th floor.

12  Q    Where are the cameras located?

13  A    The cameras are located throughout the court floors.

14  Q    I was just going to ask you to talk a little slower, so I

15  can follow what's going on.

16  A    My apologies.

17  Q    Do the video cameras record events at or near the time

18  they occur?

19  A    Yes, they do.

20  Q    How is the video stored?

21  A    The video is stored electronically on digital video

22  recorders.

23  Q    Are the videos then kept by the United States Marshal

24  Service in the ordinary course of business?

25  A    Yes, they are.

 1  Q    Is there an Attorneys' Lounge at the Federal Building at

 2  450 Golden Gate Avenue?

 3  A    Yes, there is.

 4  Q    Where is that located?

 5  A    It's located on the 18th floor of the building.

 6  Q    Are there video cameras that record activity near the

 7  elevators on the 18th floor of this building?

 8  A    Yes, there are.

 9  Q    Is there a camera directed at the hallway heading to the

10  Attorneys' Lounge?

11  A    Yes, there is.

12  Q    Is there a camera directed at the 18th floor elevator in

13  the Federal Building?

14  A    Yes, there is.

15  Q    I would like you now to -- I'd like to ask you some

16  questions about what's been marked as Government's Exhibit 141.

17       MS. HARRIS:   And only bring that up for the witness,

18  your Honor, and the Court.

19       (Video displayed to the witness and the Court.)

20  BY MS. HARRIS

21  Q    Do you recognize the video that is Government's

22  Exhibit 141?

23  A    Yes, I do.

24  Q    What is it a video of?

25  A    This is a video of the hallway on the 18th floor leading

 1  towards the Pretrial Office and the Attorneys' Lounge.

 2  **Q**   And was this video taken on February 5, 2015?

 3  **A**   Yes, it was.

 4  **Q**   How do you know that?

 5  **A**   It includes a time and date stamp from when it was

 6  recorded.

 7  **Q**   Have you reviewed Exhibit 141 before today?

 8  **A**   Yes, I have.

 9  **Q**   Does Exhibit 141 fairly and accurately reflect the events

10  at the time recorded?

11  **A**   Yes, it does.

12        **MS. HARRIS:**  Your Honor, I offer Government's

13  Exhibit 141 into evidence, and I'd ask to play the video for

14  the jury.

15        **THE COURT:**  Any objection?

16     (No response.)

17        **THE COURT:**  Hearing none, I will allow it in

18  evidence.

19     (Trial Exhibit 141 received in evidence.)

20        **THE COURT:**  Go ahead.

21     (Videotape played in open court.)

22        **THE COURT:**  Is it --

23  **BY MS. HARRIS**

24  **Q**   Can you tell us what we're looking at as we watch

25  Exhibit 141 together?

1   A    Certainly.

2          THE COURT:  Can you see it in the jury box?

3          (Jury panel nodding affirmatively.)

4          THE COURT:  Thank you.  I can't tell.

5          All right.  Go ahead.  Play the video.

6          (Videotape played in open court.)

7   BY MS. HARRIS

8   Q    Can you describe for the jury what we're looking at and as

9   we go along through the video, please explain to us what is

10  being depicted?

11  A    Certainly.

12         At this point it appears to be two individuals coming

13  towards the camera from the Attorney Lounge.

14  Q    Do you recognize any of the people that we just see in the

15  video right now?

16  A    Yes.  I recognize the individuals as Defendant Brugnara

17  and Attorney Erik Babcock.

18  Q    Okay.  All right.

19         MS. HARRIS:  Can we continue playing the video?

20         (Videotape played in open court.)

21  A    And it appears they went into the men's room.

22  BY MS. HARRIS

23  Q    When you say "it appears they went into the men's room,"

24  is the right turn that we just saw on the video the area of the

25  men's restroom on the 18th floor?

1   A    That is correct.

2   Q    Can you tell is what we're looking at now?

3   A    It appears that Defendant Brugnara and Attorney Babcock

4   have left the restroom.  There is another individual walking

5   towards the camera, who I do not recognize.

6   Q    Let me ask you -- if we could stop the video for a

7   minute -- if you can tell us in the video which one is

8   Mr. Babcock and which one is Mr. Brugnara?

9        (Videotape paused.)

10  A    Attorney Babcock is the individual wearing the sport coat.

11  Defendant Brugnara has a T-shirt and slacks.

12        **MS. HARRIS:**  If we could continue playing the video

13  now?

14        (Videotaped played in open court.)

15  **BY MS. HARRIS**

16  Q    Where are there he going now on the 18th floor?

17  A    It appears they are moving away from the camera.  It looks

18  to be that they may be moving towards the Pretrial Office,

19  which is also located in that area.

20  Q    Was Mr. Brugnara being followed by Mr. Babcock?

21  A    Yes, he was.

22  Q    Okay.  What's happening in the video now?

23  A    Now it appears that Mr. Brugnara and Mr. Babcock left the

24  area there and are heading again towards the camera.

25  Q    Is Mr. Brugnara the first person we see?

KOLC - DIRECT EXAMINATION / HARRIS                    1813

1   **A**    Yes, that is correct.

2   **Q**    What direction are they headed now?

3   **A**    It appears they have turned the corner heading towards the

4   elevator bank on the 18th floor.

5   **Q**    I would now like to ask you about Government's

6   Exhibit 141.

7              **THE COURT:**  I thought that was 141.

8              **MS. HARRIS:**  I'm sorry, your Honor.  142.

9        And if we could bring up Exhibit 142 just for the witness?

10       (Videotape displayed to the witness and the Court.)

11  **BY MS. HARRIS**

12  **Q**    Do you see Exhibit 142 there?

13  **A**    Yes, I do.

14  **Q**    Do you recognize the video that's Exhibit 142?

15  **A**    Yes.  This is a video of the elevator bank on the 18th

16  floor.

17  **Q**    Was this video recorded on February 5, 2015?

18  **A**    Yes, it was.

19  **Q**    How do you know n?

20  **A**    This video also has a time and date stamp from the time

21  that it was recorded.

22  **Q**    And have you reviewed Exhibit 142 before today?

23  **A**    Yes, I have.

24  **Q**    Does Exhibit 142 fairly and accurately reflect the events

25  at or near the time recorded?

KOLC - DIRECT EXAMINATION / HARRIS

 1  **A**    Yes, it does.

 2          **MS. HARRIS:**  Your Honor, I offer Government's

 3  Exhibit 142 into evidence.

 4          **THE COURT:**  Received.

 5      (Trial Exhibit 142 received in evidence.)

 6  **BY MS. HARRIS**

 7  **Q**    If we could now play the video of Exhibit 142 for the

 8  jury?  And can you remind us what this is a videotape of?

 9  **A**    This is a video of the elevator bank on the 18th floor of

10  the building.

11  **Q**    And, again, is the 18th floor where the Attorneys' Lounge

12  is located?

13  **A**    That is correct.

14  **Q**    Okay.

15          **MS. HARRIS:**  Let's play Government's Exhibit 142, if

16  we could?

17      (Videotape played in open court.)

18  **BY MS. HARRIS**

19  **Q**    What are you seeing now?

20  **A**    It appears that --

21  **Q**    Can we stop --

22      (Videotape paused.)

23  **A**    It appears --

24          **MR. BRUGNARA:**  Objection, your Honor.  He's saying

25  "it appears."  You know, it's self-explanatory what the video

KOLC - DIRECT EXAMINATION / HARRIS                    1815

 1    shows.

 2          THE COURT:  Well, no editorial comment, but you

 3    may -- you may state what -- for the record, what is being

 4    shown, but no editorial comment.

 5          Go ahead.

 6          (Videotape played in open court.)

 7    BY MS. HARRIS

 8    Q    What is being shown on the video that we're watching right

 9    now, Exhibit 142?

10    A    The video shows Mr. Brugnara and Mr. Babcock entering the

11    elevator bank and Mr. Brugnara pushing one of the elevator

12    buttons.

13          THE COURT:  Not the elevator bank.  The lobby where

14    the elevators are.

15          THE WITNESS:  Yes, sir.

16          THE COURT:  All right.

17    BY MS. HARRIS

18    Q    Did you see which button Mr. Brugnara pushed on the

19    elevator?

20    A    The video shows him pushing the down button.

21          MR. BRUGNARA:  Your Honor, I object.  Unless he has

22    Superman vision, I don't -- I don't -- I don't see how anyone

23    can see what button was pushed.

24          THE COURT:  Well, just replay it and the jury can see

25    for itself what button is being pushed.

1      **MS. HARRIS:**  Can we replay the video and show the

2   portion of pushing the elevator button?

3   **BY MS. HARRIS**

4   **Q**   And I would ask if the Deputy Marshal recognizes which

5   button is being pushed?

6       (Videotape replayed in open court.)

7   **A**   It looks to me like he is pushing the "Down" button.

8   **BY MS. HARRIS**

9   **Q**   Okay.  Where is the United States Marshal Service located

10  in this building?

11  **A**   The Marshals office is located on the 20th floor of the

12  building.

13  **Q**   And is that two floors up from the 18th floor?

14  **A**   That is correct.

15  **Q**   Mr. Brugnara, from what you see, has pushed the "Down"

16  button, is that correct?

17  **A**   Correct.

18  **Q**   Okay.

19      **MS. HARRIS:**  Let's continue the video.

20      (Videotape played in open court.)

21  **BY MS. HARRIS**

22  **Q**   What are we seeing now?

23  **A**   An elevator has arrived, indicating it's going down.

24  **Q**   How do you know it's going down?

25  **A**   The elevators in this building have indicator lights.  The

1 red lights indicate that the elevator is going down.  A green

2 light or white light indicates it's going up.

3 Q    Can we stop right where we're and can you point to the

4 jury where you are seeing the red light indicating that

5 Mr. Brugnara is get into a down elevator?

6 A    That would be located above the elevator door itself.

7 Q    For the record, is this the area you're referring to

8 (indicating)?

9 A    Yes, that's correct.

10 Q    And that shows a red down elevator button?

11 A    Yes.  That's what it looks like to me.

12        MS. HARRIS:  If we could continue playing the video?

13        (Videotape played in open court.)

14 BY MS. HARRIS

15 Q    What happens now?

16 A    Mr. Brugnara enters the elevator and the elevator departs.

17 Q    Who is standing in the video now?

18 A    Mr. Babcock remains in the elevator lobby.

19 Q    And who is Mr. Babcock?

20 A    He is Mr. Brugnara's attorney.

21 Q    Do you know the person who is coming into the view of the

22 video now?

23 A    No.  That person I don't know.

24 Q    Okay.  Is -- what's happening now?

25 A    Another individual entered the elevator lobby, entered an

 1  elevator.  Mr. Babcock has remained in the elevator lobby.

 2          **MR. BRUGNARA:**  Your Honor, could they reverse that

 3  and -- it appeared that Mr. Babcock was pressing the same

 4  button.

 5          **MS. HARRIS:**  Your Honor, I would object to Mr.

 6  Brugnara's speaking objections.  He will have an opportunity to

 7  play the video.

 8          **THE COURT:**  All right.  So the objection is

 9  overruled.

10      (Videotape played in open court.)

11  **BY MS. HARRIS**

12  **Q**   Now, what are we looking at?

13  **A**   Another elevator has arrived.  It appears to be heading in

14  the down direction.  It opens and closes.

15  **Q**   Now, Mr. Babcock, what happens with Mr. Babcock?

16  **A**   Mr. Babcock enters another elevator that has arrived.

17  **Q**   Okay.  Can you tell which direction that elevator is

18  going?

19  **A**   Not from this distance, no.

20      (Discussion held off the record between government

21       counsel.)

22          **MS. HARRIS:**  Your Honor, the Government has no

23  further questions.

24          **THE COURT:**  All right.

25          **MR. BRUGNARA:**  A short one.

1                        <u>**CROSS EXAMINATION**</u>

2    **BY MS. HARRIS**

3    **Q**    Sir, your name is Mr. Kolc?

4    **A**    That's correct.

5    **Q**    Mr. Kolc, so let me just ask you a few questions.

6          You're in charge of the video monitoring systems.  Are you

7    just a Marshal that handles all the different duties?

8    **A**    I oversee the camera monitoring systems for the court.

9    **Q**    Okay.  And that court would also mean for the parties that

10   are under the, hmm, care and custody of the court?

11   **A**    I'm not sure what you mean.

12   **Q**    Well, the people that are held in custody?

13   **A**    Yes, correct.

14   **Q**    Okay.  So if I'm under the care and custody of this court,

15   you would be responsible for me when I'm under your care and

16   custody?

17   **A**    I assume so.

18   **Q**    So, I mean, care and custody, what I mean specifically is

19   to be fed, to be housed --

20          **MS. HARRIS:**  Objection, your Honor.  This exceeds the

21   scope of the direct.

22          **MR. BRUGNARA:**  It doesn't exceed the scope.  He's in

23   charge of the video cameras and he's with the U.S. Marshals.

24          **THE COURT:**  You getting into --

25          **MR. BRUGNARA:**  I'm very much getting into some

 1  material --

 2          **THE COURT:**  You're getting into what happened at

 3  Glenn Dyer.

 4          **MR. BRUGNARA:**  Everyone likes to rush me when I

 5  always want to make my point.  I make my point over a period of

 6  time.

 7          **THE COURT:**  Well --

 8          **MR. BRUGNARA:**  My point -- okay.  Same thing.  I can

 9  never cross examine anybody.  Do I get a thirty-second warning

10  yet?  Okay?  Listen.

11  **BY MR. BRUGNARA**

12  **Q**    Are you -- you said the word "accountability."  I wrote

13  down three words here:  "Responsible" and "accountability."

14  That's the U.S. Marshals.  "Responsible" and "accountability."

15  So you're accountable and you're responsible, correct?

16  **A**    Yes, sir.

17  **Q**    And if I'm in your custody, which means I'm chained up

18  like a zoo animal --

19          **MS. HARRIS:**  Your Honor.

20  **BY MR. BRUGNARA**

21  **Q**    -- I certainly can't tend to myself --

22          **MS. HARRIS:**  Your Honor --

23  **BY MR. BRUGNARA**

24  **Q**    -- are you responsible for me?

25          **MS. HARRIS:**  Your Honor.

KOLC - CROSS EXAMINATION / BRUGNARA

1  A    Sir, I don't handle prisoners in the scope of my duties.

2        MS. HARRIS:  Your Honor.  Your Honor.

3        THE COURT:  Wait.

4  BY MR. BRUGNARA

5  Q    Under the capacity of the video monitoring system --

6        THE COURT:  It's beyond the scope.

7        MR. BRUGNARA:  It's not beyond the scope.

8  BY MR. BRUGNARA

9  Q    You just said you had video cameras for a purpose.  Is the

10 video camera --

11       THE COURT:  He's talking about the video cameras in

12 the building.

13 BY MR. BRUGNARA

14 Q    What purpose -- no one has ever escaped from this

15 building.  So what's the purpose of the video camera?

16       MS. HARRIS:  Your Honor, I'm going to object to --

17 BY MR. BRUGNARA

18 Q    Is the purpose for violence?  I'm confused.  What is --

19 it's for many things, right?  It's for --

20       THE COURT:  All right.  All right.

21 BY MR. BRUGNARA

22 Q    -- if there is physical altercation --

23       THE COURT:  You may ask the question:  What is the

24 purpose of the video system in this building?

25       THE WITNESS:  The purpose of the video systems in

1   this building is to monitor the activity that occurs on a daily

2   basis.

3   **BY MR. BRUGNARA**

4   **Q**    And that would include possible violence, possible

5   whatever, right?

6   **A**    It would include anything that occurs.

7   **Q**    Correct.

8        And the other point that I tried to make is, if I am

9   unable to care for myself because whoever determined in

10  whatever powers it be that they want you to be responsible for

11  my safety and my well-being under my care and custody, you, in

12  fact -- your exact words are you're responsible and you're

13  accountable, right?

14            **MS. HARRIS:**  Your Honor, I object to that question --

15  **A**    Can you repeat the question?  I don't understand.

16  **BY MR. BRUGNARA**

17  **Q**    You're responsible and accountable to the extent of what

18  your duties are monitoring cameras, correct?

19  **A**    Correct.

20  **Q**    Okay.  Now, does the Marshal's jurisdiction exceed this

21  building?  The United States Marshals, does their jurisdiction

22  exceed this actual building?

23  **A**    Yes, it does.

24  **Q**    Okay.  So when you're outside of this building --

25  obviously, you can't put cameras in every corner, so you can

1  only do what's reasonably necessary to perform your duties for

2  accountability and reasonableness, correct?

3  **A**    Correct.

4  **Q**    Okay.  So, but when we go into another federal facility

5  from this federal facility, there certainly should be the same

6  level of precautionary -- don't you think there should be a

7  standard --

8              **MS. HARRIS:**  Your Honor, objection.

9  **BY MR. BRUGNARA**

10 **Q**    -- a consistent standard --

11             **MS. HARRIS:**  The defendant is making a speech.

12 **BY MR. BRUGNARA**

13 **Q**    -- as to your capacity -- in your capacity as a --

14             **THE COURT:**  Wait, wait, wait.

15             **MS. HARRIS:**  Your Honor --

16             **THE COURT:**  It's a speech.  This is a speech.

17 **BY MR. BRUGNARA**

18 **Q**    It's a question.

19      I said:  In your capacity as an expert for the U.S.

20 Marshals in videos and surveillance, would it be prudent to

21 have a consistent standard for each federal facility so you

22 can, in fact, perform your duties effectively?

23             **MS. HARRIS:**  Objection, your Honor.  The witness is

24 not being asked for expert testimony, and this exceeds the

25 scope of the direct and is not relevant.

1          **THE COURT:**  Sustained.

2   **BY MR. BRUGNARA**

3   **Q**    Okay.  Let me ask you this then.  Are you aware of whether

4   or not the federal facility that the U.S. Marshals house their

5   pretrial innocent-until-proven-guilty or

6   innocent-until-acquitted-and-found-not-guilty defendants, do

7   you know where they house them?

8          **MS. HARRIS:**  Objection, your Honor.  It exceeds the

9   scope.

10         **THE COURT:**  Sustained, sustained.  He did not testify

11  on direct examination about pretrial custody facilities.

12  **BY MR. BRUGNARA**

13  **Q**    Okay.  Who is responsible for the custody or the care of a

14  pretrial innocent defendant?

15         **MS. HARRIS:**  Objection, your Honor.  Mr. Brugnara has

16  inserted all sorts of propaganda into his question.

17         **MR. BRUGNARA:**  Propaganda?  This isn't Nazi Germany.

18  This is a United States institution --

19         **MS. HARRIS:**  Your Honor.  Your Honor, could you

20  stop Mister --

21         **THE COURT:**  All right.  This --

22         **MR. BRUGNARA:**  You dress like a Nazi.

23         **THE COURT:**  All right.  This is -- this witness came

24  here to testify --

25         **MR. BRUGNARA:**  No.  This is all --

1           **THE COURT:**  -- about the videos.

2    BY MR. BRUGNARA

3    Q    Okay.  Are you aware -- are you aware -- are you aware --

4    are you aware that where the Marshals house their innocent

5    pretrial defendants, they have no video system at all and

6    no cameras?

7           **MS. HARRIS:**  Your Honor, objection.

8    BY MR. BRUGNARA

9    Q    Are you aware of that --

10          **MS. HARRIS:**  Assumes facts not in evidence.

11   BY MR. BRUGNARA

12   Q    -- video personnel for the United States Marshals?  I

13   mean, would that interest you to -- are you aware of that?

14          **THE COURT:**  All right.  The jury -- I can't say it

15   every time; I just say it occasionally.  But I have told you

16   repeatedly, the things that Mr. Brugnara says or the attorney

17   says is not evidence.  Even if it's preceded by "Would it

18   surprise you to know..."

19          **MR. BRUGNARA:**  Okay.

20          **THE COURT:**  Or whatever.  It is not evidence unless

21   the witness says it.

