Volume 12

Pages 2887 - 3139

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. ) No. CR 08-0222 WHA
) No. CR 14-0306 WHA
LUKE D. BRUGNARA, )
) San Francisco, California
Defendant. ) Tuesday
) May 12, 2015
) 7:28 a.m.

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:** MELINDA HAAG
United States Attorney
450 Golden Gate Ave.
San Francisco, California 94102
**BY: ROBIN HARRIS, AUSA**
**BENJAMIN KINGSLEY, AUSA**

**For Defendant:** **LUKE D. BRUGNARA**
- pro se

**Advisory Counsel:** LAW OFFICES OF PAUL WOLF
717 Washington Street
Second Floor
Oakland, California 94607
**BY: JAMES R. STEVENS, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by: Belle Ball, CSR and Debra Pas, CSR
*Official Reporters - US District Court*

**APPEARANCES: (CONTINUED)**

**Advisory Counsel:** LAW OFFICES OF TAMOR & TAMOR
311 Oak Street
Suite 108
Oakland, California 94607
**BY: RICHARD ALAN TAMOR, ESQ.**

**Also Present:** FBI Special Agent Jeremy Desor

FBI Special Agent Aleksandr Kobzanets

Denise Oki, U.S. Attorney's Office

\- - -

**P R O C E E D I N G S**

**TUESDAY, MAY 12, 2015 7:28 A.M.**

(The following proceedings were held outside of the presence of the jury.)

**THE COURT:** Good morning. Good morning. All right, it's time to start. So both sides are present; the jury is not.

Any issues to bring up with the Judge before we bring in the jury?

**MR. BRUGNARA:** Yes, I had one -- I mean, notwithstanding the objections that I had on the final version, I think there is one typo mistake here that I noted. Give me a second here.

**THE COURT:** Typo mistake in the instructions?

**MR. BRUGNARA:** Yes.

**THE COURT:** All right. Well, if you take that out maybe I can correct it.

**MR. BRUGNARA:** On 35, it should be at the last -- on Page 11, it should be "Government has proven beyond a reasonable doubt." It just has "Government has proven."

**THE COURT:** All right, I will put that in. It's not necessary, but I'll do it, "beyond a reasonable doubt." Because earlier, the instructions say that at any time I say "proven" it means beyond a reasonable doubt. But that's okay. We will put it in.

All right. All right. What else? Ms. Harris, anything on your side?

**MS. HARRIS:** No, Your Honor.

**THE COURT:** Okay. I received the Government's exhibit list. Do I have any objections to that going into the jury assembly room?

**MR. BRUGNARA:** We just had the -- got handed this about ten seconds ago, so can I look at it?

**THE COURT:** Sure. We'll take it up later. But do you need to look at it in order -- does the defense have such a list?

**THE CLERK:** Only what I typed. It's not anything --

**THE COURT:** Can I see your list?

**THE CLERK:** And I have to edit the un- --

**MR. BRUGNARA:** I don't know how I can approve or disapprove this list because it's just by reference, and I just got it ten seconds ago, so --

**THE COURT:** Well, I'm giving you time to look at it.

(Off-the-Record discussion between Defendant and Clerk)

**THE CLERK:** I would have to remove the exhibits that were not received.

**THE COURT:** Ms. Harris, did you see that the -- the list that Dawn prepared for the benefit of the defense that has the defense exhibits?

**MR. KINGSLEY:** We didn't -- I don't think we -- did

we see that?

**THE CLERK:** The one I e-mailed you that just had Mr. Brugnara's exhibits.

**MR. KINGSLEY:** Oh, yeah, yeah.

**THE COURT:** We would omit those items that were not received in evidence. There were a few on there. So, can we do that, Dawn?

**THE CLERK:** I could, yes.

**THE COURT:** Is the system working yet?

**THE CLERK:** I don't know. I haven't tried -- yeah, I'm getting in to do some stuff, so --

**THE COURT:** All right. So you need to do -- put in just the ones that were admitted, and then give it to both sides so they can see it. All right?

**THE CLERK:** Okay.

**THE COURT:** Great. Now, ready? Ready to go?

**MR. KINGSLEY:** Yes, Your Honor. The Government's ready.

**MR. BRUGNARA:** Yes.

**THE COURT:** All right. Let's see if the jury is all present.

**MR. BRUGNARA:** Your Honor, do we have a box of exhibits too, can I look at that? At least look at mine, because I'll know mine.

**THE COURT:** Well, you -- you can only send in to the

jury room what was in -- admitted in evidence. The things that were not admitted into evidence -- and there were a number that you marked that were not received in evidence -- they have to stay out.

**MR. BRUGNARA:** I understand. But is there a box like this (Indicating) that has my exhibits as well?

**THE CLERK:** No. Yours are like this (Indicating).

**MR. BRUGNARA:** Okay. Can I take a look at that? Thanks.

**THE COURT:** And according to Dawn's note here, one document was missing, which is Old Republic Title preliminary report. But then there was also one called the same thing that was admitted, called U. But V has the same exact title, and it was missing.

I don't know what that means, but that's a curiosity.

**MR. BRUGNARA:** Well, one was Las Vegas and one was Sea Cliff.

**THE COURT:** Well, V was never admitted into evidence anyway, so it wouldn't go into the jury room anyway.

**MR. BRUGNARA:** Can I get the ones that are admitted? Do you have the summary list of admitted items?

**THE COURT:** Is this the only list?

**THE CLERK:** That is the only copy I have printed.

(Document handed down)

**THE COURT:** Now, Ms. Harris, are you going to be

arguing from the lectern where it is?

**MS. HARRIS:** I think so, your Honor. We are going to be putting exhibits on the ELMO, and I thought it would be easier.

**THE COURT:** Then you need to keep your voice up.

I just say to the court reporter: I like to give the lawyers freedom to move around the courtroom, and be an advocate. And I don't want them to have to be standing by the microphone. So take off the earphones, please, and just listen in a normal, conventional way.

But Ms. Harris, please try to keep your voice up.

**MS. HARRIS:** Can you hear me now?

**THE COURT:** There is a microphone there.

**MS. HARRIS:** There's a microphone.

**THE COURT:** I didn't see the mic. All right.

**MS. HARRIS:** Does this -- yeah, this works too (Indicating).

**THE COURT:** Are you going to be using the ELMO?

**MS. HARRIS:** I'm going to be using the ELMO, and --

**THE COURT:** Is it technically hooked up? Are we going to have a snafu whenever the first document comes up?

**MS. HARRIS:** I think the ELMO --

**THE COURT:** Dawn, is it -- is it passing through?

**THE CLERK:** It should work, but I haven't turned it on yet this morning, so I will.

I haven't had a problem with the ELMO, so it should be fine.

**MS. HARRIS:** And then there will be a point where we have to turn the ELMO off because we're going to play a video.

**THE COURT:** Oh. Now, did Mr. Brugnara and the Government work out the -- whatever it is that you want the -- that Mr. Brugnara wanted to show from the video, the video -- remember the video? You wanted to show a video and wanted the Government to show that for you during your closing.

So, has that been set up, and ready to go? Or --

**MS. HARRIS:** He has not told us what he wants.

**MR. KINGSLEY:** We have the videos here, but we don't know what he wants to play.

**THE COURT:** Well, you need to advise the Government what it is. They can't just instantaneously pull it off the shelf.

(Off-the-Record discussion between Defendant and Counsel)

**THE COURT:** Okay. Let's see if the jury is present, ready to go.

(A pause in the proceedings)

**MR. BRUGNARA:** Judge Alsup, you said I could play that part of the deposition, right?

**THE CLERK:** They're not all here.

**THE COURT:** I'm sorry; I didn't hear you.

**MR. BRUGNARA:** You said I could play the part of the

video deposition that you read into evidence yesterday, from the tape.

**THE COURT:** I said you should set it up with the Government. Can we do that?

**MR. KINGSLEY:** I don't think we have that portion because we never played that, and this is the first time Mr. Brugnara said he wanted it played.

**THE COURT:** Then it will just have to be read out loud.

**MR. BRUGNARA:** How can you not have it? It's on a disk, right?

**MR. KINGSLEY:** We had a laptop that we loaded with videos that we admitted as exhibits.

**MR. BRUGNARA:** And you don't have the complete video?

**MR. KINGSLEY:** I don't -- do we have the complete video?

**MR. BRUGNARA:** They would have to have it, because you admitted that into evidence yesterday.

**THE COURT:** No, I only read it -- that's why I read it. So you will just have to read it. Just read it the way I read it. And, make sure you read it accurately. But, it is in evidence.

**MR. BRUGNARA:** It's in evidence. I don't see it here in the evidence folder.

**THE COURT:** It's read verbally. It's on the court

reporter's transcript.

**MR. BRUGNARA:** I know. What I'm trying to say, though, is they have actually in the evidence folder here, the balance of the deposition.

**THE COURT:** I'm sorry, Mr. Brugnara. I'm not going to make them go back and re-manufacture something that they -- it would be hard to do.

They -- what they are saying is that for trial, they made a video presentation of the parts they wanted to read in. And they did not do that for the part you want to have read in.

So you are going to have to do it the old-fashioned way, which is you can take the document that you -- that I read from, and just read that out loud.

**MR. BRUGNARA:** Okay.

**THE COURT:** But make sure you read the right -- the one that I did read in.

**MR. BRUGNARA:** All right.

**THE COURT:** Mr. Stevens, you had -- you had connect -- it was appended to or part of a motion to -- under the rule of completeness that you or Mr. Brug- -- I think it was you that filed. And so, do you have that handy?

You should make sure that Mr. Brugnara has the right transcript whenever he starts to read.

**MR. STEVENS:** Right.

**THE COURT:** Just so it's very clear, not everything

in the deposition of that witness is in evidence. It's just the parts that were shown or read to the jury that are in evidence.

(Off-the-Record discussion between Court and law clerk)

**THE COURT:** I want to say if anyone plans on using No. 35 in the closing, which is "One issue for you to decide is intent" and so forth, then the -- the thing I sent out does not have "The Government has proven beyond a reasonable doubt"; it has "proven." So just say that the Judge is going to say "beyond a reasonable doubt," and I'll agree that that's what it is.

**MR. BRUGNARA:** That's related to 35?

**THE COURT:** The change that you made this morning. On Paragraph 35 of the instructions. You said it was a typo. And -- the thing about "beyond a reasonable doubt."

**MR. BRUGNARA:** Yes.

**THE COURT:** If anyone is going to refer to that during the closing arguments, you may refer to it in the way in which it's going to be amended. And if there's any doubt about that, I can interject and explain to the jury that it will be -- it will say beyond "a reasonable doubt."

All right. Are we ready yet?

**THE CLERK:** No, still two missing.

**THE COURT:** Still two missing. All right. If anyone needs to use the facility, this would be the time to do it

because we're waiting for a couple of jurors. But as soon as they're here, I would like to start.

(A pause in the proceedings)

**THE COURT:** Dawn, try again and see if they're here.

(A pause in the proceedings)

(Documents handed out by the clerk)

**THE CLERK:** Still missing one. See if I have a message.

No message, Judge. No message. There is no message.

(A pause in the proceedings)

**THE CLERK:** Still one missing. I'll go call him.

(A pause in the proceedings)

**THE CLERK:** All right. He's here; they're all here now and just getting ready to line up.

**THE COURT:** All right. We will bring the jury in, in just a moment.

(The following proceedings were held in the presence of the Jury)

**THE CLERK:** All rise.

**THE COURT:** Welcome back, and please be seated. And, let me make a couple of comments to you before we start with the closing arguments. I want to give you a heads-up on the timeline for today.

And, what I'm leading up to is if it's possible for you to stay past 1:00 that would be a good thing to do, but since I

didn't bring it up yesterday and maybe not -- you may not be able to, and we'll just see.

But, so, the order -- three -- these are the things that we need to do today. One is the -- we will have the closing arguments. And, the way the closing arguments work is that because the burden of proof is also on the Government, the Government gets to start and then to finish. And in between is the defense closing argument.

So we'll have really three chapters. Chapter 1 is the Government. Chapter 2 is the defense. Chapter 3 is the Government in rebuttal.

Now, both sides get the same amount of time, so the Government has to divide its share of the time between those two chapters. And the Government -- and the defense gets to go in the middle with all of its time.

So, the -- the Court has given both sides up to two hours, so that's four hours potentially of closing argument. And so, you can see that we're going to be listening to closing arguments for right up until at least noontime, although sometimes they won't take all of the time that's been allotted. We'll just have to see. It's up to them.

Then I give you the closing instructions of law and that will take -- well, you can see how long it is. It's about that long (Indicating). It's double-spaced. It probably will take -- I'm going to say 40 minutes for me to read that to

you. And that is the point in time when you get a -- you go to the law school, so to speak, and become educated on the points of law that pertain to this case.

So then in the jury room you put the law together with the evidentiary record. And the question is always: Has the Government carried its burden of proof?

So, that's the drill. Now, I again want to come back to the point about staying all day, or at least past 1:00. But, when you take your first break, you might want to consult about that and see how long past 1:00 you can stay today.

If the answer is you made other plans, then that's fine. We can live with that. But you might think about tomorrow, and the next day, if need be, to stay later. Usually the juries like to stay later when they get into deliberations. And I made an error yesterday by not mentioning that to you in advance, so I apologize for that oversight.

One short admonition to you before we start with the closings now, and that is I want to make a comment about the -- what is called readbacks, and the fact that you will not have a transcript of the testimony in the jury room.

I think I mentioned this earlier, but these court reporters, they take it down, but it is not going to be in the jury room. That's for a different purpose. And, that's why you take notes and so forth.

But you are entitled, if you ask for a readback of any

particular testimony when you are in your deliberations to, for example, say "What did Witness X say about subject ABC," then we will try to figure that out for you, and bring you back in here and read back that exact same testimony if that's what you wanted.

So you don't have the transcript, but do you have the ability to ask for what's called a readback. It's not necessarily easy to do, and sometimes it takes some time for us to prepare a readback. So, keep that in mind.

Now, remember when we started the case, I said to you that not one word that a lawyer ever says in the courtroom is evidence, and the same is true for anybody acting as their own attorney. For both sides, the lawyer, as well as someone acting as their own attorney, not one word they ever say in the courtroom is evidence.

And, the evidence is what comes from the witness stand under oath, subject to cross-examination, and the documents that get received into evidence. So, I want you to remember that.

And, in the closing arguments, neither side may inject or -- neither side is supposed to inject any facts not supported by the evidentiary record at trial. And it is your duty as is the jury to remember what was testified to at trial, and the things placed into the evidentiary record.

And if an argument is made in closing that you think goes

beyond the evidentiary record or any reasonable inference from the evidentiary record, it is your duty to discount the argument accordingly.

I have found in my experience that juries are very good as a whole, 12 people as a whole, very good at remembering what was said and what was not said by the witnesses. And it's enough for me to remind you as we start out here that all fact-based points must be in the evidentiary record to count, and otherwise must be discounted.

Again, I remind you about your right to -- if you're uncertain on a point like that, to ask for a readback.

All right. At this time, on behalf of the United States, Robin Harris will begin the closing argument.

**CLOSING ARGUMENT**

**BY MS. HARRIS:**

Good morning, ladies and gentlemen. This is a very, very simple case about a con man who schemed to steal works of art that were owned by Rose Long, Walter Maibaum and others. But what Luke Brugnara did wasn't just underhanded and despicable, it was a series of federal crimes.

The defendant exploited Rose Long and he defrauded her with false promises. He told her that he would buy five crates of art and he would put them in his museum. He lied about having the money to buy the art; he lied about intending to buy the art.

**MR. BRUGNARA:** Objection, Your Honor.

**MS. HARRIS:** And he lied about --

**MR. BRUGNARA:** Objection, Your Honor. Misstates the evidence.

**THE COURT:** All right. The -- the objection is overruled. This is a reasonable -- it's up to the jury to decide whether or not it is a reasonable inference from the evidence. But this is argument. And, if the argument -- if the jury find that the argument is reasonably based in the evidence, then it is a permissible argument. So it's up to the jury to decide whether or not the evidence showed that the defendant lied.

Objection overruled. Please continue.

**MS. HARRIS:** Back to where I was, ladies and gentlemen. And I'm going to walk you through the evidence that supports each of the Government's contentions here. It's all supported by the evidence around the witnesses that you heard.

But let me take you through it now. He lied about having the money to pay for the art. He lied about intending to pay for the art. And he lied about having a museum to put the art in.

He also, after he lied to get the art delivered to his home at 224 Sea Cliff, which as you know from Rose Long's testimony she thought was his museum, he then made the

preposterous, outrageous, outlandish claim that Rose Long had given him the art as a gift.

He also lied to this art -- this Court under oath by falsely claiming that he had sent an email to Sotheby's and --

**MR. BRUGNARA:** Objection, Your Honor.

**MS. HARRIS:** And Sotheby's had responded and advised that --

**THE COURT:** Wait. What is the objection?

**MR. BRUGNARA:** She said that I lied. That is absolutely not in evidence. Under oath. It's false.

**THE COURT:** Well, it's up to the jury to decide whether or not there is a -- the evidence supports that -- that contention. And, if it's a reasonable inference from the evidence, then the jury can draw that conclusion. And the jury could draw the opposite conclusion. That is up to the jury to decide.

So, that objection is overruled.

**MS. HARRIS:** I'm sorry, ladies and gentlemen.

In a few minutes I'm going to read you the defendant's actual testimony under oath, and then I'm going to show you the proof the Government brought before you in court to show you how that was a lie under oath.

But right now I'm just giving you an overview of what the evidence showed. It showed that he lied when he said he was going pay for the art. He never intended to pay for the art.

It shows he lied when he said he had a museum to house the art. He had no museum. He came into this court, he lied under oath about sending an email to Sotheby's and having it responded to by telling him from Sotheby's that the art was fake. That never happened.

And then he made another lie, he expounded upon that, and he falsely claimed under oath that he had told Rose Long this lie about Sotheby's, and that he had done so before April 7, when the art was delivered. We have proven to you beyond a reasonable doubt that every word there was a lie, except that he sent an email.

Then, just as the walls were closing in on the defendant, and he was set to go to trial on February 26th, his day of reckoning, he engaged in his most brazen last-ditch effort to avoid this trial. He escaped this Court and was a fugitive on the run for almost a week until he was captured by the United States Marshals.

Even when Luke Brugnara was caught in Los Gatos, he didn't stop lying. He gave a false name to the arresting officers, he falsely identified himself as Glenn.

And then he lied --

**MR. BRUGNARA:** Objection, Your Honor.

**MS. HARRIS:** -- and said he was going to the gym.

**THE COURT:** What is the objection?

**MR. BRUGNARA:** Not in evidence.

**THE COURT:** Overruled.

**MS. HARRIS:** You will recall, and we will get to this when I talk about the defendant's lies when he was arrested, you will recall that Agent Ioyagi testified that he was present at the arrest, and when the Defendant was asked to give his name, he falsely identified himself as Glenn, and he lied and said he was going to the gym. We'll talk about that in a little bit.

The evidence of the defendant's guilt in this case is absolutely overwhelming. He has convicted himself with his own emails, his own text messages, his own false statements under oath. And we have presented you with everything you need to convict him on all counts, including videotape of his escape from this building and his sprint through the Tenderloin.

Now let's talk about where the case really began. You will recall Rose Long testified that she met the defendant not in person, but had contact with the defendant ten years ago when she sold him a Renoir painting. That deal went well. He paid a deposit up front, and then later made good on the full $500,000 that the painting cost.

However, the intervening ten years, the defendant was a broken person, financially. As you now know, he has been convicted of multiple federal felonies.

**MR. BRUGNARA:** Objection, Your Honor.

**MS. HARRIS:** Those are in evidence before you as Exhibits 290 and 291.

**THE COURT:** I'm sorry? What's the objection? What is the objection?

**MR. BRUGNARA:** That's only in the context of credit, did you say?

**MS. HARRIS:** The defendant has --

**THE COURT:** The objection is overruled.

**MS. HARRIS:** As I was saying, the defendant has been convicted of multiple federal felonies. You have those federal felonies in evidence before you. They are Government Exhibits 290 and 291. By his own admission, he is a broken man financially. His felon status has made it impossible --

**MR. BRUGNARA:** Objection, Your Honor. I never stated that.

**MS. HARRIS:** We'll get to the defendant's statements in a minute, ladies and gentlemen.

**THE WITNESS:** Okay.

**THE COURT:** Objection overruled.

**MR. BRUGNARA:** Your Honor, you already said that was an admission solely for the purposes of credit, and was pertaining to January, 2013. Now you're expanding the scope of that? She said --

**THE COURT:** The Government did -- the Government's closing argument did put it in the -- those convictions in the

context of creditworthiness at the time in question. That is the way Ms. Harris just used it. And that is the purpose for which it was admitted --

**MR. BRUGNARA:** Well, that's not what she said. She said "a broken man." I've never been a broken man, and it's never impeded or affected my credit.

**MS. HARRIS:** Ladies and gentlemen --

**THE COURT:** The Government's closing argument is proper. Your objection is overruled.

**MS. HARRIS:** Please bear with me as I try to present you with the evidence you actually heard in court. And as Judge Alsup has instructed you repeatedly, nothing that the defendant says that wasn't under oath in this courtroom or admitted into evidence by stipulation is evidence before you, including what was just spoken.

So let's get to the defendant's financial situation. He is a broken man, financially. His own sworn statements to the United States Probation Officer proved that. And, I'm going to talk to you about some of those statements right now.

You have in evidence Government Exhibit 10. And I'm going to show you that right now.

(Document displayed)

**MS. HARRIS:** I particularly want to call your attention to Government Exhibit 10. And one of the reasons it's so significant is Government Exhibit 10 was signed and

submitted by the defendant under penalty of false statement on April 7, 2014.

As you will recall from the evidence that was presented to you, April 7, 2014 is the milestone date in this case. That is also the same day that Rose Long showed up at his house and the same day that the art was delivered. So this is the defendant's own words about his financial condition.

First thing I want to call your attention to is the phone number on Page 1. Because this phone number is important, and I'm going to be talking about that a little bit later (Indicating).

The defendant always identifies both his home phone and his cell phone number as is (415)871-8011. You will see that on multiple exhibits that are in evidence, but I'm calling your attention to it now just so you know that this is on his sworn statement as his home and cell phone.

(Document displayed)

**MS. HARRIS:** Let's look at Page 2. This is also on April 7, the defendant's own words, his own sworn statement about his financial picture. Nothing. He has nothing. He has no gross salary (Indicating), he has no take-home pay, he has no commissions. He has zero.

(Document displayed)

**MS. HARRIS:** His spouse also has zero. Not one spot of income or assets. And this is on April 7, 2014, at the

same time that he has committed to buy $11 million worth of art from Rose Long.

Let's also look at what defendant says about bank accounts. His own bank account, Luke Brugnara, his checking account, he, under oath, says he has $100. Brugnara Properties VI, under oath, he says has $200. And then we have a Wells Fargo account in name of his wife, with $100. So his sum total of cash on hand is $400 on April 7, 2014.

(Document displayed)

**MS. HARRIS:** Let's also look at what the defendant says about any real estate that he has in the last six years. Question No. 49 (As read):

"Have you sold or transferred any property..."

And that's any property.

"...including real estate or personal property, during the past 6 years?"

Answer:

"No."

Ladies and gentlemen, all of that testimony that you heard -- and we'll talk about that in a little bit -- of the lenders that the defendant called and took on a trip down Memory Lane in the past six years, the defendant has not sold or transferred any property. That was all completely irrelevant to this case right now.

**MR. BRUGNARA:** Your Honor, objection. Misstates the

evidence.

**THE COURT:** Overruled.

**MR. BRUGNARA:** Misstates the evidence. She just misstated the evidence of the lenders. None of them --

**MS. HARRIS:** Then, ladies and gentlemen --

**THE COURT:** Overruled, Mr. Brugnara.

(Off-the-Record discussion between Defendant and Counsel)

**MS. HARRIS:** -- you will see that the defendant certifies under oath on April 7, 2014, the exact same day that the $11 million worth of art is delivered, that every word in Government's Exhibit 10 is true.

(Document taken off display)

**MS. HARRIS:** You also have in evidence the defendant's narrative about his financial condition. That's Government Exhibit 11. And the defendant has done you the favor of explaining in his own words what his financial situation is.

Thank you.

You will recall that Jennifer James, the defendant's Probation Officer for all of 2013 and January of 2014 testified about Government Exhibit 11.

What this exhibit was and is, is the Defendant's own words that he had ghost-written and set up for Jennifer James' signature, and asked her to file with the Court. She did not do so, but this is a representation of what the Defendant --

**MR. BRUGNARA:** Objection, Your Honor, misstates the evidence. Jennifer James said it was never ghost-written. Jennifer James says it was given to her as a template for reference.

**THE COURT:** This is a proper argument, based on the evidence. Overruled.

**MS. HARRIS:** Anyway, ladies and gentlemen, let me get back to Government Exhibit 10. This was drafted by the defendant, and set up for his Probation Officer's signature. It was what he wanted to convey to the Court about his financial picture.

And let's look at what the defendant says. He says his current financial condition -- and there's a big heading, "CURRENT FINANCIAL CONDITION" (As read):

"The house which Luke Brugnara resides in is currently under foreclosure...and is scheduled for foreclosure June 3rd, 2013. No payments have been made on this loan for excess of three years."

He then goes on later, and this is under the Current Financial Condition:

"Luke Brugnara has calculated his net worth as zero, based upon no assets and some pending liabilities. His wife Kay has no assets either, and has borrowed money from friends and family to pay basic living expenses for their family."

Then let's listen to what his summary is:

"In summary, Luke Brugnara's current financial condition is indigent status: Zero net worth. Luke Brugnara has no ability whatsoever to pay any restitution amount and has a legal and moral duty to provide for his four children."

He also describes his situation with his lenders in his conclusion:

"Luke Brugnara has been blackballed and prohibited from continuing his prior profession due to his felon status. Without this access to capital, Luke Brugnara has no future in the financial industry."

And then this is key:

"Luke Brugnara's future employment will likely be as a coach or other instructor of some sort, to pass on...knowledge to others."

And he says also, and this is Luke's writing:

"Luke has stated that he may either try to seek employment as track and field coach, since e works well with youths and is knowledgeable about athletics."

You might wonder as you listen to this how an unemployed track and field coach could afford $11 million worth of art on April 7, 2014.

You don't have to take Luke Brugnara's own sworn word for

how financially destitute he was in April of 2014. His Russian girlfriend testified to the same in the videotaped deposition that you listened to. We played parts of that deposition for you.

**MR. BRUGNARA:** Objection, Your Honor.

**MS. HARRIS:** In court --

**MR. BRUGNARA:** Not in evidence; gratuitous statement.

**MS. HARRIS:** And as you recall, Ms. Schlyapina --

**THE COURT:** I'm sorry --

**MR. BRUGNARA:** Gratuitous statement, not in evidence.

**THE COURT:** Overruled.

**MS. HARRIS:** Ms. Schlyapina testified that she was involved in a romantic relationship with the defendant in 2014. And she confirmed that the defendant had no money and no job.

You also saw pictures of what the defendant's house looked like in 2014. That's Government Exhibit 106A. The house was in total disrepair. There were piles of rubbish everywhere, and no artwork.

None of this is known to Rose Long. Enter Rose Long, in early 2014. She's had no contact with the defendant since she sold him a Picasso in either 2005 or 2006. And she knows nothing about his reversal of fortune. Remember, she testified that she was looking to downsize her art collection. And she recalled that she had done business with Luke Brugnara

some almost decade earlier, and out of the blue decides to make a phone call to him. This phone call started this entire fraud that you have listened to. An opportunity to commit fraud has just fallen into the defendant's lap.

After this first phone call that Rose Long made some time in early 2014, all of the subsequent contact between the defendant from March 22, 2014, through April 7, the day of the delivery of the artwork, all of that was by email.

**MR. BRUGNARA:** Objection, Your Honor.

**MS. HARRIS:** We have proven that to you.

**MR. BRUGNARA:** Objection, Your Honor. Objection, Your Honor, misstates the evidence.

**THE COURT:** What is the --

**MR. BRUGNARA:** Rose Long said there was many calls. Objection, Your Honor; misstating the evidence.

**MS. HARRIS:** I'm going to show you the phone records later.

**MR. BRUGNARA:** Objection, your Honor. Would you like to see the transcript, your Honor? Misstates the evidence.

**THE COURT:** This is a point you may make on your closing argument.

**MR. BRUGNARA:** Well, she just misstated --

**THE COURT:** Objection overruled.

(Multiple speakers)

**MR. BRUGNARA:** -- transcript, evidence saying that

there weren't phone calls.

**MS. HARRIS:** Ladies and gentlemen, as you know, nothing Mr. Brugnara says is evidence. What Rose Long says is evidence. Rose Long took an oath and swore before you. And she clarified that the phone call she was referring to during this time period were phone calls between herself and Walter Maibaum, not herself and the Defendant.

And Rose Long's testimony under oath in that witness chair (Indicating) --

**MR. BRUGNARA:** Objection, your Honor. Misstates the evidence.

**MS. HARRIS:** -- is corroborated --

**THE COURT:** What is the objection?

**MR. BRUGNARA:** The objection is she's stating false evidence to the jury, and she can't misstate the transcribed record.

**THE COURT:** The -- the objection is overruled.

Continue.

**MS. HARRIS:** Ladies and gentlemen, as you can hear, these objections are being overruled. And I am presenting to you the Government's argument about what the evidence --

**MR. BRUGNARA:** (Inaudible) transcript, your Honor.

**MS. HARRIS:** -- is for you. Rose Long testified that the telephone contact that she was referring to were telephone calls between herself and Walter Maibaum to discuss pricing of

art and whatnot. All of the contact between the defendant, Luke Brugnara, the man on trial, and Rose Long was by email.

And you don't just have to take Rose Long's word for it. We have the phone records in evidence. That is Government Exhibit 287.

The reason I read you the defendant's phone number off of Government's Exhibit 10 -- and you will see that on many other exhibits including Exhibit 77, the Tigers waybill -- is because you have his phone records in evidence. You don't have to take Rose Long's word for it. We have given you the phone records that corroborate what she is saying. All of their contact was by email.

And, let me remind you of Rose Long's phone number, if you want to double-check. Her testimony is that her -- and this is also in evidence, and confirmed by Exhibits 73, 74 and 77.

Rose Long's cell phone number is (901)270-6632. And she also gave you her home phone number, (212)628-2189. On Government Exhibit 287, the phone records, you will not see a single phone call between March 22 and April 7, between Rose Long and the defendant. Those phone records prove to you that she was telling the truth. And any suggestion to the contrary is not in evidence.

On April 7, the day the art is delivered, of course there are phone calls. But all of the email correspondence between them up until the time that the art was delivered, that was

all done by email.

You also heard testimony about the artwork and the value that it had to Ms. Long, Walter Maibaum and others. Rose Long, herself, paid $350,000 for the George Luks painting. Mr. Maibaum spent a great deal of time talking to you about the provenance of the Little Dancer, the sculpture that's now missing, and the value of the Valsuani casts that were found. This is not from the original Degas casting, but was discovered later. You will recall that testimony and the value and importance Mr. Maibaum put on that statue.

But now let's talk about the fraud. The fraud is established by the emails. And the first thing I want to say to you about this is -- and you're going to get a jury instruction on this -- there is no written contract necessary to convict the defendant of mail fraud and wire fraud. No written contract.

If you start hearing something about there was no contract, you're going to get a jury instruction that explains to you this is not a breach-of-contract case. We are not in the civil court of law. This is a criminal fraud case. And the Government does not need to prove that there was a contract. That's Jury Instruction No. 32, and I'll just read you a portion of it now. The Judge is going read it to you later.

