IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>LUKE D. BRUGNARA,<br><br>    Defendant.<br>                                     / | No. CR 14-00306 WHA<br><br>**NOTICE AND REQUEST FOR BRIEFING ON CERTAIN SENTENCING ISSUES** |

    In the briefing for sentencing and in the PSR, counsel and probation should be mindful that, under the jury instructions, the jury did not necessarily find any particular value or even that a contract had been made. The government should not argue that the jury made "findings" in this regard. Moreover, although it was inadmissible at trial, the email from Sotheby's in response to Attorney Erik Babcock's email may possibly be usable for value/loss purposes for sentencing. Please keep these points in mind.

                                                *                  *                  *

    In the 33 hearings leading up to his trial and conviction, the offender, Luke Brugnara, made numerous statements to the Court, usually while represented by counsel, despite admonishments that his statements might later be used for or against him. For purposes of sentencing, the Court requests the views of both sides — and the probation officer's assessment via the PSR — concerning the truthfulness of certain of those statements and the extent to which they may be taken into account in setting the sentence. This notice and request is without

prejudice to either side citing to other examples of good faith or bad faith statements made by the offender.

     1.    At multiple hearings, the offender stated that he had never been accused of fraud in his business career. For example, during the Form 12 evidentiary hearing on June 17, 2014, the offender testified that he's "engaged in two and a half billion dollars of commerce without partners," and "none [of his] lenders, banks . . . the hedge funds, the commercial securitized lenders, the tenants . . . have ever accused [him] of fraud ever in [his] life [or his] business career . . ." (No. 08–CR–222, Dkt. No. 310 at 17:8–12). At that same hearing, the offender testified, "All I know is what I understood, and I've done $2 billion of transactions, and *I've never had anybody in 22 years say that I defrauded them*" (*id.* at 33:16–19) (emphasis added).

At the next day of the evidentiary hearing, however, the government presented Exhibit 20, a "Complaint for Fraud" against a Brugnara corporation (although not against Brugnara in his individual capacity) in a prior state action. Later at that hearing, the government produced Exhibit 21, which was a "Statement of Decision" on the aforementioned complaint from the state action. In that decision, the state court judge wrote on page six: "The Court finds that in giving plaintiffs a promissory note and deed of trust to property not actually owned by Brugnara Corporation, *defendant acted fraudulently*." The state court judge then wrote: "*Defendant's fraudulent acts were patently clear*" (No. 08–CR–222, Dkt. No. 311 at 46:21–53:23) (emphasis added).

     2.    During the Form 12 evidentiary hearing on June 18, 2014, the offender testified that he had not made false statements to law enforcement agents (No. 08–CR–222, Dkt. No. 311 at 55:13–56:16):

> Q. Now, let's talk a little bit about your criminal history. You made false statements to law enforcement agents several times; is that right?
>
> A. No, I haven't.

On May 28, 2010, however, in the criminal case before Judge Maxine Chesney, the offender pled guilty to two counts of false statements to government agents as well as other charges (No. 08–CR–236, Dkt. No. 101 at 2).

2

3. As part of his motion to disqualify the United States Attorney's Office, the offender claimed that Assistant United States Attorney Maureen Bessette had falsified information for the Bureau of Prisons so that he was sent to La Tuna Correctional Facility rather than Lompoc Camp (No. 14–CR–306, Dkt. No. 103 at 2). The offender claimed that Judge Alsup had ordered Lompoc Camp for designation. The offender also blurted out the following at a status conference for the underlying tax case (No. 08–CR–222, Dkt. No. 252 at 18:1–8):

> So I went to prison when you ordered me to go to a camp, and I'm going to a skinhead prison medium in Texas because the U.S. Attorneys said I had 22 designation points when I only had six designation points because I filed an appeal, and you said I'd report within 96 days by your own order, and I reported within 48 hours because I filed an appeal. So this is just a kangaroo court. That's my opinion.

In fact, the amended judgment that concerned the offender's custody designation stated: "The Court makes the following recommendations to the Bureau of Prisons: * Defendant be designated to the Lompoc Camp" (No. 08–CR–222, Dkt. No. 134 at 2). In other words, this was not an order for Lompoc Camp, only a recommendation.

