1
2
3
4
5
6                           IN THE UNITED STATES DISTRICT COURT

7                          FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9
10   UNITED STATES OF AMERICA,

11              Plaintiff,                              No. CR 14-0306 WHA

12        v.

13   LUKE D. BRUGNARA,                                 **ORDER RE MOTION FOR NEW
                                                       TRIAL AND MOTION FOR
14              Defendant.                             JUDGMENT OF ACQUITTAL**

15   _____/

16                                    **INTRODUCTION**

17        In this art fraud prosecution, the offender represented himself during a twelve-day jury

18   trial and was convicted on two counts of wire fraud, one count of mail fraud, one count of making

19   false statements, one count of escape, and one count of contempt of court and won an acquittal on

20   three other counts.  Now, the offender, represented by counsel since the verdict, moves for a

21   judgment of acquittal under Rule 29 or, in the alternative, for a new trial under Rule 33.  For the

22   reasons stated below, the offender's motions are **DENIED**.

23                                     **STATEMENT**

24        For the benefit of the court of appeals, this order will lay out the procedural history of this

25   prolix case, beginning with the offender's background.

26   **1.      BRUGNARA'S BACKGROUND AND PRIOR CONVICTIONS.**

27        Luke Brugnara, now 51 years old and a San Francisco native, was a real-estate investor in

28   the 1990s and early 2000s.  He bought and managed several commercial buildings in San

Francisco, acquired a mansion overlooking the Golden Gate, and pursued an art collection.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    According to an article Brugnara himself bragged about in court, he acquired a reputation as "San

2    Francisco's most bombastic and, perhaps, pugnacious commercial landlord" (Jeremy Mullman,

3    *Luke Brugnara Makes His Point*, SF WEEKLY, Jan. 30, 2002).

4      By 2008, Brugnara's fortunes plummeted. Several of his companies filed for bankruptcy.

5    The government charged him with two sets of separate offenses — one for filing false tax returns

6    and the other for Endangered Species Act violations and false statements to a government agent

7    (Case Nos. CR 08-0222; CR 08-0236). The undersigned judge presided over the tax case while

8    Judge Maxine Chesney presided over the other. Although counsel represented Brugnara during

9    those proceedings, his conduct then foreshadowed the obstructionist behavior yet to come.

10    Brugnara developed a habit of taking over the argument in court from his counsel. And, he

11    manipulated the proceedings. The tax case had a trial date of June 15, 2009. One month before

12    that date, after several rounds of pre-trial filings, Brugnara pled guilty. Two weeks before

13    sentencing (and after the trial date had passed), Brugnara moved to withdraw his guilty plea. An

14    order allowed him to do so, setting a new trial date for February 1, 2010. After a one-month

15    continuance at Brugnara's request, he again pled guilty shortly before trial. Once again, after the

16    trial date had passed, Brugnara moved to withdraw his guilty plea. A ruling denied this second

17    request and sentenced Brugnara to thirty months in prison.

18      Brugnara followed a similar pattern throughout the Endangered Species Act case before

19    Judge Chesney. He pled guilty on the eve of trial and moved to withdraw his guilty plea before

20    sentencing. Then, Brugnara changed his mind again and stuck with his guilty plea. Judge

21    Chesney sentenced Brugnara to fifteen months in prison, concurrent with the tax case sentence.

22      Brugnara served his time and began supervised release in August of 2012.

23      **2.**      THE PRE-TRIAL HISTORY OF THE PRESENT CASE.

24      In his salad days, Brugnara had purchased a Renoir from art dealer Rose Long in New

25    York. In 2014, she reconnected with Brugnara and inquired if he had interest in buying a

26    collection of assorted artworks. She had no knowledge of his interlude in federal prison.

27    Brugnara and Long negotiated the terms of the art transaction over several weeks, as

28    demonstrated by the communications presented at trial. Brugnara demanded and received a

discount based on his representation that the art would be placed in his "museum," and he agreed to pay $11 million for the items. Long agreed to ship the art to Brugnara's "museum" in San Francisco. At the time, however, Brugnara had no income, no net assets, no discernable way to pay, and no museum.

The five crates of art arrived at the "museum" address. So did Long. When she arrived, Long was surprised to find the address to be a residence rather than a museum. The items of art shipped included: (1) a Valsuani "Little Dancer" sculpture by Edgar Degas; (2) a series of etchings by Pablo Picasso; (3) a drawing by Juan Miro; (4) a painting by George Luks; and (5) sixteen oils on paper by Willem de Kooning.

Instead of being ready to authenticate and inspect the works, as was expected, Brugnara told Long to have the delivery man put the crates in his garage. They talked in his living room, and she gave him a book featuring the Little Dancer, as part of a show at the Hermitage in St. Petersburg, Russia. Brugnara then abruptly sent her off so that he could meet a real estate broker. For the next few days, Long tried and tried to get Brugnara to complete the inspection process, but he kept putting her off. Finally, he texted her that the entire shipment had been a "gift" from her to him and he refused to pay for it, a preposterous proposition. Long and another dealer supplying some of the items, Walter Maibaum, then turned to the FBI, who raided Brugnara's garage and house and recovered four of the five crates of art. The fifth crate, containing the Valsuani Degas "Little Dancer" sculpture, was and remains missing.

Based on the foregoing, Brugnara's probation officer submitted a Form 12 alleging that he had violated the conditions of his supervised release by engaging in a fraudulent scheme. Several days later, a grand jury indicted Brugnara on one count of mail fraud. Brugnara went into custody. Assistant Federal Public Defender Brandon LeBlanc became his counsel.

At the first hearing, Brugnara elbowed his counsel aside and stated that the whole situation had been a misunderstanding, that Long had actually been trying to defraud him (rendering him the real victim), and he demanded an immediate evidentiary hearing. A three-day evidentiary hearing took place on June 16, 17, and 18, 2014. Several witnesses testified, including Victim Long. Brugnara testified as well. When the evidence developed in a way

United States District Court
For the Northern District of California

3

adverse to Brugnara, he requested that any ruling on the Form 12 be deferred until after resolution of the indictment. The Form 12 proceeding paused, and the parties agreed to include the trial record as part of the Form 12 record.

During his testimony at the Form 12 evidentiary hearing, Brugnara suggested that Attorney LeBlanc had blessed the plan for him to keep the artwork. This made Attorney LeBlanc a potential witness in the case, necessitated his moving to withdraw, and led to the appointment of new CJA counsel.

By this point, Brugnara had exhibited a pattern and practice of elbowing his attorney to one side and taking charge of courtroom arguments. Counsel could not control him. Nor could the Court despite the repeated admonitions that he should only speak through counsel and that his statements could be used against him.

CJA Attorney Erik Babcock came in to represent the accused and a new trial date was set for August 4, 2014. Two weeks before that date, the grand jury issued a superseding indictment, adding false statement charges (stemming from Brugnara's testimony at the Form 12 evidentiary hearing) along with wire fraud charges. As a result, the trial date slipped to September 17. Several weeks later, Attorney Babcock stated that he could not be ready for that date and the trial slipped to October 22. Attorney Babcock requested and received yet another continuance to January 5, 2015. Attorney Babcock eventually said that he could not be ready for a January 5 trial date, necessitating a continuance to February 26 and further necessitating the re-alignment of prosecutors due to the departure of the lead prosecutor at the end of January.

Because the charges occurred while Brugnara had been on supervised release, because he posed a threat to the community, and because he was not amenable to supervision, Brugnara remained in detention until a ruling eventually permitted his release to a halfway house, where he abused its personnel and violated its rules, leading to his remand. To help the defense prepare for trial, an order put in place a special procedure to furlough Brugnara (in civilian clothes) to the custody of Attorney Babcock for the sole purpose of meeting with him in the attorney lounge at the federal building for trial preparation (Dkt. No. 257).

**United States District Court**
For the Northern District of California

On February 5, Brugnara absconded while on furlough, literally running away from the federal building and remaining at large for six days until apprehended (in the company of a former girlfriend).  The grand jury issued a second superseding indictment, adding escape and contempt charges.  In subsequent hearings, Brugnara elbowed his lawyer aside and blurted out that Attorney Babcock had "greenlighted" his dash out of the courthouse.  This forced Attorney Babcock to withdraw as counsel (since he then became a witness to whether he had "greenlighted" the absconding).

By now, a reader may well wonder how someone living in a San Francisco mansion (in Sea Cliff) could possibly qualify for CJA counsel in the first place.  The answer is that Brugnara said he had no income or net assets and, even today, all evidence continues to indicate that this was true.

CJA Attorney Jeffrey Bornstein arrived next.  Only one week later, however, he moved to withdraw from the case due to a severe personal conflict in style, which motion ultimately was granted.

Brugnara then said he wished to proceed *pro se*, necessitating the setting of a *Faretta* hearing for the following week.  While Brugnara had blurted out in previous hearings that he "wanted to go *pro se*," he had always thought better of these requests and made up with counsel.  This time, however, the accused remained adamant about his desire to waive counsel, despite the fact that Attorney Bornstein attempted to reconcile his differences with Brugnara and explained the dangers of waiving his right to counsel.

In anticipation of Attorney Bornstein's withdrawal, the CJA department inquired as to whether Attorney George Boisseau would be willing to take on the representation (as defendant's fourth CJA attorney).  Attorney Boisseau stated that he would take the case, could be ready for a July 6 trial date (but not sooner), and appeared at both days of the *Faretta* hearing.

