Pages 1 - 195

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )
  vs.                          )  No. CR 08-0222 WHA
                               )  No. CR 14-0306 WHA
LUKE D. BRUGNARA,              )
                               )  San Francisco, California
              Defendant.       )  Thursday
                               )  October 20, 2015
_____)  7:30 a.m.

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES:</u>**

**For Plaintiff:**          BRIAN J. STRETCH
                            Acting United States Attorney
                            450 Golden Gate Ave.
                            San Francisco, California  94102
                     BY:    **ROBIN HARRIS, AUSA**
                            **BENJAMIN KINGSLEY, AUSA**


**For Defendant:**          LAW OFFICES OF GEORGE C. BOISSEAU
                            740 4th Street
                            Second Floor
                            Santa Rosa, California 95404
                     BY:    **GEORGE C. BOISSEAU, ESQ.**

                            LAW OFFICES OF DENA MARIE YOUNG
                            740 4th Street
                            Second Floor
                            Santa Rosa, California 95404
                     BY:    **DENA MARIE YOUNG, ESQ.**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 Official Reporter - US District Court
                 Computerized Transcription By Eclipse

<pre>
 1                    P R O C E E D I N G S

 2   OCTOBER 20, 2015                              7:40 A.M.

 3        (Defendant present, in custody.)

 4        THE CLERK:  Calling criminal No. CR 08-222 and

 5   related case CR 14-306.  They are both United States versus

 6   Luke D. Brugnara.  Matter is on for further sentencing.

 7        Counsel, please state your appearances.  And Probation.

 8        MR. KINGSLEY:  Good morning, your Honor.  Ben

 9   Kingsley and Robin Harris for the United States.

10        MR. BOISSEAU:  Good morning, your Honor.  George

11   Boisseau and Dena Young on behalf of Mr. Brugnara, who is

12   present before the Court.

13        PROBATION OFFICER:  Good morning, your Honor.  Jill

14   Spitalieri, Probation.

15        THE COURT:  Good morning, everyone.

16      We're here for the third session of the sentencing

17   hearing, and I think the first order of business is to hear

18   from any witnesses for the evidentiary hearing part of it, or

19   do we have any witnesses with time problems?

20        MS. HARRIS:  We do, your Honor.  We have a witness

21   that needs to be in Palo Alto this morning.

22        THE COURT:  How about on your side?

23        MR. BOISSEAU:  No.  He's here for the day.

24        THE COURT:  All right.  Then we'll hear the

25   Government's witness first.
</pre>

| | |
|---|---|
| 1 | **MS. HARRIS:**  Thank you, your Honor.  United States |
| 2 | calls Deputy Smith. |
| 3 | <ins>**DAVID SMITH**</ins>, |
| 4 | called as a witness for the Government herein, having been |
| 5 | first duly sworn, was examined and testified as follows: |
| 6 | **THE WITNESS:**  I do. |
| 7 | **THE CLERK:**  Thank you.  Please be seated. |
| 8 | Please state your full name for the record. |
| 9 | **THE WITNESS:**  David Smith. |
| 10 | <ins>**DIRECT EXAMINATION**</ins> |
| 11 | BY MS. HARRIS |
| 12 | **Q**    Good morning, Deputy Smith.  Where do you currently work? |
| 13 | **A**    850 Bryant.  San Francisco County Jail. |
| 14 | **Q**    How long have you worked at San Francisco County Jail? |
| 15 | **A**    Approximately six years. |
| 16 | **Q**    And can you just describe your general duties and |
| 17 | responsibilities? |
| 18 | **A**    I work in the jail, make sure inmates are taken care of, |
| 19 | all their needs, security, safety. |
| 20 | **Q**    Drawing your attention to June 26, 2015, were you on duty |
| 21 | that day? |
| 22 | **A**    Say the date again. |
| 23 | **Q**    June 26, 2015. |
| 24 | **A**    Yes. |
| 25 | **Q**    Okay.  Did you witness an incident between the defendant |

1   Luke Brugnara and Nurse Kitchin?

2   **A**    Yes.

3   **Q**    Can you describe what you saw?

4   **A**    I saw and heard Luke explode at Kitchin, Christian, the

5   nurse, and use threatening language towards him.

6   **Q**    Can you describe what the threatening language was as best

7   as you recall?

8   **A**    I apologize.  It was days later as I wrote my statements.

9   And at that very time I couldn't remember the exact verbiage he

10   used, but at that very moment he did threaten the nurse and

11   say, you know, to the nurse and use the word "family."  But I

12   don't recall the exact, like, statement.  I could kind of

13   assume, but I wouldn't want to assume in court, like, what he

14   kind of said, you know.

15   **Q**    Do you remember Luke Brugnara threatening the nurse's

16   family?

17   **A**    Yes.

18   **Q**    Do you also remember Luke Brugnara threatening

19   Nurse Kitchin?

20   **A**    Yes.

21   **Q**    After the incident that you witnessed, did the jail do

22   anything with regard to Luke Brugnara's housing situation after

23   he threatened the nurse?

24   **A**    Can you say that again?

25   **Q**    Was Mr. Brugnara moved after there was a threat to the

1  nurse?

2  **A**    Yes.

3  **Q**    Can you describe what happened?

4  **A**    A supervisor came, multiple deputies.  They removed Luke

5  from his housing unit, from his roommate, placed him in a

6  safety cell for danger to others.

7           **MS. HARRIS:**  Nothing further from the Government,

8  your Honor.

9           **THE COURT:**  All right.  Cross examination.

10          **MR. BOISSEAU:**  Yes.

11                        **CROSS EXAMINATION**

12  **BY MR. BOISSEAU**

13  **Q**    Deputy Smith, you were accompanying the Nurse Kitchin that

14  day on the 26th of June, correct?

15  **A**    Correct.

16  **Q**    And you're there to -- to ensure his safety, are you not?

17  **A**    All inmates?

18  **Q**    No.  The nurse.  You were there to ensure his safety?

19  **A**    The nurse -- the nurse and the inmates on my line, yes.

20  **Q**    Okay.  And you -- when -- when Mr. Brugnara had been

21  complaining about the nurse not attending to his needs for a

22  strep throat, correct?

23          **MS. HARRIS:**  Objection.  Assumes facts not in

24  evidence.

25          **THE COURT:**  Well, he's asking the question.  It's

1    cross examination.   Overruled.

2        Please answer the question.

3    A    I don't know Luke's medical needs at that time, or recall.

4    **BY MR. BOISSEAU**

5    Q    Okay.  But Mr. Brugnara was talking to the nurse and

6    trying to get the nurse's attention for medical attention,

7    correct?

8    A    Umm, I don't know.  I know the nurse was administering

9    pill call in the line.

10   Q    And you're -- you're sitting next to the nurse, correct?

11   A    Negative.  Standing.

12   Q    You're standing.

13   A    Standing.

14   Q    Okay.  You're standing.  The nurse is sitting?

15   A    No.

16   Q    Okay.  He's standing also?

17   A    The nurse is standing.

18        Would you like me to describe how pill call is given?

19   Q    Yes, please.

20   A    Pill call is given with a cart, and he administers pill

21   call to the inmates.  And as a deputy, I have multiple inmates

22   on the line, so I stand by the nurse for their safety and while

23   they are administering pill call.  I'm not always right next to

24   the nurse.  I could be 3 feet, 5 feet.  I have to move away

25   sometimes, be in the proximity of the nurse.

1   **Q**    Okay.  When you heard this yelling between the nurse and

2   Mr. Brugnara, Mr. Brugnara yelling at the nurse, you were

3   within a few feet from the nurse?

4   **A**    I would say maybe like 5 feet.

5   **Q**    Okay.  And within ear shot, correct?

6   **A**    Excuse me?

7   **Q**    Within ear shot, correct?

8   **A**    What do you mean by "shot"?

9   **Q**    Within ear shot.  You could hear what was said.

10  **A**    Yes, I could hear.

11  **Q**    And wasn't Mr. Brugnara saying that he would have the

12  nurse's job?  Didn't he say that?

13  **A**    I don't remember that.  If I remembered that, I would

14  write that down.

15  **Q**    Okay.  So you don't remember what actually was said, do

16  you?

17  **A**    Exactly, no.  That's why I couldn't write -- I could

18  assume and try to go back in memory and start throwing out

19  ideas what was getting thrown out, but I don't want to say that

20  in court.

21  **Q**    You are -- there are certain protocol for protection of --

22  of other workers within your -- within that mod, correct?

23       There is a certain protocol if threats are made, that you

24  are to report those threats, correct?

25  **A**    Correct.

1  Q    Okay.  Now, this -- after this incident on the 26th, you

2  did not make a report, did you?

3  A    I regret to say I should have.

4  Q    Okay.  I -- my question is:  You did not, did you?

5  A    I did not.

6  Q    And, in fact, the first time you were contacted -- the

7  first time you were contacted regarding this incident was about

8  three days later, correct?

9  A    No.

10  Q    Well, when were you first contacted?

11  A    When we placed him in a safety cell with a supervisor for

12  danger to others.  So we were -- at that time it was -- he was

13  placed in a safety cell for danger to others.  So I was -- you

14  know, there was contact.

15       Now, if you're asking when I was contacted to write my

16  statement, that's a different question.

17  Q    Yes.  All right.  You were contacted to write a statement

18  on July 3rd, 2015, correct?

19  A    Correct.

20  Q    That's several days after this incident, correct?

21  A    Several days, yes.  But I was off during those days and

22  came back.

23  Q    Okay.  Were you contacted when you were off?

24  A    I was contacted when I came back to work.

25  Q    I take it during the -- the pill call, the inmates are

1  separated by -- by the cells themselves?

2  **A**     Yes.

3  **Q**     Okay.  So anything that was said between Mr. Brugnara and

4  the nurse, he was being separated by cells, cell doors or

5  cells?

6  **A**     They are open cell doors.  All there is is a wall between

7  each cell.

8  **Q**     Okay.  And Mr. Brugnara had no physical contact with that

9  nurse, correct?

10  **A**     Just this close (indicating), you know, from the bars.

11  **Q**     So just -- so he was just yelling at the nurse?

12  **A**     Yelling, threatening, came up at the bars.

13          **THE COURT:**  The witness indicated about 2 feet away,

14  with his hands.

15  **BY MR. BOISSEAU**

16  **Q**     The -- there were other inmates around that area, correct?

17  **A**     Yes.

18  **Q**     Inmate Erik Paul was present, also, correct?

19  **A**     I believe that's his roommate.

20          **MR. BOISSEAU:**  I have no further questions.

21          **THE COURT:**  Anything more?

22                    <u>**REDIRECT EXAMINATION**</u>

23  **BY MS. HARRIS**

24  **Q**     Deputy Smith, after the incident that you witnessed

25  between Nurse Kitchin and Luke Brugnara, did Nurse Kitchin say

1    anything to you?

2    **A**    Yes.  After we stepped away, he said:  I took that very

3    seriously.  He just threatened me and my family.

4          **MS. HARRIS:**  No further questions.

5          **MR. BOISSEAU:**  Object -- could we read the question

6    back?

7          (Whereupon the record was read as requested.)

8          **MR. BOISSEAU:**  I -- I object.  It's hearsay.  Move to

9    strike that statement.

10         **MS. HARRIS:**  Your Honor, it -- it goes to state of

11   mind and to rebut any claim of recent fabrication given

12   Mr. Brugnara -- Mr. Boisseau's cross examination.

13         Also, this is an evidentiary hearing and hearsay is

14   permitted.

15         **THE COURT:**  Well, it is admissible because it does go

16   to the state of mind of the recipient of the threat to indicate

17   that he took it seriously and it was not a light-hearted

18   exchange.  So the objection is overruled.

19         Anything more?

20         **MR. BOISSEAU:**  Okay.  Thank you, your Honor.

21         **THE COURT:**  Can the witness leave now?

22         **MS. HARRIS:**  Yes, your Honor.

23         **THE COURT:**  Mr. Boisseau, may the witness be excused?

24         **MR. BOISSEAU:**  Yes.

25         **THE COURT:**  Thank you, sir.  You're free to go.

```
 1        (Witness excused.)

 2            THE COURT:  Do we have any more evidentiary hearing

 3   witnesses?

 4            MR. BOISSEAU:  Yes.  Defense will call Erik Paul to

 5   the stand.

 6            THE COURT:  Fine.  Let's bring him in.

 7        (Brief pause.)

 8            THE COURT:  Is he in custody back there?

 9            MR. BOISSEAU:  Yes.

10            THE COURT:  Are the Marshals bringing him out?

11            MR. BOISSEAU:  I thought they were.

12            THE COURT:  They might not realize who they have in

13   custody.

14        (Brief pause.)

15            THE COURT:  The witness is not handcuffed, is he?

16            THE WITNESS:  No.

17            THE COURT:  Please raise your right hand.

18                         ERIK PAUL,

19   called as a witness for the defendant herein, having been first

20   duly sworn, was examined and testified as follows:

21            THE WITNESS:  Yes.

22            THE CLERK:  Okay.

23            THE COURT:  Now, you see how the microphone moves

24   around.  You need to keep it about this close to your voice so

25   everyone can hear.
```

1        Please tell us your name.

2              **THE WITNESS:**  Erik Paul.

3              **THE COURT:**  Thank you.

4        Go ahead, Counsel.

5              **MR. BOISSEAU:**  Thank you.

6                        <u>DIRECT EXAMINATION</u>

7   **BY MR. BOISSEAU:**

8   **Q**    Mr. Paul, are you currently housed at the San Francisco

9   County Jail?

10  **A**    Yes.

11  **Q**    On June 26th were you also housed at the San Francisco

12  County Jail?

13  **A**    Yes, I was.

14  **Q**    And do you know Luke Brugnara?

15  **A**    Yes.

16  **Q**    And do you see him in the courtroom today?

17  **A**    Yes, I do.

18  **Q**    And how do you know Mr. Brugnara?

19  **A**    I have been his cellmate for the last, like, three or four

20  months.

21  **Q**    Could you identify him for the record please?

22  **A**    He's wearing red, behind you.

23              **MR. BOISSEAU:**  May the record reflect --

24              **THE COURT:**  He identified the defendant.

25        All right.  Are you going to establish whether he was the

```
 1  cellmate at the time?

 2           MR. BOISSEAU:  Yes, I am.

 3           THE COURT:  All right.  Go ahead.

 4  BY MR. BRUGNARA

 5  Q    On June 26, 2015 were you Mr. Brugnara's roommate?

 6  A    Yes, I was.

 7  Q    And do you remember a -- do you know a Nurse Kitchin?

 8  A    Yes.  He's like a tall -- like, 6-foot-6 or something

 9  nurse.

10  Q    Okay.  How do you know him?

11  A    Well, I just know him because he's the pill call nurse

12  that comes by when we were on K Block.  He comes by like three

13  or four times a day to do pill call.

14  Q    And do you know a Deputy Smith?

15  A    Yes.

16  Q    And how do you know Deputy Smith?

17  A    I have been in custody for a year, and he has been a

18  deputy for several years.  So he's just -- he's at the jail.

19  Q    I'm going to direct your attention to an incident that

20  occurred on June 26 of 2015 between Mr. Brugnara and

21  Nurse Kitchin.  Do you remember that date?

22  A    Yes, I do.

23  Q    And do you remember that incident?

24  A    Yes.

25  Q    And where were you located during -- when Mr. Brugnara had
```

```
 1   contact with -- verbal contact with Nurse Kitchin?

 2   A    In the cell with Luke on K Block in Cell Number 2.

 3   Q    Who was with Nurse Kitchin that you could observe from the

 4   jail?

 5   A    Deputy Smith.

 6   Q    And how close was he to -- to --

 7   A    Like --

 8   Q    -- Nurse Kitchin?

 9   A    Like 2 to 4 feet away from the pill call nurse.

10   Q    What did you observe that --

11   A    Well, first of all, Luke had a fever and a sore throat and

12   coughing and nasal congestion for, like, over a week.  And he's

13   been -- he was asking several times, like multiple times

14   throughout the week for medical attention.  And that deputy --

15   or not deputy, the Nurse Kitchin was ignoring him.

16        And on this particular day, the pill call nurse ignored

17   him and -- because when Luke requested medical care and said:

18   I need to see the doctor for my strep throat.

19        And Kitchin said:  Well, you don't have strep throat.  You

20   have allergies.

21   Q    Let me stop you right there.

22   A    All right.

23   Q    So you -- you heard that interaction?

24   A    Yes.

25   Q    What happened next?
```

1  **A**    What happened next was the -- once the guy said:  I

2  have -- you have allergies, you don't have strep throat, that's

3  when it angered Luke.  And the guy kind of ignored him, just

4  kept going, like, past us to the next cell.

5       And Luke got a little angry with him and said that:  You

6  can't deny me medical care because I have strep throat and I

7  need to see the doctor, and if you continue to deny me medical

8  care, I'll -- I will see you and you'll lose your job.

9  **Q**    Did you -- now, how quick was this interaction between

10  Nurse Kitchin and Mr. Brugnara?

11  **A**    Oh, like, maybe a minute to maybe three or four minutes.

12  **Q**    Did Mr. Brugnara say anything else to the nurse that you

13  could remember?

14  **A**    No, I don't.

15  **Q**    Did -- did you hear Mr. Brugnara threaten the nurse with

16  bodily injury?

17  **A**    No, he -- no, he did not.

18  **Q**    Did you hear Mr. Brugnara threaten to hurt -- to

19  physically harm Nurse Kitchin's family?

20  **A**    No, I did not.

21  **Q**    Did -- did you even know whether Nurse Kitchin had a --

22  now I'm asking your personal knowledge, whether Nurse Kitchin

23  had a family?

24  **A**    No, I don't.  I have no idea.  He wasn't wearing a wedding

25  ring I noticed, but...

```
 1   Q    Did you hear Mr. Brugnara talk -- tell Nurse Kitchin that

 2   he would lose his job because of his inattention to

 3   Mr. Brugnara?

 4   A    I believe so.

 5   Q    What --

 6   A    Because he said:  You can't deny me medical care.

 7        And that's a grave, like, negligence or something, in my

 8   opinion.

 9   Q    Okay.  Now, what -- what else did you observe the

10   interaction between Mr. Brugnara and Nurse Kitchin on this

11   occasion?

12   A    That was basically it.  The guy totally ignored him, like

13   nothing happened.  Like just shrugged it off and kept walking,

14   and Deputy Smith didn't take any action, do anything, and just

15   kept going to the next cell.

16   Q    Okay.  Were you moved at all that -- later that evening?

17   A    No.

18   Q    Do you know if Mr. Brugnara was moved?

19   A    I don't recall.

20   Q    Okay.  Was -- was he still your roommate that -- that

21   night?

22   A    Yes.

23   Q    Do you remember you and Mr. Brugnara being transferred to

24   any other housing block that -- that evening?

25   A    Not that day, no.
```

1  Q     And what housing block were you in during this incident on

2  June 26?

3  A     K Block and then Cell 2.

4  Q     Is that general population?

5  A     No.  It's Ad Seg, or Administrative Segregation.

6  Q     And -- and how many people to a cell?

7  A     Two.

8         **MR. BOISSEAU:**  No further questions.  Thank you.

9         **THE COURT:**  Thank you.

10     Cross examination.

11                    **CROSS EXAMINATION**

12 **BY MS. HARRIS**

13 Q     Good morning, Mr. Paul.

14     Isn't it true that Mr. Brugnara was moved after the

15 incident with Nurse Kitchin?

16 A     I -- you -- I believe so.

17 Q     And you did not write up any documentation of the incident

18 you witnessed, correct?

19 A     No, I did not.

20 Q     So we're just getting your memory four or five months

21 later for the first time now?

22 A     Yes.

23 Q     Okay.  Now, Mr. Paul, you have a prior federal -- federal

24 felony conviction, correct?

25 A     Yes.

1  **Q**    Okay.  For dealing methamphetamine?

2  **A**    Possible -- yes.

3  **Q**    And, in fact, you're currently charged with attempted

4  murder --

5           **MR. BOISSEAU:**  Objection.

6  **BY MS. HARRIS**

7  **Q**    -- for slashing the neck of your roommate?

8           **THE COURT:**  I'm sorry.  What?

9           **MR. BOISSEAU:**  Objection.  Relevancy.  It's not a

10 prior -- he's presumed innocent.

11          **THE COURT:**  So what's your answer to that?

12          **MS. HARRIS:**  The incident involves Mr. Paul's prior

13 roommate, and Mr. Brugnara and Mr. Paul are current roommates.

14          **THE COURT:**  All right.  Overruled.

15     Please answer.

16 **BY MS. HARRIS**

17 **Q**    Isn't that true that you're charged with attempted murder

18 for slashing the neck of your prior roommate?

19 **A**    Sure.

20          **THE COURT:**  She's not asking whether you did it, but

21 whether or not you're charged with doing that.

22 **A**    It's a charge, yes.

23 **BY MS. HARRIS**

24 **Q**    And you're also charged with assault with a deadly weapon?

25 **A**    Am I on trial here?

1  Q    You can answer the question.

2         THE COURT:  You need to answer the question.

3  A    Sure.  Yes.

4         MS. HARRIS:  No further questions, your Honor.

5         THE COURT:  Anything more?

6         MR. BOISSEAU:  That was the last question?

7         THE COURT:  That was the last question.

8                    **REDIRECT EXAMINATION**

9  BY MR. BOISSEAU

10  Q    Just one question.

11        Do you remember any phone calls between Mr. Brugnara and

12  his mother regarding his strep throat?

13        MS. HARRIS:  Objection.  Exceeds the scope of the

14  cross.

15        THE COURT:  It's true.  What do you say to that?

16        MR. BOISSEAU:  Can I have a little bit of leeway?

17  It's the only one question I'm going to ask.

18        THE COURT:  All right.

19  BY MR. BOISSEAU

20  Q    You can answer.

21        THE COURT:  I will allow the question.

22  A    Can you ask the question again?

23  BY MR. BOISSEAU

24  Q    Do you remember phone calls between Mr. Brugnara and his

25  mother regarding his strep throat?

1  **A**    Yes, I do.

2           **MR. BOISSEAU:**  No further questions.

3           **THE COURT:**  Anything?

4           **MS. HARRIS:**  No, your Honor.

5           **THE COURT:**  Okay.  The witness may step down.

6      (Witness excused.)

7           **THE COURT:**  Any more witnesses?

8      (Pause.)

9           **THE COURT:**  Any more witnesses on this subject?

10          **MR. BOISSEAU:**  May I have a moment, your Honor?

11  Please.

12          **THE COURT:**  Sure.  Do you want me to leave the bench

13  or do you want me to stay?

14          **MR. BOISSEAU:**  Yes.  The Court could leave the bench,

15  that would be -- while I have a discussion with Mr. Brugnara.

16          **THE COURT:**  All right.  We'll take a 10-minute break.

17          **MR. BOISSEAU:**  Thank you.

18      (Whereupon there was a recess in the proceedings

19       from 8:02 a.m. until 8:15 a.m.)

20          **THE COURT:**  Everyone is back.  The defendant is here.

21      Mr. Boisseau.

22          **MR. BOISSEAU:**  That concludes the evidentiary portion

23  of this -- this hearing.  There will be no further evidence.

24          **THE COURT:**  All right.  Well, so before we leave the

25  subject of the incident last June, each side may have a few

1    moments to summarize their argument.

2           Let's hear from the Government first.

3           **MS. HARRIS:**   Thank you, your Honor.

4           Nurse Kitchin testified before the Court.  He was a very

5    large person who has worked in the prison system for 22 years,

6    including at San Quentin with the worst of the worst, and he

7    has never before made a formal complaint about any inmate's

8    conduct toward him.  He testified in this courtroom that he

9    remains frightened through today and that he wanted to make

10   sure there was a record of the incident because it was so

11   disturbing to him.

12          The deputy that witnessed it did not recall the exact

13   language but was certain that there were threats made to the

14   nurse and to the nurse's family.  The threats were taken so

15   seriously that Mr. Brugnara was moved to a safety cell for the

16   protection of other inmates, as well as the staff at 850 Bryant

17   Street.  And this incident can't be looked at in the vacuum of

18   just one situation with Mr. Brugnara.  It has to be looked at

19   in the context of Mr. Brugnara's entire history so that we can

20   evaluate the veracity of the witnesses today.

21          Mr. Brugnara has a history of threatening people, throwing

22   his weight around, bullying, engaging in bombastic behavior and

23   making the jail -- the jail's lives miserable.

24          And so when we weigh the credibility of his roommate, who

25   has a prior federal felony and is charged with serious violence

1    against his prior roommate, when you weigh that against the two

2    professionals that the Court heard from, and in particular the

3    demeanor of Nurse Kitchin while he testified, and you take that

4    in the light of all the other evidentiary hearings this Court

5    has held where Mr. Brugnara's claims have been found to be

6    unfounded, the contentions he has put forth have been found to

7    be exaggerated or flat-out false, I think all that has to weigh

8    in the Court's opinion as to the credibility here.  And I think

9    when the Court assesses the witness's credibility, the nurse in

10   particular, given who he is, what his history is in the jail

11   system and the fact that he has never before made a formal

12   complaint against any inmate, that has to be taken very

13   seriously.

14        And what Mr. Brugnara did is truly terrible.  He has

15   thrown his weight around throughout the duration of the time he

16   has been incarcerated in this case.  But to threaten someone

17   with physical violence and to threaten their family, regardless

18   of whether Mr. Brugnara knew or didn't know that the nurse had

19   a family, the nurse did.  And he took that threat very

20   seriously.

21        And I think under the circumstances, the Court should find

22   that the Government's witnesses were credible, that Mr. Paul

23   was not and that Mr. Brugnara did threaten the nurse and

24   threaten the nurse's family.

25             **THE COURT:**  All right.  Thank you.

1        Mr. Boisseau?

2            **MR. BOISSEAU:**  Thank you, your Honor.

3        First of all, let me put this -- this statement in

4    context.  This is an uncharged criminal conduct that is -- that

5    I objected to inclusion in the Presentence Report.

6        The issue before the Court is whether there is evidence

7    supporting this.  We -- and it must be viewed in terms of the

8    nurse himself said he didn't make the report, a formal report,

9    until at least two days afterwards.  The -- the deputy that

10   accompanied him, who was with him all times didn't make his

11   report until July 3rd, several days -- almost -- that's about

12   seven days afterwards.

13       The -- the issue is what was said.  First of all, no -- no

14   physical violence was -- was -- no one hurt anyone.  No one

15   touched anyone.

16       We -- we produced a witness, Mr. Brugnara's roommate, Erik

17   Paul, who said he threatened -- he threatened his job, which is

18   probably consistent with many other times that Mr. Brugnara has

19   threatened people's jobs.  But the -- the -- the threat of

20   violence wasn't made, and I -- I submit there is no credible

21   evidence to believe that had -- had there been a threat of

22   violence, that would have been something that would have been

23   an immediate report according to the protocol of the jail.

24   Nothing was said at that point in time.

25       I mean, I'm not saying that you could threaten a person's

```
 1   job, that's not good, but certainly not threatening -- you
 2   know, that's not akin to threatening a person's life.
 3        How would Mr. Brugnara know Nurse Kitchin's family?  You
 4   know, he didn't know.  And -- and even according to
 5   Nurse Kitchin, says -- said:  Oh, he said he'd get out
 6   tomorrow.
 7        Well, you know, he was in custody.  He wasn't -- he wasn't
 8   getting out.
 9        So at first I want -- the -- I -- I would like this
10   incident out of the Presentence Report because there is no
11   credible evidence supporting it.
12        And secondly, if that is not what the Court is going to
13   do, then I would ask the Court not to take that as a threat of
14   physical violence and just, you know, put it what it really
15   was:  A threatening of a job.  That really is something that
16   has been done before by Mr. Brugnara, but -- and he doesn't
17   have any -- any real violence in any of these incidents.  I
18   mean, there is a lot of blustery talk, a lot of talk.  And --
19   and this, itself, is just talk.
20        You -- so what we're -- what we're doing is with uncharged
21   criminal conduct saying:  Oh, he's a threat.  You know, commit
22   violence.
23        Well, there is nothing in context as far as history that's
24   actually been supported by any evidence, except a restraining
25   order which, you know, didn't go very far against his own
```

1  brother with no -- no violence against his brother.  So there

2  is nothing to suggest that Mr. Brugnara would hurt anybody.

3      And that's not the underlying charge.  The charge is mail

4  fraud.  There is no violence, you know, in this.  So we're

5  really chasing -- we're really chasing something that's not

6  consistent with a character trait for violence.  And that --

7  and people wish to push this as Mr. Brugnara is a violent

8  person.

9      He's 52 years of age, and he's -- and there is nothing to

10  suggest that he's a violent person.  The incident -- there's

11  fights in jail, but you have to look at that in context.  I

12  mean, there is -- you know, jail is a tough place.  But out on

13  the street there are no fights.  And there's -- there's just

14  allegations that have never been supported.

15      And this one is another allegation of a threat which

16  wasn't real and it wasn't really made, a threat to the person's

17  well-being.  It was a threat to have the person lose his job,

18  which is, you know, disturbing itself for Nurse Kitchin, but

19  not the same thing as a threat on a person's life.  Especially

20  for an inmate who is not getting out, who under circumstances

21  suggesting that the parties were angry at each other.

22      So I'm -- my first request is to take this out of the

23  Presentence Report and not to consider this as a real threat.

24      **THE COURT:**  Anything more?

25      **MS. HARRIS:**  No, your Honor.

1       **THE COURT:**  The ruling is as follows:  It is relevant

2  and it should stay in the Presentence Report because it

3  bespeaks a larger pattern of conduct that helps inform the

4  reader about the personal characteristics of the defendant.

5      With respect to the merits, the Court believes that the --

6  and finds that the nurse told the truth and that the threat

7  against his life and family was, in fact, made by the defendant

8  in June of this year, as testified to by the nurse and by the

9  deputy, although not in the same detail.

10     And the Court finds Mr. Paul is not credible.  He's a

11  convicted felon.  He's a roommate of the defendant, and he has

12  many incentives to fudge.  And even his version of he's going

13  to make sure he loses his job is not too flattering, but the --

14  Mr. Paul did not tell the truth or conveniently forgot the

15  truth about what actually happened on that date.

16     So that's the finding.  The Presentence Report will stand

17  as written.

18     Okay.  Now, we go to the -- if I understand the situation,

19  I want to take up the Maibaum supplemental materials.  And I

20  would like for the lawyers to explain to me why this was not

21  e-filed.

22       **MR. COOPERSMITH:**  Thank you, your Honor.  Our

23  understanding of the rule --

24       **THE REPORTER:**  Counsel, your name, please.