22          **MR. BRUGNARA:**  Okay.

23   BY MR. BRUGNARA:

24   Q    Do you --

25          **THE COURT:**  Now, wait.  Wait.  All these are improper

1 questions.  It's way beyond the scope of the direct

2 examination, and we're not going to get into it.  So move to a

3 proper subject.

4             MR. BRUGNARA:  Well, his specialty in the Marshal's

5 office is videos and surveillance.

6             THE COURT:  He came here to testify about one thing.

7 His videos.  In this building.

8             MR. BRUGNARA:  And I have one issue with videos and

9 surveillance.

10            THE COURT:  That has to do with the jailhouse.

11            MR. BRUGNARA:  No, because the Marshals don't have me

12 in their care and custody.  The Alameda Sheriffs, the Marshals

13 do.

14            MS. HARRIS:  Your Honor, I would object.

15 BY MR. BRUGNARA:

16 Q    Who testified in this court a few weeks ago with Alameda

17 County --

18            MS. HARRIS:  Objection, Your Honor.

19 BY MR. BRUGNARA:

20 Q    Who runs the videos there?

21            THE COURT:  All right, just a second.  I'm going to

22 allow one thing, but I'll allow the question, even though it is

23 beyond the scope of the direct examination.

24      Deputy -- it is Deputy, right?

25            THE WITNESS:  Yes, sir.

 1          **THE COURT:**  All right.  Deputy, do you know of your

 2   own personal knowledge the way in which, if at all, there is a

 3   video monitoring system at the Glenn Dyer jail?

 4          **THE WITNESS:**  No, I do not.

 5          **THE COURT:**  All right.  That's the end of that

 6   subject.

 7   **BY MR. BRUGNARA:**

 8   **Q**   Okay.  Do you -- do you feel a responsibility as a

 9   Marshal, if you're assigning responsibility to someone else --

10          **THE COURT:**  This is improper.

11   **BY MR. BRUGNARA:**

12   **Q**   -- to make sure --

13          **THE COURT:**  This is improper.

14   **BY MR. BRUGNARA:**

15   **Q**   -- a standard that upholds your standard as a United

16   States Marshal?

17          **THE COURT:**  This is improper.

18          **MS. HARRIS:**  Objection, Your Honor.

19          **MR. BRUGNARA:**  That's not --

20          **THE COURT:**  That is not a proper subject for this

21   witness.

22   **BY MR. BRUGNARA:**

23   **Q**   Okay.  If one of your detainees, pretrial detainees who

24   are innocent until proven otherwise gets killed at Glenn Dyer,

25   do you have a system in the United States Marshals, as an

1  expert in the surveillance, to go back and check what happened

2  to the party that you are responsible for?

3          **MS. HARRIS:**  Your Honor, I object to this question,

4  as well.

5          **THE COURT:**  This is improper.  He knows nothing about

6  the video system over there.  And, you cannot ask him these

7  questions.  I'm asking you to stop and move to a proper

8  subject.

9  **BY MR. BRUGNARA:**

10 **Q**    Okay.  Do you have any venue in the United States Marshal,

11 in your capacity, videos and surveillance, to make suggestions

12 or to give opinion, opine to your superiors regarding

13 procedures?

14         **MS. HARRIS:**  Objection, Your Honor.  That was

15 completely convoluted, and irrelevant.

16         **MR. BRUGNARA:**  If you listen, it's not convoluted.

17 People seem to understand what I say for 23 years in business.

18 I think it's very clear.

19         **THE COURT:**  The question is incomprehensible, and

20 will be disregarded.

21     All right, I'll give you one more question; then you're

22 done.  One more question.

23     All right, you're --

24 **BY MR. BRUGNARA:**

25 **Q**    No, my question, in short, is:  There is no video camera

```
 1   -- you know, then, that there is no video cameras in a jail

 2   full of murderers.  You know that, don't you?

 3           MS. HARRIS:  Your Honor, I again object to the

 4   question; move to strike.

 5   BY MR. BRUGNARA:

 6   Q    Where you're putting innocent pretrial detainees who are

 7   getting assaulted and abused, because you don't want a record

 8   of it.  That's the truth.  We're in the 21st century.

 9           THE COURT:  The jury will disregard --

10   BY MR. BRUGNARA:

11   Q    Every place has video cameras.  Do you agree --

12           THE COURT:  Mr Brugnara, you have to stop.

13       (Simultaneous speakers)

14           THE COURT:  You've got to stop.  I'm ordering to you

15   stop.  And have a seat.

16       The jury will disregard everything that Mr. Brugnara said

17   in those speeches.

18       Do you have any redirect?

19           MS. HARRIS:  No, Your Honor.

20           THE COURT:  All right.  You can step down.  You are

21   free to go.

22           THE WITNESS:  Thank you.

23       (Witness excused)

24           THE COURT:  Next witness.

25           MS. HARRIS:  Thank you, your Honor.  The United
```

 1  States calls Harold Pritchett.

 2                     **HAROLD PRITCHETT**,

 3  called as a witness for the Government herein, having been

 4  first duly sworn, was examined and testified as follows:

 5             THE WITNESS:  Yes, I do.

 6             THE CLERK:  Thank you.

 7             THE COURT:  Okay, have a seat.  Welcome.

 8      You see how my mic phone moves all around?  Yours does

 9  that.  And it needs to be about this close to your voice in

10  order to catch it.

11             THE WITNESS:  Okay.

12             THE COURT:  Why don't you say your name.

13             THE WITNESS:  Harold Pritchett.

14             THE COURT:  You've got to get a little closer, I'm

15  sorry, move it a little closer.

16             THE WITNESS:  Harold Pritchett.

17             THE COURT:  All right.  Go ahead, please.

18                     **DIRECT EXAMINATION**

19  BY MS. HARRIS:

20  Q    Good morning, Mr. Pritchett.  Where do you work?

21  A    I work on the first floor of 450 Golden Gate, in the

22  control center.

23  Q    Is that the building we're in right now?

24  A    Yes, it is.

25  Q    What do you do there?

1   A    I -- part of my responsibility is to monitor all the

2   security cameras that are around the building.

3   Q    How long have you worked for 450 Golden Gate?

4   A    Since 2006.

5   Q    Does the federal building at 450 Golden Gate have a video

6   surveillance system that has cameras activated on the ground

7   floor of the building?

8   A    Yes, it does.

9   Q    Do your responsibilities include overseeing portions of

10  the video cameras?

11  A    Yes.

12  Q    What floors are you responsible for the video

13  surveillance?

14  A    The first floor.  And I think that there's one camera on

15  the second floor that we monitor.

16  Q    Is the first floor also known as the lobby of the federal

17  building?

18  A    Yes.

19  Q    Okay.  What is the purpose of the video surveillance

20  cameras in the lobby of the federal building?

21  A    It's part of a security camera measure to videotape and

22  record people coming in and out of the building on a 24-hour

23  basis.

24  Q    How does the system work?

25  A    It records 24 hours a day.  And the data is maintained on

 1  the hard drive of the DVRs for approximately 30 to 45 days.

 2  Q    And are the videotapes that you are referring to kept by

 3  the Federal Protective Service in its ordinary course of

 4  business?

 5  A    Yes.

 6  Q    And are there video cameras that record activity on the

 7  lobby near the entry level?

 8  A    Yes.

 9  Q    And is there a camera directed at the entryway heading out

10  of the federal building?

11  A    Yes.

12  Q    Are there cameras directed at the perimeter of 450 Golden

13  Gate Avenue?

14  A    Yes.

15  Q    I would like to now ask you some questions about

16  Government Exhibit 143.

17          MS. HARRIS:   And I would ask if we can just bring it

18  up for the witness and the Court.

19      (Witness examines video)

20  BY MS. HARRIS:

21  Q    Do you recognize this video that is Government Exhibit

22  143?

23  A    Yes, I do.

24  Q    What, what is Exhibit 143?

25  A    This is a camera angle of the lobby entrance from Turk

 1   Street.

 2   **Q**    Is Exhibit 143 -- was it recorded on February 5, 2015?

 3   **A**    Yes, it was is.

 4   **Q**    How do you know that?

 5   **A**    Because in the upper left-hand corner there is a date and

 6   timestamp on the reporting.

 7   **Q**    Have you reviewed Exhibit 143 before today?

 8   **A**    Yes.

 9   **Q**    Does Exhibit 143 fairly and accurately reflect the events

10   at or near the time the video recorded?

11   **A**    Yes, it does.

12        **MS. HARRIS:**  Your Honor, I offer Government Exhibit

13   143 into evidence.

14        **THE COURT:**  Received.

15      (Trial Exhibit 143 received in evidence)

16        **MS. HARRIS:**  May we publish Exhibit 143 to the jury?

17        **THE COURT:**  Yes, you may.

18      (Portion of videotape played in open court)

19   **BY MS. HARRIS:**

20   **Q**    Can you tell us, Mr. Pritchett, what we are looking at now

21   in Exhibit 143?

22   **A**    Basically we're looking at the lobby checkpoint where the

23   Court Security Officers inspect personnel and personal items

24   entering from the Turk Street --

25        **MS. HARRIS:**  Okay.  Can we stop the video?

1          THE WITNESS:  -- side of the building.

2    BY MS. HARRIS:

3    Q    Do you see -- and I'm directing your attention, do you see

4    an individual wearing tan pants and a blue shirt now in the

5    frame that we see on Government Exhibit 143?

6    A    Yes, I do.

7    Q    And, is that in the left-hand corner, just past the desk

8    in the middle of the frame?

9    A    Yes, it is.

10   Q    Is this the person you are referring to right here

11   (indicating)?

12   A    Uh-huh.  Yes.  Yes.

13   Q    Okay.  And can you describe for the record, what the

14   person -- it's a male -- is it a male person you see?

15   A    Yes, it is.

16   Q    And can you describe what he's wearing in the videotape?

17   A    It looks like he is wearing tan pants and a blue polo

18   shirt.

19          MS. HARRIS:  If we could continue playing the video.

20       (Portion of videotape played in open court)

21          MS. HARRIS:  Okay, stop.  All right.

22   BY MS. HARRIS:

23   Q    Now, we have a look at the individual as he is walking.

24   What direction is the individual in the tan pants and the blue

25   shirt walking?

1   **A**    It appears that he's walking north.  Towards the exit.

2   **Q**    When you say "Towards the exit," what side of the building

3   is this on?

4   **A**    The Turk Street side of the building.

5   **Q**    Okay.

6            **MS. HARRIS:**  Can we keep playing the video?

7            (Portion of videotape played in open court)

8   **BY MS. HARRIS:**

9   **Q**    Now, you mentioned that you also are in charge of

10  videotape that records what occurs on the perimeter of the

11  federal building.

12       I would like to now bring up Exhibit 144A for you only to

13  the review.  And I would ask you if you recognize the video in

14  Government Exhibit 144A.

15           (Witness examines video)

16  **A**    I do recognize it.

17  **Q**    What is the video that is Government Exhibit 144A?

18  **A**    This, this is an easterly-direction view of Turk Street,

19  going towards -- facing towards Larkin.

20  **Q**    And was this video recorded on February 5th, 2015?

21  **A**    Yes, it was.

22  **Q**    And have you reviewed Government Exhibit 144A before

23  today?

24  **A**    Yes, I have.

25  **Q**    Does Government's Exhibit 144A fairly and accurately

PRITCHETT - DIRECT EXAMINATION / HARRIS                1836

 1  reflect the events of the perimeter of the federal building at

 2  or near the time recorded?

 3  **A**    Yes, it does.

 4          **MS. HARRIS:**  Your Honor, I offer Government Exhibit

 5  144A into evidence.

 6          **THE COURT:**  That's received.

 7      (Trial Exhibit 144A received in evidence)

 8          **THE COURT:**  But, I have question.  In the lower

 9  right-hand side, what is that thing sticking out?  What is

10  that?  The roof?  What is that?

11          **THE WITNESS:**  Are we talking about the large

12  structure that's jutting out of the building?

13          **THE COURT:**  Correct.

14          **THE WITNESS:**  That's -- that was built a number of

15  years ago to cover the air vents, after the events of 9-11.

16  Because I believe they were -- they use that as a

17  countermeasure to avoid people being able to put --

18          **THE COURT:**  It's a little unclear, but you've cleared

19  it up now.

20          **THE WITNESS:**  Yeah.

21          **THE COURT:**  So that's -- that's something that blocks

22  part of the view of the sidewalk.  Correct?

23          **THE WITNESS:**  Yes, it does.

24          **THE COURT:**  All right.

25          **THE WITNESS:**  Uh-huh.

1              THE COURT:   Okay, go ahead.

2    BY MS. HARRIS:

3    Q    For the record, Mr. Pritchett, is the area that the Court

4    asked you about this area that I'm circling in red right now

5    (indicating)?  Is that what was placed on the ground after

6    9-11?

7    A    I believe it was, yes.

8    Q    All right.  Now?

9              MS. HARRIS:   Now if we could play Government Exhibit

10   144A.

11         (Portion of videotape played in open court)

12             MS. HARRIS:   Okay.  Can we stop Exhibit 144A right

13   now.

14   BY MS. HARRIS:

15   Q    I'm going to ask you if you see the outline of an

16   individual where I circled (indicating).

17   A    Yes, I do.

18   Q    And can you describe what appears in the circle, and where

19   that is relative to the federal building?

20   A    It appears to be a male subject with tan pants and a polo

21   shirt, walking easterly on Turk Street.

22             MS. HARRIS:   Can we continue with the video?

23         (Portion of videotape played in open court)

24   BY MS. HARRIS:

25   Q    And then do you see --

 1          **MR. BRUGNARA:**  Your Honor, I object.  This is

 2   extremely confusing.  I'm looking at the -- the federal

 3   building is facing in an east-west direction.  So he's saying

 4   this person here is heading down Turk Street down towards

 5   Market?

 6          **THE COURT:**  You can cross-examine on that.  But if

 7   you want to clarify now -- Mr. Pritchett, right?

 8          **THE WITNESS:**  Uh-huh.

 9          **THE COURT:**  Why don't you go ahead and answer that

10   question now.

11          **THE WITNESS:**  Okay.  Maybe I can better explain it.

12   This camera angle is positioned at the corner of Turk and Polk.

13   But it is facing in an eastbound direction down Turk Street.

14   So that's --

15          **THE COURT:**  Toward downtown?

16          **THE WITNESS:**  Yes, down toward Market, down toward

17   the Tenderloin area.

18          **THE COURT:**  Is this a time-lapse or is it -- how fast

19   is the --

20          **THE WITNESS:**  This is a time-lapse.

21          **THE COURT:**  So it's not like the other video.  This

22   goes slower.  Is that correct?

23          **THE WITNESS:**  Well, actually, they run at the same

24   speeds.

25          **THE COURT:**  Okay.  Looks a little jerky to me.

 1          **THE WITNESS:**  Uh-huh.

 2          **THE COURT:**  Why is that?

 3          **THE WITNESS:**  I believe it's because of the way the

 4    film was recorded, it was recorded in AVI, instead of native.

 5    If you record something in native it gives you a more higher,

 6    clearer definition.  But AVI will give you more pixillation and

 7    more jerky movements when you do a playback.

 8          **THE COURT:**  All right.  So why don't you play it

 9    again.

10          **MS. HARRIS:**  Can we play Exhibit 144A again in its

11    entirety?

12       (Portion of videotape played in open court)

13          **MS. HARRIS:**  Can you stop it right here?

14    **BY MS. HARRIS:**

15    **Q**    Again, what direction is the individual, the male subject

16    in tan pants and a polo shirt, what direction is he headed now

17    as we see in the video?

18    **A**    He appears to be headed in an eastbound direction.

19    **Q**    Is eastbound toward Larkin Street?

20    **A**    That is correct, yes.

21    **Q**    Okay.

22       (Portion of videotape played in open court)

23    **Q**    I would like now ask you some questions about Government's

24    Exhibit 144B, and ask you take a look at Exhibit 144B before we

25    publish -- before I ask you some questions about it.

1  **A**    Okay.

2  **Q**    Do you recognize the video that is Government Exhibit

3  144B?

4        (Witness examines video)

5  **A**    Yes, I do.

6  **Q**    What is it a video of?

7  **A**    It's a video from the westbound perspective.  A camera is

8  located above the intersection of Turk and Larkin Streets, and

9  it's facing in a westerly direction towards Van Ness Avenue.

10 **Q**    Okay.  And, was Exhibit 144B a video recorded on

11 February 5th, 2015?

12 **A**    Yes, it was.

13 **Q**    How do you know that?

14 **A**    Because I -- the timestamp in the upper left-hand corner.

15 **Q**    Have you reviewed Exhibiting 144B before today?

16 **A**    Yes, I have.

17 **Q**    And does Exhibit 144B fairly and accurately reflect the

18 events at or near the time recorded on February 5th, 2015?

19 **A**    Yes, it does.

20        **MS. HARRIS:**  Your Honor, I offer Government Exhibit

21 144B into evidence.

22        **THE COURT:**  Received.

23        (Trial Exhibit 144B received in evidence)

24        **MS. HARRIS:**  Now if we could play for the jury the

25 videotape that is Government Exhibit 144B.

1   BY MS. HARRIS:

2   Q    I would then ask you to describe for the jury what we're

3   looking at.

4        (Portion of videotape played in open court)

5   A    Okay.  Coming into view from the upper left corner we see

6   a male subject with tan pants, and possibly a blue polo.  You

7   can't -- it's hard to distinguish the shirt.  But it appears to

8   be the same individual that departed via --

9             MR. BRUGNARA:  Your Honor, I object.  It's

10  self-explanatory, the video.

11            THE COURT:  All right.  It's editorial comment.

12            MR. BRUGNARA:  Yeah, this is a little --

13            THE COURT:  The witness should not be saying -- the

14  jury will disregard that it appears to be the same individual.

15  But the jury can decide for itself.

16       But go ahead, continue with your comments.

17            THE WITNESS:  It appears to be a male subject walking

18  eastbound on Turk Street.

19  BY MS. HARRIS:

20  Q    And what does the male individual appear to be wearing?

21  A    Tan pants and a short-sleeved polo type shirt.

22            MS. HARRIS:  Now if we could continue the video.

23       (Portion of videotape played in open court)

24  BY MS. HARRIS:

25  Q    Do you see the pace now, and is the individual right here

```
 1  (indicating)?

 2  A    Yes.

 3  Q    What pace is the individual moving at to --

 4         MR. BRUGNARA:  Object, Your Honor.  It's -- opine.

 5  We can all see, and --

 6         THE COURT:  Okay --

 7  BY MS. HARRIS:

 8  Q    Can you describe what we're seeing in the video?

 9         MR. BRUGNARA:  Just said "defendant walking,"

10  your Honor.  She's leading the witness now.

11         THE COURT:  No.

12         MR. BRUGNARA:  She's leading the witness now.  He --

13  he just said -- go back in the transcript.  It says "defendant

14  walking down the street."

15      And she goes, "Well what pace is he going at?"  Leading

16  the witness.

17         THE COURT:  Can you, from your experience, in looking

18  at these types of videos, can you tell what pace somebody's

19  going at?

20         THE WITNESS:  Um, yes.  I can make a fair assessment.

21         THE COURT:  All right.  What is your assessment of

22  how fast or slow that individual was going?

23         MR. BRUGNARA:  Objection.  He already answered that

24  question, your Honor, when he said he's walking down the

25  street.  Pull up the transcript and confirm it.  Now you're
```

1  leading the witness.

2          MS. HARRIS:  Your Honor, he's discussing --

3          THE COURT:  I'm not leading the witness.

4          MR. BRUGNARA:  He already answered the question.

5          THE COURT:  I'm asking you if you can say how fast or

6  slow that individual was going, if you can, from your

7  experience.  But I don't want you to give some kind of guess at

8  it.