But, please keep it in mind, should you be hearing later

in somebody else's closing argument that there was no contract. This is what the Judge is going to instruct you on the law (As read):

"To prove wire or mail fraud, the Government need not prove that a contract was signed or formed. If the Government proves all of the elements of wire or mail fraud, it need not go further to prove that a contractual relationship existed. Nor is it necessary for the government to prove a breach of any contract."

And there's a very simple reason for that. The defendant's intent was to defraud, and Ms. Long's intent was a legitimate art transaction. Of course, there was no contract.

The emails back and forth, all of which we have put into evidence for you, show that Rose Long is trying to clarify what the defendant wanted to buy. In Government Exhibit 57 she sends an email saying what -- "What other pieces do you have in your collection?" That is the defendant asking Ms. Long. And Rose Long lists all of the pieces she has available. That's Government Exhibit 58.

Now let's turn to Government Exhibit 59. And this is the first count in the indictment. I'll talk more about that when we talk about the indictment.

(Document displayed)

**MS. HARRIS:** This is Count 1 of the indictment. And

the defendant is charged with wire fraud for this email. But, look at what he says to Ms. Long on Sunday, March 23, 2014 (As read):

> "Rose, I will buy all of the paintings and put them in my museum. I will need a discounted price. You will need to send the paintings to me at 26th Sea Cliff Avenue, so I can inspect them. Luke."

Think about this. "Rose, I will buy all the paintings." You saw his financial statement. He has no money. Zero, zero, zero. He has no assets, no real estate, and his house at Sea Cliff, by his own admission in Government Exhibit 10, is $3 million under water.

"Rose, I will buy all the paintings and put them in my museum." Flat-out lie. He was not going to buy those paintings, and he had no museum to put them in.

(Document taken off display)

**MS. HARRIS:** Rose Long then asked the defendant to clarify what pieces the defendant wants to buy. She's not sure. Remember, she testified that she thought he might only be referring to the de Koonings, and so she sends a clarifying email, you know, "What is it that you're interested in?" That's Government Exhibit 60.

Now, let's look at what the defendant does, because he commits another wire fraud when he responds. This is Government Exhibit 61. It is also Count 2 of the indictment.

(Document displayed)

(Document taken off display)

**MS. HARRIS:** I apologize, ladies and gentlemen. It's Government Exhibit 61, which is Count 2 of the indictment. And, in Government Exhibit 61, which I'll show you when we talk about the indictment, the defendant clarifies and he says, quote (As read):

"I mean all the art pieces...including the etchings and the bronzes. I need you to send everything to me."

That's Count 2 of the indictment.

(Document displayed)

**MS. HARRIS:** As you can see, ladies and gentlemen, he is driving this deal. He is driving this fraud and he is trying to get more and more art under his control. "Send me everything."

Then the defendant tells another lie to induce Rose Long to send the art. This is Count 3 of the indictment, and it's Exhibit 69.

(Document displayed)

**MS. HARRIS:** Here comes the whopper about the museum:

"Thank you. I look forward to putting them in my museum."

We'll talk about the museum or the lack of a museum in a minute.

(Document taken off display)

**MS. HARRIS:** There's another sign that Luke Brugnara is staging a massive con. He refuses to make a deposit for the art, and he insists that it be shipped to him without paying for any shipping and crating, even though in his prior transaction with Rose Long, he has agreed to pay a deposit.

Of course he has no intention for paying for this art, he's not going to pay a cent for a deposit, and he has no money. So the stage is set for the con.

Let's talk a little bit about the museum. Rose Long and Walter Maibaum both testified about why the museum was so important to them. As an art lover and someone who is in the art business, this was a very seductive inducement to them. They both testified that it was important, so that the public could enjoy these beautiful works of art.

And in fact, Luke Brugnara negotiated a discount in price based on his false promise that he would put this artwork in a museum. But the mention of a museum and the false promise from the defendant about a museum made the transaction seem more legitimate to Rose Long and Walter Maibaum, and it also played to their psyche as lovers of art and people who wanted the world to see pieces like the Valsuani Degas Little Dancer, which unfortunately you have not been able to see in person because it was stolen.

Rose Long's testimony is corroborated by the emails which

we have gone through in this trial, and some of which are charged counts in the indictment and the texts. The emails that I have just shown you and which you heard about during the testimony now show that Rose Long has an arrangement in place to ship the defendant all the art pieces.

Ladies and gentlemen, the fraud was complete here. This was enough for the Government to prove its case, because the defendant lied to Rose Long to get the art, by saying he would buy -- in other words, pay for the art, and he had no money and no intent to do so.

And, he told another lie. He was going to put it in his museum, which was an important fact to both Rose Long and Walter Maibaum, and induce them to part with the art and to discount the price. The fraud was complete here. He could have ended it right here. And he would still be guilty of Counts 1 through 5 in the indictment.

And, by the way, Count 5 is the mail fraud. And that relates to the American Airlines shipping of the crates. And I'll talk about that when we get to the indictment.

Five crates were shipped to the defendant's residence at 224 Sea Cliff Avenue, but Rose Long, of course, thought that they were being shipped to his museum. She thought that that was the address of the museum.

Let's talk about how we know that there were five crates that were shipped. We brought before you to testify the

people all along the delivery chain from, the person who packed the crates at the Cirkers warehouse and to the truck driver who personally delivered the crates to the defendant's residence on April 7th.

Something I do want to point out to you about all five of the witnesses who testified along the delivery chain is not one of them has is any stake in the outcome in this case. They are all just hard-working people doing right by their obligations, and right by society, who came in here and told you what they did to pack this art, to ship this art, and to deliver this art.

And let's recall what they said. First you heard from Warner Trejos. He was the gentleman who personally packed the art at Cirkers. And he had received an email from Walter Maibaum -- that's Government Exhibit 38 -- telling him to pack the Little Dancer from Mr. Maibaum's storeroom.

Mr. Trejos did something that turned out to be very important at this trial that he could hardly have imagined at the time that he did it would be important. He took a photograph of the Little Dancer in the crate. And that's Government Exhibit 109. Unfortunately, this is the last time anyone got to see the Little Dancer because as you know, after it was delivered to the defendant, it was stolen.

(Photograph displayed)

**MS. HARRIS:** Here's what the Little Dancer looked

like when Mr. Trejos packed it at the Cirkers warehouse in New York, along with the other four crates. This was one of the five crates that were packed and shipped to the defendant.

That's how we know that the missing crate contained the Little Dancer, which Rose Long and Walter Maibaum both testified was by far the most important and the single most valuable piece in the entire collection that was shipped to the defendant.

(Photograph taken off display)

**MS. HARRIS:** Warner Trejos did something else that was important. He measured the crates so that the dimensions are now established, and we know exactly what was stolen.

You also heard from Sean Benson. He was the witness who took the five crates from the Cirkers warehouse to Mack Cargo (Phonetic), and he signed the Tigers waybill which is in evidence as Government Exhibit 77. And that confirms the five crates.

Next you heard from the next person along the delivery chain, Gabe Pedreros, who picked up the five crates and brings them from the warehouse to American Airlines at John F. Kennedy Airport. This is confirmed by Mr. Pedreros' timesheets which are in evidence, and confirms five crates.

You heard from the American Airlines witness who confirmed that five crates were taken from John F. Kennedy Airport and loaded on the plane. By the way, that's also Count 5, the

mail fraud count in the indictment.

And then you heard from Eddy Castillo. He was the gentleman who picked up the five crates at San Francisco Airport and personally delivered them to the defendant's house at 224 Sea Cliff.

Mr. Trejos, the first person on the delivery line, the one who packed the Little Dancer and took the photograph that's Exhibit 109, testified under oath to you he was 100 percent certain there were five crates.

Eddy Castillo, the last person along the delivery line, testified to you he was 100 percent certain there were five crates delivered to the defendant. You will recall that Mr. Castillo also testified that the defendant personally helped Mr. Castillo push the five crates into the garage.

Okay, so now that the defendant has lied to Rose Long, and told her that he would buy $11 million worth of artwork, and he has gone so far as to negotiate a discount based on his lie that it was going to a museum, he now sets about figuring out how to best leverage the theft. And we presented you the evidence of what he did after he had lied to get the art. He lied to keep the art.

The first thing he did was he held onto the five crates of art, he basically held those crates of art as hostage in his garage. And he stalls for time, using his lawyer Bob Kane to do his bidding. The defendant needed to stall for time, and

he did so until he had enough time to steal the Degas sculpture outright, and he needed a few weeks to figure out what to do to make it vanish.

Let's talk about what his first move is while he's trying and going through the mental machinations of how he can best leverage the art that he now has as hostage in his garage. Rose Long is in San Francisco on April 7. She is ready and willing to inspect the art. She flies here to help the defendant unpack the art, and expects him to have his authenticator there.

But what does he do on April 7? He refuses to allow her to open the art. He does not have an authenticator present to inspect the art, and he basically shoos her out of his house, completely blows her off. That is what he does. Rose Long refuses to leave, and she extends her stay in San Francisco for weeks to try to resolve the situation.

The next move the defendant did was one of the more outrageous things you have seen in this trial. Let's look at the text messages he sent which are Government's Exhibit 79 and 80.

As you know from Rose Long's testimony, she is becoming frantic about all of this valuable art that she thought was going to be delivered to a museum instead being in the defendant's garage. And on April 9, the defendant --

(Document displayed)

**MS. HARRIS:** She tries to get ahold of the defendant and receives a text message back: "Sorry I'm busy. Call back later." And she sends the defendant a very long text message that's all in evidence for you, this is Government Exhibit 79, and she tells Mr. Brugnara that she is not leaving. She's very sorry that they didn't get to open the crates together. She looked forward to seeing his surprise at their beauty. She knows he's a very busy man.

But she never dreamed (As read):

> "...you would assume I wouldn't be a nervous wreck, leaving them in a garage; no matter your significance & wealth..."

Which of course we know is zero as of this time, but Ms. Long doesn't know that.

> "...No matter your significance & wealth, I was horrified and am still concerned about how quickly your expert will arrive to evaluate my works of art."

Of course, there was no expert, because the defendant never intended to inspect the works of art. He just intended to steal the works of art.

She asks:

> "Please, send me his name; during our 10 minutes with interruptions for one of your real-estate acquisitions..."

And she goes on and on. And she says:

"Next, by not letting me inspect the works of art, you are causing me breech (sic) of contract on any Claim, God, forbid!"

She says:

"I won't leave until I have your signed statement and written delivery."

And then she says:

"Please don't make this..."

Any -- any more difficult. As you can see, she is becoming frantic and desperate for what is about to become of the art.

And the defendant then sends an outrageous text back.

(Document displayed)

**MS. HARRIS:** Let's look together at what the defendant says to Rose Long (As read):

"Rose, you freely gave me these items April 7th because you said you were downsizing and wanted me to have them..."

"You freely gave me these gifts"? "You said you were downsizing"? Then he goes on and on about something with the Renoir, which Rose Long testified he had never said a word to her.

An then, he sends another text. That's Page 2 of Government Exhibit 80 (As read):

"Rose, I also need to inform you that your attorney

forwarded to my attorney invoices which were never given to me from you..."

"And he says:

"...as you gave me these items as a gift."

Have you ever heard of anything as ridiculous in your life? This is important not just because it's a lie, but because it's probative of the defendant's intent to defraud Rose Long.

Then he says:

"Notwithstanding you giving me the items as a gift..."

And he puts a price on them. He goes on and on in his text. And he says (As read):

"In short, the actual commercial value of the gift received, if they are what you state in your email to my attorney, is approximately 100,000 to 120,000 total. This is the gift valuation I will use for my records..."

Ladies and gentlemen, we know the art was worth a lot more than that. But the defendant has now set the floor that it's worth between 100,000 and $125,000.

(Document taken off display)

**MS. HARRIS:** Which, of course, he pays nothing on.

Rose Long's texts also refer to the defendant's belligerent behavior. You see that in Government Exhibit 79

and 80. And she says that he is acting belligerently toward her in the text. After sitting through this trial, do you have any doubt that her word choice was an understatement?

The next thing that happens after the defendant makes the outrageous and false claim that Rose Long has given him $11 million worth of art as a gift, she consults with the lawyer, Harvey Schochet.

Mr. Schochet is referred by the defendant to Bob Kane. And in their first telephone conversation, Harvey Schochet testified that Bob Kane implied that the defendant wanted something of value in exchange for returning the art. Harvey Schochet interpreted that as a ransom demand. He rejected the idea outright of Rose Long paying Luke Brugnara to get her own five crates of art back.

And then Mr. Kane is goes to a fallback position. He conveys Mr. Brugnara's false position that the art was a gift, and you see --

**MR. BRUGNARA:** Objection, Your Honor; she is misstating the testimony, not only from Kane but from Schochet.

**THE COURT:** Overruled, overruled.

**MS. HARRIS:** Ladies and gentlemen, you heard Harvey Schochet's testimony about the defendant attempting to ransom the art and you heard Mr. Kane's testimony about the emails back and forth.

Luke Brugnara is demanding a release before he will return the art. And you saw that Mr. Schochet and his partner, Allison Davis -- and you have all of the emails and draft affidavits in front of you as evidence -- are working over the weekend to try and resolve this situation. And multiple versions of the affidavit are sent back and forth. We put those in evidence for you.

But the important thing for you to remember is that Luke Brugnara redlined them. And, we know it's Mr. Brugnara making the changes in those affidavits for two reasons. Harvey Schochet testified that that's what Mr. Kane told him. And because the changes in the redlines are things that only Luke Brugnara could have known.

For example, if you check Exhibit 93, which is one of the draft affidavits, Mr. Brugnara inserts that the delivery driver was, quote, a Hispanic male. Two questions come to mind. Why would Mr. Brugnara even think that was necessary to insert? I don't know that we need to answer that, but you might wonder. And the second is: That was something only Mr. Brugnara would know.

Luke Brugnara makes an outrageous and in the series of affidavits, but he never, ever changes the number of crates. It's always five crates. After the initial clarification where Mr. Schochet sends an email to Mr. Kane trying to clarify the number, they confirm that it's five crates.

"They" being Mr. Kane and Mr. Brugnara. And that always remains the case. That is, until the defendant stole the Degas.

You will recall that on April 15, 2014, the last version of the draft affidavit before Mr. Brugnara steals the Degas has all of the redlining, but still has the number of crates as five.

Then we get to April 17. And I submit to you that the defendant stole or arranged to have the Degas missing some time between April 15th and April 17th. It's not necessary for your deliberations on this fraud, but that is what the evidence shows.

As of April 15th, Mr. Brugnara is still maintaining five crates of art were delivered in the affidavits. Suddenly on April 17, Mr. Kane, by way of email, Government Exhibit 100, tells Harvey Schochet there are only four crates. When five crates becomes four crates, that becomes a dealbreaker.

I also want to call your attention to a version of the affidavit that were downloaded from the defendant's phone after it was seized during the search warrant. We put those downloaded versions of the affidavit into evidence, and Agent Hadley testified about the folders that were located on the defendant's phone.

You'll note that in those versions of the affidavit, you can see the defendant's own handwritten changes where he

confirms that there were five crates delivered, and the "5" is his handwriting. That came straight from his phone.

Let's get to the defendant's next wire fraud. I've talked about Counts 1, 2 and 3 which are the wire-fraud lies to get the art, the lie about paying for the art, and the museum. And now let's look at the email that's Government Exhibit 95. This is Count 4 in the indictment.

(Document displayed)

**MS. HARRIS:** On April 15, 2014, Mr. Kane wrote to Harvey Schochet and his partner, Allison Davis (As read):

"Dear Harvey and Allison, Mr. Brugnara was not given a Hermitage Book or any authentication documents."

Ladies and gentlemen, this is a flat-out lie. And I'm going to show you how the Government proved that in this trial, and explain to you why it's important.

(Document taken off display)

**MS. HARRIS:** Government's Exhibit 5 is the very Hermitage book that the defendant lied and said he never received. The proof in this trial was that Rose Long gave this book, Government Exhibit 5, to Luke Brugnara at his house on April 7th. And Rose Long explained why she did that. She gave this book to Luke Brugnara because he had agreed to buy the Degas Little Dancer which was featured in the exhibition at the Hermitage.

And let me show you the book. First of all, some of the

book -- most of it is written in Russian. But as soon as you turn it over you can see that it was the catalog -- and this is all in English -- for the exhibition, the State Hermitage Museum in St. Petersburg, from December of 2013 to February, 2014.

And Ms. Long explained why she had given this to the defendant. It was a Valsuani Degas. The same Degas that was being sold to Mr. Brugnara, the Valsuani Degas, was the Degas that was exhibited at the Hermitage Museum. And she thought that this would be an important piece of material for Mr. Brugnara to have, since he was buying the Valsuani Little Dancer.

Mr. Brugnara flat-out lied and said he was never given this book. And not only do we know it was false because of Rose Long's testimony, but we know exactly what he did with the book after he was given it by Rose Long. He gave it to his Russian mistress --

**MR. BRUGNARA:** Objection, Your Honor.

**MS. HARRIS:** -- Ms. Schlyapina, who testified during trial.

**MR. BRUGNARA:** Objection, Your Honor, misstatements, not on record.

**THE COURT:** Overruled.

**MR. BRUGNARA:** Overruled?

**THE COURT:** Overruled.

**MR. BRUGNARA:** Hm.

**MS. HARRIS:** You'll recall that Ms. Schlyapina testified that she had a romantic relationship with the defendant. In fact, it was at the very time that this art transaction was supposed to be taking place. And that the defendant gave her Government Exhibit 5 as a present. She talked about it in the videotaped deposition that we played for you.

So Rose Long's testimony is corroborated by the Defendant's own girlfriend. Not only do we know that Rose Long gave it to the defendant, but we know exactly what he did. He gave it to Ms. Schlyapina. And now we know why he did it.

The reason the defendant lied, I submit, about receiving the Hermitage book which we have proven he did receive, the reason he lied was for two reasons. This book is very important in this trial because it was about the very sculpture that was delivered to the defendant.

And he lied about receiving the book in Exhibit 95, the email, because he had disposed of the Degas, and now he needed to get rid of the evidence, the book, Exhibit 5, because he knew that it would incriminate him in having received the Degas sculpture.

In other words, there would be no reason for the defendant to have possession of Government Exhibit 5 unless he had

actually received the Degas sculpture.

So he gets rid of the incriminating evidence by giving it to his Russian girlfriend. You heard her testimony that her visa was about to expire, and she would be leaving for Russia shortly. And she was given the book by the defendant. That's Count 4 in the indictment. The false lie about receiving the Hermitage book. And we have proved up to you that it was a lie, and we've also proved up to you why he lied about it.

Let's talk a little bit about the Little Dancer. As you know, Walter Maibaum and Rose Long testified that this was the most important and valuable piece of art that was shipped. We know that it vanished after it was delivered to the defendant, because Eddy Castillo testified that he delivered five crates of art and placed them in the defendant's garage. And by the time the FBI had obtained a search warrant, it was gone.

As I suggested to you before, it was probably stolen between April 15 and April 17 of 2014, but it doesn't really matter when the defendant stole it. Because the fraud in this case was complete when the art was shipped. He is not charged with stealing the Degas, although I submit to you that is what he did.

He is charged with the false statements, Counts 1, 2, 3, 4, and 5. The fraud is that he lied about buying the art, he lied about intending to buy the art, and he lied about having a museum.

But the theft of the Degas is probative because it shows that it was Luke Brugnara's intent to defraud. And it shows that he was not negotiating when he was using Bob Kane. He was not negotiating to return the art, but he was negotiating to buy time to steal the Degas.

Now let's talk about how the Government proved up the lies. First, the defendant had no money. We talked about that a little bit. His own financial statement the day the art was delivered, Exhibit 10, his own written statement to the U.S. Probation office, Exhibit 11. His own girlfriend's testimony under oath, Ms. Schylapina. The defendant is unemployed and has no money.

And by the way, that deposition is taken at -- shortly after the case was charged and the defendant had given her Exhibit 5.

And then, the defendant's own witnesses testified about all the deals they did with the defendant, years ago. The defendant confirmed that, in Exhibit 10. In the past six years, he confirmed no deals for any real property.

Mr. Crossley, a defense witness, testified that the defendant did not own any of the buildings that were being testified to by 2014, which is the time period of this case. That's the no-money part of the lie.

Now let's talk about the no-museum part of the lie. We know he didn't have a museum because he had Rose Long ship the

art to his residence. But he did a little bit more than that. He falsely implied to Rose Long that 224 Sea Cliff was his museum. Rose Long sent the defendant an email, it's Government Exhibit 71. And in the email, she asked the defendant to recommend a hotel. She says, quote, "Which hotel is closest to the museum?"

Rose Long also sends an email asking for the exact museum address and hours of operation, and any time limits on the driver's delivery to the museum. All of these emails are in evidence for you. And the defendant responds with, quote, "There is a fairly wide straight street." He omits that this is his home, not a museum. And he misled Rose Long into believing that 224 Sea Cliff was his museum.

I want to talk about another piece of proof that the Government gave you about the fact that there is no museum. This comes from the defendant's own statements. The defendant stated -- and we've put this into evidence, this is Government Exhibit 200. This is one of the statements of the defendant that is actually in evidence, unlike most of what the Judge -- what Judge Alsup instructed you that is not in evidence that came from the defendant's mouth, this is in evidence, and you may consider it. This is Government's Exhibit 200.

And the defendant stated, and this is during testimony on June 18, 2014, quote, Nick Barbato would confirm the museum financing.

Ladies and gentlemen, the Government called Nick Barbato as a witness in this trial. And Mr. Barbato confirmed just the opposite.

**MR. BRUGNARA:** Misstates evidence, your Honor.

**MS. HARRIS:** Let's talk about Mr. Barbato's testimony.

**MR. BRUGNARA:** Misstates the evidence.

**THE COURT:** Overruled. Please continue.

**MS. HARRIS:** As you can hear, the objection was overruled.

Let's now talk about Mr. Barbato's testimony during this trial. Mr. Barbato testified that he closed loans for the defendant in 1997 and 1998. He testified that none of these loans involved financing for a museum. He further testified that he had no dealings with the defendant until 2013 or 2014, after the defendant got out of prison.

Mr. Barbato confirmed that the defendant's felonies affected his creditworthiness. He said they were not a showstopper, but the defendant would have to get partners, which the defendant, himself, reiterated he never did, during his cross-examination of Mr. Barbato.

Mr. Barbato further testified that he never closed any loan for the defendant in 2013 or 2014. He amplified on that. He said he was never close to closing any loan for the defendant in 2013 or '14.

Mr. Barbato testified that he would never do a loan for someone with no assets, no income, and no partner, which basically described the defendant to a T. Mr. Barbato also said that he and the defendant never discussed financing a museum in Las Vegas or anywhere, that he was not involved with financing a museum for Luke Brugnara --

**MR. BRUGNARA:** Your Honor, misstates testimony, Nick Barbato. I have it right here (Indicating).

**MS. HARRIS:** And then Mr. Barbato's final --

**MR. BRUGNARA:** (Inaudible)

**THE COURT:** Objection overruled. If you feel that it's been misrepresented, you can quote from the transcript --

**MR. BRUGNARA:** Oh, okay. That's fine. I'll do that.

**THE COURT:** -- during your time.

**MS. HARRIS:** Actually, I will quote for you, ladies and gentlemen, from the transcript of Mr. Barbato.

Mr. Barbato testified, and this was during cross-examination during questioning by the defendant, Mr. Barbato testified, quote, he would have a better chance of successfully doing brain surgery than placing a museum loan for Luke Brugnara.

That's what Mr. Barbato's testimony was. So the man that the defendant put before this Court as someone who would confirm the museum testified to you there was no museum, no deal to do a museum, and he would have a better chance of

doing brain surgery than doing a museum loan for the defendant.

That's the proof that there was no museum.

The defendant doubled down in this case and that is a recurring theme. He doubled down on the fraud he's already committed and he started lying about it under oath in court. He's charged with that, too. That's Counts 6 and 7 of the indictment.

And I would ask you as we go through the proof on his false statements under oath to consider this: If the defendant hadn't committed fraud against Rose Long, which of course he did, there would have been no reason for him to lie under oath about it.

So not only are these crimes in and of themselves that you will be deliberating on and that he's charged with, but they're also proof of a fraud he committed in Counts 1 through 5.

In other words, once he had lied and defrauded Rose Long, now that he's testifying under oath, he had to lie about it because he had defrauded her. If he hadn't committed fraud, there would have been no reason for him to lie.

Okay, let's talk about what the lies were under oath. Exhibit 155 is the actual false testimony. And I'm going to read that to you in a little bit. But essentially what the defendant testified to was that on April 3rd, 2014, he sent an

email to Sotheby's. That is true. That is in evidence and it it's Government Exhibit 81. However, every piece after that is false.

The email was sent to Tobias Meyer. You heard testimony from the Sotheby's witnesses that Tobias Meyer left Sotheby's in November of 2013. You also heard testimony that as of April 3rd, 2014, the day of the email, only two people had access to Tobias Meyer's email account. Those two people were Alex Rotter and Gail Skelly, and they both testified in this trial. Alex Rotter testified that he didn't know he had access to the account until June of 2014, long after the April 7 delivery of the art. And Gail Skelly testified that she stopped checking Tobias Meyer's email account in December or January.

You also heard from the head of Sotheby's, Dwayne Kurzrok. And he testified that the email, Government Exhibit 81, was in an unread state. Luke Brugnara never heard back from anyone because no one at Sotheby's ever opened the email.

But let's take a look at his false testimony. This is Government Exhibit 155.

(Document displayed)

**MS. HARRIS:** This is the testimony under oath of Luke Brugnara on June 17, 2014. And you also have in evidence Mr. Brugnara taking the oath; that's Government Exhibit 158. I'm not going to read you that now, but I refer you to that,

should you need it.

Here are the questions and answers.

(Document displayed)

**MS. HARRIS:** (As read)

"QUESTION: Okay. So after you wrote Ms. Long this email, the discussion sort of transitions into when she was going to ship the art pieces to Sea Cliff, is that correct?

Mr. Brugnara's answer:

"No.

"QUESTION: Okay."

Here is Mr. Brugnara's answer:

"I took the emails that I got from her, and I sent them to the head of Sotheby's in New York, who is also the head of Bond Street and London, and I asked, what's the value or -- I don't have the specific email in front of me, but the essence of it was, quote, how much would you sell these for, and what are they worth? Just a simple valuation inquiry."

Now listen to this. This is what Mr. Brugnara testifies under oath:

"And I heard back the de Koonings are not authentic and they would not sell them as de Koonings, and the Degas -- they would not sell the Degas because it's not authentic, was cast 12 years ago, 14 years.

Whenever it was cast, it was cast recently. However, they do sell the original Degases."

A flat-out lie. No one at Sotheby's ever opened the email. Tobias Meyer, to whom it was directed, had left Sotheby's in November of 2013. The email sat in an unread state.

Then the defendant amplifies on his lie, and this is the second charge, this is Count 7 in the indictment.

"So when I had that information, I phoned Rose Long, and I told Rose Long that, you know, these de Koonings are not authentic.

"QUESTION: Was that before she made arrangements for those to be shipped to Sea Cliff?

"ANSWER: That was before."

Flat-out lie. The email is April 13, 2014. The art is shipped and delivered -- delivered on April 7, 2014. And Government Exhibit 287, the phone records, show absolutely no phone contact between the two of them. None, whatsoever.

We have proven to you beyond a reasonable doubt that every word there was a lie.

(Document taken off display)

**MS. HARRIS:** We also proved to you that the defendant lied under oath, because Rose Long testified that defendant never told her this, and that he never questioned the authenticity of the art until after it was delivered and he

had falsely claimed it was a gift. Rose Long is corroborated by Exhibit 287, the phone records.

And the defendant's false statements to this Court under oath are also proof of the wire and mail fraud counts. His shifting explanations to this Court under oath were an attempt to justify the unjustifiable. He had lied to get the art, he had lied to keep the art, and then he lied to this Court under oath.

Now as you know, this case was originally set for trial on February 26, 2015. We put into evidence the trial setting dates. The walls are closing in on Luke Brugnara. Now that you have heard all the evidence in this case, you can understand why he wanted to run.

He has been furloughed to the custody of his attorney. That attorney testified in the defendant's case-in-chief. You have the furlough documents in evidence. They're Government Exhibit 136 and 137.

The terms of the furlough are totally clear. The defendant may not leave the federal building. The defendant can only be in the lockup facility on the 20th Floor and the attorneys' lounge on the 18th Floor, and the elevator in between. The defendant is not allowed to possess or use a phone. You can read the order, yourself. We've read a lot of it into evidence.

Now let's turn to what happened on February 5th, 2015.

We showed you the video of the defendant on the 18th Floor. We showed you the video of the defendant in the lobby of the federal building, walking purposefully, yet unobtrusively out of the building. We showed you the video of the defendant in full sprint on Willow Street. And we are going to show you that again in a few moments.

We showed you the video of the defendant resting at the British Motorcars after he had exhausted himself with his breakaway sprint. And we presented testimony that the defendant called another one of his former mistresses --

**MR. BRUGNARA:** Objection, Your Honor.

**MS. HARRIS:** -- and asked her to pick him up in San Francisco.

**MR. BRUGNARA:** (Inaudible) testimony, reflection of the testimony.

**THE COURT:** This is argument. It's a proper argument. Overruled.

**MS. HARRIS:** We also presented you with testimony that the very first day after Ms. Record picked the defendant up in San Francisco, he directed her to buy him a phone at Radio Shack, and went with her while she did it, although he waited in the car for obvious reasons. So he's charged with escape.

And let's talk about the escape. That has been proven to you six ways to Sunday. You've seen the videotape -- and

you'll have it in evidence -- of the defendant pushing the down button and purposefully and willfully walking out of this building.

Then he broke into a sprint, and arranged for his mistress Abidja Record to pick him up in San Francisco and harbor him for six days in Los Gatos. That is the escape.

I also want to talk to you a little bit about some of the suggestions that you have heard about the defendant's physical or medical condition. Anything the defendant put into evidence about his medical reasons for leaving this building have absolutely no bearing on this escape count.

You are going to get a jury instruction which I'm going to read to you in part but Judge Alsup is going to tell you that whatever the defendant put in about his medical situation has absolutely no bearing on the escape charge.

Jury instruction No. 41, Judge Alsup's going to tell you (As read):

> "With respect to the escape charge itself, however, you may not consider the reason for departure. Put differently, if the Government proves the above elements for escape, it does not matter what the reasons for the escape were in reaching your verdict."

Now I'm going to suggest to you what the reasons the defendant's escape were. I suggest to you, and I submit based

on the evidence you've heard, that the reason the defendant fled this building was he didn't want to face trial. The walls were closing in on him. You've seen the abundant evidence of his guilt. And you have heard his disdain for being in custody. That's why he left this building.

But, the reasons he left have no bearing on his guilt on the escape charge. None, whatsoever. I just ask you to consider his consciousness of guilt as being further proof of his guilt on the mail fraud and false-statement counts. Anything you've heard about his medical testimony is not a justification or a defense to the escape, and that's the jury instruction you are going to get, and that you are charged with following.

I also want to tell you and suggest to you, based on the evidence you have heard, that the medical reasons you were given some testimony about were also false or grossly exaggerated. The defendant claimed that he had certain problems with his shoulder; he told that to Abidja Record. Now let's take a look at Government Exhibit 146. This is the videotape of the February 5th escape and sprint.

(Portion of videotape played in open court)

**MS. HARRIS:** Look at the Defendant moving his shoulders beautifully like an Olympic sprinter there. He could have been a track coach. That is the very day of his escape.

Let's play it again.

(Portion of videotape played in open court)

**MS. HARRIS:** Watch him move both shoulders to propel him faster and faster. Beautiful.

I suggest to you that everything you heard about the defendant's medical condition was false, or totally exaggerated. You just had unambiguous proof of that.

He was also out and about on day two with Abidja Record, running errands and directing him (sic) to buy a cell phone. She also testified that he walked around Los Gatos with her, and directed her to take him somewhere to use a computer, which was also a violation of the furlough order.