4. During his testimony at the evidentiary hearing regarding the attorney-client procedures at Glenn Dyer Jail, the offender testified that Attorney Erik Babcock had only met with him once in the seven months since Babcock had been appointed (No. 14–CR–306, Dkt. No. 231 at 139–40):

> Q. Have you had any difficulties meeting with me, or other lawyers for that matter, while you've been in custody in this case?
>
> A. I've had extreme difficulties meeting with you in this case, my attorney of record, that are so far beyond my worst nightmare, I can't even put it into words. And it comes across very badly in court at times. But, for instance, I have only met with you in seven months one time, contact visit, and that was three days ago. One time in seven months for an hour and 40 minutes.

The records from Glenn Dyer, however, showed that Attorney Babcock visited the offender eleven times between July 7 and December 9, 2014. Moreover, the offender's other attorney, James Stevens, visited Glenn Dyer four times in that time frame. When this came out, the offender said he had not counted non-contact visits by Attorney Babcock.

3

5. In an order dated September 11, 2014, the undersigned judge stated the following (No. 14–CR–306, Dkt. No. 113):

> With respect to Attorney Babcock's pithy request for permitting defendant "to close his current transaction in Las Vegas to support his family and pay the $1.9 million restitution," Attorney Babcock is invited to explain the status of this Las Vegas transaction in detail, and to propose conditions for a telephone call by defendant to allow him to "close" this transaction (including provisions to protect the other side in this transaction from fraud). Attorney Babcock appears to represent that all that is needed is to "close" the Las Vegas transaction, implying that all of the details have been worked out, all paperwork has been done, and all that is needed now is a closing ceremony. The Court's recollection from the Form 12 proceeding is to the contrary, namely, that plans for a deal in Las Vegas were extremely preliminary, that not even a tentative deal ever emerged, and that there is nothing in Las Vegas to close. So before permission could possibly be granted to "close" any Las Vegas transaction, counsel must supply details of who is involved in the deal, what the deal is, and what remains to be done to close.

At the hearing on January 6, 2015, the offender stated in open court that he had met the conditions of this order with a subsequent handwritten filing. The Court noted that it did not remember any such filing. Counsel and the offender were unable to supply any such filing at the hearing. The Court reviewed all of the offender's handwritten motions and could not find such a filing. The Court then requested that the defense provide the filing the offender was referencing. In a subsequent submission, defense counsel stated that after review, they could not find such a filing (No. 14–CR–306, Dkt. No. 292).

6. At a pretrial hearing on March 26, 2015, the offender stated that while he was on pretrial release in September, Pretrial Services Officer Allen Lew only allowed him to have lunch with his family once, in violation of a court order (No. 14–CR–306, Dkt. No. 387 at 50--51). Officer Lew, however, responded to this accusation by filing a letter with the Court. Officer Lew stated that he attempted to facilitate several lunches between the offender and his family, but the offender declined several suggested dates, was non-responsive to Officer Lew's inquiries, and his wife failed to respond to Officer Lew's calls.

4

7.      At a pretrial hearing on April 1, 2015, the offender stated (No. 14–CR–306, Dkt. No. 395 at 38): " I have witnesses who will show that I never evicted a tenant. Literally thousands of tenants, I've never evicted a tenant in 20 years. I always work with them. I treat them how I want to be treated." In fact, a 1998 San Francisco Magazine article titled *Luke's Town* (that the offender had referenced several times) described how the offender had evicted a commercial tenant merely because the tenant, during the offender's high school days, had orchestrated the offender's suspension from a fly casting club and took away his clubhouse locker. When confronted, the offender admitted to this eviction later in the hearing.

8.      At trial on May 5, 2015, the offender stated (No. 14–CR–306, Dkt. No. 568 at 1937): "If you read my Form 12 testimony, and I've never deviated from it, I said I don't know whether four or five were delivered. I never said there were four or five delivered. I don't know how many were delivered." In fact, upon review of the Form 12 testimony, the offender actually stated (No. 08–CR–222, Dkt. No. 311 at 74): "There was a small box and four large boxes, and that position has never changed."

9.      At trial on May 7, 2015, the offender stated the following (No. 14–CR–306, Dkt. No. 584 at 2491): "I've been in this court for six years, and I've never complained about the other — the other U.S. Attorneys. Tom Newman, I never complained about Tom Newman; and I never complained about Sprague . . . except calling him a liar when he said a painting was missing when he knew darn well it wasn't. But I never interrupted him as far as procedural matters." In fact, throughout these proceedings, the offender has denigrated several Assistant United States Attorneys other than Robin Harris, including Ben Kingsley, Doug Sprague, Maureen Bessette, and Charles Parker. He even filed a motion, on which a hearing was held, to disqualify the entire United States Attorney's Office for the Northern District of California because they were allegedly biased against him (No. 14–CR–306, Dkt. No. 103).