Although Attorney Bornstein had explained the dangers of self-representation to the accused, the Court understood its duty under *Faretta* and held a hearing devoted to that issue, covering two days, on March 24 and 26.  At the hearing, Brugnara heard the nature of the charges against him, the possible penalties, and the dangers and disadvantages of self-representation.  It

was stressed to Brugnara that he would have difficulty preparing for trial from jail.  The consequences of waiving his right to appointed free counsel were thoroughly explained.  Sergeant Daniel Dixon of Glenn Dyer jail testified on the second day of the hearing.  For the benefit of the accused, he meticulously described the restrictions and privileges for *pro se* defendants at Glenn Dyer.  Sergeant Dixon also entered into the record a four-page document laying out the procedures for *pro se* defendants at Glenn Dyer.  Brugnara took the time to read this document, stated that he understood it, and reiterated his unequivocal request to proceed *pro se*.

During the *Faretta* colloquy, Brugnara plainly understood (and was expressly told) that he could have Attorney Boisseau, one of the finest trial lawyers in California, represent him free of charge.  Attorney Boisseau met the accused, talked with him, and stood beside him at the *Faretta* hearing on March 24 and 26.  As Brugnara was also told, however, Attorney Boisseau would not be able to come up to speed and to try the case until at least July 6 (nor could any other new attorney in this case).  Brugnara recognized that if he represented himself, the Court would attempt to make an April 27 trial date work, but that it could not be guaranteed.  The accused knew he had a clear choice to go with Attorney Boisseau (standing then beside him) or to forego that opportunity and to exercise his right to self-representation.  He chose to represent himself.

Based on Brugnara's responses at the *Faretta* hearing, an order found that Brugnara understood the charges against him and their possible penalties, understood the dangers and disadvantages of self-representation, understood that he had a constitutional right to a free lawyer, but refused one, that Brugnara unequivocally and voluntarily waived his right to a lawyer and unequivocally and voluntarily exercised his constitutional right to represent himself.  Brugnara understood the consequences of his decision and was mentally competent to make this decision (Dkt. No. 390).  (Brugnara's mental competence will be further addressed below.)

Two advisory CJA counsel signed on.  No standby counsel were appointed because time was too short, based on the April 27 trial date (demanded by Brugnara), for any standby counsel to come up to speed and step in to take charge of a trial in progress.

As the April 27 trial date approached, Brugnara laid out his trial strategy in a jail call to his mother.  Specifically, he told his mother (Dkt. No. 489 at 70–71):

United States District Court

For the Northern District of California

1
2
3

> I'm going to bring up everything in court.  I'm going to bring up
> everything.  And they may say, oh you can't hear that.  But once it
> comes out of my mouth, it's already out of my mouth and the jury
> hears it.  That's the other reason they don't want me to go *pro se*.
> I'm going to say everything I need to say, believe me.

4   At the final pre-trial conference, after the above comment became public, the Court strongly

5   ordered Brugnara not to do the things listed in the call to his mother, and he promised he would

6   behave.  Brugnara filed several motions *in limine*, requested subpoenas be served, opposed the

7   government's motions *in limine*, and competently argued several issues at the pre-trial

8   conference.

9        **3.     THE TRIAL.**

10       Trial began on April 27.  Despite Brugnara's repeated assurances that he would comply

11  with the rules of evidence and would behave himself in front of the jury, he tried to derail the

12  process at every phase, doing just what he told his mother he would do — and worse.

13       •    Despite admonishment, Brugnara's opening statement included numerous

14            "facts" that would never be shown by the evidence.

15       •    During the government's direct examination of witnesses, Brugnara

16            persisted in making improper speaking objections and argumentative

17            objections.  For example, he would object to the relevance of a question

18            and how it related to the victim "trying to sell me the fake art."

19       •    Despite admonishment, Brugnara's examinations of government witnesses

20            were riddled with speeches framed as prologues to questions.

21       •    When rulings were being announced from the bench, Brugnara regularly

22            interrupted, usually in mid-sentence, to argue with most phrases in the

23            ruling.

24       •    Brugnara regularly violated the rules of evidence and repeatedly failed to

25            lay proper foundation and, instead, resorted to bullheadedly reading

26            hearsay statements in unadmitted documents out loud as if they were in

27            evidence — including statements specifically excluded by motions *in*

28            *limine*.

7

United States District Court
For the Northern District of California

- Brugnara's cross-examination questions, after the prologue, included, "Would it surprise you?" or "Are you aware?" followed by some "fact" not in evidence and not likely ever to get in evidence. He used these phrases thirty times during the cross-examination of two government victim witnesses, even though he had been ordered not to do so on multiple occasions.

- When the government attorneys rose to make objections, Brugnara regularly interrupted them, as he did with the judge, in mid-sentence so that they could not make their record. Consequently, the proceedings came out disjointed despite best efforts to maintain clarity and decorum. As the trial progressed and Brugnara continued to misbehave, specific orders requested that he cease this recurring behavior, which orders he violated repeatedly.

- In the presence of the jury, Brugnara hurled abusive insults at the prosecutors. He told AUSA Robin Harris in the presence of the jury "you dress like a Nazi" (Tr. 1824). On another occasion, addressing Attorney Harris, he said, "she should move to North Korea, your Honor. I think, you know, she's dressed for it" (Tr. 826). On another occasion in the presence of the jury, he stated (Tr. 771):

  > She's interrupting me, your Honor. She is trying to play judge. Ms. Harris hasn't been appointed to be a judge. Apparently they don't think she is qualified to be a judge and she has been passed over for God knows how many years. Maybe she should sit down and let the judge be the judge and she can be prosecutor.

- After a Manhattan investment banker who had assisted Brugnara in his salad days, Nick Barbato, testified and evidently disappointed Brugnara because, among other things, he contradicted Brugnara's theme that he was still able to raise millions of dollars, Brugnara pitched into an extended top-of-his-lungs tirade, accusing the prosecutors of corrupting his star witness. (This outburst came while the jury sat in the jury room.)

United States District Court
For the Northern District of California

• On one occasion, Brugnara's facial expressions, physical movements, and demeanor seemed so hostile as to pose an immediate physical threat to the prosecutors, so much so that the marshals were asked to stand closer to the offender.  (This was out of the presence of the jury.)

• Brugnara used his closing argument as another avenue to put his story in front of the jury.  Although the offender had every right to exercise his Fifth Amendment privilege not to testify, he was not within his right to lay before the jury a closing argument of supposed facts that had never been supported by the evidence at trial.

In addition, as a "defense" to the fraud charges, Brugnara repeatedly argued to the jury that Victims Long and Maibaum had been trying to defraud him.  In response, the jury instructions rejected the defense (Dkt. No. 601 at 11):

> If the government proves that the defendant committed wire or mail fraud beyond a reasonable doubt, it would not matter whether any alleged victim of the scheme was trying to defraud the defendant, trying to defraud someone else, or was negligent in some manner.  The crimes of wire or mail fraud are complete upon the occurrence of all four elements of the crime.  If, however, you find that an alleged victim acted dishonestly or carelessly in any way, then you may consider such conduct in evaluating the credibility of his or her testimony, giving it such weight as you think it deserves, taking into account all of the facts and circumstances shown by the evidence.

During jury deliberations, an issue arose concerning one juror who wound up having to be discharged for having engaged in juror misconduct and having been dishonest about his criminal history during voir dire, among other things.  The juror was brought into the courtroom for questioning.  Beforehand, both the government and defendant were explicitly told not to say a word and that only the judge would address the juror.  As the supplemental voir dire began, the juror launched into a screaming political tirade about Nazis and communists that lasted twenty minutes.  Among other things, the juror declared that the judge was a "Nazi judge," the jury was a "Nazi jury," the "lawyers are crooks," and "Brugnara, he's Italian, he's not guilty."  Eventually, a deputy marshal concluded that the situation was not safe and that the crazed juror had to be removed.  After the juror had been cooling down for about fifteen minutes, court security officers

brought him back into the courtroom.  Before the juror completed his first step back into the courtroom and before anyone could even say one word, the juror launched into another screaming tirade that lasted for five minutes, before court security officers again removed him.  He was discharged.  A previous order has described the juror's tirades in detail (Dkt. No. 647).

Despite the order to remain silent during the supplemental voir dire, Brugnara interrupted several times.  Brugnara clapped his hands at the juror to get his attention and attempted to coach him by shouting to the juror, "this isn't helping me."

After the crazed juror had been dismissed, one of the alternate jurors returned, was sworn, and the reconstituted jury began its deliberations anew.  The next day, the jury returned a verdict of guilty on six of the counts and not guilty on three counts.  Immediately after the verdict had been read, Brugnara launched into a personal attack on the judge, all in the presence of the jury and a packed courtroom, accusing the judge of prejudice and claiming that the judge had orchestrated the verdict.

Due to the numerous violations of court orders during trial, several rulings held Brugnara in criminal contempt and sentenced him to 471 days in custody over and above whatever sentence eventually rendered for the counts of conviction.  Brugnara's criminal contempt sentences, and the factual bases that supported them, have been described in detail in previous orders (Dkt. Nos. 529, 547, 561, 592, 606, 626).

**4.      HEARINGS REGARDING BRUGNARA'S PRE-TRIAL RELEASE.**

The issue of Brugnara's pre-trial release arose frequently.  From the moment he stepped into the courtroom in the present case, up through the post-conviction proceedings, Brugnara has relentlessly demanded to be released on bail.  The issue has been heavily litigated before several judges in this district.

The Court repeatedly recognized that it was (and remains) unusual to detain a white-collar criminal defendant pending trial.  Brugnara presented the rare exception.  This section now summarizes the numerous hearings that took place regarding the issue of Brugnara's requested pre-trial release.

10

United States District Court

For the Northern District of California

Magistrate Judge Jacqueline Scott Corley ordered Brugnara detained after finding that he had failed to show by clear and convincing evidence that he was not a danger to the community (Dkt. Nos. 6, 7), given that Brugnara had been on supervised release and he thus had the burden of establishing by clear and convincing evidence that he was not a danger to the community.  *See* Rule 32.1(a)(6); 18 U.S.C. 3143.  On that issue, Judge Corley found that Brugnara had "a history of doling out threats of violence — [with] several individuals [having] obtained restraining orders against him" — and that he had not shown that he was amenable to complying with the rules of a halfway house or other conditions of his release — given his courtroom demeanor at this hearing and his prior admission to two counts of failing to truthfully answer inquiries by the probation officer while on supervised release (*see* CR 08-0222, Dkt. No. 231).

On June 11, 2014, Brugnara asked Magistrate Judge Nat Cousins for pre-trial release (Dkt. Nos. 12, 15).  Judge Cousins denied that request and confirmed that Brugnara was not amenable to supervision, based again on his courtroom demeanor at that hearing, his persistent habit of elbowing aside his lawyer, and arguing his own case, usually to his detriment (despite repeated admonishments to cease).

As stated, a three-day evidentiary hearing before the district judge on the alleged Form 12 violations began on June 16, 2014 (*see* CR 08-0222, Dkt. Nos. 307, 310, 311).  This hearing included testimony from several witnesses over the course of more than thirteen hours.  Brugnara had agreed to purchase the artwork for approximately $11 million, according to the victims.  At the same time, he had represented that he was too cash-poor to hire a lawyer and therefore deserved CJA counsel.  The hearing also covered an earlier state civil action in which defendant had been accused of fraud and the state court judge found that defendant's "fraudulent acts were patently clear" in that matter (although the damages were too speculative to award) (CR 08-0222 Dkt. No. 311 at 46–54).  Following the evidentiary hearing, which included substantial testimony from defendant himself, the Form 12 proceeding was held in abeyance at defendant's request. The evidence would be considered, pro and con, as relevant to the issue of pre-trial detention.

Next, Judge Cousins held another hearing on June 27, 2014, after Brugnara moved for reconsideration of his detention (Dkt. Nos. 37, 38).  Finding that "most of the arguments made in

United States District Court
For the Northern District of California

1   support of [defendant's] motion for reconsideration are not valid reasons to reopen a detention

2   hearing under 18 U.S.C. [] 3142(f)," Judge Cousins nevertheless continued the motion until

3   transcripts from the Form 12 evidentiary hearings (which had occurred earlier) became available.

4          Next came a request to be released to a halfway house and defense counsel and Brugnara

5   said he would abide by whatever strict conditions were imposed.  Several hearings on this request

6   followed.  Real estate agent Mark Levinson and defendant's wife testified to determine what

7   equity remained in a Sea Cliff house owned by Brugnara Properties VI to secure a possible bond

8   for defendant, who asserted that the Sea Cliff house contained sufficient equity.  The government

9   argued the opposite.  Defendant and his wife were unwilling to allow an independent appraisal of

10  the Sea Cliff house, and on that ground, an order denied defendant's request.

11         Brugnara and his wife gave up on their objection to the independent appraisal, and by

12  August 22 an appraiser had evaluated the Sea Cliff house and testified (Dkt. No. 92).  Based

13  thereon, an order found that there was enough plausible equity in the Sea Cliff house to secure a

14  $500,000 bond for defendant's pre-trial release to a halfway house.

15         Pre-trial Services then proposed a number of conditions for release to a halfway house,

16  which were ventilated with the parties at a hearing.  Among other items, the conditions while at

17  the halfway house included no phones (other than using the halfway house phone in the presence

18  of halfway house staff members), GPS monitoring, no financial transactions, and no contact with

19  any victims or witnesses in the case (unless in the presence of defense counsel) (Dkt. No. 93).

20         On August 25, Judge Cousins oversaw defendant's bail hearing and the actual issuance of

21  his bond (Dkt. Nos. 93, 94).  There, Judge Cousins again admonished Brugnara as to each

22  condition of release, including the ones already discussed at the previous hearing.  Brugnara was

23  then released to a halfway house.

24         Next, on September 3 — approximately one week after the August 25 bail hearing —

25  defendant appeared before Judge Cousins after Pre-trial Services reported that defendant had

26  failed to charge his GPS location monitoring device on several occasions, had attempted to have a

27  conversation with a witness (his girlfriend) before her deposition, and had tried to meet with

28  Attorney Babcock at the halfway house without prior approval from the halfway house's staff

(Dkt. Nos. 100, 101).  Nevertheless, in an effort to facilitate defendant's access to Attorney Babcock, Judge Cousins modified the conditions of release so that defendant could walk to and meet with Attorney Babcock at the federal courthouse, with advance notice and approval by Pre-trial Services.  All other conditions remained unchanged, however, and defendant was again "strongly admonished to comply with his conditions of release."

Later on September 3, defendant requested modification of the conditions of release so that he could call his wife, civil attorney Robert Kane, and other prospective criminal defense counsel (*e.g.*, Attorney John Keker).  The request to call the wife and Attorney Kane were denied, but defendant could call Attorney Keker that same day to discuss possible representation (Dkt. No. 102).  (Attorney Keker never agreed to represent Brugnara.)

Following defendant's claims that he was having trouble calling and meeting with Attorney Babcock or other potential new criminal defense counsel, the conditions of release were further relaxed so that defendant could make an unlimited number of calls on the halfway house's phone to Attorney Babcock and potential new criminal defense counsel, and have in-person meetings with Attorney Babcock in a closed room at the halfway house (Dkt. Nos. 105, 136).  Moreover, on September 10, an order permitted defendant to have a cell phone but he could only use that phone to call Attorney Babcock and potential new defense counsel (Dkt. No. 109).  (The latter condition was soon rescinded, as laid out below.)

Soon thereafter, Brugnara claimed that the staff members at the halfway house refused him phone calls to Attorney Babcock.  In response, a four-hour evidentiary hearing ensued. Three professionals from the halfway house testified that the offender had threatened them about how "the judge is going to shut [the halfway house] down" and how they would get fired if the offender was not given immediate access to the halfway house's phone (Dkt. No. 142 at 54–55). The professionals further testified as to how they tried to accommodate the offender's persistent and relentless requests to use the halfway house's phone and to use the conference room for attorney meetings.  Based on such testimony, as well as the offender's own testimony, a ruling determined that the claims of the offender having to wait for hours for the halfway house's phone and having trouble meeting with his attorney were false or greatly exaggerated at best, and that in

United States District Court

For the Northern District of California

1    fact, the offender had violated the conditions of release by calling his wife and civil Attorney Bob

2    Kane when there was no permission to do so (Dkt. No. 142).

3         Next, at a hearing on September 24, Judge Cousins found that Brugnara had again violated

4    the conditions of his supervised release and remanded him into custody.  In his oral ruling, Judge

5    Cousins stated:  "I find that the Government has shown by more than clear and convincing

6    evidence that Mr. Brugnara has violated special release conditions numbers Three and Eight.

7    Three is the use of a telephone, and the evidence for that is both [pre-trial services officer] Lew's

8    testimony and the phone records, as well as the testimony of Mr. Brugnara.  And special

9    condition number Eight, which is that the defendant shall have no contact, direct or indirect with

10   any victim or witness in this case unless in the presence of defense counsel of record" (Dkt. No.

11   156 at 105).

12        Brugnara appealed Judge Cousin's remand order.  After a hearing, an order affirmed

13   Judge Cousin's detention ruling, finding that Brugnara had used the telephone in the attorney

14   lounge at the federal building to place a 51-minute call to a girlfriend (a witness in the case

15   against him).  This clearly violated the conditions of his supervised release, which prohibited

16   Brugnara from using a telephone except for specific purposes and barred him from having any

17   contact with witnesses in the case.  The order stressed the numerous chances Brugnara had

18   received and how he had promised to abide by "any" conditions of supervised release (Dkt. No.

19   167).  Despite this, Brugnara could not follow the very basic and straightforward rules.  Our court

20   of appeals eventually affirmed the order remanding Brugnara into custody (Dkt. No. 228).

21        In other cases, this would have been the end of the issue, but Brugnara insisted on

22   litigating the issue of pre-trial release.  The next hearing took place on November 24, before

23   Judge Cousins.  There, Judge Cousins found that Brugnara had offered no new evidence that

24   would warrant reconsideration of his latest detention order.  Brugnara again appealed Judge

25   Cousins' ruling, which was again denied for the same reasons after a hearing on December 16.

26        Despite this, the Court fashioned a furlough procedure to enable Brugnara to meet with

27   Attorney Babcock in the attorney's lounge in the federal building to prepare for trial.  On

28

14

United States District Court

For the Northern District of California

February 5, 2015, Brugnara absconded during a furlough meeting with Attorney Babcock.  The FBI apprehended him six days later.  Brugnara continued his relentless requests for bail.

A further hearing on the bail issue was held on April 1, 2015, before Judge Cousins, who again denied Brugnara's bail request, citing his escape as clear evidence that he epitomized a flight risk.  Brugnara orally appealed Judge Cousin's ruling at a subsequent pre-trial motion hearing, which was denied on the record.  After being constantly interrupted by Brugnara while trying to make a ruling on the bail appeal, the undersigned judge found (Dkt. No. 395 at 69):

> And I want to just end it by saying you are a flight risk, you are not amenable to supervision, and you are an economic danger to the United States of America.  So that is what the Court feels, and I just cannot -- we're not going to go revisit this.

While Brugnara continued to relentlessly request bail, and demanded that he be released to his Sea Cliff mansion pending and during trial, no more hearings were held solely dedicated to the issue of pre-trial release.

## 5.   OTHER EVIDENTIARY HEARINGS.

In September 2014, the offender moved to disqualify the entire United States Attorney's Office in this district, alleging that he had been the victim of a vendetta and prosecutorial misconduct by three Assistant United States Attorneys, including the prosecutor in this action.  In his motion, the offender claimed that in August 2014, two FBI agents broke through the front gate of the Sea Cliff property to intimidate his wife, Kay, into refusing to sign as a surety for the offender.  The FBI agents allegedly did so by telling Mrs. Brugnara about his girlfriend, among other things.  In Brugnara's view, the FBI agents were acting upon the instruction of Assistant United States Attorney Doug Sprague.  But at the September 16 evidentiary hearing on this issue, both of the FBI agents testified otherwise (Dkt. No. 129).  Specifically, the agents testified that in August 2014, they visited Mrs. Brugnara at the Sea Cliff property to develop potential leads on the whereabouts of the missing fifth crate of artwork.  During that visit, there was no mention of the offender's girlfriend, and hardly any conversation with Mrs. Brugnara inasmuch as she was on the phone with her attorney Bob Kane.

One agent further testified that he also visited Mrs. Brugnara at the Sea Cliff property in July 2014.  During that visit, the topic of the offender's girlfriend did come up, but only because

Mrs. Brugnara herself brought it up and asked the agents about the girlfriend.  In fact, during Mrs. Brugnara's testimony at the September 16 hearing, she stated that she solicited information about the offender's other relationships, stating (Dkt. No. 129 at 58):

> Q.  Were you asking them questions about that relationship?
>
> A.  Ah, yeah, I did.
>
> Q.  So you wanted -- you were soliciting information from them?
>
> A.  I was.  Yeah.  I was interested.

Both agents further testified that they arrived at the front door through a front gate on the public sidewalk.  Attorney Sprague never gave any direction to these agents for these two visits.

*                           *                           *

Several months later, the offender claimed that Glenn Dyer jail, where he had been housed pending trial, created unreasonable obstacles that prevented him from meeting with his then counsel, Attorney Erik Babcock.  Specifically, Brugnara claimed that the attorney-client visiting hours were inadequate and that he did not have sufficient access to written discovery.

In response, an evidentiary hearing took place to get to the bottom of defendant's allegations.  The government presented the testimony of four Glenn Dyer staff members who were familiar with the process for attorney-client visits and exchange of documents at the jail. While the offender and his attorney claimed the visiting hours were inadequate, they could not cite a single example of being denied a request for a visit.  Furthermore, the evidence showed that the offender's claims relating to lack of access to documents had been wildly exaggerated.  Glenn Dyer's procedures for intake and distribution of documents for review were adequate (*See* Dkt. No. 249).

*                           *                           *

During trial, the offender claimed that Deputy Alex Faber, a deputy at Glenn Dyer jail, went into his cell on three different occasions and intentionally disorganized his case documents. The offender also claimed that Deputy Faber took one of his banker boxes of documents and threw it away.  The offender further asserted that Deputy Faber taunted him and called him names.

United States District Court

For the Northern District of California

1    This provoked another evidentiary hearing where Deputy Faber appeared to testify under

2    oath.  Deputy Faber stated that the offender's allegations were completely false.  In fact, Deputy

3    Faber played a video taken by a body camera worn by a Glenn Dyer staff member.  The video

4    showed Deputy Faber and the offender interacting in a professional manner.

5    **6.    POST-TRIAL PROCEEDINGS.**

6    After conviction, Brugnara requested to be represented by counsel for "all purposes" for

7    the duration of the proceedings.  Attorneys George Boisseau and Dena Young came in and

8    advisory counsel phased out.  Shortly thereafter, Brugnara submitted several filings stating that he

9    wanted to revert to *pro se* status.  The government, appointed defense counsel, and Brugnara

10   himself submitted briefing as to whether the offender had forfeited his right to represent himself

11   as a result of his contumacious behavior at trial.  An order then held that Brugnara had, indeed,

12   forfeited his right to self-representation and could only be represented by counsel for the duration

13   of the proceedings (Dkt. No. 684).

14   Walter Maibaum's art company moved for return of certain art items (Dkt. No. 670).  This

15   led to an evidentiary hearing over the authenticity and value of the de Kooning subset of items

16   (for the purpose of loss calculation at sentencing).  Experts were retained to examine the art and

17   an evidentiary hearing took place on September 2, 2015, which showed that these particular items

18   had little or no commercial value.  This will be considered at sentencing.

19                        *                    *                    *

20   Now, Brugnara moves for a judgment of acquittal or, in the alternative, for a new trial.

21   After the evidentiary hearing regarding valuation of the de Koonings, Brugnara supplemented his

22   motion for a new trial.  This order follows full briefing and oral argument.

23   **ANALYSIS**

24   **1.    BRUGNARA'S MOTION FOR A JUDGMENT OF ACQUITTAL.**

25   Under Rule 29, a judgment of acquittal is required when the evidence presented at trial is

26   insufficient to sustain a conviction beyond a reasonable doubt.  A judgment of acquittal is

27   improper if "viewing the evidence in the light most favorable to the prosecution, any rational trier

28

United States District Court
For the Northern District of California

1    of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*

2    *v. Virginia*, 443 U.S. 307, 319 (1979).

3        Brugnara moves for a judgment of acquittal on four of the six counts on which the jury

4    convicted him — Counts Two, Four, and Five (the wire and mail fraud counts) and Count Six

5    (the false statement count).  For the reasons stated below, Brugnara's Rule 29 motion is **DENIED**.

6                        **A.    Wire and Mail Fraud Counts.**

7        To prove wire fraud or mail fraud, as the jury instructions stated, the government must

8    establish the following elements:  (1) the defendant knowingly participated in, devised, or

9    intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or

10   property by means of false or fraudulent pretenses, representations, promises, or by means of

11   statements made misleading by reason of omissions of fact; (2) the statements made or facts

12   omitted as part of the scheme were material; that is, they had a natural tendency to influence, or

13   were capable of influencing, a person to part with money or property; (3) the defendant acted with

14   the intent to defraud, that is, the intent to deceive or cheat; and (4) the defendant used, or caused

15   to be used, a wire communication or the mail to carry out or attempt to carry out an essential part

16   of the scheme.

17       Viewing the evidence presented at trial in the light most favorable to the prosecution, a

18   rational trier of fact could easily have found that the government met each of these four elements.

19   The jury could rationally have found that Brugnara's emails led Long to believe that Brugnara

20   would pay for the art once she had shipped it to him and that his plan all along was to gain

21   possession, hold it for ransom, claim it was a gift, and grind her down to some unfair

22   compromise.

23       The second factor relates to the materiality of the statements made or facts omitted.  At

24   trial, Long testified to the materiality of the statements Brugnara made regarding his willingness

25   to pay millions for the art.  Plainly, a rational jury could find that Bruganara's statements, and his

26   omissions regarding his actual financial health, were capable of influencing Long and Maibum to

27   deliver the art to him.

28

*United States District Court*
For the Northern District of California

18

United States District Court

For the Northern District of California

1    The third factor is intent, which a rational jury could have found from Brugnara's

2  numerous lies.  While negotiating for the art, he lied about his financial health, as stated above.

3  He misled Long into thinking he had a San Francisco museum and used it to extract a ten percent

4  discount.  After the art had been delivered, he lied about it being a gift.  In an email from

5  Brugnara's attorney, he lied about having received the Hermitage book from Long when she

6  delivered the art to him.  Moreover, a rational jury could have found intent and consciousness of

7  guilt from Brugnara's escape on the eve of trial.

8    As to the fourth element, a rational jury could find that Brugnara used wire

9  communications and the mail to carry out essential parts of his scheme.  In regards to wire fraud,

10  almost all of Brugnara's communications with Long took place over email.  The two specific

11  emails on which the jury convicted Brugnara of wire fraud were an email to Long agreeing to buy

12  the art (Count 2) and an email from Brugnara's attorney stating that Brugnara had never been

13  given a Hermitage book (Count 4).  There is no dispute that these were wire communications and

14  a rational jury could easily find that they were an essential part of carrying out his scheme.  In

15  regards to mail fraud, a commercial shipper delivered the art, which both sides agree qualifies as

16  the mail, an event which Brugnara caused to take place.  The actual shipment of the art of course

17  constituted an essential part of Brugnara's scheme.

18    Although Brugnara's motion does not state specifically which elements of mail and wire

19  fraud the government failed to prove, he makes several arguments as to why the government

20  failed to prove wire and mail fraud as a whole.  Oddly, Brugnara's motion stresses that Long

21  approached Brugnara about the transaction, rather than the other way around.  The motion states:

22  "This case would be different if BRUGNARA had initially solicited Long to buy her 'valuable'

23  artwork or had even agreed to pay some money as a deposit for the $11 million in art being

24  shipped to his home" (Br. at 7).  Not so.  The elements of wire and mail fraud make no mention of

25  who must approach whom to consummate the transaction.  Rather, there must be intent and a

26  scheme to defraud.  Despite the fact that Long initially approached Brugnara and asked if he

27  would be interested in the art, the government presented ample evidence from which a rational

28  jury could find that Brugnara took full advantage of an opportunity that fell into his lap.

19

United States District Court
For the Northern District of California

1    Next, Brugnara focuses on the lack of a written contract or deposit for the art.  Again, as

2  the undersigned told the jury at trial, the government did not need to prove up a contract.  While

3  the existence or nonexistence of a contract or deposit could go to the element of intent, it was not

4  a required element of wire or mail fraud.  The jury instruction regarding the existence/non-

5  existence of a contract stated as follows (Dkt. No. 602 at 11):

6         To prove wire or mail fraud, the government need not prove that a
          contract was signed or formed.  If the government proves all
7         elements of wire or mail fraud, it need not go further and prove
          that a contractual relationship existed.  Nor is it necessary for the
8         government to prove a breach of any contract.  On the other hand,
          in determining the intent of the defendant (and all other elements
9         of the offense), you may take into account, as part of the overall
          evidence in the case, any purchase terms and conditions you find
10        from the evidence influenced the defendant's intentions.

11  The jury considered this evidence and determined that the elements of wire and mail fraud had

12  been met nonetheless.  Based on the evidence available to it, the jury did not make an irrational

13  determination.

14         Lastly, Bruganara's motion resorts to attacking the victims, Long and Maibaum.

15  Brugnara states (Reply at 4):

16        There were numerous falsehoods and half-truths testified to during
          the course of the trial.  However, BRUGNARA was not the only
17        source of such deceptive statements.  Most of everything Long said
          about the artwork, including that she owned it, was false.
18        Maibaum did everything he possibly could to hide his identity, and
          even his existence, from BRUGNARA.

19
20  During trial, however, Brugnara made this exact argument.  The jury rejected it.  Even if Long

21  and Maibaum had been trying to reciprocally defraud Brugnara, that would not have negated any

22  of the elements of wire fraud and would not have been a defense (although it would have gone to

23  their credibility, as the jury was instructed).

24         **B.    False Statement Count.**

        The indictment alleged that Brugnara made two false statements during the Form 12

25  evidentiary hearing described above.  To prove that Brugnara made a false statement, the

26  government had to establish the following elements:  (1) the defendant testified under oath before

27  a court; (2) the testimony was false; (3) the defendant knew that the testimony was false; and

28  (4) the false testimony was material to the matters before the court; that is, it had a natural

20

1   tendency to influence, or was capable of influencing, the court.  Furthermore, "to be material a

2   false statement need only be 'relevant to any subsidiary issue under consideration.'"  *United*

3   *States v. McKenna*, 327 F.3d 830, 839 (9th Cir. 2003) (quoting *United States v. Lococo*, 450 F.2d

4   1196, 1999 (9th Cir. 1972)).

5          In his motion, Brugnara only argues that the government failed to prove the fourth

6   element — materiality.  Brugnara concedes that a rational jury could have found that the other

7   three elements had been met.  Rather, Brugnara argues that because the government did not

8   explain the context of the Form 12 hearing in which Brugnara made his false statement, no

9   rational jury could have determined that the statement was material.  The only issue, therefore, is

10  whether sufficient context was presented during trial such that a rational jury could find that

11  Brugnara's false statement had been material to the proceeding in which it was made.

12         Our court of appeals has established that there are "very broad parameters for the

13  definition of materiality.  Essentially anything that could influence or mislead the trial court or the

14  jury is considered to be material."  *United States v. Dipp*, 581 F.2d 1323, 1328 (9th Cir. 1978)

15  (internal quotations omitted).

16         The context for the false statement at issue was presented to the jury in the following

17  manner (Tr. 1054):

18              THE COURT:  I will explain to the jury what this is before you
                read it.  We have had other — as you can gather from what's
19              already been read to you and quoted from, there were prior
                proceedings in this case in the courthouse.  In fact, in this
20              courtroom.  And I was the judge there.  And at one point Mr.
                Brugnara testified under oath and gave certain testimony.  And that
21              part of that testimony is what the Government is challenging in its
                count that I summarized for you earlier in the case.  The count
22              concerning — which offense is it?

23              MS. HARRIS:  This is Counts Six and Seven, the false statements
                regarding Sotheby's.
24
                THE COURT:  All right.  So in order to prove up the alleged false
25              statements, the Government is going to now read exactly the
                testimony that was given by Mr. Brugnara under oath on that
26              occasion, and then the Government will try in some manner — the
                burden is on them — to proffer that that was false testimony.  So
27              that's what is happening here.  And there we go.

28

United States District Court
For the Northern District of California

21

Brugnara objected to the introduction of his Form 12 testimony based on the rule of completeness (which was overruled), but did not specifically object to the context given in this instruction. From this, a rational jury could have concluded that the statement at issue — that Brugnara had contacted Sotheby's regarding the value of the art and heard back that the de Koonings and the Degas were not authentic — had been material.  The jury heard that the proceeding in which Brugnara made the statement at issue had been a hearing in the present case and took place in the same courtroom.  Based on the evidence presented, the jury knew the details of the case, and could thus determine the relevance of whether Sotheby's had contacted Brugnara to tell him the art was inauthentic.  Furthermore, during the trial, Brugnara read into evidence several portions of Long's testimony from the Form 12 proceeding, which provided even more context.  The jury knew not only that Brugnara testified at the previous hearing, but that Long did as well, and that the substance of the hearing overlapped with many of the issues at trial.  The jury did not need to know the specific contours of the Form 12 hearing to determine the materiality of the false statement.

Moreover, in the excerpt from the Form 12 hearing read to the jury at trial, the judge had asked a question following up on Brugnara's statement.  In the middle of Brugnara's statement, the judge had asked:  "What was the name of the person at Sotheby's who told you they were not authentic?" (Tr. 1057).  A rational jury could infer that if the had judge asked a follow-up question regarding the statement at issue, then the content of that statement had been material to the judge.

Explaining the contours of a prior proceeding to the jury in a criminal trial is sometimes sensitive, especially in the context of hearings related to prior charges or convictions (such as a Form 12 proceeding).  If too much detail is provided to the jury, such detail may imply guilt and be unfairly prejudicial.  On the other hand, the jury should have some understanding of the context in which the allegedly false statement was made, so that it can determine its materiality.  Here, the Court did its best to thread that needle, and this order finds that the jury had sufficient context to determine that Brugnara's false statement had been material.

For these reasons, Brugnara's Rule 29 motion is **DENIED**.

United States District Court

For the Northern District of California

1    **2.    BRUGNARA'S MOTION FOR A NEW TRIAL.**

2         Rule 33(a) provides that a trial judge may vacate a judgment and grant a new trial if the

3    interest of justice so requires.  The decision to grant a new trial lies within the trial judge's

4    discretion.  *United States v. Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984).  A motion for a new trial

5    should only be granted in "exceptional" circumstances where the "evidence preponderates

6    sufficiently heavily against the verdict such that a serious miscarriage of justice may have

7    occurred."  *United States v. Alston*, 974 F.2d 1206, 1211–12 (9th Cir. 1992) (citations omitted);

8    *United States v. Hsieh Hui Mei Chen*, 754 F.2d 817, 821 (9th Cir. 1985).  The burden of justifying

9    a new trial rests with the defendant.  *See United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir.

10   1986).

11        Brugnara asserts five independent bases justifying a new trial:  (1) the termination of

12   Brugnara's cross-examination of Sotheby's witness Alexander Rotter; (2) Brugnara's inability to

13   access his legal materials when he was moved to a different jail during trial; (3) the failure to *sua*

14   *sponte* terminate Brugnara's self-representation during trial; (4) a juror's omission of her criminal

15   history during voir dire; and (5) newly discovered evidence regarding the value of the art at issue.

16   None of these bases, however, rises to the level of "exceptional circumstances."

17        **A.    Termination of Brugnara's Cross-Examination of Alexander Rotter.**

18        During trial, the government called witness Alexander Rotter, the head of the

19   Contemporary Art Department at Sotheby's.  His direct examination focused on whether he had

20   ever responded to an inquiry from Brugnara regarding the value of the de Koonings and Degas at

21   issue in the case.  Rotter stated that he never had any contact with Brugnara, and further testified

22   that his department did not authenticate art, but rather appraised it, which typically took several

23   weeks to a month.  Rotter further testified that his department would not appraise a Degas — that

24   would be done by a different department at Sotheby's (Tr. 1075–82).

25        Brugnara's cross-examination veered far outside the scope of Rotter's direct testimony,

26   included several questions prefaced with the statement "would it surprise you," which Brugnara

27   knew was improper, and consisted of several speeches in which Brugnara boasted about his

28   "preferred" Sotheby's status and the millions of dollars he had spent on art in his life.

In fact, sixteen separate objections to Brugnara's questions were sustained during the cross-examination. Despite the objections, Brugnara spoke over rulings, requiring the judge at one point to exclaim "sustained, sustained, sustained" in response to repeated objections. After several rounds of irrelevant, argumentative, and abusive questioning, Brugnara's cross-examination had to be terminated (Tr. 1082–99).

Brugnara argues that he should be given a new trial because he did not have the opportunity to ask Rotter about the value of the de Koonings at issue and how Rotter would have gone about appraising them. Brugnara contends that the "failure to allow BRUGNARA to explore this issue with Rotter denied him a fair trial" (Reply at 2).

Not so. As a preliminary matter, Rotter testified that he had never viewed, authenticated, or appraised the art at issue. Thus, he could not have offered any relevant testimony about its value. Second, the questions Brugnara argues he should have been able to ask, surrounding authentication of the de Kooning paintings, were outside of the scope of Rotter's direct testimony. The government's examination of Rotter focused on the false statement charge — specifically whether Rotter, or anyone in his department, had ever responded to an inquiry from Brugnara. His direct testimony, therefore, had nothing to do with his appraisal of the artwork at issue, because he had never appraised it (or even seen it). Instead of staying within the scope of this direct testimony, Brugnara used his cross-examination as a stage to make speeches and ask argumentative questions that could not lead to useful testimony from this witness. After the abusive cross-examination had gone on for some time, Brugnara was warned and told he could have one more question. After Brugnara asked five additional questions (all outside the scope of the direct), his cross-examination was terminated (Tr. 1096–99).

Brugnara fails to make any showing that the termination of his cross-examination of Rotter constituted a "miscarriage of justice" that would warrant a new trial under our court of appeals' standard. *Alston*, 974 F.2d at 1212. Terminating Brugnara's cross-examination constituted the only reasonable option in the face of its abusive nature.

United States District Court
For the Northern District of California

### B.   Access to Case Materials.

"An incarcerated defendant may not meaningfully exercise his right to represent himself without access to law books, witnesses, or other tools to prepare a defense. We are mindful that this right is not unlimited. Security considerations and avoidance of abuse by opportunistic or vacillating defendants may require special adjustments." *Milton v. Morris*, 767 F.2d 1443, 1446 (9th Cir. 1985).

After the first full week of trial, on Friday, May 1, and in the presence of several deputy marshals at the end of the day, Brugnara made a comment regarding a "hanging," which Brugnara later explained referred merely to the judge as a "hanging judge." The deputies, however, took this as a potential suicide threat and sought an emergency medical evaluation. This turned out not to be a real suicide attempt but, Brugnara's weekend was worse than normal, aggravated by the detention facility's bagging and boxing up of his case materials in anticipation of a move (although Brugnara was eventually returned to his original jail cell).

The deputies acted out of caution in taking Brugnara to San Francisco General Hospital for examination and then to Santa Rita Detention Center (which has medical-suicide facilities superior to Glenn Dyer, the latter preferred by Brugnara). The Court recognized that this snafu might have prejudiced his ability to prepare for the next trial day. On Sunday, May 3, the undersigned judge contacted the marshals and requested that they ask Brugnara whether he would be ready to continue with trial on Monday or whether he wanted a continuance. The word came back, via the marshals, that Brugnara wanted to proceed (Tr. 1463). First thing Monday morning (out of the presence of the jury), the Court asked Brugnara "[a]re you ready to resume today?" Brugnara responded: "I want to go forward" (Tr. 1474). Despite Brugnara's insistence, more inquiry ensued (Tr. 1475):

> THE COURT: Well, do you want us to skip today with the witnesses?
>
> MR. BRUGNARA: No. No, I don't want to skip anything because we got to keep moving this ahead. It's one of those things. We're in battle. You can't stop.

Marshal Brendan McDonald, who had been present and responded to Brugnara's "hanging" comment, then testified (again, out of the presence of the jury). Brugnara asked him questions

25

**United States District Court**
For the Northern District of California

under oath.  After hearing this testimony, more inquiries into Brugnara's preparedness took place

(Tr. 1491–92):

>            THE COURT:  Wait.  Are you prepared to go forward this
>            morning?
>
>            MR. BRUGNARA:  Yes.
>
>            THE COURT:  I want to be clear.  On account of what happened,
>            if you don't want to go forward this morning, we will send [the
>            jury home] -- even though they are all here right now.
>
>            MR. BRUGNARA:  No, I won't do that to this Court.  Listen,
>            man, I'm totally being hamstrung in this case.  I'm totally being
>            handicapped in this case.  I have said all along, you can't prove the
>            negative.  I'm innocent.  If I need to call a witness back I'll call a
>            witness back when we put on our case.  But I'm going to do my
>            best so we don't have do that, but we'll just keep --
>
>            THE COURT:  I'll take you at your word that you are ready to go
>            forward.  Is that true?
>
>            MR. BRUGNARA:  It's true.

As the colloquy went on, Brugnara continued to insist that he did not want a trial continuance (Tr.

1497):

>            THE COURT:  I cannot -- I told you, I would cancel today and let
>            you have all those meetings today.
>
>            MR. BRUGNARA:  Listen your Honor, I have literally slept, in
>            the last three days, a total of less than two hours.  I -- I couldn't
>            even absorb what they're saying.  Right now I'm moving ahead on
>            overdrive.  And I'll get it done.  I'm not here to make excuses or
>            set a forum to make excuses.  I just want this Court in moving
>            ahead to understand the hamstringing and the handicapping that's
>            happening, because it's just in violation of all of the Court's
>            directives of appointing [CJA advisory counsel] James Stevens and
>            Richard -- what's the point of appointing James Stevens and
>            Richard Tamor, when they can't meet with me for the six hours
>            that they spent two weeks setting up for the middle of this trial,
>            because somebody thinks that -- you know.
>
>            THE COURT:  A large part of that is because you made that
>            comment.  And all of that flowed about the – thereafter is your
>            own fault.
>
>            MR. BRUGNARA:  Your Honor, do you know what the difference
>            between --
>
>            THE COURT:  Nonetheless, I would give you -- I would
>            give you an extra day if you said that's what you wanted.  But you
>            are telling me no.

26

**United States District Court**
For the Northern District of California

Despite Brugnara's repeated assurances, an evidentiary hearing followed trial on Monday, May 4, to get to the bottom of what happened with Brugnara's documents.  Captain Jack Tucker from Glenn Dyer jail testified to the facts surrounding Brugnara's departure from Glenn Dyer.  At that evidentiary hearing, while making a ruling, the undersigned found as follows (Tr. 1740):

> I told you, I would have given you today off.  And, and so that you could recover from that.  I, in fact, inquired of the Deputy Conroy whether -- yesterday, whether or not you wanted to take today off, and the answer came back no.  And then I asked you again today.  And I would have done that.  And you said no, you wanted to go ahead.  All right, so you wanted to go ahead.

In response, Brugnara again demanded bail, but then stated that he preferred to be returned to Glenn Dyer.  At the end of the court day on May 4, the undersigned judge reiterated the following (Tr. 1741):

> But, as soon as they clear him to go back to Glenn Dyer, I want him to go back to Glenn Dyer, if he wants to.  If he doesn't want to make the move, then we will not make the move.  And I want to be clear:  Unless some extraordinary thing comes up, if you do make the move, and it takes you a day to reorganize your papers, we're going to do that.  We'll take a day off so that you can get yourself organized, and that you don't have the problem of having to reorganize overnight.  So that's the best I can do on this.  I -- I'm just going to leave it at that if and when they clear him to go back to Glenn Dyer, please take him back.  You said you would.  If he wants to go back.  And, if he wants a day off from the trial in order to make that transition work, then most likely I'm going to give that day off.

At trial the next morning, on Tuesday May 5, following more complaints from Brugnara, the following colloquy took place (Tr. 1777):

> THE COURT:  Are you asking for a continuance?
>
> MR. BRUGNARA:  No.  This is the thing.  This is a fight.  You can't back down now.

As demonstrated, Brugnara was given numerous chances to have a continuance, if he so wanted.  Brugnara refused every time.  He made the tactical choice to continue on, and cannot now claim that he has been denied a constitutional right.  Instead, Brugnara attempted to use his difficult weekend as a way of demanding bail.  When that failed, he emphatically stated that he wanted to go forward.

27

This order also notes that Brugnara's motion has failed to provide one shred of evidence that he was actually prejudiced by his lack of access to his legal documents. There is no evidence describing how disorganized the case materials actually were or how this disorganization actually affected him at trial. The motion contains no declarations on this topic. All Brugnara has provided are quotations of his unsworn statements from the trial transcript and argument in the motion stating "it is clear from the state of the record that BRUGNARA was irreparably prejudiced by the jail actions" (Br. at 9).

As stated above, a motion for a new trial should only be granted in "exceptional" circumstances and the burden of justifying a new trial rests with the defendant. *Alston*, 974 F.2d at 1211–12 (citations omitted); *Shaffer*, 789 F.2d at 687. Brugnara has failed to meet this standard.

### C.     Decision Not to *Sua Sponte* Terminate Brugnara's Self-Representation During Trial.

"Trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." *Illinois v. Allen*, 397 U.S. 337, 343 (1970). A trial judge "may terminate self-representation by a defendant who deliberately engages in serious and obstructionist conduct." *Faretta v. California*, 422 U.S. 806, 835 n. 46 (1975). Neither the Supreme Court nor our court of appeals, however, has ever held that a trial judge is required to terminate self-representation in any particular situation.

In his motion, Brugnara argues that based on his own contumacious conduct, his self-representation should have been terminated, *sua sponte*, during trial. Then, Brugnara contends, the trial should have continued (with advisory counsel representing Brugnara) or a mistrial should have been declared. This argument fails.

As an initial matter, the situation presented no choice but to allow Brugnara to continue representing himself during trial. After Brugnara knowingly and voluntarily waived his right to counsel, he demanded a speedy trial under the Speedy Trial Act. Brugnara knew that he could likely have the April 27 trial date, but that there would not be sufficient time for any standby counsel to get up to speed. Therefore, while advisory counsel were appointed, standby counsel were not and could not have been appointed. With no standby counsel ready to step in, and with

28

1    Brugnara's repeated refusal to waive time under the Speedy Trial Act, there was no other option

2    but to allow Brugnara to continue to represent himself.  Our court of appeals' decision in *United*

3    *States v. Mack*, 362 F.3d 597, 601–02 (9th Cir. 2004), which held that a *pro se* defendant could

4    not be excluded from the courtroom during trial unless standby counsel were available and ready

5    to step in, is on point.  After the verdict, however, an order revoked Brugnara's *pro se* status and

6    appointed CJA counsel, as the Speedy Trial Act no longer presented an issue.  The reasons for

7    that decision were laid out in a previous order (Dkt. No. 684).

8          Notwithstanding the speedy trial and standby counsel issues, Brugnara's actions at trial

9    embodied part of a deliberate strategy.  While Brugnara did not make this argument in his motion,

10   his conduct during trial did not demonstrate any mental competency issues.  The Court is

11   convinced, after more than three dozen hearings with Brugnara over almost a year (in addition to

12   many hearings from the 2008 tax fraud proceeding) that his misbehavior was part of a considered

13   strategy to bull his way through difficult situations.  It was a calculated part of his defense.  As

14   described above, before trial, he told his mother that, as an advantage of representing himself, he

15   planned to lay all manner of inadmissible matters before the jury and expected that the jury would

16   be unable to sort out the real evidence from his ersatz evidence.  This is exactly what he did at

17   trial, despite many orders to cease doing so.  This constituted a calculated, thought-out,

18   consistently executed ploy, not a series of random acts caused by any incapacitating mental

19   disease.

20         As for his hostile and disrespectful outbursts, in which he berated the judge, the appellate

21   judges (who affirmed his pre-trial detention), every prosecutor on the case, all prior defense

22   lawyers, and almost every complaining witness (among others), these resulted from his attack-dog

23   personality, meaning his modus operandi is to attack everyone who argues or rules against him

24   with character assassinations.  This does not show mental incompetence.  It reveals Brugnara's

25   true personality, one that rarely accepts responsibility, has no empathy for others, almost always

26   viciously blames someone else, and tries to find a misstep in their past and repackage it as a

27   monumental dishonesty — all the while lying himself.

28

As for his repetition of arguments rejected over and over, Brugnara himself put it best — "persistence wears down resistence."  He is accustomed to bulling his way through difficult circumstances and tries to land blow after blow until the obstacle gives way.  This is not incompetence — this is bullying.  No doubt, in his past success as a commercial landlord in San Francisco, bulling his way through worked against hapless tenants.  It even worked, to an extent, throughout these proceedings, the failed halfway house and furlough efforts being examples.  The main point is that it is an ever-present rational, if unattractive, feature of Brugnara's character.

Brugnara insisted that he was mentally competent to represent himself at trial and this order agrees.  This order finds that, despite his obstructionist and outrageous behavior at trial, Brugnara was mentally competent to represent himself and his self-representation could not have been terminated during trial.  He foreshadowed his trial strategy in the jail call to his mother and dutifully executed it.  The decision not to terminate his self-representation for carrying out this strategy did not deny Brugnara a fair trial.

### D.    Juror's Failure to Disclose Criminal History.

The Sixth and Fourteenth Amendments guarantee that a criminal defendant will receive a verdict by a fair and impartial jury.  The Constitution, however, "does not require a new trial every time a juror has been placed in a compromising situation."  *Tinsley v. Borg*, 895 F.2d 520, 524 (9th Cir. 1990).

Our court of appeals has recognized three forms of juror bias:

> (1) actual bias, which stems from a pre-set disposition not to decide an issue impartially; (2) implied (or presumptive) bias, which may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury; and (3) so-called *McDonough*-style bias, which turns on the truthfulness of a juror's responses on voir dire where a truthful response would have provided a valid basis for a challenge for cause.

*United States v. Olsen*, 704 F.3d 1172, 1189 (9th Cir. 2013) (citations omitted).

Brugnara argues he is entitled to a new trial because one of the jurors, C.D., lied about her criminal history.  During voir dire, all prospective jurors were asked the following question: "Have any of you ever — or a member of your family or a close friend, ever been a defendant in a

30

United States District Court

For the Northern District of California

1    criminal case or been accused of criminal conduct?" (Tr. 198).  Juror C.D. did not speak up in

2    response to this question.  During trial, however, Brugnara's investigator conducted a background

3    check on the jurors and discovered that Juror C.D. had the following criminal history.

- June 15, 2010 — violation of Vehicle Code Section 23103(a) (reckless driving) — pled no contest.

- August 11, 2004 — violation of Health and Safety Code Section 11364 (possession of drug paraphernalia) — case was dismissed.

- July 26, 2004 — violation of Penal Code Section 242 (battery) — sentenced to ten days.

- July 22, 2004 — violation of Penal Code Section 166(a) (contempt of court) — sentenced to ten days.

- June 1, 2004 — violation of Health and Safety Code Section 11377(a) (possession of methamphetamine) — no record of disposition.

Brugnara's motion simply asserts that because Juror C.D. lied during voir dire, he is entitled to a

new trial.  Brugnara does not assert that Juror C.D. was either actually biased or presumptively

biased.  Instead, the motion merely describes Juror C.D.'s criminal history, cites the seminal

Supreme Court decision on juror bias (*McDonough Power Equipment, Inc. v. Greenwood*,

464 U.S. 548 (1984)), and states that "it is impossible to know whether she concealed anything

else to obtain her seat on the jury" (Br. at 15).  Furthermore, Brugnara has not requested an

evidentiary hearing on this issue.

       Even if Brugnara could somehow show that Juror C.D.'s omission during voir dire

amounted to unconstitutional juror bias (he has not), Brugnara has waived that argument.

"[W]here the defendant or defense counsel knows of juror misconduct or bias before the verdict is

returned but fails to share this knowledge with the court until after the verdict is announced, the

misconduct may not be raised as a ground for a new trial."  *United States v. Bolinger*, 837 F.2d

436, 439 (11th Cir. 1988) (per curiam).  In a recent decision, *United States v. Parse*, 789 F.3d 83

(2d Cir. 2015), the Second Circuit considered the issue of waiver of a juror bias argument.  While

*Parse* found that the defendant there did not become aware of the juror's potential bias until after

trial, the decision stated:  "In sum, if the defendant knew prior to the end of trial that a prospective

juror had given false voir dire responses and did not then reveal the disqualifying falsehoods or

1    nondisclosures to the court, the 'interest of justice,' [Rule] 33(a), generally will not require a new

2    trial." *Id*. at 109.

3        Trial in our case began on April 27.  Closing arguments finished and the jury began

4    deliberations on May 12.  Andrew Koltuniak, the defense's private investigator, learned of Juror

5    C.D.'s criminal history on May 18.  At noon on May 18, Koltuniak told Advisory Counsel James

6    Stevens about Juror C.D.'s criminal history and Attorney Stevens received an email of

7    Koltuniak's report at 1:48 P.M. that same day.  Court convened at 7:38 A.M. the next day.

8    Attorney Stevens participated and said nothing about Juror C.D.'s criminal history during the

9    session, which ended at 8:41 A.M.  Nor did Brugnara.  Court reconvened at 10:46 A.M., when the

10   jury rendered its verdict (Koltuniak Decl., Dkt. No. 713).

11       Based on this sequence of events, the defense knew about Juror C.D.'s criminal history for

12   almost 24 hours before the jury issued its verdict.  Despite this knowledge, the defense said

13   nothing.  The reasonable inference is that the defense had the information and necessarily made a

14   tactical decision not to raise it until after the verdict, no doubt hoping that Juror C.D.'s criminal

15   history would bias her in the defense's favor.  Thus, the defense waived any argument relating to

16   Juror C.D.'s voir dire omissions because they knew of her criminal history before the jury

17   rendered its verdict and said nothing.

18       The Court is disappointed that the defense has left the impression that this was newly

19   discovered information.  The motion for a new trial failed to submit a declaration from the

20   defense's investigator regarding the discovery of Juror C.D.'s criminal history.  On its own, the

21   Court had to order the investigator to swear to "all material facts and stat[e] with particularity

22   when the investigator learned the information and when he relayed that information to defendant

23   and/or defense counsel or advisory counsel" (Dkt. No. 707).  Investigator Koltuniak's first

24   declaration then failed to state the sequence of events with sufficient particularity.  He merely

25   stated that advisory counsel James Stevens provided him with the list of jurors on May 17 and

26   that Koltuniak returned the criminal history to Attorney Stevens on May 18 (Dkt. No. 711).  In

27   response, a follow-up order required a supplemental declaration from Koltuniak and asked him to

28   state "with particularity (the date and time) when he actually learned of the information.  The

1    declaration shall also specify each communication (including the date and time), whether oral or

2    in writing, by which any aspect of the information relating to Juror C.D.'s criminal history was

3    communicated to defendant or his counsel" (Dkt. No. 712).  Only then did the exact timing and

4    sequence of events come forth.  In short, the motion left the impression that there had been newly

5    discovered information and only upon studied inquiry did the true sequence come out.

6              **E.       Newly Discovered Evidence Regarding the Value of the Art.**

7         To prevail on a motion for a new trial based on newly discovered evidence, "the movant

8    must satisfy a five-part test:  (1) the evidence must be newly discovered; (2) the failure to

9    discover the evidence sooner must not be the result of a lack of diligence on the defendant's part;

10   (3) the evidence must be material to the issues at trial; (4) the evidence must be neither

11   cumulative nor merely impeaching; and (5) the evidence must indicate that a new trial would

12   probably result in acquittal."  *United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991).

13        The art items included a set of de Kooning paintings.  A post-trial evidentiary hearing

14   directed, in part, to the sentencing issue of the amount of loss resulted in a finding that this

15   particular set had a commercial value of no more than $80,000.  (All other items appear to have

16   been authentic.)  Now, Brugnara characterizes this as newly discovered evidence warranting a

17   new trial.

18        This evidence regarding the value of the de Koonings is simply not new and Brugnara's

19   failure to present it to the jury via expert testimony resulted from the defense's lack of diligence.

20   Within days of receiving the art at issue, in April 2014, Brugnara claimed that it was worth less

21   than Long's quoted price.  In a text message to Long, Brugnara stated:  "Moreover, your values

22   on those invoice documents, sent to my attorney, are not accurate regarding values,

23   notwithstanding you giving the items to me as a gift" (TX 80).  Although Brugnara asserted from

24   the outset that the art was "fake," he and his counsel never bothered to inspect the art themselves,

25   despite seven different offers from the government to do so (Gov't Exh. 1).  At the pre-trial

26   conference in December 2014, Attorney Babcock raised the issue and made an unusual motion for

27   the appointment of a court-sponsored expert under Rule 706 to inspect the art and to testify to its

28   value at trial.  An order denied the motion, stating:  "If defendant wishes to have an expert

33

examine and evaluate the art at issue, he can go through the CJA expert appointment process"

(Dkt. No. 224 at 4).  Brugnara and his counsel never followed up on the offer to appoint a CJA

expert (until the post-trial hearing described above).

At the *Faretta* hearing, Brugnara was repeatedly warned about the dangers and limitations

he would face preparing for trial from jail.  Specifically, before he waived his right to counsel,

Brugnara heard admonitions regarding experts and investigation in the following manner (Dkt.

No. 366 at 62–63):

> THE COURT:  Experts.  I don't know how you're going to get an
> expert from jail.  That's your problem.  If you want to do this from
> jail, maybe you can do it.  I don't know.  But you will be greatly
> hampered in your ability to investigate this case and to contact
> witnesses.  You will be greatly hampered because you're in jail
> and the Government is not in jail.  But if you had a lawyer who
> was out of jail, he could be doing all of those things for you.

The admonitions continued, as the following colloquies took place (*id*. at 64–71):

> THE COURT:  All right.  Nonetheless, Mr. Brugnara, even if they
> give you some additional privileges over there on account of you
> being *pro se*, there is absolutely no doubt that you will be greatly
> hampered in your preparing the defense compared to what Mr.
> Boisseau can do for you on account of you being in jail.  Do you
> understand that?
>
> THE DEFENDANT:  I disagree.
>
> THE COURT:  Well, then how can you disagree with that?
> Explain to me why it is that -- what you mean by that.
>
> THE DEFENDANT:  I think that I know this case better than
> anybody.  Mr. Bornstein, Babcock, they all said -- I've done
> nothing for the past five months but read through every piece of
> discovery about a thousand times.  I know this case on the tip of
> my tongue, I know this case stamped into the back of my hand and
> my brain, and I understand every facet of this case.  And I know
> exactly the questions I need to ask the witnesses.  I only have a
> handful of witnesses that I'm going to call.  It will probably take a
> couple of days at the most.  And this, in my opinion, and all the
> counts that I've had thus far, is a relatively simple, straightforward
> case regarding the fraud aspect. . . . I don't think Mr. [Boisseau],
> even if he had six months, would be as prepared as I am.  Because,
> again, I've had a lot of experience in court.  Even though I'm not
> an attorney, I've assisted my attorney, my civil attorney, in every
> single case for the last 20 years.

*United States District Court*
For the Northern District of California

34

United States District Court

For the Northern District of California

*       *       *

THE COURT:  All right.  Someone like Mr. Boisseau has done a lot of trials in this courthouse against these very -- this very U.S. Attorney's Office, and he would be good at giving you advice on what the best strategy is.  The best strategy for picking a jury.  The best strategy for how to -- which points to concede and which points not to concede.  Any number of points in a trial that I think even in a simple trial there are a dozen things that a lawyer and a client have got to decide.  And in a more complicated case like this, there are probably a hundred things.  And you won't have the benefit of Mr. Boisseau's advice, or anyone; you'd just be on your own.  Do you understand that?

THE DEFENDANT:  Yes.

*       *       *

THE COURT:  All right.  Mr. Boisseau could follow up on leads, he could dig up evidence, he could talk to witnesses, he could consult with experts -- whether they testify or not, he could go out and find impeachment evidence against the Government's witnesses, he could go get an investigator and have that investigator go out and ask questions, and you will be greatly limited in all of those things.  Do you understand that?

THE DEFENDANT:  Yeah.  But in all fairness, Your Honor, Mr. Babcock, was, what, seven, eight days away from a trial, so all that preparation work has already been done by prior counsel, with the exception of the subpoenas.  And, like I said, we got this case nailed down.

At trial, Brugnara never presented an expert to testify that he had inspected the art and found it to be of little commercial value.  Nevertheless, Brugnara repeatedly argued to the jury that the art was fake and that the victims were actually fraudsters.  During his opening statement, Brugnara told the jury the following (Tr. 327–36):

But the fact of the matter is all the art in this case is completely fake.  It's stuff — crap — you reject off eBay.  You know what I mean?  This — that — and you're going to hear that the two thieves that tried to defraud me are actually suing themselves right now in Federal District Court in New York, affirming everything that I'm going to tell you; that the art is worth nothing; that it's fake; that one guy, Maibaum, sold — sold her the fake art and then she tried to dump it off on me.

35

United States District Court

For the Northern District of California

                    \*        \*        \*

> I'm going to show you an email right here. Here is all you need to see. This is from Sotheby's. It says the Degas that they say is worth millions, it is worth nothing. You can get something on eBay for 100 bucks. Okay (document displayed). Okay. Here it is. Read this here. This is the head of the Impressionists at Sotheby's, and it's basically explaining that it's of decorative value only. You're going to hear from Sotheby's what decorative value only means. It means, like, a couple hundred bucks.

Brugnara continued on this theme during his cross-examination of Victims Long and Maibaum. He asked Victim Maibum "would it surprise you to learn that the various other reputable art dealers in Manhattan are not interested in selling these de Koonings as authentic de Koonings?" and stated to Victim Long: "Walter Maibaum was using you as a front to sell me fake art for millions of dollars that all the auction houses had rejected and was worth nothing; isn't it true?" (Tr. 469, 822).

During his closing argument, Brugnara again told the jury that the art was fake (Tr. 2973–3030):

> They were trying to rip me off for $11 million, trying to sell me a bunch of garbage. That's what this case is about.

                    \*        \*        \*

> Sotheby's and Christie's won't sell the Valsuani as authentic. Yeah. Duh. But it's a reproduction and it was done 12, what, 15 years ago? You heard Jennifer Biederbeck, NSV. Doesn't matter whether it's a Degas. Doesn't matter whether it's a Picasso. Doesn't matter if it's a Rodan. They don't sell reproductions less than a couple of grand. That's what they said. You heard what their own witness said. Maibaum. Oh, yeah, Sotheby's and Christie's won't sell it. Yeah. You know why? It's not worth anything.

                    \*        \*        \*

> They didn't bring in one person on this entire planet, in the entire world, that walked up to this stand over here -- man, women or child -- and said: Hey, that Degas, I swear to God, is worth a million dollars. That Degas is worth $100,000. That Degas is even worth $5. Because it's not worth anything.

                    \*        \*        \*

> That thing was a joke. Did you see what they said was a de Kooning? It was a joke. It was a -- it was a bunch of garbage on a piece of -- you saw it with your eyes. Infer? That was a piece of garbage. Did you see -- did you see what Rotter did when he

36

United States District Court
For the Northern District of California

walked by it?  I am pseudo perceptive.  I am very, very, very, very, very, very perceptive.  I think you saw the same thing as me.  He walked by that de Kooning and he didn't even look at it.  He walked right by it.

*             *             *

That piece of garbage that they put in front of you?  You know what that thing is worth?  Nothing.

*             *             *

And the art wasn't worth anything and it's still not worth anything.

As demonstrated, Brugnara repeatedly argued during trial that the works at issue were fake, that Victims Maibaum and Long were liars, and that he was the actual victim in the scenario.  The idea that the art happened to be less valuable than the agreed upon price was not a new and groundbreaking revelation.  Brugnara, representing himself, simply failed to convince the jury of this conclusion.  Had Brugnara accepted Attorney Boisseau's representation, things may have worked out differently.  Expert testimony might have been presented.  Poor trial strategy by a *pro se* defendant, however, is not grounds for a new trial.  Brugnara was warned about the dangers of self-representation at the *Faretta* hearing.  He knowingly and voluntarily embraced them.  Any "new" evidence regarding the actual value of the art does not amount to exceptional circumstances required for the grant of a new trial.

At oral argument, the defense further asserted that Walter Maibaum presented false testimony at trial.  None of the trial citations read at the hearing, however, constituted an explicit or flat out representation by Maibaum that the artwork had a value of $11 million.  To support their contention, defense counsel pointed to *United States v. Young*, 17 F.3d 1201, 1204 (9th Cir. 1994).  That decision is distinguishable from our case.  *Young* involved perjured testimony from a key witness that the prosecutor knew had been false when given.  On those facts, our court of appeals granted the defendant a new trial.  Here, in contrast, there is no evidence of plainly false evidence nor any indication that the prosecutors knowingly presented perjured testimony.

In this context, the defense inflates the materiality of the $11 million valuation to mythical proportions.  While the agreed upon price for the works of art had been $11 million, the actual

37

United States District Court
For the Northern District of California

1   value of the art was disputed at trial and the government's case did not depend upon proving an

2   $11 million valuation.  To the contrary, even if the art had an actual value of only $1 million, the

3   jury could easily have found that Brugnara engaged in a scheme to trick the victims into

4   delivering the artwork, hold it for ransom (regardless of its true value), claim it had been a gift,

5   and extract an unfair compromise.  The government presented overwhelming proof of that

6   scheme at trial, which did not depend on the actual value of the art.

7                                **F.       All Factors in Combination.**

8             At oral argument, the defense contended that the aggregate of all of these factors, taken in

9   combination, warrants a new trial.  This order disagrees.  Almost all of the present criticisms of

10  the trial are anchored in the conscious choices and strategies Brugnara pursued throughout the

11  proceedings.  He has no one to blame but himself for the way his strategy played out.  The one

12  exception was the bagging up of Brugnara's case materials during trial.  The jail made the wrong

13  decision in attempting to move a *pro se* defendant in the middle of trial.  This issue, however, was

14  adequately dealt with by offering Brugnara numerous opportunities for a continuance, as

15  described above.  The combination of arguments likewise fails to warrant a new trial.  For these

16  reasons, Brugnara's motion for a new trial is **DENIED**.

17                                          **CONCLUSION**

18            For the reasons stated herein, the offender's motions for a judgment of acquittal and for a

19  new trial are **DENIED**.

20

21            **IT IS SO ORDERED.**

22

23  Dated:  October 9, 2015.                      _____

                                                  WILLIAM ALSUP
24                                                UNITED STATES DISTRICT JUDGE

25

26

27

28

                                                38