25       **MR. COOPERSMITH:**  Jeff Coopersmith for Walter Maibaum

1    and Modernism.

2            **THE COURT:**  Cite me any rule that says you couldn't

3    have e-filed it.  What rule says you just throw it into the --

4    over the -- into the clerk's office where we never find it?

5            **MR. COOPERSMITH:**  Your Honor, my understanding of the

6    rule --

7            **THE COURT:**  Cite me the rule.

8            **MR. COOPERSMITH:**  Well, I would have to look it up,

9    your Honor.  But we're a third party.  We're not a party to the

10   case.  And my understanding is you cannot e-file when you're

11   not a party to the case.  But if you give me a minute, I can

12   probably find the local rule.  I don't have it off the top of

13   my head.

14           **THE COURT:**  How did you expect that we were going to

15   get this?

16           **MR. COOPERSMITH:**  I had it delivered to chambers

17   yesterday as a courtesy copy, your Honor.

18           **THE COURT:**  Well, it wasn't -- we didn't get any --

19           **MR. COOPERSMITH:**  I don't know why that's the case,

20   but we did have it delivered.

21           **THE COURT:**  All right.

22           **MR. COOPERSMITH:**  We also served it on --

23           **THE COURT:**  I'm going to let you summarize what's in

24   here.  My law clerk has tried to do that for me.  I think I

25   know what's in here, but I'm going to let you summarize it

 1  verbally because we're not going to delay this any more on

 2  account of this last-minute filing.

 3          **MR. COOPERSMITH:**  Yes, your Honor.

 4      At last week's hearing, last Wednesday, when I was

 5  speaking, the Court made comments that it doubted the validity

 6  of the bills of sale, showing the purchase of 16 de Koonings by

 7  Mr. Stone and Mr. Carlson, the two gentlemen who consigned the

 8  works to Mr. Maibaum and his company.  I didn't have the check

 9  or the payment record with me that day, and I apologize for

10  that.  But since then I've gone back to Mr. Anders -- I'm

11  sorry, Mr. Carlson and Mr. Stone and I've got the evidence.

12      So, first of all, the declaration of Michael Stone we

13  filed yesterday.  Just to cut to the chase, your Honor, if you

14  look at Exhibit A of that document to Mr. Stone's declaration,

15  there are two wire transfer records, one dated May 31st, 2013

16  and the second one dated October 9th, 2013, showing the wire

17  transfer from Mr. Stone to Mr. John McWhinney of $300,000 for

18  each wire transfer, a total of $600,000.

19      The memo line reads:  Purchase, art purchase three

20  de Koonings paintings.  And then the second one the same.  So

21  that's six de Koonings, $600,000, just as the bills of sale

22  describe.

23      The second declaration is from the second purchaser,

24  Mr. Carlson, Anders Carlson.  Mr. Carlson took a few days to

25  assemble his records.  He, apparently, had his records in a

1   house in Arizona and he's currently in Los Angeles.  But

2   Exhibit A to Mr. Carlson's declaration shows four wire

3   transfers from Mr. Carlson's attorney in Los Angeles to John

4   McWhinney for the payment of art.  The first one is for

5   $200,000, $70,000, and the third one is for $50,000, another

6   50-.  That's $370,000 of wire transfers.  So, so far we're up

7   to $970,000 paid by Mr. Carlson and Mr. Stone.

8        Exhibit B to Mr. Carlson's declaration is a receipt he

9   received from Mr. McWhinney for -- showing an additional

10  $30,000 in cash that was paid.  That brings us up to

11  $1 million.

12       Mr. Carlson originally intended to purchase all 16

13  de Koonings.  As it turned out, he changed his mind and ended

14  up purchasing ten.  Mr. Stone ended up purchasing the other

15  six.

16       The balance of the money that Mr. Carlson owed Mr.

17  McWhinney was $100,000, bringing it up to 1.1 million.  The

18  extra $100,000 was paid in a combination of cash, $30,000, as

19  stated in the declaration.  And then there was a trade for some

20  pieces of art known as Chinese Lingbi stones.  Mr. Carlson

21  thinks they are worth about $70,000.

22       The records we did attach to Exhibit C to Mr. Carlson's

23  declaration shows the shipping for about $5,000 of those Lingbi

24  stones to Mr. McWhinney.  They are very large Chinese stones,

25  and there are some records about the shipping.

1      But the bottom line or the more important thing, your

2    Honor, is that there is over $1 million in wire transfers and

3    cash:  $970,000 in wires, $60,000 in cash.  It's 1,030,000 and

4    the rest in these -- this trade.

5      So, your Honor, I appreciate the chance to speak.  There

6    has been a lot of comments made on the record in this case,

7    especially by the defendant, that Mr. Maibaum -- and, frankly,

8    Mr. Carlson and Mr. Stone -- were engaged in some kind of scam.

9      What this shows unequivocally is that this was over

10   $1 million that Mr. Carlson and Mr. Stone paid for this art to

11   Mr. McWhinney.  They did forensic testing.  They had research

12   done.  They did everything they could to assure themselves that

13   these were genuine de Koonings.  They had providence, you know,

14   directly from the artist in their interviews.

15      Regardless of what the Court thinks of the art in

16   actuality, we obviously disagree with any comments that they

17   are fake.  But there can be no doubt that these are victims who

18   paid over $1 million for art that Mr. Brugnara stole.  And

19   if -- the reputational damage in this case to my client as well

20   as to Mr. Carlson and Mr. Stone has been extreme.  They are

21   going to -- have to take a long time to rebuild for that, but

22   I'm hoping that the Court will consider this evidence and

23   hopefully make comments on the record that at least begin to

24   repair that damage.

25      If the Court has any questions, I'm happy to answer them.

```
 1   Otherwise I appreciate the chance to speak.

 2             THE COURT:  All right.  Thank you.

 3        Anything by Mr. Boisseau?

 4        MR. BOISSEAU:  I received this yesterday via email.

 5   All right.  First of all, the issue before the Court I thought

 6   was the -- whether Mr. Maibaum had paid what he had paid for

 7   the Little Dancer, which was an issue.  And we had said that if

 8   he produces proof that he paid 300-and-some euros, 300,000

 9   euros, you know, that was an issue for restitution.  But I

10   don't see anything here.

11        The issue of the de Koonings, we -- we had a Government

12   appraiser -- we had -- a Government appraiser said these were

13   worth nothing, probably fake.  We had a defense appraiser look

14   at this.

15        But, okay.  We -- that's -- that's already been resolved.

16   I -- you know, the de Koonings, for whatever they are worth to

17   these gentlemen, will be returned.  And they are not missing.

18   They are -- they will be returned and they can deal with --

19   with that.

20        I read this declaration, this request as saying -- kind of

21   like a request for the Court to say they are not fake.  Well,

22   that's -- you know, that's not the issue before this Court.

23   That's not the issue of restitution.  There is no restitution

24   before the de Koonings because they -- they are still there.

25   They are going to be returned to these -- the parties, whoever
```

1   owned them.

2       And, also, the -- even if we were to look at some of these

3   documents, the Court might remember the -- Mr. McWhinney was

4   actually interviewed by Victor Wiener who said:  I didn't

5   represent that they were de Koonings.  I -- you know, I -- you

6   know, he backed away from that providence which is being touted

7   right now as the authenticity of the de Koonings.

8       So, I -- I mean -- and we don't see any declaration

9   from -- recent declaration from Mr. McWhinney.  Whatever

10  Mr. McWhinney did with, you know, these gentlemen, that's --

11  that's one thing, but it's not relevant to the issues before

12  this Court, and certainly not relevant to the ultimate

13  restitution issue.

14      The second part of this was the attorney's fees.  The

15  attorney's fees were broken into three portions.  There was, I

16  believe, portion one which the -- now they are -- Modernism is

17  only seeking the first portion, and I believe that is -- that

18  is 60,000.

19      That was -- it's a -- they are not asking for phase two

20  and three.  Phase three is the return of property.  They are

21  not asking for restitution and those attorney's fees.  And they

22  are not asking for phase two, which is a bulk of the attorney's

23  fees which deal with -- deal with the prepping Mr. Maibaum for

24  his FBI interview and the -- and the Court process.  They are

25  only asking for phase one, which is Mr. Schochet's interaction

1  with Mr. Brugnara's attorney at the -- at the outset of this

2  case.

3      Now, I'd ask the Court when considering this to take this

4  into context.  We did learn from Rose Long's current attorney,

5  Mister -- I believe Mr. Shapiro, that -- in his declaration for

6  restitution that Mr. Schochet was instructed by Mr. Maibaum,

7  there were other instructions, never to -- or not to disclose

8  this to the authorities, and which was -- if -- out of context,

9  you might wonder, that's kind of like a -- a -- why would

10 someone say that?  But then when we found out that at least two

11 experts said that the de Koonings were worth nothing, they were

12 being sold for $7 million, then the context is supplied.

13     That -- you know, now we know -- and this was subject to

14 motions for a new trial and newly-discovered evidence.  And

15 so -- and I apologize if I'm repeating what was in the

16 pleadings, but it does, you know, make a difference in terms of

17 restitution.

18     The -- the alleged amounts, attorney's fees, were -- I

19 mean, some attorney's fees might have been generated from

20 the -- the several emails, but the amount is totally excessive.

21 And in context where the -- the authorities were not going to

22 be brought in for obvious reasons.  And -- and then the -- also

23 the question is that, which is somewhat strange, is that

24 Mr. Schochet, who is the attorney for Maibaum, was representing

25 Rose Long at this point in time allegedly, according to the

1   emails and everything.

2        So there is so much in -- in this that is unsaid and

3   unsavory that I would -- I would ask the Court not to grant

4   restitution for attorney's fees for Mr. Maibaum in any amount,

5   and certainly not the amount, even the reduced amount, in phase

6   one.

7            **THE COURT:**  Mr. Kingsley.

8            **MR. KINGSLEY:**  Your Honor, I don't think this Court

9   needs to resolve whether or not -- I mean, I understand why

10  Mr. Coopersmith makes -- made his presentation and why the

11  victims filed those declarations, but this Court doesn't need

12  to resolve this for the purpose of sentencing.

13       With respect to restitution specifically, the mandatory

14  Victim's Restitution Act provides that the restitution award

15  must reimburse the victims for expenses incurred during

16  participation in the investigation or prosecution of the

17  offense or attendance at proceedings related to the offense.

18       And the Ninth Circuit in *United States versus Gordon*, 393

19  F.3d 1044, has said that basically that that includes losses

20  that are proximately caused by the defendant's conduct and

21  includes attorney's fees if that is proximately caused by the

22  defendant's conduct in the offense.

23       And all of the fees that both victims are asking for are

24  those incurred from the time the defendant got the art until

25  the Government took over the case.

1          THE COURT:  Well, that's not enough to be proximately

2     caused.  There is more to it.  There has got to be -- so if

3     they had put in for $1 million, you would be telling me to

4     grant that.

5          MR. KINGSLEY:  I would be saying that's --

6          THE COURT:  There has got to be some kind of

7     reasonable connection.

8          MR. KINGSLEY:  That would -- that $1 million would be

9     incredibly excessive.

10          THE COURT:  Yes, it would be.

11          MR. KINGSLEY:  $61,000 --

12          THE COURT:  So I have to make a judgment.

13          MR. KINGSLEY:  I agree, the Court has to make a

14     judgment.  I think -- all the Government knows is that we have

15     a declaration from an attorney saying --

16          THE COURT:  Look.  Some day maybe you'll be a judge

17     and you'll see how excessive these lawyer requests are.  They

18     ask for everything.  It's ridiculous.  You've seen this one go

19     from $300,000 down to $60,000 just because the judge questioned

20     it.

21          MR. KINGSLEY:  Well, what they did was they separated

22     their fees out and focused on, I think, what would be most

23     clearly proximately caused by the offense.  And this Court

24     knows that Mr. Schochet was dealing with Bob Kane and, thus,

25     Mr. Brugnara.

1          THE COURT:  I know that.

2          MR. KINGSLEY:  And he's going to be incurring fees

3    during that time.

4          THE COURT:  So there are definitely some fees that

5    were reasonably incurred.  The question is how much.

6          MR. KINGSLEY:  I can only go based on what the

7    declaration says, and I would submit based on that.

8        I think the law is clear that this Court has the ability

9    to determine what it believes was proximately caused.

10         THE COURT:  All right.  I'll now make some findings.

11         MR. KINGSLEY:  Yes, your Honor.

12         THE COURT:  The restitution -- do you have more to

13   say?

14         MR. BOISSEAU:  No.  We do have the issue of the

15   Degas.  I mean, that was -- my objection was the Degas should

16   be -- the restitution would be what Mr. Maibaum paid for it,

17   and we know from the trial testimony it was 300-some euros.

18       And I thought one of the things the Court had asked about

19   Mr. Maibaum's attorneys were, you know, proof of the payment of

20   that, so...

21         THE COURT:  Actually, I don't think that's what I

22   asked for.

23         MR. KINGSLEY:  Your Honor, and I addressed this last

24   time.  The statute says that it's the value at the time of

25   sentencing or at the time of loss, and this Court is finding

1   that separately.

2        **THE COURT:**  You're wrong on that, Mr. Boisseau.  I

3   didn't ask for that.

4        **MR. BOISSEAU:**  All right.  I --

5        **THE COURT:**  I thought what I was asking for is the

6   check from Mr. Maibaum for 1.2 million, which was not supplied

7   to me.  What was supplied to me are wire transfers from other

8   people earlier in the chain.

9        All right.  Can I now make some rulings or do you want to

10  say more?

11       **MR. KINGSLEY:**  Nothing from the Government, your

12  Honor.

13       **MR. BOISSEAU:**  No.  That's fine, your Honor.

14       **THE COURT:**  All right.  First, every single item of

15  art will eventually be returned, except the Degas statue.  Even

16  though possibly that could be returned, but it's -- the record

17  indicates that Mr. Brugnara hid that some place and he's still

18  got it or knows where it is.  And that's the best reading of

19  the evidence.  And that has not been returned.  So $600,000

20  goes to Mr. Maibaum for that.  That's restitution, 600,000 for

21  the Degas.

22       All the other art, no restitution because the owners are

23  going to get that back in due course.  And in my judgment it's

24  their own fault for having dealt with Mr. Brugnara in the first

25  place and not doing any due diligence; that there is going to

1    be a delay and they are getting back some of the art.

2         Number three, $60,000 goes for attorney's fees to Maibaum

3    on account of the reduction down to $60,000.  That's

4    reasonable.

5         And then Ms. Rose Long had a request for, I think it

6    was --

7              **MR. KINGSLEY:**  It was a little over 27,000.

8              **THE COURT:**  $27,000-plus will go to her for

9    restitution for her attorney's fees.  That was a reasonable

10   request.

11        I think that's all we're going to do on restitution.

12             **MR. KINGSLEY:**  Your Honor, just as a --

13             **THE COURT:**  I'm not making any revisions to any

14   statements that I previously made about any of the victims.

15   And it's quite clear from the experts and their report about

16   these de Koonings that very likely these are not authentic.

17   And I stand by that.

18        Now, as to whether or not Mr. Maibaum or Ms. Long

19   intentionally tried to mislead anyone, that's a different

20   question, and I'm not saying that they did or didn't.  That

21   would require more proof than has been made available to the

22   Court.  So I'm not saying that they tried to cheat somebody.

23   I'm saying that the de Koonings, most likely, were not

24   authentic.  All right.

25             **THE DEFENDANT:**  Can I say something?  (Inaudible.)

```
 1          THE COURT:  Mr. Brugnara, you need to please stop.
 2   You're going to get your opportunity for allocution.  You can
 3   say what you want then.  But, please, in the meantime don't --
 4   don't make any outbursts.
 5       All right.  We now, I believe, are ready for the general
 6   issue of sentencing, unless there is something more that you
 7   want to bring up.
 8       So, Mr. Boisseau, before -- tell me, is there more?
 9          MR. COOPERSMITH:  Your Honor, could I have one moment
10   to make one clarification?
11          THE COURT:  All right.  Please come forward.
12          MR. COOPERSMITH:  Thank you, your Honor.
13       I understand the Court's ruling regarding return of the
14   art that -- that has been recovered.
15       As the Court may recall, last week Mr. Kingsley pointed
16   out there were four works that were entered into evidence.  We
17   understand that those are going to be in evidence until the
18   appeal process runs its course and whether a new trial is
19   granted is determined.
20       The other art, which is not in evidence, the Court's
21   comments last week were that you would probably return that art
22   after sentencing.
23       As the Court knows, these people are out a lot of money.
24   Mr. Maibaum didn't write the check, by the way, to
25   Mr. McWhinney because he had the works on consignment.  It was
```

 1   Mr. Anders and Mister -- Mr. Carlson and Mr. Stone who paid

 2   Mr. McWhinney over $1 million for the artwork.  They then

 3   consigned it for sale to Mr. Maibaum.  That's why the checks or

 4   the wire transfer records rather went from Carlson and Stone to

 5   McWhinney.

 6        But in any event, your Honor, as I remarked last week, the

 7   de Koonings, just to take those, the Government's expert has

 8   testified that they have no commercial value.

 9        Any new trial that occurs in this case, the Government is

10   going to be stuck with that evidence.  They are never going to

11   be able to argue that they are higher than zero.  Obviously, I

12   disagree with it, but that's the record in the case.

13        So there is no harm and certainly no prejudice to

14   Mr. Brugnara for the de Koonings to come back to their rightful

15   owners.  Mr. Carlson and Mr. Stone have designated Mr. Maibaum

16   as the person who should receive that art back under the

17   statute which allows designation, 3663(a)(B)(1)(a).

18        As for the rest of the works, there is Picassos.  There is

19   a Mirò, which is evidence I understand that's not coming back.

20   But all of the works except for the works in evidence, we think

21   there is no prejudice to those coming back to the owners.

22   That's Mr. Maibaum in some cases.  And then there is one, I

23   think that's Ms. Long's, the Lux.

24        So we're asking the Court, based on the right under

25   Section 3771, to timely and full restitution and 3663(a) which

1   requires an order returning the property that the Court order

2   the artwork to come back to at least end the financial hardship

3   that has occurred by the works being held.

4         So I'm asking the Court to return the art as the Court

5   indicated it might do last -- last week.

6         Thank you.

7              THE COURT:  What does the Government say?

8              MR. KINGSLEY:  As we said last week, we're okay

9   returning the artwork that wasn't a trial exhibit, but we want

10  to hold on to the trial exhibits.

11        I think this Court's restitution order needs to cover all

12  of the artwork because the Government got it from Mr. Brugnara

13  and the Court needs to make some sort of adjudication that

14  permits the Government to return it to the victims.  What the

15  Government would ask for is that the restitution order covers

16  the artwork, but stays restitution for the four pieces that

17  were trial exhibits pending resolution of all appeals in this

18  case.

19             THE COURT:  It seems like -- Mr. Boisseau, it seems

20  that the reason that we had the experts in the first place was

21  so that we could return the artwork and that if there was any

22  future need for it, it would have already been looked at by the

23  experts and you could take photographs and all of that.  The

24  photographs would be exhibits if they were needed later and

25  there is no need for us to hold on to these any longer.

```
 1        So why shouldn't I return all of this, except for the ones
 2   the Government used as trial exhibits?
 3            MR. BOISSEAU:  Your Honor, I -- the Court will -- we
 4   had -- we were given the opportunity to look at the art, that's
 5   true.  I'm a little bit concerned only because of the motion
 6   for new trial and the issues involved in that that might
 7   implicate all the artwork.  So I'm not prepared to agree,
 8   although I've stated my record.
 9        I don't need the -- my expert has seen them, taken --
10   taken pictures, but I don't want to agree that they should be
11   released.  And that will be the Court's ruling, and I'm
12   concerned because of all the motions we filed, the motion for
13   judgment of acquittal, that any concession on my part might be
14   viewed negatively.
15            THE COURT:  All right.  I want to -- I think this is
16   the right answer, and I will try to explain it for the benefit
17   of the parties, mainly, and then the Court of Appeals.
18        The trial is over.  It's subject only to appeal.  And if
19   the convictions are affirmed, then there won't be any need for
20   any of this artwork.  If the conviction is reversed and
21   remanded for some reason, then we might need to have a new
22   trial.  And in that event, the Government has said that it
23   wishes to hold on to the items that -- I believe four items
24   that were actual trial exhibits and rely on photographs, I
25   guess, for any of the rest of it.  That's perfectly okay with
```

1 me.

2      On the other hand, the defendant might wish to make the

3 argument again that he was a victim, even though that's not a

4 defense.  But nevertheless, some of that came into -- it would

5 certainly go to credibility of Mr. Maibaum and to Rose Long if

6 it could be proven that they intentionally were trying to sell

7 counterfeit art.  So there is a plausible need for the defense

8 to have access to the materials to be able to prove up.

9 Otherwise, Mr. Kingsley would be here arguing:  Well, they

10 don't have any proof.  They don't have any -- where is the

11 proof of any fraud?

12      So anticipating that very scenario way back in the summer,

13 in June of this year and maybe May, I gave each side an

14 opportunity to inspect the art, take all the pictures they

15 wanted, to do their homework on it now so that then the art

16 could be returned.  And then if a future trial ever came along,

17 we could rely on the substitutes, the photographs and so forth.

18      And I think that is the best way to proceed, is to let the

19 artwork go back to the owners, except for the ones the

20 government wants to keep temporarily, and that the defense will

21 be able to rely upon the photographs that were taken and the

22 expert analysis that was done, and there will be no prejudice

23 to the defense as a result of returning the art.  That's --

24 that's my view.

25      So I'll give you one last chance to argue against that.

1    Otherwise, that's going to be the ruling.

2         So, Mr. Boisseau, what do you say?

3         **THE DEFENDANT:**  George.  George.  George, I need to

4    talk to you.

5         (Discussion held off the record between the defendant

6          and his counsel.)

7         **MR. BOISSEAU:**  Your Honor, I've stated my position in

8    the criminal case.

9         There are -- there are potential civil -- civil issues,

10   civil litigation issues that may implicate -- may be implicated

11   by the return or -- of the property.

12        Right now I -- I -- my -- I have those concerns and I've

13   made -- I've not conceded the return.  So I'll stand by the

14   Court's ruling.

15        **THE COURT:**  You're submitting on that.

16        All right.  Anything more by Mr. Kingsley?

17        **MR. KINGSLEY:**  No, your Honor.

18        **THE COURT:**  All right.  What I said earlier will be

19   the ruling of the Court.  I want the Government to prepare an

20   order that is faithful to what I just said and don't overreach,

21   and then I will sign that order.

22        **MR. KINGSLEY:**  Thank you, your Honor.

23        **THE COURT:**  And on civil litigation, I just can't

24   control everything.  I don't care about the civil litigation.

25   That's not a factor.

```
 1        All right.  Let's -- now can we proceed to the general
 2   issue of sentencing?
 3              MR. BOISSEAU:  Yes.
 4              MR. KINGSLEY:  Yes, your Honor.
 5              THE COURT:  All right.  So to summarize where we
 6   are -- and I hope I got this right.  You all correct me if I'm
 7   wrong -- I believe that I've come out with Criminal History IV
 8   and Offense Level 24, which is different than what the PSR had
 9   originally said.  And that I have found that the loss amount is
10   between 550,000 and 1.5 million.  I'm going to use the loss
11   table that goes in effect on November 1.
12        I've determined that the museum enhancement will not
13   apply.
14        The Court has found that the tax in the fish case are two
15   separate and were two separate cases for criminal history
16   purposes; that the long list of falsehoods and half truths as
17   told by Mr. Brugnara will remain in the PSR, despite the
18   defense objection; that the Court accepts the PSR's groupings
19   of the convictions for guideline purposes and overrules the
20   objection.
21        So I believe that I come out with No. 24, No. IV, which
22   has a guideline range of 77 to 96 months.
23        All right.  So let me stop there and make sure that -- and
24   that's just for the -- that's not yet counting the 471 days for
25   contempt or the 12 months for the Form 12.  But I -- and I'm
```

1   not saying that I'm going to sentence within the guideline

2   range, but I just want to make sure that our starting point

3   after three hearings, we're all on the same page.

4        Have I said it correctly, Mr. Kingsley?

5        **MR. KINGSLEY:**  Yes, your Honor.  With the caveat of

6   what we talked about before, which was that -- and I'm not --

7   I've never dealt with this before; that the Court should find

8   that the guidelines are what the guidelines are now, which

9   would be Level 26, and then vary downward based on the

10  anticipated change.  And that's what Probation thinks is the

11  correct way of doing it.

12       **THE COURT:**  I'm happy to do that, but I'm going to

13  use 24.  26 may be the correct one now, all right, I'll say

14  that, but I'm going to use 24, being lenient in favor of the

15  change that's coming up very soon.

16       **MR. KINGSLEY:**  Thank you, your Honor.

17       **THE DEFENDANT:**  He just lied, your Honor.  He just

18  lied, your Honor.

19       **THE COURT:**  No, you don't get to say anything,

20  Mr. Brugnara.  You'll get your right of allocution soon.  But

21  you don't get to say anything.  You have to speak only through

22  Mr. Boisseau.

23       (Discussion held off the record between the defendant

24        and his counsel.)

25       **MR. BOISSEAU:**  Your Honor --

```
 1            THE COURT:  All right.  Mr. Boisseau, do you have
 2   something to say?
 3            MR. BOISSEAU:  Yes.
 4            THE COURT:  Please.
 5            MR. BOISSEAU:  Your Honor -- all right.
 6            THE COURT:  Please.
 7            MR. BOISSEAU:  The Court has made those rulings,
 8   and -- you know, and I don't mean to review those, but the
 9   Court -- one of my objections was that the grouping was
10   improper because it should be one -- one group and not two
11   separate groups.
12            THE COURT:  I overruled that.
13            MR. BOISSEAU:  I -- I understand that.
14            THE COURT:  I'm not going to go back on that.
15            MR. BOISSEAU:  And I don't mean -- but I just --
16   there was an additional argument that the obstruct -- that the
17   escape guidelines were such, they start at Level -- they go up
18   to a Level 11.  If we would use escape as the operative second
19   group, then the -- they would not be -- it would be over --
20   over eight -- over eight levels difference and he wouldn't have
21   the -- the one level grouping enhancement which now is before
22   the Court.
23       So I'll make that representation to the Court and submit
24   it.
25       Also, in terms of -- and this -- and please bear with me,
```

1   your Honor.   The terms of the -- the loss, there is the issue

2   that I raised that we -- we shouldn't use loss with the Degas

3   at 600- -- not my amount because loss is not a proper gauge of

4   seriousness of the offense, but the Court overruled that.

5        But there is an issue regarding the -- the actual value

6   of -- of the Degas that overstates its value because of the

7   chain of history of this, and even the expert agreed that it

8   would be worth 600,000, assuming all these other sales were --

9   were authentic.   And there is a -- there is a serious issue

10  regarding the authenticity of these other sales and whether

11  they were between friends to bump up the price.

12       So I would ask on that grounds also that the Court not

13  take that value of the Degas in its loss figures.

14       **THE COURT:**   All right.   Those objections are

15  overruled.   The Court's loss calculation is extremely generous

16  to Mr. Brugnara.   And a good argument can be made that it

17  should be more than 1.5 million, but we're going to stay with

18  the loss amount that I've calculated.

19       All right.   So at this time we will have the following,

20  but before we do it I want to say I will listen to a different

21  procedure.   Normally I would have Mr. Boisseau go first, the

22  Government go next, and then give the defendant the last word

23  and a right of allocution.   Although, depending on what was

24  said, I might let the Government respond to the allocution.

25  However, if you have a better way to go, I would be happy to

```
 1  listen to that.

 2       What would you like to do, Mr. Boisseau?

 3            MR. BOISSEAU:  Mr. Brugnara would like to go first.

 4            THE COURT:  Then we will let him go first.

 5            THE DEFENDANT:  Can I use the restroom for two

 6  minutes before I start?

 7            THE COURT:  We'll take a 5-minute -- we'll take a

 8  10-minute break.  You use the restroom as long as you want, and

 9  then we'll come back and hear your allocution.

10            THE DEFENDANT:  Great.

11       (Whereupon there was a recess in the proceedings

12        from 9:00 a.m. until 9:09 a.m.)

13            THE COURT:  Please be seated.

14       So before we get started, to tell you the procedure,

15  Mr. Brugnara will be allowed to make his allocution now, if

16  that's what you still want.  Then we will hear from

17  Mr. Boisseau, and then we will hear in the Government.

18       To be clear, the right of allocution does not include a

19  right of reply by Mr. Brugnara.  So if he wants to do that,

20  I'll let him go last.  But, otherwise, if he wants to go first,

21  that's fine.  But he doesn't get to get up and start doing

22  rebuttal to the Government.

23       Does everybody understand that?

24            THE DEFENDANT:  (Nodding.)

25            THE COURT:  Mr. Boisseau, do you want to do the
```

1  allocution first or last or some other way?

2         MR. BOISSEAU:  No.  We have decided to do allocution

3  first.

4         THE COURT:  Okay.  That's fine.  We will do that.

5     And, Mr. Brugnara, are you prepared to proceed?

6         THE DEFENDANT:  Yes, I am.

7     Judge Alsup --

8         THE COURT:  The floor is yours.  Please go ahead.

9         THE DEFENDANT:  Judge Alsup, I wanted to talk first

10 about -- as I understand it, my allocution, I could discuss

11 mitigating circumstances regarding the sentencing and also, you

12 know, plead and whatnot personal.  So I wanted to discuss first

13 what was on the table last here about the sentencing

14 guidelines.

15     One thing I think you and I share as a common denominator

16 is our understanding of numbers and graphs.  I'm mathematically

17 inclined myself.

18     And, you know, I have had the benefit of having different

19 attorneys in this case and saw some of their input, and the

20 first thing I want to discuss with -- actually, it was a prior

21 attorney, Bornstein, he had put the groupings 8 and 9 together

22 and he explained to me why.

23     And then I did my own further research and confirmed it

24 also with present counsel that they had the second group of 8

25 and 9, which was the escape charge and then the ancillary

```
1    contempt charge, and the contempt charge was for specifically
2    using the phone and then violating the written furlough order.
3         So the way Mr. Bornstein had seen it, of course, is that
4    the best representative charge -- which is what is the
5    guideline for grouping, is the best representative charge --
6    was, of course, escape, because that is the -- that is the
7    charge, escape.  So escape was the grouping charge.
8         And then it was 13 points.  And then it was minus 4 points
9    for non-custody furlough.  And then he added 2 points for the
10   obstruction, which addressed the contempt regarding the
11   contempt part of that grouping charge, as opposed to using --
12   as opposed to using obstruction of justice as the best
13   representative charge for escape and contempt.
14        Now, interestingly, if you just had contempt on its own,
15   the sentencing guidelines recommend that you use obstruction of
16   justice as the defense because there is no guideline chart
17   for -- for contempt.  So -- so what -- what the U.S. Attorneys
18   did was they took that charge as a best representative charge
19   for -- for the -- for the contempt, but it's not the best
20   representative charge for the grouping.
21        The best representative charge for the grouping is
22   obviously escape, because that is what the basis was for the
23   ancillary charge of the contemptuous behavior pertinent to the
24   escape.
25        So if you -- if you take those numbers -- and, again,
```

this -- this -- again, from the benefit of Mr. Bornstein, it's

13 on the escape and then it's minus 4 for furlough -- you

know, not -- not in chains.  They even gave a minus 4 for

absconding from halfway houses and, surprisingly, from camps,

you know, from BOP camps.  So the minus 4 was applied, and then

plus 2 for the obstruction for the contempt.  So it's 11.

And then -- and so if you take the 11 and then you compare

it with the first grouping, we don't get the extra point added

on for the fraud grouping.  So that would take it down to 23.

So I'd like you to consider that, because I think that's

clearly the best representative charge for the grouping of 8

and 9.  I can't imagine how someone can say obstruction of

justice is the better charge, most representative charge for

the grouping when, in fact, escape is available as the -- you

know, as -- as the charge.  So you don't -- you don't have to

deviate from that base charge.

So then -- that's a first request I would make.  So that

would take us down to 23 points.

The other thing I wanted to talk about was the Criminal

History Category because the first thing is, you know, back in

2010 when Brian Getz was handling this case, it was a concern

of his when we were going to be sentenced.  If you remember the

first time that -- that we did the plea, if you remember they

dropped the fish charges all together.  When Ken Wine and Pat

Hallinan did the plea with you, the fish charges were dropped

1   in totality in this Court.

2        If you also remember, the U.S. Attorney on the fish

3   charges, Ms. Bessette, she would always accompany Tom Newman,

4   even in your court, as Tom Newman would accompany Bessette in

5   Judge Chesney's court.  So they were always married together,

6   those two cases.  And then -- and then -- and then the first

7   time that the -- on the plea that the fish case was dropped in

8   its entirety.

9        But then the second time around when the plea wasn't

10  allowed to be dropped in that particular case.  All the charges

11  stayed.  But it was globally resolved -- it was globally

12  resolved.  Judge Chesney resolved it as a global resolution.

13  We resolved it globally with Harris Taback.  And that's how we

14  got the second plea.

15       Even though you didn't let the second plea get withdrawn,

16  there was still a second plea.  And the second plea was

17  resolved with Harris Taback, Bessette and Tom Newman.  And that

18  plea was to globally resolve what these cases were married

19  together.

20       And the irony here is that, of course, if -- if these --

21  if these cases were sentenced on the same day, meaning with you

22  and Judge Chesney, which we tried to do with Brian Getz, then

23  there wouldn't even be any question that I'm a Category 3.  We

24  would actually be up here arguing for Category 2 because I get

25  2 points for being on supervised release, and I only had one

1  year of supervised release.  If you remember, that was extended

2  for another year but it was supposed to be canceled after six

3  months.  That would actually take me down to a Category 2.  But

4  if we were sentenced on the same day in 2010, it would be

5  undisputable I'm a Category 3.

6      So why didn't I get sentenced on the same day?  Well,

7  Brian Getz wanted me sentenced on the same day.  Judge Chesney,

8  if you remember back to 2010, she had a circumstance with her

9  husband.  And I don't remember what it was, but I think he was

10 ill or something was going on with her husband in 2010.

11 Because Brian Getz is a very good lawyer, and he -- and he knew

12 the ramifications of the same-day sentencing.

13     And Tom Newman even said:  Oh, no.  He's a Category 1.

14 He's a Category 1.  He's a Category 1 in your case.

15     Okay.  And so I was sentenced afterwards.  Because it was

16 made clear -- otherwise it would have been a Category 2 because

17 I was already sentenced in the fish case.  So the fact of the

18 matter is, I'm a Category 3 because those two cases were only

19 sentenced on different days to accommodate Judge Chesney and

20 accommodate your court calendar.

21     Because, again, Brian Getz is a very astute and very good

22 lawyer.  He was paid a lot of money.  And he -- he covered my

23 tail on that, because he knew the ramifications of not being

24 sentenced on the same day; that if there is ever any problems

25 in the future with a supervised release violation or anything

1    like that, all of a sudden you would have 6 points instead of

2    3.  So, you know, I -- I absolutely believe it's a 3 based upon

3    the record of that case and I'd like you to consider that.

4         And then, you know, I want to talk about the valuation.

5    And you said, you know, even though you didn't accept this

6    particular email at -- during the trial, you said you will

7    consider it at sentencing and you said that in your written

8    order requesting certain information.  And it's the email from

9    Sotheby's to Mr. Babcock regarding the alleged Degas.  And what

10   it says -- I will read it again:

11         "Thank you for contacting Sotheby's regarding

12        your property.  After careful review of the

13        information and images provided, it appears your work

14        is a reproduction and not original work by Edward

15        Degas.  As such, Sotheby's cannot sell it under our

16        terms of guaranteeing authenticity, as we believe

17        it's of decorative value only.  We appreciate you

18        bringing this property to our attention and look

19        forward of being of great service to you in the

20        future."

21        So in layman's terms, Sotheby's, which is the largest

22   purveyor of art in the world for the last 300 years, says the

23   Valsuani Degas is worth -- and we're going to get into the

24   trial testimony here, because I know you like everything

25   buttoned down.  Well, we know right here it says it's of

1   decorative value only.

2        But then Ms. Solomon testified.  Even though she didn't

3   testify in front of the jury, she did testify in front of your

4   Honor and she said -- she expanded on that.  What she said

5   was -- and it says -- it says here on Page 2263 of the

6   transcript of Kathryn Solomon.

7        She goes:  Yes, I sent this email.  This is what we call

8   an NSV, which is No Sales Value.

9        So she expanded on that in her -- in her testimony to your

10  Honor.  And she says:

11       "Basically, Mr. Babcock's email with the images

12       came in to our box.  Our specialists reviewed them

13       together.  Then they decided that those pieces of art

14       don't have any sales value.  They put them in the

15       folder.  It appears your work is a reproduction, so

16       that means it has No Sale Value reproduction."

17  And then she went on to say down here at the bottom 2263:

18       "There are four specialists who review all the

19       inquiries, that review everything as a team."

20  And it says here on Page 2271:

21       "So if someone says they have a Degas and we

22       don't believe it's a Degas, we can't sell that as a

23       Degas."

24  Again, she states No Sales Value in 2262.

25       And then she cites the four experts that are in the

1    Impressionist and Modern Department that collectively come to

2    this conclusion.  So it's not an arbitrary or capricious

3    determination that's, you know, perhaps a -- you know, a novice

4    or a -- or -- or -- or an apprentice there.  It's actually four

5    experienced members that she said have -- we'll get into from

6    the other Sotheby's statements.  It says their specialists,

7    Julian Dawes, Sian Folley, Edith Eustis.  And she gave the four

8    names and she went on to say that this is what they do.

9          So then -- so what this tells us is that four experts at

10   Sotheby's, which is the largest purveyor of art in the world

11   for 300 years, and quite ironically is used as the expert by

12   the U.S. Attorney's Office, at least according to Mr. Wiener,

13   in the prosecution of an older case that was addressed in his

14   appraisal.  He said that Knoelder Art Gallery in New York got

15   shut down after being in business 150 years for selling a fake

16   Pollock for $17 million.  And if you read in the appraisal, it

17   says they relied upon the indictment of Knoelder based upon

18   Sotheby's saying the painting allegedly by Pollock had NSV, No

19   Sales Value.

20         So here you have the Manhattan office of the U.S.

21   Attorney's Office and, by the way, the district courts of New

22   York and the federal bankruptcy courts in San Francisco,

23   because they relied in the Brugnara I reorganization,

24   Judge Montali and the U.S. trustees, solely on Sotheby's valued

25   the art that Brugnara I owned.  So all the district courts,

1    bankruptcy courts and at least the U.S. Attorney's Office in

2    Manhattan are relying upon what Sotheby's says as the basis for

3    determination of value.

4         And one of them, again, if you go back to Ms. --

5    Ms. Kathryn Solomon's email, it says:  Our terms of

6    guaranteeing authenticity.

7         And that's really the linchpin.  An appraiser could really

8    say anything.  I mean, come on.

9         You could -- did you see the appraisal on the -- on the

10   Degas for 15 million?  I mean, you know, it's laughable.  You

11   know, I mean, really it is.  Because the reality is you have to

12   go by who is going to guarantee it.

13        Now, who is going to put their money where their mouth is?

14   Only Sotheby's.  And that's why the Government only depends and

15   relies on what Sotheby's says.

16        Because you can really get 10 different appraisers up here

17   and, depending on what you pay them or how much you twist their

18   arm metaphorically, you can get 10 different values.  But when

19   someone says:  I guarantee it, I guarantee it, I put my name

20   behind it, then -- then, you know, you have a real number to

21   work off and you have a real number you can go and indict

22   someone on.

23        But in my particular case, of course, when the attorney

24   saw this, they said:  Oh, my God, the case is over.

25        They said the case is over.  The thing is worth nothing,

1    at least according to the Manhattan U.S. Attorney's Office, who

2    depend and rely on Sotheby's at least to indict people and shut

3    down a 150-year-old art company.

4         But in my case it's a different set of standards here.  We

5    take this.  We bury it.  We hide it.  Pretend it never

6    happened.

7         You know, I tried to put out a 17(a) subpoena for all four

8    of these, and I know it wasn't timely.  And now in light of the

9    fact that the de Koonings are fake -- I don't think the

10   de Koonings should be given back.  Some poor sucker is going to

11   get ripped off for $2- or $3 million.  Forget about civil

12   litigation all that.  They are going to rip off somebody for a

13   million or $2- or $3 million.  And that's shocking that the

14   U.S. Attorneys really don't care.

15        That's the argument that should have been made by both my

16   esteemed counsel and the U.S. Attorneys:  Yeah, they try to rip

17   off Luke for 7 million.  They are going to rip off someone else

18   for whatever they can get.

19        So whatever the case, regarding my situation, though, is

20   in light of the fact that we know the stuff is fake, this gives

21   a lot more weight to this testimony from Kathryn Solomon and

22   the meaningful 17(a) subpoenas from Edith and the rest of them

23   where they -- they collectively determined the Degas had no

24   value.

25        Now it takes us to the next testimony that came in from

1    Jennifer Biederbeck, who's actually been at Sotheby's for, she

2    said, what, 25 years.  And Jennifer Biederbeck then came up and

3    testified after Kathryn Solomon.  And what Jennifer Biederbeck

4    testified was that what -- what exactly NSV means as far as

5    exact dollars and cents.  And she gave us an exact -- here it

6    is.  I'm sorry, your Honor.  Right under my nose here.

7         And I apologize, your Honor, for some of the things I've

8    said, you know, over the last year.  I have been to hell and

9    back, you know.  Come on.  That -- that guy that you heard

10   testify, he's the best guy in the jail.  I mean, as far as

11   safety and nice guys.  And he's in here for what, murder?  How

12   many times -- that's what I have been dealing with for 17 --

13   that's the best of the best right there.  I mean, that's like

14   supposedly:  Okay, Brugnara.  You're a complainer.  We're going

15   to put you in with, you know, the easiest, nicest guy.

16        You heard what -- you heard what Ms. Harris said.  Okay.

17   Now, what are you in here for?  You slashed your roommate's

18   neck, right?

19        Yeah.  That's what he's in here for.  He slit his

20   roommate's neck.  Okay?  So that's -- that's what I have been

21   dealing with.  And believe me, this is the best situation I

22   have had for 17 -- 17 months.

23        I was with murderers in Oakland.  They were showing me

24   pictures.  Literally butcher knives out of the guy's heart with

25   the head at the bottom of a Victorian stairwell and the feet

1  up.  Hey, Luke, can you help me with -- try to get out of jail?

2  You know something more than I do, don't you?

3      And then the guy next to me, Randy Alana in Oakland, head

4  of the Black Guerilla Family, just got sentenced to 140 years

5  for killing five people.  You know, he's telling me how he's

6  the only guy that has gotten away with killing two people,

7  tried for two people, killing two people in Glenn Dyer over the

8  last 30 years.  That was one of the cases he got -- I mean, was

9  my neighbor for nine months on one side.  My neighbor on the

10 other side stuck a knife in the guy's heart.

11     Anyway, you know, the thing is -- your Honor, this is the

12 thing.  So this is what Jennifer Biederbeck says.  Jennifer --

13 and she's the Sotheby's vice president of San Francisco.  She

14 testified in front of the jury, though.

15     Here is her quote on 2309.  She says:  NSV -- and, again,

16 we're tying this into what Kathryn Solomon said.  Kathryn

17 Solomon said NSV, meaning the four experts said the Degas is

18 NSV.  But she didn't quantify.  Because NSV could mean a

19 million bucks, right?  Who knows what NSV means.  She didn't

20 quantify.

21     But now it's quantified by Jennifer Biederbeck.  She

22 goes -- right here, 2309:  NSV, short for no value, if

23 something doesn't have -- and then dot dot meet our minimum

24 value threshold of $5,000.

25     So she now quantifies it as less than $5,000.  So now we

```
 1   have testimony from two Sotheby's employees, one for 25 years,
 2   one who had direct contact with the committee because she is
 3   their liaison.  Remember, she has a degree from Cornell, that
 4   young girl who was here.  The committee said it's worth NSV.
 5   Decorative value only.  They won't sell it and it's NSV.  She
 6   said it's NSV.  That's what they decided.
 7        So now we ask Jennifer Biederbeck what does NSV mean.  It
 8   means, right here:  Does not meet our minimum value threshold
 9   of $5,000.
10        So now it's quantified.  The Valsuani Degas, despite all
11   the hype of Walter Maibaum who has, you know, a vested interest
12   in it, is worth less than $5,000.
13        We also asked, if you remember, Jennifer Biederbeck:
14   Well, do you have any sort of ethical considerations about what
15   you sell?  No.
16        Remember, she said:  We'll sell old -- an old Pope
17   slippers, remember that, or an old chandelier.
18        So it's not about an ethical -- it's strictly about money.
19   It's strictly about money.  So it's worth less than 5,000.
20        So that -- so here is what I ask.  So if -- so -- so -- so
21   how does that fall into Wiener?  Ahh.  So I went and looked at
22   the appraisal, because we are not -- we don't want to impeach
23   our good friend Wiener here because he did the appraisal.  But
24   if you look at his appraisal, it was a conditional appraisal.
25   It was not an appraisal without conditions.  It was a
```

 1   conditional appraisal.

 2        Just like you can get office building appraisals

 3   conditioned upon X, Y, Z; A, B, C.  The appraisal from Wiener

 4   was conditioned.  And the condition of the Wiener appraisal --

 5   and I will read to you exactly what it says, but what it says

 6   is based upon the -- here it is.

 7        On Page 10:

 8             "Based upon the truth from listing and correct

 9        and information provided to VWA."

10        Which is Victor Wiener and Associates.

11        So Wiener doesn't need to be impeached by Sotheby's

12   valuation of less than $5,000 because he based his valuation

13   upon Maibaum, the truthfulness of Walter Maibaum's

14   recommendations that the Valsuani had sold under his reign

15   between 200,000 and $900,000.  You know, and if you remember on

16   the record, he said he sold 20 of them.

17        Okay.  Now, this is the thing.  If you remember, your

18   Honor, you agreed to the 17(c) subpoena for Maibaum to produce

19   any and all bank receipts from even one sale, even one sale of

20   the Valsuani Little Dancer.  You've got to remember this from

21   20.  And we're not talking about ancient history.  This whole

22   nonsense started in 2004.  So we are talking about -- so in a

23   10-year span you sold 20 of them.  Give us one, one, one, one

24   bank wire receipt, canceled check, anything.

25        And remember, that Indian gentleman came up here and he

1  gave you some dog-ate-my-homework excuse, and you nearly blew

2  your top, your stack.  You started wagging your finger at him

3  saying:  You got to be kidding me.  You don't have any

4  banking -- remember the Indian gentleman from the law firm?

5  But he actually was telling the truth.  They don't have any

6  banking proof of any of those 20 sales because they never

7  happened.  They never happened.  There are no sales.  There are

8  no sales of Maibaum's 20 Valsuanis.

9       You heard what Sotheby's said.  They are not worth

10  anything.  It's not worth anything.  It's worth less than

11  $5,000.  It's worth less than -- the guy doesn't have any --

12  how can he have a canceled check when he hasn't sold any and he

13  hasn't bought any?  Aha.  Well, maybe he just doesn't keep --

14  God, when it comes to showing the repairs, though, to that

15  painting -- remember how they did a cartwheel in front of your

16  Honor last week?  Look at this.  We spent 20 grand repairing

17  that hole in this painting.

18       They have this -- they have their banking proof.  They

19  bank at Wells Fargo.  You can make one phone call.  They don't

20  have any because there were no sales.

21       So if you go by the preponderance of the evidence or clear

22  and convincing standard, or any standard, Maibaum has zero

23  credibility.  So it's not impeaching Wiener because Wiener has

24  a carve-out of the truthfulness of Maibaum's representations on

25  the -- on the Degas.  And that's really all he -- that's all he

1   relied upon to get the $600,000.  Okay.  That's all he relied

2   upon to get the $600,000, was Maibaum's 20 sales.

3        So, you know, what I ask this Court to do is take the

4   standard bearer for the United States of America federal

5   government, meaning the district courts, the federal bankruptcy

6   courts, the U.S. trustees, and at least the U.S. Attorney's

7   Office in Manhattan, you know, who showed deference to

8   Sotheby's.  And also Chase Manhattan and Citibank who are the

9   only lenders of fine art in the country that are federally

10  insured banks.  There is a couple private lenders.  All of them

11  do the same thing.  They rely upon Sotheby's determination of

12  value because Sotheby's guarantees it.

13       Just like Kathryn said.  They are the only one who

14  guarantees it.  So -- so -- so the backstop is if Sotheby's is

15  wrong, the FDI insured bank, who is under of the umbrella of

16  the United States Government, Sotheby's is on the hook for it.

17       Okay.  So -- so that being said, the Degas is worth clear

18  and convincingly, or at least by a preponderance, worth less

19  than 5 grand.  All of a sudden that takes my sentencing

20  guidelines down to 7, plus 2 for obstruction of justice.  And

21  that's 4 to 10 months at a Category 3 and 8 to 14 months at a

22  Category 4.

23       They said okay.  Well, what about these other items?  The

24  de Koonings are fake.

25       The Mirò, there was another caveat.  In fact, I'm going to

1    read the -- the Mirò was conditioned solely upon it having an

2    original certificate of authenticity, which, of course, doesn't

3    exist.  And, of course, they never took it out of the glass.

4    But the reality is the Mirò was conditioned on Page 126 -- and

5    I'm going to read it to you -- in Wiener's appraisal.  You have

6    to read these appraisals carefully.

7        It says:

8            "We have not seen the original certificate of

9            authenticity, only a photocopy of the certificate was

10           given, a practice not common for a sale that is

11           presumed to have occurred.  Since the subject

12           property appears to correspond closely to the

13           photograph illustrated in the catalogue raisonné, we

14           have taken the extraordinary" -- I emphasize

15           extraordinary -- "assumption that the drawing is

16           genuine."

17       So that's quite -- that's quite an extraordinary --

18   extraordinary assumption, considering the guy was just trying

19   to sell, you know, 16 de Koonings where the paint still hasn't

20   dried.  Remember Mr. Boisseau said, he said -- he almost

21   started laughing when he pulled off the wax paper and the wet

22   paint was still stuck to one of the, you know, de Koonings.

23       And the other thing, they are not -- you know, it's really

24   insulting to de Kooning to call them de Koonings because if you

25   look at the U.S. Attorneys' appraisal, he doesn't call them

1    de Koonings.  It says "Twentieth Century School."

2         All right.  But if you get a Sotheby's catalog, they have,

3    in fact, the tiers of authenticity.  One is by, let's say

4    Judge Alsup, because you're a photographer.  "By Alsup."  And

5    the next is "Attributed to Alsup."  Then the next is "School of

6    Alsup" -- no, excuse me, "In the Manner of Alsup."  And then

7    "School of Alsup."  And then just "Twentieth Century School."

8         This is -- this is basically him saying, you know, you

9    should probably go arrest these guys.  I'm not even going to

10   call it "attributed to."

11        And this is the U.S. Attorneys' appraiser, who wasn't even

12   supposed to be giving authenticity determinations, as you

13   remember, but he was so disgusted he wouldn't even call it a

14   de Kooning.

15        And this is the thing about me, you know.  I mean, people

16   may not like -- this is the thing about me, your Honor.  Some

17   people like my style, some people don't, but the people, they

18   trust me.  People trust me with their careers.  People trust me

19   with hundreds of millions of dollars.  I've paid back every

20   penny.  You know, you can say:  Well, what about this guy

21   Abinader, you know.

22        Listen, I had three lenders sit up there collectively said

23   I borrowed a billion three.  Abinader was 900 grand.  If you

24   look at the details of the case, it went -- from 1994 he was

25   paid all of his principal in double-digit interest for 14

1   years, and we still -- we still -- because he had a higher

2   interest rate, we still let him put his claim into a

3   reorganization.  He said:  What about this?  This says fraud.

4        Listen, this guy put together a note and a deed of trust,

5   if you look at any explanation of this, and if you look at what

6   the ruling said.  He put the note and deed of trust in the

7   wrong name.  He put it under Brugnara Corporation, when it

8   should have been Brugnara I.  I told him.  I mean, it's

9   obvious.  It's Brugnara I.

10       No, no.  You just sign it.

11       I signed it.

12       The judge said:  You shouldn't have signed it.  You knew

13   it was wrong.  You shouldn't have signed it.

14       Okay.  It doesn't -- I let him correct it.  I let him put

15   the claim into the Brugnara I reorganization.

16       So I allowed him, without any opposition, to correct his

17   mistake without -- there was no sham.  I mean, this guy made

18   millions and millions of dollars with me lending money

19   throughout the years.

20       The bottom line -- let's look at it in totality.  So if

21   you take a billion three dollars paid back, okay, over 20

22   years -- which is an insane sum of money considering I came

23   from a very modest humble middle class background.  Okay?  And

24   no one has ever cut me a break.

25       One of the reasons I am the way I am is nobody has ever

1  cut me a break.  If I'm off by 2 cents or 5 cents or a dollar,

2  it's like I just, you know, screwed a lender out of a billion

3  dollars.  I have been trained by my lenders to be absolutely

4  precise.  That's who I am.

5      So the fact of the matter is, even if you have -- in

6  totality you say:  Well, this guy is a con man.  Wait a second.

7  He has paid back a billion three.  You have one claim over here

8  of 900 grand, but there was no monetary loss.  That is less

9  than 1/2 of 1 percent of claims.  That doesn't even fall into a

10  contingency -- a contingency.  Contingency is for -- for

11  general accounting principles is 3 to 5 percent.  That -- that

12  doesn't get traction for general accounting principles

13  contingency.  I mean, I am so far in the A plus plus plus plus

14  plus range for being credible, a borrower.

15      And this is the thing.  And I told this to all my

16  attorneys here.  The U.S. Attorneys got a great office, but the

17  vetting out that they do with their PSRs is nothing, nothing

18  compared to the vetting out that I have had to endure from my

19  lenders.

20      Merrill Lynch, I was the biggest borrower in

21  San Francisco.  Gramercy Capital.  GE Capital.  You have

22  Morrison Foerster do GE Capital's vetting out.  Orrick

23  Herrington or Merrill Lynch.  Because in order for them to lend

24  me $50 million, they have to get through the procedures a

25  third-party law firm, and they go with the biggest law firms,

```
1   to vet out me or anyone else they lend the money to.  And you
2   know that.
3       So what they do is they run the LexisNexis for all
4   criminal and all civil complaints.  Not just criminal, but all
5   civil.  And they go through every -- and one strike you're out.
6   There is no three strikes you're out.  One strike, you're out.
7       But the difference between them and the U.S. Attorneys,
8   they give me the courtesy of discussing.  Because where there
9   is smoke, there is not fire.  That's one thing I learned.
10  Where there is smoke, sometimes there is not fire.
11      So if you look at the totality of the details and you look
12  at the claims against me -- Babcock said it one time, because
13  he does some, you know, real estate development.  He said it's
14  not -- it's not a lot of issues for the volume that Luke has
15  done.
16      But I've passed the vetting process with the biggest law
17  firms, Orrick, MoFo, Jeffer Mangels, and they have gone through
18  each and every item on the LexisNexis, criminal complaints,
19  civil complaints, and they gave me the courtesy -- I mean, this
20  doesn't take two to three hours.  You have to have an attorney
21  who is willing to sit for 20 hours, okay, 15 hours, 10 hours,
22  12 hours.  It's not -- it's 68 pages.
23      It's not an:  Oh, I'm going to meet with you for 15
24  minutes and I'm going to talk with them on the phone for a half
25  hour.  I mean, you know, you get what you paid for.  That's why
```

1    I begged:  Let me have my own private counsel because my civil

2    liberty is at stake, because I have an answer for everything.

3         You can say:  Well, there is Luke.  He's got an answer for

4    everything.  Look at this guy.  You know, he's smart.  He --

5         That's not it.  Because the guys that are at MoFo and

6    Orrick that vetted me out for this 50 -- they are way starter

7    than me.  They are way smarter than me.  And their reputation

8    is on the line, and they don't care about lending me a penny.

9    Okay.  But they get instructions from the lender, vet this guy

10   out.

11        So I have already been vetted out.  That's why I -- if you

12   release me today, I'll go get another deal done, 100 million,

13   200 million.  Doesn't matter, because I only have -- I have

14   institutional lenders that will lend me money, and then I have

15   a whole group of private lenders that will lend me money.  And

16   I have paid back every penny to every one of them.  And I

17   proved this.

18        When I got out on -- from the tax case -- I mean, come on.

19   I closed -- for starters, in 2010 Frank Center (phonetic

20   spelling) said I paid back a $48 million loan.  Okay.  And then

21   the PEM loan.  Okay.  And then in -- in 2013 I got the two --

22   the one million two loan and the one million five loan was

23   keyed up.  Jennifer Senhaji testified about that.  And we had

24   the Chase loan on the Tiburon house.  All open.  Everything was

25   done.

```
 1        So the fact of the matter is -- I'm trying to say I'm not
 2   a con.  Maibaum is the con man.  Okay.  I mean, everyone has
 3   blinders on.  But what about that 15 million appraisal?  Man.
 4   The $15 million appraisal on the piece of art that's worth less
 5   than $5,000.  This is -- this is the guy that's a danger
 6   walking around.
 7        I mean, how about this?  He has got five of those in his
 8   apartment.  Check out where he lives.  He lives in an apartment
 9   in South Jersey, man.  And he's got five of these Little
10   Dancers clogged up in his closet.  Okay?  Because nobody wants
11   them.  Sotheby's says right here, it's worth less than $5,000.
12        I'm asking this Court to use -- you know, to be fair.  And
13   to say:  Well, how can you say it's worth more than 5,000?
14        That's the better question.  How can you say it's possibly
15   worth more than $5,000?
16        Well, say, Maibaum -- well, no, you got the Wiener
17   appraisal.  Wiener says it was 600.  Aha.  The Wiener says it's
18   conditioned upon the truthfulness of Maibaum's 20 sales,
19   because that's what he's -- because, remember, that's what he's
20   relying on for the 600 grand.
21        So now all of a sudden we get:  Well, hold on a second.
22   Maibaum has zero credibility.
23        So once we carve out those -- those sales from Maibaum,
24   what do we have?  Well, we have the $5,000 value of the
25   Valsuani.  And, again, it's not just Sotheby's on their own.
```

1   Just some independent company.  It's relied upon for decades by

2   the United States of America District Court, U.S. Trustees

3   Bankruptcy Court and U.S. Attorneys.

4        So, now, the other thing I wanted to discuss was the --

5   you know, there is other deductions that you can do.

6        You know, it's frustrating because I know that, that

7   you're mathematically inclined and you like to go off the

8   graph.

9        And the other thing, your Honor, if you want to even do --

10  if you want to even do an average, you know, give some value,

11  you have to remember the only two other claims of purported

12  sales independent of Maibaum was in the Bates document from the

13  U.S. Attorneys from the French Vogue.  And it said they had

14  sold some for $60,000, you know, to unnamed sources.

15       But, you know, the thing is you can go down to Fisherman's

16  Wharf or the entrance at -- you know, to Farinelli's.  There's

17  two or three of them on Fisherman's Wharf.  You see these

18  bronzes that are really, you know, perfect reproductions

19  basically, but they are not by Valsuani.  They might be by an

20  Americana foundry in Virginia that's been around for 200 years.

21       So there's many of -- Valsuani is not some -- you know, no

22  deference is -- is deserved to Valsuani.  There is many

23  foundries that have been in business a long time that do

24  reproductions, as this is, and they sell for 5 grand or 6 grand

25  or 2 grand.  You see them.  You see some with The Giraffe, The

```
 1   Thinker, and that's it.  You know, but the bottom line is who
 2   do -- who can we rely upon?
 3        And listen, my life is -- my life is at stake.  My -- my
 4   life is at stake here.  I mean, not only do I absolutely -- and
 5   that also goes down to the whole basis of this case.
 6        I sent the text, the email saying this stuff was fake out
 7   of the gate.  This isn't:  Luke, ha ha ha.  Let me, you know,
 8   cauldron up here, you know, my -- you know, what I'm going to
 9   pitch to Judge Alsup.
10        No, I said it out of the gate.  The de Koonings are fake.
11   The Degas is fake.  Okay.  I said that in the first day here.
12   Okay.  I said they are both fake.
13        I'm not going to steal.  A, I'm not a thief.  Okay.  I'm
14   not a thief.  No one has ever called me a thief in 50 years of
15   my life.  I'm not a thief.  But you know something?  It
16   wasn't -- I'm not going to steal something that's worth
17   nothing.  The whole concept is absurd, man.
18        We -- we -- we had -- we had a supervised release status
19   hearing two weeks later.  I mean, come on.  I mean, that would
20   be someone who is mentally ill.  I'm not mentally ill.  Okay.
21   I mean, the whole concept is insane.
22        What every one of my attorneys said, from Bornstein to
23   Babcock to Bob, everyone says it, the piece never came off --
24   the piece never came off the truck.  They go:  Luke, why do you
25   think that that guy Castillo dropped it off the truck?
```

```
 1        I said:  Well, he has this big crucifix.  Ha ha.  You
 2   know, I mean, the first thing where red flags go up is when you
 3   see a guy wearing a big crucifix, you know, that's 3 inches
 4   around his -- his neck.  You know, if someone is religions, God
 5   bless them, but, you know, you don't need to display it to the
 6   world, a 3-inch.
 7        You know, with me, I got the nuns and priests bringing me
 8   up.  I am, like, okay.  This guy can't lie.  He's got this big
 9   crucifix.  You know, Castillo is at -- but no.
10        When you start putting the dots together, it never came
11   off the truck.  It never -- it never came off the truck, your
12   Honor, because he filed a two -- Maibaum files a $2 million
13   insurance claim.  I mean, this dude is very smart, Maibaum.  He
14   had a double stop going on here.
15        A, he had me on the hook.  And that's -- and that's why
16   Rose Long came out to sign for the delivery.  If you read her
17   FBI report and her testimony, she said:  I had to make sure
18   Luke took possession.
19        She didn't -- she said:  I had to make sure Luke took
20   possession.  That's a legal term.  So she was sent out there by
21   Maibaum, if you look at her FBI reports.
22        Maibaum told her to go out there.  Maibaum told her to go
23   out to make sure I took possession.  So he had a double stopgap
24   here of the boxes.
25        And the other one never came off -- the other one never
```

1   came off the truck.  That's what happened.  Because the fact of

2   the matter is -- so he had a double shot.  He had a shot, A,

3   with the insurance, the fraudulent insurance claim.  And then

4   the backstop was me, getting a criminal action against me and a

5   restitution based upon these inflated appraisals.

6       So it's we're either going to get the money from the

7   insurance company or get the money from Brugnara, but we're

8   going to get the money.  And that's what happened.  That's what

9   happened.  This is a massive, well thought-out fraud.

10      So she comes out, and she -- and -- and that's it.  I

11  mean, this is the thing.  I contacted Bob Kane.  And this goes,

12  again, to your sentencing.  I'm not trying to retry the case.

13  It goes to the intended loss that you need to calculate for the

14  monetary amount for sentencing loss.

15      It says intended loss has to be what the defendant's

16  intent was based upon, quote, concealment.  Because how could

17  you ever know what the defendant's intent is?

18      Well, you know, they characterize it by the word

19  "concealment," at least in the Ninth Circuit.  But the thing is

20  we -- I never concealed anything because I contacted Bob Kane

21  to get the stuff out to the garage.  Bob Kane testified.

22      And, again, you know, this is -- he's not a federal judge

23  obviously, but the guy is a superior court judge, professor at

24  Hastings for 20 years.  He's been doing mediation for the

25  Superior Court of California for 20 years.  You know, I mean,

1  he's not Judge -- he's not William Alsup, but, you know,

2  he's -- he's -- he's -- he's pretty high up there, you know.

3  He's not some guy working out of some back office.

4      He testified:  Hey, listen.  Luke contacted me and said:

5  Get the stuff out of my garage.  Get the -- my kid -- my kid --

6  listen.  The thing that destroys me most about this,

7  Judge Alsup, is my four -- I've got a 12-year-old daughter,

8  Brianna, who sent you a letter.  I have a 14-year-old daughter

9  Lauren.  I have got Vincent, who is 16.  Luke, who is turning

10  19.  I mean, this has just been horrible and horrific on my

11  children because I am an integral part of their life.

12      One thing I have learned being in the jail is how these

13  guys -- they don't care about their children.  They are

14  laughing, man.  They are loving life there.  They could care

15  less.  They can have five kids, they can have 10 kids or they

16  can have one or no kids, they take no responsibility.

17      The Presentence Report says from the interviews that they

18  had with third parties -- they interviewed my mother.  They

19  interviewed my wife.  And they -- and, also, based on the first

20  Presentence Report -- the first Presentence Report says I never

21  spent a night away from my children, which is true.  I spent

22  every -- because I want to be with them.

23      I coach their baseball teams.  I was trusted enough by the

24  schools to coach their teams.  I had no problems with any

25  parents coaching the baseball teams.  We won the city

1    championship twice.  My son is a great baseball player.

2         You know, I've contributed a lot -- a lot to the

3    non-profits in San Francisco.  I mean, just off the top of my

4    head:  Cartoon Art Museum, Habitat for Humanity, AIDS

5    Foundation, Rain Forest Coalition, tuberculosis clinic.  You

6    know, I've always tried my best to try to help out, you know,

7    people that need help.  And no one has ever said:  Hey, you're

8    a bully over this.

9         What people say about me is if someone comes at me or whom

10   I'm there to protect -- usually it's my family, but let's say

11   it's the kids on the baseball time or whatever, man, I'll be --

12   yeah, I'm going to be a pit bull.

13        Am I going to come short of physically assaulting someone?

14   Absolutely not.  But, man, think of everything where someone

15   says:  Oh, Luke is a hot head, or this or that.

16        I'm always on the defensive.  It's always some group

17   coming after me, not me aggressively going after them.  Always

18   somebody coming after me.

19        Even with this nurse.  You know, I have my wife and my

20   mother here.  And you have all the phone calls recorded.  You

21   have all the phone calls recorded from the jail.  Do you know

22   how many times I phoned them and said:  I can't swallow.  I

23   can't talk.  This is going to --

24        You know me.  I'm a neurotic, too.

25        I said:  The strep throat is going to go into my heart.

 1  This is going to kill me.  I can't do this any more.  I can't

 2  swallow.  I have a fever.  I had strep throat.

 3      That guy had no credibility.  If you go and read -- and

 4  you can do this after the hearing.  Go subpoena the phone

 5  records.  That guy lied and said I wanted pain medication for

 6  my shoulder.  I never had any pain in my shoulder.  I had strep

 7  throat.

 8      And the crazy thing is I got medication for it right when

 9  he filed this thing.  I saw the doctor.  I still have

10  medication for my sinus infection.

11      So I complained literally, literally for 10 days to this

12  jerk here to give me my medicine because I could not swallow.

13  I could not barely eat.  I had strep throat.

14      And he said to me -- I have four -- he goes:  Oh, you have

15  allergies.

16      Man, I've got four kids.  I mean, my wife -- I don't -- I

17  have strep.  Yeah, I went off on a tirade.  I did not know if

18  this guy -- A, I did not threaten to kill him.  I did not

19  threaten -- I told him I'm going to have him fired.

20      I said:  I'm going to sue you.  I said I'm going to

21  make sure you're out of this job and you are never going to get

22  -- yeah, that's what I said, and I still mean it.

23      You know, this guy here didn't get me any medicine.  And

24  that's his job.  He's pulling $100,000-plus a year salary to do

25  something simple, take my fever and give me some medicine.  I'm

1   under the care and custody of the Marshals in this Court, and

2   he didn't give me the medicine -- he didn't cover he a-s-s

3   move.

4         And you know what?  Do you believe for a second -- come

5   on.  You've sat here for 20 years as a judge.  Do you really

6   believe that that guy worked for 12 years at San Quentin and no

7   one ever threatened him?  You would have to be the most naive

8   person in the world.  That guy lied right to your face.

9         And I will tell you.  I have had urine thrown on me.

10  People spit on me probably twice a week since I have been taken

11  out of Oakland, because Oakland they had me in a dungeon with

12  one little window on the door.  Here I'm like, you know, old

13  school with open bars.  People throwing urine on me.  People

14  spitting on me.  Come on, man.

15        And these are the animals that are at San Quentin.  That

16  guy lied.  That guy had zero credibility.

17        And I will tell you, if you want, my mother and my wife

18  are here.  You want to ask how many times I phoned and

19  complained about my sore throat and strep throat?  The guy --

20  the guy is a liar.

21        You know, but my issue here is that I was put in a

22  situation that was almost impossible because I thought I had

23  done the right thing, you know.

24        My mistake, of course, was ever even dealing with this

25  woman, but -- and this is where the U.S. Attorneys' entire

```
 1  argument falls.  But, you know, he didn't have the $11 million,

 2  so that was fraud.  Ha.  I don't get it, man.  I had the

 3  ability to get 11.  I have the ability to get 11 million now if

 4  the stuff is real.

 5       Here is the proof.  Here is the appraisal right here from

 6  Wiener.  And it says right here:  If they were real.  If they

 7  were real.

 8       And this is on Page 88.  If they were real, 6 million --

 9  excuse me, your Honor -- $6,578,000.  Same size as the fake

10  ones, right?

11       On page -- excuse me, your Honor.  On Page 90 -- excuse

12  me.  There are three in a row.  Page 89, $3,050,000.  And the

13  third one, $2,882,000.

14       Now, if you remember back to my Form 12, I made a

15  statement.  And, again, I have been locked up since the

16  Form 12.  This is all pure memory.  Because guess what?  I

17  still don't have my 20 boxes.  They are sitting over in

18  Oakland.  That's what I have had to deal with.

19       Poor George Boisseau.  I can't have even meaningful

20  dialogue even about this sentencing because my 20 boxes are

21  still in Oakland, and I put in at least 15 written requests and

22  grievances, have gone through the administrative process.  I

23  even had a two-hour meeting with Captain Miyamoto, who promised

24  me:  You will have them within 24 hours.  Oh, I'm so sorry.

25  You will have them within 24 hours.
```

1        Well, my life is on the line.  Can I get them please?  I

2    go:  I believe I have a constitutional right to due process to

3    have those within a reasonable period of time.

4        It's been 120 days.  But they are still over in Oakland.

5    And it's intentional.  Because a Deputy Castellano, who is a

6    sergeant, told me he offered to go over and pick them up and he

7    was told no.  Deputy Castellano.  So, you know, these are just

8    the facts that I deal with.

9        So look at this, your Honor.  I said -- but I said at my

10   Form 12 -- and the only reason I stated that is because I had

11   the Form 12, your Honor, in my 17 boxes.  I'm not insane.  I'm

12   just trying to tie the conversation together.

13       In that box is my Form 12 transcript, and then I would

14   actually be able to recite for you word to word what I -- what

15   I said.  But I'm going to do it from memory.

16       And what I said was:  Your Honor, if these de Koonings are

17   real, they are worth $50 million.  I can get $11 million like

18   that (snapping fingers).  I can get 11 million bucks and

19   another $10 million cash out if they were real.  And so could

20   you.

21       Because the reality is -- and if you went back to Jennifer

22   Biederbeck's testimony, she testified they lent me six million

23   nine fifty on the one art transaction.  I'll give you the date

24   on that -- the page number.  The page number here on that for

25   Jennifer Biederbeck was -- the point I'm trying to say is,

 1   Sotheby's lent me -- here it is, your Honor.

 2        Sotheby's lent me $6,950,000 recently, a few years ago, to

 3   buy art, okay?  And Jennifer Biederbeck testified to that.

 4   Here it is.  It's on -- bear with me one more second.

 5   Page 2302.  2302.  $6,950,000.

 6        Okay.  So we know -- okay.  And this all ties into the

 7   email to Tobias Meyer.  The what they lend you on, Sotheby's or

 8   Citibank or Chase Manhattan, is 50 percent of the auction

 9   estimate of what Sotheby's says.  Okay?

10        So, okay.  So that's what they lend on.  And that ties

11   into what the content to my email to Tobias Meyer was.  The

12   email to Tobias Meyer wasn't:  Hey, are those authentic?  Or:

13   Hey, how much are these worth?

14        I never said that in the email to Tobias Meyer.  The email

15   to Tobias Meyer said:  What is your auction estimate on these?

16        Because I know that I can borrow 50 percent of their

17   auction estimate because I've already done it.  Okay.

18        So if it's what she says it is based upon what Wiener says

19   the real ones sell for here in the appraisal, they are worth

20   50 million.

21        So if they were worth what she says, authentic 16

22   de Koonings, I could borrow probably 25 million bucks.  And

23   they would take a UCC1 on them, either let me keep them with

24   insurance in my house or put them in ShipArt, in a third-party

25   escrow, but I would still have ownership of them.  Okay?  And

1    that's it, you know.

2        I mean, the U.S. Attorneys take the wrong approach.  Well,

3    if you don't have $11 million in the bank, this is fraud.

4        That is absurd.  Listen.  If you buy a house for $100,000,

5    you don't need to have $100,000 in the bank to buy a $100,000

6    house.  You can borrow -- borrow $100,000 and buy a $100,000

7    house, or you can put down 10,000 and buy it.

8        What we also know is Jennifer Senhaji testified that I had

9    Brugnara Properties closing a million five loan that week with

10   escrow open.  And it -- eventually it did close, by the way,

11   after -- after I got put in jail.

12       So I could have pulled -- and only $177,000 of that was

13   going toward the Tiburon downpayment, and then the Chase loan

14   was being assumed over there.  So there -- so that leaves over

15   $1 million there.

16       So the fact is there was $1 million there.  I had credit

17   with Sotheby's for at least on the six million nine loan, plus

18   the reality is that I borrowed a billion three.

19       And you heard the testimony from Frank Sanders and Nick

20   Barbato.  David Pick alone has let me $200 million.  Remember

21   he said:  Oh, yeah, David Pick.  He has been very good to you.

22       That's an equity lender, which means it's a private

23   individual.  He's 97 years old.  If I'm off by 2 cents, he gets

24   on the phone and starts screaming at me:  Luke, how did you

25   make this mistake?

```
 1           Oh, my God.  What's wrong with it?  It's 2 cents.
 2           I don't care if it's 2 cents or it's $2 million.  You
 3   don't make the mistakes, blah, blah.
 4           This is how I have been trained for over 20 years.  So I
 5   am exact.  Okay.  So I can borrow money from -- he lent me
 6   money on art.
 7           The fact of the matter is I could have easily borrowed the
 8   $11 million.  Okay.  So where did I go wrong?
 9           Okay.  She says:  Do you want to buy 16 de Koonings and a
10   Degas for 11 million bucks?
11           Yeah.  Okay.  Send it to me.  I'm not paying for anything.
12   Send it to me.
13           I don't think it's probably real.  Because if it's real,
14   it's worth 50 million bucks.  Based upon -- don't believe me.
15   Let's go by what Wiener says, because that's what they sell for
16   when they are -- you know, it's like a real Monet.  The real
17   Monet is worth $10 million or $20 million.  It's not a really
18   good fake.
19           It's like a $100 bill.  The $100 bill is either worth
20   either 100 bucks or it's not worth anything except no one
21   for -- in a magic shop, you know, for 2 bucks or 3 bucks.
22           So the fact is, in that -- okay.  And I was really upset
23   also about them saying, well, if they knew -- okay.  They are
24   the one -- the U.S. Attorneys put them up as experts up there.
25           Like you said, there are experts all over the world.  Why
```

1   would they put up their two claimants as experts?  Because

2   there is nobody on the planet that believes the Degas is worth

3   anything more than a couple of thousand bucks and that the

4   de Koonings are worth anything.

5        My God.  Their own -- their own -- their own -- their own

6   expert said it's -- please don't call it de Koonings.  Let's

7   call this "Twentieth Century School," what it is.  Some student

8   did it.  Thank you for the $40,000.  Thank you so much.  Make

9   sure it's a cashier's check, please.

10       But you people are nuts.  Thank you for wasting my

11  taxpayer dollars.

12       You really hate Luke Brugnara.  What did he do to you?

13  What did this guy do to you?

14       Well, you know what, this is an ongoing witch hunt.

15  Because if we go back one year earlier, your Honor, my wife and

16  my daughter and my three other children had to move out of Sea

17  Cliff because they got scared after having 30-plus federal

18  agents kicking their door the last week of my supervised

19  release.  Because Luke is holding out on paying that million

20  bucks.

21       I had sent already sent Tom Newman an email:  I'll pay you

22  out of -- out of the Vegas deal.

23       And Tom Newman is a decent guy.  He -- he wasn't attached

24  to that, and I know he wasn't.  We had good dialogue.

25       I don't hate everyone in the U.S. Attorney.  There is --

the head of this U.S. Attorneys Office that happened to go to
high school with me, Stretch, whose mother knew my dad very
closely, who is deceased now.  And I just think that's a weird
coincidence that he happened to be behind the tax case.  Now he
happens to be behind this.  What -- why?  Why?  Because it
makes no -- it makes no sense.

        Brandon LeBlanc said:  I've never seen a raid like that.
Okay.  And what did they get out of it?  They got nothing.
They got a bank statement that said:  Hey, you didn't pay 80
bucks -- you didn't tell us about this $80 in the Brugnara VII
account, so we are extending your supervisory release by one
year.

        And that's why I said I could almost be a Category II
because that's such a -- Brandon LeBlanc said it's called a
hypertechnical default.

        What it was about really, your Honor, is because in the
tax case, they originally indicted me for $45 million.
$45 million.  I have had no problems up until that day.  They
piggybacked off the civil tax case in Judge Haynes' court in
this building where they said I owed $11 million.

        The week that it went to Judge Haynes' court, I won that
case.  Brugnara Corporation owed zero.  They said I owed
$11 million; I owed zero.  They had to give me an $87,000
credit, and then I get indicted 48 hours later saying:  You owe
45 million for 2000, 2001 at the end of the seven-year statute

1  of limitations period, right, in taxes.  Okay.

2      Well, we go through the forensic accounting.  Oh, wow.

3  It's 300 grand.  I mean, in the real world everyone -- it's

4  clean house.  Man.  I always have told all my attorneys:  My

5  God, man.  Judge Alsup, you know, he's tough.

6      I go:  I know this guy is real because I know who you are.

7  I know people that knew you at Morrison and Foerster.  You were

8  the top litigator there.  You went to Harvard.  I know that you

9  know the reality of commercial real estate and commercial

10 litigation, and you -- you can't get your arm twisted up your

11 back by the United States Government because you didn't need

12 this job.  You're the top litigator.

13     They say you were the top one or two guys over at Morrison

14 and Foerster for litigation.  So you don't -- didn't need to be

15 a judge.  You didn't need that to get, you know, power.  You

16 already had it at MoFo.  You did -- that's why -- I figure I

17 can talk sensibly because this is the sort of person I've dealt

18 with for 20 years.

19     Because I try to talk to the U.S. Attorneys:  This is

20 crazy.  I'll help you go arrest Maibaum.

21     They are like:  No, no, no.  We've got to crucify you

22 first and then we'll think about him.

23     Well, why?  I haven't done anything.  I have four

24 children, man, I haven't seen in 17 months.

25     But let's go back to the tax case, $45 million indictment.

```
 1   If they worked at MoFo or Orrick and they said:  Oh, hey,
 2   Brugnara owes 45 million.  Sorry, Bill Murry at Orrick, who --
 3   by the way, the managing partner who did all my partnerships, I
 4   do have respect there.  He would fire all them and they would
 5   be blackballed, man.  They would be working somewhere in -- in
 6   Florida or Virginia or God knows where, because you can't make
 7   a mistake like that in the real world.  There's called
 8   accountability.  Accountability.  And they have no
 9   accountability.  They have no accountability.  They are immune
10   from litigation in civil reprisal, but they have no
11   accountability.
12        Man, $45 million and it's 300 grand.  Says, okay.  Well,
13   guess what?  We came back and said we missed $6.4 million of
14   property taxes that were paid at the title company.  We filed a
15   Rule 36 motion in here.  I'm not blaming you.  But what -- you
16   said something to me in that case I took into this case when I
17   felt like just settling it and I felt like I was dying.
18        You said:  You pled guilty twice.  You said to me:  I
19   would never plead guilty if I was innocent.  You said that to
20   me when I was going off on one of my monologues:  I would never
21   plead guilty if I was innocent.
22        And you were right.  You were right.  You were right.
23   Should never plead innocent -- guilty if you're innocent.  You
24   should never plead guilty if you're innocent.
25        I've been tortured, but it's true.  So I'm sitting here
```

```
1   waiting for justice.  And it seems like the tide is turning.
2   Every piece of information that comes in this case is more and
3   more affirming everything I've said, but what ends up happening
4   in the tax case is all these things are set up in partnerships,
5   ownership, what-have-you, not in my name.
6        So it's like, okay.  First thing I said to Jennifer James
7   is:  If I can borrow a million nine, do I have to pay back the
8   million nine?
9        And she said:  No.  It has to be income.
10       I go:  Okay.
11       So I -- you know my personality.  It's like you do this to
12  me, you know you're wrong.  You said I owed 45 million bucks.
13  It's 300 grand.  You pumped it up to a million nine.  Okay, a
14  million nine.  Whatever.  You made $103 million of income.
15       That's -- if you made 100 grand a year, it's like fighting
16  over, from 10 years ago, you know, less than a thousand bucks.
17  That's not a crime because they did forensic accounting all the
18  way through 2010, and there were no further indiscrepancies.
19       So if somebody is a criminal, they are going to have
20  indiscrepancies each subsequent year because they are a
21  criminal.  They are a criminal.
22       No.  It was an accounting report.  So they are to cover
23  their a-s-s.  Well, you know, we have got millions of dollars
24  invested in your persecution and your crucifixion, so, you
25  know, we -- you know, we got to cover our own tail.  We got to
```

1  get a felony out of you, you know.

2      So then it's like:  Let's do the witch hunt, you know.  We

3  are at his supervised release.  He gave us 50 bucks.

4      When I gave him 50 -- I'm like:  Screw you.  Here is 50

5  bucks.  Talk to my attorney.  See if you can get the million

6  nine out of him.

7      And -- and -- and I told Tom Newman:  I'm going to pay you

8  the million nine from the tax case.  I was just letting them

9  know.  You think you're all so smart.  You think you're all

10 going to bully me.  The bullies are them.  It's like:  Here.

11     And, you know, they couldn't get it.  So what they did,

12 the dirty trick, the dirty trick, my -- my supervised release

13 is over.  They had -- first, they lied to Judge -- poor

14 Judge Beeler, the new Judge Beeler.  They lied to her through

15 Norris and -- and that guy Charles Parker.

16     And they have Charles Parker, you know, the little front

17 guy, the young guy going:  You know, we have got a Warhol in

18 there worth $7.7 million.  Remember that?  You've got to give

19 us this -- you've got to give us this warrant.

20     That's what they got on the sly from Beeler, if you read

21 the warrant.  Lied to her.  Wasn't a 7.7.  But they got that to

22 kick in the door.

23     And, you know, the first guys in the door -- was funny,

24 was two guys, two big federal Fish and Game jackets on.  Hmm.

25 Hmm.  How does that tie into a warrant?  How does that tie into

1  a warrant for a painting?  Two Fish and Game guys.  I don't get

2  it.

3      Oh, let me guess.  You weren't honest on the request for

4  the warrant?  That would be different if they got in there and

5  then the Fish and Game guys came an hour later because, oh,

6  here is a rhino head.  Let's call Fish and Game.

7      No.  They were there.  They were the first ones at the

8  door.  They couldn't wait to get in to go find the rhino heads,

9  you know, that they had to give back because they are all

10  legally owned.  Okay.  No.  It was a witch hunt to find that

11  hidden, you know, crate of money, you know, buried under the

12  ground, you know, buried in the basement, saying:  Ha ha.  Luke

13  Brugnara is a bad guy.  Look at this.  We just found 5 million

14  bucks of gold and money and God knows what else, and see, he's

15  a liar.

16      Huh.  No.  What they don't realize is that people that do

17  the vetting out for me for my lenders are on a completely

18  different league than them.  They have already vetted me.  They

19  won't even talk to me if I was a con man or if they even

20  thought I was.

21      You think Barbato -- man, they wouldn't even -- they

22  would, A, quash the motion on Barbato.  Barbato works at --

23  at -- at -- at Coopersmith Horowitz.  He's the top investment

24  banker in Manhattan.  These are the guys I deal with.  And you

25  think I'm -- you know, I'm -- I'm mentally ill.  That guy talks

1  twice as fast as me.  He's twice as abrupt as me.  These are

2  the guys I deal with.  Bah, bah, bah, bah, bah.  So the point

3  I'm trying to make here is, yeah, I'm a victim.

4      My family is the main victim, because this is what I want

5  to tell you.  The warrant was for ten days.  Ten days.  Okay?

6  And they came at ten to 7:00 when my four children are getting

7  dressed for school.  My two little girls, putting on their

8  panties for school.  My wife in the shower.  You think --

9      And look at her smiling.  See.  The U.S. Attorney -- and

10  that's why I said to her:  You must have no family.  And I said

11  it to her -- and it's not to try to besmirch her.  It's because

12  I would never do that to her.  I would never do that to her if

13  she had children.  Even if I had a valid warrant, I would show

14  some deference and respect for innocent children and let them

15  go to school.  Because it's a 10-day warrant.

16      But their goal was to harm my family, and they succeeded

17  in doing it.  With guns at their side, rushing through the

18  house, waking my two sons up out of their bed.  And you wonder

19  why I am an asshole.  That's why I'm an asshole in this court.

20  Because they are taking my tax dollars and they are using it

21  against me and my family.

22      And that's why I am who I am, against them at least.  And

23  all -- no.  Tom Newman, I like Tom Newman.  And Bill -- Kevin

24  Ryan, I like Kevin Ryan.

25      In fact, the irony is we have got a Freedom of Information

```
 1   Act before Stretch took over on the tax thing.  And Kevin --
 2   Bill -- I don't remember if it was Bill or Kevin.  It was two
 3   twin -- Kevin Ryan.  Ryan kicked it back on a civil case.  No,
 4   there is nothing criminal here.  There is nothing criminal
 5   here.  And then boom.  Once Ryan is out, boom, political.
 6   Attack on Brugnara.
 7        You know, and what -- and what's Stretch's qualifications
 8   to be a U.S. Attorney?  Listen.  The fact of the matter is --
 9   so my family and I -- now we're talking about the suffering of
10   my family here.  They can't take it anymore.
11        I go to prison on a tax case where I'm innocent.  It was
12   an accounting error.  We even know what the accounting error
13   was.  I did a loss carryback for 100 percent for tax year
14   2002-2003.  You can only do loss carry back, 90 percent.  And
15   it was -- that's what the accounting error was, the $300,000
16   tax loss.  Because I'm good in math.  That was an accounting
17   error.
18        So here we are.  But like you said, I shouldn't have pled
19   guilty.  And I'm not trying to impeach this Court.  I shouldn't
20   have pled.  Only an idiot would plead guilty if they are
21   innocent like this.  And I was an idiot doing that.  I was an
22   idiot to plead guilty.  I should have --
23        But you got to remember, Pat Hallinan had a stroke right
24   before my scheduled hearing date.  Come on.  You don't want to
25   do it.  You can get someone else.
```

```
 1        Listen, to make a long story short, we move ahead and now
 2   we come into -- I get my probation extended.  And, of course,
 3   there is no goal, no hidden money in there.  You know, they --
 4   they come up with $80 in the bank account.  Oh, look at this.
 5   $80.  Let's extend the guy's probation a year so we can grind
 6   him down even more.
 7        So we're moving along here, and we come up to this instant
 8   matter case.  And in this instant matter, so what did I do
 9   wrong?  I'm asking myself.  You know, I want to come up here
10   and say:  God, your Honor, I did this wrong, you know.  I'm an
11   idiot.
12        And I don't -- I just don't see what I've done wrong here,
13   because I was solicited by her.  Do you want to buy this
14   $50 million of art for $11 million, or whatever, you know.  Go
15   look at it.  You have a contingency period.  The email says
16   you've got a year to decide.  She says:  Oh, I only gave him
17   seven days.
18        Doesn't matter whether she gave me seven days or a year.
19   The fact of the matter is Bob Kane undisputedly contacted them
20   within 48 hours and the deal was off.  I rejected the deal.  I
21   rejected -- the irony is, of course, even if the stuff is worth
22   $1 billion or worth -- or whether it's worth $1, I rejected the
23   transaction.
24        And I -- I do know contracts because I've bought, you
25   know, a lot of real estate.  I rejected the transaction.  And I
```

1  know it's important for leases, too, because once you reject a

2  lease, then you can enter legally into negotiations with a --

3  with a different party without, you know, engaging in fraud.

4      So I rejected the transaction through counsel, and the

5  ball was in his court.  She contacted me two, three days later.

6  You keep talking about, well, the emails.  You gave it to me as

7  a gift.

8      The first email I said to her in response is:  Oh, you got

9  to pay $11 million.

10     I said:  You need to go through your attorneys.  We have

11 attorneys involved.

12     And the second one was:  But, oh, by the way, you gave it

13 to me as a gift.  That's what I said to her.  That's what I

14 said to her.

15     And you can say:  Well, my God, she never said that.

16 Really?  Think about this.  I got -- that guy charged me 400

17 bucks an hour.  I don't want this stuff.  It's fake.  It's not

18 worth anything.

19     Yeah, she said it.  Is it part of her scam?  Is it part

20 of the -- she was drunk.

21     Your Honor, listen.  This woman got arrested in the middle

22 of this instant matter assaulting two police officers in a

23 Walgreen's while filling a false narcotic prescription.  That

24 is a felony.  How many 72-year-old women attack police officers

25 while filling fake drug prescriptions?  Someone who is nuts.

1    That's my mother's age.  My mother attacking some police

2  officer with a deadly weapon in Walgreen's while she's filing a

3  false -- and, oh, I can't believe she ever said that's a gift.

4  Oh, no, no.  That's the Virgin Mary up there.  We -- we got to

5  give her deference.  She gets no deference.  She's nuts.

6    She said that the garage was empty.  Giving her the

7  benefit that she was maybe on drugs and not absolutely insane,

8  she said the garage was empty the day she came there.  Empty?

9  Man, the bicycles of my kids were piled up this high on top of

10  tires.  You heard everyone say it was the messiest garage they

11  have ever seen in their life.

12    She's nuts.  She doesn't know what came out of her mouth.

13  I know what came out of her mouth.  Did I act upon it?  No.  I

14  said -- I didn't act upon it.  I hired counsel to give the

15  stuff back.  We never said:  We're digging in our feet.  Hey,

16  Bob, don't give this stuff back.  I want to steal this fake

17  stuff.

18    No.  It's:  Get this crap out of my garage.

19    And if you look at the Swanson emails, I told him contact

20  the FBI.  I said contact the FBI, after three weeks.  I -- I

21  thought there was drugs and guns in there.  I didn't know what

22  the hell was in those boxes.  I said contact the FBI.

23    No, no.  We will get -- we will get this stuff out.

24    Bob Kane testified that when he left to go pick up his

25  daughter from Vanderbilt for graduation, whatever, he said

1   there were no open issues.  That's what he said.  That's what

2   he told me.  He was my agent.

3        I thought I did the right thing.  I didn't have any

4   communication with these people for over 30 days.  It was all

5   going through Bob Kane.  Okay.  What else could I have done

6   than hire an attorney, who is a mediator for the State of

7   California, who is a judge pro tem, who is a professor for

8   constitutional -- who has been my attorney.  Say get this crap

9   out.  What else -- what else could I have done different?

10        I rejected the deal.

11        Well, a box is missing.

12        Oh, okay.  Good.  Come pick up the other boxes.  A box is

13   missing.  Pick up the other boxes and sue me.  That's the

14   American way, isn't it?  Something is missing.  I mean, do we

15   get Fed Ex -- it's Christmas time.  We sent five Christmas

16   presents to your door.  One is missing.  Arrest that man.

17   Throw him in with the murderers, the guy that slit the guy's

18   throat, you know.  Okay.

19        It's like, no.  It's an agenda.  No.  We spent

20   45 million -- we said this guy owed $45 million two years ago.

21   It was only 300 grand.  Ehh.  They would have been canned at

22   any -- any law firm or accounting firm that has any merit in

23   the United States.

24        And then let's waste another -- Brandon LeBlanc said they

25   spent 100 grand trashing my house to drive out my -- my wife

1    and children.  Ehh.  Didn't find that big pot of gold hidden

2    under the basement, right?

3        And then the irony is when they brought the rhino heads

4    back, they come and put them on the driveway.  And I say:  Put

5    those in the house where you found them.

6        Because I don't show them deference.  Again, why are you

7    an asshole?  Because they attacked my family.  Put them back.

8    I'm not going to carry those in.  You put them back.

9        So he had to get on the phone.  Blah, blah, blah.  You

10   know, Brugnara says put them back.

11       Yeah, they had to go put them back.  It's like, okay, so

12   you want to go to war with me?  We'll go to war because I'm

13   protecting my family.

14       Okay.  So here -- so here we are now in this case.  Okay.

15   So I'm really in a horrible situation now.  So I get -- I get

16   arrested.  You know, Bob Kane is picking up his daughter.  The

17   FBI comes in and kicks in my door.

18       I'm like:  Yeah.  Why are you here?  Are you here to come

19   get this -- I thought they were there to come get the boxes.

20   You're here to come get the boxes?

21       No.  You're under arrest.

22       I go:  Really?  What for?

23       I go:  My attorney has been trying to get this crap out of

24   my garage for the last month.

25       Tell it to the judge.

1        All right.  So I go in with Elizabeth Falk, who is nine

2   months, nine and a half months pregnant.  Go in front of

3   Judge Corley.

4        She goes:  Well, you know, we got to hold you.  You know,

5   because Sprague goes:  You know, there is a missing $450,000

6   painting, and there is $11 million of art, you know, that he

7   tried to steal.

8        So, you know, the entire bail was squashed upon a lie.  A,

9   there is not a 450- -- and the thing is, I'm not trying to

10  castigate -- crucify Sprague, but I'm being held to a certain

11  standard where I can't ever make a mistake.  Because I make

12  mistakes, and you make mistakes, and Sprague makes mistakes,

13  and Kingsley makes mistakes, and so does Robin Harris.  But

14  when they make a mistake, it's all:  Oh, come on.  You're just

15  being a bully and a jerk.

16       When I make a mistake, it's:  Ooh, hold on.  Let's put a

17  microscope on Luke.

18       You know, what happened here?  Oh, wow.  You know, keep

19  it -- he says to -- to -- to Judge Corley, you know, there is a

20  $450,000 painting missing and, you know, he's stealing

21  $11 million.

22       Imagine this.  Imagine if the truth came out.  Imagine if

23  he said:  Well, you know, there is a $4,000 painting missing

24  and there are some paintings in there that are worth nothing

25  that they were trying to sell to him.  Corley would have never

1   denied me bail.  And that's -- and that's -- that's -- that's

2   the horror of this entire case.

3       If the truth came out out of the gate, I -- I would

4   have -- I would have never -- this thing never would have gone

5   to first base.  You know, if they just had a human being

6   conversation with me where I could say:  Hey, listen.  I could

7   have borrowed the money to buy that.  You don't need the

8   money -- I bought 490 Post Street when I had less money than I

9   have now.  I paid 25 million bucks for that.  Finance the

10  first, made up a gap equity on the second, that's 25 million

11  bucks.  And that was worth, 30, 40 million bucks.

12      But this thing, if it was real, it's worth 50 million.

13  It's not worth 11.  It's not worth -- and that's based upon

14  what Wiener says.  And this happens to be the top art man in

15  the world, Wiener, according to his resume.  I mean, the guy is

16  the director of the Appraisal Institute of America and did the

17  John McEnroe case and Steve -- I know he's good because he did

18  the Steve Wynn case.  And Steve Wynn hires the best of the

19  best.  So you know the guy is good.

20      And he says:  Listen.  If these things are real, they are

21  worth 50 million based upon inference.

22      So here I am.  I'm arrested now.  I figure I'm going to be

23  out, right?  Go to the next -- you know, I -- I do my talking

24  over Elizabeth Falk.  Now I'm unamenable -- unamenable to

25  supervision because I -- Elizabeth -- because they were saying,

1    just let him -- let me at least go to the halfway house at the

2    minimum because -- I was -- "Shh.  Be quiet, Luke.  Be quiet."

3    Now you're unamenable.

4         Okay.  So now I go next.  And poor Brandon LeBlanc comes

5    back from his vacation.  He's like, well, you know what?

6    Brandon LeBlanc makes a pitch, well, he's not a threat or a

7    danger because we have all the reports -- because I was

8    released in the tax case, clear and convincing, no danger.  But

9    I'm unamenable to supervision.

10        And I said:  Brandon, blah, blah, blah, you know.

11        See, there you go again, Brugnara.  Ha.  Lock him up, you

12   know.

13        So I get -- Brandon and Steven Kalar doing a good job, but

14   Brandon LeBlanc has to go to his -- to his pre-scheduled

15   training in Georgia, just so happened to be the same time the

16   beginning of my trial.  I oppose this.  You remember standing

17   right here.  He gets released.  Fine.  So be it.

18        But Babcock comes into the case.  Now, Erik Babcock did

19   one good thing at least.  He got Sotheby's to state that this

20   piece is worth nothing.  But the problem is in this particular

21   case, I think there were 40 subpoenas.  There wasn't one

22   subpoena that was sent out when we had the trial scheduled, you

23   know.  Literally, you kept extending it.  There was never

24   any -- never any subpoena sent out.  I mean, how many times did

25   you extend the trial?  Six times?

1    I mean, God bless Babcock.  He doesn't even have a

2 secretary and he's -- he's a very good talker.  And I think

3 he's a great -- he's the sort of attorney, if you worked at

4 MoFo or Orrick, the guy would be great.  If he had a good

5 support staff, the guy would be deadly.

6    But as good of a talker as he is, and as good as -- how

7 he's good looking.  He's tall.  He presents well.  He's not

8 fearful of you, you know.  He is highly deficient as far as

9 procedural, getting in all the documents.  I was writing half

10 those documents.  Okay?  I mean, how am I -- this is like a

11 nightmare.  It was like a nightmare for me because I know the

12 stuff's fake.

13    So then, you know, here I am.  Okay.  Okay.  Listen.  I

14 lost 100 pounds.  If you look at me now, I look different than

15 in terms -- I've put on 45 pounds.  Okay.  And I want you to

16 consider this in the sentencing.  This is all tying into the

17 sentencing.  Everything I'm saying is tying in to the

18 sentencing because I want you to consider this.  Okay.

19    I weighed 270 pounds when I got arrested, okay.  I dropped

20 down to 170 for the trial, or right before the trial when I was

21 locked up in Oakland and I thought I had cancer.  Oh, my God.

22 I'm dying.  Because, you know, my mother just had her colon

23 removed from cancer.  I've had three uncles that died from

24 cancer.  My brother had melanoma but he survived it.  I --

25 cancer runs in my family.

1        Well, how can I lose all this weight?  It was the diet

2   they were giving me at -- at Oakland.  Because I ate everything

3   they gave to me.  They had me on this low-salt, low-fat diet

4   because I have high blood pressure.  Apparently, it was only

5   1100 calories or something.  I got starved to death over there.

6   So I was -- I was literally skin and bones.  And I don't know

7   how that affects you mentally.  I mean, I don't think that I

8   was acting right.

9        I mean, just -- and complete isolation.  I like

10  communicating with people, too.  I was in absolute isolation

11  24/7 in the dungeon.  I'm in the exact opposite now.  It's like

12  an insane asylum where I'm at now, but it's probably -- it's

13  obviously better for me than the dungeon because I put on

14  45 pounds.

15       But when the trial happened, remember my skin was like

16  literally hanging off any face.  And then from there it just --

17  and I'll tell you, I thought I did a pretty darn good job on

18  those pretrial motions.  You even complimented me, if you look

19  back at the thing.  You said:  Hey, Brugnara, you did good on

20  those pretrial motions.  Even though I didn't really win a lot

21  of them, at least I held my own with Kingsley.  So I was trying

22  to stay focused.

23       But then when the trial started, the destruction in the

24  trial was when my stuff got bagged.  It's no fault of anyone

25  here, but what happened was I had 20 boxes, banker boxes, of

1  100,000 pages.  And you don't get staples and you don't get

2  paper clips.  And you don't even get colored paper separators,

3  okay.

4        So I -- and you know me.  I'm extremely methodical, even

5  here on this sentencing portion where I like to -- okay.  I

6  like to -- I like to be very mathematical and objective

7  thinking when I present arguments, because that's how I have

8  been trained with my lenders.

9        My life has been with lenders and with tenants where you,

10 you know, objectively go down why, because then they can't win

11 the argument.  You can't -- you can't win a logical argument

12 based upon mathematics or quotes and representations made on

13 the transcribed record in your case.

14       So I had all my stuff from all the transcripts and all the

15 FBI 302s and everything, and it was all meticulously put

16 together, as I am.  And they came and took my stuff before my

17 case-in-chief and dumped it into eight garbage bags.  Eight

18 garbage bags.

19       And you can ask off the record or on the record Marshal

20 Price.  I've asked for all these people to be subpoenaed.  My

21 attorneys are busy doing other things, but Marshal Price was

22 there.  He brought them to Santa Rita, and then Sergeant

23 O'Brien and Sergeant Nixon.  And I've also put it in previous

24 motions.

25       But the fact is it's undisputed.  It went into eight

1   garbage bags.

2        So think of this, twenty banker boxes and eight garbage

3   bags without any paper clips or staples.  So it was a disaster

4   at that point and it was unwinnable.  I mean, it was unwinnable

5   at -- even if you're innocent, it was unwinnable at that point

6   because you can't put together just logically -- being a

7   mathematician, you can't mathematically put together 100,000

8   pages in a day.

9        And if you -- when I went and looked at the transcript

10  last night and I asked you.  You said:  I'm going to give you a

11  day.  And I said:  I want a week.  And I need James Stevens,

12  and I need Tamor to help me, and then we might be able to put

13  it together in a week.

14       And you thought it was kind of a smoke screen.  Oh, this

15  is just Brugnara trying to twist my arm for bail or something

16  like that.  You know what I mean.  But that wasn't the case

17  because if you look at the logic of it, there is no way you can

18  put together 100,000 pages of trial documents in a day from 20

19  banker boxes into eight garbage bags.

20       So, you know, this isn't trying to point fingers.  I'm

21  just trying to tell you what happened.  Okay.

22       And it negatively affected how the jury perceived me

23  because, A, I was disorganized.  Stuff was scattered and it

24  just -- it -- it -- it -- it was -- it was a horrible

25  impediment that was no fault of this Court that just destroyed

1  any chance that I had at somehow -- and I think the other huge

2  mistake that happened in the court was not granting the 17(a)

3  subpoena for the four Sotheby's specialists.

4       And I talked to Bob Kane.  He said you didn't have to do

5  it.  Alsup did not have to grant that because it was mid trial,

6  it was his discretion.  And it -- you know, it's not

7  overturnable.  But I'm -- I'm just talking about now that we

8  know what we know now, you know what I mean?

9       What we know now -- if they came up here, because what I

10 read to you, it says they are modern and impressionist.  Those

11 are the four experts in their Modern and Impression Department,

12 and what I would have asked them in front of the jury would

13 have been:  A, you -- you sent this.  Jennifer Biederbeck says

14 it's 5,000.  So now we know the Degas is 5,000.

15      I think, okay, by the way, see these de Koonings over

16 here?  Can you take a look at them?  And now we know what they

17 would have said.  They would have said they are fake.  I would

18 have walked.

19      And, you know, God bless Kingsley.  He said this -- this

20 is overwhelming.  There is nothing overwhelming, man.  I beat

21 half the charges, half the fraud charges.  I beat them.  I beat

22 half.  I beat them.  Guy has never tried a case in his life.

23 Nothing was overwhelming.  Nothing was overwhelming about this

24 case.

25      You guys lost half the -- because you were -- you --

1   you -- you were pitching a lie here.  It -- it -- it -- it

2   wasn't true.  The stuff was fake.  All of it's fake.  It's all

3   fake.  All the stuff's fake.

4        One thing I'm guilty of is -- is -- is -- is -- is being

5   disrespectful to -- to you, your Honor, at certain times.  The

6   level of frustration was off the chart.  My family is suffering

7   heinously, mainly emotionally.

8        My family doesn't need much money.  You know, we kind of

9   live a middle class lifestyle anyway, aside from living in a

10  nice house.  But my wife drives a 2001 Suburban.

11       Even when I made $100 million two, three years later, my

12  wife was like, no, I will just keep the -- I will keep the same

13  Suburban.  You know, she comes from a meat-and-potatoes family.

14  She doesn't -- she's not into the money.

15       You know, I just miss being with my children because they

16  need me at formative years.  You know, they are 12, 14, 16, 18,

17  they need their father every day, every day.  And that's the

18  tragedy here, you know.

19       So -- so -- so I was is in this position --

20            THE COURT:  Mr. Brugnara, I'm going to let you

21  continue, but we've gone almost 80 minutes --

22            THE DEFENDANT:  Okay.  But, your Honor --

23            THE COURT:  And I need to -- we all need a short

24  break.  So you can resume when we come back.  So we'll take a

25  10-minute recess and then resume.  Thank you.

```
 1          (Whereupon there was a recess in the proceedings

 2           from 10:25 a.m. until 10:42 a.m.)

 3          THE COURT:  All right.  Everyone is here.

 4      Continue, Mr. Brugnara.

 5          THE DEFENDANT:  Thank you, your Honor.

 6      So when I -- when we left I was explaining about some of

 7  the behavioral issues in this court, irrespective whether there

 8  is a massive weight loss or a ruling that I don't like in light

 9  of, you know, your pedigree.

10      The fact that -- like I indicated, you know, you are at

11  the top of your profession, independent of being a judge in a

12  highly, highly, highly, highly, highly, highly competitive

13  field.

14      I didn't show the deference to the Court that you deserve.

15  You know, that you earned.

16      (Brief pause.)

17      And that -- that's -- that's the regret I have from this

18  particular case.  And I apologize for that.  Because your Honor

19  deserves deference and respect through the entire proceedings.

20      And I know you do your best to make sure they are -- they

21  are fair.  So I want to make sure that you understand that.

22      And I was very compromised on many different levels,

23  physically and mentally, but that's no excuse.  People are

24  accountable for what they say, so...

25      You know, I would ask for a new trial.  I mean, I know
```

1  you've made a ruling.  I've put in a handwritten motion for --

2  for a new trial just based upon the facts and for you not

3  casting any -- pointing any blame on anyone in particular.  I

4  mean, I probably have the most blame.

5      You know, I -- Jeff Bornstein's willing to go ahead, and

6  I'm certain this would have a different outcome.  And I

7  understand the Court made an effort to get Jeff Bornstein

8  involved.  I mean, I really felt physically like I couldn't

9  last in Oakland.  I mean, I lost so much weight and I didn't

10  know what it was.  I really thought it was cancer.  Apparently,

11  it wasn't cancer because I put on 40 pounds from the diet

12  change.

13      So does that make me mentally ill?  No.  It's because it

14  was stupid because Bornstein just needed, what, four months.

15  And I'm sure he could have done a great job with all the truths

16  that surfaced eventually through the hard work of Mr. Boisseau.

17  And although I've cast a few arrows in Mr. Boisseau's

18  direction, he's a great attorney.

19      But, again, this was the sort of case where you needed a

20  Jeff Bornstein.  He had a big law firm behind him.  He had

21  three assistants helping him.  And he was just the perfect

22  team, you know, that this Court put together, you know.  And it

23  just lets you know because I do things straight and

24  objectively, but I was really compromised and I just want the

25  Court to consider that.  And I admit that was the biggest

1    mistake by far and away.

2        But regarding the sentencing, if you don't grant a new

3    trial, I would ask respectfully that you consider the facts.  I

4    mean, I don't -- you know, on objective things, I don't like to

5    beg for a break, you know.  I don't -- I think everyone should

6    be treated the same, you know.  I really do.  I -- I really do.

7        And -- but in this particular case, I think if I'm treated

8    the same as everyone else, whether I'm some guy from the ghetto

9    or Getty standing here from Pacific Heights, it's just

10   overwhelming that this art isn't worth anything.  And I think

11   nobody can dispute that, you know.  And for someone to say,

12   well, your own appraiser says it's worth 600 grand, it was

13   conditioned.  It was a conditional appraisal.  Conditioned upon

14   certain extraordinary assumptions that weren't met.  And this

15   is the thing.  They weren't met objectively with an

16   objective -- you know, I always love Star Trek because I love

17   Spock.  Everyone always says:  Oh, you're like Kirk.  You're

18   the emotional guy.  But I am like Spock for business.

19       You know, you look at this unemotionally.  What is the

20   missing item worth?  It's worth less than $5,000 because they

21   were given the opportunity in your court by your own directive

22   under the 17(c) subpoena to hit a home run out of -- as you

23   say, hit a home run out of the -- out of the park.  All they

24   had to do was come up with that canceled check, that wire

25   receipt of one of the 20 sales or one of the 20 purchases.

1   Say:  Well, your Honor, here we go.  We couldn't find the other

2   19, but here is that $1 million.  Or:  Hey, here is even the

3   $300,000, you know.

4        And remember this is 20, 20 transactions under his own FBI

5   302.  I think he said 15 to 20, was the exact sentence.

6   Whether it be 15 or 20, it's the same thing.  It's a big

7   number.  And he couldn't even produce one canceled check, one

8   wire receipt, one bank statement.

9        And that is overwhelming proof, at least in my opinion,

10  whether it's clear and convincing or preponderance.  You know,

11  I'm not an attorney.  I don't know what the threshold is on

12  those, but, you know, just from a layman's standpoint, there

13  were no sales.

14       And I remember that Indian gentleman standing there, you

15  know, trying to tread water, you know, having nothing to hold

16  in his hand.  And you -- and you -- you blew your stack.  You

17  said:  Listen, man.  Are you serious?  We gave this guy a 17(c)

18  subpoena.  Where -- where is the...  Well, he doesn't have any.

19       Okay.  So based upon that -- and that's what -- so now the

20  Wiener comes up to $600,000 based upon the truthfulness of

21  Maibaum's word, the man, you know, who is selling the

22  de Koonings where the ink hasn't even dried, the paint hasn't

23  even dried yet, who the U.S. Attorneys' own appraiser said:

24  Please don't call them de Koonings.  They are Twentieth

25  Century.  Please do not call them attributed to de Kooning.

```
 1   Please do not insult de Kooning.  They are School.  Not even
 2   School of de Koonings.  They are Twentieth Century School.
 3       Go look up Sotheby's online.  Have your clerk check it.
 4   That's the lowest denominator for Sotheby's, Christie's,
 5   Bonhams, Phillips.  School of Twentieth Century means that some
 6   student did it in high school or something or some junior
 7   college.
 8       So that's who the U.S. Attorneys paid $40,000 or $20,000
 9   of taxpayers money to come up with that answer.  So you have to
10   give some deference to that.  They are fake.  They are not
11   worth anything.  They shouldn't be given back to Maibaum.  He's
12   going to defraud someone else if he's not indicted.  He's going
13   to take advantage of somebody else.
14       I mean -- and that just shows you how unfair these
15   proceedings have been, what I heard today.  What I heard today,
16   we have Kingsley -- and one advice I gave to Kingsley after the
17   trial was get the hell out of the office.  Go work at MoFo or
18   Orrick or Jeffer Mangles or somewhere.  Don't do this to your
19   Honor.
20       To actually stand up there and ask for attorney's fees for
21   Walter Maibaum, that -- that was a shock.  I mean, that's all
22   time low.  The guy who is using that office, taxpayer money to
23   defraud the public, defraud me, defraud this Court after he
24   then told you:  Oh, by the way, here is a -- under penalty of
25   perjury, I have another buyer for $6 million.
```

 1          And then this -- your Honor, you know, you -- you know,

 2     I've learned about you.  You know, people misread your -- you

 3     have your own way of doing things.  That's what I've learned

 4     about you.  You have your own way of doing things.  People

 5     underestimate you.  You're very sharp.

 6          Hey, do me a favor.  Tell me who that was that's buying it

 7     for 6 million.

 8          Oh, whoa, whoa, whoa, whoa, whoa, whoa.  Hold on a second.

 9     We actually don't have a buyer.  We're trying to sell it for

10     6 million.

11          This guy continues to lie and perjure himself to the very

12     end.

13          And the things that shocks me isn't that Maibaum did it,

14     because the guy is a dirt bag.  The fact that the U.S.

15     Attorneys will still, to cover their own tail, to cover

16     their -- and they don't realize they are destroying their

17     reputation in the process, because the truth is going to come

18     out on this one way or another.  They will actually go up there

19     and say:  Well, you know, these --

20          Think about this for a career-ending move for these U.S.

21     Attorneys.  How about this for a career-ending move, your

22     Honor.  You release the paintings, okay.  He sells them to some

23     other unwitting buyer in Manhattan, and that unwitting buyer

24     has a little juice with the U.S. Attorneys office in Manhattan

25     and, you know, gets 5 million bucks for them.  Just like he

```
 1    did -- you know, this guy is brazen.  He ripped off S.I.

 2    Newhouse on a fake -- I mean, that guy -- that guy is living in

 3    an apartment in New Jersey, man.  He had a mail drop in

 4    Manhattan.  That's why the Marshals couldn't serve him.  He

 5    lives in a little apartment in New Jersey.

 6        He ripped off S.I. Newhouse for 6 million bucks.  This guy

 7    is brazen.  You think he's going to go rip off someone else on

 8    those de Koonings.

 9        And what sort of embarrassment will that put on this

10    office and this Court when there is someone being indicted back

11    in the Second Circuit for Maibaum ripping them off for 5 or

12    6 million bucks on fake de Koonings?  They don't care.  That's

13    how badly they want to hang me.  They don't care.

14        What have I done?  I mean, really.  What have I done?

15    I -- just for my own career I would be saying, my God, keep

16    these.  Don't give this man a thing.  Let's wait and see, and

17    maybe we're going to indict this guy.  We've got to think about

18    it.

19        We got to -- you know, and that goes to the whole crux of

20    what happened in this case.  You know what Bob Kane said?  You

21    know, he's kind of a real doomsday sort of -- you know, I've

22    always done well in civil, the civil world because Bob is my

23    stopgap, you know.  He's like not the cheerleader.  He is like:

24    No, Luke.  No, no, no.

25        You know what really upset me with this?  They didn't even
```

1    talk to me.  Because I sent 80 emails or whatever, 40 emails

2    with Schochet back and forth.  The FBI didn't even phone Bob

3    Kane before they arrested me.  They didn't phone Bob Kane.  And

4    if you look at the last email that was submitted to this Court

5    between Bob Kane and Shapiro, it was:  Okay.  Here is the last

6    draft with Schochet.

7        And it was the attached email where Schochet said:  Come

8    pick up the four boxes, whatever.  I suggested to my client we

9    litigate the fifth box.  She doesn't want to go for it,

10   whatever.  She's hiring Shapiro.

11       But the whole gist of that last email to Shapiro from Bob

12   Kane was:  Okay, here is -- you know -- you know, the release

13   document.  If you want to change it, let me know what changes

14   you want to make to it, okay?  You know, this stuff is a

15   nuisance.  Let's get it out of his garage, whatever.  Next

16   thing I know they are kicking in my doors.

17       Okay.  So the fact of the matter, I couldn't have done

18   anything else.  I hired competent counsel to get this stuff out

19   of my -- and it is stuff.  It's garbage.  Okay.  Like I said to

20   the jury, it's garbage.  And the jury thought I was nuts.

21   Okay.  The jury thought I was nuts.  Okay.  Oh, this guy --

22   this guy is an idiot.  He's saying this stuff's worth nothing.

23       You know, it is worth nothing.  But -- so it comes down to

24   intended loss for the sentencing guidelines.  Okay.  So here is

25   what I ask you.

```
 1        Okay.  So I want to carve out everything but the Degas.
 2   So how do we get to intended loss just with the Degas?  They
 3   could have picked up those other four crates at any time.  Bob
 4   Kane -- unless you -- they want to indict Bob Kane and say he's
 5   a liar.  Bob Kane testified up there that he sent that email to
 6   Schochet, you can pick up those boxes.  Okay.  He testified
 7   there were no open issues for them picking up those four boxes
 8   and litigating.  But now you know why they never picked up the
 9   four boxes.  It's all part of the scam.  If they picked up the
10   four boxes, how can they get any money.
11        I mean, their big dream here was to get me indicted.  You
12   don't think they knew that I had that charge?  Come on.  You
13   type in "Luke Brugnara," it's the first thing that pops up on
14   the first page on Google.  Oh, you went to prison for tax, this
15   and that.  This guy knew exactly what he was doing.  He was
16   going to get the insurance money on the Degas, have a backstop
17   on the de Koonings.
18        Man, this is a massive payday.  And this is a guy -- if
19   you go back and read the FBI 302, he borrowed 10 grand from
20   Rose Long to take his wife -- to take his wife to France when
21   this whole charade was going on.  This guy has so little money,
22   he don't even have 10 grand, okay.  Yet he has five of these
23   multimillion-dollar Degas sitting in his little apartment in
24   Jersey Shores.  I mean, don't you think that's kind of ironic?
25        Let me borrow 10 grand and go pop the champagne bottle in
```

 1  France, you know, for this sucker.  You know, we just cooked

 2  him.  And that's, of course, why he didn't want, you know,

 3  any -- any of this to implode on him, because he knew

 4  eventually the truth would surface.

 5       I ask that we get a new trial.  I mean, I think if -- if

 6  you really look at this thing totally, objectively and say:

 7  Okay.  You know what, you screwed up.

 8       But, you know, U.S. Attorneys screwed up, too.  They lied

 9  to you on this, your Honor.  I don't know what other word I can

10  use.  They lied to you.  Three times they told you they were

11  going to get it appraised.

12       In fairness to you, you always tried to make sure things

13  were moving along, said:  Now, have you gotten this stuff

14  appraised?  Mr. Brugnara is up here saying this stuff is worth

15  nothing.

16       And you did that back in June.  You did that in October.

17  You did that in September.  You did it at least three times.  I

18  know Boisseau found it three times that you said it before

19  Robin Harris came on the case when Sprague was on the case.

20       I would -- I would be surprised -- Mr. Boisseau has said

21  it and so has my other attorney.  I wouldn't be surprised under

22  a little *Brady* action that we find out that maybe someone did

23  value those things, because I think it's awfully coincidental

24  Doug Sprague leaving the office when you start telling him we

25  need that stuff valued.  That's real coincidental, in my

1  opinion.

2      But, you know, fact of the matter is it's been inferred by

3  George Boisseau in his filings.  Is this intentional ignorance

4  or is it *Brady*?  You know, whatever the -- the reality is, I'm

5  sure if we have a new trial, we'll get a full investigation

6  into that.  Because I don't think anybody in this room would be

7  surprised if we found out that those de Koonings were found to

8  be worthless.

9      Because the reality is you have to go back to what

10  happened four months earlier, your Honor, on the -- on that

11  Warhol.  Do you remember how quickly your Honor had found out

12  about the value of that?  What?  24 hours?  48 hours?  Remember

13  how quickly it was.

14      So if you just take the Spock logic, the Dr. Spock logic,

15  wouldn't it be logical that they would go down through that

16  same valuation on this big indictment that they did for the

17  writ of execution.  I mean, that's just simple logic.  That's

18  Dr. Spock logic.

19      Okay.  They did this on the writ of execution.  They

20  contacted these two people locally to value it.  Okay?

21  Wouldn't that make logical sense they would do it on all this

22  art three, four months later?  Because remember the big push

23  was:  Well, it doesn't matter what it's worth.  It doesn't

24  matter what it's worth.  It went from being -- to the Grand

25  Jury, it's worth $11 million.

```
 1          And that's the other thing.  I would have never been
 2   indicted by the Grand Jury if they knew that it's fake.  I
 3   would never have been indicted by the Grand Jury.  They never
 4   would have indicted me.  They would have heard the truth, would
 5   have been:  Well, these people tried to sell Mr. Brugnara this
 6   art for $11 million and it's worth nothing.  But find him
 7   guilty of fraud because he didn't have $11 million in his bank
 8   account.
 9          Ahh, but he's borrowed a billion three.  Let's get to the
10   truth.  He's borrowed a billion three and he's paid back every
11   penny.  And he's bought office buildings with no money in his
12   account either for $30 million and he has borrowed millions of
13   dollars from Sotheby's.  And Sotheby's lends 50 percent on the
14   dollar off their low auction estimate to anybody, you know,
15   who -- anybody out there who is credible, you know, based
16   upon -- and then even if you're not credible, they'll actually
17   take physical possession of it.
18          Okay.  The fact of the matter is -- the truth is I don't
19   get indicted because it's not fraud.
20          I can't be forced into buying fake art.  And that's why,
21   also, it's so important now to have a new trial because the art
22   is fake.  I'm not -- because think about the logic.  I'm forced
23   into buying fake art for millions and millions and millions of
24   dollars.  I have a right to say I don't want to buy it during
25   the contingency period, don't I?
```

    1         Don't I have a right to say:  Well, hold on.  I have a

    2    contingency period.

    3         Let's even say it's seven days.  It's a year, but let's

    4    just say it's seven days.  It's undisputed that Bob Kane and

    5    Schochet said there ain't no deal after a few days.  I have a

    6    right during the contingency period to say I don't want to buy

    7    it.

    8         I don't want to buy this art.  And I said it was fake

    9    because you can go to the text that I sent her.  It's not by

   10    de Kooning.  It's fake.  And I did talk to somebody.

   11         Think about this.  You know where the key is because

   12    you're logical.  How the hell did I come up with $30,000 on the

   13    Luks?  How did I get the $30,000 on the Luks?  I spoke to

   14    somebody.  Come on.  How would I know it's $30,000?  Because

   15    she said it was $450,000, remember, for the Luks?

   16         She says:  Well, I paid 350 for it, right?  I'm selling it

   17    to you for 450 on the Luks.

   18         Let's just talk about the Luks for a second.  How the hell

   19    did I put in my text the Luks is worth 30,000 bucks?  That's

   20    exactly what Wiener says it's worth.  Their -- their --

   21    their -- their -- their appraiser says it's worth 4,000.  How

   22    -- I spoke to somebody.  I spoke to somebody.  Somebody told me

   23    it's worth 30 grand.

   24         They also said the Degas is worth nothing and they said

   25    the de Kooning is worth nothing.

```
 1        I am a big -- your Honor, I have four children.  I'm
 2   working on the Vegas deal, and you saw it's not pie in the sky.
 3   I had Mr. Martin, who is Related Group's president and CEO,
 4   sending emails -- that's Exhibit H and I -- saying:  Where is
 5   Brugnara?  We have a conference call today.
 6        They are emailing Barbato to get in touch with me.  Okay?
 7   This is the same Related Group that made $30 million on the
 8   back lot in Las Vegas, if you read Exhibit H, I, J.  They
 9   already made 30 -- 30 million bucks with me.  It's the biggest
10   hedge fund in the United States.  They were giving me the
11   equity to make up a stopgap between the debt and the purchase
12   price.  Okay?  And that's who I was on the phone -- I was on
13   the phone with.  Okay?
14        And the reason why they do it is because I already had the
15   leases lined up.  I was taking land on that property,
16   negotiating the leases subject to closing escrow, and that
17   creates the added value to get the equity from these lenders
18   because the properties are valid on capitalization rates of the
19   rents, of the net rents, okay?  So I had all this going on.
20        My family is getting their property, you know, situated
21   for school over there because the kids are going to school.
22   And I'm doing the refinance with Mark Levinson to get the
23   downpayment for the Tiburon property.  The woman says:  You
24   want to buy this art?  Boom.
25        I mean, the fact of the matter is, your Honor, I can't be
```

1   forced into buying fake art.  And if you go by their concept,

2   well, you have to buy it.  I don't have to buy it.

3       Now, here I am now stuck with the sentencing guideline

4   table.  I don't think I -- I am stuck with it.  I think you can

5   say:  You know what, this -- I mean, you can -- you can acquit

6   this case.  You can do whatever you want, based upon the truth.

7       And I -- I read up on this rule, too.  It -- it says truth

8   and justice usurp procedure.  And that's why I add that Rule 2.

9   You can interpret any of the federal criminal rules based on

10  what you think is in the best interest of justice, and that's

11  the authority that you have.

12      And in this particular -- I mean, you go back to the

13  founding fathers.  They say we would rather see, you know, 12

14  guilty men go free, Thomas Jefferson said, than one innocent

15  man be in jail or in prison.

16      You know, and -- and, unfortunately, in this case all of

17  the truth and the evidence has come in by drips and drabs, and

18  now we finally have it all here, or at least most of it here.

19  You know, maybe there is going to be one more drip and drab.

20      The U.S. Attorneys had this valuation, you know, a lot

21  sooner than we thought they did.  It was certainly my counsel's

22  belief, based on their demeanor.  I mean, think about it.  If

23  you really believe it's worth $11 million -- we're going back

24  to Spock from Star Trek.  If you really think it's worth

25  11 million bucks, why would you even say to the Court:  It

1  doesn't matter what it's worth.  Think about it.  It doesn't

2  matter what it's worth.  Even if it's worth nothing, he's still

3  guilty of fraud.

4      See what I'm saying?  They knew.  Or as George Boisseau

5  said, intentional ignorance.  Whatever the case is, you know,

6  this hasn't been fair to me.

7      And I don't believe for a second, you know -- you -- you

8  know, that snafu, or whatever you want to call it, mid trial

9  having all my stuff bagged and thrown into garbage bags and

10  having me put in this feces cell in Santa Rita was -- was by

11  chance.  It -- it was intentional.

12      I mean, how can you -- I -- I was in Oakland, your Honor.

13  I'm in Oakland for 10 months.  So I'm in Oakland for 10 months

14  straight.  Not moved, not anything in my cell, all my stuff

15  organized.  And them right in the dead middle of just a 10-day

16  trial, they come and take all my stuff and throw it in garbage

17  bags.  I'm taken to a different city?

18      And then whoa, whoa, whoa.  He made that "hanging judge"

19  -- no, no.  That happened at 2:00 p.m.  And you remember they

20  bagged all my stuff at 9:00 a.m.  This was already a

21  preconceived attack on -- on -- on my right to a fair trial.

22  And it was done intentionally.  It was done intentionally.

23      And I think I'm entitled just on that alone to -- to a new

24  trial, with someone like Boisseau or Bornstein representing me

25  and putting forth the truth in front of an impartial jury.

1          And that's a whole nother thing, the impartiality.  I

2    mean, I remember you said the word "Jakic."  That was insane,

3    Jakic.  That was crazy -- that was crazy.  I mean, that was --

4    but it gets even crazier.

5          You have sweet little Ms. Demorest up there with her five,

6    you know, recent criminal convictions, you know, silent as a

7    mouse.  You know, and then you go:  Well -- to George Boisseau:

8    Well, you know, you didn't argue why, you know, it prejudices

9    you to a fair trial, you know, when -- listen.  That's why I

10   filed what I filed yesterday.

11         You know, Judge Sandra O'Connor said:  If a juror lies --

12   on the *McDonough*, during voir dire on the *McDonough* Supreme

13   Court ruling -- it doesn't matter why they lied.  We're not

14   here to play psychiatrist.  That's an inference, but she said

15   it doesn't matter why they lied.  What it does do is it proves

16   that -- that they are not impartial.  And that was the whole

17   basis.

18         So if there is a basis for removal for cause, I

19   automatically get a new trial.  And there is a basis for

20   removal for cause.

21         And under the *Warner* -- under the *Warner* ruling, they

22   actually -- the defense wanted the person with the criminal

23   history removed, not -- not the prosecutors because they

24   thought then that they were worried then about possible perjury

25   charges and possible -- an informant incurring favor with the

```
 1   U.S. Attorneys.  So they believed that -- and, in fact, the
 2   judge pulled off that -- that person in the Warner.
 3        So the fact is that warrants a new trial, certainly, the
 4   bagging of the documents.
 5        And, of course, the big bombshell that this stuff being
 6   worth nothing, you know.  I -- I think if -- if you go all the
 7   way back to, you know -- the Grand Jury indictment would have
 8   never happened if the truth was provided to the Grand Jury.  If
 9   they were given the truth, I wouldn't have been indicted.  And
10   that just goes to the whole heart of this thing.
11        And then it goes to the next step.  Okay.  Well, what have
12   you -- they lied to deny me bail.  And all this kind of just
13   snowballed into where we're at now, and then it goes to the
14   jury.  I mean, this jury -- they -- they acquitted me of half
15   the fraud charges.
16        And think about it.  You told the jury:  Do not believe --
17   you even spelled words -- Z-E-R-O of what Brugnara says.
18   Z-E-R-O.  And this is in evidence.
19        The bottom line is I really had no evidence.  All I could
20   do was take their evidence, based upon your instructions, and
21   have them make inferences of what wasn't presented and make
22   inferences based upon what evidence was presented by their
23   experts and witnesses.
24        Now it's a completely different dynamic.  Now we have
25   real -- and -- and -- and the thing is, you know, it's really
```

```
 1  sick because they have unlimited resources to fly in all these
 2  people from New York.  And they never flew in an independent
 3  third party to say -- you know, like Wiener or Bellamy.
 4       And, again, I don't believe for a second, I don't think
 5  this Court is that naive to believe for a second they didn't
 6  know.  Come on.  You don't think that they went to get an
 7  independent third-party witness?  Of course they did.  I mean,
 8  you -- you could certainly -- to not believe that, that would
 9  be absurd.  Because the second Maibaum and Long get impeached
10  on the witness stand, they would need to have a backstop of
11  someone saying there was value there.  But they couldn't find
12  anybody because there is no value.
13       So I wanted to come back to the sentencing guidelines and
14  ask this from you.  If you are not going to grant a new trial,
15  I would please ask you to use truth to the valuation of this
16  and not allow any of the items that refused to be picked up to
17  be included in loss because intended loss is the intention of
18  the defendant, and based upon my agent, Bob Kane, who had all
19  the communications with them and he's credible, he was a
20  witness.  He said they could have picked up the stuff.  And
21  they didn't pick it up.  And that's what all the emails say.
22       In fact, the last email to Schochet was:  Your client
23  could have picked up all these and signed the release on
24  April 11th.  They could have picked up the boxes and litigated
25  the fifth box.  That's what any sane, normal person would do.
```

1   They would pick up the crates and litigate the fifth box.

2        Or at the very least when Shapiro got involved, he would

3   have said:  Okay.  We don't like that.  Here is our revision of

4   what will -- what we will accept, of what we will accept.  And

5   what we will accept is change this, this and this and then

6   we'll pick up the four boxes.

7        Whatever the case is, Shapiro didn't do that.  I get my

8   door kicked in.

9        So I shouldn't be held accountable for the fake

10  de Koonings or the Mirò, in my opinion, hasn't been proven that

11  it has any value either way.

12       But either way, my intention was clear.  It says that

13  concealment is the measuring point.  Because all this case law

14  says how do you determine what the intent is of the defendant.

15       And then the guidelines say you just go by concealment.

16  Well, we didn't conceal anything because Bob Kane sent 44

17  photographs of the boxes and all the measurements.  So that

18  shows cooperation between my agent.  And then here is the

19  measurements, here is the boxes, here's the photographs.

20       So tell us, you know, in your opinion, you know, what do

21  you think is missing?  You know, we were working with Schochet.

22  I mean, that is someone who is cooperating, isn't it, your

23  Honor?  Someone who is taking photographs and measurements.

24       So it's like, okay, here is -- here is the photographs.

25  Here is the boxes.  And I'm paying.  Bob Kane is not working

1    for free.  He's charging me by the hour.  Okay?  So either Bob

2    Kane is in on it, a judge, or he's working in good faith just

3    like Mr. Boisseau is.  Okay.

4         Okay.  Here is -- here is the measurements.  Here is the

5    photographs.  Okay.  So it wasn't -- so that leaves us again to

6    the value of the Degas.  The Degas is worth less than $5,000.

7    And I think the real -- aside from Sotheby's saying it's less

8    than 5,000 -- again, Jennifer Biederbeck testified No Sales

9    Value.  NSV means less than $5,000.

10         And the backstop to that objective determination is the

11   fact that Walter Maibaum was given an order from this court, an

12   order under 17(c) subpoena to produce a bank statement of any

13   of these purported sales, and he didn't even produce one check.

14   Not even one bank statement, one check, one wire receipt.  And

15   that just proves to you there were no sales.  That proves --

16   but even if there were a sale, which there weren't any, but

17   even if there were a sale, I still believe Sotheby's authority

18   usurps Maibaum because they are the ones that are relied upon

19   by the U.S. Attorneys and the U.S. District Courts and the

20   Bankruptcy Courts, and mainly the FDIC banks.

21         So, but to make it even easier to make the decision, you

22   say:  Well, Sotheby's has relied upon the United States

23   Government, United States of America.

24         But, you know, Maibaum gave us this canceled check here.

25   So what do I do now?  I've got three checks canceled for

 1   Maibaum for 300-, 500-, 800,000, and we've got this.  But this

 2   is easy.  This is an easy call because he didn't give you any

 3   checks under your order.  And that poor attorney of his, this

 4   guy is such a coward, he -- he hid -- he was hiding somewhere.

 5   And this poor young Indian gentleman, attorney, had to take the

 6   brunt of it.

 7        Okay.  And then the other thing that I ask for is under

 8   your mathematical reasoning, that I appreciate, is there is

 9   only two deductions that -- that you can use under this

10   sentencing table that would seem to be -- uphold some sort of

11   appellate review.  One is victim misconduct, which is 5K2.10.

12   And it is -- you have the authority to, based upon misconduct

13   of a victim, to go up to 13 points reduction.

14        It was upheld by *Koon*, which was that Rodney King case,

15   when they -- when they sued him, you know, in Federal Court for

16   civil rights violations.  And there is another one that was

17   minus five.  But they got up to 13 points on that reduction.

18   So -- and that was victim -- on victim misconduct.  And it said

19   it can be applied also to non-violent -- non-violent crimes as

20   well.

21        It says it in the guideline -- excuse me.  It says right

22   here under 5K2.10, it says:

23        "There may be unusual circumstances on which

24        substantial victim misconduct would warrant a reduced

25        penalty in the case of a non-violent offense."

1    So the federal sentencing law says that you can go on a

2   non-violent offense under victim misconduct.

3    And then the family responsibility and ties, which is

4   5H1.6.  That is regarding -- and the really key measure there

5   is irreplaceability.  You know, addresses hardship in detail

6   and suffering, you know, to the family.  But the real measuring

7   stick, you know, in summation is the irreplaceability of the --

8   of the person.  And the main case there, that was the

9   benchmark, was a case called *Galante*.  And in that particular

10   case what it says is -- it was upheld en banc and he got a

11   4-point reduction.  They noted that, quote -- it says here:

12        "This case is an example of the significant

13        impact *Koon* can have on downward departures.  It's

14        hard to imagine this case being upheld before *Koon*

15        was decided."

16    And that's where this guy Galante on the -- on the family

17   responsibilities.  And he just had three children and married,

18   and he got that reduction.  You know, 4 points.

19    So, I mean, you have -- and that was upheld en banc --

20   en banc in -- in the Second Circuit, which is a pretty tough

21   circuit.  So that was upheld, and that was in 1997.

22    So, you know, the -- so what I'm asking is that you use

23   the proper grouping for 8 and 9 of the escape, because that is

24   the best representative charge which will take off a point.

25    I'm asking that I be a Category III, because I shouldn't

1    be punished for cooperating with Judge Chesney to accommodate

2    her -- you know, for sentencing.  Because if I was sentenced on

3    the same day in this Court on the tax and fish case, it

4    wouldn't even be open for discussion.  I would be a III.  And

5    Brian Getz was doing a good job for me.  You remember, he was a

6    good attorney, so...

7         And then the big one, you know.  The big one, of course,

8    is the valuation of the -- of -- of -- of this Degas

9    reproduction.  I mean, I just don't see how anybody can come

10   at -- can rebut the argument of Sotheby's that it has no value

11   and that that is enhanced by the fact that, you know, he was

12   non-compliant with your 17(c) subpoena to produce even one --

13   one iota of evidence that he -- he, in fact, completed one sale

14   of a Degas Little Dancer.  Not even one.  Not even one out of

15   15 to 20.  Not even one.

16        And, you know, this -- this Court said last week -- you

17   chastised one of the attorneys for saying:  Well, anybody can

18   do an invoice.  You know, anybody can do an invoice.  Anybody

19   can do an invoice.

20        You know, the funny thing -- the invoice that he did for

21   the -- for the $350,000 purchase came from Europe in

22   Switzerland.  When our private investigator, Andrew Kaliniak,

23   tried to find them out -- I'll give you options here.

24        Option one:  They don't exist.  Option -- well, you know,

25   Maibaum is not going to do that because Maibaum is really good

1   at covering his tail.

2        Option two is, you know, out of business.  You know, was

3   in business.  Not anymore.  Can't reach them.

4        You know, so it's one of those things.  You know,

5   Switzerland, can't reach them.  Can't confirm that.  Maibaum

6   does a good job.  But, you know, the fact is -- but you nailed

7   him.  You said:  Hey, listen.  Give us a -- give us a banking

8   receipt.  I mean, we're only talking about five or six years

9   ago.  Okay.  Give us a canceled check.

10       I mean, they did cartwheels to show you the canceled check

11  on that repair work on the -- on the painting.  Oh, look, we

12  paid $21,000 to repair this $4,000 painting, you know.

13       Okay.  Well, let's see one of those 20 sales.

14       Well, there are none.

15       Well, why not?

16       If this is a confessional, you know, on his death bed,

17  well, I confess.  You know, I mean, I didn't sell -- I didn't

18  sell any.  I didn't sell any.

19       Well, you know, that's why the federal courts use

20  Sotheby's, because they guarantee what they say.  Because this

21  is -- the beauty of the Sotheby's, the beauty of the Sotheby's

22  things is if someone goes out and then sells it for a million

23  bucks, you've got a cause of action for a million bucks against

24  them.

25       Sotheby's takes their job seriously.  Sotheby's is relied

1   upon by the United States of America, by the banks,

2   FDIC-insured banks, the District Courts --

3          **THE COURT:**  Mr. Brugnara, you've said this several

4   times.

5          **THE DEFENDANT:**  Okay.  Okay.

6       So the final thing, your Honor -- and I'll wrap it up.

7   I'll wrap it up with this is, you know, for me, my family,

8   my -- my -- my children -- Lauren, Brianna, Luke, Vincent -- my

9   wife, I have missed them for the last 17 months.  I've missed

10  Brianna's 11th birthday.  I have missed Brianna's 12th birthday

11  in June.  I missed it in -- I missed her 11th birthday.  I

12  missed her 12th birthday.

13      I've missed Lauren's birthday in January.  I've missed my

14  wife's 25th anniversary.

15      You know, you could say:  Well, listen.  Look at what's

16  come up in this trial regarding you and your family or this or

17  your wife.  You know, let me tell you this, your Honor.  I --

18  I -- I think you're married.  You know, if you look at a

19  marriage in totality over 25 years, I think that's the

20  measuring stick of -- and, you know, if people make mistakes,

21  which they oftentimes do, I mean, A, it's personal -- of a

22  personal nature; but, B, you know, you've got to look in

23  totality.  In totality it's universal.

24      All the Presentence Report says that I'm a great father.

25  I'm very attentive to my children.  I spend a tremendous amount

1  of time with my children.

2      And the thing is I -- I've always been around like-kind

3  people that live the same way as I do.  You know, they are at

4  the baseball games for their children.  You know, they take

5  walks in the park and take hikes and what-have-you; watch TV,

6  eat their meals.  But, apparently, there are many people that

7  do not have a vested interest in their children.  And I've seen

8  that where I've housed for the last 17 months, where they think

9  there is no problem having children, having -- not being

10  involved in their lives.

11      I'm very, very, very involved in my four children's lives.

12  And that's evidenced by all the reports that were done by

13  independent third-party interviews with my wife, my mother, my

14  children writing letters to this Court.  And they are really

15  suffering, your Honor.

16      I mean, I believe you have children.  Can you imagine

17  if -- if your children didn't have you during their formative

18  years?  Because this is the thing.  When they get older, if

19  they are healthy and normal, I mean, you're going to be lucky

20  to see them whenever, right?  I mean, I guess a lot less than

21  you will when they are in their formative years at 12 and 14

22  and 16 and 18.  They desperately need me every day.  Every day.

23      You know, I always helped them with their homework.  I'm

24  real smart.  I've always assisted them with all their homework.

25  They never get to watch TV until they finish their homework.

1    You know, we have rules.

2         And -- and -- and they are all very good children, good

3    students.  Great part to my wife, who is a wonderful mother,

4    wonderful woman.  You know, very patient and has been -- gone

5    above and beyond the call in this marriage to uphold her end of

6    the bargain.

7         But, you know, it's a wonderful family.  And the thing is

8    my wife has been punished heinously, too, because she has

9    assumed her role as caretaker of our children.  And she has --

10   she has a university degree.  You know, she chose that path,

11   you know, to be there for our children.

12        And now she's suffering financially and has, having to

13   assume all these additional roles that I had for the last

14   20-plus years.  And it's putting a horrific burden on her

15   because she's just not capable -- really not capable of doing

16   that.

17        And, you know, I think if you look in totality of

18   everything here, you know, for what I have had to endure has

19   been an extremely hard time in reference to the sentence, you

20   know.

21        I mean, when you have to look forward to every day,

22   whether or not you're going to get spit on -- like I said, I'm

23   around murderers and -- and -- and -- and armed robbers and

24   rapists.  That's who I have been with for the last 17 -- 17

25   months, and it's been an extremely, extremely hard time.  And I

1   think that's, you know, a multiple of whatever the actual

2   months are because of the -- how -- how -- how hard the time

3   has been.

4        But, you know, in summation I just -- I just would like

5   you to, again, consider a new trial because you have that

6   right.  You're -- you're not held to anyone's judgment about

7   what's fair, what's fair in your court.

8        And I've made mistakes, you know, to reach -- you know,

9   where I'm at right now, but I think, you know, the mistakes

10  that I've made are -- are small compared to -- to the truth

11  that's surfaced now, you know, to -- to ultimately get justice

12  in this case, which I believe would be overwhelming.

13       I don't even -- you know, every one of my attorneys can't

14  even imagine this thing going to a trial if there was a new

15  trial.  But if there was, I would be happy to be fully

16  vindicated in a trial too.  But I -- I really would like the

17  truth because, you know, my entire life is -- is in the

18  balance.

19       I mean, if this was you or even any of the U.S. Attorneys

20  here, you know, the fact that everyone was lied to, everyone

21  was deceived here, is shocking.  But, you know, why am I the

22  person that has to take the brunt of -- of that, because

23  everyone has made mistakes in this case.

24       The U.S. Attorneys made mistakes in not getting it valued.

25  The U.S. Attorneys made a lot of mistakes.  And I'm the one

1   that got all my stuff jumbled in the trial.

2       I still -- and I still don't even have it.  I mean, it's

3   in boxes now completely still jumbled.  I'm the one that now

4   has to realize that -- that the Grand Jury was lied to, the

5   jury was lied to, the magistrates were lied to, you know, when

6   I was trying to get bail.  That's -- that's not fair, you know.

7       I mean -- and if you're going to say, okay, no trial -- no

8   new trial, well, then at least -- at least be fair on the

9   valuation where you look at it like Spock, you know.  You know,

10  let's cut aside the emotions and everything.  Let's look at

11  this thing logically, you know.

12      The United States of America depends on this group.  They

13  say it's worth nothing.  And the appraiser conditioned it upon

14  the truthfulness of Maibaum, who is not -- who is a liar and

15  who couldn't even produce one statement.

16      So if you do that, I would be happy to put this entire

17  thing behind me and get on with my life.  I would not be

18  looking to cause any grief in the United States Attorneys

19  Office or this Court on any -- any appeals or anything like

20  that because I just want to get on with my life with my family,

21  and -- and everyone has just suffered enough, you know.

22      And that's -- that's what I ask, your Honor.

23          **THE COURT:**  Okay.  Thank you.

24      Mr. Boisseau, your turn.

25          **MR. BOISSEAU:**  Your Honor, I came into this case late

1  after trial.  And from that first time I knew certain things.

2  I didn't know anything about Mr. Brugnara.  I didn't -- I only

3  heard about the case through word of mouth.

4       And -- and so Ms. Young and I had to start from -- looking

5  at this case from a -- the perspective of, yes, we had a trial.

6  What do we do now?  What was lacking?  And a lot of things

7  that were -- that came up that we discovered for the first

8  time.

9       We had worked on the issue -- the valuation became an

10 issue, and that is an issue before the Court, not only because

11 of valuation in terms of guideline sentence, but -- but the

12 conduct of Mr. Maibaum and Ms. Long in the -- the scope of this

13 case was -- was an important consideration when we looked at it

14 and said:  Okay.  What did they do?  What -- because they --

15 they are the ones that initiated contact.  So we had to look at

16 it -- the case in the context of what they did.

17      Then we had to, obviously, look at Mr. Brugnara's conduct

18 during the trial.  I mean, we had all the trial transcripts.

19 We could tell what had happened during the trial.  And we --

20 and we worked with Mr. Brugnara, meeting with him.

21      But, also -- but looking at what had -- had transpired

22 during the course of the trial, and seeing -- we could look at

23 the cold record.  We could even listen, if we wanted to, listen

24 to tape recordings of Mr. Brugnara in his numerous contempt

25 citations and the conduct that underlied that.

```
 1        But then we had to go further from that.  We -- we had to

 2   examine why did he act that way?  What -- what were the causes

 3   of that?  Because those are the -- I mean, the Court can look

 4   at it and say:  Okay.  His -- his behavior was so bad, so I'm

 5   going to punish him for -- for his behavior, not only for the

 6   contempt, but for, you know -- that would be a consideration at

 7   time of sentencing.

 8        So, and the Court has discretion to do that.  But we

 9   wanted to get behind that.  So we did get behind that.  We were

10   able to -- to have a psychologist examine Mr. Brugnara, to look

11   at his history, to find the root cause of his behavior.

12   Because, yes, it was out of line.  But there had to be a

13   reason.

14        So we found the reason.  So all of this said, so we -- we

15   could come -- we could point to mental illness.  We could point

16   to -- you know, to -- to the reasons for Mr. Brugnara's conduct

17   in -- in part, because some -- some parts were -- were not

18   necessarily related to mental illness.  But then we could also

19   look to the conduct of Mr. Maibaum and Long.

20        So we could -- so we -- and I'll address those issues as

21   they work together.  But as Mr. Brugnara said, the one constant

22   in his family, regardless is -- the one constant in his life is

23   his family.  They are all present before the Court, and they

24   care for him very much.  And they -- they -- they attested to

25   the fact that he is needed at home; that he is loved at home;
```

1   that they really miss him.  And these have been tough times for

2   the family, not only economically but just emotionally.  So

3   they looked at -- you know, those -- that was the concept we

4   could look at.

5        And they are here.  They are here to support him.  And so

6   you -- and you look at that.  And we are the sum total of all

7   our lives, all our conduct.

8        And, yes, Mr. Brugnara, the Court is going to look at his

9   uncharged criminal conduct, is going to look at his prior --

10  prior record.  And, certainly, that's fair for the Court to do

11  so.  But looking at his family, this is a person that raised

12  four children.

13       So there is more than Mr. Brugnara than just the conduct

14  that's outlined in a Presentence Report.  There is a real

15  person, a loving person, a person who is loved, a person who is

16  needed.

17       So that is the context of -- you know, that is a factor

18  that -- that permeates this case, but so does mental illness.

19       I -- I'm asking the Court -- I have brought this issue up

20  in -- in different contexts, but I'm asking the Court to open

21  its mind to the possibility that a lot of this behavior by

22  Mr. Brugnara in the -- in the past, during trial, and even his

23  conduct in this particular case and the -- you know, leading up

24  to this case is in large part driven by mental illness.  Mental

25  illness, which is suffered by many people and can be treated,

1    but in -- in this particular case when it was untreated, led to

2    a lot of this behavior.

3         Mr. Brugnara, as we've mentioned, is -- has suffered from

4    bipolar disorder.  He has delusional disorder and he has

5    narcissistic personality disorder.  This was done by testing.

6    It's borne out by the conduct.

7         So you look at this.  Even the -- the statement given by

8    Mr. Brugnara.  I mean, there is a -- a lot of it comes from

9    thoughts that are racing through his mind.  He's unmedicated.

10   These are thoughts that come to his mind and he says -- and

11   they -- they are repetitive many times.  The Court has seen

12   that.  He repeats the same things.  Some -- and some of these

13   things are delusional.  And -- and, you know, yes, it sounds

14   rational.  He can say it, you know, in a rational manner, but

15   that doesn't make it less delusional, doesn't make it less

16   manic behavior.

17        And then you -- you couple these things with his

18   narcissistic personality disorder.

19        Then you have the unfortunate situation where

20   Mr. Brugnara, you know, in large part, cannot control some of

21   his behavior, but, yet, when you challenge his -- his

22   conception of himself, then it becomes even worse.  And you've

23   seen that in this courtroom.

24        When you talk about his -- when you mention his inability

25   to -- to fund art or when you -- or when you talk about his

1   house, things like that set, you know, the manic disorder off,

2   and then the behavior becomes greater and greater and it

3   becomes sometimes uncontrollable.

4         So all these things can be explained by his mental

5   disorder.  We've tried our best to do that and present that for

6   the Court so the Court doesn't take this out of context.

7         Yes, the Court has mentioned Mr. Brugnara can be a bully.

8   He's a bully, yes.  He can be a pathological liar, the Court

9   says that.  And the Court says that he can be threatening.  The

10  Court has seen that.

11        But on the other hand, you know, what are the causes of

12  this?  And if they have causes that can be traced to mental

13  illness, they can be treated.  And they can be, you know,

14  controlled sometimes by medication, sometimes by therapy.  But

15  they can be -- you know, they can controlled to a point that he

16  can remain a productive citizen to -- you know, to not have the

17  edges on him, but to have -- you know, so he can go back to his

18  family and support his family in a way that we will all

19  consider -- all consider productive and meaningful.

20        So I'm asking the Court to look past his courtroom

21  behavior, look past some of the things he has said and, you

22  know, that have not been entirely accurate or they are not --

23  look past that.  Look for the root cause of that.  Because only

24  then can we know Mr. Brugnara and what -- what motivates some

25  of this, the worst aspects of this behavior.

```
1        It's -- it's easy to say:  Oh, you're a bully.  You're a
2   pathological liar.  But, you know, fail to see the cause of
3   this.
4        And because -- you know, there are -- I mean, there's
5   times -- and the Court has seen this -- that a person who might
6   be a sociopath.  I mean, they usually act in their best
7   interest, but Mr. Brugnara, his behavior is not ever in his
8   best interest.
9        I mean, along the universal theme is that it's based on
10  some delusions, and it's very -- it always works against him.
11  This entire trial worked against him.  Because he did -- there
12  were things that were out there.  He could have presented in a
13  rational fashion, but instead he didn't.  And, you know,
14  instead we dealt with behavioral issues the entire trial.
15       That brings into the -- we -- that brings into the issue
16  of what this case was about.  Mr. Brugnara -- I mean, you know,
17  he's right.  You know, the guidelines talk about conduct of the
18  victims, a circumstance for departures.
19       Now, you know, the Court has considerably more discretion
20  now that guidelines are just advisory.  In the past we had to
21  pigeonhole things as departures in order to get below certain,
22  you know, guideline calculations.  We don't have to do that
23  because the 3553(a) factors include things like conduct of the
24  victim.  Because the offense conduct is what the Court looks
25  at.
```

1          This case is -- is truly unique.  Mr. Brugnara was

2     contacted.  He -- you know, they -- you know, there was a

3     contact trying to sell him art, okay?  The case went to trial

4     as -- went to trial like this art was worth $11 million and the

5     Government had a certain theory.

6          Now we know differently.  Now we know a majority of that

7     art was fake, or certainly not worth the $7 million that was

8     the asking price for it.  So, and we have that.

9          Then we know from the facts of the case, and we know from

10    sometimes the victim impact reports -- and we didn't know this

11    during the case -- is that Mr. Maibaum gave instructions, you

12    know, that no authorities were to be contacted.  Now, that's an

13    odd position to take.

14         Now, we know that from Ms. Long's attorneys who -- who put

15    that in a declaration.  We didn't know that prior to trial.

16         But then you start seeing the -- the pattern of this case,

17    and it is different from what it was at -- at trial.  It was

18    different than it was prior to trial.  So that is a factor the

19    Court has to take in consideration and give it what weight

20    it -- it thinks is -- is necessary.

21         But I suggest to the Court that it's a very important

22    factor in this case.  Because it -- it really -- yes, it may

23    not be the defense that he tried to defraud someone that was

24    defrauding him.  Yes, that may not be a perfect defense.  And

25    I'm not conceding that, but that's something we've argued back

1   and forth.  But it's certainly something the Court should have

2   looked at in terms of overall conduct of Mr. Brugnara in this

3   case.

4        Because if -- if -- if he was being defrauded also,

5   then -- then what -- what are we doing just by a straight

6   guideline calculation?  Are we -- are we rewarding the -- the

7   culpable victims in this case and punishing a person

8   unnecessarily severely for conduct that may not be excusable,

9   but certainly less serious than the -- what we thought

10  originally?  So I think the Court has to factor that into --

11  you know, this case.

12       In terms of even the -- the mental illness, I -- that

13  would have factored into the case also in terms of thinking

14  that some of the conduct in this case that led up to trial.

15  None of this stuff was totally explainable.  Most of it was not

16  in Mr. Brugnara's best interest.

17       And if, indeed, which we contend is -- is motivated by

18  his -- his symptoms of his mental disorders, then the Court can

19  take that consideration and mitigate for some of the worst

20  conduct in this case.  That's something that -- that has -- has

21  troubled the Court from the get-go.

22       The Court was extremely patient with Mr. Brugnara.  Yes,

23  the Court bent over backwards to give -- to attempt to give him

24  a fair trial and look past sometimes some of the more egregious

25  behavior and -- and looked -- and extremely patient right now

1  listening to his statement.

2       So, yes, but you -- and being patient, sometimes, as we

3  all know, sometimes it's just not enough.  Sometimes we -- we

4  have to look at a person's motivations and to judge a person

5  not just by their actions but why they acted a certain way.

6  And in this way Mr. Brugnara sometimes cannot control his

7  behavior.

8       Now, this is not violent behavior for the most part.  He

9  threatens.  He blusters.  He does a lot of different things

10 throughout, but it's -- it's not violent behavior.  I mean,

11 this is a white collar case.  This is a -- a fraud case.

12 He's -- and his prior case was a tax case.  And his prior --

13 and the other case was a Fish and Game violation, false

14 statements.  But it wasn't violent offenses.

15      He doesn't have that type of history, that -- of violence

16 against individuals.

17      Throughout there has been threats.  There have been things

18 that were made, but never -- never materialized.  And some are

19 just -- are from magazine articles and kind of the persona of

20 Mr. Brugnara.  The courtroom is full of people that are -- that

21 know Mr. Brugnara's persona.  They may or may not know him

22 personally, but they know of his reputation, which always

23 precedes us.

24      But his reputation is -- is full of bluster, full of

25 exaggerations, full of -- of statements that -- that sound good

1   in the press, but aren't -- don't turn out to be true.  And

2   there -- and, certainly, at this point in time it's a -- it's

3   a -- for some people it's -- it looks at, well, the fall of

4   Mr. Brugnara, someone who is -- who had a reputation and -- as

5   a tycoon at one point in time.  Now we're going to -- to look

6   and see what happens to him.  But the Court has to see past

7   that.

8       I'm asking the Court to see past Mr. Brugnara's persona,

9   to look at the person behind the -- the mask so to speak.  Look

10  upon a person that -- that, yes, if the Court punishes him can

11  remain a functioning member of this society, a person that

12  could raise his kids, that could raise his family in a way that

13  makes -- helps them be productive members of society, can

14  support his family.

15      Just warehousing Mr. Brugnara, although that might be

16  superficially -- superficially satisfying because of some of

17  the rough edges and some of the things he did during this case,

18  really doesn't serve the interests of our society.  It -- it

19  just -- he is -- if one were to -- from the very start had --

20  had completed -- had done everything wrong, multiple violations

21  from the time he was 20, you know, had a long history of

22  violations, one could look at, well, that person is maybe a

23  threat to society.

24      But Mr. Brugnara doesn't have that history.  His history

25  is relatively recent, you know, his late 40s and early 50s.

1   He's 52 years of age.  He has -- I mean, irrespective of

2   whether some -- some things might be exaggerations, he was a

3   businessman in San Francisco.  He -- he was a successful real

4   estate individual.  He did, you know, at a point in time

5   sell -- you know, people trusted him with money.

6       So all these things were true.  And, yet, he has fallen on

7   hard times, no doubt.  But, you know, is this a function of --

8   of, you know, him always being like this and just necessarily

9   not having the talent?  No.  This is a function of his mental

10  illness being uncontrolled and, you know, the bad judgments he

11  made over this period of time and -- but that could be

12  remedied.  That doesn't need just to be warehoused.  That can

13  be remedied by, you know, strict conditions of supervised

14  release that monitor his mental illness.  Things that allow,

15  you know, a counseling program.

16      We really kind of have to think outside the box in this

17  case.  Straight punishment benefits no one.  Certainly, not his

18  family, not society in general.  It is superficial --

19          **THE COURT:**  Punishment has a deterrent value.  That's

20  the main reason things like this go -- people go to prison,

21  so -- to stop other people in similar circumstances from doing

22  the same thing.

23          **MR. BOISSEAU:**  Well --

24          **THE COURT:**  So there is value.  I mean, it's -- you

25  call it "warehousing," but it's punishment designed to deter.

 1   That's the point.

 2         **MR. BOISSEAU:**  And then the question is:  How long is

 3   that necessary?  How long is that necessary --

 4         **THE COURT:**  Under the statute, the sentence has to be

 5   the lowest sentence that will satisfy the expressed objectives

 6   of Congress and 3553(a).  So that's what I do.

 7         **MR. BOISSEAU:**  And I understand that.  And I do

 8   understand that's the Court.  And I understand deterrence.

 9   That's, you know, a factor.

10         But brought to this case, brought to the issues in this

11   case, what is necessary?  Not one day longer than necessary to

12   reach the sentencing objectives.  And I have recommended a

13   sentence of 30 months.  Certainly, that's much lower than the

14   Government recommends, but it is punishment.

15         I mean, these 17 months that he has done already have been

16   really, really difficult on Mr. Brugnara.

17         The county jail sentence, I mean, everyone acknowledges

18   the fact that county jail is the toughest place that anyone is

19   going to be.  But these were 17 months of very difficult times

20   for Mr. Brugnara.  That is undisputable.

21         I mean, yes, there may be exaggerations upon the

22   conditions or maybe all these things, but these have been tough

23   times away from his family.

24         So, okay.  I'm recommending a sentence that's over that.

25   That is the deterrent factor.  That is the punishment factor.

1   That is -- that punishes him for the actual conduct in this

2   case.  This is what he actually did, what -- you know, in -- in

3   considering the conduct of Mr. Maibaum and Ms. Long and given

4   the fact that it wasn't even Mr. Brugnara that sought them out,

5   they sought him out.  And that -- as I put in my motion for a

6   new trial, that was significant because I think they thought

7   they had an easy mark.  But that is -- those factors have to be

8   considered.

9        Mr. Brugnara talks about accountability.  A sentence like

10  that makes him accountable, makes him accountable for his

11  conduct.  And then he has, you know, a significant period of

12  supervised release afterwards.

13           THE COURT:  His entire two hours of allocution I

14  never heard him once accept any responsibility for what had

15  happened.  He defended everything that he did.  And, yet, the

16  facts are that he induced those people to send the art out

17  there.  As soon as he got it in the garage, he wouldn't give it

18  back.  And then he sent a text message in black and white

19  saying it had been a gift.  A gift.

20       So even if you say it's only worth half a million dollars,

21  he's taken a half million dollars.  He's holding it for ransom,

22  trying to grind them down to some other deal.  And only after

23  the lawyers got -- after they got a lawyer on the other side

24  did he get his lawyer involved and try to extract it into some

25  kind of a settlement.

```
 1        Now, is that the way -- is that the way commerce is
 2   supposed to work in this country?
 3             MR. BOISSEAU:  No.  I -- I don't --
 4             THE COURT:  No.  Of course not.
 5             MR. BOISSEAU:  I don't --
 6             THE COURT:  People have to be punished for doing
 7   something like that.  He didn't even acknowledge that he had
 8   done that.
 9             MR. BOISSEAU:  Well --
10             THE COURT:  He -- he -- the closest he came was he
11   said Ms. Long said it was a gift, which is preposterous.
12   People don't give away art like that.  Even if -- even if some
13   of it's fake.
14        So I just -- what do you do with a case where the
15   defendant won't accept responsibility?
16             MR. BOISSEAU:  Well, you have --
17             THE COURT:  He won't say -- he won't -- he wouldn't
18   say:  I made a mistake.  I wish I hadn't done that.
19        No, he didn't.  It was -- so, anyway.
20             MR. BOISSEAU:  You have --
21             THE COURT:  Please.  I'm interrupting you.  It's your
22   turn.
23             MR. BOISSEAU:  No, I -- and it's a fair question,
24   your Honor.  I was going to get to that.
25        Acceptance of responsibility.  I mean, you -- you have to
```

1    look at it in the context of his mental illness.  I mean, one

2    can -- you know, you have to look at his narcissistic

3    personality disorder, the -- the concept of -- the delusional

4    concept of his self, the issue -- all of -- and his bipolar

5    disorder, all these things almost factor into a perfect storm

6    that he cannot accept responsibility when that responsibility

7    challenges his conception of his self.

8        We tried to explain that to the Court how this works, you

9    know, the dynamic of mental illness.  That's why I'm asking the

10   Court to open -- to open its mind to this.

11        **THE COURT:**  If you had come in and said -- I'm not

12   saying how much weight I would have given this, but I would

13   have given your argument more weight if you had come in and

14   said:  The doctor had said if he takes Drug ABC, that will get

15   rid of the narcissism.  If he takes Drug DEF, that will get rid

16   of the bipolar.  And if he takes FGY, that will get rid of the

17   other thing and then he will be a normal person for the rest of

18   his life, as long as he stays on his meds.

19        You said none of that.

20        **MR. BOISSEAU:**  Well --

21        **THE COURT:**  You said none of that.  You just said

22   recognize that he's got a mental illness and cut him some slack

23   on account of that.  And then throw away a little statement

24   about giving a supervised release condition of -- supervised

25   release condition of mental health treatment.  That -- that's

1  called comfort.

2      You know, I wish you had given me a medical plan.  You

3  didn't.  It's just tossing up this to the wind to hope that

4  he's going to be any better whenever he comes out of prison,

5  even on the strictest terms of supervised release.  It's --

6  he -- you know, you -- I think he's a pathological liar.  He

7  has a hard time telling the truth.  He is a master of the

8  half-truth.

9      I've said this before.  I've seen it over and over again

10 in the courtroom.  And maybe there is some mental things going

11 on in his mind that help contribute to that, but you haven't

12 given me a medical plan to deal with it.

13          **MR. BOISSEAU:**  Well, the --

14          **THE COURT:**  So I don't know what to make of this.

15          **MR. BOISSEAU:**  Well, the medical treatment -- we --

16 we addressed it somewhat in the Sentencing Memorandum.

17          **THE COURT:**  What is the prescription?  What drug do

18 we prescribe?

19          **MR. BOISSEAU:**  Well, our doctor, Dr. Shields, is --

20 does not prescribe medication.

21          **THE COURT:**  Okay.  See, there is no plan.  There is

22 no plan.

23          **MR. BOISSEAU:**  But -- not he -- okay.  But he

24 suggests what needs to be done is medication for the bipolar

25 disorder.  Then if you control the -- the random thoughts, the

155

1    racing manic thoughts, then you can control the delusional

2    thoughts that come along with those manic thoughts, and then

3    that -- this -- that helps with the narcissistic personality

4    disorder.

5        So that -- you treat the bipolar disorder first.  And then

6    the other two things come --

7            **THE COURT:**  You could have said:  And by the way, the

8    drug that does that is ABC with a 99 percent success rate, or

9    whatever.

10       I don't know any of that myself.  For all I know, there is

11   no way to treat it.

12       But you haven't given the judge any basis on which to hope

13   that that would be a successful plan.  You've just --

14   Dr. Shields says treat -- you know, generic treat the mental

15   illness.

16       Well, I don't know.  That's called comfort to me.  I've

17   seen too much in this job to just take that at face value.  I

18   would want to know a lot more specifics.  So I'm not so

19   convinced that that's the right program.

20           **MR. BOISSEAU:**  Well, it is the program that has to be

21   developed.  It's -- I mean, I'm asking the Court to consider

22   that in the context of what Mr. Brugnara's conduct, the

23   treatment plan would have to be developed upon his release.

24   That was the only time -- then you can monitor it.  The Court

25   is still involved in that process at that point in time.  It's

1    still -- the Court can monitor that progress and could develop

2    a treatment program with the -- the help of Probation.

3        So that would come at the end of deterrence.  Okay.  So

4    that is what the plan would be to -- to deal with, you know,

5    some of the worst aspects of this illness.

6        I mean, you know, that would need to be done at the end.

7    I'm asking the Court to consider that as -- as a reason why

8    some of these actions are done by Mr. Brugnara, to consider it

9    as a circumstance in -- in mitigation.  Because that mental

10   illness is a circumstance in mitigation.  As is family.  As is

11   victim's conduct.  Those are circumstances the Court has to

12   look at.

13            **THE COURT:**  Okay.  I'm going to consider that, but I

14   don't know how much weight to give it, and I don't know how

15   much weight in the rehabilitation phase of this we can give it.

16   It's a hard thing to judge.

17       But it doesn't take away from the fact my firmly convinced

18   view that Mr. Brugnara knew what he was doing and he -- he

19   knows that he's a bully.  He likes to bull his way through

20   difficult circumstances.  And he's a master at the half-truth,

21   and that's how he gets through life.

22       And in this case that got him caught up with the -- in

23   this art fraud deal, and there will be future deals like that

24   in the future.  That's what bothers me.

25       So, yes, he's got some mental problems, but they don't

1   take away -- he's totally competent.  I don't doubt that for a

2   moment.  But how much weight do you give something like that

3   when somebody commits a crime that a completely normal person

4   wouldn't commit?  I don't know.

5        We can't -- we can't go around cutting a lot of slack to

6   people because they don't go out and get themselves treated for

7   mental illness and so that we can -- you know, they behave like

8   a normal person.

9             **MR. BOISSEAU:**  Well, if you -- if you look at

10   Mr. Brugnara's case, he's 52 years of age.  Right?  And all his

11   criminal conduct for the most part has been over the last few

12   years.  The tax fraud case, and Fish and Wildlife false

13   statements case, and then this mail fraud case.  So, I mean,

14   this -- we can look at -- and prior to that -- I mean, yes, the

15   persona is there, but he was a successful businessman.

16        So you look upon that, his history, and say:  Okay.  If we

17   treat this, can he once again be a productive member of society

18   without those edges?

19        And I say -- I'm asking the Court to say:  Well, yes, he

20   can be.  Because if you're --

21             **THE COURT:**  Why didn't he do that sooner?  Why -- why

22   didn't he get himself on meds before he committed the tax

23   fraud?  Which is another thing he totally refuses to accept.

24   He pled guilty to that twice.  I let him out of it the first

25   time after the trial had conveniently passed.  He said he

1    wanted to take it back.  I said:  Okay.  You can take it back.

2        And then we had to set another trial date six months out.

3    That trial date approached, he pled guilty again.  As soon as

4    that trial date passed, oh, amazing.  He wanted to get out of

5    that plea, too.  At that point I said no.

6        But he -- he confessed to the accusation twice.  But you

7    heard what happened here today.  He refuses to even -- he says

8    that was a complete sham by the Government; that he was

9    innocent, that -- he -- he will not admit he has ever done a

10   thing wrong.  He's all right.  He's okay.  Everyone else is the

11   one at fault.  You can't go through and be a productive member

12   of the commerce of the United States by taking that kind of an

13   attitude.

14        **MR. BOISSEAU:**  No.  I --

15        **THE COURT:**  You've got to accept responsibility and

16   be honest.

17        **MR. BOISSEAU:**  Yes.

18        **THE COURT:**  Not misrepresenting things to people on

19   the other side of the table all the time.

20        **MR. BOISSEAU:**  I -- I don't adopt --

21        **THE COURT:**  I think -- I think he's a threat to the

22   commerce of this country, because he will not be honest to the

23   people he's doing business with.

24        Now, those banks, they had him locked up every which way.

25   All of those properties got sold.  He lost everything in the

1    downturn.  The banks had it locked up so they took all the

2    property away, and all he's got left is whatever equity he's

3    got in his house in Sea Cliff.  I'm sorry it came to that.  But

4    because of those desperate circumstances, I think he's willing

5    to do anything.  And that's what bothers me.

6         **MR. BOISSEAU:**  I -- and that's why I'm asking for

7    a -- although the Court can criticize the defense we don't have

8    an actual treatment program, I'm suggesting the reasons for it

9    and that it can be developed.

10        And the question is -- I didn't -- I'm not adopting the --

11   the statements of Mr. Brugnara.  I mean, you know, yes, I

12   would -- certainly would be a lot better if he accepted

13   responsibility for his conduct in the past and his

14   responsibility for his role in this offense.  I -- I understand

15   the Court's concern of that, but I'm telling the reason why he

16   can't.

17        And that is not so much in his control.  And that is -- I

18   mean, that is a function of mental illness.  It's not a

19   function of just being an antisocial personality disorder,

20   because that's not -- he doesn't even act in his best interest

21   most of the time.

22        You know, yes, half-truths, you know.  He's a master of

23   that, but at the same time everyone knows it's not true

24   because --

25        **THE COURT:**  No, that's not correct.  For the first

1  half of this case I gave him the benefit of the doubt and

2  believed most of what he said.  Then I come to find out that

3  you can't trust a thing that he says.  It's always qualified,

4  so you find out the qualification later.

5       Here is another thing.  He hasn't agreed to take whatever

6  drugs get prescribed.  I don't know -- I doubt that the judge

7  can even require as a condition of supervised release that he

8  take certain medications.  It would be like forceable

9  administration of psychotropic drugs.  Can I -- can I require

10 that --

11           MR. BOISSEAU:  You --

12           THE COURT:  -- on a term of supervised release?

13 You've given me no authority to that effect.  You've given me

14 no consent by the defendant that he's willing to do that.

15      You're just -- I'm taking a big gamble that maybe there

16 will be a treatment plan in the future that -- after he gets

17 the benefit of a reduced sentence, that maybe he would go along

18 with it.  I don't think that's his personality.

19           MR. BOISSEAU:  But --

20           THE COURT:  I don't think -- I don't think his

21 personality is one to submit to forceable administration of

22 psychotropic drugs.

23           MR. BOISSEAU:  But, you know -- you know, there's

24 psychotropic drugs and then there's treatment programs.

25 There's counseling for which we have a history of counseling.

1        Now, the Court is going to be in a position to monitor

2   this.  The Court is going to be on top of this.  And that --

3   you know, you're not losing jurisdiction.  You're just -- you

4   know, you're -- you're -- we're --

5            **THE COURT:**  Okay.  Let's play that out.  Okay.  He

6   comes out of prison, we have a few hearings.

7        How are you doing, Mr. Brugnara?

8        Doing fine.  I've got a deal going in Las Vegas.

9        Are you telling them the truth?

10       Oh, yes.  I'm telling them the truth.

11       Okay.  Great.

12       And then:  Are you taking your meds?

13       I don't need those meds.

14       Well, I'm ordering you to take the meds.

15       No, I'm not going to take the meds.

16       What do I do then?  The Marshals come get him and force

17  him to take the meds?

18            **MR. BOISSEAU:**  I -- I --

19            **THE COURT:**  I don't think that's going to work.

20            **MR. BOISSEAU:**  I think that would probably be --

21  first of all, this would be done through the Probation

22  Department.  It would be done with the -- the doctors.  There

23  would be doctors involved in it.  And it would be a process

24  that the Court could monitor.

25       I mean, it's not a simple matter of just the Court saying

```
 1   do this.  It's a question of setting conditions, you know,
 2   mental health conditions, complying with those conditions, run
 3   through Probation, run through doctors and would be -- and the
 4   Court would accept -- would have to accept the best medical and
 5   psychological evidence available for it.  So it would be --
 6           THE COURT:  I'm saying I would be willing to do that,
 7   but I don't think the defendant would do that.  And I think the
 8   defendant would resist any drugs and would resist the treatment
 9   program, some sort of George Orwellian futuristic thing that
10   would be unconstitutional.
11       And, you know, I can just hear the speech now.  He
12   wouldn't do it.  I'm positive he wouldn't do it.  And then what
13   do I do?
14           MR. BOISSEAU:  The Court has options.
15           THE COURT:  Put him back in jail?  Put him back in
16   jail because he won't be medicated?
17           MR. BOISSEAU:  The Court has options.  The Court --
18   Court has options.  But what -- what we're doing right now is
19   saying:  Well, the only option is to put Mr. Brugnara in jail
20   for a significant period of time.  What good does that do?
21   That doesn't help either.
22       I mean, this would be at least an option the Court would
23   have in -- in dealing with one of our fellow citizens to -- to
24   ensure that there was compliance with the rules.
25       I mean, we -- we talk about, you know, yes, Mr. Brugnara
```

1  has rules for his children.  He's going to have to realize

2  there's rules for him too.  And that's part of the learning

3  process.  That's the part --

4          **THE COURT:**  You've seen how he obeys the rules,

5  right?  About the halfway house rules?  The furlough rules?  He

6  believes he's above all of the rules.  He will agree to

7  anything.

8      He told me -- he agreed to the halfway house.  He agreed

9  to the furlough rules.  He violated them right off the bat.  He

10 is not amenable to supervision.  So that's the -- that's a

11 serious problem.

12     I don't think he would take a single drug that the doctors

13 told him to take.

14         **MR. BOISSEAU:**  Well, you know, if the -- if the issue

15 was family is at stake, I think you might see a different

16 person for that.  Because at that point in time, you know, as

17 he mentioned, his family is suffering, his children, his -- his

18 wife.  I mean, the persons that love him the most.

19     His mother is in the courtroom.  She always understood the

20 problem.  He had mental illness.  And it was a cry in the -- it

21 was a cry in the wind.

22     I mean, she was asking for -- for help for her son.  And

23 now we -- we have a situation.  I'm -- I'm asking for help from

24 the Court to -- to consider this.  You know, consider the

25 treatment options, consider the mitigation, consider the

1   motivations why some of this behavior happened, to not just

2   say:  Okay, he's just a pathological liar.  He's just --

3           **THE COURT:**  I am considering -- I will -- I will

4   consider it, but it's not going to get down to 30 months.

5   That's not going to work.

6           **MR. BOISSEAU:**  Okay.  Then -- I -- well, and -- you

7   know, the Court -- I understand the Court, and I -- you know, I

8   just -- I want -- in my final parting remarks, it's just -- I

9   ask the Court to consider this entire case, not just on his

10  behavior during court, which is inexcusable, but all the facts

11  of this case, all the facts of this case that the Court learned

12  mostly afterwards.

13          **THE COURT:**  I am going to consider it.  I will do

14  that.

15          **MR. BOISSEAU:**  And then -- and look at -- and look at

16  the context of this case, because as -- the jury ruled a

17  certain way, and I have to accept that.  Although we have filed

18  motions for a new trial.  But we have to accept the fact that

19  the jury's verdict and we have to accept the responsibility of

20  the Court to sentence Mr. Brugnara to a fair sentence, not a

21  day over what's necessary for the -- all of the factors for

22  sentencing.

23          And then -- but I have to do that.  But if you consider

24  all the facts of this case, that I -- I contend and I submit

25  that a sentence where the Government wants to go is just not

```
 1   fair.  It's not needed.  It's not a fair and reasonable
 2   sentence.
 3        So I'm asking you for a sentence below the sentencing
 4   guidelines.  And then with -- in terms of supervision, at least
 5   ensure the Court's -- make sure the Court's mind has  -- has
 6   some control over his behavior in the past.  Because I'm sure
 7   the Court wants, we all want, a different Mr. Brugnara when he
 8   gets out, someone that's not prone to what he has done in the
 9   past.
10        THE COURT:  All right.  Thank you.
11        Before we go on, let me ask -- Ms. Harris, who is going to
12   argue this?
13        MS. HARRIS:  Mr. Kingsley.
14        THE COURT:  Mr. Kingsley, how much time do you need?
15        MR. KINGSLEY:  Maybe 10 minutes, hopefully less.
16        THE COURT:  Well --
17        MR. KINGSLEY:  I'll try to keep it brief.
18        THE COURT:  We have been going a long time.  We're
19   going to take a break.  We're going to take a 10-minute break
20   and then come back and do your argument.
21        (Whereupon there was a recess in the proceedings
22         from 12:07 p.m. until 12:20 p.m.)
23        THE COURT:  All right.  Everyone is here.  The
24   defendant is here.  Let's let Mr. Brugnara have a seat much.
25        Please go ahead.
```

1     **MR. KINGSLEY:**  Your Honor, since the beginning of

2  this case, the courts of this district have found Mr. Brugnara

3  to be an economic danger to the community, and now he's been

4  convicted of an offense.  He's awaiting sentencing.

5     We have a PSR full of the history of threats of bullying,

6  of lies in this case and outside of this case.  And the

7  Government is respectfully requesting, based on that, the

8  history of the fraud and the history of his lies in the case,

9  and everything he did outside of this case that this Court

10  knows about, we're requesting a sentence of 149 months,

11  including the supervised release violation.

12     So I think to start, this Court has pointed out the risk

13  that Mr. Brugnara poses to commerce, and I think the best way

14  to describe him is an economic catastrophe to the community.

15     We have -- we proved at trial not only that he was out

16  there  trying to steal this artwork from the victims in this

17  case, but at the time of his arrest, he was sending emails to

18  lenders with misrepresentations in them about his assets.  Some

19  of them included misrepresentations of artwork.  Some of them

20  included misrepresentations about property that he owned.  It's

21  not a single one-off thing.  We're not just talking about

22  this -- this particular fraud.

23     But the fraud itself is brazen.  And its brazenness goes

24  to Mr. Brugnara's willingness to lie to get whatever he wants

25  and his total lack of respect for the rule of law and for the

1   rules of this Court and society.

2        And I think his allocution today underscores just how

3   brazen it was.  He still -- he stood up here today and

4   repeatedly argued about the value of the Degas, that it should

5   be considered worthless, when we know -- we proved beyond a

6   reasonable doubt at trial, and this Court knows, the defendant

7   stole that sculpture and still won't give it back.

8        This is one of the few crimes, economic crimes at least,

9   that we see in this district where we have a defendant who not

10  only won't accept responsibility and who shows no remorse at

11  sentencing, but, in fact, still has the property that he stole.

12       And I think that that's -- that undercuts any argument

13  that he is going to be a changed man; that his lies, as Mr.

14  Boisseau argued, are sort of haphazard, things that he -- that

15  result from his mania, that he tells things here or there.  He

16  stole this sculpture.  He planned this out.  He stole the

17  sculpture and he still has it.

18       Looking at the fraud itself, Mr. Boisseau has argued

19  about -- as though this case were about the value of the art or

20  $11 million worth of artwork.  And we've talked about that a

21  lot.  And I don't want to spend a lot more time on that, but I

22  do want to focus on the lies that he told.

23       He said he would buy the artwork.  He said that in an

24  email.  He said that he had a museum, and he texted and said

25  that the artwork was a gift.  He then stole the Degas, changed

1   his story, and said that there were four crates of art when we

2   know there are five.  He lied about the Hermitage book.

3       When he gets arrested in this case, he immediately starts

4   lying to the Magistrate Courts of this district to try to get

5   himself out of custody.  And then he lies to this Court in a

6   Form 12.

7       And we charged him with only one set of false declarations

8   regarding Sotheby's, but there was a lot of other stuff in

9   there that were false.  And I think it goes -- that was the

10  first in a number of evidentiary hearings we had where the

11  defendant testified or started something that was patently

12  false and this Court and the Government had to go run down and

13  prove that it was inaccurate.

14      And this goes to one of the things Mr. Boisseau was

15  arguing, which is that we could put the defendant on supervised

16  release.  We can do things and trust him to treat himself.  And

17  this Court got directly to the point.  He is not amenable to

18  supervision.  And as soon as he's out on supervision, he's

19  going to be trying to make another deal.  He's going to be

20  lying about what his assets are or what he's -- whether he's

21  taking his medication, and we're going to have to have an

22  evidentiary hearing.  We'll be back here again doing exactly

23  the same thing we did again and again and again in this case,

24  trying to prove something that he made up -- that he just made

25  up.

```
 1         Now, that brings me to another point about the -- what
 2    defendant's lies are.  They are not, as the defense would
 3    suggest, the ravings of a madman.  And as I said, they are not
 4    haphazard.  Almost all of the lies he told in this case, a lot
 5    of them might not have worked out for them, but they had a
 6    purpose.  He told them to try to get something.
 7         He lied to Rose Long because he wanted to get the artwork.
 8    He lied through his lawyers to try to keep the artwork.  He
 9    lied to this Court because he wanted to get out on -- on bail.
10    He lied because he wanted to get the U.S. Attorney's Office
11    recused.  He lied because he wanted to get released to the
12    custody of Erik Babcock to prepare for trial.  That was yet
13    another lie.  And I -- I don't think we can forget that these
14    are not -- these lies are all things that he does that are
15    consistent with his behavior, not in this case, outside, out
16    there in the world, but things that he tells people in order to
17    get what he wants.
18         And to some extent, these lies -- I mean, I think we have
19    777 docket entries in this case.  This case was charged about a
20    year and a half ago.  And a lot of that comes from the
21    defendant's lies.  And we gave him due process.  And we have to
22    give him due process.
23         And now we're at the point where we can take into account
24    all of those things that he did and all of those lies that he
25    told and say:  You know what?  We're not going to tolerate this
```

1    any more.  We're not going to just put you away for a short

2    period of time knowing that you're going to come out and you're

3    going to do the same things again and again and again and we're

4    going to be here again relitigating a bunch of things that you

5    just make up.

6         And I -- I think that we're not warehousing the defendant

7    and asking for a long sentence for him.  We're not.  This Court

8    pointed out general deterrence.  I think that's an important

9    thing to keep in mind.  But I think incapacitation of this

10   defendant.

11        I mean, whatever the cause is of his behavior, whatever

12   makes him the bully that he is, the person who threatens a city

13   attorney, who threatens his mistress, who threatens his

14   brother, who threatens halfway house employees, who threatens

15   the nurse at the jail; or the person who lies, which is the

16   other thing he does to get what he wants, whatever the cause of

17   it is, I -- I don't know the answer to that.  I don't think we

18   have a conclusive answer.

19        It is who he is, and it's -- it's who he has been for a

20   long period of time.  This isn't just some new conduct.

21        It's true his first federal case was in 2008, but that was

22   seven years ago.  In the tax conduct at issue, it happened

23   early in the 2000s.  There is incidents in the PSR dating back

24   to the early 2000s.  This is who he is.

25        And the -- the concept that somehow he's going to change

 1  now based on a representation of defense counsel that, you

 2  know, maybe he can, we know he's not going to.  There is no

 3  treatment proposed.  He is a liar.  He doesn't have empathy for

 4  other people, and he tries to bully his way to get whatever he

 5  wants.  And this Court has said this again and again and again.

 6       When looking at the sentencing guidelines, we've

 7  calculated -- this Court has calculated a guidelines range of

 8  77 to 96 months.  And then we'd add on 12 months for supervised

 9  release violation.  And the high end of the guidelines would be

10  108 months --

11            **THE COURT:**  We don't add on.  It's concurrent, isn't

12  it?

13            **MR. KINGSLEY:**  It's consecutive, I believe.  The

14  guidelines say it should be consecutive.

15            **THE COURT:**  Well, for a -- I don't think that's

16  right.

17       Well, a month apart is what I'm talking about.

18            **MR. KINGSLEY:**  Well, the Court has discretion on

19  that, but the guidelines recommend that it's consecutive.  And

20  I can find that.

21       But -- and I think part of the reason for that under the

22  guidelines is to punish the violation.  And not -- he committed

23  new criminal conduct, but the fact that he was committing it on

24  supervised release and disobeying this Court's order is the

25  purpose of that.

1      **THE COURT:**  Don't we already ding him under the fact

2   that he did it on supervised release?  Doesn't -- hasn't he

3   already gotten some points for that?

4      **MR. KINGSLEY:**  He does get criminal history points

5   for that.  Anyway --

6      **THE COURT:**  I think that's double counting.

7      **MR. KINGSLEY:**  Putting that aside, let's say that the

8   high end is 96 months then.  There is so much conduct that's

9   not contemplated by those guidelines.  The escape from custody

10  weeks before trial, which resulted from a series of lies about

11  the access -- problems with access to counsel that he was

12  having at the jail.  Lies to this Court that got this Court to

13  do an extraordinary thing to help the defendant prepare for

14  trial.  He took advantage of that and violated most of the

15  rules in that order, ran away, got caught, came back and lied

16  about what had happened.

17      That's one example of how he's not amenable to

18  supervision.  And one example of something that that affects

19  his guidelines by adding one point in how the counts group.

20  One point for that.

21      All of the conduct described in Paragraph 37, the lies

22  again and again and again that required the evidentiary

23  hearings that I've talked about, that this Court has talked

24  about.  He gets plus two for obstruction of justice on the

25  fraud case.  Plus two.  And that's justified by his conviction

```
 1   for making a false declaration to the Court.  But he only gets

 2   that enhancement once.

 3       A defendant who comes in and committed the same crime as

 4   the defendant and lied a single time to this Court would

 5   probably get that plus two as well.  All of his lies throughout

 6   this case need to be taken into account.  They need to be

 7   punished because they were attempts by the defendant to break

 8   the criminal justice system, to bend it, to do what he wanted

 9   to do.  And because they are consistent with his conduct when

10   he's out in the world.

11       He was doing the same things to this Court and to the U.S.

12   Attorney's Office and to his lawyers that he does to people

13   that he's engaging in economic transactions with.  So all of

14   that conduct needs to be taken into account.  It warrants a

15   variance, a variance upward.

16       And I want to emphasize here because the defense --

17   Mr. Boisseau has suggested that we're punishing him for his

18   being disrespectful or being a jerk or being difficult.  And he

19   certainly can be all those things, but I don't think that's --

20   that's not the reason that the Government is asking for a high

21   sentence.  It -- it goes to the lies that he tells and the

22   things that he does to try to get his way, because that

23   reflects how dangerous he is and how dangerous he's going to be

24   out in the community.

25       I want to talk for a second about some of the mitigating
```

1  factors that the defense has proposed.  The mental illness is

2  the first one.  And, again, I just see no evidence that this is

3  anything other than a person who is a sociopath, who will do

4  whatever he can to get what he wants.  And there is no evidence

5  either in this case or in the realm of criminal cases that

6  exist in our country that suggest that somebody like him is

7  suddenly at the age of 52 going to get treated for this and

8  stop doing it.  There is no evidence of that.

9      And I think that it's -- we're putting the blinders on and

10  being naive if we think we can sentence Mr. Brugnara to four or

11  five years in custody, he will come out, and we'll have some

12  good time on supervised release.

13          **THE COURT:**  But aren't there white collar criminals

14  who have committed major securities frauds against our country

15  who haven't even been prosecuted?  But even those that get

16  prosecuted, they don't serve long sentences like that.

17          **MR. KINGSLEY:**  I think a lot of those people are

18  first-time offenders.  The defendant was convicted in two

19  separate federal cases.  And they are also people who don't --

20  I don't think you have the risk of reoffending.  A lot of the

21  people that our office prosecutes in white collar cases, I

22  think everybody agrees at sentencing that individual deterrence

23  is not much of an issue, that the defendant is not going to

24  commit this crime again.  Even some of the biggest frauds,

25  that's the case.

1    We know that's not true for this defendant.  We know he's

2  a risk of doing it again.  We know that the prior sentence he

3  got of, I think it was 30 months in the tax case, didn't deter

4  him one bit.  And that's what Mr. Boisseau is asking for now,

5  to do the same thing we did before.

6    And his crimes got worse after he got out, probably

7  because he got more desperate, which is another thing.

8  Defendant again and again said that he wants to go out and take

9  care of his family.  He wants to be the breadwinner.  And I

10  think that that's true.  I think he's telling the truth.  I

11  don't know how he's going to do that legitimately.

12    There was no evidence in this case, and defendant tried to

13  make that an issue at trial, that after he got out of custody

14  from his first convictions, that he had any ability to

15  legitimately earn a living.

16    And this Court knows from this case and from some of the

17  emails he was sending at the time he was arrested that he was

18  willing to say or do whatever he could to get a loan, to get

19  his hands on a piece of real estate, to get his hands on

20  artwork.  And I don't think that's going to get better.

21    In terms of his family, in terms of him being a family

22  man, which he has trotted out again and again and again, I

23  don't doubt whether he loves his wife or his children, but I

24  will say that at the time that this crime happened, defendant

25  wasn't living with his family.  He was living in Sea Cliff by

1  himself, and he was giving the Hermitage book that he lied

2  about to his Russian girlfriend, with whom he had a child that

3  he denied throughout this case, and he still hasn't

4  acknowledged.

5      He mentions four children again and again.  And I don't

6  think that this Court needs to get into that and resolve that,

7  but I do think it under -- undercuts his argument that he's

8  some good family man who just wants to go home, go back to

9  being the father that he always was and, you know, go out and

10  earn a honest living for his family.

11      We know that's not what's going to happen.  That's not

12  what happened last time he got out of custody.  And things

13  certainly aren't going to be different the next time.

14          **THE COURT:**  What do you say to the argument that

15  under the guidelines the Court can take into account the

16  conduct of the victims?

17          **MR. KINGSLEY:**  So I believe that's 5K2.10.  And I

18  think the Court can take into account whatever it wants under

19  3553, but I think one of the things is -- when you look at this

20  guideline, it's clearly written for violent conduct.

21      And then at the end Mr. Brugnara said:  There may be

22  unusual circumstances in which substantial victim misconduct

23  would warrant a reduced penalty in the case of a non-violent

24  offense.  For example, an extended course of provocation and

25  harassment might lead a defendant to steal or destroy property

1    in retaliation.

2         And at least what the guidelines I think are looking at

3    are circumstances in which the victim's conduct mitigates the

4    defendant's conduct.  And I don't think that's true here.  I

5    think that if anybody had any suspicion about what this

6    value -- what this artwork was worth, the defendant knew all

7    along.  He stole the most valuable piece of artwork.  He didn't

8    steal the de Koonings.  He stole what turned out to be most

9    valuable.

10        I think that he -- I think he saw people who were

11   desperate to sell the artwork and he saw that as an opportunity

12   for himself.  I don't think it mitigates his conduct.

13        To the extent that it makes a difference, it's reflected

14   in the guidelines.  I mean, we have a lower loss amount for

15   that purpose.  And I think -- I can't remember whether it was

16   Mr. Brugnara or Mr. Boisseau who said that we would be

17   rewarding the victims by punishing Mr. Brugnara.  That's not --

18   I mean, they don't get anything from Mr. Brugnara going to

19   jail.  And what this Court is looking at and what the

20   Government is looking at in making a sentencing recommendation

21   doesn't really turn on -- we're not trying to benefit the

22   victims.  We're trying to keep Mr. Brugnara from being out

23   there causing economic harm again and again and again.  And

24   that's the biggest concern of the Government in this case.  And

25   I don't -- I don't see how the victim's conduct mitigates it.

1          And them reaching out to him in the first instance -- I

2     mean, if this were the only thing that defendant were doing at

3     that time that suggested fraud and, you know, he could argue

4     that he didn't have a propensity to do this and, you know,

5     maybe it's not a defense, but they kind of pushed him into

6     doing it in some way, I could see that mitigating him.  But

7     that's not what happened at all.  And we know that he would

8     have taken any opportunity at that time to get something of

9     value without paying for it.  And that's -- that's what

10    happened.

11         The other thing about the victim's conduct, and I don't

12    think -- again, I don't think the Court needs to weigh in on

13    what they knew at the time that they were selling him the

14    artwork.  But Rose Long begged him to appraise this artwork.

15    She begged him.  I mean, that was part of the deal.

16         She shows up there with tools to open the crates.  She

17    says in emails:  Is your appraiser going to be here?

18         Nobody was hiding this information from him.  Everybody

19    wanted him to open the artwork and appraise it at the time the

20    transaction happened, and he didn't.  And as far as I know, he

21    never -- he never looked at the artwork or asked somebody to

22    look at the artwork on his behalf until we did it just this

23    summer, a year and a half after he got it for the first time.

24         So all of this smoke and noise about, well, you know,

25    there was -- somebody knew what this was worth or they were

1  unloading artwork on him, they may have been -- they may have

2  known that the de Koonings weren't as valuable as they priced

3  them for.  And I don't think we need to resolve that.

4  Mr. Brugnara had every opportunity in the world to look at the

5  artwork and he didn't because he didn't care.

6      It wasn't -- he wanted to steal Degas sculpture, and

7  that's what he did.  He wasn't going to appraise the

8  de Koonings because he had no money to pay for them and he

9  wasn't going to pay for them.  And so I think that's another

10 reason you don't -- it really doesn't mitigate his conduct at

11 all.  His -- his lies were brazen and consistent regardless of

12 what that art is, regardless of what's in that -- in those

13 crates because he never actually looked at what was in the

14 crates.

15     So I think -- in conclusion I just want to say, I can't

16 emphasize enough that this is not a situation where we have

17 somebody who is, you know -- who doesn't know what he's doing.

18 And this Court has said that again and again and again.  He

19 knows what he's doing, I think this Court said, and I'm

20 paraphrasing, that a phone in his hand is like a gun in the

21 hands of a violent criminal.  And that is exactly true --

22         **THE COURT:**  No, I didn't quite say that.  I said a

23 cell phone in his hand is like putting a gun in the hand of a

24 bank robber.

25         **MR. KINGSLEY:**  A bank robber.

1          **THE COURT:**  I did not say "violent" --

2          **MR. KINGSLEY:**  Well, I would consider a bank robbery

3   with a gun to be a violent crime, but -- but my point -- the

4   point is the same, is that that analogy is going to be true in

5   one year, in five years and in ten years.

6      And I think --

7          **THE COURT:**  We can't punish him for the crimes he

8   hasn't yet committed.

9          **MR. KINGSLEY:**  No, but the guidelines --

10         **THE COURT:**  We can only avoid giving leniency on

11  account of his propensity to commit crimes.  But I -- I feel

12  uncomfortable saying that he's going to commit crimes in the

13  future and, therefore, we're going to double his sentence.  I

14  don't think -- that's like punishing him in advance.  I don't

15  think we can do that.

16         **MR. KINGSLEY:**  I'm not suggesting that -- I mean,

17  incapacitation is a legitimate purpose of punishment, and so is

18  individual deterrence.

19         **THE COURT:**  Sure.  I agree with that.

20         **MR. KINGSLEY:**  And I'm not saying we can predict with

21  100 percent certainty what he's going to be doing in 10 years,

22  and that's not what this Court does.  But we know what he's

23  done up to this point.  And given all of the information that

24  we have up to this point, we have a guidelines range of 77 to

25  96 months.  Somebody who steals $600,000 and obstructs justice

1   is basically going to be looking at a similar guideline range

2   with the same criminal history as the defendant.

3       And we have somebody who not only did that, but who kept

4   the artwork that he stole, shows no signs of remorse, and lied

5   at least 40-something times in this case on the basis of the

6   PSR and more times than that.  And I think that strongly

7   supports an upward variance.  It supports an inference that

8   he's going to keep committing crimes when he gets out of

9   prison.

10      And we're not asking for twice the guidelines range, but I

11  think an upward variance is -- is supported here.

12          **THE COURT:**  Thank you.

13          **MR. KINGSLEY:**  Thank you, your Honor.

14          **THE COURT:**  All right.  The Court is now, after three

15  hearings, ready to announce and pronounce the sentence.  I need

16  to go through some things.

17      First, I want to thank the family for being here.  I see

18  both the wife, the mom, the daughter.  This must be the hardest

19  thing you've ever had to go through in your life, and I -- I'm

20  very sympathetic to what you're feeling.  And no family member

21  should ever have to do this.  But good for you that you're here

22  to show your support for your family member, Mr. Brugnara.

23      Next, on the new trial, I have denied the motion for a new

24  trial.  I did receive another handwritten thing from

25  Mr. Brugnara after I denied it, and I am not going to go

1  revisit it.  It's not even filed by his attorney.  So that is a

2  non-starter.  I have given the new trial motion my best shot

3  and I'm not going to revisit that yet again.

4      So what is left here is for sentencing.  Much of what

5  Mr. Brugnara said in his allocution was designed to show that

6  Maibaum and Ms. Long were fraudsters themselves and that he was

7  the victim.  Now, the law is that that's not a defense.  If you

8  try to defraud somebody and they are trying to defraud you,

9  maybe you both go to jail, but you don't get out of it because

10  the other side was just as bad as you.  That's not a defense.

11      You can show that for credibility purposes, and the Court

12  at trial allowed a lot of the argument, at least, and some of

13  the evidence about what the value of the artwork was in order

14  to impeach Long and Maibaum.  That was legitimate.  But that's

15  not a defense to the -- if Mr. Brugnara committed the elements

16  of wire fraud or mail fraud, if he committed those elements,

17  then he's guilty, regardless of whether they also are guilty of

18  something.  And that is just clear-cut law and there we go.

19      The evidence was sufficient for the jury to find that

20  Mr. Brugnara had a plan to get his hands on this artwork, hold

21  it for ransom, maybe steal the Degas and try to, in some

22  manner, grind down the victims until they would agree to some

23  lesser price.  That plan went awry when the victims went out

24  and got a lawyer and the lawyer then -- even then -- even then

25  there was -- he wouldn't give it back.  He inserted his own

```
 1  lawyer to try to negotiate terms.  And then finally the FBI had
 2  to come in and seize the property, only to find that there were
 3  four, not five crates, and that the fifth crate was missing,
 4  the one with the Degas.
 5       So that's what the jury could easily and reasonably have
 6  found, and that something like that was always the plan that he
 7  had from the get-go and, therefore, the fraud crime had been
 8  committed when the mail and wires were used.
 9       Now, it's not up to me to decide.  That's what the jury
10  does.  The jury made its decision.  We must respect it.  It's a
11  statutory creature.  That's the way it works.  The jury decides
12  that.  There was a fair trial, and the jury made its decision,
13  ruling against Mr. Brugnara on most of the counts but
14  acquitting him on a few.
15       Mr. Brugnara has never, never accepted any responsibility.
16  Usually the defendant acknowledges that they did things wrong
17  and wishes they had done -- promises to do better in the
18  future, and Mr. Brugnara does none of that.  He does not accept
19  responsibility for what he did wrong, that the jury found that
20  he did wrong.
21       And sadly we've seen in this case that he does -- as the
22  Government points out and the PSR points out, he has a
23  persistent history of telling half-truths and sometimes totally
24  false things to get out of whatever jam he's in or to get what
25  he wants.  And maybe that's explainable by mental illness, but
```

1   it's the way he is.  We've seen it many dozens of times in this

2   very case alone.

3       Those of you who have not been paying attention to the

4   case may not realize this, but I just -- what happened to the

5   Degas?  Well, today we heard from -- in the allocution that it

6   never came off the truck.  That was repeated several times;

7   that the delivery guy had a big crucifix.  Mr. Brugnara said

8   the crucifix was a red flag that should have indicated the guy

9   was crooked and that the guy just never took it off the truck.

10       Well, that was -- that was yet another in a long series of

11   theories.  The first theory in the case by Mr. Brugnara was

12   that the Degas had never been shipped out of New York in the

13   first place; that there were only four crates to begin with;

14   that Mr. Maibaum was somehow back there or Ms. Long was back

15   there playing around with the numbers and it was only four

16   shipped and not five.  But then at trial the evidence was

17   pretty strong that, yes, indeed there was five crates shipped.

18   They even had a photograph of it before shipping.

19       So then during the middle of the trial, the second theory

20   was something like -- which I remember quite well, was

21   Mr. Brugnara said:  Well, it did come off the truck.  The fifth

22   crate did come off the truck.  And the guy with the crucifix

23   did put it in his garage, but workmen who were doing work on

24   the same street down the street repairing some house.  They

25   came along and thought it was a toilet or something like that

1    and stole it.  So that was another theory.

2         But today we've heard yet another theory, which was that

3    it never came off the truck and that the guy with the crucifix

4    stole it.

5         So the evidence is pretty clear in the Court's mind that

6    it was delivered.  It went into that garage just as the

7    delivery guy testified, and that Mr. Brugnara has it hidden

8    away some place for the day that maybe he'll cash it in.

9         Now, what is the right sentence in a case like this?

10   First, we have to look at the guideline range, and the

11   guideline range is 77 to 96 months.  We've gone through all of

12   the calculations, Offense Level 24, Criminal History IV.  And

13   that comes out to 77 to 96, which is lower than the -- what the

14   PSR had calculated and that the Government had calculated.  But

15   that's not necessarily what the sentence should be.  That's an

16   important consideration.

17        Under the statute, Congress has directed judges to impose

18   the lowest sentence that will carry out the factors that

19   Congress has set forth in Section 3553(a) of Title 18.  And

20   those include things like the need for deterrence.  You must

21   impose a sentence that will keep other people from -- being in

22   similar circumstances from doing the same crime.  Because if

23   you go easy on everybody every time and there is no distant

24   sentence, people will commit crimes, so you need to deter.

25   This is very important.  It's called general deterrence.

1    Another factor is preventing that individual, in this case

2 Mr. Brugnara, from committing crimes in the future.

3    And another factor is to take into account the seriousness

4 of the crime, the possibility that the offender will reoffend

5 later in the future, which is a very high risk in this case as

6 we've seen.  There are other factors that I could summarize,

7 but I'm just giving you examples.

8    Now, there is a couple of factors that I am taking into

9 account that work in Mr. Brugnara's favor.  One is that I do

10 believe, even though he's totally competent, even though he is

11 totally able to defend himself in the case and was competent to

12 do so and competent to waive his right to counsel as he

13 insisted on doing, nevertheless, he does have mental illness

14 problems, like many people do.  And in his case they contribute

15 to his manic modes in which he starts trying to work his way

16 out of problems and lies as needed to do so.  So I think there

17 is a mental illness factor at work here.

18    You can't give that too much weight, though, because he

19 should have recognized that.  He should have put himself on

20 medicine to -- to control it.  We can't let society go around

21 excusing everybody who commits a serious crime when they could

22 have solved the problem themselves by going to the doctor and

23 getting some medicine that would have mitigated the mental

24 illness.  And all of us know people who do have these kinds of

25 mental illnesses, who are medicated and who perform very well

1    as good contributing members of society.

2        Mr. Brugnara could have done that, but he didn't.  So I'm

3    sympathetic a little bit to the argument, but it doesn't get

4    as -- it doesn't deserve as much weight as the defense counsel,

5    the excellent defense counsel, Mr. Boisseau, supposes.

6        Another factor that works in his favor is the conduct of

7    the victims here.  I am not saying that the victims

8    intentionally tried to defraud Mr. Brugnara.  The evidence

9    doesn't go that far.  I'm not saying they didn't either.  But

10   the evidence is just not there to suggest that they were

11   committing fraud, though with investigation possibly the

12   Government could uncover such evidence.  But the -- the

13   evidence is pretty strong that the de Koonings were not

14   authentic, and they were about half of the supposed purchase

15   price.

16       I don't like that circumstance about this case, and I do

17   wish we had known that before the trial.  But as I said in the

18   motion for a new trial, Mr. Brugnara was so insistent on going

19   to trial as soon as possible, representing himself, he gave up

20   on the opportunity that I had served up to go and get an expert

21   to evaluate the art.  And he's got nobody to blame but himself

22   for that decision.  And we don't go back and do a redo just

23   because maybe that would have worked out well for him if he had

24   done it.  It would have been good impeachment evidence against

25   the complaining victims, but that's not a basis for a new

1  trial.  Nevertheless, I am going to take it into account in

2  deciding what the sentence ought to be.

3       A lot of the -- I am considering a number of other

4  factors, but let me just go ahead and tell you where I think

5  this comes out and what the right and the lowest sentence that

6  will carry out the intentions of Congress is.

7       First, let's start with the -- the contempt of court,

8  which was 471 days.  I'm going to reduce that to 15 months,

9  which is a few -- rounding down about two-thirds of a month.

10 So that will be 15 months, added to the larger sentence that

11 we'll come to in a minute.

12      With respect to the Case No. 08-222, which was the Form 12

13 supervised release violation, based on the same conduct as the

14 fraud, the PSR recommends 12 months, and that will be 12

15 months.  And it will be concurrent with the -- with the main

16 count.

17      Now, in the Court's judgment, 69 months is the proper

18 number of months to be imposed for the conviction in Case

19 No. 14-306.  That's the main event, 69 months.  That is the

20 lowest number of months that will carry out the sentencing

21 objectives of Congress under Section 3553.

22      So that comes up to a total of 84 months as follows:  69

23 months in Case No. 306; 12 months concurrent with that.  So

24 that doesn't add to it, but it is concurrent.  Then 15 months

25 for the contempt of court, the 471 days rounded down to the

1    number of months, 15 months to the 69, and that adds up to 84

2    months, which is exactly seven years.

3         So that will be the sentence.

4         I will now read -- read the sentence.  Pursuant to the

5    Sentencing Reform Act, it is the judgment of the Court that

6    Luke Brugnara is hereby committed to the custody of the Bureau

7    of Prisons for a term of -- now, here I may need the help of

8    lawyers and Probation.  So I'm going to say term of 84 months.

9    This term consists of 69 months on Counts Two, Four and Five;

10   60 months on Counts Six, Eight and Nine, all to be served

11   concurrently.  The defendant was previously ordered to serve

12   471 days of summary contempt, which shall be served

13   consecutively to the 69 months imposed above, which comes out

14   to a total of 84 months.

15        He is to be sentenced to 12 months on the supervised

16   release violation in Docket No. 08-222.  And that will be

17   concurrent, not consecutive.  It will be concurrent.

18        Upon release from imprisonment, the defendant shall be

19   placed on supervised release for three years.  This consists of

20   three years on Counts Two, Four, Five, Six, Eight and Nine, all

21   concurrent.

22        Within 72 hours of release from the custody of the Bureau

23   of Prisons, the defendant shall report in person to the

24   Probation Office in the district to which he is released.

25        While on supervised release, the defendant shall not

1   commit another federal, state or local crime, shall comply with

2   the standard conditions adopted by the Court, shall refrain

3   from any unlawful use of a controlled substance, and submit to

4   a drug test within 15 days of release on supervised release and

5   two periodic drug tests thereafter and the following:

6       One:  The defendant shall participate in a mental health

7   treatment program and pay his fair share as directed by

8   Probation.  And this shall include taking medication as

9   directed by the doctor and shall further include treatment

10  directed to the importance of telling the truth.

11      Two:  The defendant shall pay the restitution and special

12  assessment imposed by the judgment.

13      Three:  Comply with the IRS and pay his outstanding tax

14  liability and all penalties and interest.

15      Next:  Pay his income taxes as his life goes on, future

16  income tax liabilities.

17      Next:  No new lines of credit or incur debt without

18  permission of Probation.

19      Next:  Give Probation access to any and all financial

20  information, including tax returns.

21      Next:  No contact with the victims in this case,

22  specifically Walter Maibaum and Rose Long, unless allowed in

23  advance by Probation.

24      Next:  Submit his person, residence, office, vehicle or

25  any property under his control to a search.  Such a search to

1  be conducted by U.S. Probation at a reasonable time and manner

2  based upon reasonable suspicion of contraband or evidence of a

3  violation of a condition of release.  Failure to submit to such

4  a search may be grounds for revocation.  The defendant shall

5  warn any residents that the premises may be subject to

6  searches.

7       Next:  Unless directed in writing otherwise, check

8  voicemail and answering machine -- directed in writing

9  otherwise by Probation, the defendant shall check his voicemail

10 and answering machine every day and follow all instructions

11 left by Probation.

12      Next:  No firearms, no ammunition, no destructive devices,

13 no dangerous weapons, and never be in a vehicle where any such

14 thing is present.

15      Next:  Cooperate in collection of DNA as directed by

16 Probation.

17      Next:  Pay a special assessment to USA, $600, due now.

18 This can be worked off through the inmate responsibility

19 program.

20      The Court finds that if the defendant cannot afford to pay

21 a fine, so the fine will be waived.  No fine.

22      It is ordered that defendant pay to Walter Maibaum and

23 Rose Long restitution as indicated earlier in the hearing.  And

24 the Government is going to give me a proposed order faithful to

25 what I said.  This can be worked off through the Inmate

```
 1   Responsibility Program at not less than $25 per quarter, and
 2   when you come out of prison at not less than $500 per month.
 3        Any reason why the form of judgment should not be entered
 4   as stated?
 5              MS. HARRIS:  No, your Honor.
 6              MR. KINGSLEY:  No, your Honor.
 7              MR. BOISSEAU:  Your Honor, could we request a federal
 8   prison camp in California?
 9              THE COURT:  I'm not going to -- I'm not going to
10   recommend a camp.  I will recommend that he be housed in
11   California, but the -- where he is, I'm not going to use the
12   word "camp."  Because that's up to the Bureau of Prisons, and
13   there is the whole history here.  And if they want to put him
14   in a higher security level, that's up to them.  I'm not going
15   to interfere with that or in any way make a recommendation.
16        But I will recommend California so that he can be near his
17   family.
18        (Discussion held off the record between the defendant
19         and his counsel.)
20              MR. BOISSEAU:  Thank you, your Honor.
21              THE COURT:  All right.  It's my duty to tell you,
22   Mr. Brugnara, that you have 14 days within which to file a
23   notice of appeal.  That's within 14 days of the entry of
24   judgment, which will probably be today or tomorrow.  So you
25   need to keep track of that 14-day period.
```

1          **THE DEFENDANT:**  Well, you know, regarding the appeal,

2    you know, I'm not so certain Mr. Boisseau is going to be doing

3    the appeal.  So I need to -- since I'm trapped in a cage 24/7,

4    I need to be able to know who to contact regarding who is

5    available for the appeal.

6          **MR. BOISSEAU:**  Your Honor, we'll -- we'll file a

7    notice of appeal and then Mr. Brugnara can substitute us out.

8    That will be fine.  We'll preserve his rights.

9          **THE COURT:**  All right.  Thank you.  Please do that.

10         And as far as I'm concerned, Mr. Boisseau and Ms. Young

11   would be excellent lawyers for you on appeal and you ought to

12   stick with them, but if you have a better plan in mind --

13         **THE DEFENDANT:**  Well --

14         **THE COURT:**  I don't know.  I'm not going to

15   necessarily do that on CJA money.

16         **THE DEFENDANT:**  Your Honor -- your Honor -- your

17   Honor, in this case you've appointed certain counsel and you,

18   through puffery, have talked them up, how great they are, and

19   all of them have fallen flat on all the serious motions.

20         So, you know, for me I -- I need -- I need to do what's

21   best for me regarding the appeal.

22         You know my feeling on this again.  You know, I did

23   apologize to you sincerely about the contemptuous behavior, and

24   I mean that from my heart.

25         Regarding this particular instant matter, I'm not a thief.

```
1   I'm innocent.  I didn't take any fake sculpture or any of their
2   art.  I've never been called a thief in my entire life.  I've
3   paid back $1.3 billion, as proven by the evidence of the court.
4           MR. KINGSLEY:  Your Honor, can we move to terminate
5   this?
6           THE COURT:  Mr. Brugnara --
7           THE DEFENDANT:  Excuse me.  Excuse me, your Honor.
8   This is --
9           MR. BOISSEAU:  Your Honor --
10          THE DEFENDANT:  Excuse me.  Thirty more seconds.  I
11  get 30 seconds.
12          THE COURT:  You had two hours awhile ago.
13          THE DEFENDANT:  Your Honor, this is --
14          THE COURT:  We're not going to -- we're coming to an
15  end here.
16          THE DEFENDANT:  Your Honor, this is -- your Honor,
17  this is a travesty of justice because I'm innocent.  And the
18  Grand Jury, this Court, the public, the jury and the
19  magistrates were all fed lies by the U.S. Attorneys that were
20  given to them by Maibaum.  The art is worth nothing.
21      You didn't even address the issue that Sotheby's states
22  that the Degas is worth nothing, No Sales Value, and that they
23  are the benchmark for the United States of America, so...
24          THE COURT:  Well, we're done.  Thank you.  Thank you.
25  The hearing is at an end.
```

1          **MR. KINGSLEY:**  Thank you, your Honor.

2       (Proceedings adjourned.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, January 11, 2016