9          MR. BRUGNARA:  Fast or slow, he's walking, because he

10 already said he's walking.  So, that's how fast is he walking,

11 how slow is he walking.

12         MS. HARRIS:  Your Honor, I move to strike all of

13 Mr. Brugnara's remarks.

14         MR. BRUGNARA:  I move to strike the leading comments.

15 Because he answered the question, she didn't like the answer,

16 so she's going to lead him now.

17         MS. HARRIS:  Your Honor, we're at a different stage

18 in the videotape than we were --

19         MR. BRUGNARA:  Your Honor, the jury has their own

20 eyes.  They can see and make their own determination, I think.

21

22         THE COURT:  Can you answer the question without

23 guessing at it?

24         THE WITNESS:  Yes, I can.

25         THE COURT:  Please go ahead and give us your answer.

```
1             THE WITNESS:  It appears that the individual in the
2     frame is walking at a slightly accelerated pace.  And, he
3     appears at the time, in this frame, to be crossing the street.
4             THE COURT:  All right.
5             THE WITNESS:  Or stepping off the curb.
6             THE COURT:  Next question.
7             MS. HARRIS:  Okay.  If we could continue playing the
8     video?
9         (Portion of videotape played in open court)
10            MS. HARRIS:  Okay.  Can you go back to that frame?
11    Can you go back just a little?
12        (Portion of videotape played in open court)
13    BY MS. HARRIS:
14    Q    Okay.  Did you see him step off the curb in the frame we
15    just played?  We'll play it for you again.
16    A    Can I see it one more time, please?
17        (Portion of videotape played in open court)
18    A    Well, it's hard to determine if he's stepping off the curb
19    or stepping into a vehicle.  It's hard to distinguish which, at
20    that time -- this time.
21            MS. HARRIS:  No further questions, your Honor.
22            THE COURT:  Any cross-examination?
23            MR. BRUGNARA:  Yes.  Could we pull up the first
24    video, the lobby?
25            THE COURT:  Sure.  144A.
```

```
 1              MR. BRUGNARA:  Please.

 2                      CROSS EXAMINATION

 3  BY MR. BRUGNARA:

 4  Q    Hello.

 5  A    Hi.

 6  Q    So I just want to make a little question, a correction

 7  question.

 8       You stated in your testimony that these gentlemen here

 9  (indicating) were security.  In fact, they're the United States

10  Marshal, aren't they?

11  A    No, they're not U.S. Marshals.  They're Court Security

12  Officers, to be exact.

13              MR. BRUGNARA:  So, can I point and have the jury see

14  what I'm pointing at?

15              THE COURT:  Well, it's going to be hard to do that

16  unless you know how to use the thing.  But which -- there are

17  only two individuals there, so --

18              MR. BRUGNARA:  Okay, well, can you advance the film,

19  please?

20              THE CLERK:  You can touch the video screen and it

21  will mark it.

22              MR. BRUGNARA:  Could you advance the film, please?

23  Could you advance the film, please?  Keep advancing it.  Keep

24  advancing, please.

25       (Portion of videotape played in open court)
```

1          **MR. BRUGNARA:**  Keep advancing, please.  Keep

2   advancing.  Okay.  All right.

3       (Portion of videotape played in open court)

4          **MR. BRUGNARA:**  Stop.  Okay.

5   **BY MR. BRUGNARA:**

6   **Q**    So there's three gentlemen here on the video screen that

7   are -- they're the ones that are watching the door?  Is that

8   it?

9   **A**    They are working that position, yes.

10  **Q**    Okay.  So, do you know any of these three men?

11  **A**    Not personally.

12  **Q**    And you are telling me that they are not United States

13  Marshals.

14  **A**    I don't know them personally, but I work that position

15  downstairs, Monday through Friday.  It's my permanent post, and

16  it has been since 2006.  And the gentlemen that work those

17  positions are Court Security Officers.

18  **Q**    Court Security.  Okay.

19         **MR. BRUGNARA:**  Go ahead and advance the tape, please.

20      (Portion of videotape played in open court)

21         **MR. BRUGNARA:**  Okay, I'll tell you when to stop.

22  Stop, and then stop again.  Keep going, and stop after one sec.

23  Stop.  Okay, hold it right there.

24      (Requests complied with by Ms. Oki)

25

BY MR. BRUGNARA:

Q    Okay.  So this is when purportedly I, me, am walking past
the three security guys (indicating).  Okay?

A    Uh-huh.

Q    This guy in the middle here (indicating) drove me from the
jail, as a U.S. Marshal, to --

        MS. HARRIS:  Objection, Your Honor.  Mr. Brugnara is
assuming facts not in evidence.

        THE COURT:  You can't be testifying like this.

BY MR. BRUGNARA:

Q    Is the man in the middle a United States Marshal?

A    I can't make that assumption.

Q    You already testified that he is not.  He is a Court
Security Officer.

A    He appears to have the uniform on of a Court Security
Officer.

Q    So if I told you --

        MS. HARRIS:  Objection, Your Honor.

        THE COURT:  Sustained.

BY MR. BRUGNARA:

Q    Okay, so if I --

        THE COURT:  Don't do that.  I'm ordering you not to
do that.

        MR. BRUGNARA:  Okay.

1   BY MR. BRUGNARA:

2   Q    Is the United States Marshal that's looking at me --

3             MS. HARRIS:  Objection, Your Honor.

4             THE COURT:  There's no United States Marshal in that

5   screen.

6             MR. BRUGNARA:  Oh, oh, oh, really?  Really?

7             THE COURT:  The witnesses said they're all three

8   Court Security Officers.

9             MR. BRUGNARA:  And I'm helping the man out.

10  BY MR. BRUGNARA:

11  Q    Is the United States Marshal in the center there that's --

12            MS. HARRIS:  Objection, Your Honor.  Misstates his

13  testimony.

14            MR. BRUGNARA:  Excuse me.

15  BY MR. BRUGNARA:

16  Q    Is the man in middle looking -- turning his head toward

17  me, looking at me?  Yes or no?

18  A    I can't fairly make that assessment because his face is

19  partially obscured by the -- by the magnetometer.

20  Q    Okay.  But you can see the head.  Is the head facing

21  towards the door?

22  A    It's turned in a general direction, sir, but I can't make

23  the assessment that he is looking at you.

24  Q    Okay, right.  Now, how much space is between me and that

25  wall right there, in your opinion?

PRITCHETT - CROSS EXAMINATION / BRUGNARA            1849

1    **A**    Which wall, sir?

2    **Q**    The wall that is on the other side of this separator here

3    (indicating).  From there to the wall, how much space would you

4    say there is?

5    **A**    The wall on the opposite side from you?

6    **Q**    Yes.

7    **A**    Hmm, I would say approximately 25, 30 feet.

8    **Q**    Okay.

9    **A**    Maybe.  Roughly.

10   **Q**    That's fair enough, whether it's 15, 20 feet or 30 feet.

11   You said 25 to 30?

12   **A**    Approximately.

13   **Q**    Okay.  Now, and you are in charge of security or security

14   cameras, right?  The monitoring?

15   **A**    Yes.

16   **Q**    Okay.  Now, and you also are somewhat of an expert on, we

17   now learn, how fast somebody's walking and pacing.  Correct?

18   At least on your...

19          Now, based on the gait --

20             **MS. HARRIS:**  Your Honor, objection.  It's

21   argumentative.

22   **BY MR. BRUGNARA:**

23   **Q**    Based on the gait in this photo, does that look like a man

24   in this photo who's trying to run past a security guard or a

25   United States Marshal?

1        **THE COURT:**  You can answer the question by saying

2   how -- whether or not he -- whether he is walking fast or slow.

3        **MR. BRUGNARA:**  Based upon this picture.

4        **THE COURT:**  Based upon the picture, just like you did

5   on the other one.

6        **MR. BRUGNARA:**  And I would like to get a screenshot

7   of this, your Honor.

8        **THE WITNESS:**  Okay.  It looks like he's walking at a

9   normal gait at this point.

10  **BY MR. BRUGNARA:**

11  **Q**   Okay.  I think it would even be a slow gait, if you can

12  see that the gait between --

13       **THE COURT:**  You can't testify.  You can't do that.

14       **MR. BRUGNARA:**  Okay.  Okay.

15  **BY MR. BRUGNARA:**

16  **Q**   Let me ask you this:  Do you get trained for reacting if

17  you see something that's unusual in your job?  Or is it mainly

18  just for gathering information?

19  **A**   Both.

20      (Mr. Stevens exits the courtroom)

21  **Q**   Okay.  So, what are you trained to do if you believe

22  there's something happening that shouldn't be happening?

23  **A**   Report it to -- to my superiors.

24  **Q**   And, is your responsibility to monitor these cameras, or

25  just to make recordings of them?  Of the images?

1        **THE COURT:**  You mean monitor them, realtime?

2        **MR. BRUGNARA:**  Yes, I asked --

3   BY MR. BRUGNARA:

4   **Q**    So your responsibility is to monitor them in realtime.

5   **A**    Both, yes.

6   **Q**    And you've been doing this for a long time, right?

7   **A**    Yes.

8   **Q**    So if you saw somebody that was acting erratic or unusual

9   or, like, running through a lobby, would that trigger a

10  warning, based on your experience?

11  **A**    Absolutely.

12  **Q**    So in this particular photograph here of this -- and this

13  is again the exact moment where the three security marshals are

14  standing, that doesn't post any red flags for you in your

15  capacity, monitoring in real time.  Correct?

16  **A**    I would have to say no.

17  **Q**    And, wouldn't you say also, as being an expert, that if

18  somebody was trying to evade capture, they certainly wouldn't

19  be walking in that 25-foot gap period from the wall to the

20  separator there, literally almost touching the separator where,

21  in fact, the three guards are?

22       They would probably --

23        **MS. HARRIS:**  Your Honor, I object to this.

24        **THE COURT:**  Sustained.

25

1  BY MR. BRUGNARA:

2  Q    As monitoring in realtime --

3         MS. HARRIS:  Objection, Your Honor.

4  BY MR. BRUGNARA:

5  Q    As monitoring -- as monitoring in realtime, looking for

6  unusual activities --

7         THE COURT:  This is improper.  It's improper.

8         MR. BRUGNARA:  No --

9         THE COURT:  It's an argument.

10        MR. BRUGNARA:  It's a security issue.  And he's

11 responsible for the security of this building.

12        THE COURT:  It's an argument.

13 BY MR. BRUGNARA:

14 Q    Let me ask you this:  In your experience of what you're

15 trained to look for, unusual activities, whether it be violence

16 or people escaping or what have you, in your experience, using

17 common sense in your position, if somebody's trying to evade

18 another individual, would they take the closest proximity to

19 that individual, if they're trying to evade them?

20      Or would they take, if they have 25 feet, which you've

21 said would be about right here (indicating), would they be

22 hugging the wall, trying to evade?  Which would they be?

23        MS. HARRIS:  Objection, Your Honor.

24        THE COURT:  Sustained.

25        MS. HARRIS:  This is completely improper.

```
 1              THE COURT:  Sustained.  That is argument.

 2              MR. BRUGNARA:  Okay, okay.  Your Honor, I have no

 3  further questions.

 4              THE COURT:  Thank you.

 5          Anything further?

 6              MS. HARRIS:  No, Your Honor.

 7              THE COURT:  All right.  Thank you.  Thank you, sir.

 8  You may -- you are free to go.

 9              THE WITNESS:  Thank you.

10          (Witness excused)

11              MS. HARRIS:  May we take a brief recess?

12              THE COURT:  I didn't hear you.

13              MS. HARRIS:  May we take a brief recess to --

14              THE COURT:  All right.  We will take a 15-minute

15  recess.  Please remember the admonition.

16              THE CLERK:  All rise.

17          (Jury excused)

18          (The following proceedings were held outside of the

19           presence of the Jury)

20              THE COURT:  All right.

21              MR. BRUGNARA:  Your Honor --

22              MS. HARRIS:  Your Honor, may I address the Court?

23              MR. BRUGNARA:  Your Honor, I request to contact Erik

24  -- the Marshals contact Erik Babcock, because he was supposed

25  to be a witness today, and we were told not to subpoena him.
```

1    And now we got blindsided today after James Stevens -- of

2    course I've been unavailable because of the logistics of going

3    back and forth.

4        But, James Stevens had set up the witness list based upon

5    the representations made by the United States Attorney that

6    Erik Babcock would be testifying.  And I spent the few hours

7    that I had in the wee hours of the morning preparing for

8    Mr. Babcock's testimony today, and I just found out ten minutes

9    ago, Erik Babcock is now being taken often their witness list.

10        So what Mr. Stevens suggested was that -- and he said

11   Babcock won't come in unless he's -- it's by subpoena.  So, I

12   request that this Court use the United States 17(a) subpoena,

13   and allow that to be used to force him in here today.

14   Otherwise, we have to issue another 17(a) subpoena.

15        It's for the same -- the same matter under the existing

16   issued subpoena, to discuss this situation.

17        **THE COURT:**  Just a moment.  It's a legitimate point

18   to raise, and I'll come to that in a minute.

19        Ms. Harris, what did you want to say?

20        **MS. HARRIS:**  Your Honor, Mr. Brugnara's behavior in

21   front of the jury was outrageous.  He made a personal attack on

22   my clothing in front of the jury, and said I was dressed like I

23   was from Nazi Germany.  This behavior is accelerating, not

24   getting any better.

25        And I would ask the Court to again find him in summary

1  contempt, and this time impose a much stronger sentence, so

2  that maybe the next time that Mr. Brugnara makes gratuitous

3  insults at Government counsel, he will think twice about it.

4  Apparently 21 days is not doing the trick.

5         **MR. BRUGNARA:**  Your Honor --

6         **MS. HARRIS:**  And now he's interviewing -- he's

7  interrupting me.

8         **MR. BRUGNARA:**  She started it.

9         **MS. HARRIS:**  He's interrupted the Court.

10        **MR. BRUGNARA:**  She started it, your Honor.

11        **THE COURT:**  Stop, Mr. Brugnara.

12     (Mr. Stevens re-enters the courtroom)

13        **MS. HARRIS:**  He has been absolutely worse than ever,

14  other than the one day where he terrorized the entire

15  courthouse by screaming at the top of his lungs.

16        **MR. BRUGNARA:**  I object to what she's saying.

17        **MS. HARRIS:**  And now he's interrupting again,

18  your Honor.

19        **MR. BRUGNARA:**  I object.

20        **THE COURT:**  I'm going to ask the court reporter to

21  find during the break the part where the Nazi comment was made.

22        **MR. BRUGNARA:**  Yeah, your Honor, she made a comment

23  and she started, she said, "There he goes with his propaganda."

24     "Propaganda" is a word used in wartime, covert destructive

25  activities.  It has no venue in this Court, using the word

1    "propaganda."  I'm highly insulted.  She started -- I want her

2    to be found in contempt, I want her to be found in summary

3    contempt, and be sanctioned.

4        And that's is the third time she's used the word

5    "propaganda," if you go back and check the transcript.  I

6    didn't say anything the first two times.  I try to let things

7    roll off me, just like being transferred back and forth.  But

8    she started using the word "propaganda."

9              THE COURT:  But, it's true.  I mean, what you -- you

10   have been violating all of the rules of the courtroom by laying

11   before the jury your arguments, your things that you're not

12   supposed to do until closing argument.

13             MR. BRUGNARA:  Your Honor, I'm not an attorney.

14   Listen.  I begged this Court for an attorney.

15             THE COURT:  See, you're interrupting me.

16             MR. BRUGNARA:  I begged this Court for an attorney.

17   I am not an attorney.  I am not a good attorney.  I'm not --

18             THE COURT:  This is such -- so false.  I hope the

19   Court of Appeals reads this.  This is so false.  This is so

20   dis- -- disrespectful.

21        It was propaganda.  All you were doing was laying your

22   material before the jury in the guise of questions which were

23   completely improper.  And you knew they were improper.

24             MR. BRUGNARA:  Absolutely not.

25             THE COURT:  And then whenever she called it

1    "propaganda," which is exactly what it was, you turned and made

2    some nasty comment that I didn't catch fully.  And I'm going to

3    read it during the break.  So --

4              MR. BRUGNARA:  Well --

5              THE COURT:  I'm not going to -- go ahead, tell me

6    what else you want to say.

7              MR. BRUGNARA:  I confer with the two esteemed

8    associate counsels that you have given to advise me, and I'm

9    trying to structure the questions in a way that --

10             THE COURT:  No, you don't.  I do not believe for a

11   moment that they told you to do that.

12             MR. BRUGNARA:  Well --

13             THE COURT:  I don't believe it for a moment.  All

14   right, I want -- I'm not going to rule on this now.

15        How close to resting are you?

16             MS. HARRIS:  We have, I believe, one more -- a few

17   more witnesses.  We have a couple more --

18        (Off-the-Record discussion between counsel)

19             THE COURT:  Can you have Mr. Babcock come so that he

20   can be called in the other side's case?

21             MS. HARRIS:  In the defendant's case-in-chief?  We

22   can attempt to contact him, but we will not be calling him in

23   the Government's case.

24             THE COURT:  All right.  Are you going to be resting

25   before the end of the day?

PROCEEDINGS                           1858

 1          **MS. HARRIS:**  I anticipate we will.

 2          **MR. BRUGNARA:**  Your Honor, Mr. Babcock said he's not

 3   coming unless he's subpoenaed.

 4       Apparently that's what he told --

 5          **THE COURT:**  No, no, the Government can ask him to

 6   come.  And once he's here, I'll order him to stay so that you

 7   can call him first thing.

 8          **MR. BRUGNARA:**  All right.

 9          **THE COURT:**  That's the way we are going to deal with

10   it, so we don't waste money on a subpoena.

11          **MS. HARRIS:**  So Mr. Brugnara will be calling

12   Mr. Babcock as his first witness?

13          **MR. BRUGNARA:**  Yes.

14          **THE COURT:**  Yes.

15          **MS. HARRIS:**  Okay.

16          **THE COURT:**  All right, so we're going to take a

17   15-minute break, ourselves.

18       And will the court reporter please bring me that take.

19       (Recess taken from 9:45 to 10:01 a.m.)

20       (The following proceedings were held outside of the

21        presence of the Jury)

22          **THE CLERK:**  All right, please come to order.

23          **THE COURT:**  All right.  Back to work.  I don't have

24   yet the reporter's transcript from the proceedings earlier

25   today.  And we're going to just have to push forward.  I don't

PROCEEDINGS                                             1859

```
 1  have time to wait for it.

 2      So, are we ready to go with our next witness?

 3          MR. KINGSLEY:  We are.  Ms. Harris just stepped out

 4  briefly, but we can with begin with the next witness.  I'll go

 5  get him.

 6          THE COURT:  Are you ready, Ms. Harris?

 7          MS. HARRIS:  Yes, Your Honor.

 8          THE COURT:  All right.  We are going to bring the

 9  jury in and continue.

10      (The following proceedings were held in the presence

11       of the Jury)

12          THE CLERK:  All rise.

13          THE COURT:  Welcome back, please be seated.  And we

14  will now go to the next witness.

15          MR. KINGSLEY:  Your Honor, the United States calls

16  DeJuan Tartt.

17          THE COURT:  All right.  Please raise your right hand;

18  take an oath to tell the truth.

19                          DEJUAN TARTT,

20  called as a witness for the Government herein, having been

21  first duly sworn, was examined and testified as follows:

22          THE WITNESS:  Yes, I do.

23          THE COURT:  All right, thank you.  See how my

24  microphone moves?  Yours does too.  It's got to get this close

25  to your voice.
```

```
 1              THE WITNESS:  Okay.

 2              THE COURT:  Say your name, please.

 3              THE WITNESS:  DeJuan Tartt.

 4              THE COURT:  That is very good.  Thank you.

 5         Go ahead, Counsel.

 6                        DIRECT EXAMINATION

 7   BY MR. KINGSLEY:

 8   Q    Who do you work for, Mr. Tartt?

 9   A    Community Housing Partnership.

10   Q    And what is Community Housing Partnership?

11   A    It's a property management company.

12   Q    What is your job at Community Housing Partnership?

13   A    I'm a property manager.

14   Q    And does Community Housing Partnership manage various

15   buildings around San Francisco?

16   A    Yes, they do.

17   Q    About how many?

18   A    About 13.

19   Q    And where are you located, specifically?

20   A    Here in San Francisco.

21   Q    What's the address?

22   A    650 Eddy Street.

23   Q    And is that one of the buildings that Community Housing

24   Partnership manages?

25   A    Yes, it is.
```

1  Q    What is the name of that building?

2  A    The Arnett Watson Apartments.

3          THE COURT:  Move a little closer to the mic.

4          THE WITNESS:  Arnett Watson Apartments.

5          THE COURT:  Thank you.

6  BY MR. KINGSLEY:

7  Q    So you said that's 650 Eddy Street.  What is the cross

8  street for that building?

9  A    Polk.  In between Larkin.

10 Q    And is there a part of the building that abuts Willow

11 Street?

12 A    Yes, that's the rear of our building.

13 Q    Okay.  And how long have you worked for Community Housing

14 Partnership?

15 A    About three years.

16 Q    Does Community Housing Partnership maintain a video

17 surveillance system at the Arnett Watson Apartments?

18 A    Yes.

19 Q    And are you familiar with that system?

20 A    Yes, I am.

21 Q    Does the system include a camera that faces Willow Street?

22 A    It includes two cameras.

23      (Mr. Stevens exits the courtroom)

24 Q    And when the cameras record video, how is it stored?

25 A    On the system hard drive.

1  Q    And, is it possible for you to access the video system to

2  pull videos from a specific camera at a specific point in time?

3  A    Yes.

4  Q    And what is the purpose of the surveillance system?

5  A    To basically keep the tenants safe in the building.

6  Q    So, are those videos that are made as part of the

7  surveillance system kept in the ordinary course of business by

8  Community Housing Partnership?

9  A    I'm sorry; could you repeat that?

10  Q    Are they kept ordinarily by Community Housing Partnership

11  just as part of your business?

12  A    Yes.

13  Q    And, the videos that are made from these cameras, do they

14  depict events recorded by the cameras at or near the time the

15  events occur?

16  A    Yes.

17  Q    Okay.  I would like to ask you about a particular video

18  now.

19         MR. KINGSLEY:  Ms. Oki, could we please play -- but

20  just for the witness -- what's previously been marked as

21  Government Exhibit 145.

22         (Witness examines video)

23  BY MR. KINGSLEY:

24  Q    Do you recognize this video?

25  A    Yes, I do.

1  **Q**   What is it?

2  **A**   It's a video that I had recorded.

3  **Q**   And which camera took this video?

4  **A**   It was the Willow Street camera.

5      (Mr. Stevens re-enters the courtroom)

6  **Q**   One of the two cameras on Willow Street?

7  **A**   One of the two cameras, yes.

8  **Q**   And did you retrieve this video from the Community Housing

9  Partnership's surveillance system?

10 **A**   Yes, I did.

11 **Q**   Do you remember what made you retrieve it from the

12 surveillance system?

13 **A**   Yeah.  A couple of agents came in, requested the footage.

14 **Q**   Okay.  Do you remember approximately when the video was

15 recorded?

16 **A**   I know it was like around in the afternoon, like,

17 February, February 6th.

18 **Q**   Okay.

19      **MR. KINGSLEY:**  The Government moves to admit Exhibit

20 145 and publish it to the jury.

21      **MR. BRUGNARA:**  Objection.

22      **THE COURT:**  What?

23      **MR. BRUGNARA:**  Object.  Hearsay.  It's not --

24 February 6 video?  Okay, well, object on that, object on

25 hearsay, object on hasn't been verified.

1          THE COURT:  Is that the correct date, February 6th?

2   BY MR. KINGSLEY:

3   Q    When did you -- do you remember --

4          MR. BRUGNARA:  He already testified, your Honor.

5          THE COURT:  All right.  I'm asking -- your objection

6   is noted.  Is that the -- I don't remember.  Is that the date?

7          MR. KINGSLEY:  The date isn't February 6th.  If I can

8   ask a followup question?

9          THE COURT:  Ask your followup questions.

10  BY MR. KINGSLEY:

11  Q    Is it your memory that you pulled the video on February

12  6th, 2015?

13  A    I know it was February.  I know it was raining.

14  Q    Okay.

15         THE COURT:  All right.  The day you pulled it, it was

16  raining?  Or the day of the video?

17         THE WITNESS:  No, the day that I pulled it, it was

18  raining.

19         THE COURT:  All right.

20  BY MR. KINGSLEY:

21  Q    And do you remember whether it was a Friday?

22  A    I'm not sure of the exact date, yeah.

23         MR. KINGSLEY:  I think that the video is

24  self-explanatory, and authenticates itself.

25         THE COURT:  Let me ask some questions.  Does this

 1  video system of yours have a time-and-date-stamp system?

 2              **THE WITNESS:**  Yes, it does.

 3              **THE COURT:**  Is that going to be on here?

 4          **MR. KINGSLEY:**  It's not on the video, itself.

 5          **MR. BRUGNARA:**  Okay.  I object, Your Honor.  I object

 6  your Honor.

 7              **THE COURT:**  Just a minute.

 8          **MR. BRUGNARA:**  I object.

 9              **THE COURT:**  All right.  Can you tell us approximately

10  the time frame when the video, itself, was taken as opposed to

11  when you retrieved it?

12              **THE WITNESS:**  Um, well, what I could do is I still

13  have the video, still in my computer.  I can look at the time

14  on it.  It says the time that it was recorded and everything on

15  the actual file, on the video file.

16              **THE COURT:**  Do you have that now?

17              **THE WITNESS:**  I don't have it, no, I don't.

18              **THE COURT:**  What do you want to do, Counsel?

19          **MR. KINGSLEY:**  Your Honor, I think the video, itself,

20  and what it depicts authenticates the time of it, based on what

21  --

22              **THE COURT:**  Well, the witness would have to say the

23  approximate time frame.

24      Can you tell us the approximate time frame --

25          **MR. BRUGNARA:**  He already answered, your Honor.  He

 1   answered this, your Honor --

 2            THE COURT:  Mr. Brugnara, I'm asking the witness some

 3   questions.

 4            MR. BRUGNARA:  Well, you're leading and correcting

 5   his answers.  He already said February 6th, which is not

 6   February 5th or not February 1st.  Now you're trying to lead

 7   him to correct his answer.  And that's not fair to me.

 8            THE COURT:  Can you tell us the approximate date that

 9   the video, itself, was taken, as opposed to the day it was

10   retrieved?

11            THE WITNESS:  I want to say -- I know it was in

12   February, for sure.  Early February.  Like the 5th or 6th, it

13   was one of those days.

14            THE COURT:  All right.  Now, I'm going to let the --

15   I am going to receive it in evidence.  And the reason I'm going

16   to receive it in evidence is because of self -- what is known

17   as self-authentication.

18        And, the jury will take into account the uncertainty by

19   the witness as to the exact date that this was recorded.  But,

20   there's enough evidence to get it into -- there's enough

21   foundation to get it into evidence.

22        So, the objection is overruled.  145 is received.

23        (Trial Exhibit 145 received in evidence)

24            MR. KINGSLEY:  Thank you, your Honor.

25        Ms. Oki, could we publish the video to the jury and play

1   it for them.

2   **BY MR. KINGSLEY:**

3   **Q**    And Mr. Tartt if you could watch on your screen, I'm going

4   to ask you a question about it after it's played.

5        (Portion of videotape played in open court)

6   **Q**    So, the video appears to depict an individual running down

7   the street.  Can you tell from the video in which direction

8   that person is running?

9   **A**    Yeah, he's running towards Polk.

10  **Q**    And from where is he coming?

11  **A**    Looks like he's coming from Larkin.

12  **Q**    And, which -- and this is on -- this is a camera you said

13  that was on Willow Street, correct?

14  **A**    Yes.

15  **Q**    So is this video of Willow Street?

16  **A**    Yes, it is.

17       (Portion of videotape replayed in open court)

18           **MR. BRUGNARA:**  Your Honor, it's unnecessary to keep

19  doing a replay on it, is it?  Or is that part --

20           **THE COURT:**  Objection overruled.  Please continue.

21  **BY MR. KINGSLEY:**

22  **Q**    Which side of the street is he on?

23  **A**    He's on the side of the street that their building is on.

24  **Q**    And how far is the San Francisco federal building from

25  where the individual in that video is running?

1   A    Let's see.  That would be Eddy Street, yeah, about two

2   blocks.

3   Q    Okay.

4            MR. KINGSLEY:  No further questions, your Honor.

5            THE COURT:  All right.  Cross-examination.

6                      CROSS EXAMINATION

7   BY MR. BRUGNARA:

8   Q    Mr. Tartt, so I just have one question for you.  Isn't

9   there a bus that runs in that same direction?

10  A    Which direction?

11  Q    On Polk Street.

12  A    Yes, there is.

13           MR. BRUGNARA:  All right, thank you.

14           THE COURT:  All right.  Anything more?

15           MR. KINGSLEY:  Nothing, your Honor.

16           THE COURT:  All right.  You may step down.  Thank

17  you.

18           THE WITNESS:  Thank you.

19      (Witness excused)

20           THE COURT:  Next witness.

21           MR. KINGSLEY:  The United States calls Ian Hiebert.

22                      IAN HIEBERT,

23  called as a witness for the Government herein, having been

24  first duly sworn, was examined and testified as follows:

25           THE WITNESS:  Yes.

```
 1              THE CLERK:  Okay, thank you.

 2              THE COURT:  All right.  Be seated.  Go ahead.

 3        You need to speak into the microphone, and pull it closer

 4   to you.

 5              THE WITNESS:  Is that it?  Okay.

 6              THE COURT:  Say your name.

 7              THE WITNESS:  My name is Ian Hiebert.

 8              THE COURT:  Very good.  Thank you.

 9        Go ahead.

10                      DIRECT EXAMINATION

11   BY MR. KINGSLEY:

12   Q    Could you spell your last name for the record, please.

13   A    Yes, H-I-E-B-E-R-T.

14   Q    Thank you.  Where do you work, Mr. Hiebert?

15   A    British Motor Cars.

16   Q    And what is British Motor Cars?

17   A    We are a high-line luxury automobile dealership here in

18   San Francisco.

19   Q    Where is that establishment located?

20   A    901 Van Ness Avenue, at the corner of Van Ness and Ellis.

21   Q    If you could slow down just a little bit, okay?  I have

22   that problem also.

23        So you said the corner of Van Ness and Ellis?

24   A    Correct.

25   Q    And is it just a dealership, or does have it other
```

```
 1   components to it?

 2   A    It is also the corporate office.  We have several

 3   dealerships around the Bay area.  So --

 4   Q    And is there a parts department that is part of the

 5   dealership?

 6   A    Correct.  Yeah.

 7   Q    And what is your job at British Motor Cars?

 8   A    I'm in charge of IT and I also help with the video and

 9   alarm systems there.

10   Q    How long have you worked at British Motor Cars?

11   A    Twenty-two years.

12   Q    Does British Motor Cars have a surveillance system?

13   A    Yes.

14   Q    And do your responsibilities extend to that surveillance

15   system?

16   A    Correct.

17   Q    What does that system entail?

18   A    It's a Watchdog DVR system, which is a digital video

19   recorder.  There are no tapes.  It records on a continuous

20   loop.  Holds about a month and a half worth of video recordings

21   on a two-terabyte hard drive.  Has 16 cameras throughout the

22   building.

23   Q    So you said information is recorded for about a month on a

24   hard drive.  Are you able to access the video system and pull

25   specific videos to save it for a longer period of time?
```

1  A    Yes.

2  Q    And what's the purpose of this video system with the 16

3  cameras?

4  A    Just for anti-theft, security, safety.

5  Q    And, does British Motor Cars keep these videos for the

6  period of time that it does in the ordinary course of its

7  business?

8  A    Correct.

9  Q    And, did the videos that are made as part of this system

10 reflect events that occurred at or near the time in which the

11 videos depicted that they occurred?

12 A    Correct.

13 Q    All right.  I would like to ask you about some particular

14 videos now.

15        MR. KINGSLEY:  Ms. Oki, could you please play Exhibit

16 146, just for the witness, please.

17 BY MR. KINGSLEY:

18 Q    Mr. Hiebert, if you could take a look at it and let me

19 know if you recognize the video.

20    (Witness examines video)

21 A    Yes, that's the internal camera of our parts department.

22 Q    Did you retrieve this video from the British Motor Cars

23 surveillance system?

24 A    Yes.

25 Q    And, do you know when it was recorded?

1   A      February 5th.  In the afternoon.  Around 2:00 or 3:00.

2   Q      And does the video system record a timestamp on the

3   videos?

4          (Off-the-Record discussion between counsel and FBI

5           agent)

6   Q      Just want to clarify, are you looking at Exhibit 146 or

7   147?

8   A      I'm looking at the parts department interior.

9          (Off-the-Record discussion between counsel and

10          Ms. Oki)

11  BY MR. KINGSLEY:

12  Q      All right.  I apologize.  I thought you were looking at a

13  different video.  Let's pull up Exhibit 146 and go through that

14  again.  Take a look at it.

15  A      This is currently the one we're looking at now.

16          THE COURT:  The witness has no way to know what the

17  numbers are.

18          MR. KINGSLEY:  I understand that.

19          THE COURT:  Well, then, whatever is on the screen,

20  what does your assistant say the number is?

21          (Off-the-Record discussion)

22          MR. KINGSLEY:  This is 146.

23          THE COURT:  All right.  So we will start over with

24  this one.

25          THE WITNESS:  This is the outside of the parts

1  department, covering the driveway and the entrance to the parts

2  department.

3         THE COURT:  What street is your place on?

4         THE WITNESS:  The address is on van they say

5  necessary.  This driveway comes off of the side street on Ellis

6  Street.

7         THE COURT:  All right.

8  BY MR. KINGSLEY:

9  Q    And so when was this video recorded?

10 A    On February 5th.  And again, I'm trying to recall the

11 timestamp, but I remember it was 1400, 1430, in that

12 neighborhood.

13 Q    And did you pull this video out of the British Motor Cars

14 surveillance system?

15 A    Yes, I did.

16        MR. KINGSLEY:  The Government moves to admit Exhibit

17 146 and publish it to the jury.

18        THE COURT:  Received in evidence.

19     (Trial Exhibit 146 received in evidence)

20        THE COURT:  You may publish it.

21        MR. KINGSLEY:  Can we just pause at 30 seconds,

22 please.

23     (Portion of videotape played in open court)

24 BY MR. KINGSLEY:

25 Q    So what are we looking at in this video right now?

1      **MR. BRUGNARA:**  Your Honor, completeness of the

2  record, he just showed the first 30 seconds with what appeared

3  to be walking in --

4      **THE COURT:**  Let's go back and do it from the start.

5  Play it through all the way through.

6      **MR. KINGSLEY:**  Can I pause it, and have him explain

7  what is on the video first, please?

8      **THE COURT:**  How long is it?  Thirty seconds?

9      (Off-the-Record discussion between counsel and FBI

10     agent)

11     **MR. KINGSLEY:**  There's -- most of the video doesn't

12  actually have anything in it.  I have specific timestamps that

13  I want to show the witness where something happens.  And that's

14  what I was trying --

15     **THE COURT:**  Well, fast-forward to --

16     **MR. BRUGNARA:**  Your Honor, completeness of the

17  record, they are -- the person walking in is in a different

18  circumstance than the end of the video.

19     **THE COURT:**  Well, we don't need to see blank images.

20     **MR. BRUGNARA:**  Yeah, but the part in the beginning is

21  the part where the walking in --

22     **MR. KINGSLEY:**  Your Honor, I intend to show --

23     **THE COURT:**  Do it your way, do it your way, Counsel.

24  And then if I think it's misleading, we will go back and fill

25  in.  All right, do it your way.

1          MR. KINGSLEY:  All right.  Can we go back to the

2    30-second timestamp please, when something first happens in

3    this video, and --

4          THE COURT:  You are making -- you're doing what

5    Mr. Brugnara does.  You're making a comment.

6       The jury will disregard that editorial document.

7       Just go back to wherever it is that you want to start.

8          MR. KINGSLEY:  Can we go back to 30 seconds, please,

9    and press "Play."

10      (Portion of videotape played in open court)

11         MR. KINGSLEY:  Can we pause it, please.

12   BY MR. KINGSLEY:

13   Q    So, it looks like there's sunlight coming into this video

14   here.  Where, where would that person who just walked in have

15   been coming from, based on the location of --

16   A    That would have been Ellis Street.

17         MR. BRUGNARA:  Objection, Your Honor.  Speculation.

18         THE COURT:  Can you -- do you know the location well

19   enough to be able to answer that question?

20         THE WITNESS:  Yes.

21         THE COURT:  All right.  Please answer.

22         THE WITNESS:  That is the driveway to our customer

23   parking and to the parts department that comes right off of

24   Ellis Street.

25

1   **BY MR. KINGSLEY:**

2   **Q**    And how far from Van Ness is that, the entrance to the

3   parking lot there?

4   **A**    About half a block.  Maybe 100 feet or so.

5   **Q**    Okay.  And how far is the San Francisco -- San Francisco

6   federal building, where we are today, from that entrance?

7   **A**    Probably three or four blocks.  I'm not real familiar.  I

8   didn't count, but I know it's a little bit of a walk.

9   **Q**    Okay.  All right.

10           **MR. KINGSLEY:**  Let's continue playing, please.

11       (Portion of videotape played in open court)

12           **MR. KINGSLEY:**  All right, please pause it.

13   **BY MR. KINGSLEY:**

14   **Q**    It appears that the individual in the video left the

15   screen.  What is to the left of what's depicted in this video?

16   **A**    It's just a wall with the doors to the entrance to the

17   parts department, the customer entrance.

18   **Q**    Okay.  Thank you.

19           **MR. KINGSLEY:**  And can we fast-forward this to about

20   the five-minute mark, please.

21       (Portion of videotape played in open court)

22           **MR. KINGSLEY:**  That's enough, thank you.

23   **BY MR. KINGSLEY:**

24   **Q**    Based on watching that video, where did the person in the

25   video come from?

1   A    That same customer entrance to the parts department.

2   Q    And where were they going when they exited the frame?

3   A    Looks like out the driveway onto Ellis Street.

4   Q    Okay.  Thank you.  All right.

5           MR. KINGSLEY:  If we can now turn to Government

6   Exhibit 147, and again just show it the only the witness,

7   please.

8        And Ms. Oki, if you could play the first ten seconds of

9   that video to Mr. Hiebert.

10       (Witness examines video)

11  BY MR. KINGSLEY:

12  Q    And let me know if you recognize the video.

13  A    Yes.  It's our interior of the parts department.  The

14  customer area.

15  Q    And did you retrieve this video from the British Motor

16  Cars surveillance system?

17  A    Yes, I did.

18  Q    When was it recorded?

19  A    February 5th.  About the same time as the other video.

20  Q    Approximately -- what did you say before?

21  A    It was somewhere in the neighborhood of 14- to 1500 hours.

22          MR. KINGSLEY:  The Government moves to admit Exhibit

23  147 into evidence.

24          THE COURT:  Hearing no objection, received.

25       (Trial Exhibit 147 received in evidence)

1      **MR. KINGSLEY:**  And if we could publish to the jury,

2  and play it from the beginning.

3      (Portion of videotape played in open court)

4      **MR. KINGSLEY:**  Could we pause right now, just so the

5  witness can explain.

6  **BY MR. KINGSLEY:**

7  **Q**    What are we looking at in the video?

8  **A**    So, this camera shows what we call the customer retail

9  area.  There are other back areas, obviously, that are not

10  seen.  But this is the only area that the public has access to.

11      And, there's two employees working behind the counter

12  there.  One of them is a gentleman named Paul, and the other

13  one is a gentleman named -- he's a new employee named Joe.

14  **Q**    And, where is this in relation to the garage area we were

15  looking at in Exhibit 146?

16  **A**    So, this -- this camera's in a very similar position.

17  It's mounted on the other side of the same wall.  And down in

18  the right corner you will see the gray mat which is where the

19  entrance door is.

20      And that's the same door that was shown -- well, shown --

21  you can't see it on the first video, but that's the door that

22  they access to get into the customer area.

23  **Q**    Okay, thank you.

24      **MR. KINGSLEY:**  Could we play the video, Ms. Oki?

25      (Portion of videotape played in open court)

```
 1           MR. KINGSLEY:  Could we pause just briefly?

 2   BY MR. KINGSLEY:

 3   Q    It appears that there's a person in the top right picture

 4   of this video.  Do you know who that is?

 5   A    Yeah, that's Donna.  She is the third part -- what we call

 6   the counter person that works there.

 7   Q    What is her last name?

 8   A    Donna Aragon.

 9   Q    Thank you.

10           MR. KINGSLEY:  Continue.

11        (Portion of videotape played in open court)

12           MR. KINGSLEY:  Can we fast forward ahead about 30

13   seconds.

14           MR. BRUGNARA:  Your Honor, I want the whole record

15   played out.

16           MR. KINGSLEY:  I have no objection to playing --

17           THE COURT:  All right, continue with it as it is.

18           MR. KINGSLEY:  Can we go back to where we were

19   before, 150, I think?

20        (Portion of videotape played in open court)

21           MR. KINGSLEY:  Can we stop it now?  Thank you.

22   BY MR. KINGSLEY:

23   Q    So, at the end of the scene here, the gentleman in the

24   video exited the frame to the right.  Where would that be

25   taking him to?
```

 1   A    Back out to the parking area, to the driveway that

 2   eventually will lead to Ellis Street.

 3   Q    Okay.  Thank you.  And again the person -- the video

 4   seemed to depict him talking to somebody at the counter.  Who

 5   is that, that he was talking to?

 6   A    That was Donna Aragon.

 7   Q    Okay.

 8        **MR. KINGSLEY:**  No further questions, your Honor.

 9        **THE COURT:**  Cross-examination.

10                       **CROSS EXAMINATION**

11   BY MR. BRUGNARA:

12   Q    Hello.

13        So, the date of the video was February 5th.  In fact, the

14   Marshals or whoever asked you for that information, did they

15   get it several weeks later?

16   A    Which information?  The video?

17   Q    The video, yeah.

18   A    Correct.  I believe it was about a week and a half, two

19   weeks later.

20   Q    About two weeks later?

21   A    Yeah.

22   Q    And, did they explain to you that Brugnara told them that

23   he went to British Motor Cars?

24   A    They were simply looking for some video of an

25   individual -- they gave me a description at the time.  That was

1  about all the information I had.

2          **MR. BRUGNARA:**  All right.  Thank you.

3          **THE COURT:**  All right.  Anything more?

4          **MR. KINGSLEY:**  No redirect, your Honor.

5          **THE COURT:**  Thank you, sir.  You are free to go.  You

6  are discharged.

7      (Witness excused)

8          **THE COURT:**  Next witness.

9          **MR. KINGSLEY:**  The United States calls Donna Aragon.

10         **THE COURT:**  Good morning, welcome.  Just stand right

11 there, and raise your right hand.

12                          **DONNA ARAGON**,

13 called as a witness for the Government herein, having been

14 first duly sworn, was examined and testified as follows:

15         **THE WITNESS:**  I do.

16         **THE CLERK:**  Okay, thank you.

17         **THE COURT:**  Welcome, and please move the mic so --

18 see how mine moves?  And move it so it catches your voice.

19         **THE WITNESS:**  Okay.

20         **THE COURT:**  Say your name, please.

21         **THE WITNESS:**  Donna Aragon.

22         **THE COURT:**  A little closer.

23         **THE WITNESS:**  Donna Aragon.

24         **THE COURT:**  That's great.  Thank you.

25     Go ahead.

1                        **DIRECT EXAMINATION**

2   **BY MR. KINGSLEY:**

3   **Q**    Where do you work, Ms. Aragon?

4   **A**    British Motor Cars.

5   **Q**    And what's your job at British Motor Cars?

6   **A**    Part sales, auto part.

7   **Q**    And, how long have you worked at British Motor Cars?

8   **A**    About 15 years.

9   **Q**    Okay.

10          **MR. KINGSLEY:**  Ms. Oki, could we pull up Government

11  Exhibit 147 again, please.  And publish it to the jury also.

12          **THE COURT:**  Can you see it there?

13          **THE WITNESS:**  I can.

14          **THE COURT:**  All right.

15          **MR. KINGSLEY:**  And if we could fast-forward to some

16  point in the middle of the video.  Okay.  Please pause it.

17      (Request complied with by Ms. Oki)

18  **BY MR. KINGSLEY:**

19  **Q**    Ms. Aragon, do you recognize what's depicted in this

20  video?

21  **A**    Yes, I do.

22  **Q**    What is it?

23  **A**    It's the parts department.

24          **MR. KINGSLEY:**  Can we actually back it up to where we

25  can see the person behind the counter?

```
 1        All right, can we pause it again.

 2        (Request complied with by Ms. Oki)

 3   BY MR. KINGSLEY:

 4   Q    Can you tell me who that -- the person in the upper

 5   right-hand corner of the video?

 6   A    It's a little bit dark.  Are you talking in the back?

 7   Q    (Indicating)

 8            THE COURT:  In the circle.

 9            THE WITNESS:  Yeah.  It's really dark on my screen.

10   I can't see.

11   BY MR. KINGSLEY:

12   Q    Okay.  Well, can you tell me where in this video -- do you

13   normally work in this room?

14   A    I do.

15   Q    And where do you normally work?

16   A    To the right, behind the counter.

17   Q    Okay.  Do you know if that person is you?  Or can you not

18   tell?

19   A    Yeah.  That's me.

20   Q    Okay.  And, do you recognize the individual seated on the

21   chairs in the bottom of the picture (indicating)?

22   A    Oh --

23   Q    Do you remember an individual matching that picture?

24   A    I do.

25   Q    Okay.
```

1        **MR. KINGSLEY:**  Can we play the video from here on to

2   the witness, please?

3        (Portion of videotape played in open court)

4   **BY MR. KINGSLEY:**

5   **Q**    And if you could just watch, and then I'm going to ask you

6   some questions about what happens in the video.

7        (Portion of videotape played in open court)

8        **MR. KINGSLEY:**  Can we just pause it, please?

9        (Request complied with by Ms. Oki)

10  **BY MR. KINGSLEY:**

11  **Q**    So I would like to direct your attention to the time that

12  this video is capturing.  Do you remember the events that are

13  happening in the video?

14  **A**    I do.

15  **Q**    All right.  Can you just describe for me, based on your

16  memory, what happened in -- leading up to the time that that

17  individual approaches you, and then while he's standing there

18  talking to you, please?

19  **A**    A gentleman came into the department, was not interested

20  in buying parts, but just was out of breath and seemed to need

21  to sit down for a minute.

22  **Q**    Did he ask you for anything?

23  **A**    Not before he walked up to the counter, no.

24  **Q**    And you said he seemed out of breath.  What made you think

25  that?

1    **A**    He was breathing heavy, and sweating.

2    **Q**    So, he walked up to you at the counter, and then what

3    happened?

4    **A**    Asked to use the telephone.

5    **Q**    Did he tell you why he wanted to use the telephone?

6    **A**    Not at first, but at some point he said he was trying to

7    call his wife.

8    **Q**    And did he tell you where his wife was at the time?

9    **A**    Upstairs.

10   **Q**    "Upstairs" referring to what?

11   **A**    British Motors, in our service department, I would

12   imagine.

13   **Q**    Did you allow him to use the phone?

14   **A**    No.  I dialed -- said I could dial for him.

15   **Q**    And did you dial for him?

16   **A**    I did.

17   **Q**    How many times did you dial for him?

18   **A**    About three times.

19   **Q**    Did he provide you with phone numbers to dial?

20   **A**    Yes.

21   **Q**    Do you remember what those numbers were?

22   **A**    I do not.

23   **Q**    Do you remember if they were all the same number?  Or some

24   were different numbers?

25   **A**    They seemed to be the same number, but the call never went

1   through.

2   **Q**    So did any of those calls go through?

3   **A**    No.

4   **Q**    And about how long did that go on for?

5   **A**    A few -- just a few minutes.

6   **Q**    Did he say anything else to you that you remember from

7   that encounter?

8   **A**    Just that he, at one point he said he felt like he was

9   going to have a heart attack.  He was breathing heavy.  And so

10  we -- he just sat down.

11  **Q**    And then what happened after he sat down?

12  **A**    I'm not -- I don't remember if it was before or after

13  that, that he needed to use the telephone.

14  **Q**    Okay.  Did eventually he leave?

15  **A**    Yes.

16  **Q**    All right.  Do you recognize the man that you spoke to

17  that day in the courtroom right now?

18  **A**    He looks like the gentleman sitting over here

19  (indicating).

20         **MR. KINGSLEY:**  May the record reflect that Ms. Aragon

21  has identified the defendant?

22         **THE COURT:**  Yes, that's what happened.

23         **MR. KINGSLEY:**  No further questions, your Honor.

24         **THE COURT:**  Cross-examination.

25

1                          **CROSS EXAMINATION**

2    **BY MR. BRUGNARA:**

3    **Q**    Hello, Ms. Aragon.

4    **A**    Good morning.  Good afternoon.

5    **Q**    Just a couple of questions.

6    **A**    Sure.

7    **Q**    When I came into the parts department there in British

8    Motors, isn't it true I was physically not doing so well?

9    **A**    Yes.

10   **Q**    And I think you interviewed with one of the agents, and I

11   think your quote was, "It looked like he was having a heart

12   attack"?

13              **MR. KINGSLEY:**  Objection.

14   **BY MR. BRUGNARA:**

15   **Q**    Can you tell us your exact -- it was similar to your

16   testimony, but it was a heart attack or stroke or something

17   along those lines?

18              **THE COURT:**  That is an improper question.  You need

19   to start all over again.  The jury will disregard that comment.

20       (Simultaneous speakers)

21       (Reporter interruption)

22              **THE COURT:**  You can't get into the interview memo

23   until she contradicts it in some way.

24   **BY MR. BRUGNARA:**

25   **Q**    Based on your observation, how did I look?

1    **A**    You looked out of breath and sweaty.  But you had

2    mentioned you felt like you were having a heart attack.

3    **Q**    Okay.  Now, you made these phone calls.  It wasn't a local

4    number, was it?

5    **A**    I don't remember.

6    **Q**    Okay.  Okay.  Do you remember that -- you don't remember

7    that it was local?  Do you remember it was a 949 prefix?

8    **A**    I do not remember.

9    **Q**    You keep a record -- your -- British Motors, I would

10   assume, keeps phone records, correct?

11   **A**    I don't know.

12   **Q**    Okay.

13           **MR. BRUGNARA:**  No further questions.

14           **THE COURT:**  Anything more?

15           **MR. KINGSLEY:**  No redirect, your Honor.

16           **THE COURT:**  All right.  Thank you, Ms. Aragon.  You

17   are free to go.

18           **THE WITNESS:**  Thank you.

19       (Witness excused)

20           **THE COURT:**  Next witness.

21           **MS. HARRIS:**  Thank you, your Honor.  The United

22   States calls Tim Aoyagi.

23

24

25

1                           **TIM AOYAGI**,

2    called as a witness for the Government herein, having been

3    first duly sworn, was examined and testified as follows:

4              **THE WITNESS:**  I do.

5              **THE COURT:**  All right welcome.  Please move the

6    microphone -- have a seat, please.  Move your microphone so

7    that it catches your voice.  It's got to be about that close.

8         Say your name, please.

9              **THE WITNESS:**  My name is Tim Aoyagi.

10             **THE COURT:**  Spell your last name.

11             **THE WITNESS:**  It's A-O-Y-A-G-I.

12             **THE COURT:**  Thank you.  Go ahead, Counsel.

13                     **DIRECT EXAMINATION**

14   BY MS. HARRIS:

15   **Q**    Good morning.  Can you tell us where you currently work.

16   **A**    I currently work at the San Jose resident agency of the

17   FBI.

18   **Q**    How long have you worked for the FBI?

19   **A**    I have worked for the FBI for about six years now.

20   **Q**    What squad are you currently on?

21   **A**    I'm on C12, which is the violent crimes squad.

22   **Q**    Can you describe for us your general duties and

23   responsibilities?

24   **A**    Well, the violent crimes squad takes care of all types of

25   violent crime, just what it sounds like.  Among is those duties

1  are fugitive work.

2  **Q**    Okay.  And when you mention "fugitive work," can you tell

3  us what that refers to?

4  **A**    Well, I specifically am part of a fugitive task force in

5  the South Bay.  And our primary responsibility is to locate and

6  apprehend fugitives.

7           **THE COURT:**  You are doing so good.  You're too close

8  to the microphone.

9           **THE WITNESS:**  Sorry, sir.

10          **THE COURT:**  I usually have to -- well, get a little

11 closer, but you're --

12          **THE WITNESS:**  Too close?

13          **THE COURT:**  Yeah, you were slightly -- yeah, try

14 about that distance.

15     Okay.  Next question.

16 **BY MS. HARRIS:**

17 **Q**    So, on February 11, 2015, were you a member of the

18 fugitive squad, fugitive task force?

19 **A**    I was.

20 **Q**    And drawing your attention to February 11, 2015, were you

21 on duty that day?

22 **A**    Yes, I was.

23 **Q**    Did you have a particular assignment?

24 **A**    On that day, we were looking for a fugitive named Luke

25 Brugnara.

 1            **MR. BRUGNARA:**  On February 11, 2015?

 2            **THE COURT:**  I thought -- what was the date you

 3  referred to?

 4  **BY MS. HARRIS:**

 5  **Q**    February 11, 2015, were you --

 6  **A**    That's right, February 11, 2015.

 7  **Q**    Okay.  And were you -- what was the name of the fugitive

 8  you were looking for?

 9  **A**    The name was Luke Brugnara.

10            **MR. BRUGNARA:**  Object, Your Honor.

11  **BY MS. HARRIS:**

12  **Q**    Were you working?

13            **MR. BRUGNARA:**  Object to the question.

14            **THE COURT:**  What is the objection?

15            **MR. BRUGNARA:**  Well "fugitive" implies conviction.

16  It doesn't imply alleged abscond.  Two completely different

17  terms.

18            **THE COURT:**  The objection is overruled.

19  **BY MS. HARRIS:**

20  **Q**    Why were you looking for Luke Brugnara?

21  **A**    We were told that he had fled from court custody in

22  San Francisco.

23  **Q**    And, on February 11, 2015, were you working with anyone

24  else that day?

25  **A**    Yes, I was working with normal members of the South Bay

1  branch of the fugitive task force.

2  Q    And were you actually on patrol?

3  A    I was on duty, yes.

4  Q    Did you receive information concerning the possible

5  location of the fugitive, Luke Brugnara?

6  A    Yes, we learned that he was likely staying at an apartment

7  complex in Los Gatos.

8  Q    After you received information that the fugitive Luke

9  Brugnara may be staying at an apartment complex in Los Gatos,

10 what did you do?

11 A    Well, the team moved to that complex and set up

12 surveillance there, because, of course, our duty was to locate

13 and apprehend him.

14 Q    Were you part of that surveillance?

15 A    Yes, I was.

16 Q    And were you in a car that day?

17 A    I was.  I was in the passenger seat of an unmarked Marshal

18 vehicle.

19 Q    Drawing your attention to approximately 10:40 in the

20 morning of February 11, 2015, can you tell us what you saw?

21 A    At about that time we saw a vehicle exiting the compound,

22 it was a blue Toyota Highlander, and we had a female driver who

23 was unknown to us.  And in the passenger seat of that vehicle

24 was a man resembling Luke Brugnara.

25 Q    When you say "resembling," a man resembling Luke Brugnara

1  was in the passenger seat, had you been shown a photograph of

2  Mr. Brugnara before you set up surveillance?

3  **A**    Yes, we had.   That was covered in the brief that morning,

4  when we discussed what we were doing that day.   We were given

5  the name Luke Brugnara, and shown the photo of Mr. Brugnara.

6  **Q**    Okay.   Taking you back to now what you saw happen at about

7  10:40, what -- where did the male get into the car, where was

8  he?

9  **A**    The male was in the passenger seat of the car.

10 **Q**    Okay.   What did you observe the car do?

11 **A**    The vehicle was exiting the compound, and drove by us

12 because where I was staged was inside the compound in one of

13 the parking spaces.

14 **Q**    When you saw the vehicle leave the compound, what was the

15 next thing you did?

16 **A**    After the vehicle left the compound, because the man in

17 the passenger seat, as I said, looked like Mr. Brugnara, we

18 followed that vehicle in order to, again, locate and apprehend

19 our fugitive.

20 **Q**    Can you tell us what you observed the car that was being

21 driven by the female and appeared to have Luke Brugnara in the

22 passenger seat do?

23 **A**    The car initially turned right which is southbound on

24 Bascom Avenue in San Jose.   And there's an onramp to the

25 freeway which is 85 within less than a mile from that apartment

1   complex.

2       So the vehicle turned on to 85 northbound.  And, seemed to

3   us that it must have seen us, because it started driving

4   erratically, weaving in and out of traffic.

5   **Q**   Were you following the vehicle at this time?

6   **A**   We were.  We were directly behind the vehicle.

7   **Q**   And when you say that the car appeared to be driving

8   erratically, can you describe for us what you saw?

9   **A**   Yes.  Initially the car was in the far right lane.  And it

10  changed all the way to the left and then back to the right,

11  weaving in and out of traffic.

12      So that appeared to us to be --

13          **MR. BRUGNARA:**  Objection.

14          **THE WITNESS:**  That type --

15          **MR. BRUGNARA:**  Objection.  Objection.  That's not

16  weaving.  Going from one side of a lane to the other side is

17  not weaving.

18          **THE COURT:**  Well, just, without characterizing it,

19  tell us how many lanes there were, how quickly the shift in

20  lanes occurred, and so forth.

21          **MR. BRUGNARA:**  The fast lane to the next exit.

22  That's not a weave.  That's a lane change.

23          **THE COURT:**  No, no, let's get the facts.  Tell us the

24  facts of the movement.

25          **MR. BRUGNARA:**  (Inaudible)

1      THE COURT:  Without characterizing it as "weaving,"

2  please.

3  BY MS. HARRIS:

4  Q    You can go ahead and tell us what you saw the car do.

5  A    We saw the car change from the far right lane to the far

6  left-hand lane, and then go back to the right lane.  And there

7  was traffic that it was going in between.

8      THE COURT:  How many lanes were there?  Were there

9  two lanes, three lanes, four lanes?  How many lanes?

10      THE WITNESS:  From what I recall, there were three

11 lanes at that part of the freeway.

12 BY MS. HARRIS:

13 Q    Based on your training and experience, what was your

14 interpretation of what you were seeing?

15 A    I -- that looked to me to be a kind of attempt to evade

16 surveillance.

17 Q    What happened after you saw what you described as an

18 abrupt lane change?

19 A    Well, after we saw that, because it appeared to us to be

20 an attempt to evade surveillance, and because it was dangerous

21 driving with other traffic on the road, we activated our

22 emergency lights and siren.

23      And after we did that, the vehicle pulled over to the

24 shoulder right away.

25 Q    Okay.  When the vehicle pulled over to the shoulder, what

1   was the next thing that you did?

2   **A**    Well, we got out of our vehicle and approached the vehicle

3   from the passenger side, in order to try to verify that this

4   was in fact our fugitive, Mr. Brugnara.

5   **Q**    Did you, when you approached the male passenger, ask for

6   photo identification?

7   **A**    Yes, we did.  As we approached, we announced we were law

8   enforcement --

9        (Reporter interruption)

10        **THE WITNESS:**  As we approached, we announced our

11   identity as law enforcement.  And we also asked the passenger

12   for a photo ID, because he looked like the photo that we had

13   been shown.  But we wanted to be sure, so we asked for that.

14   **BY MS. HARRIS:**

15   **Q**    Did the passenger give you any photo identification?

16   **A**    No, he said that he did not have any photo ID.

17   **Q**    Did you ask the passenger what his name was?

18   **A**    Yes.  I did.

19   **Q**    What did the passenger and the male passenger say his name

20   was?

21   **A**    He told that his name was Glenn.

22   **Q**    Do you see the person who identified himself as Glenn

23   sitting in this courtroom?

24   **A**    I do.  I see him at the defense table, on the far right.

25        **MS. HARRIS:**  For the record, can the record reflect

1  that the witness has identified the defendant?

2           THE COURT:  Yes, that's what occurred.

3  BY MS. HARRIS:

4  Q    After the defendant told you his name was Glenn, did he

5  say where he was going?

6  A    Yes.  He said he was going to the gym.

7  Q    What was the defendant wearing when he told you he was

8  going to the gym?

9  A    At the time he was just wearing street clothes, which,

10  again, in conjunction with the --

11           MR. BRUGNARA:  Objection, Your Honor.  Sweat clothes

12  is not street clothes.  Objection, he's obviously been coached.

13           THE COURT:  No, just answer with respect to what you

14  saw, and not give us editorial comment.

15  BY MS. HARRIS:

16  Q    What was the defendant wearing?

17  A    He was wearing a sweatshirt, and from what I recall, it

18  was a pair of jeans.

19  Q    Okay.  After the defendant said he was going to the gym,

20  what was the next thing that happened?

21  A    At that point, we had the person we saw exit the vehicle,

22  and handcuffed him and searched him.

23  Q    Okay.  And was the female defendant also detained --

24  female driver also detained?

25  A    Yes.  She was also removed from the vehicle, but she was

1  handled separately from Mr. Brugnara.

2  **Q**    At some point after Mr. Brugnara was detained, did you

3  receive information about the female driver?

4  **A**    Yes, we did.  The Marshal, who is addressing the female

5  driver at the same time I was addressing Mr. Brugnara, said

6  that she had said that the man's name was Luke.

7  **Q**    After the female driver identified the passenger as being

8  named Luke, what was the next thing that happened with respect

9  to the defendant.

10 **A**    At that point we placed the defendant under arrest because

11 that verified our belief that this was, in fact, our fugitive.

12 **Q**    Was the defendant searched incident to his arrest?

13 **A**    Yes, he was.

14 **Q**    And were any items removed from his person during the

15 search?

16 **A**    Yes.  He had a black cellular phone, a flip phone.

17         **MS. HARRIS:**  Your Honor, may I approach the witness?

18         **THE COURT:**  Yes.

19 **BY MS. HARRIS**

20 **Q**    I'm showing you what's been marked as Government's

21 Exhibit 150 for identification.

22      (Whereupon exhibit was tendered to the witness.)

23 **Q**    Is Exhibit 150 the phone that was booked into evidence as

24 having been removed from Luke Brugnara's person on February 10,

25 2015?

1899

1  **A**    That's correct.

2  **Q**    And what was the date that Mr. Brugnara was actually

3  arrested?  I think there is some confusion.

4       I may have misspoken earlier.  What date was he actually

5  arrested?

6  **A**    It was February 11th.

7  **Q**    February 11th?

8  **A**    Of this year.

9  **Q**    So what date was the cell phone taken from Mr. Brugnara's

10 person?  Was that also February 11th?

11 **A**    Yes.  It was the same day.

12          **MS. HARRIS:**  Your Honor, I offer Government's

13 Exhibit 150 into evidence.

14          **THE COURT:**  Received.

15      (Trial Exhibit 150 received in evidence.)

16 **BY MS. HARRIS**

17          **MS. HARRIS:**  No further questions, your Honor.

18          **THE COURT:**  Thank you.  Cross-examination.

19                       <u>**CROSS EXAMINATION**</u>

20 **BY MR. BRUGNARA**

21 **Q**    Good morning.

22 **A**    Good morning.

23 **Q**    Mr. Aoyagi?

24 **A**    Yes, that's very close.

25 **Q**    All right.  Were you in the military, Mr. Aoyagi?

```
 1   A    Yes, sir.

 2   Q    Good guess, huh.

 3        So first question, Mr. Aoyagi, is, in fact, you knew

 4   exactly the apartment where I was at because I notified the

 5   authorities where I was at; isn't that true?

 6   A    No, it's not.

 7   Q    Really?  What makes you say that comment?

 8           MS. HARRIS:  Objection, argumentative.

 9           THE COURT:  Again, the -- anything the witness says

10   like that is not evidence and may not be taken by you as

11   evidence.  You may ask questions --

12           MR. BRUGNARA:  I will ask another question.

13           THE COURT:  You may not make affirmative statements

14   to the jury.

15   BY MR. BRUGNARA

16   Q    When you got that burner phone, as you qualified it, did

17   you check the numbers on that phone?

18   A    No, I didn't.

19   Q    Okay.  But you, in fact, knew about the phone, did you

20   not?

21   A    Well, all I knew was that you were supposedly staying at

22   that apartment complex.  I knew that and I had been shown a

23   photo.

24   Q    Correct.

25   A    That's the extent of my knowledge.
```

1   Q    They knew I was at that -- did the Marshals tell you, in

2   fact, since you were assisting the Marshals -- you testified

3   you were assisting the Marshals, correct?

4   A    That's right.

5   Q    Did the Marshals tell you that they knew that I was there

6   because I notified them that I was there?

7            MS. HARRIS:  Objection.  Assumes facts not in

8   evidence.

9            THE COURT:  Sustained.

10           MS. HARRIS:  Hearsay.

11           THE COURT:  Sustained.

12  BY MR. BRUGNARA

13  Q    You guys, you're on the Violent Task Force in San Jose?

14  A    The Violent Crime Squad, yes.

15  Q    You guys run out of bad guys down there to apprehend, huh?

16  A    Not often.

17  Q    Really?  So why would an FBI assist the Marshals on a

18  non-violent, single-claimant financial matter?

19           THE COURT:  Argumentative.  Ignore that question.

20           MR. BRUGNARA:  Well, it's a --

21           THE COURT:  Ask a proper question.

22           MR. BRUGNARA:  He opened the door when he said he's a

23  violent crime FBI agent.  They must be running out of violent

24  criminals if they have a lot of free time to be wasting

25  taxpayer's money in this.

1          **THE COURT:**  Ask a question.  That's not proper.  The

2    jury will disregard that speech.

3    **BY MR. BRUGNARA**

4    **Q**    Regarding when the car was pulled over.  In fact, you

5    didn't -- in fact, the party that, in fact, pulled the car over

6    was not you, isn't that correct?

7    **A**    I was the passenger of the car that pulled you over.

8    **Q**    Oh, you were in the passenger -- it was a white male that

9    was in the car with you, isn't that correct?

10   **A**    That's correct.

11   **Q**    And, in fact, when you guys came out of the car he was, in

12   fact, the one that asked me the question, not you, isn't that

13   correct?

14   **A**    He announced that he was -- identity as law enforcement.

15   And, honestly, I don't remember who asked you what your name

16   was.

17   **Q**    Okay.  He, in fact -- the question he, in fact, asked to

18   me, as you were standing there, was:  Where did you come from?

19   And isn't it true that I told both of you "Glenn Dyer."

20   **A**    You did not tell us that when we first apprehended you.

21   **Q**    That's what I said and --

22          **MS. HARRIS:**  Objection, your Honor.

23   **BY MR. BRUGNARA**

24   **Q**    And do you know -- do you know --

25          **THE COURT:**  Sustained.

1   BY MR. BRUGNARA

2   Q    Do you know --

3            THE COURT:   The jury will disregard that comment.

4   BY MR. BRUGNARA

5   Q    Do you know what Glenn Dyer is?

6            THE COURT:   Mr. Brugnara, when I'm ruling you must

7   be -- you must be respectful.

8            MR. BRUGNARA:   I'm sorry.

9            THE COURT:   And stop doing what you're doing,

10  interrupting the judge.

11       That comment that was made by Mr. Brugnara is not

12  evidence.  You must disregard it.  Only what the witness

13  affirms is evidence.

14  BY MR. BRUGNARA

15  Q    Do you know what Glenn Dyer is?

16  A    Yes, I do.

17  Q    Okay.  What is it?

18  A    It's a jail.

19  Q    And are you aware that Luke Brugnara was at Glenn Dyer?

20  That's where he was being housed?

21  A    I did not know that.

22  Q    Okay.  Isn't it true that -- or when you pulled over the

23  vehicle with your partner from the Marshals, he couldn't

24  recognize me, isn't that factual?  A factual statement?

25  A    No.  What happened was, you resemble the picture that we

PROCEEDINGS                                  1904

1  were shown very much, but always want to make sure that we're

2  not, obviously, arresting the wrong person.  So we ask

3  follow-up questions to try to verify that our suspicions were

4  correct and you were, in fact, Luke Brugnara.

5  **Q**    Why didn't I look similar to the photograph that you had?

6  **A**    You looked a little bit older and thinner in person than

7  you had in the photo.

8  **Q**    Okay.  And that photo was from just a few months earlier,

9  isn't that correct?

10 **A**    I have no idea when the photo was taken.

11 **Q**    I have no further questions.

12        **THE COURT:**  Anything more?

13        **MS. HARRIS:**  No, your Honor.

14        **THE COURT:**  All right.  Thank you.

15     Thank you, Agent.  You're free as to go.

16        **THE WITNESS:**  Thank you, sir.

17     (Witness excused.)

18        **THE COURT:**  Next witness.

19        **MR. KINGSLEY:**  Your Honor, the Government moves to

20 admit what's previously marked -- been marked as Exhibit 287.

21 It's an authenticated set of business records, of AT&T records.

22        **THE COURT:**  Are these the ones we went over prior to

23 trial?

24        **MR. KINGSLEY:**  Yes, a subset of them.

25        **THE COURT:**  Received.

PROCEEDINGS                                    1905

```
 1          (Trial Exhibit 287 received in evidence.)

 2              MR. KINGSLEY:  The government also moves to admit a

 3     prior statement recorded in a certified transcript as

 4     Government's Exhibit 293.

 5          Do you want to take a look at it?

 6              THE COURT:  Yes, I would.

 7          (Whereupon, document was tendered to the Court.)

 8              THE COURT:  Have you shown the defendant?

 9          (Brief pause.)

10              THE COURT:  All right.  So any objection?

11              MR. KINGSLEY:  I'm not sure if the defendant has that

12     exact copy.

13              THE COURT:  Show them what you just showed me.

14          (Document was shown to Mr. Brugnara counsel.)

15              MR. BRUGNARA:  Yes, your Honor.

16          We already provided your Honor with the three-page

17     completeness of the record to complete this exact transcript

18     from a few pages thereafter.

19              THE COURT:  Well, I still have that under

20     consideration, and I haven't sorted that out yet.  But if -- if

21     the rule of completeness requires that those additional pages

22     be included, then I'm going to include them, even if it's in

23     your case.

24          And so -- so just -- any other objection?

25              MR. BRUGNARA:  Just rule of completeness, your Honor.
```

```
 1              THE COURT:  Thank you.

 2              MR. BRUGNARA:  And you have those pages.  They were

 3   provided to you.

 4              THE COURT:  293.  Can I -- but I would like to have a

 5   copy for my -- because I am evaluating that question.  Do you

 6   have a copy I can use?

 7              MR. KINGSLEY:  We can give you a copy, yes.

 8              THE COURT:  All right.  Thank you.

 9          (Trial Exhibit 293 received in evidence.)

10              MR. KINGSLEY:  May I read it to the jury, please?

11              THE COURT:  Yes, go ahead.

12          Say "Question," "Answer," "Question," "Answer," so that

13   the jury can follow along and tell them the date and all of

14   that.

15              MR. KINGSLEY:  This is a transcript of proceedings

16   dated Wednesday, June 18, 2014.  It is the testimony of Luke

17   Brugnara.  It states he was previously sworn.  And the

18   examination is by Mr. Sprague.

19          And I'm going to start with a question.

20              "QUESTION:  You testified that you got a phone

21          call in response to this email from one of 12 or one of

22          500 --

23              "ANSWER:  Uh-huh.

24              "QUESTION:  -- people at Sotheby's, is that

25          correct?
```

PROCEEDINGS

1       **"ANSWER:**  That's the way I testified.  That's

2       correct.

3           **"QUESTION:**  And when did you get that phone call?

4           **"ANSWER:**  I don't have -- I don't have to -- I

5       don't have my -- my -- it's recently -- I mean, right

6       around this same period.

7           **"QUESTION:**  Around Thursday, April 3?

8           **"ANSWER:**  Yes, somewhere -- somewhere -- it would

9       be somewhere in that range.

10          **"QUESTION:**  Was it before Ms. Long showed up at

11      your house on April 7?

12          **"ANSWER:**  Yeah.

13          **"QUESTION:**  So between the evening of April 3 and

14      the morning of April 7?

15          **"ANSWER:**  I would have to check, but somewhere in

16      that period of time.

17          **"THE COURT:**  Well, how could it possibly have

18      been before your email to the guy at Sotheby's?

19          **"THE WITNESS:**  Well --

20          **"THE COURT:**  That was April 3rd.

21          **"THE WITNESS:**  Well, I sent an email, yeah.  I

22      sent an email to Sotheby's here on the 3rd, so it

23      would have to be sometime -- yeah, it would be

24      sometime in that period, so."

25      **BY MR SPRAGUE:**

1             **"QUESTION:**  Okay.  So on April 4, 5th or 6th you

2        get a call from somebody at Sotheby's who says that the

3        de Koonings are not authentic?

4             **"ANSWER:**  That's correct.

5             **"QUESTION:**  Who was that person?

6             **"ANSWER:**  I don't have that person's name."

7             **THE COURT:**  All right.

8             **MR. BRUGNARA:**  Your Honor, again, objection.

9        I think this is the time, for the sake of judicial economy

10   in the court, to read the subsequent superseding information

11   regarding that exact -- that subject matter.

12             **THE COURT:**  The Court is going to -- it still has

13   that under consideration.

14             **MR. BRUGNARA:**  Yeah, but the jury now sitting with

15   information that's incomplete.  It's prejudicial to me unless

16   we complete the record now since the Court has already -- has

17   the one page --

18             **THE COURT:**  I'm overruling that point because I only

19   got from you today what you wanted me to read --

20             **MR. BRUGNARA:**  Your Honor, I had it last week --

21             **THE COURT:**  -- and I have not had a chance to review

22   it.  So your objection is overruled.

23        All right.  Next witness.

24             **MS. HARRIS:**  Your Honor, the United States rests.

25             **THE COURT:**  All right.  We've reached a milestone in

1    the case.  You've now heard the government's side of the issue.

2        We're going to take a 15-minute recess at this point, and

3    so there we go.

4        Please don't talk about the case, even though you now

5    heard the government's case-in-chief.  So, please, go back to

6    the jury room and have some good hot coffee and I'll see you in

7    15 minutes.

8        (Jury exits courtroom at 11:04 a.m.)

9        **THE COURT:**  Everyone, please, be seated.

10       I need the Government to give me what you just read in so

11   under the rule of completeness, I have -- I was trying to sort

12   that out.  If you don't have a copy, give me the original.  My

13   law clerk will go copy it.

14       (Whereupon, document was tendered to the Court.)

15       **MR. KINGSLEY:**  I have the exhibit and I also brought

16   an unredacted version of it as well.  I'm not sure --

17       **THE COURT:**  Give me the one that was read, all right?

18   My law clerk will -- please, go copy that.  Thank you.

19       All right.  Are there any -- I'm going to -- at this point

20   I'm going to deem that the defendant has made a motion for

21   acquittal under Rule 29, is that correct?

22       **MR. BRUGNARA:**  Yes, your Honor.  We want to make a

23   motion for Rule 29 on all counts and -- let me get the counts

24   and I'll go down each one.

25       **THE COURT:**  So how could there not -- I'll tell you

1   what we're going to do.  We're going to reserve the argument on

2   this until 1:00 o'clock because it will -- I want to give you

3   as much time as you need to make your points.  But we've got to

4   resume with the jury.  And if you're correct, then that count

5   will be dismissed based on the record to date, not on what

6   happens thereafter.

7        All right?  So we will hear the argument on the Rule 29

8   motion after the jury leaves for the day.

9        The one thing -- all right.  So -- so anything else that

10  the lawyers wish to bring up?

11           **MR. BRUGNARA:**  Yes.  I need time to meet with James

12  Stevens and Richard Tamor --

13           **THE COURT:**  Where is your first witness?

14           **MR. BRUGNARA:**  Well, that's one of the -- that's one

15  of the problems.  I was -- I -- in the limited amount of time

16  that I had last night, literally -- actually, not even last

17  night, this morning, by the time I finally got released into a

18  cell.  I had prepared for Erik Babcock and --

19           **THE COURT:**  Is he here?

20           **MR. STEVENS:**  He is.

21           **MS. HARRIS:**  Yes, your Honor.

22           **THE COURT:**  All right.  So we'll go with Babcock

23  first.

24           **MR. BRUGNARA:**  Good.  And then I want to find out if

25  we're going to be having anyone else.  And I need to go -- see,

1   the problem is this.  I don't have any staples.  I don't have

2   any paper clips.  I don't even have a color divider.  So I'm

3   left in this horrible situation where I have a scattering of

4   white papers without even a color divider.

5        So I have to -- and this Court goes very quickly through

6   its witness list.  I have to make sure, at least, I have one or

7   two witnesses keyed up here in my box.  So once Babcock is

8   done, we flow into the next one.  But I need a few minutes to

9   get organized.

10            **THE COURT:**  Well, we'll give you a few minutes.

11        All right.  I'm ready to make a ruling on the pending

12   motion for contempt.  Is there anything more that needs to be

13   said on that point?

14            **MS. HARRIS:**  No, your Honor.

15            **THE COURT:**  All right.  I am -- here is -- I went

16   back and looked at the official transcript, and I'll just read

17   the relevant part:

18            **"MR. BRUGNARA:**  Propaganda?  This isn't Nazi

19        Germany.  This is a United States institution --

20            **"MS. HARRIS:**  Your Honor.  Your Honor, could you

21        stop Mister --

22            **"THE COURT:**  All right.  This --

23            **"MR. BRUGNARA:**  You dress like a Nazi."

24        All right.  So 90 additional days.

25        And you've got to stop this, Mr. Brugnara.

1           **MR. BRUGNARA:**  That's not -- this just isn't -- this

2     isn't fair.

3           **THE COURT:**  Take it up with the Court of Appeals.

4           **MR. BRUGNARA:**  This isn't fair.  I'm a family man.  I

5     have children that I haven't seen in ten -- can I speak?

6           **THE COURT:**  No.  You're not going to speak anything

7     more.  The ruling is made.

8           **MR. BRUGNARA:**  This is unprecedented.

9           **THE COURT:**  Ninety days is going to be tacked on to

10    whatever else you --

11          **MR. BRUGNARA:**  This is unprecedented.

12          **THE COURT:**  You're racking up a lot of time in this

13    case, but you deserve more.

14          **MR. BRUGNARA:**  This is unprecedented.

15       Your Honor, I want to make one comment, and I'm going to

16    be very calm and relaxed despite having one hour of sleep in

17    three -- you have orchestrated this venue.  I had competent

18    counsel with Steven Kalar and Brandon LeBlanc.  You summarily

19    dismissed them when they had full knowledge of the emails that,

20    of course, are never even going to come into this case because

21    a Special Master had already sealed them off.

22       But the fact is I would have had my trial in July and I

23    would have never had to speak a word.  I would have been silent

24    as a church mouse, like I was with Brian Getz, and Pat

25    Hallilnan, and Ken Wine.  I never spoke out once.

1   But, instead, you put me in this untenable position with

2   Erik Babcock, who is a sole practitioner without even a

3   secretary.  And for seven months he met with me in one

4   face-to-face visit in seven months because he was inundated

5   with his state case.  And then I was forced into being pro se

6   status because then you took him, severing this case from the

7   abscond charge, which you could have done.  You didn't sever

8   the abscond charge to let the man finish his ten -- eight

9   months' investments into the fraud claim.

10   Instead, you pulled him off this case and you put me in

11   the untenable position of proceeding ahead pro se, which I

12   didn't want to do.  And now you're punishing me just

13   capriciously, unfairly with what?  Now what is it?  Nine months

14   of contempt?

15   That's -- that's I mean, I have sat back there with guys

16   that have Form 12 violations, illegal drugs, methamphetamine,

17   cocaine in your court on a Form 12 violation that you have just

18   given four months to.  Illegally breaking the laws.

19   I'm here exerting my First Amendment rights to free

20   speech.  The First Amendment of the United States Constitution

21   and not using profanity, not doing anything that would warrant

22   a Marshal coming up and even physically touching me.  And

23   because you don't like and she doesn't like the way I

24   communicate, you're penalizing me under the laws of the United

25   States.

```
 1        No.  I have a family.  I have four teenage children.  I
 2   haven't seen them in ten months.  I laughed when I saw what
 3   they admitted to evidence on the furlough order, where it says,
 4   "And Mr. Brugnara will get to see his children for one hour at
 5   Christmas."  I never saw them one hour at Christmas.
 6        You know why?  Because they never signed the stipulation
 7   that Allen Lew signed.  My wife phoned five times, Allen Lew.
 8   Oh, we're waiting for the United States Government, the
 9   prosecutors, to sign the stipulation.
10        They don't care.  Yeah, she's worse than a Nazi in my
11   opinion.  Because the reality is at least they got to be around
12   their families in a concentration camp.  They don't care if I
13   don't see my children --
14             THE COURT:  Mr. Brugnara.  Mr. Brugnara.
15             MR. BRUGNARA:  That's -- they're beyond --
16             THE COURT:  Mr. Brugnara --
17             MR. BRUGNARA:  No.  You don't care.  My mother could
18   have died.  She had her colon stripped out of her body in
19   February -- in September and I begged you:  Let me phone her.
20   Let me go see her.  And you said:  No.  You're not going to see
21   your dying mother.  Thank God, she survived.
22        You don't care about me.  Do you don't care about my
23   mother.  You don't care about my children.  None of you care
24   about me.  You don't care I slept on a room fool of feces for
25   30 hours.
```

```
 1          Listen.  You saw what Barbato said.  I'm dignified.  I'm
 2   respected outside the walls of this courtroom, where people are
 3   lending me hundreds of millions of dollars.  Yeah, another
 4   guy's going to come and say:  Yeah, I lent him 200 million.
 5          Okay.  Well, Barbato is at 600 million.  200 million.  A
 6   billion dollars.  That just puts it in perspective how many
 7   people trust me.  And I get no respect and no, my day is more
 8   valuable than anybody's or, certainly, on par with the value of
 9   your day.
10          So you say:  Ahh, I'm going to take another 90 days of
11   your life because of what you said about Ms. Harris.
12          THE COURT:  Well, now, for the record, I'm not going
13   to try to argue with you again on the many misrepresentations
14   and falsehoods in your recent speech just now.  I just hope the
15   Court of Appeals will go back and find the true record on what
16   happened that those circumstances.
17          You had earlier got away with saying that Ms. Harris
18   dresses like she belongs in North Korea.  I let that one pass
19   and told you not to do it again.  You did it again.
20          MR. BRUGNARA:  No, you didn't --
21          THE COURT:  Lawyers -- lawyers don't --
22          MR. BRUGNARA:  You gave me 90 days --
23          THE COURT:  Lawyers don't --
24          MR. BRUGNARA:  You gave me 90 days on that.
25          THE COURT:  Lawyers don't -- well, if I did, you
```

1    deserved it.

2            MR. BRUGNARA:  So you're giving me six months --

3            THE COURT:  So you are not going to -- you're not

4    going to do it again.  I'm giving you what I hope will deter

5    you from this kind of --

6            MR. BRUGNARA:  It won't deter me.

7            THE COURT:  This poor jury has had to listen to

8    tirades by you.  You're trying to make this trial into the

9    biggest train wreck you can.

10           MR. BRUGNARA:  You're not going to change me because

11   I'm innocent.

12       If I was guilty, I would be the first to lay on this floor

13   and say:  Punish me as best you think is fit.

14       I am innocent of these charges and I am not going to

15   continue to be persecuted like this.  This isn't a prosecution.

16   This is a persecution.  I was thrown in a cell with feces and

17   liquid human waste for 30 hours.  It was an outrage.

18       I have been dragged through this mud for ten months having

19   attorneys not see me for -- thrown this pods with murderers who

20   are actually convicted.

21       No.  I'm innocent and I haven't done anything.  I didn't

22   steal that stupid Degas bronze.  We're going to have testimony

23   that it's not even worth a thousand bucks.  No one has ever

24   called me a thief in 50 years of my life.

25           THE COURT:  If it were worth $10, the evidence is

```
 1  overwhelming --
 2              MR. BRUGNARA:  Oh, and I'm a thief.  I live in a
 3  $25 million house.  I'm going to steal a 1,000 or 50,000 --
 4              THE COURT:  All right.  You interrupted me once
 5  again.
 6       All right.  This hearing at an end.  When I come back, you
 7  better have your first witness ready or you will be deemed to
 8  have rested.  All right.
 9       (Whereupon there was a recess in the proceedings
10        from 11:14 a.m. until 11:26 a.m.)
11              THE COURT:  All right, be seated.
12       Are we ready?
13              MR. BRUGNARA:  Your Honor, I feel that I'm being
14  rushed and not given enough opportunity to prepare for my
15  case-in-chief in light of the logistic issues that have
16  happened in the last five days.
17       First, I need to find out -- because, apparently,
18  Mr. Levinson is here -- if he's going to be able to opine on
19  the value of the Sea Cliff.
20              THE COURT:  I'm sorry.  Mr. Who?
21              MR. BRUGNARA:  Levinson.  He is the president of
22  the -- just sold the house two doors over last week.
23              THE COURT:  He's out in the hallway?
24              MR. BRUGNARA:  Yeah, yeah.
25              THE COURT:  What's the problem?
```

1          **MR. BRUGNARA:**  Well, because you just said that I

2    needed to file a 706 on paper to you.  If that's the case, I'll

3    write one up right now just to save judicial economy and time

4    here.

5          **THE COURT:**  I -- I will let him testify up to the

6    point that it becomes opinion testimony, but there are some --

7    there are things that would probably help you that are in the

8    nature of things he could testify to as a fact witness and

9    where we reach the point of -- I don't know Mr. Brugnara.  I

10   have to go question by question.

11         **MR. BRUGNARA:**  Okay.  So I'll reserve the right to

12   call him back, just so we keep plodding ahead.

13         **THE COURT:**  If you've got him out there in the

14   hallway, you ought to call him now.

15         **MR. BRUGNARA:**  This is the thing.  You know, I'm

16   really -- this is the problem.  I'm hitting the end of my rope

17   here metaphorically with this process because I have so many

18   obstacles to overcome starting with just my living conditions

19   and my physical conditions and what I'm enduring being

20   hamstrung in this case.  And then being compounded with being

21   hit with violations of what the Court perceives as

22   inappropriate conduct, you know, which is just stealing from me

23   my liberty.  I just -- you know.  And then, okay, but now let's

24   proceed ahead, case-in-chief.  It's just not that simple.  It's

25   not that black and white.

1          Compounded with the fact this Court has already ruled that

2     my rights were violated, being pulled out on Friday and I lost

3     the entire weekend.  I'm still trying to be cooperative.

4     Plodded ahead yesterday.  And then I got moved again last

5     night.

6          You know, as long as I have a right to call back

7     witnesses -- you've got to remember, too, the Court appointed

8     associate attorneys.  I lost four hours of meetings with them

9     that were scheduled already on Saturday and Sunday that this

10    Court determined was necessary for the fluid operation -- you

11    know, the fluid conduct in this case.

12         So for me to be hit with two successive contempt orders in

13    great part that were due to procedural problems I was

14    encountering, interpretation of the Rules of Evidence, that's

15    the exact reason why these two guys were hired by the Court.

16    And it wasn't my fault that I didn't meet with them for four

17    hours.

18         So I want you -- I would request that you reconsider that;

19    not now, but at your own leisure.  And, you know, let's -- like

20    you said, let's keep moving ahead, but I'm not happy about

21    how -- how I'm being cut short.  I'm not getting time to

22    meet-and-confer with my procedural counsel here.  It's not fair

23    to me.

24              **THE COURT:**  That was a long rambling speech.  We're

25    not going to go back and revisit your inflammatory comments

1    about Ms. Harris and the way she dresses.  It's unacceptable,

2    and we're not going to have any more of that.  And there is no

3    way you needed to consult with anybody to know that that was

4    improper.  So, too bad for you.  We're not going to revisit

5    that.

6         All right.  Now, if you are asking for a continuance --

7    you said you were ready to go with Mr. Babcock.  Is he out

8    there in the hallway?

9              MS. HARRIS:  Yes, your Honor.

10             THE COURT:  Do you not want to put Babcock on the

11   stand?

12             MR. BRUGNARA:  Well, I just was conferring with

13   associate counsel on the procedural questions, and they advised

14   me that certain questions need to be tailored in a certain

15   fashion as to not upset the Court.

16        So we were just discussing -- I mean, just giving an extra

17   ten, 15 minutes would -- I think would save a lot of grief for

18   this Court, just so I can make sure the questions are

19   structured to comply with the Rules of Evidence.

20        I mean, listen, Mr. Kingsley, who's I guess one of the

21   esteemed lawyers in the U.S. Attorney's Office, he's literally

22   reading the questions -- and I'm sure that's good procedure, it

23   makes sense to me, right -- from a script.

24        I mean, it should be the reverse.  I should be the one

25   reading from a script with the benefit of my associate counsels

```
 1   from a procedural standpoint.  Certainly not winging an
 2   impromptu, and just losing my train of thought, having to deal
 3   with objections.
 4          THE COURT:  Are you asking for 15 minutes more of a
 5   break?  Is that what you're asking for?
 6          MR. BRUGNARA:  Yes.
 7          THE COURT:  I'll be even more generous than that, if
 8   you want.  If you want to call it quits for the day and sit
 9   here with your advisory counsel in the courtroom while I -- and
10   I'll let the Marshals leave you here so you can consult with
11   them, and start fresh tomorrow, if that's what want to do.
12      Or if you want to take 15 minutes and do that now, I will
13   give you that, and we'll start in 15 more minutes.
14          MR. BRUGNARA:  I accept your offer.  I want --
15          THE COURT:  Which offer?
16          MR. BRUGNARA:  Take the rest of the day.  But I beg
17   you to order at least James and at least Richard for part of
18   the time to be with me until a time certain, because I need as
19   much time as I can get with them.
20          THE COURT:  I'm going to order them to be here until
21   1:00 with you.  It's now 11:30.
22          MR. STEVENS:  Your Honor, we have several witnesses
23   outside that I want to make sure are ordered back.
24          THE COURT:  Bring them in.  I'll order them to come
25   back tomorrow.
```

```
 1              MR. STEVENS:  I will.

 2              THE COURT:  Before we do this, let's see if any of

 3   them has a problem.  Bring them all in right now.

 4              MR. TAMOR:  Your Honor, the other thing is I don't

 5   need to be ordered to meet with Mr. Brugnara.  I mean, I

 6   understand my obligations to the Court.

 7              THE COURT:  He asked me to order you.

 8              MR. TAMOR:  I know, but I'm saying --

 9              THE COURT:  Are you able to do it?

10              MR. TAMOR:  Yes, but --

11              THE COURT:  Then, I accept that.  I don't order you

12   to, but I request you to do it.

13              MR. TAMOR:  Very well.

14         (Brief pause.)

15         (Potential witnesses enter the courtroom)

16              THE COURT:  All witnesses, I want them to come up

17   here.  Yes, all the witnesses who have been standing in the

18   hallway, come up here.

19         All right.  I need for you to speak loudly so that the

20   court reporter can -- how many.

21         Your name is?

22              MR. LEVINSON:  Mark Levinson.

23              THE COURT:  Your name?

24              MS. SENHAJI:  Jennifer Senhaji.

25              THE COURT:  And your name?
```

```
 1              MS. RECORD:  Abidja Record.

 2              THE COURT:  And your name?

 3              MR. BABCOCK:  Erik Babcock.

 4              THE COURT:  All right.  I need to order all of you to

 5  be back here at 7:30 in the morning to give testimony tomorrow.

 6  Is there any reason why you cannot do that?

 7              MR. BABCOCK:  No, your Honor.

 8              MR. LEVINSON:  Yes, your Honor.  I've got meetings in

 9  the morning.

10              THE COURT:  Well, you'll have to reschedule them.

11              MR. LEVINSON:  I'm trying to push something together.

12  Everyone's relying on me, sir.

13              THE COURT:  What time would be the best for you to

14  testify tomorrow?

15              MR. LEVINSON:  I'm good tomorrow at 7:30, if I can

16  get out of here by 8:30.

17              THE COURT:  Well, I don't know by 8:30,  but we'll do

18  our best to get you out of here.  And we'll put you on first.

19         Is that okay, Mr. Brugnara?

20              MR. BRUGNARA:  Yes.

21              MR. LEVINSON:  Thank you.  I'll be here tomorrow at

22  7:30.

23              THE COURT:  How about you two?  You need to be here

24  at 7:30.  I order all to be here at 7:30.

25         (Potential witnesses nodding affirmatively.)
```

```
 1          THE COURT:  So you don't need to stay around today
 2   then; just be back here at 7:30 in the morning.  All right?
 3   Thank you.  You're free to go now.
 4          MR. STEVENS:  Just so the Court knows, there are two
 5   witnesses, Tony Crossley and Frank Sanders, who have been here
 6   today, who I have on phone standby.  And I was going to have
 7   them come back, because they are nearby.  I'm going to work
 8   things out with them, but if I have to, I would just ask that
 9   the Court be available for --
10          THE COURT:  Just a second.  We're going to bring the
11   jury back and excuse them, and then we'll then continue this
12   after the jury has gone for the day.
13          Dawn, let's bring in the jury.
14          (Jury enters courtroom at 11:35 a.m.)
15          THE COURT:  All right.  Welcome, please be seated.
16   I'm just going to detain you for a minute, and then I'm going
17   to let you go for the day.  We are -- it's now 11:40, almost.
18   And we're going to break until tomorrow at 7:30 or 7:45 for
19   you.  And we will continue with the case at that time.
20          But we are at a point where I need to talk with both
21   sides, and it's just going to -- it's going to take up so much
22   time that I feel it's best to let you go for now.  We are
23   making good progress, and I don't want you to be disillusioned
24   by not taking advantage of the time today.
25          I do want you to know that we're far enough ahead on the
```

1   schedule that we can afford to take an hour and a half off

2   early.

3       Remember my admonitions:  No talking about the case.  Even

4   though the Government's case-in-chief is now presented, you may

5   not talk about it with anyone.

6       You may not do your own investigation or your own

7   homework, and you don't go on the internet, any of those things

8   that I previously told you not to do.  You must keep an open

9   mind until all the evidence comes in.  Then it will be your

10  duty to deliberate, but not yet.

11      So, see you here tomorrow morning.  Thank you.

12      (Jury exits courtroom at 11:38 a.m.)

13          **THE COURT:**  Everyone be seated.

14      I have -- I want to go through some of the problems and

15  make sure that we -- that there is a plan in place.

16      Now, Joan Michelman, my note here says that she was

17  supposed to be on at 7:30 in the morning.  Where does that

18  stand, Mr. Stevens?

19          **MR. STEVENS:**  Well, yes.  She was set to be on at

20  7:45 tomorrow morning.  I can adjust her a little bit later.

21  That would be my preference.  Mr. Levinson goes, and then she

22  goes.

23          **THE COURT:**  Fine.  Do that.

24          **MR. STEVENS:**  Okay.

25          **THE COURT:**  But you said -- you know, I need your

1  help to get this organized.  And so you, be the organizer.

2  Have you talked with Stefan Curl?

3          MR. STEVENS:  I have not.

4          THE COURT:  Well, you know, the images don't appear

5  in here like a hologram.  It's got to be done with our court

6  staff.  They have to bring in IT equipment.  It's got to be

7  wired in to go all the way back to New York.

8      I don't know how to do that, but they know how to do it.

9  But it takes some time.  You've got to got that worked out,

10 yourself.

11         MR. STEVENS:  I understand.  So I've emailed with

12 that individual, and he's aware of what we're trying to do.  So

13 I'm not sure where we're at at this point, but that process

14 is --

15         THE COURT:  Before you leave the building today you

16 should talk with him, make sure that that's on track.

17         MR. STEVENS:  I will do that.

18         THE COURT:  All right.  Now, okay.  You know about

19 these four witnesses who are here.  Then you mentioned a couple

20 of other witnesses.  So, tell me, Crossley was one.  Who else

21 did you want?

22         MR. STEVENS:  And Frank Sanders.  They were both

23 coming back in the next few minutes.  I can have them come back

24 and have them ordered back, or I can --

25         MR. BRUGNARA:  Your Honor, can I give their cell

1   phone number so they're not inconvenienced coming here?

2   They're both banking executives.

3           THE COURT:  You give Mr. Stevens the cell phone

4   number.

5           MR. STEVENS:  I have their numbers.  I can call them.

6           THE COURT:  Then you work -- you know, telephone

7   standby is your judgment.  If you can trust them to show up, do

8   that.  It's up to you.  I don't have to order them to come

9   back.  I do that whenever there is doubt as to whether or not

10  they will come back.

11      Now, how about Ms. Record, where does it stand with her?

12  Do you still -- did you ever get the return of service?

13          MR. BRUGNARA:  She was here.  She was standing right

14  there.

15          THE COURT:  That was Ms. Record?

16          MR. STEVENS:  Yes, it was.

17          THE COURT:  I didn't catch her name.  Okay.  Any

18  other witnesses?

19          MR. STEVENS:  I believe everything else is being

20  organized.  We have quite a few people now that have been told

21  to come tomorrow, and we'll continue to adjust to what happens

22  during the day.

23          THE COURT:  All right.  Remember your Rule 16

24  reciprocal obligations.

25      Now, I want to say this to the Government while I'm

1  thinking about it.  On the document that had the word

2  "tantrum," the Court's parole order, you need to take that

3  sentence out and redact it.  So, before it goes into the jury

4  room.  "Tantrums" and "outbursts," I think.

5           MS. HARRIS:  Your Honor could we also redact the

6  portion --

7           MR. BRUGNARA:  It was twice, your Honor, on that

8  page.

9           THE COURT:  It appears twice.

10          MS. HARRIS:  Can we also redact the portion about the

11 Christmas furlough?  Because it's not relevant to the charges.

12          MR. BRUGNARA:  No, it is relevant.

13          MS. HARRIS:  And he's going to start --

14          THE COURT:  Redact that.

15          MS. HARRIS:  Thank you, your Honor.

16          MR. BRUGNARA:  No, your Honor, that's relevant, and I

17 completely absolutely disagree.  It's absolutely relevant.

18 It's absolutely relevant.

19          THE COURT:  If you're going to make an argument that

20 you didn't get your Christmas furlough and start blaming it on

21 the Government, and it becomes a Donnybrook as to why somebody

22 didn't stipulate as to -- we're not going to go down -- under

23 Rule 403, we're not going to do that.  I'm going to rule that

24 off limits.  That's off limits.  It does not prove anything.

25 So you -- you redact that as well.

 1         And I'm ordering you, Mr. Brugnara, don't bring it up.

 2    Don't bring up the Christmas furlough that I -- or visit, visit

 3    with your children.

 4         MR. BRUGNARA:   Your Honor, your Honor, did the

 5    Government ever get even admonished for that?   I'm just

 6    curious.   I know they didn't get sanctioned, but did they get

 7    admonished?

 8         THE COURT:   It's so far past, in the past, I can't

 9    reconstruct it.

10         MR. BRUGNARA:   I understand it was my family and my

11    life, so it just doesn't matter.   I get it.   I understand.

12         THE COURT:   No, I gave you opportunities.   You had a

13    lunch with your family at one point.

14         MR. BRUGNARA:   In September.

15         THE COURT:   Allen Lew was there.

16         MR. BRUGNARA:   Last September.   That's right.

17         THE COURT:   Yeah, that's right.   Okay.   So it's not

18    like I have been insensitive to that.

19         MR. BRUGNARA:   (Laughing.)

20         THE COURT:   That is so far afield from what we're

21    going to be dealing with.

22         MR. BRUGNARA:   Can we do the Rule 29, at least, now?

23         THE COURT:   Just a second.   We're going to come to

24    that.

25         Is there anything more by way of witnesses and preparation

1   for Mr. Brugnara commencing his case tomorrow that I need to

2   help you with?

3        (No response.)

4            **THE COURT:**  Hearing nothing.  Now, you've got to have

5   it lined up.  If you run out of witnesses, I won't say for

6   sure, but you might be deemed to have rested.

7            **MR. BRUGNARA:**  I'll be a witness then, and I can talk

8   for days, your Honor.  And I'll ask myself the questions.

9            **MR. STEVENS:**  The one thing I should say on that,

10  your Honor, is that I asked the Sotheby's witnesses from New

11  York City on Monday to be here on Wednesday.  They basically

12  told me that's impossible, and so they're set to be here

13  Thursday morning.  And I --

14           **THE COURT:**  What are their names?

15           **MR. STEVENS:**  Kathryn Solomon, and the counsel who

16  comes with Kathryn Solomon.

17           **THE COURT:**  What are they going to testify to?

18           **MR. BRUGNARA:**  You know what, what they're going to

19  testify to is our defense.

20           **THE COURT:**  Well, all right.  I -- I don't -- at this

21  point I'm not going to get into it.

22           **MR. STEVENS:**  So I --

23           **THE COURT:**  I question whether -- I don't know.

24  You -- it's your job to get them here.

25           **MR. STEVENS:**  Right.  And they will be here.  What

PROCEEDINGS                                                1931

1    I'm saying is I believe we have enough witnesses for tomorrow

2    for a full day.  But if we cut it close, I would just ask --

3            **THE COURT:**  If you cut it close, I will cut you that

4    much slack.  But it's got to be -- you can't give me -- waste

5    an hour of time tomorrow.  You've got to fill up most of the

6    day.

7        I mean, 30 minutes I'll give you, 45 minutes I would give

8    you.  But an hour, I start to draw the line.

9            **MR. STEVENS:**  Understood.

10           **THE COURT:**  All right.

11           **MR. KINGSLEY:**  Your Honor?

12           **THE COURT:**  Yes.

13           **MS. HARRIS:**  On the Sotheby's witness, the Government

14   doesn't think that the testimony is going to be admissible.

15   And before that Sotheby's person flies out here --

16           **THE COURT:**  I don't care.  I don't care.  I mean, I

17   do care, but you know, every time -- it's a legitimate

18   question.  But --

19           **MR. KINGSLEY:**  I just wanted to raise it.

20           **THE COURT:**  You've raised it.  And when it turns out

21   that -- if it turns out -- if it turns out that it's irrelevant

22   and can't be used, then so be it.

23       But, all right.  Anything else on witnesses that I can

24   help you with?

25           **MS. HARRIS:**  Yes, your Honor.  The defendant just

1  said that he would be a witness and could talk for days.  Can

2  the Court reiterate that Mr. Brugnara is supposed to submit his

3  questions in advance to Mr. Stevens, who will then vet them to

4  make sure that they're--

5          **THE COURT:**  That's the procedure.

6          **MS. HARRIS:**  -- within the Rules of Evidence.

7          **THE COURT:**  That's the procedure.  Reiterating that.

8      All right, Rule 29.  Let's hear your motion.

9          **MR. BRUGNARA:**  Can you clarify to the defendant what

10  the standard is, in the Court's view, to grant a Rule 29?

11         **THE COURT:**  The question is:  Is there sufficient

12  evidence to go to the jury, even if the evidence is contested,

13  that would allow the jury to find beyond a reasonable doubt all

14  the elements of the offense charged?

15     Even if you've got a defense, that doesn't matter.  What

16  matters is whether or not the Government has presented

17  sufficient evidence to support its side of the problem.

18         **MR. BRUGNARA:**  Regarding -- I want to start with

19  something that the Court mentioned for several months, in at

20  least three or four hearings, you discussed how concerned you

21  were where the chain of title.

22         **THE COURT:**  Chain of custody.

23         **MR. BRUGNARA:**  Excuse me, chain of custody.  Forgive

24  me.

25         **THE COURT:**  I think they proved that.  They have done

PROCEEDINGS

```
 1   a good job on that.
 2            MR. BRUGNARA:  I would like to state what I have to
 3   state.
 4            THE COURT:  State what you want, but I was paying
 5   close attention.
 6            MR. BRUGNARA:  They made their point from the point
 7   in time they -- they lost it on the very first link.  Because
 8   the gentleman that crated -- I think his name was Mr. Trejos?
 9   Yeah, Mr. Trejos who crated the missing item, whatever it is,
10   there was no one present.  No expert present.  No insurance
11   company present.
12       He testified under oath that he's not an expert.  That he
13   has no formal training in art, and he simply makes crates for
14   this shipping company.  All he said is he doesn't know the
15   difference between a real and a fake.
16       So there is no -- no chain of custody on the missing item,
17   because what was ever put in the crate, they can never prove.
18   They can prove that it -- if you believe all of the delivery
19   drivers -- and we don't put up a defense to refute the chain
20   that it made it to wherever, but we don't know what was in it.
21       And your exact quote, and I can pull it up from transcript
22   if you give me an hour:  We don't know what was in that crate.
23   Could have been a fake, could have been a bunch of bubble gum.
24            THE COURT:  That's what I said.  "Bubble gum."
25            MR. BRUGNARA:  And you said it could have been a
```

1    fake, it could have been --

2              **THE COURT:**  They took a picture of it.  And it wasn't

3    bubble gum inside the crate.  It was the Little Dancer.

4              **MR. BRUGNARA:**  The guy said it could have been a

5    fake, or it could have been -- the guy already said he didn't

6    know whether it was a fake.

7         In order for it to be proved up that it was not a fake --

8    and I also -- if you really check the transcript clearly, I do

9    know what I'm doing.  Even though you don't think I know what

10   I'm doing.

11        I asked a specific question to Rose Long, and I asked a

12   specific question to Walter Maibaum:  Were you there when that

13   item was crated?  And he said no, and she said no.

14        And I asked the guy that packed it, then.  So we know

15   neither of them were there.

16        And then I asked the guy, Trejos:  Was there an insurance

17   company there.  He said no.

18        Them I asked a real big question, because Maibaum said

19   what certifies it as a Valsuani and not a fake or bubble gum,

20   whatever you want to use -- metaphor you want to use, was the

21   two certificates.

22        Maibaum said under oath:  Hey, we had one certificate, and

23   the other one was coming from Paris, France.

24        Okay.  I asked Trejos:  Was there at least one certificate

25   that you put in the box?  He said there is no certificate put

1    in the box.   Just -- just the bronze piece.

2        So what the testimony proves is:  We don't know what was

3    in the box.   What qualifies it as a Valsuani was not in the

4    box, despite the fact that they both said that the certificates

5    came with the sale, to make it fully qualified as a Valsuani.

6        So, like you said, it's a fake in the box; there's no

7    proof that it's real Valsuani.   And that has to be removed from

8    chain of title.

9            **THE COURT:**  All right.   What's the Government say in

10   response?

11           **MS. HARRIS:**  Your Honor, the Government doesn't have

12   to prove chain -- he's saying "chain of title."

13           **THE COURT:**  It's chain of custody.

14           **MS. HARRIS:**  What's at issue is the chain of custody.

15   We proved from where it originated at Cirkers until it was

16   delivered at Sea Cliff.   We had every witness along the way,

17   including the one who packed it, and took a photograph of what

18   he put in there and what's now missing.

19       We know what was put in there, because we've got the

20   photograph of it, that we proved that it was packed up.   When

21   the trucker came to pick it up from Cirkers, we had the trucker

22   testify about the five crates.   Then the trucker delivered it

23   to the warehouse.   And the warehouse person testified, and

24   brought in his timesheets with the five pieces.

25       Then the American Airlines person who picked up the five

1    pieces from the warehouse testified to the five pieces he

2    loaded on the plane.

3        Then the person who -- Eddy Castillo picks it up here in

4    San Francisco, at San Francisco Airport.

5              **MR. BRUGNARA:**  Your Honor, she's --

6              **THE COURT:**  Please, Mr. Brugnara.

7        **MS. HARRIS:**  And he testifies to the five pieces that

8    he picked up and brought, and had Mr. Brugnara personally help

9    unload.  And I will point out that Mr. Castillo said he was

10   100 percent certain it was five pieces, as did Warner Trejos.

11             **MR. BRUGNARA:**  She's not listening to what I said,

12   obviously.  What I -- I didn't refute the chain in the link.  I

13   refuted the first chain of the link, where you specifically

14   said -- this is well before Ms. Harris ever got into the case.

15   It was with Doug Sprague.

16       You admonished Doug Sprague at least four times.  And if

17   you give me an hour in that cell, I'll pull up all four times.

18   And you said it with different verbiage, but the last one was

19   the "bubble gum" and "a fake."

20       And there were other ones.  You wagged your finger at him,

21   and said:  Man, I'm telling you, I think you've got a problem

22   with the chain of title because you don't know what was in the

23   box.  There'd better be someone that saw that go in the box.

24       And you know what?  There wasn't.  Rose Long wasn't there.

25   Walter Maibaum wasn't there.  Their two experts.  And, in fact,

 1   the guy admitted -- now, if he admitted: Hey, I'm an expert,

 2   that's something else.  He admitted he's not an expert.  He

 3   doesn't know the difference between a fake and a real.

 4       Notwithstanding the fact that this guy Maibaum has got a

 5   whole track record of selling fakes to SI Newhouse, Christie's,

 6   selling thousand-dollar fakes for $6 million.  This guy's got a

 7   real bad track record on this.

 8       And hey, hey, hey, hey, get this, get this.  For a Columbo

 9   explanation, lo and behold, the guy puts in a $2 million

10   insurance claim.  It doesn't take a brain surgeon to figure out

11   what this guy Maibaum's about.  It was an insurance fraud.

12       But the fact is they don't have to worry about it in this

13   case, because they don't have any proof of what was in that

14   crate.  And this is the irony.

15       **THE COURT:**  I thought you said you didn't get the

16   crate.  Are you on -- is your position that you didn't get the

17   crate?  Or you did get the crate?

18       **MR. BRUGNARA:**  If you read my Form 12 testimony, and

19   I've never deviated from it, I said I don't know whether four

20   or five were delivered.  I never said there were four or five

21   delivered.  I don't know how many were delivered.  I don't know

22   how many crates were delivered.  They were all piled in there.

23   That wasn't a big concern of mine.  I was working with Mark

24   Levinson on a couple of big deals.  It was not a big concern.

25       **THE COURT:**  All right.  This --

```
 1          MR. BRUGNARA:  But, but, you had already prefaced

 2   this entire trial, saying:  You better make sure somebody saw

 3   what was going in there that knew what was going in.  And this

 4   guy testified:  I don't know what -- I don't know the

 5   difference between a Valsuani and the one you buy online for

 6   100 bucks.

 7          THE COURT:  All right.  This is not a hard problem.

 8   Mr. Brugnara has, up to a point, he raises a point that can be

 9   argued to the jury, I guess.  But I'm not even sure then where

10   it would go.

11          There were five -- the evidence is overwhelming, and

12   certainly enough to go to the jury that there were five boxes.

13   The box that we're arguing over now had something in it,

14   because the photograph looked like it, that was a -- resembled

15   and to my eye looked exactly like the Little Dancer.

16          So, there's evidence from which the jury can conclude that

17   the Little Dancer was in that box.

18          MR. BRUGNARA:  Can you, can you --

19          THE COURT:  So now you say:  Well, I only know --

20          MR. BRUGNARA:  That will help you.  That's what you

21   get, an exact computerized --

22          THE COURT:  You interrupted me again.

23          MR. BRUGNARA:  That's a computerized replica of the

24   exact measurements, and what's the price?  $112.

25          THE COURT:  Now, if it was worth even $10, it's wire
```

1   fraud.

2          MR. BRUGNARA:  If there was fraud.

3          THE COURT:  If there were -- if you got them to

4   deliver that, using the wires through a scheme to cheat Rose

5   Long, then you are guilty of wire fraud.  Even if she's trying

6   to defraud you, even if she's negligent, and even if what was

7   in there was worth a lot less than they were going to charge

8   you for it.

9          And you have been off on a -- and I've told you this

10  before -- a bogus defense from day one that her fraud -- if it

11  were a fraud, and I'm not saying it was -- if she was guilty of

12  fraud it somehow erases your fraud.  That's not the law.

13         MR. BRUGNARA:  I never said --

14         THE COURT:  That's not the law.

15         MR. BRUGNARA:  I never said -- I always stated that I

16  had a one-year contingency period, and she superseded that by

17  saying this is a gift, when she was drunk and on drugs.

18         But the fact of the matter is, I had one year.  It's

19  memorialized in the email.  That was the last correspondence

20  regarding any due-diligence period.  So the fact of the matter

21  is, a due-diligence period, as Mr. Schochet very clearly

22  stated, is in fact not a formalized, finalized contract.  It is

23  a period where you can in fact --

24         THE COURT:  Well, then that's an argument for the

25  jury.

```
 1              MR. BRUGNARA:  I'm not worried about that.

 2              THE COURT:  You argue to the jury --

 3              MR. BRUGNARA:  I'm trying to carve out the one

 4   item --

 5              THE COURT:  -- that she gave that to you.  And if

 6   anyone believes that, then you are pretty good.

 7              MR. BRUGNARA:  Well, I haven't even put on my case

 8   yet.  Believe me.  That's why I want to take a little bit of a

 9   break.

10      Do you think I can get a billion dollars from a standing

11   start, and not know how to talk to people?

12              THE COURT:  Look.

13              MR. BRUGNARA:  Watch and see.

14              THE COURT:  The argument that the counts are

15   defective on chain of custody is denied.  I don't -- I'm not

16   going to say anything more about that.

17      Let's move -- we're -- at 2:00 o'clock I have to kick you

18   out of this room because I have a criminal calendar.  So we're

19   using up time that I would otherwise give to you --

20              MR. BRUGNARA:  Well, then we'll recess.  Because this

21   is the thing: Everything with my is always the big rush job,

22   and then I go sit in a cell with a bunch of murderers.

23              THE COURT:  You bring up bogus points.  I have to --

24   and then you interrupt me.

25              MR. BRUGNARA:  Let me ask you this.  Let's say that
```

```
1  thing is worth $100.  You have three auction houses say that
2  thing's worth $100.  Or maybe $1,000.
3       Do you think it's judicial economy sitting there on the
4  bench, using your Rule 2 to oversee this, that the Government
5  would spend a million dollars to go try to figure out:  Hey,
6  this -- Aoyagi said it best.  Man, you guys run out of bad
7  guys.  They got the FBI and everyone else, and spending all
8  this money, when this woman is nuts and the guy is a fraudster.
9       You do all you can to insulate the jury, shielding the
10 truth about what these people are all about.  Man, they're
11 suing each another right now in Federal Court --
12           THE COURT:  Rule 29 --
13           MR. BRUGNARA:  -- saying stuff isn't real.
14           THE COURT:  The Rule 29 motion is denied in it's
15 entirety.  It's pointless.  So, be prepared to go forward
16 tomorrow.
17           MR. BRUGNARA:  I would like to make a motion for
18 reconsideration on full disclosure of that lawsuit.
19           THE COURT:  No, no.  We're not going to do any of
20 that.  You and your two lawyers, you sit here.
21      I'm going to ask the Marshals to leave him in here until
22 2:00 when the normal criminal calendar starts.  So you have two
23 hours now with your -- and if you, Mr. Stevens want to go down
24 and get him a cafeteria lunch, just like we did the other day,
25 be my guest.  And, we'll stay here until 2:00.
```

PROCEEDINGS                                    1942

1     The Marshals will watch you and then -- is that all right

2  with the Marshals?

3          **THE MARSHAL:**  Yes.

4          **THE COURT:**  All right.  So you take advantage of the

5  time, and good luck with you and your -- your lawyers.  The

6  Rule 29 is denied.

7          **MR. KINGSLEY:**  Thank you, Your Honor.

8     (Whereupon at 11:57 a.m. further proceedings were

9      adjourned until Wednesday, May 6, 2015 at 7:30 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1943

<u>I N D E X</u>

| <u>PLAINTIFF'S WITNESSES</u> | <u>PAGE</u> | <u>VOL.</u> |
|---|---|---|
| **SHLYAPINA, NATALIA** | | |
| VIDEOTAPED DEPOSITION PLAYED | 1793 | 7 |
| | | |
| **KOLC, MARK** | | |
| (SWORN) | 1806 | 7 |
| Direct Examination by Ms. Harris | 1807 | 7 |
| Cross Examination by Mr. Brugnara | 1819 | 7 |
| | | |
| **PRITCHETT, HAROLD** | | |
| (SWORN) | 1830 | 7 |
| Direct Examination by Ms. Harris | 1830 | 7 |
| Cross Examination by Mr. Brugnara | 1845 | 7 |
| | | |
| **TARTT, DEJUAN** | | |
| (SWORN) | 1859 | 7 |
| Direct Examination by Mr. Kingsley | 1860 | 7 |
| Cross Examination by Mr. Brugnara | 1868 | 7 |
| | | |
| **HIEBERT, IAN** | | |
| (SWORN) | 1868 | 7 |
| Direct Examination by Mr. Kingsley- | 1869 | 7 |
| Cross Examination by Mr. Brugnara | 1880 | 7 |
| | | |
| **ARAGON, DONNA** | | |
| (SWORN) | 1881 | 7 |
| Direct Examination by Mr. Kingsley | 1882 | 7 |
| Cross Examination by Mr. Brugnara | 1887 | 7 |
| | | |
| **AOYAGI, TIM** | | |
| (SWORN) | 1889 | 7 |
| Direct Examination by Ms. Harris | 1889 | 7 |
| Cross Examination by Mr. Brugnara | 1899 | 7 |

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 135 | | | 1795 | 7 |
| 136 | | | 1797 | 7 |
| 137 | | | 1803 | 7 |
| 138 | | | 1805 | 7 |
| 139 | | | 1805 | 7 |
| 141 | | | 1810 | 7 |
| 142 | | | 1814 | 7 |
| 143 | | | 1833 | 7 |
| 144A | | | 1836 | 7 |
| 144B | | | 1840 | 7 |
| 145 | | | 1866 | 7 |
| 146 | | | 1873 | 7 |
| 147 | | | 1877 | 7 |
| 150 | | | 1899 | 7 |
| 287 | | | 1905 | 7 |
| 293 | | | 1906 | 7 |

– – –

## CERTIFICATE OF REPORTER

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_____

Belle Ball, CSR 8785, CRR, RMR, RPR

Tuesday, May 5, 2015