The defendant is also charged in Count 9 of contempt. This is similar to the escape, but it's a different count. Specifically, this alleges that he violated the furlough order by leaving the federal building. We've proven to you that he left the federal building, which was a direct violation of the Court's order.

And he also violated that order by possessing a phone and using a phone. We have actually got the phone in evidence, that's Government Exhibit 150. Ms. -- Agent Aboyan (Phonetic) testified that that was taken from the defendant's actual person, when he was searched incident to his arrest in Los Gatos on February 11, 2014.

Government Exhibit 150 is proof beyond a reasonable doubt

that the defendant violated the furlough order. Not only did he violate it by leaving the federal building, but he used a phone and he had a phone on his person. That's the contempt of court, Count 9.

Judge Alsup has instructed you repeatedly throughout this trial that the Government always bears the burden of proof. We welcome that burden. It's our constitutional obligation. And I submit to you we have more than met it here. A defendant never has to put on a defense or call a single witness. Doesn't have to do anything. But in this case, the defendant did put on a defense, and so let's talk about that.

There's certain things Luke Brugnara cannot get around. Not one witness that the defense called could possibly contest the email that said, quote, "I will buy all the paintings and put them in my museum." Not one defense witness had one word to rebut that.

Not one defense witness can rebut the fact the defendant negotiated a discount price based on the lie about a museum. Not one witness was able to contest the fact that the same day the art was delivered on April 7th, the defendant submitted a sworn statement to the U.S. Probation office, stating that he is destitute with no income, no assets, nothing.

Another thing the defendant cannot get around, and his defense in no way suggested anything to the contrary, he never returned the crates, and he insisted on a series of impossible

clauses in the release he was demanding. For example, insisting that Rose Long sign a release affirming that the crates were delivered as a gift was a flat-out lie and an impossible demand. And changing the number of crates from four -- from five to four was an impossible demand.

There is no evidence whatsoever to explain how five crates became four crates while the crates were under the defendant's control, other than the evidence the Government put forth that the defendant stole it.

Not one defense witness had any testimony concerning the false statements about the Sotheby's email. The events that -- the evidence on Counts 6 and 7, the false testimony under oath, Government Exhibit 155, is completely uncontested. All of the lenders the defendant called to testify testified about deals they did years ago. None of them had anything relevant to add to this case.

Even Joan Michelman, the person who testified by videotape from New York -- you'll probably remember that -- talked about art sales that were years before this case ever came into existence.

Only the Realtor, Mark Levinson, talked about anything in 2014. And he testified about the defendant's efforts to try and leverage the Sea Cliff house in 2014, and I might add, unsuccessfully. And that Luke Brugnara was trying to get money out of Sea Cliff for a down payment on a house on

Tiburon. Not to pay for the art he got from Rose Long. Mark Levinson had nothing relevant to add to this trial.

The medical witnesses you heard from are not a defense to any count in this indictment. They are not a defense to the escape and not a defense to the contempt. I just read you Jury Instruction 41. You may not consider the reason for the departure.

But you also heard testimony from Dr. McCoy. She saw the defendant on January 20, 2015. And, he declined to any pain medication for his shoulder. She recommended a blood test, which he did not do. All this proves is that the defendant was getting medical attention in jail. He supports the Government's case through all of his own witnesses.

Now let's talk about Abidja Record. The Defendant called her, his mistress or former mistress, in his case. Their entire --

**MR. BRUGNARA:** Objection, Your Honor. That absolutely misstates the testimony.

**THE COURT:** Overruled.

**MS. HARRIS:** Their entire relationship was based on a lie. You'll recall that they met on an online dating service --

**MR. BRUGNARA:** Objection, Your Honor.

**MS. HARRIS:** -- at a time at that the defendant was married. He's not being charged --

**THE COURT:** What is the objection?

**MR. BRUGNARA:** She is misstating the testimony.

**THE COURT:** I remember that testimony. That is what she said. That objection is overruled.

**MS. HARRIS:** Their entire relationship, like the defendant's life, is based on a lie. They met on an online dating service at a time when he was married.

The defendant told her -- and this tells you something about the defendant, as well as the power differential in their relationship. The defendant tells her that if anyone asks -- since he's married, if anyone asks, she should tell people she's his cleaning lady.

Think about that.

He turns to Abidja Record, the woman he has lied about, and lied to, and asks her to harbor him while he's on the run. She is a registered nurse, but that's not what he tells her to tell people. He tells her to tell people she's his cleaning lady.

And her nursing of the defendant during the six days he was with her consisted of chicken soup and Motrin. She did not take the defendant to a doctor, a hospital, or anywhere for x-rays. That's because he didn't need it.

On his first full day with Abidja Record, he's well enough to run errands with her, and he directs her to buy a cell phone. A cell phone which he isn't permitted to have, and

which is proof positive of Count 9 in the indictment, contempt of court.

The defendant also called his own attorney at the time, Erik Babcock, who was with him on February 5th, the day of the escape. Mr. Babcock testified, quote, he saw no observable injuries on the defendant.

All of the defense witnesses supported the Government's case. However, the best evidence of the defendant's determination to avoid this trial is shown by what he did the day he was arrested on February 11, 2015. And this is why I submit to you his escape is evidence of his consciousness of guilt.

When the car was stopped, the car that Abidja Record was driving, the defendant gave the officers who stopped the car a false name. He told them his name was Glenn. Then he further lied to the arresting agents and said he was on his way to the gym. To the gym. Not a hospital, not back to the federal building to surrender. He was going to the gym.

Defendant's own actions show that he thought he was going to be convicted, which is why he fled, why he hid in the car when Abidja Record brought him the cell phone, and why he gave a false name and lied about where he was going when he was captured.

And you've seen all the evidence now. You now know why he didn't want to face trial. He knew he was guilty. He knew he

would be found guilty, and that's why he ran. And that's something you can consider as you deliberate on Counts 1 through 7 of the indictment.

I want to take you through the indictment. We have talked about it, but I want to show thank you exact counts you are going to be deliberating on so it's clear to you when you are in the jury room.

Count 1 is Government Exhibit 59. That's the email I already showed you, and that's a wire fraud count. Count 2 is Government Exhibit 61. Count 3 is Government Exhibit 69. And Count 4 is Government Exhibit 95. Those are all wire frauds.

And what the Government needs to prove is that the defendant knowingly participated in a scheme to defraud by using false promises. I have talked at length about those false promises. He lied about having a museum. There was no museum. But how very seductive that would be to an art dealer and a lover of art.

He claimed that he would buy the art, and then he falsely lied and claimed that Rose Long had given it as a gift. He confirmed that five crates were delivered, and then after he stole the Degas that morphed into four crates when he was stalling for time with the lawyers.

This is not a civil breach-of-contract case, and the fraud was complete when he lied to Rose Long to get the art and she arranged for it to be shipped to him in San Francisco.

The government has also proven to you that the defendant's false statements about buying the art, having the ability to buy the art, and putting it in a museum were material. Rose Long actually agreed to discount the price because the art was going to a museum. That shows the importance and the value she placed on having these beautiful works of art shown so that the public can enjoy them. And the statement about having money to pay for the art, buying (Indicating quotation marks) the art was absolutely material. Ms. Long testified that this was always a financial transaction.

We have also proven to you that the defendant acted with the intent to defraud, which is also an intent to cheat. He intended to lie to Rose Long, he lied to Rose Long, he got the art, and then he cheated to try and keep the art. He falsely claimed that it was a gift when it was clearly not. He falsely claimed that it was going to a museum, when it was going to his garage.

The last element that the Government needs to prove -- and there's really no contest at all in the evidence about this -- is that he used or caused the interstate wires to carry out an essential part of the scheme. You probably wondered why you were hearing from a witness at America Online. You now know. The America Online witness confirmed that the emails that were used in this case were all used with an AOL e-mail account, and the America Online server is located in Virginia. That

means all of the emails that were sent from San Francisco using an AOL email account traveled in interstate commerce through the state of Virginia. That element has been met, as have all the others.

Count 5 is mail fraud, and that's identical to the wire fraud, but all the Government need to prove there is that the mails were used. The Judge is going to instruct you that an interstate air carrier is -- proof of an interstate carrier for the mail like an airline, a commercial airline, is using a mail as part of a fraud. American Airlines testified that they shipped the five crates. That's Count 5.

Count 6 and 7 are the false declarations under oath. I read you Luke Brugnara's testimony under oath. It's also Government Exhibit 155. I've proven to you, the Government has proven to you, all of the witnesses have proven to you, that that testimony was flat-out false. No one from Sotheby's read the email; no one from Sotheby's called him.

And Luke Brugnara never called Rose Long to report that Sotheby's said the art was fake. It never happened. The defendant knew his testimony was false. And he was testifying falsely because he was guilty of the fraud Counts 1 through 5, and the tangled web he had woven required more lies. This time under oath.

His lies went to the heart of the transaction of what transpired between him and Rose Long. And they were material

to this case, and to your deliberations on the fraud as well as Counts 6 and 7.

Count 8 is the escape. What the Government needs to prove to you and has proved to you is that the defendant was in custody. That means that he was in detention or that there was a restriction on his movements. You've heard a great deal of testimony about that, and the furlough orders tell you what the restrictions on his movement were. He was also in custody by process of the District Court on a felony. The instructions will tell you that this element is met.

The defendant was arrested for felonies. No -- no contest on that. And the defendant knowingly and voluntarily left custody without permission. He had no permission to leave the federal building. And you have had the luxury of watching his crime on videotape as he purposefully leaves this building, and breaks into a sprint, and is on the lam for six days.

The last count you are going to be deliberating on is contempt. What the Government needs to prove is that there was an order, a court order -- that's Exhibit 136, the furlough order -- and that the defendant knew of that order and violated it.

We have proven to you that he knew of the order, and agreed to it. That's Government Exhibit 137, which is the defendant's signed written acknowledgment of the furlough order. He is in contempt of that order by leaving this

building, by using a phone, by possessing a phone. All three of those were contempt of court.

Ladies and gentlemen, the evidence in this case has shown beyond a reasonable doubt that Luke Brugnara defrauded Rose Long. He never had the ability to pay for the artwork. He never intended to pay for the artwork. And he never had a museum to showcase the art.

No legitimate art transaction rests on lies and no lie supports a legitimate art transaction. Luke Brugnara told lie upon lie to induce Rose Long to ship art to his residence, which he misled her into believing was a museum. Once the art was under is his control, Luke Brugnara stole what Rose Long and Walter Maibaum considered to be the most valuable piece in the entire transaction.

Luke Brugnara then doubled down and he lied under oath to this Court. He lied that he had heard something back from Sotheby's about the authenticity of the art; that was a lie. And he lied that he communicated this by phone to Rose Long before April 7th, 2014.

His final act of desperation was to flee this building and to remain on the run until he was captured by the United States Marshals. Even then, even then when the gig was up, he still continued to lie. He gave a false name, and he lied and said he was going to the gym.

We have proven to you beyond a reasonable doubt that Luke

Brugnara is the consummate con artist. Please, please, don't let his last fraud be on you. We ask you to find him guilty on each and every count in the indictment.

**THE COURT:** Thank you. We will take a 15-minute recess. Remember, you cannot talk about the case yet. Very soon it will be your duty to do so. But, please, not yet.

We will see you in 15 minutes.

**THE CLERK:** All rise.

(Jury excused)

(The following proceedings were held in open court, outside the presence and hearing of the jury.)

**THE COURT:** Everyone please be seated. Those members of the public who want to be here, now, you are most welcome, of course. But I ask you to be back in your seat before we resume so that we don't have people coming in and out and disturbing the defense closing argument.

Mr. Brugnara, while we're on the break, you can -- do you want to rearrange any of the lecterns?

**MR. BRUGNARA:** I need to use the bathroom, please.

**THE COURT:** Of course, you can, but you can also turn the lectern left or right as you wish, set up your documents to be ready to go. And so, we will get right into your closing argument as soon as we start.

By my watch, the Government used one hour and 20 minutes of your two hours. All right? Does that agree with what you

have?

**MR. KINGSLEY:** Yes, Your Honor.

**THE COURT:** All right. Thank you. We'll take 15 minutes.

(Recess taken from 9:30 to 9:42 a.m.)

**THE COURT:** All right, be seated, please. Thank you.

Are both sides ready to bring in the jury?

**MS. HARRIS:** Yes.

**THE COURT:** Mr. Brugnara, are you ready?

**MR. BRUGNARA:** Yes, I am.

**THE CLERK:** She's gathering them.

(Jury enters the courtroom)

(The following proceedings were held in open court, in the presence of the Jury:)

**THE COURT:** Okay. Okay. Welcome back, and please, be seated.

Let's wait til everyone has their notepads open and ready to go. Every one ready over there?

(Jury panel nodding affirmatively.)

**THE COURT:** All right. At this time Mr. Brugnara will give his closing argument.

Mr. Brugnara, the floor is yours.

**CLOSING ARGUMENT**

**BY MR. BRUGNARA:**

Ladies and gentlemen, I want to start off by thanking you

for bearing with us for these last two and a half weeks, taking the time out of your important lives. I'm going to get into all the arguments that were made by Ms. Harris in detail, but this is the most important thing I want to say, because you have no obligation to be here. Your time is as valuable to anyone in this room, and I appreciate you taking your time, making the sacrifice, driving here early in the morning. I'm always going to remember it and it's important to me that you know that.

And I'm -- I'm going to get into every single detail in this case because the difference between me and the claimant, Rose Long, the sole claimant, is I'm extremely detail oriented. I'm in a business that's specific to details. People's lives and careers are on the line. And every penny, every communication, every inference is of extreme importance because your reputations and your careers -- you know, I just want to start off because I know there's Hispanic -- ma'am, I don't disrespect any -- any race. My mother's maiden name is Rivera, okay? So --

**MS. HARRIS:** Objection, your Honor.

**THE COURT:** I'm sorry.

**MR. BRUGNARA:** So any inferences to --

**THE COURT:** What is the objection?

**MR. BRUGNARA:** So any inferences to -- any inferences to -- any inferences --

(Simultaneous cross talk.)

**MS. HARRIS:** That's not in evidence, your Honor --

**MR. BRUGNARA:** -- that are made by --

**THE COURT:** Sustained --

**MS. HARRIS:** -- about his mother's maiden name.

**THE COURT:** Sustained. Sustained. That's not in evidence.

**MR. BRUGNARA:** Just shows the level -- the level they will sink to try to taint and besmirch me. So, you know, it's ridiculous.

But the fact of the matter is, getting back -- and that's important for me to tell you, because that would be important for me. You know, I would want to hear somebody --

**THE COURT:** Mr. Brugnara, you need to stick to the --

**MR. BRUGNARA:** The fact of the matter is --

**THE COURT:** Mr. Brugnara, please, stop. You need to stick to what's in evidence.

**MR. BRUGNARA:** I'm sticking. I'm getting -- I'm going to get into every detail in this case.

**THE COURT:** The thing about your mother-in-law or your mother, the maiden name is not in evidence.

**MR. BRUGNARA:** The fact of the matter is they didn't prove anything in this case. They have a burden to prove beyond a reasonable doubt.

You know, I have been in civil litigation, not much, for

$2 billion of transactions, but the threshold is minimal. It's 51 percent. "Beyond a reasonable doubt" is a subjective term. What it means in layperson's language is a reasonable doubt. Oh, he may not have done it. He probably didn't do it. And then it's extended beyond that. It's beyond that reasonable doubt. So it's the highest level of doubt that exists in the court system, in the state or federal court.

So you basically have to be 99 --

**MS. HARRIS:** Objection, your Honor.

**MR. BRUGNARA:** Some --

**MS. HARRIS:** Objection.

**THE COURT:** I'm sorry?

(Simultaneous cross talk.)

**MS. HARRIS:** That's is misstatement of --

**THE COURT:** Look, I will instruct the jury on what reasonable doubt means.

It is correct that the Government must prove the case beyond a reasonable doubt --

**MR. BRUGNARA:** Correct.

**THE COURT:** -- and prove each element beyond a reasonable doubt.

**MR. BRUGNARA:** Correct, correct.

**THE COURT:** But the law does not quantify it at 99 percent.

**MR. BRUGNARA:** Correct, and it doesn't.

But the good news is it doesn't matter, because I'm 100 percent innocent and I'm going to take you through each charge.

So even if it was a threshold of 5 percent, it's clear and convincing, I didn't do any of the charges.

See, because my word means everything to me. I have four -- as Mark Levinson testified, I have four school-age children, and you teach your children -- I know most of you have children on the jury here. You teach your children values, ethics and you set an example for them the best you can.

And I am an honest person. The testimony from the top executives in the world; in the world, not in San Francisco.

And you have to forgive Ms. Harris. You know, she is doing her job. You have to understand she's good at what she does. She doesn't know anything about business, and that's no besmirchment to her. She's an attorney that prosecutes criminal matters.

Mr. Hellman knew everything I was talking about. I, individually, haven't owned anything my entire life. I haven't owned nothing. When I'm closing $2 billion of deals, my financial statement is the exact same. We discussed that with Nick Barbato. We discussed that in detail. Mr. Hellman knows that.

But a limited liability company is the same -- is not the

same as an individual. So you can literally own nothing and control $5 billion, $10 billion. It's at my discretion how much salary I want to draw. If I want to draw $500 million, $1, it all depends on what I want and what serves me. But that's the way it works, okay? People don't like it, you know. Some people say: Hey, that's Reaganomics. Hey, that's the way it is.

But the fact of the matter is, unfortunately, you heard the testimony from Mr. Janie Zhuang up there. I asked her -- and this is somewhat -- it's frightening because she's controlling my liberty. She's controlling whether or not I'm in jail.

And I said: Do you know the difference between a limited liability company and a corporation? And she said no.

Do you know the difference between an individual taxpayer number and a taxpayer I.D. number? No.

I mean, huh? What? But then I have to give her, you know, a ten-page document that says, okay, zeros. But do you want to see what Brugnara Properties XYZ? That one will be $200 million.

**MS. HARRIS:** Objection, your Honor. There is no evidence --

**MR. BRUGNARA:** There is evidence, and -- she's wrong. There is. If she listened -- if she listened -- and we'll go through each of these. I'm going to back up everything --

something she didn't do, I'm going to do. I'm going to back up everything I say with the testimony.

See all the transcripts here? I had to go through, like, 3,000 pages last night. Everything I say I'm going to back up with sworn testimony. And I didn't have to do that. I could have just sat there and arbitrarily tried to swim through this. But I have testimony from each and every witness.

And I got news for you. I got 20 lies, perjured lies, felonies that they're trying to hang me on here. Twenty perjuries from Rose Long. And you saw how quickly they tried to get her off that witness stand. Everyone is trying to get her off that witness stand. The sole claimant in this case. They could not wait. They interrupted me every question. They were trying to drag her off the witness stand. The fact is, she still lied 20 times.

Let me just give you a taste of a couple of lies. Let's give you the first few.

And do you know how we know they are lies? Because we have sworn testimony from their other witnesses that completely contradict what she says, okay? And this is just a little preface of what I've had to deal with.

Here is the first one. Let's start with this one. This is Page 681. You should take these notes, because you can ask the judge to forward it to you.

Here is 681.

Can I get the --

**THE CLERK:** Is it okay for the jurors to see this?

**MR. BRUGNARA:** And, again --

**THE COURT:** What?

**MR. BRUGNARA:** This goes to credibility, meaning --

**THE CLERK:** Can this be shown to the jurors?

**THE COURT:** Is this from the trial transcript?

**MR. BRUGNARA:** This is all transcripts.

**THE COURT:** Okay. If this is the trial transcript, you can show the jury.

(Document displayed.)

**MR. BRUGNARA:** And this goes to credibility because there are clearly communications between her and I that were not in those emails.

**MS. HARRIS:** Objection, your Honor.

**MR. BRUGNARA:** And that were proven by her own statements.

**THE COURT:** Well, look --

**MR. BRUGNARA:** That will be proven by her own -- excuse me, sworn statements. I'm going to get to those also.

**THE COURT:** All right. The objection is overruled on your representation.

**MR. BRUGNARA:** (As read)

"**QUESTION:** Was ShipArt involved in this particular transaction?

**"ANSWER:** No -- yes, they were. That's who sent out the truck.

**"QUESTION:** Was ShipArt in any way being used as an escrow agent for the art in this transaction?

**"ANSWER:** Yes."

Let's go to Mr. Castillo, who, in fact, dropped off the art. So here we go. Here is Mr. Castillo.

And you've got to remember, this is sworn. Meaning, this isn't me talking to you guys out in front of MacDonalds. Hey, this is her swearing to God under felony perjury.

I guarantee you, she gets a pass because they are on a mission. And it's like a military mission here. They are on a mission. That's why the FBI never talked to Bob Kane. That's why the FBI never talked to me. Didn't even give me one minute of an interview, because they are on a mission.

And it goes back to the tax matter that they want to bring up and talk about, the 45- -- that Nick Barbato said is $45 million, and that would be 200 grand. And it would be one-third of one percent. So if you made 100 grand here, it would be like fighting over $300 ten years ago. That's why they are after me.

And Nick Barbato even said it. If you look at the transcript -- we'll get to it. Oh, yeah, they're after Luke Brugnara. This is what they do when they are, quote, on a mission. They are on a mission.

So look at this. Because if they are not on a mission, and they are actually fair and impartial, Rose Long should have an arrest warrant before this closing is over.

So let's go to Mister -- or Mr. Castillo. Either Mr. Castillo is a liar or Rose Long is a liar. But the good news is, we've got Rose Long lying not just to Mr. Castillo. I've got Rose Long lying to Harvey Schochet. I've got Rose Long being impeached by -- by everybody. I mean, everyone she spoke to.

Trejos. She says she was there packing -- when the stuff was being packed in New York. And I'm going to show it to you. It's right here.

"**QUESTION:** Mr. Trejos, was anyone there when you were packing?

"**ANSWER:** No."

Rose Long: Oh, yeah, I was there watching him pack it.

You know, she lied about that.

Listen, there are so many lies, so many felonious lies, and they give her a pass on. This woman has no credibility.

And I'm mad, because I have been sitting in jail for 11 months based on this one person's lie. Not like 5, 12 people. One crazy woman, crazy insane woman put me in jail. Because it was like a spider web.

But we're going to go through this. This is all in the evidence. You don't have to take my word for it. It's in the

evidence.

Look at this here.

(Document displayed.)

Mr. Castillo.

**"QUESTION:** So did ShipArt contact you to make this delivery?

**"ANSWER:** No, sir.

**"QUESTION:** They did not?

**"ANSWER:** No."

Okay. That's lie number one. Rose Long, lying under oath. The liar.

That, by the way, is a felony, to let you know, but it doesn't end there. Let's go to the second one that she does.

Oh, okay. Here we go. This is Rose Long. This is felony number two.

(Document displayed.)

**"QUESTION:** Okay" --

But -- but it goes to the credibility of her in this case. Because this is going to be he said/she said.

Same thing that we all deal with who have children. You know, the sister says this, the brother says that. We've got to listen to what they both say and who do you believe?

Well, you know who you're going to believe here. I had the top businessmen and businesswomen in the country sitting right there saying: Luke has never done any criminalist

conduct in 23 years that we have known him.

And this is Tony Crossley. If you remember, he's the number one in the world for Colliers. Barbato, you saw that guy. He's straight out of Hollywood Central, top investment banker in Manhattan. You had the head of Sotheby's, Ms. Biederbeck, for 25 years.

All these people consistently lending me millions and millions and millions. Man, we're talking about tens of millions, hundreds of millions of dollars in transactions. No one ever said: Hey, Luke's this. Luke's that.

You know, it's not even worth, I'm sorry that you had to waste your time.

One thing I agree with what Ms. Harris said, this is a very, very simple case. It's a very simple case. This case is totally simple. They were trying to rip me off for $11 million, trying to sell me a bunch of garbage. That's what this case is about.

And when I didn't bite the hook and I immediately went to my attorney, who is not just a regular attorney working over a liquor store, you know, down at the corner. An esteemed attorney, Bob Kane, head of the Jewish Federation. He's a professor at U.C. Hastings for over 20 years, which is, you know, University of California. He represents insurance companies. And then, of course, he's a judge, Superior Court judge, adjudicating matters for the Superior Court of

California, pro tem, and a mediator.

So, I mean, I had, like, the best guy saying: You know what -- and this is after 48 hours, trying to distract myself from this insane woman. Say: Here man. Boom. That's corroborated.

Did you see Natalia's testimony? She said: Oh, yeah. Luke said he's got to get his attorney involved, you know, because this woman is crazy and she has a criminal history of fraud.

It's right on the -- I'm going to read from the transcript. "Criminal history of fraud."

And it was also in evidence on the first email that I sent to Harvey Schochet. And it's in evidence and I'm going to show it to you, so there is no misunderstanding there. Fraud. All over. For fraud. She's a fraudster.

I'm not a fraudster. I'm the guy that's done $2 billion of deals and I could bore you to death, but it doesn't matter because, man, I don't care about money. All I care about is just being left alone, walking through the park. My kids go to public schools. I'm not some pretentious jerk that they try to make me out to be. They are the jerks. They are the ones that show my house, a few closets with a bunch of garbage in it, try to besmirch me and my family. I'll show you some pictures of the living room that I got from them, and it looks fine.

What they're trying to do -- they are on a mission. You know, it's the same thing -- it's an analogy, and an inference would be, you know, sending the military in to take out a town. Hey, but there's women and children in there.

Hey, they are on a mission, man. You don't question your superiors when you work for the federal government and you're on a mission. You do what you're told.

**MS. HARRIS:** Your Honor, this is objectionable --

**MR. BRUGNARA:** I'm allowed to make an inference and that is an inference that I make in my defense and that's the same --

**THE COURT:** I'll allow the argument. Overruled.

**MR. BRUGNARA:** So this is the thing. So, here's -- let's go on some more impeachment. Here is this.

**"QUESTION:** Okay. Ms. Long, when you got to Sea Cliff, did you see the delivery truck?

**"ANSWER:** In a few minutes. Fifteen minutes or so, yes. After the truck had arrived, he opened the garage door and came out through the garage."

And then she goes on. She goes on.

**"QUESTION:** Ms. Long, did the delivery truck park on the street or did it back in the driveway?

**"ANSWER:** It backed in the driveway, yes.

**"QUESTION:** Okay, that's fine."

Now, let's see what Mr. Castillo said. You've got to

remember. This is not us talking on the street, or her talking. This is sworn, I swear to God, you know, strike me dead, felony if you lie. She could have said, "I don't remember." She could have said, "I don't know." "I don't remember what happened."

She gave a specific situation of what her answer is. But I guarantee you on my life, strike me dead, she will get a pass.

And I got 20 of them here, so we'll keep burning through these until -- until you guys understand the point I'm making here.

So then what Castillo says -- and you've got to remember. I had to put this stuff together, 85,000 pages in a cell that's like from ma'am here to the corner. You know, a banker box? That's 22 banker boxes. You know how hard that is? I mean, this is, like, torturous for me. I've got four children I haven't seen in 11 months.

And I have been tortured. We're going to get into that. I have been --

**MS. HARRIS:** Objection, your Honor.

**MR. BRUGNARA:** -- tortured.

**THE COURT:** Sustained.

**MR. BRUGNARA:** Okay. So let's go into that. Let's go into Castillo.

So here is what Castillo says. Castillo. Castillo.

Mr. Castillo says is -- here we go. What Mr. Castillo says:

**"QUESTION:** Oh, you didn't have a conversation with" --

Okay. So:

**"QUESTION:** She to was there when you pulled up across the street?

**"ANSWER:** No.

**"QUESTION:** And when you walked across the street with the crates, she was not there?

**"ANSWER:** No, sir."

Okay. Let's go back and see what Long said, just to refresh your memory.

And I'm sorry. I'm sorry for my emotion and my frustration, but you have to understand if you put yourself in the same situation that I have been put in, it's beyond -- I mean, it's beyond surreal. "Surreal" does not even come close to what I have had to endure.

I wish I never made -- today I wish I never made 30 grand in my life. I wish I never made a penny. Because when you make money, you become a target. I wish I never had any money. Money is crap. What makes people happy is walking in a park, looking at museums. Money is bad. And that's one thing I'll -- look what Long says here. Here.

(Document displayed.)

**"QUESTION:** Did the delivery truck park on the street

or back in the driveway?

**"ANSWER:** Backed in the driveway."

Okay. So now go to the next one. That's two. But it gets worse. Each one gets progressively worse.

Look at this one.

(Document displayed.)

This is a good one. This is Long.

**"QUESTION:** Were of the crates of art that you had sold to Mr. Brugnara unloaded at 224 Sea Cliff Avenue?

**"ANSWER:** Yes, they were.

**"QUESTION:** How many crates were unloaded?

**"ANSWER:** Five.

**"QUESTION:** Did you personally see all five?

**"ANSWER:** Yes, I did.

**"QUESTION:** Who unloaded the crates from the truck?

**"ANSWER:** Two gentlemen that were sent to remove them."

She goes on.

(Document displayed.)

**"QUESTION:** Were the crates -- where were the crates when they were taken off the truck?

**"ANSWER:** First they were put down on the ground because I had to check each one."

Again, this is sworn testimony under penalty of perjury.

Meaning, a felony.

**"QUESTION:** What were you checking for?

**"ANSWER:** Checking to see if there was any damage, if someone had tampered with it."

Okay. So, listen. I don't know where this woman is at. I mean, is she at my house? That's not what Castillo says.

What does Castillo say? Let's see what Castillo says. Here is what Castillo says.

This is the witness, by the way, for the Government. Castillo is not my witness. Remember, they called him. They can't even get their two witnesses straight.

The fact of the matter is Rose Long is a liar. And I'm going to get into all the lies she said to me. I mean, I have so many lies I can keep you here for ten hours and I barely even dealt with this woman.

Okay, look. Look at this.

(Document displayed.)

**"QUESTION:** Mr. Castillo, I want to start by talking about when you arrived at 224 Sea Cliff. You indicated, in fact, you parked across the street, didn't you?

**"ANSWER:** That's it.

**"QUESTION:** Did you back into the drive?

**"ANSWER:** Correct."

And then I'm thinking, I'm going to give this woman the

benefit of the doubt. Maybe she met with him beforehand. Maybe she met at a coffee shop. Maybe she met on the corner. Trying to cut her some slack. Let's see what she said:

"**QUESTION:** Before you came to 224 Sea Cliff Avenue, did you meet with Rose Long?

"**ANSWER:** No, sir."

So he didn't meet with her even beforehand.

And then here it is. Next.

(Document displayed.)

"**QUESTION:** And where did you park when you got there?

"**ANSWER:** I parked across the street from his house in front of his garage."

Okay. Okay. So she's saying that she was waiting for him for 15 minutes. She's saying he backed into the garage. And this, again, under sworn testimony. He's saying: No, I parked across the street and she wasn't waiting for me.

She even goes so far to say: Oh, I watched each crate come out of the truck.

This woman is a liar, is what she is. She's just a liar. She's a liar. Either she's a liar or Castillo is a liar. And if Castillo is a liar, well, it's obvious. That fifth crate stayed on the truck if Castillo is a liar. If Castillo is a liar, the fifth crate is on the truck. If Rose Long is a liar, God knows the endless possibilities of what the possible

explanations are for this.

Then we go to the next one. Oh, look at this. I've got, like, 25 lies here, you know, just to let you know. Maybe the FBI might want to go arrest her.

So here is the next one.

(Document displayed.)

Oh, this is bad.

**"QUESTION:** So the delivery truck arrived at some point?"

Your answer:

**"ANSWER:** Yes."

So, I mean, she just keeps going on. She has multiple times to correct her answer and she just continues to lie.

Then we go on to the next one.

**"ANSWER:** Well, then the men that knew I would be there, you know, fine. You know, we greeted. And then they proceeded, because they had already had his address and everything and they, too, were surprised it wasn't a museum."

Oh, really? That's funny. Here is Castillo. Castillo says he wasn't surprised at all. Castillo said he was heading to the residence. Let me show you.

Like I said. One lie after another.

Just bear with me a second here.

(Brief pause.)

**"QUESTION:** Did she meet with you anywhere else?

**"ANSWER:** No.

**"QUESTION:** Was she waiting for the you at 224 Sea Cliff?

**"ANSWER:** No.

**"QUESTION:** Was she -- and she wasn't there when you pulled up and parked across the street?

**"ANSWER:** No.

**"QUESTION:** And when you walked across the street with the crates, she was not there?

**"ANSWER:** No, sir."

Okay. So here she is saying under sworn testimony she saw each and every crate delivered off of the truck. And he's saying that's absolutely false, she wasn't even there.

(Brief pause.)

I'm trying to find out, maybe there was another truck that she mistook it for. I'm giving this woman every chance to correct it.

**"QUESTION:** Was there another truck to assist you in this delivery?

**"ANSWER:** No."

Okay? So this is called thorough vetting out. What I have to do every day in business. Cover all the bases. Something they don't do. That's why I'm so frustrated.

I'm very frustrated with them. Very frustrated with them.

Because I didn't get the benefit of a five-minute phone call and I haven't seen my children in nine months --

**MS. HARRIS:** Objection, your Honor. This is --

**THE COURT:** Sustained.

**MR. BRUGNARA:** Okay. So let's continue on. Let me grab my glasses so I can see.

(Brief pause.)

How about this one? You're going to love this one.

"**QUESTION:** Okay. Starting with Crate One, where did the delivery crew put the crate? Did you see them put it in the garage?

"**ANSWER:** Yes."

Okay. So she's watching the crates go in. That's a different world than Castillo and I are in.

"**QUESTION:** Was it completely empty?

"**ANSWER:** Oh, yes."

Wow. Wow. This is an empty garage. There it is.

(Photograph displayed.)

Just to refresh your memory, that's the empty garage.

If you remember the testimony, Mark Levinson said it was the messiest garage he'd seen. Castillo said it's not the messiest garage he has ever seen, but it was one of the messiest garages he has ever seen.

And everyone says it's messy. I mean, I don't know who didn't say it was messy. There's so many people who talked

about that messy garage.

But she actually was so out of it -- or she's just a liar. Doesn't really matter. Because I'm the one who's being crucified here. She says that garage is empty. Empty. She's out of it.

And then you can't believe they were -- Ms. Harris goes: Can you believe that's the craziest thing I ever said. She said that that art was a gift. That's what she said. Did I have to pawn it? No.

This nut job came in my house for ten minutes --

**MS. HARRIS:** Objection, your Honor. The defendant is testifying --

**MR. BRUGNARA:** -- for ten minutes --

**MS. HARRIS:** -- and he did not take the stand.

**MR. BRUGNARA:** No, Mark Levinson testified --

**MS. HARRIS:** Objection, your Honor.

**MR. BRUGNARA:** Mark Levinson testified that I told him to come back in 15 minutes and he came back in 20 minutes. She was in there 15, 20 minutes.

And you heard her testimony, that she said: I gave him a book as a gift. Yeah, she gave me a gift. That's not what she said. She didn't say: Oh, this book is a gift.

And what's in testimony is, what? The text message. She gave me the art as a gift. She did. It's in evidence. They can't pull it out of evidence. It's already in evidence. She

gave me the art as a gift.

Who are you going to believe, this woman or me? Who act -- did I act on it being a gift? Did I go: Hey, I'm going to open all this stuff?

I hired my attorney: Get this stuff -- that's what Bob Kane called it, "stuff." "Luke hired me to get this stuff out of his garage immediately." "Stuff out of his garage."

I'm not going to -- I'm not going to retract what comes out of her mouth. She said there was a gift.

There is coherency here. In her mind somewhere deep in her brain she's giving me a gift. What comes out of her mouth is a disconnect, obviously, of what's going into her brain here. Because I know exactly what she said to me. I know exactly --

**MS. HARRIS:** Objection, your Honor.

**THE COURT:** Sustained.

**MS. HARRIS:** Objection, your Honor. This is totally --

**MR. BRUGNARA:** I know exactly --

**THE COURT:** Sustained.

(Simultaneous cross talk.)

**MS. HARRIS:** Objection, your Honor.

**MR. BRUGNARA:** It's in evidence.

**MS. HARRIS:** Objection. This is improper --

**MR. BRUGNARA:** It's in evidence. It's in evidence

in -- it's in evidence in -- it's in evidence in the text that the Government put in.

**THE COURT:** The text is in evidence.

**MR. BRUGNARA:** That's correct.

**THE COURT:** And the jury, of course, can consider that.

**MR. BRUGNARA:** And you can infer --

**THE COURT:** But you -- your statements now --

**MR. BRUGNARA:** You can infer --

**THE COURT:** -- are not under oath --

**MR. BRUGNARA:** Okay. You can infer --

**THE COURT:** They are not testimony.

**MR. BRUGNARA:** You can infer -- you can infer -- you are allowed to infer.

You're allowed to get testimony and inference from the evidence. You can infer from my text what I said. That's what you can do. You can infer from it.

And you can also infer that I don't lie based upon the witnesses that sat up there for, what, a day and a half and said I've done $2 billion of deals. I don't lie. You can infer that, because that's what they said, and you can take it as fact, because that's what they said.

You can also infer that men and women like that would have nothing to do with a liar because they don't need it. Because, see, there's people that need, and there's people

that don't need it. And every one of those men and women that sat up there, you can infer they don't need hassle. They don't need problems. They don't need to deal with people that lie, because you know why?

You can also infer from their testimony that they get paid upon their work product. You can infer that they're not pulling a salary. You can infer that every one of those men and women are making millions and millions and millions of dollars based on not wasting their time. Anyone sitting here that has anything to do with business knows you don't make money when you waste time with liars. Unfortunately, I didn't extract myself out of the situation quick enough.

I -- I couldn't make them -- move these boxes. They are a thousand pounds. What, 843 pounds? How am I going to get those out of the garage? She has to come pick them up. She has to come get them.

What else can I -- you tell me now. What else could I do? I immediately say: Okay, this was a huge mistake.

You can put it in a personal level. You can infer. Have you ever been on a date? Oh, my God I've got to get out of this. Have you ever been in a situation. This is -- immediately hit me. The boxes were already there. This woman is looped up out of her mind --

**MS. HARRIS:** Objection, your Honor. There is no evidence --

**MR. BRUGNARA:** You can infer -- you can infer -- you can infer --

**MS. HARRIS:** This is totally improper.

**MR. BRUGNARA:** You can infer by a woman saying this garage is empty and saying Castillo was backed up in the driveway, and you can infer what came out of her mouth, okay, when you didn't have Judge Alsup and the U.S. Attorneys to try to steer her off. Can you imagine her unabated, what would come out of her mouth in 15 or 20 minutes?

That is beyond belief. And that's when I realized, this is going to be a problem and I -- Bob Kane testified, I immediately contacted him, within 48 hours.

This is the thing. You can't have fraud unless there is intent. It doesn't matter if the stuff is worth a billion dollars or it's worth two cents. You can't have fraud unless I intended to defraud, which is the most absurd concept anybody in this room can even imagine. I attempted to defraud her out of art that wasn't even real?

Every email I sent, I don't retract. It's all factual, everything that was provided to you. And I, in fact, did, as I stated on the text, get returned communication from the auction houses and other parties that the de Koonings are fake. And it was --

**MS. HARRIS:** Objection, your Honor.

**MR. BRUGNARA:** It's in evidence. It's in evidence.

**MS. HARRIS:** It's not in evidence.

**THE COURT:** It's not in evidence, Mr. Brugnara.

(Simultaneous cross talk.)

**MR. BRUGNARA:** The text messages said -- the text messages said, we can read them, that I heard back the de Koonings and the Degas are fake. There is an email that the de Koonings and the Degas are fake. It doesn't matter --

**MS. HARRIS:** Objection, your Honor. There is no email.

**MR. BRUGNARA:** It doesn't -- it doesn't -- I'm going to show it to you.

The difference between me and her, I know this case. I'm going to show it to you. Okay?

The fact of the matter is, it doesn't matter, because I told -- what I had -- this is a good one. Here is her attorney -- and this is the thing.

They, of course, had a little Wizard of Oz thing going here where Maibaum was the Wizard sitting behind the curtain. Rose Long was her front, trying to rip me off.

And here is what Harvey Schochet says regarding contingency period. Because this is important in the context of this alleged fraud.

Let me show you this. Okay. Look at this.

(Document displayed.)

And this is, again, their attorney. This isn't Bob Kane.

This is their attorney. It says:

"**QUESTION:** So, are you aware that if there is a due diligence period; that is, in essence, a period where one of the parties can decide whether or not they want to proceed forward or choose not to proceed forward?

"**ANSWER:** Yes. That's a correct observation, would be a correct observation.

"**QUESTION:** Okay. So you agree, then, that if there is a due diligence period, in fact, there is not a consummated transaction?

"**ANSWER:** Yes. I agree with that."

Okay? So there is no consummated transaction even in the mind of Harvey Schochet, who is immediately engaged. So their attorney saying there is no contract. There is no deal.

They constantly misrepresented to you. They want to call me a thief. They are just ignorant of contract law. They are ignorant of factual business facts.

But this is something even a kid knows, who is in first grade. Hey, I'll trade you my peanut butter sandwich, you know, for your cookies.

You have to have a meeting of the minds. This is just simple grade school stuff. There was never a meeting of the minds.

But the one thing that's interesting, as she contrived

these contractual concepts of what we had going on, whether it was by Maibaum instructing her to further set me up, one thing they all agreed upon was a due diligence period. And that due diligence period on the email that I -- that I'm going to show you was 365 days, and that was my understanding.

But the funny thing is --

**MS. HARRIS:** Objection, your Honor.

**MR. BRUGNARA:** -- even if you --

**MS. HARRIS:** This is totally improper.

**MR. BRUGNARA:** I will show -- I will show --

**MS. HARRIS:** Your Honor, could the Court --

(Simultaneous cross talk.)

**THE COURT:** Wait. Wait. Mr. Brugnara, I need to admonish the jury about something. You need over there in the jury box to keep straight what is argument --

**MR. BRUGNARA:** This is in evidence, your Honor.

**THE COURT:** -- versus what was testified to under oath --

**MR. BRUGNARA:** I'm showing everything under testimony.

**THE COURT:** -- or is supported by an email or some other document in evidence.

**MR. BRUGNARA:** So, so --

**THE COURT:** Just a minute. Let me finish.

**MR. BRUGNARA:** Well, I have two hours and I need

every minute of it.

**THE COURT:** I -- I need to make a ruling here.

It's important that you keep that distinction in mind. And with that, I'm going to let Mr. Brugnara continue.

**MR. BRUGNARA:** Okay. So anyways -- thank you. I have been waiting 11 months. Thank you.

So let's look at this. This is what a rational person would construe from this, at least somebody who has done $2 billion of transactions, or even somebody who has done $1 of transactions.

"Thank you for your concerns."

And this is the only email that talks about any sort of contingency period or some reflection of a due diligence period.

"I'll be happy to give you a year after we arrange any or full price to check yourself."

See that "any"? "Any" (indicating). "Any or."

Now, "any or" means, you want an apple or an orange? I will take the apple. I do not want the orange. Okay? So we don't have to worry about the orange if I take the apple. So we're going to cross out the apple, okay? We're going to cross it out. So, boom.

Full price. I'm not paying that. I'm not paying full price. So we're going to cross that out because I already

know these things probably aren't real.

So it says --

**MS. HARRIS:** Objection, your Honor. Mr. Brugnara just testified again.

**MR. BRUGNARA:** Any price -- price -- price --

**THE COURT:** All right. Sustained.

**MR. BRUGNARA:** -- to check yourself.

(Simultaneous cross talk.)

**MS. HARRIS:** Your Honor, can you give an instruction on that, too?

**THE COURT:** Sustained.

**MR. BRUGNARA:** So this email that they put into evidence, "any price to check yourself." "To check yourself." That's not a consummated transaction by their own attorney. So I have one year to decide.

And my next email says: Go ahead send it. The gist of it is -- and you have it in your evidence binder -- I'm not paying for anything. I'm not paying for anything. You want to send it, send it.

She solicited me. She solicited me. I didn't call her. I didn't call her. She called me. Luke, you want this stuff? I didn't call her. I am busy. You heard the testimony from multiple witnesses. What am I busy with? A, I'm basis with keeping my kids in school and --

**MS. HARRIS:** Objection, your Honor.

(Simultaneous cross talk.)

**MR. BRUGNARA:** Mark Levinson says -- Mark Levinson's testimony --

**MS. HARRIS:** No testimony on this at all.

**MR. BRUGNARA:** Mark Levinson's testimony was that I was buying 130 Geldert Avenue, which we'll show you the contract here. It's in evidence.

**THE COURT:** All right. The objection is overruled. I remember that testimony.

(Document displayed.)

**MR. BRUGNARA:** And here in the contract is 130 Geldert. That's one thing I was doing.

What is the second thing I was doing? The second thing that I was doing is I was getting the loan on 224 Sea Cliff to facilitate the purchase of 130 Geldert. And 130 Geldert is a house that is $3.2 million. And the loan on Sea Cliff -- and I was making up the downpayment, which was $190,000. And that is in evidence, and I'm going to show that to you.

You know, you're going to get all the evidence binders back there, too, so you can go through this at your leisure, but I'm going to show you because I'm going to do what Ms. Harris didn't. I'm going to prove up everything.

(Document displayed.)

So there is the contract. Now, you heard Mark Levinson go: Yeah, but it was out of contract on the 8th. Right? But

it doesn't matter, though. He went on to testify that he was still in daily communication with the title company and they wanted to essentially wait for me to close the Sea Cliff loan.

Now, they tried to besmirch me and say: Hey, this guy, you know, whatever, has been, you know -- I don't know what derogatory term. They, obviously, didn't listen to the evidence, and I'm going to pull it up on the transcript. I paid down $12 million last year on Sea Cliff, and we proved it with the title report. $12 million in -- it was in 2013. And then I borrowed a million seven on that property in 2013. So, right there is 14 million bucks, okay?

They tried to show you a draft document that I showed to Probation to help her out, to help her out with her job. I mean, she testified. It wasn't to try to influence her or anything. I said: Hey, listen. This would be a good template for you to use. Because at that point in time that was the fact.

But I rebounded immediately. Three months later I closed just under a $2 million loan, paid down $12 million. That's 14 million bucks. But it wasn't me. It was a Brugnara entity.

So it's still factual, what I said in April. They are just sour grapes about it, you see? They are sour grapes about that because it's done legally. It's done legally. Because the corporate entity is different than a limited

partnership. It's different from a limited liability company. It's different from this and that and this and that. And you know what? It's all done legally. Okay? It's all done legally. What I do is legal.

You know what the proof is? You can infer that by the women and the men that sat there (indicating).

We -- I picked each one of you on purpose. Every one of you is smart. That man over there is -- every one of you is smart. You can infer from who you saw sit up there as my witnesses, you can infer who I am.

Because for me to go up there and say: Oh, I'm Luke Brugnara. I'm great. Blah, blah, blah, blah. I mean, who is this idiot, right?

You get the men up there and the women up there to say, you know what? Hey. Let's talk about some of the things they said.

Barbato, add up from the transcript how much money they lent me. $600 million. Including the pending transaction on the Riviera Resort and the property in Vegas where the museum is going. Where the museum is going. Man, where the museum is going.

Let's talk about -- they tried to say Barbato said it's like doing brain surgery. They are trying to deceive you. I'm going to tell you Barbato's exact quote when we had him on the examination on that. What he said was he didn't -- he

wouldn't remember the museum. Here. Here it is.

"**QUESTION:** All right, okay. Regarding the email and the museum" --

And I'm going to show you that email. It's right here.

(Document displayed)

Here is the email, and it's in evidence. These are all in evidence, ladies and gentlemen of the jury. Here is the evidence that you have here, okay?

"Las Vegas Strip Retail Plaza." This is last year in May. It's $100 million deal. Okay? And here is the museum, right there (indicating). Boom. In plain writing. Museum (indicating). Museum. Museum. Museum. Museum. Museum. Museum. Museum. Museum. There is the museum.

And then I go so far as, look, there is even a map for people who can't figure it out in this office over here (indicating). Here is a map of where the museum is. And this is well before they were ever involved. It's on No. 3. Oh, there it is. Boom.

The museum is going there. The museum is going there. That is where the museum is going. You see? I have a museum. It will be there. Go check it out. I developed this entire property here. You heard the testimony --

**MS. HARRIS:** Objection, your Honor. That completely --

**MR. BRUGNARA:** You heard the testimony from Nick

Barbato --

**THE COURT:** Sustained. Sustained.

**MR. BRUGNARA:** You heard the testimony from Nick Barbato --

**MS. HARRIS:** Your Honor --

**THE COURT:** Sustained --

(Simultaneous cross talk.)

**MS. HARRIS:** Your Honor, can you instruct the jury on this. It's totally improper and untrue.

**THE COURT:** Sustained. Sustained.

**MR. BRUGNARA:** The -- the museum --

**THE COURT:** Mr. Brugnara --

**MR. BRUGNARA:** The museum is going on this property.

**MS. HARRIS:** Your Honor --

**MR. BRUGNARA:** And now we go next to the email --

**THE COURT:** I'm sorry. Wait. Wait a minute.

**MR. BRUGNARA:** I'm allowed to talk. I have my --

**THE COURT:** No, you're not, when I tell you not to. I'm listening to an objection.

Repeat your point.

**MS. HARRIS:** That's a completely false statement that he just said about "I have a museum" --

(Simultaneous cross talk.)

**MR. BRUGNARA:** Your Honor, if they want to counter after, they can counter what they want. I don't want to be

interrupted any more.

**THE COURT:** I'm sorry, Mr. Brugnara, but I have to rule on this.

My memory of it is that the deal that you're talking about there did not --

**MR. BRUGNARA:** Your memory isn't what's important. It's the jury's memory.

**THE COURT:** Of course, that's true.

**MR. BRUGNARA:** Okay? Your memory is not -- I would like to continue, please.

**THE COURT:** But I have to rule on it.

**MR. BRUGNARA:** Okay. Okay. This is in evidence, your Honor. It's not a matter of -- the jury --

**THE COURT:** What is the date of that document?

**MR. BRUGNARA:** The date is May 14, 2014. Okay? And here is emails from before that --

**THE COURT:** Wasn't that a deal that did not close?

**MR. BRUGNARA:** No. It's still in escrow right now.

**THE COURT:** All right.

**MR. BRUGNARA:** Don't besmirch me, please. Thank you.

**THE COURT:** All right. All right. So -- so --

**MR. BRUGNARA:** Jennifer Senhaji testified from Old Republic Title Company that the escrows are still open -- I'll pull that up next -- on all the deals. They are waiting for me to get out of this chokehold so everyone can make money

again, like they've done for the last, what, 15, 18 years. Everyone makes money on my deals. You heard them all. Okay? They are waiting for me to get out.

Here is the crazy thing. And these emails are -- check out who these conference calls are with. The week that I get grabbed and thrown in the Oakland jail, the two biggest hedge funds in the world with the director. Nobody in this building can get the director of the biggest hedge funds in the world on the phone except me. Okay? Because I am credible. Because I'm not a thief --

**MS. HARRIS:** Your Honor, this some vouching and there is no evidence about this at all.

**MR. BRUGNARA:** Here is the evidence, ladies and gentlemen --

**THE COURT:** Sustained.

**MR. BRUGNARA:** Ms. Harris doesn't know the evidence. Here it is right here.

(Document displayed.)

Silver Peak Finance: "Luke, when are you available for the conference call."

This is Barbato proactively contacting me. I am not soliciting them. They are contacting Luke Brugnara. Not Brugnara. Brugnara, okay? Luke Brugnara. That's who they are contacting. When are you available? That guy. That hard-nosed guy. "Luke."

They are chasing me. That's how my life has been for 20 years. They pursue me because I close all my deals, and you heard Jennifer San say that. Yeah, Luke closes mostly all of his deals. Okay? That's who I am.

And guess what? My advice to anybody, it's not worth it. For what I had to endure for the last 11 months, it's not worth it, because money isn't worth it.

But this just proves that I am truthful. Look at this. Let's go to the next one.

(Document displayed.)

"Luke" -- and this is a different one. It's not Silver Peak. It's Related. Related Group is the biggest hedge fund in the world.

"Luke" -- that's a $50 billion hedge fund, and this guy is the director, Patrick Martin.

"Luke, before we have a conference call, Patrick wants to see some numbers."

We go to the next one. Look at this.

(Document displayed.)

This is after I'm already in jail. This is a few days after I'm in -- this is how stupid the Government is. They lock me up when they want money. You have someone like me, you leave them out to make money and then you figure out a way to collect payment.

But that, again, wasn't the mission. The mission wasn't

to get money from Luke Brugnara. The mission was: Choke this guy out. And we're going to have the evidence that I'm going to show you of my complaints to the doctor that I'm housed with murderers, convicted murderers, convicted murderers, to choke me out into a plea. Man, they will have to kill me first. I will die before I ever admit to something I didn't do.

**MS. HARRIS:** Objection, your Honor.

**MR. BRUGNARA:** We're going to have evidence and testimony --

**THE COURT:** Sustained. Sustained. There is no evidence --

**MR. BRUGNARA:** We have transcribed -- you heard it yourself, three doctors -- a doctor and two nurses said I have a one-in-five chance of cancer. The one registered nurse of Kaiser and --

**MS. HARRIS:** Your Honor --

**MR. BRUGNARA:** -- and El Camino Hospital --

**THE COURT:** Mr. Brugnara, please.

**MR. BRUGNARA:** I'm going to read the transcript.

**MS. HARRIS:** Your Honor --

**THE COURT:** Please.

**MR. BRUGNARA:** They are trying to muffle me because they are all on the same team, and you've seen it for two weeks. And I can't change who I am.

I even deal with men like --

**THE COURT:** Mr. Brugnara.

**MR. BRUGNARA:** -- Nick Barbato. Nick Barbato --

**MS. HARRIS:** Your Honor. Your Honor --

(Simultaneous cross talk.)

**MR. BRUGNARA:** Nick Barbato testified to how much money he lent --

**MS. HARRIS:** Your Honor --

**MR. BRUGNARA:** Excuse me. This is my closing argument.

**THE COURT:** But you need to stop when I'm -- there is no evidence in this case to support the idea that the Government was trying to force anybody into a guilty plea.

**MR. BRUGNARA:** Okay. You can infer -- ladies and gentlemen, what you can do is you can infer, infer from the evidence what you choose to infer. You can choose to infer with your own brains what you decide is the truth from the evidence that's presented.

So I'm presenting you the evidence and you can make your own inferences from that evidence, based on what was presented, based on what wasn't presented; based upon the evidence and based on the inferences of that evidence.

And now we're going to go to the next email.

(Document displayed.)

Look at this, June 3rd. "Luke, please respond."

Here is these guys waiting for me for the conference call. "Please respond."

Okay. We go down to the next email.

(Document displayed.)

Here is the Riviera, again. Look who this is to. Patrick Martin of Related Group. That's the biggest hedge fund in the world --

**MS. HARRIS:** Objection, your Honor. There is no evidence of that and no --

**MR. BRUGNARA:** Barbato testified. It's right here on the --

(Simultaneous cross talk.)

**THE COURT:** Sustained. Sustained.

**MS. HARRIS:** Just because he's yelling doesn't mean the objection doesn't get ruled on, your Honor.

**MR. BRUGNARA:** Here's the salient terms --

**THE COURT:** I said sustained.

**MR. BRUGNARA:** This has already been admitted into evidence.

**THE COURT:** Sustained.

**MS. HARRIS:** Your Honor?

**MR. BRUGNARA:** It's been admitted into evidence --

**MS. HARRIS:** Your Honor, can you please stop him?

**THE COURT:** I can't hear you, Ms. Harris.

**MR. BRUGNARA:** The salient terms of the

transaction --

**THE COURT:** Mr. Brugnara, please.

What's your objection?

**MS. HARRIS:** That there was no evidence about that hedge fund or Patrick --

**THE COURT:** I sustained that objection. The jury should realize there is no evidence to support that.

**MR. BRUGNARA:** Okay, okay. I'd like the jury to go ask for the transcript where we detail which email address was Nick Barbato, and he said on the transcribed record -- make sure you get it from the judge -- my email address is Barbato, B-A-R-B-A-T-O-G-B-N-B@aol.com. And that's what it says right there (indicating). And if you look on this email, there is his email address (indicating). So he confirmed.

So use your own inference if he lied about the email address. I was in jail for the last 11 months. I certainly couldn't craft this document, okay? So...

You know, this is all about oppression, supression. They are on a mission. They don't care. It could be you. It could be me. It could be anyone in the audience. They do what they are told. Don't -- don't hold them responsible. They are just doing what they are told from who knows -- believe me, it's coming from a high -- a high source because, as you can see, a lot of people love me and a lot of people don't like me. But the people who don't like me are the ones

that don't know me, or the people that are my competitors that want to shut me down, okay?

So let's go to the next email.

And that came from Nick Barbato, by the way. You can check the testimony. That's not conjecture on my part. Nick Barbato testified: Luke Brugnara had political issues going on. Blah, blah, blah, blah, blah. It's on the transcript, and I'll read it to you if we have enough time here. And that's not a man who talks errantly. He speaks the truth.

Okay. Look. Here it is again. Here is April 29.

(Document displayed.)

"Luke, before we have the conference call, Patrick wants to see the numbers."

Okay. Here is the Riviera. Goes to the Riviera deal. And the Riviera deal is laid out pretty interesting.

Nick also said, Barry Sternlicht, I have his private cell phone number. Bury Sternlicht is the CEO -- and it's in the testimony -- of Starwood, which owns, of course, W Resorts, Ritz Carlton, Sheraton. It's the largest hotel company in the world. And Barbato testified, I have direct contact with this guy 24/7 on his personal cell. It's in the transcribed record.

And it says here: Okay. Barry Sternlicht is giving me $100 million first, okay, and then -- that's going to be at six-and-a-half percent interest. And then I need $30 million

to consummate the transaction. Talks to -- and then I talk about the structuring on the $30 million. Okay?

And this is --

**MS. HARRIS:** Your Honor, the Court sustained a hearsay objection --

**MR. BRUGNARA:** And this is in the transcribed record as --

**MS. HARRIS:** It's not being admitted for the truth of the matter --

(Simultaneous cross talk.)

**MR. BRUGNARA:** Nick Barbato testified that three acres on another Las Vegas property was sold --

**MS. HARRIS:** Your Honor --

**THE COURT:** I don't remember if I did or not, Ms. Harris. I can't -- we'll have to deal with it later.

**MR. BRUGNARA:** Nick Barbato testified -- and I encourage you, anything that comes out of my mouth on this closing, to please ask the judge for a transcribed proof, if I can't show it to you here. It's all in the transcribed record.

I already have a relationship. The guy that I'm getting on the conference call, they already made 50 million bucks with me. And that's -- I sold them the rear lot. Okay? It's here on the email that's already in evidence? Look at this, down here, look.

(Document displayed.)

"Brugnara Properties has an a long-standing beneficial relationship with Related Group selling them the Las Vegas strip condo site in 2006 for $15 million, which Related sold two years later for $45 million."

Like I say, same thing. You heard Barbato. We keep -- you know, why do people keep -- I don't know the exact word, but why do people keep dealing with Luke? Said, okay. You know, the guy is a whirling dervish. Everybody is making money. They're making money. Barbato is making money. Tony Crossley is making money. It's not a personal thing. You know, it's business. You know, you make money.

That's what this case about. It's about credibility. Who do you believe? Plus the fact, do you really think with four school-age children, I'm going to steal anything? I mean, the most ludicrous concept I've ever heard in my life. Like you heard from Mark Levinson. He's saying, no, he's trying to get the kids in school and this and that. The whole thing is absurd. This is them trying to rip me off for their own also scheme.

And you heard the testimony. I don't need to go through these papers. I remember it. I remember it. Maibaum: Sotheby's and Christie's won't sell the Valsuani as authentic.

Yeah. Duh. But it's a reproduction and it was done 12, what, 15 years ago?

You heard Jennifer Biederbeck, NSV. Doesn't matter whether it's a Degas. Doesn't matter whether it's a Picasso. Doesn't matter if it's a Rodan. They don't sell reproductions less than a couple of grand. That's what they said.

You heard what their own witness said. Maibaum. Oh, yeah, Sotheby's and Christie's won't sell it. Yeah. You know why? It's not worth anything. It's the same people that are saying --

**MS. HARRIS:** Objection, your Honor. There is no evidence of that.

**MR. BRUGNARA:** They took --

**THE COURT:** Sustained. Sustained. Sustained.

(Simultaneous cross talk.)

**MR. BRUGNARA:** They testified --

**THE COURT:** Sustained.

**MS. HARRIS:** Your Honor --

**MR. BRUGNARA:** There is evidence -- okay, okay. I'm glad she said that. I'm glad she said that. Because now I'm going to show you the evidence right out of Maibaum, their little wizard, that came up and said it right out of his own mouth.

Let me find it here.

(Brief pause.)

Here we go. Here we go.

You've got to remember, Maibaum is the brains behind this little team here. That was pretty obvious. The guy did a great job of insulating himself from a lawsuit.

I don't even think in criminal terms -- this guy is pretty sharp. Used her as a front. Made it purportedly an arm's length transaction so if anything ever exploded on him, it would all drop on Long and he's hiding back in the background waiting for the big pay day.

See?

(Document displayed.)

Okay. So let's look at this. I mean, this -- and then, of course, did you catch what he said about the insurance? Already paid on the insurance on the missing piece. How can you be paid insurance on a piece that isn't worth anything? How can you?

The only person on the planet -- remember what Judge Alsup said. It's not the evidence that's presented. It's the evidence that's not presented.

What did they ever say that this piece is worth? They didn't bring in one person on this entire planet, in the entire world, that walked up to this stand over here -- man, women or child -- and said: Hey, that Degas, I swear to God, is worth a million dollars. That Degas is worth $100,000. That Degas is even worth $5. Because it's not worth anything.

It's not just what the evidence was that is presented. It's what evidence wasn't presented.

How hard can it be to get somebody up there and say: Hey, man, that piece is a great work of art. That thing is amazing. It is worth millions of dollars.

They can't find anybody, because it's a scam. That's why Maibaum said himself -- here, let's take it from Maibaum's own mouth here.

Okay. Look. Let's take it from Maibaum's own mouth. Let's start with the de Koonings.

(Document displayed.)

"**QUESTION:** Would it surprise you that neither of the major auction houses will sell these de Koonings as authentic."

He says:

"**ANSWER:** I can't speak to that."

Okay. That's fine.

Let's go to the Degas then. Okay?

(Document displayed.)

Okay, look.

"**QUESTION:** Do you know if the major auction houses would accept the Valsuani Little Dancer for auction at this time?

"**ANSWER:** Not at this point in time."

Duh. Yeah. It's fake. You heard Jennifer Biederbeck,

NSV means less than $5,000.

So let's do what's called inference, which -- one thing I've learned in this crazy trial is it's a riddle. You've got -- I've got to talk to you in riddles. You've got to hear my riddles.

But I can now run with this inference that I love, because you can infer from what the evidence is. Trust me. You've got a lot of stuff that you would have had heartburn over.

But based upon the evidence you did get, let's infer. Jennifer Biederbeck says NSV equals less than $5,000. And they only deal with things that are worth more than $5,000. And Maibaum already said the auction houses won't take it. I mean, auction houses take dirty old chandeliers. Auction houses sell old robes that Popes wore. Auction houses --

**MS. HARRIS:** Objection, your Honor. There is no evidence about any of this.

**MR. BRUGNARA:** It has to have pecuniary value. Auction houses don't care what they are selling. This is an ethical consideration. Well, I can't sell that because I believe in this. No they are out to make money. Jennifer Biederbeck said that. We don't sell something if it's less than $5,000. So we say NSV. And Maibaum says it right here. They won't sell it at this time.

And then he goes -- look. Look at this one. Is this a did you question?

**"QUESTION:** Do you have a personal financial stake in whether these Little Dancers are accepted as legitimate by the marketplace."

This is crazy. This is what Ben Kingsley asked him. Thank you, Ben. That's a good one.

**"ANSWER:** Yes.

**"QUESTION:** Do you own multiple Valsuani Little Dancer bronzes?

**"ANSWER:** Yes."

You know, I mean, yeah. I can imagine what's in his closet at the house. You know, this Degas Little Dancer that they can't show the jury because, you know, it's, like the, you know, Mona Lisa.

Oh, my God. We would love it if we could bring it in here and show you that Little Dancer, but Mr. Brugnara stole it. You know, he's in the middle of buying the Riviera with Related Group for $130 million. You know, he's in the middle of buying his family a house, which Jennifer Senhaji said is scheduled to close by June 1st.

And you know what? But, oh, by the way, Maibaum has got a whole cachet of these. All right?

I mean, it's insulting to the jury. You should be insulted. You should be insulted. They are dragging my lender from New York -- think about this. Infer. Inference. Infer this. Infer this. They drag out my lender, Nick

Barbato, who makes God knows how much money. And you saw how mad he was. But they can't drag out one of Maibaum's cachet of Little Dancers? You should be mad. That's deceptive from them. That's what you should infer from that.

Because Judge Alsup said, it's what they don't show you also. What evidence isn't shown to you. I don't have to show you anything. You heard from Judge Alsup. I don't have to show anything. They do have to be honest with you. They are dishonest. You can infer they are dishonest.

Why didn't they show you that Little Dancer? Do you know why? Because the first thing I would do would be pull up that (indicating), the reproduction stamp. It's stamped "Reproduction."

Did you hear the story Maibaum gave? Oh, my God. This guy is just unbelievable. Well, why is it stamped "Reproduction"? It's stamped "Reproduction" because that's the French law. Really? No. It's stamped "Reproduction" because it was made ten years ago and the originals were made 100 years ago. The guy is an idiot.

So let's go on. Then he says:

> "**ANSWER:** Okay. Auction houses won't accept the Little Dancer.
>
> "**QUESTION:** Has it been exhibited in the United States?"

I like this. You know, they pull up the Hermitage book.

Do you know how big the Hermitage is? I think we had some testimony. It's, like, the size five football fields. Can you imagine the corner they had this thing placed in?

And you heard what he testified. The guy that owns the Valsuani Foundry in San Francisco is the Russian who lives in St. Petersburg. It's --

**MS. HARRIS:** Your Honor, there was no evidence on that --

**MR. BRUGNARA:** You can infer -- you can infer -- you can infer --

**MS. HARRIS:** You can't infer that just because Mr. Brugnara is screaming at the top of his lungs.

**THE COURT:** Sustained.

(Simultaneous cross talk.)

**MS. HARRIS:** Your Honor, can you please tell him to stop screaming over the --

**THE COURT:** Mr. Brugnara, you cannot scream over the objection.

**MR. BRUGNARA:** Let's look at this --

**THE COURT:** Please. Stop.

**MR. BRUGNARA:** (As read)

**"QUESTION:** Have the Valsuani Little Dancer bronze been exhibited" --

**THE COURT:** Mr. Brugnara, stop.

My memory of it is -- is that the -- you had asked that

question.

**MR. BRUGNARA:** That's not --

**THE COURT:** -- but the witness could not confirm it and that is, therefore, not in evidence.

**MR. BRUGNARA:** Okay.

"**QUESTION:** Have the Valsuani Little Dancer" --

This is in evidence though. Because, like you said, your Honor, we're in the United States of America. That's all that matters. The United States of America. To hell with everyone else.

Hey, look.

"**QUESTION:** Have the Valsuani Little Dancer bronzes been exhibited in museums in the United States?

"**ANSWER:** No, not at this point."

Been rejected by the museums. Been rejected by all the auction houses. Everyone knows the auction houses will sell anything to make a buck. They are not worth anything.

But they are going to go sell it to the idiot Brugnara over here for, what, 4 million, 3 million. Who knows how much? I mean -- I mean, that's like the craziest part of the story. They are going to rip me off? Selling me some garbage -- and then -- and they are going to sell -- how about this? This is just off memory.

You heard Rotter say, the guy from Sotheby's -- and I'll give you the exact quote. He said: How do you determine if a

de Kooning is real?

Well, first, you've got to go back to what Maibaum says. Maibaum said: Well, you know, I go to the provenance.

Well, are you an expert on de Kooning? He goes: No, I'm not an expert on de Kooning. I defer that to Long.

Defer it to Long? Okay. Well, it doesn't matter. All right? "I go by the provenance."

So he goes: So if I believe the provenance comes from someone that I trust, I'll sell it and put my name on it.

So he says he trusts this guy named Carlson. It's right in the transcribed record. I go: So you trust Carlson because he said it came -- that this is by de Kooning? He goes: Yes.

I go: But Carlson -- I go: You're aware he's a geologist. How does he know if it's by de Kooning? Doesn't matter. I trust them. I mean, this guy has an answer for everything.

Okay? And then I said: Are you aware that he purportedly paid $50,000? He goes: Oh, I don't know. He can charge whatever he wants.

I go: You're putting your name on it. Don't you have an ethical duty, was my question to him, before you put your name on something to at least do a vetting out and do, at least, an ethical amount of due diligence before you try to sell something from him? He goes: No. He basically said: I

trusted the guy that brought it to me.

Then I basically said: You're telling me if this guy brings you another ten de Koonings, you're going to go sell it for go another $6 million or whatever millions you can get? He goes: Yes.

So basically this guy that he has only known for two years, Carlson, has a money printing machine. Think about this. Infer this. He's got a money printing machine sitting back in Connecticut or wherever he's at. Okay. Time to get another million bucks. I think I'm going to bring this over to Maibaum that my kid, my grandchild, or whoever -- you saw. That thing was a joke. Did you see what they said was a de Kooning? It was a joke. It was a -- it was a bunch of garbage on a piece of -- you saw it with your eyes. Infer? That was a piece of garbage.

Did you see -- did you see what Rotter did when he walked by it? I am pseudo perceptive. I am very, very, very, very, very, very perceptive. I think you saw the same thing as me. He walked by that de Kooning and he didn't even look at it. He walked right by it.

**MS. HARRIS:** Your Honor, this is a --

**MR. BRUGNARA:** You remember it.

**MS. HARRIS:** The artwork was not in the room when that man testified, so this is completely false and untrue.

**MR. BRUGNARA:** That artwork sat there in this room.

**THE COURT:** I'm sorry. What witness are we talking about?

**MR. BRUGNARA:** She made a false statement. You know how long that artwork was here --

**MS. HARRIS:** Your Honor --

(Simultaneous cross talk.)

**MS. HARRIS:** He's screaming. He's screaming.

**THE COURT:** Ms. Harris is correct.

**MS. HARRIS:** Your Honor. Your Honor. Your Honor, can you rule so that the jury can hear the ruling on the objection and stop him from screaming?

(Simultaneous cross talk.)

**THE COURT:** Mr. Brugnara, you need to let me rule. I believe Ms. Harris is --

**MR. BRUGNARA:** Ms. Harris isn't going to cut me off.

**THE COURT:** -- correct. When that witness was here, that artwork had been removed.

**MR. BRUGNARA:** Not true. Not true.

**THE COURT:** Okay. The jury is going to go -- go with your own memory.

**MR. BRUGNARA:** Not true. He's --

(Simultaneous cross talk.)

**THE COURT:** Wait. The jury goes with your own memory of how you remember that, but there is an issue. So be mindful that there is an issue.

Go ahead, Mr. Brugnara.

**MR. BRUGNARA:** Okay. So let's go to salient terms that we know what he said, because this is on the transcript. And, please, be very liberal about asking Judge Alsup to see the transcript because that's what this case is about, the evidence.

And what Rotter said was -- and, again, I'm really pressed for time, because I actually deciphered it out here. So what I'm telling you, I've already vetted out in each of these piles.

This is the thing. What Rotter said, the gist of it was two-fold. A, we're going to go see and we're going to see if it's in one of these eight books. Meaning, if Sotheby's is going to sell it as an authentic de Kooning. If it's not in one of the eight books, we contact the de Kooning Foundation and the daughter is at the de Kooning Foundation and they let us know anywhere, he said, I believe, from a week to a month or somewhere in a few-week period. Could be quicker depending on the urgency if it's a de Kooning.

So there's two ways to authentic a de Kooning, which is the exact opposite of what Rose Long and Maibaum said. They said, no, the de Kooning Foundation does not authenticate works of art. Totally impeached by the head of Sotheby's. They don't authenticate works of art, but they authenticate real works of art.

And what determines whether or not a de Kooning is worth millions and millions and millions of dollars or me putting a scribble on this paper, that you all can do, and taking a pencil and signing "de Kooning."

And it goes back to the emails that were put in to evidence. First email was Schochet. "Your client has a history of art fraud." That was allowed into evidence. Okay?

Do you remember the question I asked Harvey Schochet? I think I finally got his name right. Hey, have you vetted out your clients?

Do you remember that question? I'll pull it up for you. I've got it in the pile. "Have you vetted out your clients?" Meaning, do you do a cursory check for criminal, civil litigation on your clients? He said no.

Infer what you need to from that. Oh, you don't have to infer too much because what Judge Alsup did let in was the *Maibaum versus Long* lawsuit that's going on right now, as we speak this very moment, in the Federal District of New York. And what's going on in that lawsuit? The two thieves are (indicating) at each other right now. Fraud, concealment, intentional deception on the exact art in this case.

And did you hear what Long said? Did you hear how she squirmed out of that one? She said: I didn't adopt that cross-complaint.

That's an insult to the jury. That is an insult to the

jury. How dare she say that? She's sitting up there, she didn't give her attorney the authority to file a cross complaint in Federal Court where these judges sit.

**MS. HARRIS:** Objection, your Honor.

**MR. BRUGNARA:** That's what she said under oath.

**THE COURT:** That's not what she said.

**MR. BRUGNARA:** That is what she -- and I will pull it out right now.

**THE COURT:** Why don't you quote what she did say?

**MR. BRUGNARA:** That is exactly -- well, I'll quote if you give me an extra five minutes. I'm not going to waste -- they can pull it up --

**THE COURT:** Then move on.

**MR. BRUGNARA:** She said -- I was not allowed to expand on that, other than what Judge Alsup read, because she squirmed out of it and said: Well, I -- I didn't read that. And Judge Alsup goes -- she didn't use the word "adopt." She goes: I didn't read that. I didn't authorize that. Judge Alsup goes: Well, it's not been adopted, so you got in what you got in.

And what we did get in, thank God, is that -- remember this one? The foot through the painting? How funny was that one? That piece of garbage that they put in front of you? You know what that thing is worth? Nothing. It's had a foot go through that. Did you hear her testimony? A foot had gone

through that painting. I mean, come on. You don't need to be an art expert to realize what that does to a painting's value. I mean, maybe if you're buying it in a thrift shop for a couple hundred bucks. This stuff is garbage.

And if you read the lawsuit that Judge Alsup allowed in, she was suing -- she's suing Maibaum because she went to the auction houses to try to dump this piece of garbage, the portrait of the girl, at the auction houses and they said: No, we've already seen this. We're not interested. We don't want it. Okay?

And you can infer from what Jennifer Biederbeck said, NSV and don't want anything worth less than five grand. So she's trying to take a piece of garbage that's worth less than $5,000 and trying to dump it on me for 450 grand.

This woman has gall, man. She gets ripped off for 350 grand by her little partner Maibaum, okay, and then she tries to dump off that piece of garbage on me for 450 grand after she knew a foot had gone through it and she already knew the auction houses had rejected it.

And she testified, and even put in one of the emails: Oh, yeah, yeah, yeah. The auction houses wants this, but no, no, no, I'm not going to -- she's a liar. She's a liar, man. She perjures herself. She's a liar. She's a deceptive, evil woman. She's bad, man. And I'm -- I've got, like, 30 other lies here. If I have time, I'll go through them. But, I

mean, you get the point.

Let me shoot off a few of them for you, just so we can keep this message coming clear here. I was the victim here. I was the victim. And I am still the victim because I'm being tortured.

**THE COURT:** You've used an hour and five minutes.

**MR. BRUGNARA:** Well, good. I've got 55 minutes then. I'm sure you will cut me off at my tongue here when that second hits. Because I have been muffled in this courtroom, as you're all aware.

So, okay. How about this one? Here is just a snapshot. I have them all backed up here.

All right. All right. We've got four covered. Let's go to five.

(Document displayed.)

"**QUESTION:** Did you watch the crates get unloaded?

"**ANSWER:** Yes."

That's a lie.

Next lie.

"**QUESTION:** Garage is completely empty."

I think we've already done that.

"**QUESTION:** Delivery crew left at that point?

"**ANSWER:** Yeah.

"**QUESTION:** Do you remember the Form hearing last year?

**"ANSWER:** Yes."

Here is the part about the empty garage.

(Document displayed)

Let's go on to the next one, okay?

(Document displayed.)

The box of tools. You saw -- you have it in evidence. Bob Kane with the little white box, it's six inches. Her box of tools to open the crates, a six-inch pair of pliers.

You heard Castillo testify you need a commercial grade screw gun to open these things up. You don't need to be a contractor to know that. The woman is nuts. She brings a six-inch Leatherman. Six inches. Bob Kane has the measurements. It's in evidence. And that's what I'm supposed to open the crates with? Absurd.

Phil Patterson filed her cross-complaint without her approval? Wow.

Here we go. You know, actually -- I actually have it here. Let's roll through these. How about this.

**"QUESTION:** Are you familiar with the lawsuit in the Southern District of New York?

**"ANSWER:** Yes.

**"QUESTION:** *Maibaum versus Littlejohn*."

That's her new name, by the way, Littlejohn. Because, I guess, too many people have found out about all of her fraud with Long.

**MS. HARRIS:** Objection, your Honor.

**MR. BRUGNARA:** Here is the --

**MS. HARRIS:** Improper.

(Simultaneous cross talk.)

**MR. BRUGNARA:** Here is the actual lawsuit --

**THE COURT:** Sustained. Objection sustained.

**MR. BRUGNARA:** Ms. Littlejohn, blah, blah, blah. Blah, blah, blah.

"The mere fact that a work of art is offered to numerous potential buyers can decrease the market value. The auction houses concluded it was heavily damaged and rejected both for inclusion."

I mean, how do you feel about that? She's here.

And this is the thing that should make you all angry. They are using your taxpayer's money.

And I come from a humble background. You know, I remember getting that 33 percent taken out of your paycheck. Where does my money go? Now -- why are you have taking this chunk of money out of my paycheck? You know what I'm saying. It goes to pay them. It goes to pay them (indicating). They are being paid from your tax dollars. Advancing her scam. That should enrage you. It enrages me. I haven't seen my children in 11 months.

Okay. Look at this. Look at this. I go on here. Look

at this.

(Document displayed.)

So, "I want to use the exact quote from your email."

And the U.S. Attorneys put this into evidence.

> "No one but auctions or dealers have tried to obtain it. Just a try by the auction houses to obtain it."

Really? That's funny. That's not what the lawsuit says. I guess Patterson is going to get disbarred in Manhattan because Patterson says here they don't want it.

So either Patterson is a liar or Long is a liar. Either I'm a liar or Long is a liar. You know, Castillo is a liar or Long is a liar.

She even said she was at the packing -- remember when I asked Long and Maibaum, I said: Hey, hey, hey. Were you there to pack -- watch the packing of the crates? Trejos goes: No. Nobody was there. Long, hey, she was there, too. I mean, this woman is all over the place, she was there watching the crate getting picked up. I will get to that next.

(Document displayed.)

There it is. Just try by the auction houses to obtain it.

I mean, how much insult does this Court need before they say this is a disgrace?

And I say: Hey, I want to get the attorney here right now

on an express flight.

So we go on here. Try to give her an out here. I'm a nice guy. I go, okay. I'm going to let this woman extract herself from this mess she has put her in. Got the name of the guy, Phil Patterson.

What I was really doing was to try to get the guy's name so we could subpoena him.

**MS. HARRIS:** Objection, your Honor.

**MR. BRUGNARA:** But we couldn't get him here because the judge doesn't want him here.

**MS. HARRIS:** Objection, your Honor. This is totally improper --

**MR. BRUGNARA:** Moving along --

**MS. HARRIS:** And I ask you to instruct the jury --

**MR. BRUGNARA:** We'll go on -- we'll go on -- we'll go on --

(Simultaneous cross talk.)

**THE COURT:** Wait, Mr. Brugnara. I need to explain.

**MS. HARRIS:** Your Honor --

**THE COURT:** I need to explain, because you now laid some blame on the Court.

The Court had a hearing outside the presence of the jury and under the law there was not a legal basis under the Rules of Evidence to bring that lawyer from New York. So that is the reason we did not issue a subpoena to the lawyer in New

York.

**MR. BRUGNARA:** And I objected.

**THE COURT:** You objected, fine. But we had a hearing on that and everyone was heard on that out of the presence of the jury.

**MR. BRUGNARA:** So Ms. Littlejohn: How did your attorney, Mr. Patterson, contrive these lies in the District Court filing if you didn't give him the information and write the document?

So, I guess, now Patterson is a clairvoyant, too --

**MS. HARRIS:** Your Honor, the objection was sustained to that.

**MR. BRUGNARA:** He knows -- he knows -- he knows about the foot going through -- he knows about the foot -- well, I'm a perfectionist when it comes to details, man. I don't need notes. I remember things.

Hey, hey. Patterson wrote in the filing that I just cited about the fake art that -- rejection by the auction houses. Then it goes on talking about the foot through the art.

How did he come up with that unless she told him? She lied again, perjured herself on the witness stand: Oh, I didn't endorse that. I don't -- I didn't see that. I didn't approve that. Wasn't me.

Okay. The woman -- the woman doesn't care -- look, how about this one? This is a funny one.

(Document displayed.)

**"QUESTION:** Okay. Sounds like you said you've sold 300 pieces of art, right? How many times have you had a sales contract?

**"ANSWER:** Quite often.

**"QUESTION:** Every time?

**"ANSWER:** Yes."

Okay. Let's -- so she's had a sales contract every time, right? Except on this big multi-million dollar scam that she's perpetuating.

And what's been put into evidence is, in fact, the Maibaum contract that we showed you what a real contract looks like on an art sale, and it has a whole page of contingencies and it has a whole page of disclaimers or paragraphs, at least. And what it does basically, it sets out the terms and conditions of the sale on an art transaction. And she, of course, didn't have it on this sale, because there was no sale. All right? And the art wasn't worth anything and it's still not worth anything.

But the thing is this. I didn't defraud her. How about this for just deflating their entire fraud argument? Notwithstanding everything else. The last email I sent her out of this little tiny little handful of emails was, "Use ShipArt." "Use ShipArt."

Maibaum testified what ShipArt is. Maibaum testified what

ShipArt -- Maibaum said: ShipArt is a third-party escrow. It's a third-party escrow. And what that means is the art goes to ShipArt and it stays there, just like on the other deal, and I go look at it. And if I want the stuff, I pay for it; and if I don't want the stuff, I don't pay for it. And that's why I told her use ShipArt.

How could it be fraud? And that's from Maibaum. Maibaum said ShipArt is a third-party escrow in his testimony. I'm going to read it to you.

That is the day -- the last email I sent her. Use ShipArt. Don't bring it to my house. Use ShipArt. Use ShipArt.

And she didn't use ShipArt. But it proves further my intent, because this case is about my intent. What was my intent? My intent was to, okay, I got 365 days. The intent is what's going on between my ears. Not what's going on between her ears.

And the intent, based upon all the correspondence that's been submitted into evidence, I had 365 days. And then she came in and says: This is a gift. But counsel is immediately hired to extract that entire situation. Extract me from it.

Bob Kane testified here just a couple of days ago that the gift was not a complete non-issue. He said: No, we're getting stuff out of the garage. His testimony -- you can pull it up from Judge Alsup -- was that we made good progress.

The gift was not an issue.

The only open issue that he said -- and he said he spent all of April before he went to pick up his daughter at Vanderbilt. The only open issue was their own internal insurance issue. That's what he testified on that witness stand. Meaning, all my issues were no longer of material point.

The only issue was whatever their internal issues were -- testified that he went home -- or, excuse me. He went to go on his vacation to go pick up his daughter from Vanderbilt, okay?

I passed the baton to Bob Kane. Bob Kane said, his understanding was to get the stuff out of the garage.

What else could have I done? I mean, really? What else could have I done? What else could have I done? Forty-eight hours. What else could have I done? What else could have I done?

You saw my first email to Schochet. The woman is involved in fraud. It's well known. What else could I have done?

So you get yourself in a bad situation. You heard everyone. None of these crates were touched. None of them were opened. Okay? Nothing was touched. Nothing was molested. Nothing was interfered with. I didn't touch anything. Okay? And that's the proof of the evidence. Nothing was touched.

And what did I do? I hired Bob Kane. And that's not cheap. That's not cheap. You can only infer how much that costs an hour, based upon your own experiences. But imagine how much money that costs.

If I'm engaged in a fraud, why would I be paying Bob Kane hundreds and hundreds and hundreds --

**MS. HARRIS:** Objection, your Honor. There is no evidence of any payment being made to Bob Kane --

**MR. BRUGNARA:** You can infer -- no, Bob Kane was hired.

(Simultaneous cross talk.)

**THE COURT:** Sustained.

**MS. HARRIS:** Your Honor, can you stop the defendant when --

**MR. BRUGNARA:** You can infer -- you can infer --

**THE COURT:** Mr. Brugnara, I need to rule on the objection. I sustain the objection. There is no evidence about how much was paid to Bob Kane.

**MR. BRUGNARA:** You can infer -- listen, you can infer what you want about how much Bob Kane charges, okay, but you can probably get a good guesstimate. He did testify that he worked on it for all of April. Okay? So infer how much that costs. He also inferred that he was out at the house for several hours.

The fact is he did everything to accommodate them. Took

photographs. The measurements. Did everything they asked. Okay? What else could have we done? Okay?

Now, he starts saying: Hey, well, listen, there is a box missing. They said: What's the problem? Hey, listen. We send them a redaction of their mistake, where it says four with a question mark. Four with a question mark.

And if you go back to -- to Schochet's -- go back to Schochet's testimony, he said that that was the -- here. I'm going to read the quote for you right here.

(Document displayed.)

"**ANSWER:** Yes. And the four crates" --

And this is Page 1400.

"**ANSWER:** And the four crates, if people will remember, were bracket 4, question mark, close bracket, because at that point we hadn't established the number."

That's a huge statement right there. This is the attorney talking now.

"At that point we hadn't established the number."

That's a very specific statement. He didn't put seven question mark. He didn't put three question mark. He didn't put five question mark. He put four question mark, because he hadn't established the number of crates.

And the fact of the matter of is, we, through Bob Kane,

put down five because there was a box there. There was a white box sitting there. Bob Kane told him there is a box. There's crates. Boom. You have it.

The measurements are taken. And the other thing is, the testimony regarding this fifth crate. The measurements are very important. And I'm going to put up some photographs to show you. Because this is the thing. Not that it's -- kind of a curiosity more than anything because I didn't commit fraud, but it is a curiosity.

And this is the other thing, going back to who they allege was the buyer was? Boom. Look. Does it say Luke Brugnara or does it say Brugnara Properties? Do you see on the screen there? That's their evidence. It says "Brugnara Properties."

Luke Brugnara hasn't done anything, man. I've always been an indigent from a legal standpoint. Brugnara Properties is it's own entity that, in fact, owns --

**MS. HARRIS:** Your Honor, Mr. Brugnara is testifying. There is no evidence that --

(Simultaneous cross talk.)

**MR. BRUGNARA:** It has come in through Mark Levinson that Brugnara Properties was --

**MS. HARRIS:** There is no evidence of this.

**THE COURT:** Of what? I'm confused. I don't even understand the point.

**MR. BRUGNARA:** Okay. The point is --

**THE COURT:** I'm afraid I can't rule on it because I don't understand the point.

**MR. BRUGNARA:** Well, you don't have to understand the point. The jury has to understand the point. And I have a limited amount of time.

The point is, they brought up a personal financial statement, which is legally completely different than a business financial statement. If they said: What is Brugnara Properties' financial statement? They are going to see hundreds every millions of dollars.

**MS. HARRIS:** Objection, your Honor. There is no evidence of that whatsoever.

**THE COURT:** Sustained.

**MS. HARRIS:** It's completely false.

(Simultaneous cross talk.)

**MR. BRUGNARA:** There is evidence from Mark Levinson?

**THE COURT:** Sustained. Sustained.

**MR. BRUGNARA:** Let me do this first, but then I'll show that to you. So you've got that.

There is the crates.

(Photograph displayed.)

**THE COURT:** I don't believe there is any financial statement showing what you just said in evidence about Brugnara Properties.

**MR. BRUGNARA:** Excuse me. There is logical

deduction -- I'm going to show it to you.

This is what I have to deal with. Getting hit from both sides here. You've seen it for two weeks.

Mark Levinson has a letter that the house is worth $21 million. Mark Levinson is the top broker in San Francisco.

Jennifer Senhaji's title report from last year says there is $7 million owed on the house. 21 minus 7 is 14 million. There's $14 million.

Barbato says he can get a $125 million loan on the water rights off a $200 million valuation. That's another $200 million. Just those two assets alone is over 200 million bucks, plus whatever else I control. Okay?

This is the fact. Look. Here's the pictures that are kind of interesting. And I'll prove those up for you. They are in evidence. Here is some interesting pictures.

(Photograph displayed.)

Here is the crates, okay? So they can't fit here. Everyone says the only place that crate could have gone is there (indicating). Okay?

Let me get a pen...

The only place that this crate could have gone is here (indicating), because it can't go here (indicating). The thing weighs, like, a thousand pounds, Castillo said, right, or more.

Okay. So here's the crates packed in. There is that coffin-shaped box right there.

(Photograph displayed.)

Here is the house. You know, they try to say my house is a garbage pit. Come on. That's a living room. That doesn't look that bad, does it? I mean, it's probably not the nicest house in the world, but, you know.

I mean, I think it's pretty slimy for them to go into closets. You heard Agent Hadley. I said: How big is that house? You get the other six or seven bedrooms? She said: No. I said: Why not? She goes: Well, no. We did get them. She goes: But they just didn't put them into evidence.

Again, infer what you want from that, but to me that sure is deceptive of what they are trying to present to the jury. I think it would have been a lot more honest showing the entire house to you so you can say: Okay. Well, some of the house is clean. Some of the house is dirty. That would have been the honest thing to do.

In business it's called being transparent. When you're transparent, you're being honest. I live in a world of transparency and honesty. They don't. They don't. I do. I live in a world of honesty. If I am wrong, I will be the first to admit I'm wrong. If I'm not wrong, I will fight to the death and you can bury me in the ground because I'm not going to concede. Okay?

The fact of the matter is, the house is fine, okay. It's good a few messy areas. You've got four kids, man. Stuff piled up. You know, 80 percent of that house is fine --

**MS. HARRIS:** Objection, your Honor. The defendant is testifying --

(Simultaneous cross talk.)

**MR. BRUGNARA:** Agent Hadley testified to that. You can infer what you want from that --

**MS. HARRIS:** Agent Hadley did not testify to that --

**MR. BRUGNARA:** Here, it is.

(Photo displayed.)

Let's talk about the missing crate. And I want to put up the good picture here, because Agent Hadley and Bob Kane and everyone all agree on one thing. And I believe that we all said on that missing crate, that it would go right there (indicating).

Okay? Now, I want to get the picture from the street to show you. So we can make some statement -- okay. So let's look at this. Let's find ought about this crate. Okay? Let's talk about this crate.

Listen. They can probably go there. Okay? You would have to squeeze it in. But I think we all agree, might probably, probably should fit. Okay?

I'm going to read the testimony to you, or you can ask Judge Alsup for it because I feel I'm going to be running

short on time, so I'm just going to cite this. And then ask Judge Alsup for the testimony.

Mark Levinson said when he got there Rose Long was leaving. He was coming in. He came in. The garage door was open. I closed it. Rose Long left. Garage door was open. When Mark Levinson and I left, the garage door was open. When Mark Levinson left, the garage door was open. He was with me for one hour. He was with me for one hour.

He testified when he came out of the garage, there was contractors there. He testified that there were -- there were movers there and that there were trucks there mulling around in front of my house. Okay? So here is the picture.

(Photograph displayed.)

Okay. Now, this is important to look at this picture because the first thing is there is construction material there.

Castillo testified that this was drywall and looked like mud and screws and sheetrocks. So if you're a contractor, you can infer this. What Mark Levinson said -- and I want to pull up his testimony, but what he said regarding this was that in his experience, also, that contractors sometimes will lift things off job sites, what-have-you. That's what he said. And I will cite that for you because the question I asked him was: Was there a guard down there? And he goes: Yes, there was. Not only was there a guard, he said, there's a uniformed

security guard, from here to the gentleman standing at the door. He said, 100 feet away. 100 feet.

So you've got a uniformed security guard, a uniformed guard on a $20 million -- he said 15- to $20 million project at Marc Benioff's house, and he said Kurt Hammett of Metallica was having his house renovated --

**MS. HARRIS:** Objection, your Honor. There was no such testimony --

**MR. BRUGNARA:** Yeah, there is. And I will pull it up. He says there were two to three projects going on --

**THE COURT:** There was some questions about a guard.

**MR. BRUGNARA:** Yeah.

**THE COURT:** I don't remember what the testimony was.

**MR. BRUGNARA:** Okay. If you want to force me to pull it up, let's do it --

(Simultaneous cross talk.)

**MS. HARRIS:** Mr. Levinson said he couldn't give the names --

**MR. BRUGNARA:** I would like to cite --

**MS. HARRIS:** -- it's confidential, and Mr. Brugnara just testified.

**MR. BRUGNARA:** Let's cite -- let's cite -- I'll read it to you, ladies and gentlemen.

**THE COURT:** What is the point you're trying to make?

**MR. BRUGNARA:** I would rather -- I would rather read

it just to get her to be quiet.

**THE COURT:** All right. Then read it, but there was something about a guard, I do recall that. I think he did say he could not give the name.

**MR. BRUGNARA:** How about this? Now that we've got the little -- you've got do remember, I have been dealing with no paper clips, no staples, nothing for --

**MS. HARRIS:** Objection, your Honor. This is totally improper.

**THE COURT:** Sustained.

**MR. BRUGNARA:** This isn't -- no, because Mark -- it goes into evidence.

I asked Jennifer Senhaji: Am I ever disorganized? She said: Never. Remember her testimony? She said: You're always extremely organized.

So for me, it's really hard.

Look at this. Hey. Mark Levinson met with the woman for 60 seconds. Look what he said. "I recall she was little slow." Boom, boom. Right there.

Let's go on to the next one. She made quite an impression on Levinson in 60 seconds. And that's actually a nice description of her.

Okay. Here it is.

(Document displayed.)

"**QUESTION:** Forty-five minutes. Walked out, the

garage door was open. Do you remember that?

**"ANSWER:** I recall there was some workmen there. I don't know if they were picking up something or" --

**MS. HARRIS:** Your Honor, he's reading the questions, not the answers.

**MR. BRUGNARA:** Excuse me. Here it is. Here it is. Ladies and gentlemen, I'm trying to get through this quick.

**THE COURT:** Well, let's make sure we can all distinguish between the questions and answers.

**MR. BRUGNARA:** (As read)

**"ANSWER:** I recall that there were some workmen there. I don't know if they were picking up something or delivering something off."

And then he gets into talking about the garage. Okay? And then here, talked about the remodel.

**"QUESTION:** So, Mark, the garage door is open and you and I are walking out. There is contractors."

Talking about the remodel he had?

**MS. HARRIS:** There was an objection.

**THE COURT:** That was a question. That was a question, not the answer.

**MR. BRUGNARA:** Here is what he says:

**"ANSWER:** Yes, sir. During the 300, 200 block of Sea Cliff Avenue is filled with pickup trucks and construction vehicles. There's probably two-plus

projects going on."

So they referred to two-plus on the one block. Just like I said. She said there weren't. I said there was either two or three. That's what he testified to.

Now we're going to get into the security guard. Let's talk about the security guard. Oh, how about this one. This guy has known me for a long time.

(Document displayed.)

"**QUESTION:** Do you think I'm a thief?

"**ANSWER:** No.

"**QUESTION:** Do you think I'm overbearing?

"**ANSWER:** Sometimes.

"**QUESTION:** But do you think I'm a thief?

"**ANSWER:** No."

Let's go to the security guard.

(Document displayed.)

"**QUESTION:** Was there is a uniformed security guard standing in front of 300 Sea Cliff?

"**ANSWER:** Yes. Yes, there was.

"**QUESTION:** Why would a security guard be at 300 Sea Cliff? Would it be for theft for would it be for another reason?

"**ANSWER:** Theft, people taking things; tools, supplies. There are valuable items that the contractors work with and that the clients buy."

So, I mean -- so what you have is a big project going on, a couple of doors -- there's actually three projects going on, dozens and dozens of contractors on their lunch break and one of them grabbed the box. That's what happened.

And you know how we know that? Because Mark Levinson also testified and -- you heard the testimony how big I was. Okay? You heard that's the only ingress and egress out of the house because the front gate is sealed. I certainly couldn't have squeezed by there.

It was gone in the first hour. That's what happened. The garage door was open. I was with them in there. They were on their lunch break. You know why they took it? Because it was -- because you can infer that it was in a nondescript pine box. Because if someone is going to grab something, they are not going to grab sheet rock or they aren't going to grab a box of screws.

You can infer, based upon your experiences and knowledge, that what comes in nondescript pine boxes are toilets, vanities, you know, things that -- you know, clearly, they didn't think there was a piece of fake in art there.

They're probably actually disappointed. That's the irony of this. They probably got back and probably tossed it where it belongs, in the garbage somewhere.

The fact is, they wanted maybe a toilet, maybe a vanity. That's the only thing that makes sense, because I didn't take

it. Anyone with any sense can see -- you know, everyone has said, you know, you can't fake passion. That's like accusing you of doing something. You can't fake that. If you can fake that, you should be in the Academy Awards right now in Hollywood. I didn't take anything. Okay. You can infer --

**MS. HARRIS:** Objection, your Honor --

**MR. BRUGNARA:** You can infer that --

**MS. HARRIS:** -- the defendant is testifying --

**THE COURT:** Sustained. Sustained.

(Simultaneous cross talk.)

**MS. HARRIS:** Your Honor, can you instruct the jury about --

**THE COURT:** The jury will disregard the statement that "I didn't take anything." That was not testified to under oath from the witness stand.

**MR. BRUGNARA:** You can infer -- you can infer -- you can infer from the witnesses that testified on my behalf, Tony Crossley, Frank Sanders, Nick Barbato and Mark Levinson, who flat-out said, you're not a thief.

Man, if -- everyone in this jury knows what a thief is. Man, you're a thief, your whole life you're a thief. And you can infer that certainly. You don't become a thief when you're 40-something or 50. I mean, you don't become a thief. You're a thief.

Hey, listen. The fact of the matter is, there is a guard

sitting there, just like that gentleman at the door there, about that far away, to prevent theft of this exact stuff that's right here. So somebody is going to come by. There is trucks. There's delivery men. They threw it in the back of their truck. They're gone in five seconds. That's what happened. You know, that's the way it goes, you know? So be it.

Maibaum, who knows. Maybe it was Maibaum. The guy was doing cartwheels to get his insurance done. He testified: Oh, I've already collected, already cashed the insurance check. Really? How can he get an insurance check cashed with Sotheby's won't even sell it for $5,000. Maybe the FBI should investigate that one. How can he get an insurance policy on an item that nobody on the planet says is worth anything. But you can infer that from the facts.

But that's what happened to the box, okay?

**THE COURT:** All right. You have 30 minutes left.

**MR. BRUGNARA:** Okay.

That's what happened to the box. Because you know what? I believe Castillo didn't take it. I still believe in human beings. You can say: Oh, well, maybe Castillo get paid off by Maibaum not to drop it off. I don't believe it. I think Castillo is a good guy. I trust people, you know. I still got a big heart, you know. I mean, I don't -- I don't think -- I don't think -- I don't think he took it. I think

some -- someone probably figured it was a toilet. That's what you can infer from that picture.

I mean, the FBI, everyone came to the same thing. If the crate got delivered, that's the only place where it could have gone, is right next to the sheet rock and screws.

Mark Levinson testifies, walks out. Boom. The crate is gone. He testified it looks the same as the first day. It's right there. Do these pictures look the same to you? Yeah they look the same.

You would know if a crate was there, okay? It wasn't there. He would say: No, I couldn't get out. I had to squeeze by really hard to get out through that front door. But he goes: No, that's the same.

So that's -- that's what happened to the crate.

Let's talk about some of these other charges. I can bore you to death here with the deals. I don't want to do it, you know. I was going to, but I don't think I have to. I will spend ten seconds on it, just so they don't continue to besmirch me on their cross.

$2 billion of transactions without any claims of criminal misconduct that came from Tony Crossley, that came from Frank Sanders, that came from Jennifer Senhaji. Three of the top real estate professionals in the country.

Testified I always paid in full on time came from Frank Sanders.

Joan Michelman and Sotheby's testified I purchased tens of millions of dollars of artwork without any issues.

Biederbeck testified they lent me $7 million. I can borrow money just on art. I can borrow money just on art. She said, right in her testimony, $6.95 million art loan. That has nothing to do with real estate. That was in her testimony.

Jennifer Senhaji testified she transferred my escrow on the Las Vegas escrow with the purchase and sale contract, which is Exhibit X that was shown her, on the Convention Center Drive project. Go look at the transcribed record. Had a purchase of sale contract. The open escrow. And that's where the museum is going.

Mark Levinson testified, I have four children, school-age children. Any of you have children on the jury, it's a club. You know how it is when you have kids. You know?

I mean, these are just outrageous accusations. They are insulting and when they don't have anything solid to back it up except conjecture, speculation and some statement from some one sole claimant who is nuts and a liar. That's -- that's horrible. Because you're dealing now with a whole family. You can infer you're dealing with a whole family --

**MS. HARRIS:** Objection, your Honor. This is totally improper.

**MR. BRUGNARA:** It is not improper --

**THE COURT:** It is not --

**MS. HARRIS:** And, your Honor, can you he instruct the jury?

**THE COURT:** It's an appeal to sympathy and it should not be --

**MR. BRUGNARA:** It is not an appeal to sympathy --

(Simultaneous cross talk.)

**MS. HARRIS:** Your Honor, can you finish your ruling so the jury can hear it without Mr. Brugnara talking over it?

**THE COURT:** Mr. Brugnara, let me finish.

The question is whether or not the Government has proven its case beyond a reasonable doubt.

**MR. BRUGNARA:** I'm -- they --

**THE COURT:** So appeal to sympathy is not proper argument.

**MR. BRUGNARA:** I'm not appealing to sympathy.

Me saying I have four children, I'm proud of that. That is more of an accomplishment to me than $2 billion of deals. Money isn't anything. My children are everything to me and that is -- that came in the testimony from Mark Levinson. He said: He has four children, school-age children.

That's why I'm here right now, to be with my children. I don't care --

**MS. HARRIS:** Your Honor, this is the same improper objection. Can you please instruct Mr. Brugnara and the

jury --

**MR. BRUGNARA:** I'm moving on, ladies and gentlemen --

**THE COURT:** The jury understands --

**MR. BRUGNARA:** They testified that I was --

(Simultaneous cross talk.)

**THE COURT:** Please.

**MR. BRUGNARA:** They testified that I paid down $11.9 million in 2013. That's the destitute washed-up guy, right? That's pretty good for a guy who is destitute and washed up, paying off 12 million bucks last year.

Okay. They gave me just under 2 million bucks two weeks later and me getting a million five ready to close June 1st. Okay? And then buying another Tiburon house where I had to assume the first at two million nine.

They are on a mission. Forgive them, please. They don't know what they are doing, all right?

They testified that my tax matter was not an impediment to getting any loans. And that's prima facie. Already got the loan last year, multi-million dollar loan, okay?

Testified that I borrowed nearly 6.9 just on one art loan. That's just one. There were many. That's just one. I mean, it's just ridiculous.

The problem is their whole concept. Hey, look at this financial statement. This guy has got no money. Really? That was two years ago. Mark Levinson said -- and we have the

evidence --

**MS. HARRIS:** Objection, your Honor. It was April 7, 2014. That misstates the testimony.

**MR. BRUGNARA:** It doesn't matter. It's the same as today. I'll make a statement. It could be ten years ago. It could be two days ago. It could be two minutes ago. It's the same. I don't own -- I don't own anything.

**MS. HARRIS:** Objection, your Honor. The defendant is now testifying and putting facts before the jury that are not in evidence.

**MR. BRUGNARA:** Here it is --

**THE COURT:** Sustained.

**MR. BRUGNARA:** Here is -- here is -- here is the proof that's in evidence. Here is the proof that's in evidence regarding values. And you have it, jury members. It's the Mark Levinson letter. You know, I've got such a scattering of paper here, but I don't have that many exhibits.

It's the letter from Mark Levinson dated from last year saying the house is worth 21 million bucks. You heard his testimony. He just sold a shack two doors over that's not even on a cliff for $3,100 a foot. So he said it's even over that price now.

So as of last year, but for this instant matter, which was this case, the instant matter, was 21 million minus 7, 14 million bucks.

Okay. Let me just finish this list up so we can get on to this abscond. Okay? Abscond is the escape.

Okay. Nick Barbato was talking about a $125 million loan on my water. Remember, once we get the municipality transaction signed on a value of $200 million, which is totally independent from all the other entities.

We have proof of the conference calls literally the week this happened with all the -- the biggest hedge funds in the world.

Okay. Now, hey. Let's go and just in a sec right now through the indictment point-by-point. I mean, this is just a complete deception right here.

I never devised any scheme to defraud. Long solicited Luke. Luke never agreed to pay anything. I had a contingency period to look and decide what I wanted to do. I told her to use ShipArt, which is a third-party escrow. It would never even have been delivered to my house. And even if ShipArt delivered the art, as you saw them with their shirts come in here, they take it out of the crates.

That came from Joan Michelman's testimony. She said when she uses hard handling services, Joan Michelman testified, she doesn't deal with the crates or even see the crates. They just bring it to her house as an accommodation after she looks at it there. But this, as you can imagine, doesn't happen in houses, logistically and for numerous other reasons.

I couldn't have done anything differently. I immediately tried to return the art through esteemed attorney Bob Kane. The insurance companies hire him. He's a judge for the Superior Court of California, pro tem, for 20 years. He's a mediator. He's an insurance -- insurance companies hire him to testify to all this. Okay? This is a first class attorney, man. He wouldn't have nothing to do with me if I wasn't of the highest moral --

**MS. HARRIS:** Objection, your Honor. There is no evidence --

**MR. BRUGNARA:** You can infer -- you can infer -- excuse me. Excuse me. I will rephrase that --

**MS. HARRIS:** No testimony about his moral --

**MR. BRUGNARA:** Excuse me. I will rephrase that.

(Simultaneous cross talk.)

**MR. BRUGNARA:** You can infer from his credentials that he would have nothing to do with somebody who didn't uphold his standard of ethics. You can infer that, certainly.

**MS. HARRIS:** There was no testimony, your Honor, about Bob Kane's --

**THE COURT:** Sustained, sustained.

**MR. BRUGNARA:** Bob Kane --

**MS. HARRIS:** Your Honor, can you instruct --

(Simultaneous cross talk.)

**THE COURT:** There is no testimony to that effect.

**MR. BRUGNARA:** Bob Kane testified he has been my for over 20 years. Okay.

I stated -- I never stated I would pay for the art. I had a due diligence period.

**MS. HARRIS:** Objection, your Honor. Mr. Brugnara is now talking about himself --

**MR. BRUGNARA:** No.

**MS. HARRIS:** -- and he did not testify.

**THE COURT:** Sustained.

**MR. BRUGNARA:** The evidence proved -- the evidence proved that I have a due diligence period. You have the email. It says one year to decided, in so many words. One year to, you know, do your due diligence. I had a year.

There was no email after that. You want to talk about emails? There was no email after that that said: Oh, by the way, it's not a year. It's five days.

Doesn't matter. Even if it was five days, Bob Kane was on the horn with this thing in 48 hours and said, come get the stuff. Come get the stuff. Okay? Come get the stuff. Come get the stuff.

And this is the thing. It's extremely important in the context of my intent to disclaim a fraud. Come get the stuff. Because the due diligence period -- Harvey Schochet even said: There is no deal if there is a contingency period. You have waive contingencies. That was their own attorney that said

that.

Okay. Contingencies weren't waived. The deal was rejected. Even if you go by her ridiculous five business days, which is actually seven days, calendar days, it was rejected. Immediately. It would be like if somebody -- an analogy, you can infer, would be if somebody said: Hey, you want to buy this Mustang? It doesn't work. We'll drop it off in your car -- drop it off in your garage. You have it there. You go: Okay. Look at it. No. Don't want it. Don't want it. You have five days. You let them know after two days. I don't want it.

When they pick up that car, it's not on you. It's on them. You understand? And it's reasonable. The attorney said it's reasonable. Everyone says it is. You have to have a release.

Even when you have UPS, you can infer -- when you have UPS you have to sign a release, man. FedEx. Everyone gets a release signed. You have to have a release, because people are accountable in this world. They are accountable.

I'm accountable. That property is owned by Brugnara Properties. It weighs a thousand -- what, 843 pounds? You saw who brought it in. God bless Mr. Castillo, man, but he said, you know, he's 5 feet tall. What if Mr. Castillo gets killed bringing these boxes out?

You need to get a release signed. That's just normal,

sensible -- you have to get a release signed. It was on them.

Bob Kane's testimony. You heard it. I'm not going to -- I'm not going to say you didn't say that. It came out of her mouth. Just like I'm not going to defend her on all the lies and perjured statements. She puts herself in these little messes.

Do you see what Schochet said, by the way, about the book? That's a good one, the book. The book.

**THE COURT:** You're down to less than 20 minutes.

**MR. BRUGNARA:** The book. Look at this --

You want me off, don't you, Judge Alsup?

**THE COURT:** No. I'm just giving you --

**MR. BRUGNARA:** You want to get that noose ready.

Look. Look at this.

(Photograph displayed.)

"**QUESTION:** I want to show you a picture. Did you ever see this book? Did you say anything else with Bob Kane?

"**ANSWER:** No.

"**QUESTION:** I see a photograph of a guy with a goatee."

Yeah. That's what we all saw.

Here is the big one. Here -- look at this. Here is how old oppression, supression, infer as you will.

"**QUESTION:** So, Mr. Schochet, looking at the cover

piece of this book" --

Remember, this is when they actually brought out the book because they are trying to say this is how slimy this case is. They are now going for second person removed.

Bob Kane told us that you don't have a book, so we're going to throw you in prison. Huh? Say what? What?

I mean, go find some, like, child molesters or some drug dealers. Man, leave me alone. You know what I mean?

Hey, look what Schochet says, the wrong thing.

"**QUESTION:** So, Mr. Socket, looking at the cover piece of this book, does it say Hermitage?"

And Harris, Ms. Harris here goes: Objection. Objection. Objection. Objection. Objection. Right? She doesn't want to get the answer.

And Judge Alsup let's it go though. God bless him.

Okay.

"**QUESTION:** Look at the cover of the book. Does it say it's a book about the Hermitage and/or book about Degas."

Answer. This is her own attorney:

"**ANSWER:** Degas. It does not say Hermitage." Okay? I mean, that says it all. Her own attorney says it's not a Hermitage book.

March, I don't speak Russian. I don't read Cyrillic. I don't --

**MS. HARRIS:** Objection, your Honor. There is no testimony about that from anyone.

**MR. BRUGNARA:** Okay. This --

**THE COURT:** Sustained.

**MR. BRUGNARA:** You can infer -- you can infer -- you can infer what you need to infer from the testimony, but the fact of the matter is, this book is not about the Hermitage.

Does that say "Hermitage"? Because if it does, I need a new pair of glasses.

"Let's go lock this guy up in jail, though, with a bunch of murderers." Hey, man, there's something funny going on here, isn't there? Am I missing something? You know, you heard Mark Levinson's testimony, I've got four kids that need me.

What's going on here? I mean, come on. You're a smart jury. This is about the tax case. And we can't get that money from the tax case. That is what you can infer. Why? Am I doing anything illegal? No. You can probably talk until you're blue in the face with Mr. Hellman. We heard that in evidence, he's an expert on tax law, an expert on LLPs, an expert on LLCs. That's what Mr. Hellman stated on the record. And he knows all about what I'm saying. It's a separate entity. And I followed the law.

That (Indicating) is not a book on the Hermitage, unless you speak Russian.

**THE COURT:** Are you referring to one of the jurors?

**MR. BRUGNARA:** I am not making any commentary. I'm just making my closing argument.

**MS. HARRIS:** Your Honor, is there a Mr. Hellman who testified in this case?

**THE COURT:** There's not. There is a Mr. Hellman on the jury.

**MS. HARRIS:** That is totally improper. The Government objects.

**THE COURT:** That is improper. And I need to explain to the jury --

**MR. BRUGNARA:** Okay, so --

**THE COURT:** Wait a minute.

Mr. Hellman is not an expert witness. You cannot give any kind of information in the jury room.

**MR. BRUGNARA:** I didn't imply that, your Honor.

**THE COURT:** Yes, you did.

**MR. BRUGNARA:** I just cited -- because I'm conscientious about --

**THE COURT:** Yes, you did. Mr. Hellman is going to decide the case like everyone else, based on the evidence presented here at trial.

**MR. BRUGNARA:** Ladies and gentlemen, the point I'm trying to make is I can tell --

**THE COURT:** Mr. Brugnara, would you let me finish?

**MR. BRUGNARA:** -- about each one of you because I memorized -- I remember everything. The difference between me and Rose Long is she doesn't remember what happened two minutes ago, and then she lies about it. I remember all about each one of you.

**THE COURT:** Did you remember me telling you to be quiet?

(Multiple speakers)

**MR. BRUGNARA:** I remember you work for PG&E --

**THE COURT:** Mr. Brugnara, you must be quiet.

**MS. HARRIS:** Your Honor, this is totally improper.

**MR. BRUGNARA:** (Inaudible)

**THE COURT:** Of course, it is. It's improper. What is going on here is improper.

**MR. BRUGNARA:** You can infer -- okay, let me continue.

**THE COURT:** All right, we are going to bring your closing argument to an end unless you move to something else. I need to explain something to the jury.

Mr. Brugnara, stop. Stop.

The reference to Mr. Hellman, who is an attorney --

**MR. BRUGNARA:** Okay. You're taking my time, please. I have 20 minutes. Okay?

**THE COURT:** Yes. You -- you brought it on yourself.

**MR. BRUGNARA:** Well, now you're taking my time. I

need --

**THE COURT:** No, I'm going to make this point. Mr. Hellman is not testifying in the jury room to anything --

**MR. BRUGNARA:** I didn't say that.

**THE COURT:** He is -- he will decide the case --

**MR. BRUGNARA:** See --

**THE COURT:** -- as an ordinary juror, based on the evidence in this courtroom, like anyone else.

**MR. BRUGNARA:** (Inaudible) Okay. So --

**THE COURT:** All right, go ahead.

**MR. BRUGNARA:** The fact is we are going down their indictment, okay. The fact of the matter is Count 1, "I'll buy the paintings and put them in my museum."

Of course, that's contingent upon the due-diligence period. The attorney already said, the due-diligence period means no deal until you have waived conditions. I had not waived conditions. There is no deal.

Of course that -- that is accurate. If those are real de Koonings and that was a real Degas, I would like to put it in that museum on the Strip.

And you heard Jennifer Biederbeck, by the way. This museum talk isn't fantasy, like some -- hey, I want to build a children's playground, and that guy goes nuts?

I already had a museum. Jennifer Biederbeck said --

**MS. HARRIS:** Objection. There is no testimony on

this, your Honor.

**MR. BRUGNARA:** Jennifer Biederbeck said my museum was three times bigger than this room.

**MS. HARRIS:** Totally untrue.

**MR. STEVENS:** -- don't remember that, from Sotheby's, she said the museum on California Street that --

**MS. HARRIS:** Your Honor.

**MR. BRUGNARA:** -- I had for 12 years --

**MS. HARRIS:** Could you please instruct the jury on this? This is wild --

**MR. BRUGNARA:** Again, she's interfering with my closing.

**THE COURT:** I can't get a word in edgewise, Ms. Harris. But --

(Multiple speakers)

**MR. BRUGNARA:** Okay, I will buy the paintings --

**THE COURT:** -- what the -- Mr. Brugnara just said to you is not supported by the evidence.

**MR. BRUGNARA:** Okay.

**THE COURT:** Whenever you actually go back and look at the evidence.

**MR. BRUGNARA:** I request --

**THE COURT:** But I commend you, yourselves, to your memory of what was actually testified there.

**MR. BRUGNARA:** Ladies and gentlemen, they are trying

to muffle me and cut me short here, so you've got to let me talk, go through the rest of the charges, because I think I made absolutely obvious there is no (Inaudible)

(Reporter interruption)

**MR. BRUGNARA:** Regarding the museum, regarding the museum, Jennifer Biederbeck from Sotheby's testified about the museum space at 351 California Street.

**MS. HARRIS:** Same objection, Your Honor.

**MR. BRUGNARA:** Okay. See, they're going to force me to pull up a document and eat up more -- here's what I request of you: Ask the Judge for that piece so you can prove it up. It is 100 percent guaranteed. You'll see it. And she said that the room is two or three times bigger than this room, from what I recall. Bigger than this room. So I already had a museum, and I'm building another one in Las Vegas.

Point -- analogy -- I'm trying to say it's not pie in the sky. I've already done it, doing it again. Okay, that's -- built a house, building another one. Did the museum, doing another museum.

So absolutely, that wasn't a lie. I absolutely would put them in my museum if I waived conditions. I didn't waive conditions. I rejected the deal. I have a right; I'm an American citizen. I can't be strong-armed into buying something or taking something that I don't want.

Just like none of you. None of you could be forced into

buying something you don't want to buy. Nobody can bully you into buying anything. Nobody can bully me into buying it, or through the Brugnara Properties. I can't be forced into buying that. I had a conditional period, and I hired Bob Kane to let their attorney know -- go -- get out of it. And that's exactly what happened.

Two, and how is that proved up in evidence? The museum. The Barbato emails, the map, the legend map, the emails talking about the museum. The conference calls with the hedge fund. The testimony from Natalia, where she said on the transcribed record -- and ask him again for the transcribed record. But she specifically states that the museum is going to Vegas. And she said it was several months prior to that. So, this is well before I even spoke to Rose Long about this art. Please, pull up the transcript, because we don't have the video to show you where she said it was many months before.

So before I even met Rose Long, she already had knowledge of the museum going to Vegas. Okay?

Now, then they say all the art pieces, including the etchings and bronze. Same thing. Contingent again upon a due-diligence period. That they even conceded. They said it's five business days, seven business -- doesn't matter. It was rejected out of the gate. I say it was 365 days.

You have to go by what I said because the only email

evidence that they want to rely upon is the email that they put in evidence, "Any or full price, you have one year look-see."

Okay? Obviously there wasn't a full price paid, so it's any. And then you got one year. Doesn't matter. We told them: Come get it. Okay?

And the reason they didn't pick up the stuff is because the crates -- I mean, how ridiculous is that? "Oh, no, we're not going to pick up the stuff because someone stole the crate." Duh. Come get the four. Come get the four. We'll fight about the fifth. Whatever. That's Schochet.

But she didn't pick it up. She didn't pick it up because she went out and hired -- it's in evidence -- U.S. Attorney. Why? Come on, you guys are smart. Why did she do that? Get a restitution, you get to sidestep the civil court process. That's why she hired him. That's why I got indicted. You get indicted, you have to pay restitution.

**MS. HARRIS:** Your Honor, there's no evidence --

**MR. BRUGNARA:** Based upon what the Judge orders --

**MS. HARRIS:** Your Honor --

(Multiple speakers)

**MR. BRUGNARA:** -- not a civil court.

**MS. HARRIS:** Your Honor --

**MR. BRUGNARA:** You guys -- this is all sensible. Understand, they knew exactly what they were doing. They knew

exactly what they were doing. That's why they -- this is the simplest question of all: Why didn't you pick up four boxes? Why didn't you pick up four boxes?

They didn't pick up the four boxes because this attorney had worked with them for 20 years, and they had put it into evidence already, Shapiro, ran to the FBI while Bob Kane's in a car driving to pick up his daughter at Vanderbilt, and gave this half-baked story for money. The evil money.

Why do we leave the office? For money. Evil money. That's why they did it. And money is rotten, believe me. I -- I regret doing all this stuff. It's not worth it.

Okay, next --

**THE COURT:** There is zero evidence to support what you just said about David Shapiro, and the attorney.

**MR. BRUGNARA:** There is evidence. There is evidence. There is evidence --

**THE COURT:** There is no evidence.

**MR. BRUGNARA:** -- saying Shapiro --

**MS. HARRIS:** Your Honor, he's just screaming over you, your Honor, and you can't --

(Multiple speakers)

**MR. BRUGNARA:** Excuse me --

**MS. HARRIS:** The jury needs to hear your instructions, your Honor.

**MR. BRUGNARA:** David Shapiro, the former U.S.

Attorney for 20 years, is now representing Long. It's like: Huh? What's that supposed to mean? What the heck? What the heck? What the heck does David Shapiro have to do with the picking up four boxes out of a messy garage?

I mean come on. Come on. At what point in time would they pick them up? Do I have to put them out by the garbage cans? If I have some people drag them out to the garbage cans, will they then pick up the crates? When are you going to pick up the crates? Come on. Come sue me on the fifth one. I don't care. I can't get in my house, man. You heard, my kids' bikes were all piled up in the garage. That was Mark Levinson's testimony. Can you imagine the grief I had to deal with, with the kids? Get the crap out. That's what the message -- they wouldn't pick up the stuff. Why? They wanted money. They wanted money. Because the stuff's fake.

How do we know the stuff's fake? Because -- inference from all the testimony. Rotter said: You know de Kooning's is real if the de Kooning Foundation signs on it as authentic, or if it's in eight books. Otherwise they don't sell it as a de Kooning.

Okay, but, hey, we got that geologist, remember? Remember the geologist that you have more experience in buying art? He said that thing was a de Kooning. Man, I've got to find that guy and get -- get a drawing from my three-year-old or four-year-old from several years ago, and have him get me a

couple million bucks one day.

He said, himself. You hear Maibaum? Oh, yeah. That guy brings me another scribbled-up drawing, I'm going to -- I'm going to advance that to some sucker.

I mean, that's reading between the lines. Isn't this an ethical consideration? It's on the transcript record. Remember that conversation? Don't you have any ethics for people that trust you?

He was like, no -- you know, passing the buck. Well, he told me, he told me it was a de Kooning.

I go yeah, but he's a geologist. I, mean come on. I mean, it's a disgrace is what it is.

Let's go on to the next one: Mr. Brugnara wasn't given the Hermitage book. Well, we've already done that ad nauseam. Their own attorney said -- what type of book is this? And he goes, "Uh, Degas?"

Yeah. Now, if they said "Degas book," then they might have some meat on the bones. Doesn't say "Degas." It says "Hermitage book." Doesn't say "Hermitage."

Didn't make any fraudulent promises, that's Count 5. I had a contingency period. Their own attorney described the contingency period as a look-see period, you have to waive contingencies in order for it to be a contract. I know a lot of you are involved in business; you know exactly what that is. No one can force you into buying stuff, that's -- oh, we

are going to deliver to you. We're not going to pick it up now; we're going to make you like miserable until you buy it. You know.

**THE COURT:** Now, six minutes to go.

**MR. BRUGNARA:** Yeah, right. Six. Oh, the phone call. Okay. Let's do that. I've got to whip through these quick.

The phone calls. You heard what Sotheby's said (Indicating). All of them said they use their cell phones. The guy who checked the records only checked the records from the land lines. He didn't check the records from any personal cell phone lines. Okay?

You look at the indictment, says I heard back from Sotheby's. It doesn't say that I -- that it was in response to that email. They try to infer to you, to see you and say: Oh, it was in response to that email.

There were phone calls, too. There were phone calls made. There were phone calls made. There were phone calls made.

**MS. HARRIS:** Your Honor, there's no evidence of that, whatsoever.

**MR. BRUGNARA:** There were phone -- you can infer there were phone calls made. You can infer there were phone calls made. Because, that's what they said. They don't check the voicemails of personal calls, they don't check the personal cell phone numbers.

And then you heard Mr. Rotter say -- I said: Do you give out your cell phone number to clients?

He goes: Yeah.

I go: Well, what about (Unintelligible).

He goes: Yeah --

(Reporter interruption)

**MR. BRUGNARA:** So the fact is they do interact with cell phone numbers. There was no confirmation that there was in any -- and then he tried to produce my cell phone records, to prove, oh, well, look at Luke's cell phone records. He didn't talk to anyone.

That even proves even more that I used another cell phone. Can you -- you can infer how many cell phone -- cell phones I have. You can infer.

**MS. HARRIS:** Objection, Your Honor. There's absolutely no evidence --

**THE COURT:** Sustained.

**MR. BRUGNARA:** You can infer -- they can infer whatever they want. The fact of the matter --

**MS. HARRIS:** No, they cannot.

**MR. BRUGNARA:** Their own client --

**THE COURT:** Sustained.

**MS. HARRIS:** Your Honor, can you instruct the jury on the --

(Multiple speakers)

**THE COURT:** I sustained the objection. You're running out of time.

**MR. BRUGNARA:** How about this one? She testified, she testified, Rose Long testified that there were, quote, many, many calls between herself and me.

And then I said: Many, many calls?

And she goes -- and please pull up this the transcript because I can't waste these next few minutes. She goes: Well, maybe not many, many, many, but a few. A few.

Okay. That proves I was using a different phone number. And it's on the transcribed record. That proves -- that proves I used a different phone number. Because they were looking at my 871 number, and they said: Well, look, there is no phone call to Rose Long, that means he didn't talk to Rose Long.

She says there were phone calls in that time period. That proves, just by the evidence that they presented, that there were phone calls to another phone, from another phone. It also proves, Alex Rotter, they don't have access to cell phone numbers. And that's how business is conducted in the 21st century. By cell phones and smartphones.

Okay, let talk's about the injuries and the alleged abscond. Dr. McCoy, who is a U.C. San Francisco doctor, said under Page No. 2389 I had a lump under my arm. This was the alleged week before the abscond. You may have missed it. I

want you to make sure you pull it up on the record. A big lump under my arm, was her exact quotes. And that I had lost over 80 pounds in eight months. And that it was one-in-five chance, one-in-six chance of having cancer, which is significantly higher than the average. It was wasting syndrome; it was not normal. She was shocked by the weight loss. That I had injured wrist and shoulder. My molars are breaking.

Castillo, who is just the honest delivery man, first thing he says, you see what he said, "Oh," he couldn't believe it. He couldn't barely recognize me. This was less than a year ago. Okay?

I mean, the fact of the matter is, you had Jaimie Record who is a registered nurse at Kaiser Hospital and -- and Mountain View Hospital. She said it takes a lot to shock her. She was shocked by my appearance. I was emaciated, malnourished. Starved. Skin, bone, veins. Injured, very, very sick. Looked like I have cancer. Starvation. Skin bones and veins. Arms shaking and body shaking. Totally a broken person, very sick, very ill. Mind was not sharp.

Okay, these are doctors working at Kaiser, and established hospitals. U.C. San Francisco.

And also I was injured -- I was also recorded where Dr. McCoy said in fact that -- it's on the thing that it happened from being injured by this Deputy Zierob (Phonetic).

I got assaulted three times, based upon the record --

**MS. HARRIS:** Objection, Your Honor. There is no testimony --

**THE COURT:** Sustained.

**MR. BRUGNARA:** And the fact of the matter is, the fact of the matter is this: You can take whatever you want. But what is on the testimony is I met with my attorney six times on this furlough, without any issues, which is on the record.

**MS. HARRIS:** Objection, Your Honor. It is not on the record.

**THE COURT:** Sustained.

**MR. BRUGNARA:** That furlough does not have any conditions whatsoever regarding medical emergency. It has no conditions. So, if something happens -- let's say one of your children is getting beat up across the street. And you're sitting in the federal building on this furlough, with your attorney. And you run across the street.

Or somebody is having -- you're having a heart -- whatever the case is, emergencies are emergencies. I don't care what this document says. I'm dying. Okay? My whole body is shaking. My whole body is shaking. You saw Jaimie Record's -- my whole body is physically -- losing a hundred pounds? Enough is enough. I got no medical treatment. That one was being abused, based on my report to the doctors that I got my

shoulder hurt, they got my wrist hurt.

This is all being amped up as they said, quote, the eve of the trial. Isn't that a funny -- does that surprise you all? Does that surprise you all that after nine months, with the trial on the, as they say, eve of the trial (Indicating quotation marks), now let's ratchet up the abuse. Why? Because they're going to lose the trial. Come on. The evidence is ridiculously obvious. So what do you do? Ratchet up, ratchet -- time for the physical abuse.

Starvation didn't work, so it's time to ratchet it up. Let's screw with his wrist. Do you see what time it happened? 6:30 in the in the morning on a Sunday morning.

**THE COURT:** All right.

**MR. BRUGNARA:** Okay --

**THE COURT:** Time is up.

**MR. BRUGNARA:** The fact of the matter is it wasn't an abscond, it wasn't an escape. I was in the custody of my attorney. And you saw the video. He did everything but call me a taxi, because he knew I was having a medical emergency. And the medical emergency --

**MS. HARRIS:** Objection, Your Honor. This is completely --

**MR. BRUGNARA:** -- was not addressed.

**MS. HARRIS:** Objection, Your Honor.

**THE COURT:** Sustained. There's no evidence of that.

**MR. BRUGNARA:** Read the furlough order. It doesn't address medical emergency.

**THE COURT:** Your time is up, Mr. Brugnara.

**MR. BRUGNARA:** It doesn't address medical emergency. You understand? So there was no escape. There was no escape. I was in civilian clothes.

**THE COURT:** All right.

**MR. BRUGNARA:** And I already testified that -- I was trying to catch a bus --

**MS. HARRIS:** Objection, Your Honor. There -- he did not testify to that.

**MR. BRUGNARA:** And you saw the video --

**THE COURT:** There's no evidence of that.

(Multiple speakers)

**MR. BRUGNARA:** You saw -- you saw -- you saw the video from the Land Rover.

**THE COURT:** All right. Mr. Brugnara, Mr. Brugnara, your time is up. Please take a seat.

**MR. BRUGNARA:** (Inaudible) Listen. You can see going on here, ladies and gentlemen. You see, and that is why I implore you to come back with a verdict of not guilty. Because I'm not guilty. I'm innocent. I would -- beyond reasonable -- I'm 100 percent not guilty. I haven't done anything. I haven't stolen anything.

All the evidence has proven beyond a shadow of a doubt

that I'm innocent. They haven't proven anything that I'm guilty, because I haven't done -- you can't prove a negative. I can't prove that you're sitting in Hawai'i when you're sitting there.

**THE COURT:** Mister --

**MR. BRUGNARA:** They can't prove this, because I haven't done anything --

**THE COURT:** Mr. Brugnara, are you -- What are you holding against your --

**JUROR JAKIC:** I don't -- I don't want to read the book, there, the title of the book. That's some Russian alphabet there (Indicating).

**THE COURT:** You're trying not to read it?

**JUROR JAKIC:** Yeah.

**THE COURT:** All right, well, you're just doing what I told you to do, so let's move that off the screen. And thank you for being so conscientious.

**MR. BRUGNARA:** All right.

**THE COURT:** Mr. Brugnara, your time is up.

**MR. BRUGNARA:** Okay. Well, thank you again for your time. And again, the facts are overwhelming in this case of what the reality is. And, and this jury is smart enough to know what the truth is. And you have seen it by just the testimony here and the facts that you have to make this decision.

So, I thank you.

**THE COURT:** Thank you, Mr. Brugnara.

We will take a 15-minute break. And, remember all the admonitions. When we come back, the Government has 40 -- what did I say, 40 minutes left to go. And then I'll go though the instructions of law.

Thank you.

**THE CLERK:** All rise.

(Jury excused)

(The following proceedings were held outside of the presence of the Jury)

**THE COURT:** Be seated. Just for the Record, so that last part with the -- Mr. Jakic on the jury, he speaks Russian. And I had told him earlier not to try to read any of the Russian.

And he -- was holding that book that had some Cyrillic characters on it, that was on the screen. And he was holding his hand over his eyes so that he would not see the Russian lettering, and good for him. He was trying to do what I said.

That's an explanation for the record.

We will take a 15-minute break, and push on when we come back.

(Recess taken from 11:48 a.m. to 12:04 p.m.)

(The following proceedings were held outside of the presence of the Jury)

**THE COURT:** Are you ready to proceed, Ms. Harris?

**MS. HARRIS:** (Inaudible)

(Off-the-Record discussion)

**THE COURT:** On the record. The jury is not present. My clerk has informed me, Mr. Brugnara, that you have the exhibits that are supposed to go into the jury room.

**MR. BRUGNARA:** I'm going through it right now.

**THE COURT:** Just a minute. But it's your responsibility to get those in good order. The Government's exhibits will go in. If yours are not in good order they will not go in, so you need to get them in good order before the case goes to the jury.

And I think you mixed them up there in your closing, according to my deputy clerk.

All right. Are you ready over there, Ms. Harris?

**MS. HARRIS:** Yes, Your Honor.

**THE COURT:** All right. Let's bring in the jury.

(A pause in the proceeding)

**MR. KINGSLEY:** Your Honor, I asked him for an exhibit that we would like to use. He's stalling in giving it to me.

**MR. BRUGNARA:** I'm not stalling. I'm going through each page. Please. (Inaudible)

**THE COURT:** You need to be -- it is only fair to do that. Mr. Brugnara.

**MR. BRUGNARA:** What do you --

**THE COURT:** Now, if you don't give it to them, I'll, in the presence of the jury, request it.

**MR. BRUGNARA:** I'm going through every page right now. What do you want me to do?

**THE COURT:** I want you to then give it to Mister -- Mr. Kingsley, can you go through it faster than he can?

**MR. BRUGNARA:** These are my documents. I'll go through my documents, and I'll give it to him once I get to it.

He just asked me 30 seconds ago. If he asked me five minutes ago, yes, he would have a point.

**THE COURT:** The jury is waiting. Please, let's get it done.

**MR. BRUGNARA:** He should have asked me more than 30 seconds ago, then.

(A pause in the proceedings)

(Document tendered to counsel)

**THE COURT:** Is that it?

**MR. KINGSLEY:** Yes.

**THE COURT:** All right. Bring the jury in.

(The following proceedings were held in the presence of the Jury)

**THE CLERK:** Okay, all rise.

**THE COURT:** Welcome back, and be seated.

Are you ready over in the jury box?

(Jury indicates affirmatively)

**THE COURT:** Looks like it.

Ms. Harris, you have 40 minutes.

**MS. HARRIS:** Okay.

**REBUTTAL ARGUMENT**

**BY MS. HARRIS:**

Good morning, ladies and gentlemen. Again, I know it's been a long morning. I really hope I don't take 40 minutes.

There are some issues that I want to raise with you in order to rebut what Mr. Brugnara said to you. You were repeatedly told in whatever you just heard from him, you need to infer this, you can infer that.

I submit to you that you do not need to infer anything. We have given you proof. No inferences are necessary. We have given you all of the emails, the videotape, and testimony. You do not need to make any of the absurd and unsupported leaps that Mr. Brugnara disavowed make because they are false and they are not supported by the evidence. In fact most of what he said to you was false, and was a false statement of the evidence.

And I want to bring you back to the heart of this case, and what it's all about, which is Mr. Brugnara's false lies and false emails. And that's what he's charged with.

First, Mr. Brugnara made an absurd statement to you that somehow he had a year contingency fee (sic) to hold the heart

-- the art hostage, at his sole discretion, and not pay a cent. There is not one bit of evidence that supports that.

What he was referring to and what he showed you was Government Exhibit 58. And let's take a look together at what Exhibit 58 says.

This is an email from Ms. Long on March 23rd, 2014.

**THE COURT:** Is the machine on?

**THE CLERK:** Yeah, there we go.

**MS. HARRIS:** Can you see it?

(The jury indicates in the negative)

**MS. HARRIS:** It's not.

**THE COURT:** It's not coming on, Dawn.

**MS. HARRIS:** Actually, I can just do it the old-fashioned way. I'll just read it to you. You will have it in evidence, and I can spare you the time.

It's in the last paragraph. And she says:

"Thank you for your concerns."

She is responding to him about the art.

And she says (As read):

"If you wish, since I want the collection of de Kooning's to stay together..."

Nothing else but the de Koonings is being referred to.

"...I'll be happy to give you a year, after we arrange any or full price to check yourself, or return your money."

In other words, payment is necessary. You do not get to keep the art for free for a year, seven and a half million dollars worth of de Koonings in your garage, and then decide whether you want to return them.

> "...after we arrange any or full price to check yourself, or return your money."

There was always a contemplation of money being exchanged. And we know that not just from Ms. Long, but look at what Mr. Brugnara wrote back immediately.

This is Government Exhibit 59, Mr. Brugnara's response to the email. And it's dated the same day, Sunday, March 23rd, of 2014. Mr. Brugnara says (As read):

> "Rose, I will buy all of the paintings and put them in my museum...I will need a discounted price..."

This is in response to what he read to you in his closing. Not one word about a contingency period or "I have at my unfettered discretion the opportunity to hold the art hostage without paying a cent." Nothing.

> "Rose, I will buy all of the paintings and put them in my museum..."

In fact, he amplifies on it:

> "I will need a discounted price..."

That's Mr. Brugnara's response, and that's what he's charged with. That's the false statement.

Mr. Brugnara's closing argument to you was notable for

what he did say, which was mostly things that were not in evidence. But it was is also notable for what he didn't say. There was not one word about the false statements he made under oath about Sotheby's.

Exhibit 81 is the April 3rd, 2014 email that he sent to Sotheby's. There are no phone calls or records of any foreign calls having been made from Sotheby's to Mr. Brugnara. And he is now asking you to make a completely absurd inference for which there is no evidentiary support, which is --

**MR. BRUGNARA:** Objection, Your Honor. Misstating evidence.

**THE COURT:** This is closing argument. This is a legitimate closing argument Mr. Brugnara. It is up to the jury --

**MR. BRUGNARA:** She is misstating what the evidence is.

**MS. HARRIS:** He is now asking you to infer --

**THE COURT:** The objection is overruled.

**MS. HARRIS:** -- that he must have some other cell phone that somehow isn't mentioned, when every single reference you have seen is to the cell phone which, by the way, was also satisfied from his house and is in evidence for you.

Now let's talk about the non-existent Brugnara gold mine that he wants you to believe existed on April 7, 2014. He

didn't talk about Exhibit 10 at all.

**THE CLERK:** It's on.

(Document displayed)

**MS. HARRIS:** It's working?

**THE CLERK:** It is working.

**THE COURT:** Can the jury see that in the jury box?

(Jury indicates negatively)

**THE COURT:** It needs to be turned on in the jury box.

(Document displayed)

**MS. HARRIS:** Here we go.

**THE COURT:** Is it on there now?

(Jury indicates affirmatively)

**THE COURT:** All right.

**MS. HARRIS:** Mr. Brugnara disavowed making the completely false inference that somehow Exhibit 10 did not refer to assets that were under the name of an entity, but not him. That is totally untrue.

Let's look at what Exhibit 10 actually says. He has to, under No. 41, list any stocks, bonds, medical funds (sic), money market funds "in which you or your spouse have any interest." "Have any interest."

(Document displayed)

**MS. HARRIS:** Same thing with No. 44. "Miscellaneous assets in which you or your spouse have any interest.

And all he says is "N/A - None."

(Document displayed)

**MS. HARRIS:** No. 47: "Is anyone holding any money on your behalf?"

"No."

And he does have something about Brugnara Properties VI on Government's Exhibit 10, which I add that he signed under penalty of false statement. He lists Brugnara Properties VI as his employer --

**MR. BRUGNARA:** Your Honor, I object (Inaudible) --

**MS. HARRIS:** And he also lists his occupation as president.

**THE COURT:** What is the objection?

**MR. BRUGNARA:** It doesn't matter. Let her finish it. It doesn't matter.

**THE COURT:** All right. Continue.

**MS. HARRIS:** As president of Brugnara Properties VI and then he has some information about the financial standing of Brugnara Properties VI.

It's got $200, according to Mr. Brugnara, in its account, as of April 7, 2014, the day the art was shipped.

(Document taken off display)

(Off-the-Record discussion between Plaintiff Counsel)

**MS. HARRIS:** And just in case you had any doubt as to whether Mr. Brugnara understood the clear English on Exhibit 10 which requires him to declare any assets in which he has

any interest, the signature page, itself, says:

"I certify that this financial statement is true, and that it is a complete statement of all my income and real and personal assets..."

Now here's the kicker:

"...whether held in my name or any other person or entity."

You saw what he swore to under penalty of false statement. "Whether held in my name or any other person or entity." Zero. Zero assets, zero income, zero employment, zero real property, zero personal property.

Oh, while we are talking about Exhibit 10, you heard Mr. Brugnara talk at length that he had a written appraisal from Mark Levinson in 2014, that actually predates Exhibit 10, that his house at Sea Cliff was worth $21 million.

I'm not sure whether he was trying to prove to you that he lied to the United States Probation Office by saying that.

(Document displayed)

**MS. HARRIS:** But in this statement that he filled out to the Probation Office, he lists fair market value as of 2014 of the house at Sea Cliff, as 7 million (Indicating). If Mr. Levinson told him it was 21 million, why did he lie to the Probation Office in Exhibit 10?

He also stated that the mortgage on the house was 10 million, so it was $3 million under water. I'm not sure

why he spent so much time telling you that the house was so valuable when he lied to the Probation Office about its value, or if he truthfully told the Probation Office, as we suspect and have proven to you he did, he had no money.

(Document taken off display)

**MS. HARRIS:** Mr. Brugnara also completely misrepresented to you what Nick Barbato testified to. There was no museum. There never was a museum.

And let's talk for a minute about the false inference he asked you to make about a museum he used to have at 351 California Street. There is no such testimony before you. And the only testimony you have about 351 California Street is that Mr. Brugnara did not own that building in 2014.

**MR. BRUGNARA:** Objection, Your Honor. The evidence states otherwise, from Jennifer Biederbeck. And the -- and the -- the jury should be instructed to pull Jennifer Biederbeck's from Sotheby's testimony. She testified to the museum on California Street.

**MS. HARRIS:** That is absolutely untrue.

**MR. BRUGNARA:** Your Honor, can you please instruct the jury that --

**THE COURT:** I don't remember.

**MR. BRUGNARA:** -- testimony?

**THE COURT:** It'll be up to the jury's memory as to what she said.

**MR. BRUGNARA:** No, no, no, no, they need to know they can pull -- not from to memory. You know the jury can pull the testimony by request --

**THE COURT:** If they want to hear a readback, I've already told them they can do the that. They don't have to do that. Once it goes to them, it's their decision what to do.

**MR. BRUGNARA:** I'm sure --

**THE COURT:** And, but I do remember the part of the testimony that Ms. Harris is talking about, that that building was sold before 2014. I do remember that part.

**MR. BRUGNARA:** Yeah; we're not talking about --

**MS. HARRIS:** Mr. Crossley testified that 351 California Street was sold years ago, and that Mr. Brugnara did not own it in 2014. That's the testimony about 351 California Street. So, no inference --

**MR. BRUGNARA:** She said there was no (Inaudible) your Honor, that was -- objection --

**MS. HARRIS:** No (Inaudible), no nothing. There was no museum, nothing, in 2014.

And let's talk about what Mr. Barbato testified to, because Mr. Brugnara basically completely misrepresented his testimony.

I'm going to read you his testimony (As read):

"What do you mean when I asked you, you weren't close, what else, and you said yes, oh, no, you were

never close, what do you mean by that?"

That was the question. Mr. Barbato's answer:

"Well, first of all, there was no contract on the property. He was pursuing properties. And we never had an application with money up."

**MR. BRUGNARA:** Objection, Your Honor.

**MS. HARRIS:** (As read)

"He was not interested in putting money up.

**MR. BRUGNARA:** Misstating evidence.

**THE COURT:** She is reading the evidence.

(Multiple speakers)

**MR. BRUGNARA:** I'm objecting. It's a misstatement of the evidence because she's deceiving the jury because Jennifer Senhaji already said she had the contract and the open escrow, sent down -- Las Vegas --

**THE COURT:** Who is this, Mister --

**MR. BRUGNARA:** Mr. Barbato.

**THE COURT:** Well, she says she is reading from Barbato. She's reading it exactly, I assume.

**MR. BRUGNARA:** No, but because then he superseded that by saying, "Oh, yeah I won't remember the museum because I was concerned with the Ross and the Walgreens and CVS."

**THE COURT:** Mr. Brugnara, please. You had your turn. It's now the Government's turn --

**MR. BRUGNARA:** Yeah, and she interrupted my --

**THE COURT:** She is reading the actual evidence. Objection overruled. Please continue.

**MS. HARRIS:** Okay, ladies and gentlemen, I can understand why this would be upsetting for Mr. Brugnara to hear. But --

**MR. BRUGNARA:** (Inaudible)

**THE COURT:** Mr. Brugnara.

**MR. BRUGNARA:** -- this whole time.

**MS. HARRIS:** You need to hear this. Here is Mr. Barbato's answer. And I'll try to read it to you so that you can hear it (As read):

"First of all, there was no contract on the property. He was pursuing properties. And we never had an application with money up. He was not interested in putting money up, even if we had an application. So without a contract, and without an application issued, you know, we were just spinning our wheels, so to speak."

No museum. Absolute false, false statement by Mr. Brugnara that they had a museum deal. But let's listen to what else Mr. Barbato said. And this is in response to a question by Mister -- actually, by Mr. Brugnara.

And, Mr. Barbato says -- he's asking about the museum. And Mr. Barbato says, referring to Mr. Brugnara's lawyer (As read):

"He asked me if I was involved in financing a museum for you, in Vegas. And told that gentleman -- I don't even know his name. I don't know if he's here. I told him I had a better shot of walking across the street, successfully doing brain surgery, than placing a museum loan for you where you're the landlord and the tenant."

This is Mr. Brugnara, questioning Nick Barbato.

**MR. BRUGNARA:** Your Honor --

**MS. HARRIS:** Nick Barbato testified --

**MR. BRUGNARA:** Your Honor, can I object? She's misstating the evidence. He then superseded that by saying, "Oh, I won't remember because I remember the Walgreen's and the credit tenants," because that's not a credit tenant in the financing, and it's superseded by all the conference calls. So she's again deceiving the jury on her mission.

**THE COURT:** The jury will remember the evidence. It's proper for the government to read from the transcript.

(Multiple speakers)

**MR. BRUGNARA:** -- admonish the jury to get the transcript and read it, yourself. Please, Jury, get the transcript and read it.

**THE COURT:** Mr. Brugnara, it's time for the government to have its say. Your objection is overruled.

Continue, Ms. Harris.

**MS. HARRIS:** Mr. Brugnara is incorrect. Later on Mr. Barbato also says (As read):

"All right, I would never concentrate on placing a museum for you."

And then Mr. Brugnara says:

"And I never asked you to, isn't that correct?"

That's Mr. Brugnara's question. And Mr. Barbato says,

"I would never concentrate on placing a museum for you."

There was no museum. The email that Mr. Brugnara showed you, by the way, was an email from Mr. Brugnara. And that email refers to a carousel museum that possibly would be in Las Vegas, and their preliminary discussions about that.

Is he seriously suggesting to you that he intended to put the Degas Little Dancer, the de Kooning paintings, a Miro and Picassos in some carousel museum that was not built --

**MR. BRUGNARA:** Objection, your Honor --

**MS. HARRIS:** -- did not exist and was never, ever --

(Multiple speakers)

**MR. BRUGNARA:** Objection, Your Honor, that's hearsay.

**THE COURT:** Please, let the Government have its say. The objection is overruled. This is proper argument.

Continue, Ms. Harris.

**MS. HARRIS:** Is he seriously suggesting to you that that was what he was telling Rose Long? Absolutely false.

That was completely conjured up after the fact. That email is dated May of 2014, long after she shipped the art, thinking it's going to a museum at 224 Sea Cliff Avenue.

There was no museum. Nick Barbato, his big financier, said "No museum, no deal. You never asked me to do it, but by the way, I would never have done it. I would have a better chance of doing brain surgery."

(Off-the-Record discussion between Defendant and Counsel)

**MS. HARRIS:** Mr. Brugnara made an astonishing suggestion to you. He suggested that you make the inference that the Little Dancer was stolen on April 7 from his garage the day it was delivered in a one-hour period when he supposedly left the garage open after having $11 million worth of art delivered, and went somewhere for an hour with Harvey Levinson (sic). That is preposterous. Absolutely absurd. There is no evidence to support it, whatsoever.

What there is evidence to support is that there were five crates in that garage, at least up until April 15th, which is the affidavits that Mr. Brugnara is redlining to indicate five crates. And that he stole it between April 15th and April 17th, when he referred to four crates of art.

Mr. Brugnara also said that he never had a meeting of the minds with Rose Long, so there was no contract. You have already been told you are going to get a jury instruction that the Government doesn't need to prove that there was a

contract. This is a fraud case, not a contract case.

But of course, there was no meeting of the minds. How could there be? Rose Long's intent was a legitimate art deal, to sell Mr. Brugnara art. Mr. Brugnara's intent was to commit fraud. There could never be a meeting of the minds.

Mr. Brugnara was trying to defraud hear her. Ms. Long was legitimately trying to have an art transaction. Of course, there was no meeting of the minds.

Mr. Brugnara also tried to suggest to you that somehow he was being defrauded by Rose Long and Walter Maibaum. There is no evidence to support that. But you are also going to get a jury instruction that tells you -- even if there was such evidence, which there isn't, you're going to get a jury instruction that says (As read):

"It would not matter whether any alleged victim of the scheme was trying to defraud the defendant, trying defraud someone else, or was negligent in some matter. As long as the Government proves beyond a reasonable doubt that the defendant committed fraud, it does not matter whether any alleged victim of the scheme was riding to defraud the defendant."

As a practical matter, no one was trying to defraud the defendant. All of his whining before you about the value of a Valsuani Degas -- we showed you the emails. He was completely on notice that this was a Valsuani Degas. Walter Maibaum

testified that Sotheby's would not sell a Valsuani Degas, but that they are recognized throughout the world, and in fact, were displayed in the Hermitage Museum.

And while we're talking about the Hermitage, the defendant wants you to believe that he had no idea that the book he had his lawyer lie about that he didn't receive was this book (Indicating). The Hermitage book.

Page 2 of this book which Rose Long went through in detail with him, says -- all you need to do is open it (As read):

"Catalog for the exhibition, the State Hermitage Museum."

It's right there in English. No translation necessary at all. And then, of course, it has the photograph of the Little Dancer that's now missing.

You also have Ms. Long's testimony. And the questions she was asked were (As read):

"Were there other picture beside the Little Dancer that you and Mr. Brugnara looked at on April 7th?

"ANSWER: Most definitely.

"QUESTION: Can you explain that to the jury?"

Ms. Long says:

"Yes. When he saw this and also knew that he had the crate right there, and we were discussing this, then he took the book and was flipping all through it, and asked me if he had any others. So that's why I was

doing it that way. Because of course, this would be the first one."

Referring to the picture of the Little Dancer. Not only did he have the book; he looked through it, and was trying to get additional pieces of art to steal from Rose Long, based on what he saw in the art book.

Mr. Brugnara also spent a great deal of time concentrating on Rose Long's description of how many delivery men were present when the creates were delivered. And where the truck was parked. Those discrepancies between what she and Eddy Castillo testified to have nothing to do with his fraud.

He did not have one word to say about the emails that he wrote. And that is what he's charged with.

It is perfectly normal for two people to see things in a slightly different light. She said there were two men that moved the crates into the house. Well, Eddy Castillo testified that he and the defendant moved the crates of art into the garage. It's perfectly reasonable that that's what Rose Long saw when she was there.

But what Mr. Brugnara didn't talk about was the emails that he sent to get that art. And as I have mentioned to you, this fraud was completed the minute that art was shipped from New York to California. The minute he lied to get the art, the fraud was complete.

You are also going to get a jury instruction. All of that

all hot and bother, hot air you heard from Mr. Brugnara about how desperately he wanted the crates removed from his property so he could get ingress and egress from his garage -- we'll talk about that in a minute -- absolutely has no bearing on whether there was a crime committed.

It does not matter if he tried to return the items he stole. Oncer they were in his possession, the fraud was complete. And you are going to get a jury instruction on that.

The jury instruction you're going to get is going to tell you (As read):

"If the Government proves a wire or a mail fraud count against the defendant, the fact that some or all of the property was returned to the alleged victims does not undo or erase the crime."

All that hot air you heard from Mr. Brugnara --

**MR. BRUGNARA:** Excuse me, Your Honor, that's --

(Multiple speakers)

**MS. HARRIS:** -- is untrue. It is also irrelevant.

**MR. BRUGNARA:** Objection, please?

**THE COURT:** What?

**MR. BRUGNARA:** That wasn't the complete instruction.

**THE COURT:** I'll read it to the jury.

**MR. BRUGNARA:** Unless there's an intent, and the intent of the -- of me was to give it back. So she again

deceives the jury by omitting the other portion of that sentence.

**MS. HARRIS:** The Judge will read you the jury instructions.

**THE COURT:** I will --

(Multiple speakers)

**MR. BRUGNARA:** (Inaudible) Thank you, your Honor.

**THE COURT:** I think -- I'm not sure that that's in there anyway.

But go ahead, Ms. Harris. I'll read the instructions in due course.

**MS. HARRIS:** Mr. Brugnara also falsely told you -- and there is no evidence to support this -- that somehow he was rebounding in 2014 financially. I would draw your attention again to Government Exhibit 10. Zero assets, zero income. He had no money.

Now let's talk about the escape, which he spent very little time on, for obvious reasons. First of all, there is no medical-emergency exception in the furlough order, at all. None, whatsoever. And there is no defense to Mr. Brugnara escaping from the federal building.

You have this exhibit; it is Government Exhibit 136. And it is unambiguous (As read):

"Defendant may not leave the federal building and may only go from the lock-up facility to attorneys'

lounge and back (plus rest facilities). In San Francisco defendant may only be in the lock-up facility, the attorney's lounge on the 18th floor, and the elevator in between."

To make it even more clear, it says:

"When the meeting is over, Attorney Babcock shall escort defendant back to the marshals' lock-up facility no later than 3 P.M., where the defendant will be immediately remanded to the custody of the United States Marshal...If defendant violates any of these rules, or attempts to leave the courthouse, his lawyer, as an officer of the court, shall notify the marshals immediately."

There is no exception to that. And the jury instructions are going to tell you the same. There is no medical-emergency exception.

**MR. BRUGNARA:** Objection, Your Honor.

**MS. HARRIS:** And there was no medical.

**MR. BRUGNARA:** Objection, Your Honor. The jury decides what they feel they need to determine. It's not up to her to --

**THE COURT:** That is incorrect. The jury will follow the instructions of law. That objection is overruled, and is incorrect.

Go ahead, Ms. Harris.

**MS. HARRIS:** That is incorrect. There is no medical exception. As a practical matter, there was no medical reason for the defendant to do that.

**MR. BRUGNARA:** Your Honor --

**MS. HARRIS:** You saw the --

**MR. BRUGNARA:** Misstating the facts. That's not what I said. I said there was no contingency in that furlough for medical emergency, and she's trying to cite that it's cited in there as not an exception, which is different. Again, the jury will decide.

**THE COURT:** The objection is overruled.

**MS. HARRIS:** I don't know what he just said, I don't know what he just means. But if I heard him say there was no medical-contingency exception in the furlough order, he's correct. There isn't. There was no defense to the leaving that building. There is none.

And whatever medical reasons he was trying to put forth, which are not defenses, were also not real. He didn't talk about that, though.

He also didn't talk about the contempt, and the phone that was found on his person. That is -- should take very little of your time to deliberate on Count 9. He was not allowed to have a phone. And he was not allowed to leave this building. He did both, and he had the phone right on his person. That's Exhibit 150. And it was removed from him when he was

arrested.

Just because the defendant yells over the Court's instructions or yells over my objections does not mean that they were not ruled on. And you were read certain things by the defendant that the Court explained to you were hearsay. Those are the statements of the defendant. They did not come in for the truth of the matter.

And the email that he read to you about his supposed museum were all his statements. Those cannot be considered for the truth, anything, any part of the truth by you, because they were hearsay. And that was an instruction you were given about statements from the defendant.

So just because he bullied through this Court and tried to bully over my objections, please don't let that happen in the jury room. He won't be there to be screaming over you, too.

(Off-the-Record discussion between counsel)

**MS. HARRIS:** This will be my last opportunity to address you, and when I sit down, this case will be out of my hands. And, it will be in yours. And we put a great deal of confidence and faith in your ability to sort through this evidence. We have given you every, every piece of evidence you need to convict him on every count.

His own emails convict him. His own false statements, under oath, which we have given you. We have given you videotapes of him fleeing, sprinting out of this building. We

have shown you the court order he violated. We have shown you his phone record which prove up his lies. And we showed you the phone that was recovered from him.

Now, now, now, I'm going to entrust the case to you, and entrust you to return a guilty verdict on all counts.

**THE COURT:** All right. Thank you.

We now come to the last part, which are the reading of the instructions. I invite anyone in the public seating who's going to leave, to leave now, because I don't -- we're going to lock the door and not let anyone come in or out while I read the instructions.

This is the one time the jury gets to hear the law. And, and as I read it, that is the official version. Although, there will be a copy of the instructions in the jury room for you, but this is the official time.

And you've heard a lot of evidence, but you haven't heard the law in full yet. And, it's very important that you hear the law, understand it, and that you follow it, just as you've taken an oath to do.

The instructions come in three parts. It's like a sandwich. There's -- the meat in the middle. And then there are some preliminary instructions on evidence and, then some concluding instructions on how to organize yourselves. Those are important, too. But the substantive part of the sandwich is in the middle.

It'll take about 40 minutes for me to read this.

## INSTRUCTIONS

**BY THE COURT:**

Members of the jury, it is now my duty to instruct you on the law that applies to this case. A copy of these instructions will be available in the jury room for you to consult as necessary.

These instructions fall into several parts. The first part will address guidelines for evaluating the evidence, the burden of proof, and related matters.

It is your duty to find the facts from all the evidence in the case. To those facts, you must apply the law as I give it to you. You must follow the law and my instructions, whether you agree with the law or not. You must not be influenced by any personal likes, or dislikes, opinions, prejudices or sympathy. That means you must decide the case fairly, on the evidence and the law. You will recall that you took an oath promising to do so at the beginning of the case.

You must follow all of the instructions and not single out some and ignore others; they are all equally are important. You immunity read into these instructions or into anything the Court may have said or done as suggesting what verdict you should return. That matter is entirely up to you.

The defendant has knowingly and voluntarily elected to

represent himself and to waive the right to counsel, as is his Constitutional right. You should not hold this choice against him, nor should you be influenced by any sympathy. The issue always is whether the evidence presented here in court proves the offenses charged beyond a reasonable doubt.

Richard Tamor and James Stevens are attorneys acting as a resources to answer procedural questions for the defendant. They are not, however, acting as trial counsel for the defendant.

The charges against the defendant are set forth in the indictment. The indictment is not evidence. A separate crime is charged against the defendant in each count. You must decide each count separately. The defendant has pleaded not guilty to the charges. He is presumed to be innocent, and does not have to testify or present any evidence to prove his innocence. The Government has the burden of proving every element of the charges here beyond a reasonable doubt. Any time I say in these instructions that the Government has the burden of proof, it means proof beyond a reasonable doubt.

A defendant in a criminal case has a constitutional right not to testify. You may not draw any inference of any kind from the fact the defendant did not testify.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced that the defendant is guilty. It is not required, however, that the Government prove guilt beyond all

possible doubt. A reasonable doubt is a doubt based upon reason and common sense, and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence, or, or from a lack of evidence.

If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty as charged, it is your duty to find him not guilty. On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty as charged, it is your duty to find him guilty.

The evidence that you are to consider consists of the sworn testimony of witnesses on both direct and cross-examination, regardless of who called the witness. This includes the deposition testimony of Natalia Schlyapina.

Next, the exhibits that have been received into evidence.

In reaching your verdict, you may consider only the types of evidence I just described. Certain things are not in evidence, and you may not consider them in deciding what the facts are. I will list them for you:

Arguments and statements by lawyers or by the defendant acting as his own lawyer are not evidence. They are not witnesses. What they said in their openings statements, closing arguments and at other times is not evidence. Your

memory of the evidence controls over the way either side has conveyed it to you.

In this case, defendant is representing himself. Anything he has said in that role is subject to the same cautions I have stated for lawyers. His questions, arguments, statements and objections are not evidence, just as questions, arguments, statements and objections by the lawyers are not evidence.

A statement or suggestion in a question to a witness is not evidence, unless it is adopted by the answer. A question by itself is not evidence. Consider it as evidence only in light of the answer by the witness. If an objection was sustained to the question, then you must disregard it and answer -- and the answer entirely.

Statements made in your presence by either side in response to a question or a remark by the Court or the other side are not evidence.

Objections to questions are not evidence.

Testimony or exhibits that have been excluded or stricken, or that you have been instructed to disregard, are not evidence and must not be considered. In addition, some testimony and exhibits have been received only for a limited purpose; where I have given a limiting instruction, you must follow it.

Anything you may have seen or heard when the Court is not in session is not evidence. You are to decide the case solely

on the evidence received at trial.

When one side or the other in this trial has loaded a question with supposed facts not in evidence, I have sometimes told you specifically to disregard the statements included in the question. Most of the time, however, I have not interrupted to do so. Instead, expecting that you have and will follow my regular admonition to treat all statements and questions made by advocates in the courtroom as non-evidence, and to treat as evidence only what is testified to under oath from the witness stand, and subject to cross-examination. And all exhibits received in evidence. In other words, the mere fact that I omitted to strike a particular question or statement or omitted to tell you to disregard it does not mean that it may now be considered as evidence. To the contrary, to repeat, a cardinal rule is that only what witnesses say under oath and subject to cross-examination and the exhibits are evidence. This admonition is very important, and you must be careful in distinguishing between mere arguments and statements, versus actual evidence.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness, about what that witness personally saw, heard or did. Circumstantial evidence is proof of one fact or more facts from which you could find another fact. By way of example, if you wake up in the morning and see that the sidewalk is wet,

you may find from that fact that it rained during the night. Other evidence however such as a turned-on garden hose may explain the presence of water on the sidewalk. Therefore, before you decide that a fact has been proven by circumstantial evidence, you must consider all the evidence in light of reason, experience, and common sense.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to see, hear, or know the things testified to; the witness's memory; the witness's manner while testifying; the witness's interest in the outcome of the case and any bias or prejudice; whether other evidence contradicted the witness's testimony; the reasonableness of the witness's testimony in light of all the evidence; and any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. Nor does it depend on which side called witnesses or produced evidence. You should base your decision on all the evidence, regardless of which party presented it.

Some witnesses have given testimony in the form of opinions, based on education, or experience. Opinion

testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves. Considering the witness's education and experience, the reasons given for the opinion, and all other evidence in the case.

You are here only to determine whether the defendant is guilty or not guilty of the crimes charged in this case. Your determination must be made only from the evidence received at the trial.

You have heard about the defendant's prior convictions. You may consider them for purposes -- you may consider them only for purposes of evaluating the defendant's creditworthiness and ability to procure loans to finance the purchase of the artwork. You may not consider the defendant's prior convictions as proof of a character trait, or that during the events in question he acted in accordance with that character trait.

You are free to deliberate over the counts in any order you think most effective. You may possibly determine that certain counts ought to be considered out of strict numerical sequence. To repeat, you are not required to address the counts in strict numerical sequence, so long as you decide all of the counts eventually.

You have heard evidence that the defendant was in pretrial detention. This is relevant only to the counts of escape and

contempt of Court, Counts 8 and 9, and any reasonable inferences that you draw concerning consciousness of guilt on the then-pending charges or other motives. It is up to you to decide what inferences to draw, and how much weight to give any evidence. That the defendant was in pretrial detention is otherwise immaterial, and may not be used by you to infer guilt.

I will now turn to the law governing the offenses charged. So, just to take a little breath here and say we are now up to Part 2 of the instructions.

The defendant is charged in Counts 1, 2, 3 and 4 of the second superseding indictment with wire fraud in violation of Section 1343 of Title 18 of the United States Code. The indictment alleges that from approximately March 2014 to May 2014, the defendant engaged in a scheme to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises and/or by omission and concealment of material facts.

The indictment alleges that the defendant in the Northern District of California and elsewhere knowingly transmitted four wire communications in furtherance of his alleged scheme to defraud.

I instruct you that San Francisco is in what is known as the Northern District of California.

The indictment alleges that the defendant knowingly

transmitted or caused to be transmitted the following four wire communications in interstate commerce which make up the four counts of wire fraud alleged in the indictment.

One, March 23, 2014, email from Brugnara to Victim 1, stating Brugnara "...will buy all the paintings and put them in my museum..."

Two, March 24, 2014, email from Brugnara to Victim 1, stating Brugnara wants, quote, "...all of the art pieces...including the etchings and the bronzes..."

Three, March 25, 2014, email from Brugnara to Victim 1 stating "Thank you. I look forward to putting them in my museum."

4, April 15, 2014, email from Luke Brugnara's attorney, stating "Mr. Brugnara was not given a Hermitage book..."

On the last item, the indictment had a typo, stating that the email regarding the Hermitage book was sent on "April 15, 2015." The Court has allowed this to be corrected to read "April 15, 2014."

In order for the defendant to be found guilty of wire fraud, the Government must prove each of the following elements beyond a reasonable doubt. I'm going to -- this is an important sentence so I'm going to repeat it.

In order for the defendant to be found guilty of wire fraud, the Government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly participated in, devised or intended to devise a scheme or plan to defraud or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, promises, or by means of statements made misleading by reason of omissions of fact;

Second, the statements made or facts omitted as part of the scheme were material. That is, they had a natural tendency to influence or were capable of influencing a person to part with money or property;

Third, the defendant acted with the intent to defraud. That is, the intent to deceive or cheat;

And fourth, the defendant used or caused to be used a wire communication to carry out or attempt to carry out an essential part of the scheme.

For short, I will refer to the these four elements as "wire fraud."

The phrase "wire communication" means to send from one state to another by means of telephone or telegraph lines. This includes a telephone communication, e-mail or facsimile, fax, by a person in one state that either passed through another state or went to another state.

Wire fraud involves the use of wire, radio or television in interstate or foreign commerce. A wiring is caused when one knows that a wire will be used in the ordinary course of business, or when one can reasonably foresee such use.

It need not have been reasonably foreseeable to the defendant that the wire communication would be interstate in nature. Rather, it must have been reasonably foreseeable to the defendant that some wire communication would occur in furtherance of the scheme, and an interstate wire communication must have actually occurred in furtherance of the scheme.

The defendant is charged in Count 5 of the second superseding indictment with mail fraud, in violation of Section 1341 of Title 18 of the United States Code. The indictment alleges that on or about April 5, 2014, through and on April 7, 2014, in the Northern District of California and elsewhere, the defendant, for the purpose of executing his material scheme to defraud, did knowingly cause crates containing art to be sent and delivered by an interstate carrier, constituting mail fraud.

In order for the defendant to be found guilty of the mail fraud charge, the Government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, promises, or by means of statements made misleading by reason of omissions of fact;

Second, the statements made or facts omitted as part of

the scheme were material. That is, they had a natural tendency to influence, or were capable of influencing a person to part with money or property;

Third, the defendant acted with the intent to defraud; that is, the intent to cheat -- to deceive or cheat;

And fourth, the defendant used, or caused to be used, the mail or any private or commercial interstate carrier to carry out or attempt to carry out an essential part of the scheme. An airline that ships freight across state lines is an interstate carrier.

For short, I will refer to these four elements as "mail fraud."

A mailing is caused when one knows that the mail will be used in the ordinary course of business, or when one can reasonably foresee such use.

Mail fraud and wire fraud are similar, except that one involves the mail and the other involves wire communications. I will now give you instructions of law that apply to both wire fraud and mail fraud.

It does not matter whether the material mailed or wired was itself false or deceptive so long as the mail or wires were used as part of or used to further a fraudulent scheme, nor does it matter whether the alleged scheme or plan was successful or that any money or property was obtained. It does not matter whether the alleged scheme covered an entire

course of dealing or only part of it so long as all four elements are proven. Nor does it matter whether the alleged scheme was directed at a single victim versus multiple victims.

If the Government proves a wire or mail fraud count against the defendant, the fact that some or all of their property was returned to the alleged victims does not undo or erase the crime. In determining whether or not the mail or wire fraud has been proven, of course, you may take into account all reasonable inferences from all the evidence, including the facts and circumstances surrounding the recovery of some or all of the property at issue in this case.

To prove wire or mail fraud, the Government need not prove that a contract was signed or formed. If the Government proves all elements of wire or mail fraud, it need not go further and prove that a contractual relationship existed. Nor is it necessary for the government to prove a breach of any contract. On the other hand, in determining the intent of the defendant and all other elements of the offense, you may take into account as part of the overall evidence in the case, any purchase terms and conditions you find from the evidence, influenced the defendant's intentions.

To prove wire or mail fraud, the Government is not required to prove that the alleged victims relied upon the alleged misleading statements or promises.

If the Government proves that the defendant committed wire or mail fraud beyond a reasonable doubt, it would not matter whether any alleged victim of the scheme was trying to defraud the defendant, trying to defraud someone else, or was negligent in some manner. The crimes of wire or mail fraud are complete upon the occurrence of all four elements of the crime. If you -- if, however, you find that an alleged victim acted dishonestly or carelessly in any way, then you may consider such conduct in evaluating the credibility of his or her testimony, giving it such weight as you think it deserves, taking into account all the facts and circumstances shown by the evidence.

One issue for you to decide is intent. In this regard, it is not fraud to make a misstatement based upon an innocent and good-faith mistake. Under the law, however, fraudulent intent is shown if a representation were made knowing it is untrue, or even if it were not known to be false, it was made with reckless disregard as to its truth or falsity. It is for you, the jury, to determine whether or not the Government has proven beyond a reasonable doubt that the defendant intended to defraud.

The defendant is charged in Counts 6 and 7 of the second superseding indictment with having made a false declaration in violation of Section 1623 of Title 18 of the United States Code. The indictment alleges that on or about June 17, 2014,

in the Northern District of California, the defendant, while under oath in a proceeding before a court of the United States, did knowingly make two false material declarations, specifically stating on direct examination, as italicized below.

I will now read the question and answer that is set forth as in the indictment.

"QUESTION: Okay. So after you wrote Ms. Long this email, the discussion sort of transitioned into when she was going to ship the art pieces to Sea Cliff; is that correct?

"ANSWER: No.

"QUESTION: Okay.

"ANSWER: I took the emails that I got from her, and I sent them to the head of Sotheby's in New York, who's also the head of Bond Street and London, and I asked, you know, what's -- you know, what's the value or -- I don't have the specific email in front of me, but the essence of it was: 'How much would you sell these for, and what are they worth?' Just a simple valuation inquiry."

And here is the italicized part that continues in the same answer:

"*And I heard back that the de Koonings are not authentic, and they would not sell them as*

*de Koonings, and the Degas -- they would not sell the Degas because it's not authentic....So when I had that information, I phoned Rose Long, and I told Rose Long that, you know, these de Koonings are not authentic."*

The Government contends that the part about hearing back from Sotheby's in response to his email about the artwork was false, and that the part about the defendant phoning Rose Long once he had that information and telling her that the artwork was not authentic was also false.

In order for the defendant to be found guilty of those charges, the Government must prove each of the following elements beyond a reasonable doubt:

First, the defendant testified under oath before a court;

Second, the testimony was false;

Third, the defendant knew the testimony was false; and

Fourth, the false testimony was material to the matters before the Court; that is, it had a natural tendency to influence, or was capable of influencing the Court.

The defendant is charged in Count 8 of the second superseding indictment with escape from custody from violation of Section 751(a) of Title 18 of the United States Code. Section 751(a) makes it a crime to escape or attempt to escape from any custody under or by virtue of any process issued by any court or judge or magistrate judge when the custody is by

virtue of an arrest on a charge of a felony.

The indictment alleges that on or about February 5, 2015, in the Northern District of California, the defendant did knowingly escape from custody to which he was confined under and by virtue of process issued under the laws of the United States by a court, judge, or magistrate judge, by virtue of an arrest on a charge of a felony, specifically, mail fraud, wire fraud, and false declarations charged herein.

In order for the defendant to be found guilty of that charge the Government must prove each of the following elements beyond a reasonable doubt:

First, the defendant was in the custody of a custodian designated by process of a District Court;

Second, the defendant was in custody under the laws of the United States, by process of a District Court, on an arrest for a felony; and

Third, the Defendant knowingly and voluntarily left custody without permission.

The word "custody" means detention, confinement, or restriction of movement or action by virtue of federal judicial authority. The concept of "custody" is not limited to confinement in a prison cell. I instruct you that the charges on which the defendant were arrested were felonies.

You have heard evidence concerning reasons the defendant departed from custody on February 5 of this year. The

Government contends that the departure constituted flight and raises an inference of consciousness of guilt on the pending charges then set for trial on February 26. The defendant denies this and contends that he left to obtain medical treatment.

You may consider both arguments in evaluating whether his departure from custody raises an inference of consciousness of guilt on the wire fraud, mail fraud, and false declaration charges. It is up to you to decide how much weight to give the evidence and what inferences to draw.

With respect to the escape charge itself, however, you may not consider the reason for the departure. Put differently, if the Government proves the above elements for escape, it does not matter what the reasons for the escape were in reaching your verdict.

The defendant is charged in Count 9 of the second superseding indictment with contempt of court in violation of Section 401(3) of Title 18 of the United States Code. The indictment alleges that beginning on or about February 5, 2015, and continuing through on or about February 11, 2015, in the Northern District of California, the defendant did willfully disobey and resist a clear and definite lawful order, rule, decree, and command of a court of the United States of which the defendant was aware, specifically, an order, rule, decree and command issued by the United States

District Court for the Northern District of California.

In order for the Defendant to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt:

First, the defendant willfully disobeyed a clear and definite court order, and

Second, the defendant was aware of that court order.

To establish that the defendant acted "willfully" in the context of a charge that the defendant has violated Section 401(3) of Title 18 of the United States Code, the Government must establish that the defendant acted volitionally and knew or should have -- should reasonably have been aware that his conduct was wrongful.

If the defendant believed in good faith that he was complying with the order of the Court, then he was not acting willfully. On the other hand, even if a lawyer told the defendant he could disobey the order, reliance on such advice would not excuse an otherwise willful violation of the order.

The punishment provided by law for the alleged crimes is for the Court to decide. You may not consider punishment in deciding whether the Government has proven its case against defendant beyond a reasonable doubt.

I'm going to repeat that sentence: You may not consider punishment in deciding whether or not the Government has proven its case against defendant beyond a reasonable doubt.

That is an entirely separate matter not relevant here, and on which you should not speculate or base your decision in any way.

You have heard unsworn statements to the effect that defendant "probably has cancer." Even if this were true, it would be irrelevant to your decision on Counts 8 and 9, and you must disregard it in deciding those counts.

Now we're coming to the very last part.

When you begin your deliberations, you should elect one member of the jury as your foreperson. That person will preside over the deliberations and speak for your here in court.

You will then discuss the case with your fellow jurors, t reach agreement if you can do so. Your verdict as to each count, if any, must be unanimous. Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should. Do not come to a decision simply because other jurors think it is right. It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to

reach a verdict.

I will give you a verdict form to guide your deliberations. However, you do not need to address the questions in the precise order listed.

Some of you have taken notes during the trial. Whether or not you took notes, you should rely upon your own memory of what was said. Notes are only to assist your memory. You should not be overly influenced by the notes. When you go into the jury room, the clerk will bring in to you the trial exhibits received into evidence to be available for your deliberation.

As I noted before the trial, when you retire to the jury room to deliberate, you will have with you the follow things:

One, all of the exhibits received into evidence, except for the artwork. If you wish to inspect the artwork, we will arrange for that here in open court.

Two, a work copy of these instructions for each of you.

Three, a work copy of the verdict form for each of you.

And, four, an official verdict form.

I'm also told that we will have indexes of exhibits for you. I think we are going to be able to do that.

Remember that none of these items is evidence except the exhibits.

When you recess at the end of a day, please place your work materials in the brown envelope provided, and cover up

any easels with your work notes so that if my staff needs to go into the jury room, they will not even inadvertently see your -- any of your work in progress.

A Court Security Officer will be outside the jury room during your deliberations. If it becomes necessary during your deliberations to communicate with me, you may send a note through the court security officer, signed by your foreperson or by one of more members of the jury.

No member of the jury should ever attempt to communicate with me except by a signed writing via the court security officer. And I will respond to the jury concerning the case only here in open court, or in writing. If you send out a question, I will consult with the parties before answering it which may take some time.

I will repeat that: If you send out a question, I will consult with the parties before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Please remember that you are not to tell anyone, including me, how the jury stands, numerically or otherwise, until after you reached a unanimous verdict or have been discharged. Do not disclose any vote count in any note to the Court.

Just to make very clear, the verdict must be unanimous on each count. That means -- "unanimous" means all 12.

You have been required to be here each day from 7:45 to

1:00 p.m. Now that you are going to begin your deliberations, however, you are free to modify this schedule within reason. For example, if you wish to continue deliberating in the afternoons after a reasonable lunch break, that's fine. The Court does, however, recommend that you continue to start your deliberations by 8:00 a.m. If you do not reach a verdict by the end of today, then you will resume your deliberations tomorrow and thereafter. And I understand that you are going to stay until 2:00 today. So, I amend that to say 2:00.

It is very important that you let the clerk know via the court security officer in advance what hours you will be deliberating, so that the parties and the lawyers may be present in the courthouse at any time you are deliberating.

You may only deliberate when all 12 of you are together. This means, for instance, that in the mornings before everyone has arrived or when someone steps out of the jury room to go the restroom, you may not discuss the case. As well, the admonition that you are not to speak to anyone outside the jury room about this case still applies during your deliberations.

Now, a word to our alternate jurors. You two please raise your hands.

(Request complied with by the Alternate Jurors)

**THE COURT:** Thank you. You will not be deliberating with the rest of the jury at the outset. You are free to

leave once the jury begins its deliberations. You may be called in to the replace one of the jurors. Therefore, your responsibilities as an alternate remain in effect. This means you are not to discuss the case with anyone until you join the regular jury in deliberations, or until a verdict is returned and I expressly release you from service. If it becomes necessary to have you replace a juror, you will be asked to return to the court. You will then be sworn into the main jury, and you and the rest of the jury will begin deliberations anew. If you are not needed, you will be notified as soon as the Court itself makes that determination.

We will pause here for a moment for our alternates to be escorted out, with our thanks. So you two stand up and go back to the jury room, and pick up any of your personal belongings, and you two get to go home now. And remember, you are under the admonitions.

(The Alternate Jurors excused from the courtroom)

**THE COURT:** All right. Thank you. All right, we are going to just pause here for a moment to give them -- I have one paragraph left. We're almost done.

Check and see.

(A pause in the proceedings)

**THE COURT:** All right. Now, the last paragraph: After all 12 of you have reached a unanimous agreement on a verdict, your foreperson will fill in, date and sign the

verdict form and advise the Court through the court security officer that you have reached a verdict. The foreperson should hold onto the filled-in verdict form and bring it into the courtroom when the jury returns the verdict.

Thank you for your careful attention. The case is now in your hands. You may retire to the jury room and begin your deliberations.

**THE CLERK:** All rise.

(Jury excused)

**THE COURT:** All right, thank you. Be seated.

Now let's go through a few --

**MR. BRUGNARA:** Dawn?

**THE COURT:** -- items.

**MR. BRUGNARA:** Can we do this real quick?

**THE CLERK:** Not yet.

**THE COURT:** Just one second. There are several housekeeping things that are very important to get done very quickly.

I am going to make the minor change I had indicated earlier on Page 12, about -- Mr. Brugnara had requested. I will then sign and send into the jury room the instructions.

We also need to send in all those other things, including the exhibits.

Is there any objection to the Government's exhibit list?

**MR. BRUGNARA:** (Inaudible)

**THE COURT:** Hearing none --

**MR. BRUGNARA:** I'm not saying there's none. I need to put together my exhibits right now for Dawn, so that's what I'm doing.

**THE COURT:** Well, you had --

**MR. BRUGNARA:** I know.

**THE COURT:** You've had many hours now. Is there any objection to the Government's exhibit list?

Hearing none, it's going to go in.

Is there any objection to the defense exhibit list that Dawn typed up?

**MR. KINGSLEY:** No, Your Honor.

**THE COURT:** All right. That will also go in. And, I want the lawyers to vet what is being set forth, what is going to go into the jury room, so that we don't have a glitch in some document that's not in evidence go in there.

(Document handed up to the Court)

**THE COURT:** What's this? Where's the Marshal? The court security officer.

**THE CLERK:** Chris, are you going to watch the jury?

**THE COURT:** Who's going to do this? Would you come forward and take the oath to -- all right. State your name on the record.

**CSO KONSTANTINO:** Your Honor, my name is Chris Konstantino, K-O-N-S-T-A-N-T-I- --

**THE COURT:** Please raise your right hand.

**MR. BRUGNARA:**

**CSO KONSTANTINO:** -- N-O.

(Court security officer sworn in)

**THE COURT:** All right, thank you. Can you go and attend to your responsibilities?

(CSO Konstantino leaves the courtroom)

**THE COURT:** All right. You all get the materials in good order so they can go into the jury room.

And, and just be aware, at this point the jury is in charge, and they can return a verdict now without reviewing a thing, and that would be perfectly lawful. So it's -- it behooves everyone to -- to pay some attention to this.

All right. I'm going to go and make my edits on this, these instructions. And also, take a look at the copy of the indictment to make sure everyone is cool with the indictment that's got to go in.

**MR. KINGSLEY:** I pulled out the penalty sheet.

**THE COURT:** I hope you did. That should not have been in there.

**MR. KINGSLEY:** Okay.

**THE COURT:** But otherwise -- it's the second superseding, right?

**MR. KINGSLEY:** Yes.

**THE COURT:** All right, thank you.

(Recess taken from 1:21 to 1:38 p.m.)

(The following proceedings were held outside of the presence of the Jury)

**THE COURT:** All right, be seated.

What's the issue?

**MR. BRUGNARA:** The issue is I need to get the -- I thought that, as you know, the Schylapina section that you admitted for completeness of the record was on their video. Remember, you said set up the video, and I assumed that it was going to be on the video that they have already into evidence. And then they said today they didn't have that; they only had the redacted portion.

So I need to make sure the transcript for that portion gets put into the evidence, because they have their portion, the redacted portion, into their evidence binder.

**THE COURT:** Let me understand the situation. So the Government's video is on a disk or something?

**MR. BRUGNARA:** Yes.

**MS. HARRIS:** Yeah, we put the video in, but not the transcript, your Honor. And we can't reopen the evidence to put in an exhibit. The Court read the portion into evidence, and the jury has it. It was read into evidence.

**THE COURT:** That's correct.

**MS. HARRIS:** So, we're not going to reopen the evidence.

**MR. BRUGNARA:** She's misstating the facts. She's saying that it's on the disk, and that's not what Ben told me. Ben told me that it's not on the disk. What's on the disk is only their --

**MS. HARRIS:** I did not.

**MR. BRUGNARA:** -- not the complete portion that included the inclusion, only their portion.

**MS. HARRIS:** That's correct.

**MR. BRUGNARA:** So they're only going to be going off memory from what you said. They need, the bare minimum, the transcript, to have the completeness of the record. That's the bare minimum, to be fair, both of them have -- I mean, as it is, I would want them to see the visual as well because they're getting the visual on their portion, for the completeness of the record.

But bare minimum, they need to have the transcript.

**THE COURT:** Dawn, does the jury have an ability to play a video in there?

**THE CLERK:** They have a jury PC in the jury room right now so that they can watch all of the videos that have been presented.

**THE COURT:** All right. Okay, so the answer is the Government is correct on this. I read, myself, to the jury the portion that you want. So the jury -- if the jury heard it, and it's on the court reporter's transcript, so it is part

of the record. And if they ask for a readback, then it will be read back.

However, the Government put its part in, as well, as an exhibit. And it is true that the jury would be able to review that on their own, and if they did, they would not see what you had submitted as well.

I can't fix everything. It's not the end of the world --

**MR. BRUGNARA:** Well, it is the end of the world for me, because my life is in the balance. So the reality is it is the end of the world for me. It's not, for you.

**THE COURT:** Once again, you interrupted me. The answer is: This is the way it's done every time. I'm sorry that you chose to represent yourself. I'm sorry that you did this to yourself. But the answer is you didn't put in a disk, which you could have done.

**MR. BRUGNARA:** Oh --

**THE COURT:** And --

**MR. BRUGNARA:** How can I put --

**THE COURT:** And, and, and the normal way that these are done anyway is by reading it to the jury. The Government went the extra mile and put it in as a -- as a video.

So --

**MR. BRUGNARA:** You're missing the point of what I'm saying.

**THE COURT:** The jury has heard it.

**MR. BRUGNARA:** No, no. The point of what I'm trying to say is to be fair, worst case -- I mean, I should be getting the disk in, but in the worst case, the transcribed record, because for the completeness of the record that you've already made is necessary, that goes into the evidence.

So they're putting -- and the thing is you have to understand, I was expecting Ben Kingsley or someone from the Government to have the video keyed up. If you remember, we just got surprised this morning that this jury's not going to be able to see that testimony. Or yesterday. So --

**MR. KINGSLEY:** That's because you didn't tell me that you wanted to play it, just for the record. I wasn't informed until this morning.

**MR. BRUGNARA:** Okay, well, obviously I wanted it played, because I said get -- get the testimony that you were getting.

I told this Court that I wanted it, your Honor, if you remember. Remember I asked you, I said, "Oh, I want that shown," and you said, "You know what, we're just going to read it in."

**THE COURT:** No, that's not the way it happened. You -- we're talking about from the -- from the closing. You're confusing two things. For the closing arguments, you did not tell me specifically what you wanted. And it was going to be played -- whatever it was, you were going to get

the Government to tee it up. And apparently for closing arguments you didn't do that.

**MR. BRUGNARA:** They didn't do it. How can I do it?

**THE COURT:** Did you tell them --

**MR. BRUGNARA:** Yes.

**THE COURT:** -- that you wanted it?

**MR. BRUGNARA:** And she said he could do it. Yes. I did.

**MR. KINGSLEY:** You said that this morning.

**THE COURT:** Mr. Kingsley --

**MR. KINGSLEY:** You said that this morning. We left it yesterday that you would tell me what you wanted, and --

**MR. BRUGNARA:** And I said I wanted it.

**MR. KINGSLEY:** You didn't say you wanted it.

**THE COURT:** Every moment that goes by is another moment that the jury could decide this case without looking at anything. And that is perfectly legal. They don't have to look at anything. They don't have to look at a document; they don't have to look at any -- anything that we send into the jury room, because it's in their hands now.

And they are within their rights to bring back an acquittal right now. They are within their rights to bring back a conviction down the line right now. And I've seen it happen in less than 17 minutes in other cases.

So it behooves us, if we want them to have the benefit of

this stuff, to hurry up and get them the material.

**MR. BRUGNARA:** Can I --

**THE COURT:** It's -- I'm ruling now. You are wrong on this, Mr. Brugnara. You are just wrong.

**MR. BRUGNARA:** Okay, well, just --

**THE COURT:** You should have -- if you wanted it that way, you should have marked it; you should have perfected the record. Instead, you want me to come after the fact -- after the fact, after the record is closed, you want me to fix it up. No.

**MR. BRUGNARA:** No, it's based on a misrepresentation by Ben Kingsley that he would have it for my closing. And he didn't have it.

**THE COURT:** Even that would not have mattered, because the jury -- would not go into the jury room just because they put it -- they show it to the jury.

**MR. BRUGNARA:** Okay. Well, I thought --

**THE COURT:** That does not fix the record.

**MR. BRUGNARA:** How about this? We'll just do a fair solution. Just give them the transcribed record which won't be an exhibit, then, for that particular statement on the record. Then that way, they'll at least have the transcribed record.

**THE COURT:** Okay, that's the motion. What is the Government's position with that motion?

**MS. HARRIS:** The Government objects to that. That just singles out a portion of the transcript of the whole trial.

**THE COURT:** So you're opposed to that?

**MS. HARRIS:** Yes.

**THE COURT:** I agree with you, that -- we're not going to do that. There's -- this is not the way you go about trying to fix up records.

**MR. BRUGNARA:** Listen, all he had to do yesterday was say we're not --

**THE COURT:** Motion denied. That's it. I want these documents, if you want them to go in -- are the Government's ready to go?

**MS. HARRIS:** Everything's ready.

**MR. KINGSLEY:** Yeah.

**THE COURT:** The Government's will go in now. Are the Defendant's ready to go?

**MR. BRUGNARA:** Uh --

**THE COURT:** And they will go in too. All right, let's take them all in.

**THE CLERK:** Confirm that both sides have vetted both sides' exhibits that are going in, as is.

**MR. KINGSLEY:** Yes.

**THE CLERK:** Mr. Brugnara, did you vet all of the Government's and Defendant's Exhibits?

**MR. BRUGNARA:** I looked at them.

**THE CLERK:** Okay, thank you.

(Record completed at 1:45 p.m.)

## I N D E X



| | PAGE | VOL. |
|---|---|---|
| Closing Argument by Ms. Harris | 2902 | 12 |
| Closing Argument by Mr. Brugnara | 2962 | 12 |
| Rebuttal Argument by Ms. Harris | 3081 | 12 |
| Instructions by the Court | 3104 | 12 |

**CERTIFICATE OF REPORTERS**

We hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Belle Ball*
Belle Ball, CSR 8785, CRR, RDR

/s/ Debra L. Pas
Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, May 12, 2015