*       *       *

Another set of issues has concerned allegations by the offender that have led to evidentiary hearings, only to find that the allegations were groundless or exaggerated, such as:

5

1. Beginning in early September 2014 — and while he was on pretrial release — the offender claimed that the staff members at the halfway house were not letting him make phone calls to talk to Attorney Babcock. In response, the Court held a four-hour evidentiary hearing on September 12. Three professionals from the halfway house testified that the offender had threatened them about how "the judge is going to shut [the halfway house] down" and how they would get fired if the offender was not given immediate access to the halfway house's phone (this was never denied) (No. 14–CR–306, Dkt. No. 142 at 54–55). In reality, the undersigned judge never made such comments. The professionals further testified as to how they tried to accommodate the offender's persistent and relentless requests to use the halfway house's phone and to use the conference room for attorney meetings. Based on such testimony, as well as the offender's own testimony, the undersigned judge found that the claims of the offender having to wait for hours for the halfway house's phone and having trouble meeting with his attorney were false or exaggerated at best, and that in fact, the offender had violated the conditions of release by calling his wife and Attorney Bob Kane when there was no permission to do so (No. 14–CR–306, Dkt. No. 142).

2. In his motion to disqualify the United States Attorney's Office, the offender claimed that in August 2014, two FBI agents broke through the front gate of the Sea Cliff property to intimidate his wife, Kay Brugnara, into refusing to sign as a surety for the offender. The FBI agents allegedly did so by telling Mrs. Brugnara about his girlfriend, among other things. In the offender's view, the FBI agents were acting upon the instruction of Assistant United States Attorney Doug Sprague. But at the September 16 evidentiary hearing on this issue, both of the FBI agents testified otherwise (No. 14–CR–306, Dkt. No. 129). Specifically, the agents testified that in August 2014, they visited Mrs. Brugnara at the Sea Cliff property to develop potential leads on the whereabouts of the missing fifth crate of artwork. During that visit, there was no mention of the offender's girlfriend, and hardly any conversation with Mrs. Brugnara as she was on the phone with her attorney Bob Kane.

One agent further testified that he also visited Mrs. Brugnara at the Sea Cliff property in July 2014. During that visit, the topic of the offender's girlfriend did come up, but only because Mrs. Brugnara had asked the agents about the girlfriend. In fact, during Mrs. Brugnara's testimony at the September 16 hearing, she stated that she was soliciting information about the offender's other relationships, stating (No. 14–CR–306, Dkt. No. 129 at 58):

> Q. Were you asking them questions about that relationship?
>
> A. Ah, yeah, I did.
>
> Q. So you wanted -- you were soliciting information from them?
>
> A. I was. Yeah. I was interested.

Both agents further testified that they arrived at the front door through a front gate on the public sidewalk. There was also no evidence from this evidentiary hearing that Attorney Sprague had given any direction to these agents for these two visits and there was testimony to the contrary.

3. The offender claimed that Glenn Dyer jail, where the offender was housed pending trial, created unreasonable obstacles that prevented the offender from meeting with his then counsel, Attorney Erik Babcock. Specifically, the offender claimed that the attorney-client visiting hours were inadequate and that he did not have sufficient access to written discovery.

In response, the Court held an evidentiary hearing to get to the bottom of the offender's allegations. The government presented the testimony of four Glenn Dyer staff members who were familiar with the process for attorney-client visits and exchange of documents at the jail. While the offender and his attorney claimed the visiting hours were inadequate, they could not cite a single example of being denied a request for a visit. Furthermore, the undersigned judge found that the offender's claims relating to access to documents were wildly exaggerated. Glenn Dyer's procedures for intake and distribution of documents for review were adequate (*See* No. 14–CR–306, Dkt. No. 249).

4. During trial, the offender claimed that Deputy Alex Faber, a deputy at Glenn Dyer jail, went into his cell on three different occasions and intentionally disorganized his documents. The offender also claimed that Deputy Faber took one of his banker boxes of documents and threw it away. The offender further asserted that Deputy Faber taunted him and called him names.

Again, in response, the Court held an evidentiary hearing and ordered Deputy Faber to appear and testify under oath. Deputy Faber testified that the offender's allegations were completely false. In fact, Deputy Faber played a video taken by a body camera worn by a Glenn Dyer staff member. The video showed Deputy Faber and the offender interacting in a cordial and professional manner.

*       *       *

The foregoing questions should be briefed in the sentencing memoranda and should be addressed by probation via the PSR.

**IT IS SO ORDERED.**

Dated: June 4, 2